# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

---

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 1 of 5 (Pages A-1 to A-274)

JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants
   Advantage Capital Holdings LLC
   and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP COUNSEL PRESS    (800) 4-APPEAL • (333478)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

i

## TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Complaint, dated May 3, 2024.................................... | A-37 |
| Exhibit 1 to Complaint - Email to Craig Gillespie from Anonymous Sender, dated September 19, 2022........................ | A-119 |
| Exhibit 2 to Complaint - Letter from Craig Gillespie to Steven W. Pasko, Joshua Wander, Damien Alfalla and Steve Pasko, dated March 24, 2023 ............................................ | A-121 |
| Exhibit 3 to Complaint - Email to Josh Wander and Others from Phil Kane, dated March 29, 2023 ................................. | A-125 |
| Exhibit 4 to Complaint - Email to Josh Wander and Others from Tom Spreutels, dated April 4, 2023................................ | A-128 |
| Exhibit 5 to Complaint - Letter from John Wells to Steven W. Pasko re: Notice of Breach of Parties' Agreements, dated November 29, 2023 ............................................... | A-130 |
| Exhibit 6 to Complaint - Wells Fargo Summary Statement Screenshot........ | A-135 |
| Exhibit 7 to Complaint - "Collection" Account Wells Fargo Monthly Statement ............................................................ | A-137 |
| Exhibit 8 to Complaint - "Reserve" Account Wells Fargo Monthly Statement ............................................................ | A-143 |

ii

**Page**

Exhibit 9 to Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024 ...... A-146

Proposed Order to Show Cause and Temporary
Restraining Order by Plaintiffs, filed May 13,
2024 ........................................................ A-169

Plaintiffs' Memorandum of Law In Support of Their
Application For (1) A Temporary Restraining
Order, and (2) An Order to Show Cause for a
Receiver or, Alternatively, A Preliminary
Injunction, dated May 13, 2024 ........................... A-173

Declaration of Craig Gillespie, for Plaintiffs
Leadenhall Capital Partners LLP and Leadenhall
Life Insurance Linked Investments Fund PLC
("Leadenhall"), in Support of Proposed
Temporary Restraining Order ("Proposed TRO"),
dated May 13, 2024 ................................................ A- 202

Exhibit 1 to Gillespie Declaration -
Loan and Security Agreement, dated May 7, 2021    A-210

Exhibit 2 to Gillespie Declaration -
Guaranty Agreement with 777 Partners and 600
Partners, dated May 7, 2021 ................................ A- 250

Exhibit 3 to Gillespie Declaration -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

iii

**Page**

Exhibit 4 to Gillespie Declaration -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 5 to Gillespie Declaration -
Excerpt from the December 2023 Compliance
Report Issued for the Dorchester Borrower ........... A-269

Exhibit 6 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the SuttonPark Borrower ............. A-271

Exhibit 7 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the Dorchester Borrower ............. A-273

Exhibit 8 to Gillespie Declaration -
Paydown and Partial Release Letter on behalf of
Leadenhall, dated February 21, 2024 .................... A-275

Exhibit 9 to Gillespie Declaration -
Default Notice, dated March 12, 2024................... A-284

Exhibit 10 to Gillespie Declaration -
Acceleration Notice, dated March 15, 2024 .......... A-295

Exhibit 11 to Gillespie Declaration -
Draft First Forbearance Agreement, dated
March __, 2024 ...................................................... A-318

Declaration of Phil Kane, for Plaintiff Leadenhall,
    in Support of Proposed TRO, filed May 13, 2024. A-360

Declaration of Luca Albertini, for Plaintiff
    Leadenhall, in Support of Proposed TRO, dated
    May 13, 2024 ....................................................... A-364

iv

**Page**

Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Proposed TRO, dated May 13, 2024 ........................................................ A-367

Exhibit A to Nathanson Declaration - Amended Verified Complaint in *Change Lending LLC v. 777 Partners LLC et al.*, Index No. 650118/2024 (N.Y. Sup.), dated March 19, 2024 .. A-372

Exhibit B to Nathanson Declaration - Particulars of Claim in *Corvus Lights Aviation et al v. 777 Partners LLC* (U.K.), dated December 8, 2023 ................................................... A-385

Exhibit C to Nathanson Declaration - Verified Amended Complaint in *MALT Family Trust et al. v. 777 Partners, LLC et al.*, C.A. No. 2022-0652-MTZ (Del. Ch.), dated November 22, 2022 ................................................ A-402

Exhibit D to Nathanson Declaration - Summons and Complaint in *Vida Longevity Fund, LP et al. v. SuttonPark Capital LLC et al.*, Index. No. 656715/2022 (N.Y. Sup.), dated July 1, 2022 ............................................................ A-452

Exhibit E to Nathanson Declaration - Complaint in *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.,* Index No. 651220/2024 (N.Y. Sup.), dated March 7, 2024 .... A-465

Exhibit F to Nathanson Declaration - Complaint in *Balanced Management LLC v. 777 Partners LLC*, Case No. 230909460 (Utah Dist. Ct.), dated December 14, 2023 ............................. A-480

v

**Page**

Exhibit G to Nathanson Declaration -
Verified Petition for Interim Measures in Aid of
Arbitration in *Nakula Management Ltd. v. Joshua
Wander et al.,* Case No. 2024-004624-CA-01
(Fla. 11th Cir. Ct.) (exhibits to the complaint are
excluded), dated March 14, 2024 .......................... A-489

Exhibit H to Nathanson Declaration -
Summons and Complaint in *1 Madison Office
Fee LLC v. 777 Partners LLC et al.,* Index No.
654397/2023 (N.Y. Sup.), dated
September 8, 2023 ................................................ A-508

Exhibit I to Nathanson Declaration -
Complaint in *Lasse Meilsoe v. 777 Partners LLC
et al.,* Case No. 2023-028758-CA-01 (Fla. 11th
Cir. Ct.), dated March 22, 2023, with Exhibits...... A-515

Exhibit J to Nathanson Declaration -
Amended Complaint in *Peter Meyers v. 777
Partners, LLC et al.,* Case No. 2024-001279-CA-
01 (Fla. 11th Cir. Ct.), dated January 30, 2024,
with Exhibits............................................................ A-541

Exhibit K to Nathanson Declaration -
Summons and Complaint in *American Express
Travel Related Services Company, Inc. v. 777
Partners LLC,* 651130/2023 (N.Y. Sup.), dated
March 3, 2023 ....................................................... A-584

Exhibit L to Nathanson Declaration -
Complaint in *Randy S. Gelber v. Joshua Wander,*
Case No. 2021-013205-CA-01 (Fla. 11th Cir.
Ct.), dated June 7, 2021, with Attachment............. A-592

vi

**Page**

Exhibit M to Nathanson Declaration -
Complaint in *The Oxbridge Group, LTD v. 777 Partners, LLC,* Index No. 651975/2023 (N.Y. Sup.), dated April 21, 2023 .................................... A-625

Exhibit N to Nathanson Declaration -
Verified Amended Complaint in *O'Neil-Dunne et al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-BWD (Del. Ch.), dated January 19, 2024 .............. A-631

Exhibit O to Nathanson Declaration -
First Amended Complaint in *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*, Case No. 22-cv-750 (N.D. Ill.), undated .............................. A-654

Exhibit P to Nathanson Declaration -
Complaint – Class Action in *Joseph Morgan et al. v. 777 Partners, LLC et al.*, Case No. 24-cv-01004 (N.D. Ill.), undated .......................... A-683

Hearing Transcript held before the Honorable John G. Koeltl, dated May 14, 2024 ............................ A-710

Redacted Declaration of Michael Saliba, for Defendant Advantage Capital Holdings LLC ("A-CAP"), in Opposition to Proposed TRO, dated May 24, 2024
(Unredacted version is reproduced in the Confidential Appendix at pp. CA-1-CA-8) .......... A-721

Reply Memorandum of Law in Further Support of Plaintiffs' Application For (1) A Temporary Restraining Order, and (2) An Order to Show Cause for a Receiver or, Alternatively, a Preliminary Injunction, dated May 30, 2024
(Redacted herein. Reproduced in the Confidential Appendix at pp. CA-9-CA-36) ............................ A-729

**vii**

Page

Declaration of Leigh M. Nathanson, for Plaintiff
Leadenhall, in Support of Reply Memorandum,
dated May 30, 2024 ................................................ A-730

Exhibit 1 to Nathanson Declaration -
Hearing Transcript held before the Honorable
John G. Koeltl, dated May 14, 2024 ...................... A-732

Exhibit 2 to Nathanson Declaration -
Email from Roger Schwartz to Shelly DeRousse
and Others, dated May 23, 2024, with
Attachment ............................................................... A-744

Exhibit 3 to Nathanson Declaration -
Email from Leigh Nathanson to Jonathan
Watkins, dated May 16, 2024 ............................... A-757

Hearing Transcript held before the Honorable John
G. Koeltl, dated June 7, 2024 ............................... A-765

Order to Show Cause and Temporary Restraining
Order, by Plaintiff Leadenhall, dated June 7,
2024 ...................................................................... A-831

Letter from David A. Pellegrino to Honorable John
G. Koeltl, dated June 10, 2024 ............................ A-835

Exhibit 1 to Letter -
Email from Leigh Nathanson to John G.
McCarthy and Others, dated June 9, 2024 ............. A-840

Exhibit 2 to Letter -
Email from David Pellegrino to Leigh Nathanson
and Others, dated June 10, 2024 .......................... A-842

Hearing Transcript held before the Honorable John
G. Koeltl, dated June 14, 2024 ............................ A-844

viii

**Page**

Memo Endorsed on Joint Letter, dated
June 18, 2024 ........................................................ A-867

Order of the Honorable John G. Koeltl, dated June
20, 2024 ................................................................ A-868

Motion, by Intervenors Haymarket Insurance
Company ("Haymarket") and ACM Delegate
LLC ("ACM Delegate"), to Intervene, filed
July 8, 2024
(Motion omitted herein):

Declaration of Jonathan Watkins, for Intervenors
Haymarket and ACM Delegate, in Support of
Motion to Intervene, dated July 8, 2024 ................ A-869

Exhibit A to Watkins Declaration -
UCC-1 Financing Statements and Amendments
filed with the Delaware Secretary of State, dated
March 3, 2020 ........................................................ A-871

Exhibit B to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated
November 27, 2023 ................................................ A-883

Exhibit C to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State or Florida Secured
Transaction Registry, dated April 12, 2021 to
December 15, 2023 ................................................ A-888

Exhibit D to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated July 12, 2022 . A-898

Hearing Transcript held before the Honorable John
G. Koeltl, dated July 8, 2024 ................................ A-902

ix

**Page**

Proposed Order to Show Cause without Emergency
Relief by Defendant A-CAP, filed July 31, 2024
(Proposed order to show cause omitted herein):

Declaration of Michael Saliba, for Defendant A-
CAP, in Support of Proposed Order to Show
Cause, dated July 29, 2024 ................................... A-935

Exhibit A to Saliba Declaration -
Email from Craig Gillespie to Kenneth King and
Others, dated October 19, 2023 ............................. A-941

Exhibit B to Saliba Declaration -
Excerpts from the Spreadsheet Attached to Email,
dated October 19, 2023 .......................................... A-944

Exhibit C to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Dorchester, dated
May 10, 2021 at 4:50pm ........................................ A-949

Exhibit D to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:54pm ..................... A-951

Exhibit E to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:58pm ..................... A-953

Exhibit F to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:03pm ..................... A-961

x

**Page**

Exhibit G to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:07pm.....................   A-963

Exhibit H to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal SML 4
LLC, dated May 10, 2021 at 5:11pm.....................   A-970

Exhibit I to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:16pm ..............................   A-972

Exhibit J to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:19pm ..............................   A-974

Exhibit K to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SPLCSS III LLC,
dated May 10, 2021 at 5:23pm ..............................   A-981

Exhibit L to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:27pm.....................   A-983

Exhibit M to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:31pm.....................   A-985

xi

**Page**

Exhibit N to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Agency
Service, dated May 11, 2021 at 3:34pm ................ A-944

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Order to
Show Cause, dated July 31, 2024 ......................... A-966

Exhibit A to Watkins Declaration -
Proposed Modified Preliminary Injunction ........... A-998

Exhibit B to Watkins Declaration -
Order from the Honorable John G. Koeltl, dated
July 8, 2024
(Reproduced in Special Appendix)

Hearing Transcript held before the Honorable John
G. Koeltl, dated August 1, 2024 ........................... A-1001

Plaintiffs' Opposition to A-CAP's Motion Under
Rule 59(E) to Amend the Preliminary Injunction,
dated August 15, 2024 ......................................... A-1011

Declaration of Craig Gillespie, for Plaintiff
Leadenhall, in Opposition to Order to Show
Cause, dated August 15, 2024............................... A-1038

Exhibit 1 to Gillespie Declaration -
Excerpts from the Loan and Security Agreement,
dated May 7, 2021 ................................................ A-1040

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Reply
Memorandum of Law, dated August 26, 2024,
with Exhibits A through E
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-37-CA-561) ......................... A-1072

xii

**Page**

Corrected Amended Complaint, dated
September 6, 2024 ................................................. A-1073

Exhibit 1 to Amended Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

Exhibit 2 to Amended Complaint -
Letter from Craig Gillespie to Steven W Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023
(Reproduced herein at pp. A-121-A-124)

Exhibit 3 to Amended Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023
(Reproduced herein at pp. A-125-A-127)

Exhibit 4 to Amended Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023
(Reproduced herein at pp. A-128-A-129)

Exhibit 5 to Amended Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 6 to Amended Complaint -
Tables .................................................................. A-1229

Exhibit 7 to Amended Complaint -
Wells Fargo Summary Statement Screenshot
(Reproduced herein at pp. A-135-A-136)

xiii

**Page**

Exhibit 8 to Amended Complaint -
"Collection" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-137-A-142)

Exhibit 9 to Amended Complaint -
"Reserve" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-143-A-145)

Exhibit 10 to Amended Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024
(Reproduced herein at pp. A-146-A-168)

Exhibit 11 to Amended Complaint -
Outstanding Accelerated Balance Sheet ................ A-1236

Exhibit 12 to Amended Complaint -
777 Partners' Draft Forbearance Agreement ......... A-1238

Exhibit 13 to Amended Complaint -
Jorge Beruff LinkedIn Profile ................................ A-1280

Exhibit 14 to Amended Complaint -
Juan Arciniegas LinkedIn Profile .......................... A-1284

Exhibit 15 to Amended Complaint -
Aaron Levy LinkedIn Profile................................. A-1289

Exhibit 16 to Amended Complaint -
Lenz Balan LinkedIn Profile ................................. A-1292

Argument and Decision held before the Honorable
John G. Koeltl, dated October 2, 2024 .................. A-1295

Notice of Appeal by Defendant A-CAP, dated
October 3, 2024 ...................................................... A-1352

xiv

**Page**

Notice of Appeal by Defendants 777 Partners LLC,
  600 Partners LLC, SPLCSS III LLC, Dorchester
  Receivables II LLC, Insurety Agency Services
  LLC, and Signal SML 4 LLC, dated
  October 22, 2024 .................................................. A-1354

A-1

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL,CASREF,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:24-cv-03453-JGK

Leadenhall Capital Partners LLP et al v. Wander et al          Date Filed: 05/03/2024
Assigned to: Judge John G. Koeltl                             Jury Demand: Plaintiff
Referred to: Magistrate Judge Barbara C. Moses (Settlement)   Nature of Suit: 470 Racketeer/Corrupt
Related Case: 1:24-cv-07913-JGK                               Organization
Cause: 18:1962 Racketeering (RICO) Act                        Jurisdiction: Federal Question

**Plaintiff**

**Leadenhall Capital Partners LLP**          represented by   **Brian Kevin Donovan**
                                                             King & Spalding LLP
                                                             1185 Avenue of the Americas
                                                             New York, NY 10036
                                                             212-556-2162
                                                             Fax: 212-556-2222
                                                             Email: bdonovan@kslaw.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Craig Carpenito**
                                                             King & Spalding
                                                             1185 Avenue of the Americas
                                                             New York, NY 10036
                                                             212-556-2142
                                                             Fax: 212-556-2222
                                                             Email: ccarpenito@kslaw.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Sheehan Taintor**
                                                             King & Spalding LLP
                                                             NY
                                                             1185 Avenue of the Americas
                                                             Ste 34th Floor
                                                             New York, NY 10036
                                                             212-556-2295
                                                             Email: mtaintor@kslaw.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Roger G. Schwartz**
                                                             Paul Hastings LLP
                                                             NY
                                                             200 Park Avenue
                                                             New York, NY 10166
                                                             212-318-6000
                                                             Email: rogerschwartz@paulhastings.com
                                                             *TERMINATED: 06/07/2024*

A-2

<div align="right">

**Leigh Mager Nathanson**
King & Spalding LLP
1185 Avenue of the Americase
New York, NY 10036
212-790-5359
Fax: 212-556-2222
Email: lnathanson@kslaw.com
*ATTORNEY TO BE NOTICED*

</div>

**Plaintiff**

| | | |
|---|---|---|
| **Leadenhall Life Insurance Linked Investments Fund PLC** | represented by | **Brian Kevin Donovan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<div align="right">

**Craig Carpenito**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Sheehan Taintor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger G. Schwartz**
(See above for address)
*TERMINATED: 06/07/2024*

**Leigh Mager Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

</div>

V.

**Defendant**

| | | |
|---|---|---|
| **Josh Wander** | represented by | **John Gerard McCarthy , Sr**<br>Smith, Gambrell & Russell, LLP (NYC)<br>1301 Avenue of the Americas, 21st Floor<br>New York, NY 10019<br>(212) 907-9700<br>Fax: (212)907-9800<br>Email: jmccarthy@sgrlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<div align="right">

**Jordan Lancaster Estes**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-4000
Fax: 212-351-4035
Email: jestes@gibsondunn.com
*ATTORNEY TO BE NOTICED*

</div>

A-3

SDNY CM/ECF NextGen Version 1.7

**Marjorie E. Sheldon**
Kramer, Levin , Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
212-715-9502
Fax: 212-715-9503
Email: MSheldon@kramerlevin.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven Pasko**                     represented by   **Christopher Blake Harwood**
Morvillo Abramowitz Grand Iason & Anello
PC
565 Fifth Avenue
New York, NY 10017
212-856-9547
Email: charwood@maglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jenna Jones**
Morvillo Abramowitz Grand Iason & Anello
PC
565 5th Ave
New York, NY 10017
212-880-9548
Fax: 212-856-9494
Email: jjones@maglaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth King**                     represented by   **Jonathan Michael Watkins**
Cadwalader, Wickersham & Taft LLP
650 South Tryon Street
Charlotte, NC 28202
704-348-5100
Email: jonathan.watkins@cwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Andrew Singer**
Cadwalader, Wickersham & Taft LLP
(Liberty St.)
200 Liberty Street
New York, NY 10281
212-504-6167
Email: mark.singer@cwt.com
*ATTORNEY TO BE NOTICED*

A-4

SDNY CM/ECF NextGen Version 1.7

**Matthew Moler Karlan**
Cadwalader, Wickersham & Taft LLP
(Liberty St.)
200 Liberty Street
New York, NY 10281
(212)-504-6000
Fax: (212)-504-6666
Email: matthew.karlan@cwt.com
*ATTORNEY TO BE NOTICED*

**Michael Edward Petrella**
Cadwalader, Wickersham & Taft LLP
200 Liberty Street
Ste 20-136
New York, NY 10281
212-504-6000
Email: michael.petrella@cwt.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**777 Partners LLC**          represented by **David Allan Pellegrino**
Smith, Gambrell & Russell, LLP
1301 Avenue of the Americas
Ste Fl 21
New York, NY 10019
212-907-9700
Fax: 212-907-9800
Email: dpellegrino@sgrlaw.com
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
Smith, Gambrell and Russell, LLP
1301 Avenue of the Americas
Ste 21st Floor
New York, NY 10019
212-907-9700
Email: rsolfaro@sgrlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**600 Partners LLC**          represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**

A-5

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Splcss III LLC**                     represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Signal SML 4 LLC**                    represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Insurety Agency Services LLC**         represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dorchester Receivables II LLC**        represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**

A-6

SDNY CM/ECF NextGen Version 1.7

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SuttonPark Capital LLC**            represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Signal Medical Receivables LLC**            represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Insurety Capital LLP**            represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SuttonPark Servicing LLC**            represented by **David Allan Pellegrino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Gerard McCarthy , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Joseph Solfaro**

A-7

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Signal Servicing LLC**                represented by   **David Allan Pellegrino**
*TERMINATED: 09/03/2024*                                 (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John Gerard McCarthy , Sr**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ryan Joseph Solfaro**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Insurety Servicing LLC**              represented by   **David Allan Pellegrino**
*TERMINATED: 09/03/2024*                                 (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John Gerard McCarthy , Sr**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Ryan Joseph Solfaro**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Advantage Capital Holdings LLC**      represented by   **Jonathan Michael Watkins**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Mark Andrew Singer**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Matthew Moler Karlan**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Michael Edward Petrella**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Intervenor**

**National Founders LP**                represented by   **Jonathan Warren Muenz**
                                                         Sidley Austin LLP (NY)
                                                         787 Seventh Avenue
                                                         New York, NY 10019
                                                         (212)-839-5901

A-8

Fax: (212) 839-5599
Email: jmuenz@sidley.com
*ATTORNEY TO BE NOTICED*

**Nicholas Primer Crowell**
Sidley Austin LLP (NY)
787 Seventh Avenue
New York, NY 10019
(212)-839-5449
Fax: (212)-839-5599
Email: ncrowell@sidley.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**ING Capital LLC**                    represented by  **Stephan Edward Hornung**
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
212-309-6285
Email: stephan.hornung@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Robert Alderson**
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212)-408-2433
Fax: (212)-326-2061
Email: jason.alderson@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Matthew C. R. Ziegler**
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103
215-963-5000
Fax: 215-963-5001
Email: matthew.ziegler@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Haymarket Insurance Company**        represented by  **Jonathan Michael Watkins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Andrew Singer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Moler Karlan**
(See above for address)
*ATTORNEY TO BE NOTICED*

A-9

Michael Edward Petrella
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**ACM Delegate LLC**                    represented by  Jonathan Michael Watkins
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Mark Andrew Singer
(See above for address)
*ATTORNEY TO BE NOTICED*

Matthew Moler Karlan
(See above for address)
*ATTORNEY TO BE NOTICED*

Michael Edward Petrella
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2024 | 1 | COMPLAINT against 600 Partners LLC, 777 Partners LLC, Advantage Capital Holdings LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Kenneth King, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. (Filing Fee $ 405.00, Receipt Number ANYSDC-29311774)Document filed by Leadenhall Life Insurance Linked Investments Fund PLC, Leadenhall Capital Partners LLP. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Errata 9).(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 2 | **FILING ERROR - PDF ERROR** - CIVIL COVER SHEET filed..(Nathanson, Leigh) Modified on 5/6/2024 (vf). (Entered: 05/03/2024) |
| 05/03/2024 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Mitsui Sumitomo Insurance Company, Limited, Other Affiliate MS&AD Insurance Group Holdings, Inc. for Leadenhall Capital Partners LLP. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC.. (Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Josh Wander, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Steven Pasko, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Kenneth King, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |

A-10

| 05/03/2024 | 7 | REQUEST FOR ISSUANCE OF SUMMONS as to 777 Partners LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| --- | --- | --- |
| 05/03/2024 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to 600 Partners LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Splcss III LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Signal SML 4 LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 11 | REQUEST FOR ISSUANCE OF SUMMONS as to Insurety Agency Services LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 12 | REQUEST FOR ISSUANCE OF SUMMONS as to Dorchester Receivables II LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 13 | REQUEST FOR ISSUANCE OF SUMMONS as to SuttonPark Capital LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 14 | REQUEST FOR ISSUANCE OF SUMMONS as to Signal Medical Receivables LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 15 | REQUEST FOR ISSUANCE OF SUMMONS as to Insurety Capital LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 16 | REQUEST FOR ISSUANCE OF SUMMONS as to SuttonPark Servicing LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 17 | REQUEST FOR ISSUANCE OF SUMMONS as to Signal Servicing LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/03/2024 | 18 | REQUEST FOR ISSUANCE OF SUMMONS as to Insurety Serving LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/03/2024) |
| 05/04/2024 | 19 | REQUEST FOR ISSUANCE OF SUMMONS as to Advantage Capital Holdings LLC, re: 1 Complaint,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/04/2024) |

A-11

| 05/06/2024 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney Leigh Mager Nathanson to RE-FILE Document No. 2 Civil Cover Sheet. The filing is deficient for the following reason(s): Nature of Suit Error. Place an [X] in one box only; Basis of Jurisdiction Section, Place an [X] in one box only; Courthouse Assignment Section not provided; Form is not signed. Re-file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the correct PDF. (vf)** (Entered: 05/06/2024) |
| 05/06/2024 | 20 | CIVIL COVER SHEET filed..(Nathanson, Leigh) (Entered: 05/06/2024) |
| 05/06/2024 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Leigh Mager Nathanson. The following case opening statistical information was erroneously selected/entered: Jurisdiction code 4 (Diversity); Cause of Action code 28:1332ri Diversity-Racketeering (RICO) Act; Nature of Suit code 370 (Other Fraud); County code Albany. The following correction(s) have been made to your case entry: the Jurisdiction code has been modified to 3 (Federal Question); the Cause of Action code has been modified to 18:1962 Racketeering (RICO) Act; the Nature of Suit code has been modified to 470 (Racketeer/Corrupt Organization); the County code has been modified to XX Out of U.S.. (vf)** (Entered: 05/06/2024) |
| 05/06/2024 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge John G. Koeltl. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(vf) (Entered: 05/06/2024) |
| 05/06/2024 | | Magistrate Judge Barbara C. Moses is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | | Case Designated ECF. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 21 | ELECTRONIC SUMMONS ISSUED as to Josh Wander. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 22 | ELECTRONIC SUMMONS ISSUED as to Steven Pasko. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 23 | ELECTRONIC SUMMONS ISSUED as to Kenneth King. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 24 | ELECTRONIC SUMMONS ISSUED as to 777 Partners LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 25 | ELECTRONIC SUMMONS ISSUED as to 600 Partners LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 26 | ELECTRONIC SUMMONS ISSUED as to Splcss III LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 27 | ELECTRONIC SUMMONS ISSUED as to Signal SML 4 LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 28 | ELECTRONIC SUMMONS ISSUED as to Insurety Agency Services LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 29 | ELECTRONIC SUMMONS ISSUED as to Dorchester Receivables II LLC. (vf) (Entered: 05/06/2024) |

A-12

| 05/06/2024 | 30 | ELECTRONIC SUMMONS ISSUED as to SuttonPark Capital LLC. (vf) (Entered: 05/06/2024) |
|---|---|---|
| 05/06/2024 | 31 | ELECTRONIC SUMMONS ISSUED as to Signal Medical Receivables LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 32 | ELECTRONIC SUMMONS ISSUED as to Insurety Capital LLP. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 33 | ELECTRONIC SUMMONS ISSUED as to SuttonPark Servicing LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 34 | ELECTRONIC SUMMONS ISSUED as to Signal Servicing LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 35 | ELECTRONIC SUMMONS ISSUED as to Insurety Servicing LLC. (vf) (Entered: 05/06/2024) |
| 05/06/2024 | 36 | ELECTRONIC SUMMONS ISSUED as to Advantage Capital Holdings LLC. (vf) (Entered: 05/06/2024) |
| 05/08/2024 | 37 | NOTICE OF APPEARANCE by Craig Carpenito on behalf of Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Carpenito, Craig) (Entered: 05/08/2024) |
| 05/08/2024 | 38 | NOTICE OF APPEARANCE by Brian Kevin Donovan on behalf of Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Donovan, Brian) (Entered: 05/08/2024) |
| 05/08/2024 | 39 | NOTICE OF APPEARANCE by Roger G. Schwartz on behalf of Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Schwartz, Roger) (Entered: 05/08/2024) |
| 05/08/2024 | 40 | NOTICE OF APPEARANCE by Jonathan Michael Watkins on behalf of Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/08/2024) |
| 05/08/2024 | 41 | NOTICE OF APPEARANCE by Mark Andrew Singer on behalf of Advantage Capital Holdings LLC, Kenneth King..(Singer, Mark) (Entered: 05/08/2024) |
| 05/10/2024 | 42 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Josh Wander served on 5/7/2024, answer due 5/28/2024. Service was accepted by Artide Neptune/Security. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 43 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Insurety Agency Services LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Brock Lilley/Corporate Counsel. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 44 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Dorchester Receivables II LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 45 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Insurety Servicing LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |

A-13

| 05/10/2024 | 46 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Signal Servicing LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 47 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Splcss III LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 48 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. SuttonPark Servicing LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 49 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. 777 Partners LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 50 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Advantage Capital Holdings LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 51 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. 600 Partners LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 52 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. SuttonPark Capital LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 53 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Signal SML 4 LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 54 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Signal Medical Receivables LLC served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/10/2024 | 55 | AFFIDAVIT OF SERVICE of Summons and Complaint,,. Insurety Capital LLP served on 5/7/2024, answer due 5/28/2024. Service was accepted by Lynanne Gares. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/10/2024) |
| 05/13/2024 | 56 | PROPOSED TEMPORARY RESTRAINING ORDER. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC.. (Nathanson, Leigh) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 05/13/2024) |
| 05/13/2024 | 57 | MEMORANDUM OF LAW in Support re: 56 Proposed Temporary Restraining Order, . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/13/2024) |

A-14

| 05/13/2024 | 58 | DECLARATION of Craig Gillespie in Support re: 56 Proposed Temporary Restraining Order,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11).(Nathanson, Leigh) (Entered: 05/13/2024) |
| --- | --- | --- |
| 05/13/2024 | 59 | DECLARATION of Phil Kane in Support re: 56 Proposed Temporary Restraining Order,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/13/2024) |
| 05/13/2024 | 60 | DECLARATION of Luca Albertini in Support re: 56 Proposed Temporary Restraining Order,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/13/2024) |
| 05/13/2024 | 61 | DECLARATION of Leigh M. Nathanson in Support re: 56 Proposed Temporary Restraining Order,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P).(Nathanson, Leigh) (Entered: 05/13/2024) |
| 05/13/2024 | | ***NOTICE TO COURT REGARDING PROPOSED TEMPORARY RESTRAINING ORDER. Document No. 56 Proposed Temporary Restraining Order, was reviewed and approved as to form. (nd) (Entered: 05/13/2024) |
| 05/13/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Show Cause Hearing set for 5/14/2024 at 11:00 AM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 05/13/2024) |
| 05/13/2024 | 62 | LETTER MOTION to Adjourn Conference / Show Cause Hearing addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 13, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/13/2024) |
| 05/13/2024 | 63 | ORDER granting in part and denying in part 62 Letter Motion to Adjourn Conference. The hearing is adjourned until 4:30 P.M. on May 14, 2024. So Ordered. (Signed by Judge John G. Koeltl on 5/13/2024) Show Cause Hearing set for 5/14/2024 at 04:30 PM before Judge John G. Koeltl. (ks) (Entered: 05/13/2024) |
| 05/14/2024 | 64 | NOTICE OF APPEARANCE by Jonathan Warren Muenz on behalf of National Founders LP..(Muenz, Jonathan) (Entered: 05/14/2024) |
| 05/14/2024 | 65 | NOTICE OF APPEARANCE by Nicholas Primer Crowell on behalf of National Founders LP..(Crowell, Nicholas) (Entered: 05/14/2024) |
| 05/14/2024 | 66 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate National Bank of Canada, Other Affiliate Credigy Solutions Inc., Other Affiliate Credigy Acquisition Corp. for National Founders LP. Document filed by National Founders LP.. (Crowell, Nicholas) (Entered: 05/14/2024) |
| 05/14/2024 | 67 | MOTION to Intervene . Document filed by National Founders LP..(Crowell, Nicholas) (Entered: 05/14/2024) |
| 05/14/2024 | 68 | MEMORANDUM OF LAW in Support re: 67 MOTION to Intervene . . Document filed by National Founders LP..(Crowell, Nicholas) (Entered: 05/14/2024) |
| 05/14/2024 | 69 | NOTICE OF APPEARANCE by John Gerard McCarthy, Sr on behalf of 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal |

A-15

|  |  | SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 05/14/2024) |
|---|---|---|
| 05/14/2024 | 70 | NOTICE OF APPEARANCE by David Allan Pellegrino on behalf of 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(Pellegrino, David) (Entered: 05/14/2024) |
| 05/14/2024 | 71 | ORDER: The parties are directed to submit a letter updating the Court as to the status of the case by May 17, 2024, at 10:00 a.m. (Signed by Judge John G. Koeltl on 5/14/2024) (ate) (Entered: 05/14/2024) |
| 05/14/2024 |  | Minute Entry for proceedings held before Judge John G. Koeltl: Show Cause Hearing held on 5/14/2024. (Fletcher, Donnie) (Entered: 05/16/2024) |
| 05/15/2024 | 72 | NOTICE OF APPEARANCE by Michael Edward Petrella on behalf of Advantage Capital Holdings LLC, Kenneth King..(Petrella, Michael) (Entered: 05/15/2024) |
| 05/17/2024 | 73 | STATUS REPORT. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/17/2024) |
| 05/17/2024 | 74 | LETTER addressed to Judge John G. Koeltl from John G. McCarthy dated May 17, 2024 re: Response for Plaintiffs' "Status Report". Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit Letter to Plaintiffs).(McCarthy, John) (Entered: 05/17/2024) |
| 05/17/2024 | 75 | RESPONSE re: 73 Status Report . Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/17/2024) |
| 05/17/2024 | 76 | CERTIFICATE OF SERVICE of Summons and Complaint,,. Kenneth King served on 5/7/2024, answer due 5/28/2024. Service was accepted by Jonathan M. Wilkins/Counsel. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/17/2024) |
| 05/17/2024 | 77 | CERTIFICATE OF SERVICE of Summons and Complaint,,. Steven Pasko served on 5/9/2024, answer due 5/30/2024. Service was accepted by Mollie Wander/Counsel. Document filed by Leadenhall Life Insurance Linked Investments Fund PLC; Leadenhall Capital Partners LLP..(Nathanson, Leigh) (Entered: 05/17/2024) |
| 05/17/2024 | 78 | ORDER: The response to the application for a temporary restraining order is due May 24, 2024. The reply is due May 30, 2024. The Court will hear the parties on June 3, 2024, at 2:30 p.m. in Courtroom 14A, 500 Pearl Street, New York, New York 10007. SO ORDERED. ( Responses due by 5/24/2024, Replies due by 5/30/2024., Status Conference set for 6/3/2024 at 02:30 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl.) (Signed by Judge John G. Koeltl on 5/17/2024) (tg) (Entered: 05/20/2024) |
| 05/22/2024 | 79 | TRANSCRIPT of Proceedings re: hearing held on 5/14/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Devon Gerber, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/12/2024. Redacted Transcript Deadline set for 6/24/2024. Release of Transcript Restriction set for 8/20/2024.. (McGuirk, Kelly) (Entered: 05/22/2024) |

A-16

| 05/22/2024 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 5/14/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 05/22/2024) |
|---|---|---|
| 05/24/2024 | 81 | OPPOSITION BRIEF re: 56 Proposed Temporary Restraining Order, . Document filed by National Founders LP..(Crowell, Nicholas) (Entered: 05/24/2024) |
| 05/24/2024 | 82 | DECLARATION of Jason S. Williams in Opposition re: 56 Proposed Temporary Restraining Order,. Document filed by National Founders LP..(Crowell, Nicholas) (Entered: 05/24/2024) |
| 05/24/2024 | 83 | LETTER MOTION to Seal addressed to Judge John G. Koeltl from John G. McCarthy dated May 24, 2024. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 05/24/2024) |
| 05/24/2024 | 84 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Atlantic Coast Life Insurance Company, Other Affiliate Sentinel Security Life Insurance Company, Other Affiliate Advantage Capital Partners LLC, Other Affiliate Haymarket Holdings I LLC, Other Affiliate Haymarket Insurance Company, Other Affiliate Advantage West LLC, Other Affiliate Advantage South LLC, Other Affiliate Advantage Capital Management LLC, Other Affiliate A-CAP LLC, Other Affiliate A-CAP Management Services LLC, Other Affiliate A-CAP Services LLC, Other Affiliate Royal Cap LLC, Other Affiliate PACA-K LLC, Other Affiliate PACA-HUD LLC, Other Affiliate PACA-SPP II for Advantage Capital Holdings LLC. Document filed by Advantage Capital Holdings LLC..(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/24/2024 | 85 | LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 24, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/24/2024 | 86 | ***SELECTED PARTIES*** OPPOSITION BRIEF re: 56 Proposed Temporary Restraining Order, . Document filed by Dorchester Receivables II LLC, 600 Partners LLC, Insurety Servicing LLC, Signal Servicing LLC, Signal Medical Receivables LLC, 777 Partners LLC, Signal SML 4 LLC, SuttonPark Capital LLC, Insurety Capital LLP, SuttonPark Servicing LLC, Splcss III LLC, Insurety Agency Services LLC, Advantage Capital Holdings LLC, Kenneth King, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Steven Pasko, Josh Wander. (Attachments: # 1 Affidavit Dec. of John G. McCarthy, # 2 Exhibit A to Dec. of McCarthy, # 3 Affidavit Dec. of Ian Ratner, # 4 Exhibit A to Dec. of Ratner, # 5 Exhibit B to Dec. of Ratner, # 6 Exhibit C to Dec. of Ratner, # 7 Exhibit D to Dec. of Ratner, # 8 Exhibit E to Dec. of Ratner, # 9 Affidavit Dec. of James Howard, # 10 Exhibit A to Dec. of Howard, # 11 Affidavit Dec. of Mark Shapiro, # 12 Exhibit A to Dec. of Shapiro, # 13 Affidavit Dec. of Christopher O'Reilly)Motion or Order to File Under Seal: 83 . (McCarthy, John) (Entered: 05/24/2024) |
| 05/24/2024 | 87 | ***SELECTED PARTIES***DECLARATION of Michael Saliba in Opposition re: 85 LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 24, 2024.. Document filed by Advantage Capital Holdings LLC, Kenneth King, 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety |

A-17

| | | |
|---|---|---|
| | | Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. Motion or Order to File Under Seal: 85 .(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/24/2024 | 88 | DECLARATION of Michael Saliba in Opposition re: 85 LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 24, 2024.. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/24/2024 | 89 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 85 LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 24, 2024. . Document filed by Advantage Capital Holdings LLC, Kenneth King, 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. Motion or Order to File Under Seal: 85 .(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/24/2024 | 90 | MEMORANDUM OF LAW in Opposition re: 85 LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated May 24, 2024. . Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 05/24/2024) |
| 05/27/2024 | 91 | ORDER granting 85 Letter Motion to Seal. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 5/27/2024) (rro) (Entered: 05/28/2024) |
| 05/27/2024 | 92 | ORDER granting 83 Letter Motion to Seal. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 5/27/2024) (rro) (Entered: 05/28/2024) |
| 05/28/2024 | 93 | LETTER MOTION for Extension of Time to File Answer *or Otherwise Respond to Complaint for All Defendants* addressed to Judge John G. Koeltl from John G. McCarthy dated May 28, 2024. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. (Attachments: # 1 Exhibit Stipulation).(McCarthy, John) (Entered: 05/28/2024) |
| 05/29/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Status Conference set for 6/3/2024 adjourned to 6/7/2024 at 12:00 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 05/29/2024) |
| 05/29/2024 | 94 | ORDER The hearing scheduled for June 3, 2024, at 2:30 p.m. is adjourned to June 7, 2024, at 12:00 p.m. SO ORDERED. (Signed by Judge John G. Koeltl on 5/29/2024) (jca) (Entered: 05/29/2024) |
| 05/29/2024 | 95 | STIPULATION FOR EXTENSION OF TIME TO ANSWER OR OTHERWISERESPOND TO COMPLAINT: Defendants other than Josh Wander and Steven Pasko shall have through and including June 3, 2024 to answer or file pre-motion letters related to motions to dismiss the complaint. SO ORDERED. 600 Partners LLC answer due 6/3/2024; 777 Partners LLC answer due 6/3/2024; Advantage Capital Holdings LLC answer due 6/3/2024; Dorchester Receivables II LLC answer due 6/3/2024; Insurety Agency Services LLC answer due 6/3/2024; Insurety Capital LLP |

A-18

|  |  | answer due 6/3/2024; Insurety Servicing LLC answer due 6/3/2024; Kenneth King answer due 6/3/2024; Signal Medical Receivables LLC answer due 6/3/2024; Signal SML 4 LLC answer due 6/3/2024; Signal Servicing LLC answer due 6/3/2024; Splcss III LLC answer due 6/3/2024; SuttonPark Capital LLC answer due 6/3/2024; SuttonPark Servicing LLC answer due 6/3/2024., Motions terminated: 93 LETTER MOTION for Extension of Time to File Answer *or Otherwise Respond to Complaint for All Defendants* addressed to Judge John G. Koeltl from John G. McCarthy dated May 28, 2024. filed by 777 Partners LLC, 600 Partners LLC, Signal SML 4 LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Servicing LLC, Steven Pasko, Insurety Capital LLP, Josh Wander, Insurety Servicing LLC, SuttonPark Servicing LLC, Signal Medical Receivables LLC, Splcss III LLC, Insurety Agency Services LLC. (Signed by Judge John G. Koeltl on 5/29/2024) (tro) (Entered: 05/29/2024) |
|---|---|---|
| 05/29/2024 | 96 | LETTER MOTION for Leave to File Excess Pages *for Reply Brief* addressed to Judge John G. Koeltl from Leigh M. Nathanson dated May 29, 2024. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/29/2024) |
| 05/30/2024 | 97 | ORDER granting 96 Letter Motion for Leave to File Excess Pages. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 5/30/2024) (ks) (Entered: 05/30/2024) |
| 05/30/2024 | 98 | LETTER MOTION to Seal addressed to Judge John G. Koeltl from Leigh M. Nathanson dated May 30, 2024. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/30/2024) |
| 05/30/2024 | 99 | ***SELECTED PARTIES*** REPLY MEMORANDUM OF LAW in Support re: 56 Proposed Temporary Restraining Order, . Document filed by Leadenhall Life Insurance Linked Investments Fund PLC, Leadenhall Capital Partners LLP, 600 Partners LLC, 777 Partners LLC, Advantage Capital Holdings LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Kenneth King, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. Motion or Order to File Under Seal: 98 .(Nathanson, Leigh) (Entered: 05/30/2024) |
| 05/30/2024 | 100 | REPLY MEMORANDUM OF LAW in Support re: 56 Proposed Temporary Restraining Order, . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 05/30/2024) |
| 05/30/2024 | 101 | DECLARATION of Leigh M. Nathanson re: 56 Proposed Temporary Restraining Order, . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3). (Nathanson, Leigh) (Entered: 05/30/2024) |
| 05/31/2024 | 102 | ORDER granting 98 Letter Motion to Seal. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 5/31/2024) (tg) (Entered: 05/31/2024) |
| 06/03/2024 | 103 | LETTER addressed to Judge John G. Koeltl from John G. McCarthy dated June 3, 2024 re: Messrs. Wander and Pasko's Request for Additional Time to Respond to the Complaint. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 06/03/2024) |
| 06/03/2024 | 104 | LETTER addressed to Judge John G. Koeltl from John G. McCarthy dated June 3, 2024 re: Request for a Pre-Motion Conference for the 777 Entity Defendants' Motion to |

A-19

| | | |
|---|---|---|
| | | Dismiss. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 06/03/2024) |
| 06/03/2024 | 105 | LETTER MOTION for Conference *regarding anticipated Motion to Dismiss* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated June 3, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 06/03/2024) |
| 06/04/2024 | 106 | MEMO ENDORSEMENT on re: 103 Letter, filed by 777 Partners LLC, 600 Partners LLC, Signal SML 4 LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Servicing LLC, Insurety Capital LLP, Insurety Servicing LLC, SuttonPark Servicing LLC, Signal Medical Receivables LLC, Splcss III LLC, Insurety Agency Services LLC, ENDORSEMENT: The time for defendants Wander and Pasko to respond to the complaint is extended to June 17, 2024. SO ORDERED (Signed by Judge John G. Koeltl on 6/4/2024) Steven Pasko answer due 6/17/2024; Jos h Wander answer due 6/17/2024. (ks) (Entered: 06/04/2024) |
| 06/05/2024 | 107 | ORDER granting 105 Letter Motion for Conference re: 105 LETTER MOTION for Conference *regarding anticipated Motion to Dismiss* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated June 3, 2024. The parties are directed to appear for a telephone pre-motion conference regarding the pending motion to dismiss on June 14, 2024 at 4:30 p.m. Dial-in:888-363-4749, with access code 8140049. SO ORDERED. (Signed by Judge John G. Koeltl on 6/5/2024) Telephone Conference set for 6/14/2024 at 04:30 PM before Judge John G. Koeltl. (ks) (Entered: 06/05/2024) |
| 06/06/2024 | 108 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent ING Financial Holdings Corporation, Other Affiliate ING Bank N.V., Other Affiliate ING Groep N.V. for ING Capital LLC. Document filed by ING Capital LLC..(Hornung, Stephan) (Entered: 06/06/2024) |
| 06/06/2024 | 109 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - (SEE DOCUMENT#110) -** NOTICE of Motion to Intervene. Document filed by ING Capital LLC..(Hornung, Stephan) Modified on 6/6/2024 (lb). (Entered: 06/06/2024) |
| 06/06/2024 | 110 | MOTION to Intervene . Document filed by ING Capital LLC..(Hornung, Stephan) (Entered: 06/06/2024) |
| 06/06/2024 | 111 | MEMORANDUM OF LAW in Support re: 110 MOTION to Intervene . . Document filed by ING Capital LLC. (Attachments: # 1 Exhibit Memorandum of Law in Limited Opposition to Plaintiffs Application for (1) Temporary Restraining Order, and (2) an Order to Show Cause for a Receiver, or Alternatively, a Preliminary Injunction, # 2 Exhibit Declaration of Jonathan Banks).(Hornung, Stephan) (Entered: 06/06/2024) |
| 06/06/2024 | 112 | MOTION for Roger G. Schwartz to Withdraw as Attorney . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 06/06/2024) |
| 06/06/2024 | 113 | NOTICE OF APPEARANCE by Matthew C. R. Ziegler on behalf of ING Capital LLC.. (Ziegler, Matthew) (Entered: 06/06/2024) |
| 06/07/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Show Cause Hearing held on 6/7/2024. (Fletcher, Donnie) (Entered: 06/07/2024) |
| 06/07/2024 | 114 | ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER: ORDERED, that Defendants 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 |

A-20

Partners"), SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Signal SML 4 LLC (the "Signal Borrower"), Insurety Agency Services LLC (the "Insurety Borrower," and together with the other above-referenced Defendants, the "Borrowers and Guarantors") show cause why an Order shall not be entered: (1) Appointing a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure with the power to: (A) take possession, custody, and control of any assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021; (B) to the extent the value of the assets pledged as collateral to Leadenhall by the Borrowers is less than the outstanding debt which Leadenhall accelerated on March 15, 2024 ($609,529,966.82 or the "Accelerated Debt"), take possession, custody, and control of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt, as further set forth herein. (2) In the alternative to appointing a receiver pursuant to paragraph (1), issuing a preliminary injunction pursuant to Rule 64 or 65 of the Federal Rules of Civil Procedure which, other than in the normal and ordinary course of business, (A) prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021, as further set forth herein. (E) requires the Borrowers and Guarantors to provide notice to Leadenhall ING and National Founders of any attempt by any Defendant to foreclose on, repossess, or exercise remedial actions against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors; as further set forth. The plaintiffs shall post a bond in the amount of $1 million by June 12, 2024 at 3:00p.m. This order will be posted on ECF and the plaintiffs should serve all defendants by 5:00p.m. on June 7, 2024 by email or overnight delivery addressed to the Defendants or their counsel within one business day and such service is good and sufficient. Show Cause Hearing set for 6/21/2024 at 09:00 AM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Signed by Judge John G. Koeltl on 6/7/2024) (mml) Transmission to Finance Unit (Cashiers) for processing. (Entered: 06/07/2024)

| 06/07/2024 | 115 | MEMO ENDORSEMENT granting 112 Motion to Withdraw as Attorney. ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 6/7/2024) Attorney Roger G. Schwartz terminated (ks) (Entered: 06/07/2024) |
| --- | --- | --- |
| 06/10/2024 | 116 | JOINT LETTER addressed to Judge John G. Koeltl from David A. Pellegrino dated June 10, 2024 re: Evidentiary Hearing for Preliminary Injunction and Appropriate Discovery. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2).(Pellegrino, David) (Entered: 06/10/2024) |
| 06/11/2024 | 117 | LETTER addressed to Judge John G. Koeltl from Jonathan M. Watkins dated June 11, 2024 re: Two points in the Joint Letter, Doc. No. 116. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 06/11/2024) |
| 06/12/2024 | 118 | **FILING ERROR - CORPORATE PARENT/OTHER AFFILIATE NOT ADDED -** RULE 7.1 CORPORATE DISCLOSURE STATEMENT.. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(Pellegrino, David) Modified on 6/12/2024 (lb). (Entered: 06/12/2024) |

**A-21**

| | | |
|---|---|---|
| 06/12/2024 | 119 | SURETY BOND, BOND #612419689 in the amount of $1,000,000.00 posted by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC.(km) (Entered: 06/12/2024) |
| 06/12/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Notice to Attorney David Allan Pellegrino to RE-FILE Document No. 118 Rule 7.1 Corporate Disclosure Statement,. The filing is deficient for the following reason(s): the corporate parent/other affiliate was not added;. Re-file the document using the event type Rule 7.1 Corporate Disclosure Statement found under the event list Other Documents - select the correct filer/filers - attach the correct signed PDF - when prompted with the message "Are there any corporate parents or other affiliates?", select the Yes or No radio button - If Yes - enter the corporate parent/other affiliate, click the Search button - select the correct corporate parent/other affiliate name from the search results list or if no person found, create a new corporate parent/other affiliate - select the party to whom the corporate parent/other affiliate should be linked - add corporate parent/other affiliate names one at a time. (lb) (Entered: 06/12/2024) |
| 06/14/2024 | 120 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate 347 Green Leasing Cayman Limited, Other Affiliate 347 Green Leasing Limited (347 GLL), Other Affiliate 42 Bruton Ltd., Other Affiliate 777 Asset Management Ltd., Other Affiliate 777 Cal Real Estate Inc., Other Affiliate 777 Oz HoldCo Pay Ltd, Other Affiliate 777 Partners UK Limited, Other Affiliate 777 Re. Ltd., Other Affiliate ABB Technologies Limited, Other Affiliate Adrift Productions UK Limited, Other Affiliate AEROCRS Ltd, Other Affiliate AHF Great Lakes, Inc., Other Affiliate Air Black Box Co LTD (UK), Other Affiliate 777 FC Gloval Limited, Other Affiliate 777 FC Global USA Corp, Other Affiliate 777 FC Global UK Ltd., Other Affiliate Professional Leagues Company Pty Ltd., Other Affiliate... for 600 Partners LLC, 777 Partners LLC. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(Pellegrino, David) (Entered: 06/14/2024) |
| 06/14/2024 | 121 | NOTICE OF APPEARANCE by Christopher Blake Harwood on behalf of Steven Pasko.. (Harwood, Christopher) (Entered: 06/14/2024) |
| 06/14/2024 | 122 | NOTICE OF APPEARANCE by Jenna Jones on behalf of Steven Pasko..(Jones, Jenna) (Entered: 06/14/2024) |
| 06/14/2024 | 123 | NOTICE OF APPEARANCE by Matthew Moler Karlan on behalf of Advantage Capital Holdings LLC, Kenneth King..(Karlan, Matthew) (Entered: 06/14/2024) |
| 06/14/2024 | 124 | ORDER As discussed at the telephone conference held earlier today, the parties are directed to provide an update to the Court by June 18, 2024. SO ORDERED. (Signed by Judge John G. Koeltl on 6/14/2024) (jca) (Entered: 06/14/2024) |
| 06/14/2024 | 125 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Settlement. Referred to Magistrate Judge Barbara C. Moses. SO ORDERED (Signed by Judge John G. Koeltl on 6/14/2024) (ks) (Entered: 06/14/2024) |
| 06/14/2024 | 126 | ORDER: The time for all defendants to respond to the complaint is August 2, 2024. If in response the plaintiffs wish to file an amended complaint, the time to file that amended complaint is August 23, 2024. If the defendants file any motions to dismiss and there is no amended complaint, the time to respond to the current complaint is September 20, 2024. The time to reply is October 11, 2024. SO ORDERED. ( Amended Pleadings due |

A-22

SDNY CM/ECF NextGen Version 1.7

| | | by 8/23/2024., Replies due by 10/11/2024.) (Signed by Judge John G. Koeltl on 6/14/2024) (tg) (Entered: 06/14/2024) |
|---|---|---|
| 06/18/2024 | 127 | JOINT LETTER addressed to Judge John G. Koeltl from Leigh M. Nathanson dated June 18, 2024 re: Status of the Temporary Restraining Order. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC.. (Nathanson, Leigh) (Entered: 06/18/2024) |
| 06/18/2024 | 128 | TRANSCRIPT of Proceedings re: CONFERNECE held on 6/7/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Paula Horovitz, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/9/2024. Redacted Transcript Deadline set for 7/19/2024. Release of Transcript Restriction set for 9/16/2024..(McGuirk, Kelly) (Entered: 06/18/2024) |
| 06/18/2024 | 129 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 6/7/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/18/2024) |
| 06/18/2024 | 134 | MEMO ENDORSEMENT on re: 127 Letter, filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC ENDORSEMENT: For good cause shown and with the consent of the parties, the temporary restraining order entered on June 7, 2024 is extended to July 5, 2024. So Ordered. (Signed by Judge John G. Koeltl on 6/18/2024) (ks) (Entered: 06/18/2024) |
| 06/20/2024 | 130 | NOTICE OF APPEARANCE by Jordan Lancaster Estes on behalf of Josh Wander.. (Estes, Jordan) (Entered: 06/20/2024) |
| 06/20/2024 | 131 | NOTICE OF APPEARANCE by Marjorie E. Sheldon on behalf of Josh Wander.. (Sheldon, Marjorie) (Entered: 06/20/2024) |
| 06/20/2024 | 132 | TRANSCRIPT of Proceedings re: MOTION held on 6/14/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/11/2024. Redacted Transcript Deadline set for 7/22/2024. Release of Transcript Restriction set for 9/18/2024.. (McGuirk, Kelly) (Entered: 06/20/2024) |
| 06/20/2024 | 133 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a MOTION proceeding held on 6/14/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 06/20/2024) |
| 06/20/2024 | 135 | ORDER: The temporary restraining order in this case is extended to July 8, 2024, at 4:30 p.m. The extension is required because July 5, 2024, is a court holiday. July 8, 2024 is the first business day thereafter. If the parties disagree, they should notify the Court immediately. SO ORDERED. (Signed by Judge John G. Koeltl on 6/20/2024) (ks) (Entered: 06/20/2024) |

A-23

| 06/20/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Show Cause Hearing set for 6/21/2024 adjourned to 7/8/2024 at 04:30 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 06/20/2024) |
| --- | --- | --- |
| 06/21/2024 | 136 | ORDER SCHEDULING SETTLEMENT CONFERENCE: Settlement Conference set for 7/10/2024 at 02:15 PM in Courtroom 20A, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Barbara C. Moses. (Signed by Magistrate Judge Barbara C. Moses on 6/21/2024) (rro) (Entered: 06/21/2024) |
| 07/03/2024 | 137 | JOINT LETTER MOTION for Conference addressed to Magistrate Judge Barbara C. Moses from ING Capital LLC and National Founders LP dated July 3, 2024. Document filed by ING Capital LLC..(Hornung, Stephan) (Entered: 07/03/2024) |
| 07/07/2024 | 138 | LETTER addressed to Judge John G. Koeltl from John G. McCarthy dated July 7, 2024 re: ECF. No. 135:. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Spless III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit Proposed Order, # 2 Exhibit Redline).(McCarthy, John) (Entered: 07/07/2024) |
| 07/08/2024 | 139 | MOTION to Intervene . Document filed by Haymarket Insurance Company, ACM Delegate LLC..(Watkins, Jonathan) (Entered: 07/08/2024) |
| 07/08/2024 | 140 | MEMORANDUM OF LAW in Support re: 139 MOTION to Intervene . . Document filed by ACM Delegate LLC, Haymarket Insurance Company..(Watkins, Jonathan) (Entered: 07/08/2024) |
| 07/08/2024 | 141 | DECLARATION of Jonathan Watkins in Support re: 139 MOTION to Intervene .. Document filed by ACM Delegate LLC, Haymarket Insurance Company. (Attachments: # 1 Exhibit A - March 3, 2020 Financing Statements and Amendments, # 2 Exhibit B - November, 27, 2023 Financing Statements, # 3 Exhibit C - Florida and Delaware Financing Statements, # 4 Exhibit D - July 12, 2022 Financing Statements).(Watkins, Jonathan) (Entered: 07/08/2024) |
| 07/08/2024 | 142 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Haymarket Holdings, LLC for Haymarket Insurance Company; Other Affiliate Advantage Capital Holdings LLC for ACM Delegate LLC. Document filed by ACM Delegate LLC, Haymarket Insurance Company..(Watkins, Jonathan) (Entered: 07/08/2024) |
| 07/08/2024 | 143 | NOTICE OF APPEARANCE by Matthew Moler Karlan on behalf of ACM Delegate LLC, Haymarket Insurance Company..(Karlan, Matthew) (Entered: 07/08/2024) |
| 07/08/2024 | 144 | NOTICE OF APPEARANCE by Michael Edward Petrella on behalf of ACM Delegate LLC, Haymarket Insurance Company..(Petrella, Michael) (Entered: 07/08/2024) |
| 07/08/2024 | 145 | NOTICE OF APPEARANCE by Mark Andrew Singer on behalf of ACM Delegate LLC, Haymarket Insurance Company..(Singer, Mark) (Entered: 07/08/2024) |
| 07/08/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Show Cause Hearing held on 7/8/2024. (Fletcher, Donnie) (Entered: 07/08/2024) |
| 07/08/2024 | 146 | ORDER: Upon the Complaint by Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall"); the accompanying declarations of Craig Gillespie, Phil Kane, Luca Albertini, and Leigh M. Nathanson; and the Memorandum of Law in Support of Plaintiffs' Application for a (i) Temporary Restraining Order, and (ii) a Receivership or, Alternatively, a Preliminary Injunction, it is ordered, that Defendants 777 Partners LLC, 600 Partners LLC, SPLCSS |

A-24

| | | |
|---|---|---|
| | | III LLC, Dorchester Receivables II LLC, Signal SML 4 LLC, and Insurety Agency Services LLC (together, the "Borrowers and Guarantors") are hereby subject to the following preliminary injunction: Pursuant to Federal Rule of Civil Procedure 65, and based on the findings of fact and conclusions of law stated on the record on June 7, 2024, ECF No. 128, the Court finds that the Temporary Restraining Order previously entered, ECF No. 114, should be issued as a preliminary injunction. The Court enters a preliminary injunction that, other than in the normal and ordinary course of business: (A) prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021; (B) to the extent the value of the assets pledged as collateral by the Borrowers to Leadenhall is less than the full amount of the Accelerated Debt, prohibits the expenditure or dissipation of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt; AS FURTHER SET FORTH IN THIS ORDER. SO ORDERED. (Signed by Judge John G. Koeltl on 7/8/2024) (vfr) (Entered: 07/08/2024) |
| 07/09/2024 | 147 | ORDER granting 137 Letter Motion for Conference re: 137 JOINT LETTER MOTION for Conference addressed to Magistrate Judge Barbara C. Moses from ING Capital LLC and National Founders LP dated July 3, 2024. No other party having objected to the intervenors' motion, the application is GRANTED. SO ORDERED.. (Signed by Magistrate Judge Barbara C. Moses on 7/9/2024) (ks) (Entered: 07/09/2024) |
| 07/10/2024 | | Minute Entry for proceedings held before Magistrate Judge Barbara Moses: Settlement Conference held on 7/10/2024. (tk) (Entered: 07/10/2024) |
| 07/29/2024 | 148 | TRANSCRIPT of Proceedings re: HEARING held on 7/8/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Devon Gerber, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/19/2024. Redacted Transcript Deadline set for 8/29/2024. Release of Transcript Restriction set for 10/28/2024.. (McGuirk, Kelly) (Entered: 07/29/2024) |
| 07/29/2024 | 149 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 7/8/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 07/29/2024) |
| 07/30/2024 | 150 | LETTER MOTION for Extension of Time addressed to Judge John G. Koeltl from Christopher B. Harwood dated July 30, 2024. Document filed by Steven Pasko. (Attachments: # 1 Exhibit 1 - Proposed Order).(Harwood, Christopher) (Entered: 07/30/2024) |
| 07/31/2024 | 151 | ORDER granting 150 Letter Motion for Extension of Tim. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 7/31/2024) (ks) (Entered: 07/31/2024) |
| 07/31/2024 | | Set/Reset Deadlines: Steven Pasko answer due 8/9/2024. Amended Pleadings due by 8/30/2024. Responses due by 9/27/2024 Replies due by 10/18/2024. (ks) (Entered: 07/31/2024) |
| 07/31/2024 | 152 | PROPOSED ORDER TO SHOW CAUSE WITHOUT EMERGENCY RELIEF. Document filed by Advantage Capital Holdings LLC, Kenneth King. Related Document Number: 146 ..(Watkins, Jonathan) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 07/31/2024) |

**A-25**

SDNY CM/ECF NextGen Version 1.7

| | | |
|---|---|---|
| 07/31/2024 | 153 | DECLARATION of Michael Saliba in Support re: 152 Proposed Order to Show Cause Without Emergency Relief,. Document filed by Advantage Capital Holdings LLC, Kenneth King. (Attachments: # 1 Exhibit A - Oct. 10, 2023 Email Re Collateral Shortfall Amounts, # 2 Exhibit B - Excerpt of Spreadsheet Re SPLCSS III Dorchester and Insurety, # 3 Exhibit C - UCC Financing Statement - 2021.05.10 04.50pm - Dorchester Receivables II, # 4 Exhibit D - UCC Financing Statement - 2021.05.10 04.54pm - Suttonpark Capital LLC, # 5 Exhibit E - UCC Financing Statement - 2021.05.10 04.58pm - Suttonpark Capital LLC, # 6 Exhibit F - UCC Financing Statement - 2021.05.10 05.03pm - Insurety Capital LLC, # 7 Exhibit G - UCC Financing Statement - 2021.05.10 05.07pm - Insurety Capital LLC, # 8 Exhibit H - UCC Financing Statement - 2021.05.10 05.11pm - Signal SML 4 LLC, # 9 Exhibit I - UCC Financing Statement - 2021.05.10 05.16pm - Signal Medical Receivables LLC, # 10 Exhibit J - UCC Financing Statement - 2021.05.10 05.19pm - Signal Medical Receivables LLC, # 11 Exhibit K - UCC Financing Statement - 2021.05.10 05.23pm - SPLCSS III LLC, # 12 Exhibit L - UCC Financing Statement - 2021.05.10 05.27pm - Suttonpark Capital LLC, # 13 Exhibit M - UCC Financing Statement - 2021.05.10 05.31pm - Suttonpark Capital LLC, # 14 Exhibit N - UCC Financing Statement - 2021.05.11 03.34pm - Insurety Agency Services LLC). (Watkins, Jonathan) (Entered: 07/31/2024) |
| 07/31/2024 | 154 | DECLARATION of Jonathan Watkins in Support re: 152 Proposed Order to Show Cause Without Emergency Relief,. Document filed by Advantage Capital Holdings LLC, Kenneth King. (Attachments: # 1 Exhibit A - Proposed Modified Preliminary Injunction, # 2 Exhibit B - July 8, 2024 Order Entering Preliminary Injunction).(Watkins, Jonathan) (Entered: 07/31/2024) |
| 07/31/2024 | 155 | MEMORANDUM OF LAW in Support re: 152 Proposed Order to Show Cause Without Emergency Relief, (A-CAP's Memorandum of Law in Support of Its Rule 59(E) Motion to Modify The Preliminary Injunction). Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 07/31/2024) |
| 08/01/2024 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER TO SHOW CAUSE WITHOUT EMERGENCY RELIEF. Document No. 152 Proposed Order to Show Cause Without Emergency Relief, was reviewed and approved as to form. (tp) (Entered: 08/01/2024) |
| 08/01/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Conference set for today, 8/1/2024 at 04:00 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 08/01/2024) |
| 08/01/2024 | | Revised Minute Entry for proceedings held before Judge John G. Koeltl: Pretrial Conference set for 8/1/2024 at 04:00 PM before Judge John G. Koeltl. Dial-in: 888 363-4749, with access code 8140049. This proceeding will be conducted via phone. (Fletcher, Donnie) (Entered: 08/01/2024) |
| 08/01/2024 | 156 | ORDER: The time to file any response to the proposed order to show cause to modify the preliminary injunction is August 15, 2024. Any reply is due August 26, 2024. SO ORDERED. (Signed by Judge John G. Koeltl on 8/1/2024) (mml) (Entered: 08/02/2024) |
| 08/01/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Pretrial Conference held on 8/1/2024. (Fletcher, Donnie) (Entered: 08/06/2024) |
| 08/06/2024 | 157 | NOTICE OF APPEARANCE by Ryan Joseph Solfaro on behalf of 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(Solfaro, Ryan) (Entered: 08/06/2024) |

A-26

| | | |
|---|---|---|
| 08/07/2024 | 158 | LETTER MOTION for Leave to File Excess Pages addressed to Judge John G. Koeltl from David Pellegrino dated 08/07/2024. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(Pellegrino, David) (Entered: 08/07/2024) |
| 08/08/2024 | 159 | ORDER granting 158 Letter Motion for Leave to File Excess Pages. The Court doubts the need for the additional but will grant the request. SO ORDERED. (Signed by Judge John G. Koeltl on 8/8/2024) (jca) (Entered: 08/08/2024) |
| 08/09/2024 | 160 | MOTION to Dismiss . Document filed by Steven Pasko..(Harwood, Christopher) (Entered: 08/09/2024) |
| 08/09/2024 | 161 | DECLARATION of Steven Pasko in Support re: 160 MOTION to Dismiss .. Document filed by Steven Pasko. (Attachments: # 1 Exhibit 1- Loan and Security Agreement). (Harwood, Christopher) (Entered: 08/09/2024) |
| 08/09/2024 | 162 | MEMORANDUM OF LAW in Support re: 160 MOTION to Dismiss . . Document filed by Steven Pasko..(Harwood, Christopher) (Entered: 08/09/2024) |
| 08/09/2024 | 163 | MOTION to Dismiss . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. Responses due by 9/27/2024.(McCarthy, John) (Entered: 08/09/2024) |
| 08/09/2024 | 164 | DECLARATION of Christopher J. O'Reilly in Support re: 163 MOTION to Dismiss .. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit 1, Subscription Agreement, # 2 Exhibit 2, First Amendment to the Third Amended and Restated Limited Liability Company Agreement, # 3 Exhibit 3, First Amendment to the Fourth Amended and Restated Limited Liability Company Agreement).(McCarthy, John) (Entered: 08/09/2024) |
| 08/09/2024 | 165 | MEMORANDUM OF LAW in Support re: 163 MOTION to Dismiss . . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 08/09/2024) |
| 08/09/2024 | 166 | MOTION to Dismiss the Complaint. Document filed by Josh Wander..(Estes, Jordan) (Entered: 08/09/2024) |
| 08/09/2024 | 167 | MEMORANDUM OF LAW in Support re: 166 MOTION to Dismiss the Complaint. . Document filed by Josh Wander..(Estes, Jordan) (Entered: 08/09/2024) |
| 08/09/2024 | 168 | MOTION to Dismiss . Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 08/09/2024) |
| 08/09/2024 | 169 | MEMORANDUM OF LAW in Support re: 168 MOTION to Dismiss . . Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 08/09/2024) |
| 08/12/2024 | 170 | TRANSCRIPT of Proceedings re: CONFERNECE held on 8/1/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Amy Walker, (212) 805-0300. Transcript may be |

A-27

| | | |
|---|---|---|
| | | viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/3/2024. Redacted Transcript Deadline set for 9/12/2024. Release of Transcript Restriction set for 11/12/2024..(McGuirk, Kelly) (Entered: 08/12/2024) |
| 08/12/2024 | 171 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 8/1/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 08/12/2024) |
| 08/15/2024 | 172 | OPPOSITION BRIEF re: 152 Proposed Order to Show Cause Without Emergency Relief, . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 08/15/2024) |
| 08/15/2024 | 173 | DECLARATION of Craig Gillespie in Opposition re: 152 Proposed Order to Show Cause Without Emergency Relief,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit 1). (Nathanson, Leigh) (Entered: 08/15/2024) |
| 08/19/2024 | 174 | RULE 26(f) DISCOVERY PLAN REPORT.Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 08/19/2024) |
| 08/20/2024 | 175 | JOINT RULE 26(f) REPORT AND SCHEDULING ORDER: Pleadings and Parties: Except for good cause shown, no additional parties may be joined or cause of action asserted by Plaintiffs after October 31, 2024. As further set forth by this Order. SO ORDERED. Amended Pleadings due by 10/31/2024. Joinder of Parties due by 10/31/2024. (Signed by Judge John G. Koeltl on 8/20/2024) (tg) (Entered: 08/20/2024) |
| 08/26/2024 | 176 | REPLY MEMORANDUM OF LAW in Support re: 152 Proposed Order to Show Cause Without Emergency Relief, *A-CAP's Reply Memorandum of Law In Further Support of Its Rule 59(E) Motion to Modify the Preliminary Injunction*. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 08/26/2024) |
| 08/26/2024 | 177 | LETTER MOTION to Seal *Exhibits* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated August 26, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 08/26/2024) |
| 08/26/2024 | 178 | ***SELECTED PARTIES***DECLARATION of Jonathan M. Watkins in Support re: 176 Reply Memorandum of Law in Support,. Document filed by Advantage Capital Holdings LLC, Kenneth King, 600 Partners LLC, 777 Partners LLC, ACM Delegate LLC, Dorchester Receivables II LLC, Haymarket Insurance Company, ING Capital LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. (Attachments: # 1 Exhibit A - Loan and Security Agreement, # 2 Exhibit B - Dorchester Receivables II LLC Pledge Agreement, # 3 Exhibit C - Insurety Agency Services LLC Pledge Agreement, # 4 Exhibit D - Signal SML 4 LLC Pledge Agreement, # 5 Exhibit E - SPLCSS III LLC Pledge Agreement)Motion or Order to File Under Seal: 177 .(Watkins, Jonathan) (Entered: 08/26/2024) |

A-28

| 08/27/2024 | 179 | ORDER granting 177 Letter Motion to Seal. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 8/27/2024) (ks) (Entered: 08/27/2024) |
| 08/28/2024 | 180 | LETTER MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Seal* addressed to Judge John G. Koeltl from Leigh M. Nathanson dated August 28, 2024. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 08/28/2024) |
| 08/29/2024 | 181 | ORDER granting 180 Letter Motion for Extension of Time to File Response/Reply. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 8/26/2024) Replies due by 9/6/2024. (ks) (Entered: 08/29/2024) |
| 08/30/2024 | 182 | AMENDED COMPLAINT amending 1 Complaint,, against 600 Partners LLC, 777 Partners LLC, Advantage Capital Holdings LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Kenneth King, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander with JURY DEMAND.Document filed by Leadenhall Life Insurance Linked Investments Fund PLC, Leadenhall Capital Partners LLP. Related document: 1 Complaint,,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16).(Nathanson, Leigh) (Entered: 08/30/2024) |
| 09/03/2024 | 183 | ORDER: The defendant is directed to provide the Court with paper courtesy copies of all papers filed in connection with the fully briefed proposed order to show cause to modify the preliminary injunction (ECF No. 155). SO ORDERED. (ks) (Entered: 09/03/2024) |
| 09/06/2024 | 184 | LETTER MOTION to Seal addressed to Judge John G. Koeltl from Leigh M. Nathanson dated September 6, 2024. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit 1 - REDACTED - Loan and Security Agreement, # 2 Exhibit 2 - Dorchester Receivables II LLC Pledge Agreement, # 3 Exhibit 3 - Insurety Agency Services LLC Pledge Agreement, # 4 Exhibit 4 - Signal SML 4 LLC Pledge Agreement, # 5 Exhibit 5 - SPLCSS III LLC Pledge Agreement).(Nathanson, Leigh) (Entered: 09/06/2024) |
| 09/06/2024 | 185 | ***SELECTED PARTIES*** LETTER addressed to Judge John G. Koeltl from Leigh M. Nathanson dated September 6, 2024 re: Motion to Seal. Document filed by Dorchester Receivables II LLC, 600 Partners LLC, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Leadenhall Capital Partners LLP, Haymarket Insurance Company, Advantage Capital Holdings LLC, Signal Medical Receivables LLC, 777 Partners LLC, Josh Wander, ACM Delegate LLC, ING Capital LLC, Signal SML 4 LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Insurety Capital LLP, Splcss III LLC, Steven Pasko, Insurety Agency Services LLC, Kenneth King. (Attachments: # 1 Exhibit 1 - Loan and Security Agreement)Motion or Order to File Under Seal: 184 . (Nathanson, Leigh) (Entered: 09/06/2024) |
| 09/06/2024 | 186 | LETTER addressed to Judge John G. Koeltl from Leigh M. Nathanson dated September 6, 2024 re: Corrected Amended Complaint. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit 1 - Corrected Amended Complaint (Redline)).(Nathanson, Leigh) (Entered: 09/06/2024) |
| 09/06/2024 | 187 | CONSENT AMENDED COMPLAINT amending 182 Amended Complaint,,, against 600 Partners LLC, 777 Partners LLC, Advantage Capital Holdings LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Kenneth King, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander with JURY |

A-29

| | | |
|---|---|---|
| | | DEMAND.Document filed by Leadenhall Life Insurance Linked Investments Fund PLC, Leadenhall Capital Partners LLP. Related document: 182 Amended Complaint,,,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 13, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16). (Nathanson, Leigh) Modified on 9/9/2024 (vf). Modified on 9/10/2024 (vf). (Entered: 09/06/2024) |
| 09/09/2024 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Leigh Mager Nathanson re: Document No. 187 Amended Complaint. The filing is deficient for the following reason(s): the order granting permission to file the pleading was not attached; Court's leave has not been granted. File the Exhibit to Pleading event found under the event list Other Documents and attach either opposing party's written consent or Court's leave. (vf) (Entered: 09/09/2024) |
| 09/09/2024 | 188 | EXHIBIT TO PLEADING re: 187 Amended Complaint,,,. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC.. (Nathanson, Leigh) (Entered: 09/09/2024) |
| 09/09/2024 | 189 | LETTER addressed to Judge John G. Koeltl from Jonathan M. Watkins dated September 9, 2024 re: Request to So-Order Proposed Briefing Schedule for Anticipated Motions to Dismiss Plaintiffs' Amended Complaint. Document filed by Advantage Capital Holdings LLC, Kenneth King. (Attachments: # 1 Proposed Order Regarding Schedule for Motions to Dismiss).(Watkins, Jonathan) (Entered: 09/09/2024) |
| 09/09/2024 | 190 | MEMO ENDORSEMENT on re: 186 Letter Corrected Amended Complaint, filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 9/9/24) (yv) (Entered: 09/09/2024) |
| 09/09/2024 | 192 | ORDER granting 184 Letter Motion to Seal. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 9/9/2024) (ks) (Entered: 09/10/2024) |
| 09/10/2024 | 191 | MEMO ENDORSEMENT on re: 185 Letter Motion to Seal filed by 777 Partners LLC, 600 Partners LLC, ACM Delegate LLC, Signal SML 4 LLC, Advantage Capital Holdings LLC, Leadenhall Life Insurance Linked Investments Fund PLC, Steven Pasko, Insurety Capital LLP, Josh Wander, Kenneth King, Leadenhall Capital Partners LLP, SuttonPark Servicing LLC, Signal Medical Receivables LLC, Haymarket Insurance Company, Splcss III LLC, Insurety Agency Services LLC, SuttonPark Capital LLC, Dorchester Receivables II LLC, ING Capital LLC, National Founders LP. ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 9/10/24) (yv) (Entered: 09/10/2024) |
| 09/10/2024 | 193 | ORDER REGARDING SCHEDULE FOR MOTIONS TO DISMISS: all parties hereby agree and stipulate that the following proposed deadlines shall apply to any motions to dismiss the Amended Complaint: 1. The deadline for Defendants to file motions to dismiss or answer the Complaint is October 10, 2024. 2. The deadline for Plaintiffs to file any opposition brief to Defendants' motions to dismiss is November 21, 2024. 3. The deadline for any reply brief in support of motions to dismiss the Amended Complaint is December 12, 2024. 4. The word limits for memoranda of law filed in connection with motions to dismiss by Defendants Advantage Capital Holdings LLC and Kenneth King, collectively, and by the 777 Entity Defendants, collectively, are extended as follows: 10,000 words or fewer for initial and opposition briefs, and 4,000 words or fewer for reply briefs. SO ORDERED (Signed by Judge John G. Koeltl on 9/10/2024) ( Motions due by 10/10/2024., Responses due by 11/21/2024, Replies due by 12/12/2024.) (ks) (Entered: 09/10/2024) |

A-30

| 09/27/2024 | 194 | ORDER: The parties are directed to appear for oral argument on October 2, 2024, at 3:00 p.m., in Courtroom 14A, 500 Pearl Street, New York, New York 10007. SO ORDERED. (Signed by Judge John G. Koeltl on 9/27/2024) ( Oral Argument set for 10/2/2024 at 03:00 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl.) (ks) (Entered: 09/27/2024) |
|---|---|---|
| 10/01/2024 | 195 | NOTICE OF APPEARANCE by Michael Sheehan Taintor on behalf of Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Taintor, Michael) (Entered: 10/01/2024) |
| 10/01/2024 | 196 | LETTER addressed to Judge John G. Koeltl from Leigh M. Nathanson dated 10/01/24 re: Recent Developments in Advance of October 2, 2024 Hearing. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 10/01/2024) |
| 10/01/2024 | 197 | LETTER addressed to Judge John G. Koeltl from John G, McCarthy dated October 1, 2024 re: Lawsuit in SD Florida. Document filed by 600 Partners LLC, 777 Partners LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit Florida Complaint).(McCarthy, John) (Entered: 10/01/2024) |
| 10/02/2024 | 198 | RESPONSE re: 196 Letter, . Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/02/2024) |
| 10/02/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Oral Argument held on 10/2/2024 re: 152 Proposed Order to Show Cause Without Emergency Relief, Filed by Advantage Capital Holdings LLC, Kenneth King, 168 MOTION to Dismiss . Filed by Advantage Capital Holdings LLC, Kenneth King. (Fletcher, Donnie) (Entered: 10/02/2024) |
| 10/02/2024 | 199 | ORDER: For the reasons stated on the record today, Defendant Advantage Capital Holdings LLC's motion to modify the preliminary injunction pursuant to Rule 59(e) is denied. The Clerk is respectfully directed to close ECF No. 152. SO ORDERED. (Signed by Judge John G. Koeltl on 10/2/2024) (mml) (Entered: 10/03/2024) |
| 10/03/2024 | 200 | NOTICE OF INTERLOCUTORY APPEAL from 199 Order, 146 Preliminary Injunction,,,,,,,. Document filed by Advantage Capital Holdings LLC, Kenneth King. Filing fee $ 605.00, receipt number ANYSDC-29988542. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Watkins, Jonathan) (Entered: 10/03/2024) |
| 10/04/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 200 Notice of Interlocutory Appeal.(km) (Entered: 10/04/2024) |
| 10/04/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 200 Notice of Interlocutory Appeal, filed by Advantage Capital Holdings LLC, Kenneth King were transmitted to the U.S. Court of Appeals.(km) (Entered: 10/04/2024) |
| 10/08/2024 | 201 | TRANSCRIPT of Proceedings re: conference held on 10/2/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/29/2024. Redacted Transcript Deadline set for 11/8/2024. Release of Transcript Restriction set for 1/6/2025..(Moya, Goretti) (Entered: 10/08/2024) |

A-31

| 10/08/2024 | 202 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 10/2/24 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 10/08/2024) |
| 10/10/2024 | 203 | MOTION to Dismiss . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. Responses due by 11/21/2024.(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 204 | DECLARATION of Christopher J. O'Reilly in Support re: 203 MOTION to Dismiss .. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit 1, September 20, 2021, Subscription Agreement and Limited Power of Attorney to Purchase Preferred Membership Unit Interests, # 2 Exhibit 2, September 20, 2021, First Amendment to the Third Amended and Restated Limited Liability Company Agreement of 600 Partners LLC, # 3 Exhibit 3, the September 20,2021, First Amendment to the Fourth Amended and Restated Limited Liability Company Agreement of 777 Partners LLC).(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 205 | MEMORANDUM OF LAW in Support re: 203 MOTION to Dismiss . . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 206 | MOTION to Stay . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 207 | DECLARATION of John G. McCarthy in Support re: 206 MOTION to Stay .. Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC. (Attachments: # 1 Exhibit 1, Plaintiffs' First Requests for Production of Documents).(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 208 | MEMORANDUM OF LAW in Support re: 206 MOTION to Stay . . Document filed by 600 Partners LLC, 777 Partners LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Insurety Capital LLP, Insurety Servicing LLC, Signal Medical Receivables LLC, Signal SML 4 LLC, Signal Servicing LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC..(McCarthy, John) (Entered: 10/10/2024) |
| 10/10/2024 | 209 | MOTION to Dismiss *the Amended Complaint*. Document filed by Josh Wander..(Estes, Jordan) (Entered: 10/10/2024) |
| 10/10/2024 | 210 | MEMORANDUM OF LAW in Support re: 209 MOTION to Dismiss *the Amended Complaint*. . Document filed by Josh Wander..(Estes, Jordan) (Entered: 10/10/2024) |

A-32

| | | |
|---|---|---|
| 10/10/2024 | 211 | MOTION to Dismiss *Plaintiffs' Amended Complaint (Dkt. 187)*. Document filed by Steven Pasko..(Harwood, Christopher) (Entered: 10/10/2024) |
| 10/10/2024 | 212 | MEMORANDUM OF LAW in Support re: 211 MOTION to Dismiss *Plaintiffs' Amended Complaint (Dkt. 187)*. . Document filed by Steven Pasko..(Harwood, Christopher) (Entered: 10/10/2024) |
| 10/10/2024 | 213 | DECLARATION of Steven Pasko in Support re: 211 MOTION to Dismiss *Plaintiffs' Amended Complaint (Dkt. 187)*.. Document filed by Steven Pasko. (Attachments: # 1 Exhibit 1- 777-Leadenhall LSA, # 2 Exhibit 2- June 2023 Memo).(Harwood, Christopher) (Entered: 10/10/2024) |
| 10/10/2024 | 214 | MOTION to Dismiss *the Amended Complaint*. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/10/2024) |
| 10/10/2024 | 215 | MEMORANDUM OF LAW in Support re: 214 MOTION to Dismiss *the Amended Complaint*. *A-CAP and King's Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint*. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/10/2024) |
| 10/17/2024 | 216 | LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Christopher Harwood dated October 17, 2024. Document filed by Steven Pasko.. (Harwood, Christopher) (Entered: 10/17/2024) |
| 10/17/2024 | 217 | LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Jordan Estes dated October 17, 2024. Document filed by Josh Wander..(Estes, Jordan) (Entered: 10/17/2024) |
| 10/18/2024 | 218 | LETTER MOTION to Seal addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 18, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/18/2024) |
| 10/18/2024 | 219 | ***SELECTED PARTIES*** LETTER addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 18, 2024 re: Guidance on a contemplated transaction. Document filed by Dorchester Receivables II LLC, 600 Partners LLC, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Leadenhall Capital Partners LLP, Haymarket Insurance Company, Advantage Capital Holdings LLC, Signal Medical Receivables LLC, 777 Partners LLC, Josh Wander, ACM Delegate LLC, ING Capital LLC, Signal SML 4 LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Insurety Capital LLP, Splcss III LLC, Steven Pasko, Insurety Agency Services LLC, Kenneth King. (Attachments: # 1 Exhibit E, # 2 Exhibit F, # 3 Exhibit G, # 4 Exhibit H)Motion or Order to File Under Seal: 218 .(Watkins, Jonathan) (Entered: 10/18/2024) |
| 10/18/2024 | 220 | ***SELECTED PARTIES***DECLARATION of Michael Saliba . Document filed by Advantage Capital Holdings LLC, Kenneth King, 600 Partners LLC, 777 Partners LLC, ACM Delegate LLC, Dorchester Receivables II LLC, Haymarket Insurance Company, ING Capital LLC, Insurety Agency Services LLC, Insurety Capital LLP, Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, National Founders LP, Steven Pasko, Signal Medical Receivables LLC, Signal SML 4 LLC, Splcss III LLC, SuttonPark Capital LLC, SuttonPark Servicing LLC, Josh Wander. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Errata C, # 4 Exhibit D)Motion or Order to File Under Seal: 218 .(Watkins, Jonathan) (Entered: 10/18/2024) |
| 10/18/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Pretrial Conference set for 10/23/2024 at 03:30 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (Fletcher, Donnie) (Entered: 10/18/2024) |

A-33

| 10/18/2024 | 222 | ORDER granting 218 Letter Motion to Seal. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 10/18/2024) (sgz) (Entered: 10/21/2024) |
|---|---|---|
| 10/18/2024 | 223 | ORDER with respect to 216 Letter Motion to Stay ; with respect to 217 Letter Motion to Stay. The parties are directed to appear in connection with the motions to stay discovery by Defendants Josh Wander and Steve Pasko, on Thursday, October 24, 2024, at 3:00 p.m., in Courtroom 14A, 500 Pearl Street, New York, New York 10007. (Signed by Judge John G. Koeltl on 10/18/2024) (sgz) (Entered: 10/21/2024) |
| 10/18/2024 | | Set/Reset Hearings: Status Conference set for 10/24/2024 at 03:00 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (sgz) (Entered: 10/21/2024) |
| 10/21/2024 | 221 | **FILING ERROR - WRONG EVENT TYPE SELECTED (SEE 225 Letter Motion) -** LETTER RESPONSE to Motion addressed to Judge John G. Koeltl from Leigh M. Nathanson dated October 21, 2024 re: 206 MOTION to Stay . . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) Modified on 10/22/2024 (db). As per ECF-ERROR Email Correspondence received on 10/22/2024 @ 10:22am. (Entered: 10/21/2024) |
| 10/21/2024 | 224 | LETTER MOTION to Stay *Discovery,* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 21, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/21/2024) |
| 10/22/2024 | 225 | LETTER MOTION for Extension of Time to File Response/Reply *to Motions to Stay Discovery* addressed to Judge John G. Koeltl from Leigh M. Nathanson dated October 21, 2024. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 10/22/2024) |
| 10/22/2024 | 226 | NOTICE OF INTERLOCUTORY APPEAL from 146 Preliminary Injunction,,,,,,,. Document filed by Insurety Agency Services LLC, Dorchester Receivables II LLC, 777 Partners LLC, 600 Partners LLC, Splcss III LLC, Signal SML 4 LLC. Filing fee $ 605.00, receipt number ANYSDC-30079060. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(McCarthy, John) (Entered: 10/22/2024) |
| 10/22/2024 | 227 | ***SELECTED PARTIES*** LETTER addressed to Judge John G. Koeltl from Leigh M. Nathanson dated October 22, 2024 re: Plaintiffs Letter Concerning A-CAPs Oct. 18 2024 Letter. Document filed by Insurety Agency Services LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLP, SuttonPark Servicing LLC, Advantage Capital Holdings LLC, Leadenhall Capital Partners LLP, National Founders LP, Leadenhall Life Insurance Linked Investments Fund PLC, ING Capital LLC, Josh Wander, Haymarket Insurance Company, ACM Delegate LLC, Steven Pasko, Kenneth King, 777 Partners LLC, 600 Partners LLC, Splcss III LLC, Signal SML 4 LLC.Motion or Order to File Under Seal: 222 .(Nathanson, Leigh) (Entered: 10/22/2024) |
| 10/23/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 226 Notice of Interlocutory Appeal.(km) (Entered: 10/23/2024) |
| 10/23/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 226 Notice of Interlocutory Appeal, filed by 777 Partners LLC, 600 Partners LLC, Signal SML 4 LLC, Dorchester Receivables II LLC, Splcss III LLC, Insurety Agency Services LLC were transmitted to the U.S. Court of Appeals.(km) (Entered: 10/23/2024) |
| 10/23/2024 | 228 | NOTICE OF APPEARANCE by Jason Robert Alderson on behalf of ING Capital LLC.. (Alderson, Jason) (Entered: 10/23/2024) |

A-34

| | | |
|---|---|---|
| 10/23/2024 | 229 | LETTER MOTION to Seal *Courtroom* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 23, 2024. Document filed by Advantage Capital Holdings LLC, Kenneth King..(Watkins, Jonathan) (Entered: 10/23/2024) |
| 10/23/2024 | 230 | ***SELECTED PARTIES*** RESPONSE re: 227 Letter,, *re. LH Misstatements*. Document filed by Advantage Capital Holdings LLC, Kenneth King, Insurety Agency Services LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLP, SuttonPark Servicing LLC, Leadenhall Capital Partners LLP, National Founders LP, Leadenhall Life Insurance Linked Investments Fund PLC, ING Capital LLC, Josh Wander, Haymarket Insurance Company, ACM Delegate LLC, Steven Pasko, 777 Partners LLC, 600 Partners LLC, Splcss III LLC, Signal SML 4 LLC. Motion or Order to File Under Seal: 222 .(Watkins, Jonathan) (Entered: 10/23/2024) |
| 10/23/2024 | 231 | ORDER granting 67 Motion to Intervene; granting 110 Motion to Intervene; granting 139 Motion to Intervene. The Court will hold a status conference on Thursday, October 24, 2024, a 3:00 p.m. in Courtroom 14A, 500 Pearl St. New York, N.Y 10007. The Court notes that there are several motions to stay discovery and the Court intends to set a schedule to complete briefing. There is an open motion by Haymarket Insurance Company to intervene in connection with the motion for a preliminary injunction. ECF No. 139. The Court allowed Haymarket to be heard on that motion. The motion was granted to the extent Haymarket was heard on that motion. The Clerk should therefore close ECF No. 139. For similar reasons, the Clerk should close docket Nos. 67 and 110, the motions to intervene by National Founders L.P. and ING Capital LLC. A-CAP has asked for guidance on a proposed transaction. The Court sees no reason to close the Courtroom because the transaction is itself public. The parties should refrain from referring to any non-public aspects of the transaction. The Clerk is respectfully directed to close ECF Nos. 67, 110, and 139. SO ORDERED. (Signed by Judge John G. Koeltl on 10/23/2024) (tg) (Entered: 10/24/2024) |
| 10/23/2024 | | Set/Reset Hearings: Status Conference set for 10/24/2024 at 03:00 PM in Courtroom 14A, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (tg) (Entered: 10/24/2024) |
| 10/24/2024 | | Minute Entry for proceedings held before Judge John G. Koeltl: Status Conference held on 10/24/2024. (Fletcher, Donnie) (Entered: 10/24/2024) |
| 10/25/2024 | 232 | ORDER As discussed at the conference held today, the plaintiff should file its response to the motion to stay discovery on or before November 8, 2024. The defendants may reply by November 18, 2024. Responses to any outstanding discovery requests are adjourned until December 6, 2024. re: Status Conference ( Responses due by 11/8/2024, Replies due by 11/18/2024.) (Signed by Judge John G. Koeltl on 10/24/2024) (jjc) (jjc). (Entered: 10/25/2024) |
| 10/30/2024 | 233 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/24/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/20/2024. Redacted Transcript Deadline set for 12/2/2024. Release of Transcript Restriction set for 1/28/2025.. (McGuirk, Kelly) (Entered: 10/30/2024) |
| 10/30/2024 | 234 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/24/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this |

A-35

| | | |
|---|---|---|
| | | transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/30/2024) |
| 11/01/2024 | 235 | NOTICE OF CHANGE OF ADDRESS by Jordan Lancaster Estes on behalf of Josh Wander. New Address: Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY, 10166, 212-351-3906..(Estes, Jordan) (Entered: 11/01/2024) |
| 11/08/2024 | 236 | MEMORANDUM OF LAW in Opposition re: 206 MOTION to Stay ., 224 LETTER MOTION to Stay *Discovery,* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 21, 2024., 216 LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Christopher Harwood dated October 17, 2024., 217 LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Jordan Estes dated October 17, 2024. . Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 11/08/2024) |
| 11/08/2024 | 237 | DECLARATION of Leigh M. Nathanson in Opposition re: 206 MOTION to Stay ., 224 LETTER MOTION to Stay *Discovery,* addressed to Judge John G. Koeltl from Jonathan M. Watkins dated October 21, 2024., 216 LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Christopher Harwood dated October 17, 2024., 217 LETTER MOTION to Stay *Discovery* addressed to Judge John G. Koeltl from Jordan Estes dated October 17, 2024.. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC. (Attachments: # 1 Exhibit A - Ltr. from L. Nathanson to J. McCarthy re Information Requests, # 2 Exhibit B - McCarthy Response Ltr. to L. Nathanson, # 3 Exhibit C - A-CAP and Mr. King's First Requests for Production of Documents).(Nathanson, Leigh) (Entered: 11/08/2024) |
| 11/12/2024 | 238 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/24/2024 before Judge John G. Koeltl. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/3/2024. Redacted Transcript Deadline set for 12/13/2024. Release of Transcript Restriction set for 2/10/2025.. (McGuirk, Kelly) (Entered: 11/12/2024) |
| 11/12/2024 | 239 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/24/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 11/12/2024) |
| 11/14/2024 | 240 | LETTER addressed to Judge John G. Koeltl from Leigh Nathanson dated November 14, 2024 re: Leadenhall's Single, Omnibus Opposition to Defendants' Motions to Dismiss. Document filed by Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC..(Nathanson, Leigh) (Entered: 11/14/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/15/2024 16:59:29 | | | |
| **PACER Login:** | Jrchmax35 | **Client Code:** | 17987.001.15927 |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-03453-JGK |

A-36

11/15/24, 5:00 PM                                        SDNY CM/ECF NextGen Version 1.7

| **Billable Pages:** | 30 | **Cost:** | 3.00 |
|---|---|---|---|

A-37

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, | Civil Action No. _____ |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, | |
| Defendants. | |

Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life," and collectively, "Leadenhall"), in their respective capacities as investment managers and/or agents, allege against Defendants Josh Wander, Steven Pasko, Kenneth King, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC ("SuttonPark Borrower"), Signal SML 4 LLC ("Signal Borrower"), Insurety Agency Services LLC ("Insurety Borrower"), Dorchester Receivables II LLC ("Dorchester Borrower"), SuttonPark Capital LLC ("SuttonPark Capital"), Signal Medical Receivables LLC ("Signal Medical"), Insurety Capital LLC ("Insurety Capital"), SuttonPark Servicing LLC (the "SuttonPark Servicer"), Signal Servicing LLC ("Signal Servicer"), Insurety

A-38

Servicing LLC ("Insurety Servicer"), and Advantage Capital Holdings LLC ("A-CAP") as follows.

## INTRODUCTION

1.     This action concerns a years-long pattern of fraud perpetrated on the lenders of hundreds of millions of dollars of debt by a group of entities operating under the domination and control of Defendants Josh Wander, Steven Pasko, and Kenneth King.  Leadenhall is the agent with the authority to bring this action for the benefit of investors in the lenders.

2.     To induce Leadenhall to fund their operation, Wander, along with his group of alter ego entities, "pledged" over $350 million in assets as collateral to Leadenhall, knowing all along that the assets either did not exist, were not actually owned by Wander's entities, or had already been pledged to another lender.  Wander has already admitted to rampant and fundamental breaches of the parties' agreements—the only question now is whether Leadenhall will be able to recover millions of dollars in damages from a house of cards on the brink of collapse.

3.     A credit facility is an agreement that allows borrowers to borrow money over an extended period of time—here, from May 2021 through September 2024—providing borrowers flexibility to use the funds as necessary for their day-to-day operations.  In a "borrowing base" credit facility, the borrowers may draw funds from the facility up to the amount of their credit limit, which is based on the value of the collateral securing the debt, *i.e.*, the borrowers' "borrowing base."

4.     On May 7, 2021, Leadenhall entered into a credit facility agreement with a group of limited liability companies, the ultimate parent companies of which are 777 Partners and 600 Partners, as memorialized in a Loan and Security Agreement (the "LSA").  777 Partners and 600 Partners are the trade names and alter egos of Josh Wander and Steven Pasko, who are the founders and so-called "Managing Partners" of 777 Partners and 600 Partners.

2

A-39

5.       Under its express terms, the credit facility was a secured facility, meaning that the borrowers were required to pledge collateral to secure the debt notes and own that collateral "free and clear" of any other security interest.  The borrowers were afforded a lower interest rate because the debt was secured.  And because the value of the borrowers' assets also functioned as the borrowing base, the borrowers were required to re-affirm, on a monthly basis and each time they drew funds from the facility, that they owned any assets pledged as collateral to Leadenhall "free and clear" of any other interests.

6.       *In other words, the cardinal rule of the entire financing arrangement was that the borrowers were required to own the assets pledged as collateral 'free and clear" of any other security interests*.  If the borrowers did not actually own the assets pledged as collateral, or if the borrowers had already pledged those assets to another lender, the entire facility would effectively become an illegal and unsecured personal piggy bank that an individual like Wander could use to finance risky private equity investments in aviation, media, and sports including professional football (soccer) teams, while paying lower rates under the pretense of secured financing.  As it turned out, that is exactly what happened here.

7.       In September 2022, more than a year and a half into the credit facility and after the borrowers had represented to Leadenhall more than 40 separate times that the collateral pledged to secure the debt was "free and clear" of any other security interest, Leadenhall received an anonymous e-mail stating that Wander "either never bought" the assets that he had pledged to Leadenhall as collateral "or already pledged them to another lender."  The tipster revealed as to Wander: "*What he is doing is criminal*."

8.       After receiving the anonymous tip, Leadenhall launched an investigation and requested information from 777 Partners to determine whether this outstanding debt from the

3

A-40

lenders to Wander's companies—totaling well into the hundreds of millions of dollars—was in fact secured.

9.      Unfortunately for Leadenhall, the tip accusing Wander of criminal activity proved to be true.  In March 2023, a third-party lender to 777 Partners called Credigy shared with Leadenhall a list of assets that 777 Partners had ostensibly pledged for the exclusive benefit of Credigy pursuant to a separate credit arrangement with 777 Partners.

10.      By reviewing the list of assets pledged to Credigy, Leadenhall discovered that over 1,600 assets worth approximately $185 million, which 777 Partners had purportedly pledged to Leadenhall, had in fact been "double-pledged"—*i.e.*, the same collateral had been pledged to *both* Credigy and Leadenhall.

11.      During conference calls in March and April 2023, recorded with Wander's permission, Wander attempted to defuse the situation by acknowledging just the tip of the iceberg, referring to the double-pledged collateral as "embarrassing," a "mistake," and a problem that he vowed to resolve—and freely admitting that 777 Partners had breached the parties' agreements while insisting that it had done so inadvertently.  But, to conceal his broader scheme, Wander lied, assuring Leadenhall that the collateral shortfall in breach of the LSA was the result of a recording glitch that could and would be easily remedied.

12.      As a result of those conference calls, Leadenhall began to discern that Wander's misrepresentations concerning Leadenhall's collateral constituted just the opening act, and that 777 Partners does not even control its own operations and ability to perform under the LSA.  The Wizard of Oz behind the 777 Partners' curtain is in fact an insurance group holding company called Advantage Capital Holdings LLC ("A-CAP").  Wander disclosed on the calls that A-CAP had a first-priority "all asset lien" over all of the assets of 777 Partners.

4

A-41

13.     In an effort to "replace" the double-pledged collateral with other security interests and continue to keep Leadenhall from filing this lawsuit, in the summer of 2023, A-CAP offered Leadenhall a fourth-priority position on the assets of 777 Partners' holding company—*i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall declined the offer.

14.     Around the same time that A-CAP's unusual role in 777 Partners' affairs became privately known to Leadenhall, the entanglement between 777 Partners and A-CAP became the subject of extensive public reporting.  A-CAP, dominated and controlled by its "Chairman and CEO" Kenneth King, was reportedly the "silent partner" behind Wander's businesses who both sits on the committee that oversees 777 Partners' investments and provides the "financial firepower" to fuel 777 Partners' dealmaking—reportedly to the tune of at least $1 billion in loans, but in actuality more than double that amount, from A-CAP and affiliates to 777 Partners and affiliates.

15.     The entire scheme reached an inflection point in early 2024, when an employee of one of Wander's companies that is a party to Leadenhall's LSA disclosed to Leadenhall that, in an attempt to prevent Leadenhall from confirming that collateral had been double-pledged, Wander-affiliated borrowers had submitted forged financial statements to Leadenhall following Leadenhall's receipt of the anonymous tip. Wander's employee also disclosed that, prior to on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered internal records to try to cover up the double-pledge of collateral.  The insider also disclosed that the boundaries between A-CAP and 777 Partners did not really exist at all—specifically, A-CAP had dictated an express agreement with 777 Partners which granted A-CAP the right to control all facets of 777 Partners' operations.

A-42

16.     As a result of the agreement between 777 Partners and A-CAP, King and A-CAP must approve every material decision that 777 Partners makes, meaning that, upon information and belief, A-CAP was well aware that Wander's entities had been double-pledging assets as collateral to purportedly secure multiple lines of credit before Leadenhall discovered the double-pledging.

17.     Since Leadenhall discovered the fraudulent scheme alleged herein, public scrutiny over 777 Partners' obfuscation of its own finances and inability to pay its bills has only intensified. This scrutiny could not come at a worse time for Wander, who is currently trying to close an acquisition of the Everton Football Club, a historic football team in the prestigious English Premier League.

18.     Everton is the latest shiny object of Wander's fraudulent scheme, solvency aside. Despite the fact that 777 Partners and many of the operating businesses and professional football teams that Wander owns are deep in debt, behind on their obligations, and on thin ice with regulators, Wander's strategy has been continued expansion—using debt to acquire new assets that he can then use as collateral for more debt, which he then fails to timely pay off, in a seemingly never-ending cycle of "robbing Peter to pay Paul."

19.     Upon information and belief, Wander and Pasko are operating a giant shell game at best, and an outright Ponzi scheme at worst, that takes money in from investors and lenders and shuffles it around to various money-losing alter egos in the enterprise to disguise their true financial condition.  The enterprise is propped up and able to attract new lenders and investors only by the patronage of A-CAP, which pays off the enterprise's last-minute obligations—including 777 Partners' own payroll—in "Whac-A-Mole" fashion to keep 777 Partners' creditors at bay, if only temporarily, and to avoid the entire scheme from being laid bare in public.

6

A-43

20.     In March 2024, as a result of the agreement between A-CAP and 777 Partners granting A-CAP the right to control 777 Partners' operations, A-CAP prevented 777 Partners from committing to repay the obligations owed to Leadenhall pursuant to an agreed-upon amortization schedule.  During these negotiations, Wander was straightforward when questioned on whether A-CAP was the puppeteer behind the 777 Partners marionette:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

21.     Leadenhall has been forced to bring this action to hold Wander, King, Pasko, 777 Partners, A-CAP, and their affiliated entities liable for their pattern of contractual breaches and fraud, which together constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

## PARTIES

### Plaintiffs

22.     Plaintiff Leadenhall Capital is a London-based asset management company which focuses on granting institutional investors access to insurance-related risks.  Leadenhall Capital is organized as a limited liability partnership under the laws of England and maintains its principal place of business in London, England at Level 15, 70 Mark Lane, London EC3R 7NQ.  Leadenhall Capital's partners are John Wells, Luca Albertini, Lorenzo Volpi, Craig Gillespie, Tom Spreutels, Phil Kane, Chris Learmonth, Kelvin Granger, and Kunal Shah—all domiciliaries of the United Kingdom; Ben Adolph—a domiciliary of Bermuda; and Mitsui Sumitomo Insurance Company Limited—a Japanese corporation with its principal place of business in Japan.  Leadenhall Capital is the Investment Manager and Administrative Agent for the lenders under the LSA, in which

A-44

capacity it may execute a variety of functions under the LSA and associated agreements, including bringing this action on behalf of the lenders.  *See* LSA § 8.01.

23.     Plaintiff Leadenhall Life is an investment company organized as a public limited company under the laws of Ireland which maintains its principal place of business in Dublin, Ireland.  Leadenhall Life is the Collateral Agent pursuant to the LSA and, in that capacity, holds the security interests in the Collateral pledged for the benefit of the lenders under the LSA.

**Defendants**

24.     Defendant 777 Partners is a Miami-based private investment firm organized as a limited liability company under the laws of Delaware which has its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131 (the "777 Partners Address").  The company is nominally focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 777 Partners has one member, SuttonPark Acquisition LLC, which is organized under the laws of Delaware and has its principal place of business in Florida.  SuttonPark Acquisition LLC has two members, JARM Capital LLC and MTCP LLC, both of which are organized under the laws of Delaware and have their principal places of business in Florida.  The sole member of JARM Capital LLC is Josh Wander, and the sole member of MTCP LLC is Steven Pasko.

25.     Defendant 600 Partners is a Miami-based private equity firm organized as a limited liability company under the laws of Delaware which has its principal place of business at the 777 Partners Address.  Like 777 Partners, 600 Partners characterizes itself as focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 600 Partners has one member: SPA II LLC, which is organized under the laws of Delaware and

has its principal place of business in Florida; and SPA II LLC has two members, MTCP LLC and Steven Pasko.

26.     Collectively, 777 Partners and 600 Partners own 100% of the equity of each of the entities acting as Sellers and Servicers under the LSA, and the Seller entities in turn own 100% of the equity of each of the entities acting as Borrowers (defined below) under the LSA.  While Josh Wander and Steven Pasko have designed the corporate structure of their web of entities to obscure their domination over the organization, Wander and Pasko, in consultation with—and with the approval and indulgence of—King and A-CAP as discussed herein, control 777 Partners, 600 Partners, and each of their subsidiaries and affiliates, including those named as Defendants here.

27.     Defendant Josh Wander is co-founder and Managing Partner of 777 Partners and 600 Partners, and he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Upon information and belief, Wander's permanent residence is 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.

28.     Defendant Steven Pasko is the other co-founder and Managing Partner of 777 Partners and 600 Partners, and, upon information and belief, he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Upon information and belief, Pasko's permanent residence is 1451 Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131.

29.     Defendant SPLCSS III LLC (defined above as the "SuttonPark Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Defendant SuttonPark Servicing LLC (defined above as "SuttonPark Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at 590 Madison Avenue, 15th Floor, New York, New York 10022.  Upon information and belief, the SuttonPark Borrower and SuttonPark Servicer have the same

9

A-46

sole member, Defendant SuttonPark Capital LLC (defined above as "SuttonPark Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, SuttonPark Capital has two members, 600 Partners and SPC Partners LLC. Upon information and belief, the members of SPC Partners LLC are all domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

30.    Defendant Dorchester Receivables II LLC (the "Dorchester Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, the Dorchester Borrower has one member, Defendant SuttonPark Capital. As set forth above, the members of SuttonPark Capital are 600 Partners and SPC Partners LLC, which are domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

31.    Defendant Signal SML 4 LLC (defined above as the "Signal Borrower," and together with the SuttonPark and Dorchester Borrowers, the "Borrowers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, the Signal Borrower has one member, Defendant Signal Medical Receivables LLC (defined above as "Signal Medical"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address, and which is a Seller under the LSA. Defendant Signal Servicing LLC (defined above as "Signal Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, Signal Medical and Signal Servicer each have the same sole member, Signal Financial Holdings LLC, and Signal Financial Holdings LLC is managed by Wander, who runs his businesses out of

10

Miami, Florida, and there is no connection between Signal Financial Holdings LLC and the United Kingdom or Bermuda. Upon information and belief, the members of Signal Medical are all domiciled in one or more states and not in the United Kingdom, Bermuda, Ireland, or Japan.

32.    Defendant Insurety Agency Services LLC (defined above as the "Insurety Borrower," and, together with the SuttonPark, Dorchester, and Signal Borrowers, the "Borrowers") is a limited liability company organized under the laws of Florida and which has its principal place of business at the 777 Partners Address. Defendant Insurety Servicing LLC (defined above as "Insurety Servicer," and, together with SuttonPark Servicer and Signal Servicer, the "Servicers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. The Insurety Borrower and Insurety Servicer have the same sole member, Defendant Insurety Capital LLC (defined above as "Insurety Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, Insurety Capital has two members, 777 Partners and John R. Zirkelbach, a natural person domiciled in Ohio, neither of which are domiciled in the United Kingdom, Bermuda, Ireland, or Japan.

33.    Advantage Capital Holdings LLC (defined above as "A-CAP") is a limited liability company organized under the laws of Delaware and has its principal place of business at 1180 Avenue of the Americas, 21st Floor, New York, New York 10036. A-CAP is controlled and dominated by Kenneth King, who is domiciled in New York. Upon information and belief, the members of A-CAP are all domiciled in one or more states of the United States and not in the United Kingdom, Bermuda, Ireland, or Japan.

34.    Defendant Kenneth King is the Chairman and CEO of Advantage Capital Management LLC (defined above as "A-CAP") and owns a controlling stake in A-CAP. Upon

11

A-48

information and belief, King's permanent residences are 15 Kensington Road, Unit 215, Bronxville, New York 10709 and 26 Wilton Road, Pleasantville, New York 10570.

## JURISDICTION AND VENUE

35.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted a claim arising under the RICO Act, 18 U.S.C. § 1964. This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

36.    The Court also has diversity jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of the United Kingdom, Ireland, Japan, and Bermuda, and, upon information and belief, Defendants are citizens of Florida, Delaware, Ohio, and New York.

37.    This Court has personal jurisdiction over Defendants 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, the Insurety Borrower, SuttonPark Capital, Signal Medical, and Insurety Capital by the terms of the LSA, which provide that these Defendants have consented to the jurisdiction of courts sitting in New York. *See* LSA § 10.09; Guaranty Agreement § 15.

38.    This Court has personal jurisdiction over Defendant Josh Wander by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers. The Court also has personal jurisdiction over Wander because—while attempting to negotiate an agreement with Leadenhall in March and April 2024 to pay back the debt that the Borrowers had borrowed in excess of contractual limitations—Wander repeatedly called Leadenhall representatives from New York City, and on at least one occasion, worked out of A-CAP's headquarters in New York City.

39.    This Court has personal jurisdiction over Defendant Steven Pasko by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers,

12

A-49

and the Servicers.  The Court also has personal jurisdiction over Defendant Steven Pasko by virtue of his signing the LSA on behalf of the Defendant signatories thereto, and because Pasko is so closely related to those Defendant signatories that he is bound by the LSA's forum selection clause.

40.     This Court has personal jurisdiction over Defendants A-CAP and Kenneth King because they are domiciled in New York.

41.     Venue is proper under 28 U.S.C. § 1391 because all Defendants are residents of the state of New York by domicile or the express terms of the LSA or Guaranty Agreement.  Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants, including but not limited to A-CAP, reside, are found, and/or transact their affairs in this district.

## STATEMENT OF THE CASE

### The Credit Facility

42.     Wander, through his trade name 777 Partners and its subsidiaries and affiliates, invests in, among other things, various forms of "receivables."  Relevant to this action, those receivables include future cash flows from so-called "structured settlements" and lottery winnings. A "structured settlement" allows an injured plaintiff, typically in a personal injury suit, to receive a settlement or damages award over time in periodic payments rather than as a lump-sum payment.

43.     This form of investment business runs on buying future cash flows from injured parties or lottery winners who are entitled to large amounts of money over a long period of time, but who need more money in the near term than those cash flows permit, and who are thus willing to sell their future cash flows for a lump sum that is a percentage of the present value.

44.     Wander uses the profits from this business both to purchase additional receivables and to infuse capital into other ventures, including Wander's interests in professional football clubs.  To accelerate the profits from this business, Wander increased the leverage on his

13

A-50

investments by borrowing against existing receivables portfolios, and using those loans to buy more receivables—rinse and repeat.

45. In 2021, following the expiration of a prior credit facility between the parties, Wander, Pasko, 777 Partners, 600 Partners, and certain entities they control named as Defendants herein entered into a new credit facility with Leadenhall, as detailed more fully below. The credit facility is embodied in a suite of contracts, at the center of which sits the LSA, executed May 7, 2021. In addition to the LSA, the parties entered Sale Agreements, Servicing Agreements, Pledge Agreements, and a Guaranty Agreement (the "Agreements"), each of which is explained in turn below. Collectively, the Agreements define the relationships between the following entities:

     a. Leadenhall Capital, which acts as Administrative Agent to the Lenders (as defined below) under the LSA, fielding borrowing requests from Borrowers, facilitating the funding of debt, and enforcing the Lenders' rights and remedies in the event of a material breach or "Event of Default";

     b. Leadenhall Life, which acts as Collateral Agent for the Lenders under the LSA, holding security interests in the receivables and related assets owned and pledged as collateral by the Borrowers, as well as 100% of the equity in the Borrowers, to secure the Lenders' debt;

     c. The Lenders, a group of nine investment funds or separate accounts for which Leadenhall Capital acts as investment manager and agent, which provided secured debt to the Borrowers pursuant to the LSA;

     d. The Borrowers, a group of four firms, all controlled by 777 Partners and 600 Partners, which borrowed secured debt from the Lenders pursuant to the LSA;

14

A-51

e. The Sellers, a group of three firms, all controlled by 777 Partners and 600 Partners, which sold receivables to the Borrowers to secure debt provided under the LSA, and which also fully owned the Borrowers and pledged their equity in the Borrowers to Leadenhall Life as collateral for the LSA pursuant to the Pledge Agreements;

f. The Servicers, a group of three firms controlled by 777 Partners and 600 Partners that agreed to service the receivables on behalf of the Borrowers and for the benefit of Leadenhall Capital as Administrative Agent; and

g. The Guarantors, 777 Partners and 600 Partners, which guaranteed all of the Borrowers' obligations under the LSA and the other Agreements.

46.     The entities controlled by 777 Partners and 600 Partners were further organized, for purposes of their rights and obligations under the LSA, into Borrower Groups each consisting of one Borrower, the Seller that owned that Borrower, and one Servicer, and each corresponding to a particular Lender Group consisting of some or all of the nine Lender entities:

a. The SPLCSS Borrower Group consisted of the SuttonPark Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

b. The Dorchester Borrower Group consisted of the Dorchester Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

c. The Insurety Borrower Group consisted of the Insurety Borrower as Borrower, Insurety Capital as Seller, and Insurety Servicer as Servicer; and

d. The Signal Borrower Group consisted of the Signal Borrower as Borrower, Signal Medical as Seller, and Signal Servicer as Servicer.

47.     To put all of the Agreements together, in brief:

15

A-52

a. **the LSA** set forth the terms on which the Lenders would provide debt secured by collateral owned by the Borrowers;

b. **the Sale Agreements** set forth the terms on which the Sellers could sell or assign assets as Collateral to the Borrowers to secure that debt;

c. **the Servicing Agreements** set forth the terms under which the Servicers would service the Collateral held by the Borrowers to ensure it did not become impaired;

d. **the Pledge Agreements** provided an additional source of Collateral in the form of pledges of the 100% equity interests in the Borrowers; and

e. **the Guaranty Agreement** provided guarantees by 777 Partners and 600 Partners of all of the Borrowers' obligations under the Agreements.

48.    Reflecting his control over 777 Partners and each of the various underlying entities, Pasko executed each of the governing Agreements on behalf of the 777 Partners entities.

**Loan and Security Agreement**

49.    The LSA is structured as a secured credit facility whereby the Borrowers were permitted to borrow secured debt from the Lenders from time to time on an ongoing basis through September 30, 2024, or until the occurrence of an "Event of Default."

50.    The "Lenders" are comprised of nine investment funds or separate accounts. Leadenhall has the authority under the LSA to act on behalf of the Lenders and brings this action in its capacity as agent for the Lenders. LSA § 8.01 ("Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative

16

A-53

Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.").[1]

51.     In exchange for providing debt to the Borrowers, the Lenders were paid interest, and Leadenhall Life, as Collateral Agent, obtained first-priority security interests in all of the assets of each Borrower, including but not limited to the receivables and related assets held by the Borrowers (the "Collateral").  *See* LSA § 2.15; *id.* art. I, "Collateral."

52.     The LSA imposed the equivalent of a credit limit on each Borrower, referred to as a "Borrowing Base," based on the value of each Borrower's receivables, which was designed to ensure that each Borrower always had enough Collateral to secure its borrowings.  Each Borrowing Base was calculated using a formula specific to the Borrower—the main component of which was the value of that Borrower's receivables, with certain adjustments.  *See* LSA "Borrowing Base," LSA Schedules VIII, IX, X, and XI.  A misrepresentation as to the value of that Borrowing Base would constitute a misrepresentation as to both the owned Collateral and the Borrowing Base.

53.     In the event the principal value of the total debt of a single Borrower ever exceeded its Borrowing Base—known as a "Borrowing Base Deficiency"—and such deficiency was not cured within three business days, it would constitute a "Borrower Group Event of Default."  Upon a Borrower Group Event of Default, Leadenhall was entitled to accelerate the entire amount of that Borrowing Group's outstanding debt and pursue remedies under the LSA and the Uniform Commercial Code on behalf of the relevant Lenders against that Borrowing Group's Collateral. LSA § 7.02(g); *id.* Art. I, "Borrowing Base Deficiency."  If the Borrowing Base Deficiency was not cured in thirty days, it would constitute a "Facility Event of Default," which would entitle

---

[1]  *See also* LSA § 8.03 ("The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a 'Lender' under this Agreement as any other Lender and may exercise the same as though it were not the Administrative Agent.").

A-54

Leadenhall to accelerate the entire amount of the outstanding debt and pursue the same remedies against all four Borrower Groups. *Id.*, § 7.01(c).

54.     If the Borrowers wanted to borrow more, the Agreements allowed them to do so by purchasing more receivables from the Sellers pursuant to the respective Sale Agreement, thereby increasing the Borrower's Borrowing Base.   *See* LSA Article I, "Borrowing Base Limitation," "Sub-Facility Limit"; *id.* §§ 2.01(a), 3.02(c).

55.     What the Borrowers could ***not*** do under the LSA was put receivables on their books that they either did not own or that were already on the books of another of Wander and Pasko's portfolio companies—pledged to some other lender, securing some other loan.

56.     The Agreements contained additional provisions to guard proactively against such defaults, rather than waiting for them to be discovered.  For instance, each time a Borrower made a "Borrowing Request" to Leadenhall Capital, *id.* at § 2.03, the Servicer had to submit a "Compliance Report" setting forth a calculation of the Borrowing Base, a representation that the Borrowing Base Limitation had not been exceeded, an affirmation that each of the representations and warranties in the LSA remained true and correct, and a representation that no Event of Default had occurred.  *See* LSA, Annex A-1.

57.     Additionally, the LSA required each Servicer to prepare a Monthly Report for its associated Borrower concerning the receivables and other assets held by that Borrower, which could not "include any Receivable that is not an Eligible Receivable . . . in the calculation of the Borrowing Base."  LSA § 5.01(j)(i).  Each Borrower's representations and warranties were renewed as of the date of each Compliance Report and each Monthly Report. *Id.*, § 4.01.

58.     Over the course of the credit facility, on behalf of the Servicers, Steven Pasko was the authorized signatory for Monthly Reports and Compliance Reports.

18

A-55

**Pledge Agreements**

59.    In addition to the security interests in the Borrowers' Collateral under the LSA, and Leadenhall Life's remedies thereunder, the Lenders' investments were meant to be protected by at least four other sets of agreements granting Leadenhall additional rights and remedies:  the Pledge Agreements, Sale Agreements, Servicing Agreements, and Guaranty Agreement, all of which were executed the same day as and in conjunction with the LSA.

60.    Leadenhall Life entered into four separate Pledge Agreements as additional protection in providing hundreds of millions of dollars of debt to the Borrowers.  In particular, Leadenhall Life entered into Pledge Agreements with each of the three Seller entities that, in turn, owned 100% of each of the four Borrowers:

  a.  SuttonPark Capital LLC (*i.e.*, "SuttonPark Capital"), which owned 100% of Dorchester Receivables II LLC (*i.e.*, the "Dorchester Borrower") and SPLCSS III LLC (*i.e.*, the "SPLCSS Borrower");

  b.  Insurety Capital LLC (*i.e.*, "Insurety Capital"), which owned 100% of Insurety Agency Services LLC (*i.e.*, the "Insurety Borrower"); and

  c.  Signal Medical Receivables LLC (*i.e.*, the "Signal Seller"), which owned 100% of Signal SML 4 LLC (*i.e.*, the "Signal Borrower").

61.    Each Borrower represented and warranted in § 4.01(l) of the LSA that it was owned 100% by the Sellers, and any change in that 100% ownership constituted an event of default pursuant to § 7.02(m).  LSA Article 1, "Change in Control."

62.    Under § 2.1 of each Pledge Agreement, each Seller pledged 100% membership interests in each Borrower, along with all present and future claims and all proceeds related thereto, to Leadenhall Life as additional security for the Borrowers' obligations.

19

A-56

63.     The remedies available under the Pledge Agreements were structured in a similar way to those available under the LSA.  In the event of a Borrower Group Event of Default, Leadenhall Life could exercise remedies with respect to the defaulting Borrower Group—*i.e.*, against that specific Seller's equity in a specific Borrower under the respective Pledge Agreement. *See* Pledge Agreements § 4.01.  A Facility Event of Default would trigger remedies under all four Pledge Agreements, thereby allowing Leadenhall Life to proceed against the equity of all of the Borrowers at once.  *Id.*

64.     The Pledge Agreements were principally between each Seller (as Pledgor) and Leadenhall Life, but each also was acknowledged by the respective Borrower wholly owned by the signatory seller.  Section 6.11 provides that, upon an Event of Default under the LSA, the Borrower "will comply with instructions originated by the Collateral Agent with respect to the Pledged Collateral without further consent of the Pledgor."

**Sale Agreements**

65.     Each of the Borrowers also entered into a Sale Agreement with the respective Seller in its Borrower Group.  The Sale Agreements set forth the terms under which the Borrowers would purchase additional receivables from the Sellers, which receivables, once purchased, would become Collateral and would factor into the Borrowing Base, enabling the Borrowers to borrow more from the Lenders.

66.     The Sale Agreements provided that the Borrowers could purchase receivables from the Sellers even if the Borrowers did not have cash on hand to pay for them, in which case "such excess shall be deemed to be a contribution to the capital of the Purchaser by the Seller on such date and the Purchaser shall increase the Seller's aggregate investment in the Purchaser accordingly in accordance with New York law."  Sale Agreements § 2.07(b).

A-57

67.     In the Sale Agreements, each Seller also acknowledged the security interests the Borrowers would grant to Leadenhall Life under the LSA, as well as that Leadenhall Life would "have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the Purchaser's rights and remedies under this Agreement." *Id.* § 2.05.

68.     Over the course of the credit facility, Steven Pasko was the authorized signatory on sales or "assignments" from the Sellers to the Borrowers.

**Servicing Agreements**

69.     Each of the Borrowers and related Sellers in each Borrower Group also entered into a Servicing Agreement with the respective Servicer in the Borrower Group.  The Servicing Agreements provide for the Servicers to service receivables held by their respective Borrowers, including by collecting payments and executing required documentation.  Servicing Agreements § 3.1.  In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced.  Servicing Agreements § 5.1.  The "Valuation Amount" of those receivables used to calculate Servicing Fees is the same as is used to calculate each Borrowers' Borrowing Base.  LSA Schedules VIII, IX, X, XI.

70.     The Servicers were also responsible, under the LSA and the Servicing Agreements, for delivering Monthly Reports and Compliance Reports to Leadenhall Capital as Administrative Agent, including accurately calculating their respective Borrowers' Borrowing Bases.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

71.     Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written

statement is delivered," and each Servicer agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report.  LSA §§ 6.06(a), 6.07(c).

72.     The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

73.     The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

**Guaranty Agreement**

74.     The final security for Leadenhall and the Lenders' investments came from a Guaranty Agreement between Leadenhall Capital on the one hand, and 777 Partners and 600 Partners on the other.  777 Partners and 600 Partners (referred to as "Guarantors" in the Guaranty Agreement) guaranteed the obligations of each of the Borrowers.  As recited in the Guaranty Agreement, each of 777 Partners and 600 Partners "is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement, and the other Transaction Documents."  *See* Guaranty Agreement at 1.

75.     Under the Guaranty Agreement, Leadenhall and the Lenders are defined as the "Recipients," and 777 Partners and 600 Partners each "jointly and severally absolutely,

A-59

unconditionally and irrevocably guarantee[d] to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower [and the Insurety Borrower Group and Signal Borrower Group, subject to certain Guaranty Limits], in each case, so long as a Trigger Event has occurred and is continuing . . . ."  Guaranty Agreement § 2(a).

76.     The Guaranty Agreement defines a "Trigger Event" to include the occurrence of any of the following events, among others:

> (i) **any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement**;

> (ii) **any act of theft or misappropriation of funds by either Guarantor** under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

> (iii) **any willful misrepresentation of a material nature by either Guarantor** under this Guaranty;

> […]

> (ix) **any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances** (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days; … or

> […]

> (xi) **any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise or enforcement of its rights and remedies against any Collateral** under the Transaction Documents or under Requirements of Law.

A-60

*Id.* at § 1, "Trigger Event."[2]

77.    The "Guaranteed Obligations" backed up by 777 Partners and 600 Partners included, the "Obligations" of the Borrowers, *id.* at § 1, "Guaranteed Obligations," which is defined under the LSA as, "with respect to each Borrower, the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA Article I, "Guaranteed Obligations."

**Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests.**

78.    The centerpiece of the credit facility is that the Collateral pledged for the benefit of the Lenders is pledged ***solely*** for the benefit the Lenders and remains free and clear of any "Adverse Claims." This thread runs through all of the Agreements as stated in the provisions set forth below.

79.    *First*, under the LSA, each Borrower made the following representation upon the execution of the Loan and Security Agreement, the date on which any borrowing was made by the Borrowers (a "Borrowing Date"), and on the date of each Monthly Report and each Compliance Report: "***Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim.***" LSA § 4.01(h).

80.    An "Adverse Claim" is defined in LSA § 1.01 as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement," and it has the same meaning in the Pledge Agreements, Sale Agreements, and Guaranty Agreement. Pledge Agreements § 1.1; Sale Agreements § 1; Guaranty Agreement § 1.

---

2    Any emphasis herein is added unless otherwise noted.

24

A-61

81.     *Second*, under the LSA, each Borrower made the following representation throughout the term of the borrowing relationship: "*[S]uch Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral*, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof." LSA § 5.01(d).

82.     *Third*, under the LSA, each Borrower makes the following representation throughout the term of the borrowing relationship: "Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) *or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person* . . . ." LSA § 5.01(k)(vi).

83.     *Fourth*, the LSA makes clear that a "Facility Event of Default" occurs whenever the security interest in the Collateral "*shall for any reason cease to be a valid and perfected first priority security interest*." LSA § 7.01(d).  Unlike other grounds for a Facility Event of Default, which apply only once a breach has continued for thirty days without being cured, any failure of any security interest "to be a valid and perfected first priority security interest" would cause *every* Borrower to be in default after only two days.  *Id.*

84.     *Fifth*, the LSA provides a right to indemnification for any losses arising out of the Borrowers' failure to vest a security interest in the Collateral free and clear of Adverse Claims: "[E]ach Borrower shall pay *on demand* to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from . . . *the failure to vest in the Collateral Agent on behalf of the Secured Parties*

A-62

*a valid and perfected security interest in the Collateral free and clear of any Adverse Claim* . . . ." LSA § 9.01(iv).

85.     *Sixth*, under the LSA, each Servicer represented that **"[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.**" LSA § 6.07(c).

86.     *Seventh*, under the Sale Agreements, each Sellers agreed with their respective Borrowers that any sale of collateral shall be "an absolute sale and transfer by the Seller (free and clear of any Adverse Claim . . . )," and each Seller represented and warranted to its respective Borrowers that, "[a]s of the applicable Purchase Date . . . , *the Seller is legal and beneficial owner of the applicable Transferred Asset free and clear of any Adverse Claim*," with certain exceptions not relevant here.  Sale Agreements §§ 2.07, 4.01(h).  Each Seller also covenants that it "*will not sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on, any Transferred Asset*, whether now existing or hereafter created, or any interest therein."  *Id.* at § 5.01(f).

87.     *Eighth*, under the Guaranty Agreements, 777 Partners and 600 Partners guarantee **all** of the Borrowers' obligations described above, and one of the specified "Trigger Events" is "*any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances* . . . ."  Guaranty Agreement § 1.

88.     In summary, the credit facility implemented by the Agreements depended on the Borrowers owning sufficient Collateral to secure debt they took on from the Lenders, and the Agreements took pains at every turn to ensure that (1) the Collateral securing the debt was free

A-63

and clear of any Adverse Claims that could interfere with the Lenders' remedies in the event of a default and, (2) if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default, and Leadenhall and the Lenders could proceed against all of the Collateral that the Borrowers currently owned, obtain additional receivables to recoup their investment, and otherwise proceed against 777 Partners and 600 Partners for the full values of the debt.

**Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral.**

**Leadenhall receives an anonymous tip sounding the alarm on Wander's "criminal" scheme.**

89.     In May 2021, pursuant to the terms of the LSA, the Borrowers began making borrowing requests to Leadenhall, taking out debt, and delivering required Monthly Reports and Compliance Reports.

90.     The first periodic reports delivered by the SuttonPark and Dorchester Servicers reflected "Outstanding Borrowings" of approximately $300 million and $80 million, respectively, and contained a list of each Borrower's assets, a calculation of the Borrowing Base based on those assets, and a representation as to whether outstanding borrowings were in compliance with the Borrowing Base.  An excerpt from the May 2021 Monthly Report delivered by the SuttonPark Servicer—reflecting a listing of "life contingent assets," *i.e.*, assets pledged for the benefit of the Lenders with payouts contingent upon the continued survival of an insured—is set forth below:

A-64

| SPLCSS III Receivables Compliance Report Borrowing Base Calculation and Compliance as of May, 2021 | | |
|---|---|---|
| **LIFE CONTINGENT RECEIVABLES** | | |
| | Swap Rate applicable to the Weighted Average Life of all Eligible Receivables that are Life Contingent Receivables | 1.97% |
| (plus) | 3.85% bps | 3.85% |
| | Life Contingent Discount Rate | 5.82% |
| | LC ASSIGNABLE ANNUITY | $- |
| | LC Assignable-No COO | $- |
| | LC HEDGED | $4,237,398.31 |
| | LC HEDGED (Premium) | $- |
| | LC Hedged (Premium) - no LE | $- |
| | LC Hedged ASSIGNABLE ANNUITY | $- |

91.     Pursuant to the terms of the LSA, by the Servicers delivering these Monthly Reports and Compliance Reports to Leadenhall, the Borrowers represented upon delivery that they were "the legal and beneficial owner[s] of the applicable Collateral free and clear of any Adverse Claim." LSA § 4.01(h).

92.     Over the period May 2021 through the end of 2022, the SuttonPark and Dorchester Servicers continued to deliver Monthly Reports and Compliance Reports to Leadenhall containing a list of the Borrowers' assets and a calculation of the Borrowing Base—and therefore the Borrowers represented month after month that Collateral pledged as security to Leadenhall was "free and clear" of any other security interest.

93.     On September 19, 2022, Leadenhall Capital Managing Partner Craig Gillespie received an email with an anonymous tip—from sender "noreply@anonymousemail.me"—that Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender. The tip expressly accused Josh Wander of criminal activity:

28

A-65

> **The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal.**

Exhibit 1 (Anonymous Tip).  The anonymous tip was a prescient warning that Leadenhall would later—despite Wander's vociferous attempts at obstruction—determine was true in all respects.

**Leadenhall visits 777 Partners' offices in Miami, during which Wander tries to assure Leadenhall that any problems with its Collateral are limited and under control.**

94.     After receiving the tip, pursuant to its audit rights under the LSA, Leadenhall began a business review of the Borrowers' receivables and assets pledged as Collateral to ensure that the hundreds of millions of dollars in debt notes provided to the Borrowers were secured and collateralized in accordance with the LSA.  *See* LSA § 5.02 (permitting Leadenhall Capital as the Administrative Agent "to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller").

95.     In the immediate aftermath of receiving the tip, Leadenhall representatives conducted a series of calls with Wander and other representatives of 777 Partners and the Borrowers, during which Leadenhall requested additional detail on assets pledged as Collateral to Leadenhall.

96.     In November 2022, Leadenhall Managing Partner Craig Gillespie, CFO and COO Chris Learmonth, and Vice President Tom Foot visited 777 Partners' offices on-site in Miami, Florida to conduct a series of in-person meetings with Wander and other individuals responsible for allocating Collateral for the benefit of the Lenders.

97.     During the on-site visit, the Leadenhall representatives met with senior management of 777 Partners and were presented with overviews of 777 Partners' businesses. Gillespie, Learmonth, and Foot also inspected the computer system used by 777 Partners and the

A-66

Borrowers—referred to as "MP Fin"—to allocate receivables and other assets to various lenders for purposes of securing the notes. Given the number of assets that 777 Partners and the Borrowers had pledged to various lenders—which numbered in the tens of thousands—Leadenhall representatives were able to conduct only a random sample "spot check" of the assets pledged as Collateral.

98. During the "spot check" of 777 Partners' computer systems, the Leadenhall and 777 Partners teams identified a relatively small number of assets that were improperly allocated to the Dorchester Borrower. To reconcile the issue, the Dorchester Borrower removed the improperly allocated assets from its Borrowing Base, amounting to approximately $7 million in value that was no longer available for the Dorchester Borrower to borrow against.

99. Removing these assets from the Dorchester Borrower's Borrowing Base resulted in a corresponding deficiency in the Dorchester Borrower's Borrowing Base compared to its Outstanding Borrowings. This deficiency is apparent by comparing the Monthly Reports from the Dorchester Borrower issued before and after the November 2022 spot-check—with the November 2022 Report showing compliance with the Borrowing Base Limitation and the December 2022 Report showing that the Dorchester Borrower was out of compliance by approximately $7 million:

**Excerpt from November 2022 Dorchester Report:**

|  |  | Borrowing Base | **$79,103,921.15** |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $79,103,921.15 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **Yes** |

A-67

**Excerpt from December 2022 Dorchester Report:**

|  |  | Borrowing Base | $71,689,952.00 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $71,689,952.00 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  |  | Compliant if difference is ≥ 0) | No |

100.   Nevertheless, Wander and 777 Partners took pains during the November 2022 on-site meetings to ensure that Leadenhall believed that, to the extent any assets were not properly allocated to Leadenhall on MP Fin, the problem was limited to the Dorchester Borrower, contained, and under control.   Upon information and belief, Wander and 777 Partners made these misrepresentations with the full knowledge that their employees had worked to alter data and obfuscate data records in advance of the meetings.

101.   As would be revealed over the following months, however, the problem was anything but contained, as Leadenhall would discover that both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and thus had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases.

102.   Following the on-site visit, Leadenhall and representatives of 777 Partners and the Borrowers continued to correspond over email and telephone to ensure that assets were properly allocated to the Borrowers.   777 Partners also agreed to add a "lender identifier" field—which was available in the MP Fin system—to the Monthly Reports to ensure that assets were properly allocated to Leadenhall.   The inclusion of this lender identifier field to the SuttonPark Borrower Monthly Reports gave no indication that Collateral was double-pledged and thus further concealed any double-pledging from Leadenhall.

A-68

**In early 2023, Wander confirms that "around $100 million" of Collateral had been double-pledged to a third-party lender called Credigy.**

103.   Through early 2023, although Leadenhall kept close watch over its lending to Wander's entities, no further issues were revealed.  For instance, the January 2023 Report for the SuttonPark Borrower represented that the Borrower was compliant with its Borrowing Base Limitation, while the Dorchester Borrower's January 2023 Report reflected approximately the same $7 million deficiency that had been identified in late 2022:

**Excerpt from January 2023 SuttonPark Report:**

|  |  | Borrowing Base | $361,309,249.45 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $361,309,249.45 |
| (less) | Outstanding Borrowings |  | $349,997,803.32 |
|  | **Compliant if difference is ≥ 0)** |  | **Yes** |

**Excerpt from January 2023 Dorchester Report:**

|  |  | Borrowing Base | $71,831,753.87 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $71,831,753.87 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

104.   In March 2023, however—nearly two years into the credit facility—a separate third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London under the auspices of a "general catch-up."  Following that meeting, Credigy sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of Credigy.  Credigy asked Leadenhall to confirm that 777 Partners had not also allocated the assets to Leadenhall.

32

A-69

105.   From Credigy's inventory of assets, Leadenhall was able to discern that 777 Partners had allocated more than 1,600 receivables—totaling approximately $185 million in value—to both Credigy and Leadenhall.  In other words, Leadenhall confirmed that Wander and Pasko had "double-pledged" Leadenhall's assets.

106.   Leadenhall would also later discover that the majority of these 1,600 double-pledged receivables had been sold or "assigned" to the SuttonPark Borrower—and therefore ostensibly pledged as Collateral to Leadenhall—via a "Form of Assignment" executed by Steven Pasko on September 30, 2022.[3]

107.   On March 24, 2023, Leadenhall sent a letter to Wander and Pasko requesting evidence that assets comprising Leadenhall's Collateral were free and clear of Adverse Claims and that the Monthly Reports and Compliance Reports were true, accurate, and complete.  *See* Exhibit 2 (Mar. 24, 2023 Letter from C. Gillespie) ("***As you are aware, it has come to our attention that certain Eligible Receivables may be subject to Adverse Claims*** . . . .  To reiterate our prior discussions, we need to receive clear and objectively determinable evidence that the Receivables constituting Collateral for our SPLCSS Loans and Dorchester Loans, respectively remain Eligible Receivables and that each of the Compliance Reports remain true, accurate and complete.").

108.   On March 28, 2023, senior executives and board members of Leadenhall held a conference call with Wander to get further detail on how assets had been double-pledged by the Borrowers and to understand whether Wander had a plan to fix the problem.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Phil Kane, and

---

[3] Pasko was the authorized signatory on the sale agreements or the "assignments" of assets by the Sellers to the Borrowers.  Because the Borrowers pledged to Leadenhall 100% of their assets as Collateral by function of the LSA, these assignment agreements in which the Borrowers acquired assets in the first place from the Sellers—and signed by Pasko—are foundational to the contractual violations and false statements herein.

A-70

General Counsel Peter Clark.  Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall recorded the call with Wander's permission.

109.    Wander's objective from the beginning of the call was to avoid explaining precisely how and when the double-pledging had occurred and instead impress upon the Leadenhall representatives that any deficit or hole in Leadenhall's Collateral could be shored up by, what he termed "replacement deals."

110.    Amidst a murky array of promises by Wander to Leadenhall concerning "replacement deals"—including replacing the double-pledged Collateral with cash from a potential sale of equity in 777 Partners' football assets—Wander acknowledged that there had been a "screwup" and "embarrassing" problem caused by 777 Partners' antiquated computer system concerning assets pledged to Leadenhall by the SuttonPark and Dorchester Borrowers.

111.    In particular, Wander expressly stated during the call that "the issue today is that **there are deals that are in Credigy's Borrowing Base that are allocated to you guys**."  Wander further explained concerning the double-pledged assets that there were "deals that sat on our Volans facility[4]—which is locked out basically now for five years—that were allocated to the [SuttonPark] facility.  **And those are the deals that that—you would consider double-pledged now, for they're on both facilities**."

112.    Wander claimed that the "screwup" was the result of 777 Partners and the Borrowers' failure to recognize, upon allocating certain assets to Leadenhall, that those assets had already been allocated as collateral to Credigy.  He further described the issue as a mistake in "portfolio input"—meaning that upon the initial "input" of the assets into the Leadenhall facility, they were already encumbered by other security interests.

---

[4] The "Volans facility" refers to 777 Partners' credit facility with Credigy.

A-71

113.    Near the end of the call, during an exchange between Wander and Leadenhall Chairman John Wells, Wander expressly acknowledged that the SuttonPark and Dorchester Borrowers' double-pledge of Collateral constituted a clear breach of the parties' agreements:

> Wells: **"There are so many breaches on these agreements now. We need to get all of this sorted out."**
>
> Wander: **"Agreed, agreed, agreed."**

114.    Wander again promised on the call that 777 Partners would individually review—or conduct a "reconciliation" of—every single asset pledged as collateral in 777 Partners' "MP Fin" system for the purpose of ensuring that assets were appropriately allocated to its lenders. Wander also promised to put a process in place to "reconcile" more frequently going forward to ensure that assets were properly allocated under 777 Partners' credit facilities.

115.    On March 29, 2023, following up on the March 28, 2023 call, Leadenhall Managing Partner Phil Kane sent an email to Wander containing a laundry list of action items under the header "**Double Pledges**," with the very first requirement for Wander listed at the top: "A reconciliation of all of our assets to the appropriate SPV for both [the SuttonPark and Dorchester Borrowers] – this should be completed as soon as possible, and by Monday 3rd of April at the latest."  Exhibit 3 (Mar. 29, 2023 Email from P. Kane).

116.    On April 3, 2023, senior executives and board members of Leadenhall held a second conference call with Wander to understand exactly how the Borrowers had double-pledged the assets.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Tom Spreutels, Managing Partner Phil Kane, General Counsel Peter Clark, and Vice President Tom Foot.  Again, Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall again recorded the call with Wander's permission.

35

A-72

117.    During the call, Wander expressly admitted to Leadenhall Chairman John Wells that the Borrowers had double-pledged "around $100 million," or over 30 percent, of the Collateral pledged to Leadenhall:

> Wells: **"What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?"**
> Wander: **"I think it was around 100 million I think."**
>
> [...]
>
> Wells: **"So over 30% of our collateral has been pledged to someone else?"**
>
> Wander: **"Yes, it appears that way."**

118.    Wander maintained that the double-pledging had been a computer system mistake and that he planned to "do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap."

119.    When pressed for details on this plan, Wander stated that the "holding company lender" was A-CAP and that, since 2020, A-CAP had extended around $200 million to $250 million in credit to 777 Partners' holding company.  Wander also disclosed that, in return for that sizeable loan, A-CAP had an "all asset lien" on the assets of 777 Partners.

120.    On April 4, 2023, following up on the April 3, 2023 call, Leadenhall Managing Partner Tom Spreutels sent an email to Wander again containing a list of action items with the very first requirement for Wander listed at the top: "*A plan to cure the identified deficiency and the associated time frame.*"  Exhibit 4 (Apr. 4, 2023 Email from T. Spreutels).

121.    Following Wander's admissions, the Monthly Reports began reflecting enormous Borrowing Base deficiencies.  For instance, on April 4, 2023, the SuttonPark Servicer delivered its Monthly Report for the month of February 2023, showing for the first time that the SuttonPark Borrower had taken on *over $170 million in debt* above its Borrowing Base.

A-73

**Excerpt from February 2023 SuttonPark Report:**

| | | Borrowing Base | $177,547,147.46 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $177,547,147.46 |
| (less) | Outstanding Borrowings | | $349,997,803.32 |
| | **Compliant if difference is ≥ 0)** | | **No** |

122.    The February 2023 Report for the Dorchester Borrower also reflected that its Borrowing Base deficiency had also grown to approximately $10 million.

**Excerpt from February 2023 Dorchester Report:**

| | | Borrowing Base | $69,080,396.57 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $69,080,396.57 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | **Compliant if difference is ≥ 0)** | | **No** |

123.    In the Reports for the following month, March 2023, the Borrowing Base deficiencies remained, with the SuttonPark Borrower disclosing a deficiency of over $160 million and the Dorchester Borrower disclosing a deficiency of over $7 million.

**Excerpt from March 2023 SuttonPark Report:**

| | | Borrowing Base | $ | 187,825,142.97 |
|---|---|---|---|---|
| | **Borrowing Base Compliance** | | | |
| | Borrowing Base Amount | | $ | 187,825,142.97 |
| (less) | Outstanding Borrowings | | $ | 349,997,803.32 |
| | **Compliant if difference is ≥ 0)** | | | **No** |

A-74

**Excerpt from March 2023 Dorchester Report:**

| | Borrowing Base | $71,517,425.07 |
|---|---|---|
| | **Borrowing Base Compliance** | |
| | Borrowing Base Amount | $71,517,425.07 |
| (less) | Outstanding Borrowings | $79,010,000.00 |
| | **Compliant if difference is ≥ 0** | **No** |

**Despite Defendants' efforts to stonewall Leadenhall's investigation, Leadenhall discovers that the Borrowers had pledged assets they never even owned, and Leadenhall formally notices the Borrowers' breaches of the Agreements.**

124.    In the ensuring months, Leadenhall continued to visit 777 Partners' offices, meet with Wander and 777 Partners' servicing teams, and conduct reviews of the assets pledged as Collateral to Leadenhall.

125.    During these meetings and telephone conferences occurring during the April through October 2023 period, Wander continued to promise that new assets and proceeds from deals just around the corner would be used to shore up the shortfall in Collateral to Leadenhall. Wander also continued to promise to conduct a so-called "reconciliation" process in his computer systems to ensure that assets pledged as Collateral to Leadenhall were actually allocated to Leadenhall in his systems. The promised proceeds and reconciliation never materialized.

126.    With the limited information that Wander and the various entities operating under his control did provide, in October and November 2023, Leadenhall determined that the double-pledge of Collateral was just the tip of the iceberg. In corresponding with 777 Partners personnel (with the permission of 777 Partners and Wander), reviewing receivables on MP Fin, and recognizing a pattern of 777 Partners' cash receipts being far lower than the amounts due, *Leadenhall determined that the SuttonPark and Dorchester Borrowers had borrowed against and pledged assets as Collateral to Leadenhall that they never purchased in the first place, did not own, and therefore could not even pledge as Collateral.*

38

127.    Leadenhall also determined that the SuttonPark and Dorchester Borrowers had sold and/or removed assets from Leadenhall's Collateral base without providing any notice to Leadenhall, further reducing their Borrowing Base relative to outstanding borrowings.

128.    Upon learning of these further material breaches of the LSA, on November 29, 2023, Leadenhall served written correspondence on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers providing formal notice that the Borrowers were in material breach of the LSA and related agreements (the "Notice of Breach"):

> **Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation.**

*See* Exhibit 5 (Notice of Breach).

129.    After accounting for these breaches—that is, by subtracting double-pledged assets, assets not owned by the SuttonPark and Dorchester Borrowers, and otherwise accounting for outstanding borrowings in excess of credit limits—Leadenhall calculated in the Notice of Breach a Borrowing Base deficiency of approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower—or more than three times the amount that Wander had admitted had been double-pledged in March 2023.

130.    In December 2023, at Leadenhall's request, the SuttonPark and Dorchester Borrowers and Servicers delivered revised Compliance Reports for the preceding months making clear the extent to which the Borrowers, Pasko, and Wander had lied all along about assets

A-76

ostensibly pledged for the exclusive benefit of Leadenhall—and admitting that the original Compliance Reports were false.

131.    For example, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer—which had previously reflected a Borrowing Base of approximately $187 million and outstanding borrowings of approximately $350 million—now reflected a Borrowing Base of only approximately $64 million, after subtracting the double-pledged assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 SuttonPark Report:**

| | Borrowing Base | $ | 64,076,151.91 |
|---|---|---|---|
| **Borrowing Base Compliance** | | | |
| Borrowing Base Amount | | $ | 64,076,151.91 |
| Outstanding Borrowings | | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | | No |

132.    In other words, the original SuttonPark Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $125 million in assets had been pledged for the exclusive benefit of the Lenders.  That $125 million of ineligible assets *was in addition to* the over $160 million in assets that the original March 2023 Compliance Report had already indicated were double-pledged.

133.    Similarly, the revised March 2023 Compliance Report delivered by the Dorchester Servicer, which had previously reflected a Borrowing Base of approximately $71 million and outstanding borrowings of approximately $79 million—now reflected a Borrowing Base of only $42 million after subtracting the double-pledge assets and/or the assets not actually owned by the Borrowers.

134.

40

A-77

**Excerpt from revised March 2023 Dorchester Report:**

| | | |
|---|---|---:|
| **Borrowing Base** | $ | **42,455,473.97** |
| **Borrowing Base Compliance** | f | |
| Borrowing Base Amount | $ | 42,455,473.97 |
| Outstanding Borrowings | $ | 79,010,000.00 |
| Compliant if difference is ≥ 0) | | No |

135.    In other words, the original Compliance Report delivered in March 2023 had falsely represented that nearly $30 million in assets had been pledged for the exclusive benefit of the Lenders.

136.    Over the period May 2021 to November 2023, the SuttonPark and Dorchester Borrowers delivered approximately 60 Compliance Reports to Leadenhall—*therefore representing approximately 60 separate times* that Collateral pledged for the exclusive benefit of Leadenhall was owned by the SuttonPark and Dorchester Borrowers "free and clear" of any other security interest when instead, this Collateral was pledged to other lenders or otherwise did not exist.

137.    While each Compliance Report was required to be signed on behalf of the SuttonPark Servicer and Dorchester Servicer, in practice, the Servicers often just submitted native Excel files of the reports. Steven Pasko, however, was the signatory on behalf of the SuttonPark Servicer of the false Compliance Reports which contained signatures, including reports issued by the SuttonPark Servicer for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022.

138.    Leadenhall would not have continued to allow the Borrowers to borrow debt under the LSA had it known that hundreds of millions of dollars in security for the debt had in fact been

A-78

double-pledged to another lender and/or did not exist. The Borrowers made each of these false representations to induce the Lenders and Leadenhall to continue allowing the Borrowers to take out debt notes under the credit facility.

**King and A-CAP Emerge as the Bankroller and Puppeteer in the Fraudulent Enterprise.**

139.    A-CAP's role in the pattern of fraud perpetrated on Leadenhall began to rear its head in April 2023, when Wander confirmed on the recorded April 3, 2023 conference call that A-CAP had an "all asset lien" on the assets of 777 Partners.

140.    Leadenhall would later find out that the story ran much deeper: A-CAP is the puppeteer to the 777 Partners' marionette, and nothing happens at 777 Partners—even execution of a last-minute restructuring agreement to repay uncontested debt and stave off this very litigation—without A-CAP's approval. A-CAP is the financial engine behind the scenes which provides last-minute loans and investments in "Whac-A-Mole" fashion to 777 Partners in order to make the enterprise appear solvent to outside lenders and investors. The ruse engineered by A-CAP even extends to 777 Partners' own employees—Wander and 777 Partners employees have disclosed to Leadenhall that A-CAP's relationship with 777 Partners is so intertwined that A-CAP has funded 777 Partners' payroll on repeated occasions.

141.    When Wander and Pasko's double-pledging was first revealed to Leadenhall, instead of behaving like an arm's-length first-lien leader with no reason to have knowledge of the misrepresentation, A-CAP became *more* involved to help 777 Partners avoid detection. Following Leadenhall's March 2023 conference calls with Wander—in an effort to "replace" the double-pledged Collateral with other security interests—A-CAP agreed to step directly into the fray and offered Leadenhall in June and July 2023 a fourth-priority position on the assets of 777 Partners, *i.e.*, multiple spots behind A-CAP's first-priority position. Leadenhall rejected the offer.

A-79

142.     During these negotiations in June and July 2023, which involved A-CAP's Chief Operating Officer Mike Saliba, Saliba expressed not even a hint of surprise that Wander had double-pledged Leadenhall's Collateral in breach of the LSA.  Given their reaction together with the facts below, A-CAP must have been well aware and "in the know" for months that Collateral pledged to Leadenhall had been double-pledged and/or did not exist and interjected itself into negotiations in order to keep Leadenhall from making the pattern of fraud public, which in turn might bring 777 Partners—and therefore A-CAP—all the way down.[5]

143.     A-CAP's undue influence over 777 Partners continued to come to light through the latter half of 2023.  In November 2023, A-CAP interjected itself into Leadenhall and 777 Partners' discussions concerning whether 777 Partners would agree to Leadenhall's proposal for the former Chief Operating Officer of Defendant SuttonPark Capital, Paul Kosinski, to perform an "asset review" of the receivables pledged to Leadenhall as Collateral.  As stated in an email to Leadenhall from Pasko in late November 2023: "*At the request of A-CAP*, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark."

144.     Pasko purported to justify A-CAP's objections (or "concerns") to Leadenhall's proposal on grounds that the asset-by-asset review "would violate [Kosinski's] severance agreement' and that Kosinski had departed for a "direct competitor" to 777 Partners.  Upon information and belief, however, A-CAP's true concern was that Kosinski, as a former high-level

---

[5] Wander also represented to Leadenhall during the course of these March 2023 discussions that any missing Collateral was maintained within the "777 corporate system"—which, upon information and belief, Wander uses to freely transfer assets among a web of trade names without regard to corporate or legal formalities.  If this is correct, it follows that the missing Collateral owed to Leadenhall has been used to pay interest on A-CAP loan facilities with 777 Partners or reduce borrowings on assets over which A-CAP has a first lien, thereby directly improving A-CAP's position through the fraud perpetrated on Leadenhall.

A-80

officer of SuttonPark Capital, had inside knowledge of 777 Partners' operations and would expose the ongoing fraud to Leadenhall.

145.    Given King's involvement in Wander's affairs, Leadenhall began conducting a deeper dive into the relationship between King and Wander.  The core of the convoluted and enmeshed relationship between King and Wander is the relationship between A-CAP and 777 Re.  777 Re is the reinsurance subsidiary of 777 Partners.

146.    Wander has pitched 777 Re as the "anchor" of 777 Partners' entire investment strategy—meaning that it is the source of funds that Wander and his alter ego companies can raid for other ventures, including professional football teams.[6]  777 Partners is a holding company which conducts no substantial business operations itself, and its value is determined by the value of its subsidiaries.

147.    Reinsurance is a contractual arrangement by which primary insurance carriers—which write and offer insurance such as life and health insurance to policyowners—pass on or "cede" certain of their insurance liabilities to a reinsurer such as 777 Re.  777 Re indemnifies the primary insurance carriers for certain of those liabilities, while the primary insurance carriers remain in privity with and directly responsible to the policyowners.  If the reinsurer becomes unable to satisfy its obligations to the primary insurance carriers, (i) the ability of the primary insurance carriers to pay policyowners and satisfy capital requirements is in jeopardy and (ii) the

---

[6] Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.  Upon information and belief, Wander himself is not permitted to sit as an official board member of 777 Re as a result of a cocaine trafficking conviction in 2003.  Wander still, however, actively participates in 777 Re's board meetings and acts as the de facto leader and manager of 777 Re.  Pasko sits on the 777 Re board, and until early 2024 following action from 777 Re's Bermuda regulator, 777 Partners appointed the key management team.

A-81

primary insurance carriers may not be able to pay dividends or return capital to their owners, without raising fresh capital themselves to fulfill their regulatory requirements.

148.    For example, A-CAP—through its King-controlled life insurance subsidiary Haymarket Insurance Company—may issue life insurance policies or annuities to a group of seniors.  For "reserving" purposes, A-CAP may then need to either allocate regulatory capital to back the block of business or, because reinsurance premiums are generally lower than the return on regulatory capital, pass on some of the insurance risk to a reinsurer.

149.    Thus, A-CAP purchases "reinsurance" from 777 Re, whereby, under a traditional reinsurance arrangement, A-CAP will make periodic premium payments and transfer any reserves established to support any existing insurance liabilities to 777 Re, and in return, 777 Re will be responsible for making all or part of the benefit payments required under the life insurance policies or annuities upon the death of the insureds (or other insured event).  In other words, a reinsurer like 777 Re is an "insurer for the insurer."  777 Re provides financial protection for A-CAP, which means A-CAP may hold less capital itself and 777 Re is responsible for indemnifying or paying A-CAP for the liabilities under the life insurance policies or annuities.

150.    In the typical reinsurance arrangement, the reinsurer is responsible for setting aside a certain amount of capital, including premiums payments, in reserve to ensure that it has the financial ability to indemnify or make a payment to the ceding insurance company, which will pay any benefit payment directly to the policyholders, upon a claims or insured event.

151.    However, in the case of A-CAP and 777 Re, the reinsurance arrangements are structured under a complex "modified coinsurance" or "funds withheld" basis.  Under a modified coinsurance arrangement, A-CAP (and/or the subsidiary insurance companies controlled by A-CAP) retains the reserves backing the claims payable by 777 Re in A-CAP's own custodial

A-82

accounts. If A-CAP's reserves (including any investment earnings thereupon) exceed the amounts required to be established or held by A-CAP—*i.e.*, if the investments are profitable or if the liabilities associated with the life insurance policies or annuities decrease—A-CAP sends the profits or any excess reserves to 777 Re as premium payments or modified coinsurance account adjustment payments.[7]

152.    Under the reinsurance arrangements between A-CAP and 777 Re, the assets supporting the insurance reserves are managed by 777 Asset Management LLC, an asset manager under the 777 Partners umbrella. The foregoing complex reinsurance structuring where the invested assets supporting the reinsurance arrangements are retained by A-CAP, and 777 Re's primary role is to invest those assets through 777 Asset Management LLC on behalf of A-CAP—for substantial management fees from A-CAP—is the start of the extreme interconnectedness of A-CAP and 777 Re. *Upon information and belief, through reinsurance arrangements, 777 Asset Management LLC has invested approximately $2.2 billion of A-CAP affiliated insurance assets—largely in risky 777 Partners-related ventures—which are supposed to be used to back claims to policyholders.*

153.    777 Re has used the reinsurance reserves—the source of which is premium payments from A-CAP, which come from premium payments made by A-CAP's policyholders to A-CAP—to make loans directly to 777 Partners and other subsidiaries under the 777 Partners

_____

[7] A "funds withheld" arrangement is similar to a modified coinsurance arrangement except that, among other things, the insurance liabilities associated with the life insurance policies and annuities are transferred to 777 Re and reported on 777 Re's statutory statements (rather than on the King-controlled life insurance company's statutory statements, which would be the case under a modified coinsurance arrangement).

A-83

umbrella.  777 Partners has in turn used those funds to make speculative bets on payday lenders, ultra-low-cost Canadian airlines, and football clubs such as the Everton Football Club.[8]

154.    The reinsurance relationship between A-CAP and 777 Partners branched out into massive loan arrangements from A-CAP to 777 Partners and affiliates.  As King acknowledged on a conference call to investors on February 27, 2024, "A-CAP is a lender to 777 for businesses outside the reinsurance relationship."  It has been reported that A-CAP and affiliates, at King's direction, has loaned 777 Partners and its web of affiliates more than $1 billion.[9]  **_Upon information belief, however, the full amount of outstanding indebtedness at year-end 2023 by 777 Partners affiliates to A-CAP, across all of the holding companies and operating companies of both 777 Partners and A-CAP, is over $2 billion._**

155.    The loans and financing activity from A-CAP (inclusive of its affiliates) to 777 Partners take all forms and have been extended to multiple parties under the 777 Partners umbrella:

a.    Since 2019 and through the present, A-CAP has provided a revolving line of credit of approximately $500 million directly to 777 Partners, secured by the equity value of 777 Partners' subsidiaries.  Reflecting A-CAP's own lack of faith in 777 Partners' ability to repay its debt obligations, the interest rate on these direct loans is as high as 20 percent per annum.

b.    Since December 2020, A-CAP has loaned JARM Capital LLC, the personal shareholding vehicle of Wander through which Wander owns 777 Partners,

---

[8]    Liz Hoffman, *Mystery investor 777 Partners bought sports teams with insurance customers' cash*, SEMAFOR (Nov. 15, 2023), https://www.semafor.com/article/11/15/2023/mystery-investor-777-partners-bought-european-sports-teams-with-insurance-customers-cash

[9]    Tariq Panja, *Everton Sale Stalls Amid Questions About Buyer's Financi*als, N.Y. TIMES (Oct. 18, 2023), https://www.nytimes.com/2023/10/18/world/europe/everton-sale-777-partners.html.

A-84

nearly $170 million. This loan was originally secured by the assets of JARM Capital and other assets owned by Wander on a *personal* basis, reflecting the intermingling of Wander personally and his professional trade names. This loan was provided so that Wander could purchase Pasko and other minority early-stage shareholders shares in 777 Partners. As a result of Wander's buy-out of Pasko's shares in 777 Partners using a loan from A-CAP, Pasko has been the primary cash beneficiary of 777 Partners' business ventures over the last few years.

c. In 2021, as represented by 777 Partners, A-CAP purchased approximately $50 million of a $250 million preferred equity share sale by 777 Partners. Upon default or liquidation of 777 Partners, A-CAP's preferred equity will be repaid only after other senior obligations of 777 Partners are repaid.

d. As of December 2023, A-CAP has provided approximately $700 million in loans and other forms of financing to support 777 Partners' aviation-related investments, and as security for the loans, A-CAP received additional equity in 777 Partners.

e. As of December 2023, A-CAP has provided approximately $290 million in loans to a 777 Partners' affiliate in to support its investments in professional football teams, as further detailed in the next section.

156.    As reported in the articles, of the approximately $11.5 billion in assets held by A-CAP and its subsidiaries, $2.9 billion—or more than 25 percent of the assets—were invested in

48

A-85

entities related to 777 Partners.[10]  The amount of the total exposure from A-CAP to 777 Partners is so large that *The New York Times* reported late last year that 777 Partners is required to regularly update A-CAP executives about its continuing business plans.[11]

157.  King also benefits personally from bankrolling all of Wander's ventures.  Using an array of transactions between 777 Partners, A-CAP, and shell companies controlled by King to obfuscate the source of the funding, King reportedly purchased an $11 million beachfront condominium in Miami using a $9 million loan from 777 Partners.[12]  And King has good reason to obfuscate the ultimate source of the funding: *the policyholders of the life insurance companies owned by A-CAP*—which made premium payments to the life insurance companies, which lent money to 777 Partners, which lent the money to a shell company controlled by King, which purchased the condo.

158.  King also has a personal stake in certain assets purchased by 777 Partners using 777 Re's reinsurance reserves, including a 10 percent stake in the ultra-low cost Canadian airline Flair Airlines.[13]

159.  In early 2024, however, Leadenhall learned that A-CAP's role in the enterprise transcended even just acting as ceding company which had transferred a massive portion of its

---

[10] Dan McCrum, Samuel Agini and Ian Smith, *US regulators push insurers to cut exposure to Everton bidder 777 Partners*, FINANCIAL TIMES (Apr. 1, 2024), https://www.ft.com/content/a225cb7d-ccdd-495d-b7f1-a8124129b8bf.

[11] *Id.*

[12] Hoffman, *The Silent Partner, supra* ("One loan last year from an A-CAP insurer to 777 was quickly re-lent to a Miami shell company controlled by King to buy an $11 million beachfront condo.").

[13] Moreover, employees of A-CAP and 777 Partners often move freely between the two firms. James Rothman, the former Head of Business Development at A-CAP, became the Chief Investment Officer of 777 Asset Management LLC, a 777 Partners subsidiary, as of 2023. Rothman subsequently left this role at 777 Asset Management LLC.

A-86

insurance risk to 777 Re and a massive creditor to 777 Partners which received regular updates about 777 Partners' business plans.

160.    For example, on February 21, 2024, Leadenhall reached an agreement with 777 Partners and 600 Partners, whereby 777 Partners and 600 Partners would pay off a relatively small, $25.6 million, portion of the loan extended to the SuttonPark Borrower, with payment being due on the date of execution.  777 Partners failed to make the payment to which it had agreed just days earlier, instead paying only $12.5 million on time, with the remaining $13.1 million being paid two days after the agreed date.  777 Partners personnel later told Leadenhall that, at that same time, A-CAP had infused cash into 777 Partners to allow 777 Partners to make payroll and cover operating expenses, underscoring the degree of 777 Partners' dependence on A-CAP, and explaining why 777 Partners could not come up with more of A-CAP's money to repay Leadenhall on the agreed date.

161.    Additionally, in early 2024, an employee of a 777 Partners subsidiary expressly admitted to a Leadenhall Managing Partner that *for approximately the last year, A-CAP had an express agreement with 777 Partners whereby A-CAP had the right to control 777 Partners' operations.*

162.    The insider also expressly admitted to Leadenhall that 777 Partners and the Borrowers had photoshopped financial statements submitted to Leadenhall and that, prior to the on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered receivables in the MP Fin system to try to cover up the double-pledge of Collateral.

163.    That insider tip prompted Leadenhall to re-examine the Compliance Reports and backup materials for those reports delivered around November 2022.  The examination resulted in full corroboration of the insider's admission.

A-87

164.    For the month November 2022, the SuttonPark Servicer had delivered a Compliance Report to Leadenhall showing outstanding borrowings of $349,997,803.32 and a borrowing base of $351,974,821.95.

**Excerpt from November 2022 SuttonPark Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **351,974,821.95** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 351,974,821.95 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **Yes** |

165.    The November 2022 Compliance Report also showed an amount of $4,344,750.19 held in a "SPLCSS III Collection" account—which comprised part of the SuttonPark Borrowers' Borrowing Base—and an amount of $4,557,291.41 held in a "SPLCSS III Reserve" account—which comprised an amount required to be reserved on a monthly basis under the LSA as a percentage of the value of the Borrower's assets.

**Excerpt from November 2022 SuttonPark Report:**



| | | |
|---|---|---|
| SPC Assignment Amount | $ | - |
| SPLCSS III Collection | $ | 4,344,750.19 |
| SPLCSS III Reserve | $ | 4,557,291.41 |
| Total | $ | 8,902,041.60 |

166.    As backup documentation for the November 2022 Compliance Report, the SuttonPark Borrower submitted to Leadenhall "screenshots" purporting to reflect summary statements from Wells Fargo for the "Collection" and "Reserve" accounts.  The summary statements showed, as of November 30, 2022, an amount of $4,344,750.19 in the SuttonPark "Collection" account (ending in *893) and an amount of $4,557,291.41 in the "Reserve" account

A-88

(ending in *885). *See* Exhibit 6 (Wells Fargo Summary Statement Screenshot). In other words, the screenshot matched the November 2022 Compliance Report with respect to the "Collection" and "Reserve" amounts.

**Excerpt from Wells Fargo Screenshot Showing Balances as of November 30, 2022:**

| Account Number | Account Name | Closing Ledger Balance | Closing Collected Balance |
|---|---|---|---|
| Account Balances for 121000248 WELLS FARGO BANK, N.A. *885 | SPLCSS II Reserve | 4,557,291.41 | 4,557,291.41 |
| Account Balances for 121000248 WELLS FARGO BANK, N.A. *893 | SPLCSS II Collection | 4,344,750.19 | 4,344,750.19 |

167.    However, following the SuttonPark Borrower's submission of the Wells Fargo screenshot to Leadenhall—and at Leadenhall's request—the SuttonPark Borrower sent Leadenhall in 2023 a full monthly bank statement for the "Collection" account (ending in *893) for the month December 2022. *See* Exhibit 7 ("Collection" Account Wells Fargo Monthly Statement).

168.    The full monthly statement showed that—contrary to the screenshot showing an amount of $4,344,750.19 in the "Collection" account (ending in *893) as of November 30, 2022— *only $300,162.82 was in the account as of November 30, 2022.*

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022**



| **Account summary** | | | | |
|---|---|---|---|---|
| **WellsOne® Account** | | | | |
| Account number | Beginning balance | Total credits | Total debits | Ending balance |
| ████893 | $300,162.89 | $7,300,296.64 | -$7,360,710.54 | $239,748.99 |

| **Daily ledger balance summary** | | | | | |
|---|---|---|---|---|---|
| Date | Balance | Date | Balance | Date | Balance |
| 11/30 | 300,162.89 | 12/05 | 148,479.91 | 12/09 | 203,182.92 |
| 12/01 | 131,109.73 | 12/07 | 197,898.92 | 12/12 | 210,065.26 |

A-89

169.    Moreover, contrary to the screenshot showing an amount of $4,557,291.41 in the "Reserve" account (ending in *885) as of November 30, 2022, **$0 was in the account as of November 30, 2022.**  *See* Exhibit 8 ("Reserve" Account Wells Fargo Monthly Statement).

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022**

**Account summary**

*WellsOne® Account*

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| ▓▓885 | $0.00 | $2,165,736.79 | -$2,165,736.79 | $0.00 |

**Daily ledger balance summary**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/30 | 0.00 | 12/01 | 0.00 | 12/12 | 0.00 |
| **Average daily ledger balance** | | | $0.00 | | |

170.    The insider's express admission of fraud—coupled with smoking gun evidence uncovered by Leadenhall—immediately precipitated Leadenhall's exercise of additional remedies.

171.    On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with written notice that "Events of Default" (*i.e.*, material breaches) under the LSA had occurred and were continuing.  Given the Events of Default, Leadenhall also sent, on March 12, 2024, "Trigger Notices" to Manufacturers and Traders Trust Company taking control of certain deposit accounts owned by the Borrowers (other than accounts owned by the Insurety Borrower).  Funds from these accounts are being swept to other accounts as directed by Leadenhall in the Trigger Notices.  To date, Leadenhall has not exercised its control rights with respect to accounts owned by the Insurety Borrower to ensure that business may continue to operate.

172.    On March 15, 2024, Leadenhall served written notice that, in light of the Events of Default, Leadenhall was exercising its right to accelerate all outstanding debt obligations of the

A-90

Borrowers, making the outstanding balance of $609,529,966.82 immediately due and payable. *See* Exhibit 9 (Mar. 15, 2024 Correspondence).

173.    In March 2024, in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations concerning a "Forbearance Agreement" whereby Leadenhall and the Lenders would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule.

174.    King again proved himself to be the master puppeteer. During negotiations over the agreement, on March 29, 2024, Wander expressly represented to Leadenhall representatives in a telephone call that, if 777 Partners signed the Forbearance Agreement without A-CAP's express consent, A-CAP would accelerate A-CAP's loans to 777 Partners. Said Wander: **"They've [A-CAP] told us they're going to default our Holdco loan if we sign the document without them agreeing to it.**

175.    Wander also represented in late March and early April 2024 to Leadenhall Managing Partner Craig Gillespie that King and Jill Gettman, Chief Legal Officer at A-CAP, were holding up execution of any agreement between Leadenhall and 777 Partners. Wander also represented that to break through the hold-up caused by A-CAP, he would try to organize a meeting directly with Leadenhall and A-CAP so that Leadenhall and the 777 Partners' businesses could come to ground on an agreement.[14]

---

[14]  Wander called Leadenhall from New York City repeatedly over the course of these negotiations, including on March 13, 2024, April 16, 2024, and April 22, 2024. Over and over again, Wander referenced Kenneth King's involvement and backroom control over the forbearance and amortization payment negotiations, and on at least one occasion—reflecting the intense entanglement between Wander, King, and A-CAP—Wander stated that he was working out of A-CAP's offices in New York City.

A-91

176.    As negotiations dragged over efforts to work out a restructuring arrangement, A-CAP continued to lurk in the background controlling Wander's every move.  In a conference call with Wander, 777 Partners Associate General Counsel Jon Walder, and Leadenhall representatives on April 2, 2024, Wander was straightforward when questioned on whether A-CAP had control over what 777 Partners was able to sign:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

177.    In a similar vein, Walder was unable to answer even basic questions as to why 777 Partners continued to make material edits to the Forbearance Agreement that moved the parties further away from a deal.  Said Walder on why certain changes were made to the Forbearance Agreement: **"I have no idea.  I just did what I was told [by A-CAP]."**  And when informed by Leadenhall that Leadenhall's investors were skeptical of whether 777 Partners could deliver even a $15 million payment to start to pay back the outstanding balance, Walder played it straight: **"I can't say I wouldn't have a degree of skepticism if I were in your investors' shoes.  But like I said I have no control over it [the payment]."**

178.    On April 16, 2024, Leadenhall Managing Partner Craig Gillespie spoke to Wander over the phone.  Gillespie stated to Wander that, because 777 Partners and A-CAP appeared to have no real intention of repaying Leadenhall, Leadenhall would have to commence an action unless Wander could promptly repay approximately $350 million to Leadenhall, which constituted the full amount of the collateral deficiencies.  Wander replied that paying $350 million to Leadenhall was "not possible" and he would never be able to find $350 million in two weeks.

A-92

179.    On April 17, 2024, Leadenhall Managing Partner Craig Gillespie again spoke to Wander.  Wander again indicated that A-CAP was holding up any negotiated repayment schedule and that Wander's view of A-CAP was that "they need to get fucking realistic" and allow the 777 Partners and 600 Partners entities to agree to a Forbearance Agreement.  It never happened.[15]

180.    Through these attempted restructuring negotiations, 777 Partners has admitted time and again that it does not control its own operations and ability to perform under the LSA. [16]

**The Ultimate Goal of Enterprise: Purchase Professional Football Teams**

181.    Despite King and A-CAP's efforts to keep Wander and his companies afloat and to cover up the scheme by providing loans to help 777 Partners meet last-minute deadlines, 777 Partners and the related entities have struggled to meet financial obligations outside of those just to Leadenhall.  It has been widely reported that Wander's shell companies "continue to miss routine payments to businesses, vendors and partners," including "miss[ing] payroll on at least two

---

[15] Over the course of the parties' interactions, certain materials and/or communications exchanged between the 777 Partners affiliates and Leadenhall were designated as subject to Federal Rule of Civil Procedure 408, and certain communications between A-CAP and Leadenhall were the subject of a non-disclosure agreement.  None of those documents or communications are cited or referenced in this complaint.

[16] A-CAP has used its control over 777 Partners' operations to inure to A-CAP's benefit in a variety of ways.  For example, in a separate credit agreement entered into in June 2022 between Leadenhall and 777 Partners to provide funding for 777 Re, 777 Partners failed to comply with the terms of the agreement and put this capital at significantly higher risk by using hundreds of millions of dollars of 777 Re's capital and reserves to lend to 777 subsidiaries on terms more favorable to the subsidiaries than would be customary between parties not affiliated with one another.  A-CAP, the controller of 777 Partners' operations, permitted these investments in 777 Partners' subsidiaries despite the fact that the investments violated guidelines because—as a lender to 777 Partners with a large security interest in both the value of 777 Partners' subsidiaries and the equity of 777 Partners—A-CAP benefitted from an inflated valuation of the 777 Partners' subsidiaries.

A-93

occasions" and failing to pay out bonuses.[17]  Among the many loans A-CAP has made to 777 Partners, "at least one covered payroll for 777 itself."[18]

182.    These financial problems at Wander's various alter ego companies have threatened what appears to be Wander's ultimate pursuit: purchasing historical football clubs from around the world, including Standard Liege in Belgium and Everton Football Club in England.  Indeed, since 2021, Wander has transformed his businesses from the relatively niche practice of investing in structured settlements and lottery winnings into making speculative bets on professional football teams.

183.    Similarly, while A-CAP started out as a business providing life insurance and annuity products to ordinary people—and a staid reliance on steady insurance premium payments—because of A-CAP's massive credit exposure to 777 Partners, its future is now tied up as well in Wander's speculative football bets.

184.    Wander has made no secret of the fact that his goal is to flip these clubs for a quick profit or "cross-sell" interests in the enterprises' insurance and media businesses to the clubs' dedicated fan bases.  In October 2023, Wander told 777 Partners' employees that the firm had built "relatively conventional but profitable finance and insurance businesses that enabled us to invest and build positions in more exciting industries such as aviation and sports."[19]  The ultimate goal, as Wander has stated to news outlets, "is that one day we're not selling hot dogs and beers to our

---

[17] Panja, *Everton Sale Stalls, supra*.

[18] Hoffman, *The Silent Partner, supra*.

[19] Giles Turner and David Hellier, *Everton's US Buyer Leaves Trail of Questions Over Its Finances*, BLOOMBERG (Dec. 7, 2023), https://www.bloomberg.com/news/articles/2023-12-07/everton-takeover-us-buyer-777-partners-leaves-questions-for-premier-league.

A-94

customers; [it's] that we're selling insurance or financial services or whatever."[20] Wander has even asked rhetorically (referring to himself in the third-person): "Is there anyone in the world that's been more serious about buying football clubs in history than Josh Wander?"[21]

185.    To actualize his goal of flipping storied football clubs for a profit and "cross-selling" to fans, Wander has invested, through 777 Partners and with the financial backing of King and A-CAP, in several teams from lower-tier football leagues, as well as other sports investments around the world.[22]    Several of the teams in which Wander has invested have flirted with insolvency due to 777 Partners' inability to make payments on time, and 777 Partners has failed in the past to pay the brokers involved in on some of the soccer deals.[23]

186.    Genoa CFC, one of the oldest football clubs in Italy—and one of the so-called "distressed assets" purchased by Wander with over $200 million in debt[24]—sought judicial approval of a deal with Italian tax authorities to reduce some of its tax debts on the grounds that it is "in a state of crisis or insolvency."[25]    777 Partners previously tried to avoid paying its debts timely by shifting liabilities to a shell company, but that gambit was rejected by Italian authorities.[26]

---

[20]    Andrew Edgecliffe-Johnson & James Fontanella-Khan, *Everton Suitor 777 Hails New Era of Football 'Hyper Commercialisation*, FIN. TIMES (Aug. 31, 2023), https://www.ft.com/content/8fc36dbe-23c1-4aae-a288-dc2c2f1d7c5f (hereinafter Edgecliff-Johnson, *Hyper Commercialisation*).

[21]    *Id.*

[22]    *Id.*

[23]    Panja, *Everton Sale Stalls, supra.*

[24]    Philippe Auclair & Paul Brown, *See You in Court*, JOSIMAR (Feb. 2, 2024), https://josimarfootball.com/2024/02/02/see-you-in-court/.

[25]    Philippe Auclair & Paul Brown, *On the Brink*, JOSIMAR (Nov. 22, 2023), https://josimarfootball.com/2023/11/22/on-the-brink/.

[26]    *Id.*

58

A-95

187.    Wander's lack of transparency about 777 Partners' finances nearly caused a Belgian regulatory body to shut down a 125-year-old club that he purchased, Standard Liege.[27]  777 Partners continued to load Standard Liege with debt in the form of loans from 777 Partners, even while it had failed to pay its players and staff on time, to the point of being sanctioned by the league.[28]

188.    Another one of Wander's football club purchases, Hertha BSC—a club that competes in the second division of German football—is in a "financial black hole" in which it does not earn enough to service its debt, and 777 Partners has had to negotiate with the league to allow it to remain operational despite its inability to invest the necessary cash in the short term.[29]

189.    There is a pattern to Wander's professional football investments.  777 Partners acquires the clubs for modest or insignificant sums—in the case of Genoa CFC, for one single euro, and for Hertha BSC, less than 15 million euro—takes on all of the club's liabilities and debt payments, and then either stiffs the clubs' creditors entirely or seeks to restructure the debt.[30]  As part of this pattern, 777 Partners reports an inflated valuation for the clubs premised on projections of growth, which in turn allows Wander to pitch new or existing lenders willing to lend money to continue expanding.[31]  Upon information and belief, Leadenhall is now caught up in this massive fraudulent enterprise.

190.    For example, the collateral 777 Partners put up to continue operating Genoa CFC was based on unrealistic projections of growth in *all* of its revenue streams and operating cost

---

[27]   *Id.*

[28]   Philippe Auclair & Paul Brown, *The Twilight Zone*, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.

[29]   Philippe Auclair & Paul Brown, The Twilight Zone, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.

[30]    Auclair & Brown, *On the Brink, supra.*

[31]    *Id.*

A-96

reductions, despite the fact that Genoa's major revenue stream from television rights will be shrinking soon.[32]  777 Partners predicated its financial projections for other clubs, including Standard Liege, Hertha, and Vasco de Gama, on meeting performance standards for promotion or participation in European leagues that are extremely unlikely to be met.[33]  600 Partners gave a substantial guarantee to keep Standard Liege afloat, but refused to provide audited financials to the Belgian regulators to prove that it could satisfy that guarantee.[34]

191.    In August 2023, just a few months after it came to light that he owed Leadenhall over one hundred million dollars beyond what he was permitted to borrow, Wander told the *Financial Times* that he needed to raise "a few hundred million" to cover his football investments.[35]

192.    These concerns came to a head most recently with Wander's attempt to purchase Everton Football Club, a historic club that competes in the world's preeminent and most prestigious football league, the English Premier League.[36]  Like the other clubs in Wander's portfolio, Everton is in very dire financial straits with a huge and growing debt load.[37]  The Everton investment was arranged and funded in large part by—unsurprisingly given its control over 777 Partners' operations—King and A-CAP.[38]

---

[32]    Auclair & Brown, *On the Brink, supra*.

[33]    Auclair & Brown, *See You in Court*, *supra*.

[34]    Auclair & Brown, *The Twilight Zone*, *supra*.

[35]    Edgecliff-Johnson, *Hyper Commercialisation, supra*.

[36]    James Robson, *English soccer club Everton to be bought by American investment firm 777 Partners*, AP NEWS (Sept. 15, 2023) https://apnews.com/article/everton-sale-777-partners-03aa0b571d19c034efbaa7d10adb00ac

[37]    Paul Brown & Philippe Auclair, *Everton or Bust?*, JOSIMAR (Feb. 16, 2024), https://josimarfootball.com/2024/02/16/everton-or-bust/.

[38]    *Id.*

A-97

193.    In September 2023, Wander announced that 777 Partners had reached an agreement to purchase Everton.  Shortly after the deal was announced, however, it was held up by concerns over 777 Partners' involvement in funding the deal.  Wander has had trouble finding investors other than King and A-CAP.  On November 26, 2023, *Forbes* ran a story titled, "777 Partners Still Reportedly Scrounging For Cash To Buy Everton FC."[39]

194.    As investigative football journal *Josimar* has revealed, an "Investment Overview" document dated August 31, 2023 concerning 777 Partners' targeted acquisition of Everton "was *not* put together by 777 [Partners] themselves but by A-CAP . . . ."  The "Investment Overview" prepared by A-CAP states that "the ultimate source of the first 40 million pound-loan made by 777 [Partners] to Everton was A-CAP, with the club paying an interest rate of 12.75 percent."  After the initial loan, 777 Partners' outstanding loans directly to Everton have "ballooned to almost 200 million pounds," with A-CAP "continuing to provide this money."[40]

195.    And if 777 Partners' position—and therefore A-CAP's position—vis-à-vis Everton was not precarious enough based merely on the size of the debt alone, its meager security on the loan makes it even riskier.  Reportedly, 777 Partners has taken a "last out position" in a lending facility behind a senior lender with a "charge over all of Everton's assets, including its bank accounts."  In exchange for A-CAP's ongoing funding, it would "receive a 2.5 percent warrant" in 777 Partners' referred to as "the 777 Football Group," with 777 Partners having to sell a minority interest in its Football Group to repay part of A-CAP's loan.  Meanwhile, the 777 Football Group

---

[39]   *See* Mike Ozanian, *777 Partners Still Reportedly Scrounging for Cash to Buy Everton FC*, FORBES (Nov. 26, 2023), https://www.forbes.com/sites/mikeozanian/2023/11/26/777-partners-still-reportedly-scrounging-for-cash-to-buy-everton-fc/?sh=2a2ad06a208c (hereinafter Ozanian, *Scrounging for Cash*).

[40]   Brown & Auclair, *Everton or Bust?*, *supra*.

A-98

is expected to require 240-300 million euros in working capital "to reach stabilization across all clubs," and even then, would "need to sell equity between 30-50% to cover financing needs."[41]

196.    In October last year, reporting on the targeted Everton transaction, *The New York Times* ran a story reporting that "[a] string of unpaid bills, some as recent as [late last year], raised" concerns for potential partners.[42] This "pattern of late and delayed payments" raised "a red flag to a potentially more significant cash-flow issue," to the point that Leadenhall is not the only former business partner of Wander's to accuse him and 777 Partners of operating "a sprawling fraudulent enterprise."[43]

197.    Additionally, Wander's refusal to provide 777 Partners' audited financial statements beyond the year 2020 and subject its financials to the most basic scrutiny raised problems with an English football regulatory body, just as it did in Belgium.[44] A former board member of a 777 Partners subsidiary is on record saying that it is "somewhat of a mystery" how 777 Partners could come up with the money to purchase Everton.[45]

198.    It has been reported that "Everton is not just the biggest sporting investment 777 have ever attempted, it is also crucial for the long-term survival of the firm itself."[46] 777 Partners needs to put Everton as an asset on its books in order to attract new investors and, invariably, new lenders in a seemingly never-ending cycle of taking on more debt.[47]

---

[41]    *Id.*

[42]    Panja, *The Mystery Company, supra.*

[43]    *Id.*

[44]    Panja, *Everton Sale Stalls*, supra.

[45]    Panja, *The Mystery Company*, supra.

[46]    Brown & Auclair, *Everton or Bust?*, supra.

[47]    Brown & Auclair, *Everton or Bust?*, supra; Auclair & Brown, *See You in Court*, supra.

A-99

199.   This all provided a powerful motive for Wander and Pasko, via 777 Partners, 600 Partners and their portfolio companies, at King and A-CAP's direction, to pursue short-term inflation of their Borrowing Base and take out more debt than they could secure, to cover payments coming due and fund further acquisitions, including of global football teams.

**Absent Injunctive Relief, the Enterprise Will Likely Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Any Assets to Avoid Satisfying Creditors.**

200.   The wheels began to come off Wander, King, and Pasko's sprawling enterprise in early 2024.   In January 2024, the Bermuda Monetary Authority—which regulates 777 Re—reportedly placed 777 Re into administrative control, freezing the $2.2 billion in assets managed by 777 Asset Management LLC which have been used to fund 777 Partners various risky, money-pit business ventures.[48]

201.   By placing 777 Re into administrative control, the Bermuda Monetary Authority sent a clear signal that it has serious questions over whether the cash cow behind 777 Partners—777 Re, as propped up by a steady flow of premium payments and loans from A-CAP—is able to meet its financial obligations.

202.   On February 16, 2024, AM Best—a credit ratings agency focused on insurers—downgraded 777 Re's credit rating from a "B" to a "C-" and assessed the strength of the firm's balance sheet as "very weak."

203.   AM Best specifically cited the firm's "exposure to affiliated assets"—meaning obligations to 777 Partners and various other companies across the enterprise through loans and investments—as the "primary driver" of the ratings downgrade.   The ratings downgrade only further confirms that lines between the various players here, whether they call themselves "777

---

[48] Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.

A-100

Partners," "SuttonPark," "A-CAP," "Josh Wander," "Steven Pasko," or "Kenneth King," are blurry, to the extent they exist at all.

204.    On February 23, 2024—on cue—citing A-CAP's "high reinsurance leverage and declining counterparty credit quality," AM Best downgraded the credit rating of A-CAP from "bbb+" to "bbb" and "with negative implications," signaling that AM Best may further downgrade A-CAP in the future.[49]

205.    On February 27, 2024, in response to AM Best's downgrade of 777 Re and A-CAP's credit rating, King announced on an investor call that because 777 Re "wasn't managed the way it needed to be," A-CAP was exiting its relationship with 777 Re and would "recapture" the insurance liabilities ceded to 777 Re within 45 to 60 days.  In other words, A-CAP would cease paying insurance premiums to 777 Re.

206.    King also noted on the call that he had not yet terminated the reinsurance arrangements with 777 Re because ***"to shut off the flow of liquidity to our reinsurer would have paralyzed them and essentially created more risk to A-CAP."***  King's unilateral ability to dictate the future and potentially cause or contribute to the demise of 777 Re via a recapture and his prior and current involvement in the disposition of a large portion of 777 Re's investment portfolio once

---

[49] In response to AM Best's statements that it intended to downgrade the credit rating of two of A-CAP's primary insurance carriers—rather than taking action sufficient to address AM Best's concerns—A-CAP made the unusual decision to sue the ratings agency.  *See Atlantic Coast Life Insurance Company and Sentinel Security Life Insurance Company v. A.M. Best Rating Services, Inc.*, No. 24-CV-5470 (D.N.J.) (Complaint Filed April 23, 2024) ("The A-CAP Insurers bring this suit to get the benefit of their bargain.  The Court should enjoin A.M. Best from issuing a faulty rating the insurers never agreed to.  It should also require A.M. Best to redo its rating according to its published methodology.").  The complaint, coupled with a verification from controller Kenneth King and a motion for a temporary restraining order, makes plain that AM Best had threatened downgrades because of the insurers' exposure to 777 Re ("A.M. Best's threatened downgrade arises out of its fixation with financial pressures on a reinsurer called 777 Re.").

A-101

again demonstrates the scope of King's control over 777 Re and its operations. King's announcement only further confirms that the faucet is about to turn off on 777 Partners.[50]

207. All the while, 777 Partners has continued to pour whatever liquidity it has into Wander's football passion project. In a LinkedIn post on April 16, 2024 by Hertha BSC, the German professional football club owned by 777 Partners, and reposted the same day by Wander, Hertha BSC announced that 777 Partners had made in early April 2024 a fresh equity investment of approximately $80 million in Hertha BSC. According to the LinkedIn post, 777 Partners' deadline for the equity infusion was the end of May 2024, meaning that 777 Partners made the investment ahead of schedule. The infusion was also made at a time when Wander had represented to Leadenhall over and over again in early April 2024 that he did not have even $15 million to pay down the debt to Leadenhall.

208. As recently as April 30, 2024, news reports broke that 777 Partners had just loaned Everton another approximately $20 million, taking the amount of 777 Partners' total loans to Everton to approximately $250 million (or £200 million). Wander and Pasko's choice to continue to dissipate millions in money-losing professional football clubs despite immediately owing Leadenhall more than $600 million in debt is reason enough to grant injunctive relief here.

---

[50] King's announced termination of A-CAP's reinsurance agreements with 777 Re has already damaged Leadenhall. As referenced in paragraph 179 and footnote 16, *supra*, Leadenhall has provided hundreds of millions of dollars in debt notes directly to 777 Partners under a separate note purchase agreement which is secured by equity interests in 777 Re's parent company. King's recapture of reserves from 777 Re has torpedoed the value of 777 Re and wiped away any equity value in 777 Partners in the process—effectively turning Leadenhall into unsecured creditors of 777 Partners. Moreover, assuming the termination and recapture occurs, A-CAP will directly hold the loans made by 777 Re to the subsidiaries of 777 Partners, and it is very unlikely that they would be able to find independent third-party lenders to refinance these loans on similar or commercially reasonable terms.

A-102

209.   In addition to the facts above showing that 777 Partners is on the brink of insolvency, Defendants are facing a slew of lawsuits seeking millions of dollars for failing to pay debts as they come due and fraudulently conveying assets to shield their assets from creditors. The facts alleged in many of those lawsuits mirror the allegations here and corroborate the actual and imminent risk that 777 Partners would frustrate any judgment on the merits in this action by further spending to the point of insolvency and transferring assets out of the shell companies named as defendants.

210.   As of the date of this Complaint, ***777 Partners and its affiliates have been named in no less than sixteen lawsuits generally concerning unpaid debts and collectively demanding more than $130 million***:

a.   On January 9, 2024, an investor sued 777 Partners seeking $30 million in damages for breach of contract, alleging that 777 Partners failed to produce certain financial information to verify its financial condition and operations, thereby triggering a right for the investor to redeem its preferred equity in 777 Partners.  Rather than honoring the repurchase right, however, 777 Partners "redirected capital into new investments and management bonuses."  *Change Lending, LLC v. 777 Partners LLC.*  As revealed in public filings in the case in April 2024, in January 2024, 777 Partners did not have even ***$1 million of liquidity*** to pay back the investor.[51]

b.   On December 12, 2023, three aircraft lessors sued 777 Partners for $30 million after 777 Partners missed lease payments for four jets.  *Corvus Lights Aviation et al v. 777 Partners LLC.*

---

[51]   Paul Brown & Philippe Auclair, *A change is gonna come?*, JOSIMAR (April 8, 2024), https://josimarfootball.com/2024/04/08/a-change-is-gonna-come/ ("In one message, sent to an employee of Change Lending on 7 January, [recently departed CFO of 777 Partners Damien] Alfalla responds to an urgent request to pay 1 million dollars of money owed by the next day by admitting: 'I don't have the liquidity to pay that tomorrow.'").

A-103

c.      On July 26, 2022, an investor sued 777 Partners and one of its aviation subsidiaries, seeking damages of at least $22 million for alleged fraud in which the defendants used corporate entities to deprive the investor of its ownership interest in the subsidiary. *MALT Family Trust et al. v. 777 Partners, LLC et al.*

d.      On July 1, 2022, lenders sued 777 Partners for defaulting on a $59.7 million loan; the lenders auctioned off $41.5 million in collateral, leaving an unpaid principal of over $20 million in debt.  Subsequently, the lenders filed a related action against 777 Partners and Pasko, alleging that despite owing the lenders over $20 million, 777 Partners fraudulently transferred two subsidiaries to Pasko in order to shield those assets from creditors. *Vida Longevity Fund, LP et al. v. Suttonpark Capital LLC et al.; Obra Capital Management, LLC et al. v. 777 Partners LLC et al.*

e.      On or around December 14, 2023, a lender sued 777 Partners to recover an unpaid debt of $11.2 million.  *Balanced Management LLC v. 777 Partners LLC.*

f.      On March 14, 2024, a lender sued Wander and 777 Partners, seeking to enjoin them from transferring any assets pending an arbitration in which the lender is seeking over €9 million for unpaid debt. *Nakula Management Ltd. v. Joshua Wander et al.*

g.      On September 8, 2023, 777 Partners' landlord sued 777 Partners under its lease for failing to pay a $5 million security deposit. *1 Madison Office Fee LLC v. 777 Partners LLC et al.*

h.      On December 22, 2023, a creditor sued 777 Partners to recover more than $2 million on two unpaid promissory notes. *Lasse Meilsoe v. 777 Partners LLC et al.*

i.      On January 23, 2024, 777 Partners was sued by a former principal of the firm, seeking over $2 million in unpaid compensation, in addition to unspecified management interests in 777 Partners' equity management plan. *Peter Meyers v. 777 Partners, LLC and 777 Partners Management, LLC.*

A-104

     j.     On March 3, 2023, American Express sued 777 Partners for breach of contract after 777 Partners "failed and refused to pay" an outstanding balance of $324,002.89 on a corporate credit card. *American Express Travel Related Services Company, Inc. v. 777 Partners.*

     k.     On or around June 7, 2021, Wander's former landlord sued Wander for more than $150,000 in damages to the landlord's property. *Randy S. Gelber v. Joshua Wander.*

     l.     On April 21, 2023, an executive search firm dedicated to recruiting investment professionals sued 777 Partners for breach of contract, alleging that after placing three candidates with 777 Partners, 777 Partners acknowledged that it owed the firm fees but "slow-rolled" the firm, only making occasional payments before disregarding the firm entirely and without any stated justification, leaving an outstanding balance of $94,000. *The Oxbridge Group, LTD v. 777 Partners LLC.*

     m.     On September 29, 2023, an investor in one of 777 Partner's subsidiaries sued 777 Partners and the subsidiary alleging that "777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise[.]" *O'Neil-Dunne et al v. Phoenicia LLC et al.*

     n.     777 Partners is also a co-defendant in two federal class actions alleging a predatory lending scheme in violation of RICO. One of the complaints states that the aggregate amount in controversy exceeds $5 million, and both complaints seek treble damages for RICO violations. *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*; *Joseph Morgan et al. v. 777 Partners, LLC et al.*

     211.     Much like many of the plaintiffs in these actions have alleged, Leadenhall has a firm basis to believe that, absent emergency injunctive relief, 777 Partners, A-CAP, and the other

A-105

Defendants will attempt to transfer their assets so as to take them out of the reach of judgment creditors, thereby causing Leadenhall irreparable harm.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of LSA Against the SuttonPark and Dorchester Borrowers)

212.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

213.    The LSA is a binding and enforceable agreement between Plaintiffs and Borrowers.

214.    Plaintiffs fulfilled their obligations under the LSA.

215.    As set forth above and in the LSA, each Borrower was required to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim."  LSA § 4.01(h); *see also id.* §§ 5.01(d), 5.01(k)(vi).  Additionally, Borrowers were prohibited from "grant[ing] an Adverse Claim on any of [their] assets to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."  *Id.* at § 5.01(k)(vi).

216.    In violation of the LSA, Borrowers failed to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim" by pledging the Collateral to multiple lenders, thereby improperly "grant[ing] an Adverse Claim" on the Collateral that was pledged to Leadenhall "to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."

217.    Specifically, Borrowers double-pledged Collateral to Plaintiffs and separate third-party lenders, pledged Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and sold and/or removed Collateral pledged to Plaintiffs without a corresponding reduction in the Principal Amount in breach of the Borrowing Base Limitation.

69

A-106

218.    By virtue of Borrowers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

## SECOND CLAIM FOR RELIEF
**(Breach of Servicing Agreement Against SuttonPark Servicer, Signal Servicer, and Insurety Servicer)**

219.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

220.    The Servicing Agreements are binding and enforceable agreements between Plaintiffs and each of the respective Servicers.

221.    Plaintiffs fulfilled their obligations under the Servicing Agreements.

222.    As set forth above and in the Servicing Agreements, each of the Servicers was responsible for, among other duties, delivering to Leadenhall Capital as Administrative Agent the Monthly and Compliance Reports required under the LSA, containing calculations of the Borrowing Base for the Borrower in their respective Borrower Groups.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

223.    Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

224.    The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

225.    The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure

70

within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

226.    As set forth above, SuttonPark Servicer delivered false and misleading Monthly Reports and Compliance Reports to Leadenhall Capital on dozens of occasions from May 2021 through the end of 2022. Those Monthly Reports and Compliance Reports overstated the SuttonPark and Dorchester Borrowers' Borrowing Bases by tens or hundreds of millions of dollars. Each such misrepresentation under § 6.07(c) of the LSA constituted a Servicer Default as it was not cured within two business days, SuttonPark Servicer's failure to notify Leadenhall Capital of its default within thirty days constituted a separate Servicer Default. The other Events of Default triggered by the Borrowers' conduct described above also constituted separate Service Defaults.

227.    In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced. Servicing Agreements § 5.1. The "Valuation Amount" of those receivables used to calculate Servicing Fees was also the most significant input into the calculation of each Borrowers' Borrowing Base. LSA Schedules VIII, IX, X, XI. Thus, by inflating the value of the Borrowing Bases, the Servicers also inflated the base on which their own Servicing Fees were calculated, thus diverting funds from the Borrowers to the detriment of the Borrowers' creditors, including Leadenhall and the Lenders.

228.    Each Servicer also agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance

A-108

Report.  LSA § 6.06(a).  Servicers have not indemnified Leadenhall against the losses and liabilities it has suffered arising from the false Monthly Reports and Compliance Reports.

229.    By virtue of the foregoing Servicer Defaults and Servicers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

### THIRD CLAIM FOR RELIEF
**(Breach of Guaranty Agreement Against 777 Partners and 600 Partners)**

230.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

231.    The Guaranty Agreement is a binding and enforceable agreement between Plaintiffs, 777 Partners, and 600 Partners.

232.    Plaintiffs fulfilled their obligations under the Guaranty Agreement.

233.    As set forth above and in the Guaranty Agreement, 777 Partners and 600 Partners jointly and severally guaranteed to Plaintiffs "the full and punctual payment and performance . . . of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower … so long as a Trigger Event has occurred and is continuing," Guaranty Agreement § 2(a), including but not limited to "any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days," *Id.* at § 1, "Trigger Event".

234.    Further, through the Guaranty Agreement, 777 Partners and 600 Partners guaranteed the Borrowers' "Obligations" as defined in the LSA, including "the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or

A-109

otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA, art. I, "Guaranteed Obligations."

235.    Thus, because the Borrowers have breached the LSA by, *inter alia*, failing to own Collateral "free and clear" of any other security interests, and because 777 Partners and 600 Partners have failed to guarantee the payment and/or performance of the Borrowers following that Trigger Event, 777 Partners and 600 Partners are jointly and severally liable for the Borrowers' breach of the LSA.

236.    By virtue of 777 Partners' and 600 Partners' breach of the Guaranty Agreement, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation Against
### Wander, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower)

237.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

238.    As alleged herein, Wander, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower engaged in a pattern of fraudulently misrepresenting to Plaintiffs that they owned Collateral "free and clear of any Adverse Claims," when, in fact, that was false, because they had double-pledged the Collateral to Plaintiffs and separate third-party lenders, and had also pledged the Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own).

239.    In particular, Wander engaged in this pattern of fraud by virtue of his domination and control over the entities named in this claim for relief, and on information and belief, directed the SuttonPark Borrower and the Dorchester Borrower to pledge (a) Collateral to Plaintiffs that had already been pledged to other third-party lenders, and (b) Collateral that was never purchased

A-110

by the Borrowers. After Plaintiffs became aware that the Collateral had either been double-pledged or was not owned by the Borrowers, Wander also made various misrepresentations about the Collateral in an effort to conceal the fraud.

240.   The SuttonPark Borrower and Dorchester Borrower engaged in this pattern of fraud by pledging (a) Collateral to Plaintiffs that had already been pledged to other third-party lenders, and (b) Collateral that was never purchased by the Borrowers.  On information and belief, the SuttonPark Borrower and Dorchester Borrower Directed the SuttonPark Servicer to prepare and submit reports to Plaintiffs falsely claiming that each Borrower owned the aforementioned Collateral "free and clear of any Adverse Claims."

241.   The SuttonPark Servicer engaged in this pattern of fraud by preparing and submitting reports to Plaintiffs falsely claiming that each Borrower owned the aforementioned Collateral "free and clear of any Adverse Claims."  Moreover, by engaging in this pattern of fraudulently inflating the Borrowers' Borrowing Bases, SuttonPark Servicer fraudulently inflated its servicing fees, which Plaintiffs paid but would not have done so had they known the truth.

242.   Plaintiffs would not have continued lending to the SuttonPark and Dorchester Borrowers had Plaintiffs known that their Collateral had been double-pledged or was not owned by the Borrowers at all.

243.   At the time that Wander, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer made these fraudulent statements, they knew the statements to be false; indeed, they made these misrepresentations with the intent to defraud Plaintiffs and induce them to continue lending.

244.   Moreover, by concealing the fact that the Collateral pledged to Plaintiffs had been pledged to other lenders or were not even owned by the Borrowers, Wander, the SuttonPark

A-111

Borrower, Dorchester Borrower, and SuttonPark Servicer fraudulently inflated the SuttonPark and Dorchester Borrowers' Borrowing Bases, with the intent to induce Plaintiffs to lend more funds than Plaintiffs would have, had Plaintiffs known the truth.

245.    Plaintiffs reasonably relied upon Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's misrepresentations, who took affirmative steps to deceive Plaintiffs and to conceal their own fraud, including by refusing to respond to reasonable requests for information regarding the double-pledged Collateral.

246.    As a result of Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's knowingly false and fraudulent misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**(Civil Conspiracy to Commit Fraud Against All Defendants)**

247.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

248.    Defendants formed and operated a conspiracy.

249.    Defendants willfully, intentionally, and knowingly agreed to violate the LSA, the Servicing Agreement, and the Guaranty Agreement, to commit wire fraud, and to defraud Leadenhall, all as further described above and incorporated herein.  Defendants operated their conspiracy to accomplish these ends.

250.    Wander, the SuttonPark Borrower, the Dorchester Borrower, and the SuttonPark Servicer were willing and critical participants in the conspiracy, because they encouraged and enabled the enterprise by fraudulently inflating the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Wander, the SuttonPark Borrower,

75

A-112

Dorchester Borrower, and SuttonPark Servicer committed fraud by misrepresenting the value of their Collateral including in multiple reports sent to Plaintiffs through interstate wires. These acts had the same or similar purposes, results, participants, victims, and methods of commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events. Moreover, Wander, in both his personal capacity and his capacity as founder and Managing Partner of 777 Partners and 600 Partners, misrepresented facts to Plaintiffs in an effort to conceal the fraud.

251. Pasko, SuttonPark Capital, 777 Partners, and 600 Partners, were willing and critical participants in the scheme. These Defendants encouraged and enabled the fraud by facilitating and encouraging the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.

252. King and A-CAP were willing and critical participants to the racketeering scheme. These Defendants encouraged and enabled the fraud by causing the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud. Moreover, these Defendants encouraged and enabled the fraud by funding 777 Partners and 600 Partners sufficiently to remain liquid and continue carrying out the fraud, all while knowing that the fraud was ongoing.

253. Each of the Defendants actively participated in the above-described civil conspiracy, and therefore each Defendant is responsible for each tortious and otherwise unlawful action of any co-conspirator.

254. As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

A-113

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against
### 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King)

255.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

256.    As alleged *supra* paragraphs 230 through 236, Wander, the SuttonPark Borrower Dorchester Borrower, and SuttonPark Servicer committed fraud against Plaintiffs.

257.    777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King substantially assisted this fraud by facilitating the pattern of making misrepresentations to Plaintiffs in order to obtain millions of dollars in debt.

258.    Additionally, every material decision by 777 Partners and its subsidiaries and affiliates must be approved by King and A-CAP in advance including, on information and belief, the decisions to commit fraud alleged herein.

259.    777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King all acted with knowledge of Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud.

260.    As a result of 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King aiding and abetting Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### (Civil RICO, 18 U.S.C. § 1962(c) Against All Defendants)

261.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

A-114

262.    Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

263.    Defendants operate as an associated-in-fact enterprise within the meaning of the RICO Act and are each a person within the meaning of 18 U.S.C. § 1961(3) and are separate from and exist independently of the enterprise.

264.    Wander, the SuttonPark Borrower, the Dorchester Borrower, and the SuttonPark Servicer were willing and critical participants in the racketeering scheme, because they encouraged and enabled the enterprise by fraudulently inflating the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Wander, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer committed mail and wire fraud from in violation of 18 U.S.C. §§ 1341, 1343, by misrepresenting the value of their Collateral including in multiple reports sent to Plaintiffs through interstate wires.  These Defendants' transfer through the interstate wires of multiple fraudulent reports constituted a predicate act within the meaning of RICO.  These acts had the same or similar purposes, results, participants, victims, and methods of commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events. Moreover, Wander, in both his personal capacity and his capacity as founder and Managing Partner of 777 Partners and 600 Partners, misrepresented facts to Plaintiffs in an effort to conceal the fraud.

265.    Pasko, SuttonPark Capital, 777 Partners, and 600 Partners, were willing and critical participants in the racketeering scheme.  These Defendants encouraged and enabled the fraud by facilitating and encouraging the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.

266.    King and A-CAP were willing and critical participants to the racketeering scheme. These Defendants encouraged and enabled the fraud by causing the SuttonPark and Dorchester

A-115

Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Moreover, these Defendants encouraged and enabled the fraud by funding 777 Partners and 600 Partners sufficiently to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

267.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of a common goal, including submitting reports to Plaintiffs with fraudulently inflated Collateral values; (b) used similar methods to perpetrate the frauds, including the use of similar fraudulent reports and misrepresentations regarding the reports; (c) had similar participants; and (d) had the same victims.

268.    Defendants' racketeering acts were a regular way of conducting their ongoing business with Plaintiffs and of conducting or participating in the ongoing RICO enterprise.  The racketeering acts were sufficiently continuous to form a pattern of racketeering activity.

269.    Defendants' racketeering acts pose a threat of continuing criminal activity.  For example, on information and belief, Defendants continue to borrow from third-party lenders, in addition to Plaintiffs, against collateral that has been fraudulently pledged to multiple lenders.

270.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**(Civil RICO Conspiracy, 18 U.S.C. § 1962(d) Against All Defendants)**

271.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

272.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to

A-116

conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

273.    The frauds that were perpetrated, and the continuance of the scheme, could not have occurred without the consent and knowing connivance of Defendants together.

274.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity. As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

275.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

276.    Plaintiffs have been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

277.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, plus interest, costs, and attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**(Unjust Enrichment Against All Defendants)**

278.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

279.    By reason of the foregoing conduct—including defrauding Plaintiffs and willfully breaching their agreements with Plaintiffs as alleged herein—Defendants have profited and enriched themselves unjustly at the expense and detriment of Plaintiffs.

280.    Defendants should not be permitted, in equity and good conscience, to retain for themselves any funds wrongfully obtained from Plaintiffs.

A-117

281.   By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at a trial but not less than $75,000, plus interest, costs, and attorneys' fees.

**<u>PRAYER FOR RELIEF</u>**

282.   Plaintiffs pray for the following relief:

a)     An award of monetary damages in an amount to be determined at trial by jury;

b)     An order enjoining Defendants violating their obligations under the Agreements;

c)     An order declaring the rights and duties of the parties as indicated herein;

d)     An order declaring that Plaintiffs may exercise any rights and remedies due to them following a material breach or Event of Default under the Agreements

e)     An award of pre- and post-judgment interest;

f)     An award of all reasonable fees, costs, and expenses, including attorneys' fees; and

g)     An award of such other and further relief as the Court deems just and proper.

A-118

Dated: May 3, 2024
       New York, New York

                           KING AND SPALDING LLP

                           */s/ Leigh M. Nathanson*

                           Craig Carpenito
                           Leigh M. Nathanson
                           Roger G. Schwartz
                           Brian Donovan
                           1185 Avenue of the Americas
                           New York, NY 10036
                           (212) 556-2100
                           ccarpenito@kslaw.com
                           lnathanson@kslaw.com
                           rschwartz@kslaw.com
                           bdonovan@kslaw.com

                           *Attorneys for Plaintiffs Leadenhall Capital Partners*
                           *LLP and Leadenhall Life Insurance Linked*
                           *Investments Fund PLC*

A-119

# EXHIBIT 1

A-120

| | |
|---|---|
| **From:** | Anonymousemail |
| **To:** | Craig Gillespie |
| **Subject:** | SuttonPark |
| **Date:** | 19 September 2022 11:49:36 |

*** **[EXTERNAL]** This message comes from an external organisation. **E**xercise caution when opening attachments or clicking links, especially from unknown senders. If you are unsure please attach the mail to a new email and send to servicedesk@lanware.co.uk. ***

Powered by **Anonymousemail** → Join Us!

The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured.  What he is doing is criminal.

A-121

# EXHIBIT 2

A-122



March 24, 2023

**VIA ELECTRONIC MAIL**

SPLCSS III LLC
Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

Attention:  Steven W Pasko, Joshua Wander, Damien Alfalla and Steve Pasko

Re:     That certain Loan and Security Agreement, dated as of May 7, 2021 (as may be amended, the "Loan Agreement"), by and among SPLCSS III LLC ("SPLCSS Borrower"), Signal SML 4 LLC ("Signal Borrower"), Insurety Agency Services LLC ("Insurety Borrower"), Dorchester Receivables II LLC ("Dorchester Borrower" and together with SPLCSS Borrower, Signal Borrower and Insurety Borrower, "Borrowers"), Leadenhall Capital Partners LLP, as Administrative Agent (in such capacity, "Administrative Agent") and Leadenhall Life Insurance Linked Investments Fund PLC, as collateral agent, together with each of the lenders from time to time party thereto (individually and/or collectively, as the context may require, "Lender"), the Servicers from time to time party thereto and the Sellers from time to time party thereto.  Capitalized terms used in this letter (this "Letter") without definition shall have the respective meanings attributed thereto in the Loan Agreement.

Ladies and Gentlemen:

As you are aware, it has come to our attention that certain Eligible Receivables may be subject to Adverse Claims.  We have communicated with Nicholas Bennett and Joshua Wander on March 17, 2023, March 20, 2023 and March 21, 2023 regarding the Receivables constituting Collateral for the SPLCSS Loans and for the Dorchester Loans and have requested that this be investigated immediately.  We want to impress upon you the seriousness of this situation and the urgency of such request.  To reiterate our prior discussions, we need to receive clear and objectively determinable evidence that the Receivables constituting Collateral for our SPLCSS Loans and Dorchester Loans, respectively remain Eligible Receivables and that each of the Compliance Reports remain true, accurate and complete.  A fundamental component of such eligibility is that an Eligible Receivable is free and clear from any Adverse Claims.

Please provide a detailed written response as to your findings by the opening of business on Monday, March 27, 2023.  Please make the appropriate and knowledgeable employees of the Servicer available for discussion with us of such report during business hours thereafter.

Please be advised that Administrative Agent, on behalf of the Lenders, hereby reserves all rights and remedies under the Transaction Documents, at law or in equity, with respect to such breaches of the Loan Agreement.  Without limiting the foregoing, Administrative

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London, EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-123

Agent, on behalf of the Lenders, hereby reserves the right to declare a Default or Event of Default, to send any default, acceleration or other notices as Administrative Agent deems necessary in its sole discretion, and upon declaring an Event of Default (and without further notice to the Borrowers or any other party), to take such action as it deems necessary and/or advisable to recover payment of the indebtedness in full, including, without limitation, foreclosure of the liens and security interests arising under the Transaction Documents.

You are hereby further advised that (a) any delay by Administrative Agent, on behalf of the Lenders, in insisting upon the strict performance by Borrower, or any other party, of any of the terms and provisions of the Transaction Documents, or in the exercise of any rights and remedies provided to Lenders under the Transaction Documents (whether prior to the date hereof, at this time or any other time), does not constitute, is not intended to constitute, and shall not be deemed to constitute, a waiver, limitation, modification, relinquishment or forbearance by Lenders of any rights and remedies under the Transaction Documents, all of which are hereby expressly reserved and may be exercised at any time, and (b) neither the delivery of this Letter, nor any delay or failure by Administrative Agent or any Lender to exercise at this time (or at any time hereafter) any of its rights and remedies, nor any acceptance and/or application of any partial prepayment or monthly payment of principal or interest by Administrative Agent, on behalf of the Lenders, is intended to constitute, nor shall any of the foregoing be deemed to constitute (i) a waiver, modification, alteration, amendment, acquiescence or release of any of the requirements of the Loan Agreement, or of any Default or any Event of Default, (ii) a course of dealing obligating Administrative Agent or any Lender to provide any additional or other accommodations, financial or otherwise, to the Borrowers or any other party to any of the Transaction Documents at any time other than those expressly set forth in the Transaction Documents, or (iii) a commitment or any agreement to make a commitment with respect to any possible waiver, amendment, consent or other modification of the terms provided in the Transaction Documents.

Nothing contained in this letter is intended to modify any of the terms of the Loan Agreement or any other Transaction Document and the Loan Agreement and each of the other Transaction Documents remain in full force and effect in accordance with their respective terms.

A-124

Very truly yours,

**ADMINISTRATIVE AGENT:**

**LEADENHALL CAPITAL PARTNERS LLP,**

By: _____

Name:   Craig Gillespie
Title:    Head of Life & Alternative
           Credit Portfolio Management

A-125

# EXHIBIT 3

A-126

| | |
|---|---|
| **From:** | Phil.Kane |
| **To:** | Josh Wander |
| **Cc:** | Luca Albertini; John Wells; Tom Spreutels; Tom Foot; Craig Gillespie; Peter Clark |
| **Subject:** | Follow-ups to 777- Leadenhall call |
| **Date:** | Wednesday, March 29, 2023 9:54:35 AM |

Dear Josh,

Thank you for the call yesterday; we created a list of action items for each of the specific areas of concern we have and some follow ups we agreed at last night call.

As you can see there is quite a list of outstanding points and we need to see serious improvements on how various entities perform their contractual agreements and address our queries.

**Double Pledges**

1. A reconciliation of all of our assets to the appropriate SPV for both SPLCSS III and Dorchester – this should be completed as soon as possible, and by Monday 3rd of April at the latest. This is important for our valuation committee notes

2. Confirm, by close of business today, the progress made through the reconciliation; can you also send the list of assets that are in multiple compliance reports (a quick reconcile) and a list of assets not appearing in any compliance report (and their PV)? We recognize this would be subject to further detailed review but helps us start to analyse the portfolio.

3. For assets that are stated as ours but for which no cash has been received, a confirmation that the cash is held at Wells Fargo and will be released to us, and what other cure plan you have in mind to solve for the shortfall.

4. A list of the assets that are proposed as replacements for Dorchester and SPLCC III, and by when they can be implemented - we would like this list by the end of the week. Please confirm the acquisition date of these assets and how they have been funded

5. Please confirm that Sutton Park will grant permission to all of its lenders to share the policy details of each lenders' pledged assets (so that any future mistake can be promptly identified). 777 to instruct counsel to produce a document to ensure that this sharing does not breach confidentiality and in addition confirming that each lender will keep confidentiality on the data which has been exchanged. This system could be replaced if a backup servicer is in place confirming there is no double counting.

**Cash and Reporting**

6. Overdue Compliance reporting for Dorchester (Feb), SPLCSS III (Feb) and Signal (Jan and Feb) (by end of this week)

7. Feb Interest for Dorchester and SPLCS III (overdue) (by end of this week)

8. We have some queries on Signal that have not been addressed; appreciate focus on this as we seek to remedy the full structure.

9. We also have outstanding queries on Insurety. Sean mentioned that they were working through a "data project that will better serve to answer your questions, which should be completed next week." This implies this week (31/03); is it ready?

10. As we quantify the deficits net of any new eligible collateral, please supply other sources of cure and how we can get comfortable with those

11. We would also request Insurety Opco Quarterly unaudited financials which have never been sent since 2020 (by end of week)

12. Management Adjusted accounts for 777 Partners, could you confirm these equity values are free and unencumbered, and are net of any liabilities. When would you expect to have the

A-127

management adjusted information as of 31st December? Can we get that ASAP?

13. If we are to consider other asset pledges we will need a to a 3rd party valuation (at your expense)? We would like to go through the report that you sent as well with whoever is closest to the metrics.
    If the suggested timelines cannot be met, please let us know when we can reasonably expect those.

14. We would like to set up some further time with your team to discuss an overview of the servicing process. Payments assigned to SPLCSS were never received by SPLCSS and held as a receivable on the cash rec (the 3k out of 3m). How does the servicing work? If they rely on MpFin why weren't we receiving payments on the double pledged assets if they were listed in the system as assigned to us?

**Brickell**

15. As you recall, the Brickell Ticking fee from year end is outstanding and another round is due after 31st March. Please pay these (ASAP)

16. We would also suggest as liquidity is created from other sources that it be used to cure the A) Master Facility Deficits and B) the reduction of the principal to our loan to Brickell. If you are able to materially reduce our loan prior to syndication we are open to discuss the ticking fee

17. We will follow up with Will on hedging or monetising the Brickell gain given rate raise expectations seem to have peaked given the banking crisis.

**Other**

18. Please let us know of the waiver you mentioned for the completion of the Sutton Park audit; there is a waiver that we executed for Brickell, but it is held in escrow based on payment of the ticking fee

19. Also, please let us know the status of the Grant Thornton audits for the insurers for 2022, and in particular the engagement with the BMA on 777Re audit.

20. You pledged on a 2nd lien basis MCAG during the Brickell transaction; We are still waiting on the execution of the documents for that. Our lawyers (Links) have chased Mcquire Woods and KL Gates multiple times. Can you get this completed asap?

Best Regards,
**Phil Kane**
**Principal Trading, Senior Credit Officer**
**Leadenhall Capital Partners LLP**
Level 15, 70 Mark Lane, London, EC3R 7NQ
Tel: +44 (0) 207 871 7280
Mob: +44 (0) 78 4333 0471

Classification: Internal

A-128

# EXHIBIT 4

A-129

Case 1:24-cv-03453-JGK   Document 1-4   Filed 05/03/24   Page 2 of 2

| | |
|---|---|
| **From:** | Tom Spreutels |
| **To:** | Josh Wander; Nicholas Bennett |
| **Cc:** | John Wells; Luca Albertini; Craig Gillespie; Phil.Kane; Peter Clark; Tom Foot |
| **Subject:** | Leadenhall Follow-up Items - Call April 3rd |
| **Attachments:** | HoldCo_Consolidated_Debt_Schedule_12.31.21_LCP_v2.xlsx |
| **Importance:** | High |

Josh, Nick,

Thanks for your time yesterday afternoon to run us through the issues list.

We have now received the various reporting files.

Could you provide us with :

1. A plan to cure the identified deficiency and the associated time frame
2. Terms of the ACAP facility at 777 Partners
3. A legally binding undertaking that any proceeds from any asset sales within the 777 Partners Group will be applied to curing the Leadenhall deficiencies, subject only to ACAP's facility agreement
4. A legally binding first lien on any and all unencumbered assets of the group, and a second lien on any and all assets which already have a first lien on them? Specifically, we want to have all the proceeds from any sale of Pivotal Post, Sutton National, Ensurem and the football assets to be applied to reduce and eliminate all deficits and overdue interest/fees across the entirety of the Leadenhall relationship
5. Updated summary table of all facilities at 777 Partners (as per the attached)
6. Answers to the outstanding questions in relation to Insurety and Signal
7. Acknowledgment we apply default interest
8. Confirmation that all cases pledged (outside of double pledged cases) are listed as Funded on the system
9. Agreement to third party servicer validation of the collateral

Let us know so we can get lawyers to start working on items 3) and 4).

Thanks,

Tom

**Tom Spreutels** | Head of Origination
Life & Alternative Credit
Leadenhall Capital Partners LLP | Level 15 | 70 Mark Lane | London EC3R 7NQ
Tel: +44 (0) 207 871 7289 | Mob: +44 (0) 7843 330 483 | tom.spreutels@leadenhallcp.com

A-130

# EXHIBIT 5

A-131



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

| | |
|---|---|
| 777 Partners LLC | 600 Partners LLC |
| 600 Brickell Ave, 19th Floor | 600 Brickell Ave, 19th Floor |
| Miami, FL 33131, | Miami, FL 33131, |
| Attention: Steven W. Pasko | Attention: Steven W. Pasko |
| Email: spasko@777part.com | Email: spasko@777part.com |
| | |
| SPLCSS III LLC | Dorchester Receivables II LLC |
| 600 Brickell Ave, 19th Floor | 600 Brickell Ave, 19th Floor |
| Miami, Florida 33131 | Miami, Florida 33131 |
| Attention: Steven W. Pasko | Attention: Steven W. Pasko |
| Email: spasko@777part.com | Email: spasko@777part.com |

**Re:     Notice of Breach of Parties' Agreements**

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation. A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements. *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2. We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-132

November 29, 2023

**_The Agreements._** On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02. To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15. Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower." Pledge Agreements § 2.1. To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations. Guaranty Agreement § 2(a).

Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest. The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "*is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim*," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement." Master Loan Agreement §§ 1.01; 4.01(h). The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "*shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral*." Master Loan Agreement § 5.01(d). Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized. *See* Master Loan Agreement § 2.01.

**_Breaches in Connection with the Lenders' Collateral._** Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender. On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Credigy, a third-party lender. Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral. Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own. Leadenhall has also learned that the Borrowers may have sold and/or

2

A-133

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation. Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied. In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base. We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

(i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

(ii)    a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

(iii)   revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

(iv)    for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

(v)     a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

(vi)    a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-134

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii) a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii) any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):      Josh Wander
                      Kenneth King
                      Michael Saliba
                      Luca Albertini
                      Craig Gillespie
                      Phil Kane

4

A-135

# EXHIBIT 6

A-136

# Express Balance Report

**Custom**
As of 11/30/2022
Company: SUTTONPARK CAPITAL LLC

**Commercial Electronic Office®**
Note: Intraday information subject to change

Summary Section

| Account Number | Account Name |
|---|---|
| Account Balances for  121000248  WELLS FARGO BANK, N.A.<br>SPLCSS II Reserve | |
| Account Balances for  121000248  WELLS FARGO BANK, N.A.<br>SPLCSS II Collection | |

WELLS FARGO

A-137

# EXHIBIT 7

A-138

# WellsOne® Account
Account number: **4003131893** ▪ December 1, 2022 - December 31, 2022 ▪ Page 1 of 5



SUTTONPARK CAPITAL LLC
SPLCSS II LLC
2255 GLADES RD STE 100E
BOCA RATON FL 33431-7360

**Questions?**

Call your Customer Service Officer or Client Services
**1-800-AT WELLS** (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (182)
PO Box 63020
San Francisco, CA  94163

## Account summary

### *WellsOne®Account*

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| 4003131893 | $300,162.89 | $7,300,296.64 | -$7,360,710.54 | $239,748.99 |

## Credits
### Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/01 | 42,193.63 | WT Seq213431 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22120187659744 Trn#221201213431 Rfb# 69106682 |
| | 12/01 | 2,164,243.01 | WT Seq457187 Suttonpark Capital LLC /Org=Suttonpark Capital LLC Srf# Gb00000055002928 Trn#221201457187 Rfb# 44423 |
| | 12/05 | 34.50 | CT Lottery Corp AP Payment 120522 Sap_102250 Michael Morant -60167_7178_653 |
| | 12/05 | 103.51 | CT Lottery Corp AP Payment 120522 Sap_102250 Heath Jerome Terry -60164_7160_665 |
| | 12/05 | 240.15 | CT Lottery Corp AP Payment 120522 Sap_102250 Michael Morant -60167_7177_653 |
| | 12/05 | 241.53 | CT Lottery Corp AP Payment 120522 Sap_102250 Kenneth M. Blount III -60147_7109_704 |
| | 12/05 | 241.53 | CT Lottery Corp AP Payment 120522 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7121_665 |
| | 12/05 | 276.04 | CT Lottery Corp AP Payment 120522 Sap_102250 Pedro E. Infante -60268_7158_493 |
| | 12/05 | 345.05 | CT Lottery Corp AP Payment 120522 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7118_665 |
| | 12/05 | 556.76 | CT Lottery Corp AP Payment 120522 Sap_102250 Orlando Pereira, Buyout From B -60231_7116_125 |
| | 12/05 | 1,380.20 | CT Lottery Corp AP Payment 120522 Sap_102250 Arthur M. Terrell -60305_7154_77 |
| | 12/05 | 2,415.35 | CT Lottery Corp AP Payment 120522 Sap_102250 Pedro Infante -60268_7168_493 |
| | 12/05 | 11,535.56 | WT Seq151508 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22120591699884 Trn#221205151508 Rfb# 69152058 |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

| A-139 |

Account number: **4003131893** ■ December 1, 2022 - December 31, 2022 ■ Page 2 of 5



**Electronic deposits/bank credits** (continued)

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/07 | 49,419.01 | WT Seq159613 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22120735446009 Trn#221207159613 Rfb# 69188994 |
| | 12/09 | 5,284.00 | WT Seq153525 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22120922041623 Trn#221209153525 Rfb# 69224393 |
| | 12/12 | 34.50 | CT Lottery Corp AP Payment 121222 Sap_102250 Michael Morant -60167_7178_654 |
| | 12/12 | 103.51 | CT Lottery Corp AP Payment 121222 Sap_102250 Heath Jerome Terry -60164_7160_666 |
| | 12/12 | 240.15 | CT Lottery Corp AP Payment 121222 Sap_102250 Michael Morant -60167_7177_654 |
| | 12/12 | 241.53 | CT Lottery Corp AP Payment 121222 Sap_102250 Kenneth M. Blount III -60147_7109_705 |
| | 12/12 | 241.53 | CT Lottery Corp AP Payment 121222 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7121_666 |
| | 12/12 | 276.04 | CT Lottery Corp AP Payment 121222 Sap_102250 Pedro E. Infante -60268_7158_494 |
| | 12/12 | 345.05 | CT Lottery Corp AP Payment 121222 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7118_666 |
| | 12/12 | 345.05 | CT Lottery Corp AP Payment 121222 Sap_102250 Heidi M Alves -60157_7152_156 |
| | 12/12 | 690.10 | CT Lottery Corp AP Payment 121222 Sap_102250 Heidi M Alves -60157_7142_156 |
| | 12/12 | 690.10 | CT Lottery Corp AP Payment 121222 Sap_102250 Heidi M Alves -60157_7147_156 |
| | 12/12 | 1,259.43 | CT Lottery Corp AP Payment 121222 Sap_102250 Bertha E.Caldwell, Buyout From -60276_7129_111 |
| | 12/12 | 2,415.35 | CT Lottery Corp AP Payment 121222 Sap_102250 Pedro Infante -60268_7168_494 |
| | 12/13 | 20,608.85 | WT Seq#70908 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22121387693598 Trn#221213070908 Rfb# 69253498 |
| | 12/15 | 6,717.52 | WT Seq120535 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22121591738230 Trn#221215120535 Rfb# 69303361 |
| | 12/19 | 34.50 | CT Lottery Corp AP Payment 121922 Sap_102250 Michael Morant -60167_7178_655 |
| | 12/19 | 103.51 | CT Lottery Corp AP Payment 121922 Sap_102250 Heath Jerome Terry -60164_7160_667 |
| | 12/19 | 240.15 | CT Lottery Corp AP Payment 121922 Sap_102250 Michael Morant -60167_7177_655 |
| | 12/19 | 241.53 | CT Lottery Corp AP Payment 121922 Sap_102250 Kenneth M. Blount III -60147_7109_706 |
| | 12/19 | 241.53 | CT Lottery Corp AP Payment 121922 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7121_667 |
| | 12/19 | 276.04 | CT Lottery Corp AP Payment 121922 Sap_102250 Pedro E. Infante -60268_7158_495 |
| | 12/19 | 345.05 | CT Lottery Corp AP Payment 121922 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7118_667 |
| | 12/19 | 2,415.35 | CT Lottery Corp AP Payment 121922 Sap_102250 Pedro Infante -60268_7168_495 |
| | 12/19 | 10,351.50 | CT Lottery Corp AP Payment 121922 Sap_102250 Mahmoud Nafa -60252_7173_10 |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

A-140

Account number: **4003131893** ■ December 1, 2022 - December 31, 2022 ■ Page 3 of 5



*Electronic deposits/bank credits (continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/19 | 20,703.00 | CT Lottery Corp AP Payment 121922 Sap_102250 Mahoud Nafa -60252_7172_10 |
| | 12/19 | 1,694,120.21 | WT Seq176697 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22121970803775 Trn#221219176697 Rfb# 69378796 |
| | 12/21 | 77,613.50 | WT Seq160538 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22122170821235 Trn#221221160538 Rfb# 69420300 |
| | 12/22 | 4,538.62 | WT Seq110208 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22122270825739 Trn#221222110208 Rfb# 69444864 |
| | 12/23 | 617,558.81 | WT Seq454424 Suttonpark Capital LLC /Org=Suttonpark Capital LLC Srf# Gb00000055502164 Trn#221223454424 Rfb# 44604 |
| | 12/27 | 34.50 | CT Lottery Corp AP Payment 122722 Sap_102250 Michael Morant -60167_7178_656 |
| | 12/27 | 103.51 | CT Lottery Corp AP Payment 122722 Sap_102250 Heath Jerome Terry -60164_7160_668 |
| | 12/27 | 240.15 | CT Lottery Corp AP Payment 122722 Sap_102250 Michael Morant -60167_7177_656 |
| | 12/27 | 241.53 | CT Lottery Corp AP Payment 122722 Sap_102250 Kenneth M. Blount III -60147_7109_707 |
| | 12/27 | 241.53 | CT Lottery Corp AP Payment 122722 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7121_668 |
| | 12/27 | 276.04 | CT Lottery Corp AP Payment 122722 Sap_102250 Pedro E. Infante -60268_7158_496 |
| | 12/27 | 293.29 | CT Lottery Corp AP Payment 122722 Sap_102250 Alexander Williams -60110_7156_187 |
| | 12/27 | 293.29 | CT Lottery Corp AP Payment 122722 Sap_102250 Alexander Williams -60110_7157_187 |
| | 12/27 | 345.05 | CT Lottery Corp AP Payment 122722 Sap_102250 Heath Jerome Terry, Buyout Fr -60164_7118_668 |
| | 12/27 | 690.10 | CT Lottery Corp AP Payment 122722 Sap_102250 Joel Smith -60311_7167_55 |
| | 12/27 | 690.10 | CT Lottery Corp AP Payment 122722 Sap_102250 -60214_7138_132 |
| | 12/27 | 1,035.15 | CT Lottery Corp AP Payment 122722 Sap_102250 Paulina Marek -60214_7115_132 |
| | 12/27 | 1,576.60 | WT Seq133812 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22122791781619 Trn#221227133812 Rfb# 69494567 |
| | 12/27 | 2,415.35 | CT Lottery Corp AP Payment 122722 Sap_102250 Pedro Infante -60268_7168_496 |
| | 12/29 | 48,610.49 | WT Seq129616 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22122942236889 Trn#221229129616 Rfb# 69546610 |
| | 12/29 | 2,500,000.00 | WT Seq452777 Suttonpark Capital LLC /Org=Sutton Park Capital LLC Srf# Gb00000055581394 Trn#221229452777 Rfb# 44637 |
| | 12/30 | 1,708.12 | WT Seq257539 Computershare Trust Com /Org=Sutton Park Concentration Account Srf# Ec22123087771743 Trn#221230257539 Rfb# 69751521 |
| | | **$7,300,296.64** | **Total electronic deposits/bank credits** |
| | | **$7,300,296.64** | **Total credits** |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

| A-141 |

Account number: **4003131893** ■ December 1, 2022 - December 31, 2022 ■ Page 4 of 5



## Debits

### Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/01 | 32,809.48 | WT Fed#04119 US Bank, NA /Ftr/Bnf=Account of Custody Truct Cash Srf# Gw00000055004918 Trn#221201223695 Rfb# 44434 |
| | 12/01 | 78,840.41 | WT Seq457563 Suttonpark Servicing LI /Bnf=Suttonpark Servicing LLC Srf# Gb00000055004887 Trn#221201457563 Rfb# 44426 |
| | 12/01 | 102,393.34 | WT 221201-223560 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055004896 Trn#221201223560 Rfb# 44428 |
| | 12/01 | 209,980.69 | WT Fed#04115 US Bank, NA /Ftr/Bnf=Custody Trust Cash Srf# Gw00000055004580 Trn#221201223646 Rfb# 44432 |
| | 12/01 | 240,807.70 | WT Fed#04231 US Bank, NA /Ftr/Bnf=Account of Custody Trust Cash Srf# Gw00000055004901 Trn#221201223590 Rfb# 44430 |
| | 12/01 | 249,566.87 | WT 221201-223663 Bank of America, N. /Bnf=Bana Re-Gcas Srf# Gw00000055004582 Trn#221201223663 Rfb# 44433 |
| | 12/01 | 276,031.32 | WT 221201-223608 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055004903 Trn#221201223608 Rfb# 44431 |
| | 12/01 | 586,911.70 | WT Fed#04103 The Bank of NEW Yo /Ftr/Bnf=Rbs Annuities Ldnh Srf# Gw00000055004664 Trn#221201223579 Rfb# 44429 |
| | 12/01 | 598,148.29 | WT 221201-223508 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055004572 Trn#221201223508 Rfb# 44427 |
| | 12/23 | 34,412.51 | WT Fed#03410 US Bank, NA /Ftr/Bnf=Account of Custody Truct Cash Srf# Gw00000055502185 Trn#221223136328 Rfb# 44613 |
| | 12/23 | 76,360.02 | WT Seq454426 Suttonpark Servicing LI /Bnf=Suttonpark Servicing LLC Srf# Gb00000055501864 Trn#221223454426 Rfb# 44605 |
| | 12/23 | 107,396.15 | WT 221223-136194 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055501813 Trn#221223136194 Rfb# 44607 |
| | 12/23 | 220,240.08 | WT Fed#03405 US Bank, NA /Ftr/Bnf=Custody Trust Cash Srf# Gw00000055501814 Trn#221223136237 Rfb# 44611 |
| | 12/23 | 252,573.25 | WT Fed#03495 US Bank, NA /Ftr/Bnf=Account of Custody Trust Cash Srf# Gw00000055502167 Trn#221223136212 Rfb# 44609 |
| | 12/23 | 261,760.38 | WT 221223-136265 Bank of America, N. /Bnf=Bana Re-Gcas Srf# Gw00000055502183 Trn#221223136265 Rfb# 44612 |
| | 12/23 | 289,517.85 | WT 221223-136223 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055501876 Trn#221223136223 Rfb# 44610 |
| | 12/23 | 615,587.46 | WT Fed#03485 The Bank of NEW Yo /Ftr/Bnf=Rbs Annuities Ldnh Srf# Gw00000055501872 Trn#221223136204 Rfb# 44608 |
| | 12/23 | 627,373.04 | WT 221223-136186 Bank of America, N. /Bnf=Bana Re - Gcas Srf# Gw00000055501869 Trn#221223136186 Rfb# 44606 |
| | 12/29 | 2,500,000.00 | WT Seq454214 Suttonpark Capital LLC /Bnf=Suttonpark Capital LLC Srf# Gb00000055586685 Trn#221229454214 Rfb# 44638 |
| | | **$7,360,710.54** | **Total electronic debits/bank debits** |
| | | **$7,360,710.54** | **Total debits** |

## Daily ledger balance summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/30 | 300,162.89 | 12/05 | 148,479.91 | 12/09 | 203,182.92 |
| 12/01 | 131,109.73 | 12/07 | 197,898.92 | 12/12 | 210,065.26 |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

A-142

Account number: **4003131893** ■ December 1, 2022 - December 31, 2022 ■ Page 5 of 5



*Daily ledger balance summary (continued)*

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/13 | 230,674.11 | 12/21 | 2,044,077.50 | 12/27 | 189,430.38 |
| 12/15 | 237,391.63 | 12/22 | 2,048,616.12 | 12/29 | 238,040.87 |
| 12/19 | 1,966,464.00 | 12/23 | 180,954.19 | 12/30 | 239,748.99 |

**Average daily ledger balance**     **$428,824.62**

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

A-143

# EXHIBIT 8

A-144

# WellsOne® Account

Account number: **4003131885** ■ December 1, 2022 - December 31, 2022 ■ Page 1 of 2



SUTTONPARK CAPITAL LLC
SPLCSS II LLC
2255 GLADES RD STE 100E
BOCA RATON FL 33431-7360

**Questions?**

Call your Customer Service Officer or Client Services
**1-800-AT WELLS** (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (182)
PO Box 63020
San Francisco, CA  94163

## Account summary

*WellsOne®Account*

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| 4003131885 | $0.00 | $2,165,736.79 | -$2,165,736.79 | $0.00 |

## Credits
### Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/01 | 2,164,243.01 | WT Seq457165 Suttonpark Capital LLC /Org=Suttonpark Capital LLC Srf# Gb00000055002208 Trn#221201457165 Rfb# 44420 |
| | 12/12 | 1,493.78 | WT Seq455444 Suttonpark Capital LLC /Org=Suttonpark Capital LLC Srf# Gb00000055211459 Trn#221212455444 Rfb# 44498 |
| | | **$2,165,736.79** | Total electronic deposits/bank credits |
| | | **$2,165,736.79** | Total credits |

## Debits
### Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 12/01 | 2,164,243.01 | WT Seq457187 Suttonpark Capital LLC /Bnf=Suttonpark Capital LLC Srf# Gb00000055002928 Trn#221201457187 Rfb# 44423 |
| | 12/12 | 723.44 | Client Analysis Srvc Chrg 221209 Svc Chge 0000 000004003131885 |
| | 12/12 | 770.34 | Client Analysis Srvc Chrg 221209 Svc Chge 1122 000004003131885 |
| | | **$2,165,736.79** | Total electronic debits/bank debits |
| | | **$2,165,736.79** | Total debits |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

A-145

Account number: **4003131885** ■ December 1, 2022 - December 31, 2022 ■ Page 2 of 2



**Daily ledger balance summary**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/30 | 0.00 | 12/01 | 0.00 | 12/12 | 0.00 |

**Average daily ledger balance**  $0.00

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

A-146

# EXHIBIT 9

A-147



March 15, 2024

**BY HAND DELIVERY AND EMAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Re:     Notice of Acceleration of all Loans, and Demand for Immediate Repayment

Ladies/Gentlemen:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and together with the Master Loan Agreement and Pledge Agreements, collectively, the "Agreements").[1]

As you know and as detailed in that certain Notice of Events of Default and Trigger Events; Reservation of Rights Letter dated March 12, 2024 and attached hereto as Exhibit C, certain Events of Default have occurred and are continuing under the Agreements and Transaction Documents as of the date hereof, including, without limitation, the Events of Default identified as "Facility Events of Default" on Exhibit A attached hereto (collectively, the "Facility Events of Default") and the Events of Default identified as "Borrower Group Events of Default" on Exhibit A attached hereto (collectively, the "Borrower Group Events of Default" and together with the Facility Events of Default, the "Specified Events of Default").

---

[1] Unless otherwise defined, capitalized terms shall have the same meanings as set forth in the respective Agreements.

March 15, 2024

     As a result of the Specified Events of Default, "Facility Events of Default" have occurred under Section 7.01 of the Master Loan Agreement, "Borrower Group Events of Default" have occurred under Section 7.02 of the Master Loan Agreement, and a "Trigger Event" (as defined in the Guaranty Agreement) has occurred.  Accordingly, pursuant to Sections 7.01 and 7.02 of the Master Loan Agreement, Leadenhall hereby accelerates and declares all Obligations under the Agreements immediately due and payable.  As of the date hereof, the total amount due under the Transaction Documents, inclusive of fees and Interest charged at the Default Interest Rate, is in an amount that is not less than $609,529,966.82 (the "Accelerated Amount") as shown on <u>Schedule I</u> attached hereto and incorporated herein.  Please be further advised that as a result of the Specified Events of Default pursuant to Section 2.08 of the Master Loan Agreement, a Default Interest Period began on March 17, 2023, and the Accelerated Amount and other Obligations continue to bear Interest at the Default Interest Rate.

     Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis.  We also reserve the right to, among other things, (i) declare any additional Facility Events of Default and/or Borrower Group Events of Default, whether now existing or arising hereafter, in addition to the Specified Events of Default, and (ii) bring any additional claims or causes of action against the Borrowers', the Borrowers' affiliates, and the Borrowers' principals, whether arising under the Master Loan Agreement or otherwise.   Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i)  a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

A-149

Sincerely,

**LEADENHALL CAPITAL PARTNERS LLP**,
as administrative agent

By: _____
Name: Craig Gillespie
Title:  Head of Life & Alternative Credit
        Portfolio Management

cc:    Josh Wander
       Steve Pasko
       Joe Metzger
       Aaron Levy
       Kenneth King
       Michael Saliba
       John Wells
       Luca Albertini
       Craig Gillespie
       Phil Kane
       Peter Clark
       Leigh Nathanson
       Roger Schwartz
Enclosures

A-150

## EXHIBIT A
### Specified Events of Default

Facility Events of Default

1. The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantors, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit B and incorporated herein (the "Notice of Breach").[2]

2. Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4. A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5. A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1. The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of

---

[2] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-151

Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(j)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-152

**<u>EXHIBIT B</u>**

**Notice of Breach**

[See Attached]

A-153



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Re:     Notice of Breach of Parties' Agreements

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation.  A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements.  *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2.  We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-154

November 29, 2023

**_The Agreements._**   On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02.   To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15.   Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower."   Pledge Agreements § 2.1.   To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations.   Guaranty Agreement § 2(a).

Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest.   The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "*is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim*," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."   Master Loan Agreement §§ 1.01; 4.01(h).   The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "*shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral*."   Master Loan Agreement § 5.01(d). Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized.   *See* Master Loan Agreement § 2.01.

**_Breaches in Connection with the Lenders' Collateral._**   Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender.   On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Credigy, a third-party lender. Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral.   Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own.   Leadenhall has also learned that the Borrowers may have sold and/or

2

A-155

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation. Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied. In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base. We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

    (i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

    (ii)     a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

    (iii)     revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

    (iv)     for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

    (v)     a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

    (vi)     a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-156

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii) a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii) any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):      Josh Wander
Kenneth King
Michael Saliba
Luca Albertini
Craig Gillespie
Phil Kane

4

A-157

**EXHIBIT C**

**Notice of Events of Default and Trigger Events; Reservation of Rights Letter**

[See Attached]

A-158

 **Leadenhall**
Capital Partners

March 12, 2024

**BY HAND DELIVERY AND EMAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Re:    Notice of Events of Default and Trigger Event; Reservation of Rights

Ladies/Gentlemen:

I write on behalf of Leadenhall Capital Partners LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and together with the Master Loan Agreement and Pledge Agreements, collectively, the "Agreements").[1]

As you know, certain Events of Default have occurred and are continuing under the Agreements and Transaction Documents as of the date hereof, including, without limitation, the Events of Default identified as "Facility Events of Default" on Exhibit A attached hereto (collectively, the "Facility Events of Default") and the Events of Default identified as "Borrower Group Events of Default" on Exhibit A attached hereto (collectively, the "Borrower Group Events of Default" and together with the Facility Events of Default, the "Specified Events of Default").

As a result of the Specified Events of Default, "Facility Events of Default" have occurred under Section 7.01 of the Master Loan Agreement, "Borrower Group Events of Default" have occurred under Section 7.02 of the Master Loan Agreement, and a "Trigger Event" (as defined in the Guaranty Agreement) has occurred. Please be further advised that, pursuant to Section 2.08 of

---

[1] Unless otherwise defined, capitalized terms shall have the same meanings as set forth in the respective Agreements.

A-159

March 12, 2024

the Master Loan Agreement, interest on the Obligations under the Agreements has been accruing at the Default Interest Rate as of March 17, 2023, as a result of the Specified Events of Default.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Leadenhall expressly reserves all rights under the Agreements, including without limitation the right to (i) declare any additional Facility Events of Default and/or Borrower Group Events of Default, whether now existing or arising hereafter, in addition to the Specified Events of Default, (ii) accelerate and declare all Obligations under the Agreements immediately due and payable and (iii) bring any additional claims or causes of action against the Borrowers, the Borrowers' affiliates, and the Borrowers' principals, whether arising under the Master Loan Agreement or otherwise. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

A-160

Sincerely,

**LEADENHALL CAPITAL PARTNERS LLP**,
as administrative agent

By: _____
Name: Craig Gillespie
Title:  Head of Life & Alternative Credit
       Portfolio Management

cc:    Josh Wander
       Steve Pasko
       Joe Metzger
       Aaron Levy
       Kenneth King
       Michael Saliba
       John Wells
       Luca Albertini
       Craig Gillespie
       Phil Kane
       Leigh Nathanson
       Roger Schwartz
Enclosures

A-161

## EXHIBIT A
### Specified Events of Default

Facility Events of Default

1. The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantors, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as <u>Exhibit B</u> and incorporated herein (the "Notice of Breach").[2]

2. Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4. A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5. A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1. The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of

---

[2] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-162

Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(j)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-163

**<u>EXHIBIT B</u>**

**Notice of Breach**

[See Attached]

A-164



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Re:     Notice of Breach of Parties' Agreements

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation. A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements. *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2. We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-165

November 29, 2023

**_The Agreements._**  On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02.  To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15. Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower."  Pledge Agreements § 2.1.  To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations.  Guaranty Agreement § 2(a).

Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest.  The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "*is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim*," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."  Master Loan Agreement §§ 1.01; 4.01(h).  The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "*shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral*."  Master Loan Agreement § 5.01(d).  Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized.  *See* Master Loan Agreement § 2.01.

**_Breaches in Connection with the Lenders' Collateral._**  Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender.  On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Crwhere, a third-party lender. Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral.  Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own.  Leadenhall has also learned that the Borrowers may have sold and/or

2

A-166

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation. Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied. In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base. We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

(i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

(ii)    a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

(iii)   revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

(iv)    for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

(v)     a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

(vi)    a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-167

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii)   a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii)   any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):      Josh Wander
                      Kenneth King
                      Michael Saliba
                      Luca Albertini
                      Craig Gillespie
                      Phil Kane

4

A-168

**SCHEDULE I[3]**

**Calculation of Accelerated Amount**

| Borrower | Principal ($) | Interest ($) | Accelerated Amount Due ($) |
|---|---|---|---|
| SPLCSS III LLC | 366,795,056.26 | 29,075,119.81 | 395,870,176.07 |
| Dorchester Receivables II LLC | 83,151,602.71 | 5,408,953.45 | 88,560,556.16 |
| Insurety Agency Services LLC | 50,562,721.62 | 274,131.88 | 50,836,853.50 |
| Signal SML 4 LLC | 73,790,592.01 | 471,789.09 | 74,262,381.09 |
| **TOTAL** | **574,299,972.60** | **35,229,994.22** | **609,529,966.82** |

---

[3] These amounts are exclusive of attorneys' fees and other fees or charges that are due or may become due under the Transaction Documents.

A-169

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 <br><br> **[PROPOSED] ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** |

Upon the Complaint by Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall" or "Plaintiffs"); the accompanying declarations of Craig Gillespie, Phil Kane, Luca Albertini, and Leigh M. Nathanson; and the Memorandum of Law in Support of Plaintiffs' Application for a (i) Temporary Restraining Order, and (ii) a Receivership or, Alternatively, a Preliminary Injunction, all annexed thereto, it is

**ORDERED**, that Defendants 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Signal SML 4 LLC (the "Signal Borrower"), Insurety Agency Services

1

A-170

LLC (the "Insurety Borrower," and together with the other above-referenced Defendants, the "Borrowers and Guarantors"[1]) show cause before this Court, at Room __, United States Courthouse, 500 Pearl Street, New York County, New York, on the ___ of _____, 2024, at _____ a.m./p.m., why an Order shall not be entered:

(1)      Appointing a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure with the power to:

(A) take possession, custody, and control of any assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021;

(B) to the extent the value of the assets pledged as collateral to Leadenhall by the Borrowers is less than the outstanding debt which Leadenhall accelerated on March 15, 2024 ($609,529,966.82 or the "Accelerated Debt"), take possession, custody, and control of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

(C) to the extent the value of (i) the assets pledged as collateral to Leadenhall by the Borrowers, plus (ii) any cash or cash equivalents owned by the Borrowers and Guarantors is insufficient to cover the full amount of the Accelerated Debt, take possession, custody, and control of the proceeds of any sale or transaction by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

---

[1] "Borrowers and Guarantors" as used herein includes any and all affiliates, agents, employees, and attorneys of, and any and all persons who are in active concert or participation with, 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, and the Insurety Borrower.

2

A-171

(D) prevent the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any other Defendant[2];

(E) provide notice to Leadenhall to the extent any Defendant makes any attempt to foreclose on, repossess, or exercise remedial action against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors;

(2)     In the alternative to appointing a receiver pursuant to paragraph (1), issuing a preliminary injunction pursuant to Rule 64 or 65 of the Federal Rules of Civil Procedure which:

(A) prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021;

(B) to the extent the value of the assets pledged as collateral by the Borrowers to Leadenhall is less than the full amount of the Accelerated Debt, prohibits the expenditure or dissipation of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

(C) to the extent the value of (i) the assets pledged as collateral by the Borrowers, plus (ii) the value of any cash or cash equivalents owned by the Borrowers and Guarantors is insufficient to cover the full amount of the Accelerated Debt, prohibits the expenditure or dissipation by the Borrowers and Guarantors of any cash or cash equivalents received from any sale or transaction up to the full amount of the Accelerated Debt;

---

[2] "Defendant" or "Defendants" as used herein includes any and all affiliates, agents, employees, attorneys of, and any and all persons who are in active concert or participation with, the individuals or entities named as defendants in the Complaint.

3

A-172

(D) prohibits the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any Defendant;

(E) requires the Borrowers and Guarantors to provide notice to Leadenhall of any attempt by any Defendant to foreclose on, repossess, or exercise remedial actions against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors;

**FURTHER ORDERED** that pending a hearing and decision on the Order to Show Cause, the Borrowers and Guarantors are enjoined from committing any of the acts set forth in paragraph (2) above; and it is

**FURTHER ORDERED** that the Borrowers and Guarantors shall file and serve their answering papers, if any, so as to be received by the Court and Plaintiffs' counsel by 5:00 p.m. ET on May ___, 2024; and it is

**FURTHER ORDERED** that Plaintiffs shall file and serve their reply papers, if any, so as to be received by the Court and defense counsel by 5:00 p.m. ET May___, 2024; and it is

**FURTHER ORDERED** that service of this Order and all papers submitted in support of Plaintiffs' application, by email or overnight delivery and addressed to the Defendants or their respective counsel, within one (1) day of the date hereof, shall be deemed good and sufficient service thereof.

Issued at New York, New York on May ___, 2024, at _____ a.m/p.m.

_____
United States District Judge

4

A-173

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR APPLICATION FOR (1) A TEMPORARY RESTRAINING ORDER, AND (2) AN ORDER TO SHOW CAUSE FOR A RECEIVER OR, ALTERNATIVELY, A PRELIMINARY INJUNCTION**

A-174

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    THE PARTIES ENTER A SECURED "BORROWING-BASE" CREDIT FACILITY.......................................................................... 3

    B.    THE BORROWERS' BREACHES COME TO LIGHT. ...................................... 5

    C.    DEFENDANTS' INABILITY TO MAKE REPAYMENT................................... 7

    D.    THE SOURCE OF FUNDING OF THE 777 PARTNERS ENTERPRISE COLLAPSES. ................................................................. 10

    E.    PROCEDURAL HISTORY AND REQUEST FOR PRELIMINARY RELIEF ................................................................................ 13

LEGAL STANDARD ............................................................................................. 14

ARGUMENT ....................................................................................................... 16

I.    LEADENHALL'S CLAIMS WILL SUCCEED ON THE MERITS. ........................... 16

II.    LEADENHALL FACES IRREPARABLE HARM ABSENT EMERGENCY INJUNCTIVE RELIEF. ........................................................................ 18

III.    THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN LEADENHALL'S FAVOR............................................................................................ 22

IV.    THE PUBLIC INTEREST WEIGHS IN LEADENHALL'S FAVOR. .......................... 23

CONCLUSION.................................................................................................... 23

A-175

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019)..............................................................15

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
  740 F. Supp. 2d 465 (S.D.N.Y. 2010)..............................................................15

*Bank of Am., N.A. v. Won Sam Yi*,
  294 F. Supp. 3d 62 (W.D.N.Y. 2018)...............................................................22

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999).............................................................................18

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
  2023 WL 8810142 (S.D.N.Y. Dec. 19, 2023) ....................................14, 18, 22

*Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*,
  2019 WL 5257995 (S.D.N.Y. Oct. 17, 2019)...................................................22

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004).............................................................................16

*In re Feit & Drexler, Inc.*,
  760 F.2d 406 (2d Cir. 1985).............................................................................18

*Nimbus Therapeutics, LLC v. Celgene Corp.*,
  570 F. Supp. 3d 100 (S.D.N.Y. 2021)..............................................................22

*NML Cap., Ltd. v. Republic of Arg.*,
  699 F.3d 246 (2d Cir. 2012).............................................................................18

*Pashaian v. Eccelston Props., Ltd.*,
  691 F.3d 275 (2d Cir. 1996).............................................................................18

*Res. Grp. Int'l Ltd. v. Chishti*,
  91 F.4th 107 (2d Cir. 2024) ......................................................................14, 15

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*,
  866 F. Supp. 2d 247 (S.D.N.Y. 2012)..............................................................14

*Wilmington Tr., N.A. v. Winta Asset Mgmt. LLC*,
  2020 WL 5802365 (S.D.N.Y. Sept. 28, 2020)................................................15

A-176

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) ................................................................18

**Statutes**

CPLR § 6201 .......................................................................................14, 15

**Other Authorities**

Federal Rule of Civil Procedure 64 ...........................................................14

Federal Rule of Civil Procedure 65 ...........................................................14

A-177

## PRELIMINARY STATEMENT

This is an extraordinary case that warrants an emergency remedy. Defendant Josh Wander, who controls the six Defendant entities that are the subject of this application, has already admitted that his companies breached the most fundamental promise of their secured credit facility with Leadenhall by double-pledging the collateral backing their debt.[1] That undisputed breach gave Leadenhall the right to call immediately due more than $600 million in debt owed by the borrowers under the facility and guaranteed by their parent entities, 777 Partners and 600 Partners. Despite those entities' immediate and undisputed obligation to repay Leadenhall, Wander and his alter-ego companies continue to divert what funds they have into their other failing businesses, particularly professional football teams, in the vain hope of perpetuating their financial musical chairs a little longer.

Leadenhall seeks the Court's intervention to prevent Wander from rendering Defendants judgment-proof and irreparably harming Leadenhall's ability to ever recover what it is owed. In the weeks preceding the filing of Leadenhall's Complaint, Wander admitted repeatedly to Leadenhall that the 777 Partners enterprise could not make even a $15 million payment as a good-faith gesture towards paying down its massive debt. During the same period, news reports announced that 777 Partners had shoveled *a hundred million dollars* into Wander's glamor project of buying professional football clubs: on April 16, 2024, an $80 million "investment" to German professional football club Hertha BSC; on April 30, 2024, another $20 million "loan" to English professional football club Everton F.C. ("Everton"). Yet days before this action was initiated,

---

[1] "Leadenhall" refers to Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life"). Capitalized terms not defined herein have the same definitions as in Leadenhall's Complaint in this action (ECF 1).

A-178

Wander solemnly represented to Leadenhall that 777 Partners could not make any payment to Leadenhall and was in the process of running down its business and disposing of assets to repay creditors.[2]

The foundation supporting the enterprise cracked earlier this year.  777 Partners was, by its own description to investors, "anchored" by its reinsurance subsidiary 777 Re.  After a dramatic credit ratings downgrade in February 2024 placed 777 Re into junk-bond territory, the five insurance companies with reinsurance exposure to 777 Re—the agreements with which comprised 99% of 777 Re's invested assets—announced they were "recapturing" or eliminating their exposure to 777 Re.  That caused a domino effect.  In the last month, 777 Partners has seen its Australian airline business (Bonza) collapse into voluntary administration; disposed of a substantial stake in its Canadian airline business (Flair); failed to pay players' wages at its Belgian football club (Standard Liege); missed a deadline to repay a loan related to Everton's new stadium; and seen its public relations firm (Teneo) cut ties because of unpaid bills.  As of the filing of the Complaint, 777 Partners and its affiliates had already been named in at least 16 lawsuits generally concerning unpaid debts and collectively demanding more than $130 million.

Through this application, Leadenhall seeks narrowly tailored relief to preserve the status quo and prevent Wander and his companies from using insolvency as a shield against judgment on claims that are essentially undisputed.  In particular, Leadenhall seeks appointment of a receiver with the power to take control of the collateral pledged to Leadenhall by the borrowers and cash (or cash equivalents) from the borrowers and their guarantors—whether presently existing or from

---

[2] On May 10, 2024—after the Complaint was filed and yet still somehow undeterred—777 Partners reportedly loaned *another $10 million* to Everton.

2

A-179

future transactions—sufficient to cover the accelerated loan amount.  The receiver would also prevent dissipation of assets through transactions with other Defendants and prevent other Defendants from foreclosing on the assets of the borrowers and their guarantors.  In the alternative, Leadenhall seeks a preliminary injunction that would freeze the same assets and prevent the same actions.  This relief is necessary to avoid irreparable harm to Leadenhall and its investors.

## STATEMENT OF FACTS

### A.  The Parties Enter a Secured "Borrowing-Base" Credit Facility.

In May 2021, Leadenhall entered into a secured credit facility with four borrowers, the parent entities of which are 777 Partners and 600 Partners.  Declaration of Craig Gillespie ("Gillespie Decl.") ¶ 2; Compl. ¶ 45.  Pursuant to the facility, "Lenders," represented by Leadenhall, provided secured debt to the "Borrowers" that would mature in September 2024. Gillespie Decl. ¶ 2 n.1 (defining "Maturity Date"); *id.* Ex. 1, Excerpts from Loan and Security Agreement dated May 7, 2021 (hereinafter "LSA") § 2.01; Compl. ¶¶ 3-4, 45-50.  Because this was a ***secured*** credit facility, each Borrower pledged to Leadenhall as Collateral first-priority security interests in 100% of its assets.[3]  Gillespie Decl. ¶ 2 n.1 (defining "Collateral"); LSA § 2.15; Compl. ¶¶ 5, 51.  To ensure the debt was secured, the Borrowers could take on debt only up to their respective credit limits—called "Borrowing Bases"—which corresponded closely to the value of their Collateral.  Gillespie Decl. ¶ 2 n.1 (defining "Borrowing Base" and "Borrowing Base Deficiency"), LSA § 2.01(a), 7.01(c), 7.02(g), scheds. VIII-XI; Compl. ¶¶ 3, 5, 52-53.

Because the Borrowers' assets corresponded one-to-one with the Collateral securing the debt, and nearly one-to-one with their Borrowing Bases, ***the cardinal rule of the credit facility*** ***was that the Borrowers at all times own the assets pledged as Collateral 'free and clear" of any***

---

[3] All emphasis is added unless otherwise stated.

3

A-180

*other claims.*  Compl. ¶¶ 5-6, 76-88.  Under the LSA, each Borrower represented that its assets were owned "free and clear" upon executing the LSA, and they reaffirmed that representation every month and every time they borrowed money from Leadenhall, by submitting Compliance Reports attesting to their Borrowing Bases and the truth of their representations.  *See* LSA §§ 4.01(h), (i) (requiring such representations upon execution of the LSA, upon any borrowing, and in each Compliance Report); Compl. ¶ 56.  If Leadenhall's security interests were impaired, or any Borrower exceeded its Borrowing Base or breached a representation and did not promptly cure, those constituted Events of Default, *i.e.*, enumerated material breaches.  LSA §§ 7.01(c), (d), 7.02(c), (d), (g).

Upon an Event of Default, Leadenhall had the right to accelerate the Borrowers' entire outstanding debt.  *Id.* §§ 7.01, 7.02 (providing that upon an Event of Default, "the Administrative Agent may in its discretion . . . declare the related Loans then outstanding to be due and payable").

The LSA contemplates two types of Events of Default—Borrower Group Events of Default and Facility Events of Default.  *Id.*  Upon a Borrower Group Event of Default, Leadenhall may exercise remedies, including acceleration, "with respect to" the affected Borrower.  *Id.* § 7.02.  Borrower Group Events of Default include breached covenants and representations, and Borrowing Base Deficiencies not cured within three business days.  *Id.* § 7.02(c), (d), (g).  But upon a Facility Event of Default, Leadenhall may accelerate the debt of *all* Borrowers, even those not directly responsible for the Event of Default.  *Id.* § 7.01.  Facility Events of Default include fundamental breaches of the facility, including any impairment of Leadenhall's first-priority security interest not cured within two business days, and any Borrowing Base Deficiency not cured within 30 days.  *Id.* § 7.01(c), (d).

A-181

In addition to first-priority security interests in the Borrowers' assets and recourse against each Borrower, Leadenhall also negotiated a guarantee from 777 Partners and 600 Partners of all of the Borrowers' obligations. *See* Gillespie Decl. ¶ 4, Ex. 2, Excerpts from Guaranty Agreement (hereinafter "Guaranty"), §§ 2, 3 (providing that 777 Partners and 600 Partners "jointly and severally absolutely, unconditionally and irrevocably guarantee[d]" the Borrowers' "Guaranteed Obligations"); *id.* § 1 (defining "Guaranteed Obligations"); Gillespie Decl. ¶ 2 n.1 (defining "Obligations"). Among the "Trigger Events" granting Leadenhall recourse against 777 Partners and 600 Partners for the Borrowers' obligations is a Borrower's "failure . . . to own the Collateral pledged free and clear." *Id.* § 1 (definition of "Trigger Event" at clause (ix)).

### B. The Borrowers' Breaches Come to Light.

On September 19, 2022, 18 months into the credit facility and after the Borrowers had borrowed hundreds of millions of dollars, Leadenhall received an anonymous e-mail stating that Wander "either never bought" assets pledged to Leadenhall as Collateral "or already pledged them to another lender." The tipster concluded, "What he is doing is criminal." Gillespie Decl. ¶ 5, Ex. 3. The e-mail prompted Leadenhall to investigate whether the debt extended to Wander's companies was secured, including by conducting a check of computer software that 777 Partners used to allocate assets to lenders. *Id.* ¶ 6.

Unfortunately, the tipster was right. In March 2023, a third-party lender called "Credigy," which had a separate credit facility with 777 Partners, sent Leadenhall a list of assets ostensibly pledged to Credigy by 777 Partners. *Id.* ¶ 7. Leadenhall identified from this inventory more than 1,600 assets, worth approximately $185 million, that the largest borrower in the LSA—the SuttonPark Borrower—had pledged to both Credigy and Leadenhall as Collateral. *Id.*

On March 28, 2023, Leadenhall held a recorded conference call with Wander. Declaration of Phil Kane ("Kane Decl.") ¶ 2. During that call, Wander admitted that the SuttonPark Borrower

5

A-182

had double-pledged Collateral to both Leadenhall and another lender in breach of the LSA. Wander stated:

- "The issue today is that **there are deals that are in Credigy's Borrowing Base that are allocated to you guys**."

- "[There are d]eals that sat on our Volans facility—which is locked out basically now for 5 years—that were allocated to the [SuttonPark] facility. **And those are the deals that that— you would consider double-pledged now, for they're on both facilities**."[4]

- And in response to the statement by Leadenhall Chairman John Wells that, **"There are so many breaches on these agreements now. We need to get all of this sorted out"**, Wander responded, **"Agreed, agreed, agreed."**

*Id.* ¶¶ 3-5.

Leadenhall held a second recorded conference call with Wander on April 3, 2023. *Id.* ¶ 7. Wander again admitted to fundamental breaches. *Id.* ¶¶ 8-9 (Wells: "What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?" Wander: "I think it was around 100 million I think."). Leadenhall later discovered the Dorchester Borrower had also pledged assets that were already pledged to another lender, sold or transferred to a third-party, or never purchased in the first place. Gillespie Decl. ¶ 9, Ex. 5.

On November 29, 2023, Leadenhall sent formal notice of the Borrowers' breaches. *Id.* ¶ 8, Ex. 4. Leadenhall stated it had become "aware that assets pledged as Collateral under the Agreements may have been double-pledged," calculating Borrowing Base shortfalls at approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower. *Id.*

In January 2024, at Leadenhall's request, the SuttonPark and Dorchester Borrowers submitted revised monthly Compliance Reports going back to March 2023. *Id.* ¶ 10, Exs. 6, 7.

---

[4] The "Volans facility" refers to Credigy's credit facility with 777 Partners. Kane Decl. ¶ 4.

A-183

The revised reports showed that—as a result of the double-pledging of assets—the SuttonPark and Dorchester Borrower had, going back to March 2023 (and likely much earlier), borrowed hundreds of millions of dollars in excess of contractual limitations:

**Excerpt from revised March 2023 Compliance Report for SuttonPark Borrower:**

| | | | |
|---|---|---|---|
| | Borrowing Base | $ | 64,076,151.91 |
| **Borrowing Base Compliance** | | | |
| Borrowing Base Amount | | $ | 64,076,151.91 |
| Outstanding Borrowings | | $ | 349,997,803.32 |
| Compliant if difference is ≥ 0) | | | No |

**Excerpt from revised March 2023 Compliance Report for Dorchester Borrower:**

| | | | |
|---|---|---|---|
| | Borrowing Base | $ | 42,455,473.97 |
| **Borrowing Base Compliance** | | f | |
| Borrowing Base Amount | | $ | 42,455,473.97 |
| Outstanding Borrowings | | $ | 79,010,000.00 |
| Compliant if difference is ≥ 0) | | | No |

*Id.*

In light of the material breaches, on December 19, 2023, all four Borrowers executed an amendment to the LSA (hereinafter the "Additional Interest Amendment"). *Id.* ¶ 11. Pursuant to the Additional Interest Amendment, the Borrowers agreed to pay additional interest on the "Uncollateralized Portion" of their outstanding debt to Leadenhall. *Id.* ¶ 11 & n.2.

### C.  Defendants' Inability to Make Repayment.

After sending the Notice of Breach, Leadenhall negotiated for months with Wander hoping to recoup the debt extended to his companies without litigation. Instead, it became clear that Wander and his companies, including 777 Partners, 600 Partners, and the Borrowers, were in financial distress and unable to commit to repaying Leadenhall at all. Compl. ¶¶ 160, 173-211.

On February 21, 2024, Leadenhall executed a "Paydown and Partial Release Letter" with the Borrowers and Guarantors (the "Paydown Letter"). Gillespie Decl. ¶ 12, Ex. 8. In the Paydown

7

A-184

Letter, the Borrowers agreed immediately to repay approximately $25 million.  *Id.* Ex. 8 §§ 1-3 & Exs. A-C thereto.  The deadline for that payment was February 21, 2024, and the Borrowers immediately missed it, instead paying half that amount—approximately $12.5 million.  *Id.* ¶ 13. The next day, Leadenhall Managing Partner Craig Gillespie received an explanation why 777 Partners failed to pay Leadenhall on time—a 777 Partners employee reported that co-Defendant A-CAP had funded its payroll and operating expenses earlier that day, so 777 Partners could not pay Leadenhall $25 million in one shot.  *Id.* ¶ 14.

As it became clearer Wander's companies would not meet even modest repayment obligations, Leadenhall took additional steps to protect its rights.  On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with a Default Notice, notifying them that the events detailed in the prior Notice of Breach constituted Facility Events of Default under the LSA.  *Id.* ¶ 15, Ex. 9.  On March 15, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with an Acceleration Notice, notifying them that, in light of the Events of Default, it was exercising its contractual right, upon a Facility Event of Default, to call immediately due and payable the outstanding balance due to Leadenhall from all four Borrowers under the facility of $609,529,966.82 (the "Accelerated Amount").  *Id.* ¶ 16, Ex. 10.

Following acceleration, Leadenhall continued attempting to negotiate a restructuring of the outstanding debt.  In late March 2023, the parties exchanged draft "Forbearance Agreements," whereby Leadenhall would forbear on exercising certain remedies in exchange for payments pursuant to a repayment plan.  On March 26, 2024, Associate General Counsel of 777 Partners Jon Walder sent a markup of the Draft Forbearance Agreement back to Leadenhall, conceding in an opening recital that, "[a]s of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing."  Gillespie Decl. ¶ 17, Ex. 11.

A-185

It became clear, however, that Wander and his companies could not make even one payment under any reasonable payment plan. One of the terms in the Draft Forbearance Agreement would have required a $15 million payment on March 29, 2024. *Id.* Ex. 11 § 5(d). But on that date, Wander stated that 777 Partners could not make that payment absent financing from A-CAP. Declaration of Luca Albertini ("Albertini Decl.") ¶ 2. Wander also said if 777 Partners even agreed to a repayment plan without A-CAP's approval of its terms, A-CAP would notice an event of default on A-CAP's outstanding loans to 777 Partners. *Id.*

During follow-up calls on March 31, April 1, 2, and 3, 2024, Wander repeatedly stated that 777 Partners could not make a $15 million payment—less than 2.5% of the Accelerated Amount—and A-CAP would not fund such payments to Leadenhall. Gillespie Decl. ¶¶ 18-21; Albertini Decl. ¶¶ 3-4. Using his usual tactic of promising payment was just around the corner if Leadenhall could hold out a little longer, Wander suggested 777 Partners could make a payment on April 15, 2024, using an alternative funding source not dependent on A-CAP. Gillespie Decl. ¶ 20; Albertini Decl. ¶ 4. Leadenhall never received such a payment. Gillespie Decl. ¶ 20; Albertini Decl. ¶ 5.

Leadenhall continued attempting to secure some consensual repayment for the benefit of its investors. On April 4, 2024, Wander told Leadenhall that 777 Partners did not have $30 million to repay Leadenhall and A-CAP would not allow such a payment. Albertini Decl. ¶ 6. On April 16, 2024, Wander stated he could not repay the $350 million Collateral shortfall within two weeks. Gillespie Decl. ¶ 22. And on April 29, 2024, Wander said 777 Partners did not have $400 million to repay the Borrowers' debts. *Id.* ¶ 23.

As April turned to May 2024, Wander also began confirming that 777 Partners and affiliates were in desperation mode. On May 2, 2024, the day before this lawsuit was filed, Wander stated that 777 Partners was running down its business and disposing of assets to repay creditors.

A-186

Albertini Decl. ¶ 7.  Wander also stated that A-CAP could no longer provide any funds to 777 Partners due to regulatory scrutiny and would itself foreclose on 777 Partners' assets.  Gillespie Decl. ¶ 24.

### D.  The Source of Funding of the 777 Partners Enterprise Collapses.

Adding to the exigency stemming from 777 Partners' inability to make even a modest repayment, Wander's businesses are currently in free-fall.

In early 2024, the foundation supporting Wander's businesses—777's Bermuda-based reinsurance subsidiary, 777 Re Ltd. ("777 Re")—crumbled, extinguishing 777 Partners' key funding source.  *See* Kane Decl. ¶¶ 12-15.  As a reinsurer, 777 Re accepts payments from primary insurance companies (and other reinsurers) in exchange for indemnifying their liabilities; in reinsurance parlance, 777 Re's customers "cede" liabilities to 777 Re.  The continued operation of many of 777 Partners' businesses—including in professional football, aircraft leasing, Canadian airlines, and asset management—depends heavily on 777 Re's assets.  *Id.* ¶¶ 15-16.  777 Partners has described itself to investors as "anchored" by 777 Re.[5]  At year-end 2023, approximately 99% of 777 Re's nearly $4 billion in invested assets were tied to reinsurance agreements with five insurers, three of which are owned by A-CAP.  *Id.* ¶¶ 11-12.  But in 2024—following regulatory scrutiny and a dramatic credit downgrade of 777 Re—those five firms announced they would "recapture" their exposure to 777 Re, causing a material reduction in 777 Re's value.[6]  *Id.* ¶¶ 13.

---

[5]    Compl. ¶ 146 (citing Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/).

[6]    The extent to which the net book value of 777 Re's assets is reduced depends on the extent to which 777 Re retains participation in the recaptured insurance assets.  777 Re has represented that it may retain some participation.

10

A-187

That caused a domino effect, and the following dominoes have fallen *in the last month alone*: Following unpaid debts by 777 Partners, an affiliate of A-CAP repossessed the entire fleet of 777 Partners' Australian budget airline, Bonza, and the airline entered voluntary court-supervised administration.[7] 777 Partners' Canadian airline, Flair, announced that 777 Partners had disposed of a substantial ownership stake.[8] 777 Partners failed to repay a nearly $200 million loan when due in connection with a new English football stadium.[9] 777 Partners failed to pay the players of its Belgian football club, Standard Liege,[10] and failed to complete the second installment

---

[7]     Andrew Curran, *Australia's Bonza goes bust as AIP Capital seizes aircraft*, CH-AVIATION (Apr. 30, 2025), https://www.ch-aviation.com/news/139721-australias-bonza-goes-bust-as-aip-capital-seizes-aircraft.

[8]     Ayesha de Kretser, *Bonza's sister airline cuts 777 Partners, restructures debt*, FINANCIAL REV. (May 2, 2024), https://www.afr.com/companies/transport/bonza-s-sister-airline-cuts-777-partners-restructures-debt-20240502-p5foes.

[9]     Jamie Nimmo and David Hellier, *Everton FC Pursued by Another US Investor as 777 Takeover Falters*, BLOOMBERG (May 8, 2024), https://www.bloomberg.com/news/articles/2024-05-08/everton-bid-explored-by-us-firm-msp-sports-capital-as-777-offer-teeters.

[10]     *From bad to worse for Standard Liege as 777 owned club have no money in their account to pay wages until the end of the season*, ONEFOOTBALL (May 8, 2024), https://onefootball.com/en/news/from-bad-to-worse-for-standard-liege-as-777-owned-club-have-no-money-in-their-account-to-pay-wages-until-the-end-of-the-season-39459085.

11

A-188

payment for its acquisition of the club.[11]  Even 777 Partners' public relations firm severed ties because of overdue bills.[12]

Additionally, Wander, his business partner Steven Pasko, 777 Partners, 600 Partners, and their affiliates are collectively facing at least sixteen other lawsuits collectively seeking more than $130 million.  *See* Declaration of Leigh M. Nathanson ("Nathanson Decl."), Exs. A-P.  Those lawsuits allege, among other things:

- 777 Partners "redirected capital into new investments and management bonuses," rather than honoring its obligations, *Change Lending, LLC v. 777 Partners LLC*, *id.* Ex. A ¶ 25;

- 777 Partners used affiliated corporate entities to deprive an investor of its ownership interest in an aviation subsidiary, *MALT Family Trust v. 777 Partners, LLC, id.* Ex. C ¶ 17;

- Wander fraudulently transferred two subsidiaries to Pasko to shield those assets from creditors, *Obra Capital Management, LLC v. 777 Partners LLC, id.* Ex. E ¶¶ 5, 36-38;

- 777 Partners acknowledged that it owed fees but "slow-rolled" its payment obligations (just as it has here), only making occasional payments before disregarding the firm entirely and without any stated justification, *Oxbridge Group, LTD v. 777 Partners LLC, id.* Ex. M ¶ 1;

- 777 Partners is "part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise," *O'Neil-Dunne v. Phoenicia LLC, id.* Ex. N ¶ 7.

These financial troubles came at the same time that 777 Partners and 600 Partners needed capital to close a deal to purchase Everton, the historic English football club, which would be the

---

[11]     Mauricio Alencar, *777 Partners takeover of Everton in further doubt after firm hit with legal action,* YAHOO! FINANCE (May 6, 2024), https://uk.finance.yahoo.com/news/777-partners-takeover-everton-further-174257384.html.

[12]     Bernard Lagan and Paul Joyce, *Everton takeover doubts grow as 777 Partners' airline collapses,* THE TIMES (April 30, 2024), https://www.thetimes.co.uk/sport/football/article/everton-takeover-doubts-grow-as-777-partners-airline-collapses-fmfnmc536.

A-189

most prominent of Wander's football investments.[13]  On April 30, 2024, after months of 777 Partners claiming an inability to pay down even a fraction of its debts to Leadenhall, 777 Partners reportedly loaned an additional $20 million to Everton.  Compl. ¶ 208.  This came on the heels of an announcement earlier in April by Hertha BSC, a German football club owned by 777 Partners, that 777 Partners had invested another $80 million in the club.  *Id.* ¶ 207.  When Leadenhall questioned Wander about this incongruity between his private claims of illiquidity and public actions, prior to filing the Complaint, Wander said the football loans constituted "protective advances" provided by A-CAP, and A-CAP could not provide any "protective advances" to Leadenhall.  Albertini Decl. ¶ 8.  And yet after the Complaint was filed, 777 Partners reportedly loaned Everton another $10 million.[14]

### E.  Procedural History and Request for Preliminary Relief

Leadenhall initiated this action on May 3, 2024.  By this application, Leadenhall seeks a temporary restraining order and a receivership or preliminary injunction against the Borrowers and their guarantors, 777 Partners, and 600 Partners (collectively, the "Borrowers and Guarantors").  The preliminary relief Leadenhall seeks is as narrowly tailored as possible to prevent the Borrowers and Guarantors from using insolvency as a shield against judgment while allowing legitimate business operations, if any, to continue.  In particular, Leadenhall seeks appointment of

---

[13]     For further context on Wander's football ventures, *see* Compl. ¶¶153-156, 181-199 and sources cited therein.

[14]     George Overhill, *Everton receive more cash from 777 Partners despite takeover bid on brink of collapse*, GOODISON NEWS (May 11, 2024), https://www.goodisonnews.com/2024/05/11/everton-receive-more-cash-from-777-partners-despite-takeover-bid-on-brink-of-collapse/.

A-190

a receiver to: (i) take control of the assets pledged as Collateral by the Borrowers, (ii) to the extent the value of the Collateral is less than the Accelerated Debt, take control of cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the Accelerated Debt, (iii) to the extent the value of the Collateral plus the cash or cash equivalents of the Borrowers and Guarantors is less than the Accelerated Debt, take control of the proceeds of any sale sufficient to cover the amount of the Accelerated Debt, (iv) prevent the Borrowers and Guarantors from dissipating assets, including by transferring assets to any persons affiliated with the Defendants, and (v) notify Leadenhall if any Defendant attempts to foreclose on assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on assets of the Borrowers and Guarantors.  In the alternative, Leadenhall seeks a preliminary injunction to freeze the same Collateral and the same cash or cash equivalents of the Borrowers and Guarantors up to the amount of the Accelerated Debt, and otherwise enjoin or require equivalent actions.[15]

## LEGAL STANDARD

The forms of preliminary relief Leadenhall seeks here—either a receiver or an injunction—are subject to analogous legal standards, requiring Leadenhall to show: (1) a likelihood of success on the merits, (2) a risk of irreparable harm, and (3) a balance of the equities.  *See, e.g., Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (discussing standard for temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65, including "that 'the balance of hardships

---

[15] Leadenhall's requested relief is designed to narrowly protect the Collateral and outstanding debt due to Leadenhall under the LSA.  Separately, Leadenhall is currently seeking the Borrowers' and Guarantors' cooperation in accordance with the terms of the LSA to protect the Collateral, and to the extent the Borrowers and Guarantors refuse to provide that contractually required cooperation, Leadenhall hereby reserves the right to seek additional injunctive relief from the Court.

14

A-191

tips in the plaintiff's favor'; and 'that the public interest would not be disserved by the issuance of the injunction.'"); *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2023 WL 8810142, at *2 (S.D.N.Y. Dec. 19, 2023) (discussing standard for attachment under Fed. R. Civ. P. 64 and New York law);[16] *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012) (discussing standard for receivership); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction."); *see also Wilmington Tr., N.A. v. Winta Asset Mgmt. LLC*, 2020 WL 5802365, at *1 (S.D.N.Y. Sept. 28, 2020) ("A federal court has the power in equity to appoint a receiver in order to protect a party's interest in . . . property," including collateral and proceeds therefrom, and noting that "imminent danger of the diminution of the value of the property is a critical factor in the analysis").

---

[16] The Court may grant the requested relief freezing assets under Fed. R. Civ. P. 64, which incorporates the remedy of prejudgment attachment under New York law, or Fed. R. Civ. P. 65. With respect to the former, Leadenhall must also show that "one or more of the enumerated statutory grounds for attachment under N.Y. CPLR § 6201 exists." *Citibank*, 2023 WL 8810142, at *2 (internal quotation marks omitted). Applicable "enumerated statutory grounds for attachment" include that Defendants "resid[e] without the state" and that, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, [Defendants have] assigned, disposed of, encumbered or secreted property, or removed it from the state or [are] about to do any of these acts." N.Y. CPLR § 6201(1), (3).

15

A-192

## ARGUMENT

### I.  Leadenhall's Claims Will Succeed on the Merits.

Leadenhall asserts both contractual and non-contractual claims in its Complaint, all of which are likely to succeed on the merits.  The preliminary relief Leadenhall seeks relates specifically to its claims arising from contractual agreements with the Borrowers and Guarantors and the Accelerated Amount undisputedly due thereunder.  Therefore, for purposes of this application, Leadenhall focuses its analysis on the contract claims, which provide on their own a sufficient basis for the Court to order the relief requested.  *See, e.g.*, *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only show a likelihood of success on the merits of at least one of [their] claims." (internal quotation marks omitted)).

To prevail on its contract claims, Leadenhall must establish (i) an enforceable agreement, (ii) the Borrowers' and Guarantors' breach, (iii) Leadenhall's performance, and (iv) damages. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). This is the rare case where the Borrowers and Guarantors have already admitted to material breaches of enforceable agreements which caused hundreds of millions of dollars in damage.

The Borrowers pledged first-priority security interests in their assets to Leadenhall as Collateral.  Gillespie Decl. ¶ 2 n.1 (defining "Collateral"), LSA § 2.15.  They were required to maintain the Collateral "free and clear of any Adverse Claim," LSA §§ 4.01(h), 5.01(d), 5.01(k)(vi), and the SuttonPark and Dorchester Borrowers violated these provisions, including by double-pledging Collateral to both Leadenhall and separate third-party lenders.  The encumbrance of Collateral and uncured Borrowing Base deficiencies constitute Facility Events of Default, giving Leadenhall the right to accelerate *all* Borrowers' debts.  *Id.* § 7.01(c), (d).

16

A-193

Further, 777 Partners and 600 Partners jointly and severally guaranteed to Leadenhall "the full and punctual payment and performance . . . of the Guaranteed Obligations of" each of the four Borrowers to the extent "a Trigger Event has occurred and is continuing." Guaranty § 2(a). A "Trigger Event" includes "any failure of a Borrower to own the Collateral pledged by such Borrower . . . free and clear . . . as a result of the action or inaction of such Borrower or a Guarantor" that is not cured within two business days. *Id.* § 1, "Trigger Event." In other words, upon double-pledge of Collateral, the Guarantors must guarantee the obligations of the Borrowers.

Wander himself already admitted during March 28, 2023 and April 3, 2023 recorded conference calls to fundamental breaches of contract by double-pledging Collateral. *See* Kane Decl. ¶¶ 2-5, 7-9 (Wells: "There are so many breaches on these agreements now. We need to get all of this sorted out." Wander: "Agreed, agreed, agreed."). And, after Leadenhall sent formal Notice of Breach in November 2023 and requested that the SuttonPark and Dorchester Borrowers issue revised Compliance Reports accounting for the double-pledging, the revised reports disclosed that as of March 2023, the Dorchester and SuttonPark Borrowers had borrowed over $35 million and $285 million in excess of their respective Borrowing Bases. *See* Gillespie Decl. ¶¶ 10, Exs. 6-7. The revised Compliance Reports constitute proof positive of massive breaches of contract.

Written draft and final contract amendments between the parties drive home the breaches. In December 2023, the Borrowers agreed to an Additional Interest Amendment to the LSA, imposing an additional interest rate on the "Uncollateralized Portion" of their debts retroactive to March 2023, when Leadenhall discovered the double-pledging. *Id.* ¶ 11 & n.2. In March 2024, 777 Partners' in-house counsel sent Leadenhall a draft amendment conceding that "[a]s of the date

A-194

hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing." *Id.* ¶ 17, Ex. 11.

The likelihood that Leadenhall will succeed on its contract claim against the Borrowers and Guarantors for approximately $600 million in Accelerated Debt is overwhelming.[17]

## II.   Leadenhall Faces Irreparable Harm Absent Emergency Injunctive Relief.

Leadenhall faces irreparable harm if injunctive relief is not granted. "[A] party's persistent efforts to frustrate the collection of money judgments" can "suffice to establish the inadequacy of a monetary relief." *NML Cap., Ltd. v. Republic of Arg.*, 699 F.3d 246, 262 (2d Cir. 2012). "Thus, preliminary injunctive relief may issue" where defendants will "'frustrate any judgment on the merits by making it uncollectible.'" *Citibank*, 2023 WL 8810142, at *4 (quoting *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996)); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012) ("The 'unlikelihood that defendants would, in any event, be able to satisfy a substantial damage award' further supports a finding of irreparable harm." (cleaned up)); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985). If Wander further dissipates the Borrowers' and Guarantors' assets, Leadenhall will lose not only its ability to recover any money judgment, but also its first-priority security interests in the Collateral and the equitable rights and remedies Leadenhall seeks to secure through its requests for injunctive and declaratory relief. Compl. ¶ 282(b)-(d). Emergency injunctive relief is warranted because, "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

---

[17] Leadenhall will also prevail on its fraud and civil RICO claims, but again, this application does not rest on those claims. Nonetheless, because a civil RICO plaintiff may seek treble damages, the likelihood of personal, ten-figure liability increases Defendants' incentives to secrete assets.

A-195

In the months preceding the filing of the Complaint, Wander's sprawling enterprise started to collapse. All the while, Wander strung along Leadenhall, offering false promises to pay down existing debt while continuing to dissipate assets into money-losing football clubs and other disintegrating companies and assets.

In the first quarter of this year, 777 Re—the reinsurance subsidiary that long "anchored" 777 Partners' most valuable businesses—collapsed. In February 2024, 777 Re was placed under administrative control by its Bermuda regulator and suffered a dramatic credit rating downgrade, placing it into junk bond territory. Compl. ¶¶ 200-03. As a result, every one of the insurance companies with reinsurance agreements with 777 Re cut ties, comprising 99% of 777 Re's invested assets, "recaptured" or eliminated their exposure to 777 Re. Kane Decl. ¶¶ 11-15.

That loss of 777 Partners' piggy bank caused an implosion. In the last month, 777 Partners' Australian airline entered voluntary administration after an A-CAP affiliate repossessed its entire fleet; 777 Partners disposed of a substantial portion of its stake in a Canadian airline; 777 Partners failed to pay its Belgian football club's players and to make its second installment payment for its purchase of that club; 777 Partners failed to repay a $200 million loan when due for an English football stadium; and it even stiffed its PR firm. Wander and his companies are collectively facing 16 other lawsuits concerning unpaid debts by businesses in the 777 Partners enterprise which collectively seek over $130 million. *See supra* § D. This is an enterprise under siege.

Leadenhall has witnessed the siege first-hand. In February 2024, the parties executed the Paydown Letter, which contemplated a payment on February 21, 2024 of $25 million (about 4% of the accelerated debt). Gillespie Decl. Ex. 8. When the payment was due, 777 Partners paid only about half on time. *Id.* ¶ 13. Further substantiating 777 Partners' illiquidity, the next day, a

A-196

777 Partners employee told Leadenhall's Craig Gillespie that A-CAP had funded 777 Partners' payroll and basic operating expenses earlier that day. *Id.* ¶ 14.

In March 2024, Leadenhall accelerated the $609 million debt due under the credit facility. *Id.* ¶ 16, Ex. 10. The parties then attempted to negotiate a Forbearance Agreement, under which Leadenhall would forbear on exercising certain remedies in exchange for a payment plan. *Id.* ¶ 17. The Draft Forbearance Agreement sent by 777 Partners' counsel on March 26, 2024, contemplated an initial payment on March 29, 2024, of $15 million (less than 2.5% of the accelerated debt). *Id.* Ex. 11. Defendants did not sign the Forbearance Agreement or make that payment. Instead, on the due date, Wander told Leadenhall that 777 Partners (and its affiliates) could not make a $15 million payment absent assistance from A-CAP, and 777 Partners could not even agree to a repayment plan without A-CAP's approval of its terms. Albertini Decl. ¶ 2. Wander reaffirmed his inability to pay Leadenhall repeatedly over the coming days, while continually offering Leadenhall false hope to stave off legal action:

- On March 31, 2024, Wander told Gillespie that 777 Partners could not make a $15 million payment, and their ability to make any such payment depended entirely on A-CAP providing the money. Gillespie Decl. ¶ 18.

- On April 1, 2024, Wander told Gillespie that 777 Partners could not make a $15 million payment, and any ability to do so depended on funding from A-CAP. Wander said A-CAP could fund a $15 million payment the following day. When asked whether the inability to pay sooner was due to A-CAP's liquidity issues, Wander responded, "must be." That payment never came. *Id.* ¶ 19.

- On April 2, 2024, Wander stated 777 Partners could not make a $15 million payment until April 15, 2024, when 777 Partners anticipated receiving funding from another source. That payment never came. *Id.* at 20.

- On April 3, 2024, Wander again said he would not have $15 million to pay Leadenhall until April 15, 2024. That payment never came. *Id.* ¶ 21.

- On April 4, 2024, Wander told Luca Albertini of Leadenhall that A-CAP would not allow 777 Partners to pay Leadenhall even $30 million, but Wander again floated the possibility of a smaller payment. Even that smaller payment never came. Albertini Decl. ¶ 6.

A-197

As it became painfully clear that any payment plan would be illusory, Leadenhall shifted to asking about 777 Partners' ability to make up the $350 million Collateral shortfall, even if it could not immediately pay the entire Accelerated Amount. On April 16, 2024, Gillespie asked whether Wander could find, in his network of companies, $350 million to repay Leadenhall in two weeks. Wander responded that he could not. Gillespie Decl. ¶ 22. On April 29, Gillespie asked Wander whether 777 Partners had $400 million to repay Leadenhall. Wander again confirmed 777 Partners did not have $400 million. *Id.* ¶ 23.

In April 2024, while Wander could not pay even $15 million on a $600 million debt, news reports indicate 777 Partners continued to plow money it owes Leadenhall into football investments, including another $20 million loan to Everton and $80 million to Hertha BSC. Compl. ¶¶ 207-08. Confronted with this discrepancy, right before the Complaint was filed, Wander confirmed in the clearest terms possible that 777 Partners and A-CAP were dissipating assets they were legally bound to protect for Leadenhall. Wander told Albertini that he was running down the 777 Partners business, and those football payments were actually made by A-CAP as "protective advances," but A-CAP was "not in a position" to make similar "protective advances" to Leadenhall. Albertini Decl. ¶ 7.

And on May 2, 2024, the day before Leadenhall filed suit, Wander told Gillespie that 777 Partners was selling off assets to repay creditors, and A-CAP could no longer fund 777 Partners due to regulatory scrutiny. Gillespie Decl. ¶ 24. In a last-ditch attempt to avoid litigation, Wander claimed he could convince A-CAP to agree to share proceeds of sales of 777 Partners' assets with Leadenhall, *id.*, which rang hollow given Wander's string of broken promises supposedly caused by A-CAP's unwillingness to fund payments to Leadenhall. When Gillespie pressed, Wander admitted that A-CAP was going to foreclose on its loans to 777 Partners and take whatever assets

21

A-198

it could.  *Id.*  In other words, 777 Partners is insolvent, and if left to his own devices, Wander will dissipate 777 Partners' remaining assets to pay his co-conspirator, A-CAP, and otherwise squander 777 Partners' dwindling liquidity, leaving nothing for Leadenhall.  On May 10, 2024, ***after the filing of the Complaint*** and yet still undeterred, 777 Partners dumped another $10 million into Everton.

### III.    The Balance of Hardships Tips Decisively in Leadenhall's Favor.

The balance of hardships tips decisively in Leadenhall's favor.  The $609 million debt Defendants owe Leadenhall is a significant sum for Leadenhall, the loss of which would seriously impact its business if Leadenhall cannot collect the judgment to which it will be entitled.  On the other hand, Defendants will suffer no cognizable hardship if Leadenhall's requested relief is granted, since they will lose nothing to which they have any entitlement.  They will only be required to hold, free and clear of adverse claims, enough assets to secure their debt, ***which they are all already obligated to do***.

Even if it turns out that being required to meet their existing obligations to Leadenhall creates difficulties with Defendants' ability to service their other delinquent debts, courts have recognized that kind of supposed hardship does not tip the scales in Defendants' favor.  *See, e.g.,* *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018) ("[T]he balance of hardships weighs in favor of Plaintiff.  To be sure, the order of seizure and a preliminary injunction preventing Defendants from interfering with Plaintiff's security interest in the Collateral may be the 'final nail in the coffin' for Defendants' floundering business.  However, Defendants have not submitted substantive evidence that they are making any progress towards securing alternative finance sources or reducing their debts . . . .  Meanwhile, Plaintiff's security interest in the Collateral . . . is likely eroding as a result of Defendants' [actions].").

22

A-199

## IV.    The Public Interest Weighs in Leadenhall's Favor.

The public interest also weighs strongly in favor of granting injunctive relief.  "[T]here is a well-recognized public interest in enforcing contracts and upholding the rule of law," especially "where, as here, the contract involves sophisticated counterparties who engaged in actual negotiation over the provisions at issue." *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 127 (S.D.N.Y. 2021); *Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*, 2019 WL 5257995, at *8 (S.D.N.Y. Oct. 17, 2019) (recognizing "the 'strong public interest in enforcing contracts' between sophisticated entities").

There is no public interest on Defendants' side of the balance.  Wander's companies do nothing to serve the public, so "the public interest would not be disserved" by tying up a portion of their capital temporarily or permanently.  *Citibank*, 2023 WL 8810142, at *2 n.3.  This is not a case where there are "two public interests . . . pitted against one another" that the Court must weigh.  *Bank of Am.*, 294 F. Supp. 3d at 82.  Wander's companies exist to enrich three people—Wander, Pasko, and A-CAP chair and CEO Kenneth King.  Their investment business is otherwise neutral at best, and often actively harmful, including to the football teams they run into the ground, and the many employees, contractors, brokers, and creditors whose bills and paychecks go unpaid.

## CONCLUSION

For the foregoing reasons, this Court should grant Leadenhall's motion for a temporary restraining order and for appointment of a receiver or, in the alternative, a preliminary injunction in accordance with Leadenhall's proposed Order to Show Cause.

A-200

Dated: New York, New York
      May 13, 2024

                                     KING AND SPALDING LLP

                                     */s/ Leigh M. Nathanson*
                                     Craig Carpenito
                                     Leigh M. Nathanson
                                     Roger G. Schwartz
                                     Brian Donovan
                                     1185 Avenue of the Americas
                                     New York, NY 10036
                                     (212) 556-2100
                                     ccarpenito@kslaw.com
                                     lnathanson@kslaw.com
                                     rschwartz@kslaw.com
                                     bdonovan@kslaw.com

                                     *Attorneys for Plaintiffs*

24

A-201

## CERTIFICATION OF COMPLIANCE

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word.  Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Law, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,947.  The foregoing Memorandum of Law complies with the formatting rules set forth in the § II.D of the Court's Individual Practices.

Dated: New York, New York
       May 13, 2024

KING AND SPALDING LLP

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

*Attorneys for Plaintiffs*

A-202

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 |

**DECLARATION OF CRAIG GILLESPIE**

I, Craig Gillespie, declare as follows:

1.      I am a Managing Partner at Leadenhall Capital Partners LLP ("Leadenhall") and my title is Head of Life and Alternative Credit Portfolio Management.  I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2.      On May 7, 2021, Leadenhall entered into a secured credit facility with a group of borrowers, memorialized in a Loan and Security Agreement (the "LSA").  I executed the LSA on behalf of Leadenhall.  The LSA contains definitions for certain terms relating to Leadenhall's

A-203

application for an Order to Show Cause.[1]  A true and correct copy of excerpts of the LSA containing provisions and definitions relating to Leadenhall's application for an Order to Show Cause is attached hereto as Exhibit 1.  Certain provisions of the LSA that are not contained within Exhibit 1 are commercially and competitively sensitive to Leadenhall.

       3.     The borrowers under the credit facility are SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Insurety Agency Services LLC, and Signal SML 4 LLC, all of which are affiliates of 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners").

       4.     On May 7, 2021, Leadenhall entered into a Guaranty Agreement with 777 Partners and 600 Partners.  I executed the Guaranty Agreement on behalf of Leadenhall.  A true and correct copy of excerpts of the Guaranty Agreement containing provisions relating to Leadenhall's application for an Order to Show Cause are attached hereto as Exhibit 2.  Certain provisions of the Guaranty Agreement that are not contained within Exhibit 2 are commercially and competitively sensitive to Leadenhall.

       5.     On September 19, 2022, I received an email from sender noreply@anonymousemail.me (the "September 19, 2022 Email") stating as follows:

> The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal.

A true and correct copy of the September 19, 2022 Email is attached hereto as Exhibit 3.

       6.     Following the September 19, 2022 Email, Leadenhall conducted a business review of assets pledged as collateral under the LSA.  In November 2022, I was part of a team that visited 777 Partners' offices on-site in Miami, Florida.  During the on-site visit, the Leadenhall team

2

A-204

inspected the "MP Fin" computer system used by 777 Partners and affiliates to manage structured settlement assets, including the allocation of assets as collateral to lenders.

7.      In March 2023, a third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London.  Credigy subsequently sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of Credigy.  From Credigy's inventory of assets, Leadenhall discerned that the SuttonPark Borrower, the largest borrower in the credit facility, had allocated more than 1,600 receivables to both Credigy and Leadenhall.  The double-pledged receivables totaled more than $185 million in value.

8.      On November 29, 2023, I sent a letter entitled "Notice of Breach of Parties' Agreements" (hereinafter, the "Notice of Breach") to 777 Partners, 600 Partners, the SuttonPark Borrower, and the Dorchester Borrower.  I also copied members of Advantage Capital Holdings LLC ("A-CAP"), including Kenneth King, on the letter.  A true and correct copy of the Notice of Breach is attached hereto as Exhibit 4.

9.      Leadenhall discerned that the Dorchester Borrower had also pledged assets that had already been pledged to another lender, had been sold or transferred to third parties, or were never purchased in the first place, or were otherwise not free and clear of other security interests.  In January 2024, the SuttonPark Servicer issued a Compliance Report for the Dorchester Borrower disclosing that—after subtracting the assets that were double-pledged, never purchased, or already sold or transferred to third parties, or otherwise not free and clear of other security interests—the Dorchester Borrower had borrowed in excess of its Borrowing Base limitation by approximately $46 million.  A true and correct copy of an excerpt from the December 2023 Compliance Report issued for the Dorchester Borrower is attached hereto as Exhibit 5.

3

A-205

10.     In January 2024, at Leadenhall's request, the SuttonPark Servicer issued Compliance Reports for the SuttonPark and Dorchester Borrowers going back to March 2023 which revised previously issued Compliance Reports.  A true and correct copy of an excerpt from the revised Compliance Report for March 2023 for the SuttonPark Borrower is attached hereto as Exhibit 6.  A true and correct copy of an excerpt from the revised Compliance Report for March 2023 for the Dorchester Borrower is attached hereto as Exhibit 7.

11.     On December 19, 2023, Leadenhall and the parties to the LSA, including the borrowers, 777 Partners, and 600 Partners, entered into an amendment to the LSA (hereinafter the "Additional Interest Amendment").  Pursuant to the Additional Interest Amendment, the Borrowers agreed to the application of an additional interest rate on the "Uncollateralized Portion" of the outstanding debt to Leadenhall, retroactive to March 17, 2023.[2]

12.     On February 21, 2024, Leadenhall, the borrowers under the LSA, and 777 Partners and 600 Partners entered into a letter agreement entitled the "Paydown and Partial Release Letter," providing, among other terms, a schedule on which the borrowers would pay down $25,622,621.15 in debt owed to Leadenhall as of February 21, 2024.  I executed the Paydown and Partial Release Letter on behalf of Leadenhall.  A true and correct copy of the Paydown Letter and Partial Release, excluding commercially sensitive exhibits, is attached hereto as Exhibit 8.

13.     The borrowers failed to make the approximately $25 million payment due in full under the Paydown and Partial Release Letter by February 21, 2024.  777 Partners and affiliates wired Leadenhall a partial payment of $12.5 million on February 21, 2024.

14.     On February 22, 2024, I spoke with an employee of 777 Partners who informed me that A-CAP had funded payroll and other operating expenses for 777 Partners earlier that day.  I understood from the conversation that because 777 Partners was relying on A-CAP to meet day-

4

A-206

to-day operating obligations such as 777 Partners' payroll, 777 Partners did not have the ability to make the payment due to Leadenhall on February 21, 2024.  On February 23, 2024, 777 Partners wired the remainder of the payment due to Leadenhall under the Paydown and Partial Release Letter.

15.    On March 12, 2024, I sent on behalf of Leadenhall to 777 Partners, 600 Partners, and the borrowers a letter entitled "Notice of Events of Default and Trigger Event; Reservation of Rights" (hereinafter, the "Default Notice").  I also copied members of A-CAP, including Kenneth King, on the Default Notice.  A true and correct copy of the Default Notice is attached hereto as Exhibit 9.

16.    On March 15, 2024, I sent on behalf of Leadenhall to 777 Partners, 600 Partners, and the borrowers a letter entitled "Notice of Acceleration of all Loans, and Demand for Immediate Repayment" (hereinafter, the "Acceleration Notice").  I also copied members of A-CAP, including Kenneth King, on the Acceleration Notice.  A true and correct copy of the Acceleration Notice is attached hereto as Exhibit 10.

17.    On March 26, 2024, Jon Walder, Associate General Counsel of 777 Partners, sent a draft agreement to members of Leadenhall, including myself, entitled "FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT" (hereinafter, the "First Forbearance Agreement").  A true and correct copy of the draft First Forbearance Agreement is attached hereto as Exhibit 11.

18.    On March 31, 2024, I spoke to Wander over the telephone concerning whether 777 Partners would be able to make a $15 million payment to pay down Leadenhall's debt.  Wander stated that whether 777 Partners would be able to pay was dependent on whether A-CAP would provide the necessary funds to 777 Partners.

5

A-207

19.     On April 1, 2024, I spoke to Wander over the telephone concerning whether 777 Partners would be able to make a $15 million payment to Leadenhall.  In the middle of the call, Wander stated that Kenneth King was calling and that he would call me back.  When Wander called me back, he stated that A-CAP would not be able to fund a $15 million payment for Leadenhall on April 1, 2024 but would be able to fund the payment on April 2, 2024.  I asked whether that was due to A-CAP's liquidity issues, and Wander replied, "must be."  Leadenhall never received the $15 million payment from 777 Partners on or after April 2, 2024.

20.     On April 2, 2024, I spoke to Wander over the telephone.  Wander stated that 777 Partners would not be able to make a $15 million payment until April 15, 2024, when Wander anticipated that 777 Partners would receive funds from another funding source.  Leadenhall did not receive $15 million from 777 Partners on or after April 15, 2024.

21.     On April 3, 2024, I spoke to Wander over the telephone.  Wander indicated that he would not have $15 million to pay Leadenhall until at least April 15, 2024.  Leadenhall did not receive $15 million from 777 Partners on or after April 15, 2024.

22.     On April 16, 2024, I spoke to Wander over the telephone.  During the call, Wander stated that he would not be able to find $350 million to repay Leadenhall within two weeks.

23.     On April 29, 2024, I spoke to Wander over the telephone.  During the call, I asked whether 777 Partners had approximately $400 million to repay Leadenhall's outstanding debt, and Wander responded that 777 Partners did not have $400 million.

24.     On May 2, 2024, I spoke to Wander over the telephone.  During the call, Wander stated that 777 Partners was currently selling off assets to repay creditors, and that A-CAP could no longer provide any funds to 777 Partners because of scrutiny by regulators.  Wander also stated that the only path for Leadenhall or A-CAP to recover from 777 Partners would be for A-CAP and

6

A-208

Leadenhall to agree to share in the proceeds of the sale of 777 Partners' assets. Wander stated that he was confident that he could persuade A-CAP to agree to this arrangement. In response, I asked why A-CAP would not simply seek recovery by foreclosing on 777 Partners' assets, and Wander replied that A-CAP would foreclose on whatever assets that it could, but would not be able to maximize the value of those assets through foreclosure.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 13th day of May, 2024.

_____
Craig Gillespie

7

A-209

---

[1] "Adverse Claim" is defined in the LSA as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."

"Borrowing Base" is defined in the LSA as "(a) with respect to the SPLCSS Borrower, the meaning specified on Schedule VIII, (b) with respect to the Signal Borrower, the meaning specified on Schedule IX, (c) with respect to the Insurety Borrower, the meaning specified on Schedule X, (d) with respect to the Dorchester Borrower, the meaning specified on Schedule XI, and (e) with respect to each Joining Borrower, the meaning specified on the Definitions Schedule attached to the Joinder Agreement for such Joining Borrower."

"Borrowing Base Deficiency" is defined in the LSA as "with respect to each Borrower, on any date of determination, an amount equal to the excess, if any of (a) the Principal Amount of all Loans made to such Borrower at such time over (b) the Borrowing Base of such Borrower at such time."

"Collateral" is defined in the LSA as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower, including the following, whether now existing or hereafter arising and wherever located: (a) all Receivables, any Health Care Provider Loan Receivables, Related Security and all Collections of such Borrower, (b) all rights of such Borrower under the related Sale Agreement, the related Servicing Agreement, the related Account Control Agreements (when executed), the Related Contracts, the related Third Party Intercreditor Agreements, the related Hedge Agreements (including any Hedge Collateral), if any, together with all rights of such Borrower to receive monies due or to become due thereunder, all claims of such Borrower for damages arising out of or for breach of or default thereunder, and all rights of such Borrower to compel performance and otherwise exercise all remedies thereunder, (c) the Borrower Accounts and Lock-Boxes with respect to such Borrower, (d) all of the Borrower's membership interests in the Lottery Holding SPVs, and (e) all proceeds of the foregoing; provided that any Receivable that is purchased or repurchased by the Related Seller (or its designee) in connection with a Repurchase shall no longer be included in the Collateral and the Collateral shall not include any Excluded Insurety Receivables or any Excluded Lottery Receivables."

"Maturity Date" is defined in the LSA as "with respect to each Borrower, September 30, 2024."

"Obligations" is defined in the LSA as "with respect to each Borrower, the performance of all of the terms, covenants and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under this Agreement or any document delivered in connection with this Agreement in accordance with the terms thereof, including the punctual payment when due of all obligations and indebtedness of such Borrower hereunder or thereunder, whether for principal, interest, fees, indemnification payments, increased costs, Hedge Payments, Taxes, expenses or otherwise and whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under this Agreement or any document delivered in connection with this Agreement in accordance with the terms thereof."

[2] "Uncollateralized Portion" is defined in the Additional Interest Amendment as "as of any date of determination, (a) with respect to the Dorchester Borrower, an amount equal to the Borrowing Base Deficiency with respect to the Dorchester Borrower at such time and (b) with respect to the SPLCSS Borrower, an amount equal to the Borrowing Base Deficiency with respect to the SPLCSS Borrower at such time."

A-210

# EXHIBIT 1

A-211

EXECUTION VERSION

# LOAN AND SECURITY AGREEMENT

Dated as of May 7, 2021

by and among

the Borrowers from time to time party hereto

And

the Lenders from time to time party hereto

And

LEADENHALL CAPITAL PARTNERS LLP,
as the Administrative Agent

And

LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,
as the initial Collateral Agent

And

the Servicers from time to time party hereto

And

the Sellers party hereto from time to time

A-212

(h)     reference to the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(i)     reference to "an Event of Default with respect to such Borrower" or words of similar import shall mean a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default, and references to a "Default with respect to such Borrower" or words of similar import shall mean an event that, but for notice or lapse of time or both, would constitute a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default;

(j)     reference to any agreement (including any Transaction Document), document or instrument means such agreement, document or instrument as amended, modified, waived, supplemented, restated or replaced and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of the other Transaction Documents, and reference to any promissory note includes any promissory note that is an extension or renewal thereof or a substitute or replacement therefor; and

(k)     reference to any applicable law means such applicable law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any Section or other provision of any applicable law means that provision of such applicable law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such Section or other provision.

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

Section 2.01    The Commitments.

(a)     Subject to and upon the terms and conditions set forth herein, each Lender in a Related Lender Group severally agrees, at any time and from time to time on any Business Day during the period from the Effective Date to the applicable Commitment Termination Date, to make Loans to each Borrower with respect to which such Lender is part of the Related Lender Group, which Loans (i) shall be denominated in Dollars, (ii) may be repaid at any time in accordance with the provisions hereof, (iii) shall not exceed for any such Lender at any time such Lender's then available Commitment with respect to such Borrower, and (iv) shall not exceed at any time the Borrowing Base Limitation with respect to such Borrower. Each Loan shall be subject to the conditions precedent set forth in Section 3.02.

(b)     At any time during the period from the Effective Date to the applicable Commitment Termination Date, the related Borrower may deliver a notice to the Administrative Agent requesting that the Lenders in the Related Lender Group agree to an Additional Commitment in an amount to be specified by such Borrower in such notice. The Lenders in the Related Lender Group, in their sole discretion, may agree to accept, or decline, such Borrower's request for an Additional Commitment. If such Lenders agree to provide an Additional Commitment, such Borrower shall have a period of five (5) Business Days after the delivery of a notice pursuant to this Section 2.01(b) to confirm such amount of the Additional Commitment by

A-213

delivering a Borrowing Request to such Lenders in accordance with the terms of this Agreement. Any such Additional Commitment approved by the Lenders in the Related Lender Group shall be effective upon the delivery of a new Note, if requested by any such Lender, indicating an increase in the Sub-Facility Limit (or the appropriate notation on the schedule attached to each applicable current Note). In the event that such Borrower does not deliver a Borrowing Request within five (5) Business Days of the notice required to be delivered under this Section 2.01(b), any approved Additional Commitment shall terminate and be reduced to zero; provided, that the aggregate amount of the Commitments shall automatically be reduced by such portion of the Additional Commitment increase that has not been borrowed within ten (10) calendar days following the effectiveness of such Commitment increase; provided, further, that no such increase shall be made if a Reserve Deficiency exists with respect to such Borrower.

Section 2.02    Loans and Borrowings.

(a)    Each Loan made to any Borrower shall be made by the Lenders in the Related Lender Group ratably in accordance with the amounts of their Commitments or Additional Commitments as the case may be. The failure of any Lender to make the Loan required to be made by it shall not relieve any other Lender in the Related Lender Group of its obligations hereunder; provided, that the Commitments and Additional Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make a Loan as required. With respect to each Loan made hereunder, the Lenders in the Related Lender Group may, as between themselves, alter the proportion (if any) of the Loan that each such Lender makes.

(b)    At the commencement of the initial Interest Period for any Loan, such Loan shall be in an aggregate amount that is an integral multiple of $10,000 and not less than the Minimum Borrowing with respect to the Borrower requesting such Loan, unless waived by the Administrative Agent, on behalf of the Lenders in the Related Lender Group.

Section 2.03    Requests for Borrowings. To request a Loan, the related Borrower shall notify the Administrative Agent of such request by providing a written Borrowing Request in the form of Annex E to the Administrative Agent by hand delivery or electronic transmission on a date that is not later than 1:00 p.m., New York City time, two (2) Business Days prior to the date of the proposed Borrowing. No Borrower may request more than one (1) Borrowing per week unless otherwise agreed to in writing by the Administrative Agent acting in its sole discretion, and such request shall be provided to the Administrative Agent simultaneously with the requests from each other Borrower requesting a Loan for such week; provided, that the Borrowers may request, with the consent of the Administrative Agent, not to be unreasonably withheld, one (1) additional Borrowing Request per week. Upon receipt of each Borrowing Request from a Borrower, the Administrative Agent shall notify each Lender in the Related Lender Group of each such Borrowing Request. Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    the aggregate amount of the Loan Requested;

(b)    the date of such Loan, which shall be a Business Day;

A-214

(b)      If at any time insufficient funds are received by and available to the Administrative Agent or any Lender in the Related Lender Group to pay fully all amounts of principal, Interest, fees and other Obligations then due hereunder, such funds shall be applied in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable.

(c)      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then (i) the Lender receiving such greater proportion shall remit to the applicable Collection Account cash in an amount equal to the amount such Lender received minus the amount representing such Lender's Ratable Share of such payment and (ii) such amount shall be shared by the other Lenders in accordance with the Ratable Share attributable to each such Lender in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable, on the next Distribution Date.

(d)      If any Lender shall fail to make any payment required to be made by it hereunder, then the Administrative Agent may, in its discretion, provide an instruction that any amounts thereafter received for the account of such Lender be used to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14   Mitigation Obligations. If any Lender requests compensation under Section 2.09, or if the Borrower with respect to which such Lender is part of the Related Lender Group is required to pay any Indemnified Taxes or any additional amount to such Lender or any Governmental Authority for the account of such Lender pursuant to Section 2.12, then such Lender (at the request of such Borrower) shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Each Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in the Related Lender Group in connection with any such designation or assignment.

Section 2.15   Security Interest. (a) To secure the performance by the Borrowers of all of the Obligations, each Borrower hereby grants to the Collateral Agent for the benefit of the Secured Parties in the Related Lender Group with respect to such Borrower, a first-priority security interest in the Collateral.

(b)      In addition, each Borrower hereby grants to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower, a second-priority security interest in the Collateral.

(c)      In furtherance of the foregoing, each Borrower hereby authorizes the Collateral Agent or its designee to file one or more financing or continuation statements, and amendments thereto and assignments thereof from time to time, which financing statements may describe the property being secured as "all assets" or "all personal property" of such Borrower.

A-215

None of the Borrowers, the Servicers or the Sellers shall have any liability under this Agreement for any failure to file an amendment to any financing statement to reflect a successor Collateral Agent if notice of such successor Collateral Agent is not given in accordance with Section 8.19.

(d)    In furtherance of the foregoing, promptly after the Effective Date, each Borrower shall deliver any promissory note related to a Receivable to the Collateral Agent, accompanied by a transfer instrument executed in blank. In the event that the Loans with respect to which such Receivable is Collateral are paid in full or the Administrative Agent applies any prepayment to repay any Loan in respect of a specific Receivable or Receivables pursuant to Section 2.07(b), such promissory note shall be automatically released from the lien created by this Agreement and the Collateral Agent shall promptly deliver the original promissory note, along with the related transfer instrument that was executed in blank, to the applicable Borrower.

(e)    Any security interest granted by the Borrowers to the Collateral Agent for the benefit of the Secured Parties with respect to such Borrower shall be prior and superior to any security interest granted to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower. Each Secured Party and each Subordinated Secured Party hereby agrees that such priority shall be applicable irrespective of the time or order of attachment or perfection of any such security interest or the time or order of filing of any financing statements or other documents, or any statutes, rules or law, or court decisions to the contrary. Furthermore, each of the Subordinated Secured Parties hereto hereby covenants and agrees that this Agreement constitutes a "subordination agreement" (within the meaning of, and subject to, Section 510(a) of the Bankruptcy Code) for purposes of the priority of security interests set forth in Article 9 of the New York UCC.

(f)    All Receivables and any Health Care Provider Loan Receivables purchased by the Borrowers shall constitute part of the Collateral; provided, that no Excluded Insurety Receivable shall constitute part of the Collateral.  To the extent any or any collections, payments or other proceeds in respect thereof are deposited into the Insurety Collection Account, the Insurety Borrower shall be entitled to withdraw and transfer such amounts to it or its designee.

(g)    Following payment in full of all Obligations with respect to a Borrower, each Secured Party and each Subordinated Secured Party, so long as no Event of Default or Borrowing Base Deficiency exists with respect to any Borrower, such Secured Parties and Subordinated Secured Parties shall release such Borrower from the lien created by this Agreement.

(h)    Each Lottery Holding SPV agrees that, upon the occurrence and during the continuance of any Event of Default with respect to the SPLCSS Borrower, it will comply with instructions originated by the Collateral Agent without the further consent of the SPLCSS Borrower.

Section 2.16   Right of Setoff. Without in any way limiting the provisions of Section 2.13(c), the Administrative Agent and each Lender and each of their respective Affiliates is hereby authorized (in addition to any other rights it may have) at any time and from time to time after the occurrence and during the continuance of an Event of Default in respect of the Borrower related thereto to set-off, appropriate and apply (without presentment, demand, protest or other notice which are hereby expressly waived) any and all deposits (general or special, time or demand,

A-216

Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent:

(i) each Account Control Agreement listed on Schedule I that has not been executed on or prior to the Closing Date;

(ii) an opinion of counsel with respect to the perfection of the Collateral Agent's security interest in each account covered by an Account Control Agreement delivered pursuant to Section 3.04(a);

(iii) a tax opinion to the effect that the Loans issued as of the Effective Date should be treated as indebtedness for U.S. federal income tax; and

(iv) a consent, duly executed by Mutual of Omaha Insurance Company, to the pledge of Medicare Commission Receivables by the Insurety Borrower; and

(b) no later than the date occurring forty-five (45) days after the Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent, an opinion of counsel confirming that the execution, delivery and performance by each of 777 Partners and 600 Partners LLC of the Guaranty will not conflict with the material agreements of 777 Partners LLC or 600 Partners LLC, as applicable; provided, that the Lenders shall be responsible for reasonable and documented legal fees related to the opinion of counsel delivered pursuant to this clause (b) in an amount of up to $100,000 and 777 Partners LLC shall be responsible for any amounts in excess thereof.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Section 4.01   Representations and Warranties of each Borrower. Each Borrower hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date, each Borrowing Date and, with respect to Section 4.01(i), the date of each Monthly Report and the date of each Compliance Report:

(a)     Such Borrower and any Lottery Holding SPV is a limited liability company validly existing and in good standing under the laws of the State of Delaware or, with respect to the Insurety Borrower, Florida, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except in such jurisdictions where the failure to qualify to do business could not be reasonably expected to result in a Material Adverse Effect.

(b)     The execution, delivery and performance by such Borrower and any Lottery Holding SPV of the Transaction Documents to which it is a party and the other documents to be delivered by it hereunder, including its use of the proceeds of the Loans, (i) are within its limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (1) its certificate of formation and limited liability company agreement, (2) any law, rule or regulation applicable to it except where such contravention could

51

A-217

not reasonably be expected to result in a Material Adverse Effect, (3) except with respect to the Insurety Borrower, any general agent agreement, carrier agreement or similar arrangement with Mutual of Omaha Insurance Company, any contractual restriction binding on or affecting it or its property or (4) any order, writ, judgment, award, injunction or decree binding on or affecting it or its properties or assets, and (iv) do not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties (except for the interest of the Collateral Agent for the benefit of the Secured Parties created pursuant to this Agreement). Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party has been duly executed and delivered by such party.

(c)       No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the due execution, delivery and performance by such Borrower or any Lottery Holding SPV of the Transaction Documents to which it is a party or any other document to be delivered thereunder (except for the filing of UCC financing statements which are referred to herein and therein), to the extent the failure to give such notices could reasonably be expected to result in a Material Adverse Effect. Such Borrower and any Lottery Holding SPV has the power and authority to (i) enter into the Transaction Documents to which it is party, (ii) grant collateral security for the Obligations as provided for under the Transaction Documents and (iii) own and to hold all of its assets and properties, and to carry on its business as now conducted.

(d)       Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party constitutes the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and general equitable principles (whether considered in a proceeding at law or in equity).

(e)       Since its date of formation, there has been no material adverse change in the business, operations, property or financial condition of such Borrower or any Lottery Holding SPV.

(f)       There is no pending or, to its knowledge, threatened action, investigation or proceeding affecting such Borrower, such Lottery Holding SPV, the Related Servicer or the Related Seller before any court, governmental agency or arbitrator which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(g)       No proceeds of any Loans made to such Borrower shall be used to acquire any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934. Neither the Related Seller nor any of its Affiliates (i) have offered or sold or will offer or sell the Receivables by any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D of the Securities Act or (ii) have engaged or will engage in any directed selling efforts within the meaning of Regulation S of the Securities Act with respect to the Receivables. Neither such Borrower nor any Lottery Holding SPV is an "Investment Company" as that term is defined under the Investment Company Act of 1940 in reliance on the exemption provided by Section 3(c)(7) thereof (although other exemptions may be available).

52

A-218

(h)      Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim (other than (u) the security interest of the Administrative Agent for the benefit of the Secured Parties hereunder, (v) the rights of the applicable trustee or agent bank for the benefit of the applicable Person under any Third Party Intercreditor Agreement, (w) claims relating to any Split Payment Receivables, (x) any lien for taxes not yet due or being contested in good faith, (y) with respect to any Medicare Commission Receivable, any lien that has not been perfected or offset right granted by the Insurety Borrower in favor of the related insurance company counterparty pursuant to the applicable carrier agreement in respect of compensation due to the Insurety Borrower thereunder and (z) liens related to attorney's fees, medical fees or other amounts for a Case which are subordinate to the security interest created by the Funding Agreement and Lawyers Acknowledgement Letter (if applicable) or the Loan Agreement, as applicable, which have been pledged to the Collateral Agent for the benefit of the Secured Parties hereunder). The Collateral Agent for the benefit of the Secured Parties (other than the Subordinated Secured Parties) has a valid and perfected first priority security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising and the Collateral Agent for the benefit of the Secured Parties and the Subordinated Secured Parties has a valid and perfected subordinated security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising. No effective financing statement or other instrument similar in effect covering any Collateral is on file in any recording office, except for those filed in favor of the Collateral Agent relating to this Agreement. On each Borrowing Date, each Receivable subject to the related Borrowing is an Eligible Receivable.

(i)      Each Compliance Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), Monthly Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), information, exhibit, financial statement, document, book, record or report furnished or to be furnished at any time by or on behalf of such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with and before or after the Effective Date is or will be accurate in all material respects as of its date or (except as otherwise disclosed to the Administrative Agent or the Lenders in the Related Lender Group, as the case may be, at such time) as of the date so furnished (or, if applicable, as of a date certain specified in such report), and no such document contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

(j)      The principal place of business and chief executive office of such Borrower and the office where such Borrower keeps its records concerning the Collateral are located at the address or addresses referred to on Schedule III.

(k)      The names and addresses of the Account Bank and all of the Account Banks, together with the post office boxes and account numbers of the Collection Account, the Lock-Boxes and the Deposit Accounts of such Borrower at such banks are as specified in Schedule I hereto, as such Schedule I may be updated from time to time pursuant to Section 5.01(g). The names and addresses of all the banks, together with the post office boxes and account numbers of the Third Party Intercreditor Accounts, if any, relating to Third Party Intercreditor Receivables,

53

A-219

are as specified in Schedule VII hereto, as such Schedule VII may be updated from time to time with the consent of the Administrative Agent. Except for any post-office boxes and bank accounts related to one or more Third Party Intercreditor Agreements, the Lock-Boxes, the Deposit Accounts and the Concentration Account are the only post office boxes and bank accounts into which Collections of Receivables are deposited or remitted (other than Collections related to Receivables arising in connection with or related to a Funding Agreement (Master Assignment), which may be deposited or remitted to the related Health Care Providers first). The Third Party Intercreditor Accounts are the only post office boxes and bank accounts into which Collections of Third Party Intercreditor Receivables are required to be deposited or remitted. Subject to the timeframe set forth in Section 3.04(a), such Borrower has delivered (or will deliver) to the Administrative Agent a fully executed and effective Account Control Agreement with respect to the Collection Account, each Deposit Account and any associated Lock-Boxes. Subject to the timeframe set forth in Section 3.04(a), all other Borrower Accounts of such Borrower are or will be the subject of a fully executed and effective Account Control Agreement. All Third Party Intercreditor Accounts related to such Borrower are subject to a fully executed and effective Third Party Intercreditor Agreement.

(l)      Neither such Borrower nor any Lottery Holding SPV is known by nor does it use any tradename or doing-business-as name. Such Borrower has no Subsidiaries other than the Lottery Holding SPVs. The Related Seller owns one hundred percent (100%) of the equity interests in such Borrower. The SPLCSS Borrower owns one hundred percent (100%) of the equity interests in the Lottery Holding SPV.

(m)      (i) The present value of the property of such Borrower is greater than the total amount of liabilities, including contingent liabilities, of such Borrower, (ii) the present fair salable value of the assets of such Borrower is not less than the amount that will be required to pay all probable liabilities of such Borrower on its debts as they become absolute and matured, (iii) such Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond such Borrower's abilities to pay such debts and liabilities as they mature and (iv) such Borrower is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Borrower's property would constitute unreasonably small capital. Neither such Borrower nor any Lottery Holding SPV is the subject of an Insolvency Event. Neither such Borrower nor any Lottery Holding SPV has any indebtedness for money borrowed from others (direct or contingent) other than (i) indebtedness owed to the Administrative Agent and the Lenders in the Related Lender Group, and (ii) obligations under any bank deposit and similar agreements required by Lenders hereunder. Neither such Borrower nor any Lottery Holding SPV has any contingent obligations or liabilities (other than any such obligations or liabilities undertaken pursuant to the Transaction Documents) that were not previously disclosed in writing (which may be provided via electronic mail) to the Administrative Agent and the Lenders in the Related Lender Group.

(n)      With respect to each Receivable and related Collateral pledged by such Borrower, such Borrower shall have received (including indirectly through such Borrower's ownership of a Lottery Holding SPV) such Receivable and related Collateral in an amount which constitutes fair consideration and reasonably equivalent value. Each such acquisition of Receivables by such Borrower or any Lottery Holding SPV under the applicable Sale Agreement

54

A-220

shall not have been made for or on account of an antecedent debt owed by the assignor thereof to such Borrower or any Lottery Holding SPV, as applicable.

(o)      Such Borrower and any Lottery Holding SPV has timely filed or caused to be filed all material United States federal, state and local tax returns and reports that are due and required to be filed by it and has paid or caused to be paid all material taxes that have become due and payable except where the payment of any such taxes is being contested in good faith by appropriate proceedings and for which such entity has set aside on its books adequate reserves.

(p)      All information heretofore furnished by, or on behalf of, such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with any Transaction Document or any Receivable or any Health Care Provider Loan Receivable or any transaction contemplated thereby, when taken as a whole, is true and accurate in all material respects (without omission of any information necessary to prevent such information from being materially misleading).

(q)      Such Borrower and any Lottery Holding SPV (and, in each case, each of its agents) has complied with (and shall comply with) all federal, State or local laws applicable to it or in connection with its acquisition of, or any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables. To the knowledge of the Seller, all parties which have had any interest in the Receivables and any Health Care Provider Loan Receivable, whether as originator, servicer, administrator, assignee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with all federal, State or local laws applicable to it or in connection with any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables.

(r)      Neither such Borrower nor any Lottery Holding SPV has dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with the transactions contemplated by the Transaction Documents. Such Borrower has facilitated the transfer of the Receivables and Health Care Provider Loan Receivables, if any, without any intent to hinder, delay or defraud any of its creditors.

(s)      None of such Borrower, any of its Affiliates or, to the knowledge of such Borrower, any director, officer, employee or agent of such Borrower or any of its Affiliates is a Person that is, or is owned or controlled by Persons that are: (i) the subject of any Sanctions or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.

(t)      Such Borrower and any Lottery Holding SPV, their Affiliates and their respective directors, officers and employees and, to the knowledge of such Borrower, the agents of such Borrower and its Affiliates, are in compliance with all applicable Sanctions and with the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption law, in all material respects. Such Borrower and its Affiliates are subject to policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or

A-221

regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption laws.

(u)     The operations of such Borrower, such Lottery Holding SPV, the Related Servicer and the Related Seller are and have been conducted at all times in compliance with Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving such Borrower, the Related Servicer or the Related Seller with respect to Anti-Money Laundering Laws is pending or, to the knowledge of such relevant entity, threatened.

(v)     For U.S. federal income tax purposes, such Borrower is not a corporation or an association taxable as a corporation.

(w)     Neither such Borrower, such Lottery Holding SPV nor any ERISA Affiliate thereof has incurred any ERISA Event. Such Borrower and such Lottery Holding SPV are not a Benefit Plan Entity.

(x)     (i) With respect to any Borrower entering into a Hedge Agreement, such Borrower's entering into any Hedge Agreement will not cause it to be considered a "commodity pool" as defined in Section 1a(10) of the Commodity Exchange Act, or (ii) if such Borrower would be a commodity pool, with respect to such Borrower as the commodity pool, its commodity pool operator ("CPO") and commodity trading advisor ("CTA") are eligible for an exemption from such registrations and all conditions precedent to obtaining such exemptions have been satisfied.

(y)     With respect to any Borrower entering into a Hedge Agreement, each of the sole member and managers of such Borrower (other than its independent manager) has agreed in writing that, if and for so long as such Borrower is a commodity pool, its CPO and CTA will take all action necessary to ensure ongoing compliance with the applicable exemption from registration as a CPO and CTA with respect to such Borrower, and any other actions required as a CPO and CTA with respect to such Borrower.

Section 4.02   Representations and Warranties of the Servicers. Each Servicer hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date and each Borrowing Date:

(a)     Such Servicer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)     The execution, delivery and performance by such Servicer of this Agreement and any other documents to be delivered by it hereunder (i) are within such Servicer's limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (A) such Servicer's certificate of formation or limited liability company agreement, (B) any law, rule or regulation applicable to such Servicer except where such contravention could not reasonably be expected to result in a Material Adverse Effect,

56

A-222

ARTICLE V

COVENANTS

Section 5.01    Covenants of Each Borrower. Each Borrower covenants and agrees with the Administrative Agent and each Lender in the Related Lender Group, until the Commitments with respect to such Borrower have expired or been terminated and the principal of and Interest on each Loan and all other Obligations have been paid in full by such Borrower, that:

(a)    Compliance with Laws, Etc. Such Borrower shall comply (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to comply) in all material respects with all applicable laws, rules, regulations and orders and preserve and maintain its limited liability company existence, rights, franchises, qualifications and privileges except to the extent that the failure so to comply with such laws, rules and regulations or the failure so to preserve and maintain such rights, franchises, qualifications and privileges could not reasonably be expected to result in a Material Adverse Effect.

(b)    Offices, Records, Name and Organization. Such Borrower shall keep (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to keep) its principal place of business and chief executive office and the office where it keeps its records concerning the Collateral at the address of such party set forth on Schedule III hereto or, upon thirty (30) days' prior written notice to the Administrative Agent, at any other locations within the United States. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) change its name or its jurisdiction of organization, unless (i) such Borrower shall have provided the Administrative Agent with at least thirty (30) days' prior written notice thereof and (ii) no later than the effective date of such change, all actions reasonably requested by the Collateral Agent to protect and perfect the security interest in the Collateral of such Borrower free and clear of any Adverse Claim (other than those permitted under this Agreement) have been taken and completed. Such Borrower shall maintain and implement (or cause the Related Servicer to maintain or implement) administrative and operating procedures (including an ability to recreate records evidencing the Receivables, any Health Care Provider Loan Receivables, the Related Contracts and the Collateral owned by such Borrower in the event of the destruction of the originals thereof), and keep and maintain (or cause the Related Servicer to maintain or implement) all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables and any Health Care Provider Loan Receivables owned by such Borrower (including records adequate to permit the daily identification of each such Receivable and Health Care Provider Loan Receivables, if any, and all Collections of and adjustments to each such Receivable and any Health Care Provider Loan Receivables).

(c)    Performance and Compliance with Contracts and Credit and Collection Policy. Such Borrower shall (and shall cause the Related Servicer to), at its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under any Related Contracts and timely and fully comply in all material respects with the Credit and Collection Policy in regard to each Receivable, the other Related Contracts and any Health Care Provider Loan Receivables and other related Collateral owned by such Borrower.

59

A-223

(d)  <u>Sales, Liens, Etc.</u>  Except for the security interests created hereunder in favor of the Collateral Agent for the benefit of the Secured Parties and for the benefit of the Subordinated Secured Parties and any lien for taxes not yet due or being contested in good faith and except as otherwise permitted under this Agreement and the other Transaction Documents (including in connection with any Repurchase or the transfer of an Excluded Lottery Receivable), such Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof.

(e)  <u>Extension or Amendment of Receivables.</u>  Except in accordance with the Credit and Collection Policy or as otherwise consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), such Borrower shall not (and shall not permit the Related Servicer, in the case of the SPLCSS Borrower, any Lottery Holding SPV, or the Related Seller, to) extend, amend or otherwise modify the terms of any Receivable or Health Care Provider Loan Receivable, or amend, modify or waive any term or condition of any Related Contracts related thereto.

(f)  <u>Change in Business or Credit and Collection Policy.</u>  Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) make any change in the character of its business or change in the Credit and Collection Policy that would impair the collectability of the Receivables or the ability of such Borrower, such Lottery Holding SPV or the Related Servicer to perform its obligations under this Agreement or the other Transaction Documents without the prior written consent of the Administrative Agent and the Required Lenders in the Related Lender Group (such consent not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that no consent shall be required from the Administrative Agent or any Lender in such Related Lender Group in connection with any change mandated by applicable law or a Governmental Authority as evidenced by an opinion of counsel delivered to the Administrative Agent and the Lenders in the Related Lender Group in form and substance reasonably acceptable to the Administrative Agent and such Related Lender Group.

(g)  <u>Change in Payment Instructions to Obligors.</u>  Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) add or terminate any bank, post office box or bank account as an Account Bank, Lock-Box or Borrower Account from those listed in <u>Schedule I</u> to this Agreement, or make any change in its instructions to Obligors regarding payments to be made to such Borrower or any Lottery Holding SPV, as applicable, or payments to be made to any such Account Bank, Lock-Box or Borrower Account, unless the Administrative Agent shall have received notice of such addition, termination or change and a fully executed Account Control Agreement with each new Account Bank with respect to each Lock-Box or Borrower Account and shall have been given a reasonable amount of time (not to exceed ten (10) Business Days) to review the proposed arrangements and to consult with outside counsel (which expenses shall be promptly reimbursed by such Borrower) to confirm the security arrangements in respect of the Collections relating to such proposed change.

(h)  <u>Deposits to Lock-Boxes and Deposit Accounts.</u>  Except for Receivables that constitute Third Party Intercreditor Receivables which shall first be remitted by the Obligors thereof to the accounts set forth in the applicable Third Party Intercreditor Agreement, such

60

A-224

Borrower shall (or shall cause the Related Servicer, in the case of the SPLCSS Borrower, each Lottery Holding SPV, or the Related Seller to) instruct all Obligors to remit all payments in respect of Receivables to the Lock-Boxes or Deposit Accounts, a Collection Account or a Concentration Account. If such Borrower shall receive any Collections directly, it shall promptly (and in any event within two (2) Business Days) deposit the same to a Deposit Account or to a Collection Account. Such Borrower, the Related Seller and the Related Servicer, as applicable, shall instruct the applicable trustee or agent bank to remit all payments in respect of Third Party Intercreditor Receivables from the related Third Party Intercreditor Account to such Borrower's Collection Account or Concentration Account. Such Borrower shall not deposit or otherwise credit, or cause or permit to be so deposited or credited, to any Lock-Box or Deposit Account cash or cash proceeds other than Collections of Receivables and other similar receivables owned by the Related Seller or an Affiliate thereof, except as contemplated by the Transaction Documents. All Collections of Receivables on deposit in any Concentration Account shall be transferred to the related Collection Account within two (2) Business Days after receipt thereof. Each Lottery Holding SPV shall transfer all Collections of Lottery Receivables received by such Lottery Holding SPV in the related Deposit Account (or Lock-Box) to the Collection Account within two (2) Business Days after receipt thereof.

(i)      Further Assurances. Such Borrower agrees from time to time, at its expense, promptly to execute and deliver all further instruments and documents, and to take all further actions, that may be reasonably necessary or desirable, or that the Administrative Agent or the Collateral Agent may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under this Agreement. Such Borrower authorizes the Collateral Agent to file financing and continuation statements, and amendments thereto and assignments thereof, relating to the Collateral.

(j)      Reporting Requirements. Such Borrower shall provide to the Administrative Agent and the Lenders in the Related Lender Group (in multiple copies, if requested by the Administrative Agent) the following:

(i)      on or prior to each Calculation Date, a duly completed and certified Monthly Report containing information regarding the Receivables and any Health Care Provider Loan Receivables owned by such Borrower as of the last day of the previous calendar month; provided, that such Borrower shall not include any Receivable that is not an Eligible Receivable as of such Calculation Date in the calculation of the Borrowing Base; provided, further, that if an Event of Default has occurred and is continuing with respect to such Borrower, such Borrower shall deliver Monthly Reports on any Business Days reasonably requested by the Administrative Agent;

(ii)      on or prior to each Distribution Date, a pro forma Compliance Report giving effect to the distributions to occur on such Distribution Date under Sections 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable;

(iii)      within one hundred fifty (150) days after the end of each of the Related Seller's and such Borrower's fiscal years (in each case, beginning with the year ending December 31, 2021), an annual audited financial statement of such Borrower and the Related

61

A-225

Seller, prepared in accordance with GAAP, in form and substance reasonably acceptable to the Administrative Agent;

(iv)   within thirty (30) days after the last day of each calendar month, a consolidated unaudited income statement and balance sheet of the Related Seller (which income statement and balance sheet shall include the Related Servicer and such Borrower), in form and substance acceptable to the Administrative Agent;

(v)   as soon as possible and in any event within three (3) Business Days after the occurrence of each Event of Default or Default with respect to such Borrower, a statement of a duly authorized officer of such Borrower setting forth details of such Event of Default or Default and the action that such Borrower has taken and proposes to take with respect thereto;

(vi)   promptly after the filing or receiving thereof, copies of all reports and notices that such Borrower or any ERISA Affiliate files under ERISA with the Internal Revenue Service or the Pension Benefit Guaranty Corporation or the U.S. Department of Labor or that such Borrower or any ERISA Affiliate receives from any of the foregoing or from any Multiemployer Plan to which such Borrower or any ERISA Affiliate is or was, within the preceding five years, a contributing employer, in each case in respect of the assessment of Withdrawal Liability or an ERISA Event or other event or condition which could, in the aggregate, result in the imposition of liability on such Borrower or any such ERISA Affiliate in excess of $50,000;

(vii)   prompt notice of such Borrower or any Lottery Holding SPV becoming a Benefit Plan Entity;

(viii)   at least thirty (30) days prior to any change in the name or jurisdiction of organization of such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer, a notice setting forth the new name or jurisdiction of organization of such Borrower, the Related Seller or the Related Servicer and the effective date thereof;

(ix)   promptly after such Borrower obtains knowledge thereof, notice of (a) any event of default, potential event of default or similar event under any Transaction Document or Related Contract and (b) any litigation, investigation or claim or any threatened litigation or claim affecting such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer which if adversely decided could reasonably be expected to have a Material Adverse Effect;

(x)   promptly after receipt thereof, copies of all notices received by such Borrower from any Person under or with respect to any Transaction Document (unless the Administrative Agent is a named notice party therein);

(xi)   promptly after the request of the Administrative Agent, information as to the amount of funds in the applicable Borrower Accounts; and

(xii)   such other information related to the Receivables, any Health Care Provider Loan Receivables, the Obligations, the Collateral or the condition or operations, financial or otherwise, of such Borrower, the Related Servicer or the Related Seller as the Administrative

62

A-226

Agent or any Lender in the Related Lender Group may from time to time reasonably request, to the extent such disclosure is permitted under applicable law, rule or regulation.

    (k)    <u>Separateness</u>.

    (i)    Such Borrower shall not direct or participate in the management of any other Borrower or any of the Other Companies' operations or of any other Person's operations (other than as sole member of a Lottery Holding SPV).

    (ii)    Such Borrower shall have stationery and other business forms separate from that of any other Borrower, the Other Companies or any other Person.

    (iii)    Such Borrower shall at all times be adequately capitalized in light of its contemplated business.

    (iv)    Except as otherwise contemplated by the Transaction Documents, such Borrower shall at all times provide for its own operating expenses and liabilities from its own funds (and, as applicable, those of a Lottery Holding SPV).

    (v)    Such Borrower shall maintain its assets and transactions separately from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and reflect such assets and transactions in financial statements separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and evidence such assets and transactions by appropriate entries in books and records separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) except as otherwise expressly permitted by the Transaction Documents, and in each case, other than for tax purposes. Such Borrower shall hold itself out to the public under such Borrower's own name as a legal entity separate and distinct from any other Borrower or the Other Companies (other than for tax purposes or with respect to a Lottery Holding SPV). Such Borrower shall not hold itself out as having agreed to pay, or as being liable, primarily or secondarily, for, any obligations of any other Borrower, the Other Companies or any other Person, except as otherwise contemplated by the Transaction Documents. Such Borrower shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person (other than a Lottery Holding SPV), and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Transaction Documents. Such Borrower shall not maintain any joint account with any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or become liable as a guarantor or otherwise with respect to any Debt or contractual obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) except in accordance with the Transaction Documents.

    (vi)    Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person except a Lottery Holding SPV or otherwise in accordance with the Transaction Documents.

    (vii)    Such Borrower shall not make loans, advances or otherwise extend credit to any of the Other Companies or to any other Person (other than to the Lottery Holding

63

A-227

SPVs) except in connection with its ownership of any Health Care Provider Loan Receivables or as otherwise contemplated by the Transaction Documents or make any investment (other than Eligible Investments) in any Person (other than a Lottery Holding SPV) or otherwise in accordance with the Transaction documents.

(viii)   Such Borrower shall observe all (A) Delaware limited liability company formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited liability company agreement in a manner that would adversely affect the existence of such Borrower as a bankruptcy-remote special purpose entity.

(ix)   Such Borrower shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person (other than for tax purposes) and shall not identify itself as a division of any other Person (other than for tax purposes).

(x)   Without limiting in any way its ability to acquire and administer Third Party Intercreditor Receivables, if applicable, such Borrower shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

(xi)   Such Borrower shall not use its separate existence to perpetrate a fraud in violation of applicable law or act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

(xii)   Except as permitted by or pursuant to the Transaction Documents (including such Borrower's acquisition of any Receivables Notes or membership interests in a Lottery Holding SPV), such Borrower shall not acquire any securities or debt instruments of any of its Affiliates or any other Person.

(xiii)   Except as otherwise contemplated by the Transaction Documents, such Borrower shall not engage in any transaction with any of the Other Companies (other than the Lottery Holding SPVs) except for a transaction that is both (a) on arm's-length terms and (b) permitted by this Agreement, its organizational documents and the other Transaction Documents.

(xiv)   If such Borrower is the SPLCSS Borrower, the Borrower shall cause the Lottery Holding SPV to comply with each covenant in this Section 5.01(k) as if such covenant was an obligation of the Lottery Holding SPV.

(l)   Nature of Business; Fiscal Year. Such Borrower shall not engage in any business other than as expressly permitted by its organizational documents, this Agreement and the other Transaction Documents. Such Borrower shall not create or form any Subsidiary (other than a Lottery Holding SPV). Neither such Borrower nor any Lottery Holding SPV shall change its fiscal year or any of its fiscal quarters, without the Administrative Agent's and Lenders in the Related Lender Group's prior written consent, which consent shall not be unreasonably withheld or delayed.

64

A-228

(m)  Mergers, Etc. Without the prior written consent of the Administrative Agent, such Borrower shall not merge with or into or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired) to, or acquire all or substantially all of the assets or capital stock or other ownership interest of, or enter into any joint venture or partnership agreement with, any Person, other than as specifically contemplated by this Agreement and the other Transaction Documents.

(n)  Distributions, Etc. Such Borrower shall not declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any class of equity interests of such Borrower, or return any capital to its members as such, or purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any shares of any class of equity of such Borrower or any warrants, rights or options to acquire any such shares, now or hereafter outstanding; provided that (x) such Borrower may declare and pay cash dividends to its members so long as (i) no Default or Event of Default with respect to such Borrower shall then exist or would occur as a result thereof, (ii) such dividends are in compliance with all applicable law and (iii) such dividends have been approved by all necessary and appropriate limited liability company action of such Borrower and are cash proceeds received by such Borrower in accordance with Section 2.18(a)(xi), Section 2.19(a)(xi), Section 2.20(a)(xii), Section 2.21(a)(xi) or Section 2.22, as applicable and (y) such Borrower shall be permitted to distribute the Receivables or any Health Care Provider Loan Receivables after the Obligations in respect of such Receivables or Health Care Provider Loan Receivables, if any, that are then due and payable have been prepaid.

(o)  Debt. Such Borrower shall not incur any Debt, other than any Debt permitted pursuant to this Agreement or the other Transaction Documents.

(p)  Organizational Documents. Such Borrower shall not (and will not permit any Lottery Holding SPV to), amend restate, delete or modify its certificate of formation, limited liability company agreement or resolutions in any material respect without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

(q)  Use of Proceeds. Such Borrower shall use the proceeds of the Loans solely to acquire Receivables and Related Security (including indirectly by contributing to a Lottery Holding SPV) and any Health Care Provider Loan Receivables which, in each case (other than the Excluded Lottery Receivables), shall be pledged as Collateral hereunder, together with any related reasonable costs and expenses related to such acquisition (including the reimbursement of origination costs and expenses to the Seller) and to pay accrued and unpaid interest on the Loans. The SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, shall agree for each LC Asset Group to an LTV Percentage and such LTV Percentage may only be changed by mutual agreement of the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group; provided, that the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, may agree to amend (whether by aggregation or separation) the LTV Percentages for any LC Asset Group and the Life Contingent Receivables constituting such LC Asset Group at any time. Such Borrower agrees not to use the proceeds of any Loan to acquire or

**A-229**

carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

(r)    <u>Sanctions; Anti-Money Laundering Laws, Use of Proceeds</u>. Such Borrower shall not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Affiliate or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable Anti-Money Laundering Law or anti-corruption law, or (ii) (A) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, a Lender or otherwise).

(s)    <u>Payment of Taxes</u>. Such Borrower shall timely pay all taxes that become due and payable except (i) where such taxes are being contested in good faith or (ii) to the extent such failure to pay could not reasonable be expected to have a Material Adverse Effect.

(t)    <u>Tax Treatment</u>. For U.S. federal income tax purposes, such Borrower shall not be treated as a corporation or as an association taxable as a corporation.

(u)    <u>Interest Rate Hedging</u>.

(i)    With respect to each of the SPLCSS Borrower and the Dorchester Borrower, within five (5) Business Days following any Borrowing Date, and on each Calculation Date (other than the initial Calculation Date), such Borrower shall maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions as to which the aggregate notional principal amount at such time (i) is approximately equal to the aggregate principal amount of all Loans to such Borrower outstanding at such time (after giving effect to any new Loans to such Borrower or repayments by such Borrower on such date), (ii) is not more than what the Valuation Amount would be at such time if "0.0%" were substituted for, in the case of the SPLCSS Borrower, the applicable percentages set forth in clauses (i)(b), (ii)(b) and (iii)(b) of the definition of Discount Rate, and in the case of the Dorchester Borrower, 0.00% in the definition of Discount Rate and (iii) that has a DV01 that offsets the DV01 of the applicable Collateral for each of the SPLCSS Borrower or the Dorchester Borrower as illustrated in Schedule XVI and (iv) that are acceptable to the Administrative Agent.

(ii)    Such Borrower shall only enter into Hedge Transactions with a Hedge Counterparty that shall be governed by a Hedge Agreement; <u>provided</u> that if (x) a Hedge Agreement ceases to be of effect, (y) such Borrower fails to fulfil its obligation under clause (i), or (z) the counterparty thereto ceases to qualify as a Hedge Counterparty, such Borrower agrees to, and the Administrative Agent may cause such Borrower, within fifteen days or a request by the Administrative Agent to the related Borrower, to enter into a Hedge Agreement and Hedge Transactions with any Hedge Counterparty that the Administrative Agent selects (in its sole discretion).

A-230

(iii)     As additional security to the Administrative Agent hereunder, such Borrower has pledged to the Collateral Agent, for the benefit of the Secured Parties, all right, title and interest of such Borrower in the Hedge Collateral, if applicable. Such Borrower acknowledges that, as a result of its pledge, such Borrower may not, without the prior written consent of the Required Lenders in the Related Lender Group, exercise any rights under any Hedge Agreement or Hedge Transaction, except for such Borrower's right under any Hedge Agreement to enter into Hedge Transactions in order to meet such Borrower's obligations hereunder. Nothing herein shall have the effect of releasing such Borrower (or, if applicable, any Affiliate of such Borrower) from any of its obligations under any Hedge Agreement or any Hedge Transaction (including the payment of the Obligations in full), nor be construed as requiring the consent of any Hedge Counterparty or the Lenders in the Related Lender Group for the performance by such Borrower (or, if applicable, any Affiliate of such Borrower) of any such obligations.

(iv)     Such Borrower shall promptly deliver to the Administrative Agent and the Lenders in the Related Lender Group a copy of all documents related to any Hedge Agreement, including (a) confirmations, schedules and an aggregate notional amortization schedule prior to entering into such agreement, and (b) any notices received by such Borrower from the Hedge Counterparty following the effective date of the Hedge Agreement.

(v)     Such Borrower shall pay all reasonable and documented costs and expenses (including reasonable and documented legal fees and disbursements) incurred by the Administrative Agent, the Collateral Agent, the Lenders and each Hedge Counterparty in connection with each Hedge Transaction in accordance with Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable to such Borrower.

(vi)     Each Hedge Agreement shall be approved by the Administrative Agent prior to the execution thereof by the applicable Borrower.

(vii)     Neither the SPLCSS Borrower nor the Dorchester Borrower shall enter into any Hedge Transaction with respect to which the Administrative Agent has previously raised an objection in writing and each of the SPLCSS Borrower and the Dorchester Borrower shall use commercially reasonable efforts to give effect to the reasonable requests of the Administrative Agent with respect to Section 5.01(u).

(v)     Eligible Receivables. All Receivables purchased by such Borrower and any Lottery Holding SPV (or Receivables securing any Health Care Provider Loan Receivables so purchased, if applicable) shall be Eligible Receivables at the time they are pledged hereunder.

(w)     Insurance. Such Borrower shall pay to any Other Company (other than the Lottery Holding SPVs) the marginal increase of (or, in the absence of such increase, the market amount of its portion of) the premium payable with respect to any insurance policy that covers the Borrower and such Other Company (other than the Lottery Holding SPVs), but the Borrower shall not, directly or indirectly, be named or enter into an agreement to be named, as a direct or contingent beneficiary or loss payee, under any such insurance policy, with respect to any amounts payable due to occurrences or events related to such Other Company (other than the other Borrowers).

67

**A-231**

(x) <u>Agreed Upon Actuarial Models</u>. With respect to the Insurety Borrower, each Agreed Upon Actuarial Model, together with the related persistency rates provided by the Independent Actuary, will be updated no less frequently than once per annum or at any time that the Administrative Agent reasonably believes that the underlying persistency rates have changed (as evidenced by a written notice provided by the Administrative Agent to the Insurety Borrower) and an Agreed Upon Actuarial Model should be updated as a result of such change; <u>provided</u>, that the initial models applied as of the Closing Date are described on <u>Schedule XV</u>.

(y) <u>Dispute Resolution</u>. If the Administrative Agent provides the Insurety Borrower and any Independent Actuary with written notice that it disputes the Valuation Amount of an Eligible Receivable, the Insurety Borrower shall cause such Independent Actuary to deliver a redetermined Valuation Amount within twenty (20) Business Days following receipt of such notice.

(z) <u>Membership Interests in Lottery Holding SPVs</u>. The SPLCSS Borrower shall not vote to enable, or take any other action to permit, any Lottery Holding SPV to issue any additional membership interests or other equity securities of any nature or to issue any other membership interests or other ownership interests convertible into or granting the right to purchase or exchange for any membership interests or other ownership interests of any nature of any Lottery Holding SPV. Whenever any membership interest of a Lottery Holding SPV is an uncertificated security, the SPLCSS Borrower shall, or shall cause such Lottery Holding SPV to, take all steps as are reasonably necessary to give exclusive control over such membership interest to the Collateral Agent in a manner reasonably satisfactory to the Collateral Agent.

Section 5.02   <u>Financial Records; Access to Information</u>. Such Borrower shall maintain its books and records in accordance with GAAP. Until the Commitments have expired or been terminated and the Principal Amount of and Interest on each Loan and all other Obligations owed by such Borrower have been paid in full, such Borrower, the Related Servicer and the Related Seller shall, at their respective expense, from time to time during regular business hours as requested by the Administrative Agent, permit the Administrative Agent or its agents or representatives (including independent public accountants, which may be such Borrower's or an Affiliate's independent public accountants), with reasonable out-of-pocket costs and expenses associated therewith reimbursable to the Administrative Agent by such Borrower (subject to the limitations set forth in <u>Section 9.02</u>), (a) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for initial due diligence of the Receivables), (b) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (c) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (b) above, and to discuss matters relating to Receivables and the Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller,

**A-232**

the account numbers of the Third Party Intercreditor Accounts, which Schedule VII may be updated from time to time with the consent of the Administrative Agent.

(b)     Payment Instructions. Except for Receivables that constitute Third Party Intercreditor Receivables, such Servicer has notified (or has caused the Related Seller to notify) the Obligor on each Receivable to make payments on such Receivable to either one of the Lock-Boxes or one of the Deposit Accounts or to the Collection Account or the Concentration Account, as applicable. Third Party Intercreditor Receivables shall be paid to the Third Party Intercreditor Accounts.

(c)     Compliance Reports and Monthly Reports. Each Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    Facility Events of Default. If any of the following events (each, a "Facility Event of Default") shall occur and be continuing:

(a)     Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure shall remain unremedied for 30 days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

(b)     Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and such failure shall continue unremedied for 30 days; or

(c)     A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within 30 days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; provided, that a Borrowing Base Deficiency shall not constitute a Facility Event of Default until such time as the Administrative Agent declares a Facility Event of Default; and provided, further, that the election by the Administrative Agent not to declare a Facility Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Facility Event of Default; or

(d)     The security interest created pursuant to Section 2.15 shall for any reason cease to be a valid and perfected first priority security interest in the Collateral, and if capable of being cured, such cessation shall remain unremedied for two (2) Business Days; or

(e)     The PBGC or the IRS shall, or shall indicate its intention to, file notice of a lien pursuant to Section 6323 of the Code or Section 4068 of ERISA with regard to the assets of

A-233

any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller; or

(f)      Should any Servicer (if such Servicer is an Affiliate of any Borrower), any Seller, any Borrower or any Lottery Holding SPV or any of their respective senior executive officers be indicted for a felony offense involving financial fraud; provided that such Facility Event of Default shall cease to exist if (i) the indictment is dismissed, (ii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller or such senior executive officer of any such parties, as applicable, enters into an agreement of settlement with the authority that has commenced such indictment, which agreement is entered into without prejudice to such party or without admission of fault or wrongdoing by such party or (iii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller, as applicable, removes direct responsibility for the origination, acquisition or administration of the Collateral from each such senior executive officer, if any, that is the subject of the applicable indictment; or

(g)      the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC ceases to be at least equal to $75,000,000; or

(h)      without the consent of the Lenders (i) either 777 Partners LLC or 600 Partners LLC, as applicable, ceases to Control all entities that are in the respective Borrower Group or (ii) 777 Partners LLC and 600 Partners LLC cease to be Affiliates of each other; or

(i)      the failure of the Borrowers to satisfy each condition subsequent set forth in Section 3.04(a)(i) through (iii) or Section 3.04(b) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrowers:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in any Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the Borrowers owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Related Lender Group, terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Lender Group, designate another Person to succeed each Servicer as the Related Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.02   Events of Default. If any of the following events (each, a "Borrower Group Event of Default") shall occur and be continuing:

(a)      Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure

76

A-234

shall remain unremedied for two (2) Business Days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

(b)     Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and except with respect to the failure to make any payment on the applicable Maturity Date, such failure shall continue unremedied for two (2) Business Days; or

(c)     Any representation or warranty made or deemed made by any Borrower, any Seller, any Lottery Holding SPV, or, so long as such Servicer is an Affiliate of any Borrower, any Servicer (or any of their respective officers) under or in connection with this Agreement or any other Transaction Document or any information or report delivered by any Borrower, any Seller or, so long as such Servicer is an Affiliate of any Borrower, any Servicer pursuant to this Agreement or any other Transaction Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered, and such condition remains unremedied for a period ending two (2) Business Days after the end of immediately succeeding Interest Period after the earlier to occur of (i) the date on which written notice of such incorrectness requiring the same to be remedied shall have been given to the applicable Borrower, the applicable Seller or the applicable Servicer by the Administrative Agent or (ii) the date on which applicable Borrower, the applicable Seller or the applicable Servicer, as applicable, acquires knowledge thereof; provided, however, to the extent such false or incorrect representation relates to a Receivable or Health Care Provider Loan Receivable, it shall not constitute a Borrower Group Event of Default if such Receivable or Health Care Provider Loan Receivable does not constitute a Defective Receivable (as defined in the applicable Sale Agreement) or if the applicable Seller Repurchases such Receivable or Health Care Provider Loan Receivable in accordance with the terms of the applicable Sale Agreement; or

(d)     Any Borrower or any Seller shall fail to perform or observe any term, covenant or agreement contained in this Agreement, the applicable Servicing Agreement or the applicable Sale Agreement on its part to be performed or observed (other than as specified in subsection (a) hereof) and any such failure shall remain unremedied for a period of thirty (30) day after the earlier to occur of (i) the date on which written notice of such failure requiring the same to be remedied shall have been given to the applicable Borrowers or the applicable Seller by the Administrative Agent or (ii) the date on which the applicable Borrower or the applicable Seller, as applicable, acquires knowledge thereof; provided that the failure of any Borrower to perform or observe any covenant contained in Sections 5.01(g), 5.01(h), 5.01(m), 5.01(o), 5.01(p) or 5.01(q) shall not be entitled to the benefit of such thirty (30)-day period; or

(e)     Any Borrower, any Servicer (if an Affiliate of any Borrower) or any Seller shall fail to pay any principal of or premium or interest on any of its Debt which is outstanding in a principal amount of at least $500,000 ($25,000 in the case of a Borrower) in the aggregate when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event

A-235

shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f)     Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Borrower, any Lottery Holding SPV, a Servicer or a Seller seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days in the case of a Servicer or a Seller, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any proceeding or petition shall be instituted or adopted for the winding up of any Borrower or any Lottery Holding SPV (whether or not in the context of a bankruptcy or insolvency proceeding); or any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall take any corporate or other action to authorize any of the actions set forth above in this <u>subsection (g)</u>; or

(g)     A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within three (3) Business Days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; <u>provided,</u> that a Borrowing Base Deficiency shall not constitute a Borrower Group Event of Default until such time as the Administrative Agent declares a Borrower Group Event of Default; and <u>provided</u>, <u>further,</u> that the election by the Administrative Agent not to declare a Borrower Group Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Borrower Group Event of Default; or

(h)     One or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (or $25,000 in the case of any Borrower or any Lottery Holding SPV) (except to the extent covered by insurance as to which the insurer has acknowledged such coverage in writing) shall be rendered against any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be taken by a judgment creditor to attach or levy upon any assets of any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) to enforce any such judgment; or

78

A-236

(i)       Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower),any Seller or any ERISA Affiliate of any of them shall fail to pay when due an amount or amounts aggregating in excess of $500,000 which it shall have become liable to pay under Section 302 or Title IV of ERISA or Section 412 of the Code with respect to any Plan or Multiemployer Plan; or notice of intent to terminate a Plan shall be filed under Title IV of ERISA by any of the foregoing, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer, any Plan; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Plan must be terminated; or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA, with respect to, one or more Multiemployer Plans which could cause any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller or one or more ERISA Affiliates of any of them to incur a current payment obligation in excess of $500,000; or (ii) any other ERISA Event shall have occurred that, in the opinion of the Administrative Agent or the Required Lenders in the Related Lender Group, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller and any ERISA Affiliate of any of them in an aggregate amount exceeding $500,000; or

(j)       Any Borrower or any Lottery Holding SPV becomes a Benefit Plan Entity and fails to cease being a Benefit Plan Entity within thirty (30) days; or

(k)       So long as a Servicer is an Affiliate of any Borrower, a Servicer Default shall occur (after giving effect to any applicable notice or cure period); or

(l)       Should any material provision of this Agreement or any other Transaction Document to which any Borrower is a party cease to be in full force and effect or any Borrower shall assert in writing (which may be provided via electronic mail) that this Agreement or any other Transaction Document is no longer in full force and or effect; or

(m)      A Change of Control shall occur; or

(n)       Any Borrower ceases to be disregarded as an entity separate from any Seller, elects to be treated as a corporation, or otherwise becomes or is treated as a corporation or partnership for U.S. federal income tax purposes; or

(o)       Subject to the timeframe set forth in Section 3.04(a), any Borrower Account or Lock-Box ceases to be the subject of one or more fully executed Account Control Agreements; provided, that if any such Lock-Box is held in the name of a Lottery Holding SPV, an Account Control Agreement shall not be required with respect to such Lock-Box so long as Collections remitted to such Lock-Box are automatically transferred by the related account bank to the Collection Account related to the SPLCSS Borrower and the absence of such Account Control Agreement shall not constitute a breach of any term or condition of any Transaction Document; or

(p)       Should (i) any event of default, termination event or additional termination event in respect of any Borrower occur under any Hedge Agreement and be continuing after any

A-237

applicable grace periods, or (ii) any Borrower fail to maintain any Hedge Transactions that it is required to maintain pursuant to Section 5.01(u) hereof, and such failure shall not have been remedied within fifteen (15) days after the occurrence of such event; or

(q)    Should any event of default, termination event or additional termination event in respect of a Hedge Counterparty occur under any Hedge Agreement and be continuing after any applicable grace periods and such Borrower fails to enter into one or more replacement Hedge Agreements with one or more other Hedge Counterparties within sixty (60) days after the occurrence of such event; or

(r)    With respect to the Insurety Borrower, the failure of the Insurety Borrower to satisfy Section 3.04(a)(iv) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrower with respect to which such Borrower Group Event of Default has occurred:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, terminate the Commitments of the Lenders in the Related Lender Group, and thereupon the Commitments of the Lenders in the Related Lender Group shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, designate another Person to succeed the Related Servicer as the Related Servicer; provided that, automatically upon the occurrence of any event (without any requirement for the passage of time or the giving of notice) described in paragraph (f) of this Section 7.02, the principal of the Loans (together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder) shall become due and payable immediately, the Commitments of the Lenders in the Related Lender Group, if any, shall terminate immediately, and the Related Servicer shall cease to be the Related Servicer, and the successor Servicer designated by the Administrative Agent with respect to the Related Servicer shall become a Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.03    Servicer Defaults. Each Borrower and each Servicer authorizes the Administrative Agent, and hereby irrevocably appoints the Administrative Agent (and each servicer appointed to act on its behalf) as its attorney-in-fact coupled with an interest, with full power of substitution and with full authority in place of such Borrower or such Servicer, following the occurrence and during the continuation of a Servicer Default, to take any and all steps in such Borrower's or such Servicer's name and on behalf of such Borrower or such Servicer that are necessary or desirable, in the determination of the Administrative Agent, to collect amounts due

A-238

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWERS:                    SPLCSS III LLC

                              By: *Steven W. Pasko*
                                  DF9B492F396A415...
                              Name:  Steven W. Pasko
                              Title:   President

                              SIGNAL SML 4 LLC

                              By: *Steven W. Pasko*
                                  DF9B492F396A415...
                              Name: Steven W. Pasko
                              Title:   President

                              INSURETY AGENCY SERVICES LLC

                              By: *John Richard Zirkelbach*
                                  1A0518B8DE884ED...
                              Name:  John R. Zirkelbach
                              Title:   Authorized Signatory

                              DORCHESTER RECEIVABLES II LLC

                              By: *Steven W. Pasko*
                                  DF9B492F396A415...
                              Name:  Steven W. Pasko
                              Title:   President

[Signature Page to Loan and Security Agreement]

A-239

SERVICERS:                          SUTTONPARK SERVICING LLC

                                    By: *Steven W. Pasko*
                                    Name:  Steven W. Pasko
                                    Title:   Chief Executive Officer


                                    SIGNAL SERVICING LLC

                                    By: *Steven W. Pasko*
                                    Name:  Steven W. Pasko
                                    Title:   Chief Executive Office

                                    INSURETY SERVICING LLC

                                    By: *Steven W. Pasko*
                                    Name:  Steven W. Pasko
                                    Title:   Authorized Signatory

[Signature Page to Loan and Security Agreement]

DocuSign Envelope ID: CF3125C8-A80B-4EF0-80DA-47EF8E0421E6

Case 1:24-cv-03453-JGK   Document 58-1   Filed 05/13/24   Page 31 of 40

SELLERS:                    SUTTONPARK CAPITAL LLC

By: _____
Name:  Steven W. Pasko
Title:   Chief Executive Officer

SIGNAL MEDICAL RECEIVABLES LLC

By: _____
Name:  Steven W. Pasko
Title:   Chief Executive Officer

INSURETY CAPITAL LLC

By: _____
Name:  Robert Gray
Title:   Chief Executive Officer

[Signature Page to Loan and Security Agreement]

A-241

ADMINISTRATIVE AGENT:          LEADENHALL CAPITAL PARTNERS LLP


By: _____
Name: Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-242

COLLATERAL AGENT:                 For and on behalf of LEADENHALL LIFE
                                  INSURANCE LINKED INVESTMENTS
                                  FUND PLC by its agent Leadenhall Capital
                                  Partners LLP


                                  By: _____
                                  Name: Craig Gillespie
                                  Title: Head Of Life & Alternative Credit Portfolio Management

A-243

LENDERS IN SPLCSS LENDER GROUP:

For and on behalf of LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name: Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL CIMETTA INSURANCE LINKED INVESTMENTS FUND ICAV by its agent Leadenhall Capital Partners LLP

By: _____
Name:  Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL DIVERSIFIED INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name:  Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE II DAC by its agent Leadenhall Capital Partners LLP

By: _____
Name:  Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-244

For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall Capital
Partners LLP


By: _____
Name: Craig Gillespie
Title:  Head Of Life & Alternative Credit Portfolio Management


For and on behalf of NATWEST PENSION
TRUSTEES LIMITED, as trustee for THE
NATWEST GROUP PENSION FUND by its
agent Leadenhall Capital Partners LLP


By: _____
Name:   Craig Gillespie
Title:     Head Of Life & Alternative Credit Portfolio Management


For and on behalf of SITKA ICAV by its agent
Leadenhall Capital Partners LLP


By: _____
Name:   Craig Gillespie
Title:     Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-245

LENDERS IN SIGNAL LENDER GROUP:

For and on behalf of LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL CIMETTA INSURANCE LINKED INVESTMENTS FUND ICAV by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL DIVERSIFIED INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL SMA III ICAV by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-246

LENDERS IN INSURETY
LENDER GROUP:

For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP

By: _____
Name: Craig Gillespie
Title: Head of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE II
DAC by its agent Leadenhall Capital Partners
LLP

By: _____
Name: Craig Gillespie
Title: Head of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall Capital
Partners LLP

By: _____
Name: Craig Gillespie
Title: Head of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL
CIMETTA INSURANCE LINKED
INVESTMENTS ICAV by its agent
Leadenhall Capital Partners LLP

By: _____
Name: Craig Gillespie
Title: Head of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-247

For and on behalf of LEADENHALL
DIVERSIFIED INSURANCE LINKED
INVESTMENTS FUND by its agent
Leadenhall Capital Partners LLP


By: _____

Name: Craig Gillespie
Title:  Head of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

A-248

LENDERS IN DORCHESTER
LENDER GROUP:

For and on behalf of NATWEST PENSION
TRUSTEES LIMITED, as trustee for THE
NATWEST GROUP PENSION FUND by its
agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:   Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

DocuSign Envelope ID: EEA9AA04-A8CA-4A7B-9D8D-4D9DB80D18B4

Acknowledged and agreed, solely with respect to Section 2.15:

ASELLUS RECEIVABLES II LLC

By: *Steven W. Pasko*

Name: Steven W. Pasko
Title: President

ACUBENS IV LLC

By: *Steven W. Pasko*

Name: Steven W. Pasko
Title: President

[Signature Page to Loan and Security Agreement]

A-250

# EXHIBIT 2

A-251

EXECUTION VERSION

# GUARANTY AGREEMENT

This **GUARANTY AGREEMENT** (as amended, restated, supplemented or otherwise modified from time to time, this "Guaranty"), dated as of May 7, 2021, is executed by **777 PARTNERS LLC**, a Delaware limited liability company ("777 Partners") and 600 Partners LLC, a Delaware limited liability company ("600 Partners" and together with 777 Partners, the "Guarantors" and each a "Guarantor"), in favor of **LEADENHALL CAPITAL PARTNERS, LLP**, as Administrative Agent under the Loan and Security Agreement (as defined below) (together with its successors and assigns, "Recipient") for the benefit of the Lenders (as defined below).

## RECITALS

**WHEREAS**, Dorchester Receivables II LLC, a Delaware limited liability company (the "Dorchester Borrower"), Insurety Agency Services LLC, a Florida limited liability company (the "Insurety Borrower"), Signal SML 4 LLC, a Delaware limited liability company (the "Signal Borrower"), SPLCSS III LLC, a Delaware limited liability company (the "SPLCSS III Borrower" and together with the Dorchester Borrower, the Insurety Borrower, the Signal Borrower and the other borrowers from time to time party thereto, the "Borrowers" and each a "Borrower"), Insurety Capital LLC, a Delaware limited liability company (the "Insurety Seller"), Signal Medical Receivables LLC, a Delaware limited liability company (the "Signal Seller") and SuttonPark Capital LLC, a Delaware limited liability company (the "SPLCSS/Dorchester Seller" and together with the Insurety Seller, the Signal Seller and the other sellers from time to time party thereto, the "Sellers"), Insurety Servicing LLC, a Delaware limited liability company (the "Insurety Servicer"), Signal Servicing LLC, a Delaware limited liability company (the "Signal Servicer") and SuttonPark Servicing LLC, a Delaware limited liability company (the "SPLCSS/Dorchester Servicer" and together with the Insurety Servicer, the Signal Servicer and the other servicers from time to time party thereto, the "Servicers"), the lenders from time to time party thereto (each a "Lender" and, collectively, the "Lenders"), the Recipient, and Leadenhall Life Insurance Linked Investments Fund PLC, as the initial collateral agent (the "Collateral Agent"), are parties to that certain Loan and Security Agreement, dated as of May 7, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan and Security Agreement"), pursuant to which the Lenders make loans to the Borrowers from time to time;

**WHEREAS**, each of the Guarantors is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement, and the other Transaction Documents (which benefits are hereby acknowledged by the Guarantors); and

**WHEREAS**, each Guarantor agrees to jointly and severally guaranty the Guaranteed Obligations (as defined below), subject to the terms of this Guaranty.

**NOW**, **THEREFORE**, each Guarantor hereby agrees as follows:

**Section 1.**     Definitions. Capitalized terms used herein and not defined herein shall have the respective meanings assigned thereto in the Loan and Security Agreement. In addition:

A-252

"Guaranteed Obligations" means, with respect to each Borrower Group, collectively

(i)      the "Obligations," as defined in the Loan and Security Agreement, of the Borrower in such Borrower Group;

(ii)     the obligations of the Servicer in such Borrower Group under the applicable Servicing Agreement; and

(iii)    the obligation of the Seller in such Borrower Group to repurchase Defective Receivables or Guaranteed Receivables pursuant to the Loan and Security Agreement.

"Guarantor Information" means, collectively (i) documentation evidencing the aggregate Tangible Net Worth of the Guarantors as of the last day of the previous calendar month; (ii) information regarding any one or more judgments or decrees entered against either Guarantor involving in the aggregate a liability (not paid or fully covered by a reputable and solvent insurance company) and such judgments and decrees either are final and non-appealable or are not vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments exceeds $1,000,000; (iii) information regarding (A) any default in any payment of any indebtedness of either Guarantor beyond the period of grace or cure, if any, provided in the instrument or agreement under which such indebtedness was created, the effect of which default is to cause any such indebtedness to become due before its stated maturity; (B) any default in the observance or performance of any agreement or condition relating to any indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, any such indebtedness to become due before its stated maturity; or (C) any indebtedness of either Guarantor that is declared to be due and payable, or required to be prepaid (other than (x) by a regularly scheduled required reduction or (y) as a mandatory prepayment (unless such required reduction or mandatory prepayment results from a default thereunder)) before the stated maturity thereof, in each case where the indebtedness as described in preceding clauses (A) through (C) is at least $1,000,000 and no such default shall have been waived by the holder or holders of such indebtedness; (iv) information regarding the exercise of any other guaranty entered into by either Guarantor; and (v) information regarding any other event that could reasonably be expected to result in the inability of either Guarantor to guaranty the performance and payment in full of the Guaranteed Obligations in accordance with the terms of this Guaranty.

"Guaranty Termination Date" means the date on which all of the Guaranteed Obligations have been paid in full in cash.

"Initial Deficit Amount" means, the amount of the Borrowing Base Deficiency indicated on Schedule XIII of the Loan and Security Agreement on the date hereof.

"Insurety Guaranty Limit" means, as of the date of payment by the Guarantors of any Guaranteed Obligations pursuant to this Guaranty, an aggregate amount equal to the product of (i) fifteen percent (15.0%) and (ii) the aggregate Commitment of the Lenders in the Insurety Lender Group with respect to the Insurety Borrower as of such date of payment.

2

A-253

"Loan and Security Agreement" has the meaning specified in the recitals.

"Net Worth" means, with respect to any Person, the excess of total assets of such Person, over total liabilities of such Person, determined in accordance with GAAP.

"Recipients" means collectively, the Lenders, the Collateral Agent and the Recipient.

"Signal Guaranty Limit" means, as of the date of payment by the Guarantors of any Guaranteed Obligations pursuant to this Guaranty, an aggregate amount equal to the product of (i) fifteen percent (15.0%) and (ii) the aggregate Commitment of the Lenders in the Signal Lender Group with respect to the Signal Borrower as of such date of payment.

"Tangible Net Worth" means, with respect to any Person as of any date of determination, the consolidated Net Worth of such Person and its Subsidiaries (together with any software expenses that are capitalized for accounting purposes where the related technology will be available for commercial use as opposed to internal use), less the consolidated net book value of all assets of such Person and its Subsidiaries (to the extent reflected as an asset in the balance sheet of such Person or any Subsidiary at such date) which will be treated as intangibles under GAAP, including such items as goodwill, trademarks, trade names, service marks, copyrights, patents and licenses.

"Trigger Event" means the occurrence of any of the following events:

(i)     any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;

(ii)     any act of theft or misappropriation of funds by either Guarantor under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

(iii)     any willful misrepresentation of a material nature by either Guarantor under this Guaranty;

(iv)     any Borrower shall file, initiate or consent to the filing of a voluntary petition under the Bankruptcy Code or any other Applicable Law or the appointment of a trustee, receiver, conservator or liquidator for all or any part of its properties and assets other than in compliance with the organizational documents of such Borrower;

(v)     any Seller, Servicer or Guarantor files, joins in the filing of, or consents to or otherwise acquiesces to the filing of, an involuntary petition against any Borrower under the Bankruptcy Code or any other Applicable Law, which is not dismissed within sixty (60) days of the date of its filing, or solicits or causes to be solicited petitioning creditors for any involuntary petition against any Borrower from any Person;

(vi)     any Change of Control not expressly approved in writing by the Administrative Agent in its sole discretion;

3

A-254

(vii)    any Borrower, Seller, Servicer or Guarantor asserts in writing any claim, defense or offset against the Administrative Agent or any Lender that such Person has expressly waived or agreed in the Transaction Documents not to assert;

(viii)    any failure by a Seller to repurchase any Receivable or Health Care Provider Loan Receivable, as applicable, required to be repurchased by such Seller pursuant to the Transaction Documents;

(ix)    any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days;

(x)    any failure by the SPLCSS Borrower or Dorchester Borrower to maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions pursuant to the Loan and Security Agreement which failure continues for thirty (30) days and results in a Borrowing Base Deficiency; or

(xi)    any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise or enforcement of its rights and remedies against any Collateral under the Transaction Documents or under Requirements of Law.

**Section 2.**    Guaranty of Payment of Guaranteed Obligations.

(a)    Each Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably guarantees to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the SPLCSS Borrower Group and the Dorchester Borrower, in each case, so long as a Trigger Event has occurred and is continuing; provided that if a Trigger Event set forth in clause (x) of the definition thereof has occurred and is continuing, such Guaranteed Obligations shall be limited to the resulting Borrowing Base Deficiency. Each Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably guarantees to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the Insurety Borrower Group and the Signal Borrower Group; provided that the aggregate obligation and liabilities of the Guarantors under this Guaranty with respect to the Guaranteed Obligations shall not at any time or in any event or circumstance exceed (i) the Insurety Guaranty Limit with respect to the Guaranteed Obligations of the Insurety Borrower, or (ii) the Signal Guaranty Limit with respect to the Guaranteed Obligations of the Signal Borrower, in each case unless a Trigger Event has occurred and is continuing (in which case the Insurety Guaranty Limit or Signal Guaranty Limit, as applicable, shall not be applicable; provided that if a Trigger Event set forth in clause (x) the definition thereof has occurred and is continuing, such Guaranteed Obligations shall be limited to the resulting Borrowing Base Deficiency). This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment

A-255

and performance of all of the Guaranteed Obligations (subject to the Insurety Guaranty Limit with respect to the Insurety Borrower Group and the Signal Guaranty Limit with respect to the Signal Borrower Group or the occurrence and continuance of a Trigger Event; provided that if a Trigger Event set forth in clause (x) the definition thereof has occurred and is continuing, such Guaranteed Obligations shall be limited to the resulting Borrowing Base Deficiency) and is in no way conditioned upon any requirement that any Recipient first attempt to collect any amounts owing in respect of the Guaranteed Obligations from any Borrower or any other Person. Should any entity in a Borrower Group default in the payment or performance of any of its Guaranteed Obligations, and Recipient (or its assigns) may require the immediate payment and performance thereof by the Guarantors and require payment and performance of any Guaranteed Obligations that are then due and payable to the Recipient for the benefit of the Recipients to be paid in full in cash by the Guarantors, without other demand or notice of any nature (other than as expressly provided herein), all of which are hereby expressly waived by each Guarantor. Each Guarantor agrees that its guarantee constitutes a guaranty of payment when due and not merely of collection. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety. Each Guarantor waives any right to require that any resort be made by the Recipient on behalf of the Recipients to the Collateral. Except as required by Applicable Law, each Guarantor hereby agrees that all payments hereunder shall be paid to the Recipient without setoff, deduction or counterclaim in U.S. dollars and in immediately available funds at the bank accounts specified by the Recipient from time to time in accordance with the Loan and Security Agreement. Without limiting the generality of the foregoing, subject to the Insurety Guaranty Limit and the Signal Guaranty Limit, if applicable, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any Borrower to any Recipient under or in respect of the Loan and Security Agreement or the other Transaction Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving a Borrower.

(b)    Each Guarantor, and by its acceptance of the benefits of this Guaranty, each of the Recipients hereby confirms that it is the intention of all such Persons that this Guaranty and the obligations of the Guarantors hereunder not constitute a fraudulent transfer or conveyance for purposes of any Applicable Law, including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the obligations of the Guarantors hereunder. To effectuate the foregoing intention, by acceptance of the benefits of this Guaranty each of the Recipients and the Guarantors, hereby irrevocably agrees that the obligations of the Guarantors under this Guaranty at any time shall be limited to the maximum amount (after giving effect to any rights of contribution pursuant to any agreements but before giving effect to any other guarantee) as will result in the obligations (including, for the avoidance of doubt, the Guaranteed Obligations) of the Guarantors under this Guaranty not constituting a fraudulent transfer or conveyance or subject to avoidance under the Bankruptcy Code or other Applicable Laws or any similar foreign, federal or state law, in each case applicable to either Guarantor.

**Section 3.**    Guaranty Absolute. To the maximum extent permitted by Applicable Law, each Guarantor agrees that its guarantee constitutes a guarantee of payment when due of the Guaranteed Obligations (up to the Insurety Guaranty Limit or Signal Guaranty Limit, as applicable, unless a Trigger Event has occurred and is continuing; provided that if a Trigger Event set forth in clause (x) the definition thereof has occurred and is continuing, such Guaranteed

5

A-256

Obligations shall be limited to the resulting Borrowing Base Deficiency) and not of collection, which will be paid strictly in accordance with the terms of the Loan and Security Agreement and the other Transaction Documents, regardless of any Applicable Law now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Recipient with respect thereto. The obligations of the Guarantors under or in respect of this Guaranty are independent of the Obligations of any entity in a Borrower Group under or in respect of the Loan and Security Agreement and the other Transaction Documents, and a separate action or actions may be brought and prosecuted against either Guarantor to enforce this Guaranty, irrespective of whether any action is brought against an entity in a Borrower Group or whether an entity in a Borrower Group is joined in any such action or actions. The liability of the Guarantors under this Guaranty shall be irrevocable, absolute and unconditional and shall not be affected or impaired by any circumstance or occurrence whatsoever irrespective of, and each Guarantor hereby irrevocably waives and agrees not to assert, to the maximum extent permitted by Applicable Law, any defenses (except for bad faith, willful misconduct or gross negligence by any Recipient, to the extent determined by a court of competent jurisdiction in a final non appealable judgment, or a defense that this Guaranty shall have been terminated pursuant to Section 7) it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of the Loan and Security Agreement, the other Transaction Documents or this Guaranty or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of, or any consent to departure from, the Loan and Security Agreement or the other Transaction Documents, including any increase (including any increase in the principal amount thereof or in the amount of interest thereon) in the Guaranteed Obligations resulting from the extension of additional credit to any Borrower or otherwise;

(c)     any taking, exchange, impairment, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of the Guarantors or any Borrower under the Loan and Security Agreement or the other Transaction Documents or any other assets of the Guarantors or any Borrower;

(e)     any change, restructuring or termination of the corporate or limited liability company structure or existence or ownership of either Guarantor or any Borrower, or any insolvency, bankruptcy, reorganization or other similar proceeding or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding affecting any Borrower or any of its respective assets or any resulting release or discharge of any obligation of any Borrower;

6

A-257

(f)      any failure of any Recipient to disclose to either Guarantor or any Borrower any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any Borrower now or hereafter known to such Recipient;

(g)      any payment made to any secured creditor on the Guaranteed Obligations which any Recipient repays to any Borrower, either Guarantor or any of their respective affiliates pursuant to a court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its Guaranteed Obligations hereunder by reason of any such proceeding;

(h)      the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from any Borrower or any other Person or other action to enforce the same or (ii) any action to enforce any Transaction Document or any Lien thereunder;

(i)      any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of any Borrower other than the performance and payment in full of the Guaranteed Obligations; or

(j)      any other circumstance (including any statute of limitations), any act or omission, or any existence of or reliance on any representation by any Recipient that might otherwise constitute a defense available to, or a discharge of, any Borrower, either Guarantor or any other guarantors or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or any part thereof, of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Recipient or any other Person upon the insolvency, bankruptcy or reorganization (or any analogous proceeding in any jurisdiction) of any Borrower or otherwise, all as though such payment had not been made. For the avoidance of doubt this paragraph shall survive the termination of this Guaranty.

**Section 4.**      <u>Waivers by the Guarantors</u>. Each Guarantor waives notice of acceptance of this Guaranty, notice of any action taken or omitted by the Recipient or any other Recipient (or its assigns) in reliance on this Guaranty, and any requirement that Recipient or any other Recipient (or its assigns) be diligent or prompt in making demands under this Guaranty, giving notice of any Event of Default, other default or omission by the Borrowers or asserting any other rights of the Recipient or any other Recipient under this Guaranty. Each Guarantor warrants that it has adequate means to obtain from the Borrowers on a continuing basis, information concerning the financial condition of the Borrowers and that it is not relying on Recipient to provide such information, now or in the future. Each Guarantor hereby waives, for the benefit of the Recipients, any right to require the Recipient or any other Recipient, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor of all or any portion of the Guaranteed Obligations or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of the Recipient or any other Recipient in favor of Borrower or any other Person or (iv) pursue any other remedy in the power of the Recipient or any other Recipient whatsoever. Each Guarantor also irrevocably waives all defenses (i) that at any time may be available in respect of the Guaranteed Obligations by virtue of any statute of limitations, valuation, stay, moratorium law or other similar law now or

7

A-258

DocuSign Envelope ID: CF3125C8-A89B-4EF0-89DA-37E586042CB6

Case 1:24-cv-03453-JGK    Document 58-2    Filed 05/13/24    Page 9 of 19

**IN WITNESS WHEREOF,** each Guarantor has caused this Guaranty to be executed and delivered as of the date first above written.

GUARANTORS:                    777 PARTNERS LLC

By: Steven W. Pasko
Name:  Steven W. Pasko
Title:   Co-Managing Partner

600 PARTNERS LLC

By: Steven W. Pasko
Name:  Steven W. Pasko
Title:   Managing Partner

[Signature Page to Guaranty Agreement]

A-259

Acknowledged and Accepted as of the date
first above written:

ADMINISTRATIVE AGENT, AS                LEADENHALL CAPITAL PARTNERS
RECIPIENT:                              LLP


By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-260

LENDERS IN SPLCSS LENDER GROUP:

For and on behalf of LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL CIMETTA INSURANCE LINKED INVESTMENTS FUND ICAV by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL DIVERSIFIED INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE II DAC by its agent Leadenhall Capital Partners LLP

By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-261

For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall
Capital Partners LLP

By: _____

Name:   Craig Gillespie

Title:   Head Of Life & Alternative Credit Portfolio Management


For and on behalf of NATWEST PENSION
TRUSTEES LIMITED, as trustee for THE
NATWEST GROUP PENSION FUND by its
agent Leadenhall Capital Partners LLP

By: _____

Name: Craig Gillespie

Title: Head Of Life & Alternative Credit Portfolio Management


For and on behalf of SITKA ICAV by its
agent Leadenhall Capital Partners LLP


By: _____

Name: Craig Gillespie

Title:  Head Of Life & Alternative Credit Portfolio Management


[Signature Page to Guaranty Agreement]

A-262

LENDERS IN SIGNAL LENDER GROUP:

For and on behalf of LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL CIMETTA INSURANCE LINKED INVESTMENTS FUND ICAV by its agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL DIVERSIFIED INSURANCE LINKED INVESTMENTS FUND PLC by its agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:    Head Of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL SMA III ICAV by its agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:    Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-263

LENDERS IN INSURETY LENDER
GROUP:

For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP


By: _____

Name:  Craig Gillespie

Title:    Head of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE
II DAC by its agent Leadenhall Capital
Partners LLP


By: _____

Name: Craig Gillespie

Title:   Head of Life & Alternative Credit Portfolio Management

For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall
Capital Partners LLP


By: _____

Name:  Craig Gillespie

Title:    Head of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
CIMETTA INSURANCE LINKED
INVESTMENTS ICAV by its agent
Leadenhall Capital Partners LLP


By: _____

Name: Craig Gillespie

Title:   Head of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-264

For and on behalf of LEADENHALL
DIVERSIFIED INSURANCE LINKED
INVESTMENTS FUND by its agent
Leadenhall Capital Partners LLP


By: _____

Name: Craig Gillespie

Title: Head of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-265

LENDERS IN DORCHESTER LENDER
GROUP:

For and on behalf of NATWEST PENSION
TRUSTEES LIMITED, as trustee for THE
NATWEST GROUP PENSION FUND by its
agent Leadenhall Capital Partners LLP


By: _____

Name:  Craig Gillespie

Title:  Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Guaranty Agreement]

A-266

DocuSign Envelope ID: EEA9AA04-A8CA-4A7B-9D8D-4D9DB80D18B4

BORROWERS:                                SPLCSS III LLC

By: _____
Name:  Steven W. Pasko
Title:   President

SIGNAL SML 4 LLC

By: _____
Name:  Steven W. Pasko
Title:   President

INSURETY AGENCY SERVICES LLC

By: _____
Name:  John R. Zirkelbach
Title:   Authorized Signatory

DORCHESTER RECEIVABLES II LLC

By: _____
Name:  Steven W. Pasko
Title:   President

[Signature Page to Guaranty Agreement]

A-267

SERVICERS:

SUTTONPARK SERVICING LLC

By: _Steven W. Pasko_____
Name:   Steven W. Pasko
Title:    Chief Executive Officer

SIGNAL SERVICING LLC

By: _Steven W. Pasko_____
Name:   Steven W. Pasko
Title:    Chief Executive Officer

INSURETY SERVICING LLC

By: _Steven W. Pasko_____
Name:   Steven W. Pasko
Title:    Authorized Signatory

[Signature Page to Guaranty Agreement]

A-268

DocuSign Envelope ID: CF3125C8-A80B-4EF0-80DA-47EF85042CB6

SELLERS:                                SUTTONPARK CAPITAL LLC

By: *Steven W. Pasko*
Name:  Steven W. Pasko
Title:    Chief Executive Officer

SIGNAL MEDICAL RECEIVABLES LLC

By: *Steven W. Pasko*
Name:  Steven W. Pasko
Title:    Chief Executive Officer

INSURETY CAPITAL LLC

By: *Robert Gray*
Name:  Robert Gray
Title:    Chief Executive Officer

[Signature Page to Guaranty Agreement]

A-269

# EXHIBIT 5

A-270

| | Report Date | 12/29/2023 |
|---|---|---|

### Dorchester Receivables Monthly Report
### Borrowing Base Calculation and Compliance as of December, 2023

**Structured Settlement Receivables**

**Discount Rate**

| | Discount Rate | 6.10000% |
|---|---|---|

**Valuation Amount**

| | | |
|---|---|---|
| [Pro forma] PV of all Receivables, discounted at the Discount Rate | $ | 38,968,632.76 |
| PV of High Grade Receivables | $ | 28,495,757.40 |
| x 95% | | 95.00% |
| Borrowing Base High Grade Receivables | $ | 27,070,969.53 |
| PV of Low Grade Receivables | $ | 10,472,875.35 |
| x 80% | | 80.00% |
| Borrowing Base Low Grade Receivables | $ | 8,378,300.28 |
| Borrowing Base SubTotal | $ | 35,449,269.82 |
| (a) (less) Excess Single Annuity Provider Concentration Amount (20.00%) | $ | - |
| (b) (less) Excess Genworth Receivables (15.00%) | $ | - |
| (c) (less) Excess Single Settlement Receivable Amount ($2 mil) | $ | (44,041.85) |
| (d) (less) Excess State Concentration Amount (20.00%) | $ | (1,516,859.83) |
| (d) (less) Excess Unrated Receivables Amount (10%) | $ | - |
| (e) (less) Defaulted Receivables | $ | (1,560,563.31) |
| (f) (less) Excess Specified Receivable Characteristics | $ | - |
| (h)(less) Met Life / Governmental Authority | $ | - |
| **Valuation Amount Sub-total** | **$** | **32,327,804.83** |
| **Valuation Amount - Structured Settlements** | **$** | **32,327,804.83** |

**Borrowing Base**

| | | |
|---|---|---|
| (plus) Cash (including all amounts on deposit in the Borrower Accounts at such time excluding the Reserve Account and Concentration Account) | $ | 6,396,178.67 |
| (plus) Interest rate derivative assets (liabilities) | $ | - |
| **DV01** Valuation | $ | 34,975.23 |
| Hedging Requirement | | |
| | Error | |
| **Borrowing Base** | **$** | **32,327,804.83** |

**Borrowing Base Compliance**

| | | |
|---|---|---|
| Borrowing Base Amount | $ | 32,327,804.83 |
| (less) Outstanding Borrowings | $ | 79,010,000.00 |
| **Compliant if difference is ≥ 0)** | | **No** |

The undersigned hereby certifies that, as of the date of this report:

(i) the accompanying spreadsheet provides a pro forma calculation of the Borrowing Base after giving effect to the distributions to occur on the related Distribution Date or related Borrowing, as applicable.

(ii) each of the representations and warranties in Article IV of the Credit Agreement, dated as of September , 2016 (as amended, the "Credit Agreement"), by and among Dorchester Receivables, LLC, Leadenhall Capital Partners, LLP, as administrative agent, the lenders party thereto, the Collateral Trustee party thereto, SuttonPark Capital LLC, as originator, and the undersigned, is true and correct in all material respects;

(iii) no Default or Event of Default has occurred and is continuing; and

(iv) the Borrowing Base Limitation is not exceeded, and no Borrowing Base Deficiency exists.

Date: December, 29, 2023

SUTTONPARK SERVICING LLC

By: _____
Authorized Signatory

A-271

# EXHIBIT 6

<div align="center">

**A-272**

</div>

| | | | | |
|---|---|---|---:|---:|
| | Report Date | | **3/31/2023** | |
| | Waiver Expiration Date | | **4/15/2023** | |
| **SPLCSS III Receivables Compliance Report** | | | | |
| **Borrowing Base Calculation and Compliance as of March, 2023** | | | | |
| **LIFE CONTINGENT RECEIVABLES** | | | | |
| Life Contingent Discount Rate | | 6.96% | | 6.96% |
| LC ASSIGNABLE ANNUITY | $ | | 685,150.29 | $ | 685,150.29 |
| LC Assignable-No COO | $ | | 14,179.48 | $ | 14,179.48 |
| LC HEDGED | $ | | 3,537,957.95 | $ | 3,537,957.95 |
| LC HEDGED (Premium) | $ | | 1,155,205.65 | $ | 1,155,205.65 |
| LC Hedged (Premium) - no LE | $ | | 160,197.27 | $ | 160,197.27 |
| LC Hedged ASSIGNABLE ANNUITY | $ | | - | $ | - |
| LC HEDGED LOTTERY | $ | | - | $ | - |
| LC LOTTERY RECEIVABLES | $ | | 1,113,633.15 | $ | 1,113,633.15 |
| LC OTHER | $ | | - | $ | - |
| LC STRUCTURED SETTLEMENTS | $ | | 54,830,599.67 | $ | 54,830,599.67 |
| LC VARIABLE ANNUITY | $ | | - | $ | - |
| LC HEDGED - no LE | $ | | 516,045.05 | $ | 516,045.05 |
| LC ASSIGNABLE ANNUITY - no LE | $ | | 101,809.92 | $ | 101,809.92 |
| LC STRUCTURED SETTLEMENTS - JOINT ANNUITANTS | $ | | 45,121.92 | $ | 45,121.92 |
| LC STRUCTURED SETTLEMENTS - NO LE | $ | | 2,383,039.48 | $ | 2,383,039.48 |
| LC STRUCTURED SETTLEMENTS - NO QUOTE | $ | | 151,367.40 | $ | 151,367.40 |
| LC HEDGED ASSIGNABLE ANNUITY - NO LE | $ | | - | $ | - |
| LC HEDGED LOTTERY - NO LE | $ | | 234,786.80 | $ | 234,786.80 |
| LC COMMUTATION | $ | | 68,656.63 | $ | 68,656.63 |
| LC LOTTERY RECEIVABLES - NO LE | $ | | - | $ | - |
| Valuation Amount of Life Contingent Receivables | $ | | 64,997,648.67 | $ | 64,997,648.67 |
| x LTV Percentage | | 71.00% | | 71.00% | |
| **Valuation Amount of Life Contingent Receivables** | **$** | | **46,148,330.56** | **$** | **46,148,330.56** |
| | | | | |
| **GUARANTEED RECEIVABLES** | | | | |
| Guaranteed Discount Rate | | 5.652% | | 5.65% |
| STRUCTURED SETTLEMENTS | $ | | 11,974,263.25 | $ | 11,974,263.25 |
| ASSIGNABLE ANNUITY | $ | | 2,273,623.67 | $ | 2,273,623.67 |
| NON-QUALIFIED ASSIGNMENT | $ | | 79,157.65 | $ | 79,157.65 |
| OTHER | $ | | 83,624.00 | $ | 83,624.00 |
| Discounted Balance - Guaranteed Receivables | $ | | 14,410,668.78 | $ | 14,410,668.78 |
| Advance Rate | | 95.00% | | 95.00% | |
| **Valuation Amount - Guaranteed Receivables** | **$** | | **13,690,135.34** | **$** | **13,690,135.34** |
| | | | | |
| **LOTTERY RECEIVABLES** | | | | |
| Lottery Discount Rate | | 5.92% | | 5.92% |
| LOTTERY RECEIVABLE | $ | | 7,346,830.81 | $ | 7,346,830.81 |
| LOTTERY -IGT | $ | | - | $ | - |
| Discounted Balance - Lottery Receivables | $ | | 7,346,830.81 | $ | 7,346,830.81 |
| Advance Rate | | 95.00% | | 95.00% | |
| **Valuation Amount - Lottery Receivables** | **$** | | **6,979,489.27** | | **6,979,489.27** |
| | | | | |
| **Valuation Amount of All Receivables** | **$** | | **86,755,148.25** | **$** | **86,755,148.25** |
| **Borrowing Base** | | | | |
| **Borrowing Base Subtotal** | **$** | | **66,817,955.16** | **$** | **66,817,955.16** |
| (a) Excess Lottery Receivable Amount (20.25%) | $ | | - | $ | - |
| (b) Excess No-Report Receivables (20.00%) | $ | | - | $ | - |
| (c) Excess Single Annuity Provider Concentration Amount of AM Best Rated BBB+ or better (30.00%) | $ | | - | $ | - |
| (d) Excess Single Annuity Provider Concentration Amount of Unrated Receivables (20.00%) | $ | | - | $ | - |
| (e) Excess Single Lottery Receivable Amount ($1,000,000.00) | $ | | (370,699.18) | $ | (370,699.18) |
| (e) Excess Single Settlement Receivable Amount ($1,500,000.00) | $ | | - | $ | - |
| (f) (less) Excess State Concentration Amount (25.00%) | $ | | - | $ | - |
| (g) Excess Unrated Receivables (12.50%) | $ | | - | $ | - |
| (h) Excess Genworth Receivables (2.50%) | $ | | - | $ | - |
| (h) Excess Single Measuring Life Receivable Amount ($650,000.00) | $ | | (2,371,114.07) | $ | (2,371,114.07) |
| (i) Excess Specified Receivable Characteristics | $ | | - | $ | - |
| PV of Receivables which (i) are Unacknowledged Receivables and (ii) more than 90 days have | | | | |
| (j) (less) elapsed since their funding dates | $ | | - | $ | - |
| **Total Excess PV** | **$** | | **(2,741,803.25)** | | **(2,741,803.25)** |
| Valuation Amount Sub-total | $ | | 64,076,151.91 | $ | 64,076,151.91 |
| Valuation Amount | $ | | 64,076,151.91 | $ | 64,076,151.91 |
| **Borrowing Base** | | | | |
| (plus) Cash (including all amounts on deposit in the Borrower Accounts at such time excluding the Collection / | $ | | 2,065,763.12 | $ | 2,065,763.12 |
| (plus) Swaption MTM - SPLCSS | $ | | - | $ | - |
| **DV01 Valuation** | | | | |
| Hedging Requirement | $ | | 128,031.61 | $ | 128,031.61 |
| | | Error | | Error | |
| **Borrowing Base** | **$** | | **64,076,151.91** | **$** | **64,076,151.91** |
| **Borrowing Base Compliance** | | | | |
| Borrowing Base Amount | $ | | 64,076,151.91 | $ | 64,076,151.91 |
| (less) Outstanding Borrowings | $ | | 349,997,803.32 | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | | No | | No |
| **Required Reserve Amount Calculation and Compliance** | | | | |
| Valuation Amount | $ | | 86,755,148.25 | $ | 86,755,148.25 |
| x 5% | | 1.00% | | 1.00% | |
| Reserve Requirement | $ | | 867,551.48 | $ | 867,551.48 |
| Reserve Account Balance | $ | | - | $ | - |
| Compliance Status | | No | | No | |

<div align="center">

SUTTONPARK SERVICING LLC

By _____
Authorized Signatory

</div>

A-273

# EXHIBIT 7

A-274

|  |  | Report Date | 3/31/2023 |
|---|---|---|---|

| Dorchester Receivables Monthly Report | | |
|---|---|---|
| Borrowing Base Calculation and Compliance as of March, 2023 | | |
| **Structured Settlement Receivables** | | |
| **Discount Rate** | | |
| | Discount Rate | 5.66437% |
| **Valuation Amount** | | |
| [Pro forma] PV of all Receivables, discounted at the Discount Rate | $ | 42,377,404.71 |
| PV of High Grade Receivables | $ | 30,888,823.38 |
| x 95% | | 95.00% |
| Borrowing Base High Grade Receivables | $ | 29,344,382.21 |
| PV of Low Grade Receivables | $ | 11,488,581.33 |
| x 80% | | 80.00% |
| Borrowing Base Low Grade Receivables | $ | 9,190,865.07 |
| Borrowing Base SubTotal | $ | 38,535,247.28 |
| (a) (less) Excess Single Annuity Provider Concentration Amount (20.00%) | $ | - |
| (b) (less) Excess Genworth Receivables (15.00%) | $ | - |
| (c) (less) Excess Single Settlement Receivable Amount ($2 mil) | $ | (97,055.80) |
| (d) (less) Excess State Concentration Amount (20.00%) | $ | (1,288,915.87) |
| (d) (less) Excess Unrated Receivables Amount (10%) | $ | - |
| (e) (less) Defaulted Receivables | $ | (2,343,972.42) |
| (f) (less) Excess Specified Receivable Characteristics | $ | - |
| (h)(less) Met Life / Governmental Authority | $ | - |
| **Valuation Amount Sub-total** | $ | **34,805,303.18** |
| **Valuation Amount - Structured Settlements** | $ | **34,805,303.18** |
| | | |
| **Borrowing Base** | | |
| (plus) Cash (including all amounts on deposit in the Borrower Accounts at such time excluding the Reserve Account and Concentration Account) | $ | 7,650,170.79 |
| (plus) | $ | - |
| (plus) Interest rate derivative assets (liabilities) | $ | - |
| **DV01** Valuation | $ | 39,769.28 |
| Hedging Requirement | $ | - |
| | | Error |
| **Borrowing Base** | $ | **42,455,473.97** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 42,455,473.97 |
| (less) Outstanding Borrowings | $ | 79,010,000.00 |
| **Compliant if difference is ≥ 0)** | | **No** |

The undersigned hereby certifies that, as of the date of this report:

(i) the accompanying spreadsheet provides a pro forma calculation of the Borrowing Base after giving effect to the distributions to occur on the related Distribution Date or related Borrowing, as applicable.

(ii) each of the representations and warranties in Article IV of the Credit Agreement, dated as of September , 2016 (as amended, the "Credit Agreement"), by and among Dorchester Receivables, LLC, Leadenhall Capital Partners, LLP, as administrative agent, the lenders party thereto, the Collateral Trustee party thereto, SuttonPark Capital LLC, as originator, and the undersigned, is true and correct in all material respects;

(iii) no Default or Event of Default has occurred and is continuing; and

(iv) the Borrowing Base Limitation is not exceeded, and no Borrowing Base Deficiency exists.

Date: March, 31, 2023

SUTTONPARK SERVICING LLC

By: _____
Authorized Signatory

# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 2 of 5 (Pages A-275 to A-540)

Jonathan M. Watkins
Michael E. Petrella
Matthew M. Karlan
Cadwalader, Wickersham & Taft LLP
*Attorneys for Defendants-Appellants*
  *Advantage Capital Holdings LLC*
  *and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP COUNSEL PRESS    (800) 4-APPEAL • (333478)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated May 3, 2024.................................. A-37

Exhibit 1 to Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022......................... A-119

Exhibit 2 to Complaint -
Letter from Craig Gillespie to Steven W. Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023 ............................................ A-121

Exhibit 3 to Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023 .................................. A-125

Exhibit 4 to Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023................................ A-128

Exhibit 5 to Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023 ................................................ A-130

Exhibit 6 to Complaint -
Wells Fargo Summary Statement Screenshot ........ A-135

Exhibit 7 to Complaint -
"Collection" Account Wells Fargo Monthly
Statement ............................................................... A-137

Exhibit 8 to Complaint -
"Reserve" Account Wells Fargo Monthly
Statement ............................................................... A-143

ii

**Page**

Exhibit 9 to Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024 ...... A-146

Proposed Order to Show Cause and Temporary
Restraining Order by Plaintiffs, filed May 13,
2024 ........................................................................ A-169

Plaintiffs' Memorandum of Law In Support of Their
Application For (1) A Temporary Restraining
Order, and (2) An Order to Show Cause for a
Receiver or, Alternatively, A Preliminary
Injunction, dated May 13, 2024 ............................. A-173

Declaration of Craig Gillespie, for Plaintiffs
Leadenhall Capital Partners LLP and Leadenhall
Life Insurance Linked Investments Fund PLC
("Leadenhall"), in Support of Proposed
Temporary Restraining Order ("Proposed TRO"),
dated May 13, 2024 ............................................... A- 202

Exhibit 1 to Gillespie Declaration -
Loan and Security Agreement, dated May 7, 2021    A-210

Exhibit 2 to Gillespie Declaration -
Guaranty Agreement with 777 Partners and 600
Partners, dated May 7, 2021 .................................. A- 250

Exhibit 3 to Gillespie Declaration -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

iii

Page

Exhibit 4 to Gillespie Declaration -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 5 to Gillespie Declaration -
Excerpt from the December 2023 Compliance
Report Issued for the Dorchester Borrower ........... A-269

Exhibit 6 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the SuttonPark Borrower ............. A-271

Exhibit 7 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the Dorchester Borrower ............. A-273

Exhibit 8 to Gillespie Declaration -
Paydown and Partial Release Letter on behalf of
Leadenhall, dated February 21, 2024 .................... A-275

Exhibit 9 to Gillespie Declaration -
Default Notice, dated March 12, 2024................... A-284

Exhibit 10 to Gillespie Declaration -
Acceleration Notice, dated March 15, 2024 .......... A-295

Exhibit 11 to Gillespie Declaration -
Draft First Forbearance Agreement, dated
March __, 2024 ...................................................... A-318

Declaration of Phil Kane, for Plaintiff Leadenhall,
in Support of Proposed TRO, filed May 13, 2024. A-360

Declaration of Luca Albertini, for Plaintiff
Leadenhall, in Support of Proposed TRO, dated
May 13, 2024 ....................................................... A-364

iv

|                                                                                                                                                                                    | Page  |
|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Proposed TRO, dated May 13, 2024 ........................................................                | A-367 |
| Exhibit A to Nathanson Declaration - Amended Verified Complaint in *Change Lending LLC v. 777 Partners LLC et al.*, Index No. 650118/2024 (N.Y. Sup.), dated March 19, 2024 ..     | A-372 |
| Exhibit B to Nathanson Declaration - Particulars of Claim in *Corvus Lights Aviation et al v. 777 Partners LLC* (U.K.), dated December 8, 2023 .................................... | A-385 |
| Exhibit C to Nathanson Declaration - Verified Amended Complaint in *MALT Family Trust et al. v. 777 Partners, LLC et al.*, C.A. No. 2022-0652-MTZ (Del. Ch.), dated November 22, 2022 ............................... | A-402 |
| Exhibit D to Nathanson Declaration - Summons and Complaint in *Vida Longevity Fund, LP et al. v. SuttonPark Capital LLC et al.*, Index. No. 656715/2022 (N.Y. Sup.), dated July 1, 2022............................................. | A-452 |
| Exhibit E to Nathanson Declaration - Complaint in *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.,* Index No. 651220/2024 (N.Y. Sup.), dated March 7, 2024 .... | A-465 |
| Exhibit F to Nathanson Declaration - Complaint in *Balanced Management LLC v. 777 Partners LLC*, Case No. 230909460 (Utah Dist. Ct.), dated December 14, 2023 ............................. | A-480 |

v

**Page**

Exhibit G to Nathanson Declaration -
Verified Petition for Interim Measures in Aid of
Arbitration in *Nakula Management Ltd. v. Joshua
Wander et al.*, Case No. 2024-004624-CA-01
(Fla. 11th Cir. Ct.) (exhibits to the complaint are
excluded), dated March 14, 2024 .......................... A-489

Exhibit H to Nathanson Declaration -
Summons and Complaint in *1 Madison Office
Fee LLC v. 777 Partners LLC et al.*, Index No.
654397/2023 (N.Y. Sup.), dated
September 8, 2023 ................................................ A-508

Exhibit I to Nathanson Declaration -
Complaint in *Lasse Meilsoe v. 777 Partners LLC
et al.*, Case No. 2023-028758-CA-01 (Fla. 11th
Cir. Ct.), dated March 22, 2023, with Exhibits...... A-515

Exhibit J to Nathanson Declaration -
Amended Complaint in *Peter Meyers v. 777
Partners, LLC et al.*, Case No. 2024-001279-CA-
01 (Fla. 11th Cir. Ct.), dated January 30, 2024,
with Exhibits........................................................... A-541

Exhibit K to Nathanson Declaration -
Summons and Complaint in *American Express
Travel Related Services Company, Inc. v. 777
Partners LLC*, 651130/2023 (N.Y. Sup.), dated
March 3, 2023 ....................................................... A-584

Exhibit L to Nathanson Declaration -
Complaint in *Randy S. Gelber v. Joshua Wander*,
Case No. 2021-013205-CA-01 (Fla. 11th Cir.
Ct.), dated June 7, 2021, with Attachment............. A-592

vi

**Page**

Exhibit M to Nathanson Declaration -
Complaint in *The Oxbridge Group, LTD v. 777
Partners, LLC,* Index No. 651975/2023 (N.Y.
Sup.), dated April 21, 2023 .................................... A-625

Exhibit N to Nathanson Declaration -
Verified Amended Complaint in *O'Neil-Dunne et
al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-
BWD (Del. Ch.), dated January 19, 2024 .............. A-631

Exhibit O to Nathanson Declaration -
First Amended Complaint in *Eido Hussam
Al-Nahhas v. 777 Partners, LLC et al.*, Case No.
22-cv-750 (N.D. Ill.), undated ............................... A-654

Exhibit P to Nathanson Declaration -
Complaint – Class Action in *Joseph Morgan
et al. v. 777 Partners, LLC et al.*, Case No.
24-cv-01004 (N.D. Ill.), undated ........................... A-683

Hearing Transcript held before the Honorable John
G. Koeltl, dated May 14, 2024 .............................. A-710

Redacted Declaration of Michael Saliba, for
Defendant Advantage Capital Holdings LLC ("A-
CAP"), in Opposition to Proposed TRO, dated
May 24, 2024
(Unredacted version is reproduced in the
Confidential Appendix at pp. CA-1-CA-8) .......... A-721

Reply Memorandum of Law in Further Support of
Plaintiffs' Application For (1) A Temporary
Restraining Order, and (2) An Order to Show
Cause for a Receiver or, Alternatively, a
Preliminary Injunction, dated May 30, 2024
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-9-CA-36) .............................. A-729

vii

| | Page |
|---|---|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Reply Memorandum, dated May 30, 2024 ................................................ | A-730 |
| Exhibit 1 to Nathanson Declaration - Hearing Transcript held before the Honorable John G. Koeltl, dated May 14, 2024 ...................... | A-732 |
| Exhibit 2 to Nathanson Declaration - Email from Roger Schwartz to Shelly DeRousse and Others, dated May 23, 2024, with Attachment.............................................................. | A-744 |
| Exhibit 3 to Nathanson Declaration - Email from Leigh Nathanson to Jonathan Watkins, dated May 16, 2024 ............................... | A-757 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 7, 2024 ............................... | A-765 |
| Order to Show Cause and Temporary Restraining Order, by Plaintiff Leadenhall, dated June 7, 2024 ..................................................................... | A-831 |
| Letter from David A. Pellegrino to Honorable John G. Koeltl, dated June 10, 2024 ............................. | A-835 |
| Exhibit 1 to Letter - Email from Leigh Nathanson to John G. McCarthy and Others, dated June 9, 2024............. | A-840 |
| Exhibit 2 to Letter - Email from David Pellegrino to Leigh Nathanson and Others, dated June 10, 2024............................ | A-842 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 14, 2024 ............................... | A-844 |

viii

**Page**

Memo Endorsed on Joint Letter, dated
June 18, 2024 ........................................................ A-867

Order of the Honorable John G. Koeltl, dated June
20, 2024 ................................................................ A-868

Motion, by Intervenors Haymarket Insurance
Company ("Haymarket") and ACM Delegate
LLC ("ACM Delegate"), to Intervene, filed
July 8, 2024
(Motion omitted herein):

Declaration of Jonathan Watkins, for Intervenors
Haymarket and ACM Delegate, in Support of
Motion to Intervene, dated July 8, 2024 ................ A-869

Exhibit A to Watkins Declaration -
UCC-1 Financing Statements and Amendments
filed with the Delaware Secretary of State, dated
March 3, 2020 ........................................................ A-871

Exhibit B to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated
November 27, 2023 ................................................ A-883

Exhibit C to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State or Florida Secured
Transaction Registry, dated April 12, 2021 to
December 15, 2023 ................................................ A-888

Exhibit D to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated July 12, 2022 . A-898

Hearing Transcript held before the Honorable John
G. Koeltl, dated July 8, 2024 ................................ A-902

ix

Page

Proposed Order to Show Cause without Emergency
Relief by Defendant A-CAP, filed July 31, 2024
(Proposed order to show cause omitted herein):

Declaration of Michael Saliba, for Defendant A-
CAP, in Support of Proposed Order to Show
Cause, dated July 29, 2024 ................................... A-935

Exhibit A to Saliba Declaration -
Email from Craig Gillespie to Kenneth King and
Others, dated October 19, 2023 ............................ A-941

Exhibit B to Saliba Declaration -
Excerpts from the Spreadsheet Attached to Email,
dated October 19, 2023 .......................................... A-944

Exhibit C to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Dorchester, dated
May 10, 2021 at 4:50pm ........................................ A-949

Exhibit D to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:54pm ...................... A-951

Exhibit E to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:58pm ...................... A-953

Exhibit F to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:03pm ...................... A-961

x

Page

Exhibit G to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:07pm...................... A-963

Exhibit H to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal SML 4
LLC, dated May 10, 2021 at 5:11pm...................... A-970

Exhibit I to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:16pm ............................. A-972

Exhibit J to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:19pm ............................. A-974

Exhibit K to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SPLCSS III LLC,
dated May 10, 2021 at 5:23pm ............................. A-981

Exhibit L to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:27pm...................... A-983

Exhibit M to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:31pm...................... A-985

xi

**Page**

Exhibit N to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Agency
Service, dated May 11, 2021 at 3:34pm ................ A-944

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Order to
Show Cause, dated July 31, 2024 ......................... A-966

Exhibit A to Watkins Declaration -
Proposed Modified Preliminary Injunction ........... A-998

Exhibit B to Watkins Declaration -
Order from the Honorable John G. Koeltl, dated
July 8, 2024
(Reproduced in Special Appendix)

Hearing Transcript held before the Honorable John
G. Koeltl, dated August 1, 2024 ........................... A-1001

Plaintiffs' Opposition to A-CAP's Motion Under
Rule 59(E) to Amend the Preliminary Injunction,
dated August 15, 2024 .......................................... A-1011

Declaration of Craig Gillespie, for Plaintiff
Leadenhall, in Opposition to Order to Show
Cause, dated August 15, 2024.................................. A-1038

Exhibit 1 to Gillespie Declaration -
Excerpts from the Loan and Security Agreement,
dated May 7, 2021 ................................................. A-1040

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Reply
Memorandum of Law, dated August 26, 2024,
with Exhibits A through E
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-37-CA-561) ......................... A-1072

xii

**Page**

Corrected Amended Complaint, dated
    September 6, 2024 .................................................. A-1073

Exhibit 1 to Amended Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

Exhibit 2 to Amended Complaint -
Letter from Craig Gillespie to Steven W Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023
(Reproduced herein at pp. A-121-A-124)

Exhibit 3 to Amended Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023
(Reproduced herein at pp. A-125-A-127)

Exhibit 4 to Amended Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023
(Reproduced herein at pp. A-128-A-129)

Exhibit 5 to Amended Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 6 to Amended Complaint -
Tables .................................................................... A-1229

Exhibit 7 to Amended Complaint -
Wells Fargo Summary Statement Screenshot
(Reproduced herein at pp. A-135-A-136)

xiii

**Page**

Exhibit 8 to Amended Complaint -
"Collection" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-137-A-142)

Exhibit 9 to Amended Complaint -
"Reserve" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-143-A-145)

Exhibit 10 to Amended Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024
(Reproduced herein at pp. A-146-A-168)

Exhibit 11 to Amended Complaint -
Outstanding Accelerated Balance Sheet ................  A-1236

Exhibit 12 to Amended Complaint -
777 Partners' Draft Forbearance Agreement .........  A-1238

Exhibit 13 to Amended Complaint -
Jorge Beruff LinkedIn Profile ................................  A-1280

Exhibit 14 to Amended Complaint -
Juan Arciniegas LinkedIn Profile ..........................  A-1284

Exhibit 15 to Amended Complaint -
Aaron Levy LinkedIn Profile.................................  A-1289

Exhibit 16 to Amended Complaint -
Lenz Balan LinkedIn Profile .................................  A-1292

Argument and Decision held before the Honorable
John G. Koeltl, dated October 2, 2024 ..................  A-1295

Notice of Appeal by Defendant A-CAP, dated
October 3, 2024 ....................................................  A-1352

xiv

**Page**

Notice of Appeal by Defendants 777 Partners LLC,
600 Partners LLC, SPLCSS III LLC, Dorchester
Receivables II LLC, Insurety Agency Services
LLC, and Signal SML 4 LLC, dated
October 22, 2024 .................................................. A-1354

A-275

# EXHIBIT 8

A-276



February 21, 2024

**BY HAND DELIVERY AND EMAIL**

| | |
|---|---|
| 777 Partners LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, FL 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com | 600 Partners LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, FL 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com |
| SPLCSS III LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, Florida 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com | Dorchester Receivables II LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, Florida 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com |
| Insurety Agency Services LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, Florida 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com | Signal SML 4 LLC<br>600 Brickell Avenue, 19th Floor<br>Miami, Florida 33131<br>Attention: Legal Department<br>Email: legaldepartment@777part.com |

Re:     **Paydown and Partial Release Letter (this "__Letter__")**

Ladies/Gentlemen:

Reference is made to (i) that certain Loan and Security Agreement (as amended, modified or supplemented, the "__Master Loan Agreement__") by and between each Borrower (as defined therein) party thereto, each Servicer (as defined therein) party thereto, each Seller (as defined therein) party thereto, each Lender (as defined therein) party thereto, Leadenhall Capital Partners, LLP as administrative agent for the Lenders (the "__Administrative Agent__"), Leadenhall Life Insurance Linked Investments Fund PLC as collateral agent for the Secured Parties (as defined therein) (the "__Collateral Agent__", and together with Administrative Agent, collectively, the "__Agents__"); (ii) those certain Pledge Agreements made by each Seller (as defined in the Master Loan Agreement) in favor of Collateral Agent (as amended, modified or supplemented, the "__Pledge Agreements__"); and (iii) that certain Guaranty Agreement made by 777 Partners LLC ("__777 Partners__") and 600 Partners LLC ("__600 Partners__") in favor of the Administrative Agent (as amended, modified or supplemented, the "__Guaranty Agreement__," and together with the Master Loan Agreement and the Pledge Agreements, collectively, the "__Agreements__"), each dated as of May 7, 2021.[1]

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the same meanings as set forth in the respective Agreements.

A-277

February 21, 2024

1.      <u>Partial Repayment</u>.  On February 21, 2024, the Borrowers intend to permanently repay a portion of the Loans, by making a payment (the "<u>Partial Repayment</u>") to the SPLCSS Lenders in immediately available funds in United States dollars in the amount of $25,622,621.15 (the "<u>Partial Repayment Amount</u>") by wire transfer to the accounts set forth in Exhibit D hereto:

Each Borrower, each Servicer, each Seller and each Guarantor (each a "<u>Loan Party</u>", and collectively, the "<u>Loan Parties</u>") hereby acknowledge and agree that pursuant to Section 2.07(b) of the Master Loan Agreement the Partial Repayment Amount shall be applied to the Loans in accordance with <u>Exhibit A</u> hereto.

2.      <u>Remaining Obligations</u>.  Each Loan Party acknowledges and agrees that after giving effect to the Partial Repayment, the aggregate principal balance (excluding interest, fees or other expenses) of the outstanding Obligations under the Master Loan Agreement is not less than the amounts set forth on <u>Exhibit B</u> hereto.

3.      <u>Conditional Release</u>.  The Administrative Agent hereby consents to the Borrowers making the Partial Repayment and to the release of any security interest held by the Collateral Agent in the Subject Collateral (as defined below) upon the occurrence of the Release Condition (as defined below) in accordance with the terms set forth herein.  The Collateral Agent hereby agrees that, upon its receipt of written confirmation (which may be in the form of e-mail) from the Administrative Agent of receipt by each of the SPLCSS Lenders of the Partial Repayment in immediately available funds in United States dollars (such receipt, the "<u>Release Condition</u>"), the security interest held by the Collateral Agent in the collateral described in <u>Exhibit C</u> hereto (the "<u>Subject Collateral</u>") shall be automatically released and assigned, transferred and conveyed (free and clear of all liens and encumbrances solely with respect to the security interest of the Collateral Agent) to the applicable Seller, Liens in such Subject Collateral pursuant to the Master Agreement, the other Agreements or any other Transaction Documents shall be automatically terminated, and such Subject Collateral shall no longer constitute "Collateral" for purpose of the Master Loan Agreement, the other Agreements or any other Transaction Documents; <u>provided</u>, that, to the extent that any payments or proceeds (or any portion thereof) received by any of the Lenders shall be subsequently invalidated, declared to be fraudulent or a fraudulent conveyance or preferential, set aside or required to be repaid to a trustee, receiver, debtor-in-possession or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent that the payment or proceeds is rescinded or must otherwise be restored by such Lender, whether as a result of any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief or otherwise, the portion of the Obligations which were intended to be satisfied by any such payment or proceeds shall be revived and continue to be in full force and effect, as if the payment or proceeds had never been received by such Lenders, and this letter shall in no way impair the claims of any Lender with

2

**A-278**

February 21, 2024

respect to the revived Obligations or other indebtedness of Loan Parties to each of the Lenders, it being further understood and agreed that all liens and security interests released pursuant to this Letter shall reattach with respect to any such amounts.  The date on which the Release Condition occurs shall be referred to herein as the "Partial Release Date".  On the Partial Release Date, (i) the Collateral Agent and/or Administrative Agent will promptly execute and deliver any additional collateral release documents reasonably requested by any Borrower and (ii) Collateral Agent and/or Administrative Agent will promptly deliver any possessory Subject Collateral in its possession to the requesting Borrower or such party as such Borrower may direct in writing.  At any time on or after the Partial Release Date, the Collateral Agent and/or Administrative Agent shall, at the Borrowers' expense, execute and deliver (and if requested, acknowledge) such customary documents, instruments and confirmations as a Borrower (or its designees) may reasonably request (including, without limitation, UCC-3 termination and/or amendment statements) in order to evidence the release and termination of the Liens and security interests in the Subject Collateral contemplated by this Letter, which shall be in form and substance reasonably acceptable to the Collateral Agent and/or Administrative Agent, as applicable.

      4.    Continuing Effect; Reaffirmation.  The terms and provisions of the Agreements and the other Transaction Documents are ratified, confirmed and reaffirmed and shall continue in full force and effect according to their terms. Each Loan Party agrees that the Master Loan Agreement and the other Transaction Documents shall continue to be legal, valid, binding and enforceable in accordance with their respective terms except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). Each Loan Party hereby acknowledges and agrees that, after giving effect to this Letter, all of its obligations and liabilities under the Transaction Documents to which it is a party, as such obligations and liabilities have been amended by this Letter, are reaffirmed and remain in full force and effect.  After giving effect to this Letter, each Loan Party reaffirms each Lien granted by it to the Agents for the benefit of the Secured Parties under each of the Transaction Documents to which it is a party (except for such Liens expressly released pursuant to this letter), which Liens shall continue in full force and hereafter, and shall continue to secure the Obligations, in each case, on a first priority basis and subject to the terms and conditions set forth in the Master Loan Agreement and the other Transaction Documents.  Nothing contained herein shall, by implication or otherwise, be deemed to constitute a waiver or amendment of, or a consent to the departure from, any term, provision or condition of the Master Loan Agreement or any other Transaction Loan Document, except as expressly set forth herein, or limit, impair or prejudice any right, power or remedy that any party to, or third party beneficiary of, a Transaction Document may now or in the future have under such Transaction Document, which shall remain in full force and effect, and the Agents and Lenders hereby reserve all such rights and remedies.  Any consent, release or waiver by Agents or Lenders set forth in this letter shall be effective only in the specific instance and for the purpose for which given and no such consent, release or waiver in any case

3

A-279

February 21, 2024

shall, in itself, entitle any Borrower to any other consent, release, waiver or further notice or demand in similar or other circumstances.  This Letter shall constitute a "Transaction Document".

     5.    <u>Miscellaneous</u>.

        a.    This letter may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same agreement.  Delivery of an executed signature page to this letter by a party by facsimile electronic transmission (including email transmission of a PDF image) or other reproduction of this letter delivered by electronic signature complying with all applicable laws (including signature via DocuSign, RightSignature or similar services) shall be deemed to be an original signature hereto shall be as effective as delivery of a manually signed counterpart of this letter.

        b.    THIS LETTER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS (OTHER THAN §§5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW)).

        c.    The  Loan Parties hereto agree that the Agents and Lenders shall be afforded all of the rights, protections, indemnities (including, but not limited to, the indemnities set forth in Article IX and Sections 2.12(d) and 6.06 of the Master Loan Agreement, immunities and privileges afforded to them under the Agreements in connection with  their execution of this letter and the execution, authorization and/or approval of any other documents or instruments in connection herewith and the performance of  their obligations hereunder and thereunder, as applicable.

[Remainder of page intentionally left blank]

4

A-280

Please indicate your agreement with the foregoing by executing a counterpart hereof.

Sincerely,

**ADMINISTRATIVE AGENT:**

**Leadenhall Capital Partners LLP**

By:_____

Name:_Craig Gillespie_____

Title:_Head of Life & Alternative Credit Portfolio_Management

**COLLATERAL AGENT:**

**Leadenhall Life Insurance**
**Linked Investments Fund PLC**

by its agent, Leadenhall Capital Partners LLP

By:_____

Name:___Craig Gillespie_____

Title:_Head of Life & Alternative Credit Portfolio_Management

*[Signature Pages to Paydown and Partial Release Letter]*

A-281

DocuSign Envelope ID: BB5FC883-4C5C-4586-9985-7AFF48B8225B

**ACKNOWLEDGED AND AGREED BY EACH LOAN PARTY:**

**BORROWERS:**

**SPLCSS III LLC**

By: _____
Name: STEVEN W. PASKO
Title: Authorized Signatory

**Dorchester Receivables II LLC**

By: _____
Name: STEVEN W. PASKO
Title: Authorized Signatory

**Insurety Agency Services LLC**

By: _____
Name: Joshua Wander
Title: managing Partner

**Signal SML 4 LLC**

By: _____
Name: Joshua Wander
Title: managing Partner

*[Signature Pages to Paydown and Partial Release Letter]*

A-282

DocuSign Envelope ID: BB5FC883-4C5C-4586-9085-7AFF4B8B225B

**SERVICERS:**

**SuttonPark Servicing LLC**

By: _____

Name: STEVEN W. PASKO

Title: Authorized Signatory

**Signal Servicing LLC**

By: _____

Name: JOSHUA WANDER

Title: Manageing Partner

**Insurety Servicing LLC**

By: _____

Name: JOSHUA WANDER

Title: Manageing Partner

*[Signature Pages to Paydown and Partial Release Letter]*

A-283

**SELLERS:**

**SuttonPark Capital LLC**

By: _____
Name: STEVEN W. PASKO
Title: Authorized Signatory

**Signal Medical Receivables LLC**

By: _____
Name: Joshua Wander
Title: manageing Partner

**Insurety Capital LLC**

By: _____
Name: Joshua Wander
Title: manageing Partner

**GUARANTORS:**

**777 Partners LLC**

By: _____
Name: Joshua Wander
Title: manageing Partner

**600 Partners LLC**

By: _____
Name: STEVEN W. PASKO
Title: Authorized Signatory

*[Signature Pages to Paydown and Partial Release Letter]*

A-284

# EXHIBIT 9

Case: 24-2647, 11/22/2024, DktEntry: 38.1, Page 27 of 282

A-285



March 12, 2024

**BY HAND DELIVERY AND EMAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Re:     Notice of Events of Default and Trigger Event; Reservation of Rights

Ladies/Gentlemen:

I write on behalf of Leadenhall Capital Partners LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and together with the Master Loan Agreement and Pledge Agreements, collectively, the "Agreements").[1]

As you know, certain Events of Default have occurred and are continuing under the Agreements and Transaction Documents as of the date hereof, including, without limitation, the Events of Default identified as "Facility Events of Default" on Exhibit A attached hereto (collectively, the "Facility Events of Default") and the Events of Default identified as "Borrower Group Events of Default" on Exhibit A attached hereto (collectively, the "Borrower Group Events of Default" and together with the Facility Events of Default, the "Specified Events of Default").

As a result of the Specified Events of Default, "Facility Events of Default" have occurred under Section 7.01 of the Master Loan Agreement, "Borrower Group Events of Default" have occurred under Section 7.02 of the Master Loan Agreement, and a "Trigger Event" (as defined in the Guaranty Agreement) has occurred. Please be further advised that, pursuant to Section 2.08 of

---

[1] Unless otherwise defined, capitalized terms shall have the same meanings as set forth in the respective Agreements.

A-286

March 12, 2024

the Master Loan Agreement, interest on the Obligations under the Agreements has been accruing at the Default Interest Rate as of March 17, 2023, as a result of the Specified Events of Default.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis.  Leadenhall expressly reserves all rights under the Agreements, including without limitation the right to (i) declare any additional Facility Events of Default and/or Borrower Group Events of Default, whether now existing or arising hereafter, in addition to the Specified Events of Default, (ii) accelerate and declare all Obligations under the Agreements immediately due and payable and (iii) bring any additional claims or causes of action against the Borrowers, the Borrowers' affiliates, and the Borrowers' principals, whether arising under the Master Loan Agreement or otherwise.   Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i)  a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

A-287

Sincerely,

**LEADENHALL CAPITAL PARTNERS LLP**,
as administrative agent

By: _____
Name: Craig Gillespie
Title:  Head of Life & Alternative Credit
       Portfolio Management

cc:    Josh Wander
       Steve Pasko
       Joe Metzger
       Aaron Levy
       Kenneth King
       Michael Saliba
       John Wells
       Luca Albertini
       Craig Gillespie
       Phil Kane
       Leigh Nathanson
       Roger Schwartz
Enclosures

A-288

## EXHIBIT A
### Specified Events of Default

Facility Events of Default

1. The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantors, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit B and incorporated herein (the "Notice of Breach").[2]

2. Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4. A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5. A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1. The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of

---

[2] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-289

Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(j)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-290

**<u>EXHIBIT B</u>**

**Notice of Breach**

[See Attached]

A-291



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Re:     Notice of Breach of Parties' Agreements

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation. A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements. *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2. We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-292

November 29, 2023

    **_The Agreements._**   On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02.   To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15.   Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower."   Pledge Agreements § 2.1.   To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations.   Guaranty Agreement § 2(a).

    Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest.   The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "*is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim*," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."   Master Loan Agreement §§ 1.01; 4.01(h).   The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "*shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral.*"   Master Loan Agreement § 5.01(d). Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized.   *See* Master Loan Agreement § 2.01.

    **_Breaches in Connection with the Lenders' Collateral._**   Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender.   On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Credigy, a third-party lender.  Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

    Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral.   Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own.   Leadenhall has also learned that the Borrowers may have sold and/or

A-293

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation.  Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied.  In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base.  We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

(i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

(ii)    a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

(iii)   revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

(iv)   for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

(v)    a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

(vi)   a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-294

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii)    a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii)   any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):      Josh Wander
                      Kenneth King
                      Michael Saliba
                      Luca Albertini
                      Craig Gillespie
                      Phil Kane

4

A-295

# EXHIBIT 10

A-296



March 15, 2024

**BY HAND DELIVERY AND EMAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Re:     Notice of Acceleration of all Loans, and Demand for Immediate Repayment

Ladies/Gentlemen:

        I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and together with the Master Loan Agreement and Pledge Agreements, collectively, the "Agreements").[1]

        As you know and as detailed in that certain Notice of Events of Default and Trigger Events; Reservation of Rights Letter dated March 12, 2024 and attached hereto as Exhibit C, certain Events of Default have occurred and are continuing under the Agreements and Transaction Documents as of the date hereof, including, without limitation, the Events of Default identified as "Facility Events of Default" on Exhibit A attached hereto (collectively, the "Facility Events of Default") and the Events of Default identified as "Borrower Group Events of Default" on Exhibit A attached hereto (collectively, the "Borrower Group Events of Default" and together with the Facility Events of Default, the "Specified Events of Default").

---

[1] Unless otherwise defined, capitalized terms shall have the same meanings as set forth in the respective Agreements.

A-297

March 15, 2024

As a result of the Specified Events of Default, "Facility Events of Default" have occurred under Section 7.01 of the Master Loan Agreement, "Borrower Group Events of Default" have occurred under Section 7.02 of the Master Loan Agreement, and a "Trigger Event" (as defined in the Guaranty Agreement) has occurred.  Accordingly, pursuant to Sections 7.01 and 7.02 of the Master Loan Agreement, Leadenhall hereby accelerates and declares all Obligations under the Agreements immediately due and payable.  As of the date hereof, the total amount due under the Transaction Documents, inclusive of fees and Interest charged at the Default Interest Rate, is in an amount that is not less than $609,529,966.82 (the "Accelerated Amount") as shown on <u>Schedule I</u> attached hereto and incorporated herein.  Please be further advised that as a result of the Specified Events of Default pursuant to Section 2.08 of the Master Loan Agreement, a Default Interest Period began on March 17, 2023, and the Accelerated Amount and other Obligations continue to bear Interest at the Default Interest Rate.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis.  We also reserve the right to, among other things, (i) declare any additional Facility Events of Default and/or Borrower Group Events of Default, whether now existing or arising hereafter, in addition to the Specified Events of Default, and (ii) bring any additional claims or causes of action against the Borrowers', the Borrowers' affiliates, and the Borrowers' principals, whether arising under the Master Loan Agreement or otherwise.   Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i)  a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

A-298

Sincerely,

**LEADENHALL CAPITAL PARTNERS LLP**,
as administrative agent

By: _____

Name: Craig Gillespie
Title:  Head of Life & Alternative Credit
        Portfolio Management

cc:    Josh Wander
       Steve Pasko
       Joe Metzger
       Aaron Levy
       Kenneth King
       Michael Saliba
       John Wells
       Luca Albertini
       Craig Gillespie
       Phil Kane
       Peter Clark
       Leigh Nathanson
       Roger Schwartz

Enclosures

A-299

## EXHIBIT A
### Specified Events of Default

Facility Events of Default

1. The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantors, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit B and incorporated herein (the "Notice of Breach").[2]

2. Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4. A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5. A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1. The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of

---

[2] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-300

Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4.  Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(j)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5.  Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6.  Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-301

**<u>EXHIBIT B</u>**

**Notice of Breach**

[See Attached]

A-302



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Re:     Notice of Breach of Parties' Agreements

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation. A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements. *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2. We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-303

November 29, 2023

    ***The Agreements.***  On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02.  To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15.  Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower."  Pledge Agreements § 2.1.  To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations.  Guaranty Agreement § 2(a).

    Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest.   The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "***is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."  Master Loan Agreement §§ 1.01; 4.01(h).  The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "***shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral***."  Master Loan Agreement § 5.01(d). Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized.  *See* Master Loan Agreement § 2.01.

    ***Breaches in Connection with the Lenders' Collateral.***  Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender.  On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Credigy, a third-party lender. Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

    Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral.  Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own.  Leadenhall has also learned that the Borrowers may have sold and/or

2

A-304

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation. Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied. In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base. We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

(i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

(ii)    a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

(iii)   revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

(iv)    for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

(v)     a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

(vi)    a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-305

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii)   a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii)   any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):   Josh Wander
Kenneth King
Michael Saliba
Luca Albertini
Craig Gillespie
Phil Kane

4

A-306

**<u>EXHIBIT C</u>**

**Notice of Events of Default and Trigger Events; Reservation of Rights Letter**

[See Attached]

A-307



March 12, 2024

**BY HAND DELIVERY AND EMAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Legal Department
Email: legalnotices@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
Email: legalnotices@777part.com

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Legal Department
E-Mail: legalnotices@777part.com

Re:    Notice of Events of Default and Trigger Event; Reservation of Rights

Ladies/Gentlemen:

I write on behalf of Leadenhall Capital Partners LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and together with the Master Loan Agreement and Pledge Agreements, collectively, the "Agreements").[1]

As you know, certain Events of Default have occurred and are continuing under the Agreements and Transaction Documents as of the date hereof, including, without limitation, the Events of Default identified as "Facility Events of Default" on Exhibit A attached hereto (collectively, the "Facility Events of Default") and the Events of Default identified as "Borrower Group Events of Default" on Exhibit A attached hereto (collectively, the "Borrower Group Events of Default" and together with the Facility Events of Default, the "Specified Events of Default").

As a result of the Specified Events of Default, "Facility Events of Default" have occurred under Section 7.01 of the Master Loan Agreement, "Borrower Group Events of Default" have occurred under Section 7.02 of the Master Loan Agreement, and a "Trigger Event" (as defined in the Guaranty Agreement) has occurred. Please be further advised that, pursuant to Section 2.08 of

---

[1] Unless otherwise defined, capitalized terms shall have the same meanings as set forth in the respective Agreements.

A-308

March 12, 2024

the Master Loan Agreement, interest on the Obligations under the Agreements has been accruing at the Default Interest Rate as of March 17, 2023, as a result of the Specified Events of Default.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Leadenhall expressly reserves all rights under the Agreements, including without limitation the right to (i) declare any additional Facility Events of Default and/or Borrower Group Events of Default, whether now existing or arising hereafter, in addition to the Specified Events of Default, (ii) accelerate and declare all Obligations under the Agreements immediately due and payable and (iii) bring any additional claims or causes of action against the Borrowers, the Borrowers' affiliates, and the Borrowers' principals, whether arising under the Master Loan Agreement or otherwise. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

2

A-309

Sincerely,

**LEADENHALL CAPITAL PARTNERS LLP**,
as administrative agent

By: _____
Name: Craig Gillespie
Title:  Head of Life & Alternative Credit
       Portfolio Management

cc:    Josh Wander
       Steve Pasko
       Joe Metzger
       Aaron Levy
       Kenneth King
       Michael Saliba
       John Wells
       Luca Albertini
       Craig Gillespie
       Phil Kane
       Leigh Nathanson
       Roger Schwartz
Enclosures

A-310

## EXHIBIT A
### Specified Events of Default

Facility Events of Default

1.  The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantors, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit B and incorporated herein (the "Notice of Breach").[2]

2.  Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3.  Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4.  A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5.  A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1.  The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

2.  Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3.  Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of

---

[2] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-311

Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(j)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-312

**<u>EXHIBIT B</u>**

**Notice of Breach**

[See Attached]

A-313



November 29, 2023

**BY HAND DELIVERY AND E-MAIL**

777 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

600 Partners LLC
600 Brickell Ave, 19th Floor
Miami, FL 33131,
Attention: Steven W. Pasko
Email: spasko@777part.com

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131
Attention: Steven W. Pasko
Email: spasko@777part.com

Re:    **Notice of Breach of Parties' Agreements**

Dear Mr. Pasko:

I write on behalf of Leadenhall Capital Partners, LLP ("Leadenhall") and the Lenders pursuant to the (i) Loan and Security Agreement (the "Master Loan Agreement"); (ii) Pledge Agreements ("Pledge Agreements"); and (iii) Guaranty Agreement each dated May 7, 2021 ("Guaranty Agreement," and collectively, the "Agreements").[1] Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation. A Borrowing Base Deficiency presently exists in the amount of an estimated $310 million with respect to the SPLCSS Borrower and $41 million with respect to the Dorchester Borrower.

Below we set forth the details of the Borrowers' material breaches and expressly reserve all rights under the Agreements, including without limitation the right to declare an Event of Default, issue a demand for Indemnification, declare a Trigger Event with respect to the Guaranteed Obligations, and terminate the Agreements. *See* Master Loan Agreement §§ 4.01, 5.01, 7.01, 9.01; Pledge Agreements §§ 2, 5.2; Guaranty Agreement § 2. We also reserve the right to bring a claim for damages on the contractual breaches specified herein, any additional breaches, or for any other legal claim such as fraud.

---

[1] Unless otherwise defined, capitalized terms have the same meaning as set forth in the Agreements.

Leadenhall Capital Partners LLP Level 15, 70 Mark Lane, London EC3R 7NQ
Registered in England and Wales No.: OC336969
Leadenhall Capital Partners LLP is authorised and regulated in the UK by the Financial Conduct Authority No.: 486112

A-314

November 29, 2023

  **_The Agreements._** On May 7, 2021, the parties entered into the Master Loan Agreement whereby the Borrowers pledged Collateral to secure Loans pursuant to a secured credit facility. *See* Master Loan Agreement §§ 2.01; 2.02. To secure the performance of the Borrowers, the Borrowers pledged for the benefit of the Lenders a "first-priority security interest in the Collateral," where "Collateral" is defined as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower," inclusive of all of the Borrowers' assets and Receivables. Master Loan Agreement §§ 1.01; 2.15. Executed on the same date as the Master Loan Agreement, the Pledge Agreements further grant the Lenders "100% of the membership interests in the Borrower." Pledge Agreements § 2.1. To guarantee the Borrowers' obligations, the Guaranty Agreement specifies that 777 Partners LLC and 600 Partners LLC "unconditionally and irrevocably guarantee[]" the "full and punctual payment and performance when due" of the obligations. Guaranty Agreement § 2(a).

  Fundamental to the credit facility is that the Borrowers have full ownership of the Collateral pledged for the benefit of the Lenders and that the Collateral remain free and clear from any other security interest. The Agreements provide that, on the Effective Date, any Borrowing Date, and the date of each Monthly Report and Compliance Report, each Borrower "***is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***," where Adverse Claim is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement." Master Loan Agreement §§ 1.01; 4.01(h). The Agreements also provide that throughout the term of the Borrower's Commitments, the Borrowers "***shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral***." Master Loan Agreement § 5.01(d). Finally, the Agreements obligate the Borrowers to comply with the Borrowing Base Limitations, which are calculated in accordance with a formula to ensure that the loans are sufficiently collateralized. *See* Master Loan Agreement § 2.01.

  **_Breaches in Connection with the Lenders' Collateral._** Over the last year, Leadenhall and the Lenders became aware that assets pledged as Collateral under the Agreements may have been double-pledged to another third-party lender. On a March 28, 2023, conference call between Leadenhall representatives and Josh Wander, Managing Partner of 777 Partners LLC—which was recorded with Mr. Wander's permission—Mr. Wander expressly acknowledged that Collateral pledged to the Lenders by the SPLCSS Borrower was double-pledged to Credigy, a third-party lender. Mr. Wander further admitted on the call that double-pledging the Lenders' Collateral was a "mistake" that he would remedy.

  Since the March 28, 2023 conference call, Leadenhall has conducted an investigation in order to obtain additional information concerning the Lenders' Collateral. Over the course of this investigation, Leadenhall has learned that the SPLCSS and Dorchester Borrowers pledged Receivables to the Lenders that the Borrowers may have never purchased in the first place and therefore did not own. Leadenhall has also learned that the Borrowers may have sold and/or

2

A-315

November 29, 2023

removed Collateral pledged to the Lenders in breach of the Borrowing Base Limitation.  Our current understanding is that a Borrowing Base Deficiency exists in the amount of at least $310 million with respect to the SPLCSS Borrower and at least $41 million with respect to the Dorchester Borrower.

In addition to uncovering these material breaches, we also have reason to believe that the Borrowers have made false statements on which the Lenders have relied.  In particular, the SPLCSS Borrower has falsely represented that certain Receivables existed on Lenders' Borrowing Base while separately representing to Credigy that the same Receivables had been released from the Lenders' Borrowing Base.  We continue to investigate the facts concerning these breaches and representations, including the extent to which other third-party lenders to the Borrowers not only had knowledge of any material breaches and false statements but benefitted from those breaches and false statements to the detriment of the Lenders.

In light of the Borrowers' undisputed, uncured, material breaches, we request that the Borrowers promptly provide the following information:

(i)     a full accounting of any Collateral that has been double-pledged to the Lenders and to any third-party, inclusive of a full identification of any such third-parties which also have an interest in the Lenders' Collateral;

(ii)    a full accounting of any Collateral pledged for the benefit of the Lenders which is not owned in full by the Borrowers, inclusive of a full identification of any parties which do own or otherwise have an interest in such Collateral);

(iii)   revised Compliance Reports amending any misrepresentations in previously delivered Compliance Reports, including any representations as to the Borrowing Base calculations;

(iv)    for each of the assets double-pledged to the Lenders and a third party, an audit trail providing, at minimum, the name of any individuals who were responsible for allocating the assets and timestamps showing each time in which the assets were allocated since inception;

(v)     a full accounting of any and all "unfunded" or "unallocated" assets which may now be allocated as Collateral to the Lenders;

(vi)    a detailed description of how, to the extent there is a shortfall in value between any "unfunded" assets which may now be allocated to the Lenders

3

A-316

November 29, 2023

and the value of the agreed-upon Collateral, the Borrowers intend to make up for that shortfall in value;

(vii)   a detailed description of any and all reconciliation procedures the Borrowers will implement to ensure that assets are owned by the Borrowers, do not exist on any other lenders' borrowing base, and are not double-pledged going forward; and

(viii)   any reporting obligations you have (whether to investors, deal targets, regulators, or otherwise) that there is has been a material breach and Event of Default as to the Agreements.

Please be advised that Leadenhall will continue to evaluate its position on a day-by-day basis. Nothing contained in this letter nor any delay or failure by Leadenhall in exercising any rights or remedies under the Master Loan Agreement, the other Transaction Documents, or applicable law shall be deemed to constitute: (i) a waiver of any Default or Event of Default now existing or hereafter arising or a waiver of compliance with any term or provision in the Master Loan Agreement or any other Transaction Document; (ii) a waiver of any rights, claims, and remedies under the Transaction Documents or applicable law; or (iii) a course of dealing among the parties.

Leadenhall hereby advises that it requires strict compliance with all of the terms and conditions of the Master Loan Agreement and the other Transaction Documents. To that end, it should be expressly understood that the parties are not entering into a mutual disregard of the terms and provisions of the Master Loan Agreement and any other Transaction Documents or any course of dealing at variance with the terms and provisions of the Master Loan Agreement and any other Transaction Documents. For the avoidance of doubt, Leadenhall fully expect you to comply with all aspects of the Master Loan Agreement and the other Transaction Documents.

Sincerely,

John Wells

CC (via e-mail):     Josh Wander
                     Kenneth King
                     Michael Saliba
                     Luca Albertini
                     Craig Gillespie
                     Phil Kane

4

A-317

**SCHEDULE I**[3]

**Calculation of Accelerated Amount**

| **Borrower** | **Principal ($)** | **Interest ($)** | **Accelerated Amount Due ($)** |
|---|---|---|---|
| SPLCSS III LLC | 366,795,056.26 | 29,075,119.81 | 395,870,176.07 |
| Dorchester Receivables II LLC | 83,151,602.71 | 5,408,953.45 | 88,560,556.16 |
| Insurety Agency Services LLC | 50,562,721.62 | 274,131.88 | 50,836,853.50 |
| Signal SML 4 LLC | 73,790,592.01 | 471,789.09 | 74,262,381.09 |
| **TOTAL** | **574,299,972.60** | **35,229,994.22** | **609,529,966.82** |

---

[3] These amounts are exclusive of attorneys' fees and other fees or charges that are due or may become due under the Transaction Documents.

A-318

# EXHIBIT 11

A-319

K&S Draft 3/23/24 777 Comments 3/26/2024

## FIRST FORBEARANCE AGREEMENT AND
## FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of March [__], 2024 by and among Dorchester Receivables II LLC and SPLCSS III LLC, as Borrowers (collectively, the "Deficiency Borrowers"), Joshua Wander, an individual resident of the State of Florida ("Wander"), Steven W. Pasko, an individual resident of the State of Florida ("Pasko"), 777 Partners LLC, a Delaware limited liability company ("777 Partners") and 600 Partners LLC, a Delaware limited liability company ("600 Partners"), the entities identified on Schedule 1 attached hereto (the "777 & 600 Affiliates" and together with Deficiency Borrowers, Wander, Pasko, 777 Partners, and 600 Partners, the "Credit Parties"), the financial institutions party hereto as Lenders under the Loan Agreement (as hereinafter defined) (collectively, the "Lenders"), Leadenhall Capital Partners, LLP, as Administrative Agent (the "Administrative Agent") and Leadenhall Life Insurance Linked Investments Fund Plc, as Collateral Agent (the "Collateral Agent", and together with the Administrative Agent, "Agent").

### RECITALS

A.    Deficiency Borrowers, the other Borrowers, certain of the other Credit Parties, Agent, and Lenders are parties to that certain Loan and Security Agreement, dated as of May 7, 2021 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), pursuant to which, among other things, Lenders agreed, subject to the terms and conditions set forth in the Loan Agreement, to make certain loans and other financial accommodations to the Borrowers.  Pursuant to that certain Guaranty, dated as of May 7, 2021 (the "Guaranty"), 777 Partners and 600 Partners (collectively, the "Guarantor Guarantors") unconditionally guaranteed Borrowers' prompt and full performance of their Obligations under the Loan Agreement and other Transaction Documents.

B.    As of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing (collectively, the "Specified Defaults").  Notice of the Specified Defaults was first given via the Notice of Breach on November 29, 2023, and was again given to the Guarantors and Deficiency Borrowers on March 12, 2024, in that Certain Notice of Events of Default and Trigger Events; Reservation of Rights Letter attached hereto as Exhibit A-2 (the "March 12 Notice").  The March 12 Notice also gives notice that the Loans have been accruing interest at the Default Interest Rate since March 17, 2023.

C.    As a result of the existence of the Specified Defaults, Agent and Lenders have declared in that certain Notice of Acceleration of Loans, Demand for Immediate Repayment dated March 15, 2024, delivered to the Guarantors and Deficiency Borrowers and attached hereto as Exhibit A-3 (the "March 15 Notice") the Obligations to be immediately due and payable.

D.    Pursuant to the notices attached hereto as Exhibit B, the accounts identified in such notices are now under the exclusive control of Agent and are being swept daily to accounts controlled by Agent or a Lender Party.

E.    Each Deficiency Borrower has requested that during the Forbearance Period, Agent and Required Lenders (sometimes referred to herein individually as a "Lender

A-320

Party," and collectively as the "Lender Parties") agree to forbear from exercising certain of their default-related rights and remedies against such Deficiency Borrower with respect to the Specified Defaults, notwithstanding the existence of the Specified Defaults and subject to the terms and conditions set forth herein.

F.    Each of the Credit Parties ~~is an Affiliate of the Deficiency Borrowers and~~ [1]receives substantial direct and indirect benefits from the transactions contemplated by this Agreement (which benefits are hereby acknowledged by such Credit Party).

G.    Subject to the terms and conditions set forth herein, (i) the Lender Parties have agreed to (a) forbear from exercising certain of their default-related rights and remedies against Deficiency Borrowers and the other Credit Parties with respect to the Specified Defaults, and (b) amend the Loan Agreement in certain respects as set forth below, in order to permit the Credit Parties an opportunity to pursue a restructuring transaction and otherwise perform all of their obligations under this Agreement and the other Transaction Documents.

NOW, THEREFORE, in consideration of the foregoing, the terms, covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.  Definitions**.  As used herein, the following terms shall have the respective meanings set forth below:

"Existing Collateral" shall mean all Collateral ~~(other than the Forbearance Collateral)~~ that secures the Leadenhall-777 SPLCSS/Dorchester Obligations as of March [____], 2024 other than (i) the Forbearance Collateral and (ii) any Collateral that secures an obligation to the Dorchester Lender Group or the SPLCSS Lender Group, as applicable, in their capacities as Subordinated Secured Parties[2].

"Forbearance Collateral" shall mean [____][3].

"Leadenhall-777 Agreements" shall mean the Loan Agreement, the Guaranty, the Subordinated Note Purchase Agreement, all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

"Leadenhall-777 Obligations" shall mean the aggregate amounts owing and outstanding from time to time to the Lender Parties under the Leadenhall-777 Agreements.  For the avoidance of doubt, the Leadenhall-777 Obligations shall include all amounts (including, but not limited to, default interest, all Additional Interest and all fees and expenses) outstanding under the Signal Loans, Insurety Loans, the Subordinated Note Purchase Agreement and the facilities made available to the Deficiency Borrowers.

---

[1] NTD: JARM and Josh are not.

[2] NTD: Assume this is what's intended?

[3] To be updated.

2

A-321

"Leadenhall-777 SPLCSS/Dorchester Obligations" shall mean the outstanding principal, interest (including all accrued interest and any interest capitalized pursuant to Section 2.08(b) of the Loan Agreement, including, but not limited to, all ~~Additional Interest and~~ fees and expenses of the Agent incurred in connection with this Agreement or the other Forbearance Documents owing and outstanding to Agent under or in respect of the facilities made available to the Deficiency Borrowers under the Leadenhall-777 Agreements, but excluding Additional Interest and default interest.

"Operating Agreements" shall mean those certain Operating Agreements dated September 10, 2021, for each of 777 Partners and 600 Partners, as provided to Leadenhall on or prior to March 20, 2024.

"Residual Payment" shall mean the final Forbearance Period Amortization Installment due on September 30, 2024.

"Subordinated Note Purchase Agreement" shall mean the Subordinated Note Purchase Agreement dated June 30, 2022, by and among 777 Partners, Leadenhall Capital Partners LLP, as Note Administrative Agent (as defined therein), and Leadenhall Life SMA III ICAV, as Second Lien Collateral Agent (as defined therein), all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

Unless otherwise defined above or elsewhere in this Agreement, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

**SECTION 2. Confirmation by Credit Parties of Obligations and Specified Defaults**. Each Credit Party acknowledges and agrees that as of March [___], 2024,

(i)     the aggregate principal balance of the outstanding Obligations under the Loan Agreement is not less than $_____,

(ii)     there are  currently no existing or further commitments of the Lender Parties to provide Loans or make other extensions of credit under the Loan Agreement and the other Transaction Documents, and

(iii)     that the respective principal balances of the various Loans as of such date were not less than the following:

| | |
|---|---|
| SPLCSS Loan | $_____ |
| Dorchester Loan | $_____ |
| Insurety Loan | $_____ |
| Signal Loan | $_____ |

The foregoing amounts do not include interest, fees, expenses and other amounts that are chargeable or otherwise reimbursable under the Loan Agreement and the other Transaction Documents.

A-322

(iv)    that the respective accrued interest amounts of the various Loans as of such date were not less than the following:

| | |
|---|---|
| SPLCSS Loan | $_____ |
| Dorchester Loan | $_____ |
| Insurety Loan | $_____ |
| Signal Loan | $_____ |

(b)    Each Credit Party acknowledges and agrees that (i) each of the Specified Defaults constitutes a material Event of Default that has occurred and is continuing as of the date hereof, (ii) none of the Specified Defaults has been cured as of the date hereof, and (iii) except for the Specified Defaults, no other material Events of Default have occurred and are continuing as of the date hereof, or are expected to occur during the Forbearance Period, as the case may be. Prior to the effectiveness of this Agreement, each of the Specified Defaults: (i) relieves the Lender Parties from any obligation to extend any Loan or provide other financial accommodations under the Loan Agreement or the other Transaction Documents (including consenting to any Credit Party's use of cash collateral), and (ii) permits the Lender Parties to, among other things, (A) suspend or terminate any commitment to provide Loans or make other extensions of credit under the Loan Agreement and the other Transaction Documents, (B) continue to charge (x) ~~default~~ interest ~~pursuant to Section 2.08 of~~at the ~~Loan Agreement (the~~ "Default Interest Rate") with respect to any and all of the Obligations effective from and after March 17, 2023, and (y) Additional Interest, (C) commence any legal or other action to collect any or all of the Obligations from the Deficiency Borrowers and, to the extent permitted by any applicable Leadenhall 777 Agreement, any other Credit Party ~~and/or any Collateral~~, (D) foreclose or otherwise realize on any or all of the Collateral and/or appropriate, set-off and apply to the payment of any or all of the Obligations, any or all of the Collateral, and (E) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by the Loan Agreement, the other Transaction Documents or applicable law.

**SECTION 3.  Amendments to Loan Agreement**.  Effective as of the Forbearance Effective Date (as hereinafter defined), the following terms and conditions of the Loan Agreement shall be amended as follows:

(a)    **Amendment to Section 1.01**.

(i)    Section 1.01 of the Loan Agreement is amended by amending and restating the following definitions in their entirety as follows:

"Collateral" means (i) all of such Borrower's right, title and interest in, to and under all assets of such Borrower, including the following, whether now existing or hereafter arising and wherever located: (a) all Receivables, any Health Care Provider Loan Receivables, Related Security and all Collections of such Borrower, (b) all rights of such Borrower under the related Sale Agreement, the related Servicing Agreement, the related Account Control Agreements (when executed), the Related Contracts, the related Third Party Intercreditor Agreements, the related Hedge Agreements (including any Hedge Collateral), if any, together with all rights of such Borrower to receive monies due or to become due thereunder, all claims of such Borrower for damages arising out of or for breach of or default thereunder, and all rights of such Borrower to compel performance and otherwise exercise all remedies thereunder, (c) the

4

Borrower Accounts and Lock-Boxes with respect to such Borrower, (d) all of the Borrower's membership interests in the Lottery Holding SPVs, and (e) all proceeds of the foregoing; provided that any Receivable that is purchased or repurchased by the Related Seller (or its designee) in connection with a Repurchase shall no longer be included in the Collateral and the Collateral shall not include any Excluded Insurety Receivables or any Excluded Lottery Receivables; and (ii) the Forbearance Collateral.

"Transaction Documents" means this Agreement, each Sale Agreement, each Servicing Agreement, each Pledge Agreement, each Account Control Agreement, the Compliance Reports, the Monthly Reports, the Payment Right Purchase Agreements, the Third Party Intercreditor Agreements, each Hedge Agreement, the Notes, the Guaranty, the Forbearance Documents, all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related hereto or thereto.

(ii)     Section 1.01 of the Loan Agreement is amended by inserting the following definitions in alphabetical order in their entirety as follows:

"Forbearance Agreement" means that certain First Forbearance Agreement and Fifth Amendment to Loan and Security Agreement, dated as of March [__], 2024, by and among the Deficiency Borrowers (as defined therein), the Credit Parties (as defined therein), the Lenders, and the Agent.

"Forbearance Collateral"[4] means all property described in any Forbearance Document as security for any Obligations and all other property of any Credit Party that now or hereafter secures (or is intended to secure) any Obligations.

"Forbearance Documents" means the Forbearance Agreement, each Forbearance Guaranty, each Forbearance Pledge Agreement, and all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

"Forbearance Effective Date" shall have~~mean~~ the ~~meaning ascribed to such term in~~effective date of the Forbearance Agreement.

"Forbearance Guaranty" means each Guaranty and Security Agreement entered into by any Credit Party (as defined in the Forbearance Agreement) in favor of the Agent for the benefit of the Lenders and each Forbearance Limited Guaranty.

"Forbearance Limited Guaranty" means each Limited Guaranty entered into by any of Joshua Wander and Steven W. Pasko in favor of the Agent for the benefit of the Lenders.

"Forbearance Pledge Agreement" means each Pledge Agreement entered into by or otherwise pledging the equity of a Credit Party (as defined in the Forbearance Agreement) in favor of the Agent for the benefit of the Lenders.

---

[4] NTD: I don't see anything described in this agreement.

A-324

**SECTION 4.**        **Forbearance; Forbearance Default Rights and Remedies.**

(a)    Effective as of the Forbearance Effective Date, each of the Lender Parties agrees that until the earlier of the expiration or termination of the Forbearance Period, it will temporarily forbear from exercising its default-related rights and remedies (X) ~~and,~~ the Deficiency Borrowers or any other Credit Party solely with respect to the Specified Defaults ~~and,~~ (Y) the other Borrowers, solely with respect to any Borrower Group Event of Default related to such Borrower that has arisen solely as a result of ~~the~~ any Specified Default ~~identified in paragraph 1 of Exhibit A~~ and (Z) withdraw the acceleration declared in the March 15 Notice; provided, however, (i) the Obligations shall ~~remain accelerated and immediately due and payable and shall~~ continue to bear interest at the Default Interest Rate, (ii) the Lender Parties shall have no obligation to make any further Loans or other extensions of credit to any Borrower or any other Credit Party, (iii) each Credit Party shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Loan Agreement or any of the other Transaction Documents during the continuance of any Event of Default, including, without limitation, any limitations, restrictions or prohibitions against the making of payments by any Borrower or any other Credit Party to any Affiliate of any Borrower or any direct or indirect owner of an equity interest in such Borrower, any other Credit Party or any Affiliate of any of the foregoing, in each case, except as explicitly described in any Forbearance Document, and (iv) nothing herein shall restrict, impair or otherwise affect any Lender Party's rights and remedies under any agreements containing subordination provisions[5] in favor of any or all of the Lender Parties (including, without limitation, any rights or remedies available to the Lender Parties as a result of the occurrence or continuation of any Specified Default) or amend or modify any provision thereof~~, and (v) nothing herein shall restrict, impair or otherwise affect Agent's right to file, record, publish or deliver a notice of default or document of similar effect under any state foreclosure law~~.

(b)    As used herein, the term "Forbearance Period" shall mean the period beginning on the Forbearance Effective Date and ending on the earlier to occur of (the occurrence of the following clause (i), (ii) or (iii), a "Termination Event"):

(i)    the occurrence of any Event of Default under subsection 7.02(f) of the Loan Agreement (a "Bankruptcy Default");

(ii)    the occurrence of any Forbearance Default (as hereinafter defined) other than a Bankruptcy Default; or

(iii)    October 7, 2024.

As used herein, the term "Forbearance Default" shall mean:

(A) the occurrence of any material[6] Event of Default other than the Specified Defaults;

---

[5] NTD: Are there any? If not, this should be removed.

[6] NTD: If we're limiting the Specified EODs to "material" EODs, it doesn't make sense for there not to be a materiality qualifier on Forbearance Defaults.

A-325

(B) the failure of any Deficiency Borrower or any other Credit Party (x) to comply timely in a material manner with any term, condition, or covenant set forth in this Agreement or (y) to use commercially reasonable efforts to ~~negotiate and~~obtain any third-party consents needed to enter into the Forbearance Documents identified on Schedule 8, and, if such consent is obtained, to negotiate and enter into such documents on or before April 26, 2024;

(C) the failure of any representation or warranty made by any Deficiency Borrower or any other Credit Party under or in connection with this Agreement to be true and complete in all material respects as of the date when made or any other material breach of any such representation or warranty; or

~~(D) the repudiation and/or assertion of any defense by any Credit Party with respect to this Agreement or any Transaction Document or the pursuit of any claim by any Credit Party against the Agent, any Lender or any Released Person;~~

[7](E) Existing Collateral with an aggregate value of $1,000,000 or more is or becomes ineligible due to (x) any Borrower or Credit Party not having title to such Existing Collateral, (y) the Agent no longer having a first priority security interest or lien in such Existing Collateral, or (z) such Existing Collateral is subject to any security interest, lien or other encumbrance in favor or any Person that is not a Lender or the Agent; or

~~(F) the termination or expiration of any other forbearance granted by another creditor of the Credit Parties.~~

[8]Any Forbearance Default shall constitute an immediate Event of Default under the Loan Agreement and the other Transaction Documents.

(c)      Upon the occurrence of a Termination Event, the agreement of the Lender Parties hereunder to forbear from exercising their respective default-related rights and remedies shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which the Deficiency Borrowers and the other Credit Parties each ~~waives~~waive. The Deficiency Borrowers and the other Credit Parties each ~~agrees~~agree that any or all of the Lender Parties may at any time thereafter proceed to exercise any and all of their respective rights and remedies under the Loan Agreement, any other Transaction Document and applicable law, including, without limitation, their respective rights and remedies with respect to the Specified Defaults. Without limiting the generality of the foregoing, upon the occurrence of a Termination Event, the Lender Parties may, in their sole discretion and without the requirement of any demand, presentment, protest, or notice of any kind, (i) continue to charge interest on any or all of the Obligations at the Default Interest Rate, effective from and after March 17, 2023, to occur on a retroactive basis[9], (ii) commence any legal or other action to collect any or all of the Obligations from the Deficiency Borrowers, any other Credit Party and/or any Collateral, (iii) foreclose or otherwise realize on any or all of the Collateral, and/or appropriate, setoff or apply

---

[7] NTD: Not in term sheet.

[8] NTD: Not in term sheet.

[9] NTD: What does this clause mean?

A-326

to the payment of any or all of the Obligations, any or all of the Collateral, and (iv) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Loan Agreement, any other Transaction Documents and applicable law, all of which rights and remedies are fully reserved by the Lender Parties.

(d)     Any agreement by the Lender Parties to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and Required Lenders.

(e)     The Deficiency Borrowers and the other Credit Parties each acknowledge that the Lender Parties have not made any assurances concerning (i) any possibility of an extension of the Forbearance Period, (ii) the manner in which or whether the Specified Defaults may be resolved or (iii) any additional forbearance, waiver, restructuring or other accommodations.

(f)     The parties hereto agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that any Lender Party may be entitled to take or bring in order to enforce its rights and remedies against any Deficiency Borrower or any other Credit Party are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(g)     The Deficiency Borrowers and the other Credit Parties acknowledge and agree that any Loan or other financial accommodation that any Lender Party makes on or after the Forbearance Effective Date has been made by such party in reliance upon, and is consideration for, among other things, the general releases and indemnities contained in Section 6 hereof and the other covenants, agreements, representations and warranties of the Deficiency Borrowers and the other Credit Parties hereunder.

**SECTION 5.   Supplemental Terms, Conditions and Covenants During the Forbearance Period**

The parties hereto hereby agree to comply with the following terms, conditions and covenants during the Forbearance Period (other than clause (i), which shall be complied with so long as any Leadenhall-777 Obligations remain outstanding), in each case notwithstanding any provision to the contrary set forth in this Agreement, the Loan Agreement or any other Transaction Document:

(a)     Each Deficiency Borrower and each other Credit Party agrees that ~~(x) it shall not enter into any agreement to retain an investment banking firm, crisis manager, chief restructuring officer, consultant, financial advisor and/or other third party professional without the prior written consent of the Agent and (y)~~ it shall use commercially reasonable efforts to obtain prior to April 26, 2024 each consent listed on Schedule 7(c) attached hereto.

(b)     Notwithstanding anything to the contrary contained in the Loan Agreement or other Transaction Document, during the Forbearance Period, the Credit Parties may sell, convey, transfer, lease or otherwise dispose of Existing Collateral; provided that, without the written consent of the Agent (i) no Existing Collateral may be sold, conveyed, transferred, leased or otherwise disposed of (x) for non-cash considerations or (y) for an amount

A-327

less than its fair market value, and (ii) all proceeds of such transaction shall be applied to repay Leadenhall-777 SPLCSS/Dorchester Obligations and shall not be applied to any Forbearance Period Amortization Installments other than the Residual Payment.

(c)     Notwithstanding anything to the contrary contained in the Loan Agreement or other Transaction Document, during the Forbearance Period, Agent may engage one or more field auditors to (x) to conduct audits of the Receivables, the Existing Collateral and the related books and records and collections systems of the Deficiency Borrowers, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for due diligence of the Receivables), (y) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (z) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (y) above, and to discuss matters relating to Receivables and the Existing Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller, as the case may be, having knowledge of such matters; provided that during the Forbearance Period, the same is done with concurrent written notice during normal business hours to the extent access to such Borrower's, the Related Servicer's or the Related Seller's premises is required and such Borrower shall be obligated to pay for all such audits. If Agent elects to engage such field auditor(s), Deficiency Borrowers and the other Credit Parties shall fully cooperate with Agent's field auditors and promptly provide all information and materials requested by such auditors and take all other action requested by the auditors to enable them to complete their audit. All such costs and expenses in connection with any field audit shall be at the expense of the Lenders unless a Forbearance Default has occurred and is continuing.

(d)     Notwithstanding anything to the contrary contained in the Loan Agreement or the other Transaction Documents, Agent or its counsel may, at Agent's sole discretion, engage one or more financial or other advisors or consultants satisfactory to Agent, to advise and assist Agent, Agent's counsel, and Lenders with their on-going assessment of each Deficiency Borrower's financial performance and its ability to repay the Obligations (such assistance to include, without limitation, (i) a review by such consultant of all accounts receivable and accounts payable of Deficiency Borrowers and the other Credit Parties, all existing contracts of Deficiency Borrowers and other Credit Parties and all contracts of Deficiency Borrowers and other Credit Parties currently under negotiation (and the projected effects on each Deficiency Borrower's future profitability), and (ii) monthly reviews and inspections by such consultant of each Deficiency Borrower's operations and the items outlined in clause (i) above). Agent and Lenders may elect to maintain the confidentiality of any conclusions reached or reports prepared by such consultant and may also provide that the consultant's conclusions shall be covered by the attorney work product privilege. Deficiency Borrowers shall reimburse Agent for any and all fees and expenses of such consultant in accordance with Section 9.02 of the Loan Agreement.

9

A-328

10

(d)   (e)  Notwithstanding anything to the contrary contained in the Loan Agreement or the other Transaction Documents, the Credit Parties shall pay Agent, for application solely to the Leadenhall-777 SPLCSS/Dorchester Obligations, the following amounts on or before the corresponding dates set forth below (provided that the failure to make any Forbearance Period Amortization Installment (including the Residual Payment) shall not constitute a Forbearance Default until the third day after such Forbearance Period Amortization Installment is due) together with accrued and unpaid interest thereon (collectively, the "Forbearance Period Amortization Installments"):

| Date:[11] | Payment: |
|---|---|
| March 29, 2024 | $15,000,000 |
| April 30, 2024 | $15,000,000 |
| May 31, 2024 | $20,000,000 |
| June 28, 2024 | $25,000,000 |
| July 31, 2024 | $75,000,000 |
| August 30, 2024 | $75,000,000 |
| September 30, 2024 | all remaining unpaid Leadenhall-777 SPLCSS/Dorchester Obligations (which, as of the date hereof, are equal to $[___].) |

In addition, contemporaneously with the payment of each Forbearance Period Amortization Installment, Deficiency Borrowers shall deliver to Agent their managements' written analysis and discussion of the Forbearance Period Amortization Installments and performance of the Existing Collateral.

(e)   (f) (i)  Notwithstanding anything to the contrary in the Loan Agreement or other Transaction Documents, the Deficiency Borrower and the other Credit Parties hereby agree to: (x) give Agent and its  Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of the Deficiency Borrowers and the other Credit Parties, (y) furnish to Agent and its Representatives such financial, operating and property related data and other information related to the Leadenhall-777 SPLCSS/Dorchester Obligations as such persons reasonably request, and (z) instruct each Deficiency Borrower's and any other Credit Party's employees and financial advisors to cooperate with Agent and its Representatives in respect of the aforementioned clauses (x) and (y).  For purposes of this Agreement, the term "Representatives"

---

[10] NTD: The field audit under (c) should be sufficient for so long as the amortization payments are being made

[11] NTD: Dates have been adjusted so as to fall on Business Days.

A-329

shall mean Agent's employees, agents, representatives, advisors and consultants (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf Agent).

(ii) ~~Deficiency Borrowers and the other Credit Parties each irrevocably authorizes, and shall cause, any financial advisors, consultants or investment bankers that are representing any or all of the Deficiency Borrowers and the other Credit Parties in connection with the Collateral (collectively, the "Financial Advisors") to: (w) disclose fully and promptly to Agent and its Representatives all material developments in connection with the efforts of Deficiency Borrowers and Financial Advisors to sell, convey, transfer, lease or otherwise dispose of the Collateral, (x) regularly consult with, and respond to the inquiries of, Agent, Lenders and their respective Representatives concerning any and all matters relating to the affairs, finances and businesses of any Deficiency Borrower or any other Credit Party, the assets and capital stock of any Deficiency Borrower or any other Credit Party, any aspect of any conveyance, transfer, lease or other disposal of the Collateral and/or Financial Advisors' activities related thereto (including, without limitation, communications outside the presence of any representatives of any Deficiency Borrower or any other Credit Party), (y) provide Agent, Lenders and their respective Representatives copies of all reports, analyses, materials (including, without limitation, any and all confidential memoranda or other work product provided by Financial Advisors to any or all of Deficiency Borrowers, Lenders and their respective Representatives) and (z) provide bi-weekly updates on a conference call with Agent, Lenders and/or their respective Representatives.~~

(ii)  ~~(e)~~

(f)    Each Deficiency Borrower ~~and the other Credit Parties~~ shall, and shall cause its respective officers, directors, employees and advisors to, cooperate fully with Agent in furnishing information as and when reasonably requested by Agent or any other Lender Party regarding the Collateral or any Deficiency Borrower~~'s or any other Credit Party~~'s financial affairs, finances, financial condition, business and operations. Each Deficiency Borrower ~~and each other Credit Party~~ authorizes Agent to meet and/or have discussions with any of their officers, directors, employees and advisors from time to time as reasonably requested by Agent to discuss any matters regarding the Collateral or any Deficiency Borrower~~'s or any other Credit Party~~'s financial affairs, finances, financial condition, business and operations, and shall direct and authorize all such persons and entities to fully disclose to Agent all information reasonably requested by Agent regarding the foregoing. Each Deficiency Borrower ~~and the other Credit Parties~~ waives and releases any such officer, director, employee and advisor from the operation and provisions of any confidentiality agreement with Deficiency Borrower ~~or other Credit Party~~, as the case may be, such that such person or entity is not prohibited from providing any of the foregoing information to Agent or any other Lender Party.

(e)    Each Deficiency Borrower ~~and other Credit Party~~ acknowledges and agrees that no Lender Party shall have any obligation whatsoever to make any additional Loans, extend any additional credit or otherwise make any further financial accommodations to any Borrower ~~or any other Credit Party~~ under the Loan Agreement, the other Transaction Documents or otherwise (including, without limitation, during the Forbearance Period).

A-330

(f)     For so long as any Leadenhall-777 Obligations remain outstanding, no Deficiency Borrower or other Credit Party shall, as applicable:

(i)     make any payment or any kind to Wander or Pasko other than the base salary and minimum annual bonus set forth in <u>Schedule 5.4</u> of each Operating Agreement;

(ii)     make any dividend payments, extraordinary payments, or similar distributions to any principal or Affiliate of 777 Partners or 600 Partners (including Wander, Pasko, and any entity solely under the control of either or both, including, but not limited to, JARM Capital LLC or MTCP LLC);

(iii)     permit 777 Partners or 600 Partners to make any dividend payments (except for dividends payable in respect of the 777 Preferred Units (as defined in the Operating Agreements), extraordinary payments, or similar distributions or repay any Debt owed to an Affiliate;

(iv)     redeem, refinance, or repay any 777 Preferred Units (as defined in the Operating Agreements), other than where there is an express contractual obligation to do so; provided that such obligation was in existence on March 20, 2024, and is disclosed in <u>Schedule 5(i)(iv)</u> hereto;

(v)     create or allow to subsist any security interest, lien or other encumbrance on the Forbearance Collateral other than such security interest, lien or other encumbrance as is expressly permitted hereunder; or

(vi)     sell, convey, transfer, lease or otherwise dispose of any Forbearance Collateral other than as is expressly permitted hereunder.

The provisions of this Section 5(ig) shall survive a Termination Event under this Agreement.

**SECTION 6.   <u>General Release; Indemnity</u>.**

(a)     In consideration of, among other things, Agent's and the Required Lenders' execution and delivery of this Agreement, each of the Deficiency Borrowers and the other Credit Parties, on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, "<u>Releasors</u>"), hereby forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity (collectively, the "<u>Claims</u>"), against any or all of the Lender Parties in any capacity and their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys,

12

A-331

advisors and other representatives of each of the foregoing (collectively, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Forbearance Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Loan Agreement and the other Transaction Documents or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between or among Deficiency Borrowers and the other Credit Parties, on the one hand, and any or all of the Lender Parties, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any aspect of the dealings or relationships between or among any or all of Wander, Pasko, 777 Partners, 600 Partners or the 777 & 600 Affiliates, on the one hand, and the Lender Parties, on the other hand, but only to the extent such dealings or relationships relate to any or all of the documents, transactions, actions or omissions referenced in clauses (i) and (ii) hereof. The receipt by any Deficiency Borrower or any other Credit Party of any Loans or other financial accommodations made by any Lender Party after the date hereof shall constitute a ratification, adoption, and confirmation by such party of the foregoing general release of all Claims against the Releasees that are based in whole or in part on facts, whether or not now known or unknown, existing on or prior to the date of receipt of any such Loans or other financial accommodations. In entering into this Agreement, Deficiency Borrowers and each other Credit Party consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof. The provisions of this Section shall survive the termination of this Agreement, the Loan Agreement, the other Transaction Documents and payment in full of the Obligations. Notwithstanding the foregoing, the release described in this subsection shall not apply to claims, counterclaims, demands, damages, debts, suits, losses, liabilities, actions, remedies, judgments, controversies or causes of action arising from a set of facts of which the Releasors are not aware (unless the Releasors would have been aware of such facts upon exercising reasonable care and diligence)

(b)     Deficiency Borrowers and other Credit Parties each hereby agrees that it shall be, jointly and severally, obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of any Deficiency Borrower, any other Credit Party, or any of their respective Subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statue, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Agreement, the other Transaction Documents, this Agreement or any other document executed and/or delivered in connection herewith or therewith; provided, that neither the Deficiency Borrowers nor any other Credit Party shall not have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of such Releasee as finally determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, Deficiency Borrowers and the other Credit Parties each agrees agree to make the maximum contribution to the payment and satisfaction thereof that is permissible under applicable law. The foregoing indemnity shall

13

survive the termination of this Agreement, the Loan Agreement, the other Transaction Documents and the payment in full of the Obligations.

(c)    Each of the Deficiency Borrowers and the other Credit Parties, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Deficiency Borrower or any other Credit Party pursuant to Section 6(a) hereof.  If any Deficiency Borrower, any other Credit Party or any of its respective successors, assigns or other legal representatives violates the foregoing covenant, each Deficiency Borrower and other Credit Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

**SECTION 7.    Representations, Warranties And Covenants Of Deficiency Borrowers and Other Credit Parties** .  To induce Agent and the other Lender Parties to execute and deliver this Agreement, each of Deficiency Borrowers and other Credit Parties represents, warrants and covenants that:

(a)    The execution, delivery and performance by each of Deficiency Borrowers and the other Credit Parties of this Agreement and all documents and instruments delivered in connection herewith and the Loan Agreement and all other Transaction Documents have been duly authorized by such Deficiency Borrower's and the Other Credit Parties' respective boards of directors, managers, sole members or other controlling party, and this Agreement and all documents and instruments delivered in connection herewith and the Loan Agreement and all other Transaction Documents are legal, valid and binding obligations of such Deficiency Borrowers and the other Credit Parties enforceable against such parties in accordance with their respective terms;

(b)    Except with respect to the Specified Defaults, each of the representations and warranties contained in the Loan Agreement and the other Transaction Documents is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, and each of the agreements and covenants in the Loan Agreement and the other Transaction Documents is hereby reaffirmed with the same force and effect as if each were separately stated herein and made as of the date hereof;

(c)    Neither the execution, delivery and performance of this Agreement, the other Forbearance Documents, and all documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby (x) requires consent of any Person not a party hereto, except as disclosed on Schedule 7(c)  hereto, and (y) does or shall contravene, result in a breach of, or violate (i) any provision of any Deficiency Borrower's or any other Credit Party's corporate charter, bylaws, operating agreement, or other governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Deficiency Borrower or any other Credit Party is a party or by

14

A-333

which any Deficiency Borrower or any other Credit Party or any of their respective property is bound;

(d)     As of the date hereof, except for the Specified Defaults, no material Event of Default has occurred or is continuing under this Agreement, the Loan Agreement or any other Transaction Document.

(e)     The Lender Parties' security interests in the Existing Collateral continue to be valid, binding, first-priority, perfected and enforceable security interests that secure the Obligations and no tax or judgment liens are currently of record against Deficiency Borrowers or any other Credit Party.

(f)     Except with respect to the Specified Defaults, any material misrepresentation of any Deficiency Borrower or any other Credit Party, or any failure of any such party to materially comply with the covenants, conditions and agreements contained in this Agreement, the Loan Agreement, any other Transaction Document or in any other agreement, document or instrument at any time executed and/or delivered by any Deficiency Borrower or any other Credit Party with, to or in favor of any Lender Party shall constitute an immediate Event of Default hereunder, under the Loan Agreement and the other Transaction Documents.

(g)     The recitals to this Agreement are true and correct, and each Deficiency Borrower and other Credit Party acknowledges and agrees that  the Loans have been accelerated and nothing contained herein is intended to change the accelerated status of the Loans.

(h)     None of the Deficiency Borrowers nor any other Credit Party has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Loan Agreement or any of the other Transaction Documents.

(i)     The Existing Collateral listed on Schedule 7(i) is all of the Existing Collateral as of the date hereof and all such Collateral is eligible to be Collateral under the Transaction Documents.

**SECTION 8. <u>Post-Closing Covenants</u>.** The Credit Parties, as applicable, will use commercially reasonable efforts to execute and deliver the documents and complete the tasks set forth on Schedule 8, in each case within the time limits specified on such schedule (or such longer period as the Agent may agree in its sole discretion).

15

A-334

**SECTION 9.  Financial Audit of 777 Partners, 600 Partners, and the 777 & 600 Affiliates.**
So long as the Credit Parties are in full compliance with the schedule of Forbearance Period Amortization Installments set forth in Section 5(e) above, the Credit Parties may provide to the Lender Parties a list of the waivers requested by the Credit Parties in connection with the Leadenhall-777 Agreements relating to the Leadenhall-777 SPLCSS/Dorchester Obligations in order to fulfill the Credit Parties' audit requirements, and each Lender Party shall consider, acting reasonably, any requests for waivers in connection with the Leadenhall-777 SPLCSS/Dorchester Obligations; provided that (i) no Lender Party shall be required to provide any waiver to the extent such Lender Party in its sole reasonable discretion determines that providing such waiver is not in such Lender Party's best interest, and (ii) upon the termination of the Forbearance Period due to any reason other than under clause (iii) of the definition of "Termination Event", any such waiver previously granted by any Lender Party shall without any further action of any Lender Party or the Agent automatically become null and void and of no further affect.

**SECTION 10.      Ratification of Liability**.  Deficiency Borrowers and the other Credit Parties, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Transaction Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Transaction Documents to which it is a party, and ratify and reaffirm their grants of liens on or security interests in their properties pursuant to such Transaction Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Loan Agreement and the other Transaction Documents, and confirms and agrees that such liens and security interests hereafter secure all of the Obligations, including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Transaction Document.  Deficiency Borrowers and the other Credit Parties further agree and reaffirm that the Transaction Documents to which they are parties now apply to all Obligations as defined in the Loan Agreement, as modified hereby (including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Transaction Document).  Each such party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Transaction Documents, as modified hereby, remains in full force and effect and is hereby ratified and confirmed.  No set-off, counterclaim or reduction, no diminution of an obligation, and no defense of any kind or nature that Guarantor or any other Credit Party may have against any Agent or any Lender Party (other than a defense of payment) shall affect, modify or impair the obligations hereunder of Guarantor or any other Credit Party.

**SECTION 11.      Reference To And Effect Upon The Loan Agreement.**

(a)      Except as specifically amended hereby, all terms, conditions, covenants, representations and warranties contained in the Loan Agreement and the other Transaction Documents, and all rights of the Lender Parties and all of the Obligations, shall remain in full force and effect.  Deficiency Borrowers and the other Credit Parties hereby confirm that the Loan Agreement and the other Transaction Documents are in full force and effect and that neither

16

A-335

Deficiency Borrowers nor any other Credit Party has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Loan Agreement or any of the other Transaction Documents.

(b)     Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) create any obligation to make any further Loans or to continue to defer any enforcement action after the occurrence of any Default or Event of Default (including, without limitation, any Forbearance Default), (ii) constitute a consent or waiver of any past, present or future violations of any provisions of the Loan Agreement or any of the other Transaction Documents or the Specified Defaults, nor constitute a novation of any of the Obligations under the Loan Agreement or the other Transaction Documents, including, but not limited to, with respect to the Insurety Borrower or Signal Borrower, (iii) amend, modify or operate as a waiver of any provision of the Loan Agreement or any of the other Transaction Documents or any right, power or remedy of any Lender Party, including, but not limited to, with respect to the Insurety Borrower or Signal Borrower, (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction or (v) constitute a course of dealing or other basis for altering any Obligations or any other contract or instrument.  Except as expressly set forth herein, each Lender Party reserves all of its rights, powers, and remedies under the Loan Agreement, the other Transaction Documents and applicable law.  All of the provisions of the Loan Agreement and the other Transaction Documents, including, without limitation, the time of the essence provisions, are hereby reiterated, and if ever waived (other than as provided herein), are hereby reinstated.

(c)     From and after the Forbearance Effective Date, (i) the term "Agreement" in the Loan Agreement, and all references to the Loan Agreement in any Transaction Document, shall mean the Loan Agreement, as amended by, among things, this Agreement, and (ii) the term "Transaction Documents" in the Loan Agreement and the other Transaction Documents shall include, without limitation, this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith.

(d)     Except as expressly provided herein, no Lender Party has waived (regardless of any delay in exercising such rights and remedies), any Default or Event of Default that may be continuing on the date hereof or any Default or Event of Default that may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and no Lender Party has agreed to forbear with respect to any of its rights or remedies concerning any Defaults or Events of Default (other than, during the Forbearance Period, the Specified Defaults solely to the extent expressly set forth herein), that may have occurred or are continuing as of the date hereof, or that may occur after the date hereof.

(e)     Deficiency Borrowers and the other Credit Parties acknowledge and agree that the Lender Parties' agreement to forbear from exercising certain of their default-related rights and remedies with respect to the Specified Defaults during the Forbearance Period does not in any manner whatsoever limit any Lender Party's right to insist upon strict compliance by Deficiency Borrowers and the other Credit Parties with the Loan Agreement, this Agreement or any other Transaction Document during the Forbearance Period, except as expressly set forth herein.

17

A-336

       (f)     This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Loan Agreement or any other Transaction Document.

**SECTION 12.**     **Costs And Expenses**   .  In addition to (to the extent not otherwise provided in the Loan Agreement), and not in lieu of, the terms of the Loan Agreement, the Forbearance Documents, and the other Transaction Documents relating to the reimbursement of Lender Party fees and expenses, Deficiency Borrowers shall, jointly and severally, reimburse Agent and the other Lender Parties, as the case may be, promptly on demand for all fees, costs, charges and expenses, including the reasonable fees, costs and expenses of counsel and other expenses, incurred in connection with this Agreement and the other agreements and documents executed and/or delivered, and to be executed and/or delivered, in connection herewith.

18

A-337

**SECTION 13.**      <u>Governing Law; Consent to Jurisdiction and Venue</u>.  THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST).  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE DEFICIENCY BORROWERS AND EACH OTHER CREDIT PARTY HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL LIMIT THE RIGHT OF AGENT TO COMMENCE ANY PROCEEDING IN THE FEDERAL OR STATE COURTS OF ANY OTHER JURISDICTION TO THE EXTENT AGENT DETERMINES THAT SUCH ACTION IS NECESSARY OR APPROPRIATE TO EXERCISE ITS RIGHTS OR REMEDIES UNDER THE TRANSACTION DOCUMENTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.  EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BY ANY MEANS PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO THE ADDRESS OF THE DEFICIENCY BORROWERS SPECIFIED IN THE LOAN AGREEMENT (AND SHALL BE EFFECTIVE WHEN SUCH MAILING SHALL BE EFFECTIVE, AS PROVIDED THEREIN).  EACH CREDIT PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING CONTAINED IN THIS SECTION 13 SHALL AFFECT THE RIGHT OF AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION.

**SECTION 14.**      <u>Construction</u>  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the parties hereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any party on the ground that such party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.  Each of the parties

19

A-338

hereto represents and declares that such party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such party knows the contents thereof and signs the same freely and voluntarily.  The parties hereto acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect.  If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option or discretion of one or more Lender Parties or their respective employees, counsel, or agents in the Loan Agreement or any of the other Transaction Documents, such action shall be deemed to be exercisable by such Lender Parties or such other Person in its sole and absolute discretion and according to standards established in its sole and absolute discretion, unless expressly stated otherwise.  Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may."

**SECTION 15.        Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.  Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile, portable document format (".pdf"), electronic signature complying with the U.S. federal ESIGN Act of 2000 (including signature via DocuSign, RightSignature or similar services) or other electronic transmission, a signature page of this Agreement signed by such party, and any such facsimile or other electronic signature shall be treated in all respects as having the same effect as an original signature.  Any party delivering by facsimile or other electronic transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement; provided that the failure to deliver such manually signed counterpart shall not affect the validity or effectiveness of this Agreement.

**SECTION 16.        Severability.**  The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.  If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**SECTION 17.        Time of Essence.**  Time is of the essence in the performance of each of the obligations of the Deficiency Borrowers and the other Credit Parties hereunder and with respect to all conditions to be satisfied by such parties.

20

A-339

**SECTION 18.** <u>No Other Creditor Action</u>. The Lender Parties' obligations to forbear hereunder are expressly conditioned upon all other creditors of any Deficiency Borrower ~~and the other Credit Parties~~ (including, without limitation, trade creditors and subordinated secured and unsecured creditors) refraining from taking any action whatsoever against the Deficiency Borrowers, ~~any of the other Credit Parties,~~or the Collateral (including, without limitation, acceleration of indebtedness) during the Forbearance Period. In the event that any such creditor takes any such action, all of the Lender Parties' obligations hereunder shall automatically and immediately terminate without further notice or demand.

**SECTION 19.** <u>Further Assurances</u>. Each Deficiency Borrower and other Credit Party agrees to take all further actions and execute all further documents as Agent may from time to time reasonably request to carry out the transactions contemplated by this Agreement and all other agreements executed and delivered in connection herewith.

**SECTION 20.** <u>Section Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

**SECTION 21.** <u>Notices</u>. All notices, requests, and demands to or upon the respective parties hereto shall be given in accordance with the Loan Agreement.

**SECTION 22.** <u>Effectiveness</u>. This Agreement shall become effective at the time (the "Forbearance Effective Date") that all of the following conditions precedent have been met (or waived) as determined by the Agent and the Lenders in their sole discretion:

(a) <u>Agreement</u>. Agent shall have received duly executed signature pages for this Agreement signed by Agent, Required Lenders, Deficiency Borrowers and the other Credit Parties.

~~(b)   Forbearance Limited Guarantees. Agent shall have received duly executed signature pages for each Forbearance Limited Guaranty from Wander and Pasko.~~

(b)   ~~(c)~~ [12]<u>Fees and Expenses</u>. The Credit Parties shall have paid all fees and expenses that under the terms of the Loan Agreement and the other Transaction Documents are due and payable on or prior to the date hereof, as well as the fees, disbursements and other charges of counsel to the Agent, including, but not limited to, the fees and expenses of King & Spalding, LLP.

(c) <u>Due Authorization</u>. Each Deficiency Borrower and other Credit Party shall have delivered to Agent (i) evidence of the corporate authority of each such party to execute, deliver and perform its obligations under this Agreement and, as applicable, all other agreements and documents executed in connection therewith, and (ii) such other documents and instruments as Agent may require, all of the foregoing of which shall be in form and substance acceptable to Agent and Lenders.

_____

[12] NTD: This is subject to ACAP consent, which hasn't been received yet. This should be part of the post-closing, where it already looks like it's covered

A-340

(d)   _Representations and Warranties_.   The representations and warranties contained herein shall be true and correct, and no Forbearance Default or event that with notice, the passage of time or both would constitute a Forbearance Default shall exist on the date hereof.

(e)   _Other Corporate Proceedings_.   All corporate proceedings taken in connection with the transactions contemplated by this Agreement and all documents, instruments, and other legal matters incident thereto shall be satisfactory to Agent.

**SECTION 23.**          **Waivers by Deficiency Borrowers and other Credit Parties.**

(a)   _Waiver of Jury Trial Right And Other Matters_.   DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH HEREBY WAIVES (i) ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY, WHICH WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE; (ii) PRESENTMENT, DEMAND AND PROTEST, AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NONPAYMENT, MATURITY, RELEASE WITH RESPECT TO ALL OR ANY PART OF THE OBLIGATIONS OR ANY COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY ANY LENDER PARTY ON WHICH DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER SUCH LENDER PARTY MAY DO IN THIS REGARD; (iii) NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF THE COLLATERAL, THE OTHER COLLATERAL OR ANY BOND OR SECURITY THAT MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING ANY LENDER PARTY TO EXERCISE ANY OF THEIR RESPECTIVE RIGHTS AND REMEDIES; (iv) ~~SUBJECT TO~~ THE ~~BENEFIT~~TERMS OF ~~ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS AND ALL RIGHTS WAIVABLE UNDER ARTICLE 9 OF THE NEW YORK UCC; (v)~~ANY TRANSACTION DOCUMENT, ANY RIGHT DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY MAY HAVE UPON PAYMENT IN FULL OF THE OBLIGATIONS TO REQUIRE ANY LENDER PARTY TO TERMINATE ITS SECURITY INTEREST IN THE COLLATERAL, OTHER COLLATERAL OR IN ANY OTHER PROPERTY OF DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY UNTIL TERMINATION OF THE FINANCING AGREEMENT IN ACCORDANCE WITH ITS TERMS AND THE EXECUTION BY DEFICIENCY BORROWERS, AND BY ANY PERSON WHO PROVIDES FUNDS TO DEFICIENCY BORROWERS THAT ARE USED IN WHOLE OR IN PART TO SATISFY THE OBLIGATIONS, OF AN AGREEMENT INDEMNIFYING ANY OR ALL OF THE LENDER PARTIES FROM ANY LOSS OR DAMAGE ANY SUCH PARTY MAY INCUR AS THE RESULT OF DISHONORED CHECKS OR OTHER ITEMS OF PAYMENT RECEIVED BY SUCH LENDER PARTY FROM ANY DEFICIENCY BORROWERS, OR ANY ACCOUNT DEBTOR AND APPLIED TO THE OBLIGATIONS AND RELEASING AND INDEMNIFYING, IN THE SAME MANNER AS DESCRIBED IN SECTION 6 OF THIS AGREEMENT, THE RELEASEES FROM ALL CLAIMS ARISING ON OR BEFORE THE DATE OF SUCH TERMINATION STATEMENT; AND (~~v~~i~~v~~) NOTICE OF ACCEPTANCE HEREOF, AND DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH

A-341

ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO AGENT'S AND THE OTHER LENDER PARTIES' ENTERING INTO THIS AGREEMENT AND THAT SUCH PARTIES ARE RELYING UPON THE FOREGOING WAIVERS IN THEIR FUTURE DEALINGS WITH DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES.  DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**SECTION 24.** **Assignments; No Third -Party Beneficiaries**. This Agreement shall be binding upon and inure to the benefit of Deficiency Borrowers, the other Credit Parties, the Lender Parties and their respective successors and assigns; provided, that neither Deficiency Borrowers nor any other Credit Party shall be entitled to delegate any of its duties hereunder or to assign any of its rights or remedies set forth in this Agreement without the prior written consent of Agent in its sole discretion.  No Person other than the parties hereto, and in the case of Section 6 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Releasees under Section 6 hereof) are hereby expressly disclaimed.

**SECTION 25.** **Final Agreement**. This Agreement, the Loan Agreement, the other Transaction Documents, and the other written agreements, instruments, and documents entered into in connection therewith (collectively, the "Borrower/Lender Documents") set forth in full the terms of agreement between the parties hereto and thereto with respect to the subject matter thereof and are intended as the full, complete, and exclusive contracts governing the relationship between such parties with respect to the subject matter thereof, superseding all other discussions, promises, representations, warranties, agreements, and understandings between the parties with respect thereto.  Except as provided therein, no term of the Borrower/Lender Documents may be modified or amended, nor may any rights thereunder be waived, except in a writing signed by the party against whom enforcement of the modification, amendment, or waiver is sought.  Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind.  Agent's or any Lender's exercise or failure to exercise any rights or remedies under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights and remedies in any other instances.  There are no oral agreements among the parties hereto.

[Signature pages to follow]

A-342

IN WITNESS WHEREOF, this First Forbearance Agreement and Fifth Amendment to Loan Agreement has been executed by the parties hereto as of the date first written above.

[SIGNATURES TO BE UPDATED]

_____,
as a Deficiency Borrower

By: _____

Name: _____

Its: _____

_____,
as Credit Party

By: _____

Name: _____

Its: _____

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-343

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-344

_____,
as Agent and a Lender

By: _____

Name: _____

Title: _____

_____,

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-345

as a Lender[213]

By: _____

Name: _____

Title: _____

---

[213] NTD: to be updated to include the Leadenhall Affiliates from the Term Sheet.

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-346

## **EXHIBIT A**

### (Specified Defaults)

Facility Events of Default

1.  The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantor, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit A-1 and incorporated herein (the "Notice of Breach").[a14]

2.  Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3.  Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution Date therefor.

4.  A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5.  A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1.  The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

---

[a14] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-347

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(i)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-348

**EXHIBIT A-1**

Notice of Breach

A-349

**EXHIBIT A-2**

March 12 Notice

A-350

**EXHIBIT A-3**

March 15 Notice

A-351

**EXHIBIT B**

Account Control Agreement Trigger Notices

A-352

## **SCHEDULE 1**

### 777 & 600 Affiliates

JARM Capital LLC
MTCP LLC
SuttonPark Acquisition LLC
SPA II LLC
Nutmeg Acquisition LLC
F3EA Holdings LLC
SuttonPark Capital LLC
Trans Atlantic Lifetime Mortgages LTD

A-353

**SCHEDULE 5(i)(iv)**

777 Preferred Unit Redemption Rights

A-354

**SCHEDULE 7(e)**

Consents

A-355

**SCHEDULE 7(i)**

Eligible Existing Collateral

A-356

## SCHEDULE 8

### Post-Closing Obligations[415]

1.  As soon as possible, but no later than April 26, 2024 (or such longer period as the Agent may agree in its sole discretion), the Credit Parties shall use commercially reasonable efforts to obtain the consents necessary to deliver to the Agent, in form and substance satisfactory to the Agent and Lenders in their sole discretion the following:

    a.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by JARM Capital LLC;

    b.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by MTCP LLC;

    c.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by 777 Partners;

    d.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by 600 Partners;

    e.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by SuttonPark Acquisition LLC;

    f.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by; SPA II LLC;

    g.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by Nutmeg Acquisition LLC;

    h.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by F3EA Holdings LLC;

    i.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by SuttonPark Capital LLC;

    j.  Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by Trans Atlantic Lifetime Mortgages LTD;

    k.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Wander, pledging 100% of the equity of JARM Capital LLC;

    l.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Pasko, pledging 100% of the equity of MTCP LLC;

---

[415] NTD: 777 to confirm identify of pledgors and if any other pledges are necessary.

A-357

m. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by JARM Capital LLC, pledging 100% of the equity of SuttonPark Acquisition LLC;

n. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by SuttonPark Acquisition LLC, pledging 100% of the equity of 777 Partners;

o. Each Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Pasko and MTCP LLC, pledging  100% of the equity of SPA II LLC, in the aggregate;

p. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by SPA II LLC, pledging 100% of the equity of 600 Partners;

q. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by [_____], pledging 100% of the equity of Nutmeg Acquisition LLC;

r. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by 777 Partners, pledging 100% of the equity of F3EA Holdings LLC;

s. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by 600 Partners, pledging 100% of the equity of SuttonPark Capital LLC;

t. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by ~~SuttonPArk~~ SuttonPark Capital LLC, pledging 100% of the equity of Trans Atlantic Lifetime Mortgages LTC; and

u. any other document necessary or otherwise requested by Agent to effectuate the terms of this Agreement.

A-358

Document comparison by Workshare 10.0 on Tuesday, March 26, 2024 6:52:19 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\JonathanWalder\OneDrive - 777 Partners\Documents\Leadenhall\3-25-2024 forbearance\777 - Forbearance Agreement (K&S Draft 3_23_24).doc |
| Description | 777 - Forbearance Agreement (K&S Draft 3_23_24) |
| Document 2 ID | file://C:\Users\JonathanWalder\OneDrive - 777 Partners\Documents\Leadenhall\3-25-2024 forbearance\777 - Forbearance Agreement (K&S Draft 3_23_24) (777 comments).doc |
| Description | 777 - Forbearance Agreement (K&S Draft 3_23_24) (777 comments) |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 114 |
| Deletions | 73 |
| Moved from | 5 |
| Moved to | 5 |

A-359

| Style changes | 0 |
|---|---|
| Format changes | 0 |
| Total changes | 197 |

A-360

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>Defendants. | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF PHIL KANE

I, Phil Kane, declare as follows:

1.      I am a Managing Partner at Leadenhall Capital Partners LLP ("Leadenhall") and my title is Principal Trading, Senior Credit Officer.  I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2.      On March 28, 2023, I attended a conference call with Josh Wander.  Leadenhall representatives John Wells, Luca Albertini, and Peter Clark also participated on the call. Leadenhall recorded the call with Wander's permission.

A-361

3.      During the March 28, 2023 call, Wander stated as follows concerning collateral pledged as security under the LSA by a 777 Partners affiliate, SPLCSS III (the "SuttonPark Borrower"): "The issue today is that there are deals that are in Credigy's borrowing base that are allocated to you guys [Leadenhall]."  Credigy is another lender to 777 Partners under a separate credit facility.

4.      Wander further stated on the call: "Deals that sat on our Volans facility—which is locked out basically now for 5 years—that were allocated to the [SuttonPark] facility.  And those are the deals that that—you would consider double-pledged now, for they're on both facilities." The "Volans facility" refers to 777 Partners' credit facility with Credigy.

5.      On the March 28, 2023 call, during an exchange between Wander and Leadenhall Chairman John Wells, Wander acknowledged that the double-pledge of collateral constituted a breach of the agreements.  In response to Wells stating, "There are so many breaches on these agreements now.  We need to get all of this sorted out," Wander stated: "Agreed, agreed, agreed."

6.      On April 2, 2024, I participated in a conference call with Wander.  Wander stated that 777 Partners did not have the ability to make even a $15 million payment to Leadenhall without funding from Advantage Capital Holdings LLC ("A-CAP").  Wander also stated that A-CAP controlled whether 777 Partners could sign an agreement on a repayment schedule to Leadenhall.

7.      On April 3, 2023, I attended a conference call with Josh Wander.  Leadenhall representatives John Wells, Luca Albertini, Peter Clark, Tom Spreutels, and Tom Foot also participated on the call.  Leadenhall recorded the call with Wander's permission.

8.      During the April 3, 2023 call, Wander admitted that the SuttonPark borrower had borrowed in excess of collateral pledged under the LSA and therefore there was a "shortfall" in

2

A-362

collateral.  During the call, Wells asked Wander: "What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?"  Wander answered: "I think it was around 100 million I think."

9.      During the April 3, 2023 call, Wells also asked Wander: "So over 30% of our collateral has been pledged to someone else?"  Wander answered: "Yes, it appears that way."

**777 Re**

10.     777 Re Ltd. ("777 Re") is a reinsurance company that is an affiliate of 777 Partners. 777 Re is based in Bermuda and is regulated by the Bermuda Monetary Authority.  I have attended board meetings of 777 Re's board in Leadenhall's capacity as board observer.

11.     As of year-end 2023, 777 Re had reinsurance agreements with Haymarket Insurance Company, Jazz Reinsurance Company, Southern Atlantic Re Inc., SILAC Insurance Company, and Singapore Life Limited.  Haymarket Insurance Company, Jazz Reinsurance Company, and Southern Atlantic Re Inc. are affiliates of A-CAP.

12.     Approximately 99% of 777 Re's reported GAAP book value of invested assets at year-end 2023 was based on 777 Re's reinsurance agreements—and the payments receivable from those reinsurance agreements—with Haymarket Insurance Company, Jazz Reinsurance Company, Southern Atlantic Re Inc., SILAC Insurance Company, and Singapore Life Limited.  At year-end 2023, 777 Re had approximately $3.936 billion in assets based on book value.

13.     In February and March 2024, SILAC Insurance Company and Singapore Life Limited recaptured their insurance risks ceded to 777 Re.  In February 2024, A-CAP recaptured, or announced that it would recapture by the second quarter of 2024, its reinsurance risks from 777 Re.  These recaptures have caused a material reduction in the net book value of 777 Re's assets.

3

A-363

14.     The continued operation of the following 777 Partners businesses was highly dependent on the financial assets of 777 Re: 777 Partners' professional football business (777 Football Group), 777 Partners' aircraft leasing business (347 Green Leasing), 777 Partners' Canadian airline business (Flair Airlines), 777 Partners' asset management business (777 Asset Management), and 777 Partners' reinsurance business (777 Re).

15.     As of March 2023, as reported by 777 Partners to Leadenhall, these businesses constituted the majority of 777 Partners' businesses by net value.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 12th day of May, 2024.

_____
Phil Kane

4

A-364

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 |

<u>**DECLARATION OF LUCA ALBERTINI**</u>

I, Luca Albertini, declare as follows:

      1.      I am a Managing Partner and the Chief Executive Officer of Leadenhall Capital Partners LLP ("Leadenhall"). I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

      2.      On March 29, 2024, I participated in a conference call with Josh Wander. Wander stated that his companies did not have the ability to make a payment of $15 million absent assistance from Advantage Capital Holdings, LLC ("A-CAP"). During the call, Wander also said

1

A-365

that if 777 Partners and its affiliates ("777 Partners") even agreed to a repayment plan in exchange for a forbearance agreement, the terms of which had not been approved by A-CAP, A-CAP would call an event of default on A-CAP's outstanding loans to 777 Partners.

3.      On April 2, 2024, Josh Wander called me over the phone concerning whether 777 Partners could make a payment to Leadenhall to pay back outstanding debt due to Leadenhall.

4.      During the April 2, 2024 call, I asked Wander whether 777 Partners could pay back even $15 million of the outstanding debt owed to Leadenhall.  Wander responded that 777 Partners could not pay Leadenhall $15 million.  Wander further stated that 777 Partners would only potentially be able to pay Leadenhall $15 million on April 15, 2024, the date on which Wander anticipated that 777 Partners would obtain funding from a separate source.

5.      In response, I stated that I was dismayed that Wander was unable to find even $15 million to repay Leadenhall.  I also stated to Wander that 777 Partners' inability to find $15 million made me doubt whether 777 Partners could meet future payment obligations to Leadenhall. Leadenhall never received a $15 million payment from 777 Partners on or after April 15, 2024.

6.      On April 4, 2024, I spoke to Wander over the telephone.  During the call, Wander stated that A-CAP would not allow 777 Partners to pay $30 million to pay down the debt owed to Leadenhall.  Wander hinted that he may be able to make an offer to pay $17.5 million.  Leadenhall never received a $17.5 million payment.

7.      On May 2, 2024, I spoke to Josh Wander over the telephone.  Wander represented that 777 Partners was presently in the process of running down its business and selling off assets in order to repay its creditors.

8.      On May 2, 2024, Wander stated that 777 Partners' loans to professional football clubs in April 2024 were "protective advances" provided by A-CAP.  Wander stated on the call

2

A-366

that 777 Partners and A-CAP were not in a position to provide any funding or "protective advances" to Leadenhall to repay the outstanding debt owed by 777 Partners.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 13th day of May, 2024.

_____
Luca Albertini

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, | Civil Action No. 1:24-cv-03453 |
| Plaintiffs, | |
| vs. | |
| JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, | |
| Defendants. | |

**DECLARATION OF LEIGH M. NATHANSON**

I, Leigh M. Nathanson, declare under penalty of perjury that the following statements are true and correct:

1.      I am an attorney licensed and admitted to practice in the state of New York and a partner at King & Spalding LLP, counsel for Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investment Fund PLC (collectively, "Leadenhall" or "Plaintiffs").

2.      I submit this Declaration in support of Leadenhall's proposed Order to Show Cause seeking as to Defendants 777 Partners, 600 Partners, and the Borrowers (together, the "Borrowers

A-368

and Guarantors"[1]): (1) the appointment of a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure to take possession, custody, and control of the assets of the Borrowers and Guarantors as specified in the proposed Order to Show Cause, and otherwise to take action as specified in the proposed Order to Show Cause; or, in the alternative, (2) a prohibition pursuant to Rule 64 or 65 of the Federal Rules of Civil Procedure on the sale, transfer, pledge, or encumbrance of the assets owned by the Borrower or in which the SuttonPark or Dorchester Borrower has any security interest, and otherwise to prohibit as to the Borrowers and Guarantors the acts set forth in the proposed Order to Show Cause.

3.      This declaration is also submitted in support of Leadenhall's application for a temporary restraining order prohibiting the Borrowers and Guarantors from committing any of the acts set forth in Paragraph (2) of the proposed Order to Show Cause pending a hearing and decision on the Order to Show Cause.

4.      A Complaint was filed in this action on May 3, 2024.

5.      Leadenhall's application is brought by Order to Show Cause rather than by Notice of Motion because swift action is required to prevent Defendants from causing Leadenhall irreparable harm by becoming insolvent to prevent Leadenhall from enforcing any judgment against Defendants in this litigation.

6.      Attached hereto as Exhibits A through P, as delineated below, are true and correct copies of the operative pleadings in the following actions against Defendants:

    A.  *Change Lending LLC v. 777 Partners LLC et al.*, Index No. 650118/2024 (N.Y. Sup.);

    B.  *Corvus Lights Aviation et al v. 777 Partners LLC* (U.K.);

---

[1] Capitalized terms shall have the same meaning as set forth in the proposed Order to Show Cause.

2

A-369

C.  *MALT Family Trust et al. v. 777 Partners, LLC et al.*, C.A. No. 2022-0652-MTZ (Del. Ch.);

D.  *Vida Longevity Fund, LP et al. v. Suttonpark Capital LLC et al.*, Index. No. 656715/2022 (N.Y. Sup.);

E.  *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.*, Index No. 651220/2024 (N.Y. Sup.);

F.  *Balanced Management LLC v. 777 Partners LLC*, Case No. 230909460 (Utah Dist. Ct.);

G.  *Nakula Management Ltd. v. Joshua Wander et al.*, Case No. 2024-004624-CA-01 (Fla. 11th Cir. Ct.) (exhibits to the complaint are excluded);

H.  *1 Madison Office Fee LLC v. 777 Partners LLC et al.*, Index No. 654397/2023 (N.Y. Sup.);

I.  *Lasse Meilsoe v. 777 Partners LLC et al.*, Case No. 2023-028758-CA-01 (Fla. 11th Cir. Ct.);

J.  *Peter Meyers v. 777 Partners, LLC et al.*, Case No. 2024-001279-CA-01 (Fla. 11th Cir. Ct.);

K.  *American Express Travel Related Services Company, Inc. v. 777 Partners LLC*, 651130/2023 (N.Y. Sup.);

L.  *Randy S. Gelber v. Joshua Wander*, Case No. 2021-013205-CA-01 (Fla. 11th Cir. Ct.);

M.  *The Oxbridge Group, LTD v. 777 Partners, LLC*, Index No. 651975/2023 (N.Y. Sup.);

3

A-370

N.   *O'Neil-Dunne et al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-BWD (Del. Ch.);

O.   *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*, Case No. 22-cv-750 (N.D. Ill.); and

P.   *Joseph Morgan et al. v. 777 Partners, LLC et al.*, Case No. 24-cv-01004 (N.D. Ill.).

7.     On May 13, 2024, I emailed outside counsel representing Defendants and, for certain Defendants, counsel which has instructed us to communicate with them pending those Defendants' retention of outside counsel, informing them that Leadenhall is filing this proposed Order to Show Cause seeking (i) a temporary restraining order, and (ii) a receivership or, in the alternative, a preliminary injunction.  I further informed counsel that we intend to email them copies of all of the papers we are now filing in support of this proposed Order to Show Cause once they have been filed.

8.     The Borrowers and Guarantors will not suffer any legally cognizable harm from the issuance of a temporary restraining order and, ultimately, a preliminary injunction seeking the appointment of a receiver or, in the alternative, the freezing of assets sufficient to cover the Accelerated Debt.

9.     There has been no prior request for the emergency relief requested in this proposed Order to Show Cause.

A-371

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 13, 2024

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

A-372

# EXHIBIT A

A-373

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM    INDEX NO. 650118/2024
NYSCEF DOC. NO. 30                                                        RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK    Document 61-1    Filed 05/13/24    Page 2 of 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
CHANGE LENDING, LLC,                                :
                                                    :    Index No. 650118/2024
                              Plaintiff,            :
                                                    :
            - against -                             :    **AMENDED VERIFIED**
                                                    :    **COMPLAINT**
                                                    :
777 PARTNERS LLC and 600 PARTNERS LLC,              :
                                                    :
                              Defendants.           :
                                                    :
-------------------------------------------------------------------X

Plaintiff Change Lending, LLC ("Change" or "Plaintiff"), by and through its undersigned

attorneys, for its Amended Verified Complaint against Defendants 777 Partners LLC ("777") and

600 Partners LLC ("600") (collectively the "777 Entities" or "Defendants"), alleges as follows:

### NATURE OF THE CASE

1.      This is a breach of contract action arising from the 777 Entities' failure and refusal

to fulfill their obligations to Change.

2.      In two separate transactions, Change invested $17,000,000.00 to purchase preferred

equity in the 777 Entities. The 777 Entities were required to deliver certain information and

materials to Change in connection with these transactions to satisfy Change about the 777 Entities'

financial condition and operations. If the 777 Entities failed to deliver, Change had the right to

immediately redeem (i.e., cause the 777 Entities to repurchase) all of the preferred equity that

Change held in the 777 Entities (the "Repurchase Right"). The 777 Entities failed to deliver,

Change exercised its Repurchase Right, and the 777 Entities refused to comply with their

obligation to repurchase all the preferred equity that Change held in the 777 Entities.

1

A-374

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM          INDEX NO. 650118/2024
NYSCEF DOC. NO. 30                                        RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK   Document 61-1   Filed 05/13/24   Page 3 of 13

3.      There is no dispute about the 777 Entities' breach.  The 777 Entities acknowledged in written correspondence between the parties that they had not complied with their obligations to Change and requested multiple extensions and accommodations.  Change provided such extensions and accommodations for months based on 777's representations that their performance was imminent.  But after initially signaling that they would work with Change, the 777 Entities delayed, made excuse after excuse, and then finally stopped responding to Change altogether regarding this matter.

4.      Change brings this action for breach of contract to recover all damages caused by the 777 Entities' failure and refusal to fulfill their commitments to Change.

<u>PARTIES</u>

5.      Plaintiff Change Lending, LLC is a California limited liability company with its principal place of business located at 175 N. Riverview Drive, Suite C, Anaheim, California 92808. Change Lending, LLC is a financial services company that is managed by The Change Company CDFI LLC, a certified Community Development Financial Institution (CDFI), meaning it is a federally recognized provider of financial services to underserved and economically distressed communities.

6.      Defendants 777 Partners LLC and 600 Partners LLC are both Delaware limited liability companies that, upon information and belief, are located at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131, and are registered to do business in New York.  777 and 600 are affiliated with the private equity firm 777 Partners, which holds investments in international soccer and basketball clubs and the insurance, aviation, and technology industries, among others.

///

///

2

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM
NYSCEF DOC. NO. 30
INDEX NO. 650118/2024
RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK    Document 61-1    Filed 05/13/24    Page 4 of 13

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this proceeding and Defendants pursuant to CPLR §§ 301 and 302 because Defendants regularly transact business within this State. Additionally, the parties consented to this Court's jurisdiction in, among other contracts between them, the Subscription Agreement and Limited Power of Attorney to Purchase Preferred Membership Unit Interests of 777 Partners LLC and 600 Partners LLC dated February 2, 2023 (the "2.2.23 Subscription Agreement").

8.      Venue in this Court is proper pursuant to CPLR §§ 501 and 503(a) because the parties consented to venue in this Court in the 2.2.23 Subscription Agreement and because a substantial part of the events or omissions giving rise to Change's claims occurred in this county.

## FACTUAL ALLEGATIONS

A.      **The Relevant Agreements and Notice**

9.      On or around August 23, 2022, Change invested in the 777 Entities by purchasing 14,000 preferred membership units ("Preferred Units") from 777 and 600 pursuant to a Subscription Agreement and Limited Power of Attorney to Purchase Preferred Membership Unit Interests of 777 Partners LLC and 600 Partners LLC dated August 23, 2022 (the "8.23.22 Subscription Agreement"). Change paid $14,000,000.00 to purchase the 14,000 Preferred Units at a price of $1,000.00 per unit.

10.     Concurrently with the 8.23.22 Subscription Agreement, Change and the 777 Entities entered into a side letter agreement which set forth provisions describing the 777 Entities' obligation to repurchase the Preferred Units from Change under certain circumstances (the "777 Repurchase Side Letter"). The 777 Repurchase Side Letter provided that: "Notwithstanding anything to the contrary set forth in the [8.23.22] Subscription Agreement, any other documents

3

A-376

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM          INDEX NO. 650118/2024
NYSCEF DOC. NO. 30                                                   RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK   Document 61-1   Filed 05/13/24   Page 5 of 13

connected in connection therewith, or the terms and conditions applicable to the Preferred Units, the Purchaser [Change] shall be entitled to require the 777 Entities at any time after the third (3rd) anniversary of the date hereof, to repurchase or cause the repurchase of the Preferred Units, for a price equal to the purchase price applicable to such Preferred Units plus any accrued and unpaid dividends through the date of such repurchase." The 777 Repurchase Side Letter further required that the 777 Entities deliver to Change certain information and materials to satisfy Change about the financial condition, reputation, and operations of the 777 Entities. Such information and materials included, among other things, the 777 Entities' unaudited financial statements for specified time periods and "such other additional diligence materials as requested by [Change] from time to time." The 777 Repurchase Side Letter provided that if the 777 Entities failed to deliver such information, or if Change "determine[d] in its sole discretion, that it is unsatisfied with the financial condition and operations of the 777 Entities or there exists or is likely to exist reputational risk related to [Change's] investment in the 777 Entities, the repurchase obligation of the 777 Entities stated in the prior paragraph [of the 777 Repurchase Side Letter] shall be immediate at [Change's] election."

11.     The 777 Entities failed to deliver the required information and materials to Change in accordance with the 777 Repurchase Side Letter.

12.     On September 2, 2022, Change and the 777 Entities entered into an Addendum to the 777 Repurchase Side Letter (the "**Addendum**"). The Addendum acknowledged that the 777 Entities had "failed to timely comply with [their] obligations" to deliver to Change the information called for by the 777 Repurchase Side Letter and extended the period of time for the 777 Entities to comply. At the same time, the Addendum expressly reserved "all of [Change's] rights" under the 777 Repurchase Side Letter and "any other agreement entered into by and among [Change]

4

A-377

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM     INDEX NO. 650118/2024
NYSCEF DOC. NO. 30        RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK   Document 61-1   Filed 05/13/24   Page 6 of 13

and the 777 Entities (or their affiliates) and in connection with the [8.23.22] Subscription Agreement and transactions contemplated thereby," including principally the right to cause the 777 Entities to repurchase the Preferred Units.

13.     Among the "other additional diligence materials" that Change had requested from the 777 Entities were certain audited financial statements, including the 777 Entities' audited combined balance sheet as of December 31, 2021. The 777 Entities acknowledged this request from Change multiple times verbally and in writing and repeatedly promised to deliver such information.

14.     On or around February 2, 2023, relying on the 777 Entities' continuing promises that the required diligence materials would be delivered, Change purchased an additional 3,000 Preferred Units from 777 and 600 pursuant to a Subscription Agreement and Limited Power of Attorney to Purchase Preferred Membership Unit Interests of 777 Partners LLC and 600 Partners LLC dated February 2, 2023 (i.e., the 2.2.23 Subscription Agreement). Change paid $3,000,000.00 to purchase the 3,000 additional Preferred Units at a price of $1,000.00 per unit. Change now held 17,000 Preferred Units at a total price of $17,000,000.00.

15.     As part of this additional investment, Change documented its requests and received an additional repurchase agreement from the 777 Entities should they not deliver the documents timely, or if Change determined the 777 Entities' financial condition was unacceptable or posed reputational risk. The 2.2.23 Subscription Agreement reaffirmed the 777 Entities' obligation to deliver to Change certain diligence materials (i.e., "Company Deliverables"), including the "audited combined balance sheet of the Company [defined as 777 and 600] as of December 31, 2021," by March 31, 2023.

5

A-378

Case 1:24-cv-03453-JGK   Document 61-1   Filed 05/13/24   Page 7 of 13

16. The 777 Entities failed to deliver all such materials required under the 2.2.23 Subscription Agreement by March 31, 2023. They still have not delivered them as of the filing of this Complaint.

17. Change requested multiple times verbally and in writing that the 777 Entities deliver all of the requested diligence materials, including their audited financial statements. For months, the 777 Entities requested extensions and accommodations and continually promised that the financial statements were forthcoming. Change cooperated with the 777 Entities and waited patiently to receive the promised financial statements. They never came.

18. The 777 Entities' failure to deliver all requested diligence materials, including their audited combined balance sheet as of December 31, 2021, triggered Change's Repurchase Right and the 777 Entities' repurchase obligations under the parties' relevant agreements.

19. Furthermore, Change determined, in its sole discretion, that it was unsatisfied with the financial condition and operations of the 777 Entities and that there existed reputational risk relating to its investment based on the limited information provided by the 777 Entities. This was exacerbated by the 777 Entities' failure to provide the documents they agreed to provide and their failure to provide audited financials requested by Change.

20. On or around September 21, 2023, Change delivered notice to the 777 Entities that it was exercising its Repurchase Right and requiring the 777 Entities to repurchase all of the Preferred Units held by Change (the "**Exercise Notice**").

21. Following delivery of the Exercise Notice, Change and the 777 Entities discussed how to consummate the transaction required by the Repurchase Right. The 777 Entities initially signaled that they would cooperate, and the parties discussed various transaction structures that would accomplish Change's request. Representatives of the 777 Entities, including their managing

6

A-379

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM  INDEX NO. 650118/2024
NYSCEF DOC. NO. 30  RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK  Document 61-1  Filed 05/13/24  Page 8 of 13

partner/co-founder Josh Wander, strung Change along for weeks, agreeing to and then rescheduling or cancelling calls, saying they were "working on it," and deflecting to other stakeholders in the 777 Partners' organization. After weeks of delays and excuses, the 777 Entities stopped responding to Change altogether regarding the matter. They also ignored two letters that gave the 777 Entities a final opportunity to consummate the requested transaction and avoid litigation.

**B.** **Change's Pre-Filing Investigation Reveals a Pattern of Similar Misconduct by the 777 Entities**

22. The 777 Entities' failure and refusal to provide audited financial statements and other key financial information to counterparties appears to be a pattern. For instance, the New York Times reported on October 18, 2023 that 777 Partners' proposed purchase of the storied English Premier League soccer team Everton F.C. had stalled because 777 Partners "failed to provide audited financial statements to a British government regulator that must approve the deal."[1] The article describes how 777 Partners had also failed to "provide details of the source of the funds behind the acquisition" and had engaged in similar conduct the prior year with Belgian soccer authorities that had raised questions about 777 Partners' business practices. The article also provides reports from current and former employees of 777 Partners that the company "continues to miss routine payments to businesses, vendors and partners ...." Change is one such business/partner.

23. In another example, on November 15, 2023, the news organization Semafor published a story that revealed 777 Partners was using insurance customers' premiums to fund

---

[1] *See* https://www.nytimes.com/2023/10/18/world/europe/everton-sale-777-partners.html (last accessed December 28, 2023).

7

A-380

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM    INDEX NO. 650118/2024
NYSCEF DOC. NO. 30                                   RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK    Document 61-1    Filed 05/13/24    Page 9 of 13

risky investments in sports teams, payday lending, aviation, and other interests.[2] 777 Partners'
financial documents and investor presentations did not fully disclose the nature of these
investments.

24.    Other publications, including the Washington Post and the Guardian, have similarly
recently reported about 777 Partners' questionable business practices and allegations of "fraud and
unpaid debts."[3]

25.    Upon information and belief, subsequent to receiving Change's Exercise Notice on
September 21, 2023, the 777 Entities redirected capital into new investments and management
bonuses instead of executing the redemption called for by Change. At the same time, Change is
aware of transactions that occurred following Change's repurchase demand that reduced the 777
Entities' regulatory capital requirements and increased the 777 Entities' liquidity, but the 777
Entities have not used any of the proceeds to repurchase a single dollar of Change's preferred
equity.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

26.    Change incorporates by reference and realleges the allegations contained in
paragraphs 1 through 25 of this Amended Complaint as though fully set forth herein.

27.    On or around August 23, 2022, Change and the 777 Entities entered into the 8.23.22
Subscription Agreement and the 777 Repurchase Side Letter, both valid contracts.

---

[2] *See* https://www.semafor.com/article/11/15/2023/mystery-investor-777-partners-bought-
european-sports-teams-with-insurance-customers-cash (last accessed December 28, 2023).
[3] *See, e.g.,* https://www.washingtonpost.com/sports/2023/09/29/everton-777-partners-josh-
wander/ and https://www.theguardian.com/football/2023/sep/27/everton-financial-future-
takeover-approved-777-
partners#:~:text=777%20has%20faced%20allegations%20of,that%20may%20be%20considered
%20spent (last accessed December 28, 2023).

8

A-381

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM    INDEX NO. 650118/2024
NYSCEF DOC. NO. 90    RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK    Document 61-1    Filed 05/13/24    Page 10 of 13

28.     On or around September 2, 2022, Change and the 777 Entities entered into the Addendum, a valid contract.

29.     On or around February 2, 2023, Change and the 777 Entities entered into the 2.2.23 Subscription Agreement, a valid contract.

30.     Change performed all of its obligations under the relevant agreements.

31.     The 777 Entities failed to perform all of their material obligations under the relevant agreements.

32.     The 777 Entities failed to deliver all of the requested diligence materials to Change, as required by the above-referenced agreements.  The 777 Entities also failed to comply with their repurchase obligation with regard to the Preferred Units under the above-referenced agreements.

33.     Change determined that the 777 Entities were in unsatisfactory financial condition and therefore demanded the repurchase of its Preferred Units.

34.     Change determined that the 777 Entities exposed Change to unacceptable reputational risks and therefore demanded the repurchase of its Preferred Units.

35.     Change determined that the 777 Entities did not deliver the required information to Change and therefore demanded the repurchase of its Preferred Units.

36.     The 777 Entities have failed to honor Change's repurchase demands and have not contested Change's right to require the 777 Entities to repurchase Change's Preferred Units.

37.     The 777 Entities' failure to comply with Change's Repurchase Right has caused significant monetary harm to Change.  In addition to the $17,000,000 the 777 Entities have failed to pay to Change, the 777 Entities have not made the required dividend payments for 2023 on Change's preferred equity, adding to Change's damages.  As a direct and proximate result of the 777 Entities' conduct, Change has suffered, and will continue to suffer, damages in an amount of

9

A-382

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM INDEX NO. 650118/2024
NYSCEF DOC. NO. 30 Case 1:24-cv-03453-JGK Document 61-1 Filed 05/13/24 Page 11 of 13 RECEIVED NYSCEF: 03/19/2024

at least $17,000,000 (the purchase price applicable to the preferred membership units) plus accrued and unpaid dividends in an amount to be determined by the Court, but which is estimated to be at least $1,983,333 as of the date of this filing. Change has also been damaged by being forced to incur high-interest debt, sell assets at below-market value, and slow originations to replace the liquidity that the 777 Entities were supposed to provide to Change.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Change Lending, LLC prays for judgment and relief against Defendants 777 Partners LLC and 600 Partners LLC as follows:

(1) On the First Cause of Action, for breach of contract, Plaintiff is entitled to at least $17,000,000 plus accrued and unpaid dividends and other reasonably foreseeable damages in an amount to be determined by the Court;

(2) Plaintiff also seeks its costs of suit incurred, and pre and post-judgment interest; and

(3) Plaintiff seeks any such further relief as the Court may deem just, necessary, and proper.

Dated: March 19, 2024

Respectfully submitted,

MICHELMAN & ROBINSON, LLP

By:

Jared B. Foley
605 Third Avenue, 30th Floor
New York, NY 10158
Telephone: (212) 730-7700
Fax: (212) 730-7725
Email: jfoley@mrllp.com

and

10

A-383

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM   INDEX NO. 650118/2024
NYSCEF DOC. NO. 90                                              RECEIVED NYSCEF: 03/19/2024

Alexander R. Safyan *(pro hac vice forthcoming)*
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90024
Telephone: (310) 299-5500
Fax: (310) 299-5600
Email: asafyan@mrllp.com

*Attorneys for Plaintiff Change Lending, LLC*

11

A-384

FILED: NEW YORK COUNTY CLERK 03/19/2024 05:52 PM          INDEX NO. 650118/2024
NYSCEF DOC. NO. 30                                        RECEIVED NYSCEF: 03/19/2024

Case 1:24-cv-03453-JGK   Document 61-1   Filed 05/13/24   Page 13 of 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
CHANGE LENDING, LLC,                          :
                                              :    Index No. 650118/2024
                    Plaintiff,                :
                                              :
      - against -                             :    **VERIFICATION**
                                              :
                                              :
777 PARTNERS LLC; 600 PARTNERS LLC,           :
                                              :
                    Defendants.               :
                                              :
------------------------------------------------------------X

STATE OF CALIFORNIA        )
                           ) ss.:
COUNTY OF LOS ANGELES      )

       Carlos P. Salas, being duly sworn, deposes and states:

       I am the Chief Executive Officer of Change Lending, LLC, the plaintiff in this action.  I

have read the annexed Verified Amended Complaint and know the contents thereof.  The same are

true of my own knowledge, except for matters alleged upon information and belief, and as to those

matters I believe them to be true.

       Executed on March 19, 2024.

                                        By:   _____
                                              Carlos  Salas,  CEO  of  Change  Lending,
                                              LLC

Sworn to me this 19th day of March, 2024

_____
Notary Public



                                        12

A-385

# EXHIBIT B

A-386

CL-

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**KING'S BENCH DIVISION**

**COMMERCIAL COURT**

(1) CORVUS LIGHTS AVIATION LIMITED
(2) MAM AIRCRAFT LEASING 4 (IRELAND) DESIGNATED ACTIVITY
COMPANY
(3) COLUMBA LIGHTS AVIATION LIMITED

**Claimants**

- and -

(1) 777 PARTNERS LLC
(2) 600 PARTNERS LLC

**Defendants**

---

**PARTICULARS OF CLAIM**

---

**OVERVIEW**

1.  The Claimants (the "**Lessors**") have, individually, leased aircraft to Flair Airlines
    Limited ("**Flair**") under four operating lease agreements (the "**Leases**"). The First
    Defendant has provided guarantees and indemnities in respect of Flair's obligations
    under each of the Leases. The Second Defendant has provided guarantees and
    indemnities in respect of Flair's obligations under three of the four Leases.

2.  Flair has failed to pay sums due under the Leases and the leasing of each of the aircraft
    under the Leases has been terminated by the Lessors. The Lessors now claim outstanding
    sums due under the Leases, as payable under the guarantees and indemnities, from the
    Defendants, alternatively damages in the same amounts.

A-387

**PARTIES**

*Lessors*

3.      Corvus Lights Aviation Limited ("**Corvus**") is a company incorporated under the laws of Ireland with its registered office at 5th Floor, The Exchange, George's Dock, IFSC, Dublin 1 Ireland, D01 W3P9.

4.      MAM Aircraft Leasing 4 (Ireland) Designated Activity Company ("**MAM 4**") is a designated activity company limited by shares incorporated under the laws of Ireland and having its registered office at 32 Molesworth Street, Dublin 2, Ireland.

5.      Columba Lights Aviation Limited ("**Columba**") is a company incorporated under the laws of Ireland with its address at 5th Floor, The Exchange, George's Dock, IFSC, Dublin 1, Ireland, D01 W3P9.

*Defendants*

6.      777 Partners LLC ("**777 Partners**") is a limited liability company established under the laws of the State of Delaware, with its registered office at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, New Castle, DE 19808, USA.

7.      600 Partners LLC ("**600 Partners**") is a limited liability company established under the laws of the State of Delaware with its registered office at c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, New Castle, DE 19808, USA.

**LEASES**

*MSN 36548 Lease*

8.      By an Aircraft Operating Lease Agreement dated 20 March 2019 between Oriental Leasing 17 Company Limited and Flair, Oriental Leasing 17 Company Limited agreed to lease to Flair one Boeing B737-800 Aircraft with Manufacturer's Serial Number ("**MSN**") 36548 (the "**MSN 36548 Lease**").

9.      By an Aircraft Lease Novation and Amendment Agreement dated 2 April 2022, Oriental Leasing 17 Company Limited, Flair and Corvus agreed that Oriental Leasing 17

2

A-388

Company Limited's rights, liabilities and obligations under the MSN 36548 Lease would be assumed by Corvus.

10. The MSN 36548 Lease provides (using the defined terms in that agreement):

    (a) Flair must pay Rent on each Rent Payment Date (clause 7.1);

    (b) Flair must pay Maintenance Reserves on each Maintenance Reserve Payment Date (clause 7.3.1);

    (c) Default interest is payable on any overdue sum in accordance with clause 7.10;

    (d) The failure of Flair to make any payment of Rent or any other scheduled payment within 3 Business Days of the date on which the payment is expressed to be due amounts to an Event of Default (clause 14.1.3);

    (e) If an Event of Default occurs or is continuing, the Lessor may at its option, amongst other things:

        (i) terminate the leasing of the Aircraft by notice in writing (clause 14.2.1(c)); and

        (ii) repossess the Aircraft (clause 14.2.1(e));

    (f) Clause 14.3.1 provides:

> "*The Lessee will indemnify each Lessor Party against, and pay to such Lessor Party from time to time on demand, any and all Losses of whatsoever kind and nature which may from time to time or at any time be imposed on, suffered or incurred by or asserted against such Lessor Party relating to, arising out of or resulting from (whether directly or indirectly) any Event of Default or any termination of the leasing of the Aircraft under this Agreement pursuant to any provision of this Agreement including:*
>
>     *(a) all amounts of Rent and all other amounts (including Maintenance Reserves) payable by the Lessee to the Lessor under this Agreement or any other Lessee Document but unpaid, together with interest thereon at the Default Rate from the date on which such Rent or other amounts fell due for payment to the date of their receipt by the Lessor;*

3

A-389

(b)     upon any such termination, all Losses (including any loss of profit and any loss of bargain) suffered by such Lessor Party resulting from (whether directly or indirectly) customising the Aircraft for the Lessee, such Lessor Party's inability to place the Aircraft on lease with another lessee on terms as favourable to such Lessor Party as this Agreement or because whatever use, if any, to which such Lessor Party is able to put the Aircraft upon its return to the Lessor or the funds arising upon a sale or other disposal of the Aircraft is not as profitable to such Lessor Party as this Agreement (including any Losses incurred because such Lessor Party does not receive rent or maintenance reserves with respect to the Aircraft for any period prior to the Scheduled Expiry Date);

(c)     upon any such termination, all Losses (including any loss of profit and any loss of bargain) suffered by such Lessor Party resulting from (whether directly or indirectly) the inability of any Lessor Party to deliver the Aircraft to a purchaser or next lessee due to a failure by the Lessee to return the Aircraft to the Lessor on the Scheduled Expiry Date in the Redelivery Condition and otherwise in accordance with the terms of this Agreement;

(d)     all costs and expenses incurred by such Lessor Party in recovering possession of the Aircraft including in or as a result of exercising any of its rights or remedies pursuant to Clauses 14.2 (Remedies) above, 14.4 (Sale or Re-lease of the Aircraft) and 14.5 (Deregistration) below and in carrying out any works or modifications required to put the Aircraft into the Redelivery Condition and in storing and insuring the Aircraft;

(e)     all reasonable legal fees and out-of-pocket expenses, stamp, documentary, registration or other like duties, taxes, costs or charges incurred by such Lessor Party and/or its professional advisers, in connection with enforcing, protecting or preserving (or attempting to enforce, perfect, protect or preserve) the rights of any Lessor Party, or in suing for or recovering any sum, under the Transaction Documents; and

(f)     all Break Costs."

**MSN 61806 Lease**

11.   By an Operating Lease Agreement dated July 2021 between MAM Aircraft Leasing 3 (Ireland) Designated Activity Company ("**MAM 3**") and Flair, MAM 3 agreed to lease to Flair one Boeing 737 Max 8 aircraft with MSN 61806 (the "**MSN 61806 Lease**").

4

A-390

12. By a novation agreement dated 30 March 2022, MAM 3, the Lessee and MAM 4 agreed that MAM 3's rights, liabilities and obligations under the MSN 61806 Lease would be assumed by MAM 4.

13. The MSN 61806 Lease provides (using the defined terms in that agreement):

(a) Rent is payable on each Rent Date (clause 5.1);

(b) Supplemental Rent is payable on each Supplemental Rent Payment Date (clause 5.3.1);

(c) Default interest is payable on any overdue amount at the Default Rate in accordance with clause 5.6;

(d) The failure to make any payment of Rent or Supplemental Rent within 3 business days of the date on which the payment is expressed to be due is an Event of Default (clause 19.1.2);

(e) If an Event of Default has occurred and is continuing, the Lessor may at its option:

(i) accept the Lessee's repudiation of the MSN 61806 Lease and by notice in writing to the Lessee terminate the leasing of the Aircraft (clause 20.1(b)); and

(ii) repossess the aircraft (clause 20.1(d)).

(f) Clause 20.3 provides:

"*If an Event of Default (has occurred and is continuing) or the Lessor terminates the leasing of the Aircraft under this Agreement pursuant to Clause 21 (Illegality), the Lessee will indemnify the Lessor and pay to the Lessor from time to time on demand against any Loss which the Lessor will sustain or incur directly as a result of such Event of Default, including:*

*(a) all the Rent the Lessee already owes (if any) and any other amounts the Lessee owes under the Transaction Documents;*

*(b) all Losses (including any loss of profit) suffered by the Lessor in customising the Aircraft for the Lessee or because of the Lessor's inability to place the Aircraft on lease with another lessee on*

5

A-391

*terms as favourable to the Lessor as this Agreement or because whatever use, if any, to which the Lessor is able to put the Aircraft upon its return to the Lessor or the funds arising upon a sale or other disposal of the Aircraft is not as profitable to the Lessor as this Agreement;*

(c)     *all costs and expenses incurred by the Lessor in recovering possession of the Aircraft and in carrying out any works or modifications required to put the Aircraft into the Redelivery Condition and in storing and insuring the Aircraft following such repossession;*

(d)     *all legal fees and out-of-pocket expenses, stamp, documentary, registration or other like duties, Taxes or charges incurred by the Lessor and/or the Lessor's professional advisers, in connection with enforcing, protecting, or preserving (or attempting to enforce, perfect, protect or preserve) any of the Lessor's rights, or in suing for or recovering any sum, under the Transaction Documents; and*

(e)     *all Break Costs.*

*The Lessor will use reasonable endeavours to mitigate such Losses (to the extent within its control to do so), but (i) the Lessor shall not be obliged to consult with the Lessee concerning any proposed course of action or to notify the Lessee of the taking of any particular action, and (ii) this provision is without prejudice to the Lessor's rights under Clause 20.4 (Sale or release of the Aircraft)."*

### MSN 64944 Lease

14.     By an operating lease agreement dated 16 July 2021, between MAM 3 and Flair, MAM 3 agreed to lease to Flair one Boeing 737 Max 8 aircraft with MSN 64944 (the "**MSN 64944 Lease**").

15.     By a novation agreement dated 30 March 2022, MAM 3, Flair and MAM 4 agreed that MAM 3's rights, liabilities and obligations under the MSN 64944 Lease would be assumed by MAM 4.

16.     The MSN 64944 Lease contains materially the same provisions as those set out in respect of the MSN 61606 Lease at paragraph 13 above.

6

A-392

*MSN 61808 Lease*

17. By an operating lease agreement dated 31 March 2022 between Columba and Flair, Columba agreed to lease to Flair one Boeing 737 Max 8 Aircraft with MSN 61808 (the "**MSN 61808 Lease**")

18. The MSN 61808 Lease contains materially the same provisions as those set out in respect of the MSN 61606 Lease at paragraph 13 above.

## GUARANTEES AND INDEMNITIES

*Guarantee and Indemnity of MSN 36548 Lease*

19. 777 Partners and Corvus entered into a deed of Guarantee and Indemnity dated 2 April 2022 (the "**MSN 36548 Guarantee**").

20. Clause 2.2 of the MSN 36548 Guarantee provides:

> "*2.2    Guarantee and indemnity
> The Guarantor irrevocably and unconditionally:*
>
> (a)    *guarantees to the Beneficiary punctual performance by the Lessee of all the Lessee's payment obligations with respect to Rent and Maintenance Reserves (each as defined in the Lease Agreement) from time to time owing under or in connection with the Transaction Documents;*
>
> (b)    *as principal debtor and not merely as surety, undertakes with the Beneficiary that whenever the Lessee does not pay any amount or perform any obligations described in subclause (a) above when due under or in connection with the Transaction Documents, it shall immediately on demand by the Beneficiary pay that amount or, as the case may be, perform or procure the performance of the relevant obligations which is not so performed; and*
>
> (c)    *agrees with the Beneficiary that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal for any reason whatsoever then, notwithstanding that the same may have been known to the Beneficiary or any Indemnitee, it will, as an independent, additional, continuing and primary obligation, immediately on demand by the Beneficiary, make payment of the*

7

**A-393**

> *amount which would, but for such illegality, invalidity or illegality, have been payable by the Lessee under or in connection with the Transaction Documents by way of a full indemnity and shall indemnify the Beneficiary and the Indemnitees against any cost, loss or liability it incurs as a result of the Lessee's failure to pay any such amount on the date when it would have been due."*

21. Clause 21 of the MSN 36548 Guarantee provides that it and any non-contractual obligations arising from or in connection with it are governed by and shall be construed in accordance with English law. Clause 22.1 provides that the English courts shall have jurisdiction to settle any disputes arising out of or in connection with the MSN 36548 Guarantee and any non-contractual obligations arising out of or in connection with it.

### Guarantee and Indemnity of MSN 61806 Lease

22. 777 Partners, 600 Partners LLC and MAM 4 entered into a deed of Guarantee and Indemnity dated 30 March 2022 in relation to the MSN 61806 Lease (the "**MSN 61806 Guarantee**").

23. Clause 2.1 of the MSN 61806 Guarantee provides:

> "**2.1    Guarantee**
> Each Guarantor hereby irrevocably and unconditionally jointly and severally:
>
> (a)    guarantees to the Lessor, as principal obligor and not merely as surety, punctual payment and performance by the Lessee of all the Lessee's obligations under the Guaranteed Documents;
>
> (b)    undertakes with the Lessor that, whenever the Lessee does not pay any amount or perform any obligation when due under the Guaranteed Documents, it shall, within five (5) Business Days of written demand by the Lessor, pay that amount or perform that obligation as if it were the principal obligor;
>
> (c)    agrees with the Lessor that if, for any reason, any amount claimed by the Lessor under this Clause 2 is not recoverable on the basis of a guarantee, it will be liable as a principal debtor and primary obligor to indemnify the Lessor against any cost, loss or liability it incurs as a result of the Lessee not paying any amount expressed to be payable by it under the Guaranteed

8

A-394

Documents on the date when they are expressed to be due; the amount payable by each Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 2 if the amount claimed had been recoverable on the basis of a guarantee; and

(a)     agrees with the Lessor that if any obligation under a Guaranteed Document is or becomes unenforceable, invalid or illegal it will, as an independent and primary obligation, indemnify the Lessor immediately on demand against any cost, loss or liability it incurs as a result of the Lessee not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it on the date when it would have been due."

24.     Clause 9.1 of the MSN 61806 Guarantee provides that it and any non-contractual obligations arising out of or in relation to it are governed by, and shall be construed in accordance with, English law. Clause 9.2 provides that the English courts shall have exclusive jurisdiction in relation to all disputes arising out of or in connection with the MSN 61806 Guarantee including any non-contractual obligations arising out of or in connection with it.

### Guarantee and Indemnity of MSN 64944 Lease

25.     777 Partners, 600 Partners LLC and MAM 4 entered into a deed of Guarantee and Indemnity dated 30 March 2022 in relation to the MSN 64944 Lease (the "**MSN 64944 Guarantee**").

26.     The MSN 64944 Guarantee contains materially the same provisions as those contained in the MSN 61806 Guarantee and set out at paragraphs 23 and 24 above.

### Guarantee and Indemnity of MSN 61808 Lease

27.     777 Partners, 600 Partners LLC and Columba entered into a deed of Guarantee and Indemnity dated 31 March 2022 in relation to the MSN 61808 Lease (the "**MSN 61808 Guarantee**").

28.     The MSN 61808 Guarantee contains materially the same provisions as those contained in the MSN 61806 Guarantee and set out at paragraphs 23 and 24 above.

9

A-395

29.     The above four guarantees are referred to below as the "**Guarantees and Indemnities**".

30.     The Lessors will rely on the Leases and the Guarantees and Indemnities for their full terms, meaning and effect.

**FLAIR'S DEFAULT AND TERMINATION OF LEASING OF THE AIRCRAFT**

31.     On 16 February 2023, the Lessors each served default notices on Flair setting out amounts that were then outstanding under the Leases and demanding payment:

   (a)    $338,970.81 in Rent, Maintenance Reserves and default interest was outstanding under the MSN 36548 Lease;

   (b)    $525,469.27 in Rent, Supplemental Rent and default interest was outstanding under the MSN 61806 Lease;

   (c)    $445,848.47 in Rent, Supplemental Rent and default interest was outstanding under the MSN 64944 Lease; and

   (d)    $535,087.35 in Rent, Supplemental Rent and default interest was outstanding under the MSN 61808 Lease.

32.     On the same day, the Lessors each sent demands under the Guarantees and Indemnities to the relevant guarantors.

33.     On 22 February 2023, the Lessors each served further default notices on Flair setting out amounts outstanding under the Leases and demanding payment:

   (a)    $523,863.22 in Rent, Maintenance Reserves and default interest was outstanding under the MSN 36548 Lease;

   (b)    $653,368.05 in Rent, Supplemental Rent and default interest was outstanding under the MSN 61806 Lease;

   (c)    $458,898.55 in Rent, Supplemental Rent and default interest was outstanding under the MSN 64944 Lease; and

   (d)    $559,664.06 in Rent, Supplemental Rent and default interest was outstanding under the MSN 61808 Lease.

A-396

34.   On the same day, the Lessors each served a "*Notice of Termination of Lessee Security*" on Flair.

35.   On 10 March 2023, the above sums still not having been paid, the Lessors terminated the leasing of the each of the Aircraft under the Leases by each sending Termination Notices to Flair.

**PAYMENT DEMANDS OF FLAIR**

36.   On 22 September 2023, the Lessors sent updated payment demands for sums due and outstanding under the Leases to Flair.

*Sums outstanding under MSN 36548 Lease*

37.   Corvus sought payment of the following sums which are due and payable under the MSN 36548 Lease:

(a)   Rent and Maintenance Reserves outstanding of $210,060 payable by Flair under the MSN 36548 Lease but unpaid as at the termination of the leasing of MSN 36548;

(b)   Losses of $2,221,598.51 sustained or incurred by Corvus in relation to lost future income under the MSN 36548 Lease. This sum has been calculated as the estimated net amount that would have been due under the MSN 36548 Lease less the estimated net amount expected to be received or received under a replacement lease agreement, giving credit for any security deposits.

(c)   Losses of $800,000, which is Corvus' best estimate of the total reconfiguration costs it will incur in advance of delivering MSN 36548 to a new lessee under a new lease (some of these costs have now been incurred);

(d)   Costs and expenses of $374,870.77 incurred by Corvus in connection with recovering possession of the aircraft and in connection with enforcing, protecting or preserving its rights under the Transaction Documents.

11

A-397

***Sums outstanding under MSN 61806 Lease***

38.   MAM 4 sought payment of the following sums which are due and payable under the MSN 61806 Lease:

(a)   Rent totalling $330,000 Flair owed under the Transaction Documents as at the date of termination of the leasing of MSN 61806;

(b)   Losses of $5,668,588.05 sustained or incurred by MAM 4 in relation to lost future income under the MSN 61806 Lease. This sum has been calculated in relation to MSN 61806 using the same methodology as set out at paragraph 37(b) above.

(c)   Losses of $2,000,000 which is MAM 4's best estimate of the total reconfiguration costs it will incur in advance of delivering MSN 61806 to a new lessee under a new lease (some of these costs have now been incurred);

(d)   Costs and expenses of $318,981.67 incurred by MAM 4 in recovering possession of the aircraft and/or legal fees and out-of-pocket expenses and charges incurred by MAM 4 and/or MAM 4's professional advisers in connection with enforcing, protecting or preserving its rights under the Transaction Documents.

***Sums outstanding under MSN 64944 Lease***

39.   MAM 4 sought payment of the following sums which are due and payable under the MSN 64944 Lease:

(a)   Rent and other amounts of $447,130.01 Flair owed under the Transaction Documents as at the date of termination of the leasing of MSN 64944;

(b)   Losses of $5,558,716.16 sustained or incurred by MAM 4 in relation to lost future income under the MSN 64944 Lease. This sum has been calculated in relation to MSN 64944 using the same methodology as set out at paragraph 37(b) above;

(c)   Losses of $2,000,000, which is MAM 4's best estimate of the total reconfiguration costs it will incur in advance of delivering MSN 64944 to a new lessee under a new lease (some of these costs have now been incurred);

A-398

(d)  Costs and expenses of $351,569.04 incurred by MAM 4 in recovering possession of the aircraft and/or legal fees and out-of-pocket expenses and charges incurred by MAM 4 and/or MAM 4's professional advisers in connection with enforcing, protecting or preserving its rights under the Transaction Documents.

*Sums outstanding under MSN 61808 Lease*

40.  Columba sought payment of the following sums which are due and payable under the MSN 61808 Lease:

(a)  Rent of $340,030.00 Flair owed under the Transaction Documents as at the date of termination of the leasing of MSN 61808;

(b)  Losses of $6,656,770.02 sustained or incurred by Columba in relation to lost future income under the MSN 61808 Lease. This sum has been calculated in relation to MSN 61808 using the same methodology as set out at paragraph 37(b) above;

(c)  Losses of $2,000,000, which is Columba's best estimate of the total reconfiguration costs it will incur in advance of delivering MSN 61808 to a new lessee under a new lease (some of these costs have now been incurred);

(d)  Costs and expenses of $359,406.07 incurred by Columba in recovering possession of the aircraft and/or legal fees and out-of-pocket expenses and charges incurred by Columba and/or Columba's professional advisers in connection with enforcing, protecting or preserving its rights under the Transaction Documents.

41.  Flair has failed to pay the above sums due under the leases.

**GUARANTORS' DEMANDS**

42.  By written demands of the Defendants dated 11 October 2023, the Lessors have demanded, pursuant to the Guarantees and Indemnities, payments of the amounts outstanding under the Leases as set out at paragraphs 37 to 39 above (save for the amounts in paragraphs 37(c) and 37(d) above, which are not amounts payable under the MSN 36548 Guarantee).

43.  In breach of the Guarantees and Indemnities, the Defendants have failed to pay the sums due.

13

**A-399**

**RELIEF**

44.　Accordingly, the Lessors are entitled to and claim at least the following total sums due, alternatively damages in the same amounts for breach of contract, as follows:

(a)　Corvus: $2,431,658.51 from the First Defendant;

(b)　MAM 4: $16,674,954.93 from the Defendants;

(c)　Columba: $9,356,206.09 from the Defendants.

45.　The amounts due and owing in relation to MAM 4 and Columba continue to increase as further costs are incurred in connection with enforcing, protecting and/or preserving the Lessors' rights under the relevant Transaction Documents.

46.　Further, the Lessors are also entitled to and claim, pursuant to the Guarantees and Indemnities, default interest which continues to accrue on the amounts due under the Leases:

(a)　Default interest is due under the MSN 36548 Lease at 6% per annum at one month rests;

(b)　Default interest is due under the other leases at 2% above the published Royal Bank of Canada prime rate at one month rests.

47.　Alternatively, the Lessors claim interest under s35A of the Senior Courts Act 1981.

**AND THE CLAIMANTS CLAIM:**

(1) The sum of $2,431,658.51 due to Corvus from the First Defendant or the like sum as damages for breach of contract;

(2) The sum of $16,674,954.93 due to MAM 4 from the Defendants or the like sum as damages for breach of contract;

(3) The sum of $9,356,206.09 due to Columba from the Defendants or the like sum as damages for breach of contract;

A-400

(4) All further costs that are incurred or estimated will be incurred by MAM 4 and Columba in connection with enforcing, protecting and/or preserving the Lessors' rights under the relevant Transaction Documents;

(5) Interest on the sums due pursuant to paragraph 46 and/or 47 above;

(6) Costs.

**ORLANDO GLEDHILL KC**

**ADAM RUSHWORTH**

The rate current in London for the purchase of US$ at close of business on 8 December 2023 was US$1.26 to the £ sterling and at this rate, the amount claimed exceeds £300,000.00.

This information was obtained from Oanda.com

**<u>STATEMENT OF TRUTH</u>**

The Claimants believe that the facts stated in these Particulars of Claim are true. The Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am authorised by the Claimants to sign this statement.

Signature:

Name: Stephanie Kaye Huts

Date: 11 December 2023

Claimants' Legal Representative

Clifford Chance LLP – Position Held: Partner

15

A-401

Claim No. [ ]

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**KING'S BENCH DIVISION**

**COMMERCIAL COURT**

B E T W E E N

**(1) CORVUS LIGHTS AVIATION
LIMITED
(2) MAM AIRCRAFT LEASING 4
(IRELAND) DESIGNATED ACTIVITY
COMPANY
(3) COLUMBA LIGHTS AVIATION
LIMITED**

**Claimants**

- and -

**(1) 777 PARTNERS LLC
(2) 600 PARTNERS LLC**

**Defendants**

---

**PARTICULARS OF CLAIM**

---

**Clifford Chance LLP**
10 Upper Bank Street
London, E14 5JJ
Solicitors for the Claimants

16

A-402

# EXHIBIT C

A-403

EFiled:  Nov 22 2022 02:12PM EST
Transaction ID 68415331
Case No. 2022-0652-MTZ

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MALT FAMILY TRUST and TIMOTHY JAMES O'NEIL-DUNNE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0652-MTZ |
| 777 PARTNERS LLC, PHOENICIA LLC, STEVEN W. PASKO, JOSHUA WANDER, and ADAM WEISS, | ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED AMENDED COMPLAINT

The MALT Family Trust and Timothy James O'Neil-Dunne (together, "Plaintiffs") bring this action on their own behalf and derivatively (as to certain claims identified herein) on behalf of Phoenicia LLC, against the above-named Defendants for damages for fraud, breach of contract, breach of fiduciary duty, and related claims.

In support of their claims, Plaintiffs allege the following:

## THE PARTIES

1.   Defendant 777 Partners LLC ("777 Partners") is a Delaware limited liability company with its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida.

A-404

2.   777 Partners is a private investment firm that reports having more than $3 billion in assets under its management, more than 600 employees, and investments in more than 50 operating companies.

3.   777 Partners has direct and indirect ownership of aviation and travel-related companies which include, among others, Defendant Phoenicia LLC, 777 Wings LLC, ABB Technologies LLC, Adlon LLC, Air Black Box Company Ltd, Air Black Box LLC, Bonza Aviation Pty Ltd., Daedalus I LLC, Flair Airlines Ltd., Flair US LLC, World Airways Group LLC, WorldTicket A/S and subsidiaries thereof, Value Alliance Travel Systems PTE, Ltd., 777 FC Global USA Corp., 777 FC Global (Singapore) Pte. Ltd., 777 FC Global UK, EURO C.R.S. Ltd. and JWARP Ltd.  On information and belief, 777 Partners conducts its aviation business through other affiliated entities as well, and Pasko and Wander own entities in the aviation business outside of 777 Partners.  Throughout this Amended Complaint, terms such as airline, travel, aircraft, jet, software, financing, lease arbitrage and direct leasing, are used flexibly to reflect the varied terms employed by the Defendants in their overlapping and integrated businesses, all of which together comprise the "aviation" business that was subject to negotiation between, and agreed to by, the parties.  The various entities owned directly or indirectly by, and/or affiliated with, 777 Partners, Pasko and Wander in the aviation business are referred to collectively herein as the "777 Aviation Portfolio."

2

A-405

4.    Defendant Phoenicia LLC ("Phoenicia") is a Delaware limited liability company with its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida.

5.    Defendant Steven W. Pasko ("Pasko") is a resident of the State of Florida.

6.    Defendant Joshua Wander ("Wander") is a resident of the State of Florida.

7.    Defendant Adam Weiss ("Weiss") is a resident of the State of Florida.

8.    Pasko and Wander are founders of 777 Partners and have been Managing Partners of 777 Partners during the time of events alleged in this Complaint.  Pasko and Wander are two of the three managers of Phoenicia, appointed by 777 Partners to serve in those positions as the Series B Managers of the company, and they have served continuously in those roles during the time of events alleged in this Complaint.

9.    Weiss is and has been the Chief Executive Officer of 777 Partners' Aviation and Travel Group.  Weiss managed the 777 Aviation Portfolio even before being formally placed in charge of it.  During the time of the events alleged in this Complaint he managed the 777 Aviation Portfolio and participated materially in the management of Phoenicia, including by making decisions on behalf of the company.

3

A-406

10. Pasko, Wander, and Weiss are referred to collectively herein as the "Individual Defendants."

11. Plaintiff MALT Family Trust ("MALT") is a discretionary trust established in accordance with the laws of the Isle of Man with its principal place of business in Thetford, England.  MALT is a Series A Member of Phoenicia holding an 8% membership interest in the company.

12. Plaintiff Timothy James O'Neil-Dunne ("O'Neil-Dunne") is a resident of the State of Washington and a beneficiary of the MALT trust.

13. O'Neil-Dunne is a Series A Member of Phoenicia holding an 8% membership interest in the company.

14. MALT and O'Neil-Dunne are referred to collectively herein as "Plaintiffs."

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 6 *Del. C.* § 18-111, 6 *Del. C.* § 2708, 10 *Del. C.* § 341 and 10 *Del. C.* §6501, *et seq.*

16. This Court has personal jurisdiction over the entity Defendants in this action pursuant to 6 *Del. C.* § 18-105 because 777 Partners and Phoenicia are Delaware entities, and over the Individual Defendants pursuant to 6 *Del. C.* § 18-109 because Pasko and Wander are managers of Phoenicia as defined in 6 *Del. C.*

A-407

§ 18-101 and because Weiss participates materially in the business of 777 Partners and in the business of Phoenicia.

## FACTUAL BACKGROUND

### Overview

17.  This action arises from a scheme by the Individual Defendants to defraud the Plaintiffs and to use corporate entities they control to deprive the Plaintiffs of the proper value of their membership interests in Phoenicia.

18.  Defendants deceived Plaintiffs regarding the contracts at issue in this action, first by convincing them with false representations to accept Phoenicia membership interests as partial consideration for assets MALT was selling to a 777 Partners-controlled affiliate, and subsequently by diverting valuable aviation opportunities from Phoenicia to other 777 Partners-affiliated entities.

19.  Those diversions greatly reduced the value of Phoenicia, and thus the consideration received by MALT for the assets it transferred to Defendants' affiliates, by many millions of dollars.

20.  Defendants' diversion of aviation opportunities, including its aircraft ownership and leasing business, from Phoenicia was self-dealing undertaken to unjustly enrich 777 Partners and the Individual Defendants at the expense of the Plaintiffs.

A-408

21. Defendants' diversion of aviation opportunities from Phoenicia was a material breach of express terms of Phoenicia's operating agreement and of the purchase agreement Defendants executed with MALT and O'Neil-Dunne to acquire assets from MALT; a material breach of Defendants' implied covenants of good faith and fair dealing in those contracts; and a material breach of fiduciary duties of loyalty and due care.

22. By this action, the Plaintiffs seek the fair value of the business opportunities that the Defendants diverted from Phoenicia.

23. To achieve this result, the Plaintiffs assert their direct rights for money damages as signing parties to contracts that have been breached materially by Defendants, and derivatively on behalf of Phoenicia as minority shareholders who have been damaged by devaluation of Phoenicia equity due to Defendants' acts and omissions complained of here.

**777 Partners' Aviation Business Scheme**

24. Following the purchase of the MALT assets described further below, Individual Defendants, in concert with other principals and employees of 777 Partners, undertook to leverage the MALT assets by, among other things, expanding its aviation business to generate income and net asset value through ownership and outbound leasing of passenger jets (the "777 Jet Leasing Business").

6

A-409

25. 777 Partners operated and operates the 777 Jet Leasing Business directly and through affiliates of 777 Partners.

26. Affiliates of 777 Partners that have been used to conduct the 777 Leasing Business include 347 Green Leasing Limited, 347 Green Leasing II LLC, Triple 7 Leasing, and numerous other entities in the U.S. and other jurisdictions (collectively, the "777 Leasing Affiliates").

27. 777 Partners and the 777 Leasing Affiliates are referred to collectively herein as the "777 Jet Lessors."

28. To further the 777 Jet Leasing Business, the 777 Jet Lessors engaged in at least two primary methods of business.

   a. The 777 Jet Lessors acquired jets and leased them to airlines, including leases to entities in the 777 Aviation Portfolio (the "Direct Leasing Business").

   b. By operating the Direct Leasing Business, the 777 Jet Lessors retain both: (1) the arbitrage between the cost to finance purchasing of the jets and the revenue received from outbound leases while purchase-money debt is serviced, and eventually (2) the net asset value of the jets after purchase-money debts are paid down.

   c. The 777 Jet Lessors also leased jets owned by other leasing companies and subleased those same jets to airlines, including

7

A-410

subleases to entities in the 777 Aviation Portfolio (the "Lease

Arbitrage Business").

    d. By operating the Lease Arbitrage Business, the 777 Jet Lessors retain

positive differences between the cost paid out for inbound leases and

the revenue received from outbound subleases.

29. The 777 Jet Lessors engaged in revenue-generating activities other than

the Lease Arbitrage Business and the Direct Leasing Business, such as the transfer

to third parties for consideration of their rights to delivery of new aircraft.

30. According to the 777 Partners website, the 777 Jet Lessors have ordered

214 Boeing 737-Max aircraft.

31. Frequently, 777 Partners creates a separate special purpose entity to

acquire and hold each airplane.  Many of the special purpose entities are owned

indirectly by 777 Partners, but none of them are owned (directly or indirectly) by

Phoenicia.  Thus, 777 Partners and the Individual Defendants, but not Phoenicia or

Plaintiffs, benefit from the profits generated by the 777 Jet Leasing Business.

32. On information and belief, the profits from which Phoenicia and

Plaintiffs are being excluded are enormous.  The 777 Jet Lessors have paid or

contracted to pay approximately $42 million to Boeing for each of the airplanes

that have already been delivered or will shortly be delivered, which is a discount to

the market rate for a new Boeing 737 Max 8.

A-411

33. On information and belief, the 777 Jet Lessors then lease the planes out, often to Flair Airlines or Bonza Aviation in the 777 Airline Portfolio, based on the market value of a new Boeing 737, which is around $52 million.

34. In short, on information and belief, the 777 Jet Lessors are realizing a profit of $8-10 million **per plane**.

35. On information and belief, the profits generated by the Jet Leasing Business are funneled in large part to the Individual Defendants, through 777 Partners and other entities.

36. The 777 Jet Leasing Business is dependent on the ability of 777 Jet Lessors to lease the airplanes they acquire. It was in part to help ensure adequate lease revenues for the 777 Jet Lessors that 777 Partners acquired controlling interests in airline companies that would lease jets owned and/or controlled by the 777 Jet Lessors.

37. On information and belief, the entities in the 777 Airline Portfolio, including Flair Airlines, are caused to sign aircraft leases with the 777 Jet Lessors to support and enable the 777 Jet Leasing Business.

38. On information and belief, were the entities in the 777 Airline Portfolio not caused to sign leases with the 777 Jet Lessors, they would be able to secure less costly leases on the open market. As such, the entities in the 777 Airline Portfolio are disadvantaged by these interested transactions.

A-412

39. On information and belief, 777 Partners and/or its affiliates (other than Phoenicia) realize additional revenue and cash flow through the use of intracompany loans at above-market interest rates. These interested transactions are also used by 777 Partners and the Individual Defendants to line their pockets at the expense of Phoenicia and Plaintiffs.

40. On information and belief, 777 Partners and/or its affiliates (other than Phoenicia) use additional methods and schemes to realize additional revenue and cash flow through the 777 Jet Leasing Business.

41. On information and belief, Defendants operated the Lease Arbitrage Business with Phoenicia affiliates commencing in or about early 2021.

42. The Defendants created 777 Leasing Affiliates in or about early 2021.

43. Certain 777 Leasing Affiliates first contracted to purchase aircraft for the Direct Leasing Business in or about March 2021.

44. Plaintiffs first learned of the existence of 777 Leasing Affiliates and their contracts to purchase jets in March of 2021.

45. The 777 Jet Lessors have obtained substantial profits to date through operation of the 777 Jet Leasing Business, as described above, and are expected to accumulate a net asset value of more than $1 billion in a fleet of jets by operation of that business.

A-413

46. On information and belief, 777 Partners and/or its affiliates have engaged in additional aviation businesses, and/or aspects or variations of the foregoing aviation businesses, of which Plaintiffs have not been informed. Such other aviation businesses should have been held directly or indirectly by Phoenicia and will be revealed in discovery in this action.

## Inducements to Contract

47. 777 Partners, by the Individual Defendants and others, approached Plaintiffs in early 2018 to propose the acquisition of certain airline and travel-related business assets owned by MALT ("MALT Assets") by 777 Partners or a 777 Partners affiliate.

48. Initial negotiations discussed an all-cash deal for the MALT Assets. The parties discussed a range of cash valuations, which were as high as $26 million.

49. 777 Partners proposed that MALT accept instead a combination of cash and a minority equity position in Phoenicia, a new entity that 777 Partners would form to hold all of its aviation assets.

50. 777 Partners and the Individual Defendants provided certain assurances to Plaintiffs regarding the expected value of Phoenicia equity by representations including, without limitation:

    a. 777 Partners would own a majority interest in and control Phoenicia;

    b. 777 Partners would guarantee Phoenicia's performance; and

11

A-414

   c. 777 Partners would own and operate all aviation and travel-related

     businesses in which it was engaged, including but not limited to the

     777 Aviation Portfolio, and all aviation and travel-related business in

     which it would later engage, directly through Phoenicia or through a

     subsidiary of Phoenicia.

51.  These representations were each made to O'Neil-Dunne by the Individual Defendants and others at 777 Partners in or around the time period from November 2017 up until the close in September 2018.

52.  Specifically, the parties held numerous in-person meetings and phone calls in which the potential transaction was discussed and during which the Individual Defendants and others affiliated with 777 Partners made the above representations.  Those meetings included, but were not limited to:

   a. An initial meeting on or around November 28-29, 2017;

   b. A meeting involving O'Neil-Dunne, Pasko, Wander, Weiss and Juan

     Arciniegas on January 29, 2018 at the Air Black Box Manchester

     office;

   c. A meeting on February 12-13, 2018 in Miami with Wander, Weiss

     and Arciniegas;

A-415

d. A three day meeting at the Hotel Adlon in Berlin, Germany from March 8-10, 2018, involving O'Neil-Dunne, Pasko, Wander, Weiss and Arciniegas;

e. A meeting on April 18-19, 2018 in Kelowna, British Columbia, Canada involving O'Neil-Dunne and one or more of the Individual Defendants;

f. The April 22-24, 2018 777 Partners company retreat in Napa;

g. A meeting on May 9-10, 2018 in Miami involving O'Neil-Dunne and one or more of the Individual Defendants;

h. A meeting on May 14-17, 2018 in Miami involving O'Neil-Dunne and one or more of the Individual Defendants;

i. A meeting on May 25-26, 2018 in Riga, Latvia involving O'Neil-Dunne and one or more of the Individual Defendants;

j. A meeting on May 26-28, 2018 in Prague, Czech Republic involving O'Neil-Dunne and one or more of the Individual Defendants;

k. A meeting on June 20-21, 2018 in Miami involving O'Neil-Dunne and one or more of the Individual Defendants; and

l. A meeting on August 27-28, 2018 in Miami involving O'Neil-Dunne and one or more of the Individual Defendants.

13

A-416

53. The concept that Plaintiffs would participate in **all** of 777 Partners' aviation business was reflected in an email from Wander on June 17, 2018, during the negotiations, in which Wander confirmed that ABB and O'Neil-Dunne were "a critical piece of anything 777 will do in the aviation space."

54. Defendants' representations were ultimately incorporated into the parties' agreement.

55. Among the set of documents that the parties signed to effect the deal was the Phoenicia LLC Limited Liability Company Agreement, dated as of September 12, 2018 and executed by 777 Partners and MALT (the "Phoenicia Agreement," described further below).

56. In the Phoenicia Agreement, 777 Partners expressly agreed that "[t]he purpose of [Phoenicia] is to (i) engage in the business of acquiring and operating airlines and other related industries, providing services and creating, selling and licensing software for use in the airline and travel industries, and such other activities incident, necessary, advisable or desirable to carry out the foregoing" (such purpose referred to herein as the "Phoenicia Purpose").

57. The foregoing provision was specifically negotiated by the parties and intended to memorialize Defendants' representations that all of 777 Partners' aviation businesses would be held by Phoenicia and therefore that Plaintiffs would participate in those businesses.

14

A-417

58. Plaintiffs were induced by Defendants' representations, including the representation within the Phoenicia Agreement that Phoenicia would carry out the Phoenicia Purpose, to accept a cash-plus-Phoenicia-equity deal structure in which the cash consideration was reduced.

59. Plaintiffs accepted the proposed cash-plus-Phoenicia-equity deal structure because they anticipated Phoenicia would be successful when operated as Defendants represented it would be, and consequently that the value of Phoenicia securities then offered would come to greatly exceed additional cash that MALT could expect to receive at the time of the transaction.  The cash consideration was ultimately reduced to just over $4 million.

60. Plaintiffs' belief in the success of Phoenicia was induced by their reliance upon the truth and completeness of Defendants' representations and upon Plaintiffs' expectation that the Defendants would act in good faith in their performance of agreements made with the Plaintiffs.

61. In the parties' negotiations, Defendants never hinted that, contrary to their representations to Plaintiffs, they actually intended to expand their aviation business by acquiring and owning more aircraft over time, but hold that business in separate, non-Phoenicia entities to exclude Plaintiffs from the economic benefits. Specifically, Defendants made statements about how their aviation business would

15

A-418

be structured and managed going forward, while intentionally withholding from Plaintiffs certain material facts including, without limitation:

    a. 777 Jet Lessors would own or lease all or nearly all of the jets that Phoenicia and its subsidiaries would lease or sublease;

    b. 777 Partners did not intend to maximize profits within Phoenicia;

    c. 777 Partners intended instead to maximize profits of the 777 Jet Leasing Business, for the benefit of the 777 Jet Lessors—specifically for 777 Partners and the Individual Defendants through their non-Phoenicia holdings; and

    d. 777 Partners intended to conduct the 777 Jet Leasing Business through entities other than Phoenicia or its subsidiaries so that they would not have to share with Plaintiffs the value generated by that business.

62. Defendants chose to speak regarding their intentions with respect to Phoenicia and the rest of their aviation business, and therefore they had a duty not to disclose facts partially or obliquely such that their statements were misleading.

63. The foregoing omissions rendered the statements made by Defendants misleading.

64. Defendants' representations to Plaintiffs and omissions were material to Plaintiffs' decisions to accept the terms offered by 777 Partners and its affiliates,

A-419

and Plaintiffs would not have entered into the contracts proposed by 777 Partners but for the false and misleading representations and omissions of the Defendants.

**<u>Selected Contracts and Key Contract Terms</u>**

**The Share Purchase Agreement**

65. 777 Partners, MALT, O'Neil-Dunne, and others executed a Share Purchase Agreement dated as of September 12, 2018 (the "Share Purchase Agreement").

66. A true copy of the Share Purchase Agreement is attached as Exhibit A hereto and is incorporated herein by reference.

67. The Share Purchase Agreement states, in part and substance:

    a. MALT would transfer the MALT Assets, and other sellers would transfer other assets, to Air Black Box Ltd ("ABB"), a 777 Partners affiliate, in one consolidated transaction;

    b. ABB committed to deliver payments to certain named persons as cash consideration for the transaction, and to deliver vested Phoenicia securities to MALT as non-cash consideration for the transaction;

    c. 777 Partners and Phoenicia committed to execute the Phoenicia Agreement with MALT at closing of the Share Purchase Agreement;

    d. The Share Purchase Agreement and the Phoenicia Agreement were among a passel of related contracts that together constituted the

17

A-420

"Transaction Documents" that defined all of the parties' rights and obligations for transfer of the MALT Assets and other consideration due pursuant to the Share Purchase Agreement;

e. 777 Partners warranted to MALT that the Phoenicia securities to be transferred to MALT would be validly issued, fully paid up, and have all of the rights set out for them in the Phoenicia Agreement;

f. 777 Partners further warranted that each Transaction Document, including the Phoenicia Agreement, would create valid and binding obligations upon 777 Partners; and

g. 777 Partners guaranteed the performance of ABB's obligations under the Share Purchase Agreement and of Phoenicia's obligations under the Phoenicia Agreement.

68. Plaintiffs sold to Defendants a viable business. After the acquisition, O'Neil-Dunne did not participate in the day to day operations of the ABB business and instead Defendants made all operational decisions.

69. The Share Purchase Agreement, and any disputes arising out of or in connection with its substance or formation, are, in accordance with the choice of law provision contained therein, governed by the laws of England.

70. The Share Purchase Agreement, agreed to by all parties, was drafted by legal counsel for the Defendants.

18

A-421

## The Phoenicia Limited Liability Company Agreement

71. As noted above, 777 Partners and MALT executed the Phoenicia Agreement as of September 12, 2018.

72. A true copy of the Phoenicia Agreement is attached as Exhibit B hereto and is incorporated herein by reference.

73. The Phoenicia Agreement states, in part and substance:

a. Phoenicia shall be controlled by 777 Partners through a two-thirds majority of company "Managers" that 777 Partners (or any successor(s) of 777 Partners) would appoint;

b. "The purpose of [Phoenicia] is to (i) engage in the business of acquiring and operating airlines and other related industries, providing services and creating, selling and licensing software for use in the airline and travel industries, and such other activities incident, necessary, advisable or desirable to carry out the foregoing" (such purpose referred to herein as the "Phoenicia Purpose"); and

c. Although Managers appointed by 777 Partners are not obliged to provide services exclusively for Phoenicia, nothing in the Phoenicia Agreement "shall limit, waive or otherwise amend the Managers' fiduciary duty of care and loyalty to the Company and its Members pursuant to Section 18-1104 of the [Delaware Limited Liability

19

A-422

Company] Act with respect to such other business interests and activities; and the Managers shall refrain from engaging in any activity which is inconsistent with their obligations thereunder."

### The Equity Consideration

74. With respect to the equity component of the consideration to be provided to MALT, the Share Purchase Agreement provides that the "Consideration Shares will be issued and allotted to Malt [sic] in full." (SPA § 5.) The Consideration Shares are defined by reference to the Phoenicia Agreement. (SPA § 1.)

75. The Phoenicia Agreement sets out the members' respective interests in Schedule A. Schedule A provides that MALT shall have an initial vested interest of 3% of the total membership interest, with another 5% in unvested interest, for a total membership interest after vesting of 8%.

76. In Schedule 1 to Schedule A, the Phoenicia Agreement provides that an additional 1% membership interest shall vest for MALT as of one, two and three years from the date of the agreement. Another 2% membership interest shall vest based upon terms set forth in the Executive Employment Agreement (which was entered into contemporaneously with the Phoenicia Agreement and Share Purchase Agreement).

A-423

77. The 8% membership interest granted to MALT is separate from, and in addition to, the 8% membership interest granted to O'Neil-Dunne under the Executive Employment Agreement.

**Breach of the Share Purchase Agreement and the Phoenicia Agreement**

78. The acquisition and leasing of passenger jets are "related industries" to the operation of airlines and are activities which are "incident, necessary, advisable or desirable to" the conduct of Phoenicia's operation of airlines and related travel businesses.

79. The 777 Partners website confirms the breadth of 777's Aviation business by touting the company's three "Aviation Segments"—aircraft financing, airlines and travel technology.  Together, the three segments give 777 Partners a "vertically integrated model."  As explained by 777 Partners:  its "unique mix of companies work together to unlock adjacent synergies.  Our airlines are powered by our technology, our aircraft are leased to our airlines, and our talented people leverage these opportunities to drive growth and create long-term value."

80. Phoenicia was obliged by the Phoenicia Agreement to operate the 777 Jet Leasing Business through Phoenicia and/or a subsidiary of Phoenicia.

81. 777 Partners was obliged by the Phoenicia Agreement to cause Phoenicia to operate the 777 Jet Leasing Business through Phoenicia and/or a subsidiary of Phoenicia.

21

A-424

82. Pasko and Wander were obliged by the Phoenicia Agreement to cause Phoenicia to pursue and conduct the 777 Jet Leasing Business.

83. Pasko and Wander were obliged by fiduciary duties to cause Phoenicia to pursue and conduct the 777 Jet Leasing Business.

84. Phoenicia did not pursue the 777 Jet Leasing Business.

85. Phoenicia caused and permitted 777 Aviation Portfolio companies under its control to lease jets from the 777 Jet Lessors.

86. The Defendants caused the 777 Jet Leasing Business to be operated through entities other than Phoenicia or a subsidiary of Phoenicia, which entities 777 Partners, Pasko and/or Wander directly or indirectly owned and/or controlled.

87. The lease agreements executed between the 777 Jet Lessors and 777 Aviation Portfolio companies for the use of jets owned by the 777 Jet Lessors (hereinafter "777 Leases") were "Interested Transactions" as that term is defined in the Phoenicia Agreement and "related-party transactions" as that term is defined by Delaware law.

88. The 777 Leases were not subjected to an entire fairness review by Phoenicia or any of the other entities controlled by 777 Partners, whether by independent directors or otherwise.

22

A-425

89. The 777 Leases were not objectively "fair and reasonable" under the circumstances for the 777 Aviation Portfolio lessees as required by Section 5.4 of the Phoenicia Agreement.

90. Phoenicia breached the Phoenicia Agreement by executing contracts which were not fair and reasonable for the company under the circumstances.

91. Weiss participated materially in the business of 777 Partners and Phoenicia during the time of events alleged in this Complaint by actions including participation in the management of 777 Partners and direct and indirect management of the 777 Leasing Affiliates and the 777 Aviation Portfolio.

92. Pasko and Wander had duties of care and loyalty to Phoenicia to endeavor in good faith to help it achieve business success.

93. Pasko and Wander had duties of care and loyalty to Phoenicia to endeavor in good faith to help it achieve the Phoenicia Purpose.

94. Pasko and Wander did not endeavor in good faith to help Phoenicia achieve business success.

95. Pasko and Wander did not endeavor in good faith to help Phoenicia achieve the Phoenicia Purpose.

96. Rather than endeavor in good faith to help Phoenicia achieve the Phoenicia Purpose, Pasko and Wander instead diverted Phoenicia business

23

A-426

opportunities to entities in which they have or had a direct or indirect financial interest.

97.  Rather than endeavor in good faith to help Phoenicia achieve the Phoenicia Purpose, Pasko and Wander instead diverted Phoenicia business opportunities to entities in which 777 Partners has or had a financial interest.

98.  Pasko and Wander diverted the Phoenicia opportunity of the 777 Jet Leasing Business to the 777 Jet Lessors instead of developing that business within Phoenicia or a subsidiary of Phoenicia.

99.  Pasko and Wander's diversion of the 777 Leasing Business to the 777 Jet Lessors, and/or other entities directly or indirectly owned (in part or full) by Pasko and Wander, instead of to Phoenicia, profited them personally.

100.  777 Jet Lessors pursued the 777 Jet Leasing Business diligently by actions including, for example, ordering more than 200 new passenger jets from the Boeing company in a series of transactions over time, selling order priority with Boeing to Flair Airlines and Bonza Aviation, and outbound leasing certain of the jets it acquired.

101.  The value of new aircraft ordered by the 777 Jet Lessors and leased or to be leased out to 777 Aviation Portfolio companies and others is projected to exceed $3 billion.

24

A-427

102.   The value of the 777 Jet Leasing Business assets, after repayment of all acquisition debt for the aircraft, is projected to exceed $1 billion.

103.   The 777 Jet Lessors obtained financing for certain of the jets it purchased.  In those transactions, the 777 Jet Lessors invested little or none of their own capital for the purchases, and instead simply undertook the obligation to service the purchase money debt.

104.   777 Partners could have caused Phoenicia to purchase jets with financing provided by the third-party lenders who financed purchases by 777 Jet Lessors, and could have guaranteed Phoenicia's performance of debt service for those purchases as it guaranteed performance by 777 Jet Lessors, rather than conducting such transactions through the 777 Jet Lessors.

105.   Alternatively, 777 Partners could have caused Flair Airlines to lease the aircraft directly, with guarantees from 777 Partners.

106.   By conducting the Leasing Business through the 777 Jet Lessors rather than through Phoenicia, Defendants deprived Phoenicia of the value of the 777 Leasing Business that could and should otherwise have been enjoyed by Phoenicia, which deprivation reduced the value of Phoenicia equity below what it would have been in the absence of Defendants' misconduct.

25

A-428

107.   By so reducing the value of Phoenicia equity, Defendants deprived MALT and O'Neil-Dunne of their respective shares of the value generated by the 777 Leasing Business that could and should have been enjoyed by Phoenicia.

108.   Defendants also caused Phoenicia to acquire and operate marginally profitable and unprofitable airline businesses in order to support the 777 Jet Leasing Business, and otherwise caused Phoenicia to be mismanaged.

109.   Defendants thereby deprived Phoenicia of revenue and asset value while burdening it with operating expenses to provide that revenue and asset value to others, which factors combined to devalue further Phoenicia securities.

110.   Plaintiffs were not, and could not have been, aware of Defendants' misconduct prior to learning that certain 777 Leasing Affiliates had contracted to purchase aircraft for the Direct Leasing Business in or about March 2021.  Prior to that time Defendants had not disclosed, and Plaintiffs had no way of discovering, Defendants' intention to expand its aviation business into leasing but exclude Phoenicia from the benefits contrary to the parties' intention in entering into the Share Purchase Agreement and Phoenicia Agreement.

**Failure To Provide Equity Consideration**

111.   As detailed above, the Share Purchase Agreement provided that, as part of the consideration for the MALT Assets, MALT would be provided with a

A-429

3% membership interest in Phoenicia immediately, with an additional unvested

interest of 5%, for a total interest of up to 8%.

112.   MALT's 8% membership interest is separate from, and in addition to,

the 8% membership interest held by O'Neil-Dunne.

113.   The 5% unvested membership interest is now fully vested.  One

percent of the interest in Phoenicia vested automatically at the end of each of the

first three years following the date of the agreement, and therefore 3% was fully

vested as of September 12, 2021.

114.   The remaining 2% unvested interest was to vest upon occurrence of

certain milestones.  Each of those milestones either were met, or would have been

met had Defendants acted in good faith and complied with the Phoenicia

Agreement by pursuing the Jet Leasing Business through Phoenicia.  Had

Defendants done so, Phoenicia's net revenue over a twelve month period would

have exceeded each of the four milestones.

115.   Accordingly, under the Share Purchase Agreement Defendants were

required to provide MALT with an 8% membership interest in Phoenicia.

116.   Plaintiffs recently discovered, however, that Defendants failed to do

so.  On July 31, 2022, 777 Partners sent to MALT a Schedule K-1 indicating that at

the beginning of 2021, according to Phoenicia, MALT had only a 5% membership

A-430

interest in Phoenicia.  Even more remarkably, the Schedule K-1 indicated that the 5% interest was somehow reduced to a 3% interest as of the end of 2021.

117.    There is no basis in the Phoenicia Agreement, or any other agreement, for 777 Partners and Phoenicia to determine that MALT's interest is anything less than 8%, much less to reduce it to 3%.

118.    The failure to provide MALT with an 8% membership interest, and then to reduce MALT's interest from 5% to 3%, was in bad faith and violates the Share Purchase Agreement as well as Pasko, Wander and 777 Partners' fiduciary duties.  Defendants' failure to comply with the requirement in the Share Purchase Agreement to provide MALT with an 8% membership interest in Phoenicia was not discovered by Plaintiffs until they received the Schedule K-1 in July 2022. Defendants never previously provided MALT with tax documentation or otherwise gave any indication that MALT had not been provided with the shares to which it was entitled, and Plaintiffs do not have access to information regarding membership interests in Phoenicia.

119.    Defendants have also failed to comply with the requirements for managing Phoenicia under the Phoenicia Agreement and Delaware law.

120.    O'Neil-Dunne was designated as the initial Series A Manager for Phoenicia, and still holds that position.

28

A-431

121.   The Phoenicia Agreement provides that "the business and affairs of the Company shall be managed and all powers shall be exercised under the ultimate direction of the board." (§ 4.1(d).)  In that regard, the Board is required to meet at least quarterly to consult with, advise and direct the officers of the company.  (§ 4.3(a).)  The issues upon which the Board is required to be consulted include, among others, the strategy and direction of the company, the appointment or removal of officers, the sale or acquisition of assets of greater than $5,000 in value, and any transfer, encumbrance or issuance of membership interests.  (*Id*.)

122.   In violation of the Phoenicia Agreement, Phoenicia's Board of Managers has not met since April 2021; no budget has been submitted to the Board of Managers for approval over that same time period; and no approval from the Board of Managers has been sought or given for any corporate action over that same time period.

123.   In particular, in May 2022 a subsidiary of Phoenicia, Adlon, acquired a company called EURO C.R.S. Ltd. (commonly known as AeroCRS).  The consideration was principally stock in Adlon.  Defendants are also considering selling, merging, or otherwise disposing of Phoenicia's 49% interest in Flair Airlines.  Although O'Neil-Dunne is on the Board of Managers of Phoenicia, he was not consulted concerning the AeroCRS transaction or the potential Flair transaction and was excluded from the negotiations.

29

A-432

124.   On information and belief, Phoenicia and/or its subsidiaries have taken additional corporate actions which were properly subject to consultation and/or approval by the Board without notifying and fully informing O'Neil-Dunne of such actions, including, without limitation, significant hires, setting up of subsidiaries and undertaking material obligations.

125.   The foregoing failures to comply with the corporate governance provisions in the Phoenicia Agreement were directed and caused by Pasko, Wander and 777 Partner, who together control a majority of the board of Phoenicia and exercise control over Phoenicia.

## CAUSES OF ACTION

### COUNT I
**Against 777 Partners and Phoenicia**
**Breach of Contract – Phoenicia Agreement**

126.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

127.   The Phoenicia Agreement is a valid contract, enforceable according to its terms.

128.   Defendants breached the Phoenicia Agreement by diversion of business opportunities from Phoenicia.

A-433

129.    Defendants breached the Phoenicia Agreement by failing to cause Phoenicia to operate the 777 Jet Leasing Business through Phoenicia and/or a subsidiary of Phoenicia.

130.    Defendants breached the Phoenicia Agreement by failing to pursue diligently and to execute the Phoenicia Purpose.

131.    Defendants breached the Phoenicia Agreement by executing self-dealing contracts which were not fair and reasonable for Phoenicia.

132.    777 Partners, through its agents and representatives, caused Phoenicia to breach the Phoenicia Agreement.

133.    777 Partners breached its covenants of good faith and fair dealing in the Phoenicia Agreement.

134.    Phoenicia breached its covenants of good faith and fair dealing in the Phoenicia Agreement

135.    Defendants' breaches of the Phoenicia Agreement were material.

136.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.  Plaintiffs' damages include, but are not limited to, Plaintiffs' share of the value of the Jet Leasing Business were it held in Phoenicia or its subsidiaries as required by the Phoenicia Agreement.

A-434

## COUNT II

### Against 777 Partners
### Breach of Contract – Share Purchase Agreement

137.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

138.   The Share Purchase Agreement is a valid contract enforceable according to its terms.

139.   The Phoenicia Agreement is a part of the Share Purchase Agreement, incorporated therein by express reference.

140.   Breach of the Phoenicia Agreement is a breach of the Share Purchase Agreement.

141.   Plaintiffs fully performed their obligations under the Share Purchase Agreement.

142.   777 Partners breached the Share Purchase Agreement by breaching the Phoenicia Agreement.

143.   777 Partners breached the Share Purchase Agreement by failing to cause Phoenicia to fully perform the Phoenicia Agreement.

144.   777 Partners breached the Share Purchase Agreement by failing to cause Phoenicia to operate the 777 Jet Leasing Business through Phoenicia and/or a subsidiary of Phoenicia.

32

A-435

145.   777 Partners represented and warranted in the Share Purchase Agreement that it would cause Phoenicia to perform the Phoenicia Agreement.

146.   777 Partners breached its covenants of good faith and fair dealing in the Share Purchase Agreement.

147.   As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.  Plaintiffs' damages include, but are not limited to, Plaintiffs' share of the value of the Jet Leasing Business were it held in Phoenicia or its subsidiaries as required by the Share Purchase Agreement.

## COUNT III

### Against 777 Partners and Phoenicia
### Breach of Contract – Failure To Provide Membership Interest

148.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

149.   The Share Purchase Agreement and Phoenicia Agreement are valid contracts, enforceable according to their terms.

150.   Defendants breached the Share Purchase Agreement and Phoenicia Agreement by failing to provide MALT with an 8% membership interest in Phoenicia as consideration for the MALT Assets.

151.   Had Defendants complied with their obligations under the Share Purchase Agreement and Phoenicia Agreement, the milestones for the vesting of

33

A-436

MALT's membership interests would have been met by now or, at the latest, will be met by the end of 2022.

152.   To the extent necessary, MALT has properly exercised its warrants to convert to a 2% vested membership interest.

153.   Defendants breached the Share Purchase Agreement and Phoenicia Agreement by baselessly and inexplicably reducing the already-improper 5% membership interest given to MALT to a 3% membership interest.

154.   Defendants' breaches of the Share Purchase Agreement and Phoenicia Agreement were material.

155.   As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

156.   In addition, preliminary and permanent injunctive relief is warranted to require that Defendants recognize MALT's full membership interest, including with respect to MALT's share of any distributions.

## COUNT IV
**Against 777 Partners, Pasko, and Wander**
**Fraudulent Inducement to Contract**

157.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

158.   777 Partners, Pasko, and Wander each had a duty to truthfully and accurately disclose material facts to Plaintiffs and to disclose subsequently

34

A-437

acquired information that they knew would make previous representations untrue or misleading.

159.   777 Partners, Pasko, and Wander each had a duty to truthfully, accurately, and completely disclose all material facts relating to their plans for Phoenicia.

160.   777 Partners, Pasko, and Wander each had a duty to truthfully, accurately, and completely disclose all material facts relating to their plans for the 777 Jet Leasing Business.

161.   777 Partners, Pasko, and Wander also subjected themselves to additional duties when they chose to make false affirmative statements.

162.   777 Partners, Pasko, and Wander made and/or caused to be made the representation set forth within the Phoenicia Agreement that Phoenicia would pursue the Phoenicia Purpose, without any intention to perform said promise.

163.   In addition, 777 Partners, Pasko, and Wander made and/or caused to be made oral and email misrepresentations and intentional omissions of material fact to O'Neil-Dunne, as alleged herein.

164.   777 Partners, Pasko, and Wander made and/or caused to be made the misrepresentations and intentional omissions alleged herein, including the misrepresentation within the Phoenicia Agreement as well as the oral and email misrepresentations outside of that agreement, in order to induce Plaintiffs to,

A-438

among other things, enter into the Share Purchase Agreement and enter into the Phoenicia Agreement.

165.  777 Partners, Pasko, and Wander made and/or caused to be made the misrepresentations and intentional omissions of material fact alleged herein in order to induce Plaintiffs to, among other things, accept membership interest in Phoenicia as part of the consideration for the MALT Assets.

166.  777 Partners, Pasko, and Wander made and/or caused to be made false representations and intentionally concealed material facts that they had a duty to accurately disclose prior to execution of the Stock Purchase Agreement and the Phoenicia Agreement, including without limitation their plans for Phoenicia.

167.  777 Partners, Pasko, and Wander made and/or caused to be made false representations and intentionally concealed material facts that they had a duty to accurately disclose, including as to their plans for the 777 Jet Leasing Business.

168.  777 Partners, Pasko, and Wander knowingly, and with intent to defraud, failed to disclose or accurately disclose other 777 Partners' intentions with respect to Phoenicia and the 777 Aviation Portfolio.

169.  777 Partners, Pasko, and Wander made these misrepresentations and intentional omissions of fact with the knowledge that they were material, false, and misleading and knowing that Plaintiffs would rely on them in determining whether to enter into the Share Purchase Agreement and Phoenicia Agreement.

A-439

170.    Plaintiffs reasonably relied on 777 Partners, Pasko, and Wander's false representations and omissions of material fact in deciding whether to enter into the Share Purchase Agreement and Phoenicia Agreement.

171.    777 Partners, Pasko, and Wander's fraudulent misrepresentations and intentional omissions of material fact were material to Plaintiffs' assessment of Phoenicia's potential value and their decision to invest in Phoenicia and to remain an investor in it.

172.    As a direct and proximate result of Defendants' misrepresentations and intentional omissions of material fact, Plaintiffs were fraudulently induced to enter into the Share Purchase Agreement and Phoenicia Agreement.

173.    As a direct and proximate result of Defendants' misrepresentations and intentional omissions of material fact, Plaintiffs have been damaged in an amount to be proved at trial.  Plaintiffs' damages include, but are not limited to, the difference between the amount of cash consideration initially contemplated for the deal, up to $26 million, and the amount of cash consideration they ultimately agreed to based upon Defendants' representations regarding the equity consideration, just over $4 million.

174.    Defendants' fraud was not known to Plaintiffs, and was inherently unknowable to Plaintiffs, until at least March 2021 when Defendants' true

A-440

intentions were revealed when it became publicly known that Defendants' affiliates had undertaken the 777 Jet Leasing Business.

## COUNT V
### Against Pasko, Wander, and Weiss
### Unjust Enrichment

175.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

176.   The Individual Defendants have been enriched by diversion of business opportunities from Phoenicia as set forth above.

177.   Plaintiffs have been damaged and impoverished by the Individual Defendants' actions set forth above.

178.   The Individual Defendants unjustly enriched themselves by diverting business opportunities from Phoenicia to other entities in which they have financial interests.

179.   The enrichment of the Individual Defendants is directly related to the impoverishments of the Plaintiffs because the diversions of business opportunities that unjustly enriched the Individual Defendants are the very same diversions of business opportunities that diminished the value of Phoenicia securities owned by the Plaintiffs.

A-441

180.   The Individual Defendants should be compelled to disgorge to the Plaintiffs the unjust enrichments they obtained by diversion of business opportunities from Phoenicia, in amounts to be determined at trial.

## COUNT VI

**Derivatively Against Pasko, Wander and 777 Partners**
**Breach of Fiduciary Duty**

181.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

182.   As Managers of Phoenicia, Pasko and Wander owed and owe fiduciary duties of loyalty and care to Phoenicia and its members, including Plaintiffs.

183.   As the holder of a majority of the membership interest in Phoenicia, 777 Partners owes fiduciary duties of loyalty and care to Phoenicia and its other members, including Plaintiffs.

184.   Pasko, Wander, and 777 Partners have breached their fiduciary duties by, among other things, conducting the 777 Jet Leasing Business through the 777 Jet Lessors rather than through Phoenicia, which deprived Phoenicia of the value generated by the 777 Jet Leasing Business that could otherwise have been enjoyed by Phoenicia, which deprivation reduced the value of Phoenicia equity below what it would have been in the absence of their misconduct.

A-442

185.   Pasko, Wander, and 777 Partners also caused Phoenicia to acquire and participate in marginally profitable and unprofitable airline businesses through Interested Transactions and related party transactions that were unfair and unreasonable to Phoenicia in order to support the 777 Jet Lessors' lease cost arbitrage and net asset accumulation objectives.

186.   Pasko, Wander, and 777 Partners also breached their fiduciary duties of care by their gross mismanagement of Phoenicia.

187.   Pasko, Wander, and 777 Partners thereby deprived Phoenicia of revenue and asset value while burdening it with operating expenses to provide that revenue and asset value to others, which factors combined to devalue further Phoenicia securities to the benefit of 777 Partners, Pasko and Wander.

188.   Pasko, Wander, and 777 Partners enriched themselves by diverting the 777 Leasing Business from Phoenicia to other entities in which they had a financial interest and in which the Plaintiffs did not have a financial interest.

189.   Pasko, Wander, and 777 Partners engaged in self-dealing in connection with their management of Phoenicia that enriched themselves and damaged the Plaintiffs.

190.   Pasko, Wander, and 777 Partners further breached their fiduciary duties by baselessly failing to provide MALT with the 8% membership interest to

A-443

which it was entitled, and by reducing the membership interest of MALT from 5% to 3% without basis and in bad faith.

191.   The breaches of fiduciary duties by Pasko, Wander, and 777 Partners were not committed on behalf of or for Phoenicia in good faith and in a manner reasonably believed by them to be in, or not opposed to, the best interests of Phoenicia.

192.   As a result of the foregoing breaches of fiduciary duty, Phoenicia has suffered and will continue to suffer damages in an amount to be proven at trial.

193.   Demand is excused given that a majority of the Phoenicia managers is conflicted and is therefore not capable of a disinterested evaluation of claims arising from Plaintiffs' allegations herein.

194.   Specifically, Phoenicia has a Board of Managers made up of three managers, two of whom are Pasko and Wander.  Therefore Pasko and Wander make up a majority of the Board.

195.   Pasko and Wander have obtained, and will continue to obtain, personal gains from the misconduct alleged herein not shared by the members of Phoenicia.  Both Pasko and Wander hold ownership interests in 777 Partners and its affiliates such that the usurpation of the Jet Leasing Business by 777 Partners, and the exclusion of Plaintiffs from participation in that business, enables Pasko

A-444

and Wander to personally reap the economic benefits of the business, including the portion of the profits that should be going to Plaintiffs.

196.   Pasko and Wander face a substantial likelihood of liability on the claims alleged herein. They are personally responsible for directing the actions of 777 Partners and all of its affiliates, personally made fraudulent statements and omissions to Plaintiffs, and personally violated their fiduciary duties to Phoenicia and its members.  Further, they personally caused Phoenicia to enter into related-party transactions with the 777 Jet Lessors to the disadvantage of Phoenicia, and those transactions are not disinterested and not subject to the business judgment rule.

### COUNT VII
**Derivatively Against Weiss**
**Aiding and Abetting**

197.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

198.   Pasko, Wander, and 777 Partners owe fiduciary duties of loyalty and care to Phoenicia and its members, including Plaintiffs, as set forth above.

199.   Pasko, Wander, and 777 Partners breached their fiduciary duties to Phoenicia and its members, including Plaintiffs, as set forth above.

200.   Weiss knew 777 Partners was the controlling member of Phoenicia, knew Pasko and Wander were the managers of Phoenicia, and knew the fiduciary

A-445

duties Pasko, Wander, and 777 Partners owed to Phoenicia during the events alleged in this Complaint.

201.   Weiss knew the terms of the Share Purchase Agreement and the Phoenicia Agreement.

202.   Weiss knew the plans of 777 Partners, Pasko, and Wander to manage Phoenicia and to manage the 777 Jet Leasing Business.

203.   Weiss knew that 777 Partners, Pasko, and Wander intended to divert the 777 Jet Leasing Business to entities other than Phoenicia.

204.   Despite his knowledge, Weiss intentionally assisted 777 Partners, Pasko, and Wander in their diversion of business opportunities from Phoenicia to other entities through his management 777 Partners' Aviation and Travel Group and related activities.

205.   Weiss knowingly participated in the breaches of fiduciary duties committed by Pasko, Wander and 777 Partners to Phoenicia.

206.   Weiss knowingly and intentionally aided and abetted the breaches of fiduciary duties committed by Pasko, Wander and 777 Partners.

207.   Weiss knew that his aiding and abetting of breaches of fiduciary duties by Pasko, Wander, and 777 Partners would cause substantial injury to Phoenicia and its minority members, and such harm was a direct and foreseeable result of Weiss's actions.

A-446

208.   As a result of Weiss's actions, Plaintiffs have been damaged in an amount to be determined at trial

## COUNT VIII
### Derivatively Against 777 Partners
### Declaratory Judgment – Guarantee Triggered

209.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

210.   This Court is authorized pursuant to 10 *Del. C.* § 6502 to issue a declaratory judgment determining any question of construction or validity arising under a written contract and making a declaration of rights, status or other legal relations thereunder.

211.   In the Share Purchase Agreement, 777 Partners represented and warranted and guaranteed the performance of Phoenicia as set forth in the Phoenicia Agreement and the Share Purchase Agreement.

212.   The controversy at hand involves a claim of right or other legal interest of Plaintiffs, specifically the parties' respective rights and obligations under the Share Purchase Agreement and Plaintiffs' claim of right to enforce the terms of the Share Purchase Agreement against 777 Partners.

213.   Plaintiffs' claims are asserted against 777 Partners, which has an interest in contesting those claims.

214.   The conflicting interests are real and adverse.

44

A-447

215.   The issue is ripe for judicial interpretation as Plaintiffs seek to enforce their right to have 777 Partners guarantee performance under the Phoenicia Agreement.

216.   Based on the allegations set forth in this Amended Complaint, Plaintiffs are entitled to a judicial declaration that 777 Partners' guarantee of performance by Phoenicia LLC in valid and enforceable and has been triggered.

## COUNT IX
### Against 777 Partners and Phoenicia
### Declaratory Judgment – Membership Interest

217.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

218.   This Court is authorized pursuant to 10 *Del. C.* § 6502 to issue a declaratory judgment determining any question of construction or validity arising under a written contract and making a declaration of rights, status or other legal relations thereunder.

219.   Under the Share Purchase Agreement and Phoenicia Agreement, MALT is entitled to an 8% membership interest in Phoenicia, including both the initial 3% vested interest and the 5% interest that has vested since the agreement was signed.

220.   777 Partners and Phoenicia have filed tax documents stating that MALT's membership interest is only 3%.

A-448

221.   The controversy at hand involves a claim of right or other legal interest of Plaintiffs, specifically the parties' respective rights and obligations under the Share Purchase Agreement and Phoenicia Agreement as to MALT's membership interest in Phoenicia.

222.   The conflicting interests are real and adverse.

223.   The issue is ripe for judicial interpretation as Plaintiffs seek to confirm MALT's membership interest in Phoenicia.

224.   Based on the allegations set forth in this Amended Complaint, Plaintiffs are entitled to a judicial declaration that MALT has an 8% membership interest in Phoenicia.

## COUNT X
### Against 777 Partners, Pasko, Wander and Phoenicia
### Breach of Contract -- Specific Performance

225.   Plaintiffs repeat and reaver the foregoing allegations as if fully set forth herein.

226.   The Phoenicia Agreement is a valid contract, enforceable according to its terms.

227.   Defendants breached, and are continuing to breach, the Phoenicia Agreement by failing to (i) hold meetings of the Board of Managers at least quarterly; (ii) submit and approve the annual budget; (iii) consult with the Board of Managers concerning the corporate actions enumerated in Section 4.3(a) of the

46

A-449

Phoenicia Agreement; and (iv) keep O'Neil-Dunne informed and apprised of the activities of the company in his capacity as a Manager of the company.

228.   777 Partners, as member of Phoenicia, and Pasko and Wander, as managers of Phoenicia, have caused and are causing Phoenicia to breach the Phoenicia Agreement.

229.   Defendants' breaches of the Phoenicia Agreement were and are material.

230.   Plaintiffs have no adequate remedy at law for the Defendants' ongoing breaches of the Phoenicia Agreement, and accordingly specific performance is warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

(a)  entering judgment finding that a demand for remedial action by the current managers of Phoenicia would be futile and permitting the Plaintiffs to proceed here on behalf of Phoenicia;

(b)  awarding compensatory damages for the direct and derivative claims in amounts to be determined at trial;

(c)  directing the Individual Defendants to disgorge their unjust enrichments to the Plaintiffs;

A-450

(d)  awarding pre-judgment and post-judgment interest to Plaintiffs on their damages;

(e)  awarding Plaintiffs' costs, including a reasonable attorney fee, as and to the extent permitted by law;

(f)  entering judgment declaring that the 777 Partners' guarantee of performance by Phoenicia is valid and enforceable and has been triggered;

(g)  entering judgment declaring that MALT holds an 8% membership interest in Phoenicia;

(h)  ordering specific performance of the Phoenicia Agreement, including that Defendants (i) hold meetings of the Board of Managers at least quarterly; (ii) submit and approve the annual budget; (iii) consult with the Board of Managers concerning the corporate actions enumerated in Section 4.3(a) of the Phoenicia Agreement; and (iv) keep O'Neil-Dunne informed and apprised of the activities of the company in his capacity as a Manager of the company;

(i)  issuing preliminary and permanent injunctions requiring that Defendants recognize MALT's 8% membership interest in Phoenicia for all purposes, including with respect to any distributions; and

(j)  granting such other and further relief as this Court deems just and equitable.

A-451

*Of Counsel*:                                     ASHBY & GEDDES

AFFELD GRIVAKES LLP                    */s/ Catherine A. Gaul*
David W. Affeld, Esq.                          Catherine A. Gaul (#4310)
(*pro hac vice* forthcoming)              Michael J. Vail (#6994)
2049 Century Park East, Suite 2460    500 Delaware Avenue, 8th Floor
Los Angeles, California                        P.O. Box 1150
(310) 979-8700                                   Wilmington, Delaware 19801
dwa@agz.com                                    (302) 654-1888
                                                          cgaul@ashbygeddes.com
PINNISI & ANDERSON                      mvail@ashbygeddes.com
Michael D. Pinnisi, Esq.
(admitted *pro hac vice*)                    *Attorneys for Plaintiffs*
120 East Buffalo Street
Ithaca, New York 14850
(607) 257-8000
mpinnisi@pinnisianderson.com


Dated: November 22, 2022

49

A-452

# EXHIBIT D

A-453

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM          INDEX NO. 655326/2022
NYSCEF DOC. NO. 19          Case 1:24-cv-03453-JGK   Document 61-4   Filed 05/13/24   Page 2 of 13          RECEIVED NYSCEF: 08/06/2022

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| VIDA LONGEVITY FUND, LP, VIDA INSURANCE CREDIT OPPORTUNITY FUND II, LP, VIDA INSURANCE CREDIT OPPORTUNITY FUND III, LP, AND VIDA CAPITAL MANAGEMENT, LLC | Index No. _____ |
| *Plaintiffs,* | **SUMMONS** |
| vs. | |
| BRICKELL PC INSURANCE HOLDINGS LLC, | |
| *Defendant.* | |

To the above-named Defendant:

YOU ARE HEREBY SUMMONED to answer the complaint and to serve a copy of your answer on the undersigned Plaintiffs' attorneys within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete, if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default and the relief demanded in the complaint.

Pursuant to CPLR 501, venue is based on the contracts governing this dispute.

A-454

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:03 PM          INDEX NO. 658328/2022
NYSCEF DOC. NO. 13                                              RECEIVED NYSCEF: 08/06/2022

Case 1:24-cv-03453-JGK   Document 61-4   Filed 05/13/24   Page 3 of 13

Dated: New York, New York
      July 1, 2022

                                    GLENN AGRE BERGMAN & FUENTES LLP

                            By: _____
                                Andrew K. Glenn
                                Kurt A. Mayr
                                Agustina G. Berro
                                55 Hudson Yards, 20th Floor
                                New York, New York 10001
                                (212) 358-5600

                                *Attorneys for Plaintiffs*

TO:
      Brickell PC Insurance Holdings LLC
      Corporation Service Company
      251 Little Falls Drive
      Wilmington, Delaware 19808

A-455

FILED: NEW YORK COUNTY CLERK 08/01/2022 07:03 PM  INDEX NO. 653326/2022
NYSCEF DOC. NO. 1  RECEIVED NYSCEF: 08/01/2022
Case 1:24-cv-03453-JGK  Document 61-4  Filed 05/13/24  Page 4 of 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

VIDA LONGEVITY FUND, LP, VIDA
INSURANCE CREDIT OPPORTUNITY FUND
II, LP, VIDA INSURANCE CREDIT
OPPORTUNITY FUND III, LP, AND VIDA
CAPITAL MANAGEMENT, LLC

*Plaintiffs,*

vs.

BRICKELL PC INSURANCE HOLDINGS LLC,

*Defendant.*

Index No. _____

**COMPLAINT**

Plaintiffs Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II, LP, Vida

Insurance Credit Opportunity Fund III, LP (collectively, the "Lenders"), and Vida Capital

Management, LLC (the "Collateral Agent" and, together with the Lenders, "Plaintiffs") by and

through their undersigned attorneys, allege as follows:[1]

**NATURE OF THE ACTION**[2]

1.  Plaintiffs Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II,

LP, and Vida Insurance Credit Opportunity Fund III, LP collectively loaned to non-party 777

Partners LLC (the "Borrower") approximately $60 million (the "Loan") pursuant that certain

Third Amended and Restated Margin Loan Agreement, dated February 22, 2022 (as amended,

amended and restated, modified and supplemented and in effect on the date hereof, the "Loan

Agreement").[3]

---

[1]  Submitted herewith is the Affirmation of Joseph Hwang, dated June 30, 2022.  Exhibit citations ("Ex. __")
refer to exhibits accompanying the Hwang Affirmation.

[2]  Except as otherwise specified herein, capitalized items used in this motion have the meanings given to them
in the Loan Agreement (as defined below).

[3]  Plaintiffs first extended credit to the Borrower pursuant to that certain Margin Loan Agreement, dated June
12, 2020.  The Margin Loan Agreement was amended and restated three times between June 12, 2020 and

A-456

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:02 PM     INDEX NO. 658328/2022
NYSCEF DOC. NO. 13     RECEIVED NYSCEF: 08/06/2022

2.      To induce the Lenders to provide the Loan to the Borrower, defendant Brickell

PC Insurance Holdings LLC ("Defendant" or the "Pledgor"), a limited liability company

sponsored by the Borrower, pledged to the Lenders certain collateral (the "Collateral") including,

among other things, 34,218,366 ordinary shares (the "Collateral Shares") of Randall & Quilter

Investment Holdings Ltd. ("RQIH") pursuant to a Pledge Agreement, dated June 12, 2020,

between Defendant, as Pledgor, and Vida Capital Management, LLC, as Collateral Agent (the

"Pledge Agreement"). *See* Hwang Aff. ¶ 4; *see also* Ex. 2 (Pledge Agreement).

3.      To ensure that the Lenders are adequately secured during the term of the Loan,

the Pledge Agreement requires that Defendant pledge additional Eligible Collateral—*i.e.* cash or

cash equivalents—if the value of the Collateral Shares falls below a contractually prescribed

threshold amount. *See* Ex. 2 (Pledge Agreement) § 5(a).  Defendant has failed to honor this

contractual obligation, leaving Plaintiffs undersecured by approximately $22.3 million. *See*

Hwang Aff. ¶ 19.  Plaintiffs thus bring this action to enforce the protections they bargained for,

and respectfully request that the Court direct Defendant to cure the collateral shortfall by

pledging additional Eligible Collateral to secure the Loan.

**PARTIES**

4.      Plaintiff Vida Longevity Fund, LP is, and at all relevant times hereinafter

mentioned was, a limited partnership organized under the laws of Delaware, with its principal

place of business in Austin, Texas.

5.      Plaintiff Vida Insurance Credit Opportunity Fund II, LP is, and at all relevant

times hereinafter mentioned was, a limited partnership organized under the laws of the Cayman

Islands, with its principal place of business in Austin, Texas.

_____

February 22, 2022.  The Third Amended and Restated Margin Loan Agreement is attached to the Hwang
Affirmation as Exhibit 1.

A-457

6.      Plaintiff Vida Insurance Credit Opportunity Fund III, LP is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of the Cayman Islands, with its principal place of business in Austin, Texas.

7.      Plaintiff Vida Capital Management, LLC is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of Delaware, with its principal place of business in Austin, Texas.

8.      Defendant Brickell PC Insurance Holdings LLC is, and at all relevant times hereinafter mentioned was, a limited liability company organized under the laws of the Delaware, with its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action and Defendant under CPLR 301 because Defendant transacts business in New York state and Defendant consented to this Court's jurisdiction under the contracts governing this dispute.

10.     Section 5-1402 of the New York General Obligations Law also provides for this Court's jurisdiction over this action and Defendant because the action arises out of contracts that: (i) contain a clause in which the parties have submitted to jurisdiction in New York (Ex. 2 (Pledge Agreement) § 10(h), Ex. 1 (Loan Agreement) § 7.08(b));  (ii) contain a clause choosing New York as the governing law over those contracts and the rights and obligations of the parties thereunder (Ex. 2 (Pledge Agreement) § 10(h), Ex. 1 (Loan Agreement) § 7.08(a)); and (iii) relate to an obligation arising from a transaction involving more than $1 million in the aggregate.

11.     Venue is proper in this Court because the contracts governing this dispute provide for venue in New York County.

A-458

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM          INDEX NO. 658320/2022
NYSCEF DOC. NO. 19                                          RECEIVED NYSCEF: 08/06/2022

## FACTS

A. **The Loan Agreement**

12.      On February 22, 2022, 777 Partners LLC, as Borrower, and Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II, LP, and Vida Insurance Credit Opportunity Fund III, LP, as Lenders, executed the Loan Agreement, pursuant to which Plaintiffs agreed to make the Loan to the Borrower.  *See* Ex. 1 (Loan Agreement).  The Loan matures on December 31, 2022.

13.      The Loan Agreement requires the Borrower to pay interest monthly in arrears.  *Id.* § 2.05(a).  The Loan Agreement also requires the Borrower to make amortization payments in an amount equal to $1,970,246.41 on each of January 31, February 28, and March 31, 2022.  *Id.* §§ 2.04(b), 3.01(e); *see also* Hwang Aff. ¶ 5.

14.      The failure to pay when due the outstanding principal amount of the Loan (including any scheduled amortization payments) and accrued interest thereon constitutes an Event of Default under the Loan Agreement.  Ex. 1 (Loan Agreement) §§ 6.01(a)(i), (iii).  Upon such an Event of Default (subject to a two-day cure period in the case of a missed interest payment), the Lenders may accelerate the Loan and declare the principal, interest, fees, and all other obligations on the Loan to be due and payable immediately.  *Id.* § 6.01.

15.      The Loan Agreement provides that all payments (including amounts received in connection with the exercise of the Lenders' rights after an Event of Default) made by the Borrower to the Lenders under any Facility Document[4] "shall be applied to amounts then due and payable in the following order: (i) to any expenses and indemnities payable by Borrower to Lenders under any Facility Document; (ii) to any accrued and unpaid interest and fees due under

---

[4]      "Facility Documents" is defined to include both the Loan Agreement and the Pledge Agreement.  *See* Ex. 1 (Loan Agreement) § 1.01.

A-459

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM          INDEX NO. 658328/2022
NYSCEF DOC. NO. 19                                         RECEIVED NYSCEF: 08/06/2022

the [Loan Agreement]; (iii) to the Total Accrued Loan Amount; and (iv) to the extent of any excess, to the payment of all other Obligations under the Facility Documents." *Id.* § 2.16(c).

### B. **The Pledge Agreement**

16.     To secure the Loan, Defendant pledged to the Lenders certain collateral including, among other things, the Collateral Shares pursuant to the Pledge Agreement.  *See* Ex. 2 (Pledge Agreement) § 2(b).

17.     The Pledge Agreement requires that Defendant pledge additional Eligible Collateral if the value of the Collateral Shares falls below a contractually prescribed threshold amount.  *Id.* § 5(a).  Specifically, if the Total Accrued Loan Amount exceeds by $5 million or more the sum of (i) the value of the Collateral Shares and (ii) any pledged Cash and Cash Equivalents (a "Collateral Shortfall Event"), Defendant is required to pledge additional Eligible Collateral in an amount sufficient to cause the shortfall—*i.e.* the difference between the Total Accrued Loan Amount and the value of the Collateral—to be less than $5 million. *Id.*

18.     The Pledge Agreement further provides that, after the occurrence of an Event of Default under the Loan Agreement, the Lenders may sell all or any part of the Collateral Shares at a public or private sale.  *Id.* at § 8(i).  If any obligations under the Loan Agreement remain after the application of the proceeds of the Collateral Shares, the Lenders may continue to enforce their remedies under the Facility Documents to collect the deficiency. *Id.* at § 8.  The Pledge Agreement continues in effect until the Loan Agreement has terminated pursuant to its terms and the Borrower's obligations have been paid in full.  *Id.* § 10(c).

### C. **The Borrower Defaulted on the Loan and Defendant Defaulted on its Obligation to Post Additional Collateral**

19.     The Borrower failed to make the amortization payments due on January 31, February 28, and March 31, 2022 (the "Scheduled Amortization Event of Default"), and the

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM    INDEX NO. 656328/2022
NYSCEF DOC. NO. 19    Case 1:24-cv-03453-JGK    Document 61-4    Filed 05/13/24    Page 9 of 13
RECEIVED NYSCEF: 08/06/2022

interest payments due on March 31, April 30, and May 19, 2022 (the "Interest Payment Event of Default"). *See* Hwang Aff. ¶¶ 5-6.

20.    Collateral Shortfall Events occurred on May 17 and May 23, 2022, requiring that Defendant post additional collateral to secure the Loan (the "Collateral Shortfall Event of Default" and, together with the Scheduled Amortization Event of Default and the Interest Payment Event of Default, the "Specified Events of Default"). *Id.* ¶ 7. Defendant did not post additional collateral in clear violation of the terms of the Pledge Agreement. *Id.*

21.    The Lenders attempted to resolve the Specified Events of Default consensually. On or about May 19, 2022, counsel for the Lenders delivered a draft forbearance agreement (the "Forbearance Agreement") to counsel for the Borrower and the Pledgor. *Id.* ¶ 8. The Forbearance Agreement required, among other things, that Defendant pledge additional collateral to cure the Collateral Shortfall Event of Default. *Id.*

22.    Having received no response from the Borrower or Defendant, on or about May 25, 2022, the Lenders delivered a notice of acceleration (the "Notice of Acceleration") to the Borrower declaring the Maturity Date to have occurred and the Loan, all accrued interest thereon, all fees and all other Obligations payable under the Loan Agreement and the other Facility Documents to be forthwith due and payable. *Id.* ¶ 9; *see also* Ex. 3 (Notice of Acceleration). The Borrower did not repay the Loan. *See* Hwang Aff. ¶ 9.

23.    On or about June 1, 2022, the Lenders demanded that the Pledgor post additional collateral to cure the Collateral Shortfall Event of Default. *Id.* ¶ 13; *see also* Ex. 4 (Demand Letter). The Pledgor did not post additional collateral. *See* Hwang Aff. ¶ 13.

24.    While the Lenders and the Borrower exchanged several drafts of the Forbearance Agreement between May 19 and June 1, 2022, they were unable to reach a consensual resolution

A-461

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM
Case 1:24-cv-03453-JGK  Document 61-4  Filed 05/13/24  Page 10 of 13
INDEX NO. 658326/2022
NYSCEF DOC. NO. 19
RECEIVED NYSCEF: 08/06/2022

through a forbearance.  *Id.* ¶¶ 8, 10-12.

D.  **The Auction**

25.      By June 1, 2022, the Borrower owed the Lenders approximately $63 million in accrued and unpaid principal and interest.  *Id.* ¶ 14.   Critically, because of Defendant's failure to honor its contractual obligations, the Lenders were also undersecured by more than $20 million. *Id.*  Accordingly, nearly six months after the Borrower initially defaulted on the Loan, the Lenders exercised their right to put the Collateral Shares up for sale.  *Id.*

26.      On June 8, the Lenders published a notice of public sale under Article 9 of the Uniform Commercial Code in Businesswire in the United States and in London, where the shares of RQIH are listed (the "Notice").  *Id.* ¶ 15; *see also* Ex. 5 (Notice of Public Sale).  That same day, the Lenders emailed the Notice to counsel for the Borrower and the Pledgor and to RQIH's largest shareholders.  *Id.*  On June 10, the Lenders also published the Notice in the Wall Street Journal.  *See* Huang Aff. ¶ 16; *see also* Ex. 6 (WSJ Notice).

27.      On June 20, at approximately 1:00 p.m. Eastern Time, the Lenders conducted a public sale of the Collateral Shares at the New York offices of their counsel, Glenn Agre Bergman & Fuentes LLP.  *See* Huang Aff. ¶ 17; *see also* Ex. 7 (Auction Transcript).  Qualified bidders were also given the option to participate virtually via Zoom.  *See* Huang Aff. ¶ 17.

28.      In addition to the Lenders, two other bidders actively participated in the Auction. *Id.* ¶ 18; *see also* Ex. 7 (Auction Transcript).  Following thirty-two (32) rounds of competitive bidding, the Lenders purchased the Collateral Shares for $41.5 million via credit bid.[5]  *Id.*  The

---

[5]       In light of applicable insurance laws and RQIH's bylaws, which prohibit any one entity from owning more than 9.9% of the company's shares, the sale was conducted in two steps. First, immediately after the auction, the Lenders closed on the maximum number of shares such that the Lenders' total ownership does not exceed 9.89% of the total outstanding shares of RQIH. The purchase of the remaining shares is contingent on the issuance by RQIH of a sufficient number of additional shares through its placing of securities announced on June 14, 2022, such that the Lenders' total ownership does not exceed 9.89% of the total outstanding shares of RQIH.  If such a contingency does not occur, the remaining shares will be

A-462

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM   INDEX NO. 658328/2022
NYSCEF DOC. NO. 19   Case 1:24-cv-03453-JGK   Document 61-4   Filed 05/13/24   Page 11 of 13   RECEIVED NYSCEF: 08/06/2022

purchase price represented a 7% discount to the closing price for RQIH's shares on the date of the Auction. *See* Huang Aff. ¶ 18.

**E.   Defendant is Required to Post Additional Eligible Collateral to Secure the Loan**

29.   As noted above, the Loan Agreement provides that payments received in connection with the Auction shall be applied to amounts then due and payable to the Lenders in the following order: (i) to expenses and indemnities; (ii) to the accrued and unpaid interest and fees; (iii) to the aggregate principal amount outstanding; and (iv) to the extent of any excess, to the payment of all other Obligations under the Facility Documents. Ex. 1 (Loan Agreement) § 2.16(c).

30.   After the applying the $41.5 million of proceeds from the sale of the Collateral Shares pursuant to the Loan Agreement waterfall, the Borrower continues to owe the Lenders principal in the sum of $22,354,065.02. *See* Hwang Aff. ¶ 19. As of the date of this filing, this deficiency remains outstanding and the only Collateral securing the Loan is approximately $20,023 in cash currently on deposit in the Collateral Account. *Id.* Accordingly, Defendant is required to post additional Eligible Collateral in an amount not less than $17,334,043.02 to secure the Loan. *See* Ex. 2 (Pledge Agreement) § 5(a).

**CLAIMS FOR RELIEF**

**COUNT ONE**

**(Specific Performance)**

31.   Plaintiffs incorporate all preceding paragraphs as if fully re-alleged herein.

32.   Plaintiff Vida Capital Management, LLC and Defendant are parties to the Pledge Agreement, a valid and enforceable contract.

---

put back up for auction. Accordingly, the final purchase price for the Collateral Shares—and resulting deficiency and collateral shortfall—are subject to change. Plaintiffs expressly reserve the right to amend this Complaint to reflect any such change.

A-463

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:02 PM          INDEX NO. 653328/2022
NYSCEF DOC. NO. 13                                        RECEIVED NYSCEF: 08/06/2022

33.    Plaintiff Vida Capital Management, LLC is ready, willing and able to perform its obligations under the Pledge Agreement and has fulfilled all of its duties thereunder to date.

34.    Plaintiff Vida Capital Management, LLC has not committed any breaches of the Pledge Agreement that would excuse Defendant from its performance of obligations thereunder.

35.    Pursuant to the Pledge Agreement, Defendant is required to post additional Eligible Collateral in an amount not less than $17,334,043.02 to secure the Loan.

36.    Defendant's failure to post additional Eligible Collateral to secure the Loan constitutes a material breach of its obligations under the Pledge Agreement.

37.    Plaintiffs have no adequate remedy at law, as monetary damages are inadequate to satisfy Defendant's obligation to secure the Loan.

38.    Accordingly, Plaintiffs are entitled to judgment declaring and adjudicating that Defendant must post additional Eligible Collateral in an amount not less than $17,334,043.02 to secure the Loan.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

a)    Enter judgment declaring and adjudicating that Defendant must post additional Eligible Collateral in an amount not less than $17,334,043.02 to secure the Loan.

b)    Grant Plaintiffs attorneys' fees and costs as required pursuant to the terms of the Pledge Agreement.

c)    Grant Plaintiffs such further relief as the Court deems appropriate.

A-464

FILED: NEW YORK COUNTY CLERK 08/00/2022 07:08 PM INDEX NO. 658328/2022
NYSCEF DOC. NO. 73 RECEIVED NYSCEF: 08/06/2022

Case 1:24-cv-03453-JGK Document 61-4 Filed 05/13/24 Page 13 of 13

Dated: New York, NY
July 1, 2022

**GLENN AGRE BERGMAN & FUENTES LLP**

By: _____
Andrew K. Glenn
Kurt A. Mayr
Agustina G. Berro
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 358-5600

*Attorneys for Plaintiffs Vida Longevity Fund, LP, Vida Insurance Credit Opportunity Fund II, LP, Vida Insurance Credit Opportunity Fund III, LP, and Vida Capital Management, LLC*

A-465

# EXHIBIT E

A-466

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM    INDEX NO. 651220/2024
NYSCEF DOC. NO. 2    Case 1:24-cv-03453-JGK    Document 61-5    Filed 05/13/24    Page 2 of 15    RECEIVED NYSCEF: 03/07/2024

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

OBRA CAPITAL MANAGEMENT, LLC f/k/a
VIDA CAPITAL MANAGEMENT, LLC, VIDA
LONGEVITY FUND, LP, VIDA INSURANCE
CREDIT OPPORTUNITY FUND II, LP, and
VIDA INSURANCE CREDIT OPPORTUNITY
FUND III, LP

*Plaintiffs,*

vs.

777 PARTNERS LLC and STEVEN W. PASKO

*Defendants.*

Index No. _____

---

## COMPLAINT

Plaintiffs OBRA CAPITAL MANAGEMENT, LLC f/k/a VIDA CAPITAL MANAGEMENT, LLC (the "Obra Capital" or the "Collateral Agent"), VIDA LONGEVITY FUND, LP ("Vida Longevity"), VIDA INSURANCE CREDIT OPPORTUNITY FUND II, LP ("Vida Insurance II"), VIDA INSURANCE CREDIT OPPORTUNITY FUND III, LP ("Vida Insurance III" and, together with Vida Longevity and Vida Insurance II, the "Lenders"), for their complaint against defendants 777 PARTNERS LLC ("777") and STEVEN W. PASKO ("Pasko"), allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## NATURE OF THE ACTION

1.    777 is a Florida-based investment manager whose early investments include (i) a company that operates a payday lending scheme that contracts with a Native American tribe to bypass state laws limiting interest rates on short-term loans and (ii) a company that was sued by attorneys general in seven states for allegedly deceiving homeowners into signing deals granting the company exclusive rights to serve as their real estate agent. One lawsuit filed by a former

Case: 24-2647, 11/22/2024, DktEntry: 38.1, Page 209 of 282

A-467

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM          INDEX NO. 651220/2024
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 03/07/2024

Case 1:24-cv-03453-JGK   Document 61-5   Filed 05/13/24   Page 3 of 15

business partner alleges that 777 is operating a "sprawling fraudulent enterprise."

2.  Until recently, 777 maintained a relatively low profile that kept its questionable business practices and penchant for stiffing creditors out of the public eye. Then in late 2021, 777 began buying multiple sports teams in Europe and Latin America. In September 2023, 777 bid nearly $700 million to purchase Everton FC, one of England's oldest and most financially troubled soccer clubs. 777's flashy shopping spree raised questions about the source of its funding and the health of its business operations.

3.  777 has not been able to answer those questions. Its purchase of Everton FC has been stalled for months because 777 has not provided regulators audited financials for the last two years. Investigative reporting by the Washington Post, New York Times, and multiple other publications has uncovered murky finances and a web of questionable related-party transactions. The DOJ is reportedly investigating 777 for money laundering and other infractions. On or around February 15, 2024, 777's CFO reportedly resigned.

4.  With this enhanced scrutiny, 777's house of cards began crumbling down. 777 and its sister company, 600 Partners, reportedly lost nearly $600 million in the twelve months ended June 30, 2022. Since then, 777 has missed payroll, failed to pay rent, and has been sued by a growing number of creditors seeking to collect unpaid debts.

5.  Consistent with its pattern of questionable business practices, on or around November 2023, 777 transferred two cash-rich subsidiaries – Sutton Specialty Insurance Company and Sutton National Insurance Company – to Defendant Pasko for no consideration to shield those assets from creditors. This action seeks (i) to avoid the transfer as a fraudulent conveyance and claw back those assets to satisfy Plaintiffs' substantial unpaid debts after they extended credit to 777 in good faith and (ii) the appointment of a receiver to take charge of the assets transferred.

2

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM
INDEX NO. 651220/2024
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 03/07/2024

## PARTIES

6.      Plaintiff Obra Capital is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of Delaware.

7.      Plaintiff Vida Longevity is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of Delaware.

8.      Plaintiff Vida Insurance II is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of the Cayman Islands.

9.      Plaintiff Vida Insurance III is, and at all relevant times hereinafter mentioned was, a limited partnership organized under the laws of the Cayman Islands.

10.     Defendant 777 is, and at all relevant times hereinafter mentioned was, a limited liability company organized under the laws of Delaware, with its principal place of business in Miami, Florida.

11.     Defendant Pasko is a resident of the state of Florida. Pasko is, and at all relevant times hereinafter mentioned was, 777's insider.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action and Defendants under CPLR 301 because Defendants transact business in New York state and Defendants consented to this Court's jurisdiction under the contracts giving rise to this dispute.

13.     Section 5-1402 of the New York General Obligations Law also provides for this Court's jurisdiction over this action and Defendants because the action arises out of contracts that: (i) contain a clause in which the parties have submitted to jurisdiction in New York (Third Amended Loan Agreement § 7.08(b), Pledge Agreement § 10(h));  (ii) contain a clause choosing New York as the governing law over those contracts and the rights and obligations of the parties thereunder (Third Amended Loan Agreement § 7.08(a), Pledge Agreement § 10(h)); and (iii) relate

3

A-469

to an obligation arising from a transaction involving more than $1 million in the aggregate.

14.     Venue is proper in this Court because the contracts giving rise to this dispute provide for venue in New York County.

## FACTS

**I.   777 Borrows $55 Million From Plaintiffs and Fails to Repay the Loan Despite Numerous Extensions and Concessions.**

15.     In June 2020, 777 borrowed $40 million (the "Loan") from Plaintiffs pursuant to that certain Margin Loan Agreement (the "Original Loan Agreement"), dated June 12, 2020. Original Loan Agreement § 2.02(a). The Loan would mature pursuant to its terms on June 12, 2021 (the "Original Maturity Date"). *Id.* § 2.04.

16.     To induce Plaintiffs to provide the Loan, one of 777's many subsidiaries pledged shares (the "Collateral Shares") of insurance company Randall & Quilter Investment Holdings Ltd. ("R&Q") to secure the Loan under a Pledge Agreement, dated June 12, 2020, by and between Brickell PC Insurance Holdings LLC ("Brickell") and Pledgor and Vida Capital Management, LLC as Secured Party (the "Pledge Agreement"). To ensure that Plaintiffs were adequately secured during the term of the Loan, 777 agreed to either prepay the Loan or cause Brickell to pledge additional Eligible Collateral – *i.e.* cash or cash equivalents – if the value of the Collateral Shares fell below a contractually prescribed threshold amount. *Id.* § 2.09(b). Specifically, if the Total Accrued Loan Amount exceeds by $5 million or more the sum of (i) the value of the Collateral Shares and (ii) any pledged Cash and Cash Equivalents (a "Collateral Shortfall Event"), Brickell was required to pledge additional Eligible Collateral in an amount sufficient to cause the shortfall – *i.e.* the difference between the Total Accrued Loan Amount and the value of the Collateral – to be less than $5 million. *Id.*

17.     The Original Loan Agreement had customary reporting requirements – including

4

A-470

furnishing Plaintiffs audited financials within one hundred twenty (120) days after the end of each

fiscal year (*id.* § 5.01(b)(iv)) – and customary restrictions on asset transfers, dividends, and

transactions with affiliates, including that:

    i.    "Without the prior consent of the Lenders, Borrower shall not, and shall cause Pledgor not to, merge or consolidated with or into, or convey, transfer, lease or otherwise dispose of, whether in one transaction or in a series of contractions, all or substantially all of the property and assets (whether now owned or hereafter acquired) of Borrower or Pledgor to any Person" (*id.* § 5.02(b));

    ii.    Subject to narrow exceptions, "Borrower shall not declare or make payment of any distribution on or in respect of any equity interests" without the Lenders' consent (*id.* § 5.02(g)); and

    iii.    "Borrower shall not, nor shall it permit Pledgor or any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate Borrower on terms that are less favorable to Borrower or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate." *Id.* § 5.02(h).[1]

777 also represented and warranted to Plaintiffs that:

> The present fair market value of each of Borrower's assets exceeds the total amount of Borrower's liabilities (including contingent liabilities), (ii) Borrower has capital and assets sufficient to carry on its businesses, and (iii) Borrower does not intend to incur and does not believe that it will incur debts beyond its ability to pay as they become due. Borrower will not be rendered insolvent by the execution, delivery and performance of documents relating to this Agreement or by the consummation of the transactions contemplated under this Agreement.

*Id.* § 4.01(l).

    18.    Less than a month after 777 borrowed the original $40 million from Plaintiffs, 777

asked Plaintiffs to extend the Original Maturity Date and provide additional financing. On July 14,

2020, 777 and Plaintiffs Vida Longevity, Vida Insurance II, and Vida Insurance III executed the

---

[1]    The Original Loan Agreement defines "Affiliate" as any Person that "directly, or indirectly through one ore more intermediaries, Controls or is Controlled by or is under common Control with the Person specified." *Id.* § 1.01. "Control," in turn, is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise." *Id.*

<center>5</center>

A-471

Case 1:24-cv-03453-JGK    Document 61-5    Filed 05/13/24    Page 7 of 15

Amended and Restated Margin Loan Agreement (the "Amended Loan Agreement"), which superseded and replaced the Original Loan Agreement. The Amended Loan Agreement upsized the Loan to $55 million and extended the Original Maturity Date to July 14, 2021 (the "Amended Maturity Date"). Amended Loan Agreement §§ 2.02(d), 2.04.

19.     Like the Original Loan Agreement, the Amended Loan Agreement (i) had customary reporting requirements, including furnishing Plaintiffs audited financials (*id.* § 5.01(b)(iv)), (ii) had customary restrictions on asset transfers, dividends, and transactions with affiliates (*id.* §§ 5.02(b), (g) & (h)), and (iii) contained representations and warranties concerning 777's solvency and capitalization (*id.* § 4.01(l)).

20.     Despite 777's representation to Plaintiffs that it was adequately capitalized and able to pay its debts as they became due, 777 did not repay the Loan at maturity. 777 also failed to furnish Plaintiffs audited financials for fiscal year 2020 by the deadline in the Amended Loan Agreement.

21.     At 777's request, Plaintiffs agreed to waive the Events of Default and extend the Amended Maturity Date to give 777 breathing room to address its liquidity constraints. On July 27, 2021, Plaintiffs and 777 executed the Second Amended and Restated Margin Loan Agreement (the "Second Amended Loan Agreement"), which extended the Amended Maturity Date to July 27, 2022 (the "Second Amended Maturity Date").

22.     Like the Original Loan Agreement and the Amended Loan Agreement, the Second Amended Loan Agreement (i) had customary reporting requirements, including furnishing Plaintiffs audited financials (*id.* § 5.01(b)(iv)), (ii) had customary restrictions on asset transfers, dividends, and transactions with affiliates (*id.* §§ 5.02(b), (g) & (h)), and (iii) contained representations and warranties concerning 777's solvency and capitalization (*id.* § 4.01(l)).

6

A-472

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM INDEX NO. 651220/2024
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 03/07/2024

23. 777 again failed to pay the Loan at maturity and did not provide Plaintiffs audited financials for fiscal year 2021, as it was required to do pursuant to the terms of the Second Amended Loan Agreement.

24. At 777's request, Plaintiffs extended the maturity date for a third time. On February 22, 2022, Plaintiffs and 777 executed the Third Amended and Restated Margin Loan Agreement (the "Third Amended Loan Agreement" or "Loan Agreement"), which extended the Second Amended Maturity Date to December 31, 2022 (the "Third Amended Maturity Date"). Third Amended Loan Agreement § 2.04(a).

25. Like the first three Loan Agreements, the Third Amended Loan Agreement (i) had customary reporting requirements, including furnishing Plaintiffs audited financials (*id.* § 5.01(b)(iv)), (ii) had customary restrictions on asset transfers, dividends, and transactions with affiliates (*id.* §§ 5.02(b), (g) & (h)), and (iii) contained representations and warranties concerning 777's solvency and capitalization (*id.* § 4.01(l)). The Third Amended Loan Agreement also required that 777 make amortization payments in an amount equal to $1,970,246.41 on each of January 31, 2022, February 28, 2022, and March 31, 2022 (*id.* §§ 2.04(b), 3.01(e)).

26. Despite repeatedly representing to Plaintiffs that it was adequately capitalized and able to pay its debts as they became due, 777 did not make ***any payments*** under the Third Amended Loan Agreement. 777 missed the first three interest payments due in March, April, and May, 2022 and the first three amortization payments due in January, February, and March, 2022.

27. 777 also defaulted in its obligation to cure Collateral Shortfall Events that occurred on May 17 and May 23, 2022.

28. Plaintiffs again attempted to resolve the defaults consensually. On or about May 19, 2022, counsel for Plaintiffs delivered a draft forbearance agreement (the "Forbearance

7

A-473

Case 1:24-cv-03453-JGK    Document 61-5    Filed 05/13/24    Page 9 of 15

Agreement") to counsel for Defendant. While the parties exchanged several drafts of the Forbearance Agreement, they were unable to reach a consensual resolution through a forbearance.

29.      On or about May 25, 2022, Plaintiffs delivered a notice of acceleration (the "Notice of Acceleration") to 777 declaring the Maturity Date to have occurred and the Loan, all accrued interest thereon, all fees and all other Obligations payable under the Loan Agreement and the other Facility Documents to be forthwith due and payable. 777 did not repay the Loan.

30.      By June 1, 2022, 777 owed Plaintiffs approximately $63 million in unpaid principal and interest. Plaintiffs were also undersecured by more than $20 million.

31.      Nearly six months after 777 initially defaulted under the Third Amended Loan Agreement, Plaintiffs exercised their right to put the Collateral Shares up for sale. On June 8, 2022, Plaintiffs published a notice of public sale under Article 9 of the Uniform Commercial Code in Businesswire in the United States and in London, where the shares of R&Q are listed. On June 20, 2022, Plaintiffs conducted a public sale of the Collateral Shares (the "Auction"). Following thirty-two (32) rounds of competitive bidding, Plaintiffs purchased the Collateral Shares for $41.5 million via credit bid. The purchase price represented a 7% discount to the closing price for R&Q's shares on the date of the Auction. After applying the $41.5 million Auction proceeds to the unpaid Loan balance, 777 still owed Plaintiffs approximately $22.4 million (the "Deficiency").

32.      On June 9, 2022, Plaintiffs sued 777 to recover the Deficiency in this Court. Plaintiffs also filed an action against Brickell seeking an order compelling Brickell to abide by the terms of the Pledge Agreement, which unambiguously requires that Brickell pledge additional collateral to cure the Collateral Shortfall Events that left Plaintiffs undersecured by more than $20 million. The two actions were consolidated and are still pending before this Court (together, the "Deficiency Action").

8

A-474

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM INDEX NO. 651220/2024
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 03/07/2024

## II. 777's Mounting Unpaid Debts.

33. Plaintiffs are not the only creditors 777 has refused to pay. 777 is a defendant in an ever-growing number of lawsuits seeking to recover unpaid debts and alleging serious misconduct, including:

- *American Express Travel Related Services Company, Inc. v. 777 Partners LLC*. On March 3, 2023, American Express sued 777 for breach of contract after 777 '*failed and refused to pay" an outstanding balance of $324,002.89* on 777's corporate card.

- *The Oxbridge Group, LTD v. 777 Partners LLC*. On April 21, 2023, The Oxbridge Group, LTD, an executive search firm dedicated to recruiting investment professionals, sued 777 for breach of contract. The complaint alleges that "after Oxbridge placed three candidates with 777, and 777 acknowledged its obligation to pay Oxbridge its fees by the deadline of August 10, 2022, 777 'slow-rolled' Oxbridge by making only occasional payments against the obligation and now, even worse, has ignored Oxbridge entirely, despite threats of litigation, and has *brazenly refused to pay the outstanding balance of $94,000*, without any explanation, let alone a legal justification."

- *1 Madison Office Fee LLC v. 777 Partners LLC et al*. On September 8, 2023, 777's landlord sued 777 for specific performance after 777 *failed to deliver a security deposit of $5 million* it was required to provide pursuant to the terms of its lease.

- *Balanced Management LLC v. 777 Partners LLC*. On or around December 14, 2023, hard money lender Balanced Management sued 777 to recover *an unpaid debt of $11.2 million*.

- *Corvus Lights Aviation et al v. 777 Partners LLC*. On December 12, 2023, three aircraft lessors sued 777 for $30 million after 777 missed lease payments for four jets. The aircraft had been repossessed in March. In a public statement the lessors alleged that "[d]espite being repeatedly notified of their financial obligations, 777 Partners *continued to ignore calls to settle outstanding payments of almost $30 million.*"

- *Lasse Meilsoe v. 777 Partners LLC et al*. On December 22, 2023, a creditor sued 777 to *recover more than $2 million on two unpaid promissory notes*.

- *Change Lending, LLC v. 777 Partners LLC*. On January 9, 2024, Change Lending, LLC ("Change"), the largest community development financial instituted in the United States, sued 777 seeking $30 million in damages for breach of contract. Change invested $17 million to purchase preferred equity in 777 and one of its affiliates. Pursuant to the terms of the parties' agreement, 777 was required to deliver certain financial information to Change to verify 777's financial condition and operations. If 777 failed to deliver the financials, Change had the right to immediately

9

A-475

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM
NYSCEF DOC. NO. 2
INDEX NO. 651220/2024
RECEIVED NYSCEF: 03/07/2024

redeem all of the preferred equity it held in 777 (the "Repurchase Right"). After 777 failed to deliver the financials, Change exercised its Repurchase Right. The complaint alleges that, instead of honoring Change's Repurchase Right, 777 "*redirected capital into new investments and management bonuses.*"

- *O'Neil-Dunne et al v. Phoenicia LLC*. On September 29, 2023, an investor in one of 777's subsidiaries, Phoenicia LLC, sued 777 and Phoenicia LLC in Delaware Chancery Court alleging that "777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a *sprawling fraudulent enterprise*[.]"

34.     777's mounting unpaid debts have also been widely reported by publications in the United States and abroad, including:

- On October 17, 2023, Josimar reported that 777 had *missed payroll in July*, *owed the landlord for its Miami, FL headquarters $142,000*, and *owed Boca Raton's Boca Beach Club $1.2 million* for an annual investment retreat 777 held at the resort eight months prior. The article also cited sources alleging that Kenneth King, who runs a network of insurance and investment firms, had been "propping up 777 Partners for a while now and that, without King's backing, [777] would be unable to meet its operational costs, and would collapse."

- On October 18, 2023, the New York Times reported that 777's proposed purchase of the English Premier League soccer team Everton F.C. had stalled because 777 "failed to provide audited financial statements to a British government regulator that must approve the deal." The article describes how 777 also failed to "provide details of the source of the funds behind the acquisition" and had engaged in similar conduct the prior year with Belgian soccer authorities that had raised questions about 777 business practices. Critically, the article also cites current and former employees of 777 who disclosed that 777 "*continues to miss routine payments to businesses, vendors and partners* …."

- On November 26, 2023, Forbes reported that 777 was "*still scrounging for cash*" to buy Everton F.C. The article cites sources alleging that the funding for the purchase was "coming from Colombia drug money."

- On January 17, 2024, soccer publication Liverpool Echo cited a statement from the English Premier League's CEO suggesting that 777's purchase of Everton F.C. was still delayed because the Premier League "haven't had satisfactory answers to the questions we have asked" 777.

- On September 22, 2023, the UK's Sunday Times published an article discussing 777's investment in the British Basketball League. According to the article, 777 agreed to a £7 million investment package in the British Basketball League in December 2021. Less than two years after 777 agreed to make that investment, the

10

A-476

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM
NYSCEF DOC. NO. 2
INDEX NO. 651220/2024
RECEIVED NYSCEF: 03/07/2024

Case 1:24-cv-03453-JGK    Document 61-5    Filed 05/13/24    Page 12 of 15

league's chairman stated in an email that "[f]ollowing **several missed payments from 777 Partners totalling circa £900k** which placed the league in a position where a number of its creditors were unwilling to continue the supply of services, indeed the league was in receipt of threatened legal action from two, [the experience] has resulted in the overwhelming number of clubs in membership wishing to bring the agreement with 777 Partners to an end."

35.      777 has gone to great lengths to hide its financial condition, refusing to provide audited financials to counterparties, regulators, and rating agencies alike. Investigative reporting by Josimar, however, paints a grim picture. According to an article published on November 6, 2023, 777 and its sister company 600 Partners lost nearly $172 million in the first half of 2021 and nearly $426 million in the first half of 2022.



| **DISCLAIMER:** 777 Partners LLC has prepared the below financial statements based on the best information known at this time. Such information is estimated, unaudited and still under review by management. Additionally, some of the underlying subsidiaries' 2021 audits are incomplete and may be subject to adjustments, the magnitude and certainty of which are unknown as of the date these financial statements were provided. Therefore, Information is subject to change and such adjustments could be material. |
|---|

| 777 Partners LLC and 600 Partners LLC Consolidated and Combined Balance Sheets | December 31, 2021 (Unaudited) |
|---|---|
| Total comprehensive income (loss) attributable to 777 Partners LLC and 600 Partners LLC | (171,536,221) |

| 777 Partners LLC and 600 Partners LLC Consolidated and Combined Balance Sheets | June 30, 2022 (Unaudited) |
|---|---|
| Total comprehensive income (loss) attributable to 777 Partners LLC and 600 Partners LLC | (425,657,305) |

The massive losses were primarily due to an unsustainable interest expense of $427 million for the twelve-months ended June 30, 2023, and to an "unrealized change in fair value of financials assets" which wiped nearly $560 million from 777's balance sheet. *Id.*

11

A-477

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM          INDEX NO. 651220/2024
NYSCEF DOC. NO. 2          Case 1:24-cv-03453-JGK   Document 61-5   Filed 05/13/24   Page 13 of 15          RECEIVED NYSCEF: 03/07/2024

### III.   777 Transfers Assets for no Consideration to Hinder and Delay Creditors.

36.     Facing mounting debts it cannot repay, 777 underwent an internal restructuring to hinder and delay payment to creditors.

37.     On November 16, 2023, rating agency AM Best placed 777 subsidiaries Sutton Specialty Insurance Company and Sutton National Insurance Company under review with negative implications following 777's decision to reorganize its ownership structure. The restructuring transferred the two Sutton entities from 777 to Pasko, 777's co-founder and current insider. *Id.*

38.     777 did not receive any consideration for the transfer. Rather, the transfer was intended to shield assets from Plaintiffs and 777's other creditors to hinder and delay their recovery on mounting debts.

### CLAIMS FOR RELIEF
### COUNT ONE
#### (Constructive Fraudulent Transfer)

39.     Plaintiffs incorporate all preceding paragraphs as if fully re-alleged herein.

40.     On or around November 2023, 777 transferred two of its subsidiaries, Sutton Specialty Insurance Company and Sutton National Insurance Company, to Pasko (the "Fraudulent Transfer").

41.     777 did not receive any consideration for the Fraudulent Transfer.

42.     At the time of the Fraudulent Transfer, 777 owed (and still owes) Plaintiffs more than $20 million.

43.     As evidenced by 777's long list of unpaid debts, at the time of the Fraudulent Transfer, 777 (i) was insolvent, (ii) engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction and (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts

12

A-478

FILED: NEW YORK COUNTY CLERK 03/07/2024 12:23 PM          INDEX NO. 651220/2024
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 03/07/2024

Case 1:24-cv-03453-JGK   Document 61-5   Filed 05/13/24   Page 14 of 15

beyond his or her ability to pay as they became due.

44.      777 did not receive reasonably equivalent value in exchange for the Fraudulent Transfer.

45.      Consequently, the Fraudulent Transfer is voidable under Sections 273(a)(2) and 274 of the New York Debtor and Creditor law, and/or Sections 726.105(1)(b) and 726.106 of the Florida Statutes.

## COUNT TWO
### (Actual Fraudulent Transfer)

46.      Plaintiffs incorporate all preceding paragraphs as if fully re-alleged herein.

47.      Pasko is, and at all relevant times was, 777's insider.

48.      777 did not receive any consideration for the Fraudulent Transfer. Rather, the Fraudulent Transfer was intended to shield assets from Plaintiffs and 777's other creditors to hinder and delay their recovery.

49.      At the time of the Fraudulent Transfer, 777 owed (and still owes) Plaintiffs more than $20 million.

50.      As evidenced by 777's long list of unpaid debts, at the time of the transfer 777 (i) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction and (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond his or her ability to pay as they became due.

51.      Consequently, the Fraudulent Transfer is voidable under Section 273(a)(1) of the New York Debtor and Creditor law and/or Section 726.105(1)(a) of the Florida Statutes.

13

A-479

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its

favor and against Defendants:

a) That the Fraudulent Transfer be avoided under N.Y. Debt. & Cred. Law § 273(a)(2) or Fla. Stat. Ann. § 726.105(1)(1);

b) That the Fraudulent Transfer be avoided under N.Y. Debt. & Cred. Law § 273(a)(1) or Fla. Stat. Ann. § 726.105(1)(a);

c)  That a receiver be appointed to take charge of the assets transferred;

d) Awarding post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full;

e) Awarding Plaintiffs all fees, costs, and expenses incurred in connection with investigating and prosecuting the claims and causes of action alleged herein;

f) Awarding Plaintiffs punitive damages; and

g) Granting Plaintiffs such other and further relief as this Court deems just and proper.

Dated: New York, NY
      March 7, 2024

Respectfully submitted,

GLENN AGRE BERGMAN & FUENTES LLP

By: ___/s/ Andrew K. Glenn___
Andrew K. Glenn
Kurt A. Mayr
Agustina G. Berro

1185 Avenue of the Americas, 22nd Floor
New York, NY 10036
Tel: (212) 970-1600
aglenn@glennagre.com
kmayr@glennagre.com
aberro@glennagre.com

*Attorneys for Plaintiffs*

14

A-480

# EXHIBIT F

A-481

DAVID P. BILLINGS (11510)
**FABIAN VANCOTT**
95 S. State Street, Suite 2300
Salt Lake City, Utah 84111
Phone: 801-531-8900
dbillings@fabianvancott.com
*Attorneys for Plaintiff*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

**IN THE THIRD JUDICIAL DISTRICT COURT**
**IN AND FOR SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| BALANCED MANAGEMENT, LLC, a Utah limited liability company, | **COMPLAINT** |
| Plaintiff, | |
| v. | Civil No. 23_____ |
| 777 PARTNERS, LLC, a New York limited liability company, | Judge _____ |
| Defendant. | Tier 3 |

**STATEMENT**

1.     Plaintiff Balanced Management, LLC, a Utah limited liability company ("BML") brings this Complaint against Defendant 777P Partners, LLC, a New York limited liability company ("777P") for breach of contract, injunctive relief, and declaratory judgment. Plaintiff seeks damages in the amount of $11,206,356.25, plus attorney fees, costs, and interest, along with a temporary restraining order, and a preliminary injunction prohibiting 777P from receiving any funding from the securitization of the assets of 777P's wholly owned subsidiary Trans Atlantic Lifetime Mortgages Limited ("TAMI") without complying with the contractual obligations 777P owes to BML.

2.     Based on the foregoing and following, BML designates this action as a Tier 3 action under Utah R. Civ. P. 26(c)(3) as the amount in controversy greatly exceeds $300,000.

**JURISDICTION AND VENUE**

1

A-482

3.      This Court is vested with jurisdiction over this matter pursuant to Utah Code § 78A-5-102(1). 777P is subject to the jurisdiction of this Court under the Utah Long Arm Statute, Utah Code § 78B-3-205, as 777P was transacted for business within this state and contracted for the supply of services within this state. Further, 777P consented to the jurisdiction through the loan agreements at issue in this matter.

4.      Venue is proper in this Court pursuant to Utah Code §§ 78B-3-304(2), as the contracts at issue state that venue for any lawsuit related to the loans "be brought in any court of the State of Utah."

### THE PARTIES

5.      Plaintiff BML is a Utah limited liability company, with its principal place of business in South Jordan, Utah.

6.      Defendant 777P is a New York limited liability company, with its principal place of business in Miami, Florida. 777P, an American private investment company, waived personal service of process under the contracts at issue.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.      TAMI is a private limited company duly organized under the laws of the United Kingdom, engaged in the practice of the lifetime mortgage originations.

8.      Upon information and belief, 777P is the manager, agent, and parent company of TAMI as well as several other affiliated companies, including Sutton Park Capital, LLC ("SPC"), and Speed Leasing Company, LLC ("SLC") (collectively, the "Affiliated Companies"). Exhibit A ¶ 28; Exhibit B at 2, 24; Exhibit C at 2, 27.

9.      Upon information and belief. 777P is the majority shareholder of TAMI. Exhibit A ¶ 28

2

A-483

10.     On or about June 30, 2023, BML entered into loan agreements with SPC and SLC, whereby BML loaned $5,200,000.00 and 5,200,000.00 respectively, plus various charges and interest rates applicable under each respective agreement. Exhibit B; Exhibit C.

11.     Both loan agreements with the Affiliated Companies were guaranteed by 777P. Exhibit B at 2; 24; Exhibit C at 2, 27.

12.     Both loan agreements set Utah as the jurisdiction and venue over any lawsuits related to the loan agreements. Exhibit B at 14; Exhibit C at 17.

13.     777P, SPC, and SLC agreed and consented to jurisdiction and venue in Utah, "each waive[d] any objections, including *forum non conveniens,* to the bringing of any such proceeding in such jurisdictions." *See* Exhibits B & C at § 31

14.     The combined outstanding amount due by the Affiliated Companies and 777P is currently $11,206,356.25. Exhibit A ¶ 14.

15.     As part of these loan agreements with the Affiliated Companies, BML entered into a Paydown Addendum, Modification and Cross- Default Agreement (the "Paydown Addendums") with both SPC and SLC as well as 777P. Exhibit D; Exhibit E.

16.     777P signed the Paydown Addendums as manager of SPC and SLC, respectively. Exhibit D; Exhibit E.

17.     The Paydown Addendums stated, "At this time, it is anticipated that affiliate TRANS ATLANTIC LIFETIME MORTGAGES LIMITED ("Tami") may receive funds in connection with a certain transactions involving the sale of securitized assets." Exhibit D; Exhibit E.

18.     Under the terms of the Paydown Addendums, "[t]he closing of any transaction or similar transaction referenced, evidenced, reflected, or contemplated or similar transaction" or "the

3

A-484

Receipt of more than [$7,200,000.00, in the case of SLC, or $7,850,000.00, in the case of SPC] in funds by TAMI" triggered a requirement that the Affiliated Companies immediately paydown the outstanding balance under each respective loan agreement. Exhibit D; Exhibit E.

19.     In order to ensure this paydown was completed, the Paydown Addendums included a clause stating: "To effectuate this Paydown, Tami shall ensure that the Transaction involving the payment of funds to Tami, shall include Balanced Management, LLC in the flow of funds for the transaction in an amount up $7,850,000.00, of which at most the loan outstanding balance will be applied as the Paydown referenced herein." Exhibit D; Exhibit E.

20.     Failure to meet those conditions qualified as an Event of Default between BML, TAMI, and the Affiliated Parties. Exhibit D; Exhibit E.

21.     Upon information and belief, a third party, A-Cap, LLC ("A-Cap"), is involved in the upcoming securitization of assets involving TAMI, to be finalized on December 17, 2023. Exhibit A.

22.     As manager, agent, and parent company of TAMI as well as the majority shareholder of TAMI, 777P has control over the flow of funds resulting for any securitization of assets involving TAMI. Exhibit A ¶ 25.

23.     777P and TAMI have not taken the proper steps required to include BML in the flow of funds for any securitization of TAMI's assets, as required by contract. Exhibit A ¶ 27.

24.     Because the securitization transaction will occur in the United Kingdom, BML will suffer irreparable harm should 777P be allowed to interfere with and ignore BML's right to be included in the flow of funds by directing TAMI to close on the transaction with A-Cap. Exhibit A ¶¶ 30-31.

4

**A-485**

25.     BML will suffer irreparable harm should 777P and TAMI interfere with and ignore BML's right to be included in the flow of funds and fail to include BML in the flow of funds from the upcoming securitization of assets involving TAMI and A-Cap. Exhibit A ¶¶ 30-31.

26.     Failure to include BML in the flow of funds from the upcoming securitization of assets involving TAMI with substantially increase the risk that BML is unable to fully recover under the terms of the contracts entered into between 777P, TAMI, the Affiliated Companies, and BML. Exhibit A ¶¶ 30-31.

## FIRST CAUSE OF ACTION
(Breach of Contract)

27.     Plaintiff reincorporates the preceding paragraphs as if fully set out herein.

28.     There is a valid contract between BML and 777P and TAMI, as set forth in the Loan Agreements and the Paydown Addendums. *See* Exhibits B-E.

29.     777P, as manager, agent, and parent company of TAMI as well as the Affiliated Companies, had the power to bind TAMI and the Affiliated Companies to the contracts with BML.

30.     777P signed the loan agreements as guarantor, thus obligating 777P to make payments in accordance with the Loan Agreements. Exhibit B; Exhibit C; Exhibit D; Exhibit E.

31.     777P breached the Loan Agreements, by causing its subsidiaries the Affiliated Companies not to pay on the Loans. Exhibit A ¶¶ 8-14, 28; Exhibits B, C, & F.

32.     77P breached the Paydown Addendums, by failing to include BML in the flow of funds resulting from the securitization of assets involving TAMI, as required by the terms of the Paydown Addendums. Exhibit A ¶ 27.

33.     Further, as guarantor of the contracts between BML and the Affiliated Companies, 777P has breached the underlying loan documents. Exhibit A ¶ 28.

A-486

34.     BML performed its obligations under the Loan Agreements and Paydown Addendums, providing millions of dollars to 777P's subsidiaries. Exhibit A ¶¶ 8-11, 28.

35.     The Loan Agreements contain an attorney fees provision. *See* Exhibits B & C at § 23.

36.     For the reasons set forth above, 777P, TAMI, and the Affiliated Companies are in default of their obligations under the Loan Agreements and Paydown Addendums, including but not limited to failure to pay the indebtedness as the guarantor when due and owing as required under the Loan Agreements and guarantees, as well as failing to include BML in the flow of funds resulting from the securitization of assets involving TAMI, as required by the terms of the Paydown Addendums.

37.     777P's, TAMI's, and the Affiliated Companies' breaches of the Loan Agreements and Paydown Addendums are the direct and proximate cause of damages to BML in the amount of no less than $11,206,356.25, plus attorney fees, costs, and interest per the terms of the Loan Documents and the Paydown Addendums.

**SECOND CAUSE OF ACTION**
(Declaratory Relief, Utah Code 78B-6-401 *et seq.* & Utah R. Civ. P. 57)

38.     Plaintiff reincorporates the preceding paragraphs as if fully set out herein.

39.     A justiciable controversy exists between BML and 777P as to Plaintiff's right to be included in the flow of funds from any securitization of assets involving TAMI and BML's rights under its contracts with 777P, TAMI, and the Affiliated Companies.

40.     The parties are adverse because 777P are in the process of committing an act in violation of BML's rights under the contract, which would render judgment against Defendants ineffectual if allowed to continue and which would produce injury to Plaintiff, who is already owed over $11 million.

6

A-487

41.     The Affiliated Companies, and several other companies that are under the common ownership and control of 777P have already defaulted on loan agreements with BML, and BML has been deprived of monies it is properly owed under those contracts.

42.     It is unlikely that TAMI, a U.K. entity of which 777P is manager and majority shareholder, will use these funds obtained from the securitization of its assets to voluntarily pay BML, given that entities under the common ownership and control of 777P, including TAMI, have already defaulted on the Paydown Addendums and Loan Agreements on the Loans the Affiliated Companies owed to BML since 777P has refused to make payments on the loans.

43.     The parties' rights are protected legal interests.

44.     Based on the foregoing, these issues are ripe for adjudication.

45.     777P will harm BML's interest in these contracts and the flow of funds from any securitization of assets involving TAMI absent the intervention of the Court.

46.     In addition to money damages, BML seeks injunctive relief and declaratory judgment that

    a.     BML is entitled to be included in the flow of funds from any securitization of assets involving TAMI pursuant to the contracts entered between BML and 777P, TAMI, and the Affiliated Companies; and

    b.     TAMI is enjoined from closing on any securitization transaction of 777P (or an affiliate thereof) with A-Cap (or any other third party) without including BML in the flow of funds.

A-488

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff Balanced Management, LLC, hereby respectfully requests the following relief:

a)   Judgment in BML's favor and against 777P for $11,206,356.25, plus attorney fees, costs, and interest per the terms of the Loan Documents and the Paydown Addendums;

b)   For declaratory relief, that BML is entitled to be included in the flow of funds from any securitization of assets involving TAMI pursuant to the contracts entered between BML and 777P, TAMI, and the Affiliated Companies;

c)   Entry of a temporary restraining order and then permanent injunction prohibiting the 777P from entering into an agreement concerning the securitization of assets involving TAMI without including BML in the flow of funds until Plaintiff's request for a preliminary injunction is ruled upon;

d)   Entry of a preliminary injunction and then permanent injunction prohibiting the 777P from entering into an agreement concerning the securitization of assets involving TAMI without including BML in the flow of funds until a final order is issued;

e)   Entry of a permanent preliminary injunction prohibiting the 777P from entering into an agreement concerning the securitization of assets involving TAMI without including BML in the flow of funds; and

f)   All other just and appropriate relief.

Dated: December 14, 2023                    FABIAN VANCOTT

                                                                    /s/ David P. Billings
                                                                    David P. Billings
                                                                    *Attorney for Plaintiff*

Plaintiff's Address:
Balanced Management, LLC
881 Baxter Drive, Ste. 100

8

A-489

# EXHIBIT G

A-490

IN THE CIRCUIT COURT OF THE
ELE ENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNT , FLORIDA

**NAKULA MANAGEMENT LIMITED**

**International Arbitration Division**

Petitioner

Case No.:

v.

**JOSHUA WANDER  and
777 PARTNERS LLC**

Defendants.

/

**VERIFIED PETITION FOR INTERIM MEASURES IN AID OF ARBITRATION
PURSUANT TO FLA. STAT.  682.031 AND  684.0028
AND COMPLAINT FOR INJUNCTIVE RELIEF**

Through this Emergency Petition (the " *etition*"), Nakula Management Limited

(hereinafter, the " *etitioner*" or "*Na u a*") seeks emergency injunctive relief and restraining order

to preclude any sale or transfer of assets, including any real estate assets in Florida, owned by

Defendants 777 Partners LLC ("   ") and Joshua Craig Wander (" *ander*") pending the

arbitration in London, United Kingdom.

**INTRODUCTION**

1.      On January 24, 2024, Petitioner commenced an international arbitration (the

" *r itration*") against, inter alia, Respondents 777 and Wander in London, United Kingdom under

the LCIA Arbitration Rules. A copy of the arbitration demand is annexed as **E hibit A** hereto.  No

arbitrator has been appointed as of yet to arbitrate this dispute.

2.      The Respondents 777 and Wander, jointly and severally, are guarantors owing more

than EURO 9 million to Petitioner, pursuant to contracts entered into in 2020.  As further discussed

below, it is undisputed that Defendants are in breach of the Guarantees (as defined below) and

A-491

there is a strong likelihood that they have just been and continue to string along and delay their payment obligations as part of a scheme to avoid payment obligations altogether. The circumstances, as further presented herein, are extraordinary and re uire emergency relief. There is also evidence, presented below, that Defendants have been actively dissipating assets and/or fraudulently transferring assets to avoid paying creditors, and that they have been lying and purposefully concealing material information from the Petitioner.

3. Petitioner seeks an order for interim measures in aid of arbitration, pursuant to Fla. Stat. 682.031 and 684.0028, granting an injunction enjoining Defendants from transferring real and personal property to frustrate Petitioner's collection efforts. Initially, Petitioner is asking for an injunction for a period of no less than 30 days pending appointment of an arbitrator and an evidentiary hearing; Petitioner intends to obtain relief from the Arbitrator once appointed. The application is necessary to preserve the status uo before an arbitrator is appointed, especially in light of bad faith and deceitful actions by the Defendants. Indeed, unless enjoined, Defendants' actions threaten to facilitate a material fraud on the Petitioner and the arbitration tribunal, and shall render any judgment against Defendants ineffectual and uncollectible.

## PARTIES

4. Nakula is a private company incorporated and existing under the laws of the Republic of Cyprus, registered under number HE 237281, with its registered office at Digeni Akrita   Kleomenous 2, 2nd floor, 1061, Nicosia, Cyprus. Nakula is part of the Finstar Financial Group (" *instar*"). Finstar is an international private e uity investment group with a diversified portfolio headed by Mr. Oleg   iktorovich Boyko ("       "), a Russian and Italian citi en residing in Swit erland, who is a founder and principal investor of Finstar. Nakula's ultimate beneficial

A-492

owner is O  B's mother, Mrs.   era Pavlovna Boyko, who is a Russian citi en. The principal business of Nakula is trading in securities through brokers.

5.      777 Partners LLC ("    ") is a Florida limited liability company. 777 is a private investment company incorporated in the United States and based in Miami.

6.      Joshua Craig Wander ("  *ander* ) is a U.S. national and resident of Miami-Dade, Florida.  Wander, upon information and belief, is the majority owner of 777, and along with Steven W. Pasko, was a co-founder and now co-managing member of this Florida-based private e uity firm. Wander owns a penthouse at the Monad Terrace condominium in Miami Beach, which he purchased for $8 million in 2019.[1] Mr. Wander is a convicted felon who pleaded no contest to cocaine trafficking in February 2004.[2] He was sentenced to two years of community control and 13 years of probation.

### JURISDICTIONAL ALLEGATIONS AND VENUE

7.      This Court has personal jurisdiction over Wander because he: (i) operates, conducts, engages in, or carries on a business or business venture in the State of Florida; (ii) owns, uses, and possesses real property in Miami-Dade County, Florida, and (iii) engages in substantial activity within the State of Florida. *See* Fla. Stat.   48.193(1)-(2).

8.      This Court has also personal jurisdiction over 777 because it: (i) is incorporated in Florida; (ii) has its principal place in business in Miami-Dade, Florida; and (iii) engages in substantial activity within the State of Florida.

---

[1]  *See*  https://www.miamicondoinvestments.com/monad-terrace/closings-have-started-for-monad-terrace-miami-beach
[2] *State* _of_ _l_orida v.  oshua Craig   ander, Florida Circuit Court for Alachua County (case no. 01-2003-CF-000703-A).

A-493

9.      This Court has subject matter jurisdiction over this action pursuant to Fla. Stat. 682.031 and   684.0028, which empowers the Court to grant interim measures in aid of arbitration.

10.      enue is proper in this Court under Fla. Stat   47.011 and 47.041.

11.      All conditions precedent to the filing of this action have occurred, have been satisfied, or have been waived.

## FACTUAL BACKGROUND

12.      Petitioner's claims asserted in the Arbitration arise out of financial arrangements contained in 3 related agreements, entered into on August 28, 2020 as amended and/or novated from time to time (the   Agreements'), comprised of:

- loan facility agreement (the "   *a i ity  greement*"), between the Claimant and Sevillastas Unidos 2020 SL ("*Se i istas*  ), the First Respondent in the Arbitration (Exhibit D hereto);

- deed of guarantee and indemnity (the "   *or orate Guarantee*"), between the Claimant and 777 Partners LLC, the Second Respondent in the Arbitration, which guarantees the First Respondent's liabilities under the Facility Agreement (Exhibit B hereto); and

- deed of guarantee and indemnity (the "   *ersona  Guarantee* " and together with the Corporate Guarantee, *the* "*Guarantees*"), between the Petitioner  and Wander, the Third Respondent in the Arbitration, which also guarantees the First Respondent's liabilities under the Facility Agreement (Exhibit C hereto).

*See* **E  hibits A-D**.

13.      The Defendants have breached the terms of the Guarantees and are now indebted to the Petitioner in an amount of over EUR 9m.  This is a fact that each of the Defendants have acknowledged in writing. *See* Exhibit A,   52, 54, 60.

14.      Sevillastas is the sole (indirect) shareholder of the Italian football and cricket club Genoa CFC and owns a minority shareholding in the Spanish football club Sevilla F tbol Club, S.A.D. ("*Se i a*     "). To the best of the Petitioner's knowledge and belief, the (indirect) majority

4

owner of Sevillistas is Mr. Steven William Pasko ("*S*      "), a U.S. citi en and a co-founder, co-managing partner and (indirect) minority owner of Defendant 777.

15.    On August 28, 2020, Nakula (as lender) and Sevillistas (as borrower) entered into the Facility Agreement, pursuant to which Nakula made available to Sevillistas a nonrevolving term loan facility in the aggregate amount of EUR 8.5 million, in order to ac uire a 9.337% shareholding in Sevilla FC.  Such shareholding was pledged to Nakula pursuant to a corresponding agreement. In addition, Wander and 777 each executed the Personal and Corporate Guarantees, respectively. *See* Exhibit A, p. 10-14.

16.    On August 30, 2020, Sevillistas drew down the entire amount of the loan facility under the Facility Agreement, i.e. EUR 8,500,000, which to the best of Petitioner's belief was used to ac uire the shares in Sevilla FC.  *Id.*, p. 14.

17.    Although Petitioner agreed to several extension re uests, the Respondents in the Arbitration were obligated to repay the outstanding debt by the end of 2022.  As of July 2023, Respondents in the Arbitration were obligated to repay €8,500,000 plus interest in the amount of €968,301.37 plus default interest in the amount of €107,589.04. *See* **E  hibit E**.

18.    Although Respondents in the Arbitration subse uently made some interest payments, as of the date of the Re  uest for Arbitration, there remains outstanding the entire amount of the principal, i.e. EUR 8.5m, EUR 686,720.71 in respect of interest, and EUR 190,027.40 in respect of default interest. *See* Exhibit A, p. 19.

19.    Throughout the past months, it has become increasingly apparent that Defendants have acted in a bad faith and deceitful manner with no intention of repaying the significant debt due. The Petitioner's investigation as to the circumstances surrounding the Defendants' recent

A-495

activities demonstrates that there is a very strong likelihood that Defendants are merely stringing things along to render any judgment against them uncollectable.

20.     Specifically, pursuant to the terms of the Personal Guaranty, section 12.2.1 (annexed hereto as Exhibit C), Wander was obligated to "supply to the Lender  i.e. Petitioner promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against him, and which, if adversely determined, would reasonably be expected to have a Material Adverse Change with respect to the Guarantor, the assets of the Guarantor or the performance of the Guarantor's obligations under this Guarantee." The same re uirement exists in the Corporate Guaranty of 777. *See* Exhibit B. Defendants breached both representations and purposefully concealed the multitude of litigations filed against them in recent months.

21.     It is apparent that the Defendants have not only purposefully avoided disclosing such litigations, as re uired by the terms of the contracts at issue, but actually provided purposefully misleading and false information.

22.     Below is a summary of numerous lawsuits pending against Wander showing not only the extent of his deceit and further breach of his contractual obligations, but the magnitude of the claims and the strong likelihood that but for injunctive relief, any judgement obtained in the arbitration will be ineffectual.

23.     Rather than truthfully disclosing all of these litigations, as re uired under the terms of their agreements, on 27 November 2023, 777 sent a letter to Nakula in response to the Final Notice, which was signed by JCW as 777's  Co-Managing Partner' and stated in part:

> In an e₁fort to provide reassurance that your request is being diligently addressed, we would like to report that we are in the process of accessing approximately   ,000,000.00 that is being withheld from a Danish subsidiary of    Partners LLC (    Partners ) by the International Air Transport Association (  IATA  ). These funds were paid by a Russian

A-496

> customer of our subsidiary into accounts controlled by the IATA, and have been withheld
> due to regulatory complications related to both E . . and .S. sanctions laws and anti-
> money laundering regulations.    nce accessed by      Partners, a sign ficant portion of
> these funds will be allocated to paying Sevillistas   nidos 2020 S.L. 's obligations to Nakula
> Management Limited under the Agreement.
>  e are currently engaged in communications with the relevant authorities on the timing
> and next steps for accessing the withheld funds and will have more detailed in formation to
> report within the next f fteen days. In addition to the funds described above, we are seeking
> alternative sources of capital in order to make payments on the outstanding amounts under
> the Agreement.
> There fore, in the interest of avoiding unnecessary legal expenses and with a view to finding
> an amicable solution that bene fits both parties, we request that you re frain from exercising
> your rights under the Agreement and related security agreements for an additional thirty
> (  ) days.

*See* Exhibit A, p. 18.

24.     Contrary to the re  uirements of the Agreements, however, neither 777 nor Wander disclosed that they have been facing more than $125 million in creditor claims, at least, in litigations filed recently across the United States.

25.     In a lawsuit filed in New   ork County Supreme Court, on March 7, 2024, the plaintiff's Complaint reveals the magnitude of Defendants' misrepresentations and deceit. *See* Complaint,   bra Capital Management LLC et al. v.      Partners LLC et al, 651220/2024, annexed hereto as **E  hibit F**.[3]  In this case, where plaintiff is seeking to recover at least $22 million from 777, plaintiff reveals that on or around November 2023, 777 transferred two of its subsidiaries, Sutton Specialty Insurance Company and Sutton National Insurance Company, to Pasko. *See id*., Count One (Constructive Fraudulent Transfer) and Count Two (Actual Fraudulent Transfer).   This Complaint also details many other lawsuits pending against the Defendants , including those filed with the past six (6) months.  *See id*., paragraph 34.

---

[3] *See also   ida Longevity   und, LP et al. v.      Partners, LLC et al.,* New   ork State Supreme Court for New   ork County (case no. 656715/2022).

7

A-497

26.     In addition to the unpaid debts which appear to be at least $125 million in total, at least, various publications have reported on 777 major problems, that include various investigations by government authorities. *See id*.

27.     Further investigation has revealed that Wander currently is being sued by his former landlord in Miami-Dade Circuit for more than $150,000 in damages he allegedly caused to the plaintiff's property.[4] A jury trial is scheduled to commence on April 1, 2024.

28.     Mr. Wander also is a co-defendant alongside 777 in an active lawsuit filed in the Court of Chancery of the State of Delaware in which the plaintiff accuses the co-defendants of defrauding him to the tune of at least $22 million.[5]

29.     777 is under investigation by the U.S. Department of Justice, according to a November 30, 2023 report published by Semafor.[6] The article cited confidential sources who stated that federal authorities in New York City and Miami were investigating the investment firm for money laundering violations and other infractions. 777 also is a party to at least nine active civil lawsuits in which the plaintiffs are collectively demanding almost $125 million.

30.     On January 23, 2024, 777 was sued by a former Principal of the firm, Peter Meyers, who alleges he is owed more than $2 million in unpaid compensation, in addition to unspecified management interests in 777's equity management plan.[7] In this lawsuit, the Plaintiff alleges, inter alia, that "the U.S. Justice Department has launched a federal probe to investigate Defendant Employer's financial backing, operations and money flow. These questions and potential

---

[4] *Randy S. Gelber v. Joshua Wander*, Florida Circuit Court for Miami-Dade County (case no. 2021-013205-CA-01).
[5] *MALT Family Trust et al. v. 777 Partners, LLC et al.*, Court of Chancery of the State of Delaware (case no. 2022-0652-MT ).
[6] Hoffman, Liz. "Feds probe sports investor 777 over money flows." SEMAFOR, November 30, 2023.
[7] *Peter Meyers v. 777 Partners, LLC and 777 Partners Management, LLC*, Florida Circuit Court for Miami-Dade County (case no. 2024-001279-CA-01).

8

A-498

forthcoming criminal charges surrounding Defendant Employer's finances have stalled the deal to ac uire Everton for the time being."

31.     On January 9, 2024, Change Lending, LLC ("Change"), the largest community development financial instituted in the United States, sued 777 seeking $30 million in damages for breach of contract.[8] Change invested $17 million to purchase preferred e uity in 777 and one of its affiliates. Pursuant to the terms of the parties 'agreement, 777 was re uired to deliver certain financial information to Change to verify 777's financial condition and operations. If 777 failed to deliver the financials, Change had the right to immediately exercise a "Repurchase Right". After 777 failed to deliver the financials, Change exercised its Repurchase Right. The complaint alleges that, instead of honoring Change's Repurchase Right, 777 "*redire ted  a ita  into  ne in estments and management  onuses*."

32.     On December 22, 2023, 777 was sued by Lasse Meilsoe to recover almost $1.8 million due under two promissory notes guaranteed by 777.[9]

33.     On December 12, 2023, three aircraft lessors sued 777 for $30 million after 777 missed lease payments for four jets.[10] The aircraft had been repossessed in March. In a public statement the lessors alleged that " d espite being repeatedly notified of their financial obligations, 777 Partners *ontinued to ignore  a s to sett e outstanding  ayments  f a most  30 mi ion* "

34.     On April 21, 2023, The Oxbridge Group, LTD, an executive search firm dedicated to recruiting investment professionals, sued 777 for breach of contract.[11] The complaint alleges

---

[8] *Change Lending, LLC v.     Partners, LLC et al.,* New  ork State Supreme Court for New  ork County (case no. 650118/2024).
[9] *Lasse Meilsoe v.     Partners, LLC et al.,* Florida Circuit Court for Miami-Dade County (case no. 2023-028758-CA-01).
[10] *Corvus Lights Aviation et al. v.     Partners, LLC et al.*, High Court of Justice in England (case no. CL-2023-000857).
[11] *The  xbridge Group, Ltd. v.     Partners, LLC,* New  ork State Supreme Court for New  ork County (case no. 651975/2023).

9

that "after Oxbridge placed three candidates with 777, and 777 acknowledged its obligation to pay Oxbridge its fees by the deadline of August 10, 2022, 777 slow-rolled 'Oxbridge by making only occasional payments against the obligation and now, even worse, has ignored Oxbridge entirely, despite threats of litigation, and has *ra en y r fused to ay t e outstanding a an e f 94 000*, without any explanation, let alone a legal justification."

35.    On July 26, 2022, an investor sued 777 and one of its aviation subsidiaries, Phoenicia LLC, alleging that the co-defendants defrauded him and used corporate entities they control to deprive him of the proper value of his membership interests in Phoenicia.[12] The plaintiff is alleging damages off at least $22 million.

36.    On July 1, 2022, ida Longevity Fund, LP and related entities (" ida") filed a motion for summary judgment in lieu of complaint after 777 defaulted on a $59.7 million loan.[13] The plaintiffs auctioned off $41.5 million in shares of Randall uilter Investment Holdings Ltd. put forward as collateral under the loan agreement, leaving unpaid principal exceeding $22.3 million.

37.    777 is a co-defendant in two separate-but-related federal class action lawsuits accusing the co-defendants of making predatory and unlawful loans with triple-digit interest rates, often exceeding 500%.[14] One of the complaints states that the aggregate amount in controversy exceeds $5 million, and both complaints seek treble damages under the Racketeer Influenced and Corrupt Organi ations Act (RICO).

---

[12] *MALT amily Trust et al. v.      Partners, LLC et al.*, Court of Chancery of the State of Delaware (case no. 2022-0652-MT ).
[13] *ida Longevity und, LP et al. v.      Partners, LLC et al.,* New ork State Supreme Court for New ork County (case no. 656715/2022).
[14] *Eido ussam Al-Nahhas v.      Partners, LLC et al.*, U.S. District Court for the Northern District of Illinois (case no. 22-C -00750); *oseph Morgan et al.* v.      *Partners, LLC et al.*, U.S. District Court for the Northern District of Illinois (case no. 24-C -01004)

A-500

38.     In view of the significant potential legal and financial liabilities facing Wander and 777, there exists a bona fide risk that Wander could take steps to dissipate, transfer or hide his assets. Indeed, a lawsuit filed against 777 on March 7, 2024 accuses the company of fraudulently transferring two cash-rich subsidiaries to shield those assets from the myriad creditors currently pursuing the company in various courts.  Wander is a convicted felon whose primary source of income is under investigation by the U.S. Department of Justice, heightening the risk that he will attempt to transfer assets.

## ARGUMENT

### A. Florida La  Em o ers the Court to Grant Interim Measures in Aid of Arbitration before the LCIA Tribunal is Constituted and an Arbitrator Can Act

39.     Section 684.0028 of the Florida International Arbitration Act provides, in relevant part, that

> A court has the same power of issuing an interim measure in relation to arbitration proceedings, irrespective of whether the arbitration proceedings are held in this state, as it has in relation to the proceedings in courts. The court shall exercise such power in accordance with its own procedures and in consideration of the specific features of international arbitration.

40. Fla. Stat. 682.031(1), titled "Provisional Remedies," provides that

> Before an arbitrator is appointed and is authori ed and able to act, the court, upon motion of a party to an arbitration proceeding and for good cause shown, may enter an order for provisional remedies to protect the effectiveness of the arbitration proceeding to the same extent and under the same conditions as if the controversy were the subject of a civil action.

41.     Section 2(b) of this statute states that "A party to an arbitration proceeding may move the court for a provisional remedy only if the matter is urgent and the arbitrator is not able to act timely or the arbitrator cannot provide an ade uate remedy."

42.     The Florida statute is taken essentially verbatim from Section 8 of the 2000 Uniform Arbitration Act.  *See*   8(a), Provisional Remedies, Uniform Arbitration Act (2000)

11

A-501

("Before an arbitrator is appointed and is authori ed and able to act, the court, upon motion of a party to an arbitration proceeding and for good cause shown, may enter an order for provisional remedies to protect the effectiveness of the arbitration proceeding to the same extent and under the same conditions as if the controversy were the subject of a civil action.")

43.    In accordance with the provisional and temporary nature of these remedies, the standard for such relief is "good cause," and not the stricter standard of "irreparable harm" applicable to preliminary injunctions. *See Scottish Re L fe Corp. v. Transamerica  ccidental L fe Ins. Co.*, 647 S.E.2d 102, 105 (N.C. App. 2007) (interpreting a similar statute based on Section 8(a) of the 2000 Uniform Arbitration Act and noting that "so long as the applicant showed 'good cause,' the trial court could order provisional remedies to the same degree possible in a state court action."); *see also  ughley v. Rocky Mountain  ealth Maint.  rg., Inc.*, 927 P.2d 1325, 1331-32 (Colo. 1996) ("The need to preserve the status  uo is especially important when an arbitrator is not immediately available to assert jurisdiction. A party to an arbitration agreement must have some recourse to ensure that the promise of arbitration is not hollow and that if successful, an award by arbitrator is not an empty victory because conditions permitting a remedy have changed.")

44.    Further, LCIA Rule 25.3 also authori es a party to apply to a Court for interim measures before an arbitrator is appointed:

> 25.3   A party may apply to a competent state court or other legal authority for interim or conservatory measures that the Arbitral Tribunal would have power to order under Article 25.1: (i) **before the formation of the Arbitral Tribunal** and (ii) after the formation of the Arbitral Tribunal, in exceptional cases and with the Arbitral Tribunal's authori ation, until the final award. After the Commencement Date, any application and any order for such measures before the formation of the Arbitral Tribunal shall be communicated promptly in writing by the applicant party to the Registrar; after its formation, also to the Arbitral Tribunal; and in both cases also to all other parties.

(emphasis added).

12

**A-502**

45.     Currently, there is no arbitrator appointed before the LCIA and therefore no arbitrator is available to act.  Although the demand for arbitration was filed on January 24, 2024, Petitioner is uncertain when an arbitrator will be appointed, but given experience in other LCIA proceedings, it is reasonable to estimate that it will take another several weeks before the LCIA tribunal is fully constituted, and an arbitrator can act.  Therefore, to preserve the status quo, Petitioner seeks interim relief hereunder for the interim period of no less than thirty (30) days and further order of the Court.

46.     As demonstrated throughout this Petition, and further detailed below, the Petitioner has established that the requisite "good cause" for the relief sought exists, and thus the Court should grant the Petitioner's requested interim relief.  The Petitioner is only requesting interim relief until the arbitration tribunal is duly constituted and the Petitioner has the opportunity to apply for and prosecute the requested relief before the arbitrator.

### B. The Petition Also Meets the Standards for a Preliminary Injunction and Temporary Restraining Order

47.     In addition, it is well-established that to obtain a temporary restraining order before this Court, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Levi Strauss Co. v. Sunrise Int'l. Trading Inc.*, 51 F.3d 982 (11th Cir. 1995). Ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm ." *Granny Goose Foods, Inc. v. Bhd. of Teamsters Auto Truck Drivers*., etc., 415 U.S. 423, 439 (1974).

13

A-503

48.     Here, Petitioner respectfully submits that it meets both the good cause standard set forth in Fla. Stat. 382.031 and the standard for a preliminary injunction, and that there are ample grounds for granting the relief sought.

49.     Petitioner clearly has a strong likelihood of success on the merits of its claims for breach of the Facility Agreement and the Guarantees, especially where the Defendants have admitted that they owe the funds to Nakula. **E  hibit A**   52, 54, 60.

50.     Further, even where "only money is at stake," a court may find the prospect of irreparable injury sufficient to justify the preliminary injunction where  a defendant's assets might be dissipated before the end of a case, leaving a prevailing plaintiff as a practical matter without a way to collect damages. *In re   ebsecure, Inc. Sec. Litig.,* Civ. A. No. 97- 10662-GAO, 1997 WL 770414, at 3 (D. Mass. Nov. 26, 1997) (citations omitted); *see also Micro Signal Research v   tus,* 417 F. 3d 28, 30-32 (1st Cir. 2005) (affirming preliminary injunction to secure assets to satisfy money judgment); *SEC v.   .fe,* 311 F. 3d 1 (1st Cir. 2002) (affirming preliminary injunction to free  e assets upon showing of likelihood of success on securities); *SEC v. Pine* , 989 F. Supp. 325 (D. Mass. 1997) (granting motion for preliminary injunction to free  e assets to preserve remedies in SEC enforcement action); *St. Paul   ire Marine Ins. Co. v. Ellis   Ellis,* 951 F. Supp. 5 (D. Mass. 1996) (granting preliminary injunction free ing assets upon showing of likelihood of success on the merits); *Absolute Activist   alue Master   und Ltd.v. Devine,* 2016 WL 1572388  9 (M.D. Fla. Apr. 9, 2016).

51.     In determining whether there is a danger of a dissipation of assets sufficient to justify a preliminary injunction, courts consider the defendant's fraudulent conduct forming the basis of the allegations. *See, e.g., Micro Signal,* 417 F. 3d at 31 (Defendant's probable fraud his prevarications about repayment  of the disputed sum  and the switch of the business  to a new

14

A-504

company are ample indication of the need for the preliminary injunction free ing assets" (emphasis added); *fe*, 311 F. 3d at 10 (considering defendant's past conduct, the defendants occupations, and their continued defense that their past conduct was blameless in determining that securities violations were likely to recur and the preliminary injunction was justified).

52.    Petitioner also submits that any harm to Defendants in restraining them from selling or transferring their personal and real property is minimal, because the relief is only being sought for a limited period of time, until an arbitrator is appointed and can act.

53.    The public interest factor also favors protecting the integrity of the arbitration process and enforcing contractual obligations of debtors, rather than frustrating collection efforts.

## CLAIMS

### COUNT I    INJUNCTIVE RELIEF

54.    Petitioner re-alleges the allegations in paragraph 1 through 53 as if set forth fully herein.

55.    Petitioner has a protectable legitimate business interest in restraining Defendants from transferring assets as well as a clear legal right to same by virtue of its pending arbitration before the LCIA in combination with evidence of Respondents' deceitful conduct set forth herein.

56.    Petitioner is likely to continue to suffer irreparable harm if judicial action is not taken to prevent any transfer of real and personal property by Defendants.

57.    There is a strong likelihood that Defendants shall li uidate and/or fraudulently transfer assets unless restrained.

58.    Petitioner is likely to succeed on the merits in the Arbitration.

59.    The balance of harms strongly favors an injunction.

A-505

60. The public interest will not be harmed by an injunction and will only be served to prevent Defendants from li uidating, diverting, transferring and/or secreting assets to attempt to frustrate Petitioner's collection efforts.

## CONCLUSION

WHEREFORE, Petitioner re uests that this Court enter judgment as follows:

(a) Issue an injunction and restraining order against disposition or transfer of the real or personal property by Defendants, and levying execution on the real property or any of its proceeds on all of the Defendants' Florida real estate;

(b) Award Petitioner attorney's fees and costs in accordance with the Agreements; and

(c) Order such other and further relief as the Court deems necessary and just.

Respectfully submitted,

Dated: March 14, 2024

ASSOULINE BERLOWE P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Telephone: (305) 567-5576

By: _Greg M. Popowit_
Eric N. Assouline (FL Bar  106143)
ena  assoulineberlowe.com
Greg M. Popowit  (FL Bar  70313)
gmp  assoulineberlowe.com

and

BENAUR LAW LLC

(www.benaurlaw.com)
George Benaur (GB1224)

16

A-506

43 W 43rd STREET
New  ork, New  ork 10036
Phone: (609) 216-6105
Email: george  benaurlaw.com

*Pro  ac  ice Application Pending*

*Counsel for Plaint f*

A-507

### VERIFICATION

I, Ellada Pozidou, am Director of Nakula Management Limited, the Petitioner in the within action. I have read the foregoing petition and complaint and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

Ellada Pozidou

Dated: March 13, 2024

A-508

# EXHIBIT H

A-509

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:48 PM INDEX NO. 654397/2023
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 09/08/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

1 MADISON OFFICE FEE LLC,

Plaintiff,

-against-

777 PARTNERS LLC and
600 PARTNERS LLC,

Defendants.

Index No.:

Date Filed:

**SUMMONS**

The basis for venue is that
plaintiff's principal office is
located in New York, New York.

To the above-named Defendants:

**You are hereby summoned** to answer the complaint in this action and to serve a copy of
your answer on the plaintiff's attorneys within 20 days after the service of this summons (or
within 30 days after the service is complete if this summons is not personally delivered to you
within the State of New York); and in case of your failure to appear or answer, judgment will be
taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial, since plaintiff's principal office is
located at c/o SL Green Realty Corp., One Vanderbilt Avenue, New York, New York.

Dated:   New York, New York
         September 8, 2023

CYRULI SHANKS & ZIZMOR LLP

By: _____
    Jonathan W. Rich
*Attorneys for Plaintiff/Landlord*
420 Lexington Avenue, Suite 2320
New York, New York 10170
(212) 661-6800

To:   777 Partners LLC
      Via the New York Secretary of State

      777 Partners LLC
      600 Brickell Avenue, 19th Floor
      Miami, Florida 33131

      600 Partners LLC
      600 Brickell Avenue, 19th Floor
      Miami, Florida 33131

A-510

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:48 PM          INDEX NO. 654397/2023
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 09/08/2023

Case 1:24-cv-03453-JGK   Document 61-8   Filed 05/13/24   Page 3 of 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

1 MADISON OFFICE FEE LLC,

                              Plaintiff,

     -against-

777 PARTNERS LLC and
600 PARTNERS LLC,

                              Defendants.

---

Index No.

**COMPLAINT**

---

     1 MADISON OFFICE FEE LLC ("Plaintiff" or "Landlord"), by its attorneys Cyruli,

Shanks & Zizmor LLP, for its complaint against defendants/tenants, jointly and severally, 777

PARTNERS LLC ("777 Partners") and 600 PARTNERS LLC ("600 Partners") (collectively,

"Tenant") alleges:

     1.     This is an action for: (i) specific performance, to compel Tenant to deliver a

security deposit in the amount of $5,000,000.00 to Landlord, as required by the lease; and (ii)

Landlord's reasonable attorneys' fees incurred in connection with the foregoing.

**The Parties**

     2.     Landlord is a Delaware Limited Liability Company, authorized to do business in

New York, with its principal office located at c/o SL Green Realty Corp., One Vanderbilt

Avenue, New York, New York 10017.

     3.     Landlord is the landlord of the building located 1 Madison Avenue, New York

(the "Building"), including all commercial spaces located therein, and more specifically of the

premises consisting of the entire rentable portion of the 27th Floor (the "Premises") in the

Building.

-1-

A-511

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:48 PM     INDEX NO. 654397/2023
NYSCEF DOC. NO. 1                                     RECEIVED NYSCEF: 09/08/2023

Case 1:24-cv-03453-JGK    Document 61-8    Filed 05/13/24    Page 4 of 7

4.    Upon information and belief, 777 Partners is a Delaware Limited Liability Company, registered to do business in New York, with a principal office located at 600 Brickell Avenue, 19th Floor, Miami, Florida.

5.    Upon information and belief, 600 Partners is a Delaware Limited Liability Company, with a principal office located at 600 Brickell Avenue, 19th Floor, Miami, Florida.

6.    Upon information and belief, each of the Defendants is a private investment company, specializing in capital markets.

**Jurisdiction and Venue**

7.    This Court has jurisdiction over 777 Partners, since 777 Partners is a foreign limited liability company, registered to do business in New York.

8.    This Court has jurisdiction over 600 Partners, pursuant to CPLR 302(a)(1), since 600 Partners is a party to the subject lease, which was negotiated, executed and performed within the State of New York.

9.    Venue is proper, since Landlord's principal office is located in New York, New York, and this action concerns the use and enjoyment of real property that is located in New York, New York, i.e., the Building and the Premises.

**The Lease/Tenant's Breach**

10.    Tenant became the tenant of the Premises, pursuant to an Agreement of Lease, dated as of January 25, 2023 (the "Lease"), made between Landlord, as landlord, and Tenant, i.e., 777 Partners and 600 Partners, as tenants, jointly and severally.

11.    As security for Tenant's obligations under the Lease, Tenant was required to deliver a security deposit in the amount of $5,000,000.00 (the "Security Deposit") to Landlord no later than February 28, 2023, in accordance with Lease Section 50.01(a), which provides:

-2-

A-512

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:48 PM          INDEX NO. 654397/2023
NYSCEF DOC. NO. 1                                         RECEIVED NYSCEF: 09/08/2023

Case 1:24-cv-03453-JGK    Document 61-8    Filed 05/13/24    Page 5 of 7

On or prior to February 28, 2023, Tenant shall deliver to Landlord either cash or an unconditional irrevocable letter of credit, and Tenant shall maintain same in effect at all times during the term hereof, in either case as security for the full and faithful performance and observance by Tenant of Tenant's covenants and obligations under this Lease, in the amount of $5,000,000.00 (such amount, the "Required Amount"), which letter of credit shall be substantially in the form annexed hereto as Exhibit M or in such other form as is reasonably satisfactory to Landlord and issued by a banking corporation reasonably satisfactory to Landlord and either having its principal place of business or a duly licensed branch or agency in the borough of Manhattan, City and County of New York ("Issuing Bank") or allowing for draws by fax without further presentation of original documents being required. The issuing Bank shall have combined capital, surplus and undivided profits of at least $1 billion, a financial strength rating of at least "B", and a long-term bank deposit rating or at least "Aa", as published by Moody's Investors Services, Inc., or its successor (collectively, the "Issuing Bank Criteria"). If at any time during the Term, the Issuing Bank does not maintain the Issuing Bank Criteria, then Landlord may so notify Tenant and, unless Tenant delivers a replacement letter of credit from another commercial bank reasonably approved by Landlord meeting the Issuing Bank Criteria within forty-five (45) days after receipt of such notice, Landlord may draw the full amount of such letter of credit and hold the proceeds in a cash security deposit in accordance with this Article 50. Such letter of credit shall have an expiration date no earlier than the first anniversary of the date of issuance thereof and shall be automatically renewed from year to year unless terminated by the issuer thereof by notice to Landlord given not less than forty-five (45) days prior to the expiration thereof. Landlord approves City National Bank of Florida as the Issuing Bank as of the Effective Date.

12.    Notwithstanding the above, Tenant has failed to deliver the Security Deposit to Landlord.

## AS AND FOR
## A FIRST CAUSE OF ACTION
### (Specific Performance)

13.    Landlord repeats and realleges each and every one of the preceding allegations as if fully set forth herein.

-3-

A-513

FILED: NEW YORK COUNTY CLERK 09/08/2023 04:48 PM
NYSCEF DOC. NO. 1 INDEX NO. 654397/2023
RECEIVED NYSCEF: 09/08/2023

14. As stated above, pursuant to Lease Section 50.01(a), Tenant was required to deliver the Security Deposit to Landlord by February 28, 2023; however, Tenant failed to do so by that date, and, to date, Tenant has still not delivered the Security Deposit to Landlord.

15. Landlord has complied with all of its obligations under the Lease.

16. Landlord is ready, willing and able to continue to perform its obligations under the Lease.

17. Accordingly, Tenant should be compelled to comply with Lease Section 50.01(a) and deliver the Security Deposit to Landlord.

**AS AND FOR**
**A SECOND CAUSE OF ACTION**
**(Attorneys' Fees)**

18. Landlord repeats and realleges each and every one of the preceding allegations as if fully set forth herein.

19. Pursuant to Lease Section 7.01, Tenant is obligated to reimburse Landlord for all expenses or obligations, including reasonable attorneys' fees, that Landlord incurs in connection with any default by Tenant under the Lease.

20. By reason of the foregoing, Tenant is liable to Landlord for all expenditures that Landlord may incur as a result of Tenant's breach of the Lease, including, but not limited to, reasonable attorneys' fees.

**WHEREFORE**, Landlord respectfully requests that a judgment now be entered:

a. against Tenant for specific performance to compel Tenant to comply with Lease Section 50.01(a);

b. against Tenant in an amount equal to Landlord's reasonable attorneys' fees and expenses incurred as a result of Tenant's default under the Lease; and

-4-

A-514

c.    granting Landlord such other and further relief as may be just and proper.


Dated:   New York, New York
         September 8, 2023

                              CYRULI SHANKS & ZIZMOR LLP


                              By: _____
                                  Joëlle B. Taub, Esq.
                                  Edmond O'Brien, Esq.
                                  Jonathan W. Rich, Esq.
                                  *Attorneys for Plaintiff/Landlord*
                                  420 Lexington Avenue, Suite 2320
                                  New York, New York 10170
                                  (212) 661-6800

-5-

A-515

# EXHIBIT I

A-516

Filing # 188600798 E-Filed 12/22/2023 02:48:55 PM

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA
## COMPLEX BUSINESS LITIGATION DIVISION

LASSE MEILSOE, an individual,

     Plaintiff,

v.           CASE NO.

ADLON LLC, a Delaware limited liability
company, and 777 PARTNERS LLC, a Delaware
limited liability company,

     Defendants.

_____/

## COMPLAINT

  The Plaintiff, Lasse Meilsoe ("**Meilsoe**"), by and through his undersigned counsel, as and

for his Complaint against the Defendants, Adlon LLC ("**Adlon**") and 777 Partners LLC ("**777**

**Partners**"), alleges as follows:

### Nature of the Action

  1.  This is an action to recover amounts owed by the Defendants under two promissory

notes.  Defendant Adlon is the maker of the promissory notes, and Defendant 777 Partners

guaranteed payment of the amount owed under one of the promissory notes.

  2.  The promissory notes have matured and are due and payable in full.  Despite

demand, the Defendants have failed to pay the amounts due and owing under the promissory notes.

Accordingly, the Plaintiff files this action to recover the amounts owed.

### The Parties

  3.  Plaintiff Meilsoe is an adult individual and a citizen of Denmark.

A-517

4.      Defendant Adlon is a limited liability company organized and existing under the laws of the State of Delaware.  Adlon maintains its principal place of business at 600 Brickell Avenue, Suite 1900, Miami, Florida 33131.

5.      Defendant 777 Partners is a limited liability company organized and existing under the laws of the State of Delaware.  777 Partners maintains its principal place of business at 600 Brickell Avenue, Suite 1900, Miami, Florida 33131.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over the Defendants pursuant to Florida Statute § 48.193 because: (a) the Defendants operate, conduct, engage in, or carry on a business or business venture in the State of Florida; (b) the Defendants maintain an office in the State of Florida; (c) the Defendants breached multiple contracts in the State of Florida by failing to perform acts required by the contracts to be performed in the State of Florida (in particular, the amounts owed by the Defendants under the promissory notes at issue in this action were to be paid, and some payments in fact were paid, in the State of Florida); and/or (d) the Defendants are engaged in substantial and not isolated activity within the State of Florida.

7.      Further, pursuant to the terms of the promissory notes at issue in this action, the Defendants have irrevocably and unconditionally submitted to the jurisdiction of this Court.

8.      Venue is proper in this Court pursuant to Florida Statute §§ 47.011, 47.051 and 47.061 because: (a) the Defendants maintain an office in Miami-Dade County; (b) the causes of action against the Defendants accrued in Miami-Dade County; and/or (c) the promissory notes at issue in this action were signed by the Defendants in Miami-Dade County.

9.      Further, pursuant to the terms of the promissory notes at issue in this action, the Defendants have irrevocably and unconditionally waived any objection to venue in this Court.

2

A-518

10.     This action is appropriate for resolution in the Complex Business Litigation Section because Plaintiff Meilsoe has suffered damages in excess of $750,000, exclusive of interest, costs, and attorneys' fees. *See* Administrative Order 17-1 (2017).

### General Allegations

11.     Defendant Adlon is indebted to Plaintiff Meilsoe under the following promissory notes (collectively, the "**Notes**"):

(a)     Promissory Note #2 dated June 28, 2021 in the principal amount of $1,587,527.53 ("**Note #2**"), a true and complete copy of which is attached hereto as **Exhibit 1**; and

(b)     Promissory Note #3 dated June 28, 2021 in the principal amount of $455,642.00 ("**Note #3**"), a true and complete copy of which is attached hereto as **Exhibit 2**.

12.     Defendant 777 Partners irrevocably, absolutely and unconditionally guaranteed the due, punctual and complete performance and payment of the amount owed under Note #2.

13.     Defendant Adlon has breached its obligations under the Notes by failing to make payment as provided for under the terms of the Notes.

14.     Defendant 777 Partners has breached its obligations under Note 2 by failing to make payment as provided for under the terms of Note 2.

15.     Plaintiff Meilsoe has incurred, and he continues to incur, damages as a result of the breach of the Notes by the Defendants.

16.     Plaintiff Meilsoe has made multiple demands on the Defendants for payment of the amount due and owing under the Notes.

17.     Despite demand, the Defendants have failed to pay the amount due and owing under the Notes.

A-519

18.     The amount due and owing under each of the Notes is as follows:

(a)     as of December 22, 2023, the total principal and accrued interest due and owing under Note #2, exclusive of attorneys' fees and expenses, was $1,223,165.37, with interest continuing to accrue; and

(b)     as of December 22, 2023, the total principal and accrued interest due and owing under Note #3, exclusive of attorneys' fees and expenses, was $570,208.65, with interest continuing to accrue.

19.     In addition, under the terms of the Notes, the Defendants agreed to reimburse all reasonable out-of-pocket fees and expenses, including reasonable attorneys' fees, incurred by Plaintiff Meilsoe in connection with the negotiation, documentation and execution of the Notes, and the enforcement of the Notes.

**Count I**
**(Breach of Note #2 – Against Defendant Adlon)**

20.     Plaintiff Meilsoe repeats and realleges the allegations set forth in paragraphs 1 through 19 as if fully set forth herein.

21.     Defendant Adlon has breached its obligations under Note #2 by failing to make payment as provided for under the terms of Note #2.

22.     As of December 22, 2023, the total principal and accrued interest due and owing under Note #2, exclusive of attorneys' fees and expenses, was $1,223,165.37, with interest continuing to accrue.

23.     In addition, Defendant Adlon is obligated under the terms of Note #2 to pay the reasonable out-of-pocket fees and expenses, including reasonable attorneys' fees, incurred by Plaintiff Meilsoe in enforcing Note #2.

4

A-520

24.     Plaintiff Meilsoe is entitled to the entry of judgment against Defendant Adlon in the amount of $1,223,165.37, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit.

**Count II**
**(Breach of Note #3 – Against Defendant Adlon)**

25.     Plaintiff Meilsoe repeats and realleges the allegations set forth in paragraphs 1 through 19 as if fully set forth herein.

26.     Defendant Adlon has breached its obligations under Note #3 by failing to make payment as provided for under the terms of Note #3.

27.     As of December 22, 2023, the total principal and accrued interest due and owing under Note #3, exclusive of attorneys' fees and expenses, was $570,208.65, with interest continuing to accrue.

28.     In addition, Defendant Adlon is obligated under the terms of Note #3 to pay the reasonable out-of-pocket fees and expenses, including reasonable attorneys' fees, incurred by Plaintiff Meilsoe in enforcing Note #3.

29.     Plaintiff Meilsoe is entitled to the entry of judgment against Defendant Adlon in the amount of $570,208.65, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit.

**Count III**
**(Breach of Guaranty of Note #2 – Against Defendant 777 Partners)**

30.     Plaintiff Meilsoe repeats and realleges the allegations set forth in paragraphs 1 through 19 as if fully set forth herein.

31.     Defendant 777 Partners has breached its guaranty obligations under Note #2 by failing to make payment as provided for under the terms of Note #2.

5

A-521

32.     As of December 22, 2023, the total principal and accrued interest due and owing under Note #2, exclusive of attorneys' fees and expenses, was $1,223,165.37, with interest continuing to accrue.

33.     In addition, Defendant 777 Partners is obligated under the terms of Note #2 to pay the reasonable out-of-pocket fees and expenses, including reasonable attorneys' fees, incurred by Plaintiff Meilsoe in enforcing Note #2.

34.     Plaintiff Meilsoe is entitled to the entry of judgment against Defendant 777 Partners in the amount of $1,223,165.37, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit.

**Prayer for Relief**

WHEREFORE, Plaintiff Meilsoe requests that the Court:

(a)     with respect to Count I, enter judgment against Defendant Adlon in the amount of $1,223,165.37, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit;

(b)     with respect to Count II, enter judgment against Defendant Adlon in the amount of $570,208.65, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit;

(c)     with respect to Count III, enter judgment against Defendant 777 Partners in the amount of $1,223,165.37, together with pre-judgment interest from December 22, 2023 through the date of entry of judgment, attorneys' fees and expenses, and costs of suit; and

(d)     grant such other and further relief as is just and proper under the circumstances.

6

A-522

Dated: December 22, 2023

Respectfully submitted,

**DLA PIPER LLP (US)**

By: _/s/ Christopher   prison_
Christopher G. Oprison (FBN 0122080)
chris.oprison@dlapiper.com
Tal Aburos (FBN 1010901)
tal.aburos@dlapiper.com
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
T: (305) 423-8522
F: (305) 657-6366

_Attorneys for Plaint.ₗf Lasse Meilsoe_

7

A-523

# EXHIBIT 1

DocuSign Envelope ID: ECE97BA7-363C-47D2-A6F8-B13D9A44A5DB

# PROMISSORY NOTE #2

| | |
|---|---|
| $1,587,527.53 | Miami, Florida |
| | June 28, 2021 |

FOR VALUE RECEIVED, Adlon LLC, a Delaware limited liability company (the **"Obligor"**) and 777 Partners LLC, a Delaware limited liability company (the **"Guarantor"**) hereby unconditionally promises to pay to the order of Lasse Meilsoe (the **"Noteholder"**) the principal amount of $1,587,527.53 (the **"Loan"**), together with all accrued interest thereon, as provided in this Promissory Note (this **"Note"**).

## RECITALS

WHEREAS, reference is made to the Share Sale and Purchase Agreement, dated April 9, 2020, by and among Celine E-Bizz Ltd., Erik Martin Troelsen Pretzmann, Obligor, as buyer, and Noteholder, as a restricted person (together with the exhibits and schedules attached thereto, collectively, the **"Purchase Agreement"**);

WHEREAS, the parties hereto acknowledge and agree that, pursuant to the Purchase Agreement, a monetary sum in the amount of the Loan is due and payable by the Obligor to the Noteholder; and

WHEREAS, the parties hereto desire to document the existence of the Loan and the terms and conditions under which the Loan shall be repaid.

1.     Payment Dates.

    (a)     Payment Date. The aggregate unpaid principal amount of the Loan, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable in the amounts and on the dates set forth on Schedule A attached hereto.

    (b)     Prepayment. The Obligor may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2.     Interest.

    (a)     Interest Rate. Except as provided in Section 2(b), principal amounts outstanding under this Note shall bear interest at a rate per annum (the **"Interest Rate"**) equal to eight percent (8.00%).

    (b)     Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear interest at ten percent (10.00%).

**A-525**

DocuSign Envelope ID: ECE97BA7-353C-47DA-A6E8-B13D9A44A5DB

    (c)   <u>Computation of Interest</u>. All computations of interest hereunder shall be made on the basis of a year of 365 days, and the actual number of days elapsed. Interest shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

    (d)   <u>Interest Rate Limitation</u>. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.    <u>Payment Mechanics</u>.

    (a)   <u>Manner of Payment</u>. All payments of principal and interest shall be made in US dollars no later than 5:00PM eastern time on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Obligor from time to time.

    (b)   <u>Application of Payments</u>. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

    (c)   <u>Business Day</u>. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, Florida are authorized or required by law to close.

4.    <u>Representations and Warranties</u>. The Obligor represents and warrants to the Noteholder as follows:

    (a)   <u>Existence</u>. The Obligor is a limited liability company duly formed, validly existing, and in good standing under the laws of the state of its organization. The Obligor has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

    (b)   <u>Compliance with Law</u>. The Obligor is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Obligor, its property, and business.

    (c)   <u>Power and Authority</u>. The Obligor has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

    (d)   <u>Authorization; Execution and Delivery</u>. The execution and delivery of this Note by the Obligor and the performance of its obligations hereunder have been duly authorized by all necessary limited liability company action in accordance with applicable law. The Obligor has duly executed and delivered this Note.

A-526

5.     Events of Default. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

(a)     Failure to Pay. The Obligor fails to pay (i) any principal amount of the Loan within ten (10) days after the date such amount is due; (ii) any interest on the Loan within ten (10) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

(b)     Breach of Representations and Warranties. Any representation or warranty made by the Obligor to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

(c)     Bankruptcy; Insolvency.

(i)     The Obligor institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

(ii)     An involuntary case is commenced seeking the liquidation or reorganization of the Obligor under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

(iii)     The Obligor makes a general assignment for the benefit of its creditors.

(iv)     The Obligor is unable, or admits in writing its inability, to pay its debts as they become due.

(v)     A case is commenced against the Obligor or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

(d)     Failure to Give Notice. The Obligor fails to give the notice of Event of Default specified in 6.

An Event of Default under this Note shall constitute (i) an "Event of Default" (as defined therein) under Promissory Note #1 or Promissory Note #3, both dated as of the date hereof, and both by and between Obligor, as obligor, and Noteholder, as noteholder, (ii) a "Breach" (as defined therein) under the Purchase Agreement, (iii) a "material breach" under the Executive Employment Agreement, dated February 28, 2020, between Obligor, as employer, and Noteholder, as executive (the "**Employment Agreement**"), and (iv) a "Trigger Event" (as defined therein) permitting the Noteholder to *immediately* terminate his employment under the Employment Agreement for "Good Reason" (as defined therein) pursuant to Section 9(c) of the Employment Agreement, without Noteholder having to (A) wait the thirty (30) day cure period provided for in Section 9(B)(i) of the Employment Agreement, or (B) provide notice via physical mail pursuant to Section 12(C) of the Employment Agreement (email notice provided for in Section 9 of this Note being sufficient).

3

**A-527**

6.     <u>Notice of Event of Default</u>. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Obligor shall notify the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.     <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Obligor declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided, however*, if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.     <u>Expenses</u>. The Obligor shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.     <u>Notices</u>. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by e-mail properly addressed; or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

        (a)     If to the Obligor or Guarantor:

                Adlon LLC
                600 Brickell Ave, Suite 1900
                Miami, FL 33131
                Attention: Ed Gehres, General Counsel
                E-mail: egehres@777part.com

        (b)     If to the Noteholder:

                Lasse Meilsoe
                c/o DLA Piper LLP (US)
                Attention: Ryan Dwight O'Quinn
                200 S. Biscayne Blvd., Suite 2500
                E-mail: Ryan.OQuinn@dlapiper.com

10.     <u>Governing Law</u>. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

4

A-528

DocuSign Envelope ID: ECE97BA7-353C-47D2-A6E8-B13D9A44A50B

11.    Disputes.

(a)    Submission to Jurisdiction. The Obligor irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami-Dade County, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Obligor in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Venue. The Obligor irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c)    Waiver of Jury Trial. THE OBLIGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12.    Successors and Assigns. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13.    Integration. This Note constitutes the entire contract between the Obligor and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto; provided, however, for the avoidance of doubt, the Purchase Agreement shall remain in full force and effect and is only amended as expressly set forth herein.

14.    Amendments and Waivers. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Obligor and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15.    No Waiver; Cumulative Remedies. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

5

DocuSign Envelope ID: ECE97BA7-363C-47DA-A6E8-B13D9A44A5DB

A-529

16.     Severability. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.     Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

18.     Guarantee. Guarantor, as primary obligor and not merely as surety, hereby irrevocably, absolutely and unconditionally guarantees the due, punctual and complete performance and payment (and not merely collection) in full of the Loan, and any other amounts payable by Obligor hereunder, as and when due and payable pursuant to any provision of this Note.

*[**Execution Page Follows**]*

6

A-530

IN WITNESS WHEREOF, the Obligor has executed this Note as of the date first set forth above.

Adlon LLC

By: _Steven W. Pasko_

Name: Steven W. Pasko

Title: Manager

777 Partners LLC

By: _Steven W. Pasko_

Name: Steven W. Pasko

Title: Co-Managing Partner

ACKNOWLEDGED AND ACCEPTED BY:

By _____

Lasse Meilsoe

A-531

**SCHEDULE A**

**PAYMENTS DUE DATES**

| Due Date | Principal Amount Due | Interest Amount Due<br><br>(these amounts are due in addition to the Principal Amounts Due) |
|---|---|---|
| October 15 2021 | 100,000 | $37,230.77 |
| December 15 2021 | 200,000 | $19,562.00 |
| March 15 2022 | 200,000 | $25,397.79 |
| May 15 2022 | 200,000 | $14,301.72 |
| August 15 2022 | 200,000 | $17,507.38 |
| October 15 2022 | 287,527 | $9,041.45 |
| December 15 2022 | 200,000 | $5,260.27 |
| February 15 2023 | 200,000 | $2,630.14 |

8

A-532

# EXHIBIT 2

**A-533**

DocuSign Envelope ID: ECE97BA7-363C-47DA-A6E8-B13D9A44A5DB

# PROMISSORY NOTE #3

| $455,642 | Miami, Florida |
|---|---|
| | June 28, 2021 |

FOR VALUE RECEIVED, Adlon LLC, a Delaware limited liability company (the **"Obligor"**) hereby unconditionally promises to pay to the order of Lasse Meilsoe (the **"Noteholder"**) the principal amount of $455,642 (the **"Loan"**), together with any accrued interest thereon, as provided in this Promissory Note (this **"Note"**).

## RECITALS

WHEREAS, reference is made to the Executive Employment Agreement, dated February 28, 2020, between Obligor, as employer, and Noteholder, as executive (the **"Employment Agreement"**);

WHEREAS, the parties hereto acknowledge and agree that, pursuant to Section 5(C)(i) and Section 5(C)(ii) of the Employment Agreement, a monetary sum in the amount of the Loan is due and payable by the Obligor to the Noteholder on August 22, 2022, without any contingencies related thereto; and

WHEREAS, the parties hereto desire to document the existence of the Loan and the terms and conditions under which the Loan shall be repaid.

1.  Payment Dates.

    (a)   Payment Date. The aggregate unpaid principal amount of the Loan, all accrued and unpaid interest, and all other amounts payable under this Note shall be due and payable in the amounts and on the dates set forth on Schedule A attached hereto.

    (b)   Prepayment. The Obligor may prepay the Loan in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

2.  Interest.

    (a)   Interest Rate. Except as provided in Section 2(b), principal amounts outstanding under this Note shall bear interest at a rate per annum (the **"Interest Rate"**) equal to eight percent (8.00%).

    (b)   Default Interest. If any amount payable hereunder is not paid when due (without regard to any applicable grace period), whether at stated maturity, by acceleration, or otherwise, such overdue amount shall bear a default interest rate at ten percent (10.00%) beginning as of the date of such default.

    (c)   Computation of Interest. All computations of interest hereunder shall be made on the basis of a year of 365 days, and the actual number of days elapsed. Interest

**A-534**

DocuSign Envelope ID: ECE97BA1-353C-47D2-A9F8-B1329A44A5DB

shall begin to accrue on the Loan on the date of this Note. On any portion of the Loan that is repaid, interest shall not accrue on the date on which such payment is made.

(d)     Interest Rate Limitation. If at any time the interest rate payable on the Loan shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

3.     Payment Mechanics.

(a)     Manner of Payment. All payments of principal and interest shall be made in US dollars no later than 5:00PM eastern time on the date on which such payment is due. Such payments shall be made by wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Obligor from time to time.

(b)     Application of Payments. All payments shall be applied, *first*, to fees or charges outstanding under this Note, *second*, to accrued interest, and, *third*, to principal outstanding under this Note.

(c)     Business Day. Whenever any payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and interest shall be calculated to include such extension. "**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in Miami, Florida are authorized or required by law to close.

4.     Representations and Warranties. The Obligor represents and warrants to the Noteholder as follows:

(a)     Existence. The Obligor is a limited liability company duly formed, validly existing, and in good standing under the laws of the state of its organization. The Obligor has the requisite power and authority to own, lease, and operate its property, and to carry on its business.

(b)     Compliance with Law. The Obligor is in compliance with all laws, statutes, ordinances, rules, and regulations applicable to or binding on the Obligor, its property, and business.

(c)     Power and Authority. The Obligor has the requisite power and authority to execute, deliver, and perform its obligations under this Note.

(d)     Authorization; Execution and Delivery. The execution and delivery of this Note by the Obligor and the performance of its obligations hereunder have been duly authorized by all necessary limited liability company action in accordance with applicable law. The Obligor has duly executed and delivered this Note.

**A-535**

    5.    <u>Events of Default</u>. The occurrence and continuance of any of the following shall constitute an "**Event of Default**" hereunder:

    (a)    <u>Failure to Pay</u>. The Obligor fails to pay (i) any principal amount of the Loan within ten (10) days after the date such amount is due; (ii) any interest on the Loan within ten (10) days after the date such amount is due; or (iii) any other amount due hereunder within ten (10) days after such amount is due.

    (b)    <u>Breach of Representations and Warranties</u>. Any representation or warranty made by the Obligor to the Noteholder herein contains an untrue or misleading statement of a material fact as of the date made.

    (c)    <u>Bankruptcy; Insolvency</u>.

    (i)    The Obligor institutes a voluntary case seeking relief under any law relating to bankruptcy, insolvency, reorganization, or other relief for debtors.

    (ii)    An involuntary case is commenced seeking the liquidation or reorganization of the Obligor under any law relating to bankruptcy or insolvency, and such case is not dismissed or vacated within sixty (60) days of its filing.

    (iii)    The Obligor makes a general assignment for the benefit of its creditors.

    (iv)    The Obligor is unable, or admits in writing its inability, to pay its debts as they become due.

    (v)    A case is commenced against the Obligor or its assets seeking attachment, execution, or similar process against all or a substantial part of its assets, and such case is not dismissed or vacated within sixty (60) days of its filing.

    (d)    <u>Failure to Give Notice</u>. The Obligor fails to give the notice of Event of Default specified in 6.

An Event of Default under this Note shall constitute (i) an "Event of Default" (as defined therein) under the Promissory Note #2, dated as of the date hereof, by and between Obligor, as obligor, 777 Partners LLC, as guarantor, and Noteholder, as noteholder, (ii) a "material breach" under the Employment Agreement, and (iii) a "Trigger Event" (as defined therein) permitting the Noteholder to *immediately* terminate his employment under the Employment Agreement for "Good Reason" (as defined therein) pursuant to <u>Section 9(c)</u> of the Employment Agreement, without Noteholder having to (A) wait the thirty (30) day cure period provided for in <u>Section 9(B)(i)</u> of the Employment Agreement, or (B) provide notice via physical mail pursuant to <u>Section 12(C)</u> of the Employment Agreement (email notice provided for in <u>Section 9</u> of this Note being sufficient).

    6.    <u>Notice of Event of Default</u>. As soon as possible after it becomes aware that an Event of Default has occurred, and in any event within two (2) Business Days, the Obligor shall notify

A-536

the Noteholder in writing of the nature and extent of such Event of Default and the action, if any, it has taken or proposes to take with respect to such Event of Default.

7.    Remedies. Upon the occurrence and during the continuance of an Event of Default, the Noteholder may, at its option, by written notice to the Obligor declare the outstanding principal amount of the Loan, accrued and unpaid interest thereon, and all other amounts payable hereunder immediately due and payable; *provided, however,* if an Event of Default described in Sections 5(c)(i), 5(c)(iii), or 5(c)(iv) shall occur, the outstanding principal amount, accrued and unpaid interest, and all other amounts payable hereunder shall become immediately due and payable without notice, declaration, or other act on the part of the Noteholder.

8.    Expenses. The Obligor shall reimburse the Noteholder on demand for all reasonable out-of-pocket costs, expenses, and fees, including the reasonable fees and expenses of counsel, incurred by the Noteholder in connection with the negotiation, documentation, and execution of this Note and the enforcement of the Noteholder's rights hereunder.

9.    Notices. All notices and other communications relating to this Note shall be in writing and shall be deemed given upon the first to occur of (x) deposit with the United States Postal Service or overnight courier service, properly addressed and postage prepaid; (y) transmittal by e-mail properly addressed; or (z) actual receipt by an employee or agent of the other party. Notices hereunder shall be sent to the following addresses, or to such other address as such party shall specify in writing:

(a)    If to the Obligor:

Adlon LLC
600 Brickell Ave, Suite 1900
Miami, FL 33131
Attention: Ed Gehres, General Counsel
E-mail: egehres@777part.com

(b)    If to the Noteholder:

Lasse Meilsoe
c/o DLA Piper LLP (US)
Attention: Ryan Dwight O'Quinn
200 S. Biscayne Blvd., Suite 2500
E-mail: Ryan.OQuinn@dlapiper.com

10.    Governing Law. This Note and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based on, arising out of, or relating to this Note and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida.

11.    Disputes.

4

**A-537**

DocuSign Envelope ID: E6E97BA7-353C-47D2-A6E8-B13D9A44A5DB

Case 1:24-cv-03453-JGK Document 61-9 Filed 05/13/24 Page 23 of 26

(a) <u>Submission to Jurisdiction</u>. The Obligor irrevocably and unconditionally (A) agrees that any action, suit, or proceeding arising from or relating to this Note may be brought in the courts of the State of Florida sitting in Miami-Dade County, and (B) submits to the exclusive jurisdiction of such courts in any such action, suit, or proceeding. Final judgment against the Obligor in any such action, suit, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) <u>Venue</u>. The Obligor irrevocably and unconditionally waives, to the fullest extent permitted by law, (i) any objection that it may now or hereafter have to the laying of venue in any action, suit, or proceeding relating to this Note in any court referred to in Section 11(a), and (ii) the defense of inconvenient forum to the maintenance of such action, suit, or proceeding in any such court.

(c) <u>Waiver of Jury Trial</u>. THE OBLIGOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

12. <u>Successors and Assigns</u>. This Note may be assigned or transferred by the Noteholder to any individual, corporation, company, limited liability company, trust, joint venture, association, partnership, unincorporated organization, governmental authority, or other entity.

13. <u>Integration</u>. This Note constitutes the entire contract between the Obligor and the Noteholder with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto; provided, however, for the avoidance of doubt, the Employment Agreement shall remain in full force and effect and is only amended as expressly set forth herein.

14. <u>Amendments and Waivers</u>. No term of this Note may be waived, modified, or amended, except by an instrument in writing signed by the Obligor and the Noteholder. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

15. <u>No Waiver; Cumulative Remedies</u>. No failure by the Noteholder to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The rights, remedies, and powers herein provided are cumulative and not exclusive of any other rights, remedies, or powers provided by law.

16. <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect

5

A-538

DocuSign Envelope ID: ECE97BA7-353C-47DA-A6F8-B13D9A44A5DB

any other term or provision of this Note or render such term or provision invalid or unenforceable in any other jurisdiction.

17.    Counterparts. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all of which taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note in electronic ("pdf" or "tif") format shall be as effective as delivery of a manually executed counterpart of this Note.

[*Execution Page Follows*]

**A-539**

IN WITNESS WHEREOF, the Obligor has executed this Note as of the date first set forth above.

Adlon LLC

DocuSigned by:

*Steven W. Pasko*

By: ___DF9B492F398A415___

Name: Steven W. Pasko

Title: Manager

ACKNOWLEDGED AND ACCEPTED BY:

DocuSigned by:

By ___C8BB56E9657C478___

Lasse Meilsoe

EAST\180881928.4

A-540

## SCHEDULE A

### PAYMENTS DUE DATES

| Due Date | Aggregate Payment Due | Interest Amount* |
|---|---|---|
| July 18, 2022 | $50,000 | $40,907 |
| July 25, 2022 | $50,000 | $695 |
| August 1, 2022 | $50,000 | $617 |
| August 8, 2022 | $50,000 | $539 |
| August 15, 2022 | $50,000 | $461 |
| August 22, 2022 | $50,000 | $384 |
| August 29, 2022 | $50,000 | $306 |
| September 5, 2022 | $50,000 | $228 |
| September 12, 2022 | $50,000 | $150 |
| September 19, 2022 | $50,000 | $72 |

*All interest amounts set forth in the 'Interest Amount' column are included in the amounts set forth in the 'Payment' column

8

# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 3 of 5 (Pages A-541 to A-816)

JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants*
 *Advantage Capital Holdings LLC*
 *and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP COUNSEL PRESS    (800) 4-APPEAL • (333478)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

i

# TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Complaint, dated May 3, 2024................................... | A-37 |
| Exhibit 1 to Complaint -<br>Email to Craig Gillespie from Anonymous<br>Sender, dated September 19, 2022........................ | A-119 |
| Exhibit 2 to Complaint -<br>Letter from Craig Gillespie to Steven W. Pasko,<br>Joshua Wander, Damien Alfalla and Steve Pasko,<br>dated March 24, 2023 ........................................... | A-121 |
| Exhibit 3 to Complaint -<br>Email to Josh Wander and Others from Phil<br>Kane, dated March 29, 2023.................................. | A-125 |
| Exhibit 4 to Complaint -<br>Email to Josh Wander and Others from Tom<br>Spreutels, dated April 4, 2023............................... | A-128 |
| Exhibit 5 to Complaint -<br>Letter from John Wells to Steven W. Pasko re:<br>Notice of Breach of Parties' Agreements, dated<br>November 29, 2023 .............................................. | A-130 |
| Exhibit 6 to Complaint -<br>Wells Fargo Summary Statement Screenshot........ | A-135 |
| Exhibit 7 to Complaint -<br>"Collection" Account Wells Fargo Monthly<br>Statement ............................................................. | A-137 |
| Exhibit 8 to Complaint -<br>"Reserve" Account Wells Fargo Monthly<br>Statement ............................................................. | A-143 |

ii

**Page**

Exhibit 9 to Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024 ...... A-146

Proposed Order to Show Cause and Temporary
Restraining Order by Plaintiffs, filed May 13,
2024 ....................... A-169

Plaintiffs' Memorandum of Law In Support of Their
Application For (1) A Temporary Restraining
Order, and (2) An Order to Show Cause for a
Receiver or, Alternatively, A Preliminary
Injunction, dated May 13, 2024 ............................ A-173

Declaration of Craig Gillespie, for Plaintiffs
Leadenhall Capital Partners LLP and Leadenhall
Life Insurance Linked Investments Fund PLC
("Leadenhall"), in Support of Proposed
Temporary Restraining Order ("Proposed TRO"),
dated May 13, 2024 ................................. A- 202

Exhibit 1 to Gillespie Declaration -
Loan and Security Agreement, dated May 7, 2021 A-210

Exhibit 2 to Gillespie Declaration -
Guaranty Agreement with 777 Partners and 600
Partners, dated May 7, 2021 .................................. A- 250

Exhibit 3 to Gillespie Declaration -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

iii

**Page**

Exhibit 4 to Gillespie Declaration -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 5 to Gillespie Declaration -
Excerpt from the December 2023 Compliance
Report Issued for the Dorchester Borrower ........... A-269

Exhibit 6 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the SuttonPark Borrower ............. A-271

Exhibit 7 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the Dorchester Borrower ............. A-273

Exhibit 8 to Gillespie Declaration -
Paydown and Partial Release Letter on behalf of
Leadenhall, dated February 21, 2024 .................... A-275

Exhibit 9 to Gillespie Declaration -
Default Notice, dated March 12, 2024................... A-284

Exhibit 10 to Gillespie Declaration -
Acceleration Notice, dated March 15, 2024 .......... A-295

Exhibit 11 to Gillespie Declaration -
Draft First Forbearance Agreement, dated
March __, 2024 ...................................................... A-318

Declaration of Phil Kane, for Plaintiff Leadenhall,
in Support of Proposed TRO, filed May 13, 2024. A-360

Declaration of Luca Albertini, for Plaintiff
Leadenhall, in Support of Proposed TRO, dated
May 13, 2024 ........................................................ A-364

iv

|  | Page |
|---|---|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Proposed TRO, dated May 13, 2024 ........................................................ | A-367 |
| Exhibit A to Nathanson Declaration - Amended Verified Complaint in *Change Lending LLC v. 777 Partners LLC et al.*, Index No. 650118/2024 (N.Y. Sup.), dated March 19, 2024 .. | A-372 |
| Exhibit B to Nathanson Declaration - Particulars of Claim in *Corvus Lights Aviation et al v. 777 Partners LLC* (U.K.), dated December 8, 2023 ................................................. | A-385 |
| Exhibit C to Nathanson Declaration - Verified Amended Complaint in *MALT Family Trust et al. v. 777 Partners, LLC et al.*, C.A. No. 2022-0652-MTZ (Del. Ch.), dated November 22, 2022 .............................................. | A-402 |
| Exhibit D to Nathanson Declaration - Summons and Complaint in *Vida Longevity Fund, LP et al. v. SuttonPark Capital LLC et al.*, Index. No. 656715/2022 (N.Y. Sup.), dated July 1, 2022............................................................ | A-452 |
| Exhibit E to Nathanson Declaration - Complaint in *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.,* Index No. 651220/2024 (N.Y. Sup.), dated March 7, 2024 .... | A-465 |
| Exhibit F to Nathanson Declaration - Complaint in *Balanced Management LLC v. 777 Partners LLC*, Case No. 230909460 (Utah Dist. Ct.), dated December 14, 2023 ............................ | A-480 |

v

**Page**

Exhibit G to Nathanson Declaration -
Verified Petition for Interim Measures in Aid of
Arbitration in *Nakula Management Ltd. v. Joshua
Wander et al.,* Case No. 2024-004624-CA-01
(Fla. 11th Cir. Ct.) (exhibits to the complaint are
excluded), dated March 14, 2024 .......................... A-489

Exhibit H to Nathanson Declaration -
Summons and Complaint in *1 Madison Office
Fee LLC v. 777 Partners LLC et al.*, Index No.
654397/2023 (N.Y. Sup.), dated
September 8, 2023 ................................................ A-508

Exhibit I to Nathanson Declaration -
Complaint in *Lasse Meilsoe v. 777 Partners LLC
et al.*, Case No. 2023-028758-CA-01 (Fla. 11th
Cir. Ct.), dated March 22, 2023, with Exhibits...... A-515

Exhibit J to Nathanson Declaration -
Amended Complaint in *Peter Meyers v. 777
Partners, LLC et al.*, Case No. 2024-001279-CA-
01 (Fla. 11th Cir. Ct.), dated January 30, 2024,
with Exhibits ........................................................ A-541

Exhibit K to Nathanson Declaration -
Summons and Complaint in *American Express
Travel Related Services Company, Inc. v. 777
Partners LLC*, 651130/2023 (N.Y. Sup.), dated
March 3, 2023 ...................................................... A-584

Exhibit L to Nathanson Declaration -
Complaint in *Randy S. Gelber v. Joshua Wander*,
Case No. 2021-013205-CA-01 (Fla. 11th Cir.
Ct.), dated June 7, 2021, with Attachment............. A-592

vi

**Page**

Exhibit M to Nathanson Declaration -
Complaint in *The Oxbridge Group, LTD v. 777
Partners, LLC,* Index No. 651975/2023 (N.Y.
Sup.), dated April 21, 2023 .................................... A-625

Exhibit N to Nathanson Declaration -
Verified Amended Complaint in *O'Neil-Dunne et
al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-
BWD (Del. Ch.), dated January 19, 2024 .............. A-631

Exhibit O to Nathanson Declaration -
First Amended Complaint in *Eido Hussam
Al-Nahhas v. 777 Partners, LLC et al.*, Case No.
22-cv-750 (N.D. Ill.), undated .............................. A-654

Exhibit P to Nathanson Declaration -
Complaint – Class Action in *Joseph Morgan
et al. v. 777 Partners, LLC et al.*, Case No.
24-cv-01004 (N.D. Ill.), undated .......................... A-683

Hearing Transcript held before the Honorable John
G. Koeltl, dated May 14, 2024 .............................. A-710

Redacted Declaration of Michael Saliba, for
Defendant Advantage Capital Holdings LLC ("A-
CAP"), in Opposition to Proposed TRO, dated
May 24, 2024
(Unredacted version is reproduced in the
Confidential Appendix at pp. CA-1-CA-8) .......... A-721

Reply Memorandum of Law in Further Support of
Plaintiffs' Application For (1) A Temporary
Restraining Order, and (2) An Order to Show
Cause for a Receiver or, Alternatively, a
Preliminary Injunction, dated May 30, 2024
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-9-CA-36) .............................. A-729

vii

|  | Page |
|---|---|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Reply Memorandum, dated May 30, 2024 | A-730 |
| Exhibit 1 to Nathanson Declaration - Hearing Transcript held before the Honorable John G. Koeltl, dated May 14, 2024 | A-732 |
| Exhibit 2 to Nathanson Declaration - Email from Roger Schwartz to Shelly DeRousse and Others, dated May 23, 2024, with Attachment | A-744 |
| Exhibit 3 to Nathanson Declaration - Email from Leigh Nathanson to Jonathan Watkins, dated May 16, 2024 | A-757 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 7, 2024 | A-765 |
| Order to Show Cause and Temporary Restraining Order, by Plaintiff Leadenhall, dated June 7, 2024 | A-831 |
| Letter from David A. Pellegrino to Honorable John G. Koeltl, dated June 10, 2024 | A-835 |
| Exhibit 1 to Letter - Email from Leigh Nathanson to John G. McCarthy and Others, dated June 9, 2024 | A-840 |
| Exhibit 2 to Letter - Email from David Pellegrino to Leigh Nathanson and Others, dated June 10, 2024 | A-842 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 14, 2024 | A-844 |

viii

|  | Page |
|---|---|

Memo Endorsed on Joint Letter, dated
June 18, 2024 ........................................................ A-867

Order of the Honorable John G. Koeltl, dated June
20, 2024 .................................................. A-868

Motion, by Intervenors Haymarket Insurance
Company ("Haymarket") and ACM Delegate
LLC ("ACM Delegate"), to Intervene, filed
July 8, 2024
(Motion omitted herein):

Declaration of Jonathan Watkins, for Intervenors
Haymarket and ACM Delegate, in Support of
Motion to Intervene, dated July 8, 2024 ................ A-869

Exhibit A to Watkins Declaration -
UCC-1 Financing Statements and Amendments
filed with the Delaware Secretary of State, dated
March 3, 2020 ........................................................ A-871

Exhibit B to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated
November 27, 2023 ................................................ A-883

Exhibit C to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State or Florida Secured
Transaction Registry, dated April 12, 2021 to
December 15, 2023 ................................................ A-888

Exhibit D to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated July 12, 2022 . A-898

Hearing Transcript held before the Honorable John
G. Koeltl, dated July 8, 2024 ................................ A-902

ix

**Page**

Proposed Order to Show Cause without Emergency
Relief by Defendant A-CAP, filed July 31, 2024
(Proposed order to show cause omitted herein):

Declaration of Michael Saliba, for Defendant A-
CAP, in Support of Proposed Order to Show
Cause, dated July 29, 2024 ................................... A-935

Exhibit A to Saliba Declaration -
Email from Craig Gillespie to Kenneth King and
Others, dated October 19, 2023 ............................ A-941

Exhibit B to Saliba Declaration -
Excerpts from the Spreadsheet Attached to Email,
dated October 19, 2023.......................................... A-944

Exhibit C to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Dorchester, dated
May 10, 2021 at 4:50pm........................................ A-949

Exhibit D to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:54pm..................... A-951

Exhibit E to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 4:58pm..................... A-953

Exhibit F to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:03pm..................... A-961

x

**Page**

Exhibit G to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:07pm...................... A-963

Exhibit H to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal SML 4
LLC, dated May 10, 2021 at 5:11pm...................... A-970

Exhibit I to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:16pm .............................. A-972

Exhibit J to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:19pm .............................. A-974

Exhibit K to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SPLCSS III LLC,
dated May 10, 2021 at 5:23pm .............................. A-981

Exhibit L to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:27pm...................... A-983

Exhibit M to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:31pm...................... A-985

xi

Page

Exhibit N to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Agency
Service, dated May 11, 2021 at 3:34pm ................ A-944

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Order to
Show Cause, dated July 31, 2024 .......................... A-966

Exhibit A to Watkins Declaration -
Proposed Modified Preliminary Injunction ........... A-998

Exhibit B to Watkins Declaration -
Order from the Honorable John G. Koeltl, dated
July 8, 2024
(Reproduced in Special Appendix)

Hearing Transcript held before the Honorable John
G. Koeltl, dated August 1, 2024 ........................... A-1001

Plaintiffs' Opposition to A-CAP's Motion Under
Rule 59(E) to Amend the Preliminary Injunction,
dated August 15, 2024 .......................................... A-1011

Declaration of Craig Gillespie, for Plaintiff
Leadenhall, in Opposition to Order to Show
Cause, dated August 15, 2024................................ A-1038

Exhibit 1 to Gillespie Declaration -
Excerpts from the Loan and Security Agreement,
dated May 7, 2021 ................................................ A-1040

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Reply
Memorandum of Law, dated August 26, 2024,
with Exhibits A through E
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-37-CA-561) ......................... A-1072

xii

**Page**

Corrected Amended Complaint, dated
September 6, 2024 .................................................. A-1073

Exhibit 1 to Amended Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

Exhibit 2 to Amended Complaint -
Letter from Craig Gillespie to Steven W Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023
(Reproduced herein at pp. A-121-A-124)

Exhibit 3 to Amended Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023
(Reproduced herein at pp. A-125-A-127)

Exhibit 4 to Amended Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023
(Reproduced herein at pp. A-128-A-129)

Exhibit 5 to Amended Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 6 to Amended Complaint -
Tables .................................................................... A-1229

Exhibit 7 to Amended Complaint -
Wells Fargo Summary Statement Screenshot
(Reproduced herein at pp. A-135-A-136)

xiii

Page

Exhibit 8 to Amended Complaint -
"Collection" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-137-A-142)

Exhibit 9 to Amended Complaint -
"Reserve" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-143-A-145)

Exhibit 10 to Amended Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024
(Reproduced herein at pp. A-146-A-168)

Exhibit 11 to Amended Complaint -
Outstanding Accelerated Balance Sheet ................ A-1236

Exhibit 12 to Amended Complaint -
777 Partners' Draft Forbearance Agreement ......... A-1238

Exhibit 13 to Amended Complaint -
Jorge Beruff LinkedIn Profile ................................ A-1280

Exhibit 14 to Amended Complaint -
Juan Arciniegas LinkedIn Profile .......................... A-1284

Exhibit 15 to Amended Complaint -
Aaron Levy LinkedIn Profile.................................. A-1289

Exhibit 16 to Amended Complaint -
Lenz Balan LinkedIn Profile ................................. A-1292

Argument and Decision held before the Honorable
John G. Koeltl, dated October 2, 2024 .................. A-1295

Notice of Appeal by Defendant A-CAP, dated
October 3, 2024 .................................................... A-1352

xiv

**Page**

Notice of Appeal by Defendants 777 Partners LLC,
    600 Partners LLC, SPLCSS III LLC, Dorchester
    Receivables II LLC, Insurety Agency Services
    LLC, and Signal SML 4 LLC, dated
    October 22, 2024 ................................................. A-1354

A-541

# EXHIBIT J

Filing # 190813591 E-Filed 01/30/2024 10:46:48 AM

Case 1:24-cv-03453-JGK   Document 61-10   Filed 05/13/24   Page 2 of 43

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

PETER MEYERS,

            Plaintiff,

    v.                                Case No. 2024-001279-CA-01

777 PARTNERS, LLC and 777 PARTNERS
MANAGEMENT LLC,

            Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff Peter Meyers ("Plaintiff") hereby sues Defendants 777 Partners, LLC ("Defendant Employer") and 777 Partners Management, LLC ("Defendant Management Equity Plan") (together, "Defendants"), and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    This is an action for Defendants' failure to pay Plaintiff millions of dollars in compensation that he earned during his five-plus-year tenure as an executive with Defendant Employer.

2.    Plaintiff is an individual who resides in Miami-Dade County, Florida. He is a citizen of the State of Florida.

3.    Defendant Employer is a Delaware limited liability company with its principal place in Miami-Dade County, Florida. One or more of its members are citizens of the State of Florida.

4.    Defendant Management Equity Plan is a Delaware limited liability company with its principal place in Miami, Florida. One or more of its members are citizens of the State of Florida.

1



BRODSKY FOTIU-WOJTOWICZ

A-543

5.      The amount in controversy exceeds $750,000.00, exclusive of interest, costs, and attorneys' fees.

6.      The Court has personal jurisdiction over Defendants as they breached a contract in this state by failing to perform acts required by the contract to be performed in this state and because the causes of actions alleged herein arise from Defendants' operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

7.      Venue is proper in Miami-Dade County, Florida as the cause of action accrued here, and Plaintiff and Defendant Employer have consented to the exclusive jurisdiction of this Court pursuant to the Executive Employment Agreement between the parties, attached hereto as Exhibit A, between the parties.

### GENERAL ALLEGATIONS

8.      Plaintiff is a finance professional with nearly twenty years of experience in the investment banking, private equity, and credit fund industries.

9.      Defendant Employer is an investment firm with interests in a variety of different businesses. In recent months, Defendant Employer has been the subject of extensive public criticism arising from its financial dealings and more specifically, its unethical and likely illegal business practices.  Defendant Employer's managing partner, Josh Wander, has also been the subject of significant media scrutiny due to his criminal past and accusations that he fostered a "win at all costs," toxic, and discriminatory work environment.

10.     However, at the time Plaintiff was approached by Wander to join Defendant Employer, in 2017, this information was not of public record and Plaintiff was unaware of the numerous red flags regarding Defendant and its management that later came to light.

2



BRODSKY FOTIU-WOJTOWICZ

A-544

11.     In April 2018, after several months of discussions and negotiations, Plaintiff signed an Executive Employment Agreement, Exhibit A, with Defendant Employer. Pursuant to the Executive Employment Agreement, Plaintiff was hired as a Principal on the investment team of Defendant for a three-year term. He was to be paid a $300,000.00 base salary and an annual bonus targeted at 100% of his base salary with a minimum guaranteed annual bonus in the amount of $250,000.00. Additionally, as is common in the investment fund space, Plaintiff was entitled to a 5% share of Defendant's management equity plan, as well as a 2% "carried interest" (i.e. equity value) on any deals he sourced. Given the value it was advertised to represent, this management equity and carried interest component represented the major financial component to Plaintiff and was the fundamental basis for his agreement to resign from his prior firm in New York City and move his family from New Jersey to Miami and accept employment with Defendant.

12.     As a further component of Plaintiff's compensation, in December 2020, Plaintiff and Defendant Employer signed a 777 Deferred Cash Plan Award Agreement, pursuant to which, over a four-year vesting schedule, beginning in April 2018, Plaintiff was awarded cash compensation in the total amount of $1,810,000.00. Plaintiff's entitlement to this cash compensation has since fully vested. Payment of this sum was to be made in five annual installments starting in April 2023. The 777 Deferred Cash Plan Award Agreement is attached hereto as Exhibit B.

13.     And in December 2020, Plaintiff and Defendant Management Equity Plan signed a Management Units Grant Agreement, a copy of which is attached hereto as Exhibit C, awarding Plaintiff 5% of the Management Interests in Defendant Management Equity Plan.

14.     Upon joining Defendant Employer, Plaintiff quickly proved to be one of the most productive members of the firm, including with respect to originating and signing lucrative

3



BRODSKY FOTIU-WOJTOWICZ

A-545

business deals. Indeed, Plaintiff brought in more than 100 high-quality deals and signed several letters of intent in his first year alone.

15.     One of the earliest deals Plaintiff closed for Defendant Employer was the acquisition of Managed Care Advisory Group, LLC ("MCAG"), which closed in May 2019. MCAG finds and manages the claims submission process on behalf of individuals and entities entitled to settlement payouts in class action lawsuits. Approximately 25% of gross settlement payouts recovered for claimants is fee revenue generated by MCAG. As of mid-2023, MCAG represented nearly 300,000 claimants across 24 class action cases that are projected to generate over $400 million in net revenue over the next several years.

16.     Plaintiff was instrumental in helping to grow MCAG into the successful and lucrative giant it is today. After closing the deal in May 2019, Plaintiff was appointed to the Board of MCAG and worked with MCAG on several initiatives, including (1) growing the expected revenue from approximately $100 million to over $400 million, (2) restructuring a sizeable obligation owed by MCAG, (3) establishing a lucrative claims purchase program, and (4) securing new and lucrative JV partners that sourced considerable additional business. Ultimately, MCAG grew into one of the most valuable businesses in Defendant Employer's portfolio with a total equity value (based on MCAG's portfolio as of mid-2023) of nearly $300 million or approximately $250 million net of the funds contributed by Defendant.

17.     Despite successfully sourcing and securing immensely profitable deals such as MCAG, it became apparent to Plaintiff over the years that Defendant Employer was more interested in the appearance of being a successful enterprise through exponential and unchecked growth, rather than exercising fiscal responsibility and executing a sustainable business model. Defendant Employer focused on acquiring as many assets as possible without regard for the overall

A-546

risks and liabilities associated with those decisions causing the firm – and Wander – to accumulate massive debt.

18.     Indeed, Defendant Employer's rampant and unchecked spending continued to create significant liquidity issues for the firm that came at the expense of its employees. For example, Defendant Employer would routinely delay annual bonus payments by six to twelve months or more and generally made only partial payments.

19.     Additionally, Plaintiff was finding it increasingly difficult to perform his job as he was frequently undermined and interfered with by his own employer, namely Wander, while attempting to secure new multi-million deals for the firm.

20.     Wander would also outright block deals originated by Plaintiff or fail to provide the necessary funding to effectuate the deals due to lack of capital or a desire to prioritize more "flashy" deals that he believed to be more perceptually appealing or "newsworthy" despite being objectively less economically attractive as compared to the sound deals being sourced by Plaintiff.

21.     For example, Defendant Employer began buying up middling sports teams throughout Europe and Latin America in recent years with documented financial struggles and continued to sink significant capital into troubled airlines. One such newsworthy deal that Defendant Employer is still attempting to finalize is the purchase of English Premier League Club, Everton FC. Defendant Employer reportedly signed an agreement to acquire a principal stake in the soccer club for nearly $700 million. However, official approval and sanction of the deal remains uncertain as (1) Defendant Employer purportedly was finding it difficult to come up with the cash needed to close the deal, (2) Defendant Employer has been unable to furnish required financial reports (financial audits, etc.), and (3) the media has documented various unethical and potentially illegal dealings of Defendant Employer and Wander. And now, it has been reported

5

A-547

that the U.S. Justice Department has launched a federal probe to investigate Defendant Employer's financial backing, operations and money flow. These questions and potential forthcoming criminal charges surrounding Defendant Employer's finances have stalled the deal to acquire Everton for the time being.

22.    Even before the Everton debacle, Defendant Employer had developed a dubious reputation throughout the finance world and with its key employees for its questionable and unethical business practices and suspected illegal conduct, which has been extensively covered by numerous media outlets in recent months.

23.    These constant concerns and issues related to Defendant Employer's liquidity, financial practices, unethical and suspected illegal business practices and damaged relationships caused by the aforementioned actions, combined with the frequent interference with Plaintiff's performance of his duties for the firm, left Plaintiff with no choice but to resign from his role with the firm on June 23, 2023. These issues and concerns were directly cited by Plaintiff to Defendants' senior management as the fundamental reason for said resignation during Plaintiff's resignation meeting on June 23, 2023.

24.    Plaintiff has not received a majority of the significant compensation that he is owed and earned through his performance, which including his annual bonus for 2022 and his prorated annual bonus for 2023 (although the Executive Employment Agreement had a three-year term, the parties continued to perform under its terms after the term expired), the cash payments owed under the Deferred Cash Plan, his 5% share of Defendant's management equity plan, and his 2% equity in MCAG.

25.    Despite multiple requests made by Plaintiff, Defendants refuse to pay any of these monies due and owing to Plaintiff at this time, which is not surprising given their well-documented

6



Case: 24-2647, 11/22/2024, DktEntry: 39.1, Page 24 of 292

A-548

Case 1:24-cv-03453-JGK   Document 61-10   Filed 05/13/24   Page 8 of 43

cash flow issues as well as their tendencies to break contracts and not pay their financial obligations to investment counterparties, vendors, lenders and employees alike.

26.     Plaintiff has retained the undersigned law firm to represent Plaintiff's interests in this matter and is obligated to pay the firm a fee for its services.

27.     All conditions precedent to this action have been performed, have occurred, or have been waived.

## COUNT I

### BREACH OF EXECUTIVE EMPLOYMENT AGREEMENT
### AGAINST DEFENDANT EMPLOYER

28.     Plaintiff realleges and incorporates by reference the allegations preceding the first count of this Complaint as if fully set forth herein.

29.     Plaintiff and Defendant Employer entered into the Executive Employment Agreement, which is valid, binding, and enforceable.

30.     Plaintiff has fully performed under the Executive Employment Agreement.

31.     Pursuant to the Executive Employment Agreement, Plaintiff was to be paid an annual bonus targeted at 100% of his base salary (i.e. $300,000.00) with a minimum guaranteed annual bonus in the amount of $250,000.00. Furthermore, Plaintiff repeatedly was paid bonuses well in excess of said target amount.

32.     Defendant Employer breached this agreement by failing to pay Plaintiff his annual bonus for the year 2022, as well as for the year 2023 (pro-rated through July 2023 when Plaintiff resigned).

33.     Defendant Employer's breach of the Executive Employment Agreement has caused Plaintiff damages.

WHEREFORE, Plaintiff demands judgment against Defendant Employer for damages,

7



BRODSKY FOTIU-WOJTOWICZ

A-549

prejudgment interest, interest, costs, attorney's fees pursuant to Florida's Fair Wage Act (Chapter 448), and all other and further relief as appropriate.

## COUNT II
### BREACH OF 777 DEFERRED CASH PLAN AWARD AGREEMENT
### AGAINST DEFENDANT EMPLOYER

34.     Plaintiff realleges and incorporates by reference the allegations preceding the first count of this Complaint as if fully set forth herein.

35.     Plaintiff and Defendant Employer entered into the 777 Deferred Cash Plan Award Agreement, pursuant to which, over a four-year vesting schedule beginning in April 2018, Plaintiff was awarded cash compensation in the total amount of $1,810,000.00.

36.     Plaintiff has fully performed under the 777 Deferred Cash Plan, which has vested and is valid, binding, and enforceable.

37.     Plaintiff was to receive the full $1,810,000.00 over a five-year payment schedule with the first payment in the amount of $181,000.00 to be paid to Plaintiff on April 16, 2023.

38.     Defendant Employer breached this agreement by failing to make the first payment of $181,000.00 to Plaintiff.

39.     Defendant Employer's breach of the 777 Deferred Cash Plan Award Agreement has caused Plaintiff damages.

WHEREFORE, Plaintiff demands judgment against Defendant Employer for damages, prejudgment interest, interest, costs, and all other and further relief as appropriate.

## COUNT III
### BREACH OF MANAGEMENT EQUITY PLAN
### AGAINST DEFENDANT MANAGEMENT EQUITY PLAN

40.     Plaintiff realleges and incorporates by reference the allegations preceding the first count of this Complaint as if fully set forth herein.

8



BRODSKY FOTIU-WOJTOWICZ

A-550

41.     Plaintiff and Defendant Management Equity Plan signed a Management Units Grant Agreement, awarding Plaintiff 5% of the Management Interests in Defendant Management Equity Plan.

42.     Plaintiff is fully vested in the Management Equity Plan, which is valid, binding, and enforceable.

43.     As such, Plaintiff is entitled to receive 5% of the Management Interests and a commensurate amount of distributions payable under the plan.

44.     Defendant Management Equity Plan breached this agreement by failing to provide Plaintiff his Membership Interests, any distributions payable under the plan, or anything of value whatsoever due to him pursuant to his interests.

45.     Defendant Management Equity Plan's breach has caused Plaintiff damages.

WHEREFORE, Plaintiff demands judgment against Defendant Management Equity Plan for damages, prejudgment interest, interest, costs, and all other and further relief as appropriate.

## COUNT IV

### DECLARATORY JUDGMENT REGARDING MCAG CARRIED INTEREST
### AGAINST DEFENDANT EMPLOYER

46.     Plaintiff realleges and incorporates by reference the allegations preceding the first count of this Complaint as if fully set forth herein.

47.     This is an action for declaratory judgment pursuant to Chapter 86 of the Florida Statutes.

48.     There is a present, bona fide dispute between the parties.

49.     More specifically, an actual and justiciable controversy exists between Plaintiff and Defendant Employer regarding Plaintiff's entitlement to 2% carried interest (or equity value) for MCAG.

9



BRODSKY FOTIU-WOJTOWICZ

A-551

50.     Pursuant to Section 4(c) of the Executive Employment Agreement, Plaintiff is entitled to 2% carried interest on any deals he sourced for Defendant Employer.

51.     Plaintiff contends that by creating and closing the deal with MCAG, as well as directly fostering its growth into a massively lucrative enterprise, he has earned and is entitled to receive payment from Defendant Employer for 2% equity in MCAG. Defendant has not recognized Plaintiff's entitlement to this equity value and has failed and/or refused to pay Plaintiff any carried interest in MCAG to date.

52.     As a result of the forgoing, Plaintiff and Defendant Employer are interested in and are in doubt about their rights with respect to the foregoing.

53.     Plaintiff is in need of a judicial determination and to have any doubts about Plaintiff's entitlement to 2% of the carried interest in MCAG and Defendant Employer's obligation to compensate Plaintiff for said interest removed.

54.     Unless the Court makes this declaration, Plaintiff will suffer substantial economic harm and other harm.

55.     There is a bona fide, actual, present, and practical need for declaratory relief based on the existing controversy alleged herein.

56.     The declaratory relief sought is based on a presently ascertainable state of facts and controversy and the rights of Plaintiff is dependent upon the resolution of this justiciable controversy.

57.     The relief sought is not merely the giving of an advisory opinion or legal advice.

58.     The parties in doubt are before the Court and are entitled to have their rights, status, powers or privileges resolved.

10



BRODSKY FOTIU-WOJTOWICZ

A-552

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment declaring:

a.　　　Plaintiff is entitled to 2% of the carried interest in MCAG from Defendant Employer pursuant to the Executive Employment Agreement;

b.　　　Plaintiff is entitled to a full accounting of MCAG's finances, portfolio value and any other relevant information as may be requested from Defendant Employer to ascertain the value of Defendant Employer's equity (and carried interest) in MCAG;

c.　　　Award Plaintiff his reasonable attorney's fees and costs; and

d.　　　Award such further relief as the Court deems proper.

Dated January 30, 2024.

Respectfully submitted,

By:_ /s/ Robert Visca_
Benjamin H. Brodsky, Esq.,
FBN: 73748
Robert Visca, Esq.,
FBN: 111800
BRODSKY FOTIU-WOJTOWICZ, PLLC
_Counsel for Plaint.,f_
200 SE 1 Street, Suite 400
Miami, Florida 33131
Tel:  305-503-5054
Fax:  786-749-7644
bbrodsky@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

BFW
BRODSKY FOTIU-WOJTOWICZ

A-553

# EXHIBIT A

A-554

## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement ("Agreement") is entered into as of May 16, 2018 (the "Effective Date") by and between 777 Partners, LLC, one of its portfolio companies, or subsidiaries, (collectively, the "Company"), and **Peter Meyers** ("Executive"). For purposes of this Agreement, the Company and Executive are collectively referred to as "the Parties."

1. TERM:  The Company hereby employs Executive, and Executive accepts employment with the Company, pursuant to the terms and provisions of this Agreement for the period commencing on the Effective Date and terminating on the third anniversary of the Effective Date unless this Agreement is earlier terminated as provided herein. If Executive is still employed by the Company upon expiration of this Agreement, Executive's status shall be one of at-will employment without the benefits of this Agreement, except as provided in Section 7(c) or as otherwise provided herein.

2. TITLE AND DUTIES: Executive shall serve as a Principal of the Company. At the conclusion of fiscal year 2019 and subject to Executive's performance, Executive will be eligible for a change in role to Managing Director or Partner. Executive shall report to the Managing Partners of the Company or such other officer as the Board of Directors or the Managing Partners may from time to time designate.

3. SERVICES TO BE EXCLUSIVE:  Executive agrees to devote his full productive time and best efforts to the performance of his duties for the Company. Notwithstanding the foregoing, Executive may serve on other boards of directors or engage in religious, charitable, or other community activities as long as such services and activities are disclosed to the Company's Managing Partners and do not materially interfere with Executive's performance of his duties as provided in this Agreement.

4. COMPENSATION:

    A. Base Salary:  In accordance with the Company's usual pay practices, the Company will pay Executive a base salary of $300,000.00 per year ("Base Salary"). The Base Salary shall be prorated for any partial years of employment and payable in equal installments on regularly scheduled Company pay dates.

    B. Annual Bonus:  Executive is eligible to participate in the Company's annual incentive bonus program(s) applicable to Executive's position, if any, in accordance with the terms of such program(s). This bonus will be targeted at 100% of Executive's base salary ("Target Bonus"). Notwithstanding the foregoing, for the Term of this Agreement and payable following the conclusion of each fiscal year (at the time the Company pays other annual bonuses), Executive will receive a minimum annual guaranteed bonus in the amount of $250,000.00 ("Minimum Bonus"), subject to customary withholdings tax and other employment taxes as required by law. For the avoidance of doubt, Executive's first year bonus shall not be pro-rated for his start date.

    C. Management Equity Plan: The Executive will be awarded five percent (5%) of the Company's Management Equity plan and will be eligible for increases commensurate with title. This Equity shall be subject to a five (5) year straight line vesting schedule, with the schedule commencing on the effective date of this agreement. In addition, Executive will receive 2.0% "carried interest" on all deals that he sources, which shall vest at a rate of one-third of the carried interest each year over three years. The specifics of the Management Equity plan are still being finalized and are

A-555

subject to change.  The details of the Management Equity shall be disclosed to Executive once finalized.

5. <u>EXPENSES AND BENEFITS</u>:

A. <u>Reasonable and Necessary Expenses</u>:  The Company shall reimburse Executive for all reasonable, customary, and necessary expenses incurred in the performance of Executive's duties.  Executive shall first account for such expenses in accordance with the policies and procedures set by the Company from time to time for reimbursement of such expenses. The amount, nature, and extent of such expenses shall always be subject to the control, supervision, and direction of the Company.

B. <u>Relocation Expenses:</u>  Until Executive and his family are able to sell their house and permanently relocate from New Jersey to Florida, the Company shall directly pay or reimburse Executive for his weekly commuting, transportation and housing accommodations. Furthermore, the Company shall directly pay or reimburse Executive for his and his family's expenses related to traveling to Florida to search for a new home at a maximum of three (3) occasions (expenses to include airfare, lodging, rental cars / transportation, food and other reasonable expenses).

In addition, Executive will be reimbursed for all other relocation expenses to be capped at $60,000.00 ("Relocation Expense Cap"). Relocation expenses to be included under the Relocation Expense Cap may include the following:

   a. Moving expenses for Executive and his family, including airfare, moving company costs, shipping of vehicles, transportation costs and other reasonable expenses.
   b. Temporary lodging (if required).
   c. Any out of pocket, non-refundable fees associated with securing a housing rental or purchase in South Florida (i.e., realtor broker fees, etc.).
   d. Housing Reimbursement: Executive will make a commercially reasonable effort to sell or rent his existing home in Montvale, NJ ("Existing Residence") prior to moving into his new residence in South Florida ("New Residence").  In the event that Executive's Existing Residence has not been sold or rented by the date that the lease or mortgage on his New Residence begins, the Company will reimburse Executive for the actual lease or mortgage costs and related utility expenses associated with his New Residence until the earlier of (a) such time as Executive's Existing Residence has been sold or rented, or (b) six (6) months following the date on which the lease or mortgage on Executive's New Residence begins.  Notwithstanding the forgoing, the Company shall not be obligated to reimburse Executive for more than $6,500 per month during such time.
   e. Equity Loss on Existing Residence: In the event that Executive sells his Existing Residence at a price that results in a loss of equity (following the payment of realtor fees and other applicable fees and taxes), the Company shall reimburse Executive for such loss, subject to (i) the Relocation Expense cap set forth above and (ii) documentation that illustrates the loss.

C. <u>Vacation</u>:  Executive shall accrue vacation in accordance with the terms and conditions of the Company's policies, as may be modified from time to time at the Company's discretion. Subject

A-556

to the maximum accrual permitted, Executive shall accrue vacation at the rate of four (4) weeks per year.

D. <u>Fringe Benefits</u>:  During Executive's employment with the Company, the Company shall provide Executive with the opportunity to participate in the Company's insurance, retirement, and other benefit plans on the same terms and conditions as other similarly situated Executives.  All such benefits shall be subject to the terms of such plans and policies, as the same may be modified from time to time in the sole discretion of the Company. Benefits shall become effective the first of the month following thirty (30) days of employment.

6. <u>OTHER EXECUTIVE DUTIES AND OBLIGATIONS</u>:

In addition to any other duties and obligations set forth in this Agreement, Executive shall be obligated as follows:

A. <u>Compliance</u>:  Executive shall be required to comply with all policies and procedures of the Company as such shall be adopted, modified, or otherwise established by the Company from time to time.  While employed by the Company pursuant to this Agreement, during at-will employment following expiration of the Agreement, or while receiving severance, incentive, or other payments or consideration from the Company following termination of this Agreement, Executive shall disclose in writing to the Company any arrest, indictment, or conviction for, or plea of guilty or *nolo contendere* to, a felony.

B. <u>Non-Disclosure</u>:

I. <u>Confidential Information</u>: As used in this Agreement, "Confidential Information" means trade secrets and other information specific to the business and investment activities and considerations of the Company.  This includes, but is not limited to, investment prospects, vendor lists, customer contact information, any pricing information, strategic and marketing plans, compilations of customer and supplier information, performance of and compensation paid to Executives, contracts with third parties, information regarding the Company's training, financial and marketing books, sales, price and marketing projections, internal employer databases, analytical tools and services and information technology products and services, other information related to the tools, products and services that facilitate the Company's ability to sell and manufacture its services, or other reports, manuals and information including information related to Company, its affiliate companies, or its customers, including those documents and items which Executive may develop or help develop while in Company's employ, whether or not developed during regular working hours or on Company's premises; provided, however, that Confidential Information shall not include any information that is or becomes public through written authorization by Company. Unless the context requires otherwise, the term "Confidential Information" shall include the original of such materials, any copies thereof, any notes derived from such materials, and any derivative work of such materials.

A-557

II.   <u>Confidentiality</u>: While employed by the Company, Executive will have access to and become familiar with Confidential Information. Executive acknowledges that Confidential Information is owned and shall continue to be owned solely by the Company and/or its affiliates. Executive agrees that Executive will not, at any time, whether during or subsequent to Executive's employment by the Company and/or its affiliates, use or disclose Confidential Information for any competitive purpose, or divulge the same to any person other than the Company or persons with respect to whom the Company has given its written consent, unless Executive is compelled to make disclosure by a federal or state court, arbitrator, or any government authority, pursuant to subpoena, or as necessary to secure legal and financial counsel from third party professionals or to enforce his or her rights under this Agreement. In such case, Executive shall give reasonable notice to the Company prior to disclosing such information and shall assist the Company in taking such legally permissible steps as are reasonable and necessary to protect the Confidential Information, including, but not limited to, the execution by the receiving party of a non-disclosure agreement in a form acceptable to the Company. The foregoing obligations of confidentiality shall not apply to any knowledge or information the entirety of which is now published or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement by the Executive or a breach of a confidentiality obligation owed to the Company by any third party, or disclosure pursuant to any applicable law or court order.

III.   <u>Limitations</u>: Notwithstanding any other provision of this Agreement (i) Executive may disclose Confidential Information when required to do so by a court of competent jurisdiction, by any governmental agency having authority over Executive or the Company's business or by any administrative body or legislative body (including a committee thereof) with jurisdiction to order Executive to divulge, disclose, or make accessible such information, and (ii) nothing in this Agreement is intended to interfere with Executive's right to (A) report any act or omission Executive reasonably believes may constitute a violation of federal, state, or local law or regulation to any governmental or law enforcement agency or entity; (B) make other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation; (C) file a claim or charge with any federal, state, or local governmental agency or entity; or (D) testify, cooperate, assist, or participate in an investigation, hearing, or proceeding conducted by any governmental or law enforcement agency, entity, or court. For purposes of clarity, in making or initiating any such reports or disclosures or engaging in any of the conduct set forth in this <u>Section 6(b)(iii)</u>, Executive may disclose Confidential Information to the extent necessary to such governmental or law enforcement agency, entity, or court, need not seek prior authorization from the Company, and is not required to notify the Company of any such reports, disclosures, or conduct.

IV.   <u>Defend Trade Secrets Act of 2016</u>: The Executive is hereby notified in accordance with the Defend Trade Secrets Act of 2016 that the Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

A-558

C.  Intellectual Property:

    I.    Work Product: Executive agrees that during Executive's employment with the Company pursuant to this Agreement, all materials created or modified by Executive, including, without limitation, all works of authorship, inventions, innovations, improvements, processes, ideas, methods, designs, concepts, apparatus, plans, systems and computer programs, and other tangible and intangible materials relating to the design, manufacture, use, marketing, distribution, and management of the Company's and/or its affiliates' products or services (collectively, "Work Product"), shall be "work for hire" and that the Company shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents, or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire," Executive hereby assigns ownership of all such Work Product to the Company and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company. Executive hereby appoints the Company as Executive's attorney-in-fact with the limited power to execute assignments of such Work Product. The obligation to assign as provided in this Agreement does not apply to any Work Product to the extent such obligation would conflict with any state or federal law.

    II.    Disclosure of Work Product: Executive agrees to disclose in writing to the Board of Directors of the Company any Work Product relating to the business of the Company and/or its affiliates, which Executive develops, conceives and/or reduces to practice in connection with any work performed by Executive for the Company, either alone or with anyone else, while employed by the Company and/or within twelve (12) months of the termination of employment. Executive shall disclose all Work Product to the Company, even if Executive does not believe that assignment to the Company is required under this Agreement or applicable state or federal law. If the Company and Executive disagree as to whether or not such Work Product is included within the terms of this Agreement, such matters will be subject to the Arbitration Rights set forth in this Agreement with the additional requirement that it will be the responsibility of Executive to prove that it is not included.

D.  Non-Competition and Non-Recruitment:

    I.    General: The Company and Executive recognize and agree that: (1) Executive has received, and will in the future receive, substantial amounts of Confidential Information and Trade Secrets, as defined in the Florida Uniform Trade Secrets Act; (2) as a consequence of using or associating Executive with the Company's name, goodwill, and reputation, Executive will develop personal and professional relationships with the Company's current and prospective customers, clients, counterparties, and vendors; and (3) provision for non-competition and non-recruitment obligations by Executive is critical to the Company's continued economic well-being and protection of the Company's Confidential Information.

    II.    Non-Competition: During Executive's employment and for six (6) months following the voluntary or involuntary termination of Executive's employment with the Company, Executive shall not, directly or indirectly, on Executive's behalf or on behalf of a third party, engage in

A-559

any commercial activity in the United States that competes with the Company; provided, however, Executive may own, directly or indirectly, solely as a passive investment, two percent (2%) or less of any class of securities of any entity traded on any national securities exchange. At its sole option, the Company may, by express written notice to Executive, waive or limit the time and/or geographic area in which Executive cannot engage in competitive activity or the scope of such competitive activity.

III.   <u>Other Executives</u>:  While employed by the Company and for one (1) year thereafter, and except as may be required in the performance of Executive's duties hereunder, Executive shall not, directly or indirectly, cause or induce, attempt to cause or induce, or otherwise solicit or encourage any person now or hereafter employed by the Company or any of its affiliates to terminate such employment.

IV.   <u>Non-Disparagement</u>:  Executive agrees that Executive will not at any time make, publish, or communicate to any person or entity, any Disparaging (defined below) remarks, comments, or statements concerning the Company or its affiliates or their respective partners, members, or employees.  The Company agrees that it will not, and it will cause its shareholders, members, managing partners, principals, or officers, at any time during and after Executive's employment with the Company, not to disparage or impugn the reputation of the Executive or any of his business interests.  "Disparaging" remarks, comments, or statements are those that impugn the character, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged.  Nothing in this Agreement shall preclude Executive or the Company from any truthful, good faith response to any inquires under oath or in response to governmental or regulatory inquiry.  Executive agrees that Executive will not speak about the Company and/or its affiliates and/or their management or business to the media, whether electronic, print or otherwise, without the express prior written approval of the Board.

V.   <u>Non-Solicitation</u>:  Executive agrees that during Executive's employment with the Company and for one (1) year thereafter, Executive's employment terminates, Executive will not, directly or indirectly, on his/her own behalf or on behalf of any other person or entity (i) hire or solicit for hire or to provide services (whether as an employee, independent contractor, or otherwise) any employee of the Company and/or its affiliates, (ii) solicit, induce, or encourage the resignation of, or attempt to solicit, induce or encourage the resignation of, to persuade any employee of the Company and/or its affiliates, (iii) solicit, induce, or encourage any independent contractor providing services to the Company and/or its affiliates to terminate or diminish any relationship with the Company and/or its affiliates, (iv) seek to persuade any employee, vendor, or independent contractor to breach any agreement with the Company and/or its affiliates, (v) take any action to solicit or divert any Clients, Sources, or Sellers (each as defined below) away from the Company and/or any of its affiliates, or (vi) solicit or encourage any Clients, Sources, or Sellers to terminate or diminish any relationship with the Company and/or its affiliates.  For purposes of this Agreement: "Clients" means all individuals or entities who or which were customers or clients of the Company and/or its affiliates, or who or which were solicited by the Company and/or its affiliates to become customers or clients of the Company and/or its affiliates (other than solicitations made solely through general, untargeted solicitations and/or mass

A-560

industry mailings), during Executive's employment with the Company. "Sources" means all brokers and persons who referred transactions to the Company and/or its affiliates, or who were solicited by the Company and/or its affiliates to refer structured settlement transactions to the Company and/or its affiliates, during Executive's employment with the Company. "Sellers" means any person who has sold or agreed to sell a transaction to Company and/or its affiliates, or who has been solicited by the Company and/or its affiliates to sell a transaction to the Company and/or its affiliates, during Executive's employment with the Company. Notwithstanding the foregoing, Executive shall only be prohibited for a period of six months from engaging in a new business relationship with investment bankers, finders, brokers, capital providers, attorneys, and accountants, so long as such business relationship does not materially impair any ongoing relationship with the Company.

VI.   Reformation:   Executive agrees and acknowledges that the restrictions contained in this Section are reasonable in scope and duration. If one or more provisions of the forgoing protective covenants are declared invalid or unenforceable for any reason by a court of competent jurisdiction, the court must reform the covenant(s) to the extent necessary to cause the limitations contained in the covenants as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the Confidential Information, goodwill or other business interests of the Company.

VII.  Covenants Are Independent Elements:   The parties acknowledge that the restrictive covenants contained in this Section are essential, independent elements of this Agreement and that, but for Executive agreeing to comply with them, Company would not continue to employ Executive. Thus, even if Executive has a claim against Company, whether that claim is based on this Agreement or not, the claim by Executive shall not be a defense to Company's enforcement of the promises and restrictions in this Section. An alleged or actual breach of the Agreement by the Company will not be a defense to enforcement of the provisions of this Section, or other obligations of Executive to the Company. The covenants in this Section will remain in full force and effect whether Executive is terminated by Company or voluntarily resigns.

E.   Remedies:   Executive agrees that breach by Executive of the provisions of Section 6(b)-(d) may cause the Company irreparable harm that is not fully remedied by monetary damages. In the event of a breach or threatened breach by Executive of the provisions of Section 6(b)-(d), the Company shall be entitled to seek an injunction restraining Executive from directly or indirectly engaging in the activities prohibited herein, without posting a bond or other security. Nothing herein shall be construed as prohibiting the Company from pursuing any other equitable or legal remedies available to it for such breach or threatened breach, including the recovery of damages from Executive.

F.   Conflict of Interest:   While employed by the Company, Executive shall comply with all Company policies regarding actual or apparent conflicts of interest with respect to Executive's duties and obligations to the Company.

G.   Return of Company Property:   Executive understands and agrees that all equipment, books, records, customer lists, and documents connected with the business of the Company and/or its

A-561

affiliates are the property of and belong to the Company ("Company Property").   Under no circumstances shall Executive remove from the Company's facilities any Company Property, or any copies of Company Property, without the Company's permission, nor shall Executive make any copies of Company Property for use outside the Company's office except as specifically authorized by the Company.   Executive shall return to the Company and/or its affiliates all Company Property upon termination of Executive's employment with the Company.

H.   <u>Survival</u>: The provisions of Section 6(b)-(d) and 6(g)-(h) shall survive expiration of this Agreement and termination of employment.

7.   <u>TERMINATION AND SEVERANCE</u>:

    A.   <u>Termination by the Company Without Cause or by Executive for Good Reason</u>: Executive's employment under this Agreement may be terminated by the Company at any time without Cause (defined below) or by Executive for Good Reason (defined below), upon thirty (30) days prior written notice to the other party.   The Company reserves the right in its absolute and sole discretion when giving notice of termination of the employment, or having received such notice from the Executive, to pay to Executive his compensation and other contractual entitlements for the relevant period of notice in lieu of notice.   In the event of a termination by the Company without Cause or by Executive for Good Reason prior to any period in which Executive becomes an Executive at-will, Executive shall be entitled to receive: (i) severance pay equal to six (6) months of Executive's then annual compensation payable over the six (6) months immediately following the last day of employment in accordance with the Company's normal payroll practices; and (ii) any prior year bonus accrued on or before the date notice of termination is given.   Furthermore, if Executive elects to continue to receive group health insurance under the Company's group health plan pursuant to COBRA, the Company shall directly pay or reimburse Executive for his monthly COBRA premiums for the six (6) month period following the termination date.   Executive must execute (and not revoke) a complete release of claims, acceptable in form and substance to the Company, as a condition to receiving Basic Severance and reimbursement of COBRA premiums.

       i.   For purposes of this Agreement, "Good Reason" shall mean any of the following "Trigger Events": (1) a material breach of this Agreement; (2) a material diminishment in the title, position, duties or responsibilities, Base Salary or vested incentive plan interests of Executive; or (3) the relocation of Executive's primary office by more than thirty (30) miles without consent of Executive.   Notwithstanding the foregoing, no basis for a termination by Executive for Good Reason will be deemed to exist unless (a) Executive notifies the Company in writing within thirty (30) days after the Trigger Event occurs that Executive intends to terminate employment for Good Reason no earlier than thirty (30) days after providing such notice; (b) the Company does not cure such condition within thirty (30) days following its receipt of such notice or states unequivocally in writing that it does not intend to attempt to cure such condition; and (c) the Executive resigns from employment prior to expiration of the end of the cure period described in (b) above.

A-562

II.     For purposes of this Agreement, "Cause" shall mean Executive's (1) repeated failures to perform Executive's duties; (2) willful refusal to comply with one or more lawful directives of the Company; (3) material breach of this Agreement; (4) misconduct, including but not limited to, use or possession of illegal drugs during work and/or any other action that is damaging or detrimental to the reputation or business affairs of the Company; (5) violation of the Company's policies, including those concerning discrimination or harassment in the workplace or workplace ethics; (6) conviction of, or plea of guilty or *nolo contendere* to, a felony or a misdemeanor requiring jail time; (7) failure to cooperate with, or any attempt to obstruct or improperly influence, any investigation authorized by the Board of Directors or any governmental or regulatory agency; or (8) misrepresentation, fraud, breach of fiduciary duty, or other similar conduct involving Executive's duties or conduct concerning the Company.  Notwithstanding the forgoing, other than in the case of points four (4), five (5), six (6), seven (7) and eight (8) listed above, in order for Cause to exist as to points one (1), two (2), and three (3), (i) the Company must provide Executive with written notice of the material basis giving rise to Cause; (ii) Executive must have at least thirty (30) days to cure such event/circumstance (but only to the extent such failure is curable); and (iii) Executive must have failed to cure such event/circumstance within such cure period.

III.    Notwithstanding anything else to the contrary in this Agreement, it is expressly understood that any obligation of the Company to pay Basic Severance shall be subject to Executive's continued compliance with the terms and conditions of Section 6 of the Agreement and Executive's continued forbearance from directly, indirectly or in any other way, disparaging the Company, its officers, Executives, vendors, customers, products or activities, or otherwise interfering with the Company's press, public, and media relations (the "Continuing Obligations").  The Company will have no liability to pay any Basic Severance if Executive violates the Continuing Obligations, and the Executive shall be obliged to immediately repay any Basic Severance previously paid.

B.    Termination by the Company for Cause or by Executive Without Good Reason:  Executive's employment under this Agreement may be terminated at any time by the Company for Cause or by Executive without Good Reason.  In the event of such a termination, Executive shall be entitled to receive: (i) any Base Salary accrued and unpaid as of the date of termination; (ii) accrued and unused vacation pay; (iii) any unreimbursed business expenses payable to the Executive, (iv) any benefits to which Executive is entitled under Company employee benefit and compensation plans and programs in which he participates (or participated); and (v) no other severance.

C.    Termination by Executive for Non-Renewal:  Executive's employment pursuant to this Agreement may be terminated by Executive for Non-Renewal.  Non-renewal means expiration after the third anniversary of the Effective Date.  In the event of a termination of employment by Executive for Non-Renewal, Executive shall be entitled to receive Basic Severance as provided in Exhibit A, so long as Executive executes (and does not revoke) a complete release of claims, acceptable in form and substance to the Company.  To exercise the right of termination for Non-Renewal, Executive must provide the Company with written notice of Executive's intent to do so, and the Company must fail to cure within forty-five (45) days of receiving such notice.  It is expressly understood that if prior to the expiration of any applicable cure period (1) Executive and the Company enter into a new written employment agreement; (2) the Company offers Executive employment on substantially the same or better terms as existed under the Agreement; or (3) Executive's

A-563

employment has otherwise been terminated pursuant to the terms of this Agreement, then Executive shall have no right or option to terminate employment for Non-Renewal.

D. <u>Termination Due to Death or Disability</u>:  Employment by the Company shall immediately cease upon Executive's death or Disability upon thirty (30) days written notice from the Company. Upon termination due to death or Disability, Executive shall be entitled to receive any Base Salary accrued and unpaid as of the date of termination.

E. <u>Termination by Mutual Agreement of the Parties</u>:  Executive's employment pursuant to this Agreement may be terminated at any time upon the mutual agreement in writing of the Parties. Any such termination of employment shall have the consequences specified in such agreement.

F. <u>Golden Parachute Restrictions</u>:  To the extent that any or all of the payments and benefits provided for in this Agreement or in any other agreement between Company and Executive constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code (the "Code") and, but for this Section 7(g), would be subject to the excise tax imposed by Section 4999 of the Code, then the aggregate amount of such payments and benefits shall be reduced by the minimum amounts necessary to equal one dollar less than the amount which would result in such payments and benefits being subject to such excise tax. The reduction, unless the Executive elects otherwise, shall be in such order that provides Executive with the greatest after-tax amount possible. All determinations required to be made under this Section, including whether a payment would result in a parachute payment and the assumptions to be utilized in arriving at such determination, shall be made by a nationally recognized accounting firm selected by the Company and consented to by the Executive, such consent not to be unreasonably withheld. The Company shall pay the cost of the accounting firm, and the accounting firm shall provide detailed supporting calculations both to the Company and the Executive.   The determination of the accounting firm shall be final and binding upon the Company and the Executive, except that if, as a result of subsequent events or conditions (including a subsequent payment or the absence of a subsequent payment or a determination by the Internal Revenue Service or applicable court), it is determined that the excess parachute payments, excise tax, or any reduction in the amount of payments and benefits, is or should be other than as determined initially, an appropriate adjustment shall be made, as applicable, to reflect the final determination.

G. <u>Treatment of Basic Severance</u>:  Any Basic Severance Payment shall be subject to usual and customary Executive payroll practices and all applicable withholding requirements.

H. <u>Other</u>:  Except for the amounts specifically provided pursuant to this Section, Executive shall not be entitled to any further compensation, bonus, damages, restitution, relocation benefits, or other severance benefits upon termination of employment.  The amounts payable to Executive pursuant to this Section shall not be treated as damages, but as compensation to which Executive may be entitled by reason of termination of employment under the applicable circumstances. The provisions of this Section shall not limit Executive's rights under or pursuant to any other agreement or understanding with the Company regarding any pension, profit sharing, insurance, or other Executive benefit plan of the Company to which Executive is entitled pursuant to the terms of such plan.

A-564

I.   <u>Internal Revenue Code Section 409A:</u>  It is intended that this Agreement will comply with Internal Revenue Code Section 409A and any regulations and guidelines issued thereunder (collectively "Section 409A") to the extent this Agreement is subject thereto.  This Agreement shall be interpreted on a basis consistent with such intent.  If any payments or benefits provided to Executive by the Company, either per this Agreement or otherwise, are non-qualified deferred compensation subject to, and not exempt from, Section 409A ("Subject Payments"), the following provisions shall apply to such payments and/or benefits:

I.   For payments and benefits triggered by termination of employment, reference to Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to Executive's "separation from service" from the Company (with such phrase determined under Treas. Reg. Section 1.409A-1(h), as uniformly applied by the Company) in tandem with Executive's termination of employment with the Company.

II.   If Executive is deemed on the date of Executive's "separation from service" to be a "specified Executive" (within the meaning of Treas. Reg. Section 1.409A-I(i)), then with regard to any payment that is required to be delayed pursuant to Code Section 409A(a)(2)(B) (the "Delayed Payments"), such payment shall not be made prior to the earlier of (1) the expiration of the six (6) month period measured from the date of Executive's "separation from service" and (2) the date of Executive's death.  Any payments other than the Delayed Payments shall be paid in accordance with the normal payment dates specified herein.  In no case will the delay of any of the Delayed Payments by the Company constitute a breach of the Company's obligations to Executive.

III.   If the sixty (60)-day period following a "separation from service" begins in one calendar year and ends in a second calendar year (a "Crossover 60-Day Period") and if there are any Subject Payments due Executive that are:  (1) conditioned on Executive signing and not revoking a release of claims and (2) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

IV.   Lump-sum severance payments shall be made, and installment severance payments initiated, within sixty (60) days following Executive's "separation from service."

V.   The Executive's right to receive installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

VI.   Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

VII.   Notwithstanding any other provision of this Agreement to the contrary, in no event shall any Subject Payment be subject to offset by any other amount unless otherwise permitted by Section 409A.

A-565

VIII.  To the extent that any reimbursement or in-kind benefits are Subject Payments: (1) the amount eligible for reimbursement or in-kind benefit in one calendar year may not affect the amount eligible for reimbursement or in-kind benefit in any other calendar year (except that a plan providing medical or health benefits may impose a generally applicable limit on the amount that may be reimbursed or paid), (2) the right to reimbursement or an in-kind benefit is not subject to liquidation or exchange for another benefit, and (3) subject to any shorter time periods provided herein, any such reimbursement of an expense or in-kind benefit must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred.

J.  Forfeiture:

I.  If the Company is required to prepare a material accounting restatement as a result of the intentional misconduct or gross negligence of Executive, then Executive shall forfeit and reimburse the Company for all of the following: (1) any bonus or other compensation paid based upon such erroneously stated financial information; (2) any bonus or other compensation received by Executive during the twelve (12) month period following the first issuance of the accounting restatement; (3) any profits realized from the sale of Company securities during that same twelve (12) month period; (4) any Basic Severance.

II.  If the Executive is subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002, and the Company is required to prepare an accounting restatement due to the material noncompliance of the Company, as a result of misconduct (within the meaning of said Section 304), with any financial reporting requirement under the United States securities laws, then the Executive shall forfeit and reimburse the Company for all of the following:  (1) any bonus or incentive compensation or equity compensation received by Executive during the twelve (12) month period following the earlier of the first public issuance or filing with the SEC of the financial document embodying the financial reporting requirement; and (2) any profits realized from the sale of Company securities during that same twelve (12) month period.

III.  Executive acknowledges that Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, among other things, requires the United States Securities and Exchange Commission to direct the national securities exchanges to prohibit the continued listing of the securities of an issuer unless the issuer develops and implements a policy providing, among other things, for the recovery of certain erroneously awarded compensation.  Upon the Company's adoption of such a policy, Executive agrees that this Agreement shall be automatically amended without any further consideration to incorporate the recovery provisions set forth in the policy.  Upon the request of the Company, Executive agrees without further consideration to execute an amendment evidencing the incorporation of said provisions into this Agreement.

8.  WAIVER OF JURY TRIAL: EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED INSTRUMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO

A-566

REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THAT FOREGOING WAIVER; AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE RELATED AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.

9.  MISCELLANEOUS:

A.  Assignment:  This Agreement shall be binding upon and shall inure to the benefit of the Parties and the successors and assigns of the Company.  Executive shall have no right to assign Executive's rights, benefits, duties, obligations, or other interests in this Agreement, it being understood that this Agreement is personal to Executive.

B.  Entire Understanding:  This Agreement sets forth the entire understanding of the Parties hereto with respect to the subject matter hereof, and no other representations, warranties, or agreements whatsoever as to that subject matter have been made by Executive or the Company. This Agreement shall not be modified, amended, or terminated except by another instrument in writing executed by the Parties.  As of the Effective Date, except as otherwise explicitly provided herein, this Agreement replaces and supersedes any and all prior understandings, plans, or agreements between Executive and the Company regarding employment and incentives.

C.  Notices: Any notice, request, demand, or other communication required or permitted hereunder, shall be deemed properly given when actually received or within five (5) days of mailing by certified or registered mail, postage prepaid, to Executive at the address currently on file with the Company, and to the Company at:

Executive:  Peter Meyers

████████████████████

Company:  Managing Partner
600 Brickell Ave Suite 1900
Miami, FL. 33131

Copy:  Ed Gehres, General Counsel

or to such other address as Executive or the Company may from time to time furnish, in writing, to the other.

D.  Headings:  The headings of the several sections and paragraphs of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction of any term or provision hereof.

E.  Waiver:  Failure of either party at any time to require performance by the other of any provision of this Agreement shall in no way affect that party's rights thereafter to enforce the same, nor

A-567

shall the waiver by either party of any breach of any provision hereof be held to be a waiver of any succeeding breach of any provision or a waiver of the provision itself.

F.   Applicable Law:  This Agreement shall constitute a contract under the internal laws of the State of Florida and shall be governed and construed in accordance with the laws of said state as to both interpretation and performance.  Venue in any dispute arising under this Agreement shall rest exclusively in Dade County, Florida.

G.   Severability:  In the event any provision or provisions of this Agreement is or are held invalid, the remaining provisions of this Agreement shall not be affected thereby.

H.   Taxes:  Executive acknowledges that Executive is responsible for all taxes related to Executive's compensation and any other payments or benefits conferred upon Executive as the result of this Agreement or Executive's employment with the Company, except for those taxes for which the Company is obligated to pay under applicable law or regulation.  Executive agrees that the Company may withhold any amounts that the Company is required to withhold under applicable law or regulation.

I.   Counterparts:  This Agreement may be executed in one or more counterparts which, when fully executed by the Parties, shall be treated as one agreement.

J.   Construction:  No ambiguity shall be construed against any party as the drafter.

[SIGNATURES ON FOLLOWING PAGE]

A-568

IN WITNESS WHEREOF, the Parties have entered this Agreement on this 2nd day of April, 2018.

**EXECUTIVE**

_____
(Signature)

Peter Meyers
(Printed Name)

4/2/18
(Date)

**777 PARTNERS LLC**

_____
(Signature)

Mali Lipscher
(Printed Name)

4|5|18
(Date)

VicePresident, Operations &
(Title) Chief of Staff

17286291

A-569

# EXHIBIT B

A-570

**777 PARTNERS DEFERRED CASH PLAN
AWARD AGREEMENT**

| Participant: | Peter Meyers |
|---|---|
| Grant Date: | December 31, 2020 |
| Award: | $1,810,000 |
| Base Date: | April 2018 |

777 Partners LLC, a Delaware limited liability company (the "Company"), pursuant to the 777 Partners Deferred Cash Plan (the "Plan"), hereby grants an award of the amount specified above the (the "Award") to the individual named above (the "Participant").

1.     Definitions. Capitalized terms used but not otherwise defined in this Award Agreement (this "Agreement") shall have the respective meanings ascribed to such terms in the Plan.

2.     Grant. Subject to the conditions set forth in the Plan and this Agreement, the Company grants to the Participant an Award in the amount specified above.

3.     Vesting. The Participant shall become vested in the Participant's Award, in four (4) equal annual installments, on each anniversary of the Base Date prior to the Participant's Termination of Service, provided that, if a Change in Control should occur prior to the Participant's Termination of Service, then subject to Section 4, the Participant shall become vested in the unvested portion of the Award.

4.     Forfeiture.

(a)     Except as otherwise set forth herein, upon the Participant's Termination of Service for any reason, the Participant shall forfeit any portion of the Award with respect to which the Participant has not yet become vested.

(b)     If, prior to the one (1) year anniversary of the Grant Date, the Participant's Termination of Service occurs for any reason other than due to the Participant's death or Disability, the Participant shall forfeit automatically, without consideration, the entire Award, including any portion of the Award in which the Participant had previously become vested.

(c)     Upon a Participant's Termination of Service due to the Participant's death or Disability, the Participant shall become vested in the portion of the Award that would have vested on the next anniversary of the Base Date.

(d)     Upon the Participant's Termination of Service for by the Company for Cause or in the event of a Participant's Restrictive Covenant Breach, the Participant shall forfeit automatically, without consideration, the Award, including any portion of the Award in which the Participant had previously become vested.

A-571

5.    <u>Award Settlement</u>.  Subject to Sections 4 and 7, the Award shall be paid to the Participant, in cash, in five installments on each anniversary of the Base Date in accordance with the table below:

| Payment Date (Anniversary of Base Date) | Percentage of Award |
|---|---|
| 5-Year Anniversary | 10% |
| 6-Year Anniversary | 15% |
| 7-Year Anniversary | 20% |
| 8-Year Anniversary | 25% |
| 9-Year Anniversary | 30% |

Each payment shall be made within ten (10) days following the applicable Payment Date; <u>provided</u> that, in the event of the Participant's death, any unpaid portion of the Award shall be paid to the Participant's estate in a single cash lump sum within ninety (90) days following the Participant's death; <u>provided</u> further that, upon a Change in Control, any unpaid portion of the Award shall be paid in its entirety within ninety (90) days following such Change in Control.

6.    <u>Transferability</u>. The Award shall not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant other than by will or by the laws of descent and distribution or, subject to the consent of the Administrator, pursuant to a DRO.

7.    <u>Withholdings</u>.  The Company or any of its subsidiaries shall have the authority and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy federal, state, local and foreign taxes (including the Participant's Federal Insurance Contributions Act obligation) required by law to be withheld with respect to any taxable event concerning the Participant arising as a result of this Agreement.

8.    <u>Incorporation by Reference</u>. The terms and provisions of the Plan are incorporated herein by reference, and the Participant hereby acknowledges receiving a copy of the Plan and represents that the Participant is familiar with the terms and provisions thereof. The Participant accepts this Award subject to all of the terms and conditions of the Plan. In the event of a conflict or inconsistency between the terms of the Plan and the terms of this Agreement, the Plan shall govern and control.

9.    <u>Captions</u>. The captions in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein.

10.    <u>Entire Agreement</u>. This Agreement together with the Plan, as either of the foregoing may be amended or supplemented in accordance with their terms, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and therein, and supersedes all prior communications, representations and negotiations in respect thereto.

11.    <u>Successors and Assigns</u>. The terms of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and permitted assigns. The Participant may not assign any of the rights or obligations under this Agreement

Case: 24-2647, 11/22/2024, DktEntry: 39.1, Page 48 of 292

A-572

without the prior written consent of the Company. The Company may assign its rights and obligations to another entity which will succeed to all or substantially all of the assets and business of the Company.

12.   **Amendments and Waivers**. Subject to the provisions of the Plan, the provisions of this Agreement may not be amended, modified, supplemented or terminated, and waivers or consents to departures from the provisions hereof may not be given, without the written consent of each of the parties hereto.

13.   **Severability**. In the event that any provision of this Agreement shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of this Agreement, and this Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

14.   **Signature in Counterparts**. This Agreement may be signed in counterparts, each which shall constitute an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

15.   **Notices**. Any notice required to be given or delivered to the Company under the terms of the Plan or this Agreement shall be in writing and addressed to the General Counsel and the Secretary of the Company at its principal corporate offices. Any notice required to be given or delivered to the Participant shall be in writing and addressed to the Participant at the address listed in the Company's personnel files or to such other address as the Participant may designate in writing from time to time to the Company. All notices shall be deemed to have been given or delivered upon: personal delivery, three days after deposit in the United States mail by certified or registered mail (return receipt requested), one business day after deposit with any return receipt express courier (prepaid), or one business day after transmission by facsimile.

16.   **Governing Law**. This Agreement shall be administered, interpreted and enforced under the internal laws of the State of Delaware without regard to conflicts of law thereof.

17.   **Waiver of Jury Trial**. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, INTERPRETATION OR ENFORCEMENT HEREOF. THE PARTIES HERETO AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

18.   **No Employment Rights**. The Participant understands and agrees that this Agreement does not impact in any way the right of the Company or its subsidiaries to terminate or change the terms of the employment of the Participant at any time for any reason whatsoever, with or without cause, nor confer upon any right to continue in the employ of the Company or any of its subsidiaries.

[Signature page follows]

A-573

DOC ID - 35752999.1                          4

A-574

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the first date set forth above.

**777 PARTNERS LLC**

By: _____

Name: Steven W. Pasko

Title: Manager

**PARTICIPANT:**

_____

Name: Peter Meyers

DOC ID - 35752999.1

A-575

# EXHIBIT C

A-576

## 777 PARTNERS EQUITY INCENTIVE PLAN

## MANAGEMENT UNITS GRANT AGREEMENT

| Participant: | Peter Meyers |
|---|---|
| Award: | 5.0% Management Interests |
| Grant Date: | December 31, 2020 |
| Base Date: | April 2018 |

777 Partners Management LLC, a Delaware limited liability company ("777 Management"), pursuant to the 777 Partners Equity Incentive Plan (the "Plan"), hereby grants the Award to the individual named above (the "Participant"). Upon acceptance of this Award, the Participant shall receive the number of Management Interests specified above, subject to the restrictions and conditions set forth herein and in the LLC Agreement and the Plan.

       1.    Definitions.  Capitalized terms used but not otherwise defined in this Management Interests Grant Agreement (this "Agreement") shall have the respective meanings ascribed to such terms in the Plan.

       2.    Acceptance of Award.  The Participant hereby accepts this Award subject to all the terms and provisions of this Agreement, the Plan and the LLC Agreement.  The Participant further agrees that all decisions under and interpretations of this Agreement, the Plan or the LLC Agreement by the Administrator shall be final, binding and conclusive upon the Participant and the Participant's beneficiaries.

       3.    Vesting and Forfeiture.  The Award shall vest and be subject to forfeiture in accordance with the terms of the Plan.

       4.    Section 83(b) Election; Withholding.  Within thirty (30) days following the Grant Date, the Participant shall file a protective election with the Internal Revenue Service ("IRS") pursuant to Section 83(b) of the Code (the "Section 83(b) Election").  The Participant shall provide 777 Management with a copy of such Section 83(b) Election within ten (10) days following the filing of any such Section 83(b) Election.  The Participant shall be responsible for all withholding taxes, if any, in connection with the Management Interests and will be required to promptly pay to 777 Management or 777 Partners, as applicable, an amount equal to such withholding taxes, if any, as determined by the Administrator in good faith.  The Participant acknowledges that neither 777 Management or 777 Partners has provided the Participant with tax advice regarding the Section 83(b) Election and has urged the Participant to consult the Participant's own tax advisor with respect to the tax consequences thereof.

       5.    Transfers of Management Interests.  Neither the Award nor any Management Interests, or any right arising in respect of such Management Interests, shall be Transferred other than in accordance with the Plan and the LLC Agreement.

       6.    Representations and Warranties of the Participant.  The Participant hereby represents and warrants to 777 Management as follows:

A-577

(a)     The Participant's execution, delivery and performance of this Agreement and Joinder Agreement to the LLC Agreement (the "Joinder Agreement") substantially in the form attached hereto as Exhibit A (together, the "Transaction Documents") do not and will not (i) result in a violation of any applicable law, statute, rule or regulation or order, injunction, judgment or decree of any court or other governmental or regulatory authority to which the Participant is bound or subject, (ii) conflict with, or result in a breach of the terms, conditions or provisions of, constitute (or, with due notice or lapse of time or both, would constitute) a default under, or give rise to any right of termination, acceleration or cancellation under, any agreement, contract, license, arrangement, understanding, evidence of indebtedness, note, lease or other instrument to which the Participant or any of his properties or assets are bound, or (iii) require any authorization, consent, approval, exemption or other action by or notice to any third party.  The Transaction Documents have been duly executed and delivered by the Participant and upon due execution and delivery by 777 Management will constitute the legal, valid and binding obligations of the Participant enforceable against the Participant in accordance with their terms, except as the enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general or by general principles of equity.

(b)     The Participant understands that the Management Interests being granted are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from 777 Management in a transaction not involving a public offering, are being offered and sold without registration under the Securities Act of 1933, as amended (the "Securities Act") in a private placement that is exempt from the registration provisions of the Securities Act and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act only in limited circumstances.  The Participant understands that it must bear the economic risk of the acquisition of the Management Interests made in connection herewith for an indefinite period of time because, among other reasons, the Management Interests have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of certain states or an exemption from such registration is available.

(c)     The Participant understands that the Management Interests being granted are subject to the Plan and the LLC Agreement and this Agreement.

7.     Representation and Warranty of 777 Management.    777 Management hereby represents and warrants to the Participant that 777 Management is a limited liability company, duly formed and in good standing under the laws of the State of Delaware.  777 Management has all requisite limited liability company power and authority to execute, deliver and carry out the transactions contemplated by the Transaction Documents, and to issue and deliver the Management Interests.

8.     Conditions.  The obligations of the Participant and 777 Management pursuant to this Agreement shall be subject to satisfaction of the following conditions on the Grant Date:

(a)     The Participant and 777 Management shall have duly executed and delivered the Joinder Agreement.

DOC ID - 34213329.4                                        2

A-578

(b)    The representations and warranties of each of the parties under this Agreement shall be true, complete and correct at and as of the Grant Date.

(c)    No governmental body or any other person shall have issued an order, injunction, judgment, decree, ruling or assessment which shall then be in effect restraining or prohibiting the completion of the transactions contemplated under any of the Transaction Documents, nor shall any such order, injunction, judgment, decree, ruling or assessment be pending or, to 777 Management's or the Participant's knowledge, threatened.

9.    General.

(a)    <u>Amendments and Waivers</u>.  The Administrator may, with prospective or retroactive effect, amend, suspend or terminate the Plan or this Agreement at any time and for any reason; provided, however, that except to the extent necessary to prevent noncompliance with applicable law or regulation, including any law or regulation related to taxes, or to reflect the exercise of any rights hereunder, no amendment, suspension, or termination, without the written consent of Participant, shall adversely affect, in any material respect, the Participant's rights under this Agreement.

(b)    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and permitted assigns. The Participant may not assign any of the Participant's rights or obligations under this Agreement without the prior written consent of 777 Management.

(c)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, shall be deemed to be an original, but all of which counterparts, taken together, shall constitute one and the same instrument.

(d)    <u>Descriptive Headings, Etc</u>.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein. Unless the context of this Agreement otherwise requires: (i) words of any gender shall be deemed to include each other gender; (ii) words using the singular or plural number shall also include the plural or singular number, respectively; (iii) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and paragraph references are to the Sections and paragraphs of this Agreement unless otherwise specified; (iv) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified; (v) "or" is not exclusive; and (vi) provisions apply to successive events and transactions.

(e)    <u>Severability</u>.  In the event that any one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the other remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

DOC ID - 34213329.4

3

**A-579**

(f)     Governing Law. This Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(g)     Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, INTERPRETATION OR ENFORCEMENT HEREOF. THE PARTIES HERETO AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND WOULD NOT ENTER INTO THIS AGREEMENT IF THIS SECTION WERE NOT PART OF THIS AGREEMENT.

(h)     Entire Agreement. This Agreement, the LLC Agreement, the Plan, and the Joinder Agreement are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the Agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings relating to such subject matter, other than those set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to such subject matter.

(i)     No Employment or Service Contract. Neither this Agreement nor the Plan shall confer upon the Participant any right to continue such Participant's relationship with 777 Management, 777 Partners or its subsidiaries, nor shall it give any Participant the right to be retained in the employ of 777 Partners or its Affiliates or interfere with or otherwise restrict in any way the rights of 777 Partners or its Affiliates, which rights are hereby expressly reserved, to terminate any Participant's employment or service at any time for any reason.

(j)     Further Assurances. Each party hereto shall do and perform, or cause to be done and performed, all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments and documents as any other party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

A-580

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

777 PARTNERS MANAGEMENT LLC

By: _____

    Name: Steven W. Pasko
    Title: Manager

PARTICIPANT:

DocuSigned by:

5E32A90FDF18402...

Name: Peter Meyers
Address: ████████████████

A-581

## EXHIBIT A

### Joinder Agreement

The undersigned, as a condition precedent to becoming the owner or holder of record of 5.0% Management Interests of 777 Partners Management LLC, a Delaware limited liability company (the "Company"), hereby agrees to become a Management Member under, party to and bound by that certain Limited Liability Company Agreement of the Company, dated as of December 31, 2020 (as it may be amended, modified or restated from time to time, the "LLC Agreement"), by and among the Members of the Company. This Joinder Agreement shall take effect and shall become an integral part of such LLC Agreement immediately upon execution and delivery to the Company of this Joinder Agreement.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be signed as of the date below written.

By: _____

Name: _____

Title: _____

Date: _____

Address for Notices:

_____

_____

Facsimile: _____

Attention: _____

with a copy to:

_____

_____

Facsimile: _____

Attention: _____

DOC ID - 34213329.4

A-582

Accepted as of the date written below:

**777 Partners Management LLC**

By: _____

Name: _____

Title: _____

Date: _____

A-583

## EXHIBIT B

### SECTION 83(b) ELECTION

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in gross income as compensation for services the excess (if any) of as taxable the fair market value of the Management Interests described below over the amount paid for such Management Interests.

1. The name, taxpayer identification number, address of the undersigned, and the taxable year for which this election is being made are:

   Name:

   SSN: _____

   Address: _____

   _____

   Taxable Year:   Calendar Year 2021

2. The property which is the subject of this election is:

   5.0% Management Interests of 777 Partners Management LLC

3. The property was transferred to the undersigned on:  February __, 2021

4. The property is subject to the following restrictions:  100% of the Management Interests vest based on continued employment or service over a four (4) year period.  In the event the Participant's employment or service terminated prior to the one (1) year anniversary of the date of grant, all vested or unvested Management Interests will be forfeited.

5. The fair market value of the property at the time of transfer (determined without regard to any restriction other than a nonlapse restriction as defined in Section 1.83-3(h) of the Income Tax Regulations) is:  $0.00.

6. For the property transferred, the undersigned paid $0.00.

7. The amount to include in gross income is $0.00.

The undersigned taxpayer will file this election with the Internal Revenue Service office with which taxpayer files his or her annual income tax return not later than thirty (30) days after the date of transfer of the property.  A copy of this election will also be furnished to the person for whom the services were performed.  The undersigned is the person performing the services in connection with which the property was transferred.

Dated: _____, _____        _____

                                     Name:

DOC ID - 34213329.4

A-584

# EXHIBIT K

A-585

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | **Index No.** |
| Plaintiff, | **Date Purchased:** |
| -against- | <u>**SUMMONS**</u> |
| 777 PARTNERS LLC, | The basis of the venue is plaintiff's principal place of business and designated by contract. |
| Defendant. | |

To:     777 Partners LLC
        600 Brickell Ave 19th floor
        Miami, FL 33131

**YOU ARE HEREBY SUMMONED** and required to serve upon plaintiff's attorney, at

the address stated below, an answer to the attached complaint.

Ifthis summons was personally served upon you in the State of New York, the answer

must be served within twenty days after such service of summons, excluding the date of service.

If the summons was not personally delivered to you within the State of New York, the answer

must be served within thirty days after service of the summons is complete as provided by law.

If you do not serve an answer to the attached complaint or otherwise appear within the

applicable time limitation stated above, a judgment may be entered against you by default for the

relief demanded in the complaint without further notice to you.

A-586

FILED: NEW YORK COUNTY CLERK 03/03/2023 11:18 AM    INDEX NO. 651130/2023
NYSCEF DOC. NO. 1    Case 1:24-cv-03453-JGK    Document 61-11    Filed 05/13/24    Page 3 of 8    RECEIVED NYSCEF: 03/03/2023

The action will be heard in the Supreme Court of the State of New York, in and for the

COUNTY OF NEW YORK. This action is brought in the COUNTY OF NEW YORK because it

is the place of plaintiff's principal place of business, with an address at: 200 Vesey St, New

York, NY 10285, and is designated by contract.

Dated:  New York, New York
        March 3, 2023

                                        JAFFE & ASHER LLP

                        By:     _____
                                Lawrence M. Nessenson
                                600 Third Avenue
                                New York, New York 10016
                                (212) 687-3000
                                *Attorneys for the Plaintiff,*
                                *American Express Travel Related*
                                *Services Company, Inc.*

A-587

FILED: NEW YORK COUNTY CLERK 03/03/2023 11:18 AM    INDEX NO. 651130/2023
NYSCEF DOC. NO. 1    Case 1:24-cv-03453-JGK    Document 61-11    Filed 05/13/24    Page 4 of 8    RECEIVED NYSCEF: 03/03/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. , | Index No.: |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| 777 PARTNERS LLC, | |
| Defendant. | |

Plaintiff, American Express Travel Related Services Company, Inc. ("American

Express"), by its attorneys, Jaffe & Asher LLP, as and for its complaint herein against defendant,

777 PARTNERS LLC, ("Defendant"), hereby alleges as follows:

**THE PARTIES**

1.    Plaintiff, American Express, is a corporation organized and existing under the

laws of the State of New York whose principal place of business is located at 200 Vesey St.,

New York, New York 10285.

2.    Upon information and belief, Defendant is a business organized and existing

under the laws of the state of Delaware with a place of business located at 600 Brickell Ave 19th

floor, Miami, FL 33131.

**FACTS**

**The  American Express Corporate Card**

3.    Defendant applied for and was given an American Express Corporate Card (the

"Card") extending charge privileges from American Express to Defendant and enabling it, and

its employees to charge items to American Express Corporate Account No. XXXX-XXXXXX-

X1003 (referred to herein as the "Account").

A-588

4.      By accepting the Card and executing the Agreement, Defendant agreed to all of the terms and conditions set forth in the Corporate Services Commercial Card Account Agreement between it and American Express Travel Related Services Company, Inc. (the "Agreement").   The relevant terms and conditions with respect to the Agreement include the following:

(a)      This court has jurisdiction over Defendant pursuant to the Agreement, wherein, Defendant agreed that the sole venue for any litigation arising out of this Agreement shall be an appropriate federal or state court located in the State of New York.

(b)      Defendant agreed to be liable for all amounts charged to the Corporate Account.

(c)      Defendant agreed that payment for all charges is due upon receipt of the monthly billing statement.

(d)      Defendant agreed to pay all court costs if American Express must refer the Account to an attorney who is not an American Express employee.

(e)      Pursuant to the Agreement, Defendant further agreed in the event of default they would pay all reasonable costs incurred by American Express (1) in collecting the balance due, including Finance charges and delinquency fees and (2) in protecting itself from any harm it may suffer as a result of the default.

**The Default**

**A.**      **The American Express Corporate Account**

5.      Defendant used the Card to charge various items to the Account for which payment was not made.

2

A-589

6.      American Express sent monthly billing Statements (the "Statements") to Defendant for the Account, which showed the balance due on the Account.

7.       In violation of the Agreement requiring Defendant to remit the payment indicated by the Statements, Defendant failed and refused to pay such balance.  As a result, American Express suspended Defendant's charge privileges on the Account.

8.      The total outstanding, overdue and unpaid balance with respect to the Account owed by Defendant to American Express is $324,002.89.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Contract)**

9.      Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 8 of this complaint as though fully set forth at length herein.

10.      By providing Defendant with the Card and allowing it to charge goods and services to the Account, Defendant agreed pay for all items charged to the Accounts.  In addition, Defendant agreed to pay American Express late fees and court costs in the event that American Express referred the Account to an outside attorney for collection.

11.      As set forth above, Defendant is indebted to American Express for unpaid charges made to the Account.

12.      Despite due demand, Defendant has failed and refused to pay American Express the outstanding balance, $324,002.89, that is due and owing.

13.      As a result of the failure to pay the amount owed, American Express referred its claim against Defendant to an outside attorney for collection.

14.      By reason of the foregoing,  American Express is entitled to judgment against Defendant for breach of contract in the sum of $324,002.89, plus court costs.

3

A-590

FILED: NEW YORK COUNTY CLERK 03/03/2023 11:18 AM INDEX NO. 651130/2023
NYSCEF DOC. NO. 1 Case 1:24-cv-03453-JGK Document 61-11 Filed 05/13/24 Page 7 of 8 RECEIVED NYSCEF: 03/03/2023

## AS AND FOR A SECOND CAUSE OF ACTION
### (Account Stated)

15.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 14 of this complaint as though fully set forth at length herein.

16.     American Express duly issued and Defendant received, monthly Statements of Account that set forth in detail all items charged to the Account and the total amount due and owing by Defendant to American Express.

17.     Defendant received the monthly Statements of Account without protest and neither objected to them nor indicated that they were erroneous in any respect. Thus, Defendant acknowledged that the debt owed by it to American Express is correct.

18.     As set forth above, despite due demand, Defendant has failed and refused to pay American Express any portion of the amount due and owing.

19.     By reason of the foregoing, American Express is entitled to judgment against Defendant for the Accounts stated in the sum of $324,002.89, plus court costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment)

20.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 19 of this complaint as though fully set forth at length herein.

21.     Defendant has benefited from all of the charges made to the Account. Given its failure to make payment for the outstanding balance owed with respect to the Account, and the fact that Defendant was the beneficiary of all items charged to the Account, it would be unjustly enriched unless judgment is entered against it for the full balance due and owing on the Account.

22.     By reason of the foregoing, American Express is entitled to judgment against Defendant for unjust enrichment in an amount to be determined at trial, plus court costs.

4

A-591

Case 1:24-cv-03453-JGK    Document 61-11    Filed 05/13/24    Page 8 of 8

**WHEREFORE** Plaintiff, American Express Travel Related Services Company, Inc.,

requests judgment against defendant 777 PARTNERS LLC:

    (i)      on the first cause of action in the sum of $324,002.89, plus court costs;

    (ii)     on the second cause of action in the sum of $324,002.89, plus court costs;

    (iii)    on the third cause of action in an amount to be determined at trial, plus

            court costs;

    (iv)    for such other and further relief as is just and proper.

Dated:  March 3, 2023
        New York, New York

                        JAFFE & ASHER LLP

                    By:   /s/ Lawrence M. Nessenson
                          Lawrence M. Nessenson
                        600 Third Avenue
                        New York, New York 10016
                        (212) 687-3000
                        *Attorneys for the Plaintiff,*
                        *American Express Travel Related*
                        *Services Company, Inc.*

                This communication is from a debt collector.

15008169

5

A-592

# EXHIBIT L

**A-593**

Case 1:24-cv-03453-JGK   Document 61-12   Filed 05/13/24   Page 2 of 33

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

RANDY S. GELBER,

      Plaintiff,

CASE NO.:

v.

JOSHUA WANDER,

      Defendant.

_____/

## COMPLAINT

COMES NOW Plaintiff, RANDY S. GELBER (hereinafter "Landlord") by and through

their undersigned counsel, and hereby sues Defendant, JOSHUA WANDER (hereinafter "Tenant")

and alleges as follows:

    1.    This is an action for damages in excess of $30,000.00 pursuant to Chapter 83 of the

Florida Statutes.

    2.    This Court has jurisdiction over all Parties as the property in question is located in

Miami-Dade County and the lease contract at issue was executed in said County.

    3.    Tenant is an individual residing in Miami-Dade, Florida.

    4.    Landlord is the owner of that certain property located at 1413 Sunset Harbour

Drive, Unit 212, Miami Beach, FL 33139 (hereinafter the "Premises").

    5.    On or around June 22, 2016, Landlord and Tenant entered into a written lease

agreement (hereinafter "Lease") for the above-mentioned Premises. The initial term of the Lease

A-594

was from July 1, 2016, through June 30, 2017. A true and correct copy of the Lease is attached hereto as Exhibit "A".

6.    As outlined within the Lease, the Premises was fully furnished when the tenancy commenced in 2016.

7.    When the initial lease term ended (in June of 2017) Tenant was authorized to continue to reside within the Premises as a month-to-month tenant.

8.    After the initial lease term expired in June of 2017, the Parties entered into several lease extension agreements (hereinafter collectively the "Extension"). Per the Extension, Tenant was permitted to remain in the Premises until March 31, 2021. True and correct copies of the Extensions are attached hereto as Composite Exhibit "B".

9.    Despite the clear deadline within the Extension, in which Tenant was to vacate the Premises by March 31, 2021, Tenant refused to vacate the Premises until May 8, 2021, and failed to tender any rent to Landlord.

10.    Based on Tenant's refusal to vacate the Premises by the deadline within the Extension, Tenant became a holdover tenant pursuant to Section 83.58, Florida Statutes, for the time period encompassing April 1, 2021 through May 7, 2021.

11.    To make matters worse, once Tenant finally vacated the Premises, it was discovered that a significant amount of damage had been caused to the Premises, as well as to various items and other furnishings within same.

12.    Although Tenant recently relinquished all rights to his prior $15,000.00 security deposit, Landlord's known damages to date still exceeds $150,000.00.

A-595

13.    All conditions precedent to the filing of this action have been fulfilled or have occurred.

### COUNT I – BREACH OF LEASE (DAMAGES)

14.    Landlord re-alleges paragraphs 1-13, above as if fully stated herein.

15.    Landlord and Tenant entered into valid and binding contracts (i.e. the Lease and Extension).

16.    Pursuant to these contracts, Tenant was permitted to reside within Landlord's fully furnished Premises for nearly five (5) years.

17.    Pursuant to the Lease and Extension, Tenant had an obligation to not destroy, deface, impair, damage or remove any part of the Premises and the contents within same.

18.    Despite this obligation, Tenant breached the Lease and Extension when he destroyed, defaced, damaged, impaired, and removed various portions of, and furnishings within, the Premises.

19.    As a result of this breach, Landlord has suffered known damages in excess of $150,000.00.[1] Landlord made a timely claim on the Tenant's $15,000.00 security deposit however, the subject security deposit is not enough to cover the full amount of Landlord's damages.

20.    Landlord has retained the undersigned attorney and is obligated to pay said attorney a reasonable fee for his services. In accordance with the Lease and Section 83.48, Florida Statutes, Landlord is entitled to recover its attorneys' fees and costs incurred in bringing this action.

---

[1] Additional damages may be incurred as extensive repair/replacement work is required within the Premises as a result of the Tenant's improper and reckless actions.

A-596

WHEREFORE, Plaintiff, RANDY S. GELBER, prays that this Honorable Court enter a Final Judgment awarding Plaintiff: (1) all monetary damages owed up and through the date of judgment; (2) damages and costs for any subsequent or newly discovered damage caused by Tenant to the Premises; (3) all attorneys' fees requested pursuant to Chapter 83, Florida Statutes and the Lease; and (4) granting such other and further relief as this Court deems just and proper.

## COUNT II – NEGLIGENCE
### (In the Alternative)

21.    Landlord adopts, realleges and incorporates by reference the allegations of Paragraphs 1 through 13 as if fully set forth herein.

22.    Tenant owed a duty to Landlord to use the Premises (inclusive of the personal items and furnishings within same) in an appropriate manner and not cause damage or harm to same.

23.    Tenant breached this duty when he destroyed and/or damaged various portions of the Premises and other furnishings and personal items (owned by Landlord) which were housed within same.

24.    As a result of Tenant's breach, the Landlord has suffered damages.

WHEREFORE, Plaintiff, RANDY S. GELBER, prays that this Honorable Court award judgment to Landlord against Tenant for actual and consequential damages against Tenant as a result of Tenant's negligence, pre- and post-judgment interest, in addition to Plaintiffs' reasonable attorneys' fees and all costs incurred herein, and further relief as this Court deems appropriate.

## COUNT III – BREACH OF LEASE (DELINQUENT RENTS)

25.    Landlord adopts, realleges and incorporates by reference the allegations of Paragraphs 1 through 13 as if fully set forth herein.

15259808V.1

A-597

26.    Landlord and Tenant entered into valid and binding contracts (i.e. the Lease and Extension).

27.    Pursuant to these contracts, Tenant was permitted to reside within Landlord's fully furnished Premises for nearly five (5) years.

28.    Pursuant to the Lease and Extension, Tenant had an obligation to pay timely rent to Landlord, when same became due, and fully vacate the Premises when the subject tenancy ended.

29.    Tenant breached the Lease and Extension by failing to vacate the Premises by March 31, 2021.

30.    Specifically, without permission or authorization from Landlord, Tenant failed to surrender possession of the Premises and remained in possession of the Premises after the Lease and Extension expired.

31.    In addition, Tenant failed to notify Landlord when he would be vacating the Premises.

32.    Ultimately, Tenant vacated and relinquished possession of the Premises on or about May 8, 2021, after the lease term ended on March 31, 2021.

33.    By failing to vacate at the end of the lease term, Tenant become a hold-over tenant under Section 83.58, Florida Statutes.

34.    As such, and pursuant to § 83.58, Fla. Stat., Landlord is entitled to double rent for the time period encompassing April 1, 2021 through May 7, 2021, because the Tenant held over and continued in possession of the Premises or any after the expiration of the lease term without the permission of Landlord.

A-598

35.    Tenant breached his obligations under the Lease and Extension (by failing to pay the aforementioned rents) which has caused Landlord to suffer damages.

36.    Landlord has retained the undersigned attorney and is obligated to pay said attorney a reasonable fee for his services. In accordance with Chapter 83 of the Florida Statutes, as well as the subject Lease, Landlord is entitled to recover its attorneys' fees and costs incurred in bringing this action.

WHEREFORE, Plaintiffs, RANDY S. GELBER, prays that this Honorable Court enter a Final Judgment awarding Plaintiff: (1) all delinquent rents and late fees owed up and through the date of judgment; (2) all attorneys' fees requested pursuant to Chapter 83, Florida Statutes and the Lease; and (3) granting such other and further relief as this Court deems just and proper.

Respectfully submitted this 7th day of June 2021.

BECKER
*Attorneys for Plaintiff*
121 Alhambra Plaza, #1000
Coral Gables, FL 33134
Telephone: (305) 262-4433
Facsimile: (305) 442-2232
ACervera@beckerlawyers.com
MJimenez@beckerlawyers.com

By: _____
    Adam Cervera
    Florida Bar No. 81679

15259808V.1

A-599

**RESIDENTIAL LEASE FOR APARTMENT OR UNIT IN MULTI-FAMILY RENTAL HOUSING (OTHER THAN A DUPLEX) INCLUDING A MOBILE HOME, CONDOMINIUM, OR COOPERATIVE (FOR A TERM NOT TO EXCEED ONE YEAR)**



(Not To Be Used For Commercial, Agricultural, or Other Residential Property)

WARNING: IT IS VERY IMPORTANT TO READ ALL OF THE LEASE CAREFULLY. THE LEASE IMPOSES IMPORTANT LEGAL OBLIGATIONS.

AN ASTERISK (*) OR A BLANK SPACE (_____) INDICATES A PROVISION WHERE A CHOICE OR A DECISION MUST BE MADE BY THE PARTIES.

NO CHANGES OR ADDITIONS TO THIS FORM MAY BE MADE UNLESS A LAWYER IS CONSULTED.

I. TERMS AND PARTIES. This is a lease (the "Lease") for a period of ___12___ months (the "Lease Term"), beginning
(number)

_____July 1, 2016_____ and ending _____June 30, 2017_____, between
(month, day, year)                              (month, day, year)

RANDY SCOTT GELBER                                                    end
(name of owner of the property)

JOSHUA WANDER
(name(s) of person(s) to whom the property is leased)

(In the Lease, the owner, whether one or more, of the property is called "Landlord." All persons to whom the property is leased are called "Tenant.")

Landlord's E-mail Address:          randy.gelber@gmail.com
Landlord's Telephone Number:        917-868-4791
Tenant's E-mail Address:            joshwander@gmail.com
Tenant's Telephone Number:          954-665-4335

II. PROPERTY RENTED. Landlord leases to Tenant apartment or unit no.  __212__  in the building located at

1413 SUNSET HARBOUR DRIVE                                            known as
(street address)

TOWNHOMES AT SUNSET HARBOUR                          MIAMI BEACH
(name of apartment or condominium)                              (city)

Florida ___33139___, together with the following furniture and appliances:
(zip code)

Landlord and tenant to make an inventory prior to move-in.
The inventory will be marked Rider 2 and become part of this
Lease.

<del>[List all furniture and appliances. If none, write "none."] (In the Lease, the property leased, including furniture and appliances, if any, is called "the Premises.")</del>

III. COMMON AREAS. Landlord grants to Tenant permission to use, during the Lease Term, along with others, the common areas of the building and the development of which the Premises are a part.

IV. RENT PAYMENTS AND CHARGES. Tenant shall pay rent for the Premises in installments of $10,000.00 each on
the ___1st___ day of each ___MONTH___ [month, week]
(a "Rental Installment Period," as used in the Lease, shall be a month if rent is paid monthly, and a week if rent is paid weekly.) Tenant
shall pay <del>with costs rent payment all taxes imposed on the rent by taxing authorities. The amount of taxes payable on the beginning</del>
date of the Lease is $_____ for each installment. The amount of each installment of rent plus taxes ("the Lease Payment"), as of the
date the Lease begins, is $10,000.00 . Landlord will notify Tenant if the amount of the tax changes. Tenant shall pay the rent and all
other charges required to be paid under the Lease by cash, valid check, or money order. <del>Landlord may appoint an agent to collect the Lease
Payment and to perform Landlord's obligations.</del>   Wire transfer - See Rider 1.

Landlord (_RG_) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 1 of 16.

RLAUCC-1  Rev 8/15.  Approved on April 19, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar
Serial# 042734-800146-8626196



EXHIBIT A

A-600

Unless this box ☐ is checked, the Lease Payments must be paid in advance beginning _____

If the tenancy starts on a day other than the first day of the month or week as designated above, the rent shall be prorated from

_____ through _____ in the amount of $_____ and shall be due

on _____ . (If rent paid monthly, prorate on a 30-day month.)

**V. DEPOSITS, ADVANCE RENT, AND LATE CHARGES.** In addition to the Lease Payments described above, Tenant shall pay the following: (check only those items that apply)

[x] a security deposit of $ 10,000.00 to be paid upon signing the Lease.

[x] advance rent in the amount of $ 20,000.00 for the Rental Installment Periods of First & Last Months to be paid upon signing the Lease.

☐ a pet deposit in the amount of $_____ to be paid upon signing the Lease.

☐ a late charge in the amount of $_____ for each Lease Payment made more than _____ days after the date it is due.

☐ a bad check fee in the amount $_____ (not to exceed $20.00 or 5% of the Lease Payment whichever is greater) if Tenant makes any Lease Payment with a bad check. If Tenant makes any Lease Payment with a bad check, Landlord can require Tenant to pay all future Lease Payments in cash or by money order.

[x] Other: Additional Security Deposit $5,000.00 to be paid upon signing the Lease.

☐ Other: _____

**VI. SECURITY DEPOSITS AND ADVANCE RENT.** If Tenant has paid a security deposit or advance rent the following provisions apply:

A.   Landlord shall hold the money in a separate interest-bearing or non-interest-bearing account in a Florida banking institution for the benefit of Tenant. If Landlord deposits the money in an interest-bearing account, Landlord must pay Tenant interest of at least 75% of the annualized average interest paid by the bank or 5% per year simple interest, whichever Landlord chooses. Landlord cannot mix such money with any other funds of Landlord or pledge, mortgage, or make any other use of such money until the money is actually due to Landlord; or

B.   Landlord must post a surety bond in the manner allowed by law. If Landlord posts the bond, Landlord shall pay Tenant 5% interest per year.

At the end of the Lease, Landlord will pay Tenant, or credit against rent, the interest due to Tenant. No interest will be due Tenant if Tenant wrongfully terminates the Lease before the end of the Lease Term.

C.   If Landlord rents 5 or more dwelling units, then within 30 days of Tenant's payment of the advance rent or any security deposit, Landlord must notify Tenant in writing of the manner in which Landlord is holding such money, the interest rate, if any, that Tenant will receive, and when such payments will be made.

**VII. NOTICES.** _____ is Landlord's Agent. All notices to Landlord and all (name)

Lease Payments must be sent to Landlord's Agent at _____ (address)

unless Landlord gives Tenant written notice of a change. Landlord's Agent may perform inspections on behalf of Landlord, subject to Article XII below. All notices to Landlord shall be given by certified mail, return receipt requested, or by hand delivery to Landlord or Landlord's Agent *or tenant may be by email or other electronic format - See Enter I.* RGV

Any notice to Tenant shall be given by certified mail, return receipt requested, or delivered to Tenant at the Premises. If Tenant is absent from the Premises, a notice to Tenant may be given by leaving a copy of the notice at the Premises.

**VIII. USE OF PREMISES.** Tenant shall use the Premises only for residential purposes. Tenant also shall obey, and require anyone on the Premises to obey, all laws and any restrictions that apply to the Premises. Landlord will give Tenant notice of any restrictions that apply to the Premises.

If the Premises are located in a condominium or cooperative development, the Lease and Tenant's rights under it, including as to the common areas, are subject to all terms of the governing documents for the project, including, without limitation, any Declaration of Condominium or proprietary lease, and any restrictions, rules, and regulations now existing or hereafter adopted, amended, or repealed.

Landlord ( RGV ) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 2 of $8.

A-601

Unless this box ☐ is checked, Landlord may adopt, modify, or repeal rules and regulations for the use of common areas and conduct on the Premises during the Lease Term. All rules and regulations must be reasonable and in the best interest of the development in which the Premises are located.

Occasional overnight guests are permitted. An occasional overnight guest is one who does not stay more than _____ nights in any calendar month (if left blank, 7). Landlord's written approval is required to allow anyone else to occupy the Premises.

Unless this box ☐ is checked or a pet deposit has been paid, Tenant may not keep or allow pets or animals on the Premises without Landlord's approval of the pet or animal in writing.

Unless this box ☐ is checked, no smoking is permitted in the Premises.

Tenant shall not keep any dangerous or flammable items that might increase the danger of fire or damage on the Premises without Landlord's consent.

Tenant shall not create any environmental hazards on or about the Premises.

Tenant shall not destroy, deface, damage, impair, or remove any part of the Premises belonging to Landlord, nor permit any person to do so.

Tenant may not make any alterations or improvements to the Premises without first obtaining Landlord's written consent to the alteration or improvement. However, unless this box ☐ is checked, Tenant may hang pictures and install window treatments in the Premises without Landlord's consent, provided Tenant removes all such items before the end of the Lease Term and repairs all damage resulting from the removal.

Tenant must act, and require all other persons on the Premises to act, in a manner that does not unreasonably disturb any neighbors or constitute a breach of the peace.

IX. MAINTENANCE. Landlord and Tenant agree that the maintenance of the Premises must be performed by the person indicated below:

A.      Landlord's Required Maintenance. Landlord will comply with applicable building, housing, and health codes relating to the Premises. If there are no applicable building, housing, or health codes, Landlord shall maintain and repair the roofs, porches, windows, exterior walls, screens, foundations, floors, structural components, and steps, and keep the plumbing in reasonable working order. If the Premises are located in a condominium, Landlord and Tenant acknowledge that the maintenance of the structural elements and common areas is performed by the condominium association as part of the common area maintenance. Landlord shall assure that the association complies with applicable building, housing, and health codes relating to the Premises. If there are no applicable building, housing, or health codes, Landlord shall assure that the association maintains and repairs roofs, porches, windows, exterior walls, screens, foundations, floors, structural components, and steps, and keeps the plumbing in reasonable working order. Landlord will be responsible for the maintenance of any items listed above for which the association is not responsible.

B.      Elective Maintenance. Fill in each blank space in this section with Landlord or Tenant to show who will take care of the item noted. If a space is left blank, Landlord will be required to take care of that item (or assure that the association takes care of the items if the Premises are located in a condominium).

| | | |
|---|---|---|
| ☒ Landlord | ☐ Tenant | Smoke Detectors |
| ☒ Landlord | ☐ Tenant | Extermination of rats, mice, roaches, ants, wood-destroying organisms, and bedbugs. |
| ☐ Landlord | ☒ Tenant | Locks and keys |
| ☐ Landlord | ☒ Tenant | Clean and safe condition of outside areas   *RG   N* |
| ☐ Landlord | ☐ Tenant | ~~Garbage removal and outside garbage receptacles~~ |
| ☒ Landlord | ☐ Tenant | Running water |
| ☒ Landlord | ☐ Tenant | Hot water   *RG ✓* |
| ☒ Landlord | ☐ Tenant | ~~Lawn~~ |
| ☒ Landlord | ☐ Tenant | Heat |
| ☒ Landlord | ☐ Tenant | Air conditioning   *RG   N* |
| ☒ Landlord | ☐ Tenant | ~~Furniture~~ |
| ☒ Landlord | ☐ Tenant | Appliances |
| ☒ Landlord | ☐ Tenant | Fixtures |
| ☐ Landlord | ☐ Tenant | ~~Pool (including filters, machinery, and equipment)~~   *RG   N* |
| ☐ Landlord | ☒ Tenant | Heating and air conditioning filters |
| ☐ Landlord | ☐ Tenant | Other: _____ |

Tenant's responsibility, if any, indicated above, shall include major maintenance or major replacement of equipment.

Landlord shall be responsible for major maintenance or major replacement of equipment, except for equipment for which Tenant has accepted responsibility for major maintenance or major replacement in the previous paragraph.
Major maintenance or major replacement means a repair or replacement that costs more than $ 250   *RG   N*

Landlord (____) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 3 of 18.

RLALICC-1x   Rev 6/19   Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar.
Serial: 842774-888188-8626790

formsimple.its

A-602

Tenant shall be required to vacate the Premises on 7 days' written notice, if necessary, for extermination pursuant to this subparagraph. When vacation of the Premises is required for extermination, Landlord shall not be liable for damages but shall abate the rent.

Nothing in this section makes Landlord responsible for any condition created or caused by the negligent or wrongful act or omission of Tenant, any member of Tenant's family, or any other person on the Premises with Tenant's consent.

C.   Tenant's Required Maintenance. At all times during the Lease Term, Tenant shall:
   1. comply with all obligations imposed upon tenants by applicable provisions of building, housing, and health codes.
   2. keep the Premises clean and sanitary;
   3. remove all garbage from the dwelling unit in a clean and sanitary manner;
   4. keep all plumbing fixtures in the dwelling unit clean, sanitary, and in repair; and
   5. use and operate in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, including elevators.

X. UTILITIES. Tenant shall pay all charges for hook-up, connection, and deposit for providing all utilities and utility services to the Premises during the Lease Term except _____ which Landlord agrees to provide at Landlord's expense. (Specify any utilities to be provided and paid for by Landlord such as water, sewer, oil, gas, electricity, telephone, garbage removal, etc.).

XI. SERVICEMEMBER. If Tenant is a member of the United States Armed Forces on active duty or state active duty or a member of the Florida National Guard or United States Reserve Forces, the Tenant has rights to terminate the Lease as provided in Section 83.682, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

XII. LANDLORD'S ACCESS TO PREMISES. Landlord or Landlord's Agent may enter the Premises in the following circumstances:

   A. At any time for the protection or preservation of the Premises.
   B. After reasonable notice to Tenant at reasonable times for the purpose of repairing the Premises.
   C. To inspect the Premises; make necessary or agreed-upon repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors under any of the following circumstances:
      1. with Tenant's consent;
      2. in case of emergency;
      3. when Tenant unreasonably withholds consent; or
      4. if Tenant is absent from the Premises for a period of at least one-half a Rental Installment Period. (If the rent is current and Tenant notifies Landlord of an intended absence, then Landlord may enter only with Tenant's consent or for the protection or preservation of the Premises.)

XIII. PROHIBITED ACTS BY LANDLORD. Landlord is prohibited from taking certain actions as described in Section 83.67, Florida Statutes, the provisions of which can be found in the attachment to this Lease.

XIV. CASUALTY DAMAGE. If the Premises are damaged or destroyed other than by wrongful or negligent acts of Tenant or persons on the Premises with Tenant's consent, so that the use of the Premises is substantially impaired, Tenant may terminate the Lease within 30 days after the damage or destruction and Tenant will immediately vacate the Premises. If Tenant vacates, Tenant is not liable for rent that would have been due after the date of termination. Tenant may vacate the part of the Premises rendered unusable by the damage or destruction, in which case Tenant's liability for rent shall be reduced by the fair rental value of the part of the Premises that was damaged or destroyed.

XV. DEFAULTS/REMEDIES. Should a party to the Lease fail to fulfill their responsibilities under the Lease or need to determine whether there has been a default of the Lease, refer to Part II, Chapter 83, entitled Florida Residential Landlord and Tenant Act which contains information on defaults and remedies. A copy of the current version of this Act is attached to the Lease.

XVI. ASSIGNMENT AND SUBLEASING. Unless this box ☐ is checked, Tenant may not assign the Lease or sublease all or any part of the Premises without first obtaining Landlord's written approval and consent to the assignment or sublease.

XVII. RISK OF LOSS. Subject to the next sentence, Landlord shall not be liable for any loss by reason of damage, theft, or otherwise to the contents, belongings, and personal effects of the Tenant, or Tenant's family, agents, employees, guests, or visitors. Landlord shall not be liable if such damage, theft, or loss is caused by Tenant, Tenant's family, agents, employees, guests, or visitors. Nothing contained in this provision shall relieve Landlord or Tenant from responsibility for loss, damage, or injury caused by its own negligence or willful conduct.

XVIII. SUBORDINATION. The Lease is automatically subordinate to the lien of any mortgage encumbering the fee title to the Premises from time to time.

XIX. LIENS. The interest of the Landlord shall not be subject to liens for improvements by the Tenant as provided in Section 713.10, Florida Statutes. Tenant shall notify all parties performing work on the Premises at Tenant's request that the Lease does not allow any liens to attach to Landlord's interest.

Landlord ( ___ ) ( ____ ) and Tenant ( ___ ) ( ____ ) acknowledge receipt of a copy of this page, which is Page 4 of 18.

RLAUCC-1s   Rev 4/15   Approved on April 18, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar.

XX. APPROVAL CONTINGENCY. If applicable, the Lease is conditioned upon approval of Tenant by the association that governs the Premises. Any application fee required by an association shall be paid by ☐ Landlord ☐ Tenant. If such approval is not obtained prior to commencement of Lease Term, either party may terminate the Lease by written notice to the other given at any time prior to approval by the association, and if the Lease is terminated, Tenant shall receive return of deposits specified in Article V, if made. If the Lease is not terminated, rent shall abate until the approval is obtained from the association. Tenant agrees to use due diligence in applying for association approval and to comply with the requirements for obtaining approval. ☐ Landlord ☐ Tenant shall pay the security deposit required by the association, if applicable.

XXI. RENEWAL/EXTENSION. The Lease can be renewed or extended only by a written agreement signed by both Landlord and Tenant, but in no event may the total Lease Term exceed one year. A new lease is required for each year.

XXII. LEAD-BASED PAINT. ☐ Check and complete if the dwelling was built before January 1, 1978. Lead Warning Statement (when used in this article, the term Lessor refers to Landlord and the term Lessee refers to Tenant)

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

Lessor's Disclosure (Initial)

_____ (a) Presence of lead-based paint or lead-based paint hazards (check (i) or (ii) below):

    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

    (ii) ☑ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b) Records and reports available to the Lessor (check (i) or (ii) below):

    (i) ☐ Lessor has provided the Lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

_____

    (ii) ☐ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

Lessee's Acknowledgment (Initial)

_____ (c) Lessee has received copies of all information listed above.
_____ (d) Lessee has received the pamphlet *Protect Your Family From Lead In Your Home.*

Agent's Acknowledgment (Initial)

_____ (e) Agent has informed the Lessor of the Lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| Lessor's signature | Date | Lessor's signature | Date |
|---|---|---|---|
| | 6/12/16 | | |
| Lessee's signature | Date | Lessee's signature | Date |
| Agent's signature | Date | Agent's signature | Date |

Landlord (___) (___) and Tenant (___) (___) acknowledge receipt of a copy of this page, which is Page 8 of 18.

RLAUCC-1x   Rev 6/15   Approved on April 18, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar
before 8/27/04-8888M-8888798

form simplicity

A-604

XXIII. ATTORNEYS' FEES. In any lawsuit brought to enforce the Lease or under applicable law, the party in whose favor a judgment or decree has been rendered may recover its reasonable court costs, including attorneys' fees, from the non-prevailing party.

XXIV. MISCELLANEOUS.

A. Time is of the essence of the performance of each party's obligations under the Lease.

B. The Lease shall be binding upon and for the benefit of the heirs, personal representatives, successors, and permitted assigns of Landlord and Tenant, subject to the requirements specifically mentioned in the Lease. Whenever used, the singular number shall include the plural or singular and the use of any gender shall include all appropriate genders.

C. The agreements contained in the Lease set forth the complete understanding of the parties and may not be changed or terminated orally.

D. No agreement to accept surrender of the Premises from Tenant will be valid unless in writing and signed by Landlord.

E. All questions concerning the meaning, execution, construction, effect, validity, and enforcement of the Lease shall be determined pursuant to the laws of Florida.

F. The place for filing any suits or other proceedings with respect to the Lease shall be the county in which the Premises is located.

G. Landlord and Tenant will use good faith in performing their obligations under the Lease.

H. As required by law, Landlord makes the following disclosure: "RADON GAS." Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

XXV. TENANT'S PERSONAL PROPERTY. TENANT MUST INITIAL IN THIS BOX [        ] FOR THE FOLLOWING PROVISION TO APPLY. BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY.

The Lease has been executed by the parties on the dates indicated below.

_____          6/22/16
Landlord's Signature                      Date

_____          _____
Landlord's Signature                      Date

_____          _____
Tenant's Signature                        Date

_____          _____
Tenant's Signature                        Date

This form was completed with the assistance of:

Name of Individual:   _____
Name of Business:     _____
Address:              _____
Telephone Number:     _____

Copy of Current Version of Florida Residential Landlord and Tenant Act, Part II, Chapter 83, Florida Statutes to Be Attached

Landlord ( AG ) (    ) and Tenant ( N ) (    ) acknowledge receipt of a copy of this page, which is Page 6 of 18.

RLAUCC-1x   Rev #/15   Approved on April 15, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar.
Serial: 845734-888148-8838798

A-605

### Early Termination Fee/Liquidated Damages Addendum

[ ] I agree, as provided in the rental agreement, to pay $ _____ (an amount that does not exceed two months' rent) as liquidated damages or an early termination fee if I elect to terminate the rental agreement and the landlord waives the right to seek additional rent beyond the month in which the landlord retakes possession.

[✓] I do not agree to liquidated damages or an early termination fee, and I acknowledge that the landlord may seek damages as provided by law.

Landlord's Signature _____     Date  6/22/16

Landlord's Signature _____     Date _____

Tenant's Signature _____     Date  6/22/16

Tenant's Signature _____     Date _____

Landlord [ C6 ] [ ] and Tenant [ ] [ ] acknowledge receipt of a copy of this page, which is Page 7 of 18.

RLAUCC-1x   Rev 8/15   Approved on April 18, 2010, by the Supreme Court of Florida, for use under rule 10-2.1(a) of the Rules Regulating the Florida Bar

**Florida Residential Landlord and Tenant Act**

PART II

RESIDENTIAL TENANCIES

83.40   Short title.
83.41   Application.
83.42   Exclusions from application of part.
83.43   Definitions.
83.44   Obligation of good faith.
83.45   Unconscionable rental agreement or provision.
83.46   Rent, duration of tenancies.
83.47   Prohibited provisions in rental agreements.
83.48   Attorney fees
83.49   Deposit money or advance rent; duty of landlord and tenant.
83.50   Disclosure of landlord's address.
83.51   Landlord's obligation to maintain premises.
83.52   Tenant's obligation to maintain dwelling unit.
83.53   Landlord's access to dwelling unit.
83.535  Flotation bedding system; restrictions on use.
83.54   Enforcement of rights and duties; civil action; criminal offenses.
83.55   Right of action for damages.
83.56   Termination of rental agreement.
83.561  Termination of rental agreement upon foreclosure.
83.57   Termination of tenancy without specific term.
83.575  Termination of tenancy with specific duration.
83.58   Remedies; tenant holding over.
83.59   Right of action for possession.
83.595  Choice of remedies upon breach or early termination by tenant.
83.60   Defenses to action for rent or possession; procedure.
83.61   Disbursement of funds in registry of court; prompt final hearing.
83.62   Restoration of possession to landlord.
83.625  Power to award possession and enter money judgment.
83.63   Casualty damage.
83.64   Retaliatory conduct.
83.67   Prohibited practices.
83.681  Orders to enjoin violations of this part.
83.682  Termination of rental agreement by a servicemember.

**83.40 Short title.** --This part shall be known as the "Florida Residential Landlord and Tenant Act."
History --s. 2, ch. 73-330.

**83.41 Application.** --This part applies to the rental of a dwelling unit.
History --s. 3, ch. 73-330; ss. 2, 20, ch. 82-66.

**83.42 Exclusions from application of part.** --This part does not apply to:
(1) Residency or detention in a facility, whether public or private, when residence or detention is incidental to the provision of medical, geriatric, educational, counseling, religious, or similar services. For residents of a facility licensed under part II of chapter 400, the provisions of s. 400.0255 are the exclusive procedures for all transfers and discharges.
(2) Occupancy under a contract of sale of a dwelling unit or the property of which it is a part in which the buyer has paid at least 12 months' rent or in which the buyer has paid at least 1 month's rent and a deposit of at least 5 percent of the purchase price of the property.
(3) Transient occupancy in a hotel, condominium, motel, roominghouse, or similar public lodging, or transient occupancy in a mobile home park.
(4) Occupancy by a holder of a proprietary lease in a cooperative apartment.
(5) Occupancy by an owner of a condominium unit.
History --s. 2, ch. 73-330; s. 40, ch. 2012-160; s. 1, ch. 2013-136.

**83.43 Definitions.** --As used in this part, the following words and terms shall have the following meanings unless some other meaning is plainly indicated:
(1) "Building, housing, and health codes" means any law, ordinance, or governmental regulation concerning health, safety, sanitation or fitness for habitation, or the construction, maintenance, operation, occupancy, use, or appearance, of any dwelling unit.
(2) "Dwelling unit" means:
(a) A structure or part of a structure that is rented for use as a home, residence, or sleeping place by one person or by two or more persons who maintain a common household.
(b) A mobile home rented by a tenant.

Landlord ( R6 ) (____) and Tenant ( W ) (____) acknowledge receipt of a copy of this page, which is Page 8 of 18.

Simplify 842731-444448-4826708                                                                    formsimplicity

A-607

(c) A structure or part of a structure that is furnished, with or without rent, as an incident of employment for use as a home, residence, or sleeping place by one or more persons.

(3) "Landlord" means the owner or lessor of a dwelling unit.

(4) "Tenant" means any person entitled to occupy a dwelling unit under a rental agreement.

(5) "Premises" means a dwelling unit and the structure of which it is a part and a mobile home lot and the appurtenant facilities and grounds, areas, facilities, and property held out for the use of tenants generally.

(6) "Rent" means the periodic payments due the landlord from the tenant for occupancy under a rental agreement and any other payments due the landlord from the tenant as may be designated as rent in a written rental agreement.

(7) "Rental agreement" means any written agreement, including amendments or addenda, or oral agreement for a duration of less than 1 year, providing for use and occupancy of premises.

(8) "Good faith" means honesty in fact in the conduct or transaction concerned.

(9) "Advance rent" means moneys paid to the landlord to be applied to future rent payment periods, but does not include rent paid in advance for a current rent payment period.

(10) "Transient occupancy" means occupancy when it is the intention of the parties that the occupancy will be temporary.

(11) "Deposit money" means any money held by the landlord on behalf of the tenant, including, but not limited to, damage deposits, security deposits, advance rent deposit, pet deposit, or any contractual deposit agreed to between landlord and tenant either in writing or orally.

(12) "Security deposits" means any moneys held by the landlord as security for the performance of the rental agreement, including, but not limited to, monetary damage to the landlord caused by the tenant's breach of lease prior to the expiration thereof.

(13) "Legal holiday" means holidays observed by the clerk of the court.

(14) "Servicemember" shall have the same meaning as provided in s. 250.01.

(15) "Active duty" shall have the same meaning as provided in s. 250.01.

(16) "State active duty" shall have the same meaning as provided in s. 250.01.

(17) "Early termination fee" means any charge, fee, or forfeiture that is provided for in a written rental agreement and is assessed to a tenant when a tenant elects to terminate the rental agreement, as provided in the agreement, and vacates a dwelling unit before the end of the rental agreement. An early termination fee does not include:

(a) Unpaid rent and other accrued charges through the end of the month in which the landlord retakes possession of the dwelling unit.

(b) Charges for damages to the dwelling unit.

(c) Charges associated with a rental agreement settlement, release, buyout, or accord and satisfaction agreement.

History. —s. 2, ch. 73-330; s. 1, ch. 74-143; s. 1, ch. 81-190; s. 3, ch. 83-151; s. 17, ch. 94-170; s. 2, ch. 2003-72; s. 1, ch. 2008-131.

**83.44 Obligation of good faith.** —Every rental agreement or duty within this part imposes an obligation of good faith in its performance or enforcement.

History. —s. 2, ch. 73-330.

**83.45 Unconscionable rental agreement or provision.** —

(1) If the court as a matter of law finds a rental agreement or any provision of a rental agreement to have been unconscionable at the time it was made, the court may refuse to enforce the rental agreement, enforce the remainder of the rental agreement without the unconscionable provision, or so limit the application of any unconscionable provision as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the rental agreement or any provision thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to meaning, relationship of the parties, purpose, and effect to aid the court in making the determination.

History. —s. 2, ch. 73-330.

**83.46 Rent; duration of tenancies.** —

(1) Unless otherwise agreed, rent is payable without demand or notice; periodic rent is payable at the beginning of each rent payment period, and rent is uniformly apportionable from day to day.

(2) If the rental agreement contains no provision as to duration of the tenancy, the duration is determined by the periods for which the rent is payable. If the rent is payable weekly, then the tenancy is from week to week; if payable monthly, tenancy is from month to month; if payable quarterly, tenancy is from quarter to quarter; if payable yearly, tenancy is from year to year.

(3) If the dwelling unit is furnished without rent as an incident of employment and there is no agreement as to the duration of the tenancy, the duration is determined by the periods for which wages are payable. If wages are payable weekly or more frequently, then the tenancy is from week to week; and if wages are payable monthly or no wages are payable, then the tenancy is from month to month. In the event that the employee ceases employment, the employer shall be entitled to rent for the period from the day after the employee ceases employment until the day that the dwelling unit is vacated at a rate equivalent to the rate charged for similarly situated residences in the area. This subsection shall not apply to an employee or a resident manager of an apartment house or an apartment complex when there is a written agreement to the contrary.

History. —s. 2, ch. 73-330; s. 2, ch. 81-190; s. 2, ch. 87-195; s. 7, ch. 90-133; s. 1, ch. 93-255.

**83.47 Prohibited provisions in rental agreements.** —

(1) A provision in a rental agreement is void and unenforceable to the extent that it:

(a) Purports to waive or preclude the rights, remedies, or requirements set forth in this part.

(b) Purports to limit or preclude any liability of the landlord to the tenant or of the tenant to the landlord, arising under law.

(2) If such a void and unenforceable provision is included in a rental agreement entered into, extended, or renewed after the effective date of this part and either party suffers actual damages as a result of the inclusion, the aggrieved party may recover those damages sustained after the effective date of this part.

History. —s. 2, ch. 73-330.

Landlord ( ) ( ) and Tenant ( ) ( ) acknowledge receipt of a copy of this page, which is Page 9 of 15.

A-608

83.48 Attorney fees. —In any civil action brought to enforce the provisions of the rental agreement or this part, the party in whose favor a judgment or decree has been rendered may recover reasonable attorney fees and court costs from the nonprevailing party. The right to attorney fees in this section may not be waived in a lease agreement. However, attorney fees may not be awarded under this section in a claim for personal injury damages based on a breach of duty under s. 83.51.
History. —s. 2, ch. 73-330; s. 4, ch. 83-151; s. 2, ch. 2013-136.

83.49 Deposit money or advance rent; duty of landlord and tenant. —

(1) Whenever money is deposited or advanced by a tenant on a rental agreement as security for performance of the rental agreement or as advance rent for other than the next immediate rental period, the landlord or the landlord's agent shall either:

(a) Hold the total amount of such money in a separate non-interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord;

(b) Hold the total amount of such money in a separate interest-bearing account in a Florida banking institution for the benefit of the tenant or tenants, in which case the tenant shall receive and collect interest in an amount of at least 75 percent of the annualized average interest rate payable on such account or interest at the rate of 5 percent per year, simple interest, whichever the landlord elects. The landlord shall not commingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys until such moneys are actually due the landlord; or

(c) Post a surety bond, executed by the landlord as principal and a surety company authorized and licensed to do business in the state as surety, with the clerk of the circuit court in the county in which the dwelling unit is located in the total amount of the security deposits and advance rent he or she holds on behalf of the tenants or $50,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of the provisions of this section. In addition to posting the surety bond, the landlord shall pay to the tenant interest at the rate of 5 percent per year, simple interest. A landlord, or the landlord's agent, engaged in the renting of dwelling units in five or more counties, who holds deposit moneys or advance rent and who is otherwise subject to the provisions of this section, may, in lieu of posting a surety bond in each county, elect to post a surety bond in the form and manner provided in this paragraph with the office of the Secretary of State. The bond shall be in the total amount of the security deposit or advance rent held on behalf of tenants or in the amount of $250,000, whichever is less. The bond shall be conditioned upon the faithful compliance of the landlord with the provisions of this section and shall run to the Governor for the benefit of any tenant injured by the landlord's violation of this section. In addition to posting a surety bond, the landlord shall pay to the tenant interest on the security deposit or advance rent held on behalf of that tenant at the rate of 5 percent per year simple interest.

(2) The landlord shall, in the lease agreement or within 30 days after receipt of advance rent or a security deposit, give written notice to the tenant which includes disclosure of the advance rent or security deposit. Subsequent to providing such written notice, if the landlord changes the manner or location in which he or she is holding the advance rent or security deposit, he or she must notify the tenant within 30 days after the change as provided in paragraphs (a)-(d). The landlord is not required to give new or additional notice solely because the depository has merged with another financial institution, changed its name, or transferred ownership to a different financial institution. This subsection does not apply to any landlord who rents fewer than five individual dwelling units. Failure to give this notice is not a defense to the payment of rent when due. The written notice must:

(a) Be given in person or by mail to the tenant.

(b) State the name and address of the depository where the advance rent or security deposit is being held or state that the landlord has posted a surety bond as provided by law.

(c) State whether the tenant is entitled to interest on the deposit.

(d) Contain the following disclosure:

YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND.

YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

(3) The landlord or the landlord's agent may disburse advance rents from the deposit account to the landlord's benefit when the advance rental period commences and without notice to the tenant. For all other deposits:

Landlord (____) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 10 of 18.

A-609

(a) Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or her intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of _____ upon your security deposit, due to _____. It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to (landlord's address) .

If the landlord fails to give the required notice within the 30-day period, he or she forfeits the right to impose a claim upon the security deposit and may not seek a setoff against the deposit but may file an action for damages after return of the deposit.

(b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages. The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

(c) If either party institutes an action in a court of competent jurisdiction to adjudicate the party's right to the security deposit, the prevailing party is entitled to receive his or her court costs plus a reasonable fee for his or her attorney. The court shall advance the cause on the calendar.

(d) Compliance with this section by an individual or business entity authorized to conduct business in this state, including Florida-licensed real estate brokers and sales associates, constitutes compliance with all other relevant Florida Statutes pertaining to security deposits held pursuant to a rental agreement or other landlord-tenant relationship. Enforcement personnel shall look solely to this section to determine compliance. This section prevails over any conflicting provisions in chapter 475 and in other sections of the Florida Statutes, and shall operate to permit licensed real estate brokers to disburse security deposits and deposit money without having to comply with the notice and settlement procedures contained in s. 475.25(1)(d).

(4) The provisions of this section do not apply to transient rentals by hotels or motels as defined in chapter 509; nor do they apply in those instances in which the amount of rent or deposit, or both, is regulated by law or by rules or regulations of a public body, including public housing authorities and federally administered or regulated housing programs including s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended, other than for rent stabilization. With the exception of subsections (3), (5), and (6), this section is not applicable to housing authorities or public housing agencies created pursuant to chapter 421 or other statutes.

(5) Except when otherwise provided by the terms of a written lease, any tenant who vacates or abandons the premises prior to the expiration of the term specified in the written lease, or any tenant who vacates or abandons premises which are the subject of a tenancy from week to week, month to month, quarter to quarter, or year to year, shall give at least 7 days' written notice by certified mail or personal delivery to the landlord prior to vacating or abandoning the premises which notice shall include the address where the tenant may be reached. Failure to give such notice shall relieve the landlord of the notice requirements of paragraph (3)(a) but shall not waive any right the tenant may have to the security deposit or any part of it.

(6) For the purposes of this part, a renewal of an existing rental agreement shall be considered a new rental agreement, and any security deposit carried forward shall be considered a new security deposit.

(7) Upon the sale or transfer of title of the rental property from one owner to another, or upon a change in the designated rental agent, any and all security deposits or advance rents being held for the benefit of the tenants shall be transferred to the new owner or agent, together with any earned interest and with an accurate accounting showing the amounts to be credited to each tenant account. Upon the transfer of such funds and records to the new owner or agent, and upon transmittal of a written receipt therefor, the transferor is free from the obligation imposed in subsection (1) to hold such moneys on behalf of the tenant. There is a rebuttable presumption that any new owner or agent received the security deposit from the previous owner or agent; however, this presumption is limited to 1 month's rent. This subsection does not excuse the landlord or agent for a violation of other provisions of this section while in possession of such deposits.

(8) Any person licensed under the provisions of s. 509.241, unless excluded by the provisions of this part, who fails to comply with the provisions of this part shall be subject to a fine or to the suspension or revocation of his or her license by the Division of Hotels and Restaurants of the Department of Business and Professional Regulation in the manner provided in s. 509.261.

(9) In those cases in which interest is required to be paid to the tenant, the landlord shall pay directly to the tenant, or credit against the current month's rent, the interest due to the tenant at least once annually. However, no interest shall be due a tenant who wrongfully terminates his or her tenancy prior to the end of the rental term.

History.—s. 1, ch. 69-282; s. 3, ch. 70-360; s. 1, ch. 72-19; s. 1, ch. 72-43; s. 5, ch. 73-330; s. 1, ch. 74-93; s. 3, ch. 74-146; ss. 1, 2, ch. 75-133; s. 1, ch. 76-15; s. 1, ch. 77-445; s. 20, ch. 79-400; s. 21, ch. 82-66; s. 5, ch. 83-151; s. 13, ch. 83-217; s. 3, ch. 87-195; s. 1, ch. 87-369; s. 3, ch. 88-379; s. 2, ch. 93-255; s. 3, ch. 94-218, s. 1372, ch. 95-147; s. 1, ch. 96-146; s. 1, ch. 2001-179; s. 53, ch. 2003-64; s. 3, ch. 2013-136.

Note.—Former s. 83.261

83.50 Disclosure of landlord's address.—In addition to any other disclosure required by law, the landlord, or a person authorized to enter into a rental agreement on the landlord's behalf, shall disclose in writing to the tenant, at or before the commencement of the tenancy, the name and address of the landlord or a person authorized to receive notices and demands in the landlord's behalf. The person so authorized to receive notices and demands retains authority until the tenant is notified otherwise. All notices of such names and addresses or changes thereto shall be delivered to the tenant's residence or, if specified in writing by the tenant, to any other address.

History.—s. 2, ch. 73-330; s. 443, ch. 95-147; s. 5, ch. 2013-136

Landlord (___) (___) and Tenant (___) (___) acknowledge receipt of a copy of this page, which is Page 11 of 18.

**83.51 Landlord's obligation to maintain premises. --**

(1) The landlord at all times during the tenancy shall:

(a) Comply with the requirements of applicable building, housing, and health codes; or

(b) Where there are no applicable building, housing, or health codes, maintain the roofs, windows, doors, floors, steps, porches, exterior walls, foundations, and all other structural components in good repair and capable of resisting normal forces and loads and the plumbing in reasonable working condition. The landlord, at commencement of the tenancy, must ensure that screens are installed in a reasonable condition. Thereafter, the landlord must repair damage to screens once annually, when necessary, until termination of the rental agreement.

The landlord is not required to maintain a mobile home or other structure owned by the tenant. The landlord's obligations under this subsection may be altered or modified in writing with respect to a single-family home or duplex.

(2)(a) Unless otherwise agreed in writing, in addition to the requirements of subsection (1), the landlord of a dwelling unit other than a single-family home or duplex shall, at all times during the tenancy, make reasonable provisions for:

1. The extermination of rats, mice, roaches, ants, wood-destroying organisms, and bedbugs. When vacation of the premises is required for such extermination, the landlord is not liable for damages but shall abate the rent. The tenant must temporarily vacate the premises for a period of time not to exceed 4 days, on 7 days' written notice, if necessary, for extermination pursuant to this subparagraph.
2. Locks and keys.

3. The clean and safe condition of common areas.

4. Garbage removal and outside receptacles therefor.

5. Functioning facilities for heat during winter, running water, and hot water.

(b) Unless otherwise agreed in writing, at the commencement of the tenancy of a single-family home or duplex, the landlord shall install working smoke detection devices. As used in this paragraph, the term "smoke detection device" means an electrical or battery-operated device which detects visible or invisible particles of combustion and which is listed by Underwriters Laboratories, Inc., Factory Mutual Laboratories, Inc., or any other nationally recognized testing laboratory using nationally accepted testing standards.

(c) Nothing in this part authorizes the tenant to raise a noncompliance by the landlord with this subsection as a defense to an action for possession under s. 83.59.

(d) This subsection shall not apply to a mobile home owned by a tenant.

(e) Nothing contained in this subsection prohibits the landlord from providing in the rental agreement that the tenant is obligated to pay costs or charges for garbage removal, water, fuel, or utilities.

(3) If the duty imposed by subsection (1) is the same or greater than any duty imposed by subsection (2), the landlord's duty is determined by subsection (1).

(4) The landlord is not responsible to the tenant under this section for conditions created or caused by the negligent or wrongful act or omission of the tenant, a member of the tenant's family, or other person on the premises with the tenant's consent.

History. --s. 2, ch. 73-330; s. 22, ch. 82-66; s. 4, ch. 87-195; s. 1, ch. 90-133; s. 3, ch. 93-255; s. 444, ch. 95-147; s. 8, ch. 97-95; s. 6, ch. 2013-136.

**83.52 Tenant's obligation to maintain dwelling unit. --** The tenant at all times during the tenancy shall:

(1) Comply with all obligations imposed upon tenants by applicable provisions of building, housing, and health codes.

(2) Keep that part of the premises which he or she occupies and uses clean and sanitary.

(3) Remove from the tenant's dwelling unit all garbage in a clean and sanitary manner.

(4) Keep all plumbing fixtures in the dwelling unit or used by the tenant clean and sanitary and in repair.

(5) Use and operate in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators.

(6) Not destroy, deface, damage, impair, or remove any part of the premises or property therein belonging to the landlord nor permit any person to do so.

(7) Conduct himself or herself, and require other persons on the premises with his or her consent to conduct themselves, in a manner that does not unreasonably disturb the tenant's neighbors or constitute a breach of the peace.

History. --s. 2, ch. 73-330; s. 445, ch. 95-147.

**83.53 Landlord's access to dwelling unit. --**

(1) The tenant shall not unreasonably withhold consent to the landlord to enter the dwelling unit from time to time in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers, or contractors.

(2) The landlord may enter the dwelling unit at any time for the protection or preservation of the premises. The landlord may enter the dwelling unit upon reasonable notice to the tenant and at a reasonable time for the purpose of repair of the premises. "Reasonable notice" for the purpose of repair is notice given at least 12 hours prior to the entry, and reasonable time for the purpose of repair shall be between the hours of 7:20 a.m. and 8:00 p.m. The landlord may enter the dwelling unit when necessary for the further purposes set forth in subsection (1) under any of the following circumstances:

(a) With the consent of the tenant;

(b) In case of emergency;

(c) When the tenant unreasonably withholds consent; or

(d) If the tenant is absent from the premises for a period of time equal to one-half the time for periodic rental payments. If the rent is current and the tenant notifies the landlord of an intended absence, then the landlord may enter only with the consent of the tenant or for the protection or preservation of the premises.

(3) The landlord shall not abuse the right of access nor use it to harass the tenant.

History. --s. 2, ch. 73-330; s. 5, ch. 87-195; s. 4, ch. 93-255; s. 446, ch. 95-147.

Landlord (_____) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 12 of 18.

**83.535 Flotation bedding system; restrictions on use.** —No landlord may prohibit a tenant from using a flotation bedding system in a dwelling unit, provided the flotation bedding system does not violate applicable building codes. The tenant shall be required to carry in the tenant's name flotation insurance as is standard in the industry in an amount deemed reasonable to protect the tenant and owner against personal injury and property damage to the dwelling units. In any case, the policy shall carry a loss payable clause to the owner of the building.
**History.** —s. 7, ch. 82-66; s. 5, ch. 93-255.

**83.54 Enforcement of rights and duties; civil action; criminal offenses.** —Any right or duty declared in this part is enforceable by civil action. A right or duty enforced by civil action under this section does not preclude prosecution for a criminal offense related to the lease or leased property.
**History.** —s. 2, ch. 73-330; s. 7, ch. 2013-136.

**83.55 Right of action for damages.** —If either the landlord or the tenant fails to comply with the requirements of the rental agreement or this part, the aggrieved party may recover the damages caused by the noncompliance.
**History.** —s. 2, ch. 73-330.

**83.56 Termination of rental agreement.** —
**(1)** If the landlord materially fails to comply with s. 83.51(1) or material provisions of the rental agreement within 7 days after delivery of written notice by the tenant specifying the noncompliance and indicating the intention of the tenant to terminate the rental agreement by reason thereof, the tenant may terminate the rental agreement. If the failure to comply with s. 83.51(1) or material provisions of the rental agreement is due to causes beyond the control of the landlord and the landlord has made and continues to make every reasonable effort to correct the failure to comply, the rental agreement may be terminated or altered by the parties, as follows:
**(a)** If the landlord's failure to comply renders the dwelling unit untenantable and the tenant vacates, the tenant shall not be liable for rent during the period the dwelling unit remains uninhabitable.
**(b)** If the landlord's failure to comply does not render the dwelling unit untenantable and the tenant remains in occupancy, the rent for the period of noncompliance shall be reduced by an amount in proportion to the loss of rental value caused by the noncompliance.
**(2)** If the tenant materially fails to comply with s. 83.52 or material provisions of the rental agreement, other than a failure to pay rent, or reasonable rules or regulations, the landlord may:
**(a)** If such noncompliance is of a nature that the tenant should not be given an opportunity to cure it or if the noncompliance constitutes a subsequent or continuing noncompliance within 12 months of a written warning by the landlord of a similar violation, deliver a written notice to the tenant specifying the noncompliance and the landlord's intent to terminate the rental agreement by reason thereof. Examples of noncompliance which are of a nature that the tenant should not be given an opportunity to cure include, but are not limited to, destruction, damage, or misuse of the landlord's or other tenants' property by intentional act or a subsequent or continued unreasonable disturbance. In such event, the landlord may terminate the rental agreement, and the tenant shall have 7 days from the date that the notice is delivered to vacate the premises. The notice shall be in substantially the following form:

You are advised that your lease is terminated effective immediately. You shall have 7 days from the delivery of this letter to vacate the premises. This action is taken because (cite the noncompliance) .
**(b)** If such noncompliance is of a nature that the tenant should be given an opportunity to cure it, deliver a written notice to the tenant specifying the noncompliance, including a notice that, if the noncompliance is not corrected within 7 days from the date that the written notice is delivered, the landlord shall terminate the rental agreement by reason thereof. Examples of such noncompliance include, but are not limited to, activities in contravention of the lease or this part such as having or permitting unauthorized pets, guests, or vehicles; parking in an unauthorized manner or permitting such parking; or failing to keep the premises clean and sanitary. If such noncompliance recurs within 12 months after notice, an eviction action may commence without delivering a subsequent notice pursuant to paragraph (a) or this paragraph. The notice shall be in substantially the following form:

You are hereby notified that (cite the noncompliance) . Demand is hereby made that you remedy the noncompliance within 7 days of receipt of this notice or your lease shall be deemed terminated and you shall vacate the premises upon such termination. If this same conduct or conduct of a similar nature is repeated within 12 months, your tenancy is subject to termination without further warning and without your being given an opportunity to cure the noncompliance.
**(3)** If the tenant fails to pay rent when due and the default continues for 3 days, excluding Saturday, Sunday, and legal holidays, after delivery of written demand by the landlord for payment of the rent or possession of the premises, the landlord may terminate the rental agreement. Legal holidays for the purpose of this section shall be court-observed holidays only. The 3-day notice shall contain a statement in substantially the following form:

You are hereby notified that you are indebted to me in the sum of ______ dollars for the rent and use of the premises (address of leased premises, including county) , Florida, now occupied by you and that I demand payment of the rent or possession of the premises within 3 days (excluding Saturday, Sunday, and legal holidays) from the date of delivery of this notice, to wit: on or before the day of , (year) .

(landlord's name, address and phone number)
**(4)** The delivery of the written notices required by subsections (1), (2), and (3) shall be by mailing or delivery of a true copy thereof or, if the tenant is absent from the premises, by leaving a copy thereof at the residence. The notice requirements of subsections (1), (2), and (3) may not be waived in the lease.
(5)(a) If the landlord accepts rent with actual knowledge of a noncompliance by the tenant or accepts performance by the tenant of any other provision of the rental agreement that is at variance with its provisions, or if the tenant pays rent with actual knowledge of a

Landlord (____) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 13 of 18.

(659 of 1435), Page 659 of 1435 Case: 24-2647, 11/22/2024, DktEntry: 39.1, Page 87 of 292

A-612

noncompliance by the landlord or accepts performance by the landlord of any other provision of the rental agreement that is at variance with its provisions, the landlord or tenant waives his or her right to terminate the rental agreement or to bring a civil action for that noncompliance, but not for any subsequent or continuing noncompliance. However, a landlord does not waive the right to terminate the rental agreement or to bring a civil action for that noncompliance by accepting partial rent for the period. If partial rent is accepted after posting the notice for nonpayment, the landlord must:

1. Provide the tenant with a receipt stating the date and amount received and the agreed upon date and balance of rent due before filing an action for possession;

2. Place the amount of partial rent accepted from the tenant in the registry of the court upon filing the action for possession; or

3. Post a new 3-day notice reflecting the new amount due.

(b) Any tenant who wishes to defend against an action by the landlord for possession of the unit for noncompliance of the rental agreement or of relevant statutes must comply with s. 83.60(2). The court may not set a date for mediation or trial unless the provisions of s. 83.60(2) have been met, but must enter a default judgment for removal of the tenant with a writ of possession to issue immediately if the tenant fails to comply with s. 83.60(2).

(c) This subsection does not apply to that portion of rent subsidies received from a local, state, or national government or an agency of local, state, or national government; however, waivers will occur if an action has not been instituted within 45 days after the landlord obtains actual knowledge of the noncompliance.

(6) If the rental agreement is terminated, the landlord shall comply with s. 83.49(3).

History. —s. 2, ch. 73-330; s. 23, ch. 82-66; s. 6, ch. 83-151; s. 14, ch. 83-217; s. 6, ch. 87-195; s. 6, ch. 93-255; s. 6, ch. 94-170; s. 1373, ch. 95-147; s. 5, ch. 99-6; s. 8, ch. 2013-136.

83.561 Termination of rental agreement upon foreclosure. —
(1) If a tenant is occupying residential premises that are the subject of a foreclosure sale, upon issuance of a certificate of title following the sale, the purchaser named in the certificate of title takes title to the residential premises subject to the rights of the tenant under this section.

(a) The tenant may remain in possession of the premises for 30 days following the date of the purchaser's delivery of a written 30-day notice of termination.

(b) The tenant is entitled to the protections of s. 83.67.

(c) The 30-day notice of termination must be in substantially the following form:

NOTICE TO TENANT OF TERMINATION

You are hereby notified that your rental agreement is terminated on the date of delivery of this notice, that your occupancy is terminated 30 days following the date of the delivery of this notice, and that I demand possession of the premises on   (date)  . If you do not vacate the premises by that date, I will ask the court for an order allowing me to remove you and your belongings from the premises. You are obligated to pay rent during the 30-day period for any amount that might accrue during that period. Your rent must be delivered to (landlord's name and address) .

(d) The 30-day notice of termination shall be delivered in the same manner as provided in s. 83.56(4).

(2) The purchaser at the foreclosure sale may apply to the court for a writ of possession based upon a sworn affidavit that the 30-day notice of termination was delivered to the tenant and the tenant has failed to vacate the premises at the conclusion of the 30-day period. If the court awards a writ of possession, the writ must be served on the tenant. The writ of possession shall be governed by s. 83.62.

(3) This section does not apply if:

(a) The tenant is the mortgagor in the subject foreclosure or is the child, spouse, or parent of the mortgagor in the subject foreclosure.

(b) The tenant's rental agreement is not the result of an arm's length transaction.

(c) The tenant's rental agreement allows the tenant to pay rent that is substantially less than the fair market rent for the premises, unless the rent is reduced or subsidized due to a federal, state, or local subsidy.

(4) A purchaser at a foreclosure sale of a residential premises occupied by a tenant does not assume the obligations of a landlord, except as provided in paragraph (1)(b), unless or until the purchaser assumes an existing rental agreement with the tenant that has not ended or enters into a new rental agreement with the tenant.

History. —s. 1, ch. 2015-96.

83.57 Termination of tenancy without specific term. —A tenancy without a specific duration, as defined in s. 83.46(2) or (3), may be terminated by either party giving written notice in the manner provided in s. 83.56(4), as follows:

(1) When the tenancy is from year to year, by giving not less than 60 days' notice prior to the end of any annual period;

(2) When the tenancy is from quarter to quarter, by giving not less than 30 days' notice prior to the end of any quarterly period;

(3) When the tenancy is from month to month, by giving not less than 15 days' notice prior to the end of any monthly period; and

(4) When the tenancy is from week to week, by giving not less than 7 days' notice prior to the end of any weekly period.

History. —s. 2, ch. 73-330; s. 3, ch. 81-190; s. 15, ch. 83-217.

83.575 Termination of tenancy with specific duration. —
(1) A rental agreement with a specific duration may contain a provision requiring the tenant to notify the landlord within a specified period before vacating the premises at the end of the rental agreement, if such provision requires the landlord to notify the tenant within such notice period if the rental agreement will not be renewed; however, a rental agreement may not require more than 60 days' notice from either the tenant or the landlord.

(2) A rental agreement with a specific duration may provide that if a tenant fails to give the required notice before vacating the premises at the end of the rental agreement, the tenant may be liable for liquidated damages as specified in the rental agreement if the landlord

Landlord ( ___ ) ( ___ ) and Tenant ( ___ ) ( ___ ) acknowledge receipt of a copy of this page, which is Page 14 of 18.

formsimpbey

A-613

provides written notice to the tenant specifying the tenant's obligations under the notification provision contained in the lease and the date the rental agreement is terminated. The landlord must provide such written notice to the tenant within 15 days before the start of the notification period contained in the lease. The written notice shall list all fees, penalties, and other charges applicable to the tenant under this subsection.

(3) If the tenant remains on the premises with the permission of the landlord after the rental agreement has terminated and fails to give notice required under s. 83.57(3), the tenant is liable to the landlord for an additional 1 month's rent.

**History.** --s. 3, ch. 2003-30; s. 1, ch. 2004-375; s. 9, ch. 2013-136.

**83.58 Remedies; tenant holding over.** --If the tenant holds over and continues in possession of the dwelling unit or any part thereof after the expiration of the rental agreement without the permission of the landlord, the landlord may recover possession of the dwelling unit in the manner provided for in s. 83.59. The landlord may also recover double the amount of rent due on the dwelling unit, or any part thereof, for the period during which the tenant refuses to surrender possession.

**History.** --s. 2, ch. 73-330; s. 10, ch. 2013-136.

**83.59 Right of action for possession.** --

(1) If the rental agreement is terminated and the tenant does not vacate the premises, the landlord may recover possession of the dwelling unit as provided in this section.

(2) A landlord, the landlord's attorney, or the landlord's agent, applying for the removal of a tenant, shall file in the county court of the county where the premises are situated a complaint describing the dwelling unit and stating the facts that authorize its recovery. A landlord's agent is not permitted to take any action other than the initial filing of the complaint, unless the landlord's agent is an attorney. The landlord is entitled to the summary procedure provided in s. 51.011, and the court shall advance the cause on the calendar.

(3) The landlord shall not recover possession of a dwelling unit except:

(a) In an action for possession under subsection (2) or other civil action in which the issue of right of possession is determined;

(b) When the tenant has surrendered possession of the dwelling unit to the landlord;

(c) When the tenant has abandoned the dwelling unit. In the absence of actual knowledge of abandonment, it shall be presumed that the tenant has abandoned the dwelling unit if he or she is absent from the premises for a period of time equal to one-half the time for periodic rental payments. However, this presumption does not apply if the rent is current or the tenant has notified the landlord, in writing, of an intended absence; or

(d) When the last remaining tenant of a dwelling unit is deceased, personal property remains on the premises, rent is unpaid, at least 60 days have elapsed following the date of death, and the landlord has not been notified in writing of the existence of a probate estate or of the name and address of a personal representative. This paragraph does not apply to a dwelling unit used in connection with a federally administered or regulated housing program, including programs under s. 202, s. 221(d)(3) and (4), s. 236, or s. 8 of the National Housing Act, as amended.

(4) The prevailing party is entitled to have judgment for costs and execution therefor.

**History.** --s. 2, ch. 73-330; s. 1, ch. 74-146; s. 24, ch. 82-66; s. 1, ch. 92-36; s. 447, ch. 95-147; s. 1, ch. 2007-136; s. 11, ch. 2013-136.

**83.595 Choice of remedies upon breach or early termination by tenant.** --If the tenant breaches the rental agreement for the dwelling unit and the landlord has obtained a writ of possession, or the tenant has surrendered possession of the dwelling unit to the landlord, or the tenant has abandoned the dwelling unit, the landlord may:

(1) Treat the rental agreement as terminated and retake possession for his or her own account, thereby terminating any further liability of the tenant;

(2) Retake possession of the dwelling unit for the account of the tenant, holding the tenant liable for the difference between the rent stipulated to be paid under the rental agreement and what the landlord is able to recover from a reletting, if the landlord retakes possession, the landlord has a duty to exercise good faith in attempting to relet the premises, and any rent received by the landlord as a result of the reletting must be deducted from the balance of rent due from the tenant. For purposes of this subsection, the term "good faith in attempting to relet the premises" means that the landlord uses at least the same efforts to relet the premises as were used in the initial rental or at least the same efforts as the landlord uses in attempting to rent other similar rental units but does not require the landlord to give a preference in renting the premises over other vacant dwelling units that the landlord owns or has the responsibility to rent;

(3) Stand by and do nothing, holding the lessee liable for the rent as it comes due; or

(4) Charge liquidated damages, as provided in the rental agreement, or an early termination fee to the tenant if the landlord and tenant have agreed to liquidated damages or an early termination fee, if the amount does not exceed 2 months' rent, and if, in the case of an early termination fee, the tenant is required to give no more than 60 days' notice, as provided in the rental agreement, prior to the proposed date of early termination. This remedy is available only if the tenant and the landlord, at the time the rental agreement was made, indicated acceptance of liquidated damages or an early termination fee. The tenant must indicate acceptance of liquidated damages or an early termination fee by signing a separate addendum to the rental agreement containing a provision in substantially the following form:

☐ I agree, as provided in the rental agreement, to pay $_____ (an amount that does not exceed 2 months' rent) as liquidated damages or an early termination fee if I elect to terminate the rental agreement, and the landlord waives the right to seek additional rent beyond the month in which the landlord retakes possession.

☐ I do not agree to liquidated damages or an early termination fee, and I acknowledge that the landlord may seek damages as provided by law.

(a) In addition to liquidated damages or an early termination fee, the landlord is entitled to the rent and other charges accrued through the end of the month in which the landlord retakes possession of the dwelling unit and charges for damages to the dwelling unit.

Landlord (_RL_) (____) and Tenant (_NB_) (____) acknowledge receipt of a copy of this page, which is Page 15 of 18.

formsimplicity

A-614

(b) This subsection does not apply if the breach is failure to give notice as provided in s. 83.575.
History. —s. 2, ch. 87-369; s. 4, ch. 88-379; s. 448, ch. 95-147; s. 2, ch. 2001-131.

**83.60 Defenses to action for rent or possession; procedure.** —

(1)(a) In an action by the landlord for possession of a dwelling unit based upon nonpayment of rent or in an action by the landlord under s. 83.55 seeking to recover unpaid rent, the tenant may defend upon the ground of a material noncompliance with s. 83.51(1), or may raise any other defense, whether legal or equitable, that he or she may have, including the defense of retaliatory conduct in accordance with s. 83.64. The landlord must be given an opportunity to cure a deficiency in a notice or in the pleadings before dismissal of the notice.

(b) The defense of a material noncompliance with s. 83.51(1) may be raised by the tenant if 7 days have elapsed after the delivery of written notice by the tenant to the landlord, specifying the noncompliance and indicating the intention of the tenant not to pay rent by reason thereof. Such notice by the tenant may be given to the landlord, the landlord's representative as designated pursuant to s. 83.50, a resident manager, or the person or entity who collects the rent on behalf of the landlord. A material noncompliance with s. 83.51(1) by the landlord is a complete defense to an action for possession based upon nonpayment of rent, and, upon hearing, the court or the jury, as the case may be, shall determine the amount, if any, by which the rent is to be reduced to reflect the diminution in value of the dwelling unit during the period of noncompliance with s. 83.51(1). After consideration of all other relevant issues, the court shall enter appropriate judgment.

(2) In an action by the landlord for possession of a dwelling unit, if the tenant interposes any defense other than payment, including, but not limited to, the defense of a defective 3-day notice, the tenant shall pay into the registry of the court the accrued rent as alleged in the complaint or as determined by the court and the rent that accrues during the pendency of the proceeding, when due. The clerk shall notify the tenant of such requirement in the summons. Failure of the tenant to pay the rent into the registry of the court or to file a motion to determine the amount of rent to be paid into the registry within 5 days, excluding Saturdays, Sundays, and legal holidays, after the date of service of process constitutes an absolute waiver of the tenant's defenses other than payment, and the landlord is entitled to an immediate default judgment for removal of the tenant with a writ of possession to issue without further notice or hearing therein. If a motion to determine rent is filed, documentation in support of the allegation that the rent as alleged in the complaint is in error is required. Public housing tenants or tenants receiving rent subsidies are required to deposit only that portion of the full rent for which they are responsible pursuant to the federal, state, or local program in which they are participating.
History. —s. 2, ch. 73-330; s. 7, ch. 83-151; s. 7, ch. 87-195; s. 7, ch. 93-255; s. 7, ch. 94-170; s. 1374, ch. 95-147; s. 12, ch. 2013-136.

**83.61 Disbursement of funds in registry of court; prompt final hearing.** —When the tenant has deposited funds into the registry of the court in accordance with the provisions of s. 83.60(2) and the landlord is in actual danger of loss of the premises or other personal hardship resulting from the loss of rental income from the premises, the landlord may apply to the court for disbursement of all or part of the funds or for prompt final hearing. The court shall advance the cause on the calendar. The court, after preliminary hearing, may award all or any portion of the funds on deposit to the landlord or may proceed immediately to a final resolution of the cause.
History. —s. 2, ch. 73-330; s. 2, ch. 74-146.

**83.62 Restoration of possession to landlord.** —

(1) In an action for possession, after entry of judgment in favor of the landlord, the clerk shall issue a writ to the sheriff describing the premises and commanding the sheriff to put the landlord in possession after 24 hours' notice conspicuously posted on the premises. Saturdays, Sundays, and legal holidays do not stay the 24-hour notice period.

(2) At the time the sheriff executes the writ of possession or at any time thereafter, the landlord or the landlord's agent may remove any personal property found on the premises to or near the property line. Subsequent to executing the writ of possession, the landlord may request the sheriff to stand by to keep the peace while the landlord changes the locks and removes the personal property from the premises. When such a request is made, the sheriff may charge a reasonable hourly rate, and the person requesting the sheriff to stand by to keep the peace shall be responsible for paying the reasonable hourly rate set by the sheriff. Neither the sheriff nor the landlord or the landlord's agent shall be liable to the tenant or any other party for the loss, destruction, or damage to the property after it has been removed.
History. —s. 2, ch. 73-330; s. 3, ch. 82-66; s. 5, ch. 88-379; s. 8, ch. 94-170; s. 1375, ch. 95-147; s. 2, ch. 96-146; s. 13, ch. 2013-136.

**83.625 Power to award possession and enter money judgment.** —In an action by the landlord for possession of a dwelling unit based upon nonpayment of rent, if the court finds the rent is due, owing, and unpaid and by reason thereof the landlord is entitled to possession of the premises, the court, in addition to awarding possession of the premises to the landlord, shall direct, in an amount which is within its jurisdictional limitations, the entry of a money judgment with costs in favor of the landlord and against the tenant for the amount of money found due, owing, and unpaid by the tenant to the landlord. However, no money judgment shall be entered unless service of process has been effected by personal service or, where authorized by law, by certified or registered mail, return receipt, or in any other manner prescribed by law or the rules of the court; and no money judgment may be entered except in compliance with the Florida Rules of Civil Procedure. The prevailing party in the action may also be awarded attorney's fees and costs.
History. —s. 1, ch. 75-147; s. 8, ch. 87-195; s. 6, ch. 88-379.

**83.63 Casualty damage.** —If the premises are damaged or destroyed other than by the wrongful or negligent acts of the tenant so that the enjoyment of the premises is substantially impaired, the tenant may terminate the rental agreement and immediately vacate the premises. The tenant may vacate the part of the premises rendered unusable by the casualty, in which case the tenant's liability for rent shall be reduced by the fair rental value of that part of the premises damaged or destroyed. If the rental agreement is terminated, the landlord shall comply with s. 83.49(3).
History. —s. 2, ch. 73-330; s. 449, ch. 95-147; s. 14, ch. 2013-136.

**83.64 Retaliatory conduct.** —

(1) It is unlawful for a landlord to discriminatorily increase a tenant's rent or decrease services to a tenant, or to bring or threaten to bring an action for possession or other civil action, primarily because the landlord is retaliating against the tenant. In order for the tenant

Landlord ( ____ ) ( ____ ) and Tenant( ____ ) ( ____ ) acknowledge receipt of a copy of this page, which is Page 18 of 18.

A-615

to raise the defense of retaliatory conduct, the tenant must have acted in good faith. Examples of conduct for which the landlord may not retaliate include, but are not limited to, situations where:

(a) The tenant has complained to a governmental agency charged with responsibility for enforcement of a building, housing, or health code of a suspected violation applicable to the premises;

(b) The tenant has organized, encouraged, or participated in a tenant organization;

(c) The tenant has complained to the landlord pursuant to s. 83.56(1);

(d) The tenant is a servicemember who has terminated a rental agreement pursuant to s. 83.682;

(e) The tenant has paid rent to a condominium, cooperative, or homeowners' association after demand from the association in order to pay the landlord's obligation to the association; or

(f) The tenant has exercised his or her rights under local, state, or federal fair housing laws.

(2) Evidence of retaliatory conduct may be raised by the tenant as a defense in any action brought against him or her for possession.

(3) In any event, this section does not apply if the landlord proves that the eviction is for good cause. Examples of good cause include, but are not limited to, good faith actions for nonpayment of rent, violation of the rental agreement or of reasonable rules, or violation of the terms of this chapter.

(4) "Discrimination" under this section means that a tenant is being treated differently as to the rent charged, the services rendered, or the action being taken by the landlord, which shall be a prerequisite to a finding of retaliatory conduct.

History. --s. 8, ch. 83-151; s. 450, ch. 95-147; s. 3, ch. 2003-72; s. 15, ch. 2013-136

**83.67 Prohibited practices. --**

(1) A landlord of any dwelling unit governed by this part shall not cause, directly or indirectly, the termination or interruption of any utility service furnished the tenant, including, but not limited to, water, heat, light, electricity, gas, elevator, garbage collection, or refrigeration, whether or not the utility service is under the control of, or payment is made by, the landlord.

(2) A landlord of any dwelling unit governed by this part shall not prevent the tenant from gaining reasonable access to the dwelling unit by any means, including, but not limited to, changing the locks or using any bootlock or similar device.

(3) A landlord of any dwelling unit governed by this part shall not discriminate against a servicemember in offering a dwelling unit for rent or in any of the terms of the rental agreement.

(4) A landlord shall not prohibit a tenant from displaying one portable, removable, cloth or plastic United States flag, not larger than 4 1/2 feet by 6 feet, in a respectful manner in or on the dwelling unit regardless of any provision in the rental agreement dealing with flags or decorations. The United States flag shall be displayed in accordance with s. 83.52(6). The landlord is not liable for damages caused by a United States flag displayed by a tenant. Any United States flag may not infringe upon the space rented by any other tenant.

(5) A landlord of any dwelling unit governed by this part shall not remove the outside doors, locks, roof, walls, or windows of the unit except for purposes of maintenance, repair, or replacement; and the landlord shall not remove the tenant's personal property from the dwelling unit unless such action is taken after surrender, abandonment, recovery of possession of the dwelling unit due to the death of the last remaining tenant in accordance with s. 83.59(3)(d), or a lawful eviction. If provided in the rental agreement or a written agreement separate from the rental agreement, upon surrender or abandonment by the tenant, the landlord is not required to comply with s. 715.104 and is not liable or responsible for storage or disposition of the tenant's personal property; if provided in the rental agreement, there must be printed or clearly stamped on such rental agreement a legend in substantially the following form:

BY SIGNING THIS RENTAL AGREEMENT, THE TENANT AGREES THAT UPON SURRENDER, ABANDONMENT, OR RECOVERY OF POSSESSION OF THE DWELLING UNIT DUE TO THE DEATH OF THE LAST REMAINING TENANT, AS PROVIDED BY CHAPTER 83, FLORIDA STATUTES, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY.

For the purposes of this section, abandonment shall be as set forth in s. 83.59(3)(c).

(6) A landlord who violates any provision of this section shall be liable to the tenant for actual and consequential damages or 3 months' rent, whichever is greater, and costs, including attorney's fees. Subsequent or repeated violations that are not contemporaneous with the initial violation shall be subject to separate awards of damages.

(7) A violation of this section constitutes irreparable harm for the purposes of injunctive relief.

(8) The remedies provided by this section are not exclusive and do not preclude the tenant from pursuing any other remedy at law or equity that the tenant may have. The remedies provided by this section shall also apply to a servicemember who is a prospective tenant who has been discriminated against under subsection (3).

History. --s. 3, ch. 87-369; s. 7, ch. 88-379; s. 3, ch. 90-133; s. 3, ch. 96-146; s. 2, ch. 2001-179; s. 2, ch. 2003-30; s. 4, ch. 2003-72; s. 1, ch. 2004-236; s. 2, ch. 2007-136.

**83.681 Orders to enjoin violations of this part. --**

(1) A landlord who gives notice to a tenant of the landlord's intent to terminate the tenant's lease pursuant to s. 83.56(2)(a), due to the tenant's intentional destruction, damage, or misuse of the landlord's property may petition the county or circuit court for an injunction prohibiting the tenant from continuing to violate any of the provisions of that part.

(2) The court shall grant the relief requested pursuant to subsection (1) in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases.

(3) Evidence of a tenant's intentional destruction, damage, or misuse of the landlord's property in an amount greater than twice the value of money deposited with the landlord pursuant to s. 83.49 or $300, whichever is greater, shall constitute irreparable harm for the purposes of injunctive relief.

History. --s. 8, ch. 93-255; s. 454, ch. 95-147.

Landlord (____) (____) and Tenant (____) (____) acknowledge receipt of a copy of this page, which is Page 17 of 18.

Serial# 047734-002440-6820708

formsimplicity

A-616

83.682 Termination of rental agreement by a servicemember. —

(1) Any servicemember may terminate his or her rental agreement by providing the landlord with a written notice of termination to be effective on the date stated in the notice that is at least 30 days after the landlord's receipt of the notice if any of the following criteria are met:

(a) The servicemember is required, pursuant to a permanent change of station orders, to move 35 miles or more from the location of the rental premises;

(b) The servicemember is prematurely or involuntarily discharged or released from active duty or state active duty;

(c) The servicemember is released from active duty or state active duty after having leased the rental premises while on active duty or state active duty status and the rental premises is 35 miles or more from the servicemember's home of record prior to entering active duty or state active duty;

(d) After entering into a rental agreement, the servicemember receives military orders requiring him or her to move into government quarters or the servicemember becomes eligible to live in and opts to move into government quarters;

(e) The servicemember receives temporary duty orders, temporary change of station orders, or state active duty orders to an area 35 miles or more from the location of the rental premises, provided such orders are for a period exceeding 60 days; or

(f) The servicemember has leased the property, but prior to taking possession of the rental premises, receives a change of orders to an area that is 35 miles or more from the location of the rental premises.

(2) The notice to the landlord must be accompanied by either a copy of the official military orders or a written verification signed by the servicemember's commanding officer.

(3) In the event a servicemember dies during active duty, an adult member of his or her immediate family may terminate the servicemember's rental agreement by providing the landlord with a written notice of termination to be effective on the date stated in the notice that is at least 30 days after the landlord's receipt of the notice. The notice to the landlord must be accompanied by either a copy of the official military orders showing the servicemember was on active duty or a written verification signed by the servicemember's commanding officer and a copy of the servicemember's death certificate.

(4) Upon termination of a rental agreement under this section, the tenant is liable for the rent due under the rental agreement prorated to the effective date of the termination payable at such time as would have otherwise been required by the terms of the rental agreement. The tenant is not liable for any other rent or damages due to the early termination of the tenancy as provided for in this section. Notwithstanding any provision of this section to the contrary, if a tenant terminates the rental agreement pursuant to this section 14 or more days prior to occupancy, no damages or penalties of any kind will be assessable.

(5) The provisions of this section may not be waived or modified by the agreement of the parties under any circumstances.

History. —s. 6, ch. 2001-179; s. 1, ch. 2002-4; s. 1, ch. 2003-30; s. 5, ch. 2003-72.

Landlord ( ___ ) ( ___ ) and Tenant ( ___ ) ( ___ ) acknowledge receipt of a copy of this page, which is Page 18 of 18.

formsimple.tv

A-617

## Lease Rider

Reference is made to the Lease between Randy Scott Geiber ("Landlord" or "Owner") and Josh Wander ("Tenant" or "You") for 1413 Sunset Harbour Drive, Apt 212, Miami Beach, FL 33139 ("the Apartment") from July 1, 2016 to June 30, 2017. Landlord and Tenant hereby agree to incorporate the following terms and conditions into the Lease.

1. **Use of the Apartment**

    The Apartment is for the sole use of Josh Wander and his immediate family. Use of the Apartment by any other parties without the written approval of the Owner is not permitted. The Apartment may not be sub-let without the express written consent of the Landlord, not to be unreasonably withheld, and prior approval of the Condo Association

2. **Rent**

    Your monthly rent for the Apartment shall be as follows:

    | Monthly Rent: | Period: |
    |---|---|
    | $10,000 | 7/1/16-6/30/17 |

    Unless otherwise instructed by Landlord, Monthly Rent and additional charges (after the amounts due upon execution of this Lease) shall be paid by wire, ACH or electronic transfer to:

    | | |
    |---|---|
    | Bank: | HSBC, NA, Miami Beach, FL |
    | ABA/Routing: | 067009390 |
    | Account: | ▉▉▉▉▉ |
    | Account: | Randy S. Geiber |
    | Address: | 260 W Broadway, Apt 8-9G, New York, NY 10013 |

    , or to another account designated from time to time by Landlord on at least thirty (30) days' advance notice to Tenant. At Tenant's option, Tenant may deposit a physical check at HSBC to the above account in lieu of electronic payment.

    Rent is due on the 1st day of the month. A penalty, payable with the next month's rent, of $250 will be charged for any payments received after the 5th day of the month. Any rent overdue for more than 30-days will accrue interest at the rate of 1% per month.

3. **Security Deposit and any Advance rents will be held in a non-interest bearing account.**

4. **Holding Over**

    If You hold over in possession of the Apartment after the expiration or sooner termination of the term of this Lease, such holding over shall not be deemed to extend the term or renew the Lease, but such holding over hereafter shall continue upon the covenants and conditions herein set forth except that the charge for use and occupancy of such holding over for each calendar month or part thereof (even if such part shall be a small fraction of a calendar month) shall be the sum of:

    a.  The Monthly Rent set forth in the Lease, times 2, plus

    Page 1 of 3 – Rider to Lease for 1413 Sunset Harbour Dr, Apt 212, Miami Beach, FL 33139

A-618

b.    1/12 of all other items of additional rent, which total sum You agree to pay Owner promptly upon demand, in full, without set-off or deduction. Neither the billing nor the collection of use and occupancy in the above amount shall be deemed a waiver or any right of Owner to collect damages for your failure to vacate the Apartment after the expiration or sooner termination of this Lease. The aforesaid provisions of the paragraph are fair and reasonable, do not constitute a penalty and shall survive the expiration or sooner termination of this Lease.

5.  Payments by the Landlord

If the Tenant fails to comply with the terms of the Lease, the Landlord may take any required action and charge the cost, including reasonable attorney fees to the Tenant as additional rent. Failure to pay such additional rent upon demand is a violation of the Lease.

6.  Insurance

You shall obtain and maintain during the Lease term, including any holdover term, liability insurance against all claims on account of personal injury and property damage for which You may become liable as a result of the use or occupancy of the Apartment by You or the Permitted Occupants of the facilities and common elements of the Condominium, with limits not less than $2,000,000 with respect to personal injury to, or the death of, any one or number of persons arising out of any occurrence, and (b) $1,000,000 per occurrence with respect to any instance of property damage. You shall provide Owner with a certificate of insurance naming Owner as an additional insured within 30 days of occupancy evidencing compliance. Failure to do so will be a violation of the lease.

7.  Electronic Format and Notices

This Lease and Rider may be executed in one or more counterparts. Execution and delivery of the parties' signatures by email in "PDF" format shall be valid and binding. All Notices to You will be made by email to joshwander@gmail.com and to Landlord at randy.gelber@gmail.com.

8.  Extension Term

A. You shall have the right to extend the term of this Lease for one (1) year commencing July 1, 2017 and ending on June 30, 2018 (the "Extension Term") provided (i) You must give Owner notice (the "Extension Notice") of your election to extend the term of the Lease; (ii) the Extension Notice must be given to the Owner at least 60 days prior to the ending date of the Lease, time being of the essence as to the giving of the Extension Notice; and (iii) You may not be in default of any provisions of the Lease when the Extension Notice is given and on the commencement date of the Extension Term. If you fail to send the Extension Notice by the date specified herein, this Article of the Rider shall be of no further force and effect.

B. The monthly rent payable by You during the Extension Term shall be $10,500.

C. All provisions of this Lease, except as modified by this Article of the Rider, shall remain in full force and effect during the Extension Term.

9.  Showing of the Apartment

Owner may show the Apartment and do any necessary work during reasonable hours at the Owner's sole discretion in the last two (2) months of the Lease with 24 hour email or telephone notice to You. You agree to

A-619

keep the apartment in reasonably clean condition during this time period otherwise Owner may have the apartment cleaned at Your expense.

### 10. Storage

Owner will keep 2 bicycles, a number of items from the renovation of the Apartment (paint, extra tile, etc) and a limited number of boxes with personal items in the storage room. Owner will provide You with code to the storage room. You may use any unused space to store permitted items. You have no liability for these items under any circumstances. You may also use the bicycles, provided Owner assumes no liability for use thereof and they are returned in similar condition.

### 11. Home Automation and Alarm System

The Apartment is equipped with a Home Automation System by Control4. Owner is not responsible for providing technical support, maintenance or any repairs to the system. Landlord will provide all necessary passwords and instructions on how to use the system. Landlord will also make sure it is in full working order at the inception of the Lease. You may obtain a service plan from Mr. Kevin Reid at TeckChoice (954-793-7483) if desired. The Apartment also has an alarm contract with AlarmNet secure at a cost of $125/quarter ($500/annum). Landlord will pay the cost of the alarm contract directly and deduct such cost from the security deposit at the end of the Lease.

### 12. Personal Property

A full Inventory of the furniture remaining in the apartment and current condition will be provided by Owner prior to the commencement of the Lease Term. You agree to take reasonable care of the items and leave them in proper working condition.

### 13. Validity of Lease

If a clause or provision of the Lease or Rider is invalid, the rest of the Lease and Rider remains in effect.

### 14. Conflict

Nothing contained herein shall be interpreted to otherwise enlarge, diminish, or modify any rights, duties, or obligations under said lease other than specifically stated in this Rider. In the event of conflict, between this Rider and the contract, the Rider shall control, to the extent allowable by law.

Signatures:

_Randy S. Gelber, Owner_

Date: 6/22/16

_Josh Wander, Tenant_

Date: 6/22/16

A-620

# LEASE EXTENSION ADDENDUM

### April 12, 2018

Reference is made to the original Lease Agreement ("the Agreement") signed June 22, 2016 between Joshua Wander ("Tenant") and Randy S. Gelber ("Landlord") where Tenant agreed to rent and Landlord agreed to lease 1413 Sunset Harbour Drive, Apt 212, Miami Beach, FL 33139 ("the Apartment") for the term July 1, 2016 through June 30, 2017. The Agreement expired on June 30, 2017 and Tenant has remained in the Apartment on a mutually agreeable month-to-month basis since that time at rent of $10,000 per month.

Landlord and Tenant, in consideration of the mutual covenants contained herein and other good and valuable consideration, now wish to formally extend the Agreement through April 30, 2019.

All other terms of the Agreement remain the same (including the rent which will continue to be $10,000 per month) with the exception of clause 8 of the Lease Rider to the Agreement which is no longer applicable. Landlord acknowledges that Tenant has already paid for the month of April 2018, so the first payment due will be May 1, 2018.

Executed this 12th day of April 2018:

_____

Joshua Wander, Tenant

4/16/2018
_____
Date

_____

Randy S. Gelber, Landlord

April 12, 2018
_____
Date



A-621

---------- Forwarded message ----------
From: **Josh Wander** <jwander@777part.com>
Date: Wed, Mar 27, 2019 at 17:53
Subject: Re: Lease Extension
To: Randy Gelber <randy.gelber@gmail.com>

HI Randy - rent was sent today. Confirmed on extension. Trade talks begin today ?

**Joshua Wander**
Managing Partner
(w) 212-537-8807
(m) 954-665-4335
600 Brickell Ave, 19th floor | Miami, FL 33131
777part.com

On Mar 27, 2019, at 4:43 PM, Randy Gelber <randy.gelber@gmail.com> wrote:

Josh - Hope you are well. As per our conversation, I attach the last Lease Extension from April 12, 2018 which extended the original Lease Agreement signed June 22, 2016 until April 30, 2019. As per our conversation, this email serves as confirmation of our Agreement to further extend the Lease an additional six (6) months to October 31, 2019. The rent remains $10,000/month. Kindly confirm by return email that you are in agreement.

Also, I would appreciate if you could take care of the March & April 2019 rent at your earliest convenience.

Regards, Randy

_____

Randy S. Gelber
+852-5223-5151 (HK)
+86-139-1147-0996 (PRC)
+1-917-259-5041 (US)
<20180507074651519.pdf>
--

_____

Randy S Gelber
+1-919-971-7777

A-622

# LEASE EXTENSION

June 3, 2020

Reference is made to the original Lease Agreement and Lease Rider ("the Agreement") signed June 22, 2016 between Joshua Wander ("Tenant") and Randy Gelber ("Landlord") where Tenant agreed to rent and Landlord agreed to lease 1413 Sunset Harbour Drive, Apt 212, Miami Beach, FL 33139 ("the Apartment") for the term July 1, 2016 through June 30, 2017. The Agreement expired on June 30, 2017 and Tenanat has remained in the Apartment with a mutually agreeable month-to-month basis and various short term extensions since that time at a rent of $10,000 per month.

Landlord and Tenant, in consideration of the mutual covenants contained herein and other good and valuable consideration including payment of the June 2020 rent, now wish to formally extend the Agreement through September 30, 2020.

All other terms of the Agreement remain the same (including the rent which will continue to be $10,000 per month) with the exception of clause 8 of the Lease Rider to the Agreement which is no longer applicable.

Executed this 3rd day of June 2020:

_____                    June 3, 2020
Randy Gelber, Landlord                      Date

_____                    _____
Joshua Wander, Tenant                       Date

A-623

## LEASE EXTENSION

### September 2, 2020

Reference is made to the original Lease Agreement and Lease Rider ("the Agreement") signed June 22, 2016 between Joshua Wander ("Tenant") and Randy Gelber ("Landlord") where Tenant agreed to rent and Landlord agreed to lease 1413 Sunset Harbour Drive, Apt 212, Miami Beach, FL 33139 ("the Apartment") for the term July 1, 2016 through June 30, 2017. The Agreement expired on June 30, 2017 and Tenant has remained in the Apartment with a mutually agreeable month-to-month basis and various short term extensions since that time at a rent of $10,000 per month.

Landlord and Tenant, in consideration of the mutual covenants contained herein and other good and valuable consideration including payment of the September 2020 rent, now wish to formally extend the Agreement through March 31, 2021.

All other terms of the Agreement remain the same (including the rent which will continue to be $10,000 per month) with the exception of clause 8 of the Lease Rider to the Agreement which is no longer applicable.

Randy S Gelber (Sep 5, 2020 21:17 EDT)

Randy Gelber, Landlord

Sep 5, 2020

Date

Joshua wander (Sep 9, 2020 08:49 EDT)

Joshua Wander, Tenant

Sep 9, 2020

Date

A-624

# Lease Extension to March 2021

Final Audit Report                                        2020-09-09

| | |
|---|---|
| Created: | 2020-09-06 |
| By: | Randy S Gelber (randy.gelber@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAgwVZ9r5FjHk4Fn8TcU_KSI8cPV_HMbc8 |

## "Lease Extension to March 2021" History

📄 Document created by Randy S Gelber (randy.gelber@gmail.com)
2020-09-06 - 1:16:07 AM GMT- IP address: 24.163.50.24

✍️ Document e-signed by Randy S Gelber (randy.gelber@gmail.com)
Signature Date: 2020-09-06 - 1:17:07 AM GMT - Time Source: server- IP address: 24.163.50.24

✉️ Document emailed to joshua wander (jwander@777part.com) for signature
2020-09-06 - 1:17:09 AM GMT

📄 Email viewed by joshua wander (jwander@777part.com)
2020-09-09 - 12:48:38 PM GMT- IP address: 38.107.82.100

✍️ Document e-signed by joshua wander (jwander@777part.com)
Signature Date: 2020-09-09 - 12:49:05 PM GMT - Time Source: server- IP address: 38.107.82.100

✅ Signed document emailed to joshua wander (jwander@777part.com) and Randy S Gelber
(randy.gelber@gmail.com)
2020-09-09 - 12:49:05 PM GMT

 Adobe Sign

A-625

# EXHIBIT M

A-626

FILED: NEW YORK COUNTY CLERK 04/21/2023 04:39 PM          INDEX NO. 651975/2023
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 04/21/2023

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
---------------------------------------------------------------x
                          :

THE OXBRIDGE GROUP, LTD         :

                          :       Index No.
            Plaintiff,     :

                          :
           v.              :

                          :       **COMPLAINT**
777 PARTNERS, LLC,           :

                          :
                          :
           Defendant.   :
---------------------------------------------------------- X

      Plaintiff, The Oxbridge Group, LTD ("Oxbridge" or "Plaintiff"), for its claims against

Defendant 777 Partners, LLC ("777" or "Defendant") avers and alleges as follows:

<div align="center"><strong>NATURE OF THE ACTION</strong></div>

      1.    Oxbridge brings this complaint to assert a claim for breach of contract against 777.

Specifically, Oxbridge entered into a contract with 777 whereby it would provide certain talent

placement services in exchange for certain fees.  However, after Oxbridge placed three candidates

with 777, and 777 acknowledged its obligation to pay Oxbridge its fees by the deadline of August

10, 2022, 777 "slow-rolled" Oxbridge by making only occasional payments against the obligation

and now, even worse, has ignored Oxbridge entirely, despite threats of litigation, and has brazenly

refused to pay the outstanding balance of $94,000, without any explanation, let alone a legal

justification.

<div align="center"><strong>PARTIES AND JURISDICTION</strong></div>

      2.    Oxbridge is a New York corporation headquartered in New York, New York.

Oxbridge is an executive search firm dedicated to identifying and recruiting top investment

professionals for the buy-side and select corporate roles.

<div align="center">1</div>

PHIL1 8605569v.1

A-627

3.      Upon information and belief, 777 Partners is a limited liability company with an office in White Plains, New York.

## FACTS

### A.  Oxbridge's Contract With 777

4.      Oxbridge engaged 777 to refer candidates for certain positions pursuant to a written contract executed January 31, 2022 (the "Engagement Letter").

5.      A true and correct copy of the Engagement Letter is attached as Exhibit A.

6.      Pursuant to the Engagement Letter, 777 hired Oxbridge to identify candidates for two Associate, two Senior Associate and two Vice President positions, each working out of 777's office in White Plains.

7.      Oxbridge was entitled to, among other things, a fee equal to one third of each hired candidate's first year total cash compensation, inclusive of all bonuses and incentives.

8.      In advance of earning a placement fee, 777 was also required to pay an upfront retainer.

9.      777 paid Oxbridge a $30,000 retainer.

### B.  777 Hires Candidates Referred by Oxbridge

10.      Oxbridge conducted a search for potential applicants which led to the referral of certain candidates for 777's open positions.

11.      777 eventually hired three of the candidates presented by Oxbridge (the "Hired Candidates").

12.      Each of the Hired Candidates began working on August 1, 2022.

13.      The total first year compensation of the Hired Candidates was $880,000.

14.      Oxbridge was therefore entitled to a fee equal to one third of $880,000, which is $293,333.

A-628

FILED: NEW YORK COUNTY CLERK 04/21/2023 04:39 PM    INDEX NO. 651975/2023
NYSCEF DOC. NO. 2                                      RECEIVED NYSCEF: 04/21/2023

15.    777 paid Oxbridge a $30,000 upfront retainer.

16.    777 therefore owed Oxbridge an additional $263,333 for the Hired Candidates (the "Placement Fee").

17.    The Engagement Letter required payment to Oxbridge within ten business days of each candidate commencing employment.

18.    The Placement Fee was due not later than August 15, 2022.

19.    Oxbridge presented 777 with numerous statements of account and demands for payment of the Placement Fee.

20.    777 has never disputed that it owed the Placement Fee to Oxbridge.

21.    Indeed, 777 repeatedly acknowledged the Placement Fee was due and owing.

22.    From October 27, 2022, through January 31, 2023, 777 made a series of payments towards the Placement Fee.

23.    In total, 777 paid $169,333 of the Placement Fee to Oxbridge.

24.    Specifically, 777 made the following payments to Oxbridge on the following dates:

   a.   October 27, 2022 - $25,000

   b.   November 4, 2022 - $10,000

   c.   November 9, 2022 - $10,000

   d.   November 18, 2022 - $10,000

   e.   December 19, 2022 - $5,000

   f.   December 20, 2022 - $15,000

   g.   December 23, 2022 - $18,333

   h.   January 4, 2023 - $15,000

   i.   January 11, 2023 - $15,000

A-629

FILED: NEW YORK COUNTY CLERK 04/21/2023 04:39 PM
NYSCEF DOC. NO. 2

INDEX NO. 651975/2023
RECEIVED NYSCEF: 04/21/2023

Case 1:24-cv-03453-JGK    Document 61-13    Filed 05/13/24    Page 5 of 6

      j.   January 31, 2023 - $50,000

     25.   Without explanation or legal justification, 777 stopped making payments and stopped responding to Oxbridge's demands for payment.

     26.   777 has a remaining balance due of $94,000.

     27.   Oxbridge fully performed all obligations under the Engagement Letter and satisfied all conditions precedent to payment.

## CLAIM

### Breach of Contract

     28.   Oxbridge incorporates by reference herein the foregoing paragraphs and allegations as if restated in full.

     29.   777 and Oxbridge entered into the Engagement Letter, which is a valid and enforceable written contract.

     30.   777 was required to pay Oxbridge the Placement Fee not later than August 15, 202.

     31.   777 breached the Engagement Letter by failing to pay the Placement Fee in full as and when due.

     32.   To date, 777 has paid Oxbridge $169,333 of the Placement Fee and therefore owes Oxbridge an additional $94,000.

     33.   Based upon the foregoing, Oxbridge suffered damages as a result of 777 breaches of contract equal to $94,000.

     34.   Oxbridge further seeks to recover 9% simple interest upon all unpaid amounts from the date of the breach until the date Oxbridge receives payment.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in Plaintiff's favor and against Defendant, containing the following relief:

FILED: NEW YORK COUNTY CLERK 04/21/2023 04:39 PM          INDEX NO. 651975/2023
NYSCEF DOC. NO. 2                                         RECEIVED NYSCEF: 04/21/2023

A. A judgment awarding damages against Defendant, and in favor of Plaintiff, for $94,000

plus interest at New York's statutory rate of 9% simple interest on the unpaid balance of

the Placement Fee that is, or was then, outstanding for any period of time on or after August

15, 2023 and continuing until it is paid in full; and

B. Such other and further relief as the Court may deem just and proper.


Dated: April 21, 2023                **KLEHR HARRISON HARVEY BRANZBURG LLP**
New York, NY


By:      */s/ Matthew J. McDonald*_____
         Matthew J. McDonald, Esq.
         5 Penn Plaza, Suite 2353
         New York, NY 10001
         (215) 569-4287
         mmcdonald@klehr.com

         *Counsel for The Oxbridge Group, Ltd.*

A-631

# EXHIBIT N

A-632

EFiled: Jan 19 2024 04:03PM EST
Transaction ID 71834503
Case No. 2023-0987-BWD

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TIMOTHY JAMES O'NEIL-DUNNE and )
MALT FAMILY TRUST, )
)
        Plaintiffs, )
)
    v. )    C.A. No. 2023-0987-BWD
)
PHOENICIA LLC, a Delaware Limited )
Liability Company, )
)
        Defendant. )
)

## VERIFIED AMENDED COMPLAINT PURSUANT TO 6 *DEL. C.* § 18-305

Plaintiffs Timothy James O'Neil-Dunne ("O'Neil-Dunne") and MALT

Family Trust ("MALT"), by and through their undersigned counsel, state as

follows as and for their complaint against Defendant Phoenicia LLC ("Phoenicia")

to compel the production of certain books and records pursuant to 6 *Del. C.*

§ 18-305.

## INTRODUCTION

1.    O'Neil-Dunne is a manager of Phoenicia.  MALT is a member of

Phoenicia.[1]

2.    O'Neil-Dunne and MALT bring this action to compel Phoenicia to

provide books and records of its business operations as required by Delaware law.

---

[1] O'Neil-Dunne is also a member of Phoenicia, but Phoenicia disputes his interest.
For simplicity O'Neil-Dunne brings this action solely in his capacity as a manager.

A-633

Phoenicia has failed and refused to provide this basic information in defiance of its legal obligations.  If Phoenicia were conducting legitimate business, it would be maintaining the books and records it is required by law to keep.  It would easily be able to furnish copies of these records to O'Neil-Dunne and MALT, particularly after statutory demands were made repeatedly.  Phoenicia's ongoing refusal to comply with basic record-keeping obligations and refusal to provide materials to O'Neil-Dunne and MALT can only be for the purpose of hiding improper activities.  Assets and even whole entities move and disappear at whim without documentation or support and without approval by, or even notice to, the Board.  Ownership and hierarchies of affiliated business entities change without notice or explanation.  High managerial positions are filled and replaced without board approval.  Phoenicia's refusal to keep or provide copies of fundamental books and records is at the direction of Phoenicia's parent company, 777 Partners LLC ("777"), and its managers including Josh Wander, Steve Pasko and Adam Weiss.

3.    O'Neil-Dunne and MALT need to learn the sources of funds flowing into Phoenicia and its related entities to ensure that those sources are legitimate and that the funds are being invested legally and comply with legal and regulatory requirements of Phoenicia and its subsidiaries, particularly in the lawful operation of airlines.  O'Neil-Dunne and MALT also need the documents to investigate 777 starting up new aviation businesses outside of Phoenicia and changing the

2

A-634

ownership of Phoenicia and its subsidiaries without informing the Board. O'Neil-Dunne and MALT are also concerned that executives of Phoenicia subsidiaries may not be receiving compensation to which they are entitled. Finally, O'Neil-Dunne and MALT wish to investigate the myriad interested transactions 777 has caused Phoenicia and its subsidiaries to enter into, including improper use of aviation assets and transactions between 777 and Phoenicia subsidiaries that are not disclosed to or approved by the Phoenicia board and are not fair to Phoenicia. Any such transactions would constitute dishonest acts by 777.

4.    O'Neil-Dunne and MALT seek to investigate, through their statutory demands for company books and records set forth below, (i) whether assets or funds of Phoenicia and its subsidiaries have been misappropriated by 777 and used for 777's own economic gain; and (ii) whether assets of Phoenicia and its subsidiaries are distressed, and if so, the reasons therefore and the current status of such assets. These questions are particularly important given the highly regulated nature of the aviation business. Actions such as moving funds between an aviation company and an unrelated business, such as a sports business, can create serious legal consequences for Phoenicia and its subsidiaries.

5.    O'Neil-Dunne and MALT's concerns about the lack of transparency on the part of Phoenicia and 777 have become more urgent in light of public reports of mismanagement and/or malfeasance by 777:

3

A-635

a. Media reports state that 777 has agreed to purchase over 90% of an English football club, Everton, for almost $700 million or more. Public reports have questioned where that money is coming from. Alarmingly, a Forbes reporter tweeted that 777 might be buying Everton with Columbian drug money. *E.g.*, https://twitter.com/MikeOzanian/status/1705208966484000920?s=20

b. Media reports have indicated that four airplanes owned and operated by a subsidiary of Phoenicia were repossessed by a lender. *E.g.*, https://www.businessinsider.com/flair-airlines-planes-repossessed-ceo-blames-conspiracy-2023-5. Public records also show that four other airplanes are the subject of a $30 million lawsuit in England alleging a failure to make lease payments. No information about the repossession or the lawsuit has been provided to Plaintiffs by Phoenicia.

c. Public records show that last month, another subsidiary of Phoenicia was subject to compulsory dissolution in Denmark. *E.g.* https://datacvr.virk.dk/enhed/virksomhed/38933884?fritekst=Worldticket&sideIndex=0&size=10. No information about the dissolution has been provided to Plaintiffs by Phoenicia.

4

A-636

6.    As a matter of corporate governance, O'Neil-Dunne and MALT urgently need to investigate these matters.  No information about any of these matters has ever been provided to O'Neil-Dunne and MALT despite their status as a member and manager of the company.

7.    Plaintiffs are informed and believe, and on that basis allege, that 777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise, now reaching such disparate businesses as airlines and professional sports franchises.  By this action, O'Neil-Dunne and MALT seek to force Phoenicia to come clean about its own operations and its related activities in coordination with the 777 sprawling fraud.

8.    Until 2021, O'Neil-Dunne was employed by 777.  Since 2021, however, he has been separated from 777 and Phoenicia, and neither he nor MALT has had any access to information about Phoenicia's business or financial condition.

9.    Starting in 2021, through public information, O'Neil-Dunne and MALT learned that 777 was diverting valuable aviation opportunities away from Phoenicia, despite its fiduciary duties to present those opportunities to Phoenicia, and in violation of contractual obligations to MALT and O'Neil-Dunne.  O'Neil-Dunne and MALT brought suit in this Court, on their own behalf and derivatively on behalf of Phoenicia, to halt and seek redress for this misconduct. *Malt Family*

5

A-637

*Trust and Timothy James O'Neil-Dunne v. 777 Partners LLC, et al.*, C.A. No. 2022-0652-MTZ (the "Phoenicia Derivative Action"). That action is pending.

10.     From August 5, 2021 until August 24, 2023, Phoenicia did not hold a meeting of either the members or the managers. Nor did Phoenicia provide O'Neil-Dunne or MALT with any information about the activities and condition of the company. O'Neil-Dunne and MALT repeatedly requested such information, including through a written request from O'Neil-Dunne on May 18, 2023 and a written request from MALT on May 15, 2023.

11.     Finally, in response to repeated demands by O'Neil-Dunne, Phoenicia scheduled a managers' meeting for July 2023. O'Neil-Dunne (again) requested documents detailing the activities and condition of the company in advance of the meeting so that he could participate meaningfully. Despite delaying the meeting several times to give Phoenicia time to provide such documents, Phoenicia ultimately provided only a copy of meeting notes from August 2021 and a single PowerPoint presentation with limited information about only two parts of its business, and no information about the rest of the business.

12.     O'Neil-Dunne and MALT are entitled to information about Phoenicia's business under both Delaware law and the company's LLC agreement. O'Neil-Dunne needs the documents to discharge his fiduciary duties as a manager of the company. MALT needs the documents to value its membership interest and

6

A-638

to investigate whether Phoenicia has taken actions that required member approval without obtaining approval, properly allocated profits, misused or misappropriated assets and funds, and otherwise treated its members fairly and in compliance with the law.  Currently, MALT cannot even file its tax return because Phoenicia has not provided tax documents for 2022.

13.    Phoenicia has failed to provide the documents requested by O'Neil-Dunne and MALT, leaving them no choice but to bring this action to compel Phoenicia to provide timely, accurate and comprehensive information.

## THE PARTIES

14.    Plaintiff Timothy James O'Neil-Dunne is a resident of the State of Washington and a beneficiary of the MALT trust.  He was the initial Series A Manager of Phoenicia and remains a manager of the company currently.

15.    Plaintiff MALT Family Trust ("MALT") is a discretionary trust established in accordance with the laws of the Isle of Man with its principal place of business in Thetford, England.  MALT is the Series A Member of Phoenicia holding an 8% membership interest in the company.

16.    Defendant Phoenicia LLC ("Phoenicia") is a Delaware limited liability company with its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida.

7

A-639

## FACTUAL BACKGROUND

17.    Phoenicia operates a diversified set of aviation and travel businesses, mostly through subsidiaries.  Among other things, Phoenicia is the part owner of Flair Airlines, Inc. ("Flair").

18.    Phoenicia was formed in 2018 in connection with 777 acquiring airline and travel-related assets owned by MALT.  The company is governed by a September 12, 2018 Limited Liability Company Agreement (the "LLC Agreement," Exhibit D).

19.    Since the company was founded, 777 has been the majority owner and Series B Member.  O'Neil-Dunne and MALT have at all times been the Series A Members.  O'Neil-Dunne was appointed as the initial Series A Manager.  O'Neil-Dunne left the company in 2021, but remained a manager.

20.    Starting in 2021, 777 began diverting valuable opportunities away from Phoenicia, including a lucrative airline leasing business.  Phoenicia also began entering into interested transactions with other companies owned and controlled by 777.  The misconduct of which O'Neil-Dunne and MALT have learned to date is detailed in the operative pleading in the Phoenicia Derivative Action.

21.    O'Neil-Dunne and MALT learned of the issues raised in the Phoenicia Derivative Action through public sources, because since 2021 they have been

8

A-640

completely shut out of Phoenicia and deprived of the information to which they are entitled as a manager and member respectively.

22.    On May 18, 2023, O'Neil-Dunne wrote a letter to Phoenicia asking that a board meeting be scheduled. Although the LLC Agreement requires that the Board of Managers meet at least quarterly, no meeting had been held since August 2021.

23.    The May 18 letter (attached as Exhibit A hereto) also sought documents for the stated purpose of enabling O'Neil-Dunne to perform his responsibilities and duties as a manager of Phoenicia, including providing informed input into the management of the company. The documents requested were:

(1)    Minutes of every board meeting held since 2018 (incorporation date), as well as all materials distributed at such board meetings;

(2)    Any written consents or other Board actions, including without limitation resolutions, since 2018;

(3)    The most recent Budget prepared by the company for consideration and approval of the Board, as required in the Operating Agreement;

(4)    Quarterly and annual financial statements for Phoenicia LLC and its direct or indirect subsidiaries from 2018 to the present, including at a

9

A-641

minimum balance sheets, P&L statements and statements of cash flows for each entity; and

(5)    The reports of any audits of the financials of Phoenicia or any of its direct or indirect subsidiaries.

24.    Phoenicia did not respond to O'Neil-Dunne's request for documents. However, it did schedule a meeting of the board of managers for July 10, 2023, which was then moved to July 13, 2023.

25.    On July 7, 2023, O'Neil-Dunne renewed his request for documents in advance of the meeting to enable him to meaningfully participate.

26.    On July 10, Phoenicia rescheduled the meeting to July 26, supposedly to give it time to provide documents in advance.  O'Neil-Dunne had received nothing by July 23, however.  He reiterated his request again, and Phoenicia promised documents by July 24.  They did not arrive, and the board meeting had to be delayed again, this time until August 3.

27.    Finally, on August 2, Phoenicia sent one document, but it was a tiny fraction of what O'Neil-Dunne had requested and needed.  The document consisted of a single PowerPoint with top-level financial information and superficial "strategy" slides for two aspects of the business (Flair and GO7); no information was provided regarding Phoenicia's other subsidiaries.

A-642

28.    Because the meeting was scheduled for the next day, O'Neil-Dunne requested it be rescheduled to give him time to review the one document he had finally received.  He also requested additional documentation necessary for him to understand the condition of the business and participate in the board meeting, including documents related to Phoenicia's other subsidiaries, transactions hinted at in the one document Phoenicia provided, material contracts, executive personnel changes, shareholding changes at Phoenicia and subsidiaries, and budget documentation.

29.    Phoenicia did not provide the requested documents.  Further requests from O'Neil-Dunne on August 3, 6, 10, and 17, 2023 also yielded no results.

30.    On August 20, 2023, O'Neil-Dunne sent further correspondence to Phoenicia expressing his concern with Phoenicia's failure to provide material information and documentation for the board meeting, and the legal risks associated with it.  (This email is attached as Exhibit B.)  O'Neil-Dunne requested (again) that company management provide complete information about major activities and events by August 21, 2023, because such information is necessary for him to perform his duties and obligations as Phoenicia's manager.  Specifically, O'Neil-Dunne requested documents regarding:

i.   Changes in executive level management.

ii.  Historical financial reports.

11

A-643

    iii.  Projected financial results and budgets.

    iv.  Any new financing.

    v.  The acquisition, disposal, or encumbrance of significant

      assets.

    vi.  The nature and status of any discussions regarding

      acquiring, selling, disposing or otherwise changing the status

      of any subsidiaries.

    vii.  Material legal matters, including litigation (threatened or

      pending) and regulatory proceedings/inquiries.

    viii.  Proposed resolutions.

31.    The foregoing documents are needed for O'Neil-Dunne to discharge his duties as manager. As set forth in Section 4.3 of the LLC Agreement, managers shall "consult with, advise and direct the Officers" with respect to a wide variety of business and governance issues, including the strategy and direction of the company, the budget, appointment and termination of Officers, financing activities, changes to material agreements, and the acquisition and sale of any assets.

32.    The board meeting was ultimately held on August 24, 2023. No further documents were provided at or before the meeting.

A-644

33.    Phoenicia's executive management team stated orally at the board meeting that Phoenicia's financials, as well as other documents O'Neil-Dunne had requested concerning subsidiary structure and asset acquisition and transfer, would be provided by the end of September. However, that commitment to provide documents was not reflected in draft minutes circulated two weeks after the meeting.   On September 8, 2023, O'Neil-Dunne emailed the executive managers and asked them to commit by September 13, 2023 that the documentation would be provided by the end of September as promised.  The company did not provide any commitment.

34.    Only after O'Neil-Dunne and MALT threatened to bring the present suit, Phoenicia began dribbling out a few documents, sending a handful on September 25 and 29, 2023.  Those documents did not remotely address O'Neil-Dunne's requests.  They included some board materials (most of which O'Neil-Dunne already had), one financial spreadsheet produced in PDF format and not understandable, and unaudited, one page balance sheets and income statements for 2022 and the first quarter of 2023. The financial statements have no detail and classify much of the revenue and expenses in catch-all categories without any meaningful description.  There are no statements of cash flow, nothing from 2021 and prior years, and no underlying financial or business information that would be necessary to understand the extremely limited financial information that was

13

**A-645**

provided.  Phoenicia has said it will provide more documents, but given its long history promising to provide information and then failing to follow through, O'Neil-Dunne cannot wait any longer to seek Court intervention.

35.    MALT has also tried to obtain documents related to its membership interest in Phoenicia, to no avail.

36.    In addition to Delaware statutory law requiring that MALT be given access to company records, the LLC provides for members to have virtually unfettered access to company documents:  "Upon written request of any Member, setting forth the purpose for such request, each Member shall have the right, during regular business hours, to inspect and copy any Company documents at the Member's expense."  (LLC Agreement at Section 6.3.)

37.    On May 15, 2023, the Trustee of MALT wrote to Phoenicia asking that it provide the monthly, quarterly and annual financial reporting that is required under the LLC Agreement.  (The May 15 letter is attached hereto as Exhibit C.) MALT also asked for additional documents, "(1) to enable the Trust to value its membership interest in Phoenicia; (2) to investigate whether Phoenicia has taken actions which required Member approval without notice to the Series A Member; (3) to investigate whether Phoenicia has engaged in Interested Transactions and, if so, whether it complied with the restrictions on such transactions; and (4) to investigate whether Phoenicia has properly allocated profits and losses."

14

A-646

38.    The documents MALT requested were:

i.    Minutes of any meeting of the Members or Managers of Phoenicia and any materials distributed in connection with such meetings;

ii.    Records reflecting any action taken by the Members of Phoenicia;

iii.    Minutes of any meeting of the Members, Managers or shareholders of any direct or indirect subsidiary of Phoenicia, and any materials distributed in connection with such meetings;

iv.    Records reflecting any action taken by the Members or shareholders of direct or indirect subsidiary of Phoenicia;

v.    Records reflecting any transfer of membership interests in Phoenicia (including subsidiaries);

vi.    Records reflecting any action by Phoenicia or its direct or indirect subsidiaries for which Member approval was required under Section 6.4 of the LLC Agreement, including, without limitation, records reflecting any indebtedness in excess of $5,000; the commencement or settlement of any litigation; and the merger, sale or dissolution of any subsidiary;

vii.    Records of any Interested Transaction (as defined in Section 5.4 of the LLC Agreement) entered into by Phoenicia and/or any of its

15

direct or indirect subsidiaries, including records of any disclosure or authorization of such transaction to the Managers or Members;

viii.   All material agreements entered into by Phoenicia and/or its subsidiaries;

ix.   Complete records of any and all contributions to and distributions from the Company;

x.   Records of each Member's Capital Account and all credits and debits thereto.

39.   Phoenicia did not respond to MALT's letter or provide any documents in response.

40.   Following the filing of the Complaint in this action, Phoenicia represented that it would provide all of documents Plaintiffs have requested.  It has not done so.  Phoenicia made two haphazard productions of documents which include only a fraction of the documents Plaintiffs have requested.

41.   Phoenicia held a board meeting on December 18, 2023.  It did not provide information in advance of the meeting, despite O'Neil-Dunne's requests.  At the meeting itself, Phoenicia provided some limited financial information about Flair, of which Phoenicia owns 49%.

42.   On January 7, 2024, O'Neil-Dunne sent an email to Phoenicia with follow-up questions about the information that had been provided at the board

16

A-648

meeting. The email also requested that Phoenicia send several documents critical to O'Neil-Dunne's understanding of the business. Specifically, the email requested:

    i.   A detailed breakdown of aircraft costs included in the income statements;

    ii.   A detailed breakdown of administrative expenses included in the income statements;

    iii.   The source material for the financial information provided at the two 2023 board meetings;

    iv.   A breakdown of the interest expense included in the income statements;

    v.   Documents showing the details for the source and terms of loans shown in the financials, including a breakdown of the amounts provided and the source of the funds, and further including documents showing any guarantees as well as communications with Boeing concerning the aircraft purchases;

    vi.   The aircraft leases and related amortization schedules;

    vii.   Audited financial statements for Flair going back to 2018;

    viii.   The most recent Flair regulatory filings (including tax returns);

17

A-649

    ix.   All agreements between Flair, on the one hand, and 777, its

affiliates and related parties (including entities owned directly,

indirectly or in partnership with Pasko and/or Wander) on the other

hand, including documentation related to specific loans identified

in the Flair financial statements;

    x.   Documentation related to the assignment of Flair leases to third

parties, including documentation related to the securitization of

any Flair leases; and

    xi.   Strategic, operational, and financial plans and financial projections

provided by Flair management.

43. To date, Phoenicia has not provided any of the foregoing records.

### COUNT I (by O'Neil-Dunne)

### VIOLATION OF 6 *DEL. C.* § 18-305

44.    O'Neil-Dunne repeats and realleges the allegations in each of the

preceding paragraphs as if fully set forth herein.

45.    O'Neil-Dunne is a manager of Phoenicia.

46.    O'Neil-Dunne made written demands to Phoenicia for records,

including in the correspondence attached as Exhibits A and B and as set forth in

Paragraph 42, that complied with the requirements of Section 18-305 with respect

A-650

to the form and manner of making a demand for the inspection of the books and records of Phoenicia.

47.    O'Neil-Dunne's purposes for demanding access to certain of the books and records of Phoenicia are proper and reasonably related to O'Neil-Dunne's interests as a manager of Phoenicia, including so that he can provide informed input into the management of the company and otherwise discharge his fiduciary duties.

48.    Phoenicia has refused to provide O'Neil-Dunne with the books and records demanded.

49.    O'Neil-Dunne is entitled to receive copies and/or inspect the books and records demanded in his written demands, including Exhibits A and B and as set forth in Paragraph 42.

50.    O'Neil-Dunne has no adequate remedy at law.

## COUNT II (by MALT)

### VIOLATION OF 6 *DEL. C.* § 18-305

51.    MALT repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

52.    MALT is a member of Phoenicia.

53.    MALT made a written demand to Phoenicia for records, Exhibit C, that complied with the requirements of Section 18-305 with respect to the form and

19

A-651

manner of making a demand for the inspection of the books and records of Phoenicia.

54.    MALT's purposes for demanding access to certain of the books and records of Phoenicia are proper and reasonably related to MALT's interests as a member of Phoenicia, including so that MALT can value its interest in Phoenicia and investigate whether Phoenicia has taken actions that required Member approval without notice to the Series A Member; has engaged in Interested Transactions as defined in the LLC Agreement and, if so, whether it complied with the restrictions on such transactions; and has properly allocated profits and losses.

55.    Phoenicia has refused to provide MALT with the books and records demanded.

56.    MALT is entitled to receive copies and/or inspect the books and records demanded in its written demand attached hereto as Exhibit C.

57.    MALT has no adequate remedy at law.

### COUNT III (by MALT)

### BREACH OF THE LLC AGREEMENT

58.    MALT repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

59.    MALT is a member of Phoenicia and a party to the LLC Agreement.

20

A-652

60.     Under Section 6.3 of the LLC Agreement, "[u]pon written request of any Member, setting forth the purpose for such request, each Member shall have the right, during regular business hours, to inspect and copy any Company documents at the Member's expense."

61.     MALT made a written demand to Phoenicia to inspect and copy records, setting forth the purpose of the request.

62.     Phoenicia has refused to permit MALT to inspect and copy the requested books and records.

63.     MALT has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, O'Neil-Dunne and MALT respectfully request that the Court enter judgment in their favor and against Phoenicia:

(i)     compelling Phoenicia to permit the inspection and copying of books and records as set forth in O'Neil-Dunne's written requests, including Exhibits A and B and as set forth in Paragraph 42;

(ii)    compelling Phoenicia to permit the inspection and copying of books and records as set forth in MALT's written request, Exhibit C; and

(iii)   granting O'Neil-Dunne and MALT such further relief as the Court deems just, including awarding reasonable attorneys' fees and costs incurred in pursuing this action.

21

A-653

*Of Counsel (pro hac vice applications to be filed)*:

AFFELD ENGLAND
& JOHNSON LLP
David W. Affeld, Esq.
Edward E. Johnson, Esq.
2049 Century Park East, Suite 2460
Los Angeles, California
(310) 979-8700
dwa@agz.com
eej@agzlaw.com


Dated: January 19, 2024

ASHBY & GEDDES

*/s/ Catherine A. Gaul*
Catherine A. Gaul (#4310)
Michael J. Vail (#6994)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
(302) 654-1888
cgaul@ashbygeddes.com
mvail@ashbygeddes.com

*Attorneys for Plaintiffs Timothy O'Neil-Dunne and MALT Family Trust*

22

A-654

# EXHIBIT O

A-655

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EIDO HUSSAM AL-NAHHAS )
on behalf of Plaintiff and the class members )
described herein, )
)
        Plaintiff, )     Case No. 1:22-cv-00750
)
)     Judge John J. Tharp, Jr.
        vs. )
)
ROSEBUD LENDING LZO d/b/a ZocaLoans; )
777 PARTNERS, LLC; )
TACTICAL MARKETING PARTNERS, LLC; )
F3EA CAPITAL, LLC; F3EA SERVICING, LLC; )
F3EA HOLDINGS, LLC; )
and JOHN DOES 1-10, )
)
        Defendants. )

## FIRST AMENDED COMPLAINT – CLASS ACTION

    1.    Plaintiff Eido Hussam Al-Nahhas ("Plaintiff") brings this action to secure redress

from predatory and unlawful loans (such as Exhibits A-D) made in the name of Defendant Rosebud

Lending LZO d/b/a ZocaLoans ("Rosebud Lending"). Other parties involved in making the loans

are 777 Partners, LLC ("777 Partners"), Tactical Marketing Partners, LLC ("Tactical"), F3EA

Capital, LLC ("F3EA Capital"), F3EA Servicing, LLC ("F3EA Servicing"), and F3EA Holdings,

LLC ("F3EA Holdings").[1] This is a case about a scheme to make online short-term loans that carry

triple-digit interest rates, often exceeding 800%, and that are illegal in many states, including Illinois.

    2.    Plaintiff seeks a declaratory judgment that the loans are void and an injunction

against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6

(Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan

Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1

*et seq.* (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the

---

    [1]    777 Partners, Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings, are
collectively referred to as the "777 Defendants".

1

A-656

Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count IV).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

4.      This Court also has jurisdiction over this lawsuit under 28 U.S.C. § 1332(d) because Plaintiff and Defendants are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest and costs.

5.      This Court has personal jurisdiction over each Defendant because they:

a.      Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

c.      Purposefully directed the lending operation at Illinois consumers and with

2

the intent of availing themselves of the privileges of doing business in Illinois. As detailed below,
777 Partners designed and implemented the lending model and actively participated in the affairs of
the enterprise. 777 Partners uses Tactical, F3EA Capital, F3EA Servicing, and  F3EA Holdings as
conduits for its supervision, control, and profits of the lending business. All of this was done with
the intention of furthering a nationwide scheme which took advantage of consumers in Illinois
and throughout the United States. Put differently, Defendants' management, oversight, and control
over the usurious lending practices were undertaken with the intent to make and collect on loans to
Illinois borrowers. Defendants purposefully availed themselves to the jurisdiction of this Court.

6.       Venue is proper because acts to obtain and collect the loans impacted Plaintiff in
the Northern District of Illinois.

7.       Article III of the Constitution of the United States is satisfied because actions for
statutory damages and invalidation of loans for usury were entertained by the courts of England and
the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original
American states replaced the English usury statutes with their own usury laws between 1641 and
1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion
in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing
statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

8.       Plaintiff Eido Hussam Al-Nahhas is a natural person and resident of Chicago,
Illinois.

### Defendants

### Rosebud Lending LZO

9.       Defendant Rosebud Lending LZO d/b/a ZocaLoans is an online lender that offers
loans to consumers at annual percentage rates exceeding 500%. (Exhibit E) It purports to be an
entity formed under the laws of, and claims to be owned and controlled by, the Rosebud Sioux

3

A-658

Tribe, a federally-recognized Indian Tribe in South Dakota. (Exhibit A, p. 1) Rosebud Lending uses the addresses P.O. Box 1147, Mission, South Dakota 57555 and 27565 Research Park Drive, Mission, South Dakota 57555. Rosebud Lending has no colorable claim to sovereign immunity as an "arm of a tribe."

10.     The Mission Address purportedly houses the offices of REDCO, the Rosebud Economic Development Corporation. It is also the offices of Rosebud Office Solutions which purports to be engaged in "providing streamlined supply and procurement for local businesses and governmental entities."

11.     On information and belief, REDCO's general manager, Mindi Jo Vavra was an executive for Fintech Financial, LLC, a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders.

12.     The Mission Address is also home to:

    a.     The Lakota Water Company;

    b.     The Sicangu Community Development Corporation, an IRS-recognized 501(c)(3) non-profit corporation; and

    c.     Tatanka Funds, a non-profit which provides down-payment assistance and home buying assistance in south central South Dakota.

13.     Neither Rosebud Lending nor any other consumer lending business operates at the Mission Address.

14.     Rosebud Lending claims that loans made in its name are authorized by Eric Lochen, an attorney in Minnesota with ties to various tribal lending schemes (Exhibit F). Mr. Lochen is not a member of the Rosebud Sioux Tribe, nor any other federally-recognized Indian tribe.

15.     The Rosebud Sioux Tribe claims to own Rosebud Lending, but its involvement in the lending business is merely superficial. The Tribe's only real contribution is to provide a cloak of sovereign immunity for the lending activities complained of herein.

16.     Subsidiaries of entities that claim to be owned by REDCO have purported to

4

operate various websites, all of which charge consumers triple-digit interest rates, including:

      a.    AdvanceMeToday.com, owned by "Rosebud Lending AMT";

      b.    FirstPayLoans.com, owned by "Rosebud Lending BHL";

      c.    MyQuickWallet.com, owned by "Rosebud Lending DRT";

      d.    PixyCash.com, owned by "Rosebud Lending PCL"; and

      e.    QCredit.com, owned by "Rosebud Lending RQC".

17.    On information and belief, each of these websites represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

18.    The lending enterprise doing business as ZocaLoans operates for the principle benefit of: (a) 777 Partners, (b) F3EA Capital, (c) F3EA Servicing, (d) F3EA Holdings, and (e) Tactical—all are non-tribal entities organized under Delaware law and located in or around Miami, Florida.

19.    The 777 Defendants pay Rosebud Lending a small percentage of the revenues generated from ZocaLoans' loans in a "rent-a-tribe" agreement as outlined below.[2] Rosebud Lending, in turn, pays REDCO a nominal share of the monies it receives for the use of REDCO and the Tribe's name.

20.    Defendants sought out Illinois residents for loans. ZocaLoans' website states that it makes loans to residents of Illinois but not residents of other states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

---

[2] *See, e.g.*, REDCO Annual Report for 2019 (showing Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and "management fee" of over $30 million paid out to non-tribal entities); REDCO Annual Report for 2018 (stating Rosebud Lending had operating revenue of only $1.8 million, and showing a $936,933 "Management Fee" paid out to non-Tribal entities); *see also e.g.*, 2021.06.15 public Facebook Post by Lynne Colombe ("We haven't seen any revenue from REDCO since 2019 (less than $300k)" "I'm tired of learning more about our 'Tribal business' from Google").

### 777 Partners, LLC

21.     Defendant 777 Partners, LLC is a Miami-based private investment and equity firm founded by Joshua Wander and Steven W. Pasko.

22.     777 Partners is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its managers are Steven W. Pasko, Joshua Wander, Ed Gehres, John Sicilian, Tom Staz, and Damien Alfalla.

23.     777 Partners claims to own Defendant F3EA Servicing.

24.     777 Partners receives the overwhelming majority of the profit from the ZocaLoans enterprise. It knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers like Mr. Al-Nahhas.

25.     777 Partners is the ultimate beneficiary of the ZocaLoan lending operation.

### F3EA Capital, LLC

26.     Defendant F3EA Capital, LLC is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

27.     F3EA Capital provides capital used to fund loans made by ZocaLoans and is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

28.     F3EA Capital is an affiliate of 777 Partners.

### F3EA Servicing, LLC

29.     Defendant F3EA Servicing, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131 and 1855 Griffin Road, B390 Dania, FL 33004.

30.     According to 777 Partners' website, F3EA Servicing "provides origination,

6

A-661

servicing, compliance and underwriting capabilities to various loan and leasing portfolios. F3EA supports client growth through its end to end servicing infrastructure..." (Exhibit G).

31.    An attorney named Mollie Wander–Joshua Wander's wife–is a member of F3EA Servicing. Ms. Wander is intimately involved in the operation of ZocaLoans and negotiated the contracts awarded to the 777 Defendants along with Ed Gehres, the former General Counsel of 777 Partners.

32.    Marie Gizzi, an employee of F3EA Servicing, states that she works for "Zocaloans subsidiary of F3EA Servicing LLC." Exhibit H And that, in her capacity as a loan processor, she "[r]eview[s] and analy[zes] loan applications, credit bureau reports, bank statements and financial documentation to ensure all loan documentation is complete, accurate and verified before submitting to underwriting." Id.

33.    Vanessa Ponce, an employee of F3EA Servicing, purports to be a "Customer Service Supervisor at Zoca Loans." Exhibit I.

34.    F3EA Servicing is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

35.    F3EA Servicing has collected hundreds of millions of dollars of ZocaLoans payments made by consumers like Mr. Al-Nahhas.

**F3EA Holdings, LLC**

36.    Defendant F3EA Holdings, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.    On information and belief, Joshua Wander, co-founder of 777 Partners, sits on the board of F3EA Holdings.

38.    F3EA Holdings has provided capital used to fund loans made by ZocaLoans and has collected loans made in the name of ZocaLoans.

39.    F3EA Holdings knowingly contracted for or received, directly or indirectly, unlawful

7

A-662

interest from loans nominally made by Rosebud Lending to consumers like Mr. Al-Nahhas.

### Tactical Marketing Partners, LLC

40.     Defendant Tactical Marketing Partners, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131.

41.     On information and belief, Tactical obtains consumer reports (credit reports) as agent or authorized service provider for Rosebud Lending.

42.     Tactical knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers like Mr. Al-Nahhas.

### Overview of Defendants' Enterprise

43.     On information and belief, 777 Partners approached individuals associated with the Rosebud Sioux Tribe in 2015 with a pitch to create an online lending business. In exchange for use of the Tribe's economic development corporation's name, 777 Partners offered to provide the capital used to fund loans made by ZocaLoans and provide the resources necessary to operate all aspects of an online lending operation.

44.     777 Partners has total control of Rosebud Lending and manages all substantive aspects of the lending business. For example, 777 Partners and its affiliates, among other things: (i) maintain a sweeping security interest in the lending operation (Exhibit I)[1]; (ii) control the lending operation's operating account by way of a deposit account control agreement (Exhibit K); and (iii)

---

[1] The financing statement covers the following collateral: all rights, interests, powers and privileges in and to the following assets now existing or hereafter arising: (i) all consumer loan receivables; (ii) all promissory notes evidencing such consumer loan receivables, together with all agreements executed in connection therewith; (iii) all rights and interests which Debtor may at the time have by law or agreement against any obligor obligated to make payment of such consumer loan or against property of such obligor; (iv) the accounts identified in the security agreement ("operating accounts", currently held at…, account number….) and (v) all proceeds of any and all of the foregoing.

are responsible for, among other things, marketing, servicing, funding, and collection of loans made in the name of Rosebud Lending.

45.    777 Partners has seen that its affiliates and subsidiaries receive all lucrative marketing and servicing contracts (Exhibit L) and has entered into multiple revolving loan and security agreements (Exhibit M) whereby it has advanced close to $100 million to fund the underlying loans (*Id.*, p. 47).

46.    The 777 Defendants also provide the technological and data science infrastructure to underwrite the loans.

47.    All material policies and procedures relating to the lending operation are instituted by the 777 Defendants without input from the Rosebud Tribe, REDCO, Rosebud Lending, or Rosebud Lending LZO.

48.    Loans made in the name of Rosebud Lending are funded by 777 Partners, F3EA Capital, F3EA Servicing, and F3EA Holdings.

49.    The monies used to fund loans made in the name of ZocaLoans are kept in bank accounts controlled by the 777 Defendants to which the Rosebud Tribe Sioux Tribe, REDCO, Rosebud Lending, and Rosebud Lending LZO have no access.

50.    F3EA Servicing entered into two Master Servicing Agreement with Rosebud Lending and provides a comprehensive suite of services to the ZocaLoans enterprise, including, but not limited to:

    a.    Marketing;

    b.    Call center;

    c.    Compliance;

    d.    Administrative;

    e.    Lead generation;

    f.    Risk and underwriting;

    g.    Modeling;

9

A-664

    h.     Collection; and

    i.     Risk-based marketing.

51.    UCC filings reveal that F3EA Capital has a security interest in Rosebud Lending's:

    a.     Assets including proceeds and products;

    b.     Negotiable instruments including proceeds and profits; and

    c.     Accounts including proceeds and profits. Exhibit J.

52.    F3EA Capital has entered into multiple revolving loan and security agreements with Rosebud Lending.

53.    Rosebud Lending claims that only the following three people are involved in the operation of ZocaLoans: "Clay Colombe, REDCO Chief Executive Officer, Mandy Medearis, Rosebud Lending LZO d/b/a ZocaLoans Operations and Compliance Manager, and Leah Running Bear, Rosebud Lending LZO d/b/a ZocaLoans loan specialist." Exhibit N.

54.    The claim is false. Rosebud Lending does not know who is involved in the ZocaLoans enterprise because all aspects of the operation are run by the 777 Defendants.

55.    Domain registration records from 2019 show that www.zocaloans.com is registered to 777 Partners (Exhibit O).

56.    The profile of Jennifer Menard, a Senior Operations Analyst at 777 Partners, states that, "[p]rior to joining 777" Menard "was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor..." Exhibit P.

57.    On information and belief, 777 Partners has ties to other high interest payday lenders.[2]

---

[2] *See, e.g.*, www.777part.com/team_member/ed-gehres/ (last visited July 1, 2022) ("Mr. Gehres also recently served as outside General Counsel to Think Finance) (Exhibit Q); www.777part.com/team_member/matthew-ghourdjian/ (last visited December 1, 2022) ("Mr. Ghourdjian served as [ ] the CIO of DiTech.com and CashCall.") (Exhibit R); www.777part.com/team_member/hussien-sleiman/ (last visited April 5, 2022) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms") (Exhibit S).

A-665

## FACTS RELATING TO PLAINTIFF AL-NAHHAS

58.    In January 2020, Plaintiff Al-Nahhas obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit A). The loan had an amount financed of $350 and an annual percentage rate of 534.75%. Plaintiff paid the loan in full, including interest payments.

59.    In March 2021, Mr. Al-Nahhas obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit B). The loan had an amount financed of $550 and an annual percentage rate of 693.10%. This loan was paid off, including interest.

60.    In May 2021, Plaintiff Al-Nahhas obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit C). The loan had an amount financed of $750 and an annual percentage rate of 691.35%. This loan was paid off, including interest.

61.    In September 2021, Plaintiff Al-Nahhas obtained an installment loan from Rosebud Lending LZO d/b/a ZocaLoans (Exhibit D). The loan had an amount financed of $900 and an annual percentage rate of 585.21%. This loan is outstanding and has not been paid.

62.    Exhibits A-D are standard form loan agreements used by Rosebud Lending LZO d/b/a ZocaLoans on a regular basis.

63.    Defendants regularly make loans to individuals in Illinois, and throughout the United States, at such rates.

64.    The loans (Exhibits A-D) were obtained for personal, family or household purposes and not for business purposes.

65.    At no time have any of the Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

66.    Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

67.    Defendants sought out Illinois residents for such loans.

11

A-666

68.     Defendant Rosebud Lending has been contacting Plaintiff for the purpose of collecting the loan. (E.g., Exhibit G)

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

69.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

70.     Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

71.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

72.     Any loan made by an unlicensed person to an Illinois resident at more than 9% interest is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

73.     Loans made by an unlicensed lender to an Illinois resident at an interest rate

12

exceeding 9% violates the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

74.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

75.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 11cv8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

76.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569; *In the Matter of Money Mutual, LLC,* No. 12 CC 408; *In the Matter of Hammock Credit Services,* No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend,* No. 17 CC 133.

### SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

77.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses–such as the 777 Defendants–engage in a business model commonly referred to as a "rent-a-tribe" scheme.

78.     Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

13

A-668

79.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

80.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

81.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

82.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

83.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

84.     Where non-tribal individuals and entities control and manage the substantive lending

14

A-669

functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

85.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Nᵤf,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

86.     Indeed, "[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.,* 922 F.3d 112, 128 (2d Cir. 2019).

87.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote,* 961 F.3d 105 (2d Cir. 2020).

### COUNT I - DECLARATORY AND INJUNCTIVE
### RELIEF AGAINST ILLEGAL CONDUCT

88.     Plaintiff incorporates paragraphs 1-87.

89.     This claim is against all Defendants.

90.     There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff must repay the outstanding loans made to him (Exhibit D, in Plaintiff's case).

91.     Declaratory relief will resolve such controversy.

92.     An injunction is necessary to prevent Defendants from taking any action to collect

A-670

the void debts.

## CLASS ALLEGATIONS

93.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

94.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan has not been paid in full.

95.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

96.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

97.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

98.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

99.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

100.     Defendant has acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

101.     The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

16

A-671

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.      Injunctive relief;

      ii.     Declaratory relief;

      iii.    Restitution of all amounts collected on the loans from members of the class;

      iv.    Costs of suit; and

      v.     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

102.    Plaintiff incorporates paragraphs 1-87.

103.    This claim is against all Defendants.

104.    Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

105.    Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

106.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

107.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

108.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

109.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

17

A-672

110.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

111.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

112.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

113.     A class action is superior for the fair and efficient adjudication of this matter, in that:

   a.     Individual actions are not economically feasible.

   b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

   i.      Damages as provided in 815 ILCS 205/6;

   ii.     Attorney's fees, litigation expenses and costs of suit; and

   iii.    Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT
### AND ILLINOIS CONSUMER FRAUD ACT

114.     Plaintiff incorporates paragraphs 1-87.

115.     This claim is against all Defendants.

116.     Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

117.     Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

### CLASS ALLEGATIONS

118.     Plaintiff bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and

18

A-673

(b)(3).

119.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

120.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

121.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

122.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

123.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

124.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

125.     A class action is superior for the fair and efficient adjudication of this matter, in that:

       a.     Individual actions are not economically feasible.

       b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

              i.      Compensatory damages;

              ii.     Punitive damages;

              iii.    Attorney's fees, litigation expenses and costs of suit; and

              iv.     Such other and further relief as the Court deems proper.

19

A-674

## COUNT IV – RICO

126.    Plaintiff incorporates paragraphs 1-87.

127.    This claim is against Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC who are the RICO "persons." 18 U.S.C. § 1964(3).

128.    Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

129.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

130.    The means and methods by which the 777 Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Illinois, where the usurious rates charged were at least twice the enforceable rate. The 777 Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois, and various other state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

131.    In addition to legal limits of interest that may be charged under Illinois law, most other jurisdictions in the United States have limits on the amounts of interest that a lender may charge. *See, e.g.,* ARIZ. REV. STAT. §§ 6-603, *et seq.*; ARK. CONST. amend. 89, § 3; ARK. CODE ANN. §§ 4–57–104, 4–57–105; CONN. GEN. STAT. § 36a–563; FLA. STAT. §§ 516.01(2), 516.03, 516.031, 687.071(3); GA. CODE ANN. §§ 7–3–6; 7–3–14, 7–4–2, 7–4–18, and 16–17–1, *et seq.*; MD. CODE ANN. COM. LAW §§ 12–306, 12–313, 12–314; M.G.L. c.140, §§ 96, 110; N.C. GEN. STAT. §§ 53–173, 53–176; N.H. REV. STAT. ANN. § 399–A12; N.J. STAT. ANN. §§ 2C:21–19(a),

20

A-675

17:11C-3, 17:11C-41; N.Y. GEN. OBLIG. LAW § 5–501; N.Y. BANKING LAW § 14-a(1); N.Y. PENAL LAW § 190.40; VT. STAT. ANN. tit. 8, § 2230; VT. STAT. ANN. tit. 9, § 41a. All of the loans made to members of the Class and Subclass and collected by the Defendants included an interest rate far in excess of twice the enforceable rate. Each of the Defendants was associated with the enterprise through the collection of unlawful debts.

132. Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise" engaged in, and whose activities affect, interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet. The enterprise's leadership is based in Miami, Florida, and other locations as addressed in preceding paragraphs. The enterprise operates throughout the United States, including the Northern District of Illinois, as well as in Germany and Panama.

133. Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with this enterprise, in that they direct the making of loans by Rosebud Lending LZO and finance the operation.

134. The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities

135. The 777 Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

136. The lending enterprise operates through ACH transactions, such as those involving the payments by Mr. Al-Nahhas. These ACH transactions involve interstate commerce because they flow through Rosebud Lending's bank account in Missouri, Mr. Al-Nahhas' bank account, and through various intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to the 777 Defendants in Miami, Florida.

137. The lending enterprise operates through a website, created and overseen by the 777 Defendants, at www.zocaloans.com. The website furthers the illegal financial transactions.

21

A-676

The website allows individuals to enter information to execute ACH wire transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

138.    The 777 Defendants work together and function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the 777 Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

139.    Acting in concert, the 777 Defendants created the ZocaLoans enterprise with essential lending services provided by F3EA Servicing so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

140.    The 777 Defendants defined the types of loans that ZocaLoans would offer to customers and the illegal terms on which the loans would be created.

141.    The 777 Defendants acted in concert in knowingly marketing the loans via the Internet and through pre-screened marketing solicitations to borrowers who reside across the United States–including Illinois–and off of Tribal lands.

142.    The 777 Defendants exercised pervasive control over the lending operation as detailed in the previous sections.

143.    As alleged above, the 777 Defendants, and other participants not yet known to Plaintiff, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

144.    In operating and conducting the affairs of the enterprise, the 777 Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. The 777 Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

145.    The predicate acts of collection of unlawful debt by the 777 Defendants are

22

A-677

described herein. The debts incurred by Plaintiff and all other members of the Class and Subclass are unlawful and unenforceable.

146.    The 777 Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiff's and Class and Subclass members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the ZocaLoans enterprise.18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

147.    777 Partners, acting in concert with F3EA Servicing, F3EA Capital and F3EA Holdings, operated ZocaLoans in a scheme to defraud tens of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance this scheme, the 777 Defendants created the ZocaLoans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Defendants knowingly intended to defraud Plaintiff and other the victims of the lending scheme.

148.    The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and developed by the 777 Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by the 777 Defendants through ZocaLoans.

149.    The 777 Defendants' leadership, management, and participation in the enterprise

23

A-678

began at some point as early as 2015, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each of the 777 Defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, the 777 Defendants induced Plaintiff and members of the Class and Subclass to repay unlawful debts. The foregoing record demonstrates that 777 Partners, through its subsidiaries or affiliates, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

150.     Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the conduct of the affairs of ZocaLoans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

151.     Plaintiff was deprived of money as a result of the 777 Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for the 777 Defendants' conduct.

152.     In addition, Plaintiff and members of the below Class and Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, the 777 Defendants are jointly and severally liable to Plaintiff and the putative members of the Class and Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964 (c).

## CLASS ALLEGATIONS

153.     Plaintiff brings this claim on behalf of one Class and one Subclass.

154.     The Class consists of: all persons (a) to whom a loan was made in the name of

24

Rosebud Lending LZO d/b/a ZocaLoans, (b) while residents of the United States (except Delaware, California, Idaho, Missouri, and Utah), and (c) which loan was made on or after a date four years prior to the filing of suit.

155.    The Subclass consists of: (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans (c) which loan was made on or after a date four years prior to the filing of suit.

156.    Plaintiff may alter the above class definitions to conform to developments in the case and discovery.

157.    The Class and Subclass are so numerous that joinder of their members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 20,000 members of the Class, and at least 1,000 members of the Subclasss.

158.    There are questions of law and fact common to members of the Class and Subclass, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

b.    Whether Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise."

c.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with Rosebud Lending LZO d/b/a ZocaLoans.

d.    Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the affairs of Rosebud Lending LZO d/b/a ZocaLoans through a pattern of making and collecting unlawful loans.

159.    Plaintiff will fairly and adequately represent the members of the Class and Subclass. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

160.    Plaintiff's claims are typical of the claims of the members of the Class and Subclass.

A-680

All are based on the same factual and legal theories.

161.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the Class and Subclass are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the Class and Subclass and against Defendants for:

i.    Treble damages;

ii.    Attorney's fees, litigation expenses and costs of suit; and

iii.    Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6297473)
Dulijaza (Julie) Clark (ARDC 6273353)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER**
**& GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

26

A-681

### JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

A-682

### NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

A-683

# EXHIBIT P

A-684

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOSEPH MORGAN and DAVID JOHNSON )
on behalf of Plaintiffs and the class members )
described herein, )
)
       Plaintiffs, )
)
    vs. )         1:24-cv-01004
)
ROSEBUD LENDING LZO d/b/a ZocaLoans; )
777 PARTNERS, LLC; )
TACTICAL MARKETING PARTNERS, LLC; )
F3EA CAPITAL, LLC; F3EA SERVICING, LLC; )
F3EA HOLDINGS, LLC; )
and JOHN DOES 1-10, )
)
       Defendants. )

### COMPLAINT – CLASS ACTION

1.    Plaintiffs Joseph Morgan and David Johnson ("Plaintiffs") bring this action to secure redress from predatory and unlawful loans (such as Exhibits A-I) made in the name of Defendant Rosebud Lending LZO d/b/a ZocaLoans ("Rosebud Lending"). Other parties involved in making the loans are 777 Partners, LLC ("777 Partners"), Tactical Marketing Partners, LLC ("Tactical"), F3EA Capital, LLC ("F3EA Capital"), F3EA Servicing, LLC ("F3EA Servicing"), and F3EA Holdings, LLC ("F3EA Holdings"). Defendants 777 Partners, Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings are collectively referred to as the "777 Defendants."

2.    The loans had triple-digit interest rates, often exceeding 500%, and are illegal in many states, including Illinois.

3.    Plaintiffs Joseph Morgan and David Johnson seek a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III – the Predatory Loan Prevention Act provides that

1

A-685

violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count IV).

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

5.      This Court also has jurisdiction over this lawsuit under 28 U.S.C. § 1332(d) because Joseph Morgan and David Johnson, on the one hand, and Defendants, on the other, are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest and costs.

6.      This Court has personal jurisdiction over each Defendant because they:

        a.      Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

        b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

        c.      Purposefully directed the lending operation at Illinois consumers and with

2

A-686

the intent of availing themselves of the privileges of doing business in Illinois. As detailed below, 777 Partners designed and implemented the lending model and actively participated in the affairs of the enterprise. 777 Partners uses Tactical, F3EA Capital, F3EA Servicing, and F3EA Holdings as conduits for its supervision, control, and profits of the lending business. All of this was done with the intention of furthering a nationwide scheme which took advantage of consumers in Illinois and throughout the United States. Put differently, Defendants' management, oversight, and control over the usurious lending practices were undertaken with the intent to make and collect on loans to Illinois borrowers. Defendants purposefully availed themselves to the jurisdiction of this Court.

7.      Venue is proper because acts to obtain and collect the loans impacted Joseph Morgan and David Johnson in the Northern District of Illinois.

8.      Article III of the Constitution of the United States is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiffs

9.      Plaintiffs Joseph Morgan and David Johnson are natural persons and residents of Cook County, Illinois.

### Defendants

### Rosebud Lending LZO

10.     Defendant Rosebud Lending LZO d/b/a ZocaLoans is or was an online lender that offers  loans to consumers at annual percentage rates exceeding 500%. (Exhibit J) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Rosebud Sioux

3

A-687

Tribe, a federally-recognized Indian Tribe in South Dakota. (Exhibit A, p. 1) Rosebud Lending uses the addresses P.O. Box 1147, Mission, South Dakota 57555 and 27565 Research Park Drive, Mission, South Dakota 57555. Rosebud Lending has no colorable claim to sovereign immunity as an "arm of a tribe."

11.     The Mission Address purportedly houses the offices of REDCO, the Rosebud Economic Development Corporation. It is also the offices of Rosebud Office Solutions which purports to be engaged in "providing streamlined supply and procurement for local businesses and governmental entities."

12.     On information and belief, REDCO's general manager, Mindi Jo Vavra was an executive for Fintech Financial, LLC, a non-tribal, Delaware-based "warehouse lender" which provides working capital to make loans to consumers for several online payday lenders.

13.     The Mission Address is also home to:

    a.     The Lakota Water Company;

    b.     The Sicangu Community Development Corporation, an IRS-recognized 501(c)(3) non-profit corporation; and

    c.     Tatanka Funds, a non-profit which provides down-payment assistance and home buying assistance in south central South Dakota.

14.     Neither Rosebud Lending nor any other consumer lending business operates at the Mission Address.

15.     The license that purports to authorize the making of loans by Rosebud Lending LZO d/b/a ZocaLoans was signed by Eric Lochen, an attorney based in Minnesota with ties to various tribal lending schemes, on behalf of the "Financial Services Regulatory Authority." Mr. Lochen is not a member of the Rosebud Sioux Tribe, nor any other federally-recognized Indian tribe.

16.     The Rosebud Sioux Tribe claims to own Rosebud Lending, but its involvement in the lending business is merely superficial. The Tribe's only real contribution is to provide a cloak of

4

A-688

sovereign immunity for the lending activities complained of herein.

17.    Subsidiaries of entities that claim to be owned by REDCO have purported to operate various websites, all of which charge consumers triple-digit interest rates, including:

     a.    AdvanceMeToday.com, owned by "Rosebud Lending AMT";

     b.    FirstPayLoans.com, owned by "Rosebud Lending BHL";

     c.    MyQuickWallet.com, owned by "Rosebud Lending DRT";

     d.    PixyCash.com, owned by "Rosebud Lending PCL"; and

     e.    QCredit.com, owned by "Rosebud Lending RQC."

18.    On information and belief, each of these websites represents a "rent-a-tribe" scheme with a different, non-tribal investor or investors.

19.    The lending enterprise doing business as ZocaLoans operated for the principle benefit of: (a) 777 Partners, (b) F3EA Capital, (c) F3EA Servicing, (d) F3EA Holdings, and (e) Tactical — all non-tribal entities organized under Delaware law and located in or around Miami, Florida.

20.    777 Partners, F3EA Capital, F3EA Servicing, F3EA Holdings, and Tactical are referred to as the "777 Defendants."

21.    The 777 Defendants pay Rosebud Lending a small percentage of the revenues generated from ZocaLoans' loans in a "rent-a-tribe" agreement as outlined herein. For example, REDCO's Annual Report for 2019 showed Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and a "management fee" of over $30 million paid out to non-tribal entities. Rosebud Lending, in turn, pays REDCO a nominal share of the monies it receives for the use of REDCO and the Tribe's name.

22.    Defendants sought out Illinois residents for loans. ZocaLoans' website states that it makes loans to residents of Illinois but not residents of other states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

5

A-689

### 777 Partners, LLC

23.     Defendant 777 Partners, LLC is a Miami-based private investment and equity firm founded by Joshua Wander and Steven W. Pasko.

24.     777 Partners is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its managers are Steven W. Pasko, Joshua Wander, Ed Gehres, John Sicilian, Tom Staz, and Damien Alfalla.

25.     777 Partners claims to own Defendant F3EA Servicing.

26.     777 Partners receives the overwhelming majority of the profit from the ZocaLoans enterprise. It knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers.

27.     777 Partners is the ultimate beneficiary of the ZocaLoan lending operation.

### F3EA Capital, LLC

28.     Defendant F3EA Capital, LLC is a limited liability company organized under Delaware law with its principal address located at 600 Brickell Avenue, Suite 1900, Miami, FL 33131. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

29.     F3EA Capital provides capital used to fund loans made by ZocaLoans and is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

30.     F3EA Capital is an affiliate of 777 Partners.

### F3EA Servicing, LLC

31.     Defendant F3EA Servicing, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131 and 1855 Griffin Road, B390 Dania, FL 33004.

32.     According to 777 Partners' website, F3EA Servicing "provides origination,

6

servicing, compliance and underwriting capabilities to various loan and leasing portfolios. F3EA supports client growth through its end to end servicing infrastructure…" .

33.     An attorney named Mollie Wander – Joshua Wander's wife – is a member of F3EA Servicing. Ms. Wander is intimately involved in the operation of ZocaLoans and negotiated the contracts awarded to the 777 Defendants along with Ed Gehres, the former General Counsel of 777 Partners.

34.     Marie Gizzi, an employee of F3EA Servicing, states that she works for "Zocaloans subsidiary of F3EA Servicing LLC" and that, in her capacity as a loan processor, she "[r]eview[s] and analy[zes] loan applications, credit bureau reports, bank statements and financial documentation to ensure all loan documentation is complete, accurate and verified before submitting to underwriting." *Id.*

35.     Vanessa Ponce, an employee of F3EA Servicing, purports to be a "Customer Service Supervisor at Zoca Loans."

36.     F3EA Servicing is the recipient of tens of millions of dollars of unlawful interest for which it contracted with Rosebud Lending to receive.

37.     F3EA Servicing has collected hundreds of millions of dollars of ZocaLoans payments made by consumers.

### F3EA Holdings, LLC

38.     Defendant F3EA Holdings, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

39.     On information and belief, Joshua Wander, co-founder of 777 Partners, sits on the board of F3EA Holdings.

40.     F3EA Holdings has provided capital used to fund loans made by ZocaLoans and has collected loans made in the name of ZocaLoans.

41.     F3EA Holdings knowingly contracted for or received, directly or indirectly, unlawful

7

interest from loans nominally made by Rosebud Lending to consumers.

### Tactical Marketing Partners, LLC

42.     Defendant Tactical Marketing Partners, LLC is a limited liability company organized under Delaware law. Its registered agent and office is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It does business at 600 Brickell Avenue, Suite 1900, Miami, FL 33131.

43.     On information and belief, Tactical obtains consumer reports (credit reports) as agent or authorized service provider for Rosebud Lending.

44.     Tactical knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Rosebud Lending to consumers.

### Overview of Defendants' Enterprise

45.     On information and belief, 777 Partners approached individuals associated with the Rosebud Sioux Tribe in 2015 with a pitch to create an online lending business. In exchange for use of the Tribe's economic development corporation's name, 777 Partners offered to provide the capital used to fund loans made by ZocaLoans and provide the resources necessary to operate all aspects of an online lending operation.

46.     777 Partners has total control of Rosebud Lending and manages all substantive aspects of the lending business. For example, 777 Partners and its affiliates, among other things: (i) maintain a sweeping security interest in the lending operation; (ii) control the lending operation's operating account by way of a deposit account control agreement; and (iii) are responsible for, among other things, marketing, servicing, funding, and collection of loans made in the name of Rosebud Lending.

47.     777 Partners has seen that its affiliates and subsidiaries receive all lucrative marketing and servicing contracts and has entered into multiple revolving loan and security agreements whereby it has advanced close to $100 million to fund the underlying loans.

48.     The 777 Defendants also provide the technological and data science infrastructure

8

A-692

to underwrite the loans.

49.     All material policies and procedures relating to the lending operation are instituted  by the 777 Defendants without input from the Rosebud Tribe, REDCO, Rosebud Lending, or Rosebud Lending LZO.

50.     Loans made in the name of Rosebud Lending are funded by 777 Partners, F3EA Capital, F3EA Servicing, and F3EA Holdings.

51.     The monies used to fund loans made in the name of ZocaLoans are kept in bank accounts controlled by the 777 Defendants to which the Rosebud Tribe Sioux Tribe, REDCO, Rosebud Lending, and Rosebud Lending LZO have no access.

52.     F3EA Servicing entered into two Master Servicing Agreement with Rosebud Lending and provides a comprehensive suite of services to the ZocaLoans enterprise, including, but not limited to:

        a.     Marketing;

        b.     Call center;

        c.     Compliance;

        d.     Administrative;

        e.     Lead generation;

        f.     Risk and underwriting;

        g.     Modeling;

        h.     Collection; and

        i.     Risk-based marketing.

53.     UCC filings reveal that F3EA Capital has a security interest in Rosebud Lending's:

        a.     Assets including proceeds and products;

        b.     Negotiable instruments including proceeds and profits; and

        c.     Accounts including proceeds and profits.

54.     F3EA Capital has entered into multiple revolving loan and security agreements

9

A-693

with Rosebud Lending.

55.    Rosebud Lending claims that only the following three people are involved in the operation of ZocaLoans: "Clay Colombe, REDCO Chief Executive Officer, Mandy Medearis, Rosebud Lending LZO d/b/a ZocaLoans Operations and Compliance Manager, and Leah Running Bear, Rosebud Lending LZO d/b/a ZocaLoans loan specialist."

56.    The claim is false. There were numerous other persons involved in the ZocaLoanS enterprise, but all were associated with the 777 Defendants.

57.    Domain registration records from 2019 show that www.zocaloans.com is registered to 777 Partners (Exhibit K).

58.    The profile of Jennifer Menard, a Senior Operations Analyst at 777 Partners, states that, "[p]rior to joining 777" Menard "was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor..."

59.    On information and belief, 777 Partners has ties to other high interest payday lenders. *See, e.g.*, www.777part.com/team_member/ed-gehres/ ("Mr. Gehres also recently served as outside General Counsel to Think Finance); www.777part.com/team_member/matthew-ghourdjian/ ("Mr. Ghourdjian served as [ ] the CIO of DiTech.com and CashCall."); www.777part.com/team_member/hussien-sleiman/ (last visited April 5, 2022) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms").

**FACTS RELATING TO PLAINTIFFS**

60.    Plaintiff Joseph Morgan obtained a loan from Rosebud on September 6, 2021 (Exhibit A).

61.    Plaintiff David Johnson obtained a series of loans from Rosebud (Exhibits B-I)

62.    The loans were written on standard form loan agreements used by Rosebud Lending LZO d/b/a ZocaLoans on a regular basis.

63.    Defendants regularly make loans to individuals in Illinois, and throughout the United

10

A-694

States, at such rates.

64. The loans were obtained for personal, family or household purposes and not for business purposes.

65. At no time have any of the Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

66. Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

67. Defendants sought out Illinois residents for such loans.

### ILLINOIS PROHIBITIONS ON PREDATORY LOANS

68. Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

69. Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

70. Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

71. Any loan made by an unlicensed person to an Illinois resident at more than 9% interest is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and

11

A-695

void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

72. Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violates the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

73. Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

74. Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 11cv8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

75. The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g.*, *In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569; *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

A-696

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

76.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses–such as the 777 Defendants–engage in a business model commonly referred to as a "rent-a-tribe" scheme.

77.      Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

78.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

79.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

80.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

81.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

82.     These so-called "tribal lenders" usually do not survive scrutiny when examined

13

closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

83. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

84. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. N₁f,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

85. Indeed, "[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

86. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, 1:16-cr-00091-PKC (S.D.N.Y.). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

### COUNT I - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT

87. Plaintiffs incorporate paragraphs 1-86.

88. This claim is against all Defendants.

89. There is a controversy between Plaintiffs and the class, on the one hand, and

14

A-698

Defendants, on the other, as to whether Plaintiffs must repay outstanding loans.

90.    Declaratory relief will resolve such controversy.

91.    An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

92.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

93.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan has not been paid in full.

94.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

95.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

96.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

97.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

98.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

99.    Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

100.    The class is entitled to a declaration that Defendants are not entitled to collect on the

15

A-699

loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

        i.        Injunctive relief;

        ii.        Declaratory relief;

        iii.        Restitution of all amounts collected on the loans from members of the class;

        iv.        Costs of suit; and

        v.        Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

101.     Plaintiffs incorporate paragraphs 1-86.

102.     This claim is against all Defendants.

103.     Defendants contracted for and collected loans at more than 9% interest from Plaintiffs and the class members, in violation of 815 ILCS 205/4.

104.     Plaintiffs and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

105.     Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

106.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

107.     Plaintiffs may alter the class definition to conform to developments in the case and discovery.

108.     The class is so numerous that joinder of all members is not practicable. On

16

A-700

information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

109.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

110.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

111.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

112.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i.    Damages as provided in 815 ILCS 205/6;

    ii.    Attorney's fees, litigation expenses and costs of suit; and

    iii.    Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

113.    Plaintiffs incorporate paragraphs 1-86.

114.    This claim is against all Defendants.

115.    Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

116.    Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

17

A-701

## CLASS ALLEGATIONS

117.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

118.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

119.    Plaintiffs may alter the class definition to conform to developments in the case and discovery.

120.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 1,000 class members.

121.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

122.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

123.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

124.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.      Individual actions are not economically feasible.

b.      Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i.      Compensatory damages;

ii.     Punitive damages;

18

A-702

        iii.      Attorney's fees, litigation expenses and costs of suit; and

        iv.      Such other and further relief as the Court deems proper.

### COUNT IV – RICO

125.    Plaintiffs incorporate paragraphs 1-86.

126.    This claim is against Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC who are the RICO "persons." 18 U.S.C. § 1964(3).

127.    Defendants 777 Partners, LLC, F3EA Holdings, LLC, F3EA Servicing, LLC, and F3EA Capital, LLC violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

128.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

129.    The means and methods by which the 777 Defendants and other members and associates conducted and participated in the conduct of the affairs of the enterprise was and continues to be the operation, direction, and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Illinois, where the usurious rates charged were at least twice the enforceable rate. The 777 Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois, and various other state laws, but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

130.    In addition to legal limits of interest that may be charged under Illinois law, most other jurisdictions in the United States have limits on the amounts of interest that a lender may charge. *See, e.g.*, Ariz. Rev. Stat. §§ 6-603, *et Seq.*; Ark. Const. Amend. 89, § 3; Ark. Code Ann. §§ 4–57–104, 4–57–105; Conn. Gen. Stat. § 36a–563; Fla. Stat. §§ 516.01(2), 516.03, 516.031, 687.071(3); Ga. Code Ann. §§ 7–3–6; 7–3–14, 7–4–2, 7–4–18, and 16–17–1, *et Seq.*; Md. Code Ann. Com. Law §§ 12–306, 12–313, 12–314; Mass. G. L. c.140, §§ 96, 110; N. C. Gen. Stat. §§ 53–173,

19

A-703

53–176; N. H. Rev. Stat. Ann. § 399–a12; N. J. Stat. Ann. §§ 2c:21–19(a), 17:11c-3, 17:11c-41; N. Y. Gen. Oblig. Law § 5–501; N. Y. Banking Law § 14-a(1); N.Y. Penal Law § 190.40; Vt. Stat. Ann. Tit. 8, § 2230; Vt. Stat. Ann. Tit. 9, § 41a. All of the loans made to members of the Class and Subclass and collected by the Defendants included an interest rate far in excess of twice the enforceable rate. Each of the Defendants was associated with the enterprise through the collection of unlawful debts.

131. Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise" engaged in, and whose activities affect, interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet. The enterprise's leadership is based in Miami, Florida, and other locations as addressed in preceding paragraphs. The enterprise operates throughout the United States, including the Northern District of Illinois, as well as in foreign countries.

132. Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with this enterprise, in that they direct the making of loans by Rosebud Lending LZO and finance the operation.

133. The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities

134. The 777 Defendants have all participated in the formation and operation of this scheme to defraud borrowers while attempting to take advantage of tribal immunity through the association with the Tribe.

135. The lending enterprise operates through ACH transactions, such as those involving the payments by Plaintiffs. These ACH transactions involve interstate commerce because they flow through Rosebud Lending's bank account in Missouri, Plaintiffs' bank account, and through various intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to the 777 Defendants in Miami, Florida.

136. The lending enterprise operates through a website, created and overseen by the 777 Defendants, at www.zocaloans.com. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire transfers to the individual

20

A-704

borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

137. The 777 Defendants work together and function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of the 777 Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

138. Acting in concert, the 777 Defendants created the ZocaLoans enterprise with essential lending services provided by F3EA Servicing so that they could attempt to take advantage of the doctrine of tribal sovereign immunity for the express purpose of trying to avoid state and federal laws that regulate and ban payday lending at usurious rates of interest.

139. The 777 Defendants defined the types of loans that ZocaLoans would offer to customers and the illegal terms on which the loans would be created.

140. The 777 Defendants acted in concert in knowingly marketing the loans via the Internet and through pre-screened marketing solicitations to borrowers who reside across the United States–including Illinois–and off of Tribal lands.

141. The 777 Defendants exercised pervasive control over the lending operation as detailed in the previous sections.

142. As alleged above, the 777 Defendants, and other participants not yet known to Plaintiffs, violated § 1962(c) of RICO by participating directly or indirectly in the conduct of the enterprise's illegal operations, through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

143. In operating and conducting the affairs of the enterprise, the 777 Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. The 777 Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

144. The predicate acts of collection of unlawful debt by the 777 Defendants are

A-705

described herein. The debts incurred by Plaintiffs and all other members of the Class and Subclass are unlawful and unenforceable.

145.    The 777 Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiffs' and Class and Subclass members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the ZocaLoans enterprise.18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

146.    777 Partners, acting in concert with F3EA Servicing, F3EA Capital and F3EA Holdings, operated ZocaLoans in a scheme to defraud tens of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance this scheme, the 777 Defendants created the ZocaLoans enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme. Defendants knowingly intended to defraud Plaintiffs and other the victims of the lending scheme.

147.    The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and developed by the 777 Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits – for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by the 777 Defendants through ZocaLoans.

148.    The 777 Defendants' leadership, management, and participation in the enterprise

22

A-706

began at some point as early as 2015, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each of the 777 Defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination, operation, and management of the lending business, the 777 Defendants induced Plaintiffs and members of the Class and Subclass to repay unlawful debts. The foregoing record demonstrates that 777 Partners, through its subsidiaries or affiliates, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

149.   Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the conduct of the affairs of ZocaLoans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

150.   Plaintiffs were deprived of money as a result of the 777 Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for the 777 Defendants' conduct.

151.   In addition, Plaintiffs and members of the below Class and Subclass have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts. Accordingly, as a direct and proximate cause of their violations of RICO, the 777 Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class and Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964 (c).

## CLASS ALLEGATIONS

152.   Plaintiffs bring this claim on behalf of one Class and one Subclass, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

153.   The class consists of: all persons (a) to whom a loan was made in the name of

23

**A-707**

Rosebud Lending LZO d/b/a ZocaLoans, (b) while residents of the United States (except Delaware, California, Idaho, Missouri, Wisconsin and Utah), and (c) which loan was made on or after a date four years prior to the filing of suit.

154. The subclass consists of: (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Rosebud Lending LZO d/b/a ZocaLoans (c) which loan was made on or after a date four years prior to the filing of suit.

155. Plaintiffs may alter the above class definitions to conform to developments in the case and discovery.

156. The Class and Subclass are so numerous that joinder of their members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 20,000 members of the Class, and at least 1,000 members of the Subclass.

157. There are questions of law and fact common to members of the Class and Subclass, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a. Whether the loans at issue are "unlawful debts" as defined in RICO.

      b. Whether Rosebud Lending LZO d/b/a ZocaLoans is an "enterprise."

      c. Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital are associated with Rosebud Lending LZO d/b/a ZocaLoans.

      d. Whether Defendants 777 Partners, F3EA Holdings, F3EA Servicing, and F3EA Capital conducted or participated in the affairs of Rosebud Lending LZO d/b/a ZocaLoans through a pattern of making and collecting unlawful loans.

158. Plaintiffs will fairly and adequately represent the members of the Class and Subclass. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

159. Plaintiffs' claims are typical of the claims of the members of the Class and Subclass.

24

A-708

All are based on the same factual and legal theories.

160.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.      Individual actions are not economically feasible.

      b.      Members of the Class and Subclass are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the Class and Subclass and against Defendants for:

      i.      Treble damages;

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6297473)
Dulijaza (Julie) Clark (ARDC 6273353)
**EDELMAN, COMBS, LATTURNER**
**& GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

### JURY DEMAND

Plaintiffs demand trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

A-709

## NOTICE OF LIEN AND ASSIGNMENT

     Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

                         */s/ Daniel A. Edelman*
                         Daniel A. Edelman

A-710

1

O4EALeaH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEADENHALL CAPITAL PARTNERS
    LLP, *et al.,*
4
                    Plaintiff,
5
            v.                          24 Civ. 3453 (JGK)
6
    NATIONAL FOUNDERS LP, KENNETH
7   KING, *et al.,*
                                        Hearing
8
                    Defendants.
9
    ------------------------------x
10                                      New York, N.Y.
                                        May 14, 2024
11                                      4:33 p.m.

12  Before:

13                      HON. JOHN G. KOELTL,

14                                      District Judge

15                          APPEARANCES

16  KING & SPALDING LLP
            Attorneys for Plaintiff
17  BY:  LEIGH MAGER NATHANSON
         BRIAN K. DONOVAN
18       ROGER G. SCHWARTZ

19  SMITH GAMBRELL & RUSSELL, LLP
            Attorneys for Defendant 777 Partners LLC
20  BY:  JOHN G. McCARTHY
         DAVID PELLEGRINO
21
    CADWALADER WICKERSHAM & TAFT LLP
22          Attorneys for Defendant Advantage Capital Holdings, King
    BY:  JONATHAN M. WATKINS
23       MARK A. SINGER

24  SIDLEY AUSTIN LLP
            Attorneys for Defendant National Founders LP
25  BY:  NICHOLAS P. CROWELL

A-711

2

O4EALeaH

1          (Case called)

2          MS. NATHANSON:  Good afternoon, your Honor.  This is

3   Leigh Nathanson from King & Spalding for the plaintiff.  I'm

4   here with my partner Roger Schwartz and my colleague Brian

5   Donovan.

6          MR. McCARTHY:  Good afternoon, your Honor.  John

7   McCarthy and David Pellegrino from Smith Gambrell & Russell,

8   LLP on behalf of 777 Partners, LLC, and the affiliated entities

9   that are defendants in this case.

10          THE COURT:  Thank you.

11          MR. WATKINS:  Good afternoon, your Honor.  Jonathan

12   Watkins, here with my colleague Mark Singer on behalf of

13   Advantage Capital Holdings, LLC, and Mr. Kenneth King.

14          THE COURT:  Good afternoon.

15          MR. CROWELL:  Good afternoon, your Honor.  Nicholas

16   Crowell from Sidley Austin for proposed intervener National

17   Founders.

18          THE COURT:  Good afternoon.

19          First of all, there's a motion to intervene by

20   National Founders.  I read the motion to intervene.  Is there

21   any objection?

22          MS. NATHANSON:  Good afternoon, your Honor.  For

23   plaintiffs, we don't have an objection to hearing National

24   Founders' position as to how the proposed relief here or the

25   proposed relief sought in the case impacts their interest.

A-712

3

O4EALeaH

1    That said, we're not sure that it does.

2         THE COURT:  Okay.  National Founders can intervene for

3    purposes of the TRO and the preliminary injunction.  For

4    purposes of the case going forward, I really need a pleading

5    indicating on which side National Founders is intervening and

6    what the nature of the complaint or answer or whatnot is by

7    National Founders.  I appreciate National Founders' interest in

8    the collateral that's allegedly been doubly posted.

9         MR. CROWELL:  Completely understand, your Honor.  And

10   we will.  We just got notice of this interest by tracking the

11   case, so we didn't get notice ahead of time.  So understand,

12   and we will file such a pleading.

13        MS. NATHANSON:  For the record, your Honor, although I

14   don't think it effects their ability to file the pleading,

15   Mr. Crowell's client was notified ahead of time through other

16   counsel.

17        THE COURT:  Oh, you mean of this hearing?

18        MS. NATHANSON:  Yes.

19        THE COURT:  I assume that's right.

20        So I don't grant TROs except in extraordinary

21   circumstances, such as where it's authorized by a statute, such

22   as in cases involving counterfeiting.  I don't grant them

23   without notice.  And then the issue is, where do we go from

24   here?  Should I listen to the parties?  Should I get additional

25   submissions?  What's the issue of urgency?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-713

4

O4EALeaH

1          To let you know what my own schedule is, I'm going to

2     be away effectively for two weeks beginning next Tuesday.  If

3     it's something that requires urgent decision while I'm away, of

4     course I can have the part one judge deal with it.  But the

5     initial questions are what should be done about the TRO and

6     then the possible scheduling of the preliminary injunction.

7          Have the parties had an opportunity to talk about this

8     in advance?

9          MS. NATHANSON:  No, your Honor.  We were just notified

10    of the identity of defense counsel a few hours ago.

11         THE COURT:  Okay.  Well, a few hours.

12         MS. NATHANSON:  Or I suppose it was a few minutes

13    ago --

14         THE COURT:  Hold on.  Hold on.

15         MR. McCARTHY:  Sorry.

16         THE COURT:  I would have thought that the parties

17    would have had a conversation about what the various

18    alternatives are.  I read the papers.  You can have a seat just

19    for a second.

20         Plainly, the situation described by the plaintiff is a

21    matter of concern.  Plaintiff alleges, among other things, that

22    there are admitted breaches of the underlying agreements, that

23    the plaintiff is owed hundreds of millions of dollars.  That,

24    as I said, there are claimed breaches of the underlying

25    agreements, and that the defendants have been unable to or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-714

5

O4EALeaH

1    unwilling even to make good faith payments of $5 million.  And
2    so the plaintiff asks for either a receivership or effectively
3    an injunction preventing the dissipation of assets until the
4    underlying case can be decided.

5         And the plaintiff asks for that on the basis of a
6    temporary restraining order, which obviously is only temporary,
7    14 days, renewable for another 14 days.  And the same relief
8    for the preliminary injunction.

9         Plainly, there are no responsive papers on the TRO,
10   which is natural because, as I said, I don't grant TROs without
11   calling the parties in and finding out what their positions
12   are, and having, if necessary, prompt briefing on the TRO, or
13   if the parties can reach some agreement, some agreement with
14   respect to the TRO and scheduling a schedule for the
15   preliminary injunction.

16        The allegations in the plaintiff's papers are serious.
17   The request for the adjournment of this proceeding, one of the
18   requests for adjournment of this proceeding, was based on
19   there's no irreparable injury, we're just talking about damages
20   here.  That's not quite right.  An exception to that rule, with
21   respect to irreparable injury doesn't exist if it can be
22   compensated for by money damages, is if there is a realistic
23   risk of insolvency because then you can't repair in money
24   damages.  So here, we have hundreds of millions of dollars at
25   risk, and defendants able not even to put up $5 million.

A-715

6

O4EALeaH

1        So there has to be some proposals out there from all

2    of the sophisticated lawyers in this room about what you expect

3    in terms of a TRO and a preliminary injunction.  And, as I

4    said, it would have been better to discuss this before coming

5    before me.  But this can be resolved.  I'll simply call a break

6    and since you're all here, you can talk among yourselves as to

7    what you think the appropriate next steps are for me.

8        Plainly, I can sign the TRO after listening to the

9    parties.  I can have briefing on the TRO, prompt briefing, so

10   that it can be decided promptly.  The plaintiff brought the

11   case in early May and waited I think about ten days to bring

12   the TRO.  So it's not as though briefing the TRO for a couple

13   of days is going to make a difference.  And then, of course,

14   there's the schedule for the preliminary injunction.

15       Finally, I would have thought that given the amount of

16   money involved, and the prior dealings among the parties, that

17   the parties would have a business suggestion with respect to

18   how to resolve the matter now that it's been brought to the

19   Court, preliminarily resolve the matter in a way that protects

20   the parties' interests.

21       So we'll adjourn briefly while you have an opportunity

22   to talk.

23       MS. NATHANSON:  Thank you, your Honor.  I just want to

24   point out I misspoke earlier.  It was minutes of notice that we

25   had had of defense counsel's identity, so that's why we didn't

A-716

7

O4EALeaH

1    talk before this hearing.

2              THE COURT:  Okay.

3              I mean, I would have thought that you all had been

4    talking with at least some counsel for defendants, might not

5    have been litigation counsel for the defendants.  But plainly,

6    there were lawyers on the other side.

7              MS. NATHANSON:  So we had been speaking with in-house

8    counsel.  We reached out immediately upon filing of the

9    complaint, which in the complaint itself previews our intent to

10   seek preliminary relief.  We also reached out and had

11   communications with in-house counsel over the past two days or

12   day and a half since the TRO application was filed, but they

13   had told us that they were in the process of retaining outside

14   counsel and wanted us to speak with outside counsel.

15             THE COURT:  Okay.

16             (Recess)

17             THE COURT:  All right.  Where are we?

18             MS. NATHANSON:  Your Honor, we've conferred with

19   defendants.

20             THE COURT:  Would you use the microphone, please.

21             MS. NATHANSON:  We've conferred with defendants and

22   they agreed, or the 777 defendants who are implicated in the

23   TRO --

24             THE COURT:  It would be useful for the reporter and

25   for me to use the microphone.

A-717

8

O4EALeaH

1          MS. NATHANSON:  Is that better?

2          THE COURT:  Yes, it is.

3          MS. NATHANSON:  Okay.  We've conferred with defendants

4    and they've agreed that they will make a proposal to us within

5    48 hours of now that would give Leadenhall some transparency

6    into what is happening at the 777 companies right now.

7          Defense counsel has told us, and this was reported in

8    the press, but we had no transparency into the scope of it,

9    that a chief restructuring officer has been appointed at 777.

10         THE COURT:  I'm sorry, I can't -- perhaps you could

11   use the podium.

12         MS. NATHANSON:  Sure.

13         THE COURT:  Or just bring the microphone closer to

14   you.

15         MS. NATHANSON:  I usually don't have this problem

16   because I'm very short.

17         So defendants have offered to provide us a proposal

18   within 48 hours of now to give Leadenhall some comfort and

19   transparency into what is happening with its collateral and

20   assets sufficient to satisfy security interest over at 777.

21         Defense counsel has told us, and we read this in the

22   press but had no transparency into the scope of it or the

23   mandate, that a chief restructuring officer has been appointed

24   at 777 to get a handle on what will happen with the companies

25   and with the assets.  And one of the things that we discussed

A-718

9

O4EALeaH

1    was that an agreement by defendants to give Leadenhall some

2    transparency into what that officer's mandate is, what is the

3    plan for the assets, what is the plan for repayment, would

4    possibly obviate the need for some or all of the temporary

5    relief we're seeking.

6            So what we would propose to do is wait those 48 hours,

7    reserve our clients' rights to essentially unpress the pause

8    button after that point.  And the reason I say this is that the

9    parties have had months of negotiations here whereby defendants

10   have made a lot of promises, including promises reduced to term

11   sheets, with no performance following.  And so I think we'll

12   need to see what the proposal looks like before deciding that

13   our clients' interests will be served by a consensual

14   resolution.  But we're hoping that we can reach one.

15           MR. McCARTHY:  I'm going to use the podium, your

16   Honor.

17           MS. NATHANSON:  Sorry.  One more point my colleagues

18   remind me of is that we've agreed in principle that if we do

19   not reach agreement on some consensual interim relief here, we

20   would be happy to brief the issue for the Court.

21           THE COURT:  You would be happy to brief the?

22           MS. NATHANSON:  We could brief the application for a

23   temporary restraining order.  We could move to the preliminary

24   injunction stage.  We're not trying to prevent the other

25   parties from having their say here.  But we do think that we're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-719

O4EALeaH

1   entitled to preliminary relief at this point.

2           THE COURT:  Okay.  Yes?

3           MR. McCARTHY:  So, your Honor, as Ms. Nathanson

4   pointed out that B. Riley, which is a nationally recognized

5   firm, has been -- I'm sorry, I'm getting feedback -- has been

6   retained by our clients as a chief restructuring officer.

7           There's a team from B. Riley in there right now.

8   We've agreed to talk to them and try to come up with the

9   proposal and we've essentially agreed -- we've agreed along the

10  lines of what Ms. Nathanson said.  We'll get back to them

11  within 48 hours of what B. Riley, the restructuring officer,

12  can do, and then hopefully resolve this.  But there's nothing

13  for your Honor to do today.

14          THE COURT:  Okay.  As I understand it, the proposal

15  from the defendant will be made by the close of business on

16  Thursday, May 16.  Right?

17          MR. McCARTHY:  Yes, your Honor.

18          THE COURT:  Okay.  So you all, either the plaintiff or

19  with the defendants, should send me a letter by Friday, May 17,

20  at 10:00 a.m. telling me what the status of the case is and

21  what the parties want me to do.

22          MS. NATHANSON:  Okay.  Thank you, your Honor.

23          THE COURT:  Okay.

24          MR. McCARTHY:  Thank you, your Honor.

25          THE COURT:  Yes, sir.

A-720

11

O4EALeaH

1        MR. WATKINS:  If I may briefly, your Honor.  Jonathan

2   Watkins for A Cap.

3        THE COURT:  You can stay seated if you want.  It's

4   okay.

5        MR. WATKINS:  Thank you, your Honor.  I stand only to

6   mention that I think Ms. Nathanson referred to defense counsel

7   on a number of occasions, and that proposal will be coming from

8   counsel for the 777 Partners entities and not my clients,

9   Advantage Capital and Mr. King.  And Ms. Nathanson in our

10  discussions indicated, as is apparent from the face of the

11  motion, that it is not directed at my clients.

12       THE COURT:  Okay.  In view of the number of parties in

13  the case and the intervener, in your correspondence you should

14  make that clear as to who the offer is being made on behalf of

15  and in the status letter to me on Friday, May 17, at

16  10:00 a.m., you should also make clear if there are any

17  differences among the various parties.  Okay?

18       Okay.

19       MR. McCARTHY:  Thank you, your Honor.

20       THE COURT:  Thank you all, and I thank the reporter

21  for staying late.

22       MS. NATHANSON:  Thank you, your Honor.

23       (Adjourned)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-721

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

LEADENHALL CAPITAL PARTNERS LLP and
LEADENHALL LIFE INSURANCE LINKED
INVESTMENTS FUND PLC,

*Plaintiffs,*

v.

JOSH WANDER, STEVEN PASKO, KENNETH
KING, 777 PARTNERS LLC, 600 PARTNERS
LLC, SPLCSS III LLC, SIGNAL SML 4 LLC,
INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,
SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY
CAPITAL LLC, SUTTONPARK SERVICING
LLC, SIGNAL SERVICING LLC, INSURETY
SERVICING LLC, and ADVANTAGE
CAPITAL HOLDINGS LLC,

*Defendants.*

Civil Action No. 1:24-cv-03453

---

## DECLARATION OF MICHAEL SALIBA

I, Michael Saliba, declare as follows:

1.     I am the Chief Operating Officer of Defendant Advantage Capital Holdings LLC
(together with its affiliates, and excluding reference to investments made in the ModCo Accounts
defined below, "A-CAP"). I have personal knowledge of the matters described in this declaration,
except where indicated that my knowledge is on information provided to me, and if called as a
witness, I could and would testify competently to the matters discussed in this declaration.

2.     I have over 18 years of experience in the capital and financial markets, including
Options, Securities, Equities, Strategic Planning, M&A, and Capital Markets.

A-722

## A-CAP's Business

3.      A-CAP is an insurance holding company that is the ultimate parent of Sentinel Security Life Insurance Company, founded in 1948; Atlantic Coast Life Insurance Company, founded in 1925; Haymarket Insurance Company; Jazz Reinsurance Company; and Southern Atlantic Re Inc.

4.      As an insurance holding company, A-CAP's focus is on fulfilling its fiduciary obligation to protect the investments of its policyholders.  A-CAP provides comprehensive services to insurance policyholders, insurance company clients, and capital partners. A-CAP also has an asset management arm that provides insurance-driven investment strategies to its own companies and third parties. A-CAP has offices in New York, Charleston, and Salt Lake City.

## The Business of Partners

5.      777 Partners LLC, 600 Partners LLC (together, "Partners HoldCo"), and their affiliates (collectively, "Partners") comprise an investment company based in Miami, Florida. Partners reports being founded in 2015 and having more than $3 billion in assets under its management, more than 600 employees, and investments in more than 50 operating companies.

6.      Partners is engaged in several lines of business, including Specialty Finance (investing in industries like aviation finance and motorcycle leasing); Litigation Finance; Sustainable (ESG) Investment; Insurance; Sports, Media, and Entertainment; and Structured Settlements.

## A-CAP's and Leadenhall's Business Relationships with Partners

7.      A-CAP has loaned a substantial amount to Partners HoldCo ("the Holdco Loan"), an amount that far exceeds the amount of Leadenhall's loans to four SPVs that Leadenhall describes in its filings in this case.  The Holdco Loan is secured by a first-priority, perfected senior

A-723

lien on the assets of Partners HoldCo, and also through senior, secured corporate guarantees from several subsidiary operating and intermediate holding companies across several of Partners' lines of business ("Partners OpCos").



10.    A-CAP does not improperly "control" Partners, and A-CAP is not involved in any illicit conspiracy with Partners. A-CAP does, as a senior creditor to Partners, have several contractual rights with respect to Partners. In my experience, those contractual rights of A-CAP are customary and appropriate given Partners' significant debt to A-CAP. Those rights are necessary and appropriate to protect A-CAP's and its insurance companies' policyholders' rights and interests. A-CAP has invoked those rights in connection with requests made of and proposals made to Partners. Every such request and proposal has been made by A-CAP because A-CAP

believed, in its best judgment, that each would protect the rights of and be in the best interests of both A-CAP and its insurance companies' policyholders.

11.     I recently reviewed assertions made by Leadenhall in its filings in this litigation. The creditor-debtor relationship between Leadenhall and Partners-related entities, as described by Leadenhall's litigation statements and the excerpted loan documents filed by Leadenhall, is much different than A-CAP's creditor-debtor relationship with Partners (as described above).  Based on my reading of Leadenhall's litigation documents, I understand that Leadenhall's only investment in any affiliate of Partners is to four SPV "Borrowers"—SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC—comprising a small subset of Partners' Structured Settlements business line.  Based on my recent review of those documents, I do not understand Leadenhall to assert that it has made any loan to any other business line of Partners, to any other Partners OpCo, to Partners Parent, or otherwise directly to Partners as a whole.

## Other Creditors of Partners

12.     Leadenhall and A-CAP are two of what I understand to be Partners' dozens of creditors across the several industries in which Partners operates.



A-725

**Alleged "Dissipation" of Assets**

14.     I understand Leadenhall to say that by making protective advances to Partners'
football club investments, A-CAP, Partners, or both were "dissipating assets they were legally
bound to protect for Leadenhall." (ECF 57, p. 21.) As an initial matter, I do not read Leadenhall's
litigation documents to suggest that Leadenhall has any security interest of any kind in Partners'
sports business, and it is unclear to me why, aside from tactical litigation reasons, Leadenhall
would suggest that it could be negatively impacted by protective advances made to football clubs.
It seems to me that such protective advances could only benefit Leadenhall or not affect Leadenhall
one way or the other.



16.     To illustrate how protective advances function and why they are a common practice
among lenders, consider a lender who provides a large loan to a company that arranges, markets,
and operates a concert set to be held in Yankee Stadium—a concert in connection with which the
company has incurred significant expense and hopes to earn even more revenue. Say the lender

A-726

learns on the eve of the concert that the company is short on cash and will be unable to make a deposit that is due to be paid to the musician the morning of the concert.  Assume that if the payment isn't made, the musician has no obligation to perform.  In that scenario, it would be reasonable and prudent for the lender to advance funds to the company so that it can pay the musician and avoid the potentially disastrous consequences of the musician refusing to perform. In that scenario, as with A-CAP's protective advances, the lender seeks to preserve its collateral and increase the borrower's odds of realizing the value of its business (and the odds of success of the lender's debt investment), thus benefitting the recipient of the protective advance, the lender, and all other stakeholders.  In return for such protective advances and the concomitant increased risk to the lender, it is usual, customary, and responsible lending practice for lenders to secure from borrowers additional contractual rights, security interests, or both.

17.    In other circumstances, it may be prudent for lenders (including A-CAP) and borrowers (including Partners) to agree to sell borrower assets to the lender at fair value.  A sale of that type does reduce the assets of the borrower, but, importantly, it *also reduces the debt* of the borrower in an equal amount.   Reducing a borrower's debt (and associated debt-service obligations) can be especially beneficial to a borrower (and thus to a secured lender's collateral) when the borrower is otherwise in financial distress.  In my experience, agreed transfers of this sort are a common part of responsible and prudent private-credit lending relationships.  I also note that in A-CAP's case, it is critically important to A-CAP that any such transactions are for fair value.  In fact, to help ensure as much, when reasonably appropriate, A-CAP and its borrower counterparty enlist the services of banks and independent valuation experts to arrive at reasonable fair value.

-6-

A-727

### The Chief Restructuring Officer

18.     In early April 2024, concerned about the risks to its investments in Partners, A-CAP requested that Joshua Wander and Steve Pasko resign their positions and that Partners appoint an independent and reputable professional in a chief restructuring officer/chief operating officer role to oversee and have complete authority in connection with the operations of and a restructuring of the business (the "CRO").

19.     A-CAP hoped for a CRO that satisfied several important criteria, including that the CRO be completely independent; be cost-efficient, so as not to drain limited resources unnecessarily; have a sterling industry reputation; and have experience with large, multi-faceted, and challenging restructuring projects.  Because A-CAP was unfamiliar with anyone who met all those criteria, A-CAP hired an outside firm (with which A-CAP had no previous relationship) to assist in identifying potential candidates who satisfied all the criteria.

20.     That firm ultimately identified four candidates, and A-CAP proposed those four candidates to Partners for Partners' consideration.  I understand, and A-CAP was advised, that all four individuals are independent, highly reputable professionals that are widely recognized as such in the restructuring industry.  To my knowledge and understanding, none of them had any prior personal or professional relationship with A-CAP or its leaders.

21.     I am informed that Partners interviewed at least some of the candidates, and may have interviewed other individuals as well.  I am also informed that A-CAP did not participate in those interviews.

A-728

22.     In early May 2024, Partners retained GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services, with Ian Ratner to serve as CRO with ultimate responsibility, and Mark Shapiro to serve as Interim COO. Mr. Ratner and Mr. Shapiro are two of the four candidates recommended to A-CAP, and which A-CAP in turn recommended to Partners.  Ratner and his team were appointed to chart a course for restructuring the business. A-CAP is not supervising or directing the work that Ratner is doing. Ratner and B. Riley are entirely independent of Partners' former leadership and independent of A-CAP.

A-729

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' APPLICATION FOR (1) A TEMPORARY RESTRAINING ORDER,
AND (2) AN ORDER TO SHOW CAUSE FOR A RECEIVER OR, ALTERNATIVELY,
A PRELIMINARY INJUNCTION, DATED MAY 30, 2024
(REDACTED HEREIN. REPRODUCED IN THE CONFIDENTIAL APPENDIX AT PP. CA-9-
CA-36)

A-730

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LEADENHALL CAPITAL PARTNERS LLP
and LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,

             Plaintiffs,

vs.

JOSH WANDER, STEVEN PASKO,
KENNETH KING, 777 PARTNERS LLC,
600 PARTNERS LLC, SPLCSS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY
SERVICES LLC, DORCHESTER
RECEIVABLES II LLC, SUTTONPARK
CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY CAPITAL
LLC, SUTTONPARK SERVICING LLC,
SIGNAL SERVICING LLC, INSURETY
SERVICING LLC, and ADVANTAGE
CAPITAL HOLDINGS LLC,

             Defendants.

Civil Action No.  1:24-cv-03453

---

**DECLARATION OF LEIGH M. NATHANSON**

Pursuant to 28 U.S.C. § 1746, Leigh M. Nathanson hereby declares as follows:

1.     I am an attorney at King & Spalding LLP and counsel for Leadenhall Capital

Partners LLP and Leadenhall Linked Investments Fund plc (together, "Leadenhall" or "Plaintiffs")

in this action.

A-731

2.      This declaration is submitted in support of Leadenhall's Reply Memorandum of Law in Further Support of its Application for (1) a Temporary Restraining Order, and (2) an Order to Show Cause for a Receiver or, Alternatively, a Preliminary Injunction.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the May 14, 2024 hearing in this action.

4.      Attached hereto as Exhibit 2 is a true and correct copy of an email with attachment sent by counsel for Leadenhall to counsel for the 777 Defendants on May 23, 2024.[1]

5.      Attached hereto as Exhibit 3 is a true and correct copy of an email sent by counsel for Leadenhall to counsel for A-CAP on May 16, 2024.

6.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
        May 30, 2024

                                KING AND SPALDING LLP

                                _/s/ Leigh M. Nathanson_____
                                Leigh M. Nathanson

---

[1] Capitalized terms have the meaning set forth in Leadenhall's Reply Memorandum of Law in Further Support of Plaintiffs' Application for (1) a Temporary Restraining Order, and (2) an Order to Show Cause for a Receiver or, Alternatively, a Preliminary Injunction.

A-732

# EXHIBIT 1

A-733

O4EALeaH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LEADENHALL CAPITAL PARTNERS
     LLP, et al.,
 4
                     Plaintiff,
 5
              v.                              24 Civ. 3453 (JGK)
 6
     NATIONAL FOUNDERS LP, KENNETH
 7   KING, et al.,
                                             Hearing
 8
                     Defendants.
 9
     ------------------------------x
10                                           New York, N.Y.
                                             May 14, 2024
11                                           4:33 p.m.

12   Before:

13                     HON. JOHN G. KOELTL,

14                                           District Judge

15                          APPEARANCES

16   KING & SPALDING LLP
             Attorneys for Plaintiff
17   BY:  LEIGH MAGER NATHANSON
          BRIAN K. DONOVAN
18        ROGER G. SCHWARTZ

19   SMITH GAMBRELL & RUSSELL, LLP
             Attorneys for Defendant 777 Partners LLC
20   BY:  JOHN G. McCARTHY
          DAVID PELLEGRINO
21
22   CADWALADER WICKERSHAM & TAFT LLP
             Attorneys for Defendant Advantage Capital Holdings, King
         BY:  JONATHAN M. WATKINS
23        MARK A. SINGER

24   SIDLEY AUSTIN LLP
             Attorneys for Defendant National Founders LP
25   BY:  NICHOLAS P. CROWELL
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-734

O4EALeaH

1        (Case called)

2        MS. NATHANSON:  Good afternoon, your Honor.  This is

3   Leigh Nathanson from King & Spalding for the plaintiff.  I'm

4   here with my partner Roger Schwartz and my colleague Brian

5   Donovan.

6        MR. McCARTHY:  Good afternoon, your Honor.  John

7   McCarthy and David Pellegrino from Smith Gambrell & Russell,

8   LLP on behalf of 777 Partners, LLC, and the affiliated entities

9   that are defendants in this case.

10        THE COURT:  Thank you.

11        MR. WATKINS:  Good afternoon, your Honor.  Jonathan

12   Watkins, here with my colleague Mark Singer on behalf of

13   Advantage Capital Holdings, LLC, and Mr. Kenneth King.

14        THE COURT:  Good afternoon.

15        MR. CROWELL:  Good afternoon, your Honor.  Nicholas

16   Crowell from Sidley Austin for proposed intervener National

17   Founders.

18        THE COURT:  Good afternoon.

19        First of all, there's a motion to intervene by

20   National Founders.  I read the motion to intervene.  Is there

21   any objection?

22        MS. NATHANSON:  Good afternoon, your Honor.  For

23   plaintiffs, we don't have an objection to hearing National

24   Founders' position as to how the proposed relief here or the

25   proposed relief sought in the case impacts their interest.

**A-735**

O4EALeaH

1    That said, we're not sure that it does.

2         THE COURT:  Okay.  National Founders can intervene for

3    purposes of the TRO and the preliminary injunction.  For

4    purposes of the case going forward, I really need a pleading

5    indicating on which side National Founders is intervening and

6    what the nature of the complaint or answer or whatnot is by

7    National Founders.  I appreciate National Founders' interest in

8    the collateral that's allegedly been doubly posted.

9         MR. CROWELL:  Completely understand, your Honor.  And

10   we will.  We just got notice of this interest by tracking the

11   case, so we didn't get notice ahead of time.  So understand,

12   and we will file such a pleading.

13        MS. NATHANSON:  For the record, your Honor, although I

14   don't think it effects their ability to file the pleading,

15   Mr. Crowell's client was notified ahead of time through other

16   counsel.

17        THE COURT:  Oh, you mean of this hearing?

18        MS. NATHANSON:  Yes.

19        THE COURT:  I assume that's right.

20        So I don't grant TROs except in extraordinary

21   circumstances, such as where it's authorized by a statute, such

22   as in cases involving counterfeiting.  I don't grant them

23   without notice.  And then the issue is, where do we go from

24   here?  Should I listen to the parties?  Should I get additional

25   submissions?  What's the issue of urgency?

A-736

O4EALeaH

```
1          To let you know what my own schedule is, I'm going to

2    be away effectively for two weeks beginning next Tuesday.  If

3    it's something that requires urgent decision while I'm away, of

4    course I can have the part one judge deal with it.  But the

5    initial questions are what should be done about the TRO and

6    then the possible scheduling of the preliminary injunction.

7          Have the parties had an opportunity to talk about this

8    in advance?

9          MS. NATHANSON:  No, your Honor.  We were just notified

10   of the identity of defense counsel a few hours ago.

11         THE COURT:  Okay.  Well, a few hours.

12         MS. NATHANSON:  Or I suppose it was a few minutes

13   ago --

14         THE COURT:  Hold on.  Hold on.

15         MR. McCARTHY:  Sorry.

16         THE COURT:  I would have thought that the parties

17   would have had a conversation about what the various

18   alternatives are.  I read the papers.  You can have a seat just

19   for a second.

20         Plainly, the situation described by the plaintiff is a

21   matter of concern.  Plaintiff alleges, among other things, that

22   there are admitted breaches of the underlying agreements, that

23   the plaintiff is owed hundreds of millions of dollars.  That,

24   as I said, there are claimed breaches of the underlying

25   agreements, and that the defendants have been unable to or
```

A-737

O4EALeaH

| | |
|---|---|
| 1 | unwilling even to make good faith payments of $5 million.  And |
| 2 | so the plaintiff asks for either a receivership or effectively |
| 3 | an injunction preventing the dissipation of assets until the |
| 4 | underlying case can be decided. |
| 5 | And the plaintiff asks for that on the basis of a |
| 6 | temporary restraining order, which obviously is only temporary, |
| 7 | 14 days, renewable for another 14 days.  And the same relief |
| 8 | for the preliminary injunction. |
| 9 | Plainly, there are no responsive papers on the TRO, |
| 10 | which is natural because, as I said, I don't grant TROs without |
| 11 | calling the parties in and finding out what their positions |
| 12 | are, and having, if necessary, prompt briefing on the TRO, or |
| 13 | if the parties can reach some agreement, some agreement with |
| 14 | respect to the TRO and scheduling a schedule for the |
| 15 | preliminary injunction. |
| 16 | The allegations in the plaintiff's papers are serious. |
| 17 | The request for the adjournment of this proceeding, one of the |
| 18 | requests for adjournment of this proceeding, was based on |
| 19 | there's no irreparable injury, we're just talking about damages |
| 20 | here.  That's not quite right.  An exception to that rule, with |
| 21 | respect to irreparable injury doesn't exist if it can be |
| 22 | compensated for by money damages, is if there is a realistic |
| 23 | risk of insolvency because then you can't repair in money |
| 24 | damages.  So here, we have hundreds of millions of dollars at |
| 25 | risk, and defendants able not even to put up $5 million. |

A-738

O4EALeaH

1      So there has to be some proposals out there from all

2  of the sophisticated lawyers in this room about what you expect

3  in terms of a TRO and a preliminary injunction.  And, as I

4  said, it would have been better to discuss this before coming

5  before me.  But this can be resolved.  I'll simply call a break

6  and since you're all here, you can talk among yourselves as to

7  what you think the appropriate next steps are for me.

8      Plainly, I can sign the TRO after listening to the

9  parties.  I can have briefing on the TRO, prompt briefing, so

10  that it can be decided promptly.  The plaintiff brought the

11  case in early May and waited I think about ten days to bring

12  the TRO.  So it's not as though briefing the TRO for a couple

13  of days is going to make a difference.  And then, of course,

14  there's the schedule for the preliminary injunction.

15      Finally, I would have thought that given the amount of

16  money involved, and the prior dealings among the parties, that

17  the parties would have a business suggestion with respect to

18  how to resolve the matter now that it's been brought to the

19  Court, preliminarily resolve the matter in a way that protects

20  the parties' interests.

21      So we'll adjourn briefly while you have an opportunity

22  to talk.

23      MS. NATHANSON:  Thank you, your Honor.  I just want to

24  point out I misspoke earlier.  It was minutes of notice that we

25  had had of defense counsel's identity, so that's why we didn't

A-739

O4EALeaH

1    talk before this hearing.

2            THE COURT:  Okay.

3            I mean, I would have thought that you all had been

4    talking with at least some counsel for defendants, might not

5    have been litigation counsel for the defendants.  But plainly,

6    there were lawyers on the other side.

7            MS. NATHANSON:  So we had been speaking with in-house

8    counsel.  We reached out immediately upon filing of the

9    complaint, which in the complaint itself previews our intent to

10   seek preliminary relief.  We also reached out and had

11   communications with in-house counsel over the past two days or

12   day and a half since the TRO application was filed, but they

13   had told us that they were in the process of retaining outside

14   counsel and wanted us to speak with outside counsel.

15           THE COURT:  Okay.

16           (Recess)

17           THE COURT:  All right.  Where are we?

18           MS. NATHANSON:  Your Honor, we've conferred with

19   defendants.

20           THE COURT:  Would you use the microphone, please.

21           MS. NATHANSON:  We've conferred with defendants and

22   they agreed, or the 777 defendants who are implicated in the

23   TRO --

24           THE COURT:  It would be useful for the reporter and

25   for me to use the microphone.

A-740

O4EALeaH

1           MS. NATHANSON:  Is that better?

2           THE COURT:  Yes, it is.

3           MS. NATHANSON:  Okay.  We've conferred with defendants

4    and they've agreed that they will make a proposal to us within

5    48 hours of now that would give Leadenhall some transparency

6    into what is happening at the 777 companies right now.

7           Defense counsel has told us, and this was reported in

8    the press, but we had no transparency into the scope of it,

9    that a chief restructuring officer has been appointed at 777.

10          THE COURT:  I'm sorry, I can't -- perhaps you could

11   use the podium.

12          MS. NATHANSON:  Sure.

13          THE COURT:  Or just bring the microphone closer to

14   you.

15          MS. NATHANSON:  I usually don't have this problem

16   because I'm very short.

17          So defendants have offered to provide us a proposal

18   within 48 hours of now to give Leadenhall some comfort and

19   transparency into what is happening with its collateral and

20   assets sufficient to satisfy security interest over at 777.

21          Defense counsel has told us, and we read this in the

22   press but had no transparency into the scope of it or the

23   mandate, that a chief restructuring officer has been appointed

24   at 777 to get a handle on what will happen with the companies

25   and with the assets.  And one of the things that we discussed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-741

O4EALeaH

```
 1    was that an agreement by defendants to give Leadenhall some

 2    transparency into what that officer's mandate is, what is the

 3    plan for the assets, what is the plan for repayment, would

 4    possibly obviate the need for some or all of the temporary

 5    relief we're seeking.

 6              So what we would propose to do is wait those 48 hours,

 7    reserve our clients' rights to essentially unpress the pause

 8    button after that point.  And the reason I say this is that the

 9    parties have had months of negotiations here whereby defendants

10    have made a lot of promises, including promises reduced to term

11    sheets, with no performance following.  And so I think we'll

12    need to see what the proposal looks like before deciding that

13    our clients' interests will be served by a consensual

14    resolution.  But we're hoping that we can reach one.

15              MR. McCARTHY:  I'm going to use the podium, your

16    Honor.

17              MS. NATHANSON:  Sorry.  One more point my colleagues

18    remind me of is that we've agreed in principle that if we do

19    not reach agreement on some consensual interim relief here, we

20    would be happy to brief the issue for the Court.

21              THE COURT:  You would be happy to brief the?

22              MS. NATHANSON:  We could brief the application for a

23    temporary restraining order.  We could move to the preliminary

24    injunction stage.  We're not trying to prevent the other

25    parties from having their say here.  But we do think that we're
```

A-742

O4EALeaH

1   entitled to preliminary relief at this point.

2           THE COURT:  Okay.  Yes?

3           MR. McCARTHY:  So, your Honor, as Ms. Nathanson

4   pointed out that B. Riley, which is a nationally recognized

5   firm, has been -- I'm sorry, I'm getting feedback -- has been

6   retained by our clients as a chief restructuring officer.

7           There's a team from B. Riley in there right now.

8   We've agreed to talk to them and try to come up with the

9   proposal and we've essentially agreed -- we've agreed along the

10  lines of what Ms. Nathanson said.  We'll get back to them

11  within 48 hours of what B. Riley, the restructuring officer,

12  can do, and then hopefully resolve this.  But there's nothing

13  for your Honor to do today.

14          THE COURT:  Okay.  As I understand it, the proposal

15  from the defendant will be made by the close of business on

16  Thursday, May 16.  Right?

17          MR. McCARTHY:  Yes, your Honor.

18          THE COURT:  Okay.  So you all, either the plaintiff or

19  with the defendants, should send me a letter by Friday, May 17,

20  at 10:00 a.m. telling me what the status of the case is and

21  what the parties want me to do.

22          MS. NATHANSON:  Okay.  Thank you, your Honor.

23          THE COURT:  Okay.

24          MR. McCARTHY:  Thank you, your Honor.

25          THE COURT:  Yes, sir.

A-743

O4EALeaH

1          MR. WATKINS:  If I may briefly, your Honor.  Jonathan

2     Watkins for A Cap.

3          THE COURT:  You can stay seated if you want.  It's

4     okay.

5          MR. WATKINS:  Thank you, your Honor.  I stand only to

6     mention that I think Ms. Nathanson referred to defense counsel

7     on a number of occasions, and that proposal will be coming from

8     counsel for the 777 Partners entities and not my clients,

9     Advantage Capital and Mr. King.  And Ms. Nathanson in our

10    discussions indicated, as is apparent from the face of the

11    motion, that it is not directed at my clients.

12          THE COURT:  Okay.  In view of the number of parties in

13    the case and the intervener, in your correspondence you should

14    make that clear as to who the offer is being made on behalf of

15    and in the status letter to me on Friday, May 17, at

16    10:00 a.m., you should also make clear if there are any

17    differences among the various parties.  Okay?

18          Okay.

19          MR. McCARTHY:  Thank you, your Honor.

20          THE COURT:  Thank you all, and I thank the reporter

21    for staying late.

22          MS. NATHANSON:  Thank you, your Honor.

23          (Adjourned)

24

25

A-744

# EXHIBIT 2

A-745

| | |
|---|---|
| **Subject:** | FW: Proposed Consent Order/Call |
| **Attachments:** | LCP_777 - Receivership Order (Draft 5.23.24) (003).docx |

**From:** Roger Schwartz <rschwartz@kslaw.com>
**Sent:** Thursday, May 23, 2024 12:23:56 PM
**To:** DeRousse, Shelly <sderousse@sgrlaw.com>; jmccarthy@sgrlaw.com <JMCCARTHY@sgrlaw.com>
**Cc:** Leigh Nathanson <lnathanson@kslaw.com>; Geoffrey King <GKing@KSLAW.com>; Brian Donovan <bdonovan@kslaw.com>
**Subject:** Proposed Consent Order/Call

Shelly/John:

Greetings and hope all is well.

As discussed on our call earlier this week, in parallel to the ongoing TRO proceeding, we have given additional thought to whether there may be a set of interim safeguards that would be sufficient to give our client comfort in lieu of a third-party receiver and/or asset freeze.  To that end, we have prepared the attached proposed Consent Order appointing B. Riley as receiver that sets forth a potential framework for providing such comfort.  While the attached remains subject to the ongoing review of our client and may not reflect an exhaustive list of protections that might be appropriate, we wanted to share it with you in hopes of furthering your discussions with your client as to a potential structure that would strike a balance between B. Riley's ongoing workstreams and the necessity for court supervision.

We would suggest a short call to provide additional thoughts and perspective here and also to make sure everything is aligned with respect to the go forward collateral review that we understand the business teams are discussing and coordinating.  Can you please let us know windows that might work for a quick catch up?  Thank you in advance.

Best,
Roger

**Roger G Schwartz**
*Partner*

T: +1 212 556 2331  |  E: rschwartz@kslaw.com  |  Bio  |  vCard

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036



kslaw.com

1

**A-746**

*K&S Draft May 23, 2024*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 <br><br> **CONSENT ORDER APPOINTING B. RILEY FINANCIAL, INC. AS RECEIVER** |

**THIS MATTER** is before the Court on Plaintiffs Leadenhall Capital Partners LLP and

Leadenhall Life Insurance Linked Investments Fund PLC's (together, "Leadenhall") Application

for (1) A Temporary Restraining Order, and (2) An Order to Show Cause for a Receiver or,

Alternatively, A Preliminary Injunction, filed on May 13, 2024 (the "Application"). ECF Nos. 56-

61. Upon review of the Complaint, filed by Leadenhall on May 3, 2024, and the Application and,

and for good cause shown, the Court finds as follows:

      1.      The Court has subject matter jurisdiction over this action and personal jurisdiction

over the Defendants which have consented to entry of this Order: 777 Partners LLC ("777

Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC (the "SuttonPark Borrower"),

1

A-747

*K&S Draft May 23, 2024*

Dorchester Receivables II LLC (the "Dorchester Borrower"), Signal SML 4 LLC (the "Signal Borrower"), and Insurety Agency Services LLC (the "Insurety Borrower," and together, the "Borrowers and Guarantors").

2.      Leadenhall, on the one hand, and the Borrowers and Guarantors, on the other hand, stipulate and consent to the relief set forth in this Order.

3.      The Application and Complaint demonstrate grounds for the appointment of a receiver to govern, manage, and operate the affairs of the Borrowers and Guarantors as specified herein.

4.      B. Riley Financial, Inc. ("B. Riley" or the "Receiver"), headquartered at 11100 Santa Monica Blvd., Suite 800, Los Angeles, CA, is hereby appointed as the receiver for the Borrowers and Guarantors during the pendency of this action.

**IT IS FURTHER ORDERED** that:

1.      **Purposes of Appointment and Powers**. The Receiver is fully authorized by the Court to perform any acts to protect the assets and value of the Borrowers and Guarantors; to prevent waste; to prevent the dissipation, stripping, or theft of assets to the detriment of creditors and investors of the Borrowers and Guarantors; and to ensure the timely and objective analysis and reporting of the financial condition of the Borrowers and Guarantors.  In addition to any statutory powers, the Receiver shall have the following specific powers, among others:

a.      Monitor and Safeguard Assets. The Receiver shall take any act necessary to preserve and safeguard the assets of the Borrowers and Guarantors, including taking immediate possession, custody and control of any assets and property of the Borrowers and Guarantors. Those assets include but are not limited to: (i) any assets pledged as collateral to any other creditor of the Borrowers and Guarantors, including Leadenhall; (ii) any cash or cash equivalents of the

2

A-748

*K&S Draft May 23, 2024*

Borrowers and Guarantors up to the amount of the outstanding debt under the Loan and Security Agreement, dated May 7, 2021, that was accelerated by Leadenhall on March 15, 2024 ($609,529,966.82, and hereinafter, the "Accelerated Debt"); and (iii) any assets which may be sold or otherwise disposed of to satisfy the Accelerated Debt.

      b.    <u>Ordinary Course Expenditures</u>.  The Receiver shall take any action necessary to determine the nature, location, and value of the assets of the Borrowers and Guarantors.  The Receiver may use these assets for paying expenses necessary or advisable in the ordinary course of business in discharging its duties as Receiver, subject to the reporting requirements set forth in paragraph 6.

      c.    <u>Removal and Appointment</u>. The Receiver shall assume full control of the Borrowers and Guarantors by terminating and/or removing, as the Receiver deems necessary or advisable, any director, officer, employee, independent contractor, or agent of the Borrowers and Guarantors, including any Defendant, from control of, management of, or participation in, the affairs of the Borrowers and Guarantors. The Receiver shall further be authorized to appoint or replace, as the Receiver deems necessary or advisable, any such director, officer, employee, independent contractor, or agent of the Borrowers and Guarantors.

      d.    <u>Books and Records</u>. The Receiver shall have full and unrestricted access to all books and records of the Borrowers and Guarantors, in whatever form said materials are maintained, and wherever located.  The Receiver shall also have full and unrestricted access to any mailboxes and post-office boxes and is authorized to open all mail directed to or received by the Borrowers and Guarantors.

      e.    <u>Banking and Bank Records</u>. The Receiver shall have access to all present bank accounts or other accounts of the Borrowers and Guarantors, and/or establish signature

3

A-749

*K&S Draft May 23, 2024*

authority over such accounts as the Receiver deems appropriate, as well as to inspect such bank transaction records. Upon presentment of this Order, all persons, including and especially any banks or financial institutions, shall provide account balance information, transaction histories, all account records, and any other records or access the Receiver or its agents request, in the same manner as they would be provided were the Receiver the signatory on the account; no separate subpoena shall be required.

        f.    <u>Litigation on Behalf of the Borrowers and Guarantors</u>. The Receiver shall have the power to commence, continue, join in, and/or control any action, suit, arbitration or proceeding of any kind or nature, in the name of the Borrowers and Guarantors or otherwise, including without limitation, proceedings to prevent or avoid transactions of any kind or nature that may dissipate or transfer ownership of any of the Borrowers and Guarantors' assets. The Receiver shall furthermore have control over the Borrowers and Guarantors' attorney-client privileges.

        g.    <u>Professionals Retained by the Receiver</u>. The Receiver is authorized to engage and compensate any service providers, professionals, independent contractors, accountants, and attorneys, as needed in the reasonable discretion of the Receiver, to advise the Receiver with regard to financial and legal matters relating to the Borrowers and Guarantors' assets, to prepare financial statements and reports required under this Order, to initiate, carry on and maintain such actions, suits and proceedings for and on behalf of the Receiver and as may be necessary for the Receiver to carry out its duties and responsibilities under this Order and as otherwise may be reasonably required by the Receiver.  The Receiver is authorized in its sole discretion to delegate specific tasks to its representatives, agents and professionals.

A-750

*K&S Draft May 23, 2024*

h.    <u>Working with the Government</u>. The Receiver is authorized, in its sole discretion, to cooperate with or enlist the help of agents, employees, and/or representatives of the governments of the United States of America or any other nation, or any regional or local governmental authorities therein, or of any law enforcement regulatory body, including the U.S. Department of Justice and the U.S. Securities & Exchange Commission.  The Receiver shall have the authority to cooperate with or enlist the help of the U.S. government and U.S. law enforcement when there exists evidence of criminal conduct or other actionable misconduct sufficient to warrant such assistance.

2.    **Independence of Receiver**. The Receiver is an officer of the Court and is subject only to the Court's direction and control.  The Receiver shall at all times act in impartial, disinterested, and neutral fashion and shall not act to promote the interests of any particular party. The Receiver owes a fiduciary duty to the Court and the interested parties to protect the assets and value of the Borrowers and Guarantors.  The Receiver shall notify the Court immediately of any attempt to control or interfere with its activities, decisions, or directives, including by any Defendants in this action.

3.    **Authority to Act**. The Receiver is authorized to act through and in the name of the Borrowers and Guarantors to carry out their duties.  The Receiver is authorized to execute, cancel terminate, modify, enforce, or deliver (or cause to be executed and delivered) any document in the name of the Borrowers and Guarantors, including but not limited to, contracts, deeds, other documents of title, and regulatory, administrative, and other governmental filings.

4.    **Cooperation**. The appointment of the Receiver herein is binding upon the Borrowers and Guarantors and their past and present directors, officers, senior management, employees, agents, and stockholders of the Borrowers and Guarantors, who shall, with all persons

5

*K&S Draft May 23, 2024*

and entities acting in concert with any of them (1) promptly deliver to the Receiver any and all mail, notices and other written communications and shall promptly notify the Receiver of any oral notices or communications in any way relating to the Borrowers and Guarantors' assets which are received by such party on and after the date of this Order; and (2) cooperate, in good faith and with due diligence, with the Receiver in the performance of its duties. None of the Defendants shall in any way disturb or interfere with the Receiver's performance of its duties under this Order.

5.      **Accessibility of Receiver**. The Receiver shall regularly consult with, and respond to the inquiries of, the creditors of the Borrowers and Guarantors, including Leadenhall, concerning any and all matters relating to the governance, management, operation, finances, and affairs of the Borrowers and Guarantors. The Receiver shall also conduct conference calls from time to time with creditors, and mandatory twice monthly phone calls with Leadenhall, to provide a status update and respond to any inquiries concerning the governance, management, operation, finances, and affairs of the Borrowers and Guarantors.

6.      **Required Reporting**. The Receiver shall provide to Leadenhall and other creditors of the Borrowers and Guarantors advance and periodic reporting as specified below.

a.      **Advance Reporting.**   Upon the entry of this Order, the Receiver shall provide advance notice and reporting of any transactions or actions specified in this subparagraph 6(a). Any notice or reporting provided by the Receiver pursuant to this subparagraph shall be provided to creditors as soon as practicable, and in no event later than five (5) business days prior to the occurrence of the transaction or action, so that any creditor can take any action necessary to challenge the transaction or action. Such advance reporting or notice shall include the economic terms of the anticipated transactions or actions, including a description of the transaction or action,

6

A-752

*K&S Draft May 23, 2024*

the basis for the transaction or action, and, if applicable, an explanation as to why the transaction or action is value maximizing to interested parties.

> i.      Any payment or expenditure in amount equal to or greater than $10,000 (individually or in the aggregate together with all related payments);

> ii.      Any sale or disposal of any asset the value of which is greater than $10,000 or the proceeds of which are expected to be greater than $10,000;

> iii.      Any loan, equity investment, or financing of any kind provided to the Borrowers and Guarantors by any party;

> iv.      Any transactions, including any sale of assets, that the Receiver expects will provide substantial value or liquidity to the Borrowers and Guarantors;

> v.      Any appointment, termination, removal, or modification of any employment agreement concerning any director, officer, or executive-level manager or partner of the Borrowers and Guarantors;

> vi.      Any plan or attempt by any creditor, including Defendant Advantage Capital Holdings LLC, to foreclose on or exercise remedies against the assets of the Borrowers and Guarantors and/or to seek the cooperation or consent of the Borrowers and Guarantors with respect to turnover of any assets of the Borrowers and Guarantors.

b.      **Periodic Reporting.**   Upon the entry of this Order, the receiver shall provide the following plans and reports on or before the seventh (7th) day of each calendar month thereafter:

A-753

*K&S Draft May 23, 2024*

      i.      A detailed plan, and periodic updates to the same, for the protection and preservation of any collateral pledged as security to creditors, including Leadenhall, by the Borrowers and Guarantors;

      ii.      A detailed plan, and periodic updates to the same, concerning how the Receiver intends to repay debt owed to creditors, including a description of any assets the Receiver intends to sell or otherwise dispose of in order to raise funds for repayment to creditors;

      iii.      Financial reporting showing the receipts, expenditures, cash flows, income, assets, and liabilities of the Borrowers and Guarantors, including a cash flow statement, income statement, and balance sheet;

      iv.      Financial reporting showing an itemization of all unpaid bills, a list of any and all liens and security interests, and any other amounts due and payable to the Borrowers and Guarantors;

      v.      A cash flow forecast covering the 13-week period beginning with the Saturday immediately preceding the delivery thereof;

      vi.      A variance report for the immediately preceding month describing the reason for any material changes and, for subparagraph 6(b)(v), a report comparing actual receipts, disbursements, and liquidity (shown by line item) to that predicted in the 13-week cash flow forecast then in effect.

7.    **Status Reports**. The Receiver shall provide reports to the Court every month from the date of this Order, or as otherwise directed by the Court or as the Receiver deems appropriate under the circumstances. Such reports shall include a statement of: (1) the Receiver's activities and findings during the preceding month; (2) recommended actions to be taken in order to satisfy

8

A-754

*K&S Draft May 23, 2024*

this Order and other further Orders of the Court; (3) the fees and expenses for which the Receiver seeks payment that were incurred during the preceding month, including the anticipated source for payment of those fees; and (4) such other information as the Receiver deems appropriate or as the Court may direct.

8.    **Exercise of Rights and Remedies by Leadenhall**. Notwithstanding anything in this Order to the contrary, (1) to the extent Receiver intends to take any action (including any actions authorized by this Order) which is an action requiring the consent of Leadenhall if such action was to be taken by a Defendant, then the Receiver shall be required to obtain such consent from Leadenhall in accordance with any applicable terms and provisions prior to taking any such action, and no action of Receiver which requires such consent shall be authorized under this Order unless Receiver first obtains such consent, and (2) Leadenhall is hereby permitted to proceed with and exercise any and all available rights and remedies, including, without limitation, exercising their rights as holders of security interests in, and equity pledges of, the Borrowers and Guarantors' assets and as secured creditors under the Loan and Security Agreement dated May 7, 2021 and related documents, under Article Nine of the Uniform Commercial Code in effect in the applicable jurisdiction or under other applicable law governing such rights, by judicial or nonjudicial foreclosure, power of sale or as otherwise provided under the applicable agreements.  Leadenhall shall notify the Receiver of any such sale or other exercise of Leadenhall's rights and/or remedies, and the Receiver shall cooperate with Leadenhall in the consummation of any such action or actions, including, without limitation, execution of such deeds, bills of sale and other documents, instruments and agreements provided that none of such documents, instruments or agreements subject the Receiver to any personal liability.

9

A-755

*K&S Draft May 23, 2024*

9.    **Compensation of the Receiver and Other Professionals**. The Receiver shall provide a copy of its engagement agreement with the Borrowers and Guarantors, or their affiliated entities as the case may be, and information on the source(s) of payment for its fees. The Receiver and its professionals shall submit invoices to the Court for approval.  All expenses approved by the Court shall be paid promptly in accordance with the engagement agreement, or as otherwise ordered by the Court.

10.    **Notice of Bankruptcy Case**. In the event that a bankruptcy case is filed by any Defendant during the pendency of the receivership created by this Order, the Borrowers and Guarantors must give notice of same to this Court, to all parties, and to the Receiver, within 24 hours of the bankruptcy filing.

11.    **Discharge of Receivership**. Upon payment of the Accelerated Debt in full, the Receiver shall within 30 days of such occurrence move the Court to be discharged and relieved from this Order and shall render a final report to the Court concerning the operations of the Borrowers and Guarantors.  The parties shall file any objections to the motion and report within fifteen (15) days of the filing of such documents. This Court expressly retains continuing jurisdiction over this receivership until after the rendition of the final report by the Receiver and the entry of an order discharging the Receiver.  Without limiting the foregoing, Leadenhall and the Receiver have the right to seek the termination of the Receiver upon written request to the Court, which shall be effective when so-ordered by the Court.  Upon the Court so-ordering such a request, the Receiver shall within forty-five (45) days render a final report to the Court concerning the operations of the Borrowers and Guarantors.  The Receiver may not be terminated or discharged other than by Order of this Court.

A-756

*K&S Draft May 23, 2024*

12. **Preservation of Documents**. The Receiver shall keep and preserve written accounts itemizing any receipts and expenditures.  The Receiver shall also ensure that documents and data related to its duties, including documents and data relevant or potentially relevant to the claims and defenses in this action, are preserved.

13. **Further Instructions and Amendment**. The Receiver and the Parties to this action may, from time to time, on an ex-ante basis or noticed motion on shortened time, petition this Court for instructions pursuant to this Order and the Court may issue further Orders based on any such petitions. Any actions to determine disputes relating to the Receiver or its actions shall be filed in this Court. Upon further Orders of this Court, this Order may be amended.

14. **Jurisdiction**. This Court shall retain jurisdiction to interpret, construe, and enforce this Order, and any such other or further Orders of this Court.

**SO ORDERED** this ___ day of _____, 2024.

_____
U.S. District Court Judge

11

A-757

# EXHIBIT 3

A-758

| | |
|---|---|
| **From:** | Leigh Nathanson |
| **Sent:** | Thursday, May 16, 2024 2:19 PM |
| **To:** | Watkins, Jonathan |
| **Cc:** | Craig Carpenito; Roger Schwartz; Brian Donovan; Imperiale, Taylor |
| **Subject:** | RE: Leadenhall v. Wander et al. |

Jon,

Following up on our call yesterday, below is a list of items Leadenhall requests from A-CAP in order to pause briefing and a determination on Leadenhall's application for injunctive relief, without prejudice to restarting those proceedings if the parties cannot reach agreement.  As we discussed, the list is designed to provide transparency into A-CAP's actions and role with respect to 777 Partners and the restructuring firm 777 Partners has recently engaged, B. Riley, in order to provide Leadenhall with protection against dissipation of 777 Partners assets during the pendency of its lawsuit for the reasons Leadenhall set forth in its application for a temporary restraining order.

We are available to discuss this afternoon or evening if helpful.

Best,
Leigh

1. Identification of all of A-CAP's (inclusive of inclusive of Kenneth King and any A-CAP affiliates, officers, members, employees, or agents) investment and credit exposure across 777 and 600 companies, including a description of the security/collateral for any loans and any guarantees of 777's and 600's obligations.
2. Notice in advance of any attempt to foreclose on or exercise remedies against 777 and 600 assets, with the following economic terms included in the notice:
   a. Description of the loan and assets on which A-CAP is foreclosing;
   b. Basis for any default;
   c. Extent to which the foreclosure will reduce the loan; and
   d. Confirmation that B. Riley has independently assessed the economic terms.
3. A-CAP's current plan/strategy to foreclose on or exercise remedies against 777's and 600's assets, including a list of assets on which A-CAP plans to foreclose, timing considerations, and economic terms of those transactions.
4. Description of the role A-CAP is playing in the governance, management, funding and operations of 777 and 600.
5. Description of the role A-CAP is playing with respect to B. Riley, including any payment of B. Riley's fees and ACAP's role in retaining, supervising, and directing B. Riley.
6. Identification of any foreclosure or monetization transactions which are "accretive" to other 777 and 600 creditors such as LCP, including a description of how they are accretive and whether A-CAP will share in the proceeds of such transactions with LCP and other creditors.
7. Identification of Cadwalader counsel who was engaged by directors of 777 Re's board, the individuals who that counsel was representing, and scope of that representation.
8. Details on A-CAP's recapture of insurance liabilities from 777 Re, including the extent to which 777 Re retains participation in the recaptured insurance assets and the status of ACAP's efforts to find other reinsurers or capital for the recaptured assets.

**Leigh M. Nathanson**

$$\boxed{\text{A-759}}$$

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard



**From:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Sent:** Wednesday, May 15, 2024 1:32 PM
**To:** Leigh Nathanson <lnathanson@kslaw.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>; Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Subject:** Re: Leadenhall v. Wander et al.

> **CAUTION: MAIL FROM OUTSIDE THE FIRM**

Yes, with the caveat that I am traveling today on a flight that has been delayed.  Assuming my flight doesn't miraculously get un-delayed, 4:00 will work.

Jonathan M. Watkins
Cadwalader, Wickersham & Taft LLP
Direct:  (212) 504-6229
Mobile:  (908) 319-7323

**From:** Leigh Nathanson <lnathanson@kslaw.com>
**Sent:** Wednesday, May 15, 2024 12:53 PM
**To:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>; Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Subject:** RE: Leadenhall v. Wander et al.

> Caution: This email originated from outside of CWT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Would 4 work?

**Leigh M. Nathanson**

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard



**From:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Sent:** Wednesday, May 15, 2024 12:31 PM
**To:** Leigh Nathanson <lnathanson@kslaw.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>; Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Subject:** RE: Leadenhall v. Wander et al.

2

A-760

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Hi Leigh,

Yes, I'm available until 1:00 and again at 2:15.

Jon

Jonathan M. Watkins
Cadwalader, Wickersham & Taft LLP
Direct: (212) 504-6229 | Mobile: (908) 319-7323

**From:** Leigh Nathanson <lnathanson@kslaw.com>
**Sent:** Wednesday, May 15, 2024 11:57 AM
**To:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>; Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Subject:** RE: Leadenhall v. Wander et al.

Caution: This email originated from outside of CWT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jon,

Do you have a few moments for a call this afternoon?

Best,
Leigh

**Leigh M. Nathanson**

T: +1 212 790 5359 | E: lnathanson@kslaw.com | Bio | vCard

**From:** Leigh Nathanson
**Sent:** Monday, May 13, 2024 3:59 PM
**To:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>; Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Subject:** RE: Leadenhall v. Wander et al.

Jon,

Thanks for speaking just now. As we discussed, normally we would be amenable to a brief adjournment as a matter of course, particularly in light of your circumstances. As set forth in our Complaint and Application for an Order to Show Cause, however, my client is concerned that the Defendants in this action are dissipating assets, and based on

3

A-761

representations made by Josh Wander in the days before the Complaint was filed, A-CAP is effectuating that dissipation of assets and/or foreclosing on or otherwise exercising remedies as to 777 Partners' assets.

We will consult with our client, but the only way we can consent to your request for an adjournment of the show-cause hearing until Wednesday is that your clients, A-CAP and Kenneth King, certify that they will temporarily cease/refrain from any actions that in any way effectuate the dissipation of assets and cease or refrain from any actions to foreclose on or otherwise exercise remedies against any of the other Defendants in this action.

Please let us know if your clients are amenable to that. Many thanks.

Best,
Leigh

**Leigh M. Nathanson**

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard

---

**From:** Imperiale, Taylor <Taylor.Imperiale@cwt.com>
**Sent:** Monday, May 13, 2024 1:21 PM
**To:** Leigh Nathanson <lnathanson@kslaw.com>
**Cc:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>; Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>
**Subject:** RE: Leadenhall v. Wander et al.

> **CAUTION: MAIL FROM OUTSIDE THE FIRM**

Leigh,

Jonathan will be attending a funeral tomorrow in Philadelphia at 11:30 AM. Given that, would Plaintiffs be amenable to an agreed motion for a brief adjournment of the show-cause hearing? Jonathan is currently tied up but if you'd like to speak to him about this, he should free up shortly.

Thank you,

**Taylor Imperiale**
*Associate*
Cadwalader, Wickersham & Taft LLP
650 South Tryon Street, Charlotte, NC 28202
Tel: +1 (704) 348-5109 | Fax: +1 (704) 348 5200
Taylor.Imperiale@cwt.com | www.cadwalader.com

---

**From:** Leigh Nathanson <lnathanson@kslaw.com>
**Sent:** Monday, May 13, 2024 10:29 AM
**To:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>

A-762

**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>
**Subject:** RE: Leadenhall v. Wander et al.

> Caution: This email originated from outside of CWT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jon,

On behalf of Leadenhall in the above-referenced action, we will be filing an application for an Order to Show Cause with a Temporary Restraining Order.  The materials we will be filing are available at the following link: https://Kingspalding.ftptoday.com

Your username is your email address, and your password is: rkcaWS4C6U98ZHpdsMmj

Thanks,
Leigh

**From:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Sent:** Tuesday, May 7, 2024 10:40 PM
**To:** Leigh Nathanson <lnathanson@kslaw.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>
**Subject:** Re: Leadenhall v. Wander et al.

> **CAUTION: MAIL FROM OUTSIDE THE FIRM**

Received and thank you.

Jonathan M. Watkins
Cadwalader, Wickersham & Taft LLP
Direct:  (212) 504-6229
Mobile:  (908) 319-7323

**From:** Leigh Nathanson <lnathanson@kslaw.com>
**Sent:** Tuesday, May 7, 2024 9:23:45 PM
**To:** Watkins, Jonathan <Jonathan.Watkins@cwt.com>
**Cc:** Craig Carpenito <CCarpenito@KSLAW.com>; Roger Schwartz <rschwartz@kslaw.com>; Brian Donovan <bdonovan@kslaw.com>
**Subject:** RE: Leadenhall v. Wander et al.

> Caution: This email originated from outside of CWT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jon,

Nice to meet you, and thank you for reaching out.  We will tell the process server to stand down based on your representation that you will accept service for Mr. King and A-CAP by email.  I attach for service copies of the summonses and complaint for Mr. King and A-CAP.

5

A-763

Best,
Leigh

——

**Leigh M. Nathanson**

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard



**From:** Watkins, Jonathan Jonathan.Watkins@cwt.com
**Sent:** Tuesday, May 7, 2024 8:09 PM
**To:** Craig Carpenito CCarpenito@KSLAW.com; Leigh Nathanson lnathanson@kslaw.com; Roger Schwartz rschwartz@kslaw.com; Brian Donovan bdonovan@kslaw.com
**Subject:** Leadenhall v. Wander et al.

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Craig, Leigh, Roger, and Brian,

My firm and I have been retained by A-CAP and Mr. King in the *Leadenhall* matter filed last Friday in the SDNY.  I understand that during the day today, a process server attempted to effect service on Mr. King at his home and interacted with his wife, and that the process server intends to show up at Mr. King's home again tomorrow.  That won't be necessary—I am authorized to accept or waive service on behalf of Mr. King and A-CAP.

Please confirm that you will call off the process server.

Look forward to working with you on the case.

Thanks,

Jon Watkins

**Jonathan M. Watkins**
*Partner*
Cadwalader, Wickersham & Taft LLP
Direct:  (212) 504-6229 | Mobile: (908) 319-7323
Jonathan.Watkins@cwt.com | www.cadwalader.com

NOTE: The information in this email is confidential and may be legally privileged.  If you are not the intended recipient, you must not read, use or disseminate the information; please advise the sender immediately by reply email and delete this message and any attachments without retaining a copy.  Although this email and any attachments are believed to

A-764

be free of any virus or other defect that may affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Cadwalader, Wickersham & Taft LLP for any loss or damage arising in any way from its use.

---

**Leigh M. Nathanson**
*Partner*

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036

kslaw.com

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

A-765

1

O676LEAC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    LEADENHALL CAPITAL PARTNER
3   LLP, ET AL.,

4              Plaintiffs,

5        v.                          24 CV3453(JGK)

6   777 PARTNERS LLC, et al.,

7              Defendants.
    ------------------------------x
8                                   New York, N.Y.
                                    June 7, 2024
9                                   12:10 p.m.
10  Before:

                      HON. JOHN G. KOELTL,
11
                                        District Judge
12                          APPEARANCES
    KING & SPALDING LLP
13       Attorneys for Plaintiffs Leadenhall
    BY:  LEIGH  NATHANSON
14       BRIAN DONOVAN

15  SMITH GAMBRELL & RUSSELL LLP
         Attorneys for Defendants 777 Partners, et al.
16  BY:  JOHN McCARTHY
         DAVID PELLEGRINO
17       KATIE SCHWARTZ
         RYAN SOLFARO
18       SHELLY DEROUSSE

19  CADWALADER WICKERSHAM & TAFT LLP
         Attorneys for Defendants Advantage Capital, et al.
20  BY:  JONATHAN WATKINS
         MARK SINGER
21       MICHAEL PETRELLA

22  SIDLEY AUSTIN LLP
         Attorneys for Movant National Founders LP
23  BY:  JONATHAN MUENZ

24  MORGAN, LEWIS & BOCKIUS LLP
         Attorneys for Intervenor ING Capital LLC
25  BY:  MATTHEW ZIEGLER

            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

A-766

O676LEAC

1          (Case called)

2          MS. NATHANSON:  Good afternoon, your Honor.

3          This is Leigh Nathanson from King & Spalding,

4    representing the plaintiffs, Leadenhall Capital Partners.  I'm

5    here with my partner, Brian Donovan.

6          MR. MCCARTHY:  Good afternoon, your Honor.

7          John McCarthy from Smith Gambrell & Russell, on behalf

8    of the 777 entity defendants.  I'm here with my colleague from

9    my New York office, David Pellegrino, Katie Schwartz, and

10   Ryan Solfaro.  I'm also joined by a colleague from our Chicago

11   office, Shelly DeRousse.  And Ian Ratner, who is the manager of

12   777 Partners and 600 Partners, is also here today.

13          THE COURT:  Okay.

14          MR. WATKINS:  Good afternoon, your Honor.

15          Jonathan Watkins, Cadwalader, Wickersham & Taft, on

16   behalf of Advantage Capital Holdings and Kenneth King, and I'm

17   here with my colleagues Michael Petrella and Mark Singer.

18          THE COURT:  Okay.

19          MR. MUENZ:  Hello, your Honor.

20          John Muenz from Sidley Austin for intervenor,

21   National Founders LLP.

22          THE COURT:  Okay.

23          MR. ZIEGLER:  Good afternoon, your Honor.

24          Matthew Ziegler of Morgan Lewis & Bockius for imposed

25   intervenor, ING Capital.

A-767

3

O676LEAC

1 We just filed our papers yesterday.  I appreciate your

2 Honor probably hasn't had much time with them.  I'm happy to

3 speak to them at the appropriate time if that would be helpful.

4 THE COURT:  No, I can deal with that at the outset.

5 You want to intervene with respect to the issue of the

6 TRO and the preliminary injunction?

7 MR. ZIEGLER:  That's correct, your Honor.

8 THE COURT:  And you don't basically have an objection

9 to a TRO or preliminary injunction so long as it doesn't

10 interfere with your clients?

11 MR. ZIEGLER:  That's correct, your Honor.

12 THE COURT:  I'm prepared to deal with your motion to

13 intervene in the same way that I did with National Founders.

14 I wouldn't grant a general motion to intervene as a

15 party in the case without a proposed complaint, which lists

16 you, for example -- not quite sure what is happening with the

17 mic -- which, for example, sets out what your allegations are

18 whether you're a plaintiff or defendant.  But I'm perfectly

19 happy to get your input in the same way that I did with

20 National Founders on the TRO and the preliminary injunction.

21 MR. ZIEGLER:  Thank you, your Honor.  That's exactly

22 what we're after.  Appreciate it.

23 THE COURT:  Okay.

24 So we turn to the issue of the TRO and the preliminary

25 injunction, and I'm perfectly prepared to listen to the

A-768

4

O676LEAC

1  parties.

2          I have an initial observation, which is, as I

3  indicated the last time that we got together, there are

4  substantial allegations supported by detailed allegations in

5  the complaint and supporting affidavits which -- and I'll

6  certainly listen to the parties -- would appear to warrant a

7  temporary restraining order to avoid dissipation of assets that

8  the plaintiffs would otherwise have a claim to.

9          On the other hand, the defendants have asked for an

10  evidentiary hearing on the preliminary injunction, and I really

11  didn't see a response by the plaintiffs on a hearing on the

12  preliminary injunction.  I also don't know from what the papers

13  tell me what the defendants claim are the disputed issues of

14  fact on a preliminary injunction.  But in any event, when I'm

15  asked to have an evidentiary hearing on a preliminary

16  injunction, I should have an evidentiary hearing on a

17  preliminary injunction, provided the parties tell me what they

18  seek to establish at an evidentiary hearing on the preliminary

19  injunction.  But similarly, if there's going to be an

20  evidentiary hearing, the parties would be entitled to limited

21  expedited discovery in support of the preliminary injunction

22  hearing.

23          My final observation is, as I've indicated, there are

24  substantial allegations to warrant a temporary restraining

25  order, essentially for a stay, to prevent dissipation of

A-769

5

O676LEAC

1    assets.  On the other hand, there are fair arguments that the

2    temporary restraining order should not interfere with the

3    rights of other parties, and so one would think that any

4    temporary restraining order would be limited to the dissipation

5    of assets in excess of expenditures in the regular and ordinary

6    course of business.

7           The proposed temporary restraining order here doesn't

8    make that clear.  And it's not clear to me that the temporary

9    restraining order actually provides what should be the proper

10   provisions of a temporary restraining order to prevent

11   dissipation of assets in excess of regular, normal, ordinary

12   course of business transfers.  Other temporary restraining

13   orders place limits, for example, on what's permitted, monetary

14   limits.  But the parties haven't suggested those things to me,

15   and every attempt at negotiation between the parties comes to

16   naught.

17          I'd also raise the issue of, it's not at all clear to

18   me why the plaintiff would be entitled to a TRO against ACAP,

19   which is not a borrower or a guarantor.  So those are my

20   initial observations.  I appreciate that any temporary

21   restraining order is limited to 14 days-plus for good cause and

22   an additional 14 days, so 28 days, which conveniently would

23   allow me to set a preliminary injunction hearing for soon —

24   indeed, after I finish the trial that I'm about to begin.

25          So having given you those preliminary observations,

A-770

6

O676LEAC

1    I'm prepared to listen to the plaintiffs and the defendants.

2              MS. NATHANSON:  Thank you, your Honor.  If it's okay

3    with you, I'm going to use the podium so I can be closer to the

4    mic.

5              THE COURT:  That would be fine.

6              MS. NATHANSON:  This is Leigh Nathanson for the

7    plaintiffs.

8              Your Honor's observations are helpful in framing our

9    asks today on behalf of the plaintiffs.  So let me try to take

10   some of the points that your Honor has made in turn, and maybe

11   we can make some progress here.

12             As to the request for an evidentiary hearing,

13   plaintiffs reaction was the same as the Courts, which is we

14   don't see any disputed issues here on evidence that would go to

15   the relief that plaintiffs are seeking in the temporary

16   restraining order.  Defendants --

17             THE COURT:  It's not at all clear to me that the

18   evidentiary hearing was being sought for a TRO.

19             MS. NATHANSON:  I'm sorry.  For the preliminary

20   injunction.

21             Defendants don't dispute that the borrower entities

22   defaulted on their contracts with the plaintiffs by, among

23   other things, double pledging collateral, which defendants have

24   admitted on recorded phone calls.  This is detailed in the

25   affidavits we've submitted.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-771

7

O676LEAC

1     Defendants also don't dispute that those defaults

2     entitled Leadenhall to accelerate $609 million worth of debt

3     owed to it, which is what Leadenhall seeks an injunction to

4     preserve while it pursues its claims.

5     Defendants also don't dispute that the guarantor

6     entities, which are the parent entities, 700 Partners and 600

7     Partners, guaranteed all of the obligations of the borrowers to

8     Leadenhall, including the borrowers' obligations to perform.

9     Leadenhall is a secured creditor, and that's where we

10    are today. We don't see any dispute as to that. Those are the

11    issues that we see as going to likelihood of success on the

12    merits.

13    On irreparable harm, we also don't see any dispute

14    from defendants that the defendants who are seeking to be

15    enjoined, which do not include ACAP -- and I'll get to that in

16    a moment -- are insolvent or on the brink of insolvency.

17    They've brought in B. Reilly, a chief restructuring officer.

18    We haven't seen any indication to the contrary, including in

19    coordination with B. Reilly which has -- although it's not

20    resulted in an agreement here, those conversations have been

21    somewhat productive, and we hope that they will continue. But

22    we don't think there's any dispute as to the fact that the 777

23    defendant entities don't have the money to pay Leadenhall back.

24    That was obviously an about-face from the position

25    that they were taking for Leadenhall that led us to this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-772

8

O676LEAC

1    situation, which was that everything is fine, your security is

2    there, and our financial condition is fine.  So I don't think

3    there are any evidentiary issues in dispute here.  We haven't

4    seen any raised in defendants' papers.

5           On the question of whether the way that the proposed

6    order is phrased is intended to disrupt the normal course of

7    business, it is not.  We structured the proposed order in a way

8    to target specifically the collateral that makes up the

9    609 million in accelerated debt or, in the absence of that

10   collateral, cash or cash equivalence or proceeds, that are

11   sufficient to preserve that amount.

12          So, we intended to leave it in the discretion of the

13   777 Defendants to operate their businesses around this

14   $609 million.  If they don't have that amount, which we suspect

15   is the case, we think that there are a number of ways to deal

16   with that.  We would not be opposed to an expressed carveout

17   for ordinary course of business.  We don't intend for this

18   relief to affect cash flows or other rights of creditors, like

19   National Founders and ING.  Again, I'll put a cap in a separate

20   category that I'll get to in a moment, but we're happy to try

21   to craft the relief, including in coordination with those

22   parties, to make everybody comfortable that what Leadenhall is

23   asking for is not any determination of preference, is not any

24   distribution of assets.  It is simply a preservation of the

25   assets necessary to avoid the irreparable harm of the

A-773

9

O676LEAC

1   777 Defendants being judgment proof as to a claim that they

2   essentially do not dispute.

3        We also would note that we proposed another form of

4   relief here in the form of a receiver. We understand that the

5   landscape has changed a little bit since we filed this

6   application, in that B. Riley is on the scene, and that is the

7   only change that we've heard from the 777 Defendants in their

8   opposition to preliminary relief here; in other words, B. Riley

9   is the adult in the room, they're acting to preserve the

10  interests of 777 and of its creditors, so don't worry.

11       We've tried to work with B. Riley and 777's counsel to

12  see if we can come to an agreement on what that would look

13  like. We proposed, over two weeks ago, a detailed consent

14  order that would put some safeguards in place to give the Court

15  some oversight and the plaintiffs some transparency into what

16  B. Riley is doing, some indicia of its independence, and other

17  measures that we think B. Riley would, and we think should be,

18  incentivized to take to be able to protect itself and make sure

19  that it can act consistent with its duties as an independent

20  fiduciary, if that's what it purports to be.

21       THE COURT: I didn't read your proposed order as

22  asking for the appointment of a receiver as part of a temporary

23  restraining order. In fact, that would probably be pretty

24  impractical.

25       MS. NATHANSON: For the 28 days, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-774

10

O676LEAC

1          THE COURT:  Yes.

2          MS. NATHANSON:  But what I'm speaking about,

3    your Honor, is, going forward, how do we deal with this.  We

4    think it would make sense for a temporary restraining order

5    along the lines we proposed.  We can add an express normal

6    course of business carveout.  We didn't do that because we

7    thought it wasn't necessary here, because we're not trying to

8    stop the normal course of business transactions that the

9    777 Defendants need to engage in.  It's up to 777 what it does

10   if it can't preserve the $609 million that's owed to Leadenhall

11   while continuing in the normal course of business.

12          So this is where I get to B. Riley.  If they're in a

13   position where they're essentially insolvent, although we're

14   not, of course, in bankruptcy at this point -- we are where we

15   are -- we proposed a number of measures for B. Riley to give

16   some oversight to the Court and transparency to creditors like

17   Leadenhall that might obviate the relief that we're asking for

18   now.  We've not made progress on that front, but that could be,

19   essentially, the type of relief that we are looking for going

20   forward here.  We're not trying to undo whatever good faith

21   work 777 is doing in having appointed B. Riley, but we have a

22   number of indicia that if they do intend to operate

23   independently, they are under a lot of pressure contrary to

24   that.

25          In fact, on the day that defendants put in their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-775

11

O676LEAC

1    opposition to the application for a temporary restraining

2    order, 777 made statements to the press to the effect that

3    Josh Wander and Steven Pasko still remained in control.  Our

4    client, which has continued to have commercial dealings with

5    777, and, again, we've had some productive conversations with

6    B. Riley, and it's not a total stonewall there, but in those

7    conversations, our client is continuing to hear information

8    from 777 saying that all decisions need to be run by

9    Josh Wander.  We have some confusion as to whether B. Riley's

10   counsel and 777's counsel were going to represent Wander and

11   Pasko.  My understanding now is that they are not going to do

12   that, although Wander and Pasko have not appeared.  And so we

13   have issues with their potential independence.

14          We also have issues with their potential independence

15   given the role of A-CAP, which, to our understanding, is the

16   most likely, if not the only, source of funding both for 777's

17   operations going forward and for B. Riley's work.  And so that

18   creates a situation where it's very difficult for B. Riley not

19   to be beholden to Wander and Pasko.  They may very well be

20   beholden to Wander and Pasko by the terms of their engagement,

21   which we've not seen and they've not shared.  It's also very

22   difficult for them not to be beholden to A-CAP if A-CAP is

23   providing its funding and the conditions that come with that

24   funding.

25          And so what we're asking for now is the limited

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-776

12

O676LEAC

1    temporary restraining order.  Again, we'd be willing to work
2    with any interested parties to put an express normal course of
3    business carveout into the order or we would be willing to work
4    with the Court and the parties to try to formalize some
5    safeguards that will ensure that B. Riley is, in fact, acting
6    as an independent fiduciary in the interests of the 777 parties
7    and its creditors.
8            Let me just touch upon the A-CAP point for a moment.
9    We do not seek relief against A-CAP.  We do have claims against
10   A-CAP that sound in fraud and RICO.  We do not seek temporary
11   relief against A-CAP.  We do not seek an injunction against
12   A-CAP.  What A-CAP is opposing is the ancillary effect that a
13   TRO, as crafted, would have on the transactions that they are
14   currently effectuating and want to effectuate vis-a-vis
15   777 Partners, and that is something that happens in a lot of
16   preliminary relief contexts.  Rule 65 contemplates specifically
17   that a TRO will apply to anyone who is in active concert with
18   the enjoined parties, and within active concert meaning they
19   are potentially helping or aiding and abetting those parties to
20   violate the TRO.
21           And so, yes, A-CAP happens to be a defendant here.  We
22   do believe that the transactions that A-CAP is effectuating are
23   effectively stripping assets from 777 using rights that they
24   created for themselves with interested party transactions.  But
25   that is not part of the TRO.  What is part of the TRO is an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-777

13

O676LEAC

1    obligation on 777 to avoid that asset stripping on terms that

2    are not commercial and whereby 777, and thereby, by extension,

3    its creditors, are not getting consideration for those

4    transactions.

5            The last point I'll make there is that when we were

6    last before your Honor, and we sat in the jury room trying to

7    see if we could work our way out of those issues, we told

8    ACAP's counsel that we would propose some similar transparency

9    measures that would help us get comfortable with what A-CAP is

10   doing and allow us to kind of limit the relief that we might be

11   seeking accordingly.  I think about a month ago, we sent, in

12   writing, some of that information to counsel for A-CAP.  We've

13   not received a response in the past month.  So this is not for

14   lack of trying, nor are we ruling out some sort of consensual

15   way forward here.

16           But as it is now, I mean, even yesterday, we're

17   reading in the press that an additional $5 million of money

18   that 777's counsel and B. Riley have represented that they

19   don't have to repay Leadenhall has gone to a football team,

20   Standard Liege.  So there's not transparency here to the extent

21   that 777 is continuing to make new investments or

22   out-of-the-ordinary course of business transactions with money

23   that they don't have because they borrowed against the terms of

24   their facility with Leadenhall, and in violation of those

25   terms, we believe that that's an appropriate scope for the

A-778

14

O676LEAC

1   injunction.  If there's an effect on A-CAP, that is something

2   that we think is contemplated by the rules and by the law.  We

3   also think there's a way around that.  If A-CAP is doing

4   aboveboard transactions with the 777 parties that inert to the

5   benefit of the 777 parties and to A-CAP, we don't see a reason

6   that that would be problematic, looking down the line for a

7   preliminary injunction or some sort of consensual resolution

8   with B. Riley.  It seems like that's the kind of thing that

9   B. Riley could put its independent eyes on, give some

10  transparency about, and if there's not a problem, if these

11  transactions are legitimate, then they can go through.  It's

12  not in plaintiffs' interests to take 777 down.  It is in

13  plaintiffs' interest for 777 to be solvent and to continue

14  operating so that it can pay plaintiffs back.

15          So we're happy to work with the parties to do that,

16  we're happy to work with the Court to do that, but we think at

17  this point, it's clear on the record that we are entitled to

18  some preliminary relief, and we want to limit it in an

19  appropriate way, but we don't think we're in a universe where

20  this can go on with no oversight.

21          THE COURT:  Okay.  Thank you.

22          MR. MCCARTHY:  Good afternoon, your Honor.

23          I thoroughly disagree with the last statement by

24  Ms. Nathanson.  It is clear that they are not entitled --

25          THE COURT:  Could you just, for the record, tell the

A-779

15

O676LEAC

1  reporter again who you are.

2       MR. MCCARTHY:  John McCarthy, from smith Gambrell, on

3  behalf of the 777 entity defendants.

4       THE COURT:  Thank you.

5       MR. MCCARTHY:  They are not entitled to injunctive or

6  temporary relief at this point, your Honor, based on the record

7  before you.  They have come before you with an unverified

8  complaint and lots of references to articles in newspapers, and

9  not evidence, and asking for extraordinary relief.

10       First, it's important, your Honor, to understand that

11  there are two different aspects of what they are asking for,

12  right?  The first aspect involves four borrowers -- actually,

13  it involves two out of four borrowers at an entity that

14  everyone refers to as SuttonPark Capital in Boca Raton,

15  Florida.  They are a secured lender to those borrowers in

16  SuttonPark Capital.  There's no evidence before your Honor,

17  there's not even an allegation before your Honor, that, right

18  now, since they got the so-called anonymous tip through now,

19  that there's any issues with any of their collateral being

20  serviced -- yes, your Honor.

21       THE COURT:  They've accelerated the loan.  They've

22  declared a default.  They've attempted to get money on any

23  number of occasions.  They've been promised money.  But those

24  who are responsible for paying them don't even come up with,

25  you know, $5 million or so.

A-780

16

O676LEAC

1      MR. MCCARTHY:  Your Honor, there's nothing in the
2  record about this $5 million.  They are claiming there was
3  $15 million, but that's not a ground --
4      THE COURT:  I heard 15.
5      MR. MCCARTHY:  -- for your Honor --
6      THE COURT:  Go ahead.
7      MR. MCCARTHY:  That's not a ground for your Honor to
8  issue a temporary restraining order.
9      So, there's the SuttonPark Capital, where they are a
10  secured creditor, they have collateral --
11      THE COURT:  Your papers continually stress that they
12  are unsecured.
13      MR. MCCARTHY:  No.  So they are unsecured as to the
14  other portion, your Honor.  And we'll talk about that in a
15  second.
16      THE COURT:  But there's no question that they are a
17  secured creditor.
18      MR. MCCARTHY:  A secured creditor of
19  SuttonPark Capital.
20      THE COURT:  And of the other borrowers.
21      MR. MCCARTHY:  No.  That is absolutely disputed and
22  not true.  They are not a secured creditor of 777 Partners --
23      THE COURT:  No, no, no, I'm not talking about the
24  guarantors.  I'm talking about the four borrowers listed in the
25  complaint.  They are a secured creditor to the four borrowers.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-781

17

O676LEAC

1       MR. MCCARTHY:  I a hundred percent agree, your Honor.

2       THE COURT:  Okay.  That's what I said.

3       MR. MCCARTHY:  I'm sorry, I misunderstood, your Honor.

4  I apologize.

5       THE COURT:  As to which you said, no, absolutely not.

6       MR. MCCARTHY:  I misunderstood, your Honor.  I

7  apologize.

8       THE COURT:  And your papers continually refer to them

9  as an unsecured creditor.

10      Go ahead.

11      MR. MCCARTHY:  Because, your Honor, with the

12  extraordinary relief they're asking about -- well, okay.  Let's

13  get past my papers.  I can't recall exactly.  But they have

14  collateral, they are secured in certain collateral at

15  SuttonPark Capital.  It's being serviced.  There are no issues.

16  You've got affidavits that have been submitted by two other

17  lenders who have assets coming into the exact same account, the

18  concentration account, it's their assets.  The collateral is

19  coming in, and it's being distributed, and there are no issues

20  that have been raised with respect to the handling of the

21  collateral.  Even though that's the case, there's no evidence

22  of any issues with the servicing that's been going on for the

23  last couple of years.  We have put in a professional from

24  B. Riley at SuttonPark to oversee it.  They've been in, they've

25  done audits, before this case began.  They're doing audits now.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-782

18

O676LEAC

1   There's really no basis to restrain anything there because

2   there's no evidence of any issues.

3           What they are asking you to do -- so they're taking

4   that, and what they're trying to do is confuse the situation,

5   and they're saying, well, we're a secured creditor over here,

6   and we want you to enjoin stuff over there, but we're not a

7   secured creditor.  That's where the temporary restraining order

8   really gets crazy, your Honor, because there's a dispute as to

9   whether the guaranty was even triggered.  There's no

10  evidence --

11          THE COURT:  Because of the use of the word solely?

12          MR. MCCARTHY:  Yes, your Honor.

13          So in order for the guaranty to be triggered, they

14  have to show that the guarantor -- because it's a bad-boy

15  guaranty that has to be triggered first.  They have to show

16  that it was solely as a result of the actions of the guarantor,

17  and there's no evidence of that, your Honor, at this stage.

18          So there's no basis to restrain what's going on at

19  777, first, because there's a dispute as to whether the

20  guaranty has been triggered under the provision that they are

21  relying on; and, second, even if it is triggered, they are an

22  unsecured creditor, and then you get to the *Grupo Mexicano*

23  case, where Justice Scalia made clear that because a remedy

24  like what they're seeking here was historically unavailable

25  from a court of equity, we hold that the district court had no

A-783

19

O676LEAC

1    authority to issue a preliminary injunction preventing

2    petitioners from disposing of their assets pending adjudication

3    of respondent's contract claim for money damages.

4           Judge Martin issued the preliminary injunction in that

5    case, and the Second Circuit affirmed Judge McLaughlin, and in

6    1999, the Supreme Court said district courts do not have the

7    authority to issue injunctions to prevent people from disposing

8    of their assets when it's a contract claim for money damages.

9    And that's what they are asking you, your Honor, to do here.

10   They have, at best, a disputed unsecured claim against

11   777 Partners and 600 Partners, and they are asking you to issue

12   a temporary restraining order today, and eventually a

13   preliminary injunction against those entities disposing of

14   their assets, when your Honor, respectfully, doesn't have the

15   authority to do so.

16          And it gets worse, your Honor, because in the order to

17   show cause that they've asked you to sign, they've asked that

18   not just the guarantor's assets be frozen, but every affiliate

19   of the guarantor, including affiliates, agents, employees, and

20   attorneys.  So if your Honor were to sign the temporary

21   restraining order that they're asking you to sign, technically,

22   I might be in contempt of it if I transferred some of my money

23   or cash equivalents.  So, there's no evidence, your Honor, to

24   grant the temporary restraining order today against either the

25   SuttonPark Capital aspect of the business or the 777 aspect of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-784

20

0676LEAC

1   the business.

2         THE COURT:  Show me where in Paragraph 2 --

3         MR. MCCARTHY:  So Paragraph 2, your Honor, refers back

4   to earlier.  If you look at footnote one, it defines borrowers

5   and guarantors as including any affiliates, agents, employees,

6   and attorneys.

7         THE COURT:  Okay.  It's not clear to me, and the

8   plaintiffs can respond, that in Paragraph 2, borrowers and

9   guarantors is meant to be as broad as footnote number one,

10   namely, anyone who is in active concert.  I would think, and

11   I'm perfectly happy to listen to the plaintiffs, but if you

12   struck footnote one, and even footnote two, Paragraph 2 would

13   then refer to the borrowers and guarantors.  That's the kind of

14   explanation that parties are usually able to work out.  But

15   that's a good point.

16         Go ahead.

17         MS. NATHANSON:  Yes, your Honor.

18         So I think footnotes one and two could be stricken

19   because they come from the language of Rule 65 as to which

20   parties are covered by a TRO.  So, yes, Paragraph 2 is not

21   meant to enjoin Mr. McCarthy from transferring money out of his

22   bank account, but we included those footnotes to recognize that

23   Rule 65 prevents these parties from assisting the parties

24   enjoined by the TRO from violating the TRO.  So, yes, I think

25   they could be stricken.  Rule 65 would still have its effect.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-785

21

O676LEAC

1        THE COURT:  In your papers, you argue that the RICO

2    claim is patently without matter.  There's been no motion to

3    dismiss yet.  I set a premotion conference for June 14.  I read

4    the allegations in the complaint, which appear to be quite

5    detailed.  They appear to touch the necessary elements for a

6    RICO claim and a RICO conspiracy claim.  If the plaintiffs need

7    further details, for example, with respect to the specific mail

8    and wire fraud predicate acts, I would normally grant the

9    plaintiffs the opportunity to file an amended complaint.  But

10   to say that the RICO claims are, as you say in your papers,

11   patently without merit, it's not clear to me why that's true.

12   There appear to be allegations of fraud.

13       MR. MCCARTHY:  There are allegations, certainly, but,

14   your Honor, we believe that this is a two party-dispute that

15   they are trying to create into a RICO claim.  We think that

16   when we fully brief that issue, your Honor will agree with us

17   that the RICO claim doesn't survive.

18       THE COURT:  You don't have to answer this right now,

19   but you've asked for an evidentiary hearing.  And I think under

20   Second Circuit law, if I'm asked to give an evidentiary hearing

21   for a preliminary injunction, I should give that hearing.  But

22   I should at least ask what the issues are for the preliminary

23   injunction hearing and should allow discovery, show, if the

24   issues are whether, in fact, collateral, which was supposed to

25   be solely for the plaintiffs, was double pledged, allegedly

A-786

22

0676LEAC

1     admittedly double pledged.  Then the people who, I assume, made

2     those kinds of statements could be deposed before the

3     preliminary injunction hearing if, in fact, those are disputed

4     issues of fact.

5             And as I say, you don't have to answer that now, but I

6     would think before I go forward with an evidentiary hearing,

7     the parties should consult as to what the issues for an

8     evidentiary hearing are and what the appropriate discovery in

9     preparation for that evidentiary hearing is.

10            MR. MCCARTHY:  That makes total sense, your Honor.

11    We'll certainly do that with Ms. Nathanson and Mr. Watkins, to

12    the extent he wants to be involved.

13            THE COURT:  Okay.

14            MS. NATHANSON:  May I just make one point, your Honor,

15    on that?

16            No objection to hearing out the defendants.  Again, we

17    don't think that there are issues in dispute here.  But

18    something that Mr. McCarthy just said struck me as potentially

19    cutting through some of these issues, and I think either it's

20    disputed that 777 does not have $609 million worth of

21    collateral earmarked for Leadenhall or not.  I think it's not

22    disputed.  But if it is disputed, and 777 is taking the

23    position that that collateral is there for Leadenhall's benefit

24    free and clear of other security and interest today, then the

25    entry of the restraining order or preliminary injunction that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-787

23

O676LEAC

1   we are seeking would not have any effect on 777's businesses

2   because you wouldn't get past Section 2A of what we're

3   proposing, which is the prohibition of sale, transfer,

4   conversion, pledge, or encumbering of the assets pledged as

5   collateral by the borrowers to Leadenhall under the loan and

6   security agreement.

7            If it is the case that there is a dispute as to

8   whether that collateral exists in full, and if 777 is taking

9   the position that collateral exists in full, then I don't see

10  what their objection would be to holding onto that collateral.

11  If there's not a dispute, and they acknowledge, as the

12  evidentiary records show and as their recorded admissions have

13  substantiated, that that collateral is not there, and the

14  servicing of the collateral that Mr. McCarthy is referencing, I

15  think he's suggesting that if we are owed $609 million, but

16  we're still getting paid on $20 million, just to use an

17  example -- I don't know what the number is -- then we should

18  take our ball and go home.  I don't think that's what the law

19  states.  So either we need an evidentiary hearing because they

20  are disputing the deficiency here, or they are not disputing

21  the deficiency, and there really shouldn't be any issue with

22  the entry of the order.  It's not disruptive to their business.

23  If they have the collateral, it's sitting right there, if

24  that's the case, I don't know why Leadenhall has not been paid

25  back on its acceleration notice that has not been contested

A-788

24

O676LEAC

1    since it was issued in March.  But I think we're creating an

2    issue here that either is not contested or should not be a

3    problem to preserve.

4           THE COURT:  Mr. McCarthy.

5           MR. MCCARTHY:  So the collateral we're talking about,

6    your Honor, as the papers made clear, is an ongoing stream of

7    revenue -- structured settlements and lottery winnings and

8    Medicare payments -- so it's not like there's $609 million of

9    cash sitting in the bank.

10          Other than the initial issue, there's been no

11   allegation the last two years that anything happened to their

12   collateral other than it's been collected and paid to them.

13          THE COURT:  No.  There's a difference between the

14   income stream and the presence of sufficient collateral to

15   support.

16          MR. MCCARTHY:  But they don't have rights beyond that,

17   your Honor.  They have the rights to the income stream

18   collateral.

19          Look, if all she wants today is a temporary

20   restraining order that says her clients' collateral will go to

21   her and no one else, that's what's happening.  There's no need

22   for a TRO.

23          THE COURT:  But they've accelerated the debt.

24          MR. MCCARTHY:  Well, there's not sufficient liquid

25   assets to pay $609 million.  Why?  SuttonPark Capital.

A-789

25

0676LEAC

1          THE COURT:  Wasn't there supposed to be?

2          MR. MCCARTHY:  No, your Honor.

3          THE COURT:  Wasn't there supposed to be sufficient

4   collateral so that if they paid out more than they were

5   supposed to pay out, there would be an event of default?

6          MR. MCCARTHY:  Your Honor, I haven't gotten that deep

7   into the weeds of how their collateral works.  My understanding

8   is a long-term income stream.  Obviously, it has value, it

9   could be liquidated.  I don't know what it is.  There's no

10  evidence in the record as to what the collateral is, what the

11  current value of it is.  It would take time to liquidate it,

12  your Honor.

13         THE COURT:  Okay.

14         MR. WATKINS:  Your Honor, if I may.  Jonathan Watkins,

15  on behalf of A-CAP.

16         THE COURT:  Go ahead.

17         MR. WATKINS:  Thank you.

18         I think, first, A-CAP certainly agrees with

19  your Honor's observation that there's no basis for the relief

20  sought here against A-CAP in terms of injunctive relief, as I

21  understood, your Honor.

22         THE COURT:  I raised that as an issue in order to ask

23  the plaintiff that question, yes.

24         And so having escaped the scope of the temporary

25  restraining order, you succeeded.  Do you want to go further?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-790

26

O676LEAC

1          MR. WATKINS:  Your Honor, had A-CAP succeeded in

2     evading the scope of the temporary restraining order, I would

3     not be standing, I assure, your Honor.

4          But Ms. Nathanson has referred to the effect on A-CAP

5     as incidental.  Not so, at least as proposed by plaintiffs.

6          I think it is important to talk about what the

7     collateral is here, because injunctive relief is only

8     appropriate insofar as there's a security interest.  And in

9     plaintiffs' papers, it is the declaration of Mr. Gillespie,

10    ECF 58, at Page 8 of 8.  Now, plaintiffs don't submit the

11    entire LSA.  They allied important parts of it.  They don't say

12    everything they allied is confidential.  They say some of it

13    is.  At any rate, in a footnote here, they define the

14    collateral, and this is the only thing in which plaintiffs have

15    any security interest.  And it's healthcare receivables,

16    lottery holding SPVs, and other receivables of these SPVs in

17    the structured settlement business that 777 did.  That's the

18    alleged collateral.

19          Now, in the TRO that they seek, your Honor asked about

20    Paragraph 2.  Mr. McCarthy was quite right to point out the

21    definition of borrowers and guarantors, far and beyond Rule 65.

22    There are hundreds of affiliates.  And so if every affiliate

23    were captured, that would be an issue.

24          But there's more than just that issue, your Honor.  On

25    the substance in Paragraph 2B, for example, it says that if the

A-791

27

O676LEAC

1   assets pledged as collateral, so lottery streams of

2   receivables, for example, isn't enough to cover the accelerated

3   debt, so that's not just the 300 million-dollar odd that was

4   actually loaned, but retroactively imposed interest, et cetera,

5   to make it $609 million they say you need to pay us now.  So if

6   there's a delta there, then they would prohibit the expenditure

7   of any cash, not just by the borrowers, not just by the

8   collateral, but by guarantors.  But to the extent the

9   guarantors guarantee anything, it can only be the underlying

10  LSA, where the only collateral is as described by

11  Mr. Gillespie — the lottery receivables, healthcare

12  receivables.

13          And so setting aside that much cash company-wide, all

14  hundreds of the different entities, would go far beyond the

15  scope of the collateral.  And it would, then, directly impact

16  other creditors' rights.

17          THE COURT:  No, but they are prepared to accept a

18  qualification other than in the normal and ordinary course of

19  business.  So the enjoined parties would be effectively

20  prohibited from disposing of assets other than in the normal

21  and ordinary course of business.  So they can continue to

22  conduct their business if, in fact, they don't have sufficient

23  collateral to pay the $609 million.

24          As I read the TRO, it is specific, and usually parties

25  can agree upon further clarifications, if necessary.  This is

A-792

28

O676LEAC

1     not a proposed TRO which, for example, limits expenditures in

2     excess of $1 million without approval or something like that.

3     It would be preventing the disposition of assets other than in

4     the normal and ordinary course of business.  So assets couldn't

5     be stripped, assets couldn't be distributed to other parts of a

6     complex corporate structure at less than fair value or an

7     extraordinary transaction, which appears to be a fairly limited

8     TRO.

9          MR. WATKINS:  Your Honor, I appreciate those points so

10    long as the entities that were so restrained, so enjoined, were

11    the borrowers.

12         THE COURT:  And the guarantors.  The borrowers and the

13    guarantors, which does not include A-CAP.

14         MR. WATKINS:  Which does not include A-CAP, to be

15    sure.  However, A-CAP is a creditor of the guarantors.  There's

16    been no showing as to how Leadenhall have secured --

17         THE COURT:  So, if the borrowers or guarantors in this

18    case, owing $609 million to Leadenhall, decided that actually

19    it's in their interest to give $109 million to A-CAP in order

20    to finance a soccer team somewhere, A-CAP would not like that.

21    But it's not clear to me that that's not a reasonable provision

22    of a temporary restraining order to prevent the dissipation of

23    assets when the borrowers and the guarantors are allowed to

24    continue their business in the normal and ordinary course of

25    business, and if assets are stripped or disposed of other than

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-793

29

O676LEAC

1    at fair value, then they would be violating the TRO, and

2    someone eventually would have to own up to that and suffer the

3    consequences.

4         MR. WATKINS:  Your Honor, the collateral, if assets

5    were dissipated from there, to be sure, that would make good

6    sense.  Those assets should not be removed from the collateral

7    base and other things done with those assets.  Quite different,

8    though, your Honor, is the sorts of soccer team advances that,

9    based on the press, Leadenhall writes about.

10        I'd like to be very, very clear.  The first page of

11   the reply brief alleges that A-CAP has foreclosed on loss, but

12   there's no allegation of a single foreclosure.  As I sit here,

13   I'm unaware of a single foreclosure.  Unaware of a single one.

14   They talk about dissipating assets.  They talk about asset

15   stripping.  This is speculation.  This is argument in a brief.

16   There's no factual basis for any of it.  There's no evidence.

17        THE COURT:  Then there will be no problem.  What they

18   do allege specifically is they've attempted to get payments to

19   pay down the debt after it was accelerated, and they were

20   promised some payments, relatively small amounts compared to

21   the amount outstanding, and the defendants were unable to make

22   good even on those promised payments.  So, Mr. McCarthy

23   corrected me, it was $15 million.  So there's a showing that

24   the assets aren't there and that the borrowers and guarantors

25   have not been able to come up with sufficient money to pay down

A-794

0676LEAC

1    the debt, even though it is accelerated.

2          MR. WATKINS:  I understand that allegation, of course.

3    There are many creditors who have alleged that they have not

4    been paid down.  Understood the allegation, for sure.  That

5    really is the crux of the argument here.  When you get through

6    the papers, they make much about ACAP's protective advances,

7    and then they say, but when Josh Wander promised us that we'd

8    get one, A-CAP said we're not in a position to finance a

9    protective advance to you, Leadenhall, a creditor to these

10   lottery receivables.  They're not in a position to do that.

11   They wanted one, and they couldn't get that.  And they are very

12   up in arms that while you couldn't pay us our $15 million in a

13   timely fashion, we see press reports about 777 generally giving

14   money to soccer teams.  They are awfully upset about that.

15         But, of course, it makes sense to give protective

16   advances when otherwise there could be calamitous consequences.

17   If a performer, who is scheduled to play a sold-out concert

18   that night, isn't paid right beforehand, of course, they may be

19   upset in advance.  It doesn't make sense when it is a lender

20   who is owed money, and everyone agrees the lender is owed

21   money.  But who is alleged to have supplied the money for

22   soccer teams?  A-CAP is alleged to have supplied that money.

23   So 777, the guarantor's assets, are not being dissipated.  I

24   suppose, under the allegation, perhaps it's a flow through.  I

25   don't think that's the reality at all.  The allegation could be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-795

31

O676LEAC

1   A-CAP and different entities in a different world, different

2   part of the world literally, of course, making protective

3   advances to protect the value of collateral in which Leadenhall

4   has no interest whatsoever.  There is no allegation that

5   collateral is being taken from lottery tickets, healthcare, and

6   so on.  It's the only collateral Leadenhall has.  There's no

7   allegation that that collateral is being used to pay for soccer

8   teams.  None whatsoever.

9           The money is alleged to be coming from outside of 777,

10  from A-CAP, and going to the soccer teams.  Leadenhall has no

11  interest in any of that, in any of that whatsoever.  And the

12  way this relief is written, it would stop, for example, any

13  transaction, any effort to exercise remedies, at other

14  affiliates, unrelated affiliates.

15          THE COURT:  No, we've stricken footnotes one and two.

16  So this deals with the borrowers and the guarantors.

17          MR. WATKINS:  Okay.  Understood.  Understood.

18          Paragraph 2E, for example, your Honor, as written now,

19  says that it would prevent any defendant -- and, of course,

20  A-CAP is a defendant -- from foreclosing on, repossessing, or

21  exercising remedial actions against the assets of the borrowers

22  and guarantors.

23          There's been no showing that Leadenhall's rights with

24  respect to the borrowers and guarantors are senior to A-CAP's.

25  In fact, they are not.

A-796

32

0676LEAC

1          THE COURT:  No, no.  Paragraph E requires the

2     borrowers and guarantors, so not A-CAP, to provide notice to

3     Leadenhall of any attempt by any defendant, which would include

4     A-CAP, to foreclose on, repossess, or exercise remedial action

5     against the assets of the borrowers and guarantors and/or

6     prevent any defendant from foreclosing or repossessing or

7     exercising remedial actions against the assets of the borrowers

8     and guarantors.  So it is limited to the assets of the

9     borrowers and guarantors.

10         MR. WATKINS:  Your Honor, the guarantors include the

11    holdcos, the senior entities.  And to the extent Leadenhall has

12    any security at all, it's limited to some lottery receivables,

13    to healthcare receivables.  They've alleged an all asset lien

14    at the holdco level.  A-CAP has a senior position to Leadenhall

15    with respect to the guarantors, and so any injunctive relief

16    that would preclude a senior creditor from exercising its right

17    at the guarantors would do harm, would disserve the public

18    interest.

19         THE COURT:  So A-CAP is saying that it can strip the

20    assets of 777, yes?  Is that what A-CAP is telling me now?

21         MR. WATKINS:  Strip is certainly a pejorative word.

22    Commonly understood generally.  A-CAP has rights as a creditor

23    with respect to assets of the holdco level.

24         THE COURT:  So we've already said that there can be a

25    limitation on transfers in the normal and ordinary course of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-797

33

0676LEAC

1  business.  So what A-CAP is telling me now is that because it

2  has senior rights in 777, it, not in the normal and ordinary

3  course of business, can simply take assets for less than fair

4  value out of 777.

5          MR. WATKINS:  No, your Honor, I've never spoken the

6  words for less than fair value.  Nor is there any evidence --

7          THE COURT:  No.  I'm just trying to understand ACAP's

8  position.  The plaintiffs have said, yes, they would agree that

9  there could be a limitation to transfers in the normal and

10 ordinary course of business.  So if 777, in the normal and

11 ordinary course of business, has a transaction with A-CAP, it

12 wouldn't be precluded if it's in the normal and ordinary course

13 of business.  But if it's not, you may not like the term

14 "strip," another term is for less than value.  But you wouldn't

15 like that either.  The question is, is A-CAP telling me that

16 that's what it should be able to do?

17         MR. WATKINS:  No, your Honor, A-CAP is not telling

18 you --

19         THE COURT:  Okay.

20         MR. WATKINS:  -- it should be able to pay for less

21 than fair value.  Anything that A-CAP intends to do anywhere

22 would be, of course, for fair value.

23         THE COURT:  And in the ordinary course of business.

24         MR. WATKINS:  So long as that is encompassed in the

25 ordinary course of business, then --

A-798

34

0676LEAC

1          THE COURT:  So, people should be careful going

2     forward, if there's a TRO, not to engage in transactions

3     involving the specific borrowers and guarantors in this case as

4     to whom Leadenhall has claims.  And A-CAP says, we wouldn't

5     think about doing that.  Okay.  If there's a temporary

6     restraining order, I assume at some point, there will be a

7     question whether there were any transactions that were not in

8     the normal and ordinary course of business which resulted in

9     taking assets away from the borrowers or guarantors which

10    otherwise could have been used to pay down the debt that

11    Leadenhall has.

12         MR. WATKINS:  Your Honor, if there were a question one

13    day about what another creditor did, whether it was for fair

14    value, that could be a claim for money damages.  And there's no

15    allegation anywhere, much less evidence, that A-CAP is unable

16    to satisfy a money judgment.  And so if it A-CAP were to engage

17    in a transaction -- let's assume a transaction where A-CAP is

18    the creditor, and --

19         THE COURT:  Hold on, hold on.  Hold on.

20         This is a case about the debts from the borrowers and

21    the guarantors, which is not A-CAP.  A-CAP is named as a

22    defendant in this case, but not as a borrower or guarantor.  So

23    it's not about transactions by A-CAP not related to the

24    borrowers or the guarantors.  You were proceeding to give me a

25    hypo about other things that A-CAP may do, but this is about

A-799

35

O676LEAC

1    the borrowers and the guarantors.

2        MR. WATKINS:  Your Honor, I believe the only thing

3    that this may be about under the law is to the extent of

4    Leadenhall security interest, the collateral so defined.  And

5    to the extent any injunctive relief reaches the guarantors, the

6    guarantors are the senior holdcos here, and those holdcos have

7    other creditors, secured senior creditors.  Those secured

8    senior creditors have contractual rights, just like Leadenhall

9    has contractual rights under its LSA.

10        Those senior secured creditors at the guarantors,

11    given the current state of affairs with borrowing entities, may

12    well exercise some of those rights.

13        As written here, however, as written in the draft TRO,

14    the proposed TRO, other creditors would be precluded from

15    exercising their remedies that they may have even for perfectly

16    fair value, everything aboveboard, remedies that they have that

17    are superior to Leadenhall at the guarantors.  And Leadenhall,

18    by getting to the courthouse at least here first, should not be

19    able to stop other creditors from exercising their rights,

20    they're senior rights.

21        THE COURT:  Okay.  Sufficient unto the day, if other

22    people, other creditors, come in and file other claims, then

23    those claims will have to be resolved.  If Leadenhall makes a

24    sufficient showing to obtain relief, it would not be a

25    reasonable basis for denying that relief to say, well, if you

A-800

36

O676LEAC

1    grant relief to them, then someone else will come in looking

2    for relief.  Someone else may come in looking for relief

3    anyway, and if they get relief, they may harm Leadenhall.  So

4    sufficient unto the day, anything else?

5         MR. WATKINS:  Your Honor, if I may, the public

6    interest demands in this posture that we look to the rights of

7    others.  And Leadenhall has made no showing --

8         THE COURT:  Okay.

9         MR. WATKINS:  -- to the extent it has any right with

10   respect to the guarantor, that its rights are superior to

11   others.  We have two intervenors here who have said that even

12   with the small pool of receivables, that they are senior.

13        THE COURT:  Both intervenors have said that they do

14   not object to the TRO providing that there's an exception for

15   transfers in the normal and ordinary course of business.  So,

16   A-CAP alone, in addition to the defendants represented by

17   Mr. McCarthy, says, oh, but there are all of these other people

18   out there who are not objecting to the TRO, who don't oppose

19   it, because they appreciate that there shouldn't be

20   transactions involving these entities other than in the normal

21   and ordinary course of business.  But A-CAP says no, no, it's

22   not sufficient to say that they shouldn't be enjoined from

23   transactions that are not in the normal and ordinary course of

24   business.  A-CAP wants an exception for transactions.  They

25   want no injunctive relief, and they don't want simply a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

| A-801 |

37

O676LEAC

1    limitation to transactions that are in the normal and ordinary

2    course of business.  Which is remarkable.

3            But, anything else?

4            MR. WATKINS:  Your Honor, only what exactly the

5    ordinary course of business is.  Perhaps I misunderstand.

6    A-CAP is only interested in making sure the scope of any relief

7    here does not affect the rights of other creditors, including

8    A-CAP.

9            THE COURT:  Okay.  All right.  So --

10           MR. MCCARTHY:  Your Honor, I have a couple of other

11   points.

12           The proposed temporary restraining order --

13           MS. NATHANSON:  May I just make a point in response to

14   Mr. Watkins?

15           THE COURT:  No.  Let me finish with Mr. McCarthy --

16           MS. NATHANSON:  Sure.

17           THE COURT:  -- and then Leadenhall can respond.

18           MR. MCCARTHY:  I would point out to your Honor that

19   Rule 65(d) requires that the contents of every restraining

20   order must describe in reasonable detail, and not by reference

21   to the complaint or other document, the act or acts restrained

22   or required.  So Paragraph 2A, if I'm a worker at

23   SuttonPark Capital servicing, servicing the debt, how am I

24   supposed to know what exactly I'm complying to without

25   referring to other documents?  So I think that would have to be

A-802

38

O676LEAC

1    modified.  Obviously, it would also have to be modified, as

2    your Honor pointed out, about the ordinary course of business.

3    And, also, there's the issue of security, your Honor, which

4    they do not include in their papers.

5         We'll require that a bond be posted.  We would think,

6    for a restraining order involving assets, we're probably

7    talking a 10-million or 20-million-dollar security would be

8    appropriate, your Honor.

9         I also think, your Honor, that in Paragraph 2C, I just

10   want to make sure that it's clear that it's cash equivalents

11   received by borrowers or guarantors, that it's limited to that.

12        Your Honor, the organizational chart, there are

13   companies that are, like, three, four, five, six levels down.

14   If there's a transaction that's never going to get up to the

15   guarantor, I just want to make clear that it's only cash

16   received by the guarantors.

17        D, I think, is completely unworkable.  I don't know

18   what that means.  I don't know how we would enforce it.  Again,

19   because the org chart goes all the way down, I could see a

20   potential argument saying, oh, there was a transaction four

21   levels down, and that dissipated your assets, and, therefore,

22   it's violating the restraining order.  So I think if you're

23   going to issue the restraining order, that should be gone.

24        And I'm not sure what the second prong of E provides

25   for other than restraining A-CAP.  So I think that has to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-803

O676LEAC

1    stricken, also, your Honor.

2           Thank you, your Honor.

3           THE COURT:  Okay.

4           MS. NATHANSON:  Just a couple of points, your Honor.

5           I think we can see that there may be a difference of

6    opinion as to what the normal course of business entails.  I

7    think most of the points that Mr. McCarthy just made are

8    nonissues because of the normal course-of-business exception.

9    For example, a worker at one of the borrower entities

10    facilitating payroll is not going to be implicated in this TRO

11    because those transactions are obviously within the normal

12    course of business.  I don't think there needs to be any

13    clarification there.  I think it is perfectly clear.

14           With respect to the transactions that A-CAP

15    contemplates, and whether they contemplate going forward and

16    characterizing those transactions as within the normal course

17    of business and then leaving us to try to seek monetary damages

18    after the fact, which I think is what Mr. Watkins suggested,

19    one thing that I do think is important in 2E of the proposed

20    order is a notice requirement of transactions like those that

21    A-CAP contemplates.  That notice provision is limited to other

22    defendants, so, yes, it would include A-CAP.  Again, it would

23    not apply to normal course of business transactions.  But we do

24    think there needs to be some transparency ahead of the fact of

25    what it is that they are planning on doing, so if there is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-804

40

0676LEAC

1    additional action that Leadenhall or any other creditor feels

2    it needs to take to prevent what it believes to be an outside

3    of the normal course-of-business transaction or an asset

4    stripping, that we're not waiting until after the fact.

5        And I know Mr. Watkins has made a lot of the fact that

6    Leadenhall is apparently an unsecured creditor. The fact of a

7    security interest is that, yes, collateral is put up to act as

8    security against the loss of the investment. If the collateral

9    is absconded with or is fictitious, that doesn't make the

10   creditor an unsecured creditor. And so the idea that

11   Leadenhall, because of the defendants' fraud, has no remedy

12   other than money damages totally defeats the purpose of what a

13   security interest is. It's not only the interest of the

14   collateral, but it's also the remedies that come with the

15   depletion of the collateral. I don't think that's disputed,

16   but apparently it is by A-CAP.

17       The last point I'll make is on the bond. Courts have

18   the discretion to waive the bond requirement or make it zero.

19   We think that's appropriate here. And, most importantly, we

20   think the defendants have the burden of making a showing that

21   there will be harm in the event that this TRO turns out to have

22   been issued wrongly. We think that risk is essentially nil

23   here. But, more importantly, there's no harm that they've

24   pointed out that would require their businesses from being

25   prohibited only from engaging in outside of the normal

A-805

41

O676LEAC

 1   course-of-business transactions with $609 million of

 2   accelerated debt on its books.

 3          If they want to use money that they don't have to make

 4   investments while this lawsuit is pending, that's not prejudice

 5   to defendants.

 6          THE COURT:  It would be extraordinary to have a

 7   temporary restraining order in a financial case, such as this,

 8   without a bond to secure the defendants from any harm from a

 9   wrongfully issued injunction.

10          Okay.  Well, I've listened to all the parties.  So let

11   me give --

12          MR. MUENZ:  Your Honor, may I be heard very, very

13   briefly?

14          THE COURT:  Yes.  Say who you are.

15          MR. MUENZ:  Thank you.  I'll just approach the podium,

16   your Honor.

17          John Muenz, for Limited Intervenor National Founders.

18   I will be very, very brief because I do want to thank

19   your Honor already for being sensitive to the concerns of the

20   intervenors.

21          It does satisfy us, your Honor, to include

22   ordinary-course exception in the TRO.  I did just want to

23   express, very briefly, that one of the significant concerns my

24   client has is, they're in the process of transferring servicing

25   responsibilities from the SuttonPark services or to another

A-806

42

O676LEAC

1   entity, and we want to be sure that nothing in the TRO order

2   would preclude that.  I don't think that's intended by

3   Leadenhall, but I wanted to put that on the record and make

4   sure parties are aware of that.  So maybe Ms. Nathanson could

5   respond.

6         MS. NATHANSON:  Plaintiffs' view is that that would

7   not be affected by the TRO.  In fact, I don't think it entails

8   the movement of assets, you know, one way or another.  It's

9   just transferring the servicing of the receivables that are

10   there.  In our view, that would not be touched by the TRO.

11         MR. MUENZ:  Wonderful.

12         Thank you, your Honor.

13         MR. ZIEGLER:  Your Honor, Matthew Ziegler, for ING.

14   I'll be pretty quick here.  We appreciate how this has all come

15   together.

16         If I understand correctly, what's under contemplation

17   is that Part 2 of the proposed order, at ECF Number 56, will be

18   used as a template for a TRO, the two footnotes will be

19   deleted, thus limiting this to the parties in the case, and

20   there will be a blanket ordinary course qualifier.  We have no

21   objection to that, your Honor.

22         I would ask, apropos to something Ms. Nathanson said a

23   moment ago, that ING be included as a notice party in Paragraph

24   E.  I appreciate this deals with Leadenhall-specific borrowers

25   and guarantors, but if there's an effort to move anything

A-807

43

O676LEAC

1    around the system, I think it's appropriate for us to assume be

2    notified of that.

3            THE COURT:  Does plaintiff have any comment on that?

4    I assume --

5            MS. NATHANSON:  Subject to speaking with my client, I

6    don't think that we'd have an objection to that.

7            THE COURT:  I assume National Founders would be in the

8    same position?

9            MR. MUENZ:  Exactly.  Thank you, your Honor.

10           MR. WATKINS:  Your Honor, if I may, to the extent E

11   requires other creditors to provide notice before they

12   foreclose on, the injunctive relief will deal with, as I

13   understand it, 777, and cannot go and reach those acting

14   independently of 777, and so if a creditor exercises a remedy,

15   I don't believe that that is something that can be reached by

16   any order here.

17           THE COURT:  All that Paragraph E does is to provide

18   notice to Leadenhall, ING, and National Founders of any attempt

19   by any defendant to foreclose.  It doesn't prevent any such

20   actions; it just provides notice.

21           MR. WATKINS:  Understood.

22           The and/or language, everything after and/or, would

23   prevent a defendant from doing anything will not be included.

24   Very good.

25           THE COURT:  Hold on.  It's the notice of any attempt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-808

44

O676LEAC

1    by any defendant to do these things and/or to prevent any

2    defendant from foreclosing.  So, as I read it, it's notice if

3    there's any attempt to prevent any defendant from foreclosing

4    is the latter part.

5              MR. WATKINS:  So long as the notice by borrowers and

6    guarantors modifies the rest.

7              THE COURT:  Right.

8              MR. WATKINS:  Okay.  Very good.  I believe I --

9              THE COURT:  Plaintiff?

10             MS. NATHANSON:  Yes, we read it as your Honor reads

11   it.  Or I should say we wrote it as your Honor reads it.

12             THE COURT:  Okay.  Let me give you some explanation

13   with respect to the TRO.

14             The plaintiffs, Leadenhall Partners LLP and Leadenhall

15   Life Insurance Linked Investment Fund PLC (together,

16   "Leadenhall") allege that the defendant borrowers and

17   guarantors defrauded the plaintiffs of hundreds of millions of

18   dollars by pledging as collateral assets that did not exist,

19   were not owned by the defendants, or had already been pledged

20   to another lender.  Leadenhall further alleges that several of

21   the defendants are on the brink of financial distress.  As a

22   result, Leadenhall seeks a temporary restraining order and the

23   appointment of a receiver over the assets of the defendants or,

24   in the alternative, a preliminary injunction that would freeze

25   the same assets.

A-809

45

O676LEAC

1          The defendants have sought an evidentiary hearing on

2     the motion for a preliminary injunction.  At this point,

3     therefore, it is only necessary to determine whether the

4     plaintiffs should be granted a temporary restraining order,

5     although the standard for a preliminary injunction is relevant

6     it whether a temporary restraining order should be issued.

7          A preliminary injunction is an extraordinary remedy,

8     never awarded as of right.  *Winter v Nat. Res. Def. Council,*

9     *Inc.*, 555 U.S. 7, 24 (2008).

10         To succeed on a motion for a preliminary injunction,

11    the plaintiff must show:  (1) a likelihood of success on the

12    merits or sufficiently serious questions going to the merits to

13    make them a fair ground for litigation and a balance of

14    hardships tipping decidedly in the plaintiff's favor; (2) a

15    likelihood of irreparable injury in the absence of an

16    injunction; (3) that the balance of hardships tips in the

17    plaintiff's favor; and (4) that the public interest would not

18    be disserved by the issuance of an injunction.  *Benihana Inc. v*

19    *Benihana of Tokyo*, 784 F.3d 887, 895 (2d Cir. 2015).

20         In the Second Circuit, the standard for issuance of a

21    temporary restraining order is the same as the standard for a

22    preliminary injunction.  See *Fairfield County Medical*

23    *Association v United Healthcare of New England*, 985 F. Supp. 2d

24    262, 270 (D. Conn. 2013), affirmed as modified.  557 F. App'x

25    53 (2d Cir. 2014).

A-810

46

O676LEAC

1          The following recitation of facts is drawn from the

2     parties' submissions.  See *Park Irmat Drug Corp. v. Optumrx,*

3     *Inc.*, 152 F. Supp. 2d 127, 132 (S.D.N.Y. 2016).  (quoting:  "In

4     deciding a motion for preliminary injunction, a Court may

5     consider the entire record, including affidavits and other

6     hearsay evidence.")

7          In May 2021, Leadenhall entered into a secured credit

8     facility with four borrowers, all subsidiaries of Defendants

9     777 Partners LLC, and 600 Partners LLC.  With a maturity date

10    in September 2024.  Declaration of Criag Gillespie paragraph 2,

11    Exhibit 1.  Excerpts from the loan and security agreement dated

12    May 7, 2021, ("LSA"), Section 2.01; complaint, paragraphs 3 to

13    4, 45 to 50.

14         Each borrower pledged to Leadenhall as collateral

15    first-priority security interest in 100 percent of its assets.

16    Moreover, the borrowers agreed to own the collateral assets

17    free and clear of any other claims at all times.

18         The borrowers reaffirmed that agreement every month

19    and every time they borrowed money from Leadenhall, by

20    submitting compliance reports and attestations.

21         The LSA contemplates two types of events of default.

22    Upon a "borrower group event of default," such as breached

23    covenants and representations and borrowing base deficiencies

24    not cured within three business days, Leadenhall may exercise

25    remedies, including acceleration with respect to the affected

A-811

47

O676LEAC

1   borrower.

2         On the other hand, upon a facility event of default,

3   such as any impairment of Leadenhall's first-priority security

4   interest, not cured within two business days and any borrowing

5   base deficiency not cured within 30 days, Leadenhall may

6   accelerate the debt of all borrowers, even those not directly

7   responsible for the event of default.

8         In addition to first-priority security interest in the

9   borrowers' assets and recourse against each borrower,

10   Leadenhall also negotiated a guarantee from 777 Partners and

11   600 Partners of all of the borrowers' obligations.  Guaranty

12   Agreement Sections 2 and 3.  Among the trigger events granting

13   Leadenhall recourse against 777 Partners and 600 Partners for

14   the borrowers' obligations is a borrower's "failure . . . to

15   own the collateral pledged . . . free and clear."

16         On September 19, 2022, Leadenhall received an

17   anonymous e-mail alleging that Defendant Josh Wander, who

18   controls the defendant entities, or allegedly controls the

19   defendant entities, had either never bought assets pledged to

20   Leadenhall as collateral or pledged them to other lenders.

21   Upon investigation, Leadenhall confirmed the anonymous tip.

22         On March 28, 2,023, Leadenhall held a recorded

23   conference call with Wander where Wander admitted that one of

24   the borrowers, SPLSS3 LLC ("SuttonPark"), had double-pledged

25   collateral to both Leadenhall and another lender in breach of

A-812

48

O676LEAC

1    the LSA.  Kane declaration, paragraphs 2 to 5.  ECF No. 59.

2            On a second recorded conference call with Wander, on

3    April 3, 2023, Wander admitted to other fundamental breaches.

4    *Id*, paragraphs 7 to 9.

5            Around this time, Leadenhall also discovered that

6    another borrower, Dorchester Receivables II LLC,

7    ("Dorchester"), had also pledged assets that were allegedly

8    pledged to another lender, sold or transferred to a

9    third-party, or never purchased in the first place.  Gillespie

10   declaration, paragraph 9, Exhibit 5.

11           On November 29, 2023, Leadenhall sent formal notices

12   of the SuttonPark and Dorchester borrowers' breaches.  In light

13   of the breaches, all of the borrowers executed an amendment to

14   the LSA, agreeing to pay additional interest on the

15   uncollateralized portion of the outstanding debt.

16           In January 2024, at Leadenhall's request, SuttonPark

17   and Dorchester submitted revised monthly compliance reports

18   going back to March 2023.

19           The revised reports confirmed that SuttonPark and

20   Dorchester had, going back to at least March 2023, borrowed

21   hundreds of millions of dollars in excess of contractual

22   limitations.  After sending the notice of breach, Leadenhall

23   began negotiations with Wander to recoup the debt extended to

24   his companies.  On February 21, 2024, Leadenhall executed a

25   paydown and partial release letter with the borrowers and

**A-813**

49

O676LEAC

1    guarantors, in which the borrowers agreed to immediately repay

2    approximately $25 million.  However, the borrowers were able to

3    pay only about half of that amount, citing difficulties with

4    Advantage Capital Holdings LLC, ("A-CAP").

5            Leadenhall then served the borrowers and guarantors

6    with a default notice on March 12, 2024, notifying them that

7    the events detailed in the prior notice of breach constituted

8    facility events of default under the LSA.  On March 15, 2024,

9    Leadenhall served the borrowers and guarantors an acceleration

10   notice, notifying them that Leadenhall was exercising its

11   contractual right, upon a facility event of default, to call

12   immediately due and payable the outstanding balance due to

13   Leadenhall from all four borrowers under the facility of

14   $609,529,966.82.

15           Following acceleration, Leadenhall continued

16   attempting to negotiate a restructuring of the outstanding

17   debt.  In March 2024, the parties exchanged draft forbearance

18   agreements, whereby Leadenhall would forebear on exercising

19   certain remedies in exchange for payments pursuant to a

20   repayment plan.

21           On March 29, 2024, however, the defendants failed to

22   make an agreed-upon $15 million payment, because 777 Partners

23   could not make that payment absent finessing from A-CAP and

24   because agreeing to a repayment plan without A-CAP's approval

25   would constitute an event of default on A-CAP's outstanding

A-814

50

O676LEAC

1    loans to 777 Partners.  Albertini Declaration, paragraphs 2 to

2    4.  See also Gillespie Declaration, paragraphs 18 to 21.

3    Wander suggested he could make a payment using an alternative

4    funding source not dependent on A-CAP, but Leadenhall never

5    received such a payment.  Throughout the month of April, the

6    parties engaged in similar negotiations, which ultimately

7    failed.

8            During this time, Wander's business began to

9    deteriorate.  Then, on May 2, 2024, Wander stated that 777

10   Partners was running down its business and disposing of assets

11   to repay creditors.  Albertini Declaration, Paragraph 7.

12           However, just three days prior, on April 3, 2024, 777

13   Partners reportedly loaned $20 million to an English football

14   club that 777 Partners was in the process of purchasing.  After

15   this complaint was filed, 777 Partners reportedly loaned

16   Everton another $10 million.

17           Leadenhall filed this action on May 3, 2024.  On

18   May 13, 2024, Leadenhall filed this application.  In

19   particular, Leadenhall seeks appointment of a receiver to, one,

20   take control of the assets pledged as collateral of the

21   defendant borrowers; two, to the extent the value of the

22   borrower is less than the accelerated debt, take control of

23   cash or cash equivalents owned by the borrowers and guarantors

24   sufficient to cover the accelerated debt; three, the extent the

25   value of the collateral plus the cash or cash equivalents is

A-815

51

O676LEAC

1    less than the accelerated debt, take control of the proceeds of

2    any sales sufficient to cover the accelerated debt; four,

3    prevent the borrowers and guarantors from dissipating assets,

4    including by transferring assets to any person affiliated with

5    the defendants; and, five, prevent any defendant from

6    foreclosing on assets of the borrowers and guarantors.

7            In the alternative, Leadenhall seeks a preliminary

8    injunction to freeze the same collateral and the same cash or

9    cash equivalents up to the amount of the accelerated debt and

10   otherwise enjoin or require equivalent actions.

11           Leadenhall also seeks a temporary restraining order

12   that orders the alternative relief pending a decision on the

13   appointment of a receiver or a preliminary injunction that

14   incorporates the alternative relief.

15           On May 14, 2024, the parties appeared before the Court

16   for a hearing concerning Leadenhall's application.  At the

17   hearing, the court granted the motion to intervene of National

18   Founders for purposes of the TRO and preliminary injunction.

19           The parties had an opportunity to confer, and the

20   defendants offered to provide the plaintiffs a proposal within

21   48 hours that might obviate the need for Leadenhall's

22   application.  Those discussions ultimately failed.

23           The Court has also received an application to

24   intervene by ING Capital, which the Court has granted on the

25   same basis as it granted the application to intervene by

A-816

52

O676LEAC

1    National Founders; namely, the ability to participate in the

2    hearings with respect to the temporary restraining order and

3    preliminary injunction.

4         Leadenhall argues that it is likely to succeed on the

5    merits of its contract claim.  To establish a likelihood of

6    success on the merits, plaintiff need not show that success is

7    an absolute certainty, but only that the probability of their

8    prevailing is better than 50 percent.  *725 Eatery Corp. v City*

9    *of New York*, 408 F.Supp. 3d, 424, 459, (S.D.N.Y. 2019).

10        Further, plaintiffs need not demonstrate a likelihood

11   of success on the merits of every claim; rather, they need only

12   show a likelihood of success on the matters on at least one of

13   their claims.  *Id.*

14        In this case, Leadenhall focuses its analysis on the

15   contract claims, which provide, on their own, a sufficient

16   basis for the Court to order the relief requested.  To prevail

17   on its contract claims, Leadenhall must establish:  One, the

18   existence of an agreement; two, Leadenhall's performance;

19   three, borrowers' and guarantors' breach; and, four, damages.

20   See *Eternity Global Master Fund Ltd. v Morgan Guaranty Trust*

21   *Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004).

22        Leadenhall has demonstrated a likelihood of

23   establishing each of the foregoing elements sufficient for

24   purposes at least of the temporary restraining order.

25   Leadenhall, the borrowers, and the guarantors entered into 18

# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 4 of 5 (Pages A-817 to A-1092)

JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants*
 *Advantage Capital Holdings LLC*
 *and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP  COUNSEL PRESS      (800) 4-APPEAL • (333478)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

i

## TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Complaint, dated May 3, 2024................................... | A-37 |
| Exhibit 1 to Complaint -<br>Email to Craig Gillespie from Anonymous<br>Sender, dated September 19, 2022......................... | A-119 |
| Exhibit 2 to Complaint -<br>Letter from Craig Gillespie to Steven W. Pasko,<br>Joshua Wander, Damien Alfalla and Steve Pasko,<br>dated March 24, 2023 ............................................ | A-121 |
| Exhibit 3 to Complaint -<br>Email to Josh Wander and Others from Phil<br>Kane, dated March 29, 2023................................... | A-125 |
| Exhibit 4 to Complaint -<br>Email to Josh Wander and Others from Tom<br>Spreutels, dated April 4, 2023................................ | A-128 |
| Exhibit 5 to Complaint -<br>Letter from John Wells to Steven W. Pasko re:<br>Notice of Breach of Parties' Agreements, dated<br>November 29, 2023 ............................................... | A-130 |
| Exhibit 6 to Complaint -<br>Wells Fargo Summary Statement Screenshot........ | A-135 |
| Exhibit 7 to Complaint -<br>"Collection" Account Wells Fargo Monthly<br>Statement ............................................................ | A-137 |
| Exhibit 8 to Complaint -<br>"Reserve" Account Wells Fargo Monthly<br>Statement ............................................................ | A-143 |

ii

                                                              **Page**

Exhibit 9 to Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024 ...... A-146

Proposed Order to Show Cause and Temporary
Restraining Order by Plaintiffs, filed May 13,
2024 ....................... A-169

Plaintiffs' Memorandum of Law In Support of Their
Application For (1) A Temporary Restraining
Order, and (2) An Order to Show Cause for a
Receiver or, Alternatively, A Preliminary
Injunction, dated May 13, 2024 ........................... A-173

Declaration of Craig Gillespie, for Plaintiffs
Leadenhall Capital Partners LLP and Leadenhall
Life Insurance Linked Investments Fund PLC
("Leadenhall"), in Support of Proposed
Temporary Restraining Order ("Proposed TRO"),
dated May 13, 2024 .............................. A- 202

Exhibit 1 to Gillespie Declaration -
Loan and Security Agreement, dated May 7, 2021   A-210

Exhibit 2 to Gillespie Declaration -
Guaranty Agreement with 777 Partners and 600
Partners, dated May 7, 2021 .................................. A- 250

Exhibit 3 to Gillespie Declaration -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

iii

|  | Page |
|---|---|
| Exhibit 4 to Gillespie Declaration - Letter from John Wells to Steven W. Pasko re: Notice of Breach of Parties' Agreements, dated November 29, 2023 (Reproduced herein at pp. A-130-A-134) | |
| Exhibit 5 to Gillespie Declaration - Excerpt from the December 2023 Compliance Report Issued for the Dorchester Borrower | A-269 |
| Exhibit 6 to Gillespie Declaration - Excerpt from the Revised Compliance Report for March 2023 for the SuttonPark Borrower | A-271 |
| Exhibit 7 to Gillespie Declaration - Excerpt from the Revised Compliance Report for March 2023 for the Dorchester Borrower | A-273 |
| Exhibit 8 to Gillespie Declaration - Paydown and Partial Release Letter on behalf of Leadenhall, dated February 21, 2024 | A-275 |
| Exhibit 9 to Gillespie Declaration - Default Notice, dated March 12, 2024 | A-284 |
| Exhibit 10 to Gillespie Declaration - Acceleration Notice, dated March 15, 2024 | A-295 |
| Exhibit 11 to Gillespie Declaration - Draft First Forbearance Agreement, dated March __, 2024 | A-318 |
| Declaration of Phil Kane, for Plaintiff Leadenhall, in Support of Proposed TRO, filed May 13, 2024 | A-360 |
| Declaration of Luca Albertini, for Plaintiff Leadenhall, in Support of Proposed TRO, dated May 13, 2024 | A-364 |

iv

**Page**

Declaration of Leigh M. Nathanson, for Plaintiff
Leadenhall, in Support of Proposed TRO, dated
May 13, 2024 ......................................................... A-367

Exhibit A to Nathanson Declaration -
Amended Verified Complaint in *Change Lending
LLC v. 777 Partners LLC et al.*, Index No.
650118/2024 (N.Y. Sup.), dated March 19, 2024 .. A-372

Exhibit B to Nathanson Declaration -
Particulars of Claim in *Corvus Lights Aviation
et al v. 777 Partners LLC* (U.K.), dated
December 8, 2023 .................................................. A-385

Exhibit C to Nathanson Declaration -
Verified Amended Complaint in *MALT Family
Trust et al. v. 777 Partners, LLC et al.*, C.A. No.
2022-0652-MTZ (Del. Ch.), dated
November 22, 2022 ............................................... A-402

Exhibit D to Nathanson Declaration -
Summons and Complaint in *Vida Longevity
Fund, LP et al. v. SuttonPark Capital LLC et al.*,
Index. No. 656715/2022 (N.Y. Sup.), dated
July 1, 2022 .......................................................... A-452

Exhibit E to Nathanson Declaration -
Complaint in *Obra Capital Management, LLC et
al. v. 777 Partners LLC et al.,* Index No.
651220/2024 (N.Y. Sup.), dated March 7, 2024 .... A-465

Exhibit F to Nathanson Declaration -
Complaint in *Balanced Management LLC v. 777
Partners LLC*, Case No. 230909460 (Utah Dist.
Ct.), dated December 14, 2023 .............................. A-480

v

**Page**

Exhibit G to Nathanson Declaration -
Verified Petition for Interim Measures in Aid of
Arbitration in *Nakula Management Ltd. v. Joshua
Wander et al.,* Case No. 2024-004624-CA-01
(Fla. 11th Cir. Ct.) (exhibits to the complaint are
excluded), dated March 14, 2024 .......................... A-489

Exhibit H to Nathanson Declaration -
Summons and Complaint in *1 Madison Office
Fee LLC v. 777 Partners LLC et al.*, Index No.
654397/2023 (N.Y. Sup.), dated
September 8, 2023 ................................................. A-508

Exhibit I to Nathanson Declaration -
Complaint in *Lasse Meilsoe v. 777 Partners LLC
et al.*, Case No. 2023-028758-CA-01 (Fla. 11th
Cir. Ct.), dated March 22, 2023, with Exhibits...... A-515

Exhibit J to Nathanson Declaration -
Amended Complaint in *Peter Meyers v. 777
Partners, LLC et al.*, Case No. 2024-001279-CA-
01 (Fla. 11th Cir. Ct.), dated January 30, 2024,
with Exhibits............................................................ A-541

Exhibit K to Nathanson Declaration -
Summons and Complaint in *American Express
Travel Related Services Company, Inc. v. 777
Partners LLC*, 651130/2023 (N.Y. Sup.), dated
March 3, 2023 ....................................................... A-584

Exhibit L to Nathanson Declaration -
Complaint in *Randy S. Gelber v. Joshua Wander*,
Case No. 2021-013205-CA-01 (Fla. 11th Cir.
Ct.), dated June 7, 2021, with Attachment............. A-592

vi

**Page**

Exhibit M to Nathanson Declaration - Complaint in *The Oxbridge Group, LTD v. 777 Partners, LLC,* Index No. 651975/2023 (N.Y. Sup.), dated April 21, 2023 ................................... A-625

Exhibit N to Nathanson Declaration - Verified Amended Complaint in *O'Neil-Dunne et al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-BWD (Del. Ch.), dated January 19, 2024.............. A-631

Exhibit O to Nathanson Declaration - First Amended Complaint in *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al*., Case No. 22-cv-750 (N.D. Ill.), undated .............................. A-654

Exhibit P to Nathanson Declaration - Complaint – Class Action in *Joseph Morgan et al. v. 777 Partners, LLC et al.*, Case No. 24-cv-01004 (N.D. Ill.), undated .......................... A-683

Hearing Transcript held before the Honorable John G. Koeltl, dated May 14, 2024 ............................. A-710

Redacted Declaration of Michael Saliba, for Defendant Advantage Capital Holdings LLC ("A-CAP"), in Opposition to Proposed TRO, dated May 24, 2024 (Unredacted version is reproduced in the Confidential Appendix at pp. CA-1-CA-8) .......... A-721

Reply Memorandum of Law in Further Support of Plaintiffs' Application For (1) A Temporary Restraining Order, and (2) An Order to Show Cause for a Receiver or, Alternatively, a Preliminary Injunction, dated May 30, 2024 (Redacted herein. Reproduced in the Confidential Appendix at pp. CA-9-CA-36) ............................. A-729

vii

|  | Page |
|---|---|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Reply Memorandum, dated May 30, 2024 | A-730 |
| Exhibit 1 to Nathanson Declaration - Hearing Transcript held before the Honorable John G. Koeltl, dated May 14, 2024 | A-732 |
| Exhibit 2 to Nathanson Declaration - Email from Roger Schwartz to Shelly DeRousse and Others, dated May 23, 2024, with Attachment | A-744 |
| Exhibit 3 to Nathanson Declaration - Email from Leigh Nathanson to Jonathan Watkins, dated May 16, 2024 | A-757 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 7, 2024 | A-765 |
| Order to Show Cause and Temporary Restraining Order, by Plaintiff Leadenhall, dated June 7, 2024 | A-831 |
| Letter from David A. Pellegrino to Honorable John G. Koeltl, dated June 10, 2024 | A-835 |
| Exhibit 1 to Letter - Email from Leigh Nathanson to John G. McCarthy and Others, dated June 9, 2024 | A-840 |
| Exhibit 2 to Letter - Email from David Pellegrino to Leigh Nathanson and Others, dated June 10, 2024 | A-842 |
| Hearing Transcript held before the Honorable John G. Koeltl, dated June 14, 2024 | A-844 |

viii

|  | Page |
|---|---|

Memo Endorsed on Joint Letter, dated
June 18, 2024 ........................................................ A-867

Order of the Honorable John G. Koeltl, dated June
20, 2024 .................................................. A-868

Motion, by Intervenors Haymarket Insurance
Company ("Haymarket") and ACM Delegate
LLC ("ACM Delegate"), to Intervene, filed
July 8, 2024
(Motion omitted herein):

Declaration of Jonathan Watkins, for Intervenors
Haymarket and ACM Delegate, in Support of
Motion to Intervene, dated July 8, 2024 ............... A-869

Exhibit A to Watkins Declaration -
UCC-1 Financing Statements and Amendments
filed with the Delaware Secretary of State, dated
March 3, 2020 ........................................................ A-871

Exhibit B to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated
November 27, 2023 .............................................. A-883

Exhibit C to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State or Florida Secured
Transaction Registry, dated April 12, 2021 to
December 15, 2023 .............................................. A-888

Exhibit D to Watkins Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State, dated July 12, 2022 . A-898

Hearing Transcript held before the Honorable John
G. Koeltl, dated July 8, 2024 ................................ A-902

ix

|  | Page |
|---|---|
| Proposed Order to Show Cause without Emergency Relief by Defendant A-CAP, filed July 31, 2024 (Proposed order to show cause omitted herein): | |
| Declaration of Michael Saliba, for Defendant A-CAP, in Support of Proposed Order to Show Cause, dated July 29, 2024 | A-935 |
| Exhibit A to Saliba Declaration - Email from Craig Gillespie to Kenneth King and Others, dated October 19, 2023 | A-941 |
| Exhibit B to Saliba Declaration - Excerpts from the Spreadsheet Attached to Email, dated October 19, 2023 | A-944 |
| Exhibit C to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Dorchester, dated May 10, 2021 at 4:50pm | A-949 |
| Exhibit D to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – SuttonPark Capital LLC, dated May 10, 2021 at 4:54pm | A-951 |
| Exhibit E to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – SuttonPark Capital LLC, dated May 10, 2021 at 4:58pm | A-953 |
| Exhibit F to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Insurety Capital LLC, dated May 10, 2021 at 5:03pm | A-961 |

**x**

                                                                    **Page**

Exhibit G to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Capital
LLC, dated May 10, 2021 at 5:07pm...................... A-963

Exhibit H to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal SML 4
LLC, dated May 10, 2021 at 5:11pm...................... A-970

Exhibit I to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:16pm .............................. A-972

Exhibit J to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Singal Medical,
dated May 10, 2021 at 5:19pm .............................. A-974

Exhibit K to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SPLCSS III LLC,
dated May 10, 2021 at 5:23pm .............................. A-981

Exhibit L to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:27pm...................... A-983

Exhibit M to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – SuttonPark Capital
LLC, dated May 10, 2021 at 5:31pm...................... A-985

xi

**Page**

Exhibit N to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Agency
Service, dated May 11, 2021 at 3:34pm ................ A-944

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Order to
Show Cause, dated July 31, 2024 .......................... A-966

Exhibit A to Watkins Declaration -
Proposed Modified Preliminary Injunction ........... A-998

Exhibit B to Watkins Declaration -
Order from the Honorable John G. Koeltl, dated
July 8, 2024
(Reproduced in Special Appendix)

Hearing Transcript held before the Honorable John
G. Koeltl, dated August 1, 2024 ........................... A-1001

Plaintiffs' Opposition to A-CAP's Motion Under
Rule 59(E) to Amend the Preliminary Injunction,
dated August 15, 2024 .......................................... A-1011

Declaration of Craig Gillespie, for Plaintiff
Leadenhall, in Opposition to Order to Show
Cause, dated August 15, 2024 ............................... A-1038

Exhibit 1 to Gillespie Declaration -
Excerpts from the Loan and Security Agreement,
dated May 7, 2021 ................................................. A-1040

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Reply
Memorandum of Law, dated August 26, 2024,
with Exhibits A through E
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-37-CA-561) ......................... A-1072

xii

                                                                    **Page**

Corrected Amended Complaint, dated
    September 6, 2024 ................................................  A-1073

Exhibit 1 to Amended Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

Exhibit 2 to Amended Complaint -
Letter from Craig Gillespie to Steven W Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023
(Reproduced herein at pp. A-121-A-124)

Exhibit 3 to Amended Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023
(Reproduced herein at pp. A-125-A-127)

Exhibit 4 to Amended Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023
(Reproduced herein at pp. A-128-A-129)

Exhibit 5 to Amended Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 6 to Amended Complaint -
Tables ...................................................................  A-1229

Exhibit 7 to Amended Complaint -
Wells Fargo Summary Statement Screenshot
(Reproduced herein at pp. A-135-A-136)

xiii

Page

Exhibit 8 to Amended Complaint -
"Collection" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-137-A-142)

Exhibit 9 to Amended Complaint -
"Reserve" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-143-A-145)

Exhibit 10 to Amended Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024
(Reproduced herein at pp. A-146-A-168)

Exhibit 11 to Amended Complaint -
Outstanding Accelerated Balance Sheet ................ A-1236

Exhibit 12 to Amended Complaint -
777 Partners' Draft Forbearance Agreement ......... A-1238

Exhibit 13 to Amended Complaint -
Jorge Beruff LinkedIn Profile ................................ A-1280

Exhibit 14 to Amended Complaint -
Juan Arciniegas LinkedIn Profile .......................... A-1284

Exhibit 15 to Amended Complaint -
Aaron Levy LinkedIn Profile ................................. A-1289

Exhibit 16 to Amended Complaint -
Lenz Balan LinkedIn Profile ................................. A-1292

Argument and Decision held before the Honorable
John G. Koeltl, dated October 2, 2024 .................. A-1295

Notice of Appeal by Defendant A-CAP, dated
October 3, 2024 .................................................... A-1352

xiv

**Page**

Notice of Appeal by Defendants 777 Partners LLC,
  600 Partners LLC, SPLCSS III LLC, Dorchester
  Receivables II LLC, Insurety Agency Services
  LLC, and Signal SML 4 LLC, dated
  October 22, 2024 .................................................. A-1354

A-817

53

O676LEAC

1     forcible agreements.  There is no evidence that Leadenhall

2     failed to perform.  Most importantly, Leadenhall has presented

3     evidence that the borrowers and guarantors breached their

4     agreements, and thereby damaged Leadenhall, and the borrowers

5     and guarantors do not refute Leadenhall's assertion.

6          This evidence includes wander's admitting to

7     double-pledged collateral, compliance reports reflecting

8     borrowing of over $300 million beyond the borrowers' credit

9     limits, executed LSA amendments retroactively applying

10    additional interest to the uncollateralized portion of the

11    outstanding debt, and draft LSA amendments in which the

12    guarantor's associate general counsel conceded, "The events of

13    default identified on Exhibit A hereto have occurred and are

14    continuing" and the guarantors "unconditionally guaranteed

15    borrowers' prompt and full performance of their obligations."

16          The defendants initially argued that Leadenhall cannot

17    demonstrate a likelihood of success on the merits because the

18    Court lacks jurisdiction over its contract claims.

19          In particular, the defendants claim that there is

20    incomplete diversity and that Leadenhall's RICO claim, which

21    provides the basis for supplemental jurisdiction over

22    Leadenhall's state law contract claims, is without merit.

23    However, the plaintiffs have made detailed allegations that

24    each of the plaintiffs is a citizen of a foreign country and

25    each of the defendants is a citizen of the United States.  The

**A-818**

54

O676LEAC

1    only evidence the defendants provide for incomplete diversity

2    is a four-paragraph declaration in which general counsel for

3    777 Partners and 600 Partners attests that fact is true, "to

4    the best of his knowledge."  And this evidence is contradicted

5    by other public statements made by the defendants.

6         The plaintiffs have made sufficient allegations of

7    diversity jurisdiction to proceed.  Moreover, the defendants do

8    not cite to any cases that demonstrate that Leadenhall's RICO

9    claims are without merit.  The complaint alleges that the

10   defendants conducted and participated in the conduct of an

11   enterprise through a pattern of racketeering activity in

12   violation of Section 1962(c) and conspired to do so in

13   violation of 18 U.S.C., Section 1962(d).

14        The defendants question whether the plaintiffs will be

15   able to prove the detailed allegations in the complaint but do

16   not proffer any evidence to the contrary.  While the defendants

17   intend to make motions to dismiss, at this time, the plaintiffs

18   have alleged sufficient plausible federal claims.  Accordingly,

19   the defendants' jurisdictional argument is without merit at

20   this time.

21        The defendants also argue that there are no facts that

22   demonstrate that the borrowers or guarantors were the sole

23   cause of any alleged breach, as required under the agreements,

24   and that Leadenhall should bear at least some responsibility.

25   However, the defendants do not dispute any of Leadenhall's

A-819

55

O676LEAC

1    allegations of breaches by the defendants or provide any

2    evidence of breach or wrongdoing on the part of Leadenhall or

3    any it other entity.

4         Finally, at various places in their briefs, the

5    defendants argue that Leadenhall is "an unsecured creditor" and

6    has "unsecured claims" against the guarantors.

7         To be clear, the papers indicate that Leadenhall has a

8    secured first-priority interest in the collateral the borrowers

9    pledged, and the borrowers do not dispute that fact.  To the

10   extent that some of the borrowers' debt is now unsecured, as a

11   result of their double-pledging and other breaches, that does

12   not affect the likelihood of Leadenhall's success on the merits

13   of its contract claim.  As to the guarantors, the guarantors

14   guaranteed performance of all the borrowers' obligations to

15   Leadenhall.  Accordingly, this case is distinguishable from

16   *Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc.,* 527

17   U.S. 308 (1999), which the defendants cite.  In *Grupo Mexicano,*

18   as opposed to this case, the notes issued by the borrower and

19   guaranteed by the guarantors were explicitly unsecured.

20        In summary, Leadenhall has demonstrated the likelihood

21   of success on the merits of its contract claims sufficient for

22   purposes of a temporary restraining order.

23        Leadenhall also argues that it has demonstrated

24   irreparable harm absent injunctive relief.  Irreparable harm is

25   the single most important prerequisite for a preliminary

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-820

56

O676LEAC

1    injunction.  See *Faiveley Transport Malmo AB v. Wabtec*, 559

2    F.3d 110, 118, (2d Cir. 2009).  Although injuries compensable

3    by monetary damages ordinarily do not give rise to irreparable

4    harm, a preliminary injunction may issue to preserve assets as

5    security for a potential monetary judgment where the evidence

6    shows that a party intends to frustrate any judgment on the

7    merits by making it uncollectable.  *Pashain v. Eccelston*

8    *Properties, Ltd.*, 88 F.3d 77, 86 to 87, (2d Cir. 1996).  "The

9    unlikelihood that defendants would in any event be able to

10   satisfy a substantial damage award further supports a finding

11   of irreparable harm."  *WPX Inc. v. ivi Inc.*, 691 F.3d 275, 286

12   (2d Cir. 2012).

13          In this case, Leadenhall has demonstrated that the

14   borrowers and guarantors would be unable to satisfy a

15   substantial damage award and intend to frustrate any judgment

16   on the merits by making an award uncollectible.  In particular,

17   Leadenhall cites:  Wander's statements, in April 2024, that the

18   borrowers and guarantors could not pay even $15 million of the

19   $609 million debt; Wander's May 2024 statement that 777

20   Partners was running down its business and liquidating assets

21   to repay creditors; Wander and Pasko's forced resignation and

22   the appointment of a chief restructuring officer and near daily

23   reports that 777 Partners was dissipating its remaining

24   liquidity into professional football teams and otherwise

25   conducting a fire sale of assets.

A-821

57

O676LEAC

1          In response, the defendants argue that Leadenhall

2     delayed in filing suit, citing the fact that Leadenhall

3     received an anonymous tip in September 2022, confirmed the tip

4     in March 2023, noticed the default in November 2023, and waited

5     20 months to file suit.

6          However, attempts by plaintiffs to resolve a dispute

7     before litigation weigh against finding delay sufficient to

8     defeat the presumption of irreparable harm.  See, for example,

9     *Weight Watchers International Inc. v. Luigino's, Inc.*, 423 F.3d

10    137, 144 (2d Cir. 2005); *Tough Traveler, Ltd. v. Outbound

11    Products*, 60 F.3d 964, 968 (2d Cir. 1995).  In this case,

12    Leadenhall attempted to negotiate and brought suit when those

13    negotiations failed.  During that time, it was the defendants

14    that prolonged negotiations by representing to Leadenhall that

15    the debts could be repaid.  Accordingly, Leadenhall has

16    demonstrated irreparable harm absent injunctive relief.

17         Leadenhall also argues that the balance of hardships

18    favors injunctive relief because the loss of the debt would

19    significantly impact Leadenhall, while the defendants, who were

20    already obligated to hold collateral free and clear of adverse

21    claims, will lose nothing to which they have an entitlement.

22         The defendants, on the other hand, argue that

23    injunctive relief would be disruptive and destructive to the

24    defendants and imperil their entire enterprise.

25         The balance of hardships weighs in favor of the

A-822

58

O676LEAC

1   plaintiff even where a preliminary injunction preventing the

2   defendants from interfering with the plaintiff's security

3   interest in the collateral may be destructive for the

4   defendants' floundering business.  See *Bank of America N.A. v.*

5   *Wan Sam Yi*, 294 F.Supp. 3d, 62, 81 (W.D.N.Y. 2018).

6          This is true where the plaintiff's substantial

7   security interest in the collateral is likely eroding as a

8   result of the defendants' failure to make progress towards

9   reducing their debts.

10         In this case, the debt owed by the defendants is a

11  substantial $600 million, rather than the $11 million

12  contemplated in *Won Sam Yi,* the defendants have failed to make

13  even preliminary payments of $15 million to Leadenhall, and the

14  defendants do not dispute that their businesses are in rapid

15  decline.

16         Accordingly, the fact that granting the plaintiff's

17  injunctive relief may damage the defendants' business does not

18  tip the balance of equities in favor of the defendants.

19         In summary, Leadenhall has demonstrated that the

20  balance of hardships leans in its favor.  Finally, Leadenhall

21  argues that the public interest favors injunctive relief.

22  There's a well recognized public interest in enforcing

23  contracts between sophisticated parties and upholding the rule

24  of law.  *See Nimbus Therapeutics LLC v. Celgene Corp.,* 570

25  F.Supp. 3d 100, 127 (S.D.N.Y. 2021).

A-823

59

O676LEAC

1              In this case, the defendants who, along with

2     Leadenhall, are plainly sophisticated entities, do not dispute

3     the terms or enforceability of the LSA, nor do they dispute

4     Leadenhall's allegations that they conceded to breaches, and

5     executed an amended LSA in light of the breaches.  As a result,

6     there is a strong public interest in granting injunctive

7     relief.

8              The temporary restraining order protects the

9     intervenors who have agreed that, providing that there is an

10    exception for transactions in the normal and ordinary course of

11    business, they do not object to the temporary restraining

12    order.

13             Finally, Leadenhall alleges improperly for the first

14    time in its reply brief that even if Leadenhall is not entitled

15    to an injunction, Leadenhall is entitled to an attachment.  A

16    reply brief is not the appropriate place to make a new request

17    for relief.  If Leadenhall seeks an attachment, it should move

18    separately for an attachment, and the Court would afford the

19    other parties an opportunity to respond, and Leadenhall an

20    opportunity to reply.

21             In sum, Leadenhall has demonstrated that the public

22    interest tips in its favor and has shown that it's motion for a

23    temporary restraining order should be granted.  The defendants

24    have requested an evidentiary hearing before a preliminary

25    injunction is granted.  The parties should confer as to the

A-824

60

O676LEAC

1   issues for an evidentiary hearing and what discovery IS

2   appropriate, and provide a joint letter to the Court by Monday,

3   June 10, 2024.  The Court is prepared to schedule an

4   evidentiary hearing before the end of the 28 days for which the

5   temporary restraining order can be in effect, subject to the

6   14-day renewal on good cause.

7          The defendants request a bond, and a bond should be

8   imposed in this case to protect against any harm from a

9   wrongfully issued temporary restraining order.  Given the

10  limited nature of the temporary restraining order, particularly

11  with the exception for transactions in the normal and ordinary

12  course of business, the prospective harm for the defendants

13  from an allegedly wrongfully imposed temporary restraining

14  order are limited.  Nevertheless, given the amounts at issue in

15  this case, the plaintiff shall post a bond in the amount of

16  $1 million by Wednesday June 12, 2024, to secure the temporary

17  restraining order.

18         So ordered.

19         I can do one of several things.  I can set the

20  temporary restraining order down to expire in 14 days and have

21  all of you back in 14 days and make a determination then as to

22  whether to continue it for another 14 days, and see where you

23  all are on the issue of the preliminary injunction.  Or if the

24  parties agree, I could issue the temporary restraining order

25  with the agreement of parties for good cause shown for 28 days.

A-825

61

O676LEAC

1          But if there's no agreement, it will just be 14 days

2     and I'll welcome you all back in 14 days.

3          MR. MCCARTHY:  Your Honor, we would ask that you set

4     it to expire within 14 days, and obviously we can -- you know,

5     to give me a chance to consult with my client and figure out --

6          THE COURT:  Absolutely.  Absolutely.

7          MR. MCCARTHY:  Thank you.

8          THE COURT:  So I've marked -- I've stricken footnotes

9     one and two.  I've added to 2A, other than in the normal and

10    ordinary course of business -- in fact, an easier way to do it

11    would be at the beginning of Paragraph 2, putting in, other

12    than in the normal and ordinary course of business.  So it

13    would say:  In the alternative to appointing a receiver

14    pursuant to Paragraph 1, issuing the preliminary injunction,

15    pursuant to the Rule 64 or 65 of the Federal Rules of Civil

16    Procedure, which, other than in the normal and ordinary course

17    of business...so that would limit each of the following

18    paragraphs, and I don't have to repeat it for each paragraph.

19         Is that clear enough for the parties?  And I've added

20    to Paragraph E, requires the borrowers and guarantors to

21    provide notice to Leadenhall, ING, and National Founders of any

22    attempt, et cetera.

23         Then the following paragraph, it's further ordered

24    that pending a hearing and decision on the order to show cause,

25    the borrowers and guarantors are enjoined from committing any

A-826

62

0676LEAC

1    of the acts set forth in Paragraph 2 above.

2          I will put the order on ECF promptly so all of the

3    parties will have notice of the TRO, and I don't need the

4    paragraphs beginning borrowers and guarantors shall file and

5    serve their answering papers.  We have a full set of papers on

6    the TRO, which the parties may think are sufficient for the

7    preliminary injunction.  If so, you can let me know in the

8    letter that you send me on Monday whether the parties seek

9    additional briefing on the preliminary injunction.  Follow?

10          MR. MCCARTHY:  Yes, your Honor.  I had a question.

11          THE COURT:  Sure.

12          MR. MCCARTHY:  During the arguments, your Honor

13    mentioned the concept of other than for fair market -- or other

14    than for fair value, and I just -- you haven't -- it's not in

15    here, and you haven't incorporated it.

16          THE COURT:  No.  But I think that would be

17    incorporated in the normal and ordinary course of business.  So

18    a transaction which is for less than fair value would not be in

19    the normal and ordinary course of business.

20          MR. MCCARTHY:  Okay.  So if there was to be the sale

21    of a subsidiary of for fair value, that would be in the

22    ordinary and normal course of business, as long as it's for

23    fair value?

24          THE COURT:  The answer to that, and I'm happy to

25    listen to the plaintiff, it's their language, it would appear

A-827

63

0676LEAC

1    to be, yes.  But there would have to be notice --

2              MR. MCCARTHY:  Notice.

3              THE COURT:  -- under Paragraph E.

4              MR. MCCARTHY:  Just want to be clear.  That's what I

5    think, your Honor.  I just wanted to make sure we're on the

6    same page.

7              THE COURT:  Plaintiff.

8              MR. MCCARTHY:  Thank you.

9              MS. NATHANSON:  I think there's one potential caveat

10   to that, which is, if the sale of a subsidiary or assets of a

11   subsidiary are somehow taking the borrowers or the guarantors

12   under $609 million in terms of assets, that is a transaction

13   that would be implicated by the TRO.  So if a -- for example,

14   if --

15             THE COURT:  I thought they are already under that.

16             MS. NATHANSON:  Yes, I think that's right.  Oh, well,

17   meaning their assets are already under that?  Well, assuming

18   they are already under that, let's say there are $300 million

19   worth of assets, and the sale of a subsidiary is designed to

20   move some subset of those assets out of the borrowers and

21   guarantors into another defendant entity, that would be

22   implicated potentially, I think not only by the notice

23   provisions, but certainly by the notice provisions.

24             THE COURT:  I would have thought that that's not in

25   the normal and ordinary course of business.

**A-828**

64

O676LEAC

1          MS. NATHANSON:  I would agree.

2          THE COURT:  If the parties are contemplating a

3     transaction that they think might violate the TRO, it would

4     behoove them to simply talk to the plaintiffs about it.

5          MR. MCCARTHY:  Understood, your Honor.  You know, the

6     way I look at it, your Honor, is if you have a sale for fair

7     market value, the fair value of the asset, there is no

8     dissipation of assets because you're trading one asset for

9     another, and I don't think that would violate the TRO as your

10    Honor has just described it.

11         THE COURT:  All right.  The transactions here are

12    complex.  The parties understand what the purpose of the TRO

13    is.  And it would behoove them to act prudently in complying

14    with the TRO.

15         It's intended to allow the ordinary course of business

16    of the -- of borrowers and the guarantors to continue.  So

17    there's no objection to my striking the final three paragraphs

18    of the order, and I will add, the plaintiffs shall post a bond

19    in the amount of $1 million by June 12, 2024, at 3:00 p.m.  So

20    issued on June 7, 2024, at 2:18 p.m.

21         Okay.  I also have a conference with you, unless it

22    gets moved, on June the 14th, about the prospective defense

23    motions, defense motions to dismiss.

24         MS. NATHANSON:  Just one housekeeping matter, your

25    Honor.

A-829

65

O676LEAC

1          For purposes of serving the TRO and any papers on

2     Mr. Wander and Mr. Pasko, we understand that as of today, they

3     may be unrepresented.  Last week, Mr. McCarthy said he would be

4     representing them.  We just want to make sure that we don't

5     have any issues with service given that they are subject to the

6     TRO.

7          THE COURT:  Mr. McCarthy?

8          MR. MCCARTHY:  Your Honor, I will consult with

9     their -- who I believe will be their counsel and get back to

10    Ms. Nathanson.  I mean --

11         THE COURT:  If, so --

12         MR. MCCARTHY:  Your Honor, I'm also willing to e-mail

13    them copies of the order, your Honor.

14         MS. NATHANSON:  We just want to make sure that they

15    are formally served since this is going into effect today.

16         THE COURT:  This order will be posted on ECF.

17         So as long as the plaintiffs have raised the issue,

18    I'll say, the plaintiffs shall serve all defendants by

19    5:00 p.m. on June 7 -- to -- no, I'll pick up the last

20    paragraph.  This order will be posted on ECF, and the

21    plaintiffs should serve all defendants by e-mail with overnight

22    delivery addressed to the defendants for their counsel within

23    one business day, and such service is going to be sufficient.

24    So if counsel appears, you can go through counsel.

25         MS. NATHANSON:  Perfect.  E-mail should be fine.

A-830

66

O676LEAC

1    Thank you, your Honor.

2              THE COURT:  Okay.  Anything further?

3              MS. NATHANSON:  Not from plaintiffs.  Thank you.

4              THE COURT:  I look forward to receiving your letter on

5    Monday.

6              MR. MCCARTHY:  Thank you, your Honor.

7              THE COURT:  Thank you, all.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-831

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, | Civil Action No. 1:24-cv-03453 |
| Plaintiffs, | [~~PROPOSED~~] **ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER** |
| vs. | |
| JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, | |
| Defendants. | |

Upon the Complaint by Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall" or "Plaintiffs"); the accompanying declarations of Craig Gillespie, Phil Kane, Luca Albertini, and Leigh M. Nathanson; and the Memorandum of Law in Support of Plaintiffs' Application for a (i) Temporary Restraining Order, and (ii) a Receivership or, Alternatively, a Preliminary Injunction, all annexed thereto, it is

**ORDERED**, that Defendants 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Signal SML 4 LLC (the "Signal Borrower"), Insurety Agency Services

1

A-832

LLC (the "Insurety Borrower," and together with the other above-referenced Defendants, the "Borrowers and Guarantors"[1]) show cause before this Court, at Room ~~14A~~ United States Courthouse, 500 Pearl Street, New York County, New York, on the 21 of ~~June~~ *stoler*, 2024, at ~~9~~ *8:0* a.m./~~p.m.~~, why an Order shall not be entered:

(1)     Appointing a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure with the power to:

(A) take possession, custody, and control of any assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021;

(B) to the extent the value of the assets pledged as collateral to Leadenhall by the Borrowers is less than the outstanding debt which Leadenhall accelerated on March 15, 2024 ($609,529,966.82 or the "Accelerated Debt"), take possession, custody, and control of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

(C) to the extent the value of (i) the assets pledged as collateral to Leadenhall by the Borrowers, plus (ii) any cash or cash equivalents owned by the Borrowers and Guarantors is insufficient to cover the full amount of the Accelerated Debt, take possession, custody, and control of the proceeds of any sale or transaction by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

---

[1] "Borrowers and Guarantors" as used herein includes any and all affiliates, agents, employees, and attorneys of, and any and all persons who are in active concert or participation with, 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, and the Insurety Borrower.

2

A-833

(D) prevent the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any other Defendant[2];

(E) provide notice to Leadenhall to the extent any Defendant makes any attempt to foreclose on, repossess, or exercise remedial action against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors;

(2)    In the alternative to appointing a receiver pursuant to paragraph (1), issuing a preliminary injunction pursuant to Rule 64 or 65 of the Federal Rules of Civil Procedure which *other than in the normal and ordinary course of business :*

(A) prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021; *other than in the normal and ordinary course of business*

(B) to the extent the value of the assets pledged as collateral by the Borrowers to Leadenhall is less than the full amount of the Accelerated Debt, prohibits the expenditure or dissipation of any cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt;

(C) to the extent the value of (i) the assets pledged as collateral by the Borrowers, plus (ii) the value of any cash or cash equivalents owned by the Borrowers and Guarantors is insufficient to cover the full amount of the Accelerated Debt, prohibits the expenditure or dissipation by the Borrowers and Guarantors of any cash or cash equivalents received from any sale or transaction up to the full amount of the Accelerated Debt;

---

[2] "Defendant" or "Defendants" as used herein includes any and all affiliates, agents, employees, attorneys of, and any and all persons who are in active concert or participation with, the individuals or entities named as defendants in the Complaint.

3

A-834

(D) prohibits the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any Defendant;

(E) requires the Borrowers and Guarantors to provide notice to Leadenhall *[ING and Network Founders]* of any attempt by any Defendant to foreclose on, repossess, or exercise remedial actions against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors;

**FURTHER ORDERED** that pending a hearing and decision on the Order to Show Cause, the Borrowers and Guarantors are enjoined from committing any of the acts set forth in paragraph (2) above; and it is

**FURTHER ORDERED** that the Borrowers and Guarantors shall file and serve their answering papers, if any, so as to be received by the Court and Plaintiffs' counsel by 5:00 p.m. ET on May ___, 2024; and it is

**FURTHER ORDERED** that Plaintiffs shall file and serve their reply papers, if any, so as to be received by the Court and defense counsel by 5:00 p.m. ET May___, 2024; and it is

**FURTHER ORDERED** that service of this Order and all papers submitted in support of Plaintiffs' application, by email or overnight delivery and addressed to the Defendants or their respective counsel, within one (1) day of the date hereof, shall be deemed good and sufficient service thereof.

*[The plaintiffs shall post a bond in the amount of $1 million by June 12, 2024 at 3:00 P.M.]*

Issued at New York, New York on May ___, 2024, at ___ a.m/p.m.

*[June 7, 2024  at 2:18 P.M.]*

_____
United States District Judge

*[This order will be posted on ECF and the plaintiffs should serve all defendants by ___ P.M. on June 7, 2024 by email or overnight delivery addressed to the Defendants or their counsel within one business day and such service is good and sufficient.]*

A-835

*1301 Avenue of the Americas*
*21st Floor*
*New York, New York 10019*
*Tel: 212-907-9700*
*www.sgrlaw.com*



*John G. McCarthy*
*Direct Tel:  212-907-9703*
*Direct Fax:  212-907-9803*
*jmccarthy@sgrlaw.com*

June 10, 2024

***V**IA **ECF***

Honorable John G. Koeltl
United States District Judge
500 Pearl St.
New York, NY 10007

Re:   *Leadenhall Capital Partners LP, et ano. v. Wander, et al.*
        24 Civ. 3453 (JGK)

Dear Judge Koeltl:

    We represent the 777 Entity Defendants in the above-entitled action. We submit this letter jointly with Plaintiffs pursuant to the Court's Order from Friday, June 7, 2024 at the TRO hearing to address whether (i) an evidentiary hearing on Leadenhall's application for the appointment of a receiver or a preliminary injunction (the "Provisional Relief") is necessary, and (ii) what discovery is appropriate in light of the evidentiary hearing.

**777 Entity Defendants' Position**

    The 777 Entity Defendants believe that the parties should, in the first instance, focus their efforts on seeking to negotiate the terms of a consensual proposed preliminary injunction order that works from the Court's June 7, 2024 TRO, and with an understanding of the flexibility necessary to continue the ongoing restructuring efforts.  The 777 Entity Defendants propose that the parties present a proposed consent order to the Court by June 18.

    If a consensual order cannot be agreed upon, the 777 Entity Defendants seek to streamline the evidentiary hearing to three disputed issues of fact, with an opportunity to conduct limited targeted discovery.

    First, the 777 Entity Defendants dispute the factual predicate of Plaintiffs' assertion that the guaranty, and any other claim beyond the defined collateral, is a secured obligation.  This disputed issue is relevant to the proper scope of any injunction.  We would seek a copy of (a) all applicable agreements plaintiffs rely upon and (b) a 30(b)(6) witness on the factual basis for

A-836

Honorable John G. Koeltl
June 10, 2024
Page 2

their assertions that there is a contractual secured interest against the HoldCos and the Borrowers beyond the extent of the collateral.

Second, the parties dispute the impact the requested Provisional Relief would have on (a) the 777 Entity Defendants and (b) creditors without notice of this action, issues relevant to the balance of hardships, the public's interest, and the appropriate scope of any Provisional Relief. We propose that we provide documentary discovery on this point, as well as produce a witness who has knowledge of the applicable facts.

Third, we dispute that Leadenhall's security interest in the collateral is eroding as a result of the defendants' failure to make progress towards reducing their debts. We propose that both parties be provided a week to produce relevant documents and each party provide a single witness who would testify at the evidentiary hearing.

The 777 Entity Defendants note that they also dispute that there is any effort to frustrate collection on any ultimate money judgment. However, because Leadenhall has represented, in a meeting among counsel this afternoon, that it relies only the 777 Entity Defendants' inability to satisfy the alleged $609 million Accelerated Debt, it will be unnecessary to present evidence on this issue.

Finally, we respectfully request the opportunity to brief the legal issues applicable to the disputed factual issues prior to the evidentiary hearing.

**Leadenhall's Position**

Leadenhall received the 777 Defendants' draft letter one hour before the filing deadline, taking a position very different from their position on the parties' meet and confer earlier in the day. For the first time at the literal eleventh hour on the day this letter was due, and almost a month after Leadenhall proposed that the parties enter into a proposed Consent Order that would obviate Leadenhall's application for preliminary relief, the 777 Defendants now ask Leadenhall to put the brakes on seeking to convert the Temporary Restraining Order into a preliminary injunction by "focus[ing] their efforts on seeking to negotiate the terms of a consensual proposed preliminary injunction order." Leadenhall has always been and will continue to be open to a consensual resolution, as we have repeatedly reiterated to Defendants as recently as this evening, to which counsel for the 777 Defendants relayed that his clients were "not there yet." Unless and until such a resolution is reached, Leadenhall will not be deterred from pursuing the remedies available under the law. Consistent with the Court's directive on June 10, 2024, Leadenhall explains below why an evidentiary hearing is neither necessary nor appropriate given the legal bases for, and undisputed evidence in support of, Leadenhall's motion for a preliminary injunction.

A-837

Honorable John G. Koeltl
June 10, 2024
Page 3

The factual elements necessary for the Court to appoint a receiver or grant a preliminary injunction are not in dispute. As set forth in Leadenhall's application for a Temporary Restraining Order, the 777 Defendants have admitted that they (1) breached the parties' agreements—including in recorded phone calls, monthly compliance reports restated to reflect a $350 million collateral deficiency, and executed and draft amendments to the LSA; and (2) are on the brink of insolvency—including by the fact that they could not make even modest repayments as a good-faith gesture in advance of the filing of the Complaint and by engaging restructuring specialists in B. Riley and Berger Singerman. The 777 Defendants also conceded insolvency at oral argument on June 7, 2024. Tr. 24:08-09 (Mr. McCarthy: "[S]o it's not like there's $609 million of cash sitting in the bank."); 24:24-25 (Mr. McCarthy: "Well, there's not sufficient liquid assets to pay $609 million."). Indeed, the Court observed at oral argument that the factual elements are not in dispute. Tr. 54:25-55:03 (The Court: "However, the defendants do not dispute any of Leadenhall's allegations of breaches by the defendants or provide any evidence of breach or wrongdoing on the part of Leadenhall or any it other entity."); 58:12-15 (The Court: "[T]he defendants have failed to make even preliminary payments of $15 million to Leadenhall, and the defendants do not dispute that their businesses are in rapid decline.").

Because the essential facts underlying Leadenhall's narrow application for preliminary relief are uncontroverted, Leadenhall's position is that neither discovery nor additional briefing is necessary for the Court to either appoint a receiver or convert the Temporary Restraining Order into a preliminary injunction, and no evidentiary hearing is necessary. *See, e.g.*, *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute.") (cleaned up); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case or when the disputed facts are amenable to complete resolution on a paper record.") (cleaned up). Before any determination from the Court on the preliminary relief, Leadenhall will seek to engage the 777 Defendants on the proposed Consent Order appointing B. Riley as independent receiver—as Leadenhall has sought to do with no avail for the past month, *see* ECF No. 101-2—which would obviate the need for an evidentiary hearing.

Leadenhall made all of these points clear to the 777 Defendants this weekend. Ex. 1 (6/9/24 Email from L. Nathanson to J. McCarthy). In response, the 777 Defendants again conceded that they do not dispute the elements necessary for entry of preliminary relief. Ex. 2 (6/10/24 Email from D. Pellegrino to L. Nathanson) ("[T]o narrow the scope of the evidentiary hearing, we will not dispute, for purposes of the preliminary injunction hearing, breach of the LSA or that if Leadenhall's claim was actually $609 Million (a fact that is disputed) that the Borrowers immediate liquid assets would be insufficient to satisfy that amount."). However, after failing to provide any position on whether there are issues in dispute until 3pm ET today, the 777 Defendants have contrived disputes as to issues *other than* those essential to Leadenhall's entitlement to preliminary relief, including whether the Guaranty Agreement provides Leadenhall with a "secured obligation"; the "impact" any preliminary relief would have on the 777

A-838

Honorable John G. Koeltl
June 10, 2024
Page 4

Defendants and "creditors without notice of this action"; whether Leadenhall's security interest is currently "eroding" (*i.e.*, whether the 777 Defendants are dissipating assets rather than A-CAP simply providing "protective advances" to football teams and whether B. Riley is acting independently). The 777 Defendants do not explain how any of these issues are relevant to whether they breached the parties' agreements and/or are on the brink of insolvency such that they would be unable to satisfy a judgment in this action. Leadenhall's position is that the purported issues raised by the 777 Defendants are designed to distract from the necessary elements and cause Leadenhall to incur additional expense while it seeks to preserve its ability to recover $609 million in accelerated debt. Moreover, in the decision granting the Temporary Restraining Order, the Court has already noted that many of these issues do not negate Leadenhall's entitlement to preliminary relief. Tr. 57:11-16 ("In this case, Leadenhall attempted to negotiate and brought suit when those negotiations failed. During that time, it was the defendants that prolonged negotiations by representing to Leadenhall that the debts could be repaid. Accordingly, Leadenhall has demonstrated irreparable harm absent injunctive relief.").

If, however, the Court determines that any of the issues raised by the 777 Defendants are relevant to the preliminary injunction Leadenhall seeks, the expedited discovery necessary to support or disprove the issues is either evidence from the face of the agreements or will necessarily come from the 777 Defendants and A-CAP. In particular, whether the Guaranty Agreement provides a "secured claim" is evident solely from the agreements themselves, which are already in the 777 Defendants' possession; the "impact" of any preliminary relief will be discernible from discovery into the 777 Defendants' operations and financial condition; and whether the 777 Defendants have or are currently dissipating assets will be discernible from communications among and involving 777 Partners' employees, A-CAP (which argues that any dissipation of assets are merely "protective advances" to football teams), and B. Riley. Leadenhall will respond to any discovery requests from Defendants permitted by the Court but notes that the issues raised by the 777 Defendants will be principally, if not solely, corroborated or disproved from information within the 777 Defendants and A-CAP's possession, custody, and control. Moreover, the 777 Defendants and A-CAP could have provided the evidentiary basis for each of the issues they raise in their oppositions to Leadenhall's application for a Temporary Restraining Order.

Thus, in the event that the Court determines that the discovery into any of issues raised by the 777 Defendants is necessary, Leadenhall will seek discovery into at least the financial condition of 777 Partners and information concerning any payments made by 777 Partners that appear to constitute a dissipation of assets, including communications between and among the 777 Defendants, A-CAP, and B. Riley concerning any payments, transfers, and/or transactions between Defendants. Leadenhall will seek the depositions of the individual Defendants in this case and some or all of the following individuals: Nicholas Bennett (Senior Associate at 777 Partners responsible for the allocation of collateral and compliance reporting), Fred Love (former President and GC of SuttonPark Capital responsible for operational management of SuttonPark), Damien Alfalla (former CFO of 777 Partners responsible for financial reporting and liquidity management), Brett Kaufman (current CFO of 777 Partners responsible for financial reporting

A-839

Honorable John G. Koeltl
June 10, 2024
Page 5

and liquidity management), Jill Gettman (Chief Legal Officer of A-CAP knowledgeable about control over 777 Partners), Mike Saliba (Chief Operating Officer of A-CAP knowledgeable about control over 777 Partners), Carson McGriffin (Special Situations Portfolio Manager at A-CAP knowledgeable about transactions with 777 Partners), Ian Ratner (B. Riley professional acting as an "independent manager" of 777 Partners of 600 Partners), James Howard (B. Riley professional acting as an "independent monitor" of the 777 Defendants), and Mark Shapiro (B. Riley professional acting an "independent Chief Operating Officer" of the 777 Defendants).  Leadenhall may also issue targeted document and written discovery requests, such as interrogatories or RFAs, in an attempt to streamline the issues for purposes of an evidentiary hearing.  To the extent additional discovery is granted, Leadenhall reserves the right to submit supplemental briefing either before or after the evidentiary hearing setting forth any additional, relevant facts and any additional preliminary relief requested (such as an injunction against A-CAP).

Respectfully yours,

*/s/David Pellegrino*

David A. Pellegrino

cc:      Attorneys of Record (via ECF)

A-840

# Exhibit 1

| | |
|---|---|
| **From:** | Leigh Nathanson |
| **Sent:** | Sunday, June 9, 2024 5:07 PM |
| **To:** | McCarthy, John G. |
| **Cc:** | rogerschwartz; Brian Donovan; Pellegrino, David; Watkins, Jonathan; Petrella, Michael; Singer, Mark; rogerschwartz |
| **Subject:** | Leadenhall v. Wander, 24-cv-3453 (S.D.N.Y) - Joint Letter Due on June 10, 2024 |

John,

We write regarding the joint letter due to the Court tomorrow, June 10, 2024 to address whether (i) an evidentiary hearing on Leadenhall's application for the appointment of a receiver or a preliminary injunction is necessary, and (ii) what discovery is appropriate in light of any evidentiary hearing.

Leadenhall's position is that the factual elements necessary for the Court to appoint a receiver or grant a preliminary injunction are not in dispute. As set forth in Leadenhall's application for a temporary restraining order, the 777 Defendants have already admitted that they breached the parties' agreements—including in recorded phone calls, monthly compliance reports, and executed draft amendments to the LSA—and that they are on the brink of insolvency—including by the fact that they could not make even modest repayment as a good-faith gesture in advance of the complaint filing and by engaging restructuring specialists in B. Riley and Berger Singerman. The 777 Defendants also conceded insolvency at oral argument on June 7, 2024. Tr. 24:08-09 (Mr. McCarthy: "[S]o it's not like there's $609 million of cash sitting in the bank."); 24:24-25 ("Well, there's not sufficient liquid assets to pay $609 million."). Moreover, the Court observed at oral argument that the factual elements are not in dispute. Tr. 54:25-55:03 (The Court: "However, the defendants do not dispute any of Leadenhall's allegations of breaches by the defendants or provide any evidence of breach or wrongdoing on the part of Leadenhall or any it other entity."); 58:12-15 (The Court: "[T]he defendants have failed to make even preliminary payments of $15 million to Leadenhall, and the defendants do not dispute that their businesses are in rapid decline."). Because the requisite elements for preliminary relief are not in dispute, Leadenhall's position is that no discovery is necessary, no additional briefing for the appointment of a receiver or preliminary injunction is necessary, and the Court should either appoint a receiver or convert the temporary restraining order into a preliminary injunction within 28 days. During that time, Leadenhall would seek to engage the 777 Defendants on the proposed Consent Order appointing B. Riley as receiver—as Leadenhall has sought to do with no avail for weeks—which would obviate the need for an evidentiary hearing.

However, if the 777 Defendants take the position that there are issues in dispute, Leadenhall will need discovery necessary to confirm that the 777 Defendants breached the parties' agreements, are on the brink of insolvency, and have defrauded Leadenhall under the direction and control of Defendants A-CAP, Kenneth King, Josh Wander, and Steven Pasko. Thus, Leadenhall will seek discovery into, at a minimum, the 777 Defendants' systems used for the allocation of assets and collateral; the creation of (falsified) monthly compliance reports and bank statements; A-CAP's lending relationships with, and purported security interests in, the 777 Defendants, and how such lending relationships and security interests came into existence; any past, current or planned agreements, transfers, foreclosures, and/or other exercises of remedies by, between, or among the 777 Defendants and A-CAP; the past and present financial condition of the 777 Defendants; and the circumstances surrounding the retention, payment for, and authority of B. Riley. We would anticipate seeking the depositions of at least Josh Wander, Steven Pasko, Kenneth King, Nicholas Bennett (Senior Associate at 777 Partners responsible for the allocation of collateral and compliance reporting), Fred Love (former President and GC of SuttonPark Capital responsible for operational management of SuttonPark), Damien Alfalla (former CFO of 777 Partners responsible for financial reporting and liquidity management), Brett Kaufman (current CFO of 777 Partners responsible for financial reporting and liquidity management), Jill Gettman (Chief Legal Officer of A-CAP knowledgeable about control over 777 Partners), Mike Saliba (Chief Operating Officer of A-CAP knowledgeable about control over 777 Partners), Carson McGriffin (Special Situations Portfolio Manager at A-CAP

A-841

knowledgeable about transactions with 777 Partners), Ian Ratner (B. Riley professional acting as an "independent manager" of 777 Partners of 600 Partners), James Howard (B. Riley professional acting as an "independent monitor" of the 777 Defendants), and Mark Shapiro (B. Riley professional acting an "independent Chief Operating Officer" of the 777 Defendants). We would also seek documents and communications concerning and involving the individuals and factual issues set forth above and may serve written discovery requests (such as RFAs) in an attempt to streamline issues for the evidentiary hearing. In light of the additional discovery, we would anticipate submitting new briefing for the evidentiary hearing, during which we would request the conversion of the temporary restraining order into a preliminary injunction or the appointment of a receiver other than B. Riley.

Please promptly let us know your position as to whether there are issues in dispute for purposes of an evidentiary hearing.

Best,
Leigh

---

**Leigh M. Nathanson**
*Partner*

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036



kslaw.com

---

**Leigh M. Nathanson**
*Partner*

T: +1 212 790 5359  |  E: lnathanson@kslaw.com  |  Bio  |  vCard

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036



kslaw.com

A-842

**Brian Donovan**

| | |
|---|---|
| **From:** | Pellegrino, David <dpellegrino@sgrlaw.com> |
| **Sent:** | Monday, June 10, 2024 3:02 PM |
| **To:** | Leigh Nathanson; DeRousse, Shelly; McCarthy, John G.; Jonathan M. Watkins (Jonathan.Watkins@cwt.com) |
| **Subject:** | Leadenhall v Wander - Disputed Issues Response |

---

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Leigh, Thank you for your note yesterday regarding the joint letter due to the Court today, June 10, 2024 to address whether (i) an evidentiary hearing on Leadenhall's application for the appointment of a receiver or a preliminary injunction is necessary, and (ii) what discovery is appropriate in light of the evidentiary hearing.

A number of factual disputes exist specifically addressing certain elements of a preliminary injunction or receivership (collectively, the "Provisional Relief") that make discovery from plaintiffs and an evidentiary hearing necessary.  We understand from your note that Leadenhall believes that no disputed issues of fact exist.

First, the existence of irreparable harm in the absence of preliminary injunctive relief is disputed by the 777 Entity Defendants.  B. Riley's appointment and progress to date and its efforts to date to work with Leadenhall with transparency while acting in an independent fiduciary capacity to all interested parties, negates any threat of irreparable harm.  To the extent this is not acknowledged, we should discuss what information is available from Leadenhall.

It appears that Leadenhall is no longer asserting that the protective advances funded by ACAP to the various football teams, or otherwise, are a dissipation of the 777 Entity Defendants assets.  But to the extent Leadenhall will assert that its collateral held by the Borrowers has been dissipated for less than fair market value or is at imminent risk, we would want discovery into the factual predicate of Leadenhall's assertion.

Second, there are factual disputes on several issues that go to the balancing of the hardships, the public interest, and the appropriate scope of any Provisional Relief, including:

- the amount of Leadenhall's alleged collateral interest under the parties' agreements;
- whether the claim upon the guaranty, or any other claim beyond the collateral, is secured;
- whether Leadenhall's security interest in the collateral is eroding as a result of the defendants' failure to make progress towards reducing their debts;
- what Leadenhall knew about its allegations and when, its conduct leading up to the litigation, whether any borrowing took place after Leadenhall learned about the impairment to collateral, to what extent the purported collateral impairment existed from the commencement of the 2021 lending facility, the impact of market forces on the alleged Borrowing Base deficiency, Leadenhall's failure to exercise customary diligence and other rights, Leadenhall's waiver of certain alleged deficiencies, and Leadenhall's communications with Credigy about the alleged evidence of double-pledged collateral.
- the impact the requested Provisional Relief would have on the 777 Entity Defendants and other creditors without notice of this action;

As noted, these issues will primarily require discovery from Leadenhall and its principals and agents, as they concern Leadenhall's conduct (including its delay in seeking relief) and purported risk of harm to Leadenhall.

1

A-843

After an exchange of documents, interrogatories and/or requests for admissions, we expect that the individuals with knowledge will be revealed but we anticipate needing depositions of John Wells and others at Leadenhall who have been involved. We also anticipate deposing Roger Schwartz, and others who know the factual basis on the guaranty and the extent of Leadenhall's claim of a secured interest beyond the collateral.

I understand from your letter that if we disputed the breach under the LSA, or the capacity to satisfy Leadenhall's claim, Leadenhall would want discovery on those issues. We disagree that the scope of discovery set forth in your email would be appropriate.

As a start, for purposes of the Provisional Relief only, and being mindful of Leadenhall's limitation to the contractual claims on this motion, and to narrow the scope of the evidentiary hearing, we will not dispute, for purposes of the preliminary injunction hearing, breach of the LSA or that if Leadenhall's claim was actually $609 Million (a fact that is disputed) that the Borrowers immediate liquid assets would be insufficient to satisfy that amount. (All rights and defenses are reserved on these issues and this is not intended to be a waiver of any defenses or other rights and remedies, or an admission for any other purpose.) Because, subject to the reservations above, those are not disputed issues for purposes of the preliminary injunction hearing, no discovery is needed on those issues at this juncture.

With respect to discovery upon the alleged fraud, that exceeds the scope of the motion, which is limited to the contractual claims. Indeed, the wide ranging discovery of 777, third parties, and other lenders outlined in your email is disproportionate to the needs of the preliminary injunction hearing, which will turn on (i) narrow questions of contractual breach (which, as noted, will be undisputed for purposes of the hearing), and (ii) Leadenhall's own conduct and allegations concerning its alleged security interests, its pre- and post-contracting conduct, its delay in bringing suit, and the risk of irreparable harm that it alleges.

Please let us know your position on these specific issues and then we can discuss a proposed discovery schedule for inclusion in the joint letter to the Court. On the last joint letter we were required to submit to the Court, the obligation was ignored without even a discussion. We feel this process would be more efficient and productive if we work together, as the Court has required.

Regards,

David

**David A. Pellegrino**
*Partner*
Smith, Gambrell & Russell, LLP

p | 646-887-9575
f | 646-887-8165
e | dpellegrino@sgrlaw.com
1301 Avenue of the Americas | 21st Floor | New York, NY 10019
www.sgrlaw.com



A-844

O6EQleaM                                                                1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEADENHALL CAPITAL PARTNERS
    LLP, et a,
4
                    Plaintiffs,
5
            v.                              24 Civ. 03453 (JGK)
6
    NATIONAL FOUNDERS LP,
7                   Movant,

8           v.

9   JOSH WANDER, et al
                    Defendants.
10
    ------------------------------x
11                                          New York, N.Y.
                                            June 14, 2024
12                                          4:40 p.m.

13  Before:

14                      HON. JOHN G. KOELTL,

15                                          District Judge

16                          APPEARANCES

17  KING & SPALDING LLP
            Attorney for Plaintiff
18  BY:  LEIGH M. NATHANSON

19  SIDLEY AUSTIN LLP
            Attorney for Movant Nat. Founders
20  BY:  NICHOLAS P. CROWELL

21  SMITH GAMBRELL & RUSSELL LLP
            Attorney for Defendant 777 Partners (entities)
22  BY:  DAVID A. PELLEGRINO

23

24

25

A-845

```
O6EQleaM                                                          2
```

1   APPEARANCES CONTINUED:

2   CADWALADER WICKERSHAM & TAFT LLP
         Attorney for Defendant Advantage Cap. and King
3   BY:  JONATHAN M. WATKINS

4

5   MORGAN LEWIS & BOCKIUS LLP
         Attorneys for Intervenor ING
6   BY:  STEPHAN E. HORNUNG

7   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
         Attorneys for Defendant Pasko
8   BY:  CHRISTOPHER HARWOOD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-846

O6EQleaM                                                                3

1            (The Court and all parties present telephonically)

2            (Case called)

3            THE COURT:  All right.  Who is on the phone please for

4     the plaintiff?

5            MS. NATHANSON:  Good afternoon, your Honor.

6            This is Leigh Nathanson from King & Spalding for

7     Leadenhall.

8            THE COURT:  Thank you.  Who is on the phone for

9     defendant 777 Partners?

10           MR. PELLEGRINO:  This is David Pellegrino from Smith

11    Gambrell for the 777 entity defendants, and not the

12    individuals.

13           THE COURT:  With respect to the individual defendants,

14    is there an appearance for Mr. Pasko?

15           MR. HARWOOD:  Good afternoon, your Honor.

16           This is Chris Harwood from Morvillo Abramowitz, and I

17    represent Mr. Pasko.

18           THE COURT:  Is there an appearance yet for Mr. Wander?

19           No response.

20           THE COURT:  Not yet.  Okay.

21           For Mr. King?

22           MR. WATKINS:  Good afternoon, your Honor.  This is

23    Jonathan Watkins with Cadwalader for Mr. King and Advantage

24    Capital.

25           THE COURT:  I'm sorry, I didn't get the last thing you

A-847

O6EQleaM                                                                          4

1    said.

2           MR. WATKINS:  And A Cap, Advantage Capital Holdings

3    LLC.

4           THE COURT:  Is that for AC?

5           MR. WATKINS:  For A Cap, yes, your Honor.

6           THE COURT:  Okay.

7           Any other parties on the line?  National Founders?

8           MR. CROWELL:  Yes, your Honor.  It's Nick Crowell from

9    Sidley Austin for National Founders.

10          THE COURT:  Okay.  Anyone else?  ING?

11          MR. HORNUNG:  Yes, your Honor.  This is Stephan

12   Hornung from Morgan Lewis & Bockius for ING.

13          THE COURT:  Great.  Anyone whom I haven't mentioned?

14   No.

15          Okay.  So the purpose of this conference was for a

16   premotion conference on behalf of the 777 parties and A Cap who

17   want to make a motion to dismiss.  And I would also like to

18   talk to the parties about the status of the TRO preliminary

19   injunction and where we go from here.  So let's start with the

20   motions to dismiss.

21          Of course, the defendants have the right to make

22   motions to dismiss.  A portion of the arguments made in the

23   motions to dismiss are essentially failure to allege with

24   sufficient particularity portions of the RICO claim or claims

25   including specification of the specific items of mail and wire

A-848

O6EQleaM                                                            5

1  fraud.  So my initial question is whether the plaintiffs want

2  to file an amended complaint in response to the letters saying

3  that the current complaint is insufficiently pleaded.

4            MS. NATHANSON:  Thank you, your Honor.  This is Leigh

5  Nathanson for the plaintiff.

6            Our inclination at this point is that nothing in the

7  premotion letters themselves have led us to any doubt about

8  whether our allegations are sufficient to meet the elements.

9  And with respect to the predicate acts for RICO in particular,

10 we think we've identified with a great deal of specificity the

11 acts of wire fraud and mail fraud that are at issue.

12 Specifically over the course of May 2021 through November 2023,

13 there were approximately 16 monthly compliance reports or

14 borrowing reports that contained representations that were

15 false about the receivables available as collateral to

16 Leadenhall.

17           We also have lies that were made by Josh Wander on

18 recorded phone calls attributing those acts of fraud to a

19 glitch or a mistake.

20           We also have evidence that's described in the

21 complaint of an admission from a 777 Partners insider to

22 Leadenhall that defendants had Photoshopped bank statements,

23 and we've detailed what these bank statements or at least some

24 of them appear to be in paragraph 162 in the complaint.  And we

25 believe that specifically some of those forged bank statements

A-849

O6EQleaM                                                                6

1   were submitted in November 2022.  That's in paragraphs 164

2   through 70 of the complaint.

3           Those are not all, but we think a sampling of the very

4   specific acts of wire fraud and mail fraud that are the

5   predicates for the RICO claims.  So that's just an example.

6           That said, we understand that after we receive the

7   defendants' full motions to dismiss, if there are particular

8   factual deficiencies that they allege that we believe would be

9   rectified by amendment, we certainly will consider doing that.

10  We are not in the interest of wasting the Court's time on a

11  pleading that could be amended, but we do think that we have

12  put forth in this complaint more than enough facts to overcome

13  the pleading standards including for RICO.

14          THE COURT:  Okay.  As far as I am concerned, that is a

15  reasonable what I would consider middle ground.  So rather than

16  fully brief a motion to dismiss or motions to dismiss, if the

17  plaintiffs believe on the basis of the motions to dismiss that

18  an amended complaint will cure any defects alleged in the

19  motions to dismiss, at that point they'll ask to file an

20  amended complaint.  And that is a request that I almost surely

21  would grant because it would avoid going through a completed

22  motion to dismiss with a request by plaintiffs, which sometimes

23  happen that if the Court found the complaint deficient, then

24  the plaintiffs would want an opportunity to file an amended

25  complaint, a situation which would result in having to have a

A-850

O6EQleaM                                                                    7

1   decision on the initial motion to dismiss followed then by an

2   amended complaint and a new motion to dismiss.

3          So I take it that what the plaintiffs are saying is if

4   they thought after the initial motions to dismiss that they

5   really should file an amended complaint, they will ask for

6   leave to file an amended complaint, and that will be their best

7   complaint.  And if I found that that amended complaint was

8   insufficient for any reason, they wouldn't ask me to file yet

9   another amended complaint.

10         Do I understand you correctly, Ms. Nathanson?

11         MS. NATHANSON:  I think that's generally fair, your

12  Honor, with one slight caveat, which is that if, for example,

13  the motions to dismiss -- to take the issue that your Honor

14  raised.  If, for example, the motions to dismiss on the RICO

15  claims allege only -- and I'm not saying that they will, but if

16  they contend only that we don't see acts of wire fraud and we

17  say we've identified 70 acts of wire fraud by report and date,

18  we may not see fit to amend even though that's a deficiency

19  that the defendants contend exist.

20         I think it's an unlikely scenario that the Court would

21  agree with defendants in that case, but I am not going to

22  forego the right to ask for leave to amend in the unlikely

23  event that something comes up in the briefing that we didn't

24  see fit to amend in the first place.

25         But all of that is to say I don't think that is a

O6EQleaM                                                                8

1    likely situation.  We will endeavor to make our amendments

2    before expending the Court's time in deciding the motion, and

3    we will endeavor to avoid asking for that relief afterwards.

4                THE COURT:  And you'll give me your best complaint.

5                MS. NATHANSON:  Yes.

6                THE COURT:  Okay.  I really can't ask for anything

7    more.

8                Also, if the motions to dismiss raise any unexpected

9    issues, I obviously can't know now how those issues would be

10   dealt with.  So we'll see.  Plainly, the plaintiffs have a

11   right to make motions to dismiss, and the plaintiffs have said

12   that -- I'm sorry -- the defendants have the right to make

13   motions to dismiss.  The plaintiffs have said if they think

14   that there are matters raised in the motions to dismiss that

15   should be responded to with an amended complaint, they'll ask

16   leave to file an amended complaint, and I've told you that I

17   would be inclined to grant that motion.  It would be an

18   exercise in futility to deny that.

19                So do the defendants want to be heard on this at all?

20                MR. PELLEGRINO:  Your Honor, it's David Pellegrino for

21   Smith Gambrell and the 777 entity defendants.  We understand

22   what you're saying.  You know, the RICO requirements are quite

23   extensive, and you refer to things that were -- that could be

24   raised for the first time in a motion to dismiss.  A true RICO

25   premotion to dismiss letter would likely be eight to ten pages,

A-852

O6EQleaM                                                                9

1    and some judges -- I didn't see it in your rules, but some

2    judges have what are called or what's called the RICO

3    statement, and I'm wondering whether that would be helpful, for

4    instance --

5              THE COURT:  No.  No.  I think that -- I thought that

6    time has passed those requirements by.  I think it is just an

7    extra time-consuming practice.  I have never done it, and I've

8    never thought it was necessary, and I think it's a waste of

9    time.  I don't think that I could reasonably dismiss RICO

10   claims based on that sort of RICO disclosure.  The federal

11   rules give us enough guidance for motions to dismiss,

12   particularly with the addition of premotion letters.  And I

13   also thought -- by the way, I don't decide anything until it's

14   briefed on the facts and the law, but that the plaintiffs

15   attempted in the complaint to dot all the I's and cross all the

16   T's with respect to the numerous requirements for a

17   well-pleaded RICO claim.  The defendants may disagree with that

18   on the facts, but it would be -- you know, I think the

19   plaintiffs have attempted to plead detailed RICO claims.  So I

20   think it will have to be tested on a motion to dismiss or

21   motions to dismiss.

22             Okay.  So when do the defendants want to make their

23   motions to dismiss?

24             MR. PELLEGRINO:  Yes, your Honor.  It's now June 14.

25   We would like till the end of July to submit that motion.  In

A-853

O6EQleaM                                                          10

1   part, the reason for that timing is I'm away the first two

2   weeks out of the country.

3           THE COURT:  Not a problem.  Not a problem at all.  So

4   how about August 2?  Motions to dismiss August 2.  Responses

5   September 13.

6           Ms. Nathanson, is that fine?

7           MS. NATHANSON:  I think we'd ask for at least one more

8   week in light of the fact that defendants would have had the

9   complaint for three months at that point.

10          THE COURT:  Okay, September 20.  Response

11  September 20.  Replies October 11.  And if the response on the

12  motion to dismiss is going to be a request to file an amended

13  complaint, then I think that response should be made by

14  August 23.  Okay?

15          MS. NATHANSON:  That sounds fine.

16          THE COURT:  Request to file an amended complaint

17  August 23.

18          All right.  Let me deal now with more generally the

19  status of the case.

20          MR. HARWOOD:  This is Chris Harwood on behalf of

21  defendant individual Pasko.  Defendant Pasko's deadline to

22  respond to the complaint to file a premotion letter is Monday,

23  which I intended to file premotion letter seeking leave to

24  dismiss joining in the entity defendants' arguments but also

25  making a lack of personal jurisdiction argument on behalf of

A-854

1    Mr. Pasko, which I am happy to summarize for the Court right

2    now.  I just wanted to raise this because especially for

3    efficiency purposes I'm happy to abide by the schedule that was

4    just determined.

5            THE COURT:  Fine.  That's fine.  Unless anyone wants

6    to move or answer earlier, I will make sure that the order says

7    the time for all defendants to move or answer or to respond to

8    the complaint is August 2.

9            MR. HARWOOD:  Thank you, your Honor.  So I need not

10   submit a premotion letter?  I can just go ahead and make my

11   additional motion?

12           THE COURT:  Yes.  Same for all defendants.  No

13   additional premotion letters are necessary.  The purpose of

14   premotion letters is primarily to see if the plaintiff wants to

15   file an amended complaint.  The defendants have the right to

16   make motions to dismiss.  So I couldn't ever look at the

17   premotion letters and say, no, you can't do that.  So it's

18   fine.  No more premotion letters necessary.

19           MR. HARWOOD:  Thank you, your Honor.

20           THE COURT:  Okay.  So we get then to the status of the

21   case.  I read the status letters, and I will give you my

22   reactions to the status letters.  Not everyone may agree with

23   this, but, first of all, the relations between the parties

24   leave something to be desired, and you all can read a prior

25   article I once read on civility.  You know, there is the

A-855

O6EQleaM                                                              12

1    comment that insufficient time was provided to have input into

2    the joint letter and, gee whiz, we ought to be working on some

3    form of consent order like what's already incorporated in the

4    TRO, but the parties haven't been able to get together on that.

5    The first observation.

6           The second observation is no one is rushing to have an

7    evidentiary hearing on the motion for a preliminary injunction,

8    and no one is rushing or you would have already — and the

9    parties can correct me if I'm wrong — issued requests for

10   expedited discovery and all sorts of specific discovery

11   requests to be answered on an expedited basis so that that

12   material would be available for an evidentiary hearing.

13          I said in deciding the temporary restraining order

14   that an evidentiary hearing was asked for, so I didn't feel in

15   a position at that point to issue the preliminary injunction

16   based upon the papers that the parties had already filed.  But

17   it's clear to me that the parties are crying out, if you will,

18   for some form of consent decree if you want to call it that, or

19   agreed-upon injunction if you want to call it that, which is

20   quite similar to what is in the current temporary restraining

21   order.  The parties don't want an evidentiary hearing on the

22   preliminary injunction, and they come up with issues that could

23   be at issue in an evidentiary hearing, but the parties really

24   don't want it.  And they come up with possible discovery but

25   they haven't engaged in it and the requests for possible

A-856

O6EQleaM                                                                13

1   discovery are lukewarm at best.

2           So with the sophisticated attorneys in the case, it's

3   pretty clear that I set out what my own thoughts were with

4   respect to the extensive papers that were submitted on the TRO,

5   and I would have the opportunity to extend the TRO and then

6   when the full 28 days have run out, then I have all of the same

7   papers on which I've decided the TRO to make a decision with

8   respect to the preliminary injunction.  And sophisticated

9   lawyers would say to themselves that the preliminary injunction

10  would look a lot like the TRO, but the parties have an

11  opportunity, you know, you're all sophisticated lawyers, to

12  work out the details of what's referred to in the papers before

13  me as a consent decree, which would provide protections for

14  both sides in a very difficult financial situation.

15          So I've also checked with Magistrate Judge Moses

16  because I intend to refer the matter to Magistrate Judge Moses

17  for purposes of settlement.  And I know that Magistrate Judge

18  Moses could meet with you I believe sometime around June 24 or

19  25, somewhere in there, if you all can't on your own work out

20  an agreement.

21          So those are my observations.  There is nothing for me

22  to do at the moment other than refer the case to Magistrate

23  Judge Moses for settlement, but I'm perfectly willing to listen

24  to the parties for anything you'd like to tell me.

25          So plaintiff goes first.  Ms. Nathanson.

A-857

O6EQleaM                                                                    14

1           MS. NATHANSON:  Thank you, your Honor.

2           We agree that a consent order makes sense here.  We

3    sent a proposed consent order to counsel for the 777 entities I

4    think a month ago today and have gotten no engagement on that,

5    so it may be --

6           THE COURT:  You see, that was sort of the tenor of the

7    correspondence which rubs me the wrong way.  It immediately

8    seeks to cast blame on the defendant rather than to say that,

9    for example, oh, that's a wonderful idea, your Honor.  We think

10   it's just wonderful to work with the defendants towards that

11   rather than we want it and they've been obstructive.

12          MS. NATHANSON:  Well, I was just going to suggest --

13          THE COURT:  Hold on.  Hold on.  That rubs me the wrong

14   way, and I can't believe that I'm not going to get a response

15   from the defendants which then attempts to blame the

16   plaintiffs.  So go ahead.

17          MS. NATHANSON:  I was just going to suggest that

18   before working back from the potential for Judge Moses to meet

19   with us the week of June 25, maybe it would help to put an

20   interim deadline presumably that defendants would consent to

21   just for them to propose -- make a counterproposal to our draft

22   consent order or send some other counterproposal that they

23   would like to send so that we can respond to it and try to get

24   some work done before we go before Judge Moses or potentially

25   to obviate that.  That's all I was going to suggest.

A-858

O6EQleaM                                                                15

1          THE COURT:  Mr. Pellegrino, anything you'd like to

2     tell me?

3          MR. PELLEGRINO:  Yes.  So the consent order -- what

4     Ms. Nathanson is referring to as a consent order is an order

5     for the appointment of receiver.  It's not really addressing

6     what I understood the Court to mean by a preliminary injunction

7     order which mirrors or works off of the existing TRO.  And you

8     know --

9          THE COURT:  By the way, you're right because in the

10    TRO I didn't appoint a receiver, and I would -- obviously, I

11    was not inclined to appoint a receiver in connection with the

12    TRO.  Among other reasons, a TRO is -- a receiver is a much

13    more restrictive form of relief that requires a higher showing,

14    and I have no basis on the papers to know whether the outside

15    consultant that the defendants have already appointed

16    supposedly to provide oversight would be an appropriate

17    receiver or not.  And if not, whether another third-party

18    receiver would be -- who it might be and whether it would do

19    more good than harm.  I certainly didn't suggest in the TRO

20    that I was about to appoint a receiver.  I would have thought

21    that -- and again, this is up to the parties and, you know, if

22    you leave it to me, I will determine whether to extend the TRO

23    and then whether to impose the preliminary injunction and what

24    the terms of the preliminary injunction would be.

25          I would have thought that the most reasonable thing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EQleaM                                                                16

1    for the parties to discuss is what are the appropriate elements

2    of interim relief short of a receiver.  We have a reporting

3    requirement in the TRO that the parties have been living with.

4    Is a more thorough reporting requirement reasonable?  If so,

5    what is it?  Are there disclosures to be made by the defendants

6    to the plaintiff to provide additional protection to the

7    plaintiff?  Those are some thoughts, but I am not a business

8    person, and all I do is decide cases based on the facts and the

9    law.

10            But I think I interrupted you, Mr. Pellegrino.

11            MR. PELLEGRINO:  So we certainly -- it was our goal,

12   and in fact we were specifically told that plaintiffs thought

13   that a consensual order was the way to go, and I just was a

14   little surprised by the response.

15            As part of the TRO, there is some ambiguity as to

16   where there's reporting requirements and where there's not.

17   And so in an abundance of caution, we have some anticipated

18   transactions that we anticipate bringing to the Court's

19   attention to determine whether they're part of the TRO or if

20   they are part of the TRO, whether they can be an exception.

21   And I'm wondering because it may be -- there may be a lot of

22   these.  You can understand we're undergoing a restructuring

23   effort, and we're trying to, you know, keep the company

24   together but at the same time raise enough cash to operate and

25   so forth, whether that would be something that Magistrate Judge

A-860

O6EQleaM                                                                17

1   Moses could address or would you prefer to have it addressed to

2   you.

3            THE COURT:  No.  I would welcome you to discuss it

4   with Magistrate Judge Moses.  I would in the -- in the first

5   instance, I think you should discuss it with the plaintiffs.

6            MR. PELLEGRINO:  Right.  We've already started that.

7            THE COURT:  Okay.  It's in both parties' interest to

8   keep the enterprise going.  I mean, so I would think that you

9   would discuss that with the plaintiffs, and reasonable lawyers

10  and financial advisers should be able to work that sort of

11  thing out.  But Magistrate Judge Moses is very sophisticated,

12  and I have great confidence in Magistrate Judge Moses, so I

13  think you would raise it with Magistrate Judge Moses as part of

14  settlement.  I am just referring it to Magistrate Judge Moses

15  as settlement, but I would think that you could raise it with

16  Magistrate Judge Moses.  Plainly, I'm not referring it to

17  Magistrate Judge Moses for the dispositive motions.  I still

18  have to decide the TRO and the preliminary injunction.

19           MR. PELLEGRINO:  Understood.

20           THE COURT:  Okay.  Can I do anything else for you at

21  the moment?  As long as I have you all, do the parties agree

22  that I can extend the TRO for the additional 14 days or not?

23  If you want me to wait until the 14th day after the original

24  TRO to make a decision as to whether to extend the TRO, I think

25  it's fairly clear what I would do.  There is no additional

A-861

O6EQleaM                                                                18

1   information that's been brought to my attention that would lead

2   to a different decision on the extension of the TRO.  I would

3   have thought also that you all could talk about any other

4   extensions that make sense to you all, and if so, under what

5   circumstances or conditions.  Sophisticated parties can make

6   better decisions than the Court.

7              MR. WATKINS:  This is Jonathan Watkins on behalf of

8   A Cap.  From A Cap's perspective, we certainly support the 777

9   defendants and Leadenhall's efforts to reach agreement on a

10  consent decree.  Obviously, progress has not gone as quickly as

11  anyone might have hoped.  And from our perspective, the

12  challenge as it stands is about the interpretation of elements

13  of the TRO.  So, for example, on dissipations of assets being

14  of course covered by the TRO, and as your Honor mentioned last

15  week, it would behoove the parties to talk to one another, I

16  understand that that has happened with some contemplated

17  transactions.  But if plaintiffs are not inclined to agree with

18  777 entities' view of things despite fair market value with

19  independent appraisers are, for example, being given, that

20  presents a challenge, it seems to me to -- in the real world,

21  and timing is such with the state of affairs that waiting

22  until, for example, to talk about settlement and interpretation

23  of the TRO until the end of June I worry could present quite a

24  practical challenge.

25             MS. NATHANSON:  May I be heard for a moment on that?

O6EQleaM                                                          19

1          THE COURT:  Yes, but I -- you know, sophisticated

2     parties with financial advisers should be able to work that

3     out.  Failing that, another alternative is for me to appoint a

4     special master, but I hesitate to do that because it provides

5     yet another layer.

6          So, Ms. Nathanson, you wanted to be heard?

7          MS. NATHANSON:  Yes.  Thank you, your Honor.

8          I just wanted to address two points that Mr. Watkins

9     made.  One is -- and I really don't like to be in this place

10    because I usually agree with your Honor that sophisticated

11    counsel should be able to work these things out, but there is

12    some concern on the part of plaintiffs that the timing here is

13    a problem, as Mr. Watkins alluded to, and the reason that we

14    included some of this timing in our letter with the proposed

15    consent order is that we have a concern that the failure of the

16    parties to engage -- we're happy to consider any

17    counterproposal or any proposal that the 777 defendants want to

18    make, but we have some concern that those discussions are being

19    delayed to run out the 28-day clock on the TRO while

20    transactions like the transaction Mr. Watkins referenced are

21    being teed up.  And so what we propose and I -- sorry.

22         THE COURT:  That would be shortsighted because I've

23    already said that although I don't decide anything until it's

24    fully briefed on the facts of the law, no one has offered me

25    any additional briefs, discovery, specific requests for a

A-863

O6EQleaM                                                                  20

1   preliminary injunction other than you've already submitted.  So

2   what would I do with the current papers and the arguments of

3   counsel?  The 28 days won't run out because the 28 days is just

4   for the TRO.  How different will the preliminary injunction be

5   from the TRO?  Unlikely to be very different.  You all haven't

6   given me any additional reasons that the TRO was not, you know,

7   well-reasoned and correct.  So it's not like you're dealing

8   with 28 days.

9           I obviously follow the law as best I can interpret the

10  law and the facts.  I can only impose a TRO for 14 days,

11  renewed on good cause for another 14 days, but it all doesn't

12  go away after 28 days.  Then I have to decide, and I have to

13  decide it before the 28th day whether I impose a preliminary

14  injunction.  What would the preliminary injunction be?  The

15  preliminary injunction that the parties asked for was either

16  the substance of the TRO that I've already entered or

17  appointing a receiver.  I have already said that a receiver in

18  my mind triggers additional problems, and it provokes

19  additional delays because the proposal for a receiver that was

20  given to me, you know, there has to be a determination of who

21  the receiver will be, what the qualifications are, time for the

22  receiver to get up to speed on all of the transactions,

23  et cetera.  So there is no clock running out as far as I can

24  tell.  If the parties think that, oh gee, the TRO's will expire

25  after 28 days, and then we're home free, no sophisticated

A-864

O6EQleaM                                                               21

1    lawyer could possibly reach that conclusion.  No

2    unsophisticated lawyer could reach that conclusion.

3            MS. NATHANSON:  I appreciate that, your Honor.  And,

4    you know, the alternative at this point that we propose to the

5    defendants was not that a third-party receiver be appointed but

6    that B. Riley be either appointed as a receiver or at least

7    agree to safeguard.

8            THE COURT:  How do I --

9            MS. NATHANSON:  You couldn't.

10           THE COURT:  Hold on.  How could I appoint Riley after

11   you spend so much of your papers criticizing Riley and saying

12   that Riley is really in the pocket of the defendants and isn't

13   independent?  And then you say, well, appoint Riley.  How can

14   I -- how could I reasonably do that?  If I were inclined to

15   appoint a receiver, would I not attempt to find a reasonable

16   sophisticated receiver who is unaffiliated with the parties who

17   would then have to spend a reasonable amount of time getting up

18   to speed?

19           MS. NATHANSON:  Yes, your Honor.

20           THE COURT:  I don't even know whether Riley having

21   been appointed by the defendants would agree to be a receiver

22   with fiduciary responsibilities owed to the Court.

23           MS. NATHANSON:  That's exactly what we're working with

24   defendants to figure out, your Honor.  And I think we asked in

25   our preliminary approval motion for an independent third party,

A-865

O6EQleaM                                                                22

1    and that's exactly what we wanted.  We think that the TRO as it

2    was entered makes a lot of sense and would make sense as a

3    preliminary injunction, but what we propose as a potential

4    compromise to defendants was a set of safeguards to see if

5    Leadenhall could get comfortable that B. Riley and the

6    defendants would agree to act in a way that would be beneficial

7    both to the business and to the preservation of the assets.

8    That's all.

9             So I think where we are now is your Honor's comment

10   has alleviated and addressed the concerns that I raised, and we

11   remain open to hearing from the defendants as to any responses

12   that they may have to either the consent order that we proposed

13   to them or some other solution.

14            THE COURT:  Well, perhaps we've made progress on this

15   call.  You all can -- I asked for a letter last time, and I got

16   some name calling.  Refresh my recollection on when the first

17   14 days runs out.

18            MS. NATHANSON:  Next Friday.

19            THE COURT:  So you all can send me a letter by Tuesday

20   telling me what the current state is and whether the parties

21   agree to extend the TRO beyond June 21 for another 14 days.

22   You also, if you want, which also happens from time to time

23   tell me that you all agree to the TRO modified in the following

24   ways as a preliminary injunction.  Failing that, I will have to

25   decide based upon everything that you've given me the nature of

A-866

O6EQleaM                                                                    23

1    the preliminary injunction to be decided upon by the 28th day.

2    And later today, I will make the reference to Magistrate Judge

3    Moses for purposes of settlement, and I'm sure that you can

4    contact the magistrate judge for a date.  I know the magistrate

5    judge told me that she thought she would be available to meet

6    with you sometime around June 20th or so, but I leave that up

7    to the magistrate judge, and I'll make sure the magistrate

8    judge gets a copy of my decision on the TRO.

9           And I give my little homily to the parties that

10   sophisticated parties can usually work out a reasonable

11   decision that protects all of their interests in a

12   sophisticated way.  So -- but failing that, then we judges have

13   to decide.  Okay.  Anyone else want to be heard today?  No.

14   Okay.  It's good to talk to you all.

15          MR. PELLEGRINO:  Thank you, your Honor.  Have a nice

16   weekend.

17          MS. NATHANSON:  Thank you, your Honor.

18          THE COURT:  Bye now.

19          (Adjourned)

20

21

22

23

24

25

A-867

Case 1:24-cv-03453-JGK   Document 127   Filed 06/18/24   Page 1 of 1

June 18, 2024

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 14A
New York, NY 10007-1312

     Re:  *Leadenhall Capital Partners LLP et al. v. Wander et al.*, 24-cv-03453-JGK

Dear Judge Koeltl:

     Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC ("Plaintiffs") and the 777 Entity Defendants write jointly as directed by the Court at the June 14, 2024 conference concerning the Temporary Restraining Order entered by the Court on June 7, 2024, which is currently set to expire on June 21, 2024.  ECF No. 114.

     Pursuant to Federal Rule of Civil Procedure 65(b)(2), the parties agree that the Temporary Restraining Order shall be extended for 14 days such that it will expire on July 5, 2024.

     The parties will also discuss whether a consensual order can be agreed upon by the parties that would obviate the need for the Court to make a determination on whether to convert the Temporary Restraining Order into other preliminary relief by July 5, 2024.

Respectfully submitted,

/s/ Leigh Nathanson
Leigh Nathanson
Brian Donovan
King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
*Attorneys for Plaintiffs*

/s/ David Pellegrino
John G. McCarthy
David Pellegrino
Smith, Gambrell & Russell LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
*Attorneys for 777 Entity Defendants*

*For good cause shown and with the consent of the parties, the temporary restraining order entered on June 7, 2024 is extended to July 5, 2024.*

*So ordered.*

*[signature] John G. Koeltl*
*6/18/24   U.S.D.J.*

A-868

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEADENHALL CAPITAL PARTNERS LLP, ET
AL.,

                    Plaintiffs,                    24-cv-3453 (JGK)

          - against -                               ORDER

JOSH WANDER, ET AL.,

                    Defendants.

---

JOHN G. KOELTL, District Judge:

     The temporary restraining order in this case is extended to
**July 8, 2024, at 4:30 p.m.** The extension is required because July
5, 2024, is a court holiday. July 8, 2024 is the first business
day thereafter. If the parties disagree, they should notify the
Court immediately.

SO ORDERED.

Dated:   New York, New York
         June 20, 2024

                                        John G. Koeltl
                              United States District Judge

A-869

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>   Plaintiffs,<br><br>vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC,  600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>   Defendants. | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF JONATHAN WATKINS

I, Jonathan Watkins, hereby declare as follows:

1.  I am an attorney at Cadwalader, Wickersham & Taft LLP and counsel for Haymarket Insurance Company ("Haymarket") and ACM Delegate LLC ("ACM Delegate," and together "Intervenors").

2.  This declaration is submitted in support of Intervenors' Motion to Intervene.

3.  Attached as Exhibit A are true and correct copies of three Delaware UCC-1 financing statements, all filed with the Delaware Secretary of State on March 3, 2020, by which Haymarket Insurance Company perfected its security interests in assets of 600 Partners LLC and 777 Partners LLC. Also included as part of Exhibit A are two amendments to UCC Initial Filing No. 2020 1566662, which are dated November 20, 2020 and February 15, 2023.

A-870

4.      Attached as Exhibit B are true and correct copies of four Delaware UCC-1 financing statements, all filed with the Delaware Secretary of State on November 27, 2023, by which ACM Delegate LLC, as Collateral Agent, perfected its security interests in assets of 600 Partners LLC, 777 Partners LLC, SPA II LLC, and SuttonPark Acquisition LLC.

5.      Attached as Exhibit C are true and correct copies of eight UCC-1 financing statements, filed with the Delaware Secretary of State or Florida Secured Transaction Registry on various dates ranging from April 12, 2021 to December 15, 2023, by which ACM Delegate LLC and Haymarket Insurance Company perfected their security interests in assets of certain subsidiaries of 777 Partners LLC and 600 Partners LLC.

6.      Attached as Exhibit D is a true and correct copy of a UCC-1 financing statement, filed with the Delaware Secretary of State on July 12, 2022, by which Leadenhall Life SMA III ICAV, as Second Lien Collateral Agent, purported to perfect a second-position lien on shares of Brickell Insurance Holdings LLC held by 777 Partners LLC.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York                                      By:  /s/ _Jonathan M. Watkins_
      July 8, 2024                                                          Jonathan M. Watkins

A-871

# Exhibit A

A-872

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> COGENCY GLOBAL INC.
> 122 E 42 STREET
> NEW YORK, NY 10168

Delaware Department of State
U.C.C. Filing Section
Filed: 04:31 PM 03/03/2020
U.C.C. Initial Filing No: 2020 1566373

Service Request No:   20201887253

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **600 Partners LLC** | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Avenue, 19th Floor** | **Miami** | | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **Haymarket Insurance Company** | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **415 Bedford Road, Suite 102** | **Pleasantville** | | **NY** | **10570** | |

4. COLLATERAL: This financing statement covers the following collateral:

**See Exhibit A attached hereto and made a part hereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:    ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**File with: DE - Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-873

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:
600 Partners LLC
600 Brickell Avenue, 19th Floor
Miami, FL 33131

Secured Party:
Haymarket Insurance Company
415 Bedford Road, Suite 102
Pleasantville, NY 10570

This financing statement covers all assets of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, other than the Excluded Property.

"Excluded Property" means:

(i)     all interests in Lumiere Financing LLC;

(ii)    the Third Amended and Restated Promissory Note, dated as of January 7, 2019 (the "Flair Note"), issued by Flair Airlines Ltd. ("Flair") to 777 Partners LLC, and all other debt securities and promissory notes issued by Flair; provided, that the Flair Note and such other debt securities and promissory notes shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

(iii)   all equity interests and equity interest equivalents of Flair; provided that such equity interests and equity interest equivalents shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

(iv)    all interests in Nutmeg Acquisitions LLC;

(v)     all interests in SuttonPark Capital LLC;

(vi)    all interests in F3EA Capital LLC;

(vii)   all interests in F3EA Servicing LLC;

(viii)  all interests in Brickell Insurance Holdings;

(ix)    all interests in 777 Re Investments LLC;

(x)     all interests in 777 SPV LLC; and

(xi)    all interests in interests in Managed Care Advisory Group, LLC.

*36604461v1*

A-874

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

COGENCY GLOBAL INC.
122 E 42 STREET
NEW YORK, NY 10168

Delaware Department of State
U.C.C. Filing Section
Filed: 04:31 PM 03/03/2020
U.C.C. Initial Filing No: 2020 1567066

Service Request No:   20201887207

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **777 Partners LLC** | | | | | |
| 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Avenue, 19th Floor** | | **Miami** | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME  Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| **Haymarket Insurance Company** | | | | | |
| 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| **415 Bedford Road, Suite 102** | | **Pleasantville** | **NY** | **10570** | |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable)   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with: DE - Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

A-875

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:                                          Secured Party:
777 Partners LLC                                 Haymarket Insurance Company
600 Brickell Avenue, 19th Floor                  415 Bedford Road, Suite 102
Miami, FL 33131                                  Pleasantville, NY 10570

This financing statement covers all of Debtor's right, title and interest in, to and under the following, whether now existing or hereafter from time to time acquired:

(a)   all Pledged Debt;

(b)   all Pledged Collateral;

(c)   all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, and claims against any Person for loss, damage or destruction of any Collateral;

(d)   all books and records pertaining to the foregoing; and

(e)   all proceeds and products, whether tangible or intangible, of any of the foregoing, and together with all proceeds of any such proceeds, and to the extent not otherwise included, any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral.

(the items referred to in clauses (a) through (e) above being collectively referred to as the "Collateral").

As used herein:

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Flair" means Flair Airlines Ltd., a British Columbia corporation.

"Flair Note" means that certain Third Amended and Restated Promissory Note, dated as of January 7, 2019, issued by Flair to the Debtor, in an original principal amount of CAD$65,000,000.

*36604874v1*

A-876

"<u>Pledged Debt</u>" means the Flair Note and all amended and restated, substitute and replacement promissory notes thereto.

"<u>Pledged Collateral</u>" means (i) the Pledged Debt, (ii) all other property hereafter delivered to, or in the possession or in the custody of, the Purchaser, in substitution for or in addition to the Pledged Debt, (iii) any other property of the Debtor, as described in <u>Section 7(c)</u> of the Security Agreement, now or hereafter delivered to, or in the possession or custody of the Purchaser, (iv) all rights, privileges, authority or powers of the Debtor as an owner of such Pledged Debt, and (v) all proceeds of the assets described in the preceding <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, and <u>(iv)</u> (including (x) all dividends, instruments or other distributions and any stocks, shares, warrants, options or other securities rights or any other right or property which the Debtor shall receive or shall become entitled to by way of redemption, exchange, purchase, substitution, conversion, consolidation, subdivision, preference or otherwise to receive for any reason whatsoever with respect to the Pledged Debt, in substitution for or in exchange for any Pledged Debt, and (y) all payments of principal or interest and other property from time in respect of the Pledged Debt and any Equity Interest issued or issuable upon conversion of any Pledged Debt).

"<u>Purchaser</u>" means Haymarket Insurance Company.

"<u>Security Agreement</u>" means the Security Agreement, dated as of the 28th day of February, 2020, by and among the Debtor and the Purchaser.

A-877

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> COGENCY GLOBAL INC.
> 122 E 42 STREET
> NEW YORK, NY 10168

Delaware Department of State
U.C.C. Filing Section
Filed: 04:31 PM 03/03/2020
U.C.C. Initial Filing No: 2020 1566662

Service Request No:   20201887219

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name). If any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **777 Partners LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Avenue, 19th Floor** | **Miami** | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME  Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Haymarket Insurance Company** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **415 Bedford Road, Suite 102** | **Pleasantville** | **NY** | **10570** | |

4. COLLATERAL: This financing statement covers the following collateral:

**See Exhibit A attached hereto and made a part hereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**File with: DE - Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-878

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:                                    Secured Party:
777 Partners LLC                           Haymarket Insurance Company
600 Brickell Avenue, 19th Floor            415 Bedford Road, Suite 102
Miami, FL 33131                            Pleasantville, NY 10570


     This financing statement covers all assets of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, other than the Excluded Property.

     "Excluded Property" means:

     (i)     all interests in Lumiere Financing LLC;

     (ii)     the Third Amended and Restated Promissory Note, dated as of January 7, 2019 (the "Flair Note"), issued by Flair Airlines Ltd. ("Flair") to 777 Partners LLC, and all other debt securities and promissory notes issued by Flair; provided, that the Flair Note and such other debt securities and promissory notes shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

     (iii)     all equity interests and equity interest equivalents of Flair; provided that such equity interests and equity interest equivalents shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

     (iv)     all interests in Nutmeg Acquisitions LLC;

     (v)     all interests in SuttonPark Capital LLC;

     (vi)     all interests in F3EA Capital LLC;

     (vii)     all interests in F3EA Servicing LLC;

     (viii)     all interests in Brickell Insurance Holdings;

     (ix)     all interests in 777 Re Investments LLC;

     (x)     all interests in 777 SPV LLC; and

     (xi)     all interests in interests in Managed Care Advisory Group, LLC.

*36604441v1*

**A-879**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Cogency Global Inc.
122 E 42 Street
New York, NY 10168

Delaware Department of State
U.C.C. Filing Section
Filed: 03:25 PM 11/20/2020
U.C.C. Initial Filing No: 2020 1566662
Amendment No: 2020 8156608
Service Request No:  20208460054

Print     Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**2020 1566662**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR
6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR
7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☑ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**See Exhibit A attached hereto and made a part hereof**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
**Haymarket Insurance Company**

OR
9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-880

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:                                    Secured Party:

777 Partners LLC                           Haymarket Insurance Company
 600 Brickell Avenue, 19th Floor           415 Bedford Road, Suite 102
Miami, FL 33131                            Pleasantville, NY 10570

    This financing statement covers all assets of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, other than the Excluded Property.

    "Excluded Property" means:

| | |
|---|---|
| (i) | all interests in Lumiere Financing LLC |
| (ii) | the Fifth Amended and Restated Promissory Note, dated as of February 14, 2020 (the "Flair Note"), issued by Flair Airlines Ltd. ("Flair") to 777 Partners LLC, and all other debt securities and promissory notes issued by Flair; provided, that the Flair Note and such other debt securities and promissory notes shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets; |
| (iii) | all equity interests and equity interest equivalents of Flair; provided that such equity interests and equity interest equivalents shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets; |
| (iv) | all interests in 777 Equipment Finance LLC; |
| (v) | all interests in Nutmeg Acquisition LLC; |
| (vi) | all interests in SuttonPark Capital LLC; |
| (vii) | all interests in F3EA Capital LLC; |
| (viii) | all interests in F3EA Servicing LLC; |
| (ix) | all interests in Brickell Insurance Holdings LLC; |
| (x) | all interests in 777 Re Investments LLC; |
| (xi) | all interests in 777 SPV I LLC; and |
| (xii) | all interests in interests in Managed Care Advisory Group, LLC. |

**A-881**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Ty Stapleton

B. E-MAIL CONTACT AT FILER (optional)
ty.stapleton@nortonrosefulbright.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY  10019-6022

Delaware Department of State
U.C.C. Filing Section
Filed: 11:41 AM 02/15/2023
U.C.C. Initial Filing No: 2020 1566662
Amendment No: 2023 1204477
Service Request No:  20230525706

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**2020 1566662; Filed 03/03/2020**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☑ **COLLATERAL CHANGE:**  Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

**See Exhibit A attached hereto and made a part hereof.**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME **Haymarket Insurance Company** | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

A-882

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:                                              Secured Party:

777 Partners LLC                                    Haymarket Insurance Company
600 Brickell Avenue, 19th Floor                     415 Bedford Road, Suite 102
Miami, FL 33131                                     Pleasantville, NY 10570


This financing statement covers all assets of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof, other than the Excluded Property.

"Excluded Property" means:

(i)      all interests in Lumiere Financing LLC

(ii)     the Sixth Amended and Restated Promissory Note, dated as of May 13, 2022 (the "Flair Note"), issued by Flair Airlines Ltd. ("Flair") to 777 Partners LLC, and all other debt securities and promissory notes issued by Flair; provided, that the Flair Note and such other debt securities and promissory notes shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

(iii)    all equity interests and equity interest equivalents of Flair; provided that such equity interests and equity interest equivalents shall cease to be Excluded Property upon any release of any existing liens thereon in connection with the repayment of the existing indebtedness secured by such assets;

(iv)     all interests in 777 Equipment Finance LLC;

(v)      all interests in Nutmeg Acquisition LLC;

(vi)     all interests in SuttonPark Capital LLC;

(vii)    all interests in F3EA Capital LLC;

(viii)   all interests in F3EA Servicing LLC;

(ix)     all interests in Brickell Insurance Holdings LLC;

(x)      all interests in MedSet Funding LLC (fka 777 Re Investments LLC);

(xi)     all interests in interests in Managed Care Advisory Group, LLC; and

(xii)    all interests in JWARP LLC, JWARP II LLC, JWARP III LLC and JWARP IV LLC and any proceeds thereof.

777 Haymarket UCC.docx                        - 1 -

A-883

# Exhibit B

A-884

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)**
Ashley Mendoza

**B. E-MAIL CONTACT AT SUBMITTER (optional)**
amendoza@crokefairchild.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 06:22 PM 11/27/2023
U.C.C. Initial Filing No: 2023 8013897

Service Request No: 20234065017

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 600 Partners LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

**5.** Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-885

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Ashley Mendoza

B. E-MAIL CONTACT AT SUBMITTER (optional)
amendoza@crokefairchild.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 06:25 PM 11/27/2023
U.C.C. Initial Filing No: 2023 8013905

Service Request No:  20234065044

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 777 Partners LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | | |
| 3b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

5. Check only if applicable and check only one box.   Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-886

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)**
Ashley Mendoza

**B. E-MAIL CONTACT AT SUBMITTER (optional)**
amendoza@crokefairchild.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 06:29 PM 11/27/2023
U.C.C. Initial Filing No: 2023 8013947

Service Request No:   20234065086

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SPA II LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

**5.** Check only if applicable and check only one box.   Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
**6b.** Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION** (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
DE SOS

A-887

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Ashley Mendoza

B. E-MAIL CONTACT AT SUBMITTER (optional)
amendoza@crokefairchild.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 06:31 PM 11/27/2023
U.C.C. Initial Filing No: 2023 8014036

Service Request No:  20234065111

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SuttonPark Acquisition LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

5. Check only if applicable and check only one box.    Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):    ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-888

# Exhibit C

A-889

FLORIDA SECURED TRANSACTION REGISTRY

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

**COGENCY GLOBAL INC.**
**115 North Calhoun Street, Suite #4**
**Tallahassee, FL 32301**

FILED

2021 Apr 12 03:15 PM

****** 202106751727 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MTCP LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL 33131 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Haymarket Insurance Company | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 415 Bedford Road, Suite 102 | Pleasantville | NY 10570 | |

4. **COLLATERAL:** This financing statement covers the following collateral:

See Exhibit A attached hereto and made a part hereof.

Florida Documentary Stamp Tax is not required.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility   ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with: FL - Secured Transaction Registry

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

Case 1:24-cv-03453-JGK   Document 141-3   Filed 07/08/24   Page 3 of 10

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:
MTCP LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

Secured Party:
Haymarket Insurance Company
415 Bedford Road, Suite 102
Pleasantville, NY 10570

This financing statement covers all Pledged Collateral.

"Pledged Collateral" means (i) all of the Debtor's rights, including all membership interests, in SuttonPark Acquisition LLC, a Delaware limited liability company (such company, "SPA", and such interests, collectively, the "LLC Interests") held or acquired by the Debtor, (ii) all of the Debtor's rights, including all membership interests, in SPA II LLC, a Delaware limited liability company ("SPA II", and together with SPA, the "Companies) held or acquired by the Debtor (such interests, collectively with the LLC Interests, the "Interests"), in each of clauses (i) and (ii), together with any of the following received by the Debtor being or having been an owner of any Interests (A) the certificates (if any) representing any of the Interests (including, without limitation, any certificate representing a dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of membership interests, membership interest split, spin-off or split-off, any promissory note or other instrument), (B) all options and other rights, whether as an addition to, substitution for, or in exchange for, any Interests, or otherwise, (C) all dividends or distributions payable in cash, instruments or other property (other than any Tax Distributions and any payments of salary and bonus) and (D) any dividends, distributions, cash, instruments, investment property and other property in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, and all proceeds of any and all of the foregoing.

38487686v1

A-891

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Ashley Mendoza

B. E-MAIL CONTACT AT SUBMITTER (optional)
amendoza@crokefairchild.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 03:44 PM 11/17/2023
U.C.C. Initial Filing No: 2023 7855033

Service Request No:   20234008858

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Nutmeg Acquisition LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-892

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) |
|---|
| Ashley Mendoza |

**B. E-MAIL CONTACT AT SUBMITTER (optional)**
amendoza@crokefairchild.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 03:51 PM 11/17/2023
U.C.C. Initial Filing No: 2023 7855538

Service Request No:  20234009012

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| F3EA Holdings LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

| 5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ /Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | | |

8. OPTIONAL FILER REFERENCE DATA:
DE SOS

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-893

Case 1:24-cv-03453-JGK   Document 141-3   Filed 07/08/24   Page 5 of 11
Doc #: 2023105531
11/28/2023 08:27 AM

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

Ashley Mendoza

B. E-MAIL CONTACT AT SUBMITTER (optional)

amendoza@crokefairchild.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| TRANS ATLANTIC LIFETIME MORTGAGES LIMITED | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

5. Check only if applicable and check only one box:   Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

DC

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-894

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)**
Ashley Mendoza

**B. E-MAIL CONTACT AT SUBMITTER (optional)**
amendoza@crokefairchild.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2023 Nov 28 01:47 PM

****** 202303234725 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JARM CAPITAL LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1300 Monad Terrace, PH B | Miami Beach | FL | 33139 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

Florida Documentary Stamp Tax is not required.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
FL Secured Transaction Registry

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)<br>Ashley Mendoza | FLORIDA SECURED TRANSACTION REGISTRY<br><br>FILED<br><br>2023 Nov 28 01:47 PM<br><br>****** 202303234776 ****** |
| B. E-MAIL CONTACT AT SUBMITTER (optional)<br>amendoza@crokefairchild.com | |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address)<br><br>Croke Fairchild Duarte & Beres<br>180 N LaSalle St Ste 3400<br>Chicago, IL 60601<br><br>SEE BELOW FOR SECURED PARTY CONTACT INFORMATION | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>JARM CAPITAL LLC | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>1300 Monad Terrace, PH B | CITY<br>Miami Beach | STATE<br>FL | POSTAL CODE<br>33139 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>ACM Delegate LLC, as the Collateral Agent | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS<br>1180 Avenue of the Americas, 21st Floor | CITY<br>New York | STATE<br>NY | POSTAL CODE<br>10036 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

Florida Documentary Stamp Tax is not required.

| 5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | |
|---|---|
| 6a. Check only if applicable and check only one box:<br>☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box:<br>☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |

8. OPTIONAL FILER REFERENCE DATA:
FL Secured Transaction Registry

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-896

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

Ashley Mendoza

B. E-MAIL CONTACT AT SUBMITTER (optional)

amendoza@crokefairchild.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Croke Fairchild Duarte & Beres
180 N LaSalle St Ste 3400
Chicago, IL 60601

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 03:10 PM 12/11/2023
U.C.C. Initial Filing No: 2023 8368077

Service Request No:   20234189780

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| F3EA Funding LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name): if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

| 5. Check only if applicable and check only one box. | Collateral is | ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|---|---|
| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box. | |
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE SOS

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

NTUCC1 - 6/27/2023 Wolters Kluwer Online

A-897

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) <br> Ashley Mendoza <br><br> B. E-MAIL CONTACT AT SUBMITTER (optional) <br> amendoza@crokefairchild.com <br><br> C. SEND ACKNOWLEDGMENT TO:  (Name and Address) <br><br> ⌈ Croke Fairchild Duarte & Beres <br> 180 N LaSalle St Ste 3400 <br> Chicago, IL 60601 ⌋ <br><br> SEE BELOW FOR SECURED PARTY CONTACT INFORMATION | FLORIDA SECURED TRANSACTION REGISTRY <br><br><br> FILED <br><br><br> 2023 Dec 15 04:13 PM <br><br> ****** 202303402180 ****** <br><br> THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MTCP LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1451 Brickell Avenue, PH 54 | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACM Delegate LLC, as the Collateral Agent | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1180 Avenue of the Americas, 21st Floor | New York | NY | 10036 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now existing or hereafter acquired and all proceeds thereof.

Florida Documentary Stamp Tax is not required

| | |
|---|---|
| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | |
| 6a. Check only if applicable and check only one box: <br> ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box: <br> ☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA: <br> FL Secured Transaction Registry | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

A-898

# Exhibit D

A-899

██████████
██████████
██████████
██████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 02:49 PM 07/12/2022**
**U.C.C. Initial Filing No: 2022 5811526**

**Service Request No:   20222967457**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | |
| 777 Partners LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| 600 Brickell Avenue, 19th Floor | Miami | FL 33131 | USA |

2. DEBTOR'S NAME  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | |
| Leadenhall Life SMA III ICAV, as Second Lien Collateral Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |
| Level 15, 70 Mark Lane | London | EC3R 7NQ | UK |

4. COLLATERAL:  This financing statement covers the following collateral:

See Schedule A, consisting of two (2) pages, attached hereto and made a part hereof.

This financing statement, together with Schedule A, is a total of three (3) pages.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File with Delaware Secretary of State          Three (3) total pages          [L-317379]

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

A-900

## SCHEDULE A
### to
### UCC-1 Financing Statement

**DEBTOR:**
777 Partners LLC
600 Brickell Avenue, 19th Floor
Miami, Florida 33131

**SECURED PARTY:**
Leadenhall Life SMA III ICAV, as Second Lien Collateral Agent
Level 15, 70 Mark Lane
London, UK EC3R 7NQ

### DESCRIPTION OF COLLATERAL

All of the following property of the Debtor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired (the "*Collateral*"):

(a)   those certain shares of capital stock or other equity interests owned beneficially and, if applicable, of record by the Debtor listed on Schedule I attached hereto and made a part hereof, and all cash, dividends, other securities, instruments, rights, and other property at any time and from time to time received or receivable in respect thereof or in exchange for all or any part thereof, including without limitation, dividends, distributions, warrants, profits, rights to subscribe, rights to return of its contribution, conversion rights, liquidating dividends, and other rights (subject to Section 7 of that certain Pledge Agreement, dated as of June 30, 2022, among the Debtor, MTCP LLC, a Florida limited liability company, and the Secured Party);

(b)   all other property hereafter delivered to the Secured Party (or any agent or bailee holding on behalf of the Secured Party) by the Debtor in substitution for or in addition to any of the foregoing, and all certificates and instruments representing or evidencing such other property and all cash, dividends, other securities, instruments, rights, and other property at any time and from time to time received or receivable in respect thereof or in exchange for all or any part thereof, including without limitation, dividends, distributions, warrants, profits, rights to subscribe, conversion rights, liquidating dividends, and other rights; and

(c)   all Proceeds (as defined in the UCC) of all of the foregoing.

### DEFINED TERMS

When used herein, the following terms shall have the following meanings:

"*UCC*" means the Uniform Commercial Code of the State of New York, as in effect from time to time.

**ANY ATTEMPT BY A THIRD PARTY TO ACQUIRE AN INTEREST IN THE COLLATERAL WITHOUT THE PRIOR WRITTEN CONSENT OF THE SECURED PARTY SHALL VIOLATE THE RIGHTS OF THE SECURED PARTY.**

A-901

**SCHEDULE I**

| Pledgor | Issuer | Issuer Jurisdiction of Organization | Class of Equity | Certificate No(s). | Number of Shares/Units | % of Outstanding Equity |
|---|---|---|---|---|---|---|
| 777 Partners LLC | Brickell Insurance Holdings LLC | Delaware | Limited liability company membership interests | N/A | N/A | 75% economic (0% voting interest) Series B Member |

*Schedule A to UCC-1*

A-902

1

O78ALeaH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEADENHALL CAPITAL PARTNERS
    LLP, *et al.*,
4
                    Plaintiff,
5
            v.                          24 Civ. 3453 (JGK)
6
    NATIONAL FOUNDERS LP, KENNETH
7   KING, *et al.*,
                                        Hearing
8
                    Defendants.
9
    ------------------------------x
10                                      New York, N.Y.
                                        July 8, 2024
11                                      4:40 p.m.

12  Before:

13                  HON. JOHN G. KOELTL,

14                                      District Judge

15                      APPEARANCES

16  KING & SPALDING LLP
        Attorneys for Plaintiff
17  BY:  LEIGH M. NATHANSON
        BRIAN K. DONOVAN
18
19  SMITH GAMBRELL & RUSSELL, LLP
        Attorneys for Defendant 777 Partners LLC
    BY:  JOHN G. McCARTHY
20      RYAN J. SOLFARO

21  CADWALADER WICKERSHAM & TAFT LLP
        Attorneys for Defendant Advantage Capital Holdings, King
22  BY:  MICHAEL E. PETRELLA
        JONATHAN M. WATKINS
23

24  SIDLEY AUSTIN LLP
        Attorneys for Movant National Founders LP
25  BY:  JON MUENZ

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

A-903

2

O78ALeaH

1                         APPEARANCES CONTINUED:

2    MORGAN, LEWIS BOCKIUS, LLP
          Attorneys for Intervenor ING CAPITAL, LLC
3    BY:  STEPHAN E. HORNUNG

4
     MORVILLO, ABRAMOWITZ, GRAND, IASON, & ANELLO P.C.
5         Attorneys for Defendant Pasko
     BY:  CHRISTOPHER HARWOOD
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-904

O78ALeaH

1          (Case called)

2          MS. NATHANSON:  Good afternoon.  This is Leigh

3     Nathanson from King & Spalding for the plaintiffs.  I'm here

4     with my colleague Brian Donovan.

5          THE COURT:  Good afternoon.

6          MR. McCARTHY:  Good afternoon, your Honor.  John

7     McCarthy and Ryan Solfaro from Smith Gambrell & Russell LLP on

8     behalf of the 777 entity defendants.

9          THE COURT:  Hold on one second.  I'm sorry.

10    Mr. McCarthy, who is your cocounsel?

11         MR. McCARTHY:  Sorry, your Honor.  It's an associate

12    from my firm Ryan Solfaro.  I thought he had filed a notice of

13    appearance in the case.  He hasn't, but he will.

14         THE COURT:  No problem.

15         MR. McCARTHY:  Thank you.

16         THE COURT:  Thank you.  Okay.

17         MR. WATKINS:  Good afternoon, your Honor.  Jonathan

18    Watkins with Cadwalader Wickersham & Taft on behalf of

19    Advantage Capital Holdings, LLC and Mr. King.  Also here on

20    behalf of proposed intervenor Haymarket Insurance Company.  And

21    I'm here this afternoon with my partner Michael Petrella, your

22    Honor.

23         THE COURT:  Okay.

24         MR. HARWOOD:  Good afternoon, your Honor.  Chris

25    Harwood from Morvillo Abramowitz for individual defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-905

4

O78ALeaH

1   Stephen Pasko.

2           THE COURT:  Okay.

3           MR. MUENZ:  Hello, your Honor.  It's Jon Muenz from

4   Sidley Austin for National Founders.

5           THE COURT:  Okay.

6           MR. HORNUNG:  And one more, Stephan Hornung from

7   Morgan Lewis for intervenor ING Capital.

8           THE COURT:  Okay.  Thank you.  So preliminarily, I

9   received today the motion by Haymarket to intervene.  Let me

10  make a couple of observations.

11          The motion begins by saying it's a motion to intervene

12  for a limited opposition to the preliminary injunction, and

13  then sets out the requirements for a motion to intervene as a

14  of right and a motion to intervene permissively and explains

15  that the motion is timely because it's made a month before

16  there are any answers or motions that are due with respect to

17  the complaint.

18          If this were a true motion to intervene as a party, it

19  ought to be accompanied by a proposed complaint.  If Haymarket

20  wants to enter the case as a plaintiff or a defendant, it

21  should give me a proper motion and the other parties would then

22  have an opportunity to respond to that motion.

23          I've allowed intervention for purposes of listening to

24  the views of others who were interested in the assets at issue,

25  National Founders and ING, who received notice under the

A-906

5

O78ALeaH

1    temporary restraining order.  And of course, if that's all that

2    Haymarket wanted, I would be inclined, I would listen to the

3    other parties, but I would be inclined certainly to listen to

4    Haymarket and provide notice to Haymarket in the same way that

5    notice goes to National Founders and ING Capital.

6              If this really were a motion to intervene as a party,

7    then as I've said, there should be a complaint and a motion

8    should be properly noticed and the other parties should have an

9    opportunity to respond.

10             By the way, just sort of a note of personal

11   preference, in the motion there are various citations to cases,

12   which after the citation to the cases say "cleaned up."  I know

13   that that's used in some court cases and briefs.  It's wholly

14   appropriate for the Supreme Court to say that various citations

15   are cleaned up.  It's awkward for a District Court to look at a

16   decision and to say, for example, a decision by the Supreme

17   Court is cleaned up, or even a decision by the Court of Appeals

18   cleaned up.  So please, in subsequent briefs before me, stop

19   doing that.  It's enough to include a footnote that says

20   internal citations, etc., are removed.  But that's a matter of

21   personal preference.  I appreciate that other judges do it

22   differently.

23             So with respect to Haymarket's motion, and frankly I

24   read the motion and didn't understand how or what argument

25   Haymarket wanted to make with respect to the preliminary

A-907

1    injunction, much less that any of the other parties disagreed

2    with that after 20 pages limited opposition to the preliminary

3    injunction.  And I don't understand what the opposition is.  So

4    I'm perfectly happy to take the views of Haymarket in the same

5    way that I've taken the views of the National Founders and ING

6    if that's that Haymarket wants.

7            MR. WATKINS:  Yes, your Honor, that is all that

8    Haymarket seeks, and it styled the motion as it did just to

9    follow as one of the previous intervenors had styled their

10   motion.  But that is all that Haymarket seeks.

11           THE COURT:  Okay.  And the plaintiff has no problem

12   with that?

13           MS. NATHANSON:  Plaintiffs don't believe this motion

14   is timely.  In addition to having the same trouble that your

15   Honor did with determining what the relief is that the motion

16   seeks, it was brought on the day of the hearing on our motion

17   for the preliminary injunction.  That motion was made on

18   May 13.  Haymarket and its affiliate A. Cap received notice of

19   the motion.  There's no explanation as to why it couldn't have

20   made this motion sooner.  Plaintiffs would not object to the

21   extent the relief Haymarket is seeking is notice under a

22   preliminary injunction of any transactions, although we believe

23   that Haymarket would likely be participating in providing

24   notice of transactions in which it intends to participate with

25   the enjoined entities.  But beyond that, to the extent there's

A-908

7

O78ALeaH

1   relief that would oppose the preliminary injunction, we believe

2   that the motion is untimely and would request a chance to

3   oppose it.

4           THE COURT:  Well, I don't think you've said anything

5   different from what I said, which was I would be prepared to

6   listen to Haymarket in the same way that I've listened to

7   National Founders and ING.  And Haymarket tells me that's all

8   that they're looking for, so.

9           MS. NATHANSON:  I think the only difference is that

10  arguably Haymarket has not even met the requirements for being

11  heard on this issue given the timeliness, but understanding

12  that we're here today and their counsel are here today, we're

13  happy to hear what they have to say.

14          THE COURT:  Okay.  So I urged the parties to try to

15  come up with a proposed preliminary injunction and the parties

16  were unable to do that.  That's what the 777 entity defendants

17  told me in their letter dated July 7, and I haven't heard from

18  the plaintiffs to the contrary.

19          The 777 entity defendants proposed a preliminary

20  injunction and I haven't gotten any response from the

21  plaintiffs.  And I thought that the proposed preliminary

22  injunction by the 777 entity defendants made a lot of sense.

23  Although, I would include in the proposed paragraph D a

24  requirement of some form of notice to the plaintiffs and

25  intervenors, some reasonable notice period so that if they

A-909

8

O78ALeaH

1   disagreed with a proposed transaction, they could make their

2   views known to the Court. And perhaps, there should be a limit

3   or a minimum with respect to any such transaction for which

4   notice would have to be given.

5          So other than that, it appeared to me that the

6   proposed preliminary injunction was reasonable, but again, I'll

7   listen to the parties. I wish that the parties had given me

8   more in advance, but the purpose of the preliminary injunction

9   was to maintain the status quo and to assure that assets that

10  otherwise would have been available are not stripped in such a

11  way that they are no longer available to the plaintiffs when

12  they should be available.

13         And I realize that this is only a preliminary

14  injunction and that there may come a time when more severe

15  restraints are necessary. I've rejected so far the appointment

16  of a receiver, but it's certainly not out of the question if

17  issues develop in the course of the litigation. I also

18  appreciate that you have a settlement conference with the

19  magistrate coming up very shortly, and these commercial matters

20  are better resolved by the parties on a commercial basis.

21         So those are my thoughts with respect to what I've

22  been given in connection with the preliminary injunction.

23  Plainly, I believe that, and find that, a preliminary

24  injunction is necessary and appropriate for all of the same

25  reasons that I detailed in granting the temporary restraining

**A-910**

9

O78ALeaH

1    order.  And I went into much more detail than I usually do on

2    the temporary restraining order with the knowledge that the

3    temporary restraining order might eventually have to be turned

4    into a preliminary injunction.

5         So for all of the findings that I made on the

6    temporary restraining order, a preliminary injunction is

7    warranted.  And the only question then is, the precise terms of

8    the preliminary injunction for all the reasons that I've

9    explained, I would not impose a receiver at this time.  But a

10   preliminary injunction that maintains the status quo and

11   prevents asset stripping is reasonable, appropriate injunctive

12   relief.

13        So the defendants proposed, and the plaintiff now,

14   what would you like to tell me?

15        MS. NATHANSON:  Thank you, your Honor.  First, just on

16   the process points, defendants did propose the form of consent

17   order that they filed with the Court late last night to us last

18   Wednesday.  We provided red line comments to them last Friday

19   and didn't hear anything before their filing last night.  So

20   plaintiffs remain willing to continue the negotiations over a

21   consent order that could replace a preliminary injunction.  We

22   think that the form of order that they have proposed is

23   insufficient to preserve the status quo for a number of reasons

24   that I'll get into momentarily.

25        But just in terms of where we go from here, we think

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-911

10

O78ALeaH

1     as your Honor has pointed out, that plaintiffs have made a

2     showing, the necessary showing, that the TRO as currently

3     formulated can and should be converted into a preliminary

4     injunction and will continue working with defendants to see if

5     we can come to a consent order that would replace that

6     preliminary injunction, but given the expiration of the TRO, we

7     don't see a reason to wait any further.

8            THE COURT:  But if the parties don't agree to extend

9     the TRO as they plainly have the ability to do, the TRO expires

10    now, and I have to replace it with a preliminary injunction.

11    You say the plaintiffs are prepared to continue to discuss the

12    terms of a preliminary injunction to replace the current TRO.

13    But I can't impose that on the parties.  If all parties agree

14    to continue to operate under the TRO, for whatever time, you

15    can certainly agree to that.  But if you don't agree to that,

16    then I have to replace the TRO with a preliminary injunction.

17    And it would have been helpful to me to have the plaintiff's

18    terms of such a preliminary injunction presented to me prior to

19    the hearing at 5:00.

20           MS. NATHANSON:  We appreciate that, your Honor.  And

21    to be clear, our position is that the preliminary injunction --

22    is that the current TRO should be converted into a preliminary

23    injunction today and we should try to work out what we can on

24    the consent order.  We, frankly, think it's premature for the

25    Court to be looking over red lines between the parties when

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-912

11

O78ALeaH

1    we've not exhausted our discussions.  Although, we have our

2    proposed form of order that we sent to defendants last week if

3    the Court would like to see it today.

4          But one of the concerns that we raised during a prior

5    conference with this Court was that defendants would make an

6    effort to run out the TRO and then put plaintiffs in a position

7    where they were not able to get the continuity of the

8    preliminary injunction for which they made the showing, and we

9    think that's exactly what's happening here.

10          THE COURT:  And I responded to that comment by saying

11    that there was an inability to run out the clock because the

12    parties appreciated from everything that I said that the

13    preliminary injunction would follow on the expiration of the

14    TRO.  And that's what's going to happen.  And because I have to

15    issue the preliminary injunction without the agreement of the

16    parties simply to continue the TRO as currently drafted, I have

17    to enter a preliminary injunction.  So I just don't understand

18    the argument of running out the clock.

19          MS. NATHANSON:  Well, your Honor, our position is that

20    the TRO that is currently in place should be converted today

21    into a preliminary injunction.  We're happy to present to the

22    Court the red line that we sent to defendants last week, but we

23    wanted to get the benefit of their views on that and the

24    parties' discussions on that so that we could, instead of

25    having the Court say, you know, it's either their order that

**A-913**

12

O78ALeaH

1    they proposed as a consent order without plaintiff's consent,

2    or the current TRO, we think that the current TRO makes sense

3    to enter.  We can always replace that preliminary injunction

4    with something to which the parties consent.  But that's not

5    what this is.

6          And I can speak to why the form of order that

7    defendants have submitted last night is problematic.  And, in

8    fact, we think it is specifically designed to allow a

9    transaction that defendants proposed and gave notice to

10   Leadenhall and then said they weren't going to do it.  Now they

11   say they're going to do it again, which involves the transfer

12   of an asset of the 777 entities to A. Cap.

13         So there are a few issues with the order that they've

14   proposed.  The principal one is that they've reserved for 777

15   and/or B. Riley, the discretion as sort of a catchall

16   proceeding, and this is in their section D, to if an asset is

17   not marketed for fair value, or if a defendant professional is

18   not able to evaluate it there's a catchall that allows 777 to

19   basically say we're acting in good faith and we think that this

20   is a good transaction and so we're going to go forward with it.

21         THE COURT:  I don't see it.  Where?

22         MS. NATHANSON:  I'm sorry.  C, subparagraph C.  C of

23   their proposed order is the section that kind of does the work

24   of saying they can't make a transfer of assets to another

25   person or entity including without limitation any defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-914

13

O78ALeaH

1   provided that, and then there are a number of exceptions.

2   There's an exception --

3           THE COURT:  I'm sorry.  I'm looking at?

4           MS. NATHANSON:  It's page three.

5           THE COURT:  I'm looking at page three, paragraph?

6           MS. NATHANSON:  Paragraph C.

7           THE COURT:  Paragraph C.

8           MS. NATHANSON:  This paragraph comes from the current

9   TRO.  It prevents the enjoined defendants from taking any

10  action to dissipate the value of their assets, including by

11  transferring assets to any other person or entity, including,

12  without limitation, any defendant.  We're fine with that.  Then

13  they have a few exceptions that would allow certain -- allow

14  transactions to go through.

15          THE COURT:  I'm sorry.  Paragraph C as in cat?

16          MS. NATHANSON:  Yes.

17          THE COURT:  To the extent the value of (i) the assets

18  pledged as collateral by the borrowers, plus (ii) --

19          MS. NATHANSON:  Oh, I'm sorry, your Honor.  I'm

20  looking at ECF number 138-1, which is what defendants filed

21  last night.

22          THE COURT:  Yes, that's what I'm looking at.

23          MS. NATHANSON:  Okay.

24          THE COURT:  Paragraph C, on page three.  Cat.

25          MS. NATHANSON:  Oh, I'm sorry.  It's paragraph D.

A-915

14

O78ALeaH

1          THE COURT:  D?

2          MS. NATHANSON:  Yes.

3          THE COURT:  As in dog.

4          MS. NATHANSON:  It's D as in dog.  Yes, this must be a

5     slightly different.  So it's D.

6          It says prevents them from taking any action to

7     dissipate the value of their assets, including by transferring

8     assets to any other person or entity, including, without

9     limitation, any defendant.  Okay with that.

10          Provided that, and then there are some exceptions that

11     says a transaction will not violate this paragraph by

12     transferring assets for fair and equivalent value, and so then

13     there are a couple of provisions following about how fair and

14     equivalent value is determined.

15          One is where the borrower and/or guarantor receives

16     equivalent value through the receipt of assets of an equivalent

17     value, reduction of the indebtedness of the transferring

18     borrower and/or guarantor in an amount equivalent to the value,

19     or any combination of the two.  The issue that we have with

20     that is the inclusion of the reduction of the indebtedness of

21     the transferring borrower.  And particularly, we're envisioning

22     asset stripping transaction, whereby A. Cap, which has what it

23     characterizes senior debt claim over the other creditors, just

24     reduces the amount of its debt, which, you know, we have issues

25     with that are alleged in the complaint.  So there's no cash or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-916

15

O78ALeaH

1     other equivalent consideration.  So that's one issue that we

2     have.

3          But when you look at the subparagraphs here,

4     romanettes (i)(ii) and (iii), these subparagraphs are

5     essentially allowing the borrowers and guarantors to make a

6     determination themselves as to whether a transfer is

7     appropriate.  The first is borrowers and guarantors make any

8     such transfer in good faith.  Yes, that should be necessary,

9     but not sufficient.

10          (ii) is borrowers and/or guarantors make the transfer

11    for a legitimate business purpose and with the genuinely held

12    belief of the guarantors' independent managers and/or chief

13    operating officer, so this is B. Riley, that the transfer is in

14    the best interest of the transferring borrowers and guarantors.

15    And the fair value of the assets is determined (a) by at least

16    one reputable and independent valuation professional; (b)

17    through a fair and open sales process in which the assets are

18    exposed to the relevant market for at least 30 days; or (c)

19    otherwise fairly and reasonably determined by the transferring

20    borrowers or guarantors.

21          So we have a couple of issues with those

22    subparagraphs.  (c) we think is -- would be an exception that

23    destroys the rule.  This would allow the borrowers and

24    guarantors, the enjoined entities, to make their own catchall

25    determination as to whether a transaction is appropriate.  (a)

A-917

16

O78ALeaH

1    and (b) we proposed some changes to whereby the sales process

2    that would determine the fair value of an asset would be the

3    number one determiner of that fair value. And only if a fair

4    and open sales process was not possible, in other words, if

5    there's no market for this asset, then an independent valuation

6    professional could be brought in to determine fair value. We

7    would ask that Leadenhall and potentially the other intervenors

8    National Founders and ING be able to approve of that

9    independent valuation professional. We don't want a situation

10   where it's circular. And we have voiced to the Court our

11   issues with the independence of B. Riley and the fact that

12   somebody who's purportedly independent, albeit paid and

13   directed by the defendants in this case, does not give us the

14   comfort that assets will not be dissipated and that the status

15   quo will not be preserved.

16          So we think that this is potentially modifiable into a

17   form that could be acceptable. We're hoping to be able to do

18   that without needing the Court to be the arbiter of red line

19   changes between the parties. We were disappointed to see this

20   letter filed last night without any response to our comments

21   from last week. And if defendants are unwilling to continue

22   negotiating, we think that's further evidence of why the TRO --

23          THE COURT: Please don't, please don't make that

24   argument.

25          MS. NATHANSON: In any case, we think that some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-918

17

O78ALeaH

1    version of this could be modified by consent of the parties to

2    effectuate what the preliminary injunction needs to effectuate,

3    but we're now on the eve -- we're now on the day of the

4    expiration of the TRO.  We think plaintiffs have made the

5    showing that they need to make to have the Court convert the

6    TRO as currently formulated into a preliminary injunction.  We

7    look forward to the settlement conference on Wednesday and

8    maybe we will be able to come to agreement on the terms of a

9    consent order.  But this is not it.

10            THE COURT:  What would the defendants like to tell me?

11            MR. McCARTHY:  Could I respectfully ask your Honor a

12   couple of questions?

13            THE COURT:  Sure.

14            MR. McCARTHY:  You mentioned reasonable notice and a

15   minimum, so I was unclear on, first, what you meant by a

16   minimum.  Is it like a minimum dollar amount?

17            THE COURT:  Yes.  Yes.

18            MR. McCARTHY:  Okay.  And then in terms of notice,

19   we're not completely opposed to it.  We think that makes this a

20   mandatory injunction instead.  But a lot of these transactions

21   need to -- as your Honor is well aware, B. Riley, the

22   professionals are restructuring professionals.  We're trying to

23   maximize the value of the overall entity for all the creditors.

24   And some of these transactions, there's not a lot of timing.

25   So if it was a short --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-919

18

O78ALeaH

1          THE COURT:  Well --

2          MR. McCARTHY:  Short period of time for notice.

3          THE COURT:  The notice period would have to be

4    sufficient for the plaintiffs if they disagreed with the

5    transaction to bring their disagreement to the Court.

6          I mean, I take it that it would be unacceptable to

7    have the safety valve provision completely up to the borrowers

8    and guarantors as provided in subparagraph C.  And it rings

9    hallow to say that sometimes these transactions have to be done

10   quickly when there's a provision in subparagraph D that

11   provides for a fair and open sales process in which the assets

12   are exposed to the relevant market for at least 30 days.

13         So the suggestion that, gee, this may have to be done

14   quickly so we can't do it in 30 days and we're going to rely on

15   the decision by the transferring borrowers and guarantors,

16   that's a loophole wide enough to drive the proverbial truck

17   through.  And, in any event, if there's supposed to be a

18   provision that say safe harbor, that should be something that's

19   subject to review by the plaintiffs and the intervenors with

20   the ability to bring it to the Court and to say, hey, this is

21   not a fair transaction.  It's more self-dealing.  And so,

22   consequently, the need for a notice provision and the -- I

23   appreciate that usually when you talk about transactions in the

24   normal and ordinary course of business, in other kinds of

25   injunctions, there's a limit, you know, a minimum to allow the

A-920

O78ALeaH

1    normal course of business.  I don't know what the minimum would

2    be in this case.  There's a lot of money involved.  At the same

3    time, we're talking about the dangers of asset stripping, not

4    leakage.

5              MR. McCARTHY:  Your Honor.

6              THE COURT:  Let me ask you another question.

7              MR. McCARTHY:  Yes.

8              THE COURT:  Mr. McCarthy.

9              MR. McCARTHY:  Sure.

10             THE COURT:  You've raised some good questions.  I

11   carefully reviewed the proposal that you all submitted.  I

12   suggested some changes that would have to be necessary.  You've

13   raised some questions.

14             Would the defendants be prepared simply to accept the

15   continuation of the temporary restraining order to another

16   reasonably short date where the parties could continue to talk

17   about what changes they wanted to make to the TRO?  And perhaps

18   even discuss it with the magistrate judge.  Otherwise, I'm left

19   with either extending the TRO as the preliminary injunction,

20   which is always subject to modification, in any event, or

21   attempting to markup your proposal in ways that you might not

22   like.

23             MR. McCARTHY:  Understood.  Your Honor, could I ask

24   for a brief recess so I can call my client.

25             THE COURT:  Sure.  Sure.  Sure.  So we'll take 10

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-921

20

O78ALeaH

1   minutes.

2           MR. McCARTHY:  Thank you.

3           MS. NATHANSON:  Your Honor, would it be helpful for us

4   during the recess to provide -- we've provided this markup to

5   defendants and assumed that it was not acceptable to them, but

6   would it be helpful for the Court to have a copy?

7           THE COURT:  Nope.  I don't think so.

8           MS. NATHANSON:  Okay.

9           THE COURT:  The time to give me that was before the

10  hearing began.  You can talk about it with Mr. McCarthy.  Okay.

11  See you shortly.

12          (Recess)

13          THE COURT:  Good afternoon.  Please be seated.

14          All right.  Mr. McCarthy.

15          MR. McCARTHY:  Thank you, your Honor.  So I spoke to

16  my client and they would consent to the preliminary injunction

17  being entered as we proposed with an additional provision of

18  that we would provide -- that the borrowers and guarantors

19  would provide the plaintiffs and the intervenors with notice of

20  any transaction under paragraph D at least 72 hours prior to

21  closing.  That would give them an opportunity if they thought

22  it was, you know, if we hadn't met the provisions or they had

23  an objection, to come to the Court.  And obviously if they

24  objected to the Court, we would not go forward with the

25  transaction, your Honor, until there was either a resolution or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-922

21

O78ALeaH

1   a determination.

2          THE COURT:  Well, plaintiffs?

3          MS. NATHANSON:  Thank you, your Honor.  For the

4   reasons that I mentioned earlier, we don't think this form is

5   acceptable.  We don't think the memorialization of a notice

6   period of 72 hours makes a difference one way or the other.

7   And Mr. McCarthy has represented to us that he's not authorized

8   to negotiate further on this document at this time including on

9   the edits that we proposed to them last week.  And so our view

10  is that the preliminary injunction should be entered as it is

11  in the TRO form and we'll continue to work with defendants if

12  they're willing to negotiate something that could modify that

13  preliminary injunction.

14         THE COURT:  Okay.  Fine.  I'm not here to negotiate

15  with the parties.  The plaintiffs want the current temporary

16  restraining order as the preliminary injunction.  The

17  defendants seek to have a modification of the preliminary

18  injunction in ways that suggest to me that what the defendants

19  are about is attempting to proceed with a transaction, which

20  they may well have in mind, which would fall within their safe

21  harbor, but not within the temporary restraining order.  A

22  notice period of 72 hours in order for the Court to review, for

23  the plaintiffs to object, and for the Court to review such a

24  transaction, is not reasonable.

25         Now, the temporary restraining order that's been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-923

22

O78ALeaH

1    issued was carefully drafted and it doesn't go as far as would

2    be possible in order to avoid the harms that it's intended to

3    preclude.  The notice provision, for example, is directed at

4    certain transactions and could be quite broader, as I've

5    already suggested, but seventy-two hours wouldn't come close

6    to -- hold on, hold on -- to meeting that.

7           So the answer is clear to me.  The parties have worked

8    with the current temporary restraining order.  I will craft the

9    preliminary injunction to mirror the temporary restraining

10   order.  A preliminary injunction is warranted for all of the

11   reasons that I explained on the record on June 7, 2024, and

12   which the parties have lived with thereafter.

13          I'm open to modifying the preliminary injunction if

14   necessary on the application of either side or by agreement if

15   the preliminary injunction doesn't adequately serve the ends

16   for which it is constructed.  Namely, to avoid the harms that I

17   found were immediate and irreparable in the findings in favor

18   of the temporary restraining order and which are equally true

19   today.  And perhaps, greater transparency on the part of the

20   defendants as to what they really intend to do would be useful.

21   And, of course, they could do that in terms of an application

22   to the Court, response by the plaintiff, and input from the

23   other intervenors who wish to be heard on the issue of

24   injunctive relief.

25          So it's not useful for the parties not to be

A-924

23

O78ALeaH

 1    transparent with respect to what they intend to do or would

 2    like to do or with what they, on the other side, oppose doing.

 3         So the one change I will make in the TRO when I enter

 4    it as a preliminary injunction is I'll add Haymarket to what is

 5    paragraph (E), (2)(E) as a party to be noticed.  And as I've

 6    said, if the parties wish to come back to me with proposed

 7    modifications of the preliminary injunction, you're welcome to

 8    do that.

 9         Yes?

10         MR. McCARTHY:  Your Honor, I just want to apologize if

11    I wasn't clear.  My suggestion was not that the Court had to

12    drop everything and decide it within 72 hours.  Our proposal

13    was that if there was an objection within that 72 hours

14    proposal, we would halt the transaction and to allow the Court

15    time necessary or to try to work it out with the plaintiffs.

16    So I apologize.

17         THE COURT:  No.  No, I think you were clear.  No

18    reason to apologize.

19         MR. WATKINS:  Your Honor, if I may on behalf of

20    Haymarket.  Your Honor mentioned that the parties have lived

21    with the TRO, and indeed, they have.

22         From the perspective of Haymarket as the senior

23    secured lender, the TRO has proved challenging in the sense

24    that transactions, contemplated transactions, outside the scope

25    of the TRO in everyone's -- in the view of Haymarket at least,

A-925

24

O78ALeaH

1  have been chilled by the TRO, by not having a clear view as to

2  whether a transaction would be okay.  And --

3          THE COURT:  You made that argument to me last time on

4  behalf of A. Cap, if memory serves me right.  And my reaction

5  then was the same as my reaction today.

6          And part of the dialogue really between the plaintiff,

7  Mr. McCarthy, and me, if there is a transaction out there that

8  can be justified, all you have to do is to bring the

9  transaction to the light of day and argue that it's perfectly

10 fine, that it is not part of an asset stripping transaction,

11 that the plaintiffs and the intervenors are not hurt by that,

12 that it's not self-dealing on behalf of any of the individual

13 parties.  But rather than that, I'm told there are these

14 transactions that we're restricted from entering into, and the

15 plaintiffs say yes, those are exactly the transactions we're

16 trying to stop.  But none of this is before me.  There's been

17 no showing that in fact those are transactions in the normal

18 and ordinary course of business and that it's not unfairly

19 prejudicing the plaintiffs or the intervenors in this case.

20         So I've said if there's a better preliminary

21 injunction, the parties should discuss that.  If there's a way

22 of resolving this case, that should be discussed with the

23 magistrate judge.  I appreciate the complexities of the case.

24 I also appreciate what the allegations from the plaintiffs are

25 about how this situation of pledging collateral, the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-926

O78ALeaH

1    collateral, more than once, how this allegedly came about.

2          So I appreciate that there are transactions that some

3    would like to engage in and that some others would argue, yes,

4    they violate the temporary restraining order.  If you think

5    that they don't, talk about it, and if necessary, bring it to

6    the Court.

7          But the notion that there are simply these

8    transactions out there, which the plaintiffs say are exactly

9    the transactions we think ought to be stopped, doesn't help.

10   And whether the argument is made by A. Cap or by Haymarket

11   doesn't improve the argument.

12         MR. WATKINS:  Understood, your Honor.  I think

13   practically speaking, there have been a number of discussions.

14   And I'll be careful and as civil as possible as I share a

15   perception.

16         THE COURT:  I don't -- you really, I mean, you don't

17   have to do that with me.  I mean, I have no papers.  I

18   deliberately asked the magistrate judge to deal with any issues

19   of settlement.  I don't get involved in settlement in any case.

20   And if the various parts of the case can be resolved, perhaps

21   the magistrate judge can help to do that.  But if there are

22   legal issues to be decided, I'll decide them.  And you don't

23   have to walk tenuously or tentatively about the possible

24   transactions.

25         I can't possibly, in the course of this hearing,

A-927

26

O78ALeaH

1    without a record, pass on some proposed transaction out there,

2    which is of such sensitivity that the parties don't want to lay

3    it in papers before me and say this is the transaction, these

4    are the objections, Judge, determine that this is in the normal

5    and ordinary course of business and really isn't asset

6    stripping.

7         So to simply tiptoe around the edges of such a

8    transaction I don't think advances the ball very much.

9         MR. WATKINS:  Understood, your Honor.  And we are

10   quite mindful that the Court is not equipped or resourced to

11   review many, many, many transactions in a short period of time

12   perhaps.

13        THE COURT:  Do you want me to appoint a receiver,

14   special master?

15        MR. WATKINS:  Your Honor, last time we were here we

16   talked of asset stripping, and for other than fair value.  And

17   I think that when your Honor took the bench today, I understood

18   your Honor to say that some of these provisions were

19   reasonable.  I do think that a safety valve of this sort would

20   be helpful to assure that there aren't transactions other than

21   for fair and reasonable value.

22        THE COURT:  I invite the parties to come up with a

23   better preliminary injunction.  I invite the parties to do

24   that.  But, in drafting it, if the draft has the width of

25   attempting to allow a transaction, which on the other side the

A-928

27

O78ALeaH

1    plaintiffs say, no, that's exactly the kind of transaction that

2    we think should be barred, it doesn't help to play sleight of

3    hand because you won't come to an agreement.  And if you did

4    come to an agreement, and then a transaction was pulled out of

5    the hat because there's an argument that, haha, the redrafted

6    injunction carefully didn't cover this transaction even though

7    the other side thought it would cover this transaction, that is

8    not a recipe for success.

9         MR. WATKINS:  Your Honor, under the current TRO,

10   plaintiffs may well be motivated to object to every transaction

11   because there's holdup value in doing so.  That is the business

12   reality.

13        THE COURT:  So I have no information before me to

14   indicate one way or another whether the plaintiffs have been

15   doing that or whether the plaintiffs are engaged in a holdup.

16   I've rejected the plaintiff's notion that the defendants were

17   running out the clock.  That argument made no sense to me.

18        If there are legitimate objections to the

19   implementation of the preliminary injunction, I invite you --

20   I'm not looking for work, but I invite you to bring them to the

21   attention of the Court.  A wholly reasonable transaction that

22   the plaintiffs object to, even though it doesn't hurt the

23   plaintiffs and they're simply using it for bargaining power to

24   increase their demands.  I don't get into settlement

25   discussions.  Okay?  You can raise settlement discussions with

A-929

28

O78ALeaH

1    the magistrate judge.  But if there are legal issues involved

2    in the implementation of the preliminary injunction, you can

3    certainly bring those with an appropriate application to the

4    attention of the Court.  But there has to be transparency on

5    both sides.  This is not a negotiation before me.

6         MR. WATKINS:  And, your Honor, I have heard plaintiffs

7    raise a concern about romanette (iii), sub C in the proposal

8    here.  I think that could be discarded with, perhaps.  We've

9    heard discussion about a notice provision.  I think a notice

10   provision makes very good sense.  And respectfully, your Honor,

11   I believe that if there is a notice provision sufficiently in

12   advance of a transaction that closes, giving the plaintiffs the

13   opportunity to raise the transaction with the Court, not

14   imposing upon the Court of course any obligation to rule in any

15   timeframe, but gives the plaintiff notice, and there are fair

16   proxies for fair value and good faith on top of that notice,

17   your Honor, all of my clients believe that that would be fair,

18   and it would not allow asset stripping to happen.  It would

19   not -- but it would allow business to happen in a way that is

20   currently being chilled, your Honor, in a way that is harming,

21   harming third parties, that is harming senior secured creditors

22   and their policyholders.

23        THE COURT:  So far -- oh, and this motion, you're

24   representing Haymarket rather than A. Cap today, right?

25        MR. WATKINS:  Your Honor, they are affiliates and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

O78ALeaH

1  we've made no --

2      THE COURT:  No, no, but I mean I've said I would add

3  Haymarket as a party to be noticed in the same way as National

4  Founders and ING.

5      MR. WATKINS:  Yes, your Honor.

6      THE COURT:  You think that's a good idea, too?  Or I

7  shouldn't say too.  You think that's a good idea?

8      MR. WATKINS:  I do, your Honor.  Of course we will

9  receive notice either way and so it's likely academic, your

10  Honor.  But I think it's fair given that there are other

11  intervenors and this is a senior secured creditor.  Frankly,

12  the reason for the intervention, really it was a comment about

13  if there are other creditors out there, I'm sure they'll come

14  before me, and there is a senior secured creditor with the

15  senior and only UCCs on the entities enjoined, and here

16  Haymarket is.

17      THE COURT:  Well, help me.  If in fact the parties are

18  unable within a short period of time to negotiate a different

19  preliminary injunction, you're welcome to make an application

20  to modify the preliminary injunction along the lines that were

21  proposed and with the modifications that Mr. McCarthy suggested

22  with an application as to the justification for the

23  modifications, and the plaintiffs can respond, and I can

24  decide.

25      But to simply say at argument that this is, as

A-931

30

O78ALeaH

1    drafted, it prevents legitimate transactions, without

2    explaining exactly what transactions there are, and why it does

3    that, and, you know, it's possible even to amend the

4    preliminary injunction to accept specific transactions.  The

5    TRO was and the preliminary injunction will be a method of

6    preserving the status quo for all of the reasons that I

7    explained in justifying the temporary restraining order.  And

8    if there are reasons to change it, make an appropriate

9    application.  If it's an urgent application, ask for it to be

10   decided urgently.  And the plaintiffs can then respond.  And of

11   course, if I think that the plaintiff's response is without

12   merit and is part of a holdup for some reason, then if the

13   application is meritorious, the application will be granted.

14   If it's not, it will be denied.

15           MR. WATKINS:  Your Honor, respectfully, the status

16   quo --

17           THE COURT:  By the way, by the way, never necessary to

18   say "respectfully".  Respectfully is a red flag that what is

19   going to come could be taken as contempt, but to assure that

20   it's not taken as contempt, you will say respectfully.  So you

21   don't have to say respectfully, just tell me what you want to

22   say.

23           MR. WATKINS:  I believe, your Honor, that the

24   practical effect of the TRO changes the status quo.  I believe

25   that the chilling effect of the TRO is effecting transactions

A-932

31

O78ALeaH

1    that, for example, senior secured creditors would otherwise

2    have entered into with their borrowers.  Transactions that are

3    not asset stripping, your Honor, that are for fair value, and a

4    junior creditor is using holdup value.  And the world is moving

5    fast, the business world is moving fast, and extracting that

6    holdup value seems to be plaintiff's aim.  The status quo --

7            THE COURT:  Hold on.  It doesn't help for either side

8    to hurl epithets at the other side.  You say the plaintiffs are

9    attempting to holdup the defendants.  The plaintiffs say that

10   the defendants are attempting to play a waiting game until the

11   TROs run out.  Both of those arguments, frankly, fall on deaf

12   ears.  It would be better if the parties would simply address

13   the merits of their respective claims.

14           I've told you how in terms of regular litigation

15   practice, objections can be made to an injunction.  New

16   applications can be made to modify the injunction.  Rather than

17   any of that, Haymarket gives me a motion to intervene on the

18   day that the preliminary injunction will be heard, and gives me

19   nothing in that motion to intervene to explain what the

20   specific objections are to the TRO or transforming the TRO into

21   a preliminary injunction.  And then at argument says the TRO

22   really is impeding transactions.  Without support, without

23   affidavit, solely argument.

24           If you want to make an application, make an

25   application.  You don't like the preliminary injunction, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-933

32

O78ALeaH

1    make an application.  You support it with an affidavit.  You

2    show why the preliminary injunction is not for some reason

3    justified or for some other acceptable reason under the law

4    should be modified.

5         It's not enough simply to get up and say you object.

6    I listen.  When parties speak, I listen.  Simply because you're

7    not making an argument that is recognized by the law, I listen.

8         Anything else?

9         MR. WATKINS:  No, your Honor.  Thank you, your Honor.

10        THE COURT:  Okay.  I will issue the preliminary

11   injunction for the same reasons that I issued the TRO.  I will

12   issue the TRO as a preliminary injunction.  It will go out

13   today.  I welcome the parties to continue to discuss how

14   mutually they think there could be a modification of the

15   preliminary injunction.  I've already suggested to the parties

16   that some form of notice provision would be appropriate.  There

17   is notice provision in the TRO, but it's actually quite a

18   limited notice provision.  The notice provision could be

19   broader, could include a minimum with respect to transactions.

20   Not all parties would welcome that form of notice or specific

21   dollar amount, but I suggested to you because it's used in some

22   other cases.

23        I know that you have the conference with the

24   magistrate judge.  Meanwhile, the case proceeds.  As Haymarket

25   reminded me, the time to move our answer is in about a month I

A-934

33

O78ALeaH

1    think.  And if for any reason the parties need to consult with

2    me -- I shouldn't say consult.  Need to make any applications

3    before me, I am constantly around.

4           So all right.  Anything further today?

5           MS. NATHANSON:  Not from plaintiffs.  Thank you, your

6    Honor.

7           MR. McCARTHY:  Not from the 777 entity defendants,

8    your Honor.

9           THE COURT:  Okay.  Thank you all.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-935

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>*Defendants.* | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF MICHAEL SALIBA

I, Michael Saliba, declare as follows:

1.      I am the Chief Operating Officer of Advantage Capital Holdings LLC ("A-CAP"). I have personal knowledge of the matters described in this declaration, except where I have indicated that my knowledge is based on information that was provided to me. If called as a witness, I could and would testify competently to the matters discussed in this declaration.

A-936

2.      In A-CAP's communications with Leadenhall Capital Partners LLP ("Leadenhall") in September 2023, Leadenhall described an alleged deficiency in the collateral that Borrowers had pledged to Leadenhall under their May 7, 2021 Loan and Security Agreement ("LSA").

3.      I understand that some portion of Leadenhall's alleged collateral deficiency is attributable to interest rates rising dramatically beginning in March 2022, when the Federal Reserve raised the Fed funds rate from 0% to 0.25%.  By July 2023, the Federal Reserve had raised the Fed funds rate to 5.25%-5.50%.[1]  The Federal Reserve has not cut the Fed funds rate since July 2023.

4.      Based on documents supplied to me by Leadenhall, the value of Leadenhall's collateral on its loans to SPLCSS III, Dorchester, and Insurety are inversely affected by interest rates.  On October 19, 2023, Craig Gillespie sent my colleagues and me an email attaching a spreadsheet that "include[s] a DV01 measure to show interest rate sensitivity of each pool of collateral."  A true and correct copy of that email is Exhibit A.  Excerpts from the spreadsheet attached to that email are Exhibit B.

5.      In Mr. Gillespie's email, he indicated that the "total aggregate [collateral deficit]" was, at that time, "USD 193m."

---

[1] Michael Adams, *Federal Funds Rate History 1990 to 2024*, Forbes Advisor (May 20, 2024), https://www.forbes.com/advisor/investing/fed-funds-rate-history/.

A-937

6.      The spreadsheet (Exhibit B) attached to Mr. Gillespie's email shows that for each increase in interest rates of 1 bps ("bps" refers to "basis points," which are one hundredth of one percent), the value of Leadenhall's collateral in its SPLCSS III facility would decrease by more than $240,000.  This translates to a "DV01" of .24, a figure that reflects the changed value of collateral, in millions of dollars, attributable to a 1 bps move in interest rates.

7.      The spreadsheet sent to me by Leadenhall shows a DV01 of 0.06 for Dorchester, reflecting about a $60,000 change in the value of that facility's collateral for each 1 bps move in rates, and .01 for Insurety, reflecting about a $10,000 change in the value of that facility's collateral for each 1 bps move in rates.

8.      In the course of our efforts to cooperate with and assist Leadenhall, we made clear that we were not willing to work on solutions to collateral shortfalls attributable to the spike in interest rates because that was risk that Leadenhall willingly undertook and had the means to protect itself against.

9.      Throughout the remainder of 2023, Leadenhall and A-CAP engaged in discussions about the alleged collateral deficiency.

10.      Eventually, Leadenhall began making aggressive threats to take action that would harm 777 Partners, its principal(s), or both. I viewed these threats as designed to coerce A-CAP to solve Leadenhall's problems in order to avoid potential harm to the value of A-CAP's debt holdings.

-3-

A-938

11.    In response to Leadenhall's threats referenced above, A-CAP, as it had previously, expressed a general willingness to entertain the idea of seeing if it could help to solve Leadenhall's stated issue with under collateralization—a collateral deficiency attributable to conduct by 777 Partners (whether a mistake, intentional, or otherwise).

12.    In November 2023, Leadenhall approached A-CAP about a collateral deficit of approximately $25 million that they alleged was not attributable to increased interest rates.  Leadenhall represented that the deficit was caused by collateral that one or more of its 777-affiliated borrowers instead assigned to Credigy (which I understand to be an affiliate of National Founders). I do not have sufficient information to assess whether, in fact, Leadenhall collateral was actually assigned to Credigy.  Nor do I have sufficient information to assess how any incorrect assigned of collateral came to be or who or what was involved in how that came to be.  To my knowledge, no one at A-CAP has sufficient information to do so.

13.    In February 2024, A-CAP even extended a $25 million loan to 777 Partners for the purpose of making up the alleged shortfall in Leadenhall's collateral. A-CAP did so in response to Leadenhall's threats to harm A-CAP's borrower. A-CAP made the loan for the sole purpose of protecting its investment and its collateral.

14.    Exhibits C through N are UCC-1 financing statements that Leadenhall has filed on the assets of the Borrowers.

-4-

A-939

15.    All exhibits attached hereto are true and correct copies of the originals, with Exhibit B being an excerpt of a true and correct copy of the original.

A-940

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 29, 2024.

Michael Saliba

A-941

# EXHIBIT A

A-942

**From:** Craig Gillespie <Craig.Gillespie@leadenhallcp.com> **Sent:**
Thursday, October 19, 2023 8:49 AM
**To:** Kenneth King <KKing@acap.com>; Michael Saliba <MSaliba@acap.com>
**Cc:** John Wells <John.Wells@leadenhallcp.com>; Luca Albertini <Luca.Albertini@leadenhallcp.com>
**Subject:** RE: [EXTERNAL] Collateral shortfall amounts as of end September 2023

Please see attached a spreadsheet where we have calculated these items split by debt facility and within which we include a DV01 measure to show interest rate sensitivity of each pool of collateral

When generating this spreadsheet we identified an error in the discount rate functionality of the compliance reporting and correcting for this in the attached we see the deficit reduce on the SPLCSS III facility by c. USD 13m.

The total aggregate deficit is therefore now USD 193m.

As a final note we are showing here just collateral values and so shortfall figures would show the point to which the collateral would need to be restored to get to a 100% LTV. These debt facilities were struck at < 100% LTV and so to establish compliance with the original borrowing base criteria on each facility would require additional curing.  Please let me know if other materials are required

Classification: Internal

**From:** Kenneth King <KKing@acap.com>
**Sent:** 18 October 2023 12:19
**To:** Craig Gillespie <Craig.Gillespie@leadenhallcp.com>; Michael Saliba <MSaliba@acap.com>
**Cc:** John Wells <John.Wells@leadenhallcp.com>; Luca Albertini <Luca.Albertini@leadenhallcp.com>
**Subject:** RE: [EXTERNAL] Collateral shortfall amounts as of end September 2023

*** **[EXTERNAL]** This message comes from an external organisation. Exercise caution when opening attachments or clicking links, especially from unknown senders. If you are unsure please attach the mail to a new email and send to servicedesk@lanware.co.uk. ***

Thanks for this.  Apologies, but please provide the basic formula (e.g. components) for determining the collateral value (e.g. Future value, yield curve and discount factors).  More specifically, we would like the sensitivity associated with interest rates.

Classification: Internal

**From:** Craig Gillespie <Craig.Gillespie@leadenhallcp.com> **Sent:**
Wednesday, October 18, 2023 6:26 AM
**To:** Kenneth King <KKing@acap.com>; Michael Saliba <MSaliba@acap.com>
**Cc:** John Wells <John.Wells@leadenhallcp.com>; Luca Albertini <Luca.Albertini@leadenhallcp.com> **Subject:**
[EXTERNAL] Collateral shortfall amounts as of end September 2023

Kenny, Mike,

A-943

One follow up item we had from yesterday's meeting was to provide you with our calculations of the collateral shortfall amounts on certain of the Leadenhall-777 debt agreements as of end September 2023:

| Investment Structure | Principal Outstanding | Interest Outstanding | Total Outstanding | Collateral Value | Shortfall |
|---|---|---|---|---|---|
| Dorchester II | 79,010,000.00 | 1,630,934.99 | 80,640,934.99 | 66,314,000.22 | (14,326,934.77) |
| SPLCSS III | 349,997,803.32 | 19,983,601.81 | 369,981,405.13 | 186,489,258.62 | (183,492,146.51) |
| Insurety | 48,972,262.23 | 472,216.05 | 49,444,478.27 | 42,833,947.72 | (6,610,530.55) |
| **Total** | **477,980,065.55** | **22,086,752.85** | **500,066,818.39** | **295,637,206.56** | **(204,429,611.83)** |

The interest figures presented here are just the base interest accrued on the debts and do not include any form of default interest.

Please let us know if anything else is required from us on this information item

Regards, Craig

**Craig Gillespie**
**Head of Life & Alternative Credit Portfolio Management**

**Leadenhall Capital Partners LLP**
Level 15, 70 Mark Lane, London, EC3R 7NQ

Tel:   +44 (0) 207 871 7276
Mob:  +44 (0) 7703 839370
craig.gillespie@leadenhallcp.com


Classification: Internal


This email and any attachments to it may be confidential and are intended solely for the use of the individual to whom it is addressed. Any views or opinions expressed are solely those of the author and do not necessarily represent those of Leadenhall Capital Partners . If you have received this e-mail in error, please notify the sender and delete this email (including any attachments) from your system. Leadenhall Capital Partners may monitor email traffic data and content of email for the purpose of security.

Leadenhall Capital Partners, Level 15, 70 Mark Lane, London, EC3R 7NQ. Registered in England and Wales. Registration No. OC336969. Telephone +44 (0)20 7871 7294

A-944

# EXHIBIT B

A-945

| Valuation Date | 9/29/2023 | | | | |
|---|---|---|---|---|---|

**Base Cash flows (USD)**

| | | | | | |
|---|---|---|---|---|---|
| Months | 1 | 2 | 3 | 4 | 5 |
| Date | 10/31/2023 | 11/30/2023 | 12/31/2023 | 1/31/2024 | 2/29/2024 |
| Life Contingent Structured Settlements | 221,739.00 | 193,891.68 | 221,316.33 | 248,844.38 | 220,825.41 |
| Guaranteed Structured Settlements | 291,283.90 | 334,008.43 | 554,907.51 | 333,904.60 | 434,829.45 |
| Lotteries | 1,023,423.63 | 552,358.60 | 353,750.51 | 430,371.92 | 787,522.51 |

**Spread**

| | |
|---|---|
| Life Contingent Structured Settlements | 3.85% |
| Guaranteed Structured Settlements | 2.25% |
| Lotteries | 2.50% |

**Swap interpolation**

*Life Contingent Structured Settlements*

| | | | |
|---|---|---|---|
| Weighted Average Life (WAL) | 26.65 | | |
| | Years | Rate | Weight |
| Swap Rate (Period Shorter than WAL) | 26.00 | 3.97% | 34.95% |
| Swap Rate (Period Longer than WAL) | 27.00 | 3.94% | 65.05% |
| Applicable swap rate | 3.95% | | |

*Guaranteed Structured Settlements*

| | | | |
|---|---|---|---|
| Weighted Average Life (WAL) | 11.14 | | |
| | Years | Rate | Weight |
| Swap Rate (Period Shorter than WAL) | 11.00 | 4.20% | 85.90% |
| Swap Rate (Period Longer than WAL) | 12.00 | 4.21% | 14.10% |
| Applicable swap rate | 4.20% | | |

*Lotteries*

| | | | |
|---|---|---|---|
| Weighted Average Life (WAL) | 4.46 | | |
| | Years | Rate | Weight |
| Swap Rate (Period Shorter than WAL) | 4.00 | 4.38% | 54.46% |
| Swap Rate (Period Longer than WAL) | 5.00 | 4.30% | 45.54% |
| Applicable swap rate | 4.34% | | |

**Discount Rate**

| | |
|---|---|
| 1m Credit Spread Adjustment | 0.114% |
| | |
| Life Contingent Structured Settlements | 7.91% |
| Guaranteed Structured Settlements | 6.57% |
| Lotteries | 6.96% |

**Collateral Valuation (USD m)**

| | |
|---|---|
| Mortality adjustment for LCSS | 74.74% |

| | Value | Value (-1bps) | DV01 |
|---|---|---|---|
| Life Contingent Structured Settlements | 110.68 | 110.88 | 0.20 |
| Guaranteed Structured Settlements | 45.26 | 45.29 | 0.03 |
| Lotteries | 43.57 | 43.58 | 0.01 |

Classification: Internal

SPLCSS III

A-946

| **Total** | **199.51** | **199.75** | **0.24** |

**Deficit (USD m)**

| | |
|---|---|
| Principal Outstanding | 350.00 |
| Interest Outstanding | 19.98 |
| **Total Outstanding** | **369.98** |
| | |
| **Shortfall** | **-170.47** |

| A-947 |
| --- |

Valuation Date                                    9/29/2023

**Base Cash flows (USD)**

| Months | 1 | 2 | 3 | 4 | 5 |
| --- | --- | --- | --- | --- | --- |
| Date | 10/31/2023 | 11/30/2023 | 12/31/2023 | 1/31/2024 | 2/29/2024 |
| High Grade Receivables | 270,781.47 | 239,568.36 | 325,126.54 | 520,848.38 | 325,884.32 |
| Low Grade Receivables | 47,109.04 | 47,317.83 | 94,243.09 | 256,983.24 | 222,627.72 |

**Spread**

All receivables                                    2.25%

**Swap interpolation**

Weighted Average Life (WAL)            14.50

| | Years | Rate | Weight |
| --- | --- | --- | --- |
| Swap Rate (Period Shorter than WAL) | 14.00 | 4.32% | 50.28% |
| Swap Rate (Period Longer than WAL) | 15.00 | 4.33% | 49.72% |
| Applicable swap rate | 4.32% | | |

**Discount Rate**

All receivables                                    6.575%

**Collateral Valuation (USD m)**

| | Value | Value (-1bps) | DV01 | |
| --- | --- | --- | --- | --- |
| High Grade Receivables | 52.45 | 52.50 | 0.05 | (Including defaulted receiva |
| Low Grade Receivables | 13.89 | 13.90 | 0.01 | |
| **Total** | **66.34** | **66.40** | **0.06** | |

**Deficit (USD m)**

| Principal Outstanding | 79.01 |
| --- | --- |
| Interest Outstanding | 1.63 |
| **Total Outstanding** | **80.64** |

| **Shortfall** | **-14.30** |
| --- | --- |

A-948

Valuation Date | 9/29/2023

**Base Cash flows (USD)**

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Months | | | | | |
| Date | 10/31/2023 | 11/30/2023 | 12/31/2023 | 1/31/2024 | 2/29/2024 |
| Medicare Commisions Receivables | 955,785.81 | 946,710.51 | 873,066.14 | 1,041,090.90 | 1,026,753.53 |
| Non Medicare Commissions Receivables | 98,990.38 | 96,897.17 | 94,998.30 | 93,336.57 | 91,838.87 |

**Discount Rate**

| | | |
|---|---|---|
| Swap rate 1m SOFR as at end Aug 2023 | 5.331% | |
| 1m Credit Spread Adjustment | 0.114% | |
| All receivables | 6.52% | Blended spread for Limited Med and Non-Limited Med |
| | | |
| Discount Rate | 11.97% | |

**Collateral Valuation (USD m)**

| | Value | Value (-1bps) | DV01 |
|---|---|---|---|
| Medicare Commisions Receivables | 35.98 | 35.99 | 0.01 |
| Non Medicare Commissions Receivables | 2.71 | 2.71 | 0.00 |
| **Total** | **38.69** | **38.70** | **0.01** |

**Deficit (USD m)**

| | | |
|---|---|---|
| Health Care Provider Loan Receivables | 2.42 | Cash flows not provided |
| | | |
| Collection Account Balance | 0.43 | |
| In Month Collections | -0.62 | |
| | | |
| **Total Collateral** | **40.92** | |
| | | |
| Principal Outstanding | 48.97 | |
| Interest Outstanding | 0.47 | |
| **Total Outstanding** | **49.44** | |
| | | |
| **Deficit** | **-8.52** | |

Insurety

A-949

# EXHIBIT C

A-950

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:50 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3634590**

Service Request No:  20211686475

Print       Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Dorchester Receivables II LLC | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or existing or hereafter acquired or arising. A purchase of, or security interest in, any collateral described in this financing statement will violate the rights of the Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)      International Association of Commercial Administrators (IACA)

A-951

# EXHIBIT D

A-952

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:54 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3634731**

Service Request No:  20211686633

Print         Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME Suttonpark Capital LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 600 Brickell Ave, 19th Floor | CITY Miami | STATE FL | POSTAL CODE 33131 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 122 Leadenhall Street | CITY London | STATE | POSTAL CODE EC3V 4AG | COUNTRY UK |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest, whether now owned or hereafter acquired, in, to and under, (a) 100% of the membership interests in Dorchester Receivables II LLC, wherever located, (b) all present and future claims, demands, causes and choses in action in respect of the foregoing, and (c) all proceeds of every kind and nature whatsoever in respect of the foregoing (collectively, the "Pledged Collateral").  A purchase of, or security interest in, any of the Pledged Collateral will violate the rights of the Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility   6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)        International Association of Commercial Administrators (IACA)

A-953

# EXHIBIT E

A-954

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:58 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3634889**

Service Request No:  20211686762

Print     Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Suttonpark Capital LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL:  This financing statement covers the following collateral:

See Exhibit A attached hereto, which is made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☑ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-955

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Suttonpark Capital LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**Print**    **Reset**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

**Dorchester Receivables II LLC**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **600 Brickell Ave, Suite 1638** | **Miami** | **FL** | **33131** | **USA** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-956

Exhibit A

to UCC-1 Financing Statement

**1. Debtor/Seller**

Suttonpark Capital LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**2. Assignor Secured Party/Buyer**

Dorchester Receivables II LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**3. Assignee Secured Party**

Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent
c/o Leadenhall Capital Partners LLP
The Leadenhall Building
122 Leadenhall Street
London, EC3V 4AG
England

**4. Description of Property Covered**

All of the Debtor/Seller's right, title and interest in and to the Transferred Assets and all amounts payable to the holders of the Transferred Assets in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including all amounts from time to time held or invested in the Borrower Accounts related to the Transferred Assets, whether in the form of cash, instruments, securities or other property, to secure the prompt and complete payment of a loan deemed to have been made in an amount equal to the aggregate Cash Purchase Price of the Receivables sold by the Assignor Secured Party/Buyer hereunder together with all of the other obligations of the Debtor/Seller hereunder.

**Defined Terms**

"*Acknowledgment*" means, with respect to a Settlement Receivable, the receipt of payments from those specifically relating to the applicable Settlement Receivable or a stipulation or a written acknowledgment to the Debtor/Seller (or an affiliate thereof) executed by the applicable Obligor,

1

A-957

that such Obligor will remit all such Settlement Payments and all other applicable payments directly to a Lock-Box.

"*Annuity Beneficiary*" means, with respect to any Assignable Annuity Contract, collectively, the person or persons (i) receiving or entitled to receive Settlement Payments thereunder, (ii) if any, identified as the "beneficiary" or "contingent beneficiary" or "payee", or similar, thereunder or (iii) otherwise entitled to acquire pursuant to the terms of such Assignable Annuity Contract any immediate or contingent right to receive Settlement Payments thereunder upon the death of the related annuitant or Annuity Owner, in each case, prior to giving effect to an assignment of such Assignable Annuity Contract to the Debtor/Seller (or an affiliate of the Debtor/Seller).

"*Annuity Contract*" means, with respect to any Settlement Receivable, any annuity contract that provides payment to either (i) a Claimant in respect of the obligations of a Settlement Counterparty under a Settlement Agreement to which such Claimant is a party or (ii) that was purchased by a Claimant or its predecessor-in-interest and is an Assignable Annuity Contract.

"*Annuity Owner*" means, with respect to any Assignable Annuity Contract, collectively, the person or persons identified therein as "owner" or "annuity holder" or "contract holder," or any similar designation that indicates the party who owns the Assignable Annuity Contract, in each case prior to giving effect to an assignment thereof to the Debtor/Seller.

"*Annuity Provider*" means the issuer of any Annuity Contract, together with its permitted successors.

"*Assignable Annuity Contract*" means any Annuity Contract that (x) does not prohibit the assignment of any rights arising thereunder by any related Annuity Beneficiary or Annuity Owner or (y) contains an anti-assignment provision that can be (and has been) waived by the parties thereto (including all parties with predecessor interests therein).

"*Borrower Accounts*" means to accounts specified on Schedule I of the Loan and Security Agreement.

"*Cash Purchase Price*" means, with respect to any Purchased Receivable, the amount paid or to be paid by the Assignor Secured Party/Buyer for such Receivable.

"*Claimant*" means any person entitled to receive a Settlement Payment under a Settlement Agreement.

"*Collections*" means, with respect to any Receivable (regardless of whether such Receivable is an Eligible Receivable), all cash payments (including Settlement Payments) or proceeds of such Receivable, whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment, including, all cash proceeds of Related Security with respect to such Receivable and the sale proceeds received by the Assignor Secured Party/Buyer in respect of any repurchase; provided, that following such repurchase, any proceeds of the related Receivable shall be for the account of the Debtor/Seller (or, if applicable, its designee) and shall not constitute "Collections".

2

A-958

"*Loan and Security Agreement*" means that certain Loan and Security Agreement, dated as of May 7, 2021, by and among, *inter alios*, the Debtor/Seller, as a seller, the Assignor Secured Party/Buyer, as a borrower, the Assignee Secured Party, as collateral agent, Leadenhall Capital Partners LLP, as administrative agent, and the lenders from time to time party thereto, as amended, restated, modified, supplemented, amended and restated or replaced from time to time.

"*Lock-Box*" means a post office box administered by an account bank for the purpose of receiving Collections that is or will be the subject of an account control agreement, provided that, any post office boxes related to one or more Third Party Intercreditor Agreements shall not constitute a Lock-Box.

"*Obligor*" means the person obligated to make payments under a Related Contract, including any Settlement Counterparty or Annuity Provider or related guarantor.

"*Payment Right Purchase Agreement*" means any Payment Right Purchase Agreement or similar agreement between the Debtor/Seller (or another initial settlement purchaser) and a Claimant pursuant to which such Claimant sold, and the Debtor/Seller bought, all rights and benefits of such Claimant to receive payments under the applicable Settlement Agreement or the Annuity Contract, as the case may be.

"*Purchased Receivable*" means Settlement Receivables that have been purchased by the Assignor Secured Party/Buyer pursuant to the Sale Agreement.

"*Receivable*" means any Settlement Receivable.

"*Related Contract*" means, with respect to any Settlement Receivable, any Settlement Agreement, Annuity Contract, Payment Right Purchase Agreement, and an Acknowledgment in respect of such Settlement Receivable.

"*Related Security*" means, with respect to any Receivable, all of the Assignor Secured Party/Buyer's right, title and interest in, to and under:

(a)    all security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Related Contracts related to such Receivable or otherwise, together with all financing statements filed against an Obligor describing any collateral securing such Receivable;

(b)    all guaranties, insurance, warranties, indemnities, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Related Contracts related to such Receivable or otherwise including rights under any related Third Party Intercreditor Agreements, the related Sale Agreement and rights or payments under or pursuant to any related Hedge Agreement or related Hedge Transaction;

(c)    the Related Contracts and Receivable File and all other books, records and other information (including, computer programs, tapes, discs, punch cards, data processing software

3

A-959

and related property and rights, subject to the rights of any licensors and to applicable law) relating to such Receivable and the related Obligor;

(d) all payments accruing and made in respect of such Receivable; and

(e) its rights under the Lock-Boxes and the Borrower Accounts and all money, instruments, investment property or other property on deposit therein from time to time, and all investments and proceeds thereof (including all income on deposit in, acquired, credited to or held in the Lock-Boxes and Borrower Accounts from time to time), in each case, solely to the extent relating to Collections in respect of such Receivable.

"*Sale Agreement*" means that certain Sale Agreement, dated as May 7, 2021, between the Debtor/Seller and the Assignor Secured Party/Buyer.

"*Settlement Agreement*" means a settlement agreement entered into between a Claimant and a Settlement Counterparty to make payments to the Claimant thereunder as compensation by the Settlement Counterparty for a tort, injury, indemnity, loss or other claim.

"*Settlement Counterparty*" means any person (and any guarantor thereof) that is obligated to make payments to a Claimant or its assignees under the terms of a Settlement Agreement.

"*Settlement Payments*" means any payments (or portions of payments) due to (i) the Claimant under the terms of a Settlement Agreement, which have been sold by such Claimant to the Debtor/Seller(or an affiliate) or (ii) any person under the terms of an Annuity Contract, which have been sold by such person to the Debtor/Seller (or an affiliate).

"*Settlement Receivable*" means any and all (i) indebtedness and other obligations owed by an Obligor under a Related Contract, whether constituting an account, chattel paper, instrument, payment intangible, general intangible (including payment intangibles), investment property, intangible or tangible chattel paper (including electronic chattel paper), instruments, documents, securities, cash, supporting obligations or any other kind of property and (ii) all other rights (but not obligations or liabilities), in any case which are purchased by the Debtor/Seller (or an affiliate of the Debtor/Seller) or its direct and indirect assignors from a person pursuant to an Assignable Annuity Contract or a Claimant pursuant to a Payment Right Purchase Agreement, including all rights to receive such periodic Settlement Payments from any assignee and all rights to receive any payments under an Annuity Contract purchased to fund payment obligations under such Settlement Agreement, whether such Settlement Payments (or such portions thereof) or other rights constitute accounts, general intangibles (including payment intangibles), investment property, intangible or tangible chattel paper (including electronic chattel paper), instruments, documents, securities, cash, supporting obligations or any other kind of property.

"*Transferred Assets*" means Receivables sold and transferred to the Assignor Secured Party/Buyer pursuant to the Sale Agreement and any Related Security related thereto.

Capitalized terms used in this Exhibit A and not defined herein shall have the meanings specified in the Sale Agreement or, if not defined therein, in the Loan and Security Agreement. A purchase

4

A-960

of or security interest in any collateral described in this financing statement will violate the rights of Secured Party.

27835522.2.EU_BUSINESS

A-961

# EXHIBIT F

A-962

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

Delaware Department of State
U.C.C. Filing Section
Filed: 05:03 PM 05/10/2021
U.C.C. Initial Filing No: 2021 3635167

Service Request No:  20211686976

Print     Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Insurety Capital LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest, whether now owned or hereafter acquired, in, to and under, (a) 100% of the membership interests in Insurety Agency Services LLC, wherever located, (b) all present and future claims, demands, causes and choses in action in respect of the foregoing, and (c) all proceeds of every kind and nature whatsoever in respect of the foregoing (collectively, the "Pledged Collateral").  A purchase of, or security interest in, any of the Pledged Collateral will violate the rights of the Secured Party.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

A-963

# EXHIBIT G

A-964

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:07 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3635274**

Service Request No: 20211687137

Print      Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Insurety Capital LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Ave, 19th Floor** | **Miami** | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **122 Leadenhall Street** | **London** | | **EC3V 4AG** | **UK** |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A attached hereto, which is made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☑ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

A-965

## UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR:  Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Insurety Capital LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| Print | Reset |

10. DEBTOR'S NAME  Provide (10a or 10b) only _one_ additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only _one_ name (11a or 11b)

11a. ORGANIZATION'S NAME

**Insurety Agency Services LLC**

OR

11b. INDIVIDUAL'S SURNAME          FIRST PERSONAL NAME          ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **600 Brickell Ave, Suite 1638** | **Miami** | **FL** | **33131** | **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

A-966

Exhibit A

to UCC-1 Financing Statement

**1. Debtor/Seller**

Insurety Capital LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**2. Assignor Secured Party/Buyer**

Insurety Agency Services LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**3. Assignee Secured Party**

Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent
c/o Leadenhall Capital Partners LLP
The Leadenhall Building
122 Leadenhall Street
London, EC3V 4AG
England

**4. Description of Property Covered**

All of the Debtor/Sellers's right, title and interest in and to the Transferred Assets and all amounts payable to the holders of the Transferred Assets in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including all amounts from time to time held or invested in the Borrower Accounts related to the Transferred Assets, whether in the form of cash, instruments, securities or other property, to secure the prompt and complete payment of a loan deemed to have been made in an amount equal to the aggregate Cash Purchase Price of the Receivables sold by the Assignor Secured Party/Buyer hereunder together with all of the other obligations of the Debtor/Seller hereunder.

**Defined Terms**

"*Borrower Accounts*" means to accounts specified on Schedule I of the Loan and Security Agreement.

"*Cash Purchase Price*" means, with respect to any Purchased Receivable, the amount paid or to be paid by the Assignor Secured Party/Buyer for such Receivable.

1

A-967

"*Collections*" means, with respect to any Receivable or Health Care Provider Loan Receivable, all cash payments or proceeds of such Receivable or Health Care Provider Loan Receivable (as applicable), whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment, including all cash proceeds of Related Security with respect to such Receivable or Health Care Provider Loan Receivable.  The sale proceeds received by the Assignor Secured Party/Buyer in respect of any repurchase shall also constitute "Collections"; provided that following such repurchase in accordance with Section 2.07(a) of the Loan and Security Agreement, any proceeds of the related Receivable shall be for the account of the Seller (or, if applicable, its designee) and shall not constitute "Collections".

"*Health Care Provider Loan Receivable*" means each loan made by the Debtor/Seller to an IMO by way of a loan agreement and secured by one or more Receivables and the right to receive repayments of such loan(s), but not any obligations in respect of such loan, have been acquired by the Assignor Secured Party/Buyer pursuant to the terms of the Sale Agreement.

"*IMO*" means each duly licensed independent marketing organization, master general agent, field marketing organization, third party administrator and carrier or any other entity that has the right to receive commissions on insurance products sold that relate to a Receivable or Health Care Provider Loan Receivable

"*Loan and Security Agreement*" means that certain Loan and Security Agreement, dated as of May 7, 2021, by and among, *inter alios*, the Debtor/Seller, as a seller, the Assignor Secured Party/Buyer, as a borrower, the Assignee Secured Party, as collateral agent, Leadenhall Capital Partners LLP, as administrative agent, and the lenders from time to time party thereto, as amended, restated, modified, supplemented, amended and restated or replaced from time to time.

"*Lock-Box*" means a post office box administered by an account bank for the purpose of receiving Collections that is or will be the subject of an account control agreement, provided that, any post office boxes related to one or more Third Party Intercreditor Agreements shall not constitute a Lock-Box.

"*Medicare Commissions*" means all of the applicable person's right, title and interest in certain rights to receive future commissions, related fees or proceeds in respect of the Medicare Commission Receivables.

"*Medicare Commission Receivable*" means Medicare Commissions that are payable in respect of supplemental Medicare Advantage and Medicare Supplement insurance products offered by insurance companies that are licensed in the United States, or in respect of loans secured thereby.

"*Non-Medicare Commissions*" means all of the applicable person's right, title and interest in certain rights to receive future commissions, related fees or proceeds in respect of the Non-Medicare Commissions Receivables.

"*Non-Medicare Commissions Receivable*" means Non-Medicare Commissions that are payable in respect of insurance products (excluding supplemental Medicare insurance products) offered

2

A-968

by insurance companies that are licensed in the United States, or in respect of loans secured thereby.

"*Obligor*" means the applicable IMO in respect of which the Non-Medicare Commissions or the Medicare Commissions (as applicable) are generated, or with respect to the Health Care Provider Loan Receivable, the borrower under the relevant loan agreement in respect of such Health Care Provider Loan Receivable.

"*Purchased Receivables*" means the Health Care Provider Loan Receivables, Medicare Commission Receivables and Non-Medicare Commissions Receivables that have been purchased by the Assignor Secured Party/Buyer pursuant to the Sale Agreement.

"*Receivables*" means a Non-Medicare Commissions Receivable, a Medicare Commission Receivable or a Health Care Provider Loan Receivable.

"*Related Contract*" means, with respect to any Receivable, any (a) assignment agreement or substantially similar agreement with an IMO or producer having the effect of transferring the rights to a Receivable or Collections thereto, or (b) master servicing or servicing agreement in respect of a Receivable or Collections thereto in place with an IMO.

"*Related Security*" means, with respect to any Receivable, all of the Assignor Secured Party/Buyer's right, title and interest in, to and under:

(a)    all security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Related Contracts related to such Receivable or otherwise, together with all financing statements filed against an Obligor describing any collateral securing such Receivable;

(b)    all guaranties, insurance, warranties, indemnities, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Related Contracts related to such Receivable or otherwise including rights under any related Third Party Intercreditor Agreements, the related Sale Agreement and rights or payments under or pursuant to any related Hedge Agreement or related Hedge Transaction;

(c)    the Related Contracts and Receivable File and all other books, records and other information (including, computer programs, tapes, discs, punch cards, data processing software and related property and rights, subject to the rights of any licensors and to applicable law) relating to such Receivable and the related Obligor;

(d)    all payments accruing and made in respect of such Receivable; and

(e)    its rights under the Lock-Boxes and the Borrower Accounts and all money, instruments, investment property or other property on deposit therein from time to time, and all investments and proceeds thereof (including all income on deposit in, acquired, credited to or held in the Lock-Boxes and Borrower Accounts from time to time), in each case, solely to the extent relating to Collections in respect of such Receivable.

3

A-969

"*Sale Agreement*" means that certain Sale Agreement, dated as May 7, 2021, between the Debtor/Seller and the Assignor Secured Party/Buyer.

"*Transferred Assets*" means the Receivables sold and transferred to the Assignor Secured Party/Buyer pursuant to the Sale Agreement and any Related Security related thereto.

Capitalized terms used in this Exhibit A and not defined herein shall have the meanings specified in the Sale Agreement or, if not defined therein, in the Loan and Security Agreement. A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Assignee Secured Party.

4

A-970

# EXHIBIT H

A-971

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> Dechert LLP
> 1095 Avenue of the Americas
> New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:11 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3635464**

Service Request No:  20211687282

| Print | Reset |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Signal SML 4 LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Ave, 19th Floor** | **Miami** | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **122 Leadenhall Street** | **London** | | **EC3V 4AG** | **UK** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor, whether now owned or existing or hereafter acquired or arising. A purchase of, or security interest in, any collateral described in this financing statement will violate the rights of the Secured Party.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Delaware Secretary of State**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-972

# EXHIBIT I

A-973

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:16 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3635597**

Service Request No:  20211687495

Print    Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Signal Medical Receivables LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest, whether now owned or hereafter acquired, in, to and under, (a) 100% of the membership interests in Signal SML 4 LLC, wherever located. (b) all present and future claims, demands, causes and choses in action in respect of the foregoing, and (c) all proceeds of every kind and nature whatsoever in respect of the foregoing (collectively, the "Pledged Collateral").  A purchase of, or security interest in, any of the Pledged Collateral will violate the rights of the Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

A-974

# EXHIBIT J

A-975

██████████
██████████
██████████
██████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:19 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3635712**

Service Request No:   20211687673

Print        Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Signal Medical Receivables LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A attached hereto, which is made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☑ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)                    International Association of Commercial Administrators (IACA)

A-976

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Signal Medical Receivables LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

**Print**     **Reset**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

**Signal SML 4 LLC**

OR

11b. INDIVIDUAL'S SURNAME     FIRST PERSONAL NAME     ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 600 Brickell Ave, Suite 1638 | Miami | FL | 33131 | USA |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut     ☐ covers as-extracted collateral     ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

17. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

A-977

Exhibit A

to UCC-1 Financing Statement

**1. Debtor/Seller**

Signal Medical Receivables LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**2. Assignor Secured Party/Buyer**

Signal SML 4 LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**3. Assignee Secured Party**

Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent
c/o Leadenhall Capital Partners LLP
The Leadenhall Building
122 Leadenhall Street
London, EC3V 4AG
England

**4. Description of Property Covered**

All of the Debtor/Seller's right, title and interest in and to the Transferred Assets and all amounts payable to the holders of the Transferred Assets in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including all amounts from time to time held or invested in the Borrower Accounts related to the Transferred Assets, whether in the form of cash, instruments, securities or other property, to secure the prompt and complete payment of a loan deemed to have been made in an amount equal to the aggregate Cash Purchase Price of the Receivables sold by the Assignor Secured Party/Buyer hereunder together with all of the other obligations of the Debtor/Seller hereunder.

**Defined Terms**

"Advance" means an advance made to a Health Care Provider in exchange for the related Receivable.

"*Borrower Accounts*" means to accounts specified on Schedule I of the Loan and Security Agreement.

1

A-978

"*Case*" means the settled, ongoing or potential lawsuit, as applicable, with respect to which the related Health Care Provider has assigned or pledged an interest in the related Gross Litigation Proceeds or Receivables arising in connection therewith or related thereto, as applicable, pursuant to a Funding Agreement or a Loan Agreement, as applicable.

"*Cash Purchase Price*" means, with respect to any Purchased Receivable, the amount paid or to be paid by the Assignor Secured Party/Buyer for such Receivable.

"*Collections*" means, with respect to any Receivable or any Health Care Provider Loan Receivable, all cash payments or proceeds of such Receivable or such Health Care Provider Loan Receivable, as applicable, whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment, including all cash proceeds of Related Security with respect to such Receivable or Health Care Provider Loan Receivable. The sale proceeds received by the Assignor Secured Party/Buyer in respect of any repurchase shall also constitute "Collections" ; provided that following such repurchase in accordance with Section 2.07(a) of the Loan and Security Agreement, any proceeds of the related receivable shall be for the account of the Debtor/Seller (or, if applicable, its designee) and shall not constitute "Collections".

"*Funding Agreement*" means an agreement between the applicable originator (and any assignees of such originator and its assigns) and a Health Care Provider pursuant to which such Health Care Provider assigns an interest in the rights to payment for medical services provided in exchange for an Advance

"*Gross Litigation Proceeds*" means, with respect to a Case, the gross cash amount payable to the related Obligor as a consequence of such Case, whether by settlement, judgment or otherwise

"*Health Care Provider*" means a provider of medical or health services, and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business.

"*Health Care Provider Loan Receivable*" means a loan made by the applicable originator to a Health Care Provider secured by one or more Receivables, which loan has been acquired by the Assignor Secured Party/Buyer and where the current amount of the aggregate Usage Proceeds Amount in respect of such Health Care Provider Loan Receivable is greater than or equal to 55% of the loan advanced.

"*Lawyer*" means, with respect to a Case, a person who is duly authorized and qualified to practice law in the applicable jurisdiction and has been retained by the related Obligor to represent him/her in such Case.

"*Lawyer's Acknowledgement Letter*" means a written acknowledgment executed by the related Lawyer in favor of the applicable originator in connection with the execution of a Funding Agreement.

"*Loan and Security Agreement*" means that certain Loan and Security Agreement, dated as of May 7, 2021, by and among, *inter alios*, the Debtor/Seller, as a seller, the Assignor Secured Party/Buyer, as a borrower, the Assignee Secured Party, as collateral agent, Leadenhall Capital

2

A-979

Partners LLP, as administrative agent, and the lenders from time to time party thereto, as amended, restated, modified, supplemented, amended and restated or replaced from time to time.

"*Lock-Box*" means a post office box administered by an account bank for the purpose of receiving Collections that is or will be the subject of an account control agreement, provided that, any post office boxes related to one or more Third Party Intercreditor Agreements shall not constitute a Lock-Box.

"*Obligor*" means the plaintiff in the related Case.

"*Purchased Receivable*" means Receivables that have been purchased by the Assignor Secured Party/Buyer pursuant to the Sale Agreement

"*Receivables*" means (a) with respect to a Health Care Provider Loan Receivable, the right of the applicable Health Care Provider to receive payment for medical costs rendered by or on behalf of such Health Care Provider payable out of the related Gross Litigation Proceeds arising from a Case and (b) otherwise, the right of the applicable originator (and any assignees of such originator and its assigns), including the Assignor Secured Party/Buyer, to receive payment for medical costs payable out of the related Gross Litigation Proceeds arising from a Case pursuant to a Funding Agreement and the related Lawyer's Acknowledgement Letter (if applicable), together with all rights under such Funding Agreement and Lawyer's Acknowledgement Letter (if applicable) with respect to the related Advances, all Usage Proceeds Amounts accrued on such Advances and all other amounts payable to such originator (and any assignees of such originator, and its assigns) pursuant to or in connection with such Funding Agreement and Lawyer's Acknowledgement Letter (if applicable).

"*Related Contract*" means, with respect to any Receivable owned by the Assignor Secured Party/Buyer, the related Funding Agreement and Lawyer's Acknowledgment Letter.

"*Related Security*" means, with respect to any Receivable, all of the applicable Assignor Secured Party/Buyer's right, title and interest in, to and under:

(a)    all security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Related Contracts related to such Receivable or otherwise, together with all financing statements filed against an Obligor describing any collateral securing such Receivable;

(b)    all guaranties, insurance, warranties, indemnities, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Related Contracts related to such Receivable or otherwise including rights under any related Third Party Intercreditor Agreements, the related Sale Agreement and rights or payments under or pursuant to any related Hedge Agreement or related Hedge Transaction;

(c)    the Related Contracts and Receivable File and all other books, records and other information (including, computer programs, tapes, discs, punch cards, data processing software

3

A-980

and related property and rights, subject to the rights of any licensors and to applicable law) relating to such Receivable and the related Obligor;

(d)    all payments accruing and made in respect of such Receivable; and

(e)    its rights under the Lock-Boxes and the Borrower Accounts and all money, instruments, investment property or other property on deposit therein from time to time, and all investments and proceeds thereof (including all income on deposit in, acquired, credited to or held in the Lock-Boxes and Borrower Accounts from time to time), in each case, solely to the extent relating to Collections in respect of such Receivable.

"*Sale Agreement*" that certain Sale Agreement, dated as of the May 7, 2021, between the Debtor/Seller and the Assignor Secured Party/Buyer.

"*Transferred Assets*" means the Receivables sold and transferred to the Assignor Secured Party/Buyer pursuant to the Sale Agreement, any Related Security related thereto.

"*Usage Proceeds Amounts*" means, with respect to any Receivable, the monthly use fee (or other investment return, howsoever defined) under the related Funding Agreement, or, if such Funding Agreement contemplates a fixed purchase price and does not specify a use fee or other investment return, the difference between such purchase price and the amount of Gross Litigation Proceeds to which the applicable originator (and its assigns) is entitled under the terms of such Funding Agreement.

Capitalized terms used in this Exhibit A and not defined herein shall have the meanings specified in the Sale Agreement or, if not defined therein, in the Loan and Security Agreement. A purchase of or security interest in any collateral described in this financing statement will violate the rights of Secured Party.

4

A-981

# EXHIBIT K

A-982

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:23 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3635902**

Service Request No:   20211687843

Print      Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SPLCSS III LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL:  This financing statement covers the following collateral:

All assets of the Debtor, whether now owned or existing or hereafter acquired or arising. A purchase of, or security interest in, any collateral described in this financing statement will violate the rights of the Secured Party.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)              International Association of Commercial Administrators (IACA)

A-983

# EXHIBIT L

A-984

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> Dechert LLP
> 1095 Avenue of the Americas
> New York, New York 10036

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:27 PM 05/10/2021**
**U.C.C. Initial Filing No: 2021 3636058**

Service Request No:  20211688022

Print      Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Suttonpark Capital LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **600 Brickell Ave, 19th Floor** | **Miami** | **FL** | **33131** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **122 Leadenhall Street** | **London** | | **EC3V 4AG** | **UK** |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Debtor's right, title and interest, whether now owned or hereafter acquired, in, to and under, (a) 100% of the membership interests in SPLCSS III LLC, wherever located, (b) all present and future claims, demands, causes and choses in action in respect of the foregoing, and (c) all proceeds of every kind and nature whatsoever in respect of the foregoing (collectively, the "Pledged Collateral"). A purchase of, or security interest in, any of the Pledged Collateral will violate the rights of the Secured Party.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)      International Association of Commercial Administrators (IACA)

A-985

# EXHIBIT M

A-986

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036

Delaware Department of State
U.C.C. Filing Section
Filed: 05:31 PM 05/10/2021
U.C.C. Initial Filing No: 2021 3636256

Service Request No:  20211688220

Print      Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Suttonpark Capital LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Brickell Ave, 19th Floor | Miami | FL | 33131 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 122 Leadenhall Street | London | | EC3V 4AG | UK |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit A attached hereto, which is made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)  ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☑ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

A-987

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Suttonpark Capital LLC**

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Print     Reset

**10. DEBTOR'S NAME** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

**SPLCSS III LLC**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **600 Brickell Ave, Suite 1638** | **Miami** | **FL** | **33131** | **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

17. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

A-988

Exhibit A

to UCC-1 Financing Statement

**1. Debtor/Seller**

SuttonPark Capital LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**2. Assignor Secured Party/Buyer**

SPLCSS III LLC
600 Brickell Ave, 19th Floor
Miami, Florida 33131

**3. Assignee Secured Party**

Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent
c/o Leadenhall Capital Partners LLP
The Leadenhall Building
122 Leadenhall Street
London, EC3V 4AG
England

**4. Description of Property Covered**

All of the Debtor/Seller's right, title and interest in and to the Transferred Assets and all amounts payable to the holders of the Transferred Assets in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including all amounts from time to time held or invested in the Borrower Accounts related to the Transferred Assets, whether in the form of cash, instruments, securities or other property, to secure the prompt and complete payment of a loan deemed to have been made in an amount equal to the aggregate Cash Purchase Price of the Receivables sold by the Assignor Secured Party/Buyer hereunder together with all of the other obligations of the Debtor/Seller hereunder.

**Defined Terms**

"*Acknowledgment*" means, with respect to (a) a Settlement Receivable, the receipt of payments from those specifically relating to the applicable Settlement Receivable or a stipulation or a written acknowledgment to the Debtor/Seller (or an affiliate thereof) executed by the applicable Obligor, that such Obligor will remit all such Settlement Payments and all other applicable

1

A-989

payments directly to a Lock-Box or (b) a Lottery Receivable, an acknowledgment of assignment of a Lottery Prize pursuant to a Transfer Order, issued by the related Lottery Commission pursuant to which such Lottery Commission agrees to pay all Scheduled Net Lottery Payments on such Lottery Prize in accordance with the terms of the Transfer Order and, in the case of Lottery Prizes originated in New York, the statutory affidavit provided in lieu of such notice.

"*Annuity Beneficiary*" means, with respect to any Assignable Annuity Contract, collectively, the person or persons (a) receiving or entitled to receive Settlement Payments thereunder, (b) if any, identified as the "beneficiary" or "contingent beneficiary" or "payee", or similar, thereunder or (c) otherwise entitled to acquire pursuant to the terms of such Assignable Annuity Contract any immediate or contingent right to receive Settlement Payments thereunder upon the death of the related annuitant or Annuity Owner, in each case, prior to giving effect to an assignment of such Assignable Annuity Contract to the Debtor/Seller (or an affiliate of the Debtor/Seller).

"*Annuity Contract*" means (a) with respect to any Settlement Receivable, any annuity contract that provides payment to either (i) a Claimant in respect of the obligations of a Settlement Counterparty under a Settlement Agreement to which such Claimant is a party or (ii) that was purchased by a Claimant or its predecessor-in-interest and is an Assignable Annuity Contract or (b) with respect to a Lottery Receivable, any annuity contract that provides payment to the related Lottery Seller in respect of obligations of the related Lottery Commission under the related Lottery Prize.

"*Annuity Owner*" means, with respect to any Assignable Annuity Contract, collectively, the person or persons identified therein as "owner" or "annuity holder" or "contract holder," or any similar designation that indicates the party who owns the Assignable Annuity Contract, in each case, prior to giving effect to an assignment thereof to the Debtor/Seller.

"*Assignable Annuity Contract*" means any Annuity Contract that (a) does not prohibit the assignment of any rights arising thereunder by any related Annuity Beneficiary or Annuity Owner or (b) contains an anti-assignment provision that can be (and has been) waived by the parties thereto (including all parties with predecessor interests therein).

"*Borrower Accounts*" means to accounts specified on Schedule I of the Loan and Security Agreement.

"*Cash Purchase Price*" means, with respect to any Purchased Receivable, the amount paid or to be paid by the Assignor Secured Party/Buyer or the applicable Lottery Holding SPV for such Receivable.

"*Claimant*" means any person entitled to receive a Settlement Payment under a Settlement Agreement.

"*Collections*" means, with respect to any Receivable (regardless of whether such Receivable is an Eligible Receivable), all cash payments (including Settlement Payments and Scheduled Net Lottery Payments, if any) or proceeds of such Receivable, whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment, including, all cash

2

A-990

proceeds of Related Security with respect to such Receivable and the sale proceeds received by the Assignor Secured Party/Buyer in respect of any repurchase; provided, that following such repurchase in accordance with Section 2.07(a) of the Loan and Security Agreement, any proceeds of the related Receivable shall be for the account of the Debtor/Seller (or, if applicable, its designee) and shall not constitute "Collections".

"*Loan and Security Agreement*" means that certain Loan and Security Agreement, dated as of May 7, 2021, by and among, *inter alios,* the Debtor/Seller, as a seller, the Assignor Secured Party/Buyer, as a borrower, the Assignee Secured Party, as collateral agent, Leadenhall Capital Partners LLP, as administrative agent, and the lenders from time to time party thereto, as amended, restated, modified, supplemented, amended and restated or replaced from time to time.

"*Lock-Box*" means a post office box administered by an account bank for the purpose of receiving Collections that is or will be the subject of an account control agreement, provided that, any post office boxes related to one or more Third Party Intercreditor Agreements shall not constitute a Lock-Box.

"*Lottery Buyer*" means any person who transfers Lottery Receivables to the Assignor Secured Party/Buyer or a Lottery Holding SPV.

"*Lottery Commission*" means the state or a state agency or subdivision thereof (including a state lottery commission) obligated to make (or responsible to ensure are made) Scheduled Net Lottery Payments in respect of a Lottery Prize.

"*Lottery Contract*" means, with respect to any Lottery Prize, any contract between the applicable Lottery Commission and the related Lottery Seller (or, if applicable, other form of document) pursuant to which such Lottery Seller is entitled to receive the Scheduled Net Lottery Payments in respect of such Lottery Prize which, in some cases in which such a contract has not been entered into and is not required to be entered into for such Lottery Prize, consist only of the winning lottery ticket or a letter sent by or on behalf of the related Lottery Commission.

"*Lottery Prize*" means the indebtedness, liability or obligation of any Lottery Commission in respect of a winning lottery ticket.

"*Lottery Seller*" means the winner or winners of a Lottery Prize.

"*Lottery Holding SPVs*" means, each of Asellus Receivables II LLC, a Delaware limited liability company, and Acubens IV LLC, a Delaware limited liability company.

"*Lottery Receivable*" means with respect to a Lottery Contract purchased by the Assignor Secured Party/Buyer or Lottery Holding SPV, the related Scheduled Net Lottery Payments, provided that, any post office boxes related to one or more Third Party Intercreditor Agreements shall not constitute a Lock-Box.

3

A-991

"*Membership Interests*" means 100% of the membership interests in Asellus Receivables II LLC, a Delaware limited liability company, and Acubens IV LLC, a Delaware limited liability company.

"*Obligor*" means (a) with respect to any Settlement Receivable, the person obligated to make payments under a Related Contract, including any Settlement Counterparty or Annuity Provider or related guarantor or (b) with respect to any Lottery Receivable, the person obligated to make the Scheduled Net Lottery Payments in respect of the related Lottery Prize, including the related Lottery Commission and, if applicable, any Annuity Provider.

"*Payment Right Purchase Agreement*" means any Payment Right Purchase Agreement or similar agreement (a) with respect to Settlement Receivables, between the Debtor/Seller (or another initial settlement purchaser) and a Claimant pursuant to which such Claimant sold, and the Debtor/Seller bought, all rights and benefits of such Claimant to receive payments under the applicable Settlement Agreement or the Annuity Contract, as the case may be or (b) with respect to Lottery Receivables, between the Lottery Buyer or a Lottery Holding SPV (or another initial lottery receivable purchaser) and a Lottery Seller pursuant to which such Lottery Seller sold, and such Lottery Buyer or Lottery Holding SPV (or such other purchaser) bought, all rights and benefits of such Lottery Seller to receive payments under the applicable Lottery Prize.

"*Purchased Receivables*" means Settlement Receivables that have been purchased by the Assignor Secured Party/Buyer pursuant to the Sale Agreement and Lottery Receivables that have been acquired by a Lottery Holding SPV, in each case other than Excluded Lottery Receivables.

"*Receivable*" means any Settlement Receivable or Lottery Receivable, as applicable, but excluding any Excluded Lottery Receivable.

"*Related Contracts*" means (a) with respect to any Settlement Receivable, any Settlement Agreement, Annuity Contract, Payment Right Purchase Agreement, and an Acknowledgment in respect of such Settlement Receivable or (b) with respect to any Lottery Receivable, any Annuity Contract (if applicable), Payment Right Purchase Agreement, Lottery Contract in respect of such Lottery Receivable, and an Acknowledgment in respect of such Lottery Receivable.

"*Related Security*" means, with respect to any Receivable, all of the Assignor Secured Party/Buyer's right, title and interest in, to and under:

(a)     all security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, whether pursuant to the Related Contracts related to such Receivable or otherwise, together with all financing statements filed against an Obligor describing any collateral securing such Receivable;

(b)     all guaranties, insurance, warranties, indemnities, insurance (and proceeds and premium refunds thereof) and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable whether pursuant to the Related Contracts related to such Receivable or otherwise including rights under any related Third Party

4

A-992

Intercreditor Agreements, the related Sale Agreement and rights or payments under or pursuant to any related Hedge Agreement or related Hedge Transaction;

(c)    the Related Contracts and Receivable File and all other books, records and other information (including, computer programs, tapes, discs, punch cards, data processing software and related property and rights, subject to the rights of any licensors and to applicable law) relating to such Receivable and the related Obligor;

(d)    all payments accruing and made in respect of such Receivable; and

(e)    its rights under the Lock-Boxes and the Borrower Accounts and all money, instruments, investment property or other property on deposit therein from time to time, and all investments and proceeds thereof (including all income on deposit in, acquired, credited to or held in the Lock-Boxes and Borrower Accounts from time to time), in each case, solely to the extent relating to Collections in respect of such Receivable.

"*Sale Agreement*" means that certain Sale Agreement, dated as May 7, 2021, between the Debtor/Seller and the Assignor Secured Party/Buyer.

"*Scheduled Net Lottery Payments*" means, with respect to a Lottery Receivable, all payments from time to time to be paid under a Lottery Contract by the related Lottery Commission or, if applicable, under the related Annuity Contract by the related Annuity Provider (in each case, net of required state and federal withholding tax).

"*Settlement Agreement*" means a settlement agreement entered into between a Claimant and a Settlement Counterparty to make payments to the Claimant thereunder as compensation by the Settlement Counterparty for a tort, injury, indemnity, loss or other claim.

"*Settlement Counterparty*" means any person (and any guarantor thereof) that is obligated to make payments to a Claimant or its assignees under the terms of a Settlement Agreement.

"*Settlement Payments*" means any payments (or portions of payments) due to (a) the Claimant under the terms of a Settlement Agreement, which have been sold by such Claimant to the Debtor/Seller (or an affiliate) or (a) any person under the terms of an Annuity Contract, which have been sold by such person to the Debtor/Seller (or an affiliate).

"*Settlement Receivable*"  means any and all (a) indebtedness and other obligations owed by an Obligor under a Related Contract, whether constituting an account, chattel paper, instrument, payment intangible, general intangible (including payment intangibles), investment property, intangible or tangible chattel paper (including electronic chattel paper), instruments, documents, securities, cash, supporting obligations or any other kind of property and (b) all other rights (but not obligations or liabilities), in any case which are purchased by the Debtor/Seller (or an affiliate of the Debtor/Seller) or its direct and indirect assignors from a person pursuant to an Assignable Annuity Contract or a Claimant pursuant to a Payment Right Purchase Agreement, including all rights to receive such periodic Settlement Payments from any assignee and all rights to receive any payments under an Annuity Contract purchased to fund payment obligations under such Settlement Agreement, whether such Settlement Payments (or such portions thereof) or

5

A-993

other rights constitute accounts, general intangibles (including payment intangibles), investment property, intangible or tangible chattel paper (including electronic chattel paper), instruments, documents, securities, cash, supporting obligations or any other kind of property.

"*Transferred Assets*" means, collectively, the Receivables sold and transferred to the Assignor Secured Party/Buyer pursuant to the Sale Agreement, any Related Security related thereto and the Membership Interests.

"*Transfer Order*" means a court order not subject to a pending appeal authorizing and approving the transfer of certain Settlement Payments or Scheduled Net Lottery Payments, as applicable, pursuant to an applicable State Transfer Act.

Capitalized terms used in this Exhibit A and not defined herein shall have the meanings specified in the Sale Agreement or, if not defined therein, the Loan and Security Agreement. A purchase of or security interest in any collateral described in this financing statement will violate the rights of Assignee Secured Party.

6

A-994

# EXHIBIT N

A-995

Case 1-24-cv-02602-SDK Document 151-14 Filed 07/01/24 Page 2 of 2

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

B. Email Address

C. SEND ACKNOWLEDGEMENT TO:
Name    Dechert LLP
Address  1095 Avenue of the Americas
Address
City/State/Zip  New York, New York  0036

FILED

2021 May 11 03:34 PM

****** 202107055481 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Insurety Agency Services LLC | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1.c MAILING ADDRESS Line One 600 Brickell Ave | This space not available. | | |
| MAILING ADDRESS Line Two 19th Floor | CITY Miami | STATE FL | POSTAL CODE 33131 | COUNTRY USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)**

| 3.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Leadenhall Life Insurance Linked Investments Fund PLC, as Collateral Agent | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3.c MAILING ADDRESS Line One 122 Leadenhall Street | This space not available. | | |
| MAILING ADDRESS Line Two | CITY London | STATE | POSTAL CODE EC3V 4AG | COUNTRY UK |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets of the Debtor, whether now owned or existing or hereafter acquired or arising. A purchase of, or security interest in, any collateral described in this financing statement will violate the rights of the Secured Party.

**5. ALTERNATE DESIGNATION ( f applicable)**  ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR

☐ AG LIEN  ☐ NON-UCC FILING  ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

To be filed with the Florida Secretary of State

STANDARD FORM - FORM UCC-1 (REV.05/2013)    Filing Office Copy    Approved by the Secretary of State, State of Florida

A-996

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> *Defendants*. | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF JONATHAN WATKINS

I, Jonathan Watkins, hereby declare as follows:

1.   I am an attorney at Cadwalader, Wickersham   Taft LLP and counsel for Advantage Capital Holdings LLC and Kenneth King (collectively, "A-CAP") in this matter.

2.   I submit this Declaration in support of A-CAP's proposed Order to Show Cause, which seeks to modify the preliminary in unction issued on July 8, 2024.

A-997

3.    A-CAP re uests that the preliminary in unction be modified to strike any restraint on Guarantors' disposition of their assets, including those in Paragraphs (B), (C), and (D). Attached hereto as Exhibit A is a proposed form of such a modified preliminary in unction.

4.    Attached hereto as Exhibit B is the preliminary in unction that A-CAP moves to modify.

5.    A-CAP's motion is brought by Order to Show Cause because swift action is re uired to prevent impediments to Guarantors' exercise of their property rights in their assets, as described in A-CAP's memorandum of law, including in connection with transactions between A-CAP and Guarantors.

6.    Plaintiffs will not suffer any legally cognizable harm from the re uested modification to the preliminary in unction.

7.    There has been no prior re uest for the emergency relief re uested in this proposed Order to Show Cause.


Pursuant to 28 U.S.C.    1746, I declare under penalty of per ury that the foregoing is true and correct.

Dated: July 31, 2024

                                         s    nat an   at ins
                                         Jonathan M. Watkins (Bar No. JW0276)

-2-

A-998

# Exhibit A

A-999

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC,  600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 |

### [PROPOSED] MODIFIED PRELIMINARY INJUNCTION

Upon the Complaint by Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall"); the accompanying declarations of Craig Gillespie, Phil Kane, Luca Albertini, and Leigh M. Nathanson; and the Memorandum of Law in Support of Plaintiffs' Application for a (i) Temporary Restraining Order, and (ii) a Receivership or, Alternatively, a Preliminary Injunction, it is ordered, that Defendants 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Dorchester Receivables II LLC, Signal

A-1000

SML 4 LLC, and Insurety Agency Services LLC (together, the "Borrowers and Guarantors") are hereby subject to the following preliminary injunction: Pursuant to Federal Rule of Civil Procedure 65, and based on the findings of fact and conclusions of law stated on the record on June 7, 2024, ECF No. 128, the Court finds that the Temporary Restraining Order previously entered, ECF No. 114, should be issued as a preliminary injunction. The Court enters a preliminary injunction that, other than in the normal and ordinary course of business:

(A) prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021;

(B) requires the Borrowers and Guarantors to provide notice to Leadenhall, ING Capital LLC, National Founders LP, Haymarket Insurance Company, and ACM Delegate LLC of any attempt by any Defendant to foreclose on, repossess, or exercise remedial actions against the assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors.

SO ORDERED.

Dated: New York, New York

_____, 2024

_____
John G. Koeltl
United States District Judge

A-1001

1

O81DLeaC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEADENHALL CAPITAL PARTNERS
    LLP, et al.,
4
                    Plaintiffs,
5
            v.                          24 Civ. 03453 (JGK)
6
    NATIONAL FOUNDERS LP,
7               Movant,

8           v.

9   JOSH WANDER, et al.,
                Defendants.
10
    ------------------------------x
11                                      New York, N.Y.
                                        August 1, 2024
12                                      4:00 p.m.

13  Before:

14                  HON. JOHN G. KOELTL,

15                                      District Judge

16                      APPEARANCES

17  KING & SPALDING LLP
        Attorney for Plaintiff
18  BY:  LEIGH M. NATHANSON

19  SIDLEY AUSTIN LLP
        Attorney for Movant Nat. Founders
20  BY:  NICHOLAS P. CROWELL

21  SMITH GAMBRELL & RUSSELL LLP
        Attorney for Defendant 777 Partners (entities)
22  BY:  DAVID A. PELLEGRINO

23

24

25

A-1002

2

O81DLeaC

1   APPEARANCES CONTINUED:

2   CADWALADER WICKERSHAM & TAFT LLP
          Attorney for Defendant Advantage Cap. and King
3   BY:   JONATHAN M. WATKINS

4   MORGAN LEWIS & BOCKIUS LLP
          Attorneys for Intervenor ING
5   BY:   ANDREW GALLO

6   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
          Attorneys for Defendant Pasko
7   BY:   JENNA JONES

8   KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
          Attorney for Defendant Wander
9   BY:   JORDAN ESTES

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1003

3

O81DLeaC

1              (The Court and all parties present telephonically)

2              (Case called)

3              THE COURT:  Good afternoon.

4              Who is here on behalf of Leadenhall?

5              MS. NATHANSON:  Good afternoon, your Honor.  Leigh

6       Nathanson from King & Spalding for Leadenhall.

7              THE COURT:  All right.  Let's see.  Who's on the line

8       for A-CAP?

9              MR. WATKINS:  Good afternoon, your Honor.  This is

10      Jonathan Watkins.

11             THE COURT:  Okay.  The reason for the conference is

12      A-CAP's proposed order to show cause to modify the preliminary

13      injunction.  So I imagine that there are other parties on the

14      phone.  So, let me see.

15             Just from the docket sheet, National Founders?

16             MR. CROWELL:  Yes, your Honor.  Nick Crowell from

17      Sidley Austin for National Founders.

18             THE COURT:  Okay.  Mr. Wander?

19             MR. ESTES:  Yes.  Good afternoon, your Honor.  Jordan

20      Estes for Mr. Wander.

21             THE COURT:  Okay.  Mr. Pasko?

22             MS. JONES:  Yes.  Good afternoon, your Honor.  This is

23      Jenna Jones from Morvillo Abramowitz for Mr. Pasko.

24             THE COURT:  Mr. King?

25             MR. WATKINS:  Good afternoon, your Honor.  Jonathan

A-1004

4

O81DLeaC

1    Watkins from Cadwalader again for Mr. King.

2         THE COURT:  Okay.  777 Partners?

3         MR. PELLEGRINO:  Yes.  David Pellegrino, from Smith,

4    Gambrell for all the 777 entity defendants.

5         THE COURT:  Okay.  Yes.  Lots of defendants.

6         Advantage Capital?

7         MR. WATKINS:  Yes, your Honor.  Jonathan Watkins from

8    Cadwalader for all of the Advantage Capital entities, Mr. King,

9    and Haymarket, intervenor Haymarket.

10        THE COURT:  Okay.  ING Capital?

11        MR. GALLO:  Yes, your Honor.  Andrew Gallo from Morgan

12   Lewis for ING Capital.

13        THE COURT:  Okay.  I think that's everyone.

14        The reason for the call was the order to show cause to

15   modify the preliminary injunction that A-CAP filed, and it was

16   brought on by an order to show cause, but there's no

17   explanation about what the time urgency is or suggestion as to

18   timing, so I thought I would listen to the parties on that.

19        Mr. Watkins.

20        MR. WATKINS:  Yes, your Honor.  This is Jonathan

21   Watkins, and I did submit a declaration along with the order to

22   show cause and the parties did confer regarding a briefing

23   schedule.  And the exigency here is the general chilling effect

24   in the market as a result of the PI as it stands now.

25        I think -- when I think about the exigency at least, I

A-1005

5

O81DLeaC

1    think that if we're wrong and this motion is denied -- well, of

2    course there is no exigency for that, but if we happen to be

3    right and the current PI exceeds the scope of the Court's

4    authority, then those whose assets are restrained beyond the

5    Court's authority are impacted.  And that's why, for example,

6    when one moves for a PI, one posts a bond.

7            And, as it so happened here, the PI has been reported

8    on, it has been misunderstood in the press, and misunderstood,

9    and the PI does have a general chilling effect on commercial

10   activity, thus the exigency.  The transactions are -- pardon

11   me, I realize, I say just the -- the exigency, and I mentioned

12   the chilling effect but don't mention that there are

13   transactions that there are -- there's commercial activity in

14   the market that but for the chilling effect would be moving

15   more quickly.

16           THE COURT:  You said there have been discussions about

17   what the timing should be on this motion.

18           MR. WATKINS:  Yes, your Honor.

19           THE COURT:  Any resolution?

20           MR. WATKINS:  We have narrowed the gap, your Honor,

21   where our last proposal is that the defendant -- pardon me, the

22   plaintiffs, Leadenhall, would have nine days to oppose, so

23   oppose next Friday, the 9th, and that we would submit a reply

24   by the 15th.  And Leadenhall has indicated that they would like

25   the full 14 days, as if we had moved under a notice of motion.

A-1006

6

O81DLeaC

1        THE COURT:  Okay.  I mean, isn't that difference

2   hardly a reason to bring this on by an order to show cause,

3   five days difference between the parties and an order to show

4   cause, which studiously doesn't mention any specific

5   transaction that's being prevented?  All of this could have

6   been avoided if A-CAP had set out what's the specific

7   transaction that it thinks is being chilled and what the timing

8   of that transaction is.  That would have made the timing of --

9   sort of front and center, because you could make some

10  determination about the timing of the transaction and it would

11  allow Leadenhall to explain why the alleged transaction, in

12  fact, justifiably came within the preliminary injunction.

13       MR. WATKINS:  Your Honor, this is Jonathan Watkins

14  again.  There is no particular transaction.  The misreporting

15  in the press and the general perception by non-lawyers has

16  caused a general chilling effect such that transactions that

17  may otherwise have progressed to the point of -- progressed

18  farther at least, have not materialized and are not -- do not

19  exist.  They're not -- there's nothing to present in terms of a

20  particular transaction, and --

21       THE COURT:  I'm sorry.  I don't mean to interrupt you.

22       MR. WATKINS:  There are many sorts of transactions,

23  much conduct -- commercial activity that is lawful, and if we

24  are right, should not be subject to this restraint that is

25  being impacted.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1007

7

O81DLeaC

 1          THE COURT:  A-CAP is not itself enjoined under the
 2     injunction, right?

 3          MR. WATKINS:  Right.  Correct, your Honor.

 4          THE COURT:  Wouldn't it be odd for me to amend the
 5     injunction not because it's wrong and not because it's
 6     hindering any particular transaction but because it's being
 7     misrepresented in the press?

 8          I would have thought the way to correct misreporting
 9     is with accurate reporting, right?  Isn't that sort of a basic
10     principle of First Amendment law, the way in which you correct
11     misinformation is with accurate information?

12          MR. WATKINS:  Your Honor, this is Jonathan Watkins
13     again.

14          For better or worse, I'm a litigator, not a PR
15     specialist, and, to be sure, I assume that there could be a PR
16     campaign about -- insisting on accurate reporting about a legal
17     order, but the basis of this motion is not -- is not about
18     practicalities.  It's not about a particular transaction.  It
19     is about the law that we believe is controlling and we believe
20     is clear.

21          THE COURT:  Go ahead.

22          MR. WATKINS:  If I may, to your Honor's question
23     about, well, a few days difference, is that a reason to move by
24     order to show cause, that is a point well taken.  I can say
25     that the -- I've presented the current state, the bid and ask.

A-1008

8

O81DLeaC

1   That is -- that is a recent development just before we got on

2   the phone with your Honor at 4:00 here today.  And so -- and

3   what we have tried to do is come to some middle ground between

4   the time that was spent on the TRO, which of course was from a

5   stop, to -- and explored a number of different issues, and the

6   full 14 and seven days for standard notice of motion.  And we

7   believe that that is a middle ground, as of -- the type we

8   propose is appropriate, when, if we're right, assets are being

9   restrained beyond the Court's authority to do so.

10          THE COURT:  Okay.  So, Ms. Nathanson.

11          MS. NATHANSON:  Thank you, your Honor.

12          Our position is that there is no exigency here, let

13  alone a showing sufficient under the rules why normal motion

14  practice would not suffice here, and so we are not looking to

15  forego our 14 days under the rules.  And we think we can

16  respond in that time and explain why the motion that's been

17  brought here under Rule 59 doesn't present any new facts or law

18  that would disturb the basis for the injunction here.

19          As your Honor mentioned, the Court provided procedures

20  for assessing certain transactions and the implications, if

21  any, of the preliminary injunction on those transactions if

22  there's any confusion either in the press or among the parties

23  or otherwise.  No such application has been made.  For what

24  it's worth, no relief -- or notification to Leadenhall has been

25  made that would enable Leadenhall to assess any prospective

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1009

9

O81DLeaC

1   transaction and potentially agree to the terms of the action if

2   there's something that's fair or not otherwise disturbed by the

3   preliminary injunction.

4           So at this point, we think we're under normal motion

5   practice.  We can respond in due course, but there's no reason

6   to disturb the normal procedure here.

7           THE COURT:  One gets the impression that there is some

8   shadow boxing going on between or among the parties.  I mean,

9   it is unusual to have an application for a TRO by a party that

10  wasn't even the object of the preliminary injunction worrying

11  about transactions undisclosed that are being chilled based on

12  the misreporting of the preliminary injunction.

13          One has to wonder if, in fact, the accurate

14  preliminary injunction is not so detrimental to any parties to

15  the preliminary injunction, how it comes about that A-CAP,

16  which is not a party to the injunction, feels so chilled by

17  misreporting what the actual injunction did so that the

18  injunction should be modified.  That's I think -- I mean, put

19  that way, it hardly cries out for urgency.

20          Just so it's clear, and I've said this before, if

21  there is a transaction, it were better that the transaction be

22  disclosed and brought to the attention of the other side and to

23  the Court.  And if there is no problem in terms of the

24  injunction with the transaction, one would think the

25  transaction would go forward.  But A-CAP hasn't done that.

A-1010

10

O81DLeaC

1          So I'll certainly consider all of the arguments.  I've
2    read the papers, including the supporting declarations.
3          Give me a moment to look at the calendar.
4          Opposition papers are due August 15.
5          Response due August 26.
6          I'll take the motion under submission then.  If I
7    think I need argument, I'll set it for argument.
8          Okay.  Good to talk to you all.
9          Anything further from anyone?
10         MS. NATHANSON:  Not from plaintiffs.  Thank you, your
11   Honor.
12         THE COURT:  Thank you for being available on short
13   notice.  Good afternoon, all.
14         MS. NATHANSON:  Likewise.  Thank you, your Honor.
15         MR. WATKINS:  Thank you, your Honor.
16         (Adjourned)
17
18
19
20
21
22
23
24
25

A-1011

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No.  1:24-cv-03453 |

## PLAINTIFFS' OPPOSITION TO A-CAP'S MOTION UNDER RULE 59(E) TO AMEND THE PRELIMINARY INJUNCTION

A-1012

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 4

BACKGROUND ................................................................................................. 7

    A.    THE COMPLAINT ............................................................................. 7

    B.    THE TEMPORARY RESTRAINING ORDER .................................... 8

    C.    THE PRELIMINARY INJUNCTION ................................................. 11

    D.    A-CAP MOVES TO MODIFY THE PRELIMINARY INJUNCTION .............. 12

ARGUMENT ................................................................................................. 13

I.    A-CAP IS RELITIGATING AN ISSUE ALREADY DECIDED BY THE COURT. ................................................................................................. 13

II.    THE COURT WAS CORRECT IN DISTINGUISHING *GRUPO MEXICANO*. ................................................................................................. 16

III.    A-CAP'S CONTENTION THAT RISING INTEREST RATES CAUSED LEADENHALL'S LOSS IS IRRELEVANT AND DEMONSTRABLY FALSE. ................................................................................................. 23

CONCLUSION ................................................................................................. 25

A-1013

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. ORT, Inc. v. ORT Israel,*
2009 WL 233950 (S.D.N.Y. Jan. 22, 2009) .................................................................10, 11

*Bank of Am., N.A. v. Won Sam Yi,*
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ............................................................................14

*Bollenbach v. Haynes,*
2018 WL 4278347 (S.D.N.Y. May 29, 2018) ................................................................19

*Citibank, N.A. v. Aralpa Holdings Ltd. Partnership,*
2021 WL 8810142 (S.D.N.Y. Dec. 19, 2023) ................................................................20

*Dong v. Miller,*
2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ...............................................15, 17, 18

*Eli Lilly & Co. v. Gottstein,*
617 F.3d 186 (2d Cir. 2010) ...........................................................................................11

*In re Evergreen Mut. Funds Fee Litig.,*
240 F.R.D. 115 (S.D.N.Y. 2007) ....................................................................................10

*Grand Crossing, L.P. v. U.S. Underwriters Ins. Co.,*
2008 WL 4525400 (S.D.N.Y. Oct.6, 2008) ...............................................................10, 17

*Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc,*
527 U.S. 308 (1999) ............................................................................................... *passim*

*Gucci Am., Inc. v. Weixing Li,*
768 F.3d 122 (2d Cir. 2014) ...........................................................................................17

*III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.,*
1999 WL 461808 (S.D.N.Y. July 2, 1999) ....................................................................14

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,*
295 F. Supp. 2d 366 (S.D.N.Y. 2003) (Koeltl, J.) ...................................................16, 19

*Klipsch Grp., Inc. v. Big Box Store Ltd.,*
2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012) ................................................................17

*Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.,*
2006 WL 2337186 (S.D.N.Y. Aug. 11, 2006) (Koeltl, J.)............................................17

A-1014

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
    2013 WL 1915330 (S.D.N.Y. May 9, 2013) ............................................................15, 16, 17

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
    2020 WL 6585702 (S.D.N.Y. Nov. 10, 2020) .......................................................................18

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*,
    144 F. Supp. 2d 241 (S.D.N.Y. 2001)..................................................................................13

*Shamrock Power Sales, LLC v. Scherer*,
    2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016) .......................................................................18

*U.S. v. Dreier*,
    952 F. Supp. 2d 582 (S.D.N.Y. 2013)..................................................................................18

**Other Authorities**

CPLR § 6201...................................................................................................................................20

Fed. R. Civ. P. 59 ............................................................................................................................2

Fed. R. Civ. P. 64 ..........................................................................................................................19

Fed. R. Civ. P. 65 ..........................................................................................................11, 13, 17, 19

Fed. R. Evid. 408 ...........................................................................................................................12

A-1015

Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") submit this memorandum of law in opposition to the motion by Advantage Capital Holdings LLC ("A-CAP") under Federal Rule of Civil Procedure 59(e) to amend the preliminary injunction issued on July 8, 2024.[1]

## INTRODUCTION

A-CAP, a defendant and alleged co-conspirator seeking to appropriate assets from the enjoined parties, moves unilaterally for reconsideration of the preliminary injunction issued on July 8, 2024. A-CAP does so not because the injunction is overbroad or otherwise prevents any legitimate transactions, but rather because of "misreporting in the press and the general perception by non-lawyers" that A-CAP contends "has caused a general chilling effect" on "commercial activity." Aug. 1, 2024 Hr'g Tr. 6:13-25. A-CAP is not an enjoined party, is not joined in this motion by the enjoined parties, and has not identified any transaction that the injunction has purportedly blocked, let alone inequitably. The only legal argument it presses in support of its motion—that *Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc*, 527 U.S. 308 (1999), prevents the Court from issuing injunctive relief beyond whatever collateral is still being held by the borrowers—was already raised by A-CAP, A-CAP's affiliate Haymarket Insurance Company ("Haymarket"), and the 777 Entity Defendants. The Court expressly considered and rejected this argument, holding that "this case is distinguishable from *Grupo Mexicano de Desarrollo S.A. v All. Bond Fund, Inc.*, 527 U.S. 308 (1999)" because Leadenhall is a secured creditor. June 7, 2024 Hr'g Tr. 55:15-17. A-CAP does not even maintain the pretense that the "commercial activity" in which it wishes to engage will create or preserve value for the enjoined parties or their creditors

---

[1] To the extent not defined herein, capitalized terms are used as defined in the preliminary injunction and the parties' underlying submissions.

A-1016

whose interests the injunction is meant to protect—its insistence on relitigating the issue serves only to demonstrate that the preliminary injunction must remain in place to prevent irreparable harm that will result from asset-stripping by A-CAP.

*First*, A-CAP has failed to meet the standard for relief pursuant to Rule 59(e). A motion to amend a preliminary injunction under Rule 59 is subject to the same standard as a motion for reconsideration and may not be used to re-litigate issues already decided by the Court. The centerpiece of A-CAP's, Haymarket's, and the 777 Entity Defendants' opposition to the temporary restraining order ("TRO") and preliminary injunction was that the Court lacks power under *Grupo Mexicano* to issue injunctive relief. The Court expressly distinguished *Grupo Mexicano* because Leadenhall is a secured creditor. June 7, 2024 Hr'g Tr. 55:07-19. A-CAP does not present a single fact or point of law not already considered by the Court which might warrant amendment of the preliminary injunction. To the contrary, A-CAP cannot substantiate its rhetoric that Leadenhall imposed "*in terrorem*" pressure on A-CAP by identifying *even one* transaction blocked by TRO or preliminary injunction—let alone a fair and legitimate transaction. A-CAP cannot dispute that Leadenhall made the requisite showing for a preliminary injunction based on the enjoined Defendants' conduct and "the fact that granting the plaintiff's injunctive relief may damage the defendants' business does not tip the balance of equities in favor of the defendants." *Id.* at 58:16-18.

*Second*, the Court correctly decided that *Grupo Mexicano* has no application to a case where a secured creditor like Leadenhall seeks injunctive relief "to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectable." *Id.* at 56:4-8 (citing *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996)). As the Court recognized at the TRO hearing,

A-1017

*Grupo Mexicano* concerned debt that was explicitly unsecured. *Grupo Mexicano*, 527 U.S. at 310. The case has no application here, nor do the various other cases A-CAP cites in its motion, which simply apply the rule that *Grupo Mexicano* forecloses preliminary relief to unsecured creditors but not to secured creditors. A-CAP identifies no case prohibiting an asset-freezing injunction against a guarantor of a borrower's secured debt obligation, let alone where the borrower absconded with the security backing the debt obligation to secretly render the creditor unsecured. No such case exists, for good reason. If A-CAP's position were correct, the Borrowers and Guarantors could have avoided a preliminary injunction simply by absconding with *all* of Leadenhall's collateral—and *Grupo Mexicano* would be eviscerated because there would be no distinction whatsoever between secured and unsecured creditors for purposes of preliminary relief.

*Third*, on behalf of its alter egos, the 777 Defendants, A-CAP speculates that the nearly $350 million of deficient collateral that the Borrowers and Guarantors already admitted they double-pledged or failed to pledge was caused in part by a rise in interest rates rather than by the Borrowers or Guarantors. That is irrelevant because, as the Court already held, Defendants' argument "that the borrowers or guarantors were [not] the sole cause of any alleged breach, as required under the agreements," did not nullify Leadenhall's likelihood of success on the merits of their contract claims because "the defendants do not dispute any of Leadenhall's allegations of breaches by the defendants." June 7, 2024 Hr'g Tr. 54:21-55:13. Notably, the 777 Defendants never advanced this argument in their oppositions to the injunction or in their pending motions to dismiss—because it is demonstrably false. The LSA expressly accounts for the interest rate sensitivity of certain assets comprising Leadenhall's collateral by requiring the Borrowers to hedge against interest-rate risk: the "DV01" interest-rate sensitivity measure that A-CAP references in its motion was—as set forth in the LSA and in every single Compliance Report issued to

6

A-1018

Leadenhall—measured by the 777 Partners enterprise for the exact purpose of engaging in offsetting hedging transactions. Thus, the Collateral valuations for the SuttonPark and Dorchester Borrowers remained steady during the rising rate cycle from March 2022 to July 2023 *until* the 777 Partners enterprise began removing hundreds of double-pledged assets from Compliance Reports in late 2022. A-CAP's red herring argument is both irrelevant and specious.

For the reasons set forth below, A-CAP's motion to amend the preliminary injunction under Federal Rule of Civil Procedure 59(e) should be denied.

## BACKGROUND

### A. The Complaint

Leadenhall filed the Complaint on May 3, 2024, alleging that the four Borrowers, subsidiaries of the Guarantors, breached a secured credit agreement with Leadenhall by double-pledging Leadenhall's collateral and pledging collateral that the Borrowers—special purpose vehicles created specifically to hold Leadenhall's security—did not own. Compl. ¶¶ 103-38. Thus, the Borrowers committed breaches of their repeated, fundamental promises to Leadenhall that they owned the assets pledged as Collateral "free and clear" of any other security interests. Compl. ¶ 78. The Complaint also alleged that the Guarantors breached a Guaranty Agreement, executed between the Guarantors and Leadenhall contemporaneously with the LSA, by failing to guarantee the "full and punctual payment and performance" of the Borrowers' obligation to provide "free and clear" security to Leadenhall. Compl. ¶¶ 75-76 (Guarantors "absolutely, unconditionally and irrevocably guarantee[d]" all of the Borrowers' obligations).

In investigating these breaches, Leadenhall discovered that the 777 Partners enterprise, with former Managing Partner Josh Wander at the helm, went to great lengths to cover up the Collateral deficiency, including by falsely attributing the double-pledge to an antiquated computer system and submitting forged bank statements to Leadenhall. Compl. ¶¶ 110-38, 160-70.

7

A-1019

Leadenhall also learned from a former employee of the 777 Partners enterprise that, for at least a year or by early 2023, A-CAP had an express agreement with the 777 Partners enterprise whereby A-CAP controlled 777 Partners' operations, approved its business decisions, and even funded payroll.  Compl. ¶¶ 16-68.  In light of the enterprise's material breaches (or "Events of Default" under the LSA), on March 15, 2024, Leadenhall exercised its right to accelerate the full amount of the outstanding balance due from the Borrowers and Guarantors, $609,529,966.82 (the "Accelerated Debt"), which was supposed to be secured pursuant to the LSA.  Compl. ¶ 172, Ex. 9.  Neither the Borrowers, Guarantors, nor A-CAP—all of which received the acceleration notice—ever disputed Leadenhall's acceleration of the outstanding debt.  ECF 58-10.  Following acceleration, A-CAP and Kenneth King refused to allow the 777 Partners enterprise to enter into a repayment schedule to repay the Accelerated Debt, and this lawsuit followed.  Compl. ¶¶ 212-81.

**B.  The Temporary Restraining Order**

On May 13, 2024, Leadenhall moved for a TRO to preserve the status quo and prevent the Borrowers and Guarantors from dissipating their remaining assets to frustrate collection of a final judgment.  ECF 56.  The TRO application was based on Leadenhall's breach of contract claims against the Borrowers and Guarantors and supported by, among other evidence, recorded admissions of the double-pledge by Josh Wander, LSA amendments applying additional interest to the "Uncollateralized Portion" of the debt (all of which was required to be collateralized), and Compliance Reports reflecting hundreds of millions of dollars of double-pledged Collateral.  ECF 58 ¶¶ 10-11, Exs. 6-7; ECF 59 ¶¶ 2-9.  Leadenhall also demonstrated irreparable harm with sworn declarations and other evidence showing that the Borrowers and Guarantors could not or would not pay down even $15 million of the $609 million Accelerated Debt, ECF 58 ¶¶ 13-14, 18-21; ECF 60 ¶¶ 5-6; that the 777 Partners enterprise was by Josh Wander's own admission in the process of running down and liquidating assets to repay creditors, ECF 58 ¶ 24; ECF 60 ¶¶ 6-8; and that

the enterprise was dissipating any remaining liquidity into professional football teams, ECF 57 at 12-13.  The TRO was designed to restrain further dissipations of assets and protect Leadenhall's right to the outstanding debt, which was supposed to be secured in accordance with the LSA.

In opposing Leadenhall's motion for a TRO, the 777 Entity Defendants, A-CAP, and Mr. King did not contest that mountain of evidence.  Instead, they argued exactly what they argue again in the instant motion—that the Court lacks power under *Grupo Mexicano* to issue injunctive relief restraining the Guarantors.  *See* ECF 86 (777 Entity Defendants Opposition Memorandum) at 14-15 (arguing that under *Grupo Mexicano*, "Plaintiffs cannot enjoin the HoldCos and other non-borrowers from disposing of assets pending adjudication of claims for money damages."); ECF 89 (A-CAP Opposition Memorandum) at 12-13 (referring to Leadenhall as an "unsecured creditor" with an "Unsecured Guarantee," devoting an entire section of its opposition brief to the argument that "**THE UNSECURED GUARANTEE CANNOT SUPPORT AN INJUNCTION**," and arguing that under *Grupo Mexicano*, "As a general matter, and when (unlike here) when the movant otherwise meets its burden on all fronts, security agreements can support injunctions on the transfer of the assets—and only those assets—that have been pledged as collateral.").

At the TRO hearing, Defendants again argued that Leadenhall is an "unsecured creditor" and that, because of *Grupo Mexicano*, the Guarantors could not be restrained and therefore A-CAP had the right to strip the Guarantors' assets.  June 7, 2024 Hr'g Tr. 18:21-25 (Mr. McCarthy: "[T]hey [Leadenhall] are an unsecured creditor, and then you get to the *Grupo Mexicano* case, where Justice Scalia made clear that because a remedy like what they're seeking here was historically unavailable from a court of equity we hold that the district court had no authority to issue a preliminary injunction . . . ."); *id.* 27:08-12; 32:19-23 (Mr. Watkins: "But to the extent the guarantors guarantee anything, it can only be the underlying LSA, where the only collateral is as

9

A-1021

described by Mr. Gillespie—the lottery receivables, healthcare receivables . . . . The Court: "So A-CAP is saying that it can strip the assets of 777, yes? Is that what A-CAP is telling me now?" Mr. Watkins: "Strip is certainly a pejorative word. Commonly understood generally. A-CAP has rights as a creditor with respect to assets of the holdco level.").

The Court rejected Defendants' argument, distinguishing *Grupo Mexicano* on grounds that Leadenhall is a secured creditor under the LSA—even if Defendants breached their obligation to provide adequate security—and that the Guarantors had guaranteed performance of the secured debt obligations. *Id.* 55:04-19. Leadenhall stated at the TRO hearing that it did not seek to restrain ordinary business transactions for fair value, and the Court made clear repeatedly that such transactions would not be restrained. *Id.* 59:08-12; 60:07-17; 61:08-22. Over a lengthy objection from A-CAP that the TRO may nonetheless impede transactions in the ordinary course of business for fair value, the Court stated, "If the parties are contemplating a transaction that they think might violate the TRO, it would behoove them to simply talk to the plaintiffs about it." *Id.* 64:02-04.

Following the hearing on June 7, 2024, the Court issued a TRO enjoining, other than in the normal and ordinary course of business: (A) the transfer of Collateral; (B) to the extent the value of the Collateral was less than the Accelerated Debt, the expenditure of cash or cash equivalents of the Borrowers and Guarantors up to the Accelerated Debt; (C) to the extent the value of the Collateral plus cash or cash equivalents of the Borrowers and Guarantors is less than the Accelerated Debt, the expenditure by the Borrowers and Guarantors of any cash or cash equivalents received from any transactions up to the Accelerated Debt; and (D) dissipation of assets by Borrowers and Guarantors, including by transferring assets to A-CAP and other Defendants. ECF 114. The TRO also required under (E) that the Borrowers and Guarantors to give Leadenhall notice if a Defendant attempted to foreclose on, repossess, or exercise remedies

A-1022

against the Borrowers' and Guarantors' assets. *Id.* With an express carve-out for transactions in the normal and ordinary course of business, the TRO was designed not to interfere with the rights of other creditors—including intervenors National Founders and ING, both of whom have supported the TRO and preliminary injunction—to the extent possible while protecting Leadenhall's rights. June 7, 2024 Hr'g Tr. 4:23-5:06; 59:08-12.

### C. The Preliminary Injunction

On July 8, 2024, after determining there were no disputed factual issues warranting an evidentiary hearing on a preliminary injunction, the Court held a hearing to convert the TRO into a preliminary injunction. Wearing the hat of Haymarket and jointly representing both A-CAP and Haymarket at the hearing, A-CAP's counsel again invoked *Grupo Mexicano* and characterized Leadenhall as an "unsecured creditor[]" with a guarantee "on an unsecured basis,'" ECF 140 at 4-5, 9, arguing the TRO had proved "challenging" because it had caused unidentified "contemplated transactions" to be "chilled." July 8, 2024 Hr'g Tr. 23:22-24:02. Haymarket further told the Court "many, many transactions" were taking place because "the business world is moving very fast" and Leadenhall was using "holdup value" to block those transactions. *Id.* 26:09-12; 30:23-31:06. The Court recognized that neither A-CAP nor its affiliate had brought any such transactions to the attention of the Court, and that if Defendants wished to amend the preliminary injunction, they could negotiate with Leadenhall or bring a motion to amend grounded in those purportedly legitimate transactions. *Id.* 29:17-32:08. The Court noted that while A-CAP (or Haymarket) asserted at argument that "the TRO really is impeding transactions," it did so "[w]ithout support, without affidavit, solely argument," and instructed, "You don't like the preliminary injunction, you make an application. You support it with an affidavit." *Id.* at 31:21-32:1. Because no circumstances had changed since the issuance of the TRO, the Court issued a preliminary injunction on July 8, 2024 with the same terms. ECF 146.

A-1023

### D. A-CAP Moves to Modify the Preliminary Injunction

On July 31, 2024, A-CAP filed a "Proposed Order to Show Cause Without Emergency Relief," ECF 152, seeking to modify the preliminary injunction. A-CAP provided no notice to Leadenhall and made no attempt to confer with Leadenhall before filing. In comparison to the current preliminary injunction, the modified preliminary injunction requested by A-CAP would permit dissipation of assets by the Borrowers and Guarantors; permit expenditure of cash or cash equivalents by the Borrowers and Guarantors even while the Collateral is worth less than the Accelerated Debt; and permit expenditure of cash or cash equivalents received from transactions by the Borrowers and Guarantors even if the Collateral plus existing cash or cash equivalents is worth less than the Accelerated Debt. ECF 154-1. In other words, the modified preliminary injunction would cut out items (B) through (D) from the current preliminary injunction. ECF 146. A-CAP's proposed injunction would retain *only* the Borrowers' and Guarantors' obligations to preserve what is left of Leadenhall's Collateral—obligations that already exist under the LSA.

A-CAP raises a single argument in support of its motion: that when the Court previously considered this exact issue twice, the Court erred in holding that it has the power under *Grupo Mexicano* to restrain assets beyond the Collateral—specifically assets of the Guarantors. ECF 155 at 13-22. A-CAP's motion does not identify any transactions that have been purportedly blocked or "chilled"—let alone inequitably or unfairly blocked—and A-CAP's counsel conceded at the August 1, 2024 conference that there were no such transactions. Aug. 1, 2024 Hr'g Tr. 6:13-20 (Mr. Watkins: "There is no particular transaction . . . . They're not – there's nothing to present in terms of a particular transaction . . . ."). A-CAP seeks an amendment not because the preliminary injunction is inequitably affecting otherwise fair and permissible transactions, but because "misreporting" in the press has caused a "general chilling effect" on transactions. *Id.* A-CAP is

A-1024

not even able to say that these unidentified transactions would inure to the benefit of the 777 Partners enterprise, let alone creditors other than A-CAP.

## ARGUMENT

A-CAP moves to amend the preliminary injunction under Federal Rule of Civil Procedure 59(e). ECF 155 at 23. A motion to amend under Rule 59(e) and a motion for reconsideration are assessed under the same strict standard. *In re Evergreen Mut. Funds Fee Litig.,* 240 F.R.D. 115, 117 (S.D.N.Y. 2007) (collecting cases). To prevail, the moving party must present "controlling decisions or factual matters that were put before the court on the underlying motion and which, had they been considered, might have reasonably altered the result before the court," or otherwise demonstrate "the need to correct a clear error or prevent manifest injustice." *Am. ORT, Inc. v. ORT Israel*, 2009 WL 233950, at *3 (S.D.N.Y. Jan. 22, 2009). Thus, the motion "may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for re-litigating issues already decided by the Court." *Grand Crossing, L.P. v. U.S. Underwriters Ins. Co.,* 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008).

**I.    A-CAP Is Relitigating an Issue Already Decided by the Court.**

A-CAP concedes, as it must, that this motion is nothing but an impermissible "vehicle for re-litigating issues already decided." *Id.* A-CAP concedes that in opposing Leadenhall's motion for injunctive relief, A-CAP and the 777 Entity Defendants already argued that *Grupo Mexicano* means the Court lacks the power to issue a preliminary injunction as to the Guarantors. ECF 155 at 7 ("For its part, A-CAP contended that, under *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), any asset-restraining preliminary relief must be limited to the Collateral." (citing ECF 89 at 12-13)). A-CAP also concedes that the Court expressly considered and rejected that argument because *Grupo Mexicano* concerned unsecured creditors, whereas "Leadenhall has a secured first-priority interest in the collateral the borrowers pledged," and "the

13

A-1025

guarantors guaranteed performance of all the borrowers' obligations to Leadenhall." ECF 155 at 10-11 (quoting June 7, 2024 Hr'g Tr. 55:07-19). A-CAP cites no "controlling decisions or factual matters" that the Court overlooked which might have altered the result. *Am. ORT*, 2009 WL 233950, at *3. *Grupo Mexicano* itself is neither controlling (because it addressed only unsecured creditors) nor overlooked by the Court. A Rule 59(e) motion may not be used to re-litigate issues already fully considered and decided. That should be the end of the matter, and the Court need not go any further to deny A-CAP's motion.

There is also no clear error or manifest injustice to be corrected. The mere fact that a preliminary injunction may affect parties other than those directly enjoined is not inequitable—it is critical to the effectiveness of such an injunction. *See* Fed. R. Civ. P. 65(d)(2)(C) (by default, preliminary injunctions bind third parties "in active concert or participation with" directly enjoined parties); *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 193 (2d Cir. 2010) (third parties may be bound by injunction regardless of "the motives that prompt the concert or participation"). As addressed below, the Court followed the law and properly weighed the equities in issuing the preliminary injunction. The creditors that intervened for purposes of the injunctive relief, ING and National Founders, support the current preliminary injunction. The enjoined parties themselves—the Borrowers and Guarantors—*have not* requested modification of the preliminary injunction. The only party that requests modification is A-CAP, reasserting its position that because A-CAP, via its affiliate Haymarket, purports to be the "senior secured creditor" to the Guarantors, ECF 155 at 3; *see also* ECF 89 at 2-4, 14-15; ECF 140 at 1-8, 9-11, it should be able to exercise whatever rights it wants as to the Guarantors' assets. A-CAP's requested modification would be an injustice, particularly given Leadenhall's allegations that A-CAP controlled the 777 Partners enterprise and therefore obtained those rights via non-arm's-length, insider transactions. Compl. ¶¶ 139-80.

A-1026

Belying any potential for injustice, the Court has repeatedly provided A-CAP with an avenue to facilitate legitimate transactions during the pendency of the injunction, but A-CAP studiously avoids identifying even a single transaction in its motion.  At the conference on August 1, 2024, A-CAP's counsel admitted that there is no particular transaction that the preliminary injunction has blocked.  Aug. 1, 2024 Hr'g Tr. 6:13-20.  Since the Court issued the TRO on June 7, 2024, A-CAP and the Borrowers and Guarantors have brought *one* proposed transaction to the attention of Leadenhall (the terms of which the Borrowers and Guarantors designated as compromise material under Federal Rule of Evidence 408), which B. Riley apparently did not pursue after Leadenhall raised concerns that it constituted a dissipation of assets to an A-CAP affiliate without fair consideration.  In support of its motion, A-CAP offers zero evidence that the current preliminary injunction is working any injustice.  A-CAP's supporting declaration addresses only two irrelevant points: (1) that Leadenhall filed financing statements as to the Collateral, and (2) A-CAP's mistaken or intentionally misleading view that the Collateral deficiency was caused by interest rate movements and not by the 777 Partners enterprise's admitted double-pledging.  Contrary to the Court's instruction at the preliminary injunction hearing, A-CAP does not support its application with evidence that "the TRO really is impeding transactions" because there is none. July 8, 2024 Hr'g Tr. 31:21-32:4.

Because the Court already considered and rejected A-CAP's *Grupo Mexicano* argument and affirmatively provided a procedure that would permit A-CAP or any other party to propose legitimate transactions while the preliminary injunction is pending, there is no basis for reconsideration.  For this reason alone, A-CAP's motion should be denied.

A-1027

## II.    The Court Was Correct in Distinguishing *Grupo Mexicano*.

1.    Grupo Mexicano Does Not Limit the Court's Power to Take Reasonable Measures to Protect Secured Creditors' Interests Pending Final Judgment.

In *Grupo Mexicano*, the Supreme Court addressed the question of whether a district court had the power under Rule 65 to issue a preliminary injunction "preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Grupo Mexicano,* 527 U.S. at 310. As this Court has already recognized in distinguishing *Grupo Mexicano*, the debt notes issued by the defendant in *Grupo Mexicano*, and guaranteed by the defendant's affiliates, were explicitly unsecured. *Id.* The Supreme Court determined that, because courts of equity traditionally lacked power to restrain asset transfers to ensure an unsecured creditor might recover a money judgment, the answer was no. *Id.* at 331-33. In ruling against the unsecured creditors in that case, the Court distinguished past precedent where "the creditor (the Government) asserted an equitable lien on the property, which presents a different case from that of the unsecured general creditor." *Id.* at 326 (citation omitted). The Court relied on "the historical principle that before judgment . . . an unsecured creditor has no rights at law or in equity in the property of his debtor," which limits the ability of "any prowling creditor" to encumber debtors' assets, but the Court identified no analogous principle for secured creditors. *Id.* at 330 (internal quotation marks omitted).

Following *Grupo Mexicano*, district courts—including this Court in this case—have held that *Grupo Mexicano* is inapplicable where a secured creditor seeks preliminary injunctive relief restraining asset transfers. *See, e.g.*, *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001) (granting preliminary injunction to a secured creditor after determining that "[t]he issue in *Grupo Mexicano*, as other courts have recognized, was whether a district court has the power to enjoin assets in which the potential

A-1028

judgment creditor has absolutely no equitable interest. Such is not the record before me and *Grupo Mexicano* is therefore distinguishable."); *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *4 n. 1 (S.D.N.Y. July 2, 1999) (granting preliminary injunction because "[t]he *Grupo* case is inapplicable here because III Finance claims a security interest in the assets subject to the preliminary injunction"); *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 79 (W.D.N.Y. 2018) (distinguishing *Grupo Mexicano* and granting preliminary injunction because "Plaintiff is a secured creditor who holds a security interest over the Collateral, as granted by Defendants through the Security Agreement") (collecting cases)).

A-CAP does not cite a single case for the central proposition in its motion that "[t]he preliminary injunction should thus be modified to restrain only the assets in which Leadenhall has a lien or equitable interest: its Collateral." ECF 155 at 14. It does not cite a single case where, as here, a borrower double-pledged, failed to pledge, or absconded with collateral backing a secured debt obligation, and a court ruled that an asset-freezing injunction extended only to the collateral with which the borrowers did not abscond. A-CAP also does not cite a single case where, as here, a borrower double-pledged, failed to pledge, or absconded with collateral backing a secured debt obligation, and a court ruled that an asset-freezing injunction could not extend to a party expressly guaranteeing the borrowers' security obligation. No such case exists, and for good reason. If A-CAP were correct, the Borrowers and Guarantors' only mistake was not absconding with *all* of the Collateral pledged to Leadenhall—if they had only gone even further in their fraud, according to A-CAP, Leadenhall would be a fully "unsecured creditor" unentitled to any preliminary relief.

A-CAP overcomplicates the facts and the law. Leadenhall is not just "any prowling creditor," it is a secured creditor under the LSA and negotiated for the debt provided to the Borrowers to be secured by specific assets. Under the Guaranty Agreement, the Guarantors

17

A-1029

guaranteed not only the Borrowers' payment obligations, but also "performance when due (whether at stated maturity, by acceleration, or otherwise) of the Guaranteed Obligations," ECF 58-2 § 2(a), including the Borrowers' obligation to pledge a first-priority security interest in specific assets to Leadenhall, *id.* § 1 (defining "Guaranteed Obligations" include all of the Borrowers' obligations in the LSA). *Grupo Mexicano* has nothing to say about cases brought by secured creditors to recover their secured debts from the parties bound to provide such security.

Following *Grupo Mexicano*, courts have repeatedly held that "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *Dong v. Miller*, 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) (citations omitted). For a court to have the power to issue an asset-restraining injunction where the plaintiff is a secured creditor, there must be a "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit." *Id.* (citations omitted). That is, the injunction must be a "reasonable measure" to preserve the status quo. *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *4 (S.D.N.Y. May 9, 2013) (granting preliminary injunction after determining that "under *Grupo Mexicano* and *Deckert*, a district court may enjoin the disposition of assets pending judgment only to the extent that an injunction is 'a reasonable measure to preserve the status quo pending final determination'" (citing *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940))).

That nexus exists here, and the current preliminary injunction is a reasonable measure to preserve the status quo pending final determination of Leadenhall's claims. Leadenhall has a security interest in the assets of the Borrowers, which are contractually required to secure

A-1030

Leadenhall's entire debt; the Guarantors guaranteed all of the Borrowers' obligations with respect to that security interest, not just the obligation to repay Leadenhall. Leadenhall's security interest in the Borrowers' assets up to the amount of their loans (the "Accelerated Amount")—is not nullified by the Borrowers' improper depletion of (or failure to own) the specific Collateral they pledged. Certain of the Guarantors' assets must be preserved to satisfy Leadenhall's guaranteed obligations, and those are the only assets affected by the preliminary injunction. It is necessary for the injunction to restrain dissipation of those assets given the undisputed evidence presented during TRO proceedings that the 777 Partners enterprise has virtually no cash or cash equivalents to satisfy the Accelerated Amount due to asset stripping. ECF 146 (subsection (D)); *see also* subsection (E) (notice requirement not contested by A-CAP). The current preliminary injunction contains no broad bar on asset transfers that would sever the nexus between the assets restrained and the final relief requested—in fact, the injunction contains an express carve-out for transactions in the normal and ordinary course of business. ECF 143. The injunction is thus a "reasonable measure to preserve the status quo pending final determination." *Paradigm*, 2013 WL 1915330, at *4.

A-CAP spends much of its brief pulling stray quotations from inapposite cases, arguing over whether a court has jurisdiction to freeze the Borrowers' assets versus assets which A-CAP wants to strip from the Guarantors, and quibbling over whether Leadenhall's claims are primarily legal or equitable. The cases A-CAP cites concerning unsecured creditors, including those decided by this Court, are not helpful for A-CAP because this case involves a secured creditor. *See, e.g.*, *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) (Koeltl, J.) (denying preliminary injunction in favor of unsecured creditor); *Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, 2006 WL 2337186, at *7 (S.D.N.Y.

19

A-1031

Aug. 11, 2006) (Koeltl, J.) (same); *Klipsch Grp., Inc. v. Big Box Store Ltd.,* 2012 WL 5265727, at *11 (S.D.N.Y. Oct. 24, 2012) (limiting the scope of a preliminary injunction because, after balancing the hardships, "it would not be equitable to restrain assets greater than" $20,000). The rule is simple: a court may issue a preliminary injunction preventing defendants from disposing of assets where a plaintiff asserts a lien as to specific assets and the injunction is a reasonable measure to preserve the status quo. *Dong*, 2018 WL 1445573, at *8; *Paradigm,* 2013 WL 1915330, at *4. Leadenhall has met that standard here.

> 2. Leadenhall Has an Equitable Interest in the Guarantors' Assets and a Right to Preliminary Relief.

A-CAP engages in a lengthy discourse about whether Leadenhall has an equitable interest in assets not previously specifically designated by Defendants as Collateral. The Court need not reach those arguments for many reasons, including because A-CAP cannot meet the high standard for reconsideration (*supra* Part I), the preliminary injunction is a "reasonable measure" to protect Leadenhall's security interest (*supra* Part II.1), and A-CAP improperly raises this argument for the first time on reconsideration. *See Grand Crossing*, 2008 WL 4525400, at *1 (Rule 59(e) motion "may not be used to advance new facts, issues or arguments not previously presented"). But even if these arguments were properly raised and were not moot, they are baseless for multiple reasons.

First, although the Court need not look beyond Leadenhall's secured creditor status to identify any equitable interest in the Borrowers' and Guarantors' assets, A-CAP acknowledges, as it must, that courts "maintain the equitable power" "to issue a prejudgment asset freeze pursuant to Rule 65" "where such relief *was* traditionally available" in courts of equity. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (citing *Grupo Mexicano*, 527 U.S. at 319). *Grupo Mexicano* acknowledges that asset freezing injunctions were "traditionally accorded by courts of equity" to creditors, like Leadenhall, with liens on the debtors' assets. 527 U.S. at 319, 326-27.

20

A-1032

And many authorities show that courts of equity enforce the "well-settled rule that 'no one shall be permitted to profit by his own fraud.'" *U.S. v. Dreier*, 952 F. Supp. 2d 582, 590 (S.D.N.Y. 2013) (rejecting argument that petitioner could not enforce security agreement). A court of equity would thus dismiss out of hand A-CAP's attempt to invoke the "traditional principles of equity jurisdiction" articulated in *Grupo Mexicano* to avoid injunctive relief, 527 U.S. at 319, where it was Defendants' own misconduct that violated Leadenhall's lien and rendered a secured debt "unsecured." The Guarantors in particular—which are the front for the entire scheme engineered by A-CAP—cannot seek the protection of equity because they have unclean hands and are estopped by their prior misrepresentations about the Collateral pledged to Leadenhall. *See Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 2020 WL 6585702, at *5 (S.D.N.Y. Nov. 10, 2020) ("The doctrine of clean hands is an established and salutary tenet of equity practice based on the principle that one who seeks equity must do equity.") (internal quotation marks omitted).

Second, Leadenhall's equitable claims for final injunctive relief offer another basis for preliminary injunctive relief. The law is again not as complicated as A-CAP makes it seem. In a "mixed case" seeking legal and equitable relief, "a court retains its equitable power to freeze assets," where there is a "nexus" between the preliminary and final equitable relief sought. *Dong*, 2018 WL 1445573, at *8; *see Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016). Here, the Guarantors guaranteed not only the Borrowers' payment obligations, but also performance of the Borrowers' obligations to set aside sufficient assets to secure Leadenhall's debt. ECF 58-2 § 2(a). Those interests arise from the Borrowers' (and Guarantors') duties to acquire and pledge sufficient Collateral, free and clear, to avoid or promptly cure any Borrowing Base Deficiency, ECF 58-1 §§ 7.01(c), 7.02(g); to purchase substitute

21

A-1033

Collateral worth more than any they sell or repledge, Declaration of Craig Gillespie ("Gillespie Decl."), Ex. 1 (Excerpts of LSA) at § 2.07; and to take reasonably necessary actions to enable Leadenhall to enforce its rights in Collateral, *id.* § 5.01(i). Leadenhall thus has an "equitable interest" in the specific assets that the Guarantors are bound to pledge to perform the Borrowers' guaranteed obligations. Leadenhall seeks to enforce that interest through an injunction requiring performance of the Guaranty. ECF 1 ¶ 282(b) (seeking final relief "enjoining Defendants violating their obligations under the Agreements"). The preliminary injunction already in place, targeting the specific assets restrained, is necessary, and no more restrictive than necessary, to ensure Guarantors still have assets to pledge when Leadenhall wins that injunction.

Thus, the Court had ample authority to issue the preliminary injunction under Rule 65. Moreover, there is no dispute the Court could issue the same relief via a prejudgment attachment order pursuant to Rule 64.[2] As this Court has recognized, even in cases unlike this one that involve *unsecured* creditors, *Grupo Mexicano* does not limit the availability of prejudgment attachment under Rule 64 and state law. *See JSC Foreign Econ. Ass'n*, 295 F. Supp. 2d at 390 & n.11; *see also Bollenbach v. Haynes*, 2018 WL 4278347, at *1 n.1 (S.D.N.Y. May 29, 2018). Each of the requirements for prejudgment attachment is indisputably satisfied here: (1) Leadenhall "has a cause of action for a money judgment;" (2) as the Court already found, "there is a probability of

---

[2] A-CAP accuses Leadenhall of "debut[ing]" the arguments above in its TRO reply brief, ignoring that it was *Defendants* who disputed the Court's power to issue injunctive relief under *Grupo Mexicano* in their TRO opposition briefs, to which Leadenhall responded. Moreover, Leadenhall did raise in its opening TRO brief that it was also entitled to pre-judgment attachment under Rule 64. ECF 57 at 14-15 & n.16.

success on the merits;" (3) at least two "of the enumerated statutory grounds for attachment under N.Y. CPLR § 6201 exist[]," because (a) the New York Department of State's Corporation and Business Entity Search Database indicates the Guarantors are "foreign corporation[s] not qualified to do business in the state,"[3] and (b), as the Court recognized in finding irreparable harm, Defendants have, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in [Leadenhall's] favor," "assigned, disposed of, encumbered or secreted property . . . or [are] about to do" so, CPLR § 6201(1), (3); and (4) "the amount demanded exceeds the amount of all counterclaims known to the party seeking the attachment." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2021 WL 8810142, at *2 (S.D.N.Y. Dec. 19, 2023) (quoting *Nanjing Textiles*, 2006 WL 2337186, at *4).

In an action brought by secured creditors, the court has the power to issue an injunction restraining defendants from dissipating assets where the restraint is a reasonable measure pending final judgment to preserve the status quo. That is exactly what the Court has done here.

### III.   A-CAP's Contention That Rising Interest Rates Caused Leadenhall's Loss Is Irrelevant and Demonstrably False.

Finally, in an apparent attempt to relitigate Leadenhall's likelihood of success on the merits against the Borrowers and Guarantors, A-CAP speculates that there are "real questions about just how much of Leadenhall's alleged deficiency is attributable to [interest] rates and what might stem from" Defendants' conceded wrongdoing. ECF 155 at 9. To raise these questions, A-CAP relies on an October 2023 email from Leadenhall Managing Partner Craig Gillespie to Kenneth King in

---

[3] An entity called 777 Partners LLC is listed in that database as a domestic LLC registered in New York in 2007. That is a different entity than Defendant 777 Partners LLC, which is organized under the laws of Delaware, ECF 1 ¶ 24, and is not qualified to do business in New York.

which Gillespie refers to a "DV01 measure to show interest rate sensitivity of each pool of collateral." ECF 153-1. A-CAP admits it "does not know how much of Leadenhall's alleged deficit is attributable to rates," but using the sensitivity measure in back-of-the-envelope math, A-CAP speculates that it could be more than $170 million. ECF 155 at 7-9 & nn.4-5.

The fact that A-CAP is willing to step into the shoes of the 777 Entity Defendants and raise "questions" on their behalf at all—let alone using an email showing that Kenneth King is personally involved in investigating their contractual breaches—further demonstrates that there is no line between A-CAP and the 777 Partners enterprise. In any event, the following undisputed facts answer A-CAP's questions: (i) the LSA requires the Borrowers to hedge any interest rate sensitivity of the Collateral, and the sole purpose of the "DV01" measure is to provide an interest-rate exposure value for the Borrowers to offset through hedging transactions, ECF 58-1 § 5.01(u) (requiring the Borrowers to enter into "Interest Rate Hedging" transactions, which are defined as having "a DV01 that offsets the DV01 of the applicable Collateral for each of the SPLCSS Borrower or the Dorchester Borrower"); (ii) that purpose is expressly set forth in the LSA and in every monthly Compliance Report submitted by the 777 Entity Defendants to Leadenhall, *see* Gillespie Decl., Ex. 1 at Schedule XVI ("The purpose of calculating DV01, in accordance with Section 5.01(u), is to support the structuring of Hedge Transactions such that the DV01 of the Collateral, when added to the DV01 of the Hedge Transactions, is offset (i.e. their sum is zero)."); and (iii) the Collateral valuations for the SuttonPark and Dorchester Borrowers remained steady during the rising interest rate cycle beginning in March 2023 *until* the 777 Partners enterprise began removing hundreds of double-pledged and fictitiously pledged assets from Compliance Reports in late 2022 and early 2023—and would have continued to remain steady through the end of the rising rate cycle in July 2023 if properly hedged. To the extent A-CAP is basing its

A-1036

"questions" on the premise that the 777 Partners enterprise failed to offset any interest rate sensitivity, that failure would constitute yet another trigger of the Guaranty Agreement obligating the Guarantors to perform in place of the Borrowers, only further reinforcing the equitable interests Leadenhall has in the Guarantors here.  ECF 58-2 at 4 (defining a "Trigger Event" to include "any failure by the SPLCSS Borrower or Dorchester Borrower to maintain in full force and effect interest rate protection mechanisms").

The Court should not revisit its well-reasoned determination that Leadenhall has made the requisite showing of likelihood of success to justify the preliminary injunction in its current form.

## CONCLUSION

For the foregoing reasons, Leadenhall respectfully requests that the Court deny A-CAP's motion to amend the preliminary injunction.

Dated: New York, New York
     August 15, 2024

               KING AND SPALDING LLP

               */s/ Leigh M. Nathanson*
               Craig Carpenito
               Leigh M. Nathanson
               Brian Donovan
               Michael Taintor
               1185 Avenue of the Americas
               New York, NY 10036
               (212) 556-2100
               ccarpenito@kslaw.com
               lnathanson@kslaw.com
               bdonovan@kslaw.com
               mtaintor@kslaw.com

               *Attorneys for Plaintiffs*

A-1037

## CERTIFICATION OF COMPLIANCE

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Law, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6962. The foregoing Memorandum of Law complies with the formatting rules set forth in the § II.D of the Court's Individual Practices.

Dated: New York, New York
        August 15, 2024

KING AND SPALDING LLP

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

*Attorney for Plaintiffs*

A-1038

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No.  1:24-cv-03453 |

## DECLARATION OF CRAIG GILLESPIE

I, Craig Gillespie, declare as follows:

1.      I am a Managing Partner at Leadenhall Capital Partners LLP ("Leadenhall"), and my title is Head of Life and Alternative Credit Portfolio Management. I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2.      Attached to this declaration as Exhibit 1 is a true and correct copy of excerpts of the Loan and Security Agreement (the "LSA") referenced in the Complaint.  Certain provisions

1

A-1039

of the LSA that are not contained within Exhibit 1 are commercially and competitively sensitive to Leadenhall.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 15th day of August, 2024.

Craig Gillespie

A-1040

# EXHIBIT 1

A-1041

EXECUTION VERSION

LOAN AND SECURITY AGREEMENT

Dated as of May 7, 2021

by and among

the Borrowers from time to time party hereto

And

the Lenders from time to time party hereto

And

LEADENHALL CAPITAL PARTNERS LLP,
as the Administrative Agent

And

LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,
as the initial Collateral Agent

And

the Servicers from time to time party hereto

And

the Sellers party hereto from time to time

A-1042

(h)    reference to the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(i)    reference to "an Event of Default with respect to such Borrower" or words of similar import shall mean a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default, and references to a "Default with respect to such Borrower" or words of similar import shall mean an event that, but for notice or lapse of time or both, would constitute a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default;

(j)    reference to any agreement (including any Transaction Document), document or instrument means such agreement, document or instrument as amended, modified, waived, supplemented, restated or replaced and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of the other Transaction Documents, and reference to any promissory note includes any promissory note that is an extension or renewal thereof or a substitute or replacement therefor; and

(k)    reference to any applicable law means such applicable law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any Section or other provision of any applicable law means that provision of such applicable law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such Section or other provision.

ARTICLE II

AMOUNTS AND TERMS OF THE LOANS

Section 2.01    The Commitments.

(a)    Subject to and upon the terms and conditions set forth herein, each Lender in a Related Lender Group severally agrees, at any time and from time to time on any Business Day during the period from the Effective Date to the applicable Commitment Termination Date, to make Loans to each Borrower with respect to which such Lender is part of the Related Lender Group, which Loans (i) shall be denominated in Dollars, (ii) may be repaid at any time in accordance with the provisions hereof, (iii) shall not exceed for any such Lender at any time such Lender's then available Commitment with respect to such Borrower, and (iv) shall not exceed at any time the Borrowing Base Limitation with respect to such Borrower. Each Loan shall be subject to the conditions precedent set forth in Section 3.02.

(b)    At any time during the period from the Effective Date to the applicable Commitment Termination Date, the related Borrower may deliver a notice to the Administrative Agent requesting that the Lenders in the Related Lender Group agree to an Additional Commitment in an amount to be specified by such Borrower in such notice. The Lenders in the Related Lender Group, in their sole discretion, may agree to accept, or decline, such Borrower's request for an Additional Commitment. If such Lenders agree to provide an Additional Commitment, such Borrower shall have a period of five (5) Business Days after the delivery of a notice pursuant to this Section 2.01(b) to confirm such amount of the Additional Commitment by

26

A-1043

delivering a Borrowing Request to such Lenders in accordance with the terms of this Agreement. Any such Additional Commitment approved by the Lenders in the Related Lender Group shall be effective upon the delivery of a new Note, if requested by any such Lender, indicating an increase in the Sub-Facility Limit (or the appropriate notation on the schedule attached to each applicable current Note). In the event that such Borrower does not deliver a Borrowing Request within five (5) Business Days of the notice required to be delivered under this Section 2.01(b), any approved Additional Commitment shall terminate and be reduced to zero; provided, that the aggregate amount of the Commitments shall automatically be reduced by such portion of the Additional Commitment increase that has not been borrowed within ten (10) calendar days following the effectiveness of such Commitment increase; provided, further, that no such increase shall be made if a Reserve Deficiency exists with respect to such Borrower.

Section 2.02    Loans and Borrowings.

(a)    Each Loan made to any Borrower shall be made by the Lenders in the Related Lender Group ratably in accordance with the amounts of their Commitments or Additional Commitments as the case may be. The failure of any Lender to make the Loan required to be made by it shall not relieve any other Lender in the Related Lender Group of its obligations hereunder; provided, that the Commitments and Additional Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make a Loan as required. With respect to each Loan made hereunder, the Lenders in the Related Lender Group may, as between themselves, alter the proportion (if any) of the Loan that each such Lender makes.

(b)    At the commencement of the initial Interest Period for any Loan, such Loan shall be in an aggregate amount that is an integral multiple of $10,000 and not less than the Minimum Borrowing with respect to the Borrower requesting such Loan, unless waived by the Administrative Agent, on behalf of the Lenders in the Related Lender Group.

Section 2.03    Requests for Borrowings. To request a Loan, the related Borrower shall notify the Administrative Agent of such request by providing a written Borrowing Request in the form of Annex E to the Administrative Agent by hand delivery or electronic transmission on a date that is not later than 1:00 p.m., New York City time, two (2) Business Days prior to the date of the proposed Borrowing. No Borrower may request more than one (1) Borrowing per week unless otherwise agreed to in writing by the Administrative Agent acting in its sole discretion, and such request shall be provided to the Administrative Agent simultaneously with the requests from each other Borrower requesting a Loan for such week; provided, that the Borrowers may request, with the consent of the Administrative Agent, not to be unreasonably withheld, one (1) additional Borrowing Request per week. Upon receipt of each Borrowing Request from a Borrower, the Administrative Agent shall notify each Lender in the Related Lender Group of each such Borrowing Request. Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    the aggregate amount of the Loan Requested;

(b)    the date of such Loan, which shall be a Business Day;

27

A-1044

(including after assignment pursuant to Section 10.03) be represented by one or more Notes in such form payable to the payee and its registered assigns.

Section 2.06    Repayment of Loans. To the extent not previously paid, each Loan shall be due and payable on the applicable Maturity Date, together with all accrued but unpaid Interest owing thereon and all other unpaid Obligations.

Section 2.07    Prepayment of Loans; Substitution of Receivables.

(a)    Each Borrower shall have the right, at any time, to prepay the Loans in whole or in part without penalty; provided that (v) no Borrower may prepay the Loans in whole or in part at any time that a Borrowing Base Deficiency or Event of Default exists with respect to any Borrower unless (i) such prepayment will cure such Borrowing Base Deficiency or Event of Default or (ii) the Administrative Agent consents to such prepayment in its sole discretion, (w) at all times prior to June 30, 2023, the aggregate Principal Amount of Loans related to any Eligible Settlement Receivables made to the SPLCSS Borrower shall equal or exceed ███████, (x)(i) in the case of the SPLCSS Borrower, prior to any partial prepayment, the SPLCSS Borrower and the Administrative Agent shall have agreed to such terms and conditions as the Administrative Agent may reasonably request in light of each portfolio of Receivables pledged hereunder that would remain following such partial prepayment (including the LTV Percentage for any remaining LC Asset Groups), and (ii) unless a partial prepayment is made in respect of a specific Receivable, any such partial prepayment made pursuant to this Section 2.07(a) shall be in a principal amount that is not less than ███████, (y) (i) each Borrower may prepay the Loans attributable to such Borrower in whole without penalty in the event that such Borrower is required to make a payment under Section 2.12(d) and (ii) each Borrower may prepay the Loans attributable to such Borrower at any time without penalty in the amount received by such Borrower in respect of (A) a Repurchase in respect of a Defective Receivable, and (B) a Repurchase of a Guaranteed Receivable or Lottery Receivable if such Borrower or Lottery Holding SPV (as applicable) receives one or more substitute Eligible Receivables having a Valuation Amount that is greater than or equal (in the reasonable determination of the applicable Servicer and the Administrative Agent) to that of the substituted Guaranteed Receivable or Lottery Receivable (as applicable). Each Borrower shall use selection procedures to substitute Eligible Receivables for Guaranteed Receivables or Lottery Receivables in a manner that is not intended to be adverse to the interests of Lenders in the applicable Lender Group in relation to the selection procedures that have been used in selecting the Receivables to be purchased by Affiliates of applicable Borrower for their own account. The Valuation Amount of the substitute Eligible Receivable shall exceed the Valuation Amount of the substituted Receivable and such substitute Eligible Receivable shall become part of the Collateral hereunder and the outstanding principal on the related Loan shall be noted (or written up) in the same amount as was noted (or written up) in respect of the applicable Receivable prior to the substitution. Immediately following such prepayment, the applicable Borrower shall be in compliance with the provisions of this Agreement and shall have complied with the terms of any Hedge Agreement requiring one or more Hedge Transactions to be terminated in whole or in part as a result of any such prepayment.

(b)    If requested by any Borrower, the Administrative Agent shall apply any such prepayment to repay the Loan in respect of a specific Receivable or Receivables, and thereafter such Receivable or Receivables shall be released from the lien created by this Agreement

30

A-1045

and such Borrower may (or may cause the Lottery Holding SPVs to) dispose of such Receivable or Receivables. Such Borrower shall notify the Administrative Agent by email (confirmed by telephone) of any prepayment hereunder not later than 1:00 p.m., New York City time, one (1) Business Day before the date of prepayment. Each such notice shall specify the prepayment date, the Loans to be prepaid and the Principal Amount of each Loan or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Such Borrower shall include the amount of any accrued interest with the principal amount being prepaid. The Administrative Agent shall promptly notify each Lender in the Related Lender Group of each notice of prepayment and any amounts required to be paid pursuant to Section 2.10 hereof.

Section 2.08    Interest.

(a)    (i) The Loans comprising each Borrowing made to the SPLCSS Borrower shall bear interest at the Interest Rate applicable to the SPLCSS Borrower.

(ii)    The Loans comprising each Borrowing made to the Signal Borrower shall bear interest at the Interest Rate applicable to the Signal Borrower.

(iii)    The Loans comprising each Borrowing made to the Insurety Borrower shall bear interest at the Interest Rate applicable to the Insurety Borrower.

(iv)    The Loans comprising each Borrowing made to the Dorchester Borrower shall bear interest at the Interest Rate applicable to the Dorchester Borrower.

(v)    The Loans comprising each Borrowing made to a Joining Borrower shall bear interest at the Interest Rate applicable to such Joining Borrower.

provided, that, during any Default Interest Period, Loans constituting each Borrowing shall bear interest at the Benchmark calculated as described on Schedule XII *plus* the Default Interest Rate.

(b)    Any Interest not paid on any Distribution Date for any reason shall be capitalized into the Principal Amount of the Loans at the end of the related Interest Period and shall itself accrue interest as follows:

(i)    With respect to the SPLCSS Borrower, for any date that is not during a Default Interest Period, at the Interest Rate applicable to the SPLCSS Borrower or, during any Default Interest Period, the Default Interest Rate, as applicable.

(ii)    With respect to the Signal Borrower, for any date that is not during a Default Interest Period, at the Interest Rate applicable to the Signal Borrower or, during any Default Interest Period, the Default Interest Rate, as applicable.

(iii)    With respect to the Insurety Borrower, for any date that is not during a Default Interest Period, at the Interest Rate applicable to the Insurety Borrower or, during any Default Interest Period, the Default Interest Rate, as applicable.

31

A-1046

(b)      If at any time insufficient funds are received by and available to the Administrative Agent or any Lender in the Related Lender Group to pay fully all amounts of principal, Interest, fees and other Obligations then due hereunder, such funds shall be applied in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable.

(c)      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then (i) the Lender receiving such greater proportion shall remit to the applicable Collection Account cash in an amount equal to the amount such Lender received minus the amount representing such Lender's Ratable Share of such payment and (ii) such amount shall be shared by the other Lenders in accordance with the Ratable Share attributable to each such Lender in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable, on the next Distribution Date.

(d)      If any Lender shall fail to make any payment required to be made by it hereunder, then the Administrative Agent may, in its discretion, provide an instruction that any amounts thereafter received for the account of such Lender be used to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14    Mitigation Obligations. If any Lender requests compensation under Section 2.09, or if the Borrower with respect to which such Lender is part of the Related Lender Group is required to pay any Indemnified Taxes or any additional amount to such Lender or any Governmental Authority for the account of such Lender pursuant to Section 2.12, then such Lender (at the request of such Borrower) shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Each Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in the Related Lender Group in connection with any such designation or assignment.

Section 2.15    Security Interest. (a) To secure the performance by the Borrowers of all of the Obligations, each Borrower hereby grants to the Collateral Agent for the benefit of the Secured Parties in the Related Lender Group with respect to such Borrower, a first-priority security interest in the Collateral.

(b)      In addition, each Borrower hereby grants to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower, a second-priority security interest in the Collateral.

(c)      In furtherance of the foregoing, each Borrower hereby authorizes the Collateral Agent or its designee to file one or more financing or continuation statements, and amendments thereto and assignments thereof from time to time, which financing statements may describe the property being secured as "all assets" or "all personal property" of such Borrower.

38

A-1047

None of the Borrowers, the Servicers or the Sellers shall have any liability under this Agreement for any failure to file an amendment to any financing statement to reflect a successor Collateral Agent if notice of such successor Collateral Agent is not given in accordance with Section 8.19.

(d)    In furtherance of the foregoing, promptly after the Effective Date, each Borrower shall deliver any promissory note related to a Receivable to the Collateral Agent, accompanied by a transfer instrument executed in blank. In the event that the Loans with respect to which such Receivable is Collateral are paid in full or the Administrative Agent applies any prepayment to repay any Loan in respect of a specific Receivable or Receivables pursuant to Section 2.07(b), such promissory note shall be automatically released from the lien created by this Agreement and the Collateral Agent shall promptly deliver the original promissory note, along with the related transfer instrument that was executed in blank, to the applicable Borrower.

(e)    Any security interest granted by the Borrowers to the Collateral Agent for the benefit of the Secured Parties with respect to such Borrower shall be prior and superior to any security interest granted to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower. Each Secured Party and each Subordinated Secured Party hereby agrees that such priority shall be applicable irrespective of the time or order of attachment or perfection of any such security interest or the time or order of filing of any financing statements or other documents, or any statutes, rules or law, or court decisions to the contrary. Furthermore, each of the Subordinated Secured Parties hereto hereby covenants and agrees that this Agreement constitutes a "subordination agreement" (within the meaning of, and subject to, Section 510(a) of the Bankruptcy Code) for purposes of the priority of security interests set forth in Article 9 of the New York UCC.

(f)    All Receivables and any Health Care Provider Loan Receivables purchased by the Borrowers shall constitute part of the Collateral; provided, that no Excluded Insurety Receivable shall constitute part of the Collateral.  To the extent any or any collections, payments or other proceeds in respect thereof are deposited into the Insurety Collection Account, the Insurety Borrower shall be entitled to withdraw and transfer such amounts to it or its designee.

(g)    Following payment in full of all Obligations with respect to a Borrower, each Secured Party and each Subordinated Secured Party, so long as no Event of Default or Borrowing Base Deficiency exists with respect to any Borrower, such Secured Parties and Subordinated Secured Parties shall release such Borrower from the lien created by this Agreement.

(h)    Each Lottery Holding SPV agrees that, upon the occurrence and during the continuance of any Event of Default with respect to the SPLCSS Borrower, it will comply with instructions originated by the Collateral Agent without the further consent of the SPLCSS Borrower.

Section 2.16    Right of Setoff. Without in any way limiting the provisions of Section 2.13(c), the Administrative Agent and each Lender and each of their respective Affiliates is hereby authorized (in addition to any other rights it may have) at any time and from time to time after the occurrence and during the continuance of an Event of Default in respect of the Borrower related thereto to set-off, appropriate and apply (without presentment, demand, protest or other notice which are hereby expressly waived) any and all deposits (general or special, time or demand,

39

A-1048

Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent:

(i) each Account Control Agreement listed on <u>Schedule I</u> that has not been executed on or prior to the Closing Date;

(ii) an opinion of counsel with respect to the perfection of the Collateral Agent's security interest in each account covered by an Account Control Agreement delivered pursuant to <u>Section 3.04(a)</u>;

(iii) a tax opinion to the effect that the Loans issued as of the Effective Date should be treated as indebtedness for U.S. federal income tax; and

(iv) a consent, duly executed by Mutual of Omaha Insurance Company, to the pledge of Medicare Commission Receivables by the Insurety Borrower; and

(b) no later than the date occurring forty-five (45) days after the Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent, an opinion of counsel confirming that the execution, delivery and performance by each of 777 Partners LLC and 600 Partners LLC of the Guaranty will not conflict with the material agreements of 777 Partners LLC or 600 Partners LLC, as applicable; <u>provided</u>, that the Lenders shall be responsible for reasonable and documented legal fees related to the opinion of counsel delivered pursuant to this clause (b) in an amount of up to $100,000 and 777 Partners LLC shall be responsible for any amounts in excess thereof.

<div align="center">ARTICLE IV</div>

<div align="center">REPRESENTATIONS AND WARRANTIES</div>

Section 4.01    <u>Representations and Warranties of each Borrower</u>. Each Borrower hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date, each Borrowing Date and, with respect to <u>Section 4.01(i)</u>, the date of each Monthly Report and the date of each Compliance Report:

(a)    Such Borrower and any Lottery Holding SPV is a limited liability company validly existing and in good standing under the laws of the State of Delaware or, with respect to the Insurety Borrower, Florida, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except in such jurisdictions where the failure to qualify to do business could not be reasonably expected to result in a Material Adverse Effect.

(b)    The execution, delivery and performance by such Borrower and any Lottery Holding SPV of the Transaction Documents to which it is a party and the other documents to be delivered by it hereunder, including its use of the proceeds of the Loans, (i) are within its limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (1) its certificate of formation and limited liability company agreement, (2) any law, rule or regulation applicable to it except where such contravention could

<div align="center">51</div>

A-1049

not reasonably be expected to result in a Material Adverse Effect, (3) except with respect to the Insurety Borrower, any general agent agreement, carrier agreement or similar arrangement with Mutual of Omaha Insurance Company, any contractual restriction binding on or affecting it or its property or (4) any order, writ, judgment, award, injunction or decree binding on or affecting it or its properties or assets, and (iv) do not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties (except for the interest of the Collateral Agent for the benefit of the Secured Parties created pursuant to this Agreement). Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party has been duly executed and delivered by such party.

(c)     No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the due execution, delivery and performance by such Borrower or any Lottery Holding SPV of the Transaction Documents to which it is a party or any other document to be delivered thereunder (except for the filing of UCC financing statements which are referred to herein and therein), to the extent the failure to give such notices could reasonably be expected to result in a Material Adverse Effect. Such Borrower and any Lottery Holding SPV has the power and authority to (i) enter into the Transaction Documents to which it is party, (ii) grant collateral security for the Obligations as provided for under the Transaction Documents and (iii) own and to hold all of its assets and properties, and to carry on its business as now conducted.

(d)     Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party constitutes the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and general equitable principles (whether considered in a proceeding at law or in equity).

(e)     Since its date of formation, there has been no material adverse change in the business, operations, property or financial condition of such Borrower or any Lottery Holding SPV.

(f)     There is no pending or, to its knowledge, threatened action, investigation or proceeding affecting such Borrower, such Lottery Holding SPV, the Related Servicer or the Related Seller before any court, governmental agency or arbitrator which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(g)     No proceeds of any Loans made to such Borrower shall be used to acquire any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934. Neither the Related Seller nor any of its Affiliates (i) have offered or sold or will offer or sell the Receivables by any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D of the Securities Act or (ii) have engaged or will engage in any directed selling efforts within the meaning of Regulation S of the Securities Act with respect to the Receivables. Neither such Borrower nor any Lottery Holding SPV is an "Investment Company" as that term is defined under the Investment Company Act of 1940 in reliance on the exemption provided by Section 3(c)(7) thereof (although other exemptions may be available).

52

(h)     Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim (other than (u) the security interest of the Administrative Agent for the benefit of the Secured Parties hereunder, (v) the rights of the applicable trustee or agent bank for the benefit of the applicable Person under any Third Party Intercreditor Agreement, (w) claims relating to any Split Payment Receivables, (x) any lien for taxes not yet due or being contested in good faith, (y) with respect to any Medicare Commission Receivable, any lien that has not been perfected or offset right granted by the Insurety Borrower in favor of the related insurance company counterparty pursuant to the applicable carrier agreement in respect of compensation due to the Insurety Borrower thereunder and (z) liens related to attorney's fees, medical fees or other amounts for a Case which are subordinate to the security interest created by the Funding Agreement and Lawyers Acknowledgement Letter (if applicable) or the Loan Agreement, as applicable, which have been pledged to the Collateral Agent for the benefit of the Secured Parties hereunder). The Collateral Agent for the benefit of the Secured Parties (other than the Subordinated Secured Parties) has a valid and perfected first priority security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising and the Collateral Agent for the benefit of the Secured Parties and the Subordinated Secured Parties has a valid and perfected subordinated security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising. No effective financing statement or other instrument similar in effect covering any Collateral is on file in any recording office, except for those filed in favor of the Collateral Agent relating to this Agreement. On each Borrowing Date, each Receivable subject to the related Borrowing is an Eligible Receivable.

(i)     Each Compliance Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), Monthly Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), information, exhibit, financial statement, document, book, record or report furnished or to be furnished at any time by or on behalf of such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with and before or after the Effective Date is or will be accurate in all material respects as of its date or (except as otherwise disclosed to the Administrative Agent or the Lenders in the Related Lender Group, as the case may be, at such time) as of the date so furnished (or, if applicable, as of a date certain specified in such report), and no such document contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

(j)     The principal place of business and chief executive office of such Borrower and the office where such Borrower keeps its records concerning the Collateral are located at the address or addresses referred to on Schedule III.

(k)     The names and addresses of the Account Bank and all of the Account Banks, together with the post office boxes and account numbers of the Collection Account, the Lock-Boxes and the Deposit Accounts of such Borrower at such banks are as specified in Schedule I hereto, as such Schedule I may be updated from time to time pursuant to Section 5.01(g). The names and addresses of all the banks, together with the post office boxes and account numbers of the Third Party Intercreditor Accounts, if any, relating to Third Party Intercreditor Receivables,

A-1051

are as specified in <u>Schedule VII</u> hereto, as such <u>Schedule VII</u> may be updated from time to time with the consent of the Administrative Agent. Except for any post-office boxes and bank accounts related to one or more Third Party Intercreditor Agreements, the Lock-Boxes, the Deposit Accounts and the Concentration Account are the only post office boxes and bank accounts into which Collections of Receivables are deposited or remitted (other than Collections related to Receivables arising in connection with or related to a Funding Agreement (Master Assignment), which may be deposited or remitted to the related Health Care Providers first). The Third Party Intercreditor Accounts are the only post office boxes and bank accounts into which Collections of Third Party Intercreditor Receivables are required to be deposited or remitted. Subject to the timeframe set forth in <u>Section 3.04(a)</u>, such Borrower has delivered (or will deliver) to the Administrative Agent a fully executed and effective Account Control Agreement with respect to the Collection Account, each Deposit Account and any associated Lock-Boxes. Subject to the timeframe set forth in <u>Section 3.04(a)</u>, all other Borrower Accounts of such Borrower are or will be the subject of a fully executed and effective Account Control Agreement. All Third Party Intercreditor Accounts related to such Borrower are subject to a fully executed and effective Third Party Intercreditor Agreement.

(l)    Neither such Borrower nor any Lottery Holding SPV is known by nor does it use any tradename or doing-business-as name. Such Borrower has no Subsidiaries other than the Lottery Holding SPVs. The Related Seller owns one hundred percent (100%) of the equity interests in such Borrower. The SPLCSS Borrower owns one hundred percent (100%) of the equity interests in the Lottery Holding SPV.

(m)    (i) The present value of the property of such Borrower is greater than the total amount of liabilities, including contingent liabilities, of such Borrower, (ii) the present fair salable value of the assets of such Borrower is not less than the amount that will be required to pay all probable liabilities of such Borrower on its debts as they become absolute and matured, (iii) such Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond such Borrower's abilities to pay such debts and liabilities as they mature and (iv) such Borrower is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Borrower's property would constitute unreasonably small capital. Neither such Borrower nor any Lottery Holding SPV is the subject of an Insolvency Event. Neither such Borrower nor any Lottery Holding SPV has any indebtedness for money borrowed from others (direct or contingent) other than (i) indebtedness owed to the Administrative Agent and the Lenders in the Related Lender Group, and (ii) obligations under any bank deposit and similar agreements required by Lenders hereunder. Neither such Borrower nor any Lottery Holding SPV has any contingent obligations or liabilities (other than any such obligations or liabilities undertaken pursuant to the Transaction Documents) that were not previously disclosed in writing (which may be provided via electronic mail) to the Administrative Agent and the Lenders in the Related Lender Group.

(n)    With respect to each Receivable and related Collateral pledged by such Borrower, such Borrower shall have received (including indirectly through such Borrower's ownership of a Lottery Holding SPV) such Receivable and related Collateral in an amount which constitutes fair consideration and reasonably equivalent value. Each such acquisition of Receivables by such Borrower or any Lottery Holding SPV under the applicable Sale Agreement

54

A-1052

shall not have been made for or on account of an antecedent debt owed by the assignor thereof to such Borrower or any Lottery Holding SPV, as applicable.

(o)    Such Borrower and any Lottery Holding SPV has timely filed or caused to be filed all material United States federal, state and local tax returns and reports that are due and required to be filed by it and has paid or caused to be paid all material taxes that have become due and payable except where the payment of any such taxes is being contested in good faith by appropriate proceedings and for which such entity has set aside on its books adequate reserves.

(p)    All information heretofore furnished by, or on behalf of, such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with any Transaction Document or any Receivable or any Health Care Provider Loan Receivable or any transaction contemplated thereby, when taken as a whole, is true and accurate in all material respects (without omission of any information necessary to prevent such information from being materially misleading).

(q)    Such Borrower and any Lottery Holding SPV (and, in each case, each of its agents) has complied with (and shall comply with) all federal, State or local laws applicable to it or in connection with its acquisition of, or any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables. To the knowledge of the Seller, all parties which have had any interest in the Receivables and any Health Care Provider Loan Receivable, whether as originator, servicer, administrator, assignee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with all federal, State or local laws applicable to it or in connection with any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables.

(r)    Neither such Borrower nor any Lottery Holding SPV has dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with the transactions contemplated by the Transaction Documents. Such Borrower has facilitated the transfer of the Receivables and Health Care Provider Loan Receivables, if any, without any intent to hinder, delay or defraud any of its creditors.

(s)    None of such Borrower, any of its Affiliates or, to the knowledge of such Borrower, any director, officer, employee or agent of such Borrower or any of its Affiliates is a Person that is, or is owned or controlled by Persons that are:  (i) the subject of any Sanctions or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.

(t)    Such Borrower and any Lottery Holding SPV, their Affiliates and their respective directors, officers and employees and, to the knowledge of such Borrower, the agents of such Borrower and its Affiliates, are in compliance with all applicable Sanctions and with the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption law, in all material respects. Such Borrower and its Affiliates are subject to policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or

regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption laws.

(u)     The operations of such Borrower, such Lottery Holding SPV, the Related Servicer and the Related Seller are and have been conducted at all times in compliance with Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving such Borrower, the Related Servicer or the Related Seller with respect to Anti-Money Laundering Laws is pending or, to the knowledge of such relevant entity, threatened.

(v)     For U.S. federal income tax purposes, such Borrower is not a corporation or an association taxable as a corporation.

(w)     Neither such Borrower, such Lottery Holding SPV nor any ERISA Affiliate thereof has incurred any ERISA Event. Such Borrower and such Lottery Holding SPV are not a Benefit Plan Entity.

(x)     (i) With respect to any Borrower entering into a Hedge Agreement, such Borrower's entering into any Hedge Agreement will not cause it to be considered a "commodity pool" as defined in Section 1a(10) of the Commodity Exchange Act, or (ii) if such Borrower would be a commodity pool, with respect to such Borrower as the commodity pool, its commodity pool operator ("CPO") and commodity trading advisor ("CTA") are eligible for an exemption from such registrations and all conditions precedent to obtaining such exemptions have been satisfied.

(y)     With respect to any Borrower entering into a Hedge Agreement, each of the sole member and managers of such Borrower (other than its independent manager) has agreed in writing that, if and for so long as such Borrower is a commodity pool, its CPO and CTA will take all action necessary to ensure ongoing compliance with the applicable exemption from registration as a CPO and CTA with respect to such Borrower, and any other actions required as a CPO and CTA with respect to such Borrower.

Section 4.02     Representations and Warranties of the Servicers. Each Servicer hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date and each Borrowing Date:

(a)     Such Servicer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)     The execution, delivery and performance by such Servicer of this Agreement and any other documents to be delivered by it hereunder (i) are within such Servicer's limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (A) such Servicer's certificate of formation or limited liability company agreement, (B) any law, rule or regulation applicable to such Servicer except where such contravention could not reasonably be expected to result in a Material Adverse Effect,

A-1054

ARTICLE V

COVENANTS

Section 5.01    Covenants of Each Borrower. Each Borrower covenants and agrees with the Administrative Agent and each Lender in the Related Lender Group, until the Commitments with respect to such Borrower have expired or been terminated and the principal of and Interest on each Loan and all other Obligations have been paid in full by such Borrower, that:

(a)    Compliance with Laws, Etc. Such Borrower shall comply (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to comply) in all material respects with all applicable laws, rules, regulations and orders and preserve and maintain its limited liability company existence, rights, franchises, qualifications and privileges except to the extent that the failure so to comply with such laws, rules and regulations or the failure so to preserve and maintain such rights, franchises, qualifications and privileges could not reasonably be expected to result in a Material Adverse Effect.

(b)    Offices, Records, Name and Organization. Such Borrower shall keep (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to keep) its principal place of business and chief executive office and the office where it keeps its records concerning the Collateral at the address of such party set forth on Schedule III hereto or, upon thirty (30) days' prior written notice to the Administrative Agent, at any other locations within the United States. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) change its name or its jurisdiction of organization, unless (i) such Borrower shall have provided the Administrative Agent with at least thirty (30) days' prior written notice thereof and (ii) no later than the effective date of such change, all actions reasonably requested by the Collateral Agent to protect and perfect the security interest in the Collateral of such Borrower free and clear of any Adverse Claim (other than those permitted under this Agreement) have been taken and completed. Such Borrower shall maintain and implement (or cause the Related Servicer to maintain or implement) administrative and operating procedures (including an ability to recreate records evidencing the Receivables, any Health Care Provider Loan Receivables, the Related Contracts and the Collateral owned by such Borrower in the event of the destruction of the originals thereof), and keep and maintain (or cause the Related Servicer to maintain or implement) all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables and any Health Care Provider Loan Receivables owned by such Borrower (including records adequate to permit the daily identification of each such Receivable and Health Care Provider Loan Receivables, if any, and all Collections of and adjustments to each such Receivable and any Health Care Provider Loan Receivables).

(c)    Performance and Compliance with Contracts and Credit and Collection Policy. Such Borrower shall (and shall cause the Related Servicer to), at its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under any Related Contracts and timely and fully comply in all material respects with the Credit and Collection Policy in regard to each Receivable, the other Related Contracts and any Health Care Provider Loan Receivables and other related Collateral owned by such Borrower.

59

A-1055

(d)    <u>Sales, Liens, Etc</u>.  Except for the security interests created hereunder in favor of the Collateral Agent for the benefit of the Secured Parties and for the benefit of the Subordinated Secured Parties and any lien for taxes not yet due or being contested in good faith and except as otherwise permitted under this Agreement and the other Transaction Documents (including in connection with any Repurchase or the transfer of an Excluded Lottery Receivable), such Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof.

(e)    <u>Extension or Amendment of Receivables</u>. Except in accordance with the Credit and Collection Policy or as otherwise consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), such Borrower shall not (and shall not permit the Related Servicer, in the case of the SPLCSS Borrower, any Lottery Holding SPV, or the Related Seller, to) extend, amend or otherwise modify the terms of any Receivable or Health Care Provider Loan Receivable, or amend, modify or waive any term or condition of any Related Contracts related thereto.

(f)    <u>Change in Business or Credit and Collection Policy</u>. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) make any change in the character of its business or change in the Credit and Collection Policy that would impair the collectability of the Receivables or the ability of such Borrower, such Lottery Holding SPV or the Related Servicer to perform its obligations under this Agreement or the other Transaction Documents without the prior written consent of the Administrative Agent and the Required Lenders in the Related Lender Group (such consent not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that no consent shall be required from the Administrative Agent or any Lender in such Related Lender Group in connection with any change mandated by applicable law or a Governmental Authority as evidenced by an opinion of counsel delivered to the Administrative Agent and the Lenders in the Related Lender Group in form and substance reasonably acceptable to the Administrative Agent and such Related Lender Group.

(g)    <u>Change in Payment Instructions to Obligors</u>. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) add or terminate any bank, post office box or bank account as an Account Bank, Lock-Box or Borrower Account from those listed in <u>Schedule I</u> to this Agreement, or make any change in its instructions to Obligors regarding payments to be made to such Borrower or any Lottery Holding SPV, as applicable, or payments to be made to any such Account Bank, Lock-Box or Borrower Account, unless the Administrative Agent shall have received notice of such addition, termination or change and a fully executed Account Control Agreement with each new Account Bank with respect to each Lock-Box or Borrower Account and shall have been given a reasonable amount of time (not to exceed ten (10) Business Days) to review the proposed arrangements and to consult with outside counsel (which expenses shall be promptly reimbursed by such Borrower) to confirm the security arrangements in respect of the Collections relating to such proposed change.

(h)    <u>Deposits to Lock-Boxes and Deposit Accounts</u>. Except for Receivables that constitute Third Party Intercreditor Receivables which shall first be remitted by the Obligors thereof to the accounts set forth in the applicable Third Party Intercreditor Agreement, such

60

A-1056

Borrower shall (or shall cause the Related Servicer, in the case of the SPLCSS Borrower, each Lottery Holding SPV, or the Related Seller to) instruct all Obligors to remit all payments in respect of Receivables to the Lock-Boxes or Deposit Accounts, a Collection Account or a Concentration Account. If such Borrower shall receive any Collections directly, it shall promptly (and in any event within two (2) Business Days) deposit the same to a Deposit Account or to a Collection Account. Such Borrower, the Related Seller and the Related Servicer, as applicable, shall instruct the applicable trustee or agent bank to remit all payments in respect of Third Party Intercreditor Receivables from the related Third Party Intercreditor Account to such Borrower's Collection Account or Concentration Account. Such Borrower shall not deposit or otherwise credit, or cause or permit to be so deposited or credited, to any Lock-Box or Deposit Account cash or cash proceeds other than Collections of Receivables and other similar receivables owned by the Related Seller or an Affiliate thereof, except as contemplated by the Transaction Documents. All Collections of Receivables on deposit in any Concentration Account shall be transferred to the related Collection Account within two (2) Business Days after receipt thereof. Each Lottery Holding SPV shall transfer all Collections of Lottery Receivables received by such Lottery Holding SPV in the related Deposit Account (or Lock-Box) to the Collection Account within two (2) Business Days after receipt thereof.

(i)    Further Assurances. Such Borrower agrees from time to time, at its expense, promptly to execute and deliver all further instruments and documents, and to take all further actions, that may be reasonably necessary or desirable, or that the Administrative Agent or the Collateral Agent may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under this Agreement. Such Borrower authorizes the Collateral Agent to file financing and continuation statements, and amendments thereto and assignments thereof, relating to the Collateral.

(j)    Reporting Requirements. Such Borrower shall provide to the Administrative Agent and the Lenders in the Related Lender Group (in multiple copies, if requested by the Administrative Agent) the following:

(i)    on or prior to each Calculation Date, a duly completed and certified Monthly Report containing information regarding the Receivables and any Health Care Provider Loan Receivables owned by such Borrower as of the last day of the previous calendar month; provided, that such Borrower shall not include any Receivable that is not an Eligible Receivable as of such Calculation Date in the calculation of the Borrowing Base; provided, further, that if an Event of Default has occurred and is continuing with respect to such Borrower, such Borrower shall deliver Monthly Reports on any Business Days reasonably requested by the Administrative Agent;

(ii)    on or prior to each Distribution Date, a pro forma Compliance Report giving effect to the distributions to occur on such Distribution Date under Sections 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable;

(iii)    within one hundred fifty (150) days after the end of each of the Related Seller's and such Borrower's fiscal years (in each case, beginning with the year ending December 31, 2021), an annual audited financial statement of such Borrower and the Related

61

A-1057

Seller, prepared in accordance with GAAP, in form and substance reasonably acceptable to the Administrative Agent;

(iv)    within thirty (30) days after the last day of each calendar month, a consolidated unaudited income statement and balance sheet of the Related Seller (which income statement and balance sheet shall include the Related Servicer and such Borrower), in form and substance acceptable to the Administrative Agent;

(v)    as soon as possible and in any event within three (3) Business Days after the occurrence of each Event of Default or Default with respect to such Borrower, a statement of a duly authorized officer of such Borrower setting forth details of such Event of Default or Default and the action that such Borrower has taken and proposes to take with respect thereto;

(vi)    promptly after the filing or receiving thereof, copies of all reports and notices that such Borrower or any ERISA Affiliate files under ERISA with the Internal Revenue Service or the Pension Benefit Guaranty Corporation or the U.S. Department of Labor or that such Borrower or any ERISA Affiliate receives from any of the foregoing or from any Multiemployer Plan to which such Borrower or any ERISA Affiliate is or was, within the preceding five years, a contributing employer, in each case in respect of the assessment of Withdrawal Liability or an ERISA Event or other event or condition which could, in the aggregate, result in the imposition of liability on such Borrower or any such ERISA Affiliate in excess of $50,000;

(vii)    prompt notice of such Borrower or any Lottery Holding SPV becoming a Benefit Plan Entity;

(viii)    at least thirty (30) days prior to any change in the name or jurisdiction of organization of such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer, a notice setting forth the new name or jurisdiction of organization of such Borrower, the Related Seller or the Related Servicer and the effective date thereof;

(ix)    promptly after such Borrower obtains knowledge thereof, notice of (a) any event of default, potential event of default or similar event under any Transaction Document or Related Contract and (b) any litigation, investigation or claim or any threatened litigation or claim affecting such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer which if adversely decided could reasonably be expected to have a Material Adverse Effect;

(x)    promptly after receipt thereof, copies of all notices received by such Borrower from any Person under or with respect to any Transaction Document (unless the Administrative Agent is a named notice party therein);

(xi)    promptly after the request of the Administrative Agent, information as to the amount of funds in the applicable Borrower Accounts; and

(xii)    such other information related to the Receivables, any Health Care Provider Loan Receivables, the Obligations, the Collateral or the condition or operations, financial or otherwise, of such Borrower, the Related Servicer or the Related Seller as the Administrative

A-1058

Agent or any Lender in the Related Lender Group may from time to time reasonably request, to the extent such disclosure is permitted under applicable law, rule or regulation.

    (k)    <u>Separateness</u>.

    (i)    Such Borrower shall not direct or participate in the management of any other Borrower or any of the Other Companies' operations or of any other Person's operations (other than as sole member of a Lottery Holding SPV).

    (ii)    Such Borrower shall have stationery and other business forms separate from that of any other Borrower, the Other Companies or any other Person.

    (iii)    Such Borrower shall at all times be adequately capitalized in light of its contemplated business.

    (iv)    Except as otherwise contemplated by the Transaction Documents, such Borrower shall at all times provide for its own operating expenses and liabilities from its own funds (and, as applicable, those of a Lottery Holding SPV).

    (v)    Such Borrower shall maintain its assets and transactions separately from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and reflect such assets and transactions in financial statements separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and evidence such assets and transactions by appropriate entries in books and records separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) except as otherwise expressly permitted by the Transaction Documents, and in each case, other than for tax purposes. Such Borrower shall hold itself out to the public under such Borrower's own name as a legal entity separate and distinct from any other Borrower or the Other Companies (other than for tax purposes or with respect to a Lottery Holding SPV). Such Borrower shall not hold itself out as having agreed to pay, or as being liable, primarily or secondarily, for, any obligations of any other Borrower, the Other Companies or any other Person, except as otherwise contemplated by the Transaction Documents. Such Borrower shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person (other than a Lottery Holding SPV), and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Transaction Documents. Such Borrower shall not maintain any joint account with any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or become liable as a guarantor or otherwise with respect to any Debt or contractual obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) except in accordance with the Transaction Documents.

    (vi)    Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person except a Lottery Holding SPV or otherwise in accordance with the Transaction Documents.

    (vii)    Such Borrower shall not make loans, advances or otherwise extend credit to any of the Other Companies or to any other Person (other than to the Lottery Holding

A-1059

SPVs) except in connection with its ownership of any Health Care Provider Loan Receivables or as otherwise contemplated by the Transaction Documents or make any investment (other than Eligible Investments) in any Person (other than a Lottery Holding SPV) or otherwise in accordance with the Transaction documents.

(viii)    Such Borrower shall observe all (A) Delaware limited liability company formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited liability company agreement in a manner that would adversely affect the existence of such Borrower as a bankruptcy-remote special purpose entity.

(ix)    Such Borrower shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person (other than for tax purposes) and shall not identify itself as a division of any other Person (other than for tax purposes).

(x)    Without limiting in any way its ability to acquire and administer Third Party Intercreditor Receivables, if applicable, such Borrower shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

(xi)    Such Borrower shall not use its separate existence to perpetrate a fraud in violation of applicable law or act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

(xii)    Except as permitted by or pursuant to the Transaction Documents (including such Borrower's acquisition of any Receivables Notes or membership interests in a Lottery Holding SPV), such Borrower shall not acquire any securities or debt instruments of any of its Affiliates or any other Person.

(xiii)    Except as otherwise contemplated by the Transaction Documents, such Borrower shall not engage in any transaction with any of the Other Companies (other than the Lottery Holding SPVs) except for a transaction that is both (a) on arm's-length terms and (b) permitted by this Agreement, its organizational documents and the other Transaction Documents.

(xiv)    If such Borrower is the SPLCSS Borrower, the Borrower shall cause the Lottery Holding SPV to comply with each covenant in this Section 5.01(k) as if such covenant was an obligation of the Lottery Holding SPV.

(l)    Nature of Business; Fiscal Year. Such Borrower shall not engage in any business other than as expressly permitted by its organizational documents, this Agreement and the other Transaction Documents. Such Borrower shall not create or form any Subsidiary (other than a Lottery Holding SPV). Neither such Borrower nor any Lottery Holding SPV shall change its fiscal year or any of its fiscal quarters, without the Administrative Agent's and Lenders in the Related Lender Group's prior written consent, which consent shall not be unreasonably withheld or delayed.

64

A-1060

(m) <u>Mergers, Etc</u>. Without the prior written consent of the Administrative Agent, such Borrower shall not merge with or into or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired) to, or acquire all or substantially all of the assets or capital stock or other ownership interest of, or enter into any joint venture or partnership agreement with, any Person, other than as specifically contemplated by this Agreement and the other Transaction Documents.

(n) <u>Distributions, Etc</u>. Such Borrower shall not declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any class of equity interests of such Borrower, or return any capital to its members as such, or purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any shares of any class of equity of such Borrower or any warrants, rights or options to acquire any such shares, now or hereafter outstanding; <u>provided</u> that (x) such Borrower may declare and pay cash dividends to its members so long as (i) no Default or Event of Default with respect to such Borrower shall then exist or would occur as a result thereof, (ii) such dividends are in compliance with all applicable law and (iii) such dividends have been approved by all necessary and appropriate limited liability company action of such Borrower and are cash proceeds received by such Borrower in accordance with <u>Section 2.18(a)(xi)</u>, <u>Section 2.19(a)(xi)</u>, <u>Section 2.20(a)(xii)</u>, <u>Section 2.21(a)(xi)</u> or <u>Section 2.22</u>, as applicable and (y) such Borrower shall be permitted to distribute the Receivables or any Health Care Provider Loan Receivables after the Obligations in respect of such Receivables or Health Care Provider Loan Receivables, if any, that are then due and payable have been prepaid.

(o) <u>Debt</u>. Such Borrower shall not incur any Debt, other than any Debt permitted pursuant to this Agreement or the other Transaction Documents.

(p) <u>Organizational Documents</u>. Such Borrower shall not (and will not permit any Lottery Holding SPV to), amend restate, delete or modify its certificate of formation, limited liability company agreement or resolutions in any material respect without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

(q) <u>Use of Proceeds</u>. Such Borrower shall use the proceeds of the Loans solely to acquire Receivables and Related Security (including indirectly by contributing to a Lottery Holding SPV) and any Health Care Provider Loan Receivables which, in each case (other than the Excluded Lottery Receivables), shall be pledged as Collateral hereunder, together with any related reasonable costs and expenses related to such acquisition (including the reimbursement of origination costs and expenses to the Seller) and to pay accrued and unpaid interest on the Loans. The SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, shall agree for each LC Asset Group to an LTV Percentage and such LTV Percentage may only be changed by mutual agreement of the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group; <u>provided</u>, that the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, may agree to amend (whether by aggregation or separation) the LTV Percentages for any LC Asset Group and the Life Contingent Receivables constituting such LC Asset Group at any time. Such Borrower agrees not to use the proceeds of any Loan to acquire or

A-1061

carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

(r)     Sanctions; Anti-Money Laundering Laws, Use of Proceeds. Such Borrower shall not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Affiliate or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable Anti-Money Laundering Law or anti-corruption law, or (ii) (A) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, a Lender or otherwise).

(s)     Payment of Taxes. Such Borrower shall timely pay all taxes that become due and payable except (i) where such taxes are being contested in good faith or (ii) to the extent such failure to pay could not reasonable be expected to have a Material Adverse Effect.

(t)     Tax Treatment. For U.S. federal income tax purposes, such Borrower shall not be treated as a corporation or as an association taxable as a corporation.

(u)     Interest Rate Hedging.

(i)     With respect to each of the SPLCSS Borrower and the Dorchester Borrower, within five (5) Business Days following any Borrowing Date, and on each Calculation Date (other than the initial Calculation Date), such Borrower shall maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions as to which the aggregate notional principal amount at such time (i) is approximately equal to the aggregate principal amount of all Loans to such Borrower outstanding at such time (after giving effect to any new Loans to such Borrower or repayments by such Borrower on such date), (ii) is not more than what the Valuation Amount would be at such time if "0.0%" were substituted for, in the case of the SPLCSS Borrower, the applicable percentages set forth in clauses (i)(b), (ii)(b) and (iii)(b) of the definition of Discount Rate, and in the case of the Dorchester Borrower, 0.00% in the definition of Discount Rate and (iii) that has a DV01 that offsets the DV01 of the applicable Collateral for each of the SPLCSS Borrower or the Dorchester Borrower as illustrated in Schedule XVI and (iv) that are acceptable to the Administrative Agent.

(ii)     Such Borrower shall only enter into Hedge Transactions with a Hedge Counterparty that shall be governed by a Hedge Agreement; provided that if (x) a Hedge Agreement ceases to be of effect, (y) such Borrower fails to fulfil its obligation under clause (i), or (z) the counterparty thereto ceases to qualify as a Hedge Counterparty, such Borrower agrees to, and the Administrative Agent may cause such Borrower, within fifteen days or a request by the Administrative Agent to the related Borrower, to enter into a Hedge Agreement and Hedge Transactions with any Hedge Counterparty that the Administrative Agent selects (in its sole discretion).

66

A-1062

(iii)    As additional security to the Administrative Agent hereunder, such Borrower has pledged to the Collateral Agent, for the benefit of the Secured Parties, all right, title and interest of such Borrower in the Hedge Collateral, if applicable. Such Borrower acknowledges that, as a result of its pledge, such Borrower may not, without the prior written consent of the Required Lenders in the Related Lender Group, exercise any rights under any Hedge Agreement or Hedge Transaction, except for such Borrower's right under any Hedge Agreement to enter into Hedge Transactions in order to meet such Borrower's obligations hereunder. Nothing herein shall have the effect of releasing such Borrower (or, if applicable, any Affiliate of such Borrower) from any of its obligations under any Hedge Agreement or any Hedge Transaction (including the payment of the Obligations in full), nor be construed as requiring the consent of any Hedge Counterparty or the Lenders in the Related Lender Group for the performance by such Borrower (or, if applicable, any Affiliate of such Borrower) of any such obligations.

(iv)    Such Borrower shall promptly deliver to the Administrative Agent and the Lenders in the Related Lender Group a copy of all documents related to any Hedge Agreement, including (a) confirmations, schedules and an aggregate notional amortization schedule prior to entering into such agreement, and (b) any notices received by such Borrower from the Hedge Counterparty following the effective date of the Hedge Agreement.

(v)    Such Borrower shall pay all reasonable and documented costs and expenses (including reasonable and documented legal fees and disbursements) incurred by the Administrative Agent, the Collateral Agent, the Lenders and each Hedge Counterparty in connection with each Hedge Transaction in accordance with Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable to such Borrower.

(vi)    Each Hedge Agreement shall be approved by the Administrative Agent prior to the execution thereof by the applicable Borrower.

(vii)    Neither the SPLCSS Borrower nor the Dorchester Borrower shall enter into any Hedge Transaction with respect to which the Administrative Agent has previously raised an objection in writing and each of the SPLCSS Borrower and the Dorchester Borrower shall use commercially reasonable efforts to give effect to the reasonable requests of the Administrative Agent with respect to Section 5.01(u).

(v)    Eligible Receivables. All Receivables purchased by such Borrower and any Lottery Holding SPV (or Receivables securing any Health Care Provider Loan Receivables so purchased, if applicable) shall be Eligible Receivables at the time they are pledged hereunder.

(w)    Insurance. Such Borrower shall pay to any Other Company (other than the Lottery Holding SPVs) the marginal increase of (or, in the absence of such increase, the market amount of its portion of) the premium payable with respect to any insurance policy that covers the Borrower and such Other Company (other than the Lottery Holding SPVs), but the Borrower shall not, directly or indirectly, be named or enter into an agreement to be named, as a direct or contingent beneficiary or loss payee, under any such insurance policy, with respect to any amounts payable due to occurrences or events related to such Other Company (other than the other Borrowers).

67

(x)    <u>Agreed Upon Actuarial Models</u>. With respect to the Insurety Borrower, each Agreed Upon Actuarial Model, together with the related persistency rates provided by the Independent Actuary, will be updated no less frequently than once per annum or at any time that the Administrative Agent reasonably believes that the underlying persistency rates have changed (as evidenced by a written notice provided by the Administrative Agent to the Insurety Borrower) and an Agreed Upon Actuarial Model should be updated as a result of such change; <u>provided</u>, that the initial models applied as of the Closing Date are described on <u>Schedule XV</u>.

(y)    <u>Dispute Resolution</u>. If the Administrative Agent provides the Insurety Borrower and any Independent Actuary with written notice that it disputes the Valuation Amount of an Eligible Receivable, the Insurety Borrower shall cause such Independent Actuary to deliver a redetermined Valuation Amount within twenty (20) Business Days following receipt of such notice.

(z)    <u>Membership Interests in Lottery Holding SPVs</u>. The SPLCSS Borrower shall not vote to enable, or take any other action to permit, any Lottery Holding SPV to issue any additional membership interests or other equity securities of any nature or to issue any other membership interests or other ownership interests convertible into or granting the right to purchase or exchange for any membership interests or other ownership interests of any nature of any Lottery Holding SPV. Whenever any membership interest of a Lottery Holding SPV is an uncertificated security, the SPLCSS Borrower shall, or shall cause such Lottery Holding SPV to, take all steps as are reasonably necessary to give exclusive control over such membership interest to the Collateral Agent in a manner reasonably satisfactory to the Collateral Agent.

Section 5.02    <u>Financial Records; Access to Information</u>. Such Borrower shall maintain its books and records in accordance with GAAP. Until the Commitments have expired or been terminated and the Principal Amount of and Interest on each Loan and all other Obligations owed by such Borrower have been paid in full, such Borrower, the Related Servicer and the Related Seller shall, at their respective expense, from time to time during regular business hours as requested by the Administrative Agent, permit the Administrative Agent or its agents or representatives (including independent public accountants, which may be such Borrower's or an Affiliate's independent public accountants), with reasonable out-of-pocket costs and expenses associated therewith reimbursable to the Administrative Agent by such Borrower (subject to the limitations set forth in <u>Section 9.02</u>), (a) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for initial due diligence of the Receivables), (b) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (c) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (b) above, and to discuss matters relating to Receivables and the Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller,

68

A-1064

the account numbers of the Third Party Intercreditor Accounts, which <u>Schedule VII</u> may be updated from time to time with the consent of the Administrative Agent.

(b)    <u>Payment Instructions</u>. Except for Receivables that constitute Third Party Intercreditor Receivables, such Servicer has notified (or has caused the Related Seller to notify) the Obligor on each Receivable to make payments on such Receivable to either one of the Lock-Boxes or one of the Deposit Accounts or to the Collection Account or the Concentration Account, as applicable. Third Party Intercreditor Receivables shall be paid to the Third Party Intercreditor Accounts.

(c)    <u>Compliance Reports and Monthly Reports</u>. Each Compliance Report, Monthly Report or other <u>pro forma</u> written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    <u>Facility Events of Default</u>. If any of the following events (each, a "<u>Facility Event of Default</u>") shall occur and be continuing:

(a)    Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure shall remain unremedied for 30 days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

(b)    Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and such failure shall continue unremedied for 30 days; or

(c)    A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within 30 days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; <u>provided</u>, that a Borrowing Base Deficiency shall not constitute a Facility Event of Default until such time as the Administrative Agent declares a Facility Event of Default; and <u>provided</u>, <u>further</u>, that the election by the Administrative Agent not to declare a Facility Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Facility Event of Default; or

(d)    The security interest created pursuant to <u>Section 2.15</u> shall for any reason cease to be a valid and perfected first priority security interest in the Collateral, and if capable of being cured, such cessation shall remain unremedied for two (2) Business Days; or

(e)    The PBGC or the IRS shall, or shall indicate its intention to, file notice of a lien pursuant to Section 6323 of the Code or Section 4068 of ERISA with regard to the assets of

75

any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller; or

(f)      Should any Servicer (if such Servicer is an Affiliate of any Borrower), any Seller, any Borrower or any Lottery Holding SPV or any of their respective senior executive officers be indicted for a felony offense involving financial fraud; provided that such Facility Event of Default shall cease to exist if (i) the indictment is dismissed, (ii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller or such senior executive officer of any such parties, as applicable, enters into an agreement of settlement with the authority that has commenced such indictment, which agreement is entered into without prejudice to such party or without admission of fault or wrongdoing by such party or (iii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller, as applicable, removes direct responsibility for the origination, acquisition or administration of the Collateral from each such senior executive officer, if any, that is the subject of the applicable indictment; or

(g)      the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC ceases to be at least equal to $75,000,000; or

(h)      without the consent of the Lenders (i) either 777 Partners LLC or 600 Partners LLC, as applicable, ceases to Control all entities that are in the respective Borrower Group or (ii) 777 Partners LLC and 600 Partners LLC cease to be Affiliates of each other; or

(i)      the failure of the Borrowers to satisfy each condition subsequent set forth in Section 3.04(a)(i) through (iii) or Section 3.04(b) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrowers:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in any Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the Borrowers owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Related Lender Group, terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Lender Group, designate another Person to succeed each Servicer as the Related Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.02   Events of Default. If any of the following events (each, a "Borrower Group Event of Default") shall occur and be continuing:

(a)      Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure

shall remain unremedied for two (2) Business Days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

        (b)    Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and except with respect to the failure to make any payment on the applicable Maturity Date, such failure shall continue unremedied for two (2) Business Days; or

        (c)    Any representation or warranty made or deemed made by any Borrower, any Seller, any Lottery Holding SPV, or, so long as such Servicer is an Affiliate of any Borrower, any Servicer (or any of their respective officers) under or in connection with this Agreement or any other Transaction Document or any information or report delivered by any Borrower, any Seller or, so long as such Servicer is an Affiliate of any Borrower, any Servicer pursuant to this Agreement or any other Transaction Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered, and such condition remains unremedied for a period ending two (2) Business Days after the end of immediately succeeding Interest Period after the earlier to occur of (i) the date on which written notice of such incorrectness requiring the same to be remedied shall have been given to the applicable Borrower, the applicable Seller or the applicable Servicer by the Administrative Agent or (ii) the date on which applicable Borrower, the applicable Seller or the applicable Servicer, as applicable, acquires knowledge thereof; provided, however, to the extent such false or incorrect representation relates to a Receivable or Health Care Provider Loan Receivable, it shall not constitute a Borrower Group Event of Default if such Receivable or Health Care Provider Loan Receivable does not constitute a Defective Receivable (as defined in the applicable Sale Agreement) or if the applicable Seller Repurchases such Receivable or Health Care Provider Loan Receivable in accordance with the terms of the applicable Sale Agreement; or

        (d)    Any Borrower or any Seller shall fail to perform or observe any term, covenant or agreement contained in this Agreement, the applicable Servicing Agreement or the applicable Sale Agreement on its part to be performed or observed (other than as specified in subsection (a) hereof) and any such failure shall remain unremedied for a period of thirty (30) day after the earlier to occur of (i) the date on which written notice of such failure requiring the same to be remedied shall have been given to the applicable Borrowers or the applicable Seller by the Administrative Agent or (ii) the date on which the applicable Borrower or the applicable Seller, as applicable, acquires knowledge thereof; provided that the failure of any Borrower to perform or observe any covenant contained in Sections 5.01(g), 5.01(h), 5.01(m), 5.01(o), 5.01(p) or 5.01(q) shall not be entitled to the benefit of such thirty (30)-day period; or

        (e)    Any Borrower, any Servicer (if an Affiliate of any Borrower) or any Seller shall fail to pay any principal of or premium or interest on any of its Debt which is outstanding in a principal amount of at least $500,000 ($25,000 in the case of a Borrower) in the aggregate when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event

A-1067

shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f)    Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Borrower, any Lottery Holding SPV, a Servicer or a Seller seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days in the case of a Servicer or a Seller, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any proceeding or petition shall be instituted or adopted for the winding up of any Borrower or any Lottery Holding SPV (whether or not in the context of a bankruptcy or insolvency proceeding); or any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall take any corporate or other action to authorize any of the actions set forth above in this <u>subsection (g)</u>; or

(g)    A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within three (3) Business Days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; <u>provided</u>, that a Borrowing Base Deficiency shall not constitute a Borrower Group Event of Default until such time as the Administrative Agent declares a Borrower Group Event of Default; and <u>provided</u>, <u>further</u>, that the election by the Administrative Agent not to declare a Borrower Group Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Borrower Group Event of Default; or

(h)    One or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (or $25,000 in the case of any Borrower or any Lottery Holding SPV) (except to the extent covered by insurance as to which the insurer has acknowledged such coverage in writing) shall be rendered against any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be taken by a judgment creditor to attach or levy upon any assets of any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) to enforce any such judgment; or

A-1068

(i)    Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower),any Seller or any ERISA Affiliate of any of them shall fail to pay when due an amount or amounts aggregating in excess of $500,000 which it shall have become liable to pay under Section 302 or Title IV of ERISA or Section 412 of the Code with respect to any Plan or Multiemployer Plan; or notice of intent to terminate a Plan shall be filed under Title IV of ERISA by any of the foregoing, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer, any Plan; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Plan must be terminated; or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA, with respect to, one or more Multiemployer Plans which could cause any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller or one or more ERISA Affiliates of any of them to incur a current payment obligation in excess of $500,000; or (ii) any other ERISA Event shall have occurred that, in the opinion of the Administrative Agent or the Required Lenders in the Related Lender Group, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller and any ERISA Affiliate of any of them in an aggregate amount exceeding $500,000; or

(j)    Any Borrower or any Lottery Holding SPV becomes a Benefit Plan Entity and fails to cease being a Benefit Plan Entity within thirty (30) days; or

(k)    So long as a Servicer is an Affiliate of any Borrower, a Servicer Default shall occur (after giving effect to any applicable notice or cure period); or

(l)    Should any material provision of this Agreement or any other Transaction Document to which any Borrower is a party cease to be in full force and effect or any Borrower shall assert in writing (which may be provided via electronic mail) that this Agreement or any other Transaction Document is no longer in full force and or effect; or

(m)    A Change of Control shall occur; or

(n)    Any Borrower ceases to be disregarded as an entity separate from any Seller, elects to be treated as a corporation, or otherwise becomes or is treated as a corporation or partnership for U.S. federal income tax purposes; or

(o)    Subject to the timeframe set forth in Section 3.04(a), any Borrower Account or Lock-Box ceases to be the subject of one or more fully executed Account Control Agreements; provided, that if any such Lock-Box is held in the name of a Lottery Holding SPV, an Account Control Agreement shall not be required with respect to such Lock-Box so long as Collections remitted to such Lock-Box are automatically transferred by the related account bank to the Collection Account related to the SPLCSS Borrower and the absence of such Account Control Agreement shall not constitute a breach of any term or condition of any Transaction Document; or

(p)    Should (i) any event of default, termination event or additional termination event in respect of any Borrower occur under any Hedge Agreement and be continuing after any

79

A-1069

applicable grace periods, or (ii) any Borrower fail to maintain any Hedge Transactions that it is required to maintain pursuant to Section 5.01(u) hereof, and such failure shall not have been remedied within fifteen (15) days after the occurrence of such event; or

(q)     Should any event of default, termination event or additional termination event in respect of a Hedge Counterparty occur under any Hedge Agreement and be continuing after any applicable grace periods and such Borrower fails to enter into one or more replacement Hedge Agreements with one or more other Hedge Counterparties within sixty (60) days after the occurrence of such event; or

(r)     With respect to the Insurety Borrower, the failure of the Insurety Borrower to satisfy Section 3.04(a)(iv) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrower with respect to which such Borrower Group Event of Default has occurred:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, terminate the Commitments of the Lenders in the Related Lender Group, and thereupon the Commitments of the Lenders in the Related Lender Group shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, designate another Person to succeed the Related Servicer as the Related Servicer; provided that, automatically upon the occurrence of any event (without any requirement for the passage of time or the giving of notice) described in paragraph (f) of this Section 7.02, the principal of the Loans (together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder) shall become due and payable immediately, the Commitments of the Lenders in the Related Lender Group, if any, shall terminate immediately, and the Related Servicer shall cease to be the Related Servicer, and the successor Servicer designated by the Administrative Agent with respect to the Related Servicer shall become a Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.03   Servicer Defaults. Each Borrower and each Servicer authorizes the Administrative Agent, and hereby irrevocably appoints the Administrative Agent (and each servicer appointed to act on its behalf) as its attorney-in-fact coupled with an interest, with full power of substitution and with full authority in place of such Borrower or such Servicer, following the occurrence and during the continuation of a Servicer Default, to take any and all steps in such Borrower's or such Servicer's name and on behalf of such Borrower or such Servicer that are necessary or desirable, in the determination of the Administrative Agent, to collect amounts due

80

A-1070

SCHEDULE XVI

DV01 CALCULATION EXAMPLE

The purpose of calculating DV01, in accordance with Section 5.01(u), is to support the structuring of Hedge Transactions such that the DV01 of the Collateral, when added to the DV01 of the Hedge Transactions, is offset (i.e. their sum is zero).

For Collateral:

DV01 = V – V'

Where

V        = Valuation Amount, as specified on Schedule VIII and XI

V'       = Valuation Amount, as specified on Schedule VIII and XI, amended such that Discount rate in (i) is increased by 0.01%

For Hedge Transaction(s):

A Hedge Transaction can be characterized within SWPM (Bloomberg Swap Manager) using a Bloomberg Terminal, and DV01 can be found as a Valuation Result on the Main section of SWPM.

SCHEDULE XVI

A-1071

ANNEX A-1

FORM OF COMPLIANCE REPORT

The undersigned hereby certifies that, as of the date of this report:

(i)     the accompanying spreadsheet provides a pro forma calculation of the Borrowing Base after giving effect to the distributions to occur on the related Distribution Date or related Borrowing, as applicable.

(ii)    each of the representations and warranties made by the undersigned and the related Borrower in Article IV of the Loan and Security Agreement, dated as of May 7, 2021 (as amended, the "Loan and Security Agreement"), by and among the borrowers party thereto, the sellers party thereto, Leadenhall Capital Partners, LLP, as administrative agent, the lenders party thereto, the Collateral Agent party thereto, and the undersigned and the other servicers party thereto, is true and correct in all material respects;

(iii)   no Default or Event of Default has occurred and is continuing; [and]

(iv)    the Borrowing Base Limitation is not exceeded, and no Borrowing Base Deficiency exists[; and][.]

(v)     [no Reserve Deficiency exists.]

Date: _____, 20__                    [SERVICER]

                                           By: _____
                                               Authorized Signatory

ANNEX A-1

A-1072

DECLARATION OF JONATHAN WATKINS, FOR DEFENDANTS
A-CAP AND KENNETH KING, IN SUPPORT OF REPLY MEMORANDUM OF
LAW, DATED AUGUST 26, 2024, WITH EXHIBITS A THROUGH E
(REDACTED HEREIN. REPRODUCED IN THE CONFIDENTIAL APPENDIX AT PP. CA-37-
CA-561)

A-1073

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP AND LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 <br><br> **CORRECTED AMENDED COMPLAINT** |

A-1074

**Table of Contents**

INTRODUCTION ................................................................................................. 4

PARTIES ............................................................................................................. 10

    A.    Plaintiffs ................................................................................... 10

    B.    Defendants ................................................................................ 11

JURISDICTION AND VENUE ........................................................................... 16

STATEMENT OF THE CASE ............................................................................. 19

I.    Leadenhall Enters into a Credit Facility with 777 Partners Secured by Collateral ......................................................................................................... 19

    A.    The Credit Facility ................................................................... 19

    B.    The Loan and Security Agreement .......................................... 22

    C.    The Pledge Agreements ........................................................... 27

    D.    The Sale Agreements ............................................................... 28

    E.    The Servicing Agreements ...................................................... 29

    F.    The Guaranty Agreement ........................................................ 31

    G.    Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests. ................................ 32

II.    Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral ....................................................................................................... 36

    A.    Leadenhall Receives an Anonymous Tip Sounding the Alarm on Wander's "Criminal" Scheme. .............................................. 36

    B.    Leadenhall Visits 777 Partners' Offices in Miami, During Which Wander Tries to Assure Leadenhall That Any problems with Its Collateral Are Limited and Under Control. .......................... 38

    C.    In Early 2023, Wander Confirms That "Around $100 Million" of Collateral Had Been Double-Pledged to a Third-Party Lender Called Credigy. ....................................................................... 42

    D.    Despite Defendants' Efforts to Stonewall Leadenhall's Investigation, Leadenhall Discovers That the Borrowers Had Pledged Assets They Never Even Owned, and Leadenhall Formally Notices the Borrowers' Breaches of the Agreements ... 48

    E.    Leadenhall Learns That 777 Partners and the Borrowers Forged and Altered Financial Records to Conceal the Fraud. ................ 55

    F.    Leadenhall Exercises Remedies under the LSA, and 777 Partners Admits It Lacks Authority to Agree to a Repayment Plan without A-CAP. ......................... 59

III.    The Collateral Scam Furthered a Broader Fraudulent Enterprise Between 777, A-CAP, and Their Principals ........................................................................... 65

2

A-1075

|   |   |   |
|---|---|---|
| | A. | King and A-CAP Controlled 777 Partners' Operations During the Fraudulent Scheme Against Leadenhall...................................... 69 |
| | B. | A-CAP Was Well Aware of and Participated in 777's Fraud on Leadenhall.......................................................................................... 72 |
| | C. | A-CAP Exercised and Continues to Exercise Its Control Over 777 Partners to Advantage Itself Over Other Creditors, Including Leadenhall.......................................................................................... 76 |
| | D. | The Tangled Web of A-CAP and 777 Partners......................... 79 |
| | E. | Wander, Pasko, and the 777 Entities Operate as Alter Egos. ............... 90 |
| | F. | As Creditors and Counterparties Learn the Truth, the A-CAP/777 Scheme Begins to Crumble..................................................... 95 |

IV.   Absent Injunctive Relief, the Enterprise Would Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Assets to A-CAP to Avoid Satisfying Creditors.................................................................. 101

CLAIMS FOR RELIEF .................................................................................. 118

FIRST CLAIM FOR RELIEF (Breach of LSA)............................................. 118

SECOND CLAIM FOR RELIEF (Breach of Sale Agreement)....................... 121

THIRD CLAIM FOR RELIEF (Breach of Servicing Agreement and LSA)

FOURTH CLAIM FOR RELIEF (Breach of Guaranty Agreement)........................ 127

FIFTH CLAIM FOR RELIEF (Civil RICO, 18 U.S.C. § 1962(c))..................... 132

SIXTH CLAIM FOR RELIEF (Civil RICO Conspiracy, 18 U.S.C. § 1962(d)) .................. 143

SEVENTH CLAIM FOR RELIEF (Fraudulent Misrepresentation) ...................... 146

EIGHTH CLAIM FOR RELIEF (Civil Conspiracy to Commit Fraud) ................... 147

NINTH CLAIM FOR RELIEF (Aiding and Abetting Fraud)).......................... 148

TENTH CLAIM FOR RELIEF (Unjust Enrichment) ................................... 152

ELEVENTH CLAIM FOR RELIEF (Actual Fraudulent Transfer) .......................... 152

TWELFTH CLAIM FOR RELIEF (Constructive Fraudulent Transfer)................... 154

PRAYER FOR RELIEF ................................................................................ 155

A-1076

Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life," and collectively, "Leadenhall"), in their respective capacities as investment managers and/or agents, allege against Defendants Josh Wander, Steven Pasko, Kenneth King, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC ("SuttonPark Borrower"), Signal SML 4 LLC ("Signal Borrower"), Insurety Agency Services LLC ("Insurety Borrower"), Dorchester Receivables II LLC ("Dorchester Borrower"), SuttonPark Capital LLC ("SuttonPark Capital"), Signal Medical Receivables LLC ("Signal Medical"), Insurety Capital LLC ("Insurety Capital"), SuttonPark Servicing LLC (the "SuttonPark Servicer"), and Advantage Capital Holdings LLC ("A-CAP") as follows.

## INTRODUCTION

1.    This action concerns a years-long pattern of fraud perpetrated on the lenders of hundreds of millions of dollars of debt by a group of entities operating under the domination and control of Defendants Josh Wander, Steven Pasko, and Kenneth King.  Leadenhall is the agent with the authority to bring this action for the benefit of investors in the lenders.

2.    To induce Leadenhall to fund their operation, Wander, along with his group of alter ego entities, "pledged" over $350 million in assets as collateral to Leadenhall, knowing all along that the assets either did not exist, were not actually owned by Wander's entities, or had already been pledged to another lender.  Wander has already admitted to rampant and fundamental breaches of the parties' agreements—the only question now is whether Leadenhall will be able to recover millions of dollars in damages from a house of cards on the brink of collapse.

3.    The scheme would not have been possible—and would not have been able to operate undetected for so long—without A-CAP.  While claiming to be nothing more than a "senior" lender to Wander, Pasko, and their constellation of businesses, A-CAP has not acted like

4

A-1077

one. If it ever was an arm's-length lender, it knowingly and willingly crossed the line to become a co-conspirator and participant in Wander and Pasko's enterprise by perpetuating the lie to Leadenhall. Regardless of exactly when A-CAP became aware of the scheme—which, as set forth below, occurred by spring 2023 *at the latest*—A-CAP has actively leveraged, and continues to leverage, its knowledge of the fraud to its own financial advantage by, among other things, (a) strategically injecting capital into the 777 businesses to create the illusion of value and financial stability where there is none, for the purpose of inducing Leadenhall to continue lending money, and (b) perpetuating and concealing 777's lies to Leadenhall about fictitious or inflated collateral to avoid the discovery and collapse of the fraudulent enterprise. In exchange for A-CAP's participation in and enabling of the scheme, Wander and Pasko, in willful abandonment of their fiduciary and other duties and obligations, gave A-CAP first dibs on every asset in the 777 empire—whether A-CAP is legally entitled to claim those assets or not.

4.      A credit facility is an agreement that allows borrowers to borrow money over an extended period of time—here, from May 2021 through September 2024—providing borrowers flexibility to use the funds as necessary for their day-to-day operations. In a "borrowing base" credit facility, the borrowers may draw funds from the facility up to the amount of their credit limit, which is based on the value of the collateral securing the debt, *i.e.*, the borrowers' "borrowing base."

5.      On May 7, 2021, Leadenhall entered into a credit facility agreement with a group of limited liability companies, the ultimate parent companies of which are 777 Partners and 600 Partners, as memorialized in a Loan and Security Agreement (the "LSA"). 777 Partners and 600 Partners are the trade names and alter egos of Josh Wander and Steven Pasko, who are the founders and so-called "Managing Partners" of 777 Partners and 600 Partners.

A-1078

6.     Under its express terms, the credit facility was a secured facility, meaning that the borrowers were required to pledge collateral to secure the debt notes and own that collateral "free and clear" of any other security interest.  The borrowers were afforded a lower interest rate because the debt was secured.  And because the value of the borrowers' assets also functioned as the borrowing base, the borrowers were required to re-affirm, on a monthly basis and each time they drew funds from the facility, that they owned any assets pledged as collateral to Leadenhall "free and clear" of any other interests.

7.     In other words, the cardinal rule of the entire financing arrangement was that the borrowers were required to own the assets pledged as collateral "free and clear" of any other security interests.  If the borrowers did not actually own the assets pledged as collateral, or if the borrowers had already pledged those assets to another lender, the entire facility would effectively become an illegal and unsecured personal piggy bank that an individual like Wander could use to finance risky private equity investments in aviation, media, and sports including professional football (soccer) teams, while paying lower rates under the pretense of secured financing.  As it turned out, that is exactly what happened here.

8.     In September 2022, more than a year and a half into the credit facility and after the borrowers had represented to Leadenhall more than 40 separate times that the collateral pledged to secure the debt was "free and clear" of any other security interest, Leadenhall received an anonymous e-mail stating that Wander "either never bought" the assets that he had pledged to Leadenhall as collateral "or already pledged them to another lender."  The tipster revealed as to Wander: "***What he is doing is criminal***."

9.     After receiving the anonymous tip, Leadenhall launched an investigation and requested information from 777 Partners to determine whether this outstanding debt from the

lenders to Wander's companies—totaling well into the hundreds of millions of dollars—was in fact secured.

10.    Unfortunately for Leadenhall, the tip accusing Wander of criminal activity proved to be true.  In March 2023, a third-party lender to 777 Partners called Credigy shared with Leadenhall a list of assets that 777 Partners had ostensibly pledged for the exclusive benefit of Credigy pursuant to a separate credit arrangement with 777 Partners.

11.    By reviewing the list of assets pledged to Credigy, Leadenhall discovered that over 1,600 assets worth approximately $185 million, which 777 Partners had purportedly pledged to Leadenhall, had in fact been "double-pledged"—*i.e.*, the same collateral had been pledged to *both* Credigy and Leadenhall.

12.    During conference calls in March and April 2023, recorded with Wander's permission, Wander attempted to defuse the situation by acknowledging just the tip of the iceberg, referring to the double-pledged collateral as "embarrassing," a "mistake," and a problem that he vowed to resolve—and freely admitting that 777 Partners had breached the parties' agreements while insisting that it had done so inadvertently.  But, to conceal his broader scheme, Wander lied, assuring Leadenhall that the collateral shortfall in breach of the LSA was the result of a recording glitch that could and would be easily remedied.

13.    As a result of those conference calls, Leadenhall began to discern that Wander's misrepresentations concerning Leadenhall's collateral constituted just the opening act, and that 777 Partners does not even control its own operations and ability to perform under the LSA.  The Wizard of Oz behind the 777 Partners curtain is in fact an insurance group holding company called A-CAP.  Wander disclosed on the calls that A-CAP had a first-priority "all asset lien" over all of the assets of 777 Partners.  Leadenhall later learned that A-CAP was behind the scenes—literally—

A-1080

for these discussions, having physically moved into 777's Miami offices to oversee Wander and Pasko's operations around the same time the Leadenhall double-pledge came to light.

14.    In an effort to "replace" the double-pledged collateral with other security interests and continue to keep Leadenhall from filing this lawsuit, in the summer of 2023, A-CAP offered Leadenhall a fourth-priority position on the assets of 777 Partners' holding company—*i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall declined the offer.

15.    Around the same time that A-CAP's unusual role in 777 Partners' affairs became privately known to Leadenhall, the entanglement between 777 Partners and A-CAP became the subject of extensive public reporting.  A-CAP, dominated and controlled by its "Chairman and CEO" Kenneth King, was reportedly the "silent partner" behind Wander's businesses who both sits on the committee that oversees 777 Partners' investments and provides the "financial firepower" to fuel 777 Partners' dealmaking—reportedly to the tune of at least $1 billion in loans, but in actuality more than double that amount, from A-CAP and affiliates to 777 Partners and affiliates.

16.    The entire scheme reached an inflection point in early 2024, when an employee of one of Wander's companies that is a party to Leadenhall's LSA disclosed to Leadenhall that, in an attempt to prevent Leadenhall from confirming that collateral had been double-pledged, Wander-affiliated borrowers had submitted forged financial statements to Leadenhall following Leadenhall's receipt of the anonymous tip. Wander's employee also disclosed that, prior to on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered internal records to try to cover up the double-pledge of collateral.  The insider also disclosed that the boundaries between A-CAP and 777 Partners did not really exist at all—specifically, A-

A-1081

CAP had dictated an express agreement with 777 Partners granting A-CAP the right to control all facets of 777 Partners' operations.

17.      As a result of the agreement between 777 Partners and A-CAP, King and A-CAP must approve every material decision that 777 Partners makes, meaning that, upon information and belief, A-CAP was well aware that Wander's entities had been double-pledging assets as collateral to purportedly secure multiple lines of credit before Leadenhall discovered the double-pledging.

18.      Since Leadenhall discovered the fraudulent scheme alleged herein, public scrutiny over 777 Partners' obfuscation of its own finances and inability to pay its bills has only intensified. This scrutiny could not come at a worse time for Wander, who had been trying to close an acquisition of the Everton Football Club, a historic football team in the prestigious English Premier League.

19.      Everton was the latest shiny object of Wander's fraudulent scheme, solvency aside. Despite the fact that 777 Partners and many of the operating businesses and professional football teams that Wander owns are deep in debt, behind on their obligations, and on thin ice with regulators, Wander's strategy has been continued expansion—using debt to acquire new assets that he can then use as collateral for more debt, which he then fails to timely pay off, in a seemingly never-ending cycle of "robbing Peter to pay Paul."

20.      Upon information and belief, Wander and Pasko are operating an enterprise that is structured and organized as a giant shell game at best, and an outright Ponzi scheme at worst, that takes money in from investors and lenders and shuffles it around to various money-losing alter-ego, though legally distinct, entities to disguise their true financial condition. The enterprise is propped up, in order to attract and deceive new lenders and investors, only by the patronage of A-

9

A-1082

CAP, which pays off the enterprise's last-minute obligations—including 777 Partners' own payroll—in "Whac-A-Mole" fashion to keep 777 Partners' creditors at bay, if only temporarily, and to avoid the entire scheme from being laid bare in public. A-CAP has called these payments "protective advances"—and they have been successful in protecting and concealing the scheme.

21.    In March 2024, exercising its control and dominion over the 777 Partners enterprise, A-CAP prevented 777 Partners from committing to repay the obligations owed to Leadenhall pursuant to an agreed-upon amortization schedule. During these negotiations, Wander was straightforward when questioned on whether A-CAP was the puppeteer behind the 777 Partners marionette:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations. And they are the ones that are doing that.**

22.    Leadenhall has been forced to bring this action to hold Wander, King, Pasko, 777 Partners, A-CAP, and their affiliated entities liable for their pattern of contractual breaches and fraud, which together constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

## PARTIES

### A. Plaintiffs

23.    Plaintiff Leadenhall Capital is a London-based asset management company focused on granting institutional investors access to insurance-related risks. Leadenhall Capital is organized as a limited liability partnership under the laws of England and maintains its principal place of business in London, England at Level 15, 70 Mark Lane, London EC3R 7NQ. Leadenhall Capital's partners are John Wells, Luca Albertini, Lorenzo Volpi, Craig Gillespie, Tom Spreutels, Phil Kane, Chris Learmonth, Kelvin Granger, and Kunal Shah—all domiciliaries of the United

A-1083

Kingdom; Ben Adolph—a domiciliary of Bermuda; and Mitsui Sumitomo Insurance Company Limited—a Japanese corporation with its principal place of business in Japan.  Leadenhall Capital is the Investment Manager and Administrative Agent for the lenders under the LSA, in which capacity it may execute a variety of functions under the LSA and associated agreements, including bringing this action on behalf of the lenders.  *See* LSA § 8.01.

24.     Plaintiff Leadenhall Life is an investment company organized as a public limited company under the laws of Ireland which maintains its principal place of business in Dublin, Ireland.  Leadenhall Life is the Collateral Agent pursuant to the LSA and, in that capacity, holds the security interests in the Collateral pledged for the benefit of the lenders under the LSA.

### B.  Defendants

25.     Defendant 777 Partners is a Miami-based private investment firm organized as a limited liability company under the laws of Delaware which has its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131 (the "777 Partners Address").  The company is nominally focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 777 Partners has one member, SuttonPark Acquisition LLC, which is organized under the laws of Delaware and has its principal place of business in Florida.  SuttonPark Acquisition LLC has two members, JARM Capital LLC and MTCP LLC, both of which are organized under the laws of Delaware and have their principal places of business in Florida.  The sole member of JARM Capital LLC is Josh Wander, and the sole member of MTCP LLC is Steven Pasko.  Reflecting the blurring of personal and professional lines, Josh Wander's wife previously operated her ice cream business, Vitali Natural LLC, out of the 777 Partners Address before the business shut down.

26.     Defendant 600 Partners is a Miami-based private equity firm organized as a limited liability company under the laws of Delaware which has its principal place of business at the 777

11

A-1084

Partners Address. Like 777 Partners, 600 Partners characterizes itself as focused on a range of investments in the insurance, aviation, sports, and media sectors. Upon information and belief, 600 Partners has one member: SPA II LLC, which is organized under the laws of Delaware and has its principal place of business in Florida; and SPA II LLC has two members, MTCP LLC and Steven Pasko.

27.    On April 19, 2023, 777 Partners' assistant general counsel, Jonathan Walder, certified in writing to Leadenhall that the governing documents for the entities listed above attached to that certification—including the Fourth Amended and Restated Limited Liability Company Agreement of 777 Partners LLC, dated September 10, 2021; the First Amended and Restated Limited Liability Company Agreement of SuttonPark Acquisition LLC, dated September 10, 2015; the Amended and Restated Limited Liability Company Agreement of MTCP LLC, dated May 2, 2019; and the Limited Liability Company Agreement of JARM Capital LLC, dated August 25, 2015—were "true and correct copies of the operating agreements governing each entity as of today's date." Those documents confirm that the sole member of 777 Partners is SuttonPark Acquisition LLC, the sole members of SuttonPark Acquisition LLC are MTCP LLC and JARM Capital LLC, and the sole members of those entities are Pasko and Wander, respectively—as of both September 10, 2021, and April 19, 2023.

28.    Further, in approximately June 2022, a 777 Partners representative sent Leadenhall an updated organizational chart listing all of the holders of membership interests in 600 Partners, which were the same members 600 Partners identified in connection with the initial execution of the secured credit facility in May 2021. Each member was a U.S.-based entity, and none has any apparent connection to the UK, Bermuda, Ireland, or Japan. Then, on September 23, 2022, a 777 Partners representative (writing from a 777 Partners email address) represented to Leadenhall that

12

A-1085

three of the four owners had exited 600 Partners, leaving SPA II LLC (wholly owned by Pasko and by Pasko's wholly-owned personal shareholding vehicle) as the "sole member of 600 Partners."

29.    As of May 24, 2024, a 777 Partners spokesperson reconfirmed, in a statement to the Financial Times, that Wander and Pasko were 100% owners of 777 Partners.[1]

30.    Collectively, 777 Partners and 600 Partners own 100% of the equity of each of the entities acting as Sellers and Servicers under the LSA, and the Seller entities in turn own 100% of the equity of each of the entities acting as Borrowers (defined below) under the LSA.  While Josh Wander and Steven Pasko have designed and organized their web of separate legal entities to obscure their domination over the entire structure, Wander and Pasko, in consultation with—and with the approval and indulgence of—King and A-CAP as discussed herein, control 777 Partners, 600 Partners, and each of their subsidiaries and affiliates, including those named as Defendants here.

31.    Defendant Josh Wander is co-founder and Managing Partner of 777 Partners and 600 Partners, and he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Wander's permanent residence is 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.  Reflecting the blurring of personal and professional lines, in purchasing the beachfront property in March 2021, Wander was represented in the purchase by 777 Partners.

32.    Defendant Steven Pasko is the other co-founder and Managing Partner of 777 Partners and 600 Partners, and, upon information and belief, he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Pasko's permanent residence is 1451

---

[1] Samuel Agini, et al., *How a Bet on Everton Engulfed a Football Investor and Its Financial Backers*, FIN. TIMES (May 24, 2024), https://www.ft.com/content/d0b2eae1-0369-40a3-b6f8-73df5a1bc2a9.

A-1086

Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131. Until May 2023, Pasko also owned a residence at 47 Annfield Ct., Staten Island, NY, 10304.

33.    Defendant SPLCSS III LLC (defined above as the "SuttonPark Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Defendant SuttonPark Servicing LLC (defined above as "SuttonPark Servicer") is a limited liability company organized under the laws of Delaware, which represented to Leadenhall that its principal place of business was at 590 Madison Avenue, 15th Floor, New York, New York 10022 as of May 2021, but which has operations in Florida and may have moved its principal office to the 777 Partners Address. Upon information and belief, the SuttonPark Borrower and SuttonPark Servicer have the same sole member, Defendant SuttonPark Capital LLC (defined above as "SuttonPark Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, SuttonPark Capital has two members, 600 Partners and SPC Partners LLC. Upon information and belief, the members of SPC Partners LLC are all domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

34.    Defendant Dorchester Receivables II LLC (the "Dorchester Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, the Dorchester Borrower has one member, Defendant SuttonPark Capital. As set forth above, the members of SuttonPark Capital are 600 Partners and SPC Partners LLC, which are domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

14

35.    Defendant Signal SML 4 LLC (defined above as the "Signal Borrower," and together with the SuttonPark and Dorchester Borrowers, the "Borrowers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, the Signal Borrower has one member, Defendant Signal Medical Receivables LLC (defined above as "Signal Medical"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address, and which is a Seller under the LSA.  Signal Servicing LLC (the "Signal Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, Signal Medical and Signal Servicer each have the same sole member, Signal Financial Holdings LLC, and Signal Financial Holdings LLC is managed by Wander, who runs his businesses out of Miami, Florida, and there is no connection between Signal Financial Holdings LLC and the United Kingdom or Bermuda.  Upon information and belief, the members of Signal Medical are all domiciled in one or more states and not in the United Kingdom, Bermuda, Ireland, or Japan.

36.    Defendant Insurety Agency Services LLC (defined above as the "Insurety Borrower," and, together with the SuttonPark, Dorchester, and Signal Borrowers, the "Borrowers") is a limited liability company organized under the laws of Florida and which has its principal place of business at the 777 Partners Address.  Insurety Servicing LLC (the "Insurety Servicer," and, together with SuttonPark Servicer and Signal Servicer, the "Servicers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  The Insurety Borrower and Insurety Servicer have the same sole member, Defendant Insurety Capital LLC (defined above as "Insurety Capital," and, together with SuttonPark Capital and Signal Medical, the "Sellers"), which is a limited liability company

15

A-1088

organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, Insurety Capital has two members, 777 Partners and John R. Zirkelbach, a natural person domiciled in Ohio, neither of which are domiciled in the United Kingdom, Bermuda, Ireland, or Japan. The Borrowers, Sellers, Servicers, and Guarantors are hereinafter referred to collectively as the "777 Entity Defendants." The 777 Entity Defendants along with Wander and Pasko are referred to collectively as the "777 Defendants."

37.     Advantage Capital Holdings LLC (defined above as "A-CAP") is a limited liability company organized under the laws of Delaware and has its principal place of business at 1180 Avenue of the Americas, 21st Floor, New York, New York 10036. A-CAP is controlled and dominated by Kenneth King, who is domiciled in New York. Upon information and belief, the members of A-CAP are all domiciled in one or more states of the United States and not in the United Kingdom, Bermuda, Ireland, or Japan.

38.     Defendant Kenneth King is the Chairman and CEO of Advantage Capital Management LLC (defined above as "A-CAP") and owns a controlling stake in A-CAP. Upon information and belief, King's permanent residences are 15 Kensington Road, Unit 215, Bronxville, New York 10709 and 26 Wilton Road, Pleasantville, New York 10570. King and A-CAP are hereinafter referred to collectively as the "A-CAP Defendants."

**JURISDICTION AND VENUE**

39.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted a claim arising under the RICO Act, 18 U.S.C. § 1964. This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

40.     The Court also has diversity jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of

the United Kingdom, Ireland, Japan, and Bermuda, and, upon information and belief, Defendants are citizens of Florida, Delaware, Ohio, and New York.

41.    This Court has personal jurisdiction over Defendants 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, the Insurety Borrower, SuttonPark Capital, Signal Medical, and Insurety Capital by the terms of the LSA, which provide that these Defendants have consented to the jurisdiction of courts sitting in New York. *See* LSA § 10.09; Guaranty Agreement § 15.

42.    This Court has personal jurisdiction over Defendant Josh Wander by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers. The Court also has personal jurisdiction over Wander because—while attempting to negotiate an agreement with Leadenhall in March and April 2024 to pay back the debt that the Borrowers had borrowed in excess of contractual limitations—Wander repeatedly called Leadenhall representatives from New York City and, on at least one occasion, worked out of A-CAP's headquarters in New York City. Furthermore, during the relevant period, 777 Partners maintained offices at 140 Grand Street, 9th Floor, White Plains, NY 10601 and 114 West 47th Street, New York, NY 10036. Upon information and belief, Wander conducted the business of 777 Partners at least in part from its New York office. The Court also has personal jurisdiction over Wander because he is so closely related to the Defendant signatories of the LSA that he is bound by the LSA's forum selection clause.

43.    This Court has personal jurisdiction over Defendant Steven Pasko by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers. The Court also has personal jurisdiction over Pasko by virtue of his signing the LSA on behalf of the Defendant signatories thereto, and because Pasko is so closely related to

17

A-1090

those Defendant signatories that it was foreseeable that he would be, and is, bound by the LSA's forum selection clause. Pasko took an active role in the transactions that went beyond simply signing the original LSA, including signing numerous monthly Compliance Reports, as well as all of the Borrowers' Borrowing Requests, and the Sellers' assignments of Collateral to the Borrowers, all of which, as discussed below, were critical components of the 777 Defendants' fraud. The Court also has personal jurisdiction over Pasko because, in his capacity as authorized signatory of the Compliance Reports on behalf of the SuttonPark Borrower and Dorchester Borrower, Pasko represented the SuttonPark Servicer, which as alleged above, has or had during the relevant period its principal place of business in New York. The Court also has personal jurisdiction over Pasko because, until at least 2023, Pasko owned a home in Staten Island, New York. The address of that home was also listed as the business address of MTCP LLC, Pasko's personal shareholding vehicle through which he owned, among other things, his stakes in 777 Partners and 600 Partners. Upon information and belief, Pasko resided and carried out the business of 777 Partners and 600 Partners at least in part from his New York home, and from 777 Partners' offices located in New York.

44.    This Court has personal jurisdiction over Defendants A-CAP and Kenneth King because they are domiciled in New York.

45.    Venue is proper under 28 U.S.C. § 1391 because all Defendants are residents of the state of New York by domicile or the express terms of the LSA or Guaranty Agreement. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants, including but not limited to A-CAP, reside, are found, and/or transact their affairs in this district.

18

A-1091

## STATEMENT OF THE CASE

**I.    Leadenhall Enters into a Credit Facility with 777 Partners Secured by Collateral.**

**A. The Credit Facility**

46.    Wander, through his trade name 777 Partners and its subsidiaries and affiliates, invests in, among other things, various forms of "receivables."  Relevant to this action, those receivables include future cash flows from so-called "structured settlements" and lottery winnings. A "structured settlement" allows an injured plaintiff, typically in a personal injury suit, to receive a settlement or damages award over time in periodic payments rather than as a lump-sum payment.

47.    This form of investment business runs on buying future cash flows from injured parties or lottery winners who are entitled to large amounts of money over a long period of time, but who need more money in the near term than those cash flows permit, and who are thus willing to sell their future cash flows for a lump sum that is a percentage of the present value.

48.    Wander uses the profits from this business both to purchase additional receivables and to infuse capital into other ventures, including Wander's interests in professional football clubs.  To accelerate the profits from this business, Wander increased the leverage on his investments by borrowing against existing receivables portfolios and using those loans to buy more receivables—rinse and repeat.

49.    In 2021, following the expiration of a prior credit facility between the parties, Wander, Pasko, 777 Partners, 600 Partners, and certain entities they control named as Defendants herein entered into a new credit facility with Leadenhall, as detailed more fully below.  The credit facility is embodied in a suite of contracts, at the center of which sits the LSA, executed May 7, 2021.  In addition to the LSA, the parties entered into Sale Agreements, Servicing Agreements, Pledge Agreements, and a Guaranty Agreement (the "Agreements"), each of which is explained in turn below.  Collectively, the Agreements define the relationships between the following entities:

19

A-1092

a.  Leadenhall Capital, which acts as Administrative Agent to the Lenders (as defined below) under the LSA, fielding borrowing requests from Borrowers, facilitating the funding of debt, and enforcing the Lenders' rights and remedies in the event of a material breach or "Event of Default";

b.  Leadenhall Life, which acts as Collateral Agent for the Lenders under the LSA, holding security interests in the receivables and related assets owned and pledged as collateral by the Borrowers, as well as 100% of the equity in the Borrowers, to secure the Lenders' debt;

c.  The Lenders, a group of nine investment funds or separate accounts for which Leadenhall Capital acts as investment manager and agent, which provided secured debt to the Borrowers pursuant to the LSA;

d.  The Borrowers, a group of four firms, all controlled by 777 Partners and 600 Partners, which borrowed secured debt from the Lenders pursuant to the LSA;

e.  The Sellers, a group of three firms, all controlled by 777 Partners and 600 Partners, which sold receivables to the Borrowers to secure debt provided under the LSA, and which also fully owned the Borrowers and pledged their equity in the Borrowers to Leadenhall Life as collateral for the LSA pursuant to the Pledge Agreements;

f.  The Servicers, a group of three firms controlled by 777 Partners and 600 Partners that agreed to service the receivables on behalf of the Borrowers and for the benefit of Leadenhall Capital as Administrative Agent; and

g.  The Guarantors, 777 Partners and 600 Partners, which guaranteed all of the Borrowers' obligations under the LSA and the other Agreements.

# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
### Volume 5 of 5 (Pages A-1093 to A-1354)

JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants*
  *Advantage Capital Holdings LLC*
  *and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP COUNSEL PRESS    (800) 4-APPEAL • (333478)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

i

## TABLE OF CONTENTS

|  | **Page** |
|---|---|
| District Court Docket Entries .................................... | A-1 |
| Complaint, dated May 3, 2024.................................. | A-37 |
| Exhibit 1 to Complaint - Email to Craig Gillespie from Anonymous Sender, dated September 19, 2022......................... | A-119 |
| Exhibit 2 to Complaint - Letter from Craig Gillespie to Steven W. Pasko, Joshua Wander, Damien Alfalla and Steve Pasko, dated March 24, 2023 ............................................ | A-121 |
| Exhibit 3 to Complaint - Email to Josh Wander and Others from Phil Kane, dated March 29, 2023.................................. | A-125 |
| Exhibit 4 to Complaint - Email to Josh Wander and Others from Tom Spreutels, dated April 4, 2023................................ | A-128 |
| Exhibit 5 to Complaint - Letter from John Wells to Steven W. Pasko re: Notice of Breach of Parties' Agreements, dated November 29, 2023 ................................................ | A-130 |
| Exhibit 6 to Complaint - Wells Fargo Summary Statement Screenshot ........ | A-135 |
| Exhibit 7 to Complaint - "Collection" Account Wells Fargo Monthly Statement ................................................ | A-137 |
| Exhibit 8 to Complaint - "Reserve" Account Wells Fargo Monthly Statement ................................................ | A-143 |

ii

**Page**

Exhibit 9 to Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024 ...... A-146

Proposed Order to Show Cause and Temporary
Restraining Order by Plaintiffs, filed May 13,
2024 ........................................................ A-169

Plaintiffs' Memorandum of Law In Support of Their
Application For (1) A Temporary Restraining
Order, and (2) An Order to Show Cause for a
Receiver or, Alternatively, A Preliminary
Injunction, dated May 13, 2024 ........................... A-173

Declaration of Craig Gillespie, for Plaintiffs
Leadenhall Capital Partners LLP and Leadenhall
Life Insurance Linked Investments Fund PLC
("Leadenhall"), in Support of Proposed
Temporary Restraining Order ("Proposed TRO"),
dated May 13, 2024 ................................. A- 202

Exhibit 1 to Gillespie Declaration -
Loan and Security Agreement, dated May 7, 2021    A-210

Exhibit 2 to Gillespie Declaration -
Guaranty Agreement with 777 Partners and 600
Partners, dated May 7, 2021 ................................. A- 250

Exhibit 3 to Gillespie Declaration -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

iii

Page

Exhibit 4 to Gillespie Declaration -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 5 to Gillespie Declaration -
Excerpt from the December 2023 Compliance
Report Issued for the Dorchester Borrower ........... A-269

Exhibit 6 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the SuttonPark Borrower ............. A-271

Exhibit 7 to Gillespie Declaration -
Excerpt from the Revised Compliance Report for
March 2023 for the Dorchester Borrower ............. A-273

Exhibit 8 to Gillespie Declaration -
Paydown and Partial Release Letter on behalf of
Leadenhall, dated February 21, 2024 .................... A-275

Exhibit 9 to Gillespie Declaration -
Default Notice, dated March 12, 2024................... A-284

Exhibit 10 to Gillespie Declaration -
Acceleration Notice, dated March 15, 2024 .......... A-295

Exhibit 11 to Gillespie Declaration -
Draft First Forbearance Agreement, dated
March __, 2024 ....................................................... A-318

Declaration of Phil Kane, for Plaintiff Leadenhall,
in Support of Proposed TRO, filed May 13, 2024.    A-360

Declaration of Luca Albertini, for Plaintiff
Leadenhall, in Support of Proposed TRO, dated
May 13, 2024 ......................................................... A-364

iv

|  | **Page** |
|---|---|
| Declaration of Leigh M. Nathanson, for Plaintiff Leadenhall, in Support of Proposed TRO, dated May 13, 2024 ........................................................ | A-367 |
| Exhibit A to Nathanson Declaration - Amended Verified Complaint in *Change Lending LLC v. 777 Partners LLC et al.*, Index No. 650118/2024 (N.Y. Sup.), dated March 19, 2024 .. | A-372 |
| Exhibit B to Nathanson Declaration - Particulars of Claim in *Corvus Lights Aviation et al v. 777 Partners LLC* (U.K.), dated December 8, 2023 .................................................. | A-385 |
| Exhibit C to Nathanson Declaration - Verified Amended Complaint in *MALT Family Trust et al. v. 777 Partners, LLC et al.*, C.A. No. 2022-0652-MTZ (Del. Ch.), dated November 22, 2022 ............................................... | A-402 |
| Exhibit D to Nathanson Declaration - Summons and Complaint in *Vida Longevity Fund, LP et al. v. SuttonPark Capital LLC et al.*, Index. No. 656715/2022 (N.Y. Sup.), dated July 1, 2022.............................................................. | A-452 |
| Exhibit E to Nathanson Declaration - Complaint in *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.,* Index No. 651220/2024 (N.Y. Sup.), dated March 7, 2024 .... | A-465 |
| Exhibit F to Nathanson Declaration - Complaint in *Balanced Management LLC v. 777 Partners LLC*, Case No. 230909460 (Utah Dist. Ct.), dated December 14, 2023 ............................. | A-480 |

v

**Page**

Exhibit G to Nathanson Declaration -
Verified Petition for Interim Measures in Aid of
Arbitration in *Nakula Management Ltd. v. Joshua
Wander et al.*, Case No. 2024-004624-CA-01
(Fla. 11th Cir. Ct.) (exhibits to the complaint are
excluded), dated March 14, 2024 .......................... A-489

Exhibit H to Nathanson Declaration -
Summons and Complaint in *1 Madison Office
Fee LLC v. 777 Partners LLC et al.*, Index No.
654397/2023 (N.Y. Sup.), dated
September 8, 2023 ................................................. A-508

Exhibit I to Nathanson Declaration -
Complaint in *Lasse Meilsoe v. 777 Partners LLC
et al.*, Case No. 2023-028758-CA-01 (Fla. 11th
Cir. Ct.), dated March 22, 2023, with Exhibits...... A-515

Exhibit J to Nathanson Declaration -
Amended Complaint in *Peter Meyers v. 777
Partners, LLC et al.*, Case No. 2024-001279-CA-
01 (Fla. 11th Cir. Ct.), dated January 30, 2024,
with Exhibits........................................................... A-541

Exhibit K to Nathanson Declaration -
Summons and Complaint in *American Express
Travel Related Services Company, Inc. v. 777
Partners LLC*, 651130/2023 (N.Y. Sup.), dated
March 3, 2023 ....................................................... A-584

Exhibit L to Nathanson Declaration -
Complaint in *Randy S. Gelber v. Joshua Wander*,
Case No. 2021-013205-CA-01 (Fla. 11th Cir.
Ct.), dated June 7, 2021, with Attachment............. A-592

vi

**Page**

Exhibit M to Nathanson Declaration -
Complaint in *The Oxbridge Group, LTD v. 777
Partners, LLC,* Index No. 651975/2023 (N.Y.
Sup.), dated April 21, 2023 .................................... A-625

Exhibit N to Nathanson Declaration -
Verified Amended Complaint in *O'Neil-Dunne et
al. v. Phoenicia LLC et al.*, C.A. No. 2023-0987-
BWD (Del. Ch.), dated January 19, 2024.............. A-631

Exhibit O to Nathanson Declaration -
First Amended Complaint in *Eido Hussam
Al-Nahhas v. 777 Partners, LLC et al.*, Case No.
22-cv-750 (N.D. Ill.), undated ............................... A-654

Exhibit P to Nathanson Declaration -
Complaint – Class Action in *Joseph Morgan
et al. v. 777 Partners, LLC et al.*, Case No.
24-cv-01004 (N.D. Ill.), undated ........................... A-683

Hearing Transcript held before the Honorable John
G. Koeltl, dated May 14, 2024 .............................. A-710

Redacted Declaration of Michael Saliba, for
Defendant Advantage Capital Holdings LLC ("A-
CAP"), in Opposition to Proposed TRO, dated
May 24, 2024
(Unredacted version is reproduced in the
Confidential Appendix at pp. CA-1-CA-8) .......... A-721

Reply Memorandum of Law in Further Support of
Plaintiffs' Application For (1) A Temporary
Restraining Order, and (2) An Order to Show
Cause for a Receiver or, Alternatively, a
Preliminary Injunction, dated May 30, 2024
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-9-CA-36) .............................. A-729

vii

| | Page |
|---|---|

Declaration of Leigh M. Nathanson, for Plaintiff
  Leadenhall, in Support of Reply Memorandum,
  dated May 30, 2024 ................................................. A-730

Exhibit 1 to Nathanson Declaration -
Hearing Transcript held before the Honorable
John G. Koeltl, dated May 14, 2024 ...................... A-732

Exhibit 2 to Nathanson Declaration -
Email from Roger Schwartz to Shelly DeRousse
and Others, dated May 23, 2024, with
Attachment ................................................................. A-744

Exhibit 3 to Nathanson Declaration -
Email from Leigh Nathanson to Jonathan
Watkins, dated May 16, 2024 ................................. A-757

Hearing Transcript held before the Honorable John
  G. Koeltl, dated June 7, 2024 ................................. A-765

Order to Show Cause and Temporary Restraining
  Order, by Plaintiff Leadenhall, dated June 7,
  2024 ........................................................................... A-831

Letter from David A. Pellegrino to Honorable John
  G. Koeltl, dated June 10, 2024 ............................... A-835

Exhibit 1 to Letter -
Email from Leigh Nathanson to John G.
McCarthy and Others, dated June 9, 2024 ............. A-840

Exhibit 2 to Letter -
Email from David Pellegrino to Leigh Nathanson
and Others, dated June 10, 2024 ............................ A-842

Hearing Transcript held before the Honorable John
  G. Koeltl, dated June 14, 2024 ............................... A-844

viii

**Page**

Memo Endorsed on Joint Letter, dated
    June 18, 2024 ........................................................ A-867

Order of the Honorable John G. Koeltl, dated June
    20, 2024 .................................................................. A-868

Motion, by Intervenors Haymarket Insurance
    Company ("Haymarket") and ACM Delegate
    LLC ("ACM Delegate"), to Intervene, filed
    July 8, 2024
    (Motion omitted herein):

Declaration of Jonathan Watkins, for Intervenors
    Haymarket and ACM Delegate, in Support of
    Motion to Intervene, dated July 8, 2024 ................ A-869

    Exhibit A to Watkins Declaration -
    UCC-1 Financing Statements and Amendments
    filed with the Delaware Secretary of State, dated
    March 3, 2020 ........................................................ A-871

    Exhibit B to Watkins Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State, dated
    November 27, 2023 ................................................ A-883

    Exhibit C to Watkins Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State or Florida Secured
    Transaction Registry, dated April 12, 2021 to
    December 15, 2023 ................................................ A-888

    Exhibit D to Watkins Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State, dated July 12, 2022 . A-898

Hearing Transcript held before the Honorable John
    G. Koeltl, dated July 8, 2024 ................................ A-902

ix

Page

Proposed Order to Show Cause without Emergency
    Relief by Defendant A-CAP, filed July 31, 2024
    (Proposed order to show cause omitted herein):

Declaration of Michael Saliba, for Defendant A-
    CAP, in Support of Proposed Order to Show
    Cause, dated July 29, 2024 .................................... A-935

    Exhibit A to Saliba Declaration -
    Email from Craig Gillespie to Kenneth King and
    Others, dated October 19, 2023 ............................ A-941

    Exhibit B to Saliba Declaration -
    Excerpts from the Spreadsheet Attached to Email,
    dated October 19, 2023 ......................................... A-944

    Exhibit C to Saliba Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State – Dorchester, dated
    May 10, 2021 at 4:50pm ........................................ A-949

    Exhibit D to Saliba Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State – SuttonPark Capital
    LLC, dated May 10, 2021 at 4:54pm ..................... A-951

    Exhibit E to Saliba Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State – SuttonPark Capital
    LLC, dated May 10, 2021 at 4:58pm ..................... A-953

    Exhibit F to Saliba Declaration -
    UCC-1 Financing Statements filed with the
    Delaware Secretary of State – Insurety Capital
    LLC, dated May 10, 2021 at 5:03pm ..................... A-961

x

| | Page |
|---|---|
| Exhibit G to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Insurety Capital LLC, dated May 10, 2021 at 5:07pm..................... | A-963 |
| Exhibit H to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Singal SML 4 LLC, dated May 10, 2021 at 5:11pm..................... | A-970 |
| Exhibit I to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Singal Medical, dated May 10, 2021 at 5:16pm ............................. | A-972 |
| Exhibit J to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – Singal Medical, dated May 10, 2021 at 5:19pm ............................. | A-974 |
| Exhibit K to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – SPLCSS III LLC, dated May 10, 2021 at 5:23pm ............................. | A-981 |
| Exhibit L to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – SuttonPark Capital LLC, dated May 10, 2021 at 5:27pm..................... | A-983 |
| Exhibit M to Saliba Declaration - UCC-1 Financing Statements filed with the Delaware Secretary of State – SuttonPark Capital LLC, dated May 10, 2021 at 5:31pm..................... | A-985 |

xi

**Page**

Exhibit N to Saliba Declaration -
UCC-1 Financing Statements filed with the
Delaware Secretary of State – Insurety Agency
Service, dated May 11, 2021 at 3:34pm ................   A-944

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Order to
Show Cause, dated July 31, 2024 ..........................   A-966

Exhibit A to Watkins Declaration -
Proposed Modified Preliminary Injunction ...........   A-998

Exhibit B to Watkins Declaration -
Order from the Honorable John G. Koeltl, dated
July 8, 2024
(Reproduced in Special Appendix)

Hearing Transcript held before the Honorable John
G. Koeltl, dated August 1, 2024 ...........................   A-1001

Plaintiffs' Opposition to A-CAP's Motion Under
Rule 59(E) to Amend the Preliminary Injunction,
dated August 15, 2024 ..........................................   A-1011

Declaration of Craig Gillespie, for Plaintiff
Leadenhall, in Opposition to Order to Show
Cause, dated August 15, 2024................................   A-1038

Exhibit 1 to Gillespie Declaration -
Excerpts from the Loan and Security Agreement,
dated May 7, 2021 ................................................   A-1040

Declaration of Jonathan Watkins, for Defendants
A-CAP and Kenneth King, in Support of Reply
Memorandum of Law, dated August 26, 2024,
with Exhibits A through E
(Redacted herein. Reproduced in the Confidential
Appendix at pp. CA-37-CA-561) .........................   A-1072

xii

**Page**

Corrected Amended Complaint, dated
September 6, 2024 ................................................. A-1073

Exhibit 1 to Amended Complaint -
Email to Craig Gillespie from Anonymous
Sender, dated September 19, 2022
(Reproduced herein at pp. A-119-A-120)

Exhibit 2 to Amended Complaint -
Letter from Craig Gillespie to Steven W Pasko,
Joshua Wander, Damien Alfalla and Steve Pasko,
dated March 24, 2023
(Reproduced herein at pp. A-121-A-124)

Exhibit 3 to Amended Complaint -
Email to Josh Wander and Others from Phil
Kane, dated March 29, 2023
(Reproduced herein at pp. A-125-A-127)

Exhibit 4 to Amended Complaint -
Email to Josh Wander and Others from Tom
Spreutels, dated April 4, 2023
(Reproduced herein at pp. A-128-A-129)

Exhibit 5 to Amended Complaint -
Letter from John Wells to Steven W. Pasko re:
Notice of Breach of Parties' Agreements, dated
November 29, 2023
(Reproduced herein at pp. A-130-A-134)

Exhibit 6 to Amended Complaint -
Tables ................................................................... A-1229

Exhibit 7 to Amended Complaint -
Wells Fargo Summary Statement Screenshot
(Reproduced herein at pp. A-135-A-136)

xiii

**Page**

Exhibit 8 to Amended Complaint -
"Collection" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-137-A-142)

Exhibit 9 to Amended Complaint -
"Reserve" Account Wells Fargo Monthly
Statement
(Reproduced herein at pp. A-143-A-145)

Exhibit 10 to Amended Complaint -
Letter from Craig Gillespie re: Notice of
Acceleration of all Loans, and Demand for
Immediate Repayment, dated March 15, 2024
(Reproduced herein at pp. A-146-A-168)

Exhibit 11 to Amended Complaint -
Outstanding Accelerated Balance Sheet ................ A-1236

Exhibit 12 to Amended Complaint -
777 Partners' Draft Forbearance Agreement ......... A-1238

Exhibit 13 to Amended Complaint -
Jorge Beruff LinkedIn Profile ............................ A-1280

Exhibit 14 to Amended Complaint -
Juan Arciniegas LinkedIn Profile ......................... A-1284

Exhibit 15 to Amended Complaint -
Aaron Levy LinkedIn Profile................................ A-1289

Exhibit 16 to Amended Complaint -
Lenz Balan LinkedIn Profile ............................... A-1292

Argument and Decision held before the Honorable
John G. Koeltl, dated October 2, 2024 ................. A-1295

Notice of Appeal by Defendant A-CAP, dated
October 3, 2024 ................................................... A-1352

xiv

**Page**

Notice of Appeal by Defendants 777 Partners LLC,
   600 Partners LLC, SPLCSS III LLC, Dorchester
   Receivables II LLC, Insurety Agency Services
   LLC, and Signal SML 4 LLC, dated
   October 22, 2024 ................................................. A-1354

A-1093

50.    The entities controlled by 777 Partners and 600 Partners were further organized, for purposes of their rights and obligations under the LSA, into Borrower Groups each consisting of one Borrower, the Seller that owned that Borrower, and one Servicer, and each corresponding to a particular Lender Group consisting of some or all of the nine Lender entities:

a.    The SPLCSS Borrower Group consisted of the SuttonPark Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

b.    The Dorchester Borrower Group consisted of the Dorchester Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

c.    The Insurety Borrower Group consisted of the Insurety Borrower as Borrower, Insurety Capital as Seller, and Insurety Servicer as Servicer; and

d.    The Signal Borrower Group consisted of the Signal Borrower as Borrower, Signal Medical as Seller, and Signal Servicer as Servicer.

51.    To put all of the Agreements together, in brief:

a.    **the LSA** set forth the terms on which the Lenders would provide debt secured by collateral owned by the Borrowers;

b.    **the Sale Agreements** set forth the terms on which the Sellers could sell or assign assets as Collateral to the Borrowers to secure that debt;

c.    **the Servicing Agreements** set forth the terms under which the Servicers would service the Collateral held by the Borrowers to ensure it did not become impaired;

d.    **the Pledge Agreements** provided an additional source of Collateral in the form of pledges of the 100% equity interests in the Borrowers; and

A-1094

e. **the Guaranty Agreement** provided guarantees by 777 Partners and 600 Partners of all of the Borrowers' obligations under the Agreements.

52.    Reflecting his control over 777 Partners and each of the various underlying entities, Pasko executed each of the governing Agreements on behalf of the 777 Partners entities.

**B. The Loan and Security Agreement**

53.    The LSA is structured as a secured credit facility whereby the Borrowers were permitted to borrow secured debt from the Lenders from time to time on an ongoing basis through September 30, 2024, or until the occurrence of an "Event of Default."

54.    The "Lenders" are comprised of nine investment funds or separate accounts. Leadenhall has the authority under the LSA to act on behalf of the Lenders and brings this action in its capacity as agent for the Lenders. LSA § 8.01 ("Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.").[2]

55.    Under the LSA, in order to borrow additional debt from the credit facility, a Borrower would submit a Borrowing Request to the Lenders in their its corresponding Lender Group. That Borrowing Request was required to include, among other things, "a pro forma Compliance Report" demonstrating that the requested debt would be adequately secured under the terms of the LSA discussed below. LSA § 2.03; *id.* art. I, "Borrowing Request." The Dorchester Borrower submitted Borrowing Requests and accompanying pro forma Compliance Reports

---

[2] *See also* LSA § 8.03 ("The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a 'Lender' under this Agreement as any other Lender and may exercise the same as though it were not the Administrative Agent.").

22

A-1095

purporting to show compliance with Borrowing Base requirements including but not necessarily limited to those dated May 12, 2021 ($69.98 million), May 19, 2021 ($10 million), January 31, 2022 ($10 million), March 18, 2022 ($16 million), and March 30, 2022 ($10 million). The SuttonPark Borrower also submitted Borrowing Requests and accompanying pro forma Compliance Reports purporting to show compliance with Borrowing Base requirements including, after it drew the initial $300 million in debt in May 2021, another request on June 30, 2021 ($50 million). Pasko signed each Borrowing Request submitted by the Borrowers to Leadenhall. Each Borrowing Request was funded shortly after it was received.

56.    In exchange for providing debt to the Borrowers, the Lenders were paid interest, and Leadenhall Life, as Collateral Agent, obtained first-priority security interests in all of the assets of each Borrower, including but not limited to the receivables and related assets held by the Borrowers (the "Collateral"). *See* LSA § 2.15; *id.* art. I, "Collateral."

57.    The LSA imposed the equivalent of a credit limit on each Borrower, referred to as a "Borrowing Base," based on the value of each Borrower's receivables, which was designed to ensure that each Borrower always had enough Collateral to secure its borrowings. Each Borrowing Base was calculated using a formula specific to the Borrower—the main component of which was the value of that Borrower's receivables, with certain adjustments. *See* LSA "Borrowing Base," LSA Schedules VIII, IX, X, and XI. A misrepresentation as to the value of that Borrowing Base would constitute a misrepresentation as to both the owned Collateral and the Borrowing Base.

58.    In the event the principal value of the total debt of a single Borrower ever exceeded its Borrowing Base—known as a "Borrowing Base Deficiency"—and such deficiency was not cured within three business days, it would constitute a "Borrower Group Event of Default." Upon a Borrower Group Event of Default, Leadenhall was entitled to accelerate the entire amount of that

A-1096

Borrowing Group's outstanding debt and pursue remedies under the LSA and the Uniform Commercial Code on behalf of the relevant Lenders against that Borrowing Group's Collateral. LSA § 7.02(g); *id.* Art. I, "Borrowing Base Deficiency." If the Borrowing Base Deficiency was not cured in thirty days, it would constitute a "Facility Event of Default," which would entitle Leadenhall to accelerate the entire amount of the outstanding debt and pursue the same remedies against all four Borrower Groups. *Id.*, § 7.01(c).

59.    If the Borrowers wanted to borrow more, the Agreements allowed them to do so by purchasing more receivables from the Sellers pursuant to the respective Sale Agreement, thereby increasing the Borrower's Borrowing Base. *See* LSA Article I, "Borrowing Base Limitation," "Sub-Facility Limit"; *id.* §§ 2.01(a), 3.02(c).

60.    What the Borrowers could *not* do under the LSA was put receivables on their books that they either did not own or that were already on the books of another of Wander and Pasko's portfolio companies—pledged to some other lender, securing some other loan.

61.    And if the Borrowers wanted to decrease their overall obligation to Leadenhall, they could prepay their debt under certain defined circumstances, but they were not permitted to sell or repledge Collateral unless they replaced it with "Substitute Collateral" of equal or greater value. LSA § 2.07(y)(ii)(B) (permitting prepayment of debt based on "a Repurchase of [certain receivables] if such Borrower . . . receives one or more substitute Eligible Receivables having a Valuation Amount that is greater than or equal . . . to that of the substituted [receivable]" and "use[s] selection procedures to substitute Eligible Receivables for Guaranteed Receivables or Lottery Receivables in a manner that is not intended to be adverse to the interests of Lenders").

62.    The Agreements contained additional provisions to guard proactively against such defaults, rather than waiting for them to be discovered. For instance, each time a Borrower made

24

A-1097

a "Borrowing Request" to Leadenhall Capital, *id.* at § 2.03, the Servicer had to submit a "Compliance Report" setting forth a calculation of the Borrowing Base, a representation that the Borrowing Base Limitation had not been exceeded, an affirmation that each of the representations and warranties in the LSA remained true and correct, and a representation that no Event of Default had occurred. *See* LSA, Annex A-1.

63.    Additionally, the LSA required each Servicer to prepare a Monthly Report for its associated Borrower concerning the receivables and other assets held by that Borrower, which could not "include any Receivable that is not an Eligible Receivable . . . in the calculation of the Borrowing Base." LSA § 5.01(j)(i).   Each Borrower's representations and warranties were renewed as of the date of each Compliance Report and each Monthly Report. *Id.*, § 4.01.

64.    Over the course of the credit facility, on behalf of the Servicers, Steven Pasko was the authorized signatory for Monthly Reports and Compliance Reports.

65.    The LSA also contained provisions to guard proactively against the risk of interest rate fluctuations affecting the value of receivables, shifting that risk to the Borrowers and Guarantors by requiring the Borrowers to "maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions" meeting defined requirements. LSA § 5.01(u).

66.    And under the LSA, each Borrower "agree[d] . . . to take all further actions, that may be reasonably necessary or desirable, or that [Leadenhall] may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under" the LSA. LSA § 5.01(i).

67.    The LSA provided Leadenhall with remedies in case of default by the 777 Entity Defendants.   Among other things, upon either a Borrower Group Event of default or a Facility

25

Event of Default, Leadenhall had the right to declare either the relevant Borrower Group's outstanding debt or the *entire* outstanding debt, respectively, "due and payable immediately, without presentment, demand, protest or other notice of any kind, all which are hereby waived by the Borrowers" including "the principal . . . together with accrued interest thereon and all fees and other obligations of the Borrowers owing hereunder." LSA §§ 7.01, 7.02. This remedy is known as "acceleration." The LSA also expressly provided that Leadenhall's right to accelerate the Borrowers' outstanding debt is *in addition to* and *cumulative of* its rights to foreclose or exercise any other remedies with respect to the Collateral:

> Upon any such declaration [that outstanding debt is immediately due and payable] . . . [Leadenhall], shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

LSA §§ 7.01, 7.02.

68.    The LSA also required the Borrowers to indemnify Leadenhall and the Lenders "against any and all claims, losses and liabilities (including reasonable attorneys' fees) . . . arising out of or resulting from [the LSA] or the other Transaction Documents, or the use of the proceeds of the Loans or the security interest granted hereunder or in respect of any Collateral," with exceptions not relevant here. LSA § 9.01. The LSA provided that "[t]he Borrowers also agree to pay, upon demand, all reasonable and documented costs and expenses of [Leadenhall], including reasonable attorneys' fees actually incurred in connection with amendments, consents, waivers, and terminations made or requested in connection with [the LSA], the other Transaction Documents and the Indebtedness (including any security interests granted thereby)," and incurred "in the collection of the Obligations, in connection with the enforcement, protection, defense and collection of this Agreement, the other Transaction Documents and the Obligations," including reasonable and documented attorneys' fees and legal expenses of [Leadenhall] Agent actually

incurred, whether or not there is a lawsuit," and "any court costs, in addition to all other sums provided by law."  LSA § 9.02.

### C. The Pledge Agreements

69.    In addition to the security interests in the Borrowers' Collateral under the LSA, and Leadenhall Life's remedies thereunder, the Lenders' investments were meant to be protected by at least four other sets of agreements granting Leadenhall additional rights and remedies:  the Pledge Agreements, Sale Agreements, Servicing Agreements, and Guaranty Agreement, all of which were executed the same day as and in conjunction with the LSA.

70.    Leadenhall Life entered into four separate Pledge Agreements as additional protection in providing hundreds of millions of dollars of debt to the Borrowers.  In particular, Leadenhall Life entered into Pledge Agreements with each of the three Seller entities that, in turn, owned 100% of each of the four Borrowers:

> a.  SuttonPark Capital LLC (*i.e.*, "SuttonPark Capital"), which owned 100% of Dorchester Receivables II LLC (*i.e.*, the "Dorchester Borrower") and SPLCSS III LLC (*i.e.*, the "SPLCSS Borrower");
>
> b.  Insurety Capital LLC (*i.e.*, "Insurety Capital"), which owned 100% of Insurety Agency Services LLC (*i.e.*, the "Insurety Borrower"); and
>
> c.  Signal Medical Receivables LLC (*i.e.*, the "Signal Seller"), which owned 100% of Signal SML 4 LLC (*i.e.*, the "Signal Borrower").

71.    Each Borrower represented and warranted in § 4.01(l) of the LSA that it was owned 100% by the Sellers, and any change in that 100% ownership constituted an event of default pursuant to § 7.02(m).  LSA Article 1, "Change in Control."

27

A-1100

72.     Under § 2.1 of each Pledge Agreement, each Seller pledged 100% membership interests in each Borrower, along with all present and future claims and all proceeds related thereto, to Leadenhall Life as additional security for the Borrowers' obligations.

73.     The remedies available under the Pledge Agreements were structured in a similar way to those available under the LSA.  In the event of a Borrower Group Event of Default, Leadenhall Life could exercise remedies with respect to the defaulting Borrower Group—*i.e.*, against that specific Seller's equity in a specific Borrower under the respective Pledge Agreement. *See* Pledge Agreements § 4.01.  A Facility Event of Default would trigger remedies under all four Pledge Agreements, thereby allowing Leadenhall Life to proceed against the equity of all of the Borrowers at once. *Id.*

74.     The Pledge Agreements were principally between each Seller (as Pledgor) and Leadenhall Life, but each also was acknowledged by the respective Borrower wholly owned by the signatory seller.  Section 6.11 provides that, upon an Event of Default under the LSA, the Borrower "will comply with instructions originated by the Collateral Agent with respect to the Pledged Collateral without further consent of the Pledgor."

**D.  The Sale Agreements**

75.     Each of the Borrowers also entered into a Sale Agreement with the respective Seller in its Borrower Group.  The Sale Agreements set forth the terms under which the Borrowers would purchase additional receivables from the Sellers, which receivables, once purchased, would become Collateral and would factor into the Borrowing Base, enabling the Borrowers to borrow more from the Lenders.

76.     Each time a Borrower purchased additional receivables from a Seller to serve as Collateral for debt, the Seller was obligated to deliver an executed assignment to the Borrower. Sale Agreements § 2.02(c).  Those assignments were then delivered to Leadenhall and purported

28

A-1101

to substantiate that receivables had, in fact, been transferred to the Borrower in question and could form part of the Borrower's Collateral and increase its Borrowing Base. These assignments were often made when the 777 Entity Defendants were reallocating assets among different borrower vehicles and when pledging additional assets to ensure continued compliance with Borrowing Base requirements. Pasko was the authorized signatory on sales or "assignments" from the Sellers to the Borrowers and signed each assignment in connection with each purported transfer of receivables from a Seller to a Borrower.

77.     The Sale Agreements provided that the Borrowers could purchase receivables from the Sellers even if the Borrowers did not have cash on hand to pay for them, in which case "such excess shall be deemed to be a contribution to the capital of the Purchaser by the Seller on such date and the Purchaser shall increase the Seller's aggregate investment in the Purchaser accordingly in accordance with New York law." Sale Agreements § 2.07(b).

78.     In the Sale Agreements, each Seller also acknowledged the security interests the Borrowers would grant to Leadenhall Life under the LSA, as well as that Leadenhall Life would "have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the Purchaser's rights and remedies under this Agreement." Id. § 2.05.

### E.  The Servicing Agreements

79.     Each of the Borrowers and related Sellers in each Borrower Group also entered into a Servicing Agreement with the respective Servicer in the Borrower Group. The Servicing Agreements provide for the Servicers to service receivables held by their respective Borrowers, including by collecting payments and executing required documentation. Servicing Agreements § 3.1. In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced. Servicing Agreements § 5.1. The "Valuation Amount" of those

receivables used to calculate Servicing Fees is the same as is used to calculate each Borrowers' Borrowing Base.  LSA Schedules VIII, IX, X, XI.

80.     The Servicers were also responsible, under the LSA and the Servicing Agreements, for delivering Monthly Reports and Compliance Reports to Leadenhall Capital as Administrative Agent, including accurately calculating their respective Borrowers' Borrowing Bases.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

81.     Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered," and each Servicer agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report.  LSA §§ 6.06(a), 6.07(c).

82.     The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

83.     The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

A-1103

### F. The Guaranty Agreement

84.     The final source of security for Leadenhall and the Lenders' investments came from a Guaranty Agreement between Leadenhall Capital on the one hand, and 777 Partners and 600 Partners on the other.  777 Partners and 600 Partners (referred to as "Guarantors" in the Guaranty Agreement) guaranteed the obligations of each of the Borrowers.  As recited in the Guaranty Agreement, each of 777 Partners and 600 Partners "is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement, and the other Transaction Documents." *See* Guaranty Agreement at 1.

85.     Under the Guaranty Agreement, Leadenhall and the Lenders are defined as the "Recipients," and 777 Partners and 600 Partners each "jointly and severally absolutely, unconditionally and irrevocably guarantee[d] to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower [and the Insurety Borrower Group and Signal Borrower Group, subject to certain Guaranty Limits], in each case, so long as a Trigger Event has occurred and is continuing . . . ." Guaranty Agreement § 2(a).

86.     The Guaranty Agreement defines a "Trigger Event" to include the occurrence of any of the following events, among others:

(i) any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;

(ii) any act of theft or misappropriation of funds by either Guarantor under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

(iii) any willful misrepresentation of a material nature by either Guarantor under this Guaranty;

[…]

31

A-1104

(ix) any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days; … or

[…]

(xi) any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise or enforcement of its rights and remedies against any Collateral under the Transaction Documents or under Requirements of Law.

*Id.* at § 1, "Trigger Event."

87.    The "Guaranteed Obligations" backed up by 777 Partners and 600 Partners included the "Obligations" of the Borrowers, *id.* at § 1, "Guaranteed Obligations," which is defined under the LSA as, "with respect to each Borrower, the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA Article I, "Guaranteed Obligations." The Guaranteed Obligations—and particularly those enumerated above concerning the allocation of adequate Collateral "free and clear" of Adverse Interests—confer to Leadenhall an equitable interest in the Guarantors' assets, since the Guarantors are required to back the Obligations of the Borrowers and provide adequate Collateral if the Borrowers are unable to.

## G. Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests.

88.    The centerpiece of the credit facility is that the Collateral pledged for the benefit of the Lenders is pledged ***solely*** for the benefit the Lenders and remains free and clear of any "Adverse Claims." This thread runs through all of the Agreements as stated in the provisions set forth below.

A-1105

89.    *First*, under the LSA, each Borrower made the following representation upon the execution of the Loan and Security Agreement, the date on which any borrowing was made by the Borrowers (a "Borrowing Date"), and on the date of each Monthly Report and each Compliance Report: "***Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***."  LSA § 4.01(h).[3]

90.    An "Adverse Claim" is defined in LSA § 1.01 as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement," and it has the same meaning in the Pledge Agreements, Sale Agreements, and Guaranty Agreement.    Pledge Agreements § 1.1; Sale Agreements § 1; Guaranty Agreement § 1.

91.    Second, under the LSA, each Borrower made the following representation throughout the term of the borrowing relationship: "[S]uch Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof." LSA § 5.01(d).

92.    *Third*, under the LSA, each Borrower makes the following representation throughout the term of the borrowing relationship: "Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) ***or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person*** . . . ." LSA § 5.01(k)(vi).

---

[3] Any emphasis herein is added unless otherwise noted.

A-1106

93.    *Fourth*, the LSA makes clear that a "Facility Event of Default" occurs whenever the security interest in the Collateral "***shall for any reason cease to be a valid and perfected first priority security interest***."  LSA § 7.01(d).  Unlike other grounds for a Facility Event of Default, which apply only once a breach has continued for thirty days without being cured, any failure of any security interest "to be a valid and perfected first priority security interest" would cause *every* Borrower to be in default after only two days.  *Id.*

94.    *Fifth*, the LSA provides a right to indemnification for any losses arising out of the Borrowers' failure to vest a security interest in the Collateral free and clear of Adverse Claims: "[E]ach Borrower shall pay ***on demand*** to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from . . . ***the failure to vest in the Collateral Agent on behalf of the Secured Parties a valid and perfected security interest in the Collateral free and clear of any Adverse Claim . . . .***"  LSA § 9.01(iv).

95.    Sixth, under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

96.    *Seventh*, under the Sale Agreements, each Sellers agreed with their respective Borrowers that any sale of collateral shall be "an absolute sale and transfer by the Seller (free and clear of any Adverse Claim . . . )," and each Seller represented and warranted to its respective Borrowers that, "[a]s of the applicable Purchase Date . . . , ***the Seller is legal and beneficial owner of the applicable Transferred Asset free and clear of any Adverse Claim,***" with certain exceptions not relevant here.  Sale Agreements §§ 2.07, 4.01(h).  Each Seller also covenants that it "***will not***

34

*sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on, any Transferred Asset*, whether now existing or hereafter created, or any interest therein." *Id*. at § 5.01(f).

97.    *Eighth*, under the Guaranty Agreements, 777 Partners and 600 Partners guarantee *all* of the Borrowers' obligations described above, and one of the specified "Trigger Events" is "*any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances . . ..*" Guaranty Agreement § 1. That Trigger Event, among many others, would trigger the Guarantors' obligations to back up *all* of the Borrowers' obligations, including not only their payment obligations, but their obligations to pledge sufficient Collateral "free and clear" and ensure Leadenhall maintains perfected, first-priority security interests in all such Collateral, giving Leadenhall direct recourse to and an equitable interest in the Guarantors' assets to secure the debt.

98.    In summary, the credit facility implemented by the Agreements depended on the Borrowers owning sufficient Collateral to secure debt they took on from the Lenders, and the Agreements took pains at every turn to ensure that (1) the Collateral securing the debt was free and clear of any Adverse Claims that could interfere with the Lenders' remedies in the event of a default and, (2) if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default, and Leadenhall and the Lenders could proceed against all of the Collateral that the Borrowers currently owned, obtain additional receivables to recoup their investment, and otherwise proceed against 777 Partners and 600 Partners for the full values of the debt.

A-1108

II.    **Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral.**

A.  **Leadenhall Receives an Anonymous Tip Sounding the Alarm on Wander's "Criminal" Scheme.**

99.    In May 2021, pursuant to the terms of the LSA, the Borrowers began making borrowing requests to Leadenhall, taking out debt, and delivering required monthly Compliance Reports to Leadenhall identifying and valuing each asset pledged by the Borrowers.

100.    The 777 Partners employees responsible for preparing and sending the Compliance Reports to Leadenhall, typically by uploading the reports to a file sharing program, were Nicholas Bennett, Senior Manager in 777 Partners' Capital Markets group, and Alexander Adnani, Financial Analyst in 777 Partners' Capital Markets group. Bennett and Adnani were also both employees of SuttonPark Capital during the relevant period, and Adnani continued to use a SuttonPark Capital email address in 2024—again, the distinction between SuttonPark Capital and 777 Partners was often disregarded, to the extent it existed at all.

101.    While Bennett and Adnani formally reported to then-Chief Financial Officer of 777 Partners Damien Alfalla as part of 777 Partners' finance function, at least for purposes of allocating assets to serve as Collateral for debt from Leadenhall and preparing and sending Compliance Reports, they reported directly to Josh Wander—typically in person or via videoconference (over the FaceTime application on the individuals' mobile phones) to ensure that Wander knew exactly who was in the room with Bennett and Adnani when they were communicating and that there was no paper trail of any communications.

102.    The first periodic reports delivered by the SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers covering May 2021 reflected that the SuttonPark and Dorchester Borrowers had already taken "Outstanding Borrowings" of approximately $300 million and $80 million, respectively, in the first month the credit facility was effective, and

A-1109

contained a list of each Borrower's assets, a calculation of the Borrowing Base based on those assets, and a representation as to whether outstanding borrowings were in compliance with the Borrowing Base. An excerpt from the May 2021 monthly compliance Report delivered by the SuttonPark Servicer on behalf of the SuttonPark Borrower—reflecting a listing of "life contingent assets," *i.e.*, assets pledged for the benefit of the Lenders with payouts contingent upon the continued survival of an insured—is set forth below:

| SPLCSS III Receivables Compliance Report | | |
|---|---|---|
| Borrowing Base Calculation and Compliance as of May, 2021 | | |
| LIFE CONTINGENT RECEIVABLES | | |
| | Swap Rate applicable to the Weighted Average Life of all Eligible Receivables that are Life Contingent Receivables | 1.97% |
| (plus) | 3.85% bps | 3.85% |
| | Life Contingent Discount Rate | 5.82% |
| | LC ASSIGNABLE ANNUITY | $- |
| | LC Assignable-No COO | $- |
| | LC HEDGED | $4,237,398.31 |
| | LC HEDGED (Premium) | $- |
| | LC Hedged (Premium) - no LE | $- |
| | LC Hedged ASSIGNABLE ANNUITY | $- |

103.    Pursuant to the terms of the LSA, by the Servicers delivering these monthly Compliance Reports to Leadenhall, the Borrowers represented upon delivery that they were "the legal and beneficial owner[s] of the applicable Collateral free and clear of any Adverse Claim." LSA § 4.01(h).

104.    Over the period May 2021 through the end of 2022, Bennett and Adnani on behalf of the SuttonPark Servicer continued to deliver monthly Compliance Reports to Leadenhall

A-1110

containing a list of the Borrowers' assets and a calculation of the Borrowing Base—and therefore the Borrowers represented month after month that Collateral pledged as security to Leadenhall was "free and clear" of any other security interest.

105.    On September 19, 2022, Leadenhall Capital Managing Partner Craig Gillespie received an email with an anonymous tip—from sender "noreply@anonymousemail.me"—that Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender. The tip expressly accused Josh Wander of criminal activity:

> **The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal.**

Exhibit 1 (Anonymous Tip). The anonymous tip was a prescient warning that Leadenhall would later—despite Wander's vociferous attempts at obstruction—determine was true in all respects.

### B. Leadenhall Visits 777 Partners' Offices in Miami, During Which Wander Tries to Assure Leadenhall That Any problems with Its Collateral Are Limited and Under Control.

106.    After receiving the tip, pursuant to its audit rights under the LSA, Leadenhall began a business review of the Borrowers' receivables and assets pledged as Collateral to ensure that the hundreds of millions of dollars in debt notes provided to the Borrowers were secured and collateralized in accordance with the LSA. *See* LSA § 5.02 (permitting Leadenhall Capital as the Administrative Agent "to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller").

107.    In the immediate aftermath of receiving the tip, Leadenhall representatives conducted a series of calls with Wander and other representatives of 777 Partners and the Borrowers, during which Leadenhall requested additional detail on assets pledged as Collateral to Leadenhall.

A-1111

108.    In November 2022, Leadenhall Managing Partner Craig Gillespie, Chief Financial Officer and Chief Operating Officer Chris Learmonth, and Vice President Tom Foot visited 777 Partners' offices on-site in Miami, Florida to conduct a series of in-person meetings with Wander and other individuals responsible for allocating Collateral for the benefit of the Lenders.

109.    During the on-site visit, the Leadenhall representatives met with senior management of 777 Partners, as well as Bennett and Adnani, and were presented with overviews of 777 Partners' businesses. Gillespie, Learmonth, and Foot also inspected the computer system used by 777 Partners and the Borrowers—referred to as "MP Fin"—to allocate receivables and other assets to various lenders for purposes of securing the notes. Bennett and Adnani in the 777 Partners Capital Markets group were responsible for allocating assets to lenders in the MP Fin system, which they did at the direction of Josh Wander.

110.    The MP Fin system contains a unique identifier for each asset and the Borrower to which the asset had been allocated. The excerpt from MP Fin below reflects that asset number "64371" was allocated by 777 Partners to "SPLCSS II LC," *i.e.*, the SuttonPark Borrower,[4] which in turn pledged 100% of its assets—including asset number 64371—to Leadenhall:

**Excerpt from MP Fin Showing "Portfolio Name" Allocation for Asset No. 64371:**

| File # | File Name | Portfolio Name | Annuity Issuer | Transfer State | Seller ID | Contract # | Annuity Owner |
|--------|-----------|----------------|----------------|----------------|-----------|------------|---------------|
| 64371 | ▮ | SPLCSS II LC | Monarch Life Insurance Company in Liquidation | Texas | 20997 | ML0493472 | United States Fire Insurance Company |

---

[4] For clarity, the Borrower that executed the LSA and related agreements at issue here is SPLCSS III LLC, but a different 777 Partners' borrower vehicle named "SPLCSS II" had borrowed from Leadenhall under a prior credit facility. When the prior credit facility ended and the facility at issue here began, 777 Partners simply did not bother to update the nomenclature in its system, so "SPLCSS II" denotes assets owned by SPLCSS III LLC as of the relevant period.

A-1112

112.    Given the number of assets that 777 Partners and the Borrowers had pledged to various lenders—which numbered in the tens of thousands—Leadenhall representatives were able to conduct only a random sample "spot check" of the assets pledged as Collateral.

113.    During the "spot check" of 777 Partners' computer systems, the Leadenhall and 777 Partners teams identified a relatively small number of assets that were improperly allocated to the Dorchester Borrower.  To reconcile the issue, Bennett and Adnani, at the direction of Josh Wander, removed the improperly allocated assets from its Borrowing Base, amounting to approximately $7 million in value that was no longer available for the Dorchester Borrower to borrow against.

114.    Removing these assets from the Dorchester Borrower's Borrowing Base resulted in a corresponding deficiency in the Dorchester Borrower's Borrowing Base compared to its Outstanding Borrowings.  This deficiency is apparent by comparing the monthly Compliance Reports from the Dorchester Borrower issued before and after the November 2022 spot-check— with the November 2022 Report showing compliance with the Borrowing Base Limitation and the December 2022 Report showing that the Dorchester Borrower was out of compliance by approximately $7 million:

**Excerpt from November 2022 Dorchester Borrower Compliance Report:**

| | | Borrowing Base | $79,103,921.15 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $79,103,921.15 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | **Compliant if difference is ≥ 0)** | | **Yes** |

A-1113

**Excerpt from December 2022 Dorchester Borrower Compliance Report:**

| | | Borrowing Base | $71,689,952.00 |
|---|---|---|---|
| | Borrowing Base Compliance | | |
| | Borrowing Base Amount | | $71,689,952.00 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | Compliant if difference is ≥ 0) | | No |

115.    Nevertheless, Wander and 777 Partners took pains during the November 2022 on-site meetings to ensure that Leadenhall believed that, to the extent any assets were not properly allocated to Leadenhall on MP Fin, the problem was limited to the Dorchester Borrower, contained, and under control.   Upon information and belief, Wander and 777 Partners made these misrepresentations with the full knowledge that their employees had worked to alter data and obfuscate data records in advance of the meetings.

116.    As would be revealed over the following months, however, the problem was anything but contained, as Leadenhall would discover that both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and thus had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases.

117.    Following the on-site visit, Leadenhall and representatives of 777 Partners and the Borrowers continued to correspond over email and telephone to ensure that assets were properly allocated to the Borrowers.   777 Partners also agreed to add a "portfolio name" field—which was available in the MP Fin system—to the monthly Compliance Reports to ensure that assets were properly allocated to Leadenhall.   The inclusion of this portfolio name field to the SuttonPark Borrower monthly Compliance Reports gave no indication that Collateral was double-pledged and thus further concealed any double-pledging from Leadenhall.

A-1114

### C. In Early 2023, Wander Confirms That "Around $100 Million" of Collateral Had Been Double-Pledged to a Third-Party Lender Called Credigy.

118.    Through early 2023, although Leadenhall kept close watch over its lending to Wander's entities, no further issues were revealed, so Leadenhall reasonably relied on the Compliance Reports it received during this period.  For instance, the January 2023 Report for the SuttonPark Borrower represented that the Borrower was compliant with its Borrowing Base Limitation, while the Dorchester Borrower's January 2023 Report reflected approximately the same $7 million deficiency that had been identified in late 2022:

**Excerpt from January 2023 SuttonPark Borrower Compliance Report:**

|  |  | Borrowing Base | $361,309,249.45 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $361,309,249.45 |
| (less) | Outstanding Borrowings |  | $349,997,803.32 |
|  | **Compliant if difference is ≥ 0)** |  | **Yes** |

**Excerpt from January 2023 Dorchester Borrower Compliance Report:**

|  |  | Borrowing Base | $71,831,753.87 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $71,831,753.87 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

119.    In March 2023, however—nearly two years into the credit facility—a separate third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London under the auspices of a "general catch-up."  Following that meeting, Credigy sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of

A-1115

Credigy.  Credigy asked Leadenhall to confirm that 777 Partners had not also allocated the assets to Leadenhall.

120.    From Credigy's inventory of assets, Leadenhall was able to discern that 777 Partners had allocated more than 1,600 receivables—totaling approximately $185 million in value—to both Credigy and Leadenhall.  In other words, Leadenhall confirmed that Wander and Pasko had "double-pledged" Leadenhall's assets.

121.    Leadenhall would also later discover that the majority of these 1,600 double-pledged receivables had been sold or "assigned" to the SuttonPark Borrower—and therefore ostensibly pledged as Collateral to Leadenhall—via a "Form of Assignment" executed by Steven Pasko on September 30, 2022.[5]

122.    On March 24, 2023, Leadenhall sent a letter to Wander and Pasko requesting evidence that assets comprising Leadenhall's Collateral were free and clear of Adverse Claims and that the monthly Compliance Reports were true, accurate, and complete.  *See* Exhibit 2 (Mar. 24, 2023 Letter from C. Gillespie) ("***As you are aware, it has come to our attention that certain Eligible Receivables may be subject to Adverse Claims*** . . . .  To reiterate our prior discussions, we need to receive clear and objectively determinable evidence that the Receivables constituting Collateral for our SPLCSS Loans and Dorchester Loans, respectively remain Eligible Receivables and that each of the Compliance Reports remain true, accurate and complete.").

123.    On March 28, 2023, senior executives and board members of Leadenhall held a conference call with Wander to get further detail on how assets had been double-pledged by the

---

[5] Pasko was the authorized signatory on the sale agreements or the "assignments" of assets by the Sellers to the Borrowers.  Because the Borrowers pledged to Leadenhall 100% of their assets as Collateral by function of the LSA, these assignment agreements in which the Borrowers acquired assets in the first place from the Sellers—and signed by Pasko—are foundational to the contractual violations and false statements herein.

43

A-1116

Borrowers and to understand whether Wander had a plan to fix the problem.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Phil Kane, and General Counsel Peter Clark.  Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall recorded the call with Wander's permission.

124.    Wander's objective from the beginning of the call was to avoid explaining precisely how and when the double-pledging had occurred and instead impress upon the Leadenhall representatives that any deficit or hole in Leadenhall's Collateral could be shored up by, what he termed "replacement deals."

125.    Amidst a murky array of promises by Wander to Leadenhall concerning "replacement deals"—including replacing the double-pledged Collateral with cash from a potential sale of equity in 777 Partners' football assets—Wander acknowledged that there had been a "screwup" and "embarrassing" problem caused by 777 Partners' antiquated computer system concerning assets pledged to Leadenhall by the SuttonPark and Dorchester Borrowers.

126.    In particular, Wander expressly stated during the call that "the issue today is that *there are deals that are in Credigy's Borrowing Base that are allocated to you guys*."  Wander further explained concerning the double-pledged assets that there were "deals that sat on our Volans facility[6]—which is locked out basically now for five years—that were allocated to the [SuttonPark] facility.  *And those are the deals that that—you would consider double-pledged now, for they're on both facilities*."

127.    Wander claimed that the "screwup" was the result of 777 Partners and the Borrowers' failure to recognize, upon allocating certain assets to Leadenhall, that those assets had already been allocated as collateral to Credigy.  He further described the issue as a mistake in

---

[6] The "Volans facility" refers to 777 Partners' credit facility with Credigy.

A-1117

"portfolio input"—meaning that upon the initial "input" of the assets into the Leadenhall facility, they were already encumbered by other security interests.

128.    Near the end of the call, during an exchange between Wander and Leadenhall Chairman John Wells, Wander expressly acknowledged that the SuttonPark and Dorchester Borrowers' double-pledge of Collateral constituted a clear breach of the parties' agreements:

> Wells: **"There are so many breaches on these agreements now. We need to get all of this sorted out."**
>
> Wander: **"Agreed, agreed, agreed."**

129.    Wander again promised on the call that 777 Partners would individually review— or conduct a "reconciliation" of—every single asset pledged as collateral in 777 Partners' "MP Fin" system for the purpose of ensuring that assets were appropriately allocated to its lenders. Wander also promised to put a process in place to "reconcile" more frequently going forward to ensure that assets were properly allocated under 777 Partners' credit facilities.

130.    On March 29, 2023, following up on the March 28, 2023 call, Leadenhall Managing Partner Phil Kane sent an email to Wander containing a laundry list of action items under the header "**Double Pledges**," with the very first requirement for Wander listed at the top: "A reconciliation of all of our assets to the appropriate SPV for both [the SuttonPark and Dorchester Borrowers] – this should be completed as soon as possible, and by Monday 3rd of April at the latest." Exhibit 3 (Mar. 29, 2023 Email from P. Kane).

131.    On April 3, 2023, senior executives and board members of Leadenhall held a second conference call with Wander to understand exactly how the Borrowers had double-pledged the assets. The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Tom Spreutels, Managing Partner Phil Kane, General Counsel Peter Clark, and Vice

45

A-1118

President Tom Foot. Again, Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall again recorded the call with Wander's permission.

132.    During the call, Wander expressly admitted to Leadenhall Chairman John Wells that the Borrowers had double-pledged "around $100 million," or over 30 percent, of the Collateral pledged to Leadenhall:

> Wells: **"What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?"**
>
> Wander: **"I think it was around 100 million I think."**
>
> […]
>
> Wells: **"So over 30% of our collateral has been pledged to someone else?"**
>
> Wander: **"Yes, it appears that way."**

133.    Wander maintained that the double-pledging had been a computer system mistake and that he planned to "do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap."

134.    When pressed for details on this plan, Wander stated that the "holding company lender" was A-CAP and that, since 2020, A-CAP had extended around $200 million to $250 million in credit to 777 Partners' holding company. Wander also disclosed that, in return for that sizeable loan, A-CAP had an "all asset lien" on the assets of 777 Partners. A-CAP extended the loan to 777 Partners through its affiliate Haymarket Insurance Company ("Haymarket"), the collateral agent for which is an A-CAP shell entity called ACM Delegate LLC.

135.    On April 4, 2023, following up on the April 3, 2023 call, Leadenhall Managing Partner Tom Spreutels sent an email to Wander again containing a list of action items with the very first requirement for Wander listed at the top: "*A plan to cure the identified deficiency and the associated time frame*." Exhibit 4 (Apr. 4, 2023 Email from T. Spreutels).

46

A-1119

136.    Following Wander's admissions, the monthly Compliance Reports began reflecting enormous Borrowing Base deficiencies.  For instance, on April 4, 2023, the SuttonPark Servicer delivered its monthly Compliance Report on behalf of the SuttonPark Borrower for the month of February 2023, showing for the first time that the SuttonPark Borrower had taken on *over $170 million in debt* above its Borrowing Base.

**Excerpt from February 2023 SuttonPark Borrower Compliance Report:**

|  |  | Borrowing Base | $177,547,147.46 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $177,547,147.46 |
| (less) | Outstanding Borrowings |  | $349,997,803.32 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

137.    The February 2023 Report for the Dorchester Borrower also reflected that its Borrowing Base deficiency had also grown to approximately $10 million.

**Excerpt from February 2023 Dorchester Borrower Compliance Report:**

|  |  | Borrowing Base | $69,080,396.57 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $69,080,396.57 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

138.    In the Reports for the following month, March 2023, the Borrowing Base deficiencies remained, with the SuttonPark Borrower disclosing a deficiency of over $160 million and the Dorchester Borrower disclosing a deficiency of over $7 million.

A-1120

**Excerpt from March 2023 SuttonPark Borrower Compliance Report:**

| | | | |
|---|---|---|---|
| | **Borrowing Base** | $ | **187,825,142.97** |
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | $ | **187,825,142.97** |
| (less) | Outstanding Borrowings | $ | 349,997,803.32 |
| | Compliant if difference is ≥ 0) | | No |

**Excerpt from March 2023 Dorchester Compliance Report:**

| | | | |
|---|---|---|---|
| | **Borrowing Base** | $ | **71,517,425.07** |
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | $ | 71,517,425.07 |
| (less) | Outstanding Borrowings | $ | 79,010,000.00 |
| | Compliant if difference is ≥ 0) | | No |

**D. Despite Defendants' Efforts to Stonewall Leadenhall's Investigation, Leadenhall Discovers That the Borrowers Had Pledged Assets They Never Even Owned, and Leadenhall Formally Notices the Borrowers' Breaches of the Agreements.**

139.    In the ensuing months, Leadenhall continued to visit 777 Partners' offices, meet with Wander and 777 Partners' servicing teams, and conduct reviews of the assets pledged as Collateral to Leadenhall.

140.    During these meetings and telephone conferences occurring during the April through October 2023 period, Wander continued to promise that new assets and proceeds from deals just around the corner would be used to shore up the shortfall in Collateral to Leadenhall. Wander also continued to promise to conduct a so-called "reconciliation" process in his computer systems to ensure that assets pledged as Collateral to Leadenhall were actually allocated to Leadenhall in his systems. The promised proceeds and reconciliation never materialized.

141.    With the limited information that Wander and the various entities operating under his control did provide, in October and November 2023, Leadenhall determined that the double-pledge of Collateral was just the tip of the iceberg. In corresponding with 777 Partners personnel

48

A-1121

(with the permission of 777 Partners and Wander), reviewing receivables on MP Fin, and recognizing a pattern of 777 Partners' cash receipts being far lower than the amounts due, **_Leadenhall determined that the SuttonPark and Dorchester Borrowers had borrowed against and pledged assets as Collateral to Leadenhall that they never purchased in the first place, did not own, and therefore could not even pledge as Collateral_**.

142.    Leadenhall also determined that the SuttonPark and Dorchester Borrowers had sold and/or removed assets from Leadenhall's Collateral base without providing any notice to Leadenhall, further reducing their Borrowing Base relative to outstanding borrowings.

143.    Upon learning of these further material breaches of the LSA, on November 29, 2023, Leadenhall served written correspondence on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers providing formal notice that the Borrowers were in material breach of the LSA and related agreements (the "Notice of Breach"):

> **Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation.**

*See* Exhibit 5 (Notice of Breach).

144.    After accounting for these breaches—that is, by subtracting double-pledged assets, assets not owned by the SuttonPark and Dorchester Borrowers, and otherwise accounting for outstanding borrowings in excess of credit limits—Leadenhall calculated in the Notice of Breach a Borrowing Base deficiency of approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower—or more than three times the amount that Wander had admitted had been double-pledged in March 2023.

A-1122

145.    In January 2024, at Leadenhall's request, the SuttonPark and Dorchester Borrowers, via the SuttonPark Servicer, delivered revised Compliance Reports for the preceding months making clear the extent to which the Borrowers, Pasko, and Wander had lied all along about assets ostensibly pledged for the exclusive benefit of Leadenhall—and admitting that the original Compliance Reports were false.

146.    For example, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer on behalf of the SuttonPark Borrower—which had previously reflected a Borrowing Base of approximately $187 million and outstanding borrowings of approximately $350 million—now reflected a Borrowing Base of only approximately $64 million, after subtracting the double-pledged assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 SuttonPark Borrower Compliance Report:**

|  | Borrowing Base | $ | 64,076,151.91 |
|---|---|---|---|
| **Borrowing Base Compliance** |  |  |  |
| Borrowing Base Amount |  | $ | 64,076,151.91 |
| Outstanding Borrowings |  | $ | 349,997,803.32 |
| Compliant if difference is ≥ 0) |  |  | No |

147.    In other words, the original SuttonPark Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $125 million in assets had been pledged for the exclusive benefit of the Lenders.  That $125 million of ineligible assets *was in addition to* the over $160 million in assets that the original March 2023 Compliance Report had already indicated were double-pledged.

148.    Similarly, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer on behalf of the Dorchester Borrower, which had previously reflected a Borrowing Base of approximately $71 million and outstanding borrowings of approximately $79 million—now

A-1123

reflected a Borrowing Base of only $42 million after subtracting the double-pledge assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 Dorchester Borrower Compliance Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **42,455,473.97** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 42,455,473.97 |
| Outstanding Borrowings | $ | 79,010,000.00 |
| **Compliant if difference is ≥ 0)** | | **No** |

149.    In other words, the original Dorchester Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $30 million in assets had been pledged for the exclusive benefit of the Lenders.

150.    In December 2023, all four Borrowers, as well as the Sellers and Servicers, agreed with Leadenhall to execute an amendment to the LSA (the "Additional Interest Amendment"). Under the Additional Interest Amendment, the Borrowers agreed to pay additional interest on the "Uncollateralized Portion" of the Borrowers' outstanding debts to Leadenhall, retroactive to March 17, 2023, when Leadenhall first discovered the double-pledging. The "Uncollateralized Portion" was defined as each Borrower's Borrowing Base Deficiency, which the Borrowers represented were reflected in the amended Compliance Reports delivered around the same time.

151.    Leadenhall also learned more about the causes of the double-pledge and failure to own Collateral. Beginning in 2021, Wander and 777 Partners considered purchasing a portfolio of assets valued at approximately $250 million from JG Wentworth, a financial services company well known for purchasing structured settlements and lottery annuity payments in exchange for lump-sum cash settlements (and renowned for the tagline, "It's my money, and I need it now!").

A-1124

152.    SuttonPark Capital conducted due diligence of the JG Wentworth portfolio and specifically insisted on receiving a "data tape" from JG Wentworth that listed the portfolio's structured settlement and lottery annuity receivables by unique identifier and calculated the net present value of each asset by their discounted cash flow.

153.    But before SuttonPark Capital acquired the JG Wentworth portfolio of assets, Wander directed Bennett, Adnani, and the Capital Markets group to use the JG Wentworth data tape *to list JG Wentworth's assets as collateral for 777's lenders*, including Leadenhall and Trinity Life (which later executed an agreement with 777 Partners by which 777 Partners would acquire Trinity Life, though the transaction was never consummated).

154.    Of course, because the assets had not been properly acquired by SuttonPark Capital, SuttonPark Capital did not own the "Collections" from those assets to pass onto Leadenhall. Servicing Agreements § 3.1 (requiring Servicers to deposit "Collections" into Leadenhall's accounts, defined to include "(all cash payments (including Settlement Payments and Scheduled Net Lottery Payments, if any) or proceeds of such Receivable, whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment."). To conceal that SuttonPark Capital did not actually own the assets it had pledged, the Capital Markets group "topped up" Leadenhall's collection account with other funds to make it appear as though the cash flows were incoming.

155.    That process became a pattern and practice for the Capital Markets group, whereby the group created shell records on the MP Fin system for assets that 777 Partners did not actually own and covered up that fact by "topping up" lenders' collection accounts such as Leadenhall, to give the illusion that cash in-flows were being received from the fictitious assets.

A-1125

156.    Moreover, the servicing notes associated with the assets pledged to Leadenhall, created and entered into the MP Fin database by the SuttonPark Capital servicing and operational teams, confirm that the Borrowers' rampant double-pledging and failure to own the Collateral was, as of March 2023, neither a new problem nor a problem that Wander had only just discovered.  The MP Fin notes reflect that, going back to 2021, 777 Partners staff were expressly aware that certain receivables pledged to Leadenhall were never acquired, had already been sold, or were determined to be ineligible to be used as collateral.  The servicing team documented those issues contemporaneously in the servicing notes, some of which were elevated directly to Bennett and Adnani on the Capital Markets team, and all of which Bennett and Adnani had the access, ability, and responsiveness to review as part of their roles in submitting Compliance Reports truthfully attesting to the value of Collateral actually owned by the Borrowers.

157.    777 Partners, as well as SuttonPark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers, thus had actual and constructive knowledge of those non-existent, double-pledged, or otherwise defective receivables and made the conscious decision to leave those assets as allocated to Leadenhall in the MP Fin system and falsely represent to Leadenhall that they existed and were "free and clear" of other interests.

158.    This practice created a problem whereby the assets listed as collateral in the MP Fin computer system were not actually on the Sutton Park Capital balance sheet maintained by Sutton Park Capital accounting department.  To solve the issue, Wander caused Bennett and Adnani to lie to SuttonPark Capital's own accounting department, falsely representing that SuttonPark Capital owned the assets that had been added into the MP Fin system.  The accounting team of SuttonPark Capital was tasked with ensuring that Sutton Park Capital's books and records were accurate.  In the course of 2023 and 2024, the team members departed one by one until the last

Accounting Controller resigned from SuttonPark Capital in July 2024, shortly after this Complaint was originally filed in May 2024.

159.    Leadenhall also discovered that, after Leadenhall entered into the LSA, 777 Partners changed the programming of the MP Fin system to allow employees to retroactively alter the names of the lenders to which assets had been allocated in the past.  For instance, by 2024, a user could alter the record for an asset to make it look like it had been pledged to Credigy for the period January 2023 to December 2023, even though the same asset had previously been shown as pledged to Leadenhall for the same period.  When Leadenhall entered into the LSA with the Borrowers in May 2021, the MP Fin system did not allow for assets to be edited nor "re-allocated" after the fact.

160.    Over the period May 2021 to November 2023, the SuttonPark and Dorchester Borrowers delivered approximately 60 Compliance Reports to Leadenhall—*therefore representing approximately 60 separate times* that Collateral pledged for the exclusive benefit of Leadenhall was owned by the SuttonPark and Dorchester Borrowers "free and clear" of any other security interest when instead, this Collateral was pledged to other lenders or otherwise did not exist.  Exhibit 6 is a table identifying the sender or uploader, transmission medium, upload date, and confirmatory email date, if any, for each monthly Compliance Report.

161.    While each Compliance Report was required to be signed on behalf of the SuttonPark Servicer, in practice, the Servicers often just submitted native Excel files of the reports.  Steven Pasko, however, was the signatory on behalf of the SuttonPark Servicer of the false Compliance Reports which contained signatures, including reports issued by the SuttonPark Servicer for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022.

A-1127

162.    Leadenhall relied on the Compliance Reports to confirm throughout the term of the LSA that the funds provided to Borrowers were secured as contractually required.  Leadenhall would not have continued to allow the Borrowers to borrow debt under the LSA had it known that hundreds of millions of dollars in security for the debt had in fact been double-pledged to another lender and/or did not exist.  The Borrowers made each of these false representations to induce the Lenders and Leadenhall to continue allowing the Borrowers to take out debt notes under the credit facility.

### E. Leadenhall Learns That 777 Partners and the Borrowers Forged and Altered Financial Records to Conceal the Fraud.

163.    In early 2024, a 777 insider told Leadenhall that 777 Partners and the Borrowers had photoshopped financial statements submitted to Leadenhall and that, prior to the on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered receivables in the MP Fin system to try to cover up the double-pledge of Collateral.

164.    That insider tip prompted Leadenhall to re-examine the Compliance Reports and backup materials for those reports delivered around November 2022.  The examination resulted in full corroboration of the insider's admission.

165.    For the month November 2022, the SuttonPark Servicer had delivered a Compliance Report on behalf of the SuttonPark Borrower to Leadenhall showing outstanding borrowings of $349,997,803.32 and a borrowing base of $351,974,821.95.

**Excerpt from November 2022 SuttonPark Borrower Compliance Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **351,974,821.95** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 351,974,821.95 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **Yes** |

A-1128

166.    The November 2022 Compliance Report also showed an amount of $4,344,750.19 held in a "SPLCSS III Collection" account—which comprised part of the SuttonPark Borrowers' Borrowing Base—and an amount of $4,557,291.41 held in a "SPLCSS III Reserve" account— which comprised an amount required to be reserved on a monthly basis under the LSA as a percentage of the value of the Borrower's assets.

**Excerpt from November 2022 SuttonPark Borrower Compliance Report:**

| | | |
|---|---|---|
| SPC Assignment Amount | $ | - |
| SPLCSS III Collection | $ | 4,344,750.19 |
| SPLCSS III Reserve | $ | 4,557,291.41 |
| Total | $ | 8,902,041.60 |

167.    As backup documentation for the November 2022 Compliance Report, the SuttonPark Borrower submitted to Leadenhall "screenshots" purporting to reflect summary statements from Wells Fargo for the "Collection" and "Reserve" accounts.  The summary statements showed, as of November 30, 2022, an amount of $4,344,750.19 in the SuttonPark "Collection" account (ending in *893) and an amount of $4,557,291.41 in the "Reserve" account (ending in *885).  *See* Exhibit 7 (Wells Fargo Summary Statement Screenshot).  In other words, the screenshot matched the November 2022 Compliance Report with respect to the "Collection" and "Reserve" amounts.

**Excerpt from Wells Fargo Screenshot Showing Balances as of November 30, 2022:**

| Account Number | Account Name | Closing Ledger Balance | Closing Collected Balance |
|---|---|---|---|
| Account Balances for  121000248  WELLS FARGO BANK, N.A. | | | |
| *885 | SPLCSS III Reserve | 4,557,291.41 | 4,557,291.41 |
| Account Balances for  121000248  WELLS FARGO BANK, N.A. | | | |
| *893 | SPLCSS III Collection | 4,344,750.19 | 4,344,750.19 |

168.    However, following the SuttonPark Borrower's submission of the Wells Fargo screenshot to Leadenhall—and at Leadenhall's request—the SuttonPark Borrower sent Leadenhall in 2023 a full monthly bank statement for the "Collection" account (ending in *893) for the month December 2022.  *See* Exhibit 8 ("Collection" Account Wells Fargo Monthly Statement).

169.    The full monthly statement showed that—contrary to the screenshot showing an amount of $4,344,750.19 in the "Collection" account (ending in *893) as of November 30, 2022—*only $300,162.82 was in the account as of November 30, 2022.*

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022:**



170.    Moreover, contrary to the screenshot showing an amount of $4,557,291.41 in the "Reserve" account (ending in *885) as of November 30, 2022, *$0 was in the account as of November 30, 2022.*  *See* Exhibit 9 ("Reserve" Account Wells Fargo Monthly Statement).

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022:**

A-1130

171.    Leadenhall also discovered that 777 Partners had—using the programming change to MP Fin in the course of 2022 or 2023 allowing users to retroactively alter the lenders to which assets had been allocated—altered receivables pledged to Leadenhall.

172.    The excerpt from the MP Fin system below for asset number "69039" reflects a suspicious "Change of Portfolio" history between Leadenhall and Credigy.  "SPLCSS II" is the SuttonPark Borrower and "Volans 2018-2-18" is the special purpose borrowing vehicle set up by 777 Partners for Credigy.  A 777 Partners member of staff, likely a Capital Markets Group employee, altered the portfolio history for asset number 69039 such that it was pledged to Leadenhall as of May 1, 2021 (*i.e.*, right before the LSA was executed), remained pledged to Leadenhall through September 16, 2021, and—then unbeknownst to Leadenhall—was re-allocated to Credigy on September 17, 2021.  The history appears to reflect that the asset remains pledged to Credigy through the present.

**Excerpt from MP Fin Showing "Change of Portfolio" History for Asset No. 69039:**



173.    In the monthly Compliance Report issued to Leadenhall as of September 30, 2021, however, and thereafter, asset 69039 continued to show as being pledged by the SuttonPark Borrower exclusively to Leadenhall:

**Excerpt from September 2021 SuttonPark Borrower Compliance Report:**

| File No | File Name | Portfolio Name | Case Type | Discount Rate | PV |
|---------|-----------|----------------|-----------|---------------|-----|
| 69039 | 109068 | SPLCSS II | STRUCTURED SETTLEMENTS | 3.83% | $ 45,143.79 |

174.    That 777 Partners deliberately altered financial records to conceal the true state of Leadenhall's collateral is proof that the deficiency was not a "mistake" but a series of recurring, carefully orchestrated acts of fraud.

**F. Leadenhall Exercises Remedies under the LSA, and 777 Partners Admits It Lacks Authority to Agree to a Repayment Plan without A-CAP.**

175.    This admission of fraud—coupled with smoking gun evidence uncovered by Leadenhall—immediately precipitated Leadenhall's exercise of additional remedies.

176.    On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with written notice that "Events of Default" (*i.e.*, material breaches) under the LSA had occurred and were continuing.  Given the Events of Default, Leadenhall also sent, on March 12, 2024, "Trigger Notices" to Manufacturers and Traders Trust Company taking control of certain deposit accounts owned by the Borrowers (other than accounts owned by the Insurety Borrower). Funds from these accounts are being swept to other accounts as directed by Leadenhall in the Trigger Notices.  To date, Leadenhall has not exercised its control rights with respect to accounts owned by the Insurety Borrower to ensure that business may continue to operate.

177.    On March 15, 2024, Leadenhall served written notice that, in light of the Events of Default, Leadenhall was exercising its right to accelerate all outstanding debt obligations of the Borrowers, making the outstanding balance of $609,529,966.82 immediately due and payable. *See*

A-1132

Exhibit 10 (Mar. 15, 2024 Correspondence). Exhibit 11 provides a breakdown of this outstanding accelerated balance into principal and interest components.[7]

178.    In March 2024, in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations concerning a "Forbearance Agreement" whereby Leadenhall and the Lenders would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule.

179.    On March 26, 2024, Walder sent a markup of a draft Forbearance Agreement to Leadenhall which contained the following concession: "As of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing (collectively, the 'Specified Defaults')." Exhibit 12 (777 Partners' Draft Forbearance Agreement). Exhibit A to the draft Forbearance Agreement was the Notice of Breach setting forth details of 777 Partners' double-pledge and failure to own Collateral.

180.    During negotiations over the agreement, on March 29, 2024, Wander expressly represented to Leadenhall representatives in a telephone call that, if 777 Partners signed the Forbearance Agreement without A-CAP's express consent, A-CAP would accelerate A-CAP's loans to 777 Partners.  Said Wander: "**They've [A-CAP] told us they're going to default our Holdco loan if we sign the document without them agreeing to it.**"

181.    Wander also represented in late March and early April 2024 to Leadenhall Managing Partner Craig Gillespie that King and Jill Gettman, Chief Legal Officer at A-CAP, were holding up execution of any agreement between Leadenhall and 777 Partners.  Wander also represented that to break through the hold-up caused by A-CAP, he would try to organize a meeting

---

[7] Exhibit 11 reflects the accelerated amount due as of March 15, 2024, the date Leadenhall served written notice of acceleration of all outstanding debt obligations.

A-1133

directly with Leadenhall and A-CAP so that Leadenhall and 777 Partners' businesses could come to ground on an agreement.[8]

182.    As negotiations dragged over efforts to work out a restructuring arrangement, A-CAP continued to lurk in the background controlling Wander's every move.  In a conference call with Wander, 777 Partners Associate General Counsel Jon Walder, and Leadenhall representatives on April 2, 2024, Wander was straightforward when questioned on whether A-CAP had control over what 777 Partners was able to sign:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

183.    In a similar vein, Walder was unable to answer even basic questions as to why 777 Partners continued to make material edits to the Forbearance Agreement that moved the parties further away from a deal.  Said Walder on why certain changes were made to the Forbearance Agreement: "**I have no idea.  I just did what I was told [by A-CAP]**."  And when informed by Leadenhall that Leadenhall's investors were skeptical of whether 777 Partners could deliver even a $15 million payment to start to pay back the outstanding balance, Walder played it straight: "**I can't say I wouldn't have a degree of skepticism if I were in your investors' shoes.  But like I said I have no control over it [the payment].**"

184.    Leadenhall personnel had phone calls with Wander about the potential for the 777 Entity Defendants to repay even small amounts of their $609 million debt—on the order of $15 or

---

[8] Wander called Leadenhall from New York City repeatedly over the course of these negotiations, including on March 13, 2024, April 16, 2024, and April 22, 2024.  Over and over again, Wander referenced Kenneth King's involvement and backroom control over the forbearance and amortization payment negotiations, and on at least one occasion—reflecting the intense entanglement between Wander, King, and A-CAP—Wander stated that he was working out of A-CAP's offices in New York City.

A-1134

$30 million—and each time, Wander failed to make good on even the modest promise of repayment, and each time he made clear that A-CAP controlled his ability to make even a relatively tiny good-faith gesture.

185. On March 31, 2024, Managing Partner Craig Gillespie of Leadenhall spoke to Wander on the telephone concerning whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall, or less than 2.5% of the outstanding debt. Wander stated that whether 777 Partners could make a payment depended on whether A-CAP would provide the necessary funds.

186. On April 1, 2024, Gillespie spoke with Wander again concerning whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall. In the middle of the call, Wander said that Kenneth King was calling him, and that Wander would call Gillespie back. When Wander called back, he stated that A-CAP would not be able to fund a $15 million payment for Leadenhall on April 1, 2024 but would be able to fund the payment on April 2, 2024. Gillespie asked whether that was due to A-CAP's liquidity issues, and Wander replied, "must be." Leadenhall never received the $15 million payment from 777 Partners on or after April 2, 2024.

187. On April 2, 2024, Leadenhall Managing Partners Luca Albertini and Phil Kane spoke to Wander, and Gillespie separately spoke to Wander again, about whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall. Wander told Leadenhall that 777 Partners would not be able to pay the $15 million previously promised without funding from A-CAP, but could potentially pay $15 million on April 15, 2024, when Wander anticipated that 777 Partners would obtain funding from another source. Wander also told Leadenhall on April 2, 2024 that A-CAP controlled whether 777 Partners could even sign an agreement committing to a repayment schedule. On April 3, 2024, Gillespie spoke to Wander again, and Wander again

A-1135

stated that he would not have $15 million to pay Leadenhall until April 15, 2024. Leadenhall never received that payment.

188.    On April 4, 2024, Albertini spoke to Wander again, and Wander stated that A-CAP would not allow 777 Partners to pay $30 million to reduce the debt owed to Leadenhall. Wander hinted that he might be able to make an offer to pay $17.5 million. Leadenhall never received a $17.5 million payment.

189.    On April 16, 2024, Leadenhall Managing Partner Craig Gillespie spoke to Wander over the phone. Gillespie stated to Wander that, because 777 Partners and A-CAP appeared to have no real intention of repaying Leadenhall, Leadenhall would have to commence an action unless Wander could promptly repay approximately $350 million to Leadenhall, which constituted the full amount of the Collateral deficiencies. Wander replied that paying $350 million to Leadenhall was "not possible" and he would never be able to find $350 million in two weeks.

190.    On April 17, 2024, Leadenhall Managing Partner Craig Gillespie again spoke to Wander. Wander again indicated that A-CAP was holding up any negotiated repayment schedule and that Wander's view of A-CAP was that "they need to get fucking realistic" and allow the 777 Partners and 600 Partners entities to agree to a Forbearance Agreement. It never happened.[9]

191.    The restructuring negotiations confirmed not only that 777 Partners had no ability whatsoever to pay back Leadenhall, but that Kenneth King operated as a near-omniscient force in Wander's head and in controlling the enterprise's every move. Wander referenced or was

---

[9] Over the course of the parties' interactions, certain materials and/or communications exchanged between the 777 Partners affiliates and Leadenhall were designated as subject to Federal Rule of Civil Procedure 408, and certain communications between A-CAP and Leadenhall were the subject of a non-disclosure agreement. None of those documents or communications are cited or referenced in this complaint.

A-1136

interrupted by King during nearly every single phone call that Wander had with Leadenhall over the course of these discussions, as catalogued below:

    a.  On March 1, 2024, Wander stated in a phone call that he had just spoken to King and that King had directed Wander to speak to A-CAP's in-house counsel concerning a term sheet on a potential restructuring agreement;

    b.  On March 4, 2024, Wander stated in text messages concerning the term sheet that "Kenny was working on it all weekend"—and further confirmed the same in a subsequent short phone call;

    c.  On March 5, 2024, Wander stated in a short phone call that he had heard from King that Leadenhall had received a draft of the restructuring term sheet;

    d.  On March 12, 2024, Wander stated in a short phone call that he was working on getting a deal done and that he was flying to New York City to see King the next day;

    e.  On March 13, 2024, Wander stated on a short phone call that he was working out of A-CAP's offices in New York City, that he was going out for lunch that day with King, and that A-CAP was working on the Forbearance Agreement;

    f.  On March 28, 2024, Wander stated in a short phone call that if Wander executed any agreement without Leadenhall's consent, King would default his "all-asset lien" loan to 777 Partners and foreclose on 777 Partners' assets;

    g.  On April 1, 2024, Wander stated that 777 Partners would not be able to make any payment to Leadenhall that day but that he had to go because King was calling him;

A-1137

h.  On April 2, 2024, Wander stated in a short phone call that he thought King needed to find a way to make a payment to Leadenhall, at which point he hung up the call to speak to King, called Leadenhall back, and then stated that he would talk to King again that night;

i.  On April 3, 2024, Wander stated in a short phone call that he needed to promptly call King to try to get a restructuring deal across the finish line;

j.  On April 17, 2024, Wander, while in New York City, stated in a short phone call that he had spoken to King five or six times over the last day concerning a potential forbearance agreement;

k.  On April 22, 2024, Wander stated in a phone call that he was in New York City waiting to meet with King, who was concerned about a downgrade of A-CAP's insurers by a ratings agency, and that Wander was still working to get a deal done with Leadenhall;

l.  On April 29, 2024, Wander told Gillespie on the phone that 777 Partners did not have $400 million, but he had to go because King was calling him.

192.    Through these attempted restructuring negotiations, 777 Partners has admitted time and again that it does not control its own operations and ability to perform under the LSA—it is part of a broader enterprise controlled by A-CAP and King.

### III.  The Collateral Scam Furthered a Broader Fraudulent Enterprise Between 777, A-CAP, and Their Principals.

193.    Wander, Pasko, and 777 falsified the collateral underlying Leadenhall's credit facility because they wanted money they did not have and, based on the true condition of their business, would not have been permitted to borrow.  Their use of false collateral to induce lenders to make loans, and their use of those loans to purchase more receivables to tout as collateral for

other loans, enabled them to keep their sprawling enterprise going when it should have folded—facilitating both personal enrichment on a grand scale and money-losing passion projects like the acquisition of professional sports teams.

194.    The 777 Defendants' partner and co-conspirator in this enterprise is A-CAP, under the control of King, who has financed Wander, Pasko, and the 777 Entity Defendants since at least February 2020.  While King and A-CAP publicly portray A-CAP as an arm's-length "senior" lender to the 777 Entity Defendants, it is anything but.  The terms of A-CAP's financing stand in stark contrast to an arm's-length commercial lending arrangement:  Through a series of insider transactions, A-CAP funds Wander and Pasko's businesses at wildly above-market interest rates in conjunction with essentially unlimited rights with respect to those entities' assets and total control and dominion over its enterprise.  As alleged in further detail below, King and A-CAP have exerted their undue and self-interested influence over the 777 Defendants by, *inter alia*:

  a.  Assuming by express agreement day-to-day control of the 777 entities;

  b.  Assuming direct dealings and operational decision-making with respect to certain of 777 Partners' portfolio companies;

  c.  Installing A-CAP and its employees on site at 777 Partners to ensure compliance with, and execution upon, A-CAP and King's directives as to the operations of the 777 Entity Defendants and their daily decision-making;

  d.  Directing the 777 Entity Defendants' ownership and management as to what decisions to make and how to implement them;

  e.  Directing how the 777 Defendants' liquidity should be used and invested, including by conditioning "protective advances" on approval by A-CAP of every expenditure;

66

A-1139

f.  Deciding which of the 777 Defendants' creditors to pay or not to pay;

g.  Deciding which of the 777 Defendants' portfolio companies should be funded or not;

h.  Assuming responsibility for and/or controlling and dictating the 777 Defendants' negotiations with creditors, stakeholders, and contractual counterparties;

i.  Holding itself out publicly as the ultimate decision-maker with respect to all of the 777 Defendants';

j.  Manipulating the lack of independent and disinterested governance at 777 Partners to force through transactions to improve A-CAP's creditor position within the 777 Defendants' enterprise without adequate consideration, or otherwise for the benefit of A-CAP, to the detriment of other creditors;

k.  Dictating corporate governance changes at the 777 Defendants' entities, including "recommend[ing] that Joshua Wander and Steven Pasko resign," recommending that 777 Partners appoint a chief restructuring officer ("CRO"), and recommending candidates for that role, including the ultimate selection, B. Riley, all of which were immediately accepted by 777 Partners;

l.  Converting or attempting to convert A-CAP's loan positions to ownership stakes in the 777 Defendants' portfolio companies without adequate consideration and on non-market terms;

m.  Engaging investment banks to market the 777 Defendants' assets for the benefit of A-CAP; and

n. Obscuring, misrepresenting, and avoiding disclosures with respect to its exposure to 777 Partners, its continued funding of 777 Partners, and the terms and conditions under which it has exercised remedies against 777 Partners' assets, including in direct discussions with Leadenhall and in connection with this litigation.

195.    Further, while A-CAP has a tendency to portray itself as if it were a "senior" or "first-lien" lender to the entire 777 Partners enterprise as a result of the "all asset lien" it holds as to 777 Partners, the reality is more nuanced.  The lien simply means that A-CAP has a security interest in the equity of 777 Partners, *i.e.*, the extent to which its assets outweigh liabilities, and the equity of 777 Partners' various operating companies.  777 Partners and its operating companies carry so much debt that it is unclear what, if anything, that equity is even worth.  In any event, ACAP's "senior" rights are more akin to structurally subordinated, mezzanine, or equity interests, which would be paid out only after virtually *all* of the operating companies' other creditors.  This is clear upon reviewing the credit agreement between 777 Partners and Haymarket—the A-CAP affiliate that holds so much of 777 Partners' debt—which charges interest between roughly 14% and 19% per annum depending on the time period, well in excess of industry standards for senior debt that is actually secured by a first lien.

196.    A-CAP, with King at the helm, has nonetheless proceeded to exercise power over the enterprise far beyond those rights to equity, operating as an all-powerful, almighty force of nature over 777 Partners and its principals to seize, foreclose, and/or liquidate many of 777 Partners' and 600 Partners' operating companies' assets.

197.    In short, King and A-CAP have conspired with Wander, Pasko, and the 777 entities to enrich A-CAP and King at the expense of all other 777 creditors, including Leadenhall.  Wander,

68

A-1141

Pasko, and 777 have agreed to this symbiotic arrangement because the continued survival of their otherwise insolvent business depends on it. A-CAP's status as a "senior" lender does not immunize it from liability for the acts 777 carried out under its control, with its knowledge, and for its benefit. Together, A-CAP and 777's use of fraud and other illegal means to induce Leadenhall to help float their continued self-enrichment scheme constitutes a RICO enterprise.

**A. King and A-CAP Controlled 777 Partners' Operations During the Fraudulent Scheme Against Leadenhall.**

198.    A-CAP's role in the pattern of fraud perpetrated on Leadenhall—but not the full extent of it—began to rear its head in April 2023, when Wander confirmed on the recorded April 3, 2023 conference call that A-CAP had a purported "all asset lien" on the assets of 777 Partners.

199.    Leadenhall would later find out that the story ran much deeper: A-CAP is the puppeteer to 777 Partners' marionette, and nothing happens at 777 Partners—even execution of a last-minute restructuring agreement to repay uncontested debt and stave off this very litigation—without A-CAP's approval. A-CAP is the financial engine behind the scenes which provides last-minute loans and investments in "Whac-A-Mole" fashion to 777 Partners in order to make the enterprise appear solvent to outside lenders and investors. The ruse engineered by A-CAP even extends to 777 Partners' own employees—Wander and 777 Partners employees have disclosed to Leadenhall that A-CAP's relationship with 777 Partners is so intertwined that A-CAP has funded 777 Partners' payroll on multiple occasions.

200.    When Wander and Pasko's double-pledging was first revealed to Leadenhall, instead of behaving like an arm's-length first-lien leader with no prior knowledge of the misrepresentation, A-CAP became ***more*** involved to help 777 Partners avoid detection and take damage control into its own hands.

69

A-1142

201.    At precisely the time Leadenhall confronted Wander—around March 2023—A-CAP formally memorialized its control of 777 Partners' operations in a memo circulated within 777 Partners via letter or e-mail correspondence.  The memo dictated a number of operational changes at 777 Partners, including the establishment of a "Steering Committee" for 777 Partners, with King at the head, to ensure that every single 777 Partners investment into a portfolio company was approved by King.  The memo also provided that certain 777 Partners employees would report directly to A-CAP executives.

202.    King also took action to ensure he had boots on the ground at 777 Partners' headquarters.  Around March 2023, King moved A-CAP Portfolio Manager Carson McGuffin and several others into the shared office of Nicholas Bennett and Alexander Adnani, the individuals in 777 Partners' Capital Markets group responsible for carrying out Wander's wishes in allocating assets to lenders in the MP Fin system and preparing Compliance Reports for Leadenhall.

203.    Bennett and Adnani were unceremoniously kicked out of the shared office and began reporting directly to A-CAP Chief Operating Officer Mike Saliba, who was installed in his own office in the opposite, executive wing of the 777 Partners office, near Wander and Pasko.

204.    Bennett ultimately attempted to leave 777 Partners for a competing firm in the summer of 2023.  However, due to high turnover within Chief Financial Officer Damien Alfalla's finance function, 777 Partners had in recent periods installed an incentive-heavy compensation retention structure including prohibitive non-compete terms and conditions.  Wander, wary of losing control over Bennett, who had been his foot soldier in committing many of the constituent acts of this fraud against Leadenhall, intervened directly by telling the competitor firm that Bennett could not join on the basis of the non-compete agreement, while telling Bennett he was simply not

allowed to leave 777 Partners. Bennett accepted his fate and returned to 777 Partners, but only after negotiating a "promotion" from the finance function to 777 Partners' investment team.

205.    Leadenhall also learned that A-CAP and King controlled 777 Partners' payroll. At least two former Managing Directors of 777 Partners, Jorge Beruff (777 Partners' former Head of Insurance), and Juan Arciniegas (777 Partners' former Head of Sports, Media, and Entertainment) initiated arbitration proceedings in May 2024 against 777 Partners, A-CAP, and King, alleging that the parties refused to pay millions of dollars in deferred compensation. A-CAP, in turn, made the demands public by bringing declaratory judgment actions in federal court. *See Advantage Capital Holdings and Kenneth King v. Beruff*, 24-cv-22620 (S.D. Fla., filed July 10, 2024); *Advantage Capital Holdings and Kenneth King v. Arciniegas*, 24-cv-22621 (S.D. Fla., filed July 10, 2024).

206.    Both former Managing Directors alleged that A-CAP assumed control over the 777 Partners enterprise in mid-2023, and therefore is liable under their compensation plans with 777 Partners, and that A-CAP and King refused to allow 777 Partners to make requisite payments under the plans. *See Beruff*, 24-cv-22620, ECF No. 1-1 at ¶¶ 53-54 ("Claimant spoke with Respondent Wander and asked why the Award payment was not being made. Respondent Wander responded that Respondent A-CAP, through Respondent King, refused to allow the Company to make the Award payments, but that Mr. Wander would speak with Respondent ACAP, through Respondent King, and try to get authority to pay Claimant his May 2024 Award payment in another form (*e.g.*, a consulting arrangement). On May 15, 2024, Respondent Wander and Claimant spoke again and ***Respondent Wander reiterated that Respondent A-CAP, and not Respondent 777, made the decision to suspend the Plan and Cash Agreement payments***." (emphasis added)); *Arciniegas*, 24-cv-22621, ECF No. 1-1 at ¶¶ 53-55 ("In and around May 2023, Claimant demanded the payment of his benefits due and in response Respondent Pasko and Respondent Wander each told

A-1144

Claimant on separate communications that the payments had not been approved by Respondent A-CAP and its chairman and CEO Respondent King, which had apparently taken over the ultimate decision making from Respondent 777's managing partners. . . . On June 13, 2023, *Respondent Pasko called Claimant and stated that Respondent A-CAP would not allow Respondent 777 to write any big checks for any purpose, even for amounts they contractually owed and were past due*." (emphasis added)).

207.    Further reflecting the enmeshment among the various Defendants here, both of these former Managing Directors characterize 777 Partners on their LinkedIn Pages as a "Family Office," presumably for Wander, Pasko, and King.  Exhibit 13 (Jorge Beruff LinkedIn Profile, available at https://www.linkedin.com/in/jorgeberuff/); Exhibit 14 (Juan Arciniegas LinkedIn Profile, available at https://www.linkedin.com/in/juan-arciniegas-40a61616/).  Other Principals and Managing Directors, such as Aaron Levy and Lenz Balan, also refer to the enterprise as a "Family Office."  Exhibit 15 (Aaron Levy LinkedIn Profile, available at https://www.linkedin.com/in/aaron-levy-41833421/); Exhibit 16 (Lenz Balan LinkedIn Profile, available at https://www.linkedin.com/in/lenz-balan-10507b3/).

**B.  A-CAP Was Well Aware of and Participated in 777's Fraud on Leadenhall.**

**1.    The False Compliance Reports**

208.    The 777 Defendants continued to send false Compliance Reports to Leadenhall through January 2024, when they issued restated Compliance Reports disclosing the full extent of the Collateral deficiency to Leadenhall from early 2023.  Until February 2023, right before King moved his lieutenants into the offices of the 777 Partners Capital Markets group, Adnani sent confirmation emails with each upload of the monthly Compliance Reports, with Bennett copied on each email.  By April 2023, after King moved A-CAP executives into the offices of the 777 Partners Capital Markets group, the monthly Compliance Reports uploads no longer came with

A-1145

confirmation emails, and the name attached to these reports was simply "SuttonPark Capital"—not Adnani, Bennett, or any other SuttonPark or 777 Partners employee.

209.    With 777 employees reporting to King and his deputies, and Adnani and Bennett no longer sending Compliance Reports to Leadenhall consistent with their prior course of dealings, A-CAP was well aware of, if not directly responsible for, the transmission of these false Compliance Reports to Leadenhall.

210.    King also took more drastic measures to ensure that Wander and his lieutenants kept a lid on the enterprise's activities.  A-CAP management—and King in particular—regularly sat in unannounced on Wander's phone calls starting around April 2023 to ensure that Wander did not say too much to outside parties, including Leadenhall.

### 2.    The Sham "Restructuring" Negotiations

211.    A-CAP overtly inserted itself into the discussions with Leadenhall around the issues with its collateral beginning in June and July 2023.  In an effort to "help" 777 "replace" Leadenhall's double-pledged Collateral with other security interests—A-CAP stepped directly into the fray and offered Leadenhall a fourth-priority position on the assets of 777 Partners, *i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall rejected the offer.

212.    During these negotiations in June and July 2023, which involved A-CAP's Chief Operating Officer Mike Saliba, Leadenhall explained to Saliba that Wander had double-pledged Leadenhall's Collateral in breach of the LSA, and impressed upon him the seriousness of the problem they had identified.  Saliba did not express even a hint of surprise or concern, inquire about how it happened, or suggest that A-CAP would take immediate steps to investigate or address the cause of the double-pledging.  Given Saliba's reaction, together with the facts below, the Leadenhall representatives who participated in those meetings inferred that A-CAP must have been

well aware and "in the know" for months that Collateral pledged to Leadenhall had been double-pledged and/or did not exist and interjected itself into negotiations in order to keep Leadenhall from making the pattern of fraud public, which in turn might bring 777 Partners—and therefore A-CAP—all the way down.[10]

213.    A-CAP again tried to prevent Leadenhall from pursuing legal avenues for recovery by injecting itself into negotiations—both on its own behalf and on behalf of 777 Partners—of a potential forbearance agreement in late 2023 up until the filing of this lawsuit, as described *supra* Section II.F.  After attempting to demand a release for *A-CAP* as a condition of negotiating, A-CAP allowed, if not directed, 777 Partners and Wander to string Leadenhall along for months with promises of a repayment plan that it knew it would not permit 777 to perform.

214.    Indeed, A-CAP and King have overtly directed 777 Partners not to repay Leadenhall and to divert funds elsewhere.  On February 21, 2024, 777 Partners and 600 Partners agreed to pay off a relatively small $25.6 million portion of the loan extended to the SuttonPark Borrower, with payment to come due on the date of execution.  777 Partners failed to make the payment to which it had agreed just days earlier, instead paying only $12.5 million on time, with the remaining $13.1 million being paid two days after the agreed date.  777 Partners personnel later told Leadenhall that, at that same time, A-CAP had infused cash into 777 Partners to allow 777 Partners to make payroll and cover operating expenses, underscoring the degree of 777

---

[10] Wander also represented to Leadenhall during the course of these March 2023 discussions that any missing Collateral was maintained within the "777 corporate system"—which, upon information and belief, Wander uses to freely transfer assets among a web of trade names without regard to corporate or legal formalities.  If this is correct, it follows that the missing Collateral owed to Leadenhall has been used to pay principal, fees, and interest on A-CAP loan facilities with 777 Partners or reduce borrowings on assets in which A-CAP has an interest, thereby directly improving A-CAP's position through the fraud perpetrated on Leadenhall.

A-1147

Partners' dependence on A-CAP, and explaining why 777 Partners could not come up with more of A-CAP's money to repay Leadenhall on the agreed date.

215.    777 Partners' acquiescence to A-CAP's direction is consistent with the admission of an employee of a 777 Partners subsidiary to a Leadenhall Managing Partner, in early 2024, that since at least early 2023, A-CAP has had an express agreement with 777 Partners whereby A-CAP has the right to control 777 Partners' operations, apparently referring to the communication setting up the Steering Committee structure discussed *supra*.

### 3.    A-CAP's Attempts to Prevent Leadenhall from Auditing Its Collateral

216.    In November 2023, A-CAP interjected itself further into Leadenhall and 777 Partners' discussions concerning whether 777 Partners would agree to Leadenhall's proposal for the former Chief Operating Officer of Defendant SuttonPark Capital, Paul Kosinski, to perform an "asset review" of the receivables pledged to Leadenhall as Collateral.  As stated in an email to Leadenhall from Pasko in late November 2023: "*At the request of A-CAP*, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark."

217.    Pasko purported to justify A-CAP's objections (or "concerns") to Leadenhall's proposal on grounds that the asset-by-asset review "would violate [Kosinski's] severance agreement" and that Kosinski had departed for a "direct competitor" to 777 Partners.  Upon information and belief, however, A-CAP's true concern was that Kosinski, as a former high-level officer of SuttonPark Capital, had inside knowledge of 777 Partners' operations and would expose the ongoing fraud to Leadenhall.

218.    When confronted with Leadenhall's clear right under the LSA to designate any representative to perform an asset review, and the fact that Kosinski did not, in fact, work for a

competitor of 777 Partners, 777 Partners acknowledged that it had no basis to prevent Kosinski from performing the review. But in August 2024, as Kosinski and his team dug deeper into the records of what little collateral is left, 777 Partners—with A-CAP-appointed B. Riley at the helm—abruptly revoked Kosinski's access to its systems, including Leadenhall's Collateral portfolio, under the guise of what its counsel called "technological issues." 777 Partners later admitted that there were no "technological issues"; they instead cited the same baseless "competition" concerns invoked by A-CAP, falsely claimed, with no explanation or proof, that the asset review team had exceeded the scope of its authorization, and demanded that Leadenhall designate a different representative. Even today, Defendants continue to frustrate Leadenhall's ability—and contractual right—to determine the extent and condition of the remaining collateral securing the investment with which they have absconded.

## C. A-CAP Exercised and Continues to Exercise Its Control Over 777 Partners to Advantage Itself Over Other Creditors, Including Leadenhall.

219.  As discussed above, A-CAP's supposed rights, liens, and claims with respect to 777 Partners' and its affiliates' assets arose from a series of insider transactions that gave Wander and Pasko funding for their vanity projects and personal pursuits and gave A-CAP control of a family of companies without the regulatory restrictions and oversight that come with running insurance companies.

220.  A-CAP has repeatedly exercised these "rights"—coupled with 777 Partners' lack of corporate formalities—to deploy 777 Partners' assets and businesses to serve the interests of A-CAP while prejudicing the rights of arm's-length creditors like Leadenhall.

221.  This includes moving or "reallocating" liens up or down 777 Partners' organizational structure without apparent adequate consideration. In December 2020, A-CAP, through its affiliate Haymarket, extended a secured loan to JARM Capital LLC ("JARM")—the

*personal* shareholding vehicle of Wander, through which Wander owns his majority shareholding of 777 Partners—for nearly $170 million. The loan was originally secured by JARM's (*i.e.*, Wander's) own assets.

222.    Haymarket provided the loan so that Wander could purchase Pasko's and other minority early-stage shareholders' shares in 777 Partners. As a result of that buyout, Pasko has received a very significant pecuniary benefit from 777 Partners and its relationship with A-CAP.

223.    In March 2021, Haymarket and JARM amended the loan documents to add a pledge by JARM of its membership interests in SuttonPark Acquisition LLC, the direct parent company of 777 Partners, and in SPA II LLC, the direct parent company of 600 Partners. On the same day that Haymarket and JARM entered into the amendment, again reflecting a mixing of personal and professional interests, Wander and Pasko entered into personal guarantees with Haymarket whereby they personally guaranteed all of JARM's obligations under the amended agreement.

224.    Despite Wander's and Pasko's personal guarantees, this shareholder loan was still risky for A-CAP. Haymarket's security interest in JARM's equity interest in 777 Partners would again give Haymarket only subordinated equity rights in the assets of 777 Partners—an even more tenuous position than that Haymarket formally held through its separate lien on the assets of 777 Partners, which translated into subordinated rights in the assets of the operating companies (though as a practical matter, A-CAP's iron grip on 777 Partners gave it power to extract assets from the operating companies far greater than the rights of a typical secured creditor). In other words, Haymarket's rights to JARM's interests in 777 Partners would have value only in the extremely unlikely event that 777 Partners repaid virtually all of its creditors.

225.    On March 4, 2024, apparently no longer satisfied with the JARM collateral for which he had negotiated, King notified Leadenhall that as "a result [of] (among other things)

pressures from the rating agencies and regulators," the security interests collateralizing the loan to JARM would be "consolidated into the HoldCo facility"—*i.e.*, King caused Wander to agree that *777 Partners*—not Wander's personal vehicle—would take on the JARM loan obligation and back that obligation with a purported first-priority position on the assets of 777 Partners.  In short, A-CAP induced 777 Partners to turn King's worthless equity pledge into a $170 million obligation at the HoldCo level *for no apparent consideration* and then used that obligation as a pretext for a senior lien on 777 Partners'—not Wander's—assets.

226.    This "up-tiering" transaction directly impaired the value of Leadenhall's Guaranty from 777 Partners (and 600 Partners).  When the JARM loan was "consolidated into the HoldCo facility"—with its many preexisting obligations to Leadenhall and other creditors—A-CAP ensured that its $170 million loan would be senior to 777 Partners' obligations to non-affiliated secured creditors like Leadenhall—virtually extinguishing those creditors' ability to be repaid from 777 Partners.

227.    JARM repaid approximately $120 million of the loan to Haymarket on January 1, 2024, and based on the fact that the entire 777 Partners ecosystem has essentially no cash of its own, that liquidity was likely an advance from A-CAP.  Haymarket's financial filings reflect that it is not unusual for the various companies, including JARM, Haymarket, and other A-CAP affiliates, to shuffle massive amounts of money between and among one another on the very same day.

228.    It is also not unusual for A-CAP to move its liens from the assets of 777 Partners itself to the assets of 777 Partners' operating companies, a practice which A-CAP leadership has referred to in the past as the "hardening" or firming up of its liens.

A-1151

229.    Further, while A-CAP portrays its practice of making enormous "protective advances" to 777 Partners and operating companies as part of the ordinary course of business for a "senior" lender, the real benefit to A-CAP is simply keeping 777 Partners out of bankruptcy for as long as possible.  A-CAP is well aware that if 777 Partners submits to the jurisdiction and oversight of a bankruptcy court, and 777 Partners is forced to treat its creditors equitably rather than rolling over to A-CAP's every demand, A-CAP's insider transactions will be subject to challenge, and the transactions described above (among likely many others) will be voidable as fraudulent transfers.

### D.  The Tangled Web of A-CAP and 777 Partners

230.    Given King's involvement in Wander's affairs, Leadenhall began conducting a deeper dive into the relationship between King and Wander.  The core of the convoluted and enmeshed relationship between King and Wander is the relationship between A-CAP and 777 Re.  777 Re is the reinsurance subsidiary of 777 Partners.

231.    Wander has pitched 777 Re as the "anchor" of 777 Partners' entire investment strategy—meaning that it is the source of funds that Wander and his alter ego companies can raid for other ventures, including professional football teams.[11]  777 Partners is a holding company which conducts no substantial business operations itself, and its value is determined by the value of its subsidiaries.

---

[11] Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.  Upon information and belief, Wander himself is not permitted to sit as an official board member of 777 Re because he was convicted of cocaine trafficking in 2003.  Wander still, however, actively participates in 777 Re's board meetings and acts as the de facto leader and manager of 777 Re.  Pasko sits on the 777 Re board, and until early 2024, following action from 777 Re's Bermuda regulator, 777 Partners appointed 777 Re's key management team.

A-1152

232.     Reinsurance is a contractual arrangement by which primary insurance carriers—which write and offer insurance such as life and health insurance to policyowners—pass on or "cede" certain of their insurance liabilities to a reinsurer such as 777 Re.  777 Re indemnifies the primary insurance carriers for certain of those liabilities, while the primary insurance carriers remain in privity with and directly responsible to the policyowners.  If the reinsurer becomes unable to satisfy its obligations to the primary insurance carriers, (i) the ability of the primary insurance carriers to pay policyowners and satisfy capital requirements is in jeopardy and (ii) the primary insurance carriers may not be able to pay dividends or return capital to their owners without raising fresh capital themselves to fulfill their regulatory requirements.

233.     For example, A-CAP—through its King-controlled life insurance subsidiary Haymarket—may issue life insurance policies to a population of senior citizens.  For "reserving" purposes, A-CAP may then need to either allocate regulatory capital to ensure it can pay those liabilities as they come due, or, because reinsurance premiums are generally lower than the return on regulatory capital, pass on some of the insurance risk to a reinsurer.

234.     Thus, A-CAP purchases "reinsurance" from 777 Re whereby, under a traditional reinsurance arrangement, A-CAP will make periodic premium payments and transfer any reserves established to support any existing insurance liabilities to 777 Re, and in return, 777 Re will be responsible for making all or part of the benefit payments required under the life insurance policies upon the death of the insureds (or other insured event).  In other words, a reinsurer like 777 Re is an "insurer for the insurer."  777 Re provides financial protection for A-CAP, which means A-CAP may hold less capital itself and 777 Re is responsible for indemnifying or paying A-CAP for the liabilities under the life insurance policies or annuities.

235.    In the typical reinsurance arrangement, the reinsurer is responsible for setting aside a certain amount of capital, including premiums payments, in reserve to ensure that it has the financial ability to indemnify or make a payment to the ceding insurance company, which will pay any benefit payment directly to the policyholders, upon a claims or insured event.

236.    However, in the case of A-CAP and 777 Re, the reinsurance arrangements are structured under a complex "modified coinsurance" or "funds withheld" basis. Under a modified coinsurance arrangement, A-CAP (and/or the subsidiary insurance companies controlled by A-CAP) retains the reserves backing the claims payable by 777 Re in A-CAP's own custodial accounts. If A-CAP's reserves (including any investment earnings thereupon) exceed the amounts required to be established or held by A-CAP—*i.e.*, if the investments are profitable or if the liabilities associated with the life insurance policies or annuities decrease—A-CAP sends the profits or any excess reserves to 777 Re as premium payments or modified coinsurance account adjustment payments.[12]

237.    Under the reinsurance arrangements between A-CAP and 777 Re, the assets supporting the insurance reserves are managed by 777 Asset Management LLC, an asset manager under the 777 Partners umbrella. The foregoing complex reinsurance structuring where the invested assets supporting the reinsurance arrangements are retained by A-CAP, and 777 Re's primary role is to invest those assets through 777 Asset Management LLC on behalf of A-CAP—for substantial management fees from A-CAP—is just the start of the extreme interconnectedness of A-CAP and 777 Re. ***Upon information and belief, through reinsurance arrangements, 777***

---

[12] A "funds withheld" arrangement is similar to a modified coinsurance arrangement except that, among other things, the insurance liabilities associated with the life insurance policies and annuities are transferred to 777 Re and reported on 777 Re's statutory statements (rather than on the King-controlled life insurance company's statutory statements, which would be the case under a modified coinsurance arrangement).

A-1154

***Asset Management LLC has invested approximately $2.2 billion of A-CAP affiliated insurance assets—largely in risky 777 Partners-related ventures—which are supposed to be used to back claims to policyholders.***

238.  777 Re has used the reinsurance reserves—the sources of which are premium payments from A-CAP, which come from premium payments made by A-CAP's policyholders to A-CAP—to make loans directly to 777 Partners and other subsidiaries under the 777 Partners umbrella.  777 Partners has, in turn, used those funds to make speculative bets on payday lenders, ultra-low-cost airlines, and football clubs such as the Everton Football Club.[13]

239.  The reinsurance relationship between A-CAP and 777 Partners branched out into massive loan arrangements from A-CAP to 777 Partners and affiliates.  As King acknowledged on a conference call to investors on February 27, 2024, "A-CAP is a lender to 777 for businesses outside the reinsurance relationship."

240.  As reported in the press, of the approximately $11.5 billion in assets held by A-CAP and its subsidiaries, $2.9 billion—or more than 25 percent of the assets—were invested in entities related to 777 Partners.[14]  The amount of total exposure from A-CAP to 777 Partners is so large that *The New York Times* reported late last year that 777 Partners is required to regularly update A-CAP executives about its continuing business plans[15]—an arrangement formalized by the memorandum and the Steering Committee discussed *supra*.

---

[13]  Liz Hoffman, *Mystery Investor 777 Partners Bought Sports Teams with Insurance Customers' Cash*, SEMAFOR (Nov. 15, 2023), https://www.semafor.com/article/11/15/2023/mystery-investor-777-partners-bought-european-sports-teams-with-insurance-customers-cash.
[14]  Dan McCrum, Samuel Agini and Ian Smith, *US Regulators Push Insurers to Cut Exposure to Everton Bidder 777 Partners*, FIN. TIMES (Apr. 1, 2024), https://www.ft.com/content/a225cb7d-ccdd-495d-b7f1-a8124129b8bf.
[15]  Tariq Panja, *Everton Sale Stalls Amid Questions About Buyer's Financials*, N.Y. TIMES (Oct. 18, 2023), https://www.nytimes.com/2023/10/18/world/europe/everton-sale-777-partners.html.

A-1155

241.    It has also been reported that A-CAP and its affiliates, at King's direction, have loaned 777 Partners and its web of affiliates more than $1 billion.[16]  *Upon information belief, however, the full amount of outstanding indebtedness at year-end 2023 by 777 Partners' affiliates to A-CAP, across all of the holding companies and operating companies of both 777 Partners and A-CAP, is over $2 billion.*

242.    The loans and financing activity from A-CAP (inclusive of its affiliates) to 777 Partners take multiple forms and have been extended to multiple parties under the 777 Partners umbrella:

a.  Since 2019 and through the present, A-CAP has provided a revolving line of credit of approximately $500 million directly to 777 Partners, secured by the equity value of 777 Partners' subsidiaries.  Reflecting A-CAP's own lack of faith in 777 Partners' ability to repay its debt obligations, the interest rate on these direct loans is as high as 20 percent per annum.

b.  In 2021, as represented by 777 Partners, A-CAP purchased approximately $50 million of a $250 million preferred equity share sale by 777 Partners.  Upon default or liquidation of 777 Partners, A-CAP's preferred equity will be repaid only after other senior obligations of 777 Partners are repaid.

c.  As of December 2023, A-CAP has provided approximately $700 million in loans and other forms of financing to support 777 Partners' aviation-related investments, and as security for the loans, A-CAP received additional equity in 777 Partners.

---

[16] *Id.*

A-1156

d.  As of December 2023, A-CAP has provided approximately $290 million in loans to a 777 Partners affiliate to support its investments in professional football teams, as further detailed in the next section.

243.  Public records confirm that through the massive amount of credit extended to the 777 Partners enterprise, A-CAP, through its affiliate ACM Delegate LLC, has an **_all-asset lien_** not only on 777 Partners but also the following entities:

a.  600 Partners, a Defendant co-conspirator in this action operating out of the 777 Partners Address which acted as Guarantor to the Borrowers;

b.  SuttonPark Acquisition LLC, a 777 Partners entity operating out of the 777 Partners Address which is the direct owner of 777 Partners;

c.  JARM, a 777 Partners entity operating out of Josh Wander's Miami penthouse which is his personal shareholding vehicle through which he has a majority ownership stake in 777 Partners;

d.  SPA II LLC, a 777 Partners entity operating out of the 777 Partners Address which is the direct owner of 600 Partners;

e.  MTCP LLC, a 777 Partners entity operating out of Steven Pasko's Miami penthouse which is a 99% owner of SPA II and which is Pasko's personal shareholding vehicle through which he has a minority ownership stake in 777 Partners and a majority ownership stake in 600 Partners;

f.  Nutmeg Acquisition LLC, a 777 Partners entity operating out of the 777 Partners Address which invests in professional football teams;

g.  777 Partners UK Limited, a 777 Partners entity operating out of the UK;

A-1157

h. 777 Asset Management LLC, a 777 Partners entity operating out of the 777 Partners Address responsible for (prior to A-CAP's "recapture" of its reinsurance business from 777 Re) managing and investing the assets of A-CAP's insurance premiums and reserves;

i. 777 Asset Management Ltd, a 777 Partners entity operating out of the 777 Partners Address responsible for (prior to A-CAP's "recapture" of its reinsurance business from 777 Re) managing and investing the assets of A-CAP's insurance premiums and reserves;

j. Trans Atlantic Lifetime Mortgages Limited, a 777 Partners entity operating out of the 777 Partners Address which originates home equity release mortgages;

k. Triplet Global LLC, a 777 Partners entity operating out of the 777 Partners Address, which owns a Bombardier Global 6000 aircraft that Wander and Pasko use to fly around the world;

l. FFI Holdings LLC, a 777 Partners portfolio company operating out of California, of which Josh Wander and Steven Pasko are Directors, and which is a provider of production, financing, evaluation, and monitoring services to the entertainment industry. Lumiere Acquisitions Company, another 777 entity, acquired a 30.1% stake of this company in 2019;

m. Film FI Holdings LLC, a 777 Partners portfolio company operating out of California which is a holding company for a provider of production and financing services to the entertainment industry;

A-1158

n.  Triple 7 Operations Limited, a 777 Partners entity operating out of Dublin, Ireland, of which Steven Pasko serves as the sole Director, whose business purpose is listed in its public filings as a "[r]ange of activities";

o.  Signal Medical Receivables LLC, a Defendant "Seller" under the LSA operating out of the 777 Partners Address which purchases medical lien receivables;

p.  Signal Servicing LLC, a "Servicer" under the LSA operating out of the 777 Partners Address which services medial debt purchased by Signal Medical Receivables LLC;

q.  Signal SML 1 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

r.  Signal SML 2 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

s.  Signal MLH Medical Receivables HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

t.  Signal Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC and which finances personal-injury litigations;

u.  Signal Financial Holdings LLC, a 777 Partners entity operating out of the 777 Partners Address which is the sole member of Signal Medical Receivables LLC and Signal Servicing LLC;

A-1159

v. Signal LF Portfolio HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

w. Signal AHF Medical Receivables HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC and which facilitates funding arrangements for medical healthcare services;

x. SKC 1 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

y. SKC RX LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

z. SLF 2 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

aa. Speed Leasing Company LLC, a 777 Partners portfolio company which provides consumer leases for used motorcycles;

bb. 777 Real Estate LLC, a 777 Partners entity operating out of the 777 Partners Address which acquired Keypad, a company that paid cash and provided real estate services to homeowners in exchange for the right to be the listing agent on a sale of the home;

cc. 777 Software LLC, a 777 Partners entity operating out of the 777 Partners Address, which is a computer software company;

dd. 777 Stream LLC, a 777 Partners entity operating out of the 777 Partners Address;

A-1160

ee. Lex Capital Holdings LLC, a 777 Partners entity operating out of the 777 Partners Address, which is a holding company for Scout Law Group LLC and which was a defendant in a 2024 Arizona lawsuit alongside 600 Partners and 777 Partners;

ff. Lumiere Acquisitions Company LLC, a 777 Partners entity operating out of the 777 Partners Address, which acquired a large stake in FFI Holdings PLC for € 11.9 million in 2019;

gg. Lumiere Financing LLC, a 777 Partners entity operating out of the 777 Partners Address, which received a $50 million COVID stimulus loan in July 2020 from the Federal Reserve;

hh. Medset Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a direct subsidiary of 777 Partners;

ii. Nimble Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Funding LLC and which connects individuals with investors willing to finance their legal claims in exchange for a portion of the proceeds from those claims;

jj. Sustainable Supplies LLC, a 777 Partners entity operating out of the 777 Partners Address;

kk. Triple7 Sports Management LLC, a 777 Partners entity operating out of the 777 Partners Address;

ll. F3EA Holdings LLC, a 777 Partners entity which is a consumer lending and finance company operating out of the address of Sky Financial Group, a personal loan company;

A-1161

mm.    F3EA Funding LLC, a 777 Partners entity operating out of the 777 Partners

Address which is a subsidiary of F3EA Holdings LLC and which is a consumer

finance company;

244.    Of course, King also benefits personally from bankrolling all of Wander's ventures. Using an array of transactions between 777 Partners, A-CAP, and a shell company controlled by King to obfuscate the source of the funding, King purchased an $11 million beachfront condominium in Miami using funds that appeared to originate from A-CAP.[17]  Specifically, an A-CAP affiliate loaned 777 Partners $9 million in November 2022, 777 Partners loaned a shell company named none other than "A-Miami LLC" $10 million the next day, and A-Miami LLC promptly purchased the $11 million condo.  The mailing address for A-Miami LLC is A-CAP's mailing address, 415 Bedford Road, Pleasantville, NY.  According to publicly available filings, Kenneth King remains a debtor to 777 Partners, and 777 Partners has security interest in all of King's "right, title and membership interests in A-Miami LLC."  In other words, King's relationship with Wander and 777 Partners offered a path of very little resistance for King to appropriate his own company's assets for personal use, without regard to A-CAP's corporate form.

245.    King has good reason to obfuscate the ultimate source of the funding: **_it is the policyholders of the life insurance companies owned by A-CAP_**, who made premium payments to the life insurance companies, which lent money to 777 Partners, which lent the money to a shell company controlled by King, which purchased the condo.

---

[17] Liz Hoffman, *The Silent Partner Behind 777's Buying Spree*, SEMAFOR (Nov. 22, 2023), https://www.semafor.com/article/11/22/2023/the-silent-partner-behind-777s-buying-spree ("One loan last year from an A-CAP insurer to 777 was quickly re-lent to a Miami shell company controlled by King to buy an $11 million beachfront condo.").  .

A-1162

246.    King also has a personal stake in certain assets purchased by 777 Partners using 777 Re's reinsurance reserves, including a 10-percent stake in Flair Airlines, an ultra-low cost Canadian airline.[18]

**E. Wander, Pasko, and the 777 Entities Operate as Alter Egos.**

247.    Wander and Pasko have repeatedly shown that they treat the 777 Partners companies as instrumentalities of their own interests and pursuits, disregarding the legal separateness of the many affiliated entities.

248.    The following examples demonstrate the lack of boundaries between and among the Wander, Pasko, and 777 Entity Defendants; the lack of corporate formalities observed; and the use by Wander and Pasko of the 777 Entity Defendants' assets for personal purposes:

   a.    In a June 21, 2023 memorandum from Pasko and Wander to the Board of 777 Re, Pasko and Wander admitted that SuttonPark Capital "lacks an active Board of Managers."

   b.    In late 2023, Wander and Pasko decided to reorganize their various businesses, and one such move involved Sutton National Insurance Company ("Sutton National")—formerly a wholly owned insurance subsidiary of 777 Partners— which Wander and Pasko nominally separated from 777 Partners and made

---

[18] Moreover, employees of A-CAP and 777 Partners often move freely between the two firms. James Rothman, the former Head of Business Development at A-CAP, became the Chief Investment Officer of 777 Asset Management LLC, a 777 Partners subsidiary, as of 2023. Rothman subsequently left this role at 777 Asset Management LLC.

A-1163

Pasko the sole owner.[19]  But in August 2024, it was reported that 777 Partners (not Pasko) had listed Sutton National for sale.[20]

c.   On or about December 31, 2022, 777 Partners placed airplanes as financial assets on 777 Re's balance sheet—for no consideration—in order to assist 777 Re in meeting certain regulatory capital maintenance requirements for 2022, and then took the planes off of 777 Re's balance sheet in January 2023, once they had served their purpose of concealing regulatory deficiencies.

d.   Upon information and belief, Wander created the 600 Partners entity to conceal his personal control over his companies' assets.  SuttonPark Capital was previously wholly owned by 777 Partners until Wells Fargo—which was providing customer accounts for SuttonPark Capital at the time—discovered Wander's prior drug convictions in a Know Your Customer/Anti-Money Laundering review.  Wells Fargo required Wander to step down from a managerial position with SuttonPark Capital as a condition of keeping its accounts open.  Wander "stepped down" on paper only, and he and Pasko created a new entity to be beneficially owned by Pasko alone—600 Partners— that would wholly own SuttonPark Capital going forward, even as Wander and Pasko continued jointly operating the 777 Partners enterprise as a whole.

---

[19] *See AM Best Places Credit Ratings of Sutton National Group's Members Under Review With Negative Implications*, (Nov. 16, 2023),
https://news.ambest.com/newscontent.aspx?refnum=254055&altsrc=23.
[20] *See* Farhin Lilywala, et al., *777 Partners-Backed Sutton National Pulls Sale Process*, INSURANCE INSIDER US (August 21, 2024),
https://www.insuranceinsiderus.com/article/2dnqq5ss12jgiihdt88w0/specialty-lines/777-partners-backed-sutton-national-pulls-sale-process.

A-1164

249.    According to a June 21, 2023 memorandum from Pasko and Wander to the Board of 777 Re, 777 Partners had raided the assets of several of its other subsidiaries that borrowed under other credit facilities.

    a.   In one instance, an entity called Heron Finance LLC ("Heron") had issued debt to buy an airplane, but when it sold the airplane, 777 Partners appropriated the cash from the sale rather than allowing Heron to pay off the debt.  Wander and Pasko explained they had understood "based on conversations with [A-CAP] that the cash could be used for short period of time while [A-CAP] increased the size of their holding company loan to the parent," but then "[t]hat increase did not take place for reasons outside of [Wander and Pasko's] control and the deficiency remained," leaving the credit facility undercollateralized, much like Leadenhall's facility.

    b.   In another instance, 777 Partners rendered a credit facility called "Medset" undercollateralized because "the cash was used by the Parent Company, 777 Partners LLC, in error as [Wander and Pasko] had thought a waiver was in place to use said proceeds to invest temporarily in non-medical lien assets."

    c.   In yet another instance, 777 Partners caused an "interest reserve shortfall" on a facility called SPSS Fund 6 because Wander and Pasko "were under the impression at closing that the cash reserve was approved to be released as part of an amendment based on discussions with internal management as the cash flow from the asset was sufficient to cover the cost of funds."

250.    In each case, Wander and Pasko claimed a mistake, but their history of "mistakes" that happen to result in 777 Partners misappropriating cash from their subsidiary borrowers

A-1165

acquired through credit facilities, leaving secured lenders without adequate collateral, constitutes an unmistakable pattern. This pattern indicates, at a minimum, that the separateness among and between Wander, Pasko, 777 Partners, and its various affiliates is paper thin, if it exists at all, and the utter lack of controls allows Wander and Pasko to do virtually whatever they want. Indeed, Wander and Pasko reported to 777 Re that SuttonPark Capital not only "lacks an active Board of Managers," but also "lacks a loan or asset accounting system able to track and report on assets" (due to numerous deficiencies with MP Fin), "lacks written processes to manage the operations when turnover occurs," and "lacks sufficiently trained staffing to manage operations," and that several of their other subsidiaries' controls are similarly deficient.

251. Wander and Pasko's conduct since this action was filed underscores the point. Shortly after the original Complaint was filed, 777 Partners purported to appoint representatives of B. Riley Advisory Services to serve as independent fiduciaries to facilitate a restructuring.

252. In a letter dated May 16, 2024, which the 777 Entity Defendants filed with the Court the following day, 777 Partners' counsel represented: "On May 6, 2024, after consultation with B. Riley, Mr. Pasko and Mr. Wander each resigned as managers of 777 Partners LLC and Mr. Pasko and Mollie Wander each resigned as managers of 600 Partners LLC. That same day, the respective members of those entities accepted the resignations and appointed Ian Ratner and Ronald Glass of B. Riley as managers of both entities. At this point, B. Riley professionals have independent and unilateral control of the 777 Entities and the companies are operating under their direction and supervision."

253. A week later, on May 24, 2024, 777 Partners doubled down on this claim, filing affidavits in support of its opposition to Leadenhall's TRO application, attesting to B. Riley's supposed independence and total control over 777 Partners' and its affiliates' operations.

93

254.    That same day, however, the *Financial Times* reported that when "[a]sked about their resignations, a 777 spokeswoman told the FT Wander and Pasko, as 100 per cent owners of 777, remained 'unreservedly committed' to its successful future. Both men, she said, 'continue to lead on strategic direction across every facet of the business, overseeing all progressive changes directed at strengthening the company's long term value.'"[21]

255.    And one week after that, on May 31, 2024, the football journal *Josimar* reported that it had seen an internal email sent by Wander to 777 Partners staff, in which "[h]e claimed that [B. Riley representatives] will only 'support the leadership team,'" "[t]hat [Wander and Pasko] 'maintain our active roles across the business, including various board positions,'" and "that B. Riley had in fact been brought in 'to collaborate with [Wander], [Pasko,] and the leadership team." *Josimar* also reported that, even though Wander and Pasko were formally removed from the boards of 777 Partners, its football division, and several of the individual football teams, Wander told a board meeting of the British Basketball League that he was "still in charge" and that despite having "hired a new COO from B. Riley," "neither he nor Steve had been removed or had their executive duties reduced from the football business and that they remained the 100% owners."[22]

256.    Even after the Court entered the preliminary injunction in this case, 777 Partners affiliate Employee Funding of America LLC entered Chapter 7 bankruptcy in August 2024, apparently without having been directed or authorized to do so by the purportedly independent fiduciaries that nominally control 777 Partners (B. Riley) or their counsel, further underscoring that B. Riley is not in control, and 777 Partners continues to bleed assets despite court intervention.

---

[21] Agini, et al., *A Bet on Everton*, *supra* note 1.
[22] Philippe Auclair & Paul Brown, *Black Friday*, Josimar (May 31, 2024), https://josimarfootball.com/2024/05/31/black-friday/.

A-1167

**F.  As Creditors and Counterparties Learn the Truth, the A-CAP/777 Scheme Begins to Crumble.**

257.    Despite King and A-CAP's efforts to keep Wander and his alter-ego companies afloat while squeezing as much financial benefit for themselves as possible, 777 Partners and the related entities have struggled to meet financial obligations besides those just to Leadenhall.  It has been widely reported that Wander's shell companies "continue to miss routine payments to businesses, vendors and partners," including "miss[ing] payroll on at least two occasions" and failing to pay out bonuses.[23]  Among the many loans A-CAP has made to 777 Partners, "at least one covered payroll for 777 itself."[24]

258.    These financial problems at Wander's various alter ego companies have threatened what appears to be Wander's ultimate pursuit: purchasing historical football clubs from around the world, including Standard Liege in Belgium and Everton Football Club in England.  Indeed, since 2021, Wander has transformed his businesses from the relatively niche practice of investing in structured settlements and lottery winnings into making speculative bets on professional football teams.

259.    Similarly, while A-CAP started out as a business providing life insurance and annuity products to ordinary people—and relying on steady insurance premium payments—because of A-CAP's massive credit exposure to 777 Partners, its future is now tied up in Wander's speculative football bets.

260.    Wander has made no secret of the fact that his goal is to flip these clubs for a quick profit or "cross-sell" interests in the enterprises' insurance and media businesses to the clubs' dedicated fan bases.  In October 2023, Wander told 777 Partners' employees that the firm had built

---

[23] Panja, *Everton Sale Stalls*, *supra* note 15.
[24] Hoffman, *Silent Partner*, *supra* note 17.

A-1168

"relatively conventional but profitable finance and insurance businesses that enabled us to invest and build positions in more exciting industries such as aviation and sports."[25] The ultimate goal, as Wander has stated to news outlets, "is that one day we're not selling hot dogs and beers to our customers; [it's] that we're selling insurance or financial services or whatever."[26] Wander has even asked rhetorically (referring to himself in the third-person): "Is there anyone in the world that's been more serious about buying football clubs in history than Josh Wander?"[27]

261.    To actualize his goal of flipping storied football clubs for a profit and "cross-selling" to fans, Wander has invested, through 777 Partners and with the financial backing of King and A-CAP, in several teams from lower-tier football leagues, as well as other sports investments around the world.[28]  Several of the teams in which Wander has invested have flirted with insolvency due to 777 Partners' inability to make payments on time and failure to pay the brokers involved on some of the soccer deals.[29]

262.    Genoa CFC, one of the oldest football clubs in Italy—and one of the so-called "distressed assets" purchased by Wander with over $200 million in debt[30]—sought judicial approval of a deal with Italian tax authorities to reduce some of its tax debts on the grounds that it

---

[25]  Giles Turner and David Hellier, *Everton's US Buyer Leaves Trail of Questions Over Its Finances*, BLOOMBERG (Dec. 7, 2023), https://www.bloomberg.com/news/articles/2023-12-07/everton-takeover-us-buyer-777-partners-leaves-questions-for-premier-league.
[26] Andrew Edgecliffe-Johnson & James Fontanella-Khan, *Everton Suitor 777 Hails New Era of Football 'Hyper Commercialisation*, FIN. TIMES (Aug. 31, 2023), https://www.ft.com/content/8fc36dbe-23c1-4aae-a288-dc2c2f1d7c5f.
[27] *Id.*
[28] *Id.*
[29] Panja, *Everton Sale Stalls, supra* note 15.
[30] Philippe Auclair & Paul Brown, *See You in Court*, JOSIMAR (Feb. 2, 2024), https://josimarfootball.com/2024/02/02/see-you-in-court/.

is "in a state of crisis or insolvency."[31]  777 Partners previously tried to avoid timely paying its debts by shifting liabilities to a shell company, but that gambit was rejected by Italian authorities.[32]

263.    Wander's lack of transparency about 777 Partners' finances nearly caused the collapse of a 125-year-old club, Standard Liege, after facing serious legal implications from a Belgian regulatory body.[33]  777 Partners continued to load Standard Liege with debt in the form of loans from 777 Partners, even while it had failed to pay its players and staff on time, to the point of being sanctioned by the league.[34]  It has been reported that Belgian authorities have now imposed (and then lifted) three different transfer bans in a single year on Standard Liege for failure to honor financial commitments, only issued a license for the 2024-2025 season after imposing the strictest monitoring measures available to the regulator, and threatened the club with more severe sanctions.[35]  As a result, both Wander and Pasko were also removed from the club's board, and on May 16, 2024, a Belgian court reportedly ordered the seizure of 777 Partners' assets in Belgium.[36]

264.    Another one of Wander's football club purchases, Hertha BSC—a club that competes in the second division of German football—is in a "financial black hole" in which it does not earn enough to service its debt, and 777 Partners has had to negotiate with the league to allow it to remain operational despite its inability to invest the necessary cash in the short term.[37]

_____

[31] Philippe Auclair & Paul Brown, *On the Brink*, JOSIMAR (Nov. 22, 2023), https://josimarfootball.com/2023/11/22/on-the-brink/.
[32] *Id.*
[33] *Id.*
[34] Philippe Auclair & Paul Brown, *The Twilight Zone*, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.
[35] Philippe Auclair & Paul Brown, *End of Season Sales*, JOSIMAR (July 10, 2024), https://josimarfootball.com/2024/07/10/end-of-season-sales/; Auclair & Brown, *Black Friday*, *supra* note 22.
[36] *Id.*
[37] Auclair & Brown, *Twilight Zone*, *supra* note 34.

A-1170

265.    There is a pattern to Wander's professional football investments.  777 Partners acquires the clubs for modest or insignificant sums—in the case of Genoa CFC, for one single euro, and for Hertha BSC, less than 15 million euro—takes on all of the club's liabilities and debt payments, and then either stiffs the clubs' creditors entirely or seeks to restructure the debt.[38]  As part of this pattern, 777 Partners reports an inflated valuation for the clubs premised on projections of growth, which in turn allows Wander to pitch new or existing lenders willing to lend money to continue expanding.[39]  Upon information and belief, Leadenhall is yet another lender caught in this massive web of fraudulent enterprise.

266.    For example, the collateral 777 Partners put up to continue operating Genoa CFC was based on unrealistic projections of growth in *all* of its revenue streams and operating cost reductions, despite the fact that Genoa's major revenue stream from television rights will be shrinking soon.[40]  Genoa's debt load continued to balloon due to continued, aggressive spending, though it bought itself some time by convincing Italian tax authorities that it was "in a state of crisis," and negotiating a significant reduction in its unpaid tax liability.[41]

267.    777 Partners predicated its financial projections for other clubs, including Standard Liege, Hertha, and Vasco de Gama, on meeting performance standards for promotion or participation in European leagues that are extremely unlikely to be met.[42]  600 Partners gave a substantial guarantee to keep Standard Liege afloat, but refused to provide audited financials to the Belgian regulators to prove that it could satisfy that guarantee.[43]  And like Standard Liege, 777

---

[38] Auclair & Brown, *On the Brink*, *supra* note 31.
[39] *Id.*
[40] *Id.*
[41] Auclair & Brown, *Black Friday*, *supra* note 22; *see* Auclair & Brown, *End of Season Sales*, *supra* note 35.
[42] Auclair & Brown, *See You in Court*, *supra* note 30.
[43] Auclair & Brown, *The Twilight Zone*, *supra* note 34.

A-1171

Partners' interest in Vasco de Gama was seized pursuant to an order of a Brazilian court, and Wander and Pasko were removed from that club's board as well.[44]

268.    In August 2023, just a few months after it came to light that he owed Leadenhall over one hundred million dollars beyond what he was permitted to borrow, Wander told the *Financial Times* that he needed to raise "a few hundred million" to cover his football investments.[45]

269.    These concerns came to a head most recently with Wander's attempt to purchase Everton Football Club, a historic club that competes in the world's preeminent and most prestigious football league, the English Premier League.[46] In accordance with Wander's patterned portfolio, Everton is in very dire financial straits with a huge and growing debt load.[47] The Everton investment was arranged and funded in large part by—unsurprisingly given its control over 777 Partners' operations—King and A-CAP.[48]

270.    In September 2023, Wander announced that 777 Partners had reached an agreement to purchase Everton.  Shortly after the deal was announced, however, it was held up by concerns over 777 Partners' involvement in funding the deal.  Wander had trouble finding investors other than King and A-CAP.  On November 26, 2023, *Forbes* ran a story titled, "777 Partners Still Reportedly Scrounging For Cash To Buy Everton FC."[49]

---

[44] Auclair & Brown, *Black Friday*, *supra* note 22.

[45] Edgecliff-Johnson, *Hyper Commercialisation*, *supra* note 26.

[46] James Robson, *English Soccer Club Everton to Be Bought by American Investment Firm 777 Partners*, AP NEWS (Sept. 15, 2023) https://apnews.com/article/everton-sale-777-partners-03aa0b571d19c034efbaa7d10adb00ac.

[47] Paul Brown & Philippe Auclair, *Everton or Bust?*, JOSIMAR (Feb. 16, 2024), https://josimarfootball.com/2024/02/16/everton-or-bust/.

[48] *Id.*

[49] *See* Mike Ozanian, *777 Partners Still Reportedly Scrounging for Cash to Buy Everton FC*, FORBES (Nov. 26, 2023), https://www.forbes.com/sites/mikeozanian/2023/11/26/777-partners-still-reportedly-scrounging-for-cash-to-buy-everton-fc/?sh=2a2ad06a208c.

271.   As investigative football journal *Josimar* revealed, an "Investment Overview" document dated August 31, 2023 concerning 777 Partners' targeted acquisition of Everton "was **not** put together by 777 [Partners] themselves but by A-CAP . . . ." The "Investment Overview" prepared by A-CAP stated that "the ultimate source of the first 40 million pound-loan made by 777 [Partners] to Everton was A-CAP, with the club paying an interest rate of 12.75 percent." After the initial loan, 777 Partners' outstanding loans directly to Everton "ballooned to almost 200 million pounds," with A-CAP "continuing to provide this money."[50]

272.   And if 777 Partners' position—and therefore A-CAP's position—vis-à-vis Everton was not precarious enough based merely on the size of the debt alone, its meager security on the loan made it even riskier. Reportedly, 777 Partners took a "last out position" in a lending facility behind a senior lender with a "charge over all of Everton's assets, including its bank accounts." In exchange for A-CAP's ongoing funding, it would "receive a 2.5 percent warrant" in "the 777 Football Group," with 777 Partners having to sell a minority interest in its Football Group to repay part of A-CAP's loan. Meanwhile, the 777 Football Group was expected to require 240-300 million euros in working capital "to reach stabilization across all clubs," and even then, would "need to sell equity between 30-50% to cover financing needs."[51]

273.   In October last year, reporting on the targeted Everton transaction, *The New York Times* ran a story reporting that "[a] string of unpaid bills, some as recent as [late last year], raised" concerns for potential partners.[52] This "pattern of late and delayed payments" raised "a red flag to a potentially more significant cash-flow issue," to the point that Leadenhall is not the only former

---

[50] Brown & Auclair, *Everton or Bust?*, *supra* note 47.
[51] *Id.*
[52] Tariq Panja, *The Mystery Company With One Foot in the Premier League*, THE NEW YORK TIMES (Oct. 10, 2023), https://www.nytimes.com/2023/10/10/world/europe/everton-777-premier-league.html

business partner of Wander's to accuse him and 777 Partners of operating "a sprawling fraudulent enterprise."[53]

274.    Additionally, Wander's refusal to provide 777 Partners' audited financial statements beyond the year 2020 and subject its financials to the most basic scrutiny raised problems with an English football regulatory body, just as it did in Belgium.[54]  A former board member of a 777 Partners subsidiary is on record saying that it is "somewhat of a mystery" how 777 Partners could have ever come up with the money to purchase Everton.[55]

275.    It has been reported that "Everton is not just the biggest sporting investment 777 have ever attempted, it is also crucial for the long-term survival of the firm itself."[56]  777 Partners needed Everton as an asset on its books in order to attract new investors and, invariably, new lenders in a seemingly never-ending cycle of taking on more debt.[57]

276.    This all provided a powerful motive for Wander and Pasko, via 777 Partners, 600 Partners and their portfolio companies, at King and A-CAP's direction, to pursue short-term inflation of their Borrowing Base and take out more debt than they could secure, to cover payments coming due and fund further acquisitions, including of global football teams.

## IV.    Absent Injunctive Relief, the Enterprise Would Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Assets to A-CAP to Avoid Satisfying Creditors.

277.    The wheels began to come off Wander, King, and Pasko's sprawling enterprise in early 2024.  In January 2024, the Bermuda Monetary Authority—which regulates 777 Re—reportedly placed 777 Re into administrative control, freezing the $2.2 billion in assets managed

---

[53] *Id.*
[54] Panja, *Everton Sale Stalls*, *supra* note 15.
[55] Panja, *The Mystery Company*, *supra* note 52.
[56] Brown & Auclair, *Everton or Bust?*, *supra* note 47.
[57] Brown & Auclair, *Everton or Bust?*, *supra* note 47; Auclair & Brown, *See You in Court*, *supra* note 30.

A-1174

by 777 Asset Management LLC which have been used to fund 777 Partners' various risky, money-pit business ventures.[58]

278.    By placing 777 Re into administrative control, the Bermuda Monetary Authority sent a clear signal that it has serious questions over whether the cash cow behind 777 Partners—777 Re, as propped up by a steady flow of premium payments and loans from A-CAP—is able to meet its financial obligations.

279.    On February 16, 2024, AM Best—a credit ratings agency focused on insurers—downgraded 777 Re's credit rating from a "B" to a "C-" and assessed the strength of the firm's balance sheet as "very weak."

280.    AM Best specifically cited the firm's "exposure to affiliated assets"—meaning obligations to 777 Partners and various other companies across the enterprise through loans and investments—as the "primary driver" of the ratings downgrade.  The ratings downgrade only further confirms that lines between the various players here, whether they call themselves "777 Partners," "SuttonPark," "A-CAP," "Josh Wander," "Steven Pasko," or "Kenneth King," are blurry, to the extent they exist at all.

281.    On February 23, 2024—on cue—citing A-CAP's "high reinsurance leverage and declining counterparty credit quality," AM Best downgraded the credit rating of A-CAP from "bbb+" to "bbb" and "with negative implications," signaling that AM Best may further downgrade A-CAP in the future.[59]

---

[58] Brown & Auclair, *Endgame*, *supra* note 11.
[59] In response to AM Best's statements that it intended to downgrade the credit rating of two of A-CAP's primary insurance carriers—rather than taking action sufficient to address AM Best's concerns—A-CAP made the unusual decision to sue the ratings agency.  *See Atlantic Coast Life Insurance Company and Sentinel Security Life Insurance Company v. A.M. Best Rating Services, Inc.*, No. 24-CV-5470 (D.N.J.) (Complaint Filed April 23, 2024) ("The A-CAP Insurers bring this

A-1175

282.    On February 27, 2024, in response to AM Best's downgrade of 777 Re and A-CAP's credit rating, King announced on an investor call that because 777 Re "wasn't managed the way it needed to be," A-CAP was exiting its relationship with 777 Re and would "recapture" the insurance liabilities ceded to 777 Re within 45 to 60 days.  In other words, A-CAP would cease paying insurance premiums to 777 Re.

283.    King also noted on the call that he had not yet terminated the reinsurance arrangements with 777 Re because *"to shut off the flow of liquidity to our reinsurer would have paralyzed them and essentially created more risk to A-CAP."*  King's unilateral ability to dictate the future and potentially cause or contribute to the demise of 777 Re via a recapture and his prior and current involvement in the disposition of a large portion of 777 Re's investment portfolio once again demonstrates the scope of King's control over 777 Re and its operations.   King's announcement only further confirms that the faucet has been turned off on 777 Partners.[60]

284.    In total, as of year-end 2023, approximately 99% of 777 Re's reported GAAP book value of invested assets at year-end 2023 was based on 777 Re's reinsurance agreements—and the

---

suit to get the benefit of their bargain.  The Court should enjoin A.M. Best from issuing a faulty rating the insurers never agreed to.  It should also require A.M. Best to redo its rating according to its published methodology.").  The complaint, coupled with a verification from controller Kenneth King and a motion for a temporary restraining order, makes plain that AM Best had threatened downgrades because of the insurers' exposure to 777 Re ("A.M. Best's threatened downgrade arises out of its fixation with financial pressures on a reinsurer called 777 Re.").  In June 2024, A-CAP and AM Best notified the court that they had reached a settlement in principle.

[60] King's announced termination of A-CAP's reinsurance agreements with 777 Re has already damaged Leadenhall.  Leadenhall has provided hundreds of millions of dollars in debt notes directly to 777 Partners under a separate note purchase agreement which is secured by equity interests in 777 Re's parent company.  King's recapture of reserves from 777 Re has torpedoed the value of 777 Re and wiped away any equity value in 777 Partners in the process—effectively turning Leadenhall into unsecured creditors of 777 Partners.  Moreover, assuming the termination and recapture occurs, A-CAP will directly hold the loans made by 777 Re to the subsidiaries of 777 Partners, and it is very unlikely that they would be able to find independent third-party lenders to refinance these loans on similar or commercially reasonable terms.

A-1176

payments receivable from those reinsurance agreements—with SILAC Insurance Company and Singapore Life Limited, as well as A-CAP affiliates Haymarket, Jazz Reinsurance Company, and Southern Atlantic Re Inc. In addition to A-CAP's recapture discussed above, the two non-A-CAP insurers, SILAC and Singapore life, recaptured their insurance risks ceded to 777 Re in February and March 2024. These recaptures caused a material reduction in the net book value of 777 Re, which had financially propped up various of 777 Partners' businesses, including in professional football, aircraft leasing, budget airlines, and asset management in addition to reinsurance.

285.    All the while, 777 Partners has continued to pour whatever liquidity it has into Wander's football passion project. In a LinkedIn post on April 16, 2024 by Hertha BSC, the German professional football club owned by 777 Partners, and reposted the same day by Wander, Hertha BSC announced that 777 Partners had made a fresh equity investment of approximately $80 million in Hertha BSC in early April 2024. According to the LinkedIn post, 777 Partners' deadline for the equity infusion was the end of May 2024, meaning that 777 Partners made the investment ahead of schedule. The infusion was also made at a time when Wander had represented to Leadenhall over and over again in early April 2024 that he did not have even $15 million to pay down the debt to Leadenhall.

286.    On April 30, 2024, news reports broke that 777 Partners had just loaned Everton another approximately $20 million, taking the amount of 777 Partners' total loans to Everton to approximately $250 million (or £200 million). Wander and Pasko's choice to continue to dissipate millions in money-losing professional football clubs despite immediately owing Leadenhall more than $600 million in debt justifies injunctive relief here.

287.    On May 2, 2024, a Leadenhall representative spoke with Wander on the phone and confronted him about 777 Partners continuing to waste money on Wander's failing vanity projects.

Wander admitted that 777 Partners was then in the process of running down its business and selling off assets to repay creditors. However, rather than sell the football assets to generate cash to pay back creditors, Wander confirmed that 777 Partners had been making "protective advances," through its patron A-CAP, and that A-CAP would not make any further "protective advances" to pay amounts due to Leadenhall.

288.    That same day, another Leadenhall representative spoke with Wander, who confirmed 777 Partners' impending fire sale. Wander admitted that A-CAP was going to stop funding 777 Partners' operations due to regulatory scrutiny and would instead seek to foreclose on whatever assets it could get its hands on. In a last-ditch attempt to stave off litigation, Wander claimed he was confident he could convince A-CAP to share the proceeds of its planned fire sale with Leadenhall. A-CAP did not act as Wander predicted.

289.    Subsequent reporting confirmed that A-CAP had seized control all of 777 Partners football assets, among other assets around the world, through an array of undisclosed maneuvers.

290.    In May 2024, A-CAP allowed the CEO of 777 Partners' football operations' contract to expire, keeping him on only as a consultant to A-CAP, and hand-picked the investment bank Moelis & Company to put *all* of 777 Partners' football clubs on the auction block.

291.    Simultaneously, A-CAP took over 777 Partners' obligations to fund the operations of teams. On May 10, 2024, even after the original complaint was filed in this action as it became increasingly clear that no sale would be consummated, 777 Partners (or more likely, A-CAP acting through 777 Partners as conduit) dumped yet another $10 million investment into Everton.

292.    Later in May 2024, A-CAP started paying 777 Partners' long-delinquent bills for its Belgian club, Standard Liege, and has ensured that Standard has just enough funding to survive

in recent months, but no more than that,[61] to the point that Standard Liege has only escaped bankruptcy and liquidation so far because of regular loans made by A-CAP, who, each time, provided just enough money to keep a growing company of wolves at the door.[62]

293.    In early June 2024, as it became clear 777 Partners lacked the financial wherewithal to close the Everton deal, the Wizard of Oz stepped out from behind the curtain, and A-CAP itself made a bid to acquire the club, presumably in the hope of recovering some of the debt that it had recklessly heaped onto Everton in the last year through its conduit, 777 Partners.[63]  Around that time, it was reported that Wander had been pitching Everton as the solution to his cash problems and effectively a vehicle to raise funds for other ventures, and that A-CAP had *also* viewed Everton as the saving grace that could prop up 777 Partners' entire crumbling football enterprise at least a while longer:  "[T]he hope was that the club's premium valuation and a new stadium . . . would, by association, 'materially increase' the value of 777's entire football portfolio."[64]

294.    Later in June 2024, the Italian press reported that A-CAP was prepared to abandon all pretense of separateness between the companies, would no longer use 777 Partners as an investment vehicle, and would instead operate directly on 777 Partners' Italian club, Genoa FC,

---

[61] Manuel Gonzalez, *Is de Miserie Compleet in Luik? '777 Partners Heeft al Maanden Niéts Meer te Zeggen en . . . Twee Schuldeisers Moeten mee Beslissen over lot van Standard'*, VOETBALKRANT (Jul. 10, 2024), https://www.voetbalkrant.com/nieuws/2024-07-10/is-de-miserie-compleet-in-luik-777-partners-heeft-al-maanden-niets-meer-te-zeggen-en-twee-schuldeisers-moeten-mee-beslissen-over-lot-van-standard.

[62] Auclair & Brown, *End of Season Sales*, *supra* note 35.

[63] Paul Quinn, *The Absurdity of a Potential Bid for Everton by A-Cap*, THE ESK (Jun. 13, 2024), https://theesk.org/2024/06/13/the-absurdity-of-a-potential-bid-for-everton-by-a-cap; Tom Morgan, *U.S. Financial Firm Emerges as Serious Everton Takeover Contender Despite 777 Links*, TELEGRAPH (June 12, 2024), https://www.msn.com/en-gb/money/other/everton-takeover-contender-under-pressure-from-us-authorities-to-cut-ties-with-777/ar-BB1o6x0D; David Hellier and Jill Shah, *Everton Gets Funding Offer From Firm Behind Previous Bidder 777*, BLOOMBERG (Jun. 6, 2024), https://www.bloomberg.com/news/articles/2024-06-06/everton-gets-funding-offer-from-firm-behind-previous-bidder-777.

[64] Agini, *A Bet on Everton*, *supra* note 1.

without intermediaries. One advantage of this plan was reportedly that it would not require the club to undergo a significant corporate reorganization—by substituting A-CAP for 777 Partners, nothing would actually change.[65]

295.    And in July, the president of Vasco de Gama, the Brazilian club that 777 Partners owned (but has since lost control over) confirmed that A-CAP was working to find new investors in Vasco de Gama to take 777 Partners' place.[66]

296.    As of July 26, 2024, A-CAP was informing 777-affiliated football clubs that all football assets of 777 Partners are now exclusively controlled by A-CAP.[67]

297.    At this point, across much of 777 Partners' global enterprise, 777 Partners and A-CAP have ceased to be independent businesses and have become virtually indistinguishable substitutes for one another.

298.    The interconnectedness of 777 Partners and A-CAP is further evidenced by A-CAP's recent motion to modify the preliminary injunction issued in this matter on the spurious notion that it has been "misunderstood in the press" and is thus having a "general chilling effect on commercial activity," despite the fact that A-CAP can point to no proposed transactions that have in fact been "chilled."[68]

---

[65] Gessi Adamoli, *Genoa, i 777 Pensano all Addio: i Finanziatori di A-Cap Pronti a Ccendere in Campo*, LA REPUBBLICA (June 25, 2024), https://genova.repubblica.it/sport/2024/06/25/news/genoa_777_verso_laddio_i_finanziatori_di_a -cap_pronti_a_scendere_in_campo-423280827/.

[66] Fabio Marseille, *Genoa, la Stretta Finale per Roman Arriverà dapo l'ok di A-Cap*, CALCIO GENOA (July 16, 2024), https://www.calciogenoa.it/2024/07/16/genoa-roman-a-cap/; Gonzalez, *supra* note 61.

[67] *VP jurídico Felipe Carregal diz que A-Cap quer ressarcir os prejuízos que a 777 Partners causou*, https://www.netvasco.com.br/n/342721/vp-juridico-felipe-carregal-diz-que-a-cap-quer-ressarcir-os-prejuizos-que-a-777-partners-causo.

[68] Aug. 1, 2024 Hearing Tr. 5:8-15.

A-1180

299.    As the Court noted during a telephone conference on August 1, 2024, "One has to wonder if, in fact, the accurate preliminary injunction is not so detrimental to any parties to the preliminary injunction, how it comes about that A-CAP, which is not a party to the injunction, feels so chilled by misreporting what the actual injunction did so that the injunction should be modified." Aug 1, 2024 Conf. Tr. at 9. The answer, of course, is that A-CAP considers 777 Partners to be an extension of itself and 777 Partners' assets as its own.

300.    A-CAP's vigorous opposition to a preliminary injunction that does not even enjoin A-CAP, and its motion for reconsideration of that injunction, are further examples of A-CAP's strong aversion to waiting for its turn in line with the rest of 777 Partners' creditors, in keeping with A-CAP's desperate bids to keep 777 Partners out of bankruptcy by funding payroll and many other obligations.

301.    777 Partners' low-budget airline ventures have suffered a similar fate to its football operations, and commentators have noted in these circumstances, too, that the relationship between 777 Partners and A-CAP "is murky at best."[69]  In March 2023, bailiffs seized four Boeing 737 MAX jets from Flair Airlines, a low-budget Canadian airline backed by 777 Partners, after months of non-payment on leases for the jets; by December, the lessors of the jets sued 777 Partners for the missed payments.[70] By January, it was revealed that Canadian tax authorities had begun seizing assets from Flair due to Flair failing to pay over $67 million CAD in taxes.[71]  As such, industry experts have described Flair as being "on the verge of collapse" and "in a death spiral."[72]  Flair's

---

[69] Sarah Milner, *Flair Airlines: Is Canada's Low-Cost Carrier in Trouble?*, TRAVELMARKET REPORT (May 30, 2024), https://www.travelmarketreport.com/articles/%20%20%20%20/air/articles/flair-airlines-is-canadas-low-cost-carrier-in-trouble.
[70] *Id.*
[71] *Id.*
[72] *Id.*

CEO stepped down in June 2024.[73]  However, on August 27, 2024, Bloomberg reported that Flair was attempting to raise funds to recapitalize itself and restructure its balance sheet, having reduced 777 Partners' stake in the company from 25 percent to 10 percent, and thanks to unspecified "support" from A-CAP.[74]

302.    777 Partners' Australian low-budget airline, Bonza, has also collapsed, with court-appointed administrators faulting 777 Partners for undercapitalizing the company and engaging in conflicted transactions with the company.[75]  Pasko was one of Bonza's founders, and he and another 777 Partners representative, Adam Weiss, sat on the company's board, while 777 Partners held a majority stake in the company through a subsidiary.  Bonza's aircrafts were all leased from entities named with some variation of "JWARP," at least three of which the administrators have confirmed were directed by Wander.  In late April 2024, the airlines' entire fleet was seized and the company was sent into receivership, and reports have revealed that more than a month earlier, representatives of 777 Partners, A-CAP (including King), and an aircraft leasing company known as AIP Capital (which was partly owned by 777 Partners until the ownership was restructured and A-CAP took part ownership) were plotting via email to "get the planes out" and "wind [Bonza] up."[76]  Reportedly, 777 Partners and A-CAP "were so entwined in their dealings that it made it

---

[73] *See* Christopher Reynolds, *Flair Airlines CEO to step down from low-cost carrier this summer*, CAN. PRESS (June 4, 2024), https://www.cp24.com/news/flair-airlines-ceo-to-step-down-from-low-cost-carrier-this-summer-1.6913297.
[74] Thomas Seal, *Canada's Flair Airlines Discusses Balance Sheet Restructure*, BLOOMBERG (Aug. 27, 2024), https://www.bloomberg.com/news/articles/2024-08-27/canada-s-struggling-flair-in-talks-to-restructure-balance-sheet.
[75] *See generally*, Bonza Aviation Pty Ltd – Voluntary Administrators' Report to Creditors (June 25, 2024), https://www.hallchadwick.com.au/wp-content/uploads/2024/06/BONZAV-Report-to-Creditors-25.06.24.pdf.
[76] Alysha de Kretser, *Bonza's Backers Plotted to 'Get the Planes Out' and 'Wind this Up'*, FIN. REV. (May 7, 2024), https://www.afr.com/companies/transport/bonza-s-backers-plotted-toget-the-planes-out-and-wind-this-up-20240506-p5fp87.

impossible for other lenders to reach an agreement with the company over its debts." Ultimately, approximately 300 employees were fired, after going without wages for months due to 777 Partners' inability to pay.[77]

303.    According to a report issued by Bonza's court-appointed administrators, "the Company was unable to reach forecasted levels of sales, it was heavily reliant on funding from 777 Partners to continue its operations, which funding was sporadic and delayed."[78] And although 777 Partners loaned $77 million to Bonza, "there is no document pertaining to the loan provided / funds advanced by 777 Partners."[79] The administrators also noted that "the leasing entities for the aircraft were related parties of 777 Partners. This added layer of complexity and the relationship between the entities, and their ultimate intentions appear to have also impacted the availability of the aircraft."[80] The administrators noted the "substantial connection between the business of 777 Partners, [A-CAP], the JWARP companies, and AIP Capital," and stated that the "dual duties" that Pasko and Weiss owed to 777 Partners and Bonza "created a situation of conflict ... where the interest of the Company was to continue to be in possession of the Aircraft ... whereas for 777 Partners, it appeared to be to terminate the funding of the Company and the lease agreements."[81]

---

[77] Amelia McGuire, *Bonza Hopes Dashed, Hundreds Sacked After No Rescue Bid Emerges*, SYDNEY MORNING HERALD (June 11, 2024), https://www.smh.com.au/business/companies/bonza-hopes-dashed-hundreds-sacked-after-no-rescue-bid-emerges-20240611-p5jkvu.html; Ayesha de Kretser, *Bonza's Administrators Concede Sale Hopes Dead, Staff to Go*, FIN. REV. (June 6, 2024), https://www.afr.com/companies/transport/bonza-s-administrators-concede-sale-hopes-dead-staff-to-go-20240606-p5jjst.
[78] Bonza Aviation Pty Ltd – Voluntary Administrators' Report to Creditors at 14 (June 25, 2024), https://www.hallchadwick.com.au/wp-content/uploads/2024/06/BONZAV-Report-to-Creditors-25.06.24.pdf.
[79] *Id.* at 16.
[80] *Id.* at 22.
[81] *Id.* at 33-34.

Moreover, the administrators stated that none of the 777 Partners representatives involved in Bonza had cooperated with their investigation, in violation of applicable Australian law.[82]

304.    On May 31, 2024, Josimar Football reported that 777 Partners had represented to Italian tax authorities that it was worth $3 billion as of October 31, 2023, while it was concurrently representing to other parties in pitch decks that it was worth $10 billion.[83]  Josimar noted that it is a crime under Italian law to give incorrect financial information to Italian tax authorities.  Further, Josimar emphasized that 777 Partners' statement of worth was made *before* 777 Re (its primary source of funds) was placed under administrative control and downgraded by AM Best.  This raises serious questions as to how much lower than $3 billion 777 Partners' self-valuation would be in a filing made today.

305.    777 Partners is not alone in obscuring its finances to trick outsiders into thinking it is adequately capitalized when it is, in reality, anything but.  The financial information posted on A-CAP's own website is hopelessly out of date.  There, A-CAP advertises its "credit mix" with a chart dated "as of Q1 2022."  It announces that "as of 12/31/21, [A-CAP] manages $4.9B of assets."  There is no mention of A-CAP's financials over the past two and a half years.

306.    And 777 Re—777 Partners' piggy bank—similarly hides its financial status from the outside world.  Not only does 777 Re not publish financial information on any publicly available platform, but it also obfuscates the finances it prepares internally.  On October 13, 2023, James Rothman—then the head of 777 Asset Management—wrote a letter "To Whom It May Concern" regarding 777 Re's engagement of 777 Asset Management "to provide a monthly estimation of fair value across the 777 Re portfolio of assets that it manages."  Mr. Rothman noted

---

[82] *Id.* at 41.
[83] Auclair & Brown, *Black Friday*, *supra* note 22.

A-1184

in his letter that, in performing this estimation, "777 AM did not analyze the financial condition of its corporate parent 777 Partners LLC and its affiliates and related entities . . . in 777 Partners' role (directly or indirectly) as debtor, guarantor or counterparty of certain transactions, other than to assume, without analysis, that 777 Partners will pay in full obligations as and when due[.]" Rothman also noted that 777 Asset Management did not adjust its valuation for various potential collateral issues.  Rothman left his position as head of 777 Asset Management shortly after publishing this letter.

307.    Several 777 Partners subsidiaries are well-known for the opacity of their finances. On August 13, 2024, Belgian outlet RTBF published a story noting that 777 SDL, the Belgian subsidiary of 777 Partners that owns the Belgian soccer team Standard Liege, had violated Belgian law by failing to publish its annual financial accounts on time.  As of the date of publication of that story, 777 SDL was three months late in disclosing its finances, which puts it in the bottom 3% of Belgian entities.  The article noted that "This situation is not exceptional in the 777 galaxy. Almost all of the American group's subsidiaries are late for publication, which reinforces the opacity around it."  It goes on to note that "777 Partners is a master in the art of accounting opacity, but also in the creation of complex structures.  At 777, holding companies have holding companies that, in turn, have holding companies that hold companies, including football clubs."[84]

308.    In addition to the facts above showing that 777 Partners is on the brink of insolvency, Defendants are facing a slew of lawsuits seeking millions of dollars for failing to pay debts as they come due and fraudulently conveying assets to shield their assets from creditors.  The facts alleged in many of those lawsuits mirror the allegations here and corroborate the actual and

---

[84] Par B. Verpoorten, *Mais Où Sont Donc Passés les Comptes de 777 SDL, Propriétaire du Standard?*, RTBF, https://rtbf.be/article/mais-ou-sont-donc-passes-les-comptes-de-777-sdl-proprietaire-du-standard-11418254.

A-1185

imminent risk that 777 Partners would frustrate any judgment on the merits in this action by further spending to the point of insolvency and transferring assets out of the shell companies named as defendants.

309.     As of the date of this Complaint, 777 Partners and its affiliates have been named in no fewer than seventeen lawsuits generally concerning unpaid debts and collectively demanding more than $130 million:

a.     On January 9, 2024, an investor sued 777 Partners seeking $30 million in damages for breach of contract, alleging that 777 Partners failed to produce certain financial information to verify its financial condition and operations, thereby triggering a right for the investor to redeem its preferred equity in 777 Partners.  Rather than honoring the repurchase right, however, 777 Partners "redirected capital into new investments and management bonuses." *Change Lending, LLC v. 777 Partners LLC.*  777 Partners' and 600 Partners' inadequate capitalization and financial distress are corroborated by documents introduced into the record in the *Change Lending* case.  For example, the plaintiff in that case filed an affidavit attaching a copy of a September 30, 2022 "Consolidated and Combined Balance Sheet" provided by 777 Partners and 600 Partners. According to that document, as of that date, 777 Partners and 600 Partners had fewer assets than liabilities, including members' equity of negative $196,342,961.00; net revenue of negative $29,825,48.00 an a total comprehensive loss of $589,753,127.00 over the nine months prior.

113

A-1186

Furthermore, as revealed in public filings in the case in April 2024, in January 2024, 777 Partners did not have even **$1 million of liquidity** to pay back.[85]

b.  On December 12, 2023, three aircraft lessors sued 777 Partners for $30 million after 777 Partners missed lease payments on four jets. *Corvus Lights Aviation et al v. 777 Partners LLC*.

c.  On July 26, 2022, an investor sued 777 Partners and one of its aviation subsidiaries, seeking damages of at least $22 million for alleged fraud in which the defendants used corporate entities to deprive the investor of its ownership interest in the subsidiary. *MALT Family Trust et al. v. 777 Partners, LLC et al.*

d.  On July 1, 2022, lenders sued 777 Partners for defaulting on a $59.7 million loan; the lenders auctioned off $41.5 million in collateral, leaving an unpaid principal of over $20 million in debt. Subsequently, the lenders filed a related action against 777 Partners and Pasko, alleging that despite owing the lenders over $20 million, 777 Partners fraudulently transferred two subsidiaries to Pasko in order to shield those assets from creditors. Accordingly, upon information and belief based on these allegations, Pasko was willing to take personal ownership of cash-rich subsidiaries of 777 Partners in order to shield those subsidiaries from creditors (like Leadenhall). Pasko was thus an active participant in Defendants' scheme. *Vida Longevity Fund, LP et al. v. Suttonpark*

---

[85] Paul Brown & Philippe Auclair, *A Change Is Gonna Come?*, JOSIMAR (April 8, 2024), https://josimarfootball.com/2024/04/08/a-change-is-gonna-come/ ("In one message, sent to an employee of Change Lending on 7 January, [recently departed CFO of 777 Partners Damien] Alfalla responds to an urgent request to pay 1 million dollars of money owed by the next day by admitting: 'I don't have the liquidity to pay that tomorrow.'").

*Capital LLC et al.*; *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.*

e. On or around December 14, 2023, a lender sued 777 Partners to recover an unpaid debt of $11.2 million. *Balanced Management LLC v. 777 Partners LLC.*

f. On March 14, 2024, a lender sued Wander and 777 Partners, seeking to enjoin them from transferring any assets pending an arbitration in which the lender is seeking over €9 million for unpaid debt. *Nakula Management Ltd. v. Joshua Wander et al.*

g. On September 8, 2023, 777 Partners' landlord sued 777 Partners under its lease for failing to pay a $5 million security deposit. *1 Madison Office Fee LLC v. 777 Partners LLC et al.*

h. On December 22, 2023, a creditor sued 777 Partners to recover more than $2 million on two unpaid promissory notes. *Lasse Meilsoe v. 777 Partners LLC et al.*

i. On January 23, 2024, 777 Partners was sued by a former principal of the firm, seeking over $2 million in unpaid compensation, in addition to unspecified management interests in 777 Partners' equity management plan. *Peter Meyers v. 777 Partners, LLC and 777 Partners Management, LLC.*

j. On March 3, 2023, American Express sued 777 Partners for breach of contract after 777 Partners "failed and refused to pay" an outstanding balance of $324,002.89 on a corporate credit card. *American Express Travel Related Services Company, Inc. v. 777 Partners.*

A-1188

k.  On or around June 7, 2021, Wander's former landlord sued Wander for more than $150,000 in damages to the landlord's property. *Randy S. Gelber v. Joshua Wander.*

l.  On April 21, 2023, an executive search firm dedicated to recruiting investment professionals sued 777 Partners for breach of contract, alleging that after placing three candidates with 777 Partners, 777 Partners acknowledged that it owed the firm fees but "slow-rolled" the firm, only making occasional payments before disregarding the firm entirely and without any stated justification, leaving an outstanding balance of $94,000. *The Oxbridge Group, LTD v. 777 Partners LLC.*

m.  On September 29, 2023, an investor in one of 777 Partners' subsidiaries sued 777 Partners and the subsidiary alleging that "777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise[.]" *O'Neil-Dunne et al v. Phoenicia LLC et al.*

n.  On July 26, 2024, the landlord of 777 Partners' office space in downtown Miami sued to evict 777 Partners for nonpayment of rent. According to the complaint in that action, 777 Partners failed to pay rent on June 1, 2024, at which time the landlord demanded $144,443 in unpaid rent pursuant to the terms of the parties' lease. 777 Partners allegedly did not respond to its landlord's demand. *Brickell Holdings, LLC v. 777 Partners LLC.* 777 Partners' website reflects a new office location in Miami.

116

o. On August 9, 2024, the landlord of 777 Partners' office space in Orange County, California also sued to evict 777 Partners and to collect $97,764.36 in past-due rent. *The Irvine Company LLC v. 777 Partners LLC*.

p. 777 Partners is also a co-defendant in two federal class actions alleging a predatory lending scheme in violation of RICO. One of the complaints states that the aggregate amount in controversy exceeds $5 million, and both complaints seek treble damages for RICO violations. *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*; *Joseph Morgan et al. v. 777 Partners, LLC et al.*

310. Much like many of the plaintiffs in these actions have alleged, Leadenhall has a firm basis to believe that, absent emergency injunctive relief, 777 Partners, A-CAP, and the other Defendants would have attempted to transfer their assets so as to take them out of the reach of judgment creditors, thereby causing Leadenhall irreparable harm.

311. During the course of this litigation, 777 Partners has repeatedly confirmed that it cannot make Leadenhall whole. For example, in an affidavit filed with the 777 Entity Defendants' opposition to a temporary restraining order, Ian Ratner of B. Riley was not even sure whether there was *any* equity remaining in the system. ECF 86-3 ¶ 12. At the TRO hearing, the 777 Entity Defendants' counsel confirmed, "it's not like there's $609 million of cash sitting in the bank" and "there's not sufficient liquid assets to pay $609 million." June 7 Hr'g Tr. 24:8-9, 24-25. And again, even after the TRO and preliminary injunction were entered, 777 Partners continued to relinquish assets, including in Employee Funding of America LLC's Chapter 7 bankruptcy.

312. Although Leadenhall, the public, and 777 Partners' own advisors appear to lack transparency into where, if anywhere, value exists within the 777 system, A-CAP knows—and it

has repeatedly proven that it will take all possible steps to recapture that value for itself if given the opportunity.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Breach of LSA Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Servicing, Signal Medical, Insurety Capital, SuttonPark Borrower, Dorchester Borrower, Signal Borrower, Insurety Borrower)**

313.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

314.    The LSA is a binding and enforceable agreement between Plaintiffs and Borrowers, as well as Sellers, and Servicers.

315.    Plaintiffs fulfilled their obligations under the LSA.

316.    As set forth above and in the LSA, each Borrower was required to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim."  LSA § 4.01(h); *see also id.* §§ 5.01(d), 5.01(k)(vi).  Additionally, Borrowers were prohibited from "grant[ing] an Adverse Claim on any of [their] assets to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."  *Id.* at § 5.01(k)(vi).

317.    In violation of the LSA, the SuttonPark Borrower and the Dorchester Borrower failed to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim" by pledging the Collateral to multiple lenders, thereby improperly "grant[ing] an Adverse Claim" on the Collateral that was pledged to Leadenhall "to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."

318.    Specifically, the SuttonPark Borrower and the Dorchester Borrower double-pledged Collateral to Plaintiffs and separate third-party lenders, pledged Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own),

and sold and/or removed Collateral pledged to Plaintiffs without a corresponding reduction in the Principal Amount in breach of the Borrowing Base Limitation.

319.    The SuttonPark and Dorchester Borrowers' foregoing breaches of the LSA constituted Facility Events of Default, which entitle Leadenhall to declare all outstanding debt of all Borrowers immediately due and payable, i.e., to "accelerate" all outstanding debt of all Borrowers. *See, e.g.*, LSA § 7.01(c), (d).  Leadenhall exercised its rights to call Facility Events of Default on March 12, 2024, and to accelerate all of the Borrowers' debt on March 15, 2024, in the amount of $609,529,966.82.  None of the four Borrowers have paid their debt, in violation of the LSA and Leadenhall's right to accelerate.

320.    Further, each Borrower "agree[d] to jointly and severally indemnify" Leadenhall "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees) . . . arising out of or resulting from [the LSA] or the other Transaction Documents," including but not limited to misstatements in Compliance Reports, "failure to vest a valid and perfected security interest in the Collateral free and clear of any Adverse Claim."  LSA § 9.01; *id.* § 9.01(i), (iv). None of the four Borrowers have indemnified Leadenhall for the loss of the accelerated amount.

321.    By virtue of each Borrowers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

322.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko.  Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the

Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles. The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own. A-CAP and King are liable for the breaches of the Borrowers, Sellers, and Guarantors because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

323.    By virtue of the SuttonPark and Dorchester Borrowers' breaches of the LSA, Plaintiffs' secured debt is largely uncollateralized in violation of the LSA, as Wander has admitted repeatedly and as the 777 Entity Defendants admitted in signing the Additional Interest Amendment and during negotiations over the draft Forbearance Agreement. Therefore, Plaintiffs seek injunctive relief compelling the SuttonPark and Dorchester Borrowers to comply with the LSA by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt, including complying with LSA §§ 2.07, 2.15, 5.01(i), 7.01(c), and 7.02(g), and by exercising their rights, if necessary, pursuant to the Sale Agreements to acquire additional receivables from SuttonPark

A-1193

Capital, which the SuttonPark and Dorchester Borrowers can do whether or not they have the cash on hand to pay for such receivables, *see* Sale Agreements § 2.07(b).

### SECOND CLAIM FOR RELIEF
### (Breach of Sale Agreement Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, Signal Medical, Signal Borrower, Insurety Borrower, Insurety Capital)

324.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

325.     The Sale Agreements are binding and enforceable agreements between each of the Borrowers and their respective Sellers, and Leadenhall is an intended third-party beneficiary of each of the Sale Agreements.

326.     In the Sale Agreements, each Seller acknowledges that, pursuant to the LSA, each Borrower will grant to Leadenhall a security interest in all of the Borrower's rights under its respective Sale Agreement, including but not limited to "claims . . . for damages arising out of or for breach or default hereunder," and each "Seller acknowledges and agrees that [Leadenhall] shall have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the [respective Borrower's] rights and remedies under this Agreement." Sale Agreement § 2.05.

327.     In the Sale Agreements, each Seller represents and warrants, among other things, that as of the date on which it transfers ownership of any receivables to its respective Borrower, the Seller "is legal and beneficial owner of the [receivable] free and clear of any Adverse Claim." Sale Agreement § 4.01(h). Each Seller also covenanted that it would "not sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on" any receivable so transferred to a Borrower, nor would it "take action inconsistent with the [Borrower's] ownership of the" receivables. *Id.* § 5.01(f).

A-1194

328.    In addition to those direct obligations owed to the Borrowers and thus to Leadenhall, each Seller also agreed to indemnify its respective Borrower and Leadenhall "from and against any and all damages, losses, claims, liabilities and related costs and expenses," arising from, among other things, any breach of the representations and warranties in § 4.01(h), any failure by the Seller or any of its Affiliates—including any of the other Sellers, the Borrowers, the Servicers, and the Guarantors—to comply with "any term, provision or covenant in" any of the Transaction Documents (including the LSA, Sale Agreements, Servicing Agreements, Pledge Agreements, Compliance Reports, Guaranty, and more), and "the Seller's gross negligence, fraud, bad faith or willful misconduct in conducting the activities contemplated by the" Sale Agreement. Sale Agreement § 7.03.

329.    SuttonPark Capital, Signal Medical, and Insurety Capital have all breached their obligations to indemnify their respective Borrowers and Leadenhall for Leadenhall's claims above arising out of breaches of the LSA.

330.    In the alternative, to the extent the SuttonPark Borrower or the Dorchester Borrower owned any of the receivables that later turned out to be double-pledged, and such receivables were double-pledged because the Sellers had either already sold those receivables to another entity prior to selling them to the Borrower or the Seller later suffered to exist an adverse claim on those receivables after selling them to the Borrower, then SuttonPark Capital breached the foregoing provisions of the Sale Agreements.

331.    By virtue of Sellers' breaches of the Sale Agreements, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

A-1195

332.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko.  Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles.  The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own.  A-CAP and King are liable for the breaches of the Borrowers, Sellers, and Guarantors because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

### THIRD CLAIM FOR RELIEF
### (Breach of Servicing Agreement and LSA Against Wander, Pasko, King, A-CAP, 600 Partners, SuttonPark Capital, SuttonPark Servicer)

333.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

334.    The LSA and the Servicing Agreements are binding and enforceable agreements between Plaintiffs and each of the respective Servicers, Borrowers, and Sellers in each Borrowing Group.

335.    Plaintiffs fulfilled their obligations under the Servicing Agreements.

336.    As set forth above and in the Servicing Agreements, each of the Servicers was responsible for, among other duties, delivering to Leadenhall Capital as Administrative Agent the Monthly and Compliance Reports required under the LSA, containing calculations of the Borrowing Base for the Borrower in their respective Borrower Groups.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

337.    Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

338.    The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

339.    The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

340.    As set forth above, SuttonPark Servicer delivered false and misleading Monthly Reports and Compliance Reports to Leadenhall Capital on dozens of occasions from May 2021 through the end of 2022.    Those Monthly Reports and Compliance Reports overstated the SuttonPark and Dorchester Borrowers' Borrowing Bases by tens or hundreds of millions of dollars. Each such misrepresentation under § 6.07(c) of the LSA constituted a Servicer Default as it was not cured within two business days, SuttonPark Servicer's failure to notify Leadenhall Capital of its default within thirty days constituted a separate Servicer Default.    The other Events of Default triggered by the Borrowers' conduct described above also constituted separate Servicer Defaults.

341.    In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced.    Servicing Agreements § 5.1.    The "Valuation Amount" of those receivables used to calculate Servicing Fees was also the most significant input into the calculation of each Borrowers' Borrowing Base.    LSA Schedules VIII, IX, X, XI.    Thus, by inflating the value of the Borrowing Bases, the SuttonPark Servicer also inflated the base on which its own Servicing Fees were calculated, thus diverting funds from the Borrowers to the detriment of the Borrowers' creditors, including Leadenhall and the Lenders.

342.    Each Servicer also agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report, LSA § 6.06(a), which as discussed above includes each Borrower's obligation "to jointly and severally indemnify" Leadenhall for all such losses.

343.    The SuttonPark Servicer has not indemnified Leadenhall against the losses and liabilities it has suffered arising from the false Monthly Reports and Compliance Reports.

A-1198

344.    By virtue of the foregoing Servicer Defaults and Servicers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

345.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko. Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles. The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own. A-CAP and King are liable for the breaches of the Servicers because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

A-1199

## FOURTH CLAIM FOR RELIEF
### (Breach of Guaranty Agreement Against Wander, Pasko, 777 Partners, 600 Partners)

346.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

347.    The Guaranty Agreement is a binding and enforceable agreement between Plaintiffs, 777 Partners, and 600 Partners.

348.    Plaintiffs fulfilled their obligations under the Guaranty Agreement.

349.    As set forth above and in the Guaranty Agreement, 777 Partners and 600 Partners jointly and severally guaranteed to Plaintiffs "the full and punctual payment and performance . . . of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower … so long as a Trigger Event has occurred and is continuing," Guaranty Agreement § 2(a), including but not limited to:

> (i) any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;

> (ii) any act of theft or misappropriation of funds by either Guarantor under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

> (iii) any willful misrepresentation of a material nature by either Guarantor under this Guaranty;

> […]

> (ix) any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days; … or

> […]

> (xi) any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise

A-1200

or enforcement of its rights and remedies against any Collateral under the Transaction Documents or under Requirements of Law.

*Id.* at § 1, "Trigger Event".

350.    Further, through the Guaranty Agreement, 777 Partners and 600 Partners guaranteed the Borrowers' "Obligations" as defined in the LSA, including "the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA, art. I, "Guaranteed Obligations."

351.    Numerous Trigger Events have occurred:

a.    The SuttonPark and Dorchester Borrowers have breached the LSA by, *inter alia*, failing to own Collateral "free and clear" of any other security interests;

b.    The SuttonPark and Dorchester Borrowers committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

c.    In the alternative, SuttonPark Capital committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

d.    In the alternative, the Guarantors committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin

A-1201

system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

e.  SuttonPark Servicing committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by submitting false and fraudulent Compliance Reports and falsified supporting documents;

f.  The SuttonPark and Dorchester Borrowers have misappropriated funds by failing to use borrowed funds to maintain their Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

g.  In the alternative, SuttonPark Capital has misappropriated funds by failing to use borrowed funds to maintain the SuttonPark and Dorchester Borrowers' Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

h.  In the alternative, the Guarantors have misappropriated funds by failing to use borrowed funds to maintain the SuttonPark and Dorchester Borrowers' Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

i.  The SuttonPark Servicer has misappropriated funds by fraudulently increasing the basis on which its servicing fees were calculated, to the detriment of the SuttonPark and Dorchester Borrowers and their creditors including Leadenhall;

A-1202

j.  The Guarantors have made material misrepresentations, including by Wander on recorded phone calls with Leadenhall misrepresenting the cause of the double-pledging and their ability to cure the deficiency caused by the double-pledging.

352.  Thus, because 777 Partners and 600 Partners have failed to guarantee the payment obligations of the Borrowers or performance of the SuttonPark and Dorchester Borrowers' obligations to pledge sufficient Collateral to secure Leadenhall's debt following that Trigger Event, 777 Partners and 600 Partners are jointly and severally liable for the Borrowers' breach of the LSA.

353.  By virtue of 777 Partners' and 600 Partners' breach of the Guaranty Agreement, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

354.  Further, Wander and Pasko are liable for the Guarantors' liability because the Guarantors are merely their alter egos.  Wander and Pasko dominate and control the Guarantors that they wholly own, which are mere alter egos of their shareholders, including because they do not observe corporate formalities, they are grossly undercapitalized, their shareholders use their funds and assets freely for non-corporate purposes, they have virtually complete overlap in ownership, officers, directors, and personnel, they share office space, they exercise no business discretion beyond following the dictates of their shareholders, they engage in transactions that are not at arm's length both which their shareholders (e.g., the JARM loan, condominium purchases, etc.), and with each other (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko), they are not independent profit centers but all exist in service of providing cash for the investment activities of their shareholders, and the companies and their shareholders use the companies' and other companies' property as if it was their own.  A-CAP and King are liable for

130

the breaches of the Guarantors because they exercise excessive and improper control over the Guarantors by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

355. Further, by virtue of the Guarantors' breaches of the Guaranty Agreement, Plaintiffs' secured debt is largely uncollateralized in violation of the LSA, as Wander has admitted repeatedly and as the 777 Entity Defendants admitted in signing the Additional Interest Amendment and during negotiations over the draft Forbearance Agreement. Therefore, Plaintiffs seek injunctive relief compelling the Guarantors to perform the Borrowers' obligations under the LSA by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt, including complying with LSA §§ 2.07, 2.15, 5.01(i), 7.01(c), and 7.02(g), and by exercising the Borrowers' rights, if necessary, pursuant to the Sale Agreements to acquire additional receivables from SuttonPark Capital, which the SuttonPark and Dorchester Borrowers can do whether or not they have the cash on hand to pay for such receivables, *see* Sale Agreements § 2.07(b), and including by directly performing the Borrowers' obligations to "remedy XX", LSA §§ 7.01(c), 7.02(g), to provide "substitute Eligible Receivables having a Valuation Amount that is greater than or equal . . . to that of the substituted" receivables, *id.* § 2.07(a)(y)(ii)(B), and "to take all further actions, that may be reasonably necessary or desirable, or that [Leadenhall] may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under this Agreement," *id.* § 5.01(i), in particular by acquiring and then transferring to the SuttonPark and Dorchester Borrower and pledging to Leadenhall adequate collateral to secure the outstanding debt.

A-1204

**FIFTH CLAIM FOR RELIEF**
**(Civil RICO, 18 U.S.C. § 1962(c), Against Wander, Pasko, King, A-CAP, 777 Partners, 600**
**Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower,**
**Dorchester Borrower)**

356.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

357.    Defendants Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower (the "RICO Defendants") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

358.    The RICO Defendants, together with the other Defendants, as well as the wholly-owned shareholding vehicles through which Wander and Pasko wholly own and control 777 Partners and 600 Partners (JARM Capital LLC, MTCP LLC, SuttonPark Acquisition LLC, and SPA II LLC), operate as an association-in-fact enterprise within the meaning of the RICO Act, and each RICO Defendant is a person within the meaning of 18 U.S.C. § 1961(3) and is separate from and exists independently of the enterprise.

359.    The enterprise shared a common purpose of enriching its principals by fraud and otherwise, particularly Wander, Pasko, and King, and obtaining capital for the principals to pursue new business opportunities, also for their personal enrichment.

360.    The structure of the enterprise begins with King's control of A-CAP and Wander and Pasko's control of 777 Entity Defendants via their personal shareholding vehicles.  While the 777 Entity Defendants are each alter egos of their shareholders due to their lack of corporate formalities, undercapitalization, and other factors discussed above, the 777 Entity Defendants are distinct from King and A-CAP (and vice versa), and together all Defendants and the shareholding

A-1205

vehicles form a RICO enterprise alleged here distinct from any Defendant or group of affiliated Defendants.  Further, each person and entity in the enterprise plays a distinct role in the hierarchy:

a.  King controls A-CAP, which in turn generates cash flows through its insurance subsidiaries (and specifically policyholder premiums) and other business activities.

b.  A-CAP funds the operations of 777 Partners and 600 Partners through loans and otherwise.

c.  Wander and Pasko control 777 Partners and 600 Partners through their personal shareholding vehicles, in part because Wander's prior felony conviction precluded him from personally controlling both entities (and their subsidiaries, including SuttonPark Capital).

d.  777 Partners and 600 Partners use their web of subsidiaries, including Sellers, Borrowers, and Servicers, to acquire receivables, service receivables, and pledge receivables as collateral to induce lenders to provide (purportedly) secured funding, while attempting to use the intricate corporate structuring to limit liability up the chain to 777 Partners and 600 Partners, including in the event of a potential bankruptcy.

e.  Each Borrower then borrows (purportedly) secured debt from a lender such as Leadenhall, using the actual (and potential) assets of the Seller to provide the appearance of collateral, and the Servicer to provide fraudulent compliance reports, while returning cash up the corporate ladder to 777 Partners and 600 Partners and, in turn, to Wander, Pasko,  and King (via A-CAP).

A-1206

361.    The enterprise described above has existed in some form since at least 2020, when A-CAP began (as far as Leadenhall is aware) funding the operations of 777 Partners and 600 Partners through massive loans, and it has existed in its current form with the membership identified above since at least 2021, when Defendants became parties to the LSA with Leadenhall. The enterprise exists independent from its acts of racketeering activity because the 777 Entity Defendants exist as a family of corporate entities managed by Wander and Pasko, most of which predate the signing of the LSA here and that, at least in theory, carry on a legitimate business in addition to acts of racketeering, and A-CAP and King's role as the funders and effective controllers predates and transcends the acts of racketeering at issue here.

362.    Each RICO Defendant committed multiple predicate acts of racketeering activity, namely mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, by making knowingly and intentionally false and fraudulent statements through the use of interstate wires, by misrepresenting the existence, encumbrance, or value of Collateral; the availability of substitute Collateral; and the nature and scope of the RICO Defendants' misconduct with respect to that Collateral, with intent to induce Leadenhall to rely on those statements in either extending debt or maintaining existing debt levels without demanding immediate repayment or exercising remedies under the LSA.  The RICO Defendants' false and fraudulent statements were critical to perpetuating the enterprise's broader fraudulent scheme and pattern of racketeering activity because (as has been made clear since Leadenhall discovered the fraud, demanded repayment, and ultimately filed this lawsuit), Leadenhall's exposure of the scheme and demand to be repaid would cripple the enterprise's ability to fraudulently obtain and use cash from Leadenhall to borrow more money and fund other business ventures, including in professional football teams, budget airlines, reinsurance, and more. These acts had the same or similar purposes, results, participants, victims, and methods of

134

commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events.

363.    The RICO Defendants' specific predicate acts include, without limitation, the following:

a.    The SuttonPark Servicer transmitted to Leadenhall, on behalf of the SuttonPark Borrower and Dorchester Borrower, false and fraudulent Compliance Reports on dozens of occasions, including without limitation those enumerated with particularity in Exhibit 6.    Servicing notes in MP Fin indicate that the SuttonPark Servicer knew, beginning in 2021 and throughout 2022 and 2023 that certain receivables purportedly pledged to Leadenhall were double-pledged, did not exist, had been sold, or otherwise were defective or ineligible to serve as Collateral, and nonetheless kept them allocated to Leadenhall in the 777 Partners computer system.    The purpose of the Compliance Reports under the LSA was to confirm to Leadenhall that its debt was secured in accordance with the terms of the LSA, which security was material to Leadenhall's decision to lend to the 777 Entity Defendants at the interest rates it did, so that Leadenhall would either extend new debt or would maintain the existing level of debt and would not call an Event of Default, demand repayment of some or all of the outstanding debt, and/or exercise other remedies available to it under the LSA. Leadenhall conducted industry-standard due diligence and reasonably relied upon statements in the Compliance Reports, as contemplated by the LSA.

b.    The SuttonPark Borrower and the Dorchester Borrower participated in and directed the transmission of the respective false and fraudulent Compliance

135

A-1208

Reports described above, which were submitted by the SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers, and the SuttonPark Borrower and SuttonPark Servicer also transmitted or participated in and directed the transmission of false and fraudulent pro forma Compliance Reports in connection with Borrowing Requests and assignments of receivables.

c. SuttonPark Capital participated in and directed the transmission of the false and fraudulent Compliance Reports described above, including because SuttonPark Capital owned (or was supposed to own) all of the receivables that were allocated to the SuttonPark Borrower and Dorchester Borrower, SuttonPark Capital employees including Bennett and Adnani directly received information from the SuttonPark Servicer stating that certain receivables were not eligible to be pledged as Collateral (either because they were double-pledged, never purchased, previously sold, or otherwise) and had the ability and responsibility to access and review the rest of those servicing notes in MP Fin, and SuttonPark Capital employees Bennett and Adnani uploaded the Compliance Reports to Leadenhall and communicated with Leadenhall about them, at least until A-CAP took over in March or April 2023. Further, the SuttonPark Servicer and SuttonPark and Dorchester Borrowers were alter egos of SuttonPark Capital during the relevant period as alleged above.

d. 777 Partners and 600 Partners participated in and directed the transmission of the false and fraudulent Compliance Reports described above, including because Bennett and Adnani acted in part in their capacity as employees of 777 Partners' and 600 Partners' Capital Markets group in taking the actions above,

136

A-1209

while they were also employees of SuttonPark Capital, and Bennett and Adnani did not act without being personally directed to do so by Wander, who jointly controlled 777 Partners and 600 Partners with Pasko.  Further, Suttonpark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of 777 Partners and 600 Partners during the relevant period as alleged above.

e.  Wander participated in and directed the transmission of the false and fraudulent Compliance Reports described above for the reasons above, including because 777 Partners, 600 Partners, Suttonpark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of Wander during the relevant period as alleged above.  Further, Wander personally made numerous intentional, material misrepresentations to Leadenhall in telephonic, e-mail, and text message communications with representatives of Leadenhall with the intent that Leadenhall would rely on those statements in extending or maintaining debt, forbearing from exercising their rights to demand repayment and/or compliance with other requirements of the LSA and other transaction documents, including to pledge adequate Collateral "free and clear," and forbearing from filing suit and publicly exposing the fraudulent scheme.  Those misrepresentations included, but were not limited to, claims that the double-pledging resulted from a computer glitch or "mistake" rather than knowing and intentional fraudulent activity and promises to reconcile receivables, promises to find substitute deals to compensate for Collateral shortfalls, and/or promises to repay some or all of his companies' debts to Leadenhall, which were

137

A-1210

knowingly false and fraudulent at the time because Wander had no intention or ability to perform those promises at the time they were made.

f.  Pasko participated in and directed the transmission of the false and fraudulent Compliance Reports described above for the reasons above, including because 777 Partners, 600 Partners, SuttonPark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of Pasko during the relevant period as alleged above.  Further, Pasko personally signed the Compliance Reports issued by SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers that contained actual signatures, including those listed on Exhibit 6 for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022, as well as the pro forma compliance reports that were transmitted with the Borrowing Requests and assignments of receivables discussed above.

g.  A-CAP participated in and directed the transmission of the false and fraudulent Compliance Reports described above and enumerated with particularity in Exhibit 6, beginning in March or April 2023 at the latest, when A-CAP removed the 777 Partners and SuttonPark Capital employees who were responsible for reviewing detail on purported Collateral and MP Fin and submitting Compliance Reports to Leadenhall—Bennett and Adnani—from their offices, and agreed with 777 Partners that the Capital Markets group, including Bennett and Adnani, would report to A-CAP Chief Operating Officer Mike Saliba, after which 777 Partners, under the direct supervision of A-CAP, continued submitting false and fraudulent Compliance Reports from April 2023 through

138

A-1211

November 2023. Further, A-CAP represented to Leadenhall during restructuring negotiations that 777 Partners had sources of liquidity other than A-CAP that 777 Partners could and/or would use to repay its obligations to Leadenhall, which A-CAP knew was false at the time and said with the intent that Leadenhall would rely on those statements in forbearing from exercising rights under the LSA and other transaction documents and in forbearing from filing suit and publicly exposing the fraudulent scheme. Further, A-CAP exercised excessive and improper control over 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower during that period and is responsible for their actions. Additionally, and separate from A-CAP's direct participation in the transmission of false and fraudulent Compliance Reports, A-CAP aided and abetted the predicate acts of mail and wire fraud committed directly by Wander, Pasko, and the 777 Entity Defendants that are RICO Defendants, by strategically injecting capital into the 777 Entity Defendants' operations to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

h. King participated in and directed the transmission of the false and fraudulent Compliance Reports described immediately above, for the reasons above, because King personally was responsible for directing that Saliba and A-CAP employee Carson McGuffin, among others, physically move into 777 Partners' offices in March 2023, for entering into the agreement with 777 Partners providing that the Capital Markets Group, including Bennett and Adnani, would report to Saliba and A-CAP going forward, as they continued to submit false

139

A-1212

and fraudulent compliance reports, and for directing A-CAP to make false representations to Leadenhall during restructuring negotiations to perpetuate the scheme and prevent or delay its exposure. Further, King exercised excessive and improper control over 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower during that period and is responsible for their actions

364.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of a common purpose, including enriching the principals Wander, Pasko, and King; by inducing Leadenhall and the various Lender Groups that Leadenhall represents to extend debt they would not have extended (at interest rates they would not have offered) in the absence of such fraud; and inducing Leadenhall and the Lenders to forbear from exercising their rights under the LSA and other transaction documents and/or from filing suit and publicly exposing the scheme; so that the RICO Defendants could continue to use the ill-gotten funds from Leadenhall to prop up other business ventures, and pay other debt obligations, and perpetuate the fraudulent scheme, while the principals of the enterprise, including King and A-CAP, continued to strip assets from the enterprise to enrich themselves. Further, the racketeering acts identified above used similar methods to perpetrate the frauds, including the use of false and fraudulent Compliance Reports, misrepresentations regarding the reports, and other misrepresentations about the extent of and reasons for inaccuracies in the Compliance Reports and the possibility of curing those issues.

365.    The acts of racketeering above had similar participants and similar victims, including Leadenhall and the Lender Groups for the SuttonPark and Dorchester Borrowers. The acts of racketeering activity above form a pattern in that they were, by definition, perpetrated on

140

A-1213

additional groups of victims beyond Leadenhall and those represented by Leadenhall, because when Collateral is double-pledged, *none* of the creditors—not Leadenhall, nor Crediigy, nor any of the other lenders on SuttonPark Capital's credit facilities—have security interests free and clear of adverse claims.

366.    Defendants' racketeering acts were a regular way of conducting their ongoing business with Plaintiffs and of conducting or participating in the ongoing RICO enterprise, and pose a threat of continuing criminal activity, and they are sufficiently continuous to form a pattern of racketeering activity.  The foregoing acts of racketeering would have continued indefinitely had Leadenhall not received the anonymous tip, investigated further, and ultimately exercised the remedies it has exercised.  Indeed, even after Leadenhall began inquiring about double-pledging following the anonymous tip, Defendants continued to perpetuate the RICO enterprise and commit fraudulent acts, including A-CAP's installation of its own employees at 777 Partners to direct the 777 Partners Capital Markets team to continue submitting fraudulent Compliance Reports.  Similarly, during that time period, even after discovery of the double-pledging and other problems with the Collateral, Wander continued to lie to Leadenhall about the extent and cause of those problems in an effort to forestall the exercise of any remedies as long as possible and allow the enterprise to continue operating.  Further, many of the dozens of other operating companies owned by 777 Partners and 600 Partners continue to have their own credit facilities with other third-party lenders, and there is no reason to think that the fraudulent practices with respect to collateral pledging alleged above are confined only to the Leadenhall facility.

367.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in the amount of the debt accelerated without dispute on March 15, 2024—$609,529,966.82—plus interest accruing from the date of acceleration, which Plaintiffs will be entitled to treble.  As alleged

above, Plaintiffs reasonably relied upon the misrepresentations contained in the false and fraudulent Compliance Reports in extending the debt that has now been accelerated, and in forbearing from or delaying demanding repayment or exercising remedies, including declining to do so at such a time when 777 Partners and 600 Partners might have had assets sufficient to repay their debts, so that Wander, Pasko, King, and A-CAP could continue using their ill-gotten gains to fund other business ventures and pay other debt obligations and keep their enterprise afloat.  Now, as Wander, the 777 Entity Defendants, and their counsel have represented repeatedly, 777 Partners and 600 Partners are unable to make even modest payments representing fractions of the outstanding debt, leaving Plaintiffs bearing $609,529,966.82 in losses plus interest.

368.    The circumstances surrounding Leadenhall's injuries establish that the RICO enterprise and Leadenhall's injuries arose in the United States, including because all of the racketeering activity alleged above was committed by U.S.-based persons and entities operating in the United States, and Defendants' racketeering activity impaired Leadenhall's rights to collect on its debt in the United States, as well as rights to assets (*i.e.*, receivables) in the United States, as required by the LSA.  *See* LSA scheds. VIII, XI (defining eligibility requirements for receivables to count towards the SuttonPark and Dorchester Borrowers' Borrowing Bases that are inherently or explicitly limited to the United States).

369.    As a result of the RICO Defendants' racketeering scheme, Plaintiffs have suffered further damages in the form of collection costs already expended prior to filing suit.  Specifically, Plaintiffs incurred substantial expenses as well as attorneys' fees in connection with investigating Defendants' fraud, tracing Defendants' assets, and attempting to negotiate a restructuring of Defendants' debt in order to collect it.

142

A-1215

370.    Separately, as a result of the RICO Defendants' racketeering scheme, Plaintiffs seek to recover their costs and attorneys' fees incurred in prosecuting this lawsuit.

371.    To put a stop to the RICO Defendants' racketeering scheme and ensure that the RICO Defendants cannot profit therefrom, Plaintiffs also seek injunctive relief enjoining any further breaches of the LSA and Guaranty Agreement, including requiring the Guarantors (and Wander and Pasko as the controllers of the Guarantors, and A-CAP and King as controllers of the Enterprise) to honor the Guarantors' obligations to guarantee the Borrowers' performance of the Guaranteed Obligations, including both the obligations to repay Leadenhall and to acquire and pledge sufficient Collateral to secure Leadenhall's debt.

## SIXTH CLAIM FOR RELIEF
### (Civil RICO Conspiracy, 18 U.S.C. § 1962(d), Against All Defendants)

372.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

373.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

374.    Defendants willfully, intentionally, and knowingly agreed to further a shared plan, which agreement was consummated no later than March 2023, when it was memorialized in a letter or email correspondence dictating a number of operational changes at 777 Partners, including the establishment of a "Steering Committee" for 777 Partners, with King at the head, to ensure that every single 777 Partners investment into a portfolio company was approved by King. The memo also provided that certain 777 Partners employees, including members of the Capital Markets

group who were responsible for sending false and fraudulent Compliance Reports to Leadenhall would report directly to A-CAP executives.

375.     The agreement between King, A-CAP, Wander, Pasko, and the 777 Entity Defendants encompassed an agreement to commit the predicate acts of racketeering described above on the part of each of the RICO Defendants, including continuing to defraud Leadenhall through the use of false and fraudulent Compliance Reports and other fraudulent misrepresentations about the financial condition of the 777 Entity Defendants and Leadenhall's prospect for repayment or recollateralization.  This agreement is evidenced by, among other things, the fact that 777 Partners Capital Markets employees Bennett and Adnani had been sending false and fraudulent Compliance Reports to Leadenhall for many months prior to A-CAP seizing control of 777 Partners; Bennett and Adnani had actual knowledge of some and constructive knowledge of other instances of double-pledged, non-existent, already-sold, or otherwise ineligible or defective receivables being pledged to Leadenhall; Bennett and Adnani then came to report directly to A-CAP Chief Operating Officer Mike Saliba after being displaced from their office by A-CAP personnel, at the direction of Kenneth King; and 777 Partners and its subsidiaries (SuttonPark Capital, SuttonPark Servicing, SuttonPark Borrower, and Dorchester Borrower) continued sending false and fraudulent reports for the rest of 2023.  The other 777 Entity Defendants, including the Insurety Borrower, Signal Borrower, Insurety Capital, and Signal Medical were also parties to the agreement that constitutes this conspiracy, because all of those entities were controlled and represented by Wander and Pasko, and their participation in the conspiracy (including refusing to repay Leadenhall what it is owed) was necessary to the success of the underlying fraud, the goal of which was to retain as much of the ill-gotten funds from Leadenhall as possible so that Wander,

Pasko, King, A-CAP, 777 Partners, and 600 Partners could continue funding other business ventures and pay other debt obligations, and keep the enterprise afloat.

376.    The frauds that were perpetrated, and the continuance of the scheme, could not have occurred without the consent and knowing connivance of Defendants together.

377.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity. As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

378.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

379.    Plaintiffs have been injured in their business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

380.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in the amount of the accelerated amount of $609,529,966.82, plus interest accruing from the date of acceleration, which Plaintiffs will be entitled to treble.

381.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered further damages in the form of collection costs already expended prior to filing suit.  Specifically, Plaintiffs incurred substantial expenses as well as attorneys' fees in connection with investigating Defendants' fraud, tracing Defendants' assets, and attempting to negotiate a restructuring of Defendants' debt in order to collect it.

382.    Separately, as a result of Defendants' racketeering scheme, Plaintiffs seek to recover their costs and attorneys' fees incurred in prosecuting this lawsuit.

A-1218

383.    To put a stop to the RICO Defendants' racketeering scheme and Defendants' broader conspiracy, and ensure that A-CAP, King, Wander, and Pasko cannot profit therefrom, Plaintiffs also seek injunctive relief enjoining any further breaches of the LSA and Guaranty Agreement, including requiring the Guarantors (and A-CAP, King, Wander, and Pasko as the controllers of the Guarantors) to honor the Guarantors' obligations to guarantee the Borrowers' performance of the Guaranteed Obligations, including both the obligations to repay Leadenhall and to acquire and pledge sufficient Collateral to secure Leadenhall's debt.

### SEVENTH CLAIM FOR RELIEF
**(Fraudulent Misrepresentation Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, Dorchester Borrower)**

384.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

385.    Wander, Pasko, King, A-CAP, SuttonPark Capital, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower engaged in the pattern described above of fraudulently misrepresenting to Plaintiffs the value of Collateral they owned "free and clear of any Adverse Claims," which statements were false and fraudulent because SuttonPark Capital, the SuttonPark Borrower, and the Dorchester Borrower had double-pledged the Collateral to Plaintiffs and separate third-party lenders, and had also pledged the Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own).

386.    The fraudulent statements described above, contained in the Compliance Reports and elsewhere, were knowingly false statements of material fact, made with intent to induce Leadenhall to rely upon them.  Leadenhall reasonably relied on those statements for the reasons set forth above.

387.    By concealing the fact that the Collateral pledged to Plaintiffs had been pledged to other lenders or was not even owned by the Borrowers, Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer fraudulently inflated the SuttonPark and Dorchester Borrowers' Borrowing Bases, with the intent to induce Plaintiffs to lend more funds than Plaintiffs would have, had Plaintiffs known the truth.  The SuttonPark Servicer also fraudulently inflated its own servicing fees, which Plaintiffs paid but would not have paid had they known the truth.  Further, the above Defendants induced Leadenhall to continue lending and to forbear from demanding repayment or exercising other remedies, including from doing so at such time when Defendants might have been able to repay Leadenhall, permitting Defendants to continue spending the ill-gotten funds from Leadenhall on other business ventures and other debt obligations, keeping their enterprise afloat, causing Leadenhall to bear losses.

388.    As a result of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrowers' knowingly false and fraudulent misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**(Civil Conspiracy to Commit Fraud Against All Defendants)**

389.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

390.    Defendants willfully, intentionally, and knowingly agreed to further a shared plan, which agreement was consummated no later than March 2023, when it was memorialized in a

A-1220

letter or email correspondence, and which shared plan included committing fraud against Leadenhall, as described above.

391.    In furtherance of that agreement, Defendants committed the acts enumerated above including committing wire fraud, defrauding Leadenhall, and violating the LSA, the Servicing Agreement, the Sale Agreement, and the Guaranty Agreement, all as further described above.

392.    Each of the Defendants actively participated in the above-described civil conspiracy as described above, and therefore each Defendant is responsible for each tortious and otherwise unlawful action of any co-conspirator.

393.    As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

**NINTH CLAIM FOR RELIEF**
**(Aiding and Abetting Fraud Against Wander, Pasko, King, A-CAP, 777 Partners,**
**600 Partners, SuttonPark Capital)**

394.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

395.    In the alternative, Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital aided and abetted the principal fraud committed by the SuttonPark and Dorchester Borrowers and the SuttonPark Servicer.

396.    In particular, each of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital had actual knowledge of the fraud for the reasons above, and because each of the 777 Entity Defendants was controlled by Wander and Pasko, as well as King and A-CAP, and pursuant to the aforementioned March 2023 agreement, every material decision by 777 Partners and its subsidiaries and affiliates must be approved by King and A-CAP in advance including, on information and belief, the decisions to commit fraud alleged herein.  King and A-CAP knew of

148

A-1221

the fraud by virtue of the close relationship between A-CAP and 777 Partners and ACAP's assistance in the affairs of 777 Partners.

397.    Each of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital substantially assisted the fraud in the following ways:

a.    SuttonPark Capital owned (or was supposed to own) all of the receivables that were allocated to the SuttonPark Borrower and Dorchester Borrower, SuttonPark Capital employees including Bennett and Adnani directly received information from the SuttonPark Servicer stating that certain receivables were not eligible to be pledged as Collateral (either because they were double-pledged, never purchased, previously sold, or otherwise) and had the ability and responsibility to access and review the rest of those servicing notes in MP Fin, and SuttonPark Capital employees Bennett and Adnani uploaded the Compliance Reports to Leadenhall and communicated with Leadenhall about them, at least until A-CAP took over in March or April 2023.

b.    777 Partners and 600 Partners provided substantial assistance because Bennett and Adnani acted in part in their capacity as employees of 777 Partners' and 600 Partners' Capital Markets group in taking the actions above, while they were also employees of SuttonPark Capital, and Bennett and Adnani did not act without being personally directed to do so by Wander, who jointly controlled 777 Partners and 600 Partners with Pasko.

c.    Wander personally made numerous intentional, material misrepresentations to Leadenhall in telephonic, e-mail, and text message communications with representatives of Leadenhall with the intent that Leadenhall would rely on

A-1222

those statements in extending or maintaining debt, forbearing from exercising their rights to demand repayment and/or compliance with other requirements of the LSA and other transaction documents, including to pledge adequate Collateral "free and clear," and forbearing from filing suit and publicly exposing the fraudulent scheme. Those misrepresentations included, but were not limited to, claims that the double-pledging resulted from a computer glitch or "mistake" rather than knowing and intentional fraudulent activity and promises to reconcile receivables, promises to find substitute deals to compensate for Collateral shortfalls, and/or promises to repay some or all of his companies' debts to Leadenhall, which were knowingly false and fraudulent at the time because Wander had no intention or ability to perform those promises at the time they were made.

d. Pasko personally signed the Compliance Reports issued by SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers that contained actual signatures, including those listed on Exhibit 6 for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022, as well as the pro forma compliance reports that were transmitted with the Borrowing Requests and assignments of receivables discussed above.

e. A-CAP removed the 777 Partners and SuttonPark Capital employees who were responsible for reviewing detail on purported Collateral and MP Fin and submitting Compliance Reports to Leadenhall—Bennett and Adnani—from their offices, and agreed with 777 Partners that the Capital Markets group,

150

A-1223

including Bennett and Adnani, would report to A-CAP Chief Operating Officer Mike Saliba, after which 777 Partners, under the direct supervision of A-CAP, continued submitting false and fraudulent Compliance Reports from April 2023 through November 2023.  Further, A-CAP represented to Leadenhall during restructuring negotiations that 777 Partners had sources of liquidity other than A-CAP that 777 Partners could and/or would use to repay its obligations to Leadenhall, which A-CAP knew was false at the time and said with the intent that Leadenhall would rely on those statements in forbearing from exercising rights under the LSA and other transaction documents and in forbearing from filing suit and publicly exposing the fraudulent scheme.  Additionally, and separate from A-CAP's direct participation in the transmission of false and fraudulent Compliance Reports, A-CAP aided and abetted the predicate acts of mail and wire fraud committed directly by Wander, Pasko, and the 777 Entity Defendants that are RICO Defendants, by strategically injecting capital into the 777 Entity Defendants' operations to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

f.  King personally was responsible for directing that Saliba and A-CAP employee Carson McGuffin, among others, physically move into 777 Partners' offices in March 2023, for entering into the agreement with 777 Partners providing that the Capital Markets Group, including Bennett and Adnani, would report to Saliba and A-CAP going forward, as they continued to submit false and fraudulent compliance reports, and for directing A-CAP to make false

151

A-1224

representations to Leadenhall during restructuring negotiations to perpetuate the scheme and prevent or delay its exposure.

398.    As a result of 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King aiding and abetting Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment Against All Defendants)

399.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

400.    By reason of the foregoing conduct—including defrauding Plaintiffs and willfully breaching their agreements with Plaintiffs as alleged herein—Defendants have profited and enriched themselves unjustly at the expense and detriment of Plaintiffs.

401.    Defendants should not be permitted, in equity and good conscience, to retain for themselves any funds wrongfully obtained from Plaintiffs.

402.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at a trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF
### (Actual Fraudulent Transfer Under N.Y. Debtor and Creditor Law § 273(a)(1) Against 777 Partners, Wander, Pasko, A-CAP)

403.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

404.    By virtue of the Guaranty Agreement, Leadenhall is, and was during all relevant periods, a creditor of 777 Partners.

A-1225

405.    Since December 2020, A-CAP has loaned nearly $170 million to Wander's personal stockholding vehicle, JARM, so that Wander could, *inter alia*, effect the purchase of all of Pasko's shares in 777 Partners.

406.    Although the JARM loan initially an obligation of JARM secured by a lien on JARM's assets, 777 Partners, Wander, Pasko, and A-CAP subsequently agreed to modify the terms of the JARM loan such that it would become an obligation of 777 Partners secured by 777 Partners' assets, without adequate consideration.  In short, the loan was "moved" from Wander's personal vehicle to 777 Partners, which it encumbered by a grant of a lien in the assets of that entity.

407.    In undertaking this arrangement, 777 Partners, Wander, Pasko, and A-CAP acted with actual intent to defraud 777 Partners' other creditors, as evidenced by the following factors enumerated in N.Y. Debtor and Creditor Law § 273(b):

  a.  The restructuring of Haymarket's JARM loan to become an obligation of 777 Partners secured by a purported first lien on the assets of 777 Partners, rather than the assets of JARM including its junior equity interests in the assets of 777 Partners, involved insiders of 777 Partners, including Wander, Pasko, and A-CAP/King;

  b.  Before the transaction took place, 777 Partners had been sued or threatened with suit by creditors including Leadenhall;

  c.  777 Partners received no or inadequate consideration for incurring the debt or the obligation, to provide security to A-CAP, in the form of a lien on its assets, and thus the value of consideration received by 777 Partners was not reasonably equivalent to the amount of the obligation incurred;

A-1226

    d.  777 Partners was insolvent or became insolvent shortly after the obligation was incurred;

    e.  These transactions in early 2024 occurred both shortly before and shortly after substantial debts were incurred by 777 Partners, including their mounting debt to A-CAP that reached the billions of dollars as of 2023, and their continuing series of loans to Everton to keep the potential acquisition alive through April and into May 2024.

408.    By reason of the foregoing, 777 Partners' payment obligation to A-CAP in connection with the JARM loan and its grant of a lien on its assets as security for the JARM loan should be avoided, and any payments made by 777 Partners to A-CAP on the JARM loan rescinded, pursuant to N.Y. Debtor & Creditor Law § 276(a)(1), to the extent necessary to satisfy Leadenhall's claims against 777 Partners.

### TWELFTH CLAIM FOR RELIEF
### (Constructive Fraudulent Transfer Under N.Y. Debtor and Creditor Law §§ 273(a)(2), 274 Against 777 Partners, Wander, Pasko, A-CAP )

409.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

410.    By virtue of the Guaranty Agreement, Leadenhall is, and was during all relevant periods, a creditor of 777 Partners.

411.    In incurring debt to A-CAP and granting A-CAP a lien on its assets to secure a loan made to and for the benefit of JARM, 777 Partners incurred an obligation without receiving a reasonably equivalent value in exchange for the obligation; indeed, 777 Partners received no consideration for the lien.

A-1227

412.    When 777 Partners incurred the obligations of the JARM loan, 777 Partners was engaged in a business for which its remaining assets were unreasonably small in relation to its business.

413.    Additionally, when 777 Partners incurred the obligations of the JARM loan, 777 Partners intended to incur, or believed or reasonably should have believed, that it would incur debts beyond 777 Partners' ability to pay as they became due.

414.    Additionally, when 777 Partners incurred the obligations of the JARM loan, 777 Partners was insolvent and/or became insolvent as a result of the transfer or obligation.

415.    In the alternative, when 777 Partners incurred the obligations of the JARM loan, even if 777 Partners received reasonably equivalent value, 777 Partners made the transfer to an insider, A-CAP, for an antecedent debt—A-CAP's existing massive loans to 777 Partners that effectively gave A-CAP unlimited leverage to impose its will on 777 Partners, which it knew to be insolvent.

416.    By reason of the foregoing, 777 Partners' payment obligation to A-CAP in connection with the JARM loan and its grant of a lien on its assets as security for the JARM loan should be avoided, and any payments made by 777 Partners to A-CAP on the JARM loan rescinded, pursuant to N.Y. Debtor & Creditor Law § 276(a)(1), to the extent necessary to satisfy Leadenhall's claims against 777 Partners.

**PRAYER FOR RELIEF**

417.    Plaintiffs pray for the following relief:

a)    An award of monetary damages on Plaintiffs' RICO claims in the accelerated amount of $609,529,966.82 plus interest, trebled pursuant to 18 U.S.C. § 1964(c);

A-1228

b)  An award of monetary damages on Plaintiffs' RICO claims in the amount of fees and

costs incurred by Plaintiffs in attempting to collect the accelerated amount, trebled

pursuant to 18 U.S.C. § 1964(c);

c)  An award of monetary damages on Plaintiffs' other claims in an amount to be determined

at trial by jury;

d)  An order enjoining Defendants violating their obligations under the Agreements;

e)  An order declaring the rights and duties of the parties as indicated herein;

f)  An order voiding fraudulent transfers and rescinding payments related thereto;

g)  An award of pre- and post-judgment interest;

h)  An award of all reasonable fees, costs, and expenses, including attorneys' fees and

i)  An award of such other and further relief as the Court deems just and proper.


Dated: September 6, 2024
New York, New York

                                KING AND SPALDING LLP
                                */s/ Leigh Nathanson*
                                Craig Carpenito
                                Leigh M. Nathanson
                                Brian Donovan
                                Michael Taintor
                                1185 Avenue of the Americas
                                New York, NY 10036
                                (212) 556-2100
                                ccarpenito@kslaw.com
                                lnathanson@kslaw.com
                                bdonovan@kslaw.com
                                mtaintor@kslaw.com

                                *Attorneys for Plaint.ıfs Leadenhall Capital
                                Partners LLP and Leadenhall L.fe Insurance
                                Linked Investments Fund PLC*

A-1229

# EXHIBIT 6

A-1230

| Dorchester II Compliance Reports | | | | | |
|---|---|---|---|---|---|
| Compliance Report for Month Ending | Date of Confirmation Email | Date Uploaded to Leadenhall's Dropbox | Sender/Uploader | Transmission Medium | Date Revised Report Sent by Alex Adnani |
| 5/28/2021[1] | 6/21/2021 | 6/21/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 6/30/2021 | 7/21/2021 | 7/21/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 7/30/2021 | N/A | 8/23/2021 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | N/A |
| 8/31/2021 | 9/22/2021 | 9/28/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 9/30/2021 | 10/25/2021 | 10/26/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 10/29/2021 | 11/18/2021 | 11/18/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 11/30/2021 | 12/23/2021 | 12/28/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 12/31/2021 | 1/18/2022 | 1/31/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 1/31/2022 | 2/24/2022 | 2/24/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 2/28/2022 | 3/21/2022 | 3/21/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 3/31/2022 | 4/26/2022 | 4/27/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 4/29/2022 | 5/13/2022 | 5/13/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |

_____

[1] All dates are in MM/DD/YYYY format.

A-1231

| Dorchester II Compliance Reports | | | | | |
|---|---|---|---|---|---|
| Compliance Report for Month Ending | Date of Confirmation Email | Date Uploaded to Leadenhall's Dropbox | Sender/Uploader | Transmission Medium | Date Revised Report Sent by Alex Adnani |
| 5/31/2022 | 6/15/2022 | 6/15/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 6/30/2022 | 7/14/2022 | 7/14/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 7/29/2022 | 8/12/2022 | 8/12/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 8/31/2022 | 9/15/2022 | 9/16/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 9/30/2022 | 10/07/2022 | 10/13/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 10/31/2022 | 12/02/2022 | 12/02/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 11/30/2022 | 12/20/2022 | 12/20/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 12/30/2022 | 2/01/2023 | 2/01/2023 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 1/31/2023 | N/A | 2/14/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | N/A |
| 2/28/2023 | N/A | 4/28/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | N/A |
| 3/31/2023 | N/A | 4/28/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 4/28/2023 | N/A | 6/09/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 5/31/2023 | N/A | 7/18/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 6/30/2023 | N/A | 7/25/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 7/31/2023 | N/A | 8/29/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 8/31/2023 | N/A | 9/27/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |

A-1232

| Dorchester II Compliance Reports | | | | | |
|---|---|---|---|---|---|
| Compliance Report for Month Ending | Date of Confirmation Email | Date Uploaded to Leadenhall's Dropbox | Sender/Uploader | Transmission Medium | Date Revised Report Sent by Alex Adnani |
| 9/29/2023 | N/A | 1/06/2024 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 10/31/2023 | N/A | 1/06/2024 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 11/30/2023 | N/A | 1/06/2024 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |

A-1233

| SPLCSS III Compliance Reports | | | | | |
|---|---|---|---|---|---|
| Compliance Report for Month Ending | Date of Confirmation Email | Date Uploaded to Leadenhall's Dropbox | Sender/Uploader | Transmission Medium | Date Revised Report Sent by Alex Adnani |
| 5/28/2021 | 6/21/2021 | 6/24/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 6/30/2021 | 7/27/2021 | 7/27/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 7/30/2021 | 8/30/2021 | 8/30/2021 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | N/A |
| 8/31/2021 | 9/24/2021 | 9/28/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 9/30/2021 | 10/26/2021 | 10/27/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 10/29/2021 | 11/22/2021 | 11/24/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 11/30/2021 | 12/23/2021 | 12/28/2021 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 12/31/2021 | 2/1/2022 | 2/1/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 01/31/2022 | 2/28/2022 | 2/28/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 02/28/2022 | 3/23/2022 | 3/23/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 03/31/2022 | 4/27/2022 | 4/27/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 04/29/2022 | 5/30/2022 | 5/31/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 5/31/2022 | 6/15/2022 | 6/15/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 6/30/2022 | 7/15/2022 | 7/15/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |

4

A-1234

| SPLCSS III Compliance Reports | | | | | |
|---|---|---|---|---|---|
| Compliance Report for Month Ending | Date of Confirmation Email | Date Uploaded to Leadenhall's Dropbox | Sender/Uploader | Transmission Medium | Date Revised Report Sent by Alex Adnani |
| 7/29/2022 | 8/12/2022 | 8/12/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 8/31/2022 | 9/16/2022 | 9/16/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 9/30/2022 | 10/4/2022 | 10/13/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 10/31/2022 | 12/2/2022 | 12/2/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 11/30/2022 | 12/20/2022 | 12/23/2022 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 12/30/2022 | 2/01/2023 | 2/01/2023 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 1/31/2023 | 2/22/2023 | 2/24/2023 | Alex Adnani - Sutton Park | Uploaded to Leadenhall's DropBox and Emailed | N/A |
| 2/28/2023 | N/A | 4/4/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | N/A |
| 3/31/2023 | N/A | 4/28/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 4/28/2023 | N/A | 5/31/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 5/31/2023 | N/A | 7/14/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 6/30/2023 | N/A | 7/27/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 7/31/2023 | N/A | 8/29/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 8/31/2023 | N/A | 10/3/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 9/30/2023 | N/A | 10/31/2023 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 10/31/2023 | N/A | 1/6/2024 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |
| 11/30/2023 | N/A | 1/6/2024 | SuttonPark Capital | Uploaded to Leadenhall's DropBox | 1/08/2024 |

A-1235

6

A-1236

# EXHIBIT 11

Outstanding Accelerated Balance

| Borrower | Principal | Interest | Additional Interest | Total Interest | Accelerated Amount Due ($) |
|---|---|---|---|---|---|
| SPLCSS | 366,795,056.26 | 1,703,257.27 | 27,371,862.54 | 29,075,119.81 | 395,870,176.07 |
| Dorchester | 83,151,602.71 | 337,619.44 | 5,071,334.01 | 5,408,953.45 | 88,560,556.16 |
| Insurety | 50,562,721.62 | 274,131.88 | - | 274,131.88 | 50,836,853.50 |
| Signal | 73,790,592.01 | 471,789.09 | - | 471,789.09 | 74,262,381.09 |
| TOTAL | 574,299,972.60 | 2,786,797.67 | 32,443,196.55 | 35,229,994.22 | 609,529,966.82 |

| | | |
|---|---|---|
| Insurety (Med) | 43,832,331.58 | 229,109.60 |
| Insurety (Non-Med) | 6,730,390.04 | 45,022.28 |

A-1237

A-1238

# EXHIBIT 12

A-1239

*K&S Draft 3/23/24* **777 Comments 3/26/2024**

# FIRST FORBEARANCE AGREEMENT AND
## FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of March [__], 2024 by and among Dorchester Receivables II LLC and SPLCSS III LLC, as Borrowers (collectively, the "Deficiency Borrowers"), Joshua Wander, an individual resident of the State of Florida ("Wander"), Steven W. Pasko, an individual resident of the State of Florida ("Pasko"), 777 Partners LLC, a Delaware limited liability company ("777 Partners") and 600 Partners LLC, a Delaware limited liability company ("600 Partners"), the entities identified on Schedule 1 attached hereto (the "777 & 600 Affiliates" and together with Deficiency Borrowers, Wander, Pasko, 777 Partners, and 600 Partners, the "Credit Parties"), the financial institutions party hereto as Lenders under the Loan Agreement (as hereinafter defined) (collectively, the "Lenders"), Leadenhall Capital Partners, LLP, as Administrative Agent (the "Administrative Agent") and Leadenhall Life Insurance Linked Investments Fund Plc, as Collateral Agent (the "Collateral Agent", and together with the Administrative Agent, "Agent").

## RECITALS

A.    Deficiency Borrowers, the other Borrowers, certain of the other Credit Parties, Agent, and Lenders are parties to that certain Loan and Security Agreement, dated as of May 7, 2021 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), pursuant to which, among other things, Lenders agreed, subject to the terms and conditions set forth in the Loan Agreement, to make certain loans and other financial accommodations to the Borrowers.  Pursuant to that certain Guaranty, dated as of May 7, 2021 (the "Guaranty"), 777 Partners and 600 Partners (collectively, the "~~Guarantor~~Guarantors") unconditionally guaranteed Borrowers' prompt and full performance of their Obligations under the Loan Agreement and other Transaction Documents.

B.    As of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing (collectively, the "Specified Defaults").  Notice of the Specified Defaults was first given via the Notice of Breach on November 29, 2023, and was again given to the Guarantors and Deficiency Borrowers on March 12, 2024, in that Certain Notice of Events of Default and Trigger Events; Reservation of Rights Letter attached hereto as Exhibit A-2 (the "March 12 Notice").  The March 12 Notice also gives notice that the Loans have been accruing interest at the Default Interest Rate since March 17, 2023.

C.    As a result of the existence of the Specified Defaults, Agent and Lenders have declared in that certain Notice of Acceleration of Loans, Demand for Immediate Repayment dated March 15, 2024, delivered to the Guarantors and Deficiency Borrowers and attached hereto as Exhibit A-3 (the "March 15 Notice") the Obligations to be immediately due and payable.

D.    Pursuant to the notices attached hereto as Exhibit B, the accounts identified in such notices are now under the exclusive control of Agent and are being swept daily to accounts controlled by Agent or a Lender Party.

E.    Each Deficiency Borrower has requested that during the Forbearance Period, Agent and Required Lenders (sometimes referred to herein individually as a "Lender

A-1240

Party," and collectively as the "Lender Parties") agree to forbear from exercising certain of their default-related rights and remedies against such Deficiency Borrower with respect to the Specified Defaults, notwithstanding the existence of the Specified Defaults and subject to the terms and conditions set forth herein.

F.    Each of the Credit Parties ~~is an Affiliate of the Deficiency Borrowers and~~ [1]receives substantial direct and indirect benefits from the transactions contemplated by this Agreement (which benefits are hereby acknowledged by such Credit Party).

G.    Subject to the terms and conditions set forth herein, (i) the Lender Parties have agreed to (a) forbear from exercising certain of their default-related rights and remedies against Deficiency Borrowers and the other Credit Parties with respect to the Specified Defaults, and (b) amend the Loan Agreement in certain respects as set forth below, in order to permit the Credit Parties an opportunity to pursue a restructuring transaction and otherwise perform all of their obligations under this Agreement and the other Transaction Documents.

NOW, THEREFORE, in consideration of the foregoing, the terms, covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.  Definitions**.  As used herein, the following terms shall have the respective meanings set forth below:

"Existing Collateral" shall mean all Collateral ~~(other than the Forbearance Collateral)~~ that secures the Leadenhall-777 SPLCSS/Dorchester Obligations as of March [_____], 2024 other than (i) the Forbearance Collateral and (ii) any Collateral that secures an obligation to the Dorchester Lender Group or the SPLCSS Lender Group, as applicable, in their capacities as Subordinated Secured Parties[2].

"Forbearance Collateral" shall mean [__][3].

"Leadenhall-777 Agreements" shall mean the Loan Agreement, the Guaranty, the Subordinated Note Purchase Agreement, all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

"Leadenhall-777 Obligations" shall mean the aggregate amounts owing and outstanding from time to time to the Lender Parties under the Leadenhall-777 Agreements.  For the avoidance of doubt, the Leadenhall-777 Obligations shall include all amounts (including, but not limited to, default interest, all Additional Interest and all fees and expenses) outstanding under the Signal Loans, Insurety Loans, the Subordinated Note Purchase Agreement and the facilities made available to the Deficiency Borrowers.

---

[1] NTD: JARM and Josh are not.

[2] NTD: Assume this is what's intended?

[3] To be updated.

2

A-1241

"Leadenhall-777 SPLCSS/Dorchester Obligations" shall mean the outstanding principal, interest (including all accrued interest and any interest capitalized pursuant to Section 2.08(b) of the Loan Agreement, including, but not limited to, all ~~Additional Interest and~~ fees and expenses of the Agent incurred in connection with this Agreement or the other Forbearance Documents owing and outstanding to Agent under or in respect of the facilities made available to the Deficiency Borrowers under the Leadenhall-777 Agreements, but excluding Additional Interest and default interest.

"Operating Agreements" shall mean those certain Operating Agreements dated September 10, 2021, for each of 777 Partners and 600 Partners, as provided to Leadenhall on or prior to March 20, 2024.

"Residual Payment" shall mean the final Forbearance Period Amortization Installment due on September 30, 2024.

"Subordinated Note Purchase Agreement" shall mean the Subordinated Note Purchase Agreement dated June 30, 2022, by and among 777 Partners, Leadenhall Capital Partners LLP, as Note Administrative Agent (as defined therein), and Leadenhall Life SMA III ICAV, as Second Lien Collateral Agent (as defined therein), all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

Unless otherwise defined above or elsewhere in this Agreement, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

**SECTION 2.  Confirmation by Credit Parties of Obligations and Specified Defaults**. Each Credit Party acknowledges and agrees that as of March [___], 2024,

(i)     the aggregate principal balance of the outstanding Obligations under the Loan Agreement is not less than  $_____,

(ii)     there are  currently no existing or further commitments of the Lender Parties to provide Loans or make other extensions of credit under the Loan Agreement and the other Transaction Documents, and

(iii)     that the respective principal balances of the various Loans as of such date were not less than the following:

| | |
|---|---|
| SPLCSS Loan | $_____ |
| Dorchester Loan | $_____ |
| Insurety Loan | $_____ |
| Signal Loan | $_____ |

The foregoing amounts do not include interest, fees, expenses and other amounts that are chargeable or otherwise reimbursable under the Loan Agreement and the other Transaction Documents.

A-1242

(iv)    that the respective accrued interest amounts of the various Loans as of such date were not less than the following:

| | |
|---|---|
| SPLCSS Loan | $ _____ |
| Dorchester Loan | $ _____ |
| Insurety Loan | $ _____ |
| Signal Loan | $ _____ |

(b)    Each Credit Party acknowledges and agrees that (i) each of the Specified Defaults constitutes a material Event of Default that has occurred and is continuing as of the date hereof, (ii) none of the Specified Defaults has been cured as of the date hereof, and (iii) except for the Specified Defaults, no other material Events of Default have occurred and are continuing as of the date hereof, or are expected to occur during the Forbearance Period, as the case may be. Prior to the effectiveness of this Agreement, each of the Specified Defaults: (i) relieves the Lender Parties from any obligation to extend any Loan or provide other financial accommodations under the Loan Agreement or the other Transaction Documents (including consenting to any Credit Party's use of cash collateral), and (ii) permits the Lender Parties to, among other things, (A) suspend or terminate any commitment to provide Loans or make other extensions of credit under the Loan Agreement and the other Transaction Documents, (B) continue to charge (x) ~~default~~ interest ~~pursuant to Section 2.08 of~~at the ~~Loan Agreement (the "~~Default Interest Rate~~")~~ with respect to any and all of the Obligations effective from and after March 17, 2023, and (y) Additional Interest, (C) commence any legal or other action to collect any or all of the Obligations from the Deficiency Borrowers and, to the extent permitted by any applicable Leadenhall-777 Agreement, any other Credit Party ~~and/or any Collateral~~, (D) foreclose or otherwise realize on any or all of the Collateral and/or appropriate, set-off and apply to the payment of any or all of the Obligations, any or all of the Collateral, and (E) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by the Loan Agreement, the other Transaction Documents or applicable law.

**SECTION 3.  Amendments to Loan Agreement**. Effective as of the Forbearance Effective Date (as hereinafter defined), the following terms and conditions of the Loan Agreement shall be amended as follows:

(a)    **Amendment to Section 1.01**.

(i)    Section 1.01 of the Loan Agreement is amended by amending and restating the following definitions in their entirety as follows:

"Collateral" means (i) all of such Borrower's right, title and interest in, to and under all assets of such Borrower, including the following, whether now existing or hereafter arising and wherever located: (a) all Receivables, any Health Care Provider Loan Receivables, Related Security and all Collections of such Borrower, (b) all rights of such Borrower under the related Sale Agreement, the related Servicing Agreement, the related Account Control Agreements (when executed), the Related Contracts, the related Third Party Intercreditor Agreements, the related Hedge Agreements (including any Hedge Collateral), if any, together with all rights of such Borrower to receive monies due or to become due thereunder, all claims of such Borrower for damages arising out of or for breach of or default thereunder, and all rights of such Borrower to compel performance and otherwise exercise all remedies thereunder, (c) the

4

A-1243

Borrower Accounts and Lock-Boxes with respect to such Borrower, (d) all of the Borrower's membership interests in the Lottery Holding SPVs, and (e) all proceeds of the foregoing; provided that any Receivable that is purchased or repurchased by the Related Seller (or its designee) in connection with a Repurchase shall no longer be included in the Collateral and the Collateral shall not include any Excluded Insurety Receivables or any Excluded Lottery Receivables; and (ii) the Forbearance Collateral.

"Transaction Documents" means this Agreement, each Sale Agreement, each Servicing Agreement, each Pledge Agreement, each Account Control Agreement, the Compliance Reports, the Monthly Reports, the Payment Right Purchase Agreements, the Third Party Intercreditor Agreements, each Hedge Agreement, the Notes, the Guaranty, the Forbearance Documents, all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related hereto or thereto.

(ii)    Section 1.01 of the Loan Agreement is amended by inserting the following definitions in alphabetical order in their entirety as follows:

"Forbearance Agreement" means that certain First Forbearance Agreement and Fifth Amendment to Loan and Security Agreement, dated as of March [__], 2024, by and among the Deficiency Borrowers (as defined therein), the Credit Parties (as defined therein), the Lenders, and the Agent.

"Forbearance Collateral"[4] means all property described in any Forbearance Document as security for any Obligations and all other property of any Credit Party that now or hereafter secures (or is intended to secure) any Obligations.

"Forbearance Documents" means the Forbearance Agreement, each Forbearance Guaranty, each Forbearance Pledge Agreement, and all amendments, modifications and supplements to the foregoing, and all other agreements, instruments and documents delivered or related thereto.

"Forbearance Effective Date" shall ~~have~~mean the ~~meaning ascribed to such term in~~effective date of the Forbearance Agreement.

"Forbearance Guaranty" means each Guaranty and Security Agreement entered into by any Credit Party (as defined in the Forbearance Agreement) in favor of the Agent for the benefit of the Lenders and each Forbearance Limited Guaranty.

"Forbearance Limited Guaranty" means each Limited Guaranty entered into by any of Joshua Wander and Steven W. Pasko in favor of the Agent for the benefit of the Lenders.

"Forbearance Pledge Agreement" means each Pledge Agreement entered into by or otherwise pledging the equity of a Credit Party (as defined in the Forbearance Agreement) in favor of the Agent for the benefit of the Lenders.

---

[4] NTD: I don't see anything described in this agreement.

5

A-1244

**SECTION 4.**        <u>**Forbearance; Forbearance Default Rights and Remedies.**</u>

(a)        Effective as of the Forbearance Effective Date, each of the Lender Parties agrees that until the earlier of the expiration or termination of the Forbearance Period, it will temporarily forbear from exercising its default-related rights and remedies (X) ~~and,~~ the Deficiency Borrowers or any other Credit Party solely with respect to the Specified Defaults ~~and,~~ (Y) the other Borrowers, solely with respect to any Borrower Group Event of Default related to such Borrower that has arisen solely as a result of ~~the~~ any Specified Default ~~identified in paragraph 1 of Exhibit A~~ and (Z) withdraw the acceleration declared in the March 15 Notice; provided, however, (i) the Obligations shall ~~remain accelerated and immediately due and payable and shall~~ continue to bear interest at the Default Interest Rate, (ii) the Lender Parties shall have no obligation to make any further Loans or other extensions of credit to any Borrower or any other Credit Party, (iii) each Credit Party shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Loan Agreement or any of the other Transaction Documents during the continuance of any Event of Default, including, without limitation, any limitations, restrictions or prohibitions against the making of payments by any Borrower or any other Credit Party to any Affiliate of any Borrower or any direct or indirect owner of an equity interest in such Borrower, any other Credit Party or any Affiliate of any of the foregoing, in each case, except as explicitly described in any Forbearance Document, and (iv) nothing herein shall restrict, impair or otherwise affect any Lender Party's rights and remedies under any agreements containing subordination provisions[5] in favor of any or all of the Lender Parties (including, without limitation, any rights or remedies available to the Lender Parties as a result of the occurrence or continuation of any Specified Default) or amend or modify any provision thereof~~, and (v) nothing herein shall restrict, impair or otherwise affect Agent's right to file, record, publish or deliver a notice of default or document of similar effect under any state foreclosure law~~.

(b)        As used herein, the term "<u>Forbearance Period</u>" shall mean the period beginning on the Forbearance Effective Date and ending on the earlier to occur of (the occurrence of the following clause (i), (ii) or (iii), a "<u>Termination Event</u>"):

(i)        the occurrence of any Event of Default under subsection 7.02(f) of the Loan Agreement (a "<u>Bankruptcy Default</u>");

(ii)        the occurrence of any Forbearance Default (as hereinafter defined) other than a Bankruptcy Default; or

(iii)        October 7, 2024.

As used herein, the term "<u>Forbearance Default</u>" shall mean:

(A) the occurrence of any material[6] Event of Default other than the Specified Defaults;

---

[5] NTD: Are there any? If not, this should be removed.

[6] NTD: If we're limiting the Specified EODs to "material" EODs, it doesn't make sense for there not to be a materiality qualifier on Forbearance Defaults.

A-1245

(B) the failure of any Deficiency Borrower or any other Credit Party (x) to comply timely in a material manner with any term, condition, or covenant set forth in this Agreement or (y) to use commercially reasonable efforts to ~~negotiate and~~obtain any third-party consents needed to enter into the Forbearance Documents identified on Schedule 8, and, if such consent is obtained, to negotiate and enter into such documents on or before April 26, 2024;

(C) the failure of any representation or warranty made by any Deficiency Borrower or any other Credit Party under or in connection with this Agreement to be true and complete in all material respects as of the date when made or any other material breach of any such representation or warranty; or

~~(D) the repudiation and/or assertion of any defense by any Credit Party with respect to this Agreement or any Transaction Document or the pursuit of any claim by any Credit Party against the Agent, any Lender or any Released Person;~~

[7](E) Existing Collateral with an aggregate value of $1,000,000 or more is or becomes ineligible due to (x) any Borrower or Credit Party not having title to such Existing Collateral, (y) the Agent no longer having a first priority security interest or lien in such Existing Collateral, or (z) such Existing Collateral is subject to any security interest, lien or other encumbrance in favor or any Person that is not a Lender or the Agent; or

~~(F) the termination or expiration of any other forbearance granted by another creditor of the Credit Parties.~~

[8]Any Forbearance Default shall constitute an immediate Event of Default under the Loan Agreement and the other Transaction Documents.

(c)    Upon the occurrence of a Termination Event, the agreement of the Lender Parties hereunder to forbear from exercising their respective default-related rights and remedies shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which the Deficiency Borrowers and the other Credit Parties each ~~waives~~waive. The Deficiency Borrowers and the other Credit Parties each ~~agrees~~agree that any or all of the Lender Parties may at any time thereafter proceed to exercise any and all of their respective rights and remedies under the Loan Agreement, any other Transaction Document and applicable law, including, without limitation, their respective rights and remedies with respect to the Specified Defaults. Without limiting the generality of the foregoing, upon the occurrence of a Termination Event, the Lender Parties may, in their sole discretion and without the requirement of any demand, presentment, protest, or notice of any kind, (i) continue to charge interest on any or all of the Obligations at the Default Interest Rate, effective from and after March 17, 2023, to occur on a retroactive basis[9], (ii) commence any legal or other action to collect any or all of the Obligations from the Deficiency Borrowers, any other Credit Party and/or any Collateral, (iii) foreclose or otherwise realize on any or all of the Collateral, and/or appropriate, setoff or apply

---

[7] NTD: Not in term sheet.

[8] NTD: Not in term sheet.

[9] NTD: What does this clause mean?

A-1246

to the payment of any or all of the Obligations, any or all of the Collateral, and (iv) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Loan Agreement, any other Transaction Documents and applicable law, all of which rights and remedies are fully reserved by the Lender Parties.

(d)    Any agreement by the Lender Parties to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and Required Lenders.

(e)    The Deficiency Borrowers and the other Credit Parties each acknowledge that the Lender Parties have not made any assurances concerning (i) any possibility of an extension of the Forbearance Period, (ii) the manner in which or whether the Specified Defaults may be resolved or (iii) any additional forbearance, waiver, restructuring or other accommodations.

(f)    The parties hereto agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that any Lender Party may be entitled to take or bring in order to enforce its rights and remedies against any Deficiency Borrower or any other Credit Party are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(g)    The Deficiency Borrowers and the other Credit Parties acknowledge and agree that any Loan or other financial accommodation that any Lender Party makes on or after the Forbearance Effective Date has been made by such party in reliance upon, and is consideration for, among other things, the general releases and indemnities contained in Section 6 hereof and the other covenants, agreements, representations and warranties of the Deficiency Borrowers and the other Credit Parties hereunder.

**SECTION 5.  <u>Supplemental Terms, Conditions and Covenants During the Forbearance Period</u>**

The parties hereto hereby agree to comply with the following terms, conditions and covenants during the Forbearance Period (other than clause (i), which shall be complied with so long as any Leadenhall-777 Obligations remain outstanding), in each case notwithstanding any provision to the contrary set forth in this Agreement, the Loan Agreement or any other Transaction Document:

(a)    Each Deficiency Borrower and each other Credit Party agrees that ~~(x) it shall not enter into any agreement to retain an investment banking firm, crisis manager, chief restructuring officer, consultant, financial advisor and/or other third party professional without the prior written consent of the Agent and (y)~~ it shall use commercially reasonable efforts to obtain prior to April 26, 2024 each consent listed on Schedule 7(c) attached hereto.

(b)    Notwithstanding anything to the contrary contained in the Loan Agreement or other Transaction Document, during the Forbearance Period, the Credit Parties may sell, convey, transfer, lease or otherwise dispose of Existing Collateral; provided that, without the written consent of the Agent (i) no Existing Collateral may be sold, conveyed, transferred, leased or otherwise disposed of (x) for non-cash considerations or (y) for an amount

8

less than its fair market value, and (ii) all proceeds of such transaction shall be applied to repay Leadenhall-777 SPLCSS/Dorchester Obligations and shall not be applied to any Forbearance Period Amortization Installments other than the Residual Payment.

(c) Notwithstanding anything to the contrary contained in the Loan Agreement or other Transaction Document, during the Forbearance Period, Agent may engage one or more field auditors to (x) to conduct audits of the Receivables, the Existing Collateral and the related books and records and collections systems of the Deficiency Borrowers, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for due diligence of the Receivables), (y) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (z) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (y) above, and to discuss matters relating to Receivables and the Existing Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller, as the case may be, having knowledge of such matters; provided that during the Forbearance Period, the same is done with concurrent written notice during normal business hours to the extent access to such Borrower's, the Related Servicer's or the Related Seller's premises is required and such Borrower shall be obligated to pay for all such audits. If Agent elects to engage such field auditor(s), Deficiency Borrowers and the other Credit Parties shall fully cooperate with Agent's field auditors and promptly provide all information and materials requested by such auditors and take all other action requested by the auditors to enable them to complete their audit. All such costs and expenses in connection with any field audit shall be at the expense of the Lenders unless a Forbearance Default has occurred and is continuing.

(d) Notwithstanding anything to the contrary contained in the Loan Agreement or the other Transaction Documents, Agent or its counsel may, at Agent's sole discretion, engage one or more financial or other advisors or consultants satisfactory to Agent, to advise and assist Agent, Agent's counsel, and Lenders with their on-going assessment of each Deficiency Borrower's financial performance and its ability to repay the Obligations (such assistance to include, without limitation, (i) a review by such consultant of all accounts receivable and accounts payable of Deficiency Borrowers and the other Credit Parties, all existing contracts of Deficiency Borrowers and other Credit Parties and all contracts of Deficiency Borrower and other Credit Parties currently under negotiation (and the projected effects on each Deficiency Borrower's future profitability), and (ii) monthly reviews and inspections by such consultant of each Deficiency Borrower's operations and the items outlined in clause (i) above). Agent and Lenders may elect to maintain the confidentiality of any conclusions reached or reports prepared by such consultant and may also provide that the consultant's conclusions shall be covered by the attorney work product privilege. Deficiency Borrowers shall reimburse Agent for any and all fees and expenses of such consultant in accordance with Section 9.02 of the Loan Agreement.

A-1248

10

 (d)   (e) Notwithstanding anything to the contrary contained in the Loan Agreement or the other Transaction Documents, the Credit Parties shall pay Agent, for application solely to the Leadenhall-777 SPLCSS/Dorchester Obligations, the following amounts on or before the corresponding dates set forth below (provided that the failure to make any Forbearance Period Amortization Installment (including the Residual Payment) shall not constitute a Forbearance Default until the third day after such Forbearance Period Amortization Installment is due) together with accrued and unpaid interest thereon (collectively, the "Forbearance Period Amortization Installments"):

| Date:[11] | Payment: |
|---|---|
| March 29, 2024 | $15,000,000 |
| April 30, 2024 | $15,000,000 |
| May 31, 2024 | $20,000,000 |
| June 28, 2024 | $25,000,000 |
| July 31, 2024 | $75,000,000 |
| August 30, 2024 | $75,000,000 |
| September 30, 2024 | all remaining unpaid Leadenhall-777 SPLCSS/Dorchester Obligations (which, as of the date hereof, are equal to $[___].) |

In addition, contemporaneously with the payment of each Forbearance Period Amortization Installment, Deficiency Borrowers shall deliver to Agent their managements' written analysis and discussion of the Forbearance Period Amortization Installments and performance of the Existing Collateral.

 (e)   (f) (i) Notwithstanding anything to the contrary in the Loan Agreement or other Transaction Documents, the Deficiency Borrower and the other Credit Parties hereby agree to: (x) give Agent and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of the Deficiency Borrowers and the other Credit Parties, (y) furnish to Agent and its Representatives such financial, operating and property related data and other information related to the Leadenhall-777 SPLCSS/Dorchester Obligations as such persons reasonably request, and (z) instruct each Deficiency Borrower's and any other Credit Party's employees and financial advisors to cooperate with Agent and its Representatives in respect of the aforementioned clauses (x) and (y). For purposes of this Agreement, the term "Representatives"

[10] NTD: The field audit under (c) should be sufficient for so long as the amortization payments are being made

[11] NTD: Dates have been adjusted so as to fall on Business Days.

A-1249

shall mean Agent's employees, agents, representatives, advisors and consultants (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf Agent).

~~(ii)    Deficiency Borrowers and the other Credit Parties each irrevocably authorizes, and shall cause, any financial advisors, consultants or investment bankers that are representing any or all of the Deficiency Borrowers and the other Credit Parties in connection with the Collateral (collectively, the "Financial Advisors") to: (w) disclose fully and promptly to Agent and its Representatives all material developments in connection with the efforts of Deficiency Borrowers and Financial Advisors to sell, convey, transfer, lease or otherwise dispose of the Collateral, (x) regularly consult with, and respond to the inquiries of, Agent, Lenders and their respective Representatives concerning any and all matters relating to the affairs, finances and businesses of any Deficiency Borrower or any other Credit Party, the assets and capital stock of any Deficiency Borrower or any other Credit Party, any aspect of any conveyance, transfer, lease or other disposal of the Collateral and/or Financial Advisors' activities related thereto (including, without limitation, communications outside the presence of any representatives of any Deficiency Borrower or any other Credit Party), (y) provide Agent, Lenders and their respective Representatives copies of all reports, analyses, materials (including, without limitation, any and all confidential memoranda or other work product provided by Financial Advisors to any or all of Deficiency Borrowers, Lenders and their respective Representatives) and (z) provide bi-weekly updates on a conference call with Agent, Lenders and/or their respective Representatives.~~

 (ii)    ~~(e)~~

(f)    Each Deficiency Borrower ~~and the other Credit Parties~~ shall, and shall cause its respective officers, directors, employees and advisors to, cooperate fully with Agent in furnishing information as and when reasonably requested by Agent or any other Lender Party regarding the Collateral or any Deficiency Borrower~~'s or any other Credit Party~~'s financial affairs, finances, financial condition, business and operations. Each Deficiency Borrower ~~and each other Credit Party~~ authorizes Agent to meet and/or have discussions with any of their officers, directors, employees and advisors from time to time as reasonably requested by Agent to discuss any matters regarding the Collateral or any Deficiency Borrower~~'s or any other Credit Party~~'s financial affairs, finances, financial condition, business and operations, and shall direct and authorize all such persons and entities to fully disclose to Agent all information reasonably requested by Agent regarding the foregoing. Each Deficiency Borrower ~~and the other Credit Parties~~ waives and releases any such officer, director, employee and advisor from the operation and provisions of any confidentiality agreement with Deficiency Borrower ~~or other Credit Party~~, as the case may be, such that such person or entity is not prohibited from providing any of the foregoing information to Agent or any other Lender Party.

(e)    Each Deficiency Borrower ~~and other Credit Party~~ acknowledges and agrees that no Lender Party shall have any obligation whatsoever to make any additional Loans, extend any additional credit or otherwise make any further financial accommodations to any Borrower ~~or any other Credit Party~~ under the Loan Agreement, the other Transaction Documents or otherwise (including, without limitation, during the Forbearance Period).

11

**A-1250**

(f)    For so long as any Leadenhall-777 Obligations remain outstanding, no Deficiency Borrower or other Credit Party shall, as applicable:

(i)    make any payment or any kind to Wander or Pasko other than the base salary and minimum annual bonus set forth in <u>Schedule 5.4</u> of each Operating Agreement;

(ii)    make any dividend payments, extraordinary payments, or similar distributions to any principal or Affiliate of 777 Partners or 600 Partners (including Wander, Pasko, and any entity solely under the control of either or both, including, but not limited to, JARM Capital LLC or MTCP LLC);

(iii)    permit 777 Partners or 600 Partners to make any dividend payments (except for dividends payable in respect of the 777 Preferred Units (as defined in the Operating Agreements), extraordinary payments, or similar distributions ~~or repay any Debt owed to an Affiliate~~;

(iv)    redeem, refinance, or repay any 777 Preferred Units ~~(as defined in the Operating Agreements)~~, other than where there is an express contractual obligation to do so; provided that such obligation was in existence on March 20, 2024, and is disclosed in <u>Schedule 5(i)(iv)</u> hereto;

(v)    create or allow to subsist any security interest, lien or other encumbrance on the Forbearance Collateral other than such security interest, lien or other encumbrance as is expressly permitted hereunder; or

(vi)    sell, convey, transfer, lease or otherwise dispose of any Forbearance Collateral other than as is expressly permitted hereunder.

The provisions of this Section 5(~~i~~g) shall survive a Termination Event under  this Agreement.

**SECTION 6.**  <u>**General Release; Indemnity.**</u>

(a)    In consideration of, among other things, Agent's and the Required Lenders' execution and delivery of this Agreement, each of the Deficiency Borrowers and the other Credit Parties, on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, "<u>Releasors</u>"), hereby forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment) actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity (collectively, the "<u>Claims</u>"), against any or all of the Lender Parties in any capacity and their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys,

12

A-1251

advisors and other representatives of each of the foregoing (collectively, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Forbearance Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Loan Agreement and the other Transaction Documents or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between or among Deficiency Borrowers and the other Credit Parties, on the one hand, and any or all of the Lender Parties, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any aspect of the dealings or relationships between or among any or all of Wander, Pasko, 777 Partners, 600 Partners or the 777 & 600 Affiliates, on the one hand, and the Lender Parties, on the other hand, but only to the extent such dealings or relationships relate to any or all of the documents, transactions, actions or omissions referenced in clauses (i) and (ii) hereof.  The receipt by any Deficiency Borrower or any other Credit Party of any Loans or other financial accommodations made by any Lender Party after the date hereof shall constitute a ratification, adoption, and confirmation by such party of the foregoing general release of all Claims against the Releasees that are based in whole or in part on facts, whether or not now known or unknown, existing on or prior to the date of receipt of any such Loans or other financial accommodations.  In entering into this Agreement, Deficiency Borrowers and each other Credit Party consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof.  The provisions of this Section shall survive the termination of this Agreement, the Loan Agreement, the other Transaction Documents and payment in full of the Obligations. Notwithstanding the foregoing, the release described in this subsection shall not apply to claims, counterclaims, demands, damages, debts, suits, losses, liabilities, actions, remedies, judgments, controversies or causes of action arising from a set of facts of which the Releasors are not aware (unless the Releasors would have been aware of such facts upon exercising reasonable care and diligence)

(b)  Deficiency Borrowers and other Credit Parties each hereby agrees that it shall be, jointly and severally, obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of any Deficiency Borrower, any other Credit Party, or any of their respective Subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statue, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Agreement, the other Transaction Documents, this Agreement or any other document executed and/or delivered in connection herewith or therewith; provided, that neither the Deficiency Borrowers nor any other Credit Party shall not have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of such Releasee as finally determined by a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, Deficiency Borrowers and the other Credit Parties each agreesagree to make the maximum contribution to the payment and satisfaction thereof that is permissible under applicable law.  The foregoing indemnity shall

A-1252

survive the termination of this Agreement, the Loan Agreement, the other Transaction Documents and the payment in full of the Obligations.

(c)    Each of the Deficiency Borrowers and the other Credit Parties, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Deficiency Borrower or any other Credit Party pursuant to Section 6(a) hereof. If any Deficiency Borrower, any other Credit Party or any of its respective successors, assigns or other legal representatives violates the foregoing covenant, each Deficiency Borrower and other Credit Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

**SECTION 7.    Representations, Warranties And Covenants Of Deficiency Borrowers and Other Credit Parties** . To induce Agent and the other Lender Parties to execute and deliver this Agreement, each of Deficiency Borrowers and other Credit Parties represents, warrants and covenants that:

(a)    The execution, delivery and performance by each of Deficiency Borrowers and the other Credit Parties of this Agreement and all documents and instruments delivered in connection herewith and the Loan Agreement and all other Transaction Documents have been duly authorized by such Deficiency Borrower's and the Other Credit Parties' respective boards of directors, managers, sole members or other controlling party, and this Agreement and all documents and instruments delivered in connection herewith and the Loan Agreement and all other Transaction Documents are legal, valid and binding obligations of such Deficiency Borrowers and the other Credit Parties enforceable against such parties in accordance with their respective terms;

(b)    Except with respect to the Specified Defaults, each of the representations and warranties contained in the Loan Agreement and the other Transaction Documents is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, and each of the agreements and covenants in the Loan Agreement and the other Transaction Documents is hereby reaffirmed with the same force and effect as if each were separately stated herein and made as of the date hereof;

(c)    Neither the execution, delivery and performance of this Agreement, the other Forbearance Documents, and all documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby (x) requires consent of any Person not a party hereto, except as disclosed on Schedule 7(c) hereto, and (y) does or shall contravene, result in a breach of, or violate (i) any provision of any Deficiency Borrower's or any other Credit Party's corporate charter, bylaws, operating agreement, or other governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Deficiency Borrower or any other Credit Party is a party or by

14

A-1253

which any Deficiency Borrower or any other Credit Party or any of their respective property is bound;

(d)     As of the date hereof, except for the Specified Defaults, no material Event of Default has occurred or is continuing under this Agreement, the Loan Agreement or any other Transaction Document.

(e)     The Lender Parties' security interests in the Existing Collateral continue to be valid, binding, first-priority, perfected and enforceable security interests that secure the Obligations and no tax or judgment liens are currently of record against Deficiency Borrowers or any other Credit Party.

(f)     Except with respect to the Specified Defaults, any material misrepresentation of any Deficiency Borrower or any other Credit Party, or any failure of any such party to materially comply with the covenants, conditions and agreements contained in this Agreement, the Loan Agreement, any other Transaction Document or in any other agreement, document or instrument at any time executed and/or delivered by any Deficiency Borrower or any other Credit Party with, to or in favor of any Lender Party shall constitute an immediate Event of Default hereunder, under the Loan Agreement and the other Transaction Documents.

(g)     The recitals to this Agreement are true and correct, and each Deficiency Borrower and other Credit Party acknowledges and agrees that  the Loans have been accelerated and nothing contained herein is intended to change the accelerated status of the Loans.

(h)     None of the Deficiency Borrowers nor any other Credit Party has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Loan Agreement or any of the other Transaction Documents.

(i)     The Existing Collateral listed on Schedule 7(i) is all of the Existing Collateral as of the date hereof and all such Collateral is eligible to be Collateral under the Transaction Documents.

**SECTION 8. Post-Closing Covenants.** The Credit Parties, as applicable, will use commercially reasonable efforts to execute and deliver the documents and complete the tasks set forth on Schedule 8, in each case within the time limits specified on such schedule (or such longer period as the Agent may agree in its sole discretion).

15

A-1254

**SECTION 9.  Financial Audit of 777 Partners, 600 Partners, and the 777 & 600 Affiliates.** So long as the Credit Parties are in full compliance with the schedule of Forbearance Period Amortization Installments set forth in Section 5(e) above, the Credit Parties may provide to the Lender Parties a list of the waivers requested by the Credit Parties in connection with the Leadenhall-777 Agreements relating to the Leadenhall-777 SPLCSS/Dorchester Obligations in order to fulfill the Credit Parties' audit requirements, and each Lender Party shall consider, acting reasonably, any requests for waivers in connection with the Leadenhall-777 SPLCSS/Dorchester Obligations; provided that (i) no Lender Party shall be required to provide any waiver to the extent such Lender Party in its sole reasonable discretion determines that providing such waiver is not in such Lender Party's best interest, and (ii) upon the termination of the Forbearance Period due to any reason other than under clause (iii) of the definition of "Termination Event", any such waiver previously granted by any Lender Party shall without any further action of any Lender Party or the Agent automatically become null and void and of no further affect.

**SECTION 10.      Ratification of Liability.** Deficiency Borrowers and the other Credit Parties, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Transaction Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Transaction Documents to which it is a party, and ratify and reaffirm their grants of liens on or security interests in their properties pursuant to such Transaction Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Loan Agreement and the other Transaction Documents, and confirms and agrees that such liens and security interests hereafter secure all of the Obligations, including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Transaction Document. Deficiency Borrowers and the other Credit Parties further agree and reaffirm that the Transaction Documents to which they are parties now apply to all Obligations as defined in the Loan Agreement, as modified hereby (including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Loan Agreement or any other Transaction Document). Each such party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Transaction Documents, as modified hereby, remains in full force and effect and is hereby ratified and confirmed. No set-off, counterclaim or reduction, no diminution of an obligation, and no defense of any kind or nature that Guarantor or any other Credit Party may have against any Agent or any Lender Party (other than a defense of payment) shall affect, modify or impair the obligations hereunder of Guarantor or any other Credit Party.

**SECTION 11.      Reference To And Effect Upon The Loan Agreement.**

(a)     Except as specifically amended hereby, all terms, conditions, covenants, representations and warranties contained in the Loan Agreement and the other Transaction Documents, and all rights of the Lender Parties and all of the Obligations, shall remain in full force and effect. Deficiency Borrowers and the other Credit Parties hereby confirm that the Loan Agreement and the other Transaction Documents are in full force and effect and that neither

16

A-1255

Deficiency Borrowers nor any other Credit Party has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Loan Agreement or any of the other Transaction Documents.

(b)      Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) create any obligation to make any further Loans or to continue to defer any enforcement action after the occurrence of any Default or Event of Default (including, without limitation, any Forbearance Default), (ii) constitute a consent or waiver of any past, present or future violations of any provisions of the Loan Agreement or any of the other Transaction Documents or the Specified Defaults, nor constitute a novation of any of the Obligations under the Loan Agreement or the other Transaction Documents, including, but not limited to, with respect to the Insurety Borrower or Signal Borrower, (iii) amend, modify or operate as a waiver of any provision of the Loan Agreement or any of the other Transaction Documents or any right, power or remedy of any Lender Party, including, but not limited to, with respect to the Insurety Borrower or Signal Borrower, (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction or (v) constitute a course of dealing or other basis for altering any Obligations or any other contract or instrument.  Except as expressly set forth herein, each Lender Party reserves all of its rights, powers, and remedies under the Loan Agreement, the other Transaction Documents and applicable law.  All of the provisions of the Loan Agreement and the other Transaction Documents, including, without limitation, the time of the essence provisions, are hereby reiterated, and if ever waived (other than as provided herein), are hereby reinstated.

(c)      From and after the Forbearance Effective Date, (i) the term "Agreement" in the Loan Agreement, and all references to the Loan Agreement in any Transaction Document, shall mean the Loan Agreement, as amended by, among things, this Agreement, and (ii) the term "Transaction Documents" in the Loan Agreement and the other Transaction Documents shall include, without limitation, this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith.

(d)      Except as expressly provided herein, no Lender Party has waived (regardless of any delay in exercising such rights and remedies), any Default or Event of Default that may be continuing on the date hereof or any Default or Event of Default that may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and no Lender Party has agreed to forbear with respect to any of its rights or remedies concerning any Defaults or Events of Default (other than, during the Forbearance Period, the Specified Defaults solely to the extent expressly set forth herein), that may have occurred or are continuing as of the date hereof, or that may occur after the date hereof.

(e)      Deficiency Borrowers and the other Credit Parties acknowledge and agree that the Lender Parties' agreement to forbear from exercising certain of their default-related rights and remedies with respect to the Specified Defaults during the Forbearance Period does not in any manner whatsoever limit any Lender Party's right to insist upon strict compliance by Deficiency Borrowers and the other Credit Parties with the Loan Agreement, this Agreement or any other Transaction Document during the Forbearance Period, except as expressly set forth herein.

A-1256

(f)    This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Loan Agreement or any other Transaction Document.

**SECTION 12.**    **Costs And Expenses** .  In addition to (to the extent not otherwise provided in the Loan Agreement), and not in lieu of, the terms of the Loan Agreement, the Forbearance Documents, and the other Transaction Documents relating to the reimbursement of Lender Party fees and expenses, Deficiency Borrowers shall, jointly and severally, reimburse Agent and the other Lender Parties, as the case may be, promptly on demand for all fees, costs, charges and expenses, including the reasonable fees, costs and expenses of counsel and other expenses, incurred in connection with this Agreement and the other agreements and documents executed and/or delivered, and to be executed and/or delivered, in connection herewith.

A-1257

**SECTION 13.**        <u>**Governing Law; Consent to Jurisdiction and Venue**</u>.  THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST).  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE DEFICIENCY BORROWERS AND EACH OTHER CREDIT PARTY HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL LIMIT THE RIGHT OF AGENT TO COMMENCE ANY PROCEEDING IN THE FEDERAL OR STATE COURTS OF ANY OTHER JURISDICTION TO THE EXTENT AGENT DETERMINES THAT SUCH ACTION IS NECESSARY OR APPROPRIATE TO EXERCISE ITS RIGHTS OR REMEDIES UNDER THE TRANSACTION DOCUMENTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.  EACH CREDIT PARTY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BY ANY MEANS PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO THE ADDRESS OF THE DEFICIENCY BORROWERS SPECIFIED IN THE LOAN AGREEMENT (AND SHALL BE EFFECTIVE WHEN SUCH MAILING SHALL BE EFFECTIVE, AS PROVIDED THEREIN).  EACH CREDIT PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING CONTAINED IN THIS SECTION 13 SHALL AFFECT THE RIGHT OF AGENT OR ANY LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW OR COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION.

**SECTION 14.**        <u>**Construction**</u>  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the parties hereto.  Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any party on the ground that such party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.  Each of the parties

19

A-1258

hereto represents and declares that such party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such party knows the contents thereof and signs the same freely and voluntarily. The parties hereto acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect. If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option or discretion of one or more Lender Parties or their respective employees, counsel, or agents in the Loan Agreement or any of the other Transaction Documents, such action shall be deemed to be exercisable by such Lender Parties or such other Person in its sole and absolute discretion and according to standards established in its sole and absolute discretion, unless expressly stated otherwise. Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may."

**SECTION 15.**     **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart. Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile, portable document format (".pdf"), electronic signature complying with the U.S. federal ESIGN Act of 2000 (including signature via DocuSign, RightSignature or similar services) or other electronic transmission, a signature page of this Agreement signed by such party, and any such facsimile or other electronic signature shall be treated in all respects as having the same effect as an original signature. Any party delivering by facsimile or other electronic transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement; provided that the failure to deliver such manually signed counterpart shall not affect the validity or effectiveness of this Agreement.

**SECTION 16.**     **Severability**. The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction. If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**SECTION 17.**     **Time of Essence**. Time is of the essence in the performance of each of the obligations of the Deficiency Borrowers and the other Credit Parties hereunder and with respect to all conditions to be satisfied by such parties.

A-1259

**SECTION 18.**    <u>No Other Creditor Action</u>.  The Lender Parties' obligations to forbear hereunder are expressly conditioned upon all other creditors of any Deficiency Borrower and the other Credit Parties (including, without limitation, trade creditors and subordinated secured and unsecured creditors) refraining from taking any action whatsoever against the Deficiency Borrowers, any of the other Credit Parties,or the Collateral (including, without limitation, acceleration of indebtedness) during the Forbearance Period.  In the event that any such creditor takes any such action, all of the Lender Parties' obligations hereunder shall automatically and immediately terminate without further notice or demand.

**SECTION 19.**    <u>Further Assurances</u>.  Each Deficiency Borrower and other Credit Party agrees to take all further actions and execute all further documents as Agent may from time to time reasonably request to carry out the transactions contemplated by this Agreement and all other agreements executed and delivered in connection herewith.

**SECTION 20.**    <u>Section Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

**SECTION 21.**    <u>Notices</u>.  All notices, requests, and demands to or upon the respective parties hereto shall be given in accordance with the Loan Agreement.

**SECTION 22.**    <u>Effectiveness</u>.  This Agreement shall become effective at the time (the "<u>Forbearance Effective Date</u>") that all of the following conditions precedent have been met (or waived) as determined by the Agent and the Lenders in their sole discretion:

(a)    <u>Agreement</u>.  Agent shall have received duly executed signature pages for this Agreement signed by Agent, Required Lenders, Deficiency Borrowers and the other Credit Parties.

(b)    Forbearance Limited Guarantees.  Agent shall have received duly executed signature pages for each Forbearance Limited Guaranty from Wander and Pasko.

(b)    (c) [12]<u>Fees and Expenses</u>.  The Credit Parties shall have paid all fees and expenses that under the terms of the Loan Agreement and the other Transaction Documents are due and payable on or prior to the date hereof, as well as the fees, disbursements and other charges of counsel to the Agent, including, but not limited to, the fees and expenses of King & Spalding, LLP.

(c)    <u>Due Authorization</u>.  Each Deficiency Borrower and other Credit Party shall have delivered to Agent (i) evidence of the corporate authority of each such party to execute, deliver and perform its obligations under this Agreement and, as applicable, all other agreements and documents executed in connection therewith, and (ii) such other documents and instruments as Agent may require, all of the foregoing of which shall be in form and substance acceptable to Agent and Lenders.

---

[12] NTD: This is subject to ACAP consent, which hasn't been received yet.  This should be part of the post-closing, where it already looks like it's covered

21

A-1260

(d)   <u>Representations and Warranties</u>.   The representations and warranties contained herein shall be true and correct, and no Forbearance Default or event that with notice, the passage of time or both would constitute a Forbearance Default shall exist on the date hereof.

(e)   <u>Other Corporate Proceedings</u>.   All corporate proceedings taken in connection with the transactions contemplated by this Agreement and all documents, instruments, and other legal matters incident thereto shall be satisfactory to Agent.

**SECTION 23.**          **Waivers by Deficiency Borrowers and other Credit Parties.**

(a)   <u>Waiver of Jury Trial Right And Other Matters</u>.   DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH HEREBY WAIVES (i) ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY, WHICH WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE; (ii) PRESENTMENT, DEMAND AND PROTEST, AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NONPAYMENT, MATURITY, RELEASE WITH RESPECT TO ALL OR ANY PART OF THE OBLIGATIONS OR ANY COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY ANY LENDER PARTY ON WHICH DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER SUCH LENDER PARTY MAY DO IN THIS REGARD; (iii) NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF THE COLLATERAL, THE OTHER COLLATERAL OR ANY BOND OR SECURITY THAT MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING ANY LENDER PARTY TO EXERCISE ANY OF THEIR RESPECTIVE RIGHTS AND REMEDIES; (iv) <u>SUBJECT TO</u> THE ~~BENEFIT~~<u>TERMS</u> OF ~~ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS AND ALL RIGHTS WAIVABLE UNDER ARTICLE 9 OF THE NEW YORK UCC; (v)~~<u>ANY TRANSACTION DOCUMENT,</u> ANY RIGHT DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY MAY HAVE UPON PAYMENT IN FULL OF THE OBLIGATIONS TO REQUIRE ANY LENDER PARTY TO TERMINATE ITS SECURITY INTEREST IN THE COLLATERAL, OTHER COLLATERAL OR IN ANY OTHER PROPERTY OF DEFICIENCY BORROWERS OR ANY OTHER CREDIT PARTY UNTIL TERMINATION OF THE FINANCING AGREEMENT IN ACCORDANCE WITH ITS TERMS AND THE EXECUTION BY DEFICIENCY BORROWERS, AND BY ANY PERSON WHO PROVIDES FUNDS TO DEFICIENCY BORROWERS THAT ARE USED IN WHOLE OR IN PART TO SATISFY THE OBLIGATIONS, OF AN AGREEMENT INDEMNIFYING ANY OR ALL OF THE LENDER PARTIES FROM ANY LOSS OR DAMAGE ANY SUCH PARTY MAY INCUR AS THE RESULT OF DISHONORED CHECKS OR OTHER ITEMS OF PAYMENT RECEIVED BY SUCH LENDER PARTY FROM ANY DEFICIENCY BORROWERS, OR ANY ACCOUNT DEBTOR AND APPLIED TO THE OBLIGATIONS AND RELEASING AND INDEMNIFYING, IN THE SAME MANNER AS DESCRIBED IN SECTION 6 OF THIS AGREEMENT, THE RELEASEES FROM ALL CLAIMS ARISING ON OR BEFORE THE DATE OF SUCH TERMINATION STATEMENT; AND (~~v~~<u>i</u>v) NOTICE OF ACCEPTANCE HEREOF, AND DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH

A-1261

ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO AGENT'S AND THE OTHER LENDER PARTIES' ENTERING INTO THIS AGREEMENT AND THAT SUCH PARTIES ARE RELYING UPON THE FOREGOING WAIVERS IN THEIR FUTURE DEALINGS WITH DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES. DEFICIENCY BORROWERS AND THE OTHER CREDIT PARTIES EACH WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**SECTION 24.**        **Assignments; No Third -Party Beneficiaries**. This Agreement shall be binding upon and inure to the benefit of Deficiency Borrowers, the other Credit Parties, the Lender Parties and their respective successors and assigns; provided, that neither Deficiency Borrowers nor any other Credit Party shall be entitled to delegate any of its duties hereunder or to assign any of its rights or remedies set forth in this Agreement without the prior written consent of Agent in its sole discretion. No Person other than the parties hereto, and in the case of Section 6 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Releasees under Section 6 hereof) are hereby expressly disclaimed.

**SECTION 25.**        **Final Agreement**. This Agreement, the Loan Agreement, the other Transaction Documents, and the other written agreements, instruments, and documents entered into in connection therewith (collectively, the "Borrower/Lender Documents") set forth in full the terms of agreement between the parties hereto and thereto with respect to the subject matter thereof and are intended as the full, complete, and exclusive contracts governing the relationship between such parties with respect to the subject matter thereof, superseding all other discussions, promises, representations, warranties, agreements, and understandings between the parties with respect thereto. Except as provided therein, no term of the Borrower/Lender Documents may be modified or amended, nor may any rights thereunder be waived, except in a writing signed by the party against whom enforcement of the modification, amendment, or waiver is sought. Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Agent's or any Lender's exercise or failure to exercise any rights or remedies under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights and remedies in any other instances. There are no oral agreements among the parties hereto.

[Signature pages to follow]

23

A-1262

IN WITNESS WHEREOF, this First Forbearance Agreement and Fifth Amendment to Loan Agreement has been executed by the parties hereto as of the date first written above.

### [SIGNATURES TO BE UPDATED]

_____,          _____,
as a Deficiency Borrower                              as Credit Party

By: _____          By: _____

Name: _____          Name: _____

Its: _____          Its: _____

A-1263

A-1264

_____,
as Agent and a Lender

By: _____

Name: _____

Title: _____

_____,

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-1265

as a Lender[213]

By: _____

Name: _____

Title: _____

---

[213] NTD: to be updated to include the Leadenhall Affiliates from the Term Sheet.

SIGNATURE PAGE TO
FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

A-1266

## **EXHIBIT A**

### (Specified Defaults)

Facility Events of Default

1. The Administrative Agent declares that a Facility Event of Default has occurred and is continuing under Section 7.01(c) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach of Parties' Agreements delivered to the Guarantor, SPLCSS Borrower, and Dorchester Borrower on November 29, 2023 and attached hereto as Exhibit A-1 and incorporated herein (the "Notice of Breach").[a14]

2. Certain Facility Events of Default have occurred and are continuing under Section 7.01(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Facility Events of Default have occurred and are continuing under Section 7.01(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for 30 days after the applicable Distribution therefor.

4. A Facility Event of Default has occurred and is continuing under Section 7.01(d) of the Master Loan Agreement as a result of the security interest created pursuant to Section 2.15 of the Master Loan Agreement ceasing to be a valid and perfected first priority security interest in the Collateral.

5. A Facility Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC falling below $75,000,000.

Borrower Group Events of Default

1. The Administrative Agent declares that a Borrower Group Event of Default has occurred and is continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

---

[a14] As of February 29, 2024, the Borrowing Base Deficiency exists in the estimated amount of at least $300 million with respect to the SPLCSS Borrower and at least $44 million with respect to the Dorchester Borrower.

A-1267

2. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(a)(ii) of the Master Loan Agreement as a result of the Borrowers' and/or Servicers' failure to deliver Compliance Certificates on or prior to certain Distribution Dates, and the continuance of such failures for two Business Days after the applicable Distribution Dates therefor.

3. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(b)(ii) of the Master Loan Agreement as a result of the failure of certain Borrowers to pay interest on the Distribution Date for which it became due and payable in violation of Section 2 of the Master Loan Agreement, and the continuance of such failures for two Business Days after the applicable Distribution therefor.

4. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(d) of the Master Loan Agreement as a result of (a) each Borrower's failure to provide an annual audited financial statement of such Borrower and the Related Seller within 150 days after the end of the fiscal years ended December 31, 2021 and December 31, 2022, in violation of Section 5.01(i)(iii) of the Master Loan Agreement, (b) the Insurety Borrower executing a loan agreement with Balanced Management and incurring debt which is not permitted pursuant to the Master Loan Agreement or other Transaction Documents in violation of Section 5.01(o) of the Master Loan Agreement, and (c) the Insurety Borrower's failure to obtain updated actuarial models and persistency rates on an annual basis for the fiscal years ended December 31, 2021 and December 31, 2022 in violation of Section 5.01(x) of the Master Loan Agreement.

5. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.02(e) of the Master Loan Agreement as a result of the Borrowers' failure to pay interest on outstanding Debt in a principal amount of at least $25,000 in the aggregate when due and payable, in violation of Section 2 of the Master Loan Agreement.

6. Certain Borrower Group Events of Default have occurred and are continuing under Section 7.01(g) of the Master Loan Agreement as a result of the Borrowing Base Deficiency and other material breaches set forth in the Notice of Breach.

A-1268

**EXHIBIT A-1**

Notice of Breach

A-1269

**EXHIBIT A-2**

March 12 Notice

A-1270

**EXHIBIT A-3**

March 15 Notice

A-1271

**EXHIBIT B**

Account Control Agreement Trigger Notices

A-1272

## **SCHEDULE 1**

### 777 & 600 Affiliates

JARM Capital LLC
MTCP LLC
SuttonPark Acquisition LLC
SPA II LLC
Nutmeg Acquisition LLC
F3EA Holdings LLC
SuttonPark Capital LLC
Trans Atlantic Lifetime Mortgages LTD

A-1273

**SCHEDULE 5(i)(iv)**

777 Preferred Unit Redemption Rights

A-1274

**SCHEDULE 7(c)**

Consents

A-1275

**SCHEDULE 7(i)**

Eligible Existing Collateral

A-1276

## SCHEDULE 8

### Post-Closing Obligations[415]

1. As soon as possible, but no later than April 26, 2024 (or such longer period as the Agent may agree in its sole discretion), the Credit Parties shall use commercially reasonable efforts to obtain the consents necessary to deliver to the Agent, in form and substance satisfactory to the Agent and Lenders in their sole discretion the following:

    a. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by JARM Capital LLC;

    b. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by MTCP LLC;

    c. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by 777 Partners;

    d. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by 600 Partners;

    e. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by SuttonPark Acquisition LLC;

    f. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by; SPA II LLC;

    g. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by Nutmeg Acquisition LLC;

    h. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by F3EA Holdings LLC;

    i. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by SuttonPark Capital LLC;

    j. Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by Trans Atlantic Lifetime Mortgages LTD;

    k. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Wander, pledging 100% of the equity of JARM Capital LLC;

    l. Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Pasko, pledging 100% of the equity of MTCP LLC;

---

[415] NTD: 777 to confirm identify of pledgors and if any other pledges are necessary.

A-1277

m.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by JARM Capital LLC, pledging 100% of the equity of SuttonPark Acquisition LLC;

n.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by SuttonPark Acquisition LLC, pledging 100% of the equity of 777 Partners;

o.  Each Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by Pasko and MTCP LLC, pledging 100% of the equity of SPA II LLC, in the aggregate;

p.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by SPA II LLC, pledging 100% of the equity of 600 Partners;

q.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by [_____], pledging 100% of the equity of Nutmeg Acquisition LLC;

r.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by 777 Partners, pledging 100% of the equity of F3EA Holdings LLC;

s.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by 600 Partners, pledging 100% of the equity of SuttonPark Capital LLC;

t.  Pledge Agreement in favor of the of the Agent for the benefit of the Lenders executed by ~~SuttonPArk~~SuttonPark Capital LLC, pledging 100% of the equity of Trans Atlantic Lifetime Mortgages LTC; and

u.  any other document necessary or otherwise requested by Agent to effectuate the terms of this Agreement.

A-1278

Document comparison by Workshare 10.0 on Tuesday, March 26, 2024 6:52:19 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\JonathanWalder\OneDrive - 777 Partners\Documents\Leadenhall\3-25-2024 forbearance\777 - Forbearance Agreement (K&S Draft 3_23_24).doc |
| Description | 777 - Forbearance Agreement (K&S Draft 3_23_24) |
| Document 2 ID | file://C:\Users\JonathanWalder\OneDrive - 777 Partners\Documents\Leadenhall\3-25-2024 forbearance\777 - Forbearance Agreement (K&S Draft 3_23_24) (777 comments).doc |
| Description | 777 - Forbearance Agreement (K&S Draft 3_23_24) (777 comments) |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 114 |
| Deletions | 73 |
| Moved from | 5 |
| Moved to | 5 |

A-1279

| Style changes | 0 |
|---|---|
| Format changes | 0 |
| Total changes | 197 |

A-1280

# EXHIBIT 13

A-1281

## Contact

www.linkedin.com/in/jorgeberuff
(LinkedIn)

## Top Skills

Private Equity
Valuation
Finance

## Languages

Spanish
English

# Jorge Beruff

Investment Professional

Miami Beach, Florida, United States

## Experience

**26North**
Partner
July 2023 - January 2024 (7 months)
Miami, Florida, United States

**Private Family Office**
Managing Director
May 2017 - May 2023 (6 years 1 month)
Miami/Fort Lauderdale Area

Private equity investments in insurance, fintech, and specialty finance

**GE Capital**
Vice President, Leveraged Finance Capital Markets / Franchise Finance
2014 - 2016 (2 years)
New York City

Structured and syndicated senior cash flow loans for sponsor-owned franchisors and franchisees of restaurants, fitness clubs, and limited service hotels. Specialized in middle market loans supporting leveraged buyouts, recapitalizations, store acquisitions, and new store development

**J.P. Morgan**
Investment Banking Associate, Leveraged Finance / Restructuring
2012 - 2014 (2 years)
New York City

Originated, structured, underwrote and syndicated leveraged loans and bonds for distressed companies nearing or emerging from bankruptcy

**Jumia**
Business Development Consultant
June 2012 - July 2012 (2 months)
Lagos, Nigeria

www.jumia.com

A Rocket Internet company, Jumia is Nigeria's largest online shopping store

Page 1 of 3

A-1282

Launched June 2012

Head of Product Purchasing, Human Resources, and Office Real Estate

University of Pennsylvania - The Wharton School
Wharton MBA Candidate
2010 - 2012 (2 years)
Greater Philadelphia Area

J.P. Morgan
Investment Banking MBA Summer Associate, Leveraged Finance / Restructuring
June 2011 - August 2011 (3 months)
New York City

- Originated, structured, underwrote and syndicated leveraged loans and bonds for distressed companies nearing or emerging from bankruptcy

- Received and accepted full-time offer

ING
Analyst, Acquisition Finance
January 2008 - June 2010 (2 years 6 months)
New York City

- Underwrote senior debt financing supporting middle market private equity sponsored acquisitions

- Manager of $240mm large-cap sponsor leveraged loan portfolio

Brown Brothers Harriman
Credit Analyst, International Risk Analysis
July 2006 - December 2007 (1 year 6 months)
New York City

- Evaluated credit quality of investment fund custody clients

———

## Education

University of Pennsylvania - The Wharton School
MBA, Finance & Entrepreneurial Management · (2010 - 2012)

A-1283

University of Pennsylvania

Bachelor of Arts - BA · (2002 - 2006)

A-1284

# EXHIBIT 14

A-1285

## Contact

www.linkedin.com/in/juan-arciniegas-40a61616 (LinkedIn)

## Top Skills

Private Credit

Sports Business

Private Equity

## Languages

Portuguese (Professional Working)

Spanish (Native or Bilingual)

Italian (Elementary)

French (Full Professional)

English (Native or Bilingual)

# Juan Arciniegas

Managing Director at Ares Management

Miami, Florida, United States

## Summary

Juan Arciniegas is an investment professional focused on a combination of investing activities, business building and operations.

In his capacity as an investor, he has covered a variety of sectors including sports, media & entertainment, financial technology, SaaS, specialty finance, litigation funding, consumer & commercial finance and aviation, and has experience investing across the capital structure.

In his capacity as an operator, he has served as interim CFO and COO at portfolio companies as well as on various boards of directors.

———

## Experience

**Ares Management Corporation**

Managing Director

December 2023 - Present (9 months)

Miami, Florida, United States

**Fz Sports**

Board Member | CFO & COO | Advisor

June 2019 - December 2023 (4 years 7 months)

Miami, Florida, United States

FZ Sports is a global technology company dedicated to connecting sports fans with the content they love. Our mission is to leverage new technologies and innovative business models to optimize the sports value chain, reinventing the way rights holders, brands and fans connect and engage with each other, and our goal is to build the world's premiere digital destination for viewing, engaging with and monetizing sports content.

**Vasco da Gama SAF**

Board Member

September 2022 - May 2023 (9 months)

A-1286

Rio de Janeiro, Brazil

## Standard de Liège
Board Member
April 2022 - May 2023 (1 year 2 months)
Belgium

## Red Star FC ✪
Board Member
April 2022 - May 2023 (1 year 2 months)
Paris, Île-de-France, France

## Genoa Cricket and Football Club S.P.A.
Board Member
November 2021 - May 2023 (1 year 7 months)
Italy

## Atalanta Media
Board Member
August 2020 - May 2023 (2 years 10 months)
Miami, Florida, United States

## 1190 Sports
Board Member
December 2019 - May 2023 (3 years 6 months)
Miami, Florida, United States

## ML Healthcare
Board Member
September 2017 - January 2023 (5 years 5 months)
Greater Atlanta Area

ML Healthcare addresses the critical gap that occurs when an injury victim does not have sufficient access to healthcare. The company provides injured clients access to a network of healthcare providers and funds the cost so they can receive treatment right away.

## Family Office
Managing Director
August 2016 - December 2022 (6 years 5 months)
Miami, Florida, United States

A-1287

Investment firm focused on building companies and acquiring mature businesses primarily in the Sports, Media & Entertainment, FinTech, Financial Services, Software and Aviation sectors globally.

Responsibilities include:

- Sourcing, evaluating and executing investment opportunities as well as capital markets transactions
- Managing and monitoring operations and performance of portfolio companies

### Flair Airlines
Board Member
January 2019 - April 2022 (3 years 4 months)
Edmonton, Canada Area

Flair is the only independent and operating pure play ultra low cost carrier ("ULCC") in Canada, flying across Canada and to a few locations in the United States. www.flyflair.com

### Bank of America Merrill Lynch
Vice President Investment Banking - Financial Sponsors Group
August 2012 - September 2016 (4 years 2 months)
New York, NY

Provide acquisition financing and advisory to top-tier private equity firms across a broad range of industries. Draft marketing materials for debt syndications (both bank and bond) and M&A processes. Lead investor calls with top tier institutional investors as part of the debt syndication process.

- Global experience across a broad range of industries including Software, Consumer & Retail, Healthcare, Media & Telecom, Energy, Gaming and Financial Institutions.
- Experience executing Leveraged Buyouts, Mergers & Acquisitions, Refinancings, Dividend Recapitalizations, IPOs and Equity Follow-On Offerings, Repricings, and Capital Markets analysis
- Provided advisory services on Leveraged Finance, Mergers & Acquisitions, Equity Capital Markets, Structured Finance and Corporate Operations Analysis for private equity-owned companies

### Credit Suisse
AVP - Leveraged Finance Capital Markets
October 2009 - May 2010 (8 months)
New York, NY

### Bank of America Merrill Lynch

A-1288

Analyst - Leveraged Finance Capital Markets
July 2007 - October 2009 (2 years 4 months)
New York, NY

---

## Education

### Duke University - The Fuqua School of Business
MBA, Corporate Finance and Investments · (2010 - 2012)

### Rensselaer Polytechnic Institute
Bachelor in Science, Industrial & Management Engineering, Economics

### Universidad de Los Andes
Exchange Student, Industrial Engineering

### Université Paris-Sorbonne
Art & French History

A-1289

# EXHIBIT 15

A-1290

## Contact

www.linkedin.com/in/aaron-levy-41833421 (LinkedIn)

## Top Skills

Financial Modeling
Bloomberg
Restructuring

# Aaron Levy

Managing Director - Monroe Capital Opportunistic Credit
Miami, Florida, United States

## Experience

**Monroe Capital LLC**
Managing Director
May 2024 - Present (4 months)
Miami, Florida, United States

**Uown Leasing**
Board Member
February 2020 - Present (4 years 7 months)
Tampa, Florida

**Family Office**
Managing Director
March 2018 - May 2024 (6 years 3 months)
Miami, Florida, United States

$10b Family Office with expertise in financial services that specializes in control investments across a broad array of industries and geographies. The firm employs proprietary capital and management friendly structures to capitalize on opportunities quickly and creatively to maximize long term value. To date the Family Office has deployed capital across various verticals including financial technology, software, insurance, consumer finance, litigation finance, aviation, media, sports & entertainment as well as special opportunities.

**Comvest Partners**
4 years 10 months

Vice President
March 2017 - March 2018 (1 year 1 month)
West Palm Beach, Florida Area

Senior Associate
March 2015 - March 2017 (2 years 1 month)

Associate
June 2013 - March 2015 (1 year 10 months)

A-1291

Raymond James
Investment Banking Analyst
July 2010 - June 2013 (3 years)

Analyst in Restructuring & Recapitalization Investment Banking

Raymond James & Associates, Inc
Summer Analyst
June 2009 - August 2009 (3 months)

Ballast Point Ventures
Summer Analyst
June 2008 - August 2008 (3 months)

———

## Education

The Wharton School
B.S. Economics, Finance and Accounting · (2006 - 2010)

A-1292

# EXHIBIT 16

A-1293

## Contact

www.linkedin.com/in/lenz-balan-10507b3 (LinkedIn)

## Top Skills

Entrepreneurship

Term Sheets

Deal Flow

# Lenz Balan

President - London Lions Basketball Club | Investments | Sports Media & Entertainment

London, England, United Kingdom

## Experience

**London Lions**
President
March 2024 - Present (6 months)

**Miami Based Family Office**
Principal Investing
July 2018 - July 2024 (6 years 1 month)
London Area, United Kingdom

**Balan Capital**
Business Development - Private Equity/Debt
July 2016 - July 2018 (2 years 1 month)
Greater New York City Area

**Morgan Stanley**
Investment Banking
June 2014 - 2016 (2 years)
New York, New York

**Industrial Revolution II**
Chief Financial Officer, Socially Responsible Manufacturing Start-up
February 2012 - June 2014 (2 years 5 months)
Port-au-Prince, Haiti

**York Street Capital**
Private Debt - Principal Investing
August 2006 - December 2010 (4 years 5 months)

**Credit Suisse**
Investment Banking
2004 - 2006 (2 years)
Leveraged Finance /  Financial Sponsors

Page 1 of 2

A-1294

The Posse Foundation
Almum
2000 - 2004 (4 years)

———

# Education

### Bowdoin College
AB, American Government · (2000 - 2004)

### Boston College High School
· (1996 - 2000)

A-1295

1

OA2VLEAO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEADENHALL CAPITAL PARTNERS
    LLP, et al.,
4
                    Plaintiffs,
5
            v.                          24 Civ. 03453 (JGK)
6
    NATIONAL FOUNDERS LP,
7
                    Movant,
8           v.

9   JOSH WANDER, et al.,

10                  Defendants.         Argument & Decision

11  ------------------------------x
                                        New York, N.Y.
12                                      October 2, 2024
                                        3:15 p.m.
13
14  Before:

15                  HON. JOHN G. KOELTL,

16                                      District Judge

17                      APPEARANCES

18  KING & SPALDING LLP
        Attorney for Plaintiff
19  BY:  LEIGH M. NATHANSON
        BRIAN K. DONOVAN
20      MICHAEL S. TAINTOR

21  SIDLEY AUSTIN LLP
        Attorney for Movant Nat. Founders
22  BY:  NICHOLAS P. CROWELL

23  SMITH GAMBRELL & RUSSELL LLP
        Attorney for Defendant 777 Partners (entities)
24  BY:  DAVID A. PELLEGRINO
        JOHN G. McCARTHY, SR.

25

A-1296

2

OA2VLEAO

1                          APPEARANCES (continued)

2

CADWALADER WICKERSHAM & TAFT LLP
3       Attorney for Defendant Advantage Cap. and King
BY:  JONATHAN M. WATKINS
4        MATTHEW M. KARLAN
         MICHAEL E. PETRELLA
5

MORGAN LEWIS & BOCKIUS LLP
6       Attorneys for Intervenor ING
BY:  STEPHAN E. HORNUNG
7

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
8       Attorneys for Defendant Pasko
BY:  JENNA JONES
9

KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
10      Attorney for Defendant Wander
BY:  JORDAN L. ESTES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1297

OA2VLEAO

1          (Case called)

2          THE DEPUTY CLERK:  Will all parties please state who

3   they are for the record.

4          MS. NATHANSON:  Good afternoon, your Honor.

5          This is Leigh Nathanson from King & Spalding, for

6   plaintiffs Leadenhall.  And I'm here with my colleagues Brian

7   Donovan and Michael Taintor.

8          MR. McCARTHY:  Good afternoon, your Honor.

9          John McCarthy from Smith, Gambrell & Russell, LLP,

10  with David Pellegrino, on behalf of the 777 entity defendants.

11         MR. WATKINS:  Good afternoon, your Honor.

12         Jonathan Watkins with Cadwalader, Wickersham & Taft.

13  I'm here today with my partners Matthew Karlan and Michael

14  Petrella, on behalf of Advantage Capital and Mr. Kenneth King.

15         MS. ESTES:  Good afternoon, your Honor.

16         Jordan Estes from Kramer Levin, on behalf of

17  Mr. Wander.

18         MS. JONES:  Good afternoon.  Jenna Jones from Morvillo

19  Abramowitz, on behalf of Steven Pasko.

20         THE COURT:  Good afternoon.

21         MR. HORNUNG:  Good afternoon, your Honor.

22         Stephan Hornung — Morgan, Lewis & Bockius — for

23  intervenor ING Capital.

24         MR. CROWELL:  Nick Crowell from Sidley Austin, for

25  intervenor National Founders.

A-1298

4

OA2VLEAO

1          THE COURT:  Okay.  Good afternoon, all.

2          I know people personally, professionally, at many of

3     your firms.  Nothing about that affects anything that I do in

4     the case.

5          This is a motion for reconsideration, although I know

6     that I got some recent correspondence about developments,

7     including the litigation in Florida and possible transactions

8     that the parties are discussing.  If anyone wants to address

9     those, they certainly can, but the issue before me is the

10    motion for reconsideration.

11         So I'll listen to argument on that.

12         Mr. Watkins.

13         MR. WATKINS:  Thank you, your Honor.

14         If I may address the Court from the podium.

15         THE COURT:  Sure.

16         MR. WATKINS:  Your Honor, the scope of federal courts'

17    authority to preliminarily restrain assets is focused on the

18    assets.

19         THE COURT:  I'm sorry, focused on?

20         MR. WATKINS:  On the assets, ask questions with

21    respect to the assets.  That is to say the law from *Grupo*

22    *Mexicano* to *Gucci* and all of the district court opinions from

23    this circuit since then ask whether the movant has a lien or

24    equitable interest in the particular assets that the movant

25    seeks to restrain.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1299

OA2VLEAO

1          So what matters is not whether a lender has a security

2     interest or an equitable interest, but which assets are

3     collateral and which are not; which assets are those in which

4     they may have an equitable interest and which are not.

5          Starting first with Leadenhall's security interest, it

6     agrees that it has a lien only on its collateral, that is to

7     say the borrowers' assets.  It acknowledges that it has no lien

8     on any other assets, including the assets of the guarantors.

9     So the Court does have the authority to restrain the

10    collateral.  It does not, at least based on the lien, have the

11    power to restrain any other asset.

12         At the TRO stage, the Court, based on Leadenhall's

13    arguments, distinguished *Grupo Mexicano* on the basis that

14    there, the creditor was an unsecured creditor.  Here, of

15    course, Leadenhall is a secured creditor.  And that's true.

16    That is a difference between *Grupo Mexicano* and here.

17         And so the outcome, the Court's authority, is

18    different too.  In *Grupo Mexicano*, there was no authority based

19    on any lien to restrain any asset whatsoever.  Here, the Court

20    does have the authority to restrain assets.  It does.  But only

21    to the extent of Leadenhall's lien, only to the extent of

22    Leadenhall's collateral.

23         There is no case — we have searched for them, have not

24    found them; Leadenhall cites none.  There is no case where a

25    court preliminarily restrained based on a lien assets other

A-1300

6

OA2VLEAO

1    than those over which a movant had a lien.  So it is an

2    asset-focused question, not a question of whether there is a

3    lien over any asset.

4           THE COURT:  Well, *Grupo Mexicano* was based upon the

5    Supreme Court's understanding of what the limits were for the

6    High Court of Chancery in 1789.  And they faced a situation

7    where there was an unsecured creditor who sought to restrain

8    assets.  And they said that was beyond the jurisdiction of a

9    court of equity in 1789.

10          You say there's no case where a court has gone beyond

11   the scope of a lien or equitable interest.  But, of course,

12   that ignores the cases which talk about what do you do when

13   there is a mixed question of law and equity, which doesn't

14   limit the scope of a court's power.

15          But rather than phrasing the question as you've

16   phrased it, Leadenhall would phrase the question somewhat

17   differently.  They say there is no case similar to this where

18   you have a secured lender and a guaranty of that security, a

19   guaranty of performance to put up the adequate security, as

20   well as the security itself.  There is no case, they say, where

21   a court has found that a federal court these days doesn't have

22   that power.

23          And, of course, in your brief you cite no such case.

24   And you can respond in a moment if there is any such case, but

25   in order to establish the lack of the Court's power, don't you

A-1301

7

OA2VLEAO

1  have to do the historical inquiry of what was the limit of a

2  court of equity or the High Court of Chancery in 1789?  And

3  there's no historical analysis in the briefs at all.  It would

4  raise questions such as ancillary jurisdiction, scope of the

5  Court's power.  It's plain that when you have a secured

6  creditor, it's a different situation from the situation that

7  was faced in *Grupo Mexicano*.

8          So two initial questions:

9          First, is there any case where you have a secured

10  lender and a guaranty of that security, where the court has

11  found that the court had no power to issue the injunction that

12  it issued?

13          And the second question is, is there any historical

14  analysis in the brief that informs the Court about what the

15  situation was in 1789?  Questions.

16          MR. WATKINS:  To the first question, the *Bank of*

17  *America* case, the *Won Sam Yi* case, is a case much like this

18  one.  There, actually, the secured guarantor posted additional

19  collateral of his own.

20          Now, there, there's a distinction, right.  The

21  plaintiff there did not ask for a restraint of assets beyond

22  the collateral.  But the court made a point of saying that

23  that's a good thing.  And we could not restrain assets outside

24  of the scope of the collateral.  I think that is very evident

25  from the *Won Sam Yi* case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1302

OA2VLEAO

1    There, the court enjoined only conduct substantially

2    impairing the value of any and all of the collateral.

3    THE COURT:  It wasn't asked to do anything else.

4    MR. WATKINS:  It wasn't asked to do anything else, and

5    yet it made a point in its opinion of saying that that was the

6    extent of the appropriate ask.

7    THE COURT:  I would have thought that the cause isn't

8    great support for you because initially the defendants in this

9    case resisted any injunction on the basis of *Grupo Mexicano*.

10   Can't do it, I was told.  *Grupo Mexicano*.

11   Now you say, Well, not quite right.  You can do it to

12   the extent of the collateral according to the district court in

13   it *Won Sam Yi*.  So question still -- and there was no issue of

14   a guaranty of performance in that case, right?  So the question

15   remains, any comparable case and what was the law in 1789.

16   MR. WATKINS:  The *Bank of America* case is a comparable

17   case, your Honor.  There, the assets were identified with

18   particularity.  They were receivables and they were equipment

19   on a floor.  And they were inventoried and identified with

20   particularity, and only those assets which were collateral were

21   enjoined.  And the court made a point of saying --

22   THE COURT:  Was there any guaranty that was at issue?

23   MR. WATKINS:  Yes.  There was a secured guaranty where

24   Dr. Won Sam Yi pled additional collateral of his own.  And the

25   only assets that were enjoined was the particular collateral,

A-1303

9

OA2VLEAO

1  was the particular collateral that was identified in that case.

2          I will say too that every case that has considered the

3  question has been very careful too when dealing with a

4  lien-based restraint on assets, only restrain assets on which

5  the movant has a security interest.

6          So in the *Quantum* case, for example, from this Court

7  in 2001, the Court enjoined only a portion of the receivables

8  that were -- that had been pledged by the borrowers as

9  collateral.  The specific funds — Court's words.  Specific

10 funds in which plaintiff possessed a security interest.

11         There were many --

12         THE COURT:  There are cases which affirm the

13 injunction with respect to collateral.  But in each of the

14 cases that you've cited, including *Bank of America*, the court

15 doesn't say, Oh, there's a guaranty and I have no authority

16 under *Grupo Mexicano* to reach the guaranty of performance.

17         MR. WATKINS:  Your Honor, the performance issue I'm

18 happy to address separately.  I think whether it's a guaranty

19 or the borrower itself, the same obligor.  The question is what

20 assets may the Court restrain.

21         THE COURT:  No, but it was a simple -- it was a simple

22 question.  The plaintiff alleges that there is no case which

23 says that the Court lacks the authority over a guarantor's

24 guaranty of performance of the underlying security interest.

25 And you so far haven't pointed to that case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1304

10

OA2VLEAO

1      MR. WATKINS:  Your Honor, you are right.  With all of

2  those requirements, right, that there has to be a guarantor, it

3  has to hold that you cannot do it, yes, there's no such case

4  that does that.  But there are many, many cases that stand for

5  propositions that get to the same place, which is to say that

6  the limit of the Court's authority is on the assets on which a

7  plaintiff has a lien or an equitable interest.  And every case

8  places the limits of the Court's authority exactly there.  No

9  case has --

10     THE COURT:  That certainly goes beyond what *Grupo*

11  *Mexicano* said, and goes beyond the situation in *Grupo Mexicano*,

12  where you simply had an unsecured creditor and the court was

13  concerned about preferring one unsecured creditor to another.

14  And that's what led the court to the exploration of what the

15  law was in 1789.

16     So is there any exploration in the brief about what

17  the limits of a court of the High Court of Chancery was in 1789

18  with respect to issues such as ancillary relief?

19     MR. WATKINS:  Your Honor, our brief obviously does not

20  do our own analysis --

21     THE COURT:  Why do you say it's obvious?  I would have

22  thought that there would be -- if you're going to say that the

23  case is controlled by *Grupo Mexicano*, there would have been

24  some exploration about what the law was with respect to this

25  situation in 1789.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OA2VLEAO

1        Go ahead.

2        MR. WATKINS:  Your Honor, it's not controlled just by

3    *Grupo Mexicano*.  Other cases too, like *Gucci*, a Second Circuit

4    case, controls as well.  And the Second Circuit is very clear

5    that the limits of the Court's power are as defined

6    historically, right.  And we don't go back and go look into the

7    research and figure out what was there in 1789 independently;

8    we rely on other cases that have done that and build on those

9    cases.

10        And those cases, *Gucci*, the controlling case, says

11    that when it comes to an equitable interest, you need to bring

12    a final claim for equitable relief over specific assets, and

13    the requested preliminary restraint on assets needs to be

14    ancillary to that requested final relief.  None of that is

15    present here, and *Gucci* most certainly controls.

16        There are cases, including cases from this Court, that

17    have said that *Gucci* controls and a lien is no longer a valid

18    basis at all to issue a preliminary restraint.  We don't

19    advance that argument; we don't go that far.  We take no

20    position on that.  What we do take a position --

21        THE COURT:  I'm sorry.  You take no position on?

22        MR. WATKINS:  On whether it's appropriate at all to

23    restrain assets based on a lien.  There is a split among

24    district courts — this Court, opinions of this Court — about

25    whether a lien is ever, after *Gucci*, a proper basis to restrain

A-1306

OA2VLEAO

1    assets.

2            THE COURT:  *Grupo Mexicano* itself referred to lien or

3    equitable interest.  How could there be a doubt as to the

4    ability to restrain assets based on a lien?

5            MR. WATKINS:  Those cases cite *Gucci* and say that

6    there needs to be an equitable interest.

7            THE COURT:  *Grupo Mexicano* said lien or equitable

8    interest.

9            MR. WATKINS:  It does.  It is not a case in which, of

10   course, there is a lien and an injunction is based on the lien.

11   I do not advocate for those cases.  But multiple courts from

12   this circuit, including this Court, the Eastern District in

13   June, I believe, of this year has held, after *Gucci*, that there

14   needs to be an equitable interest.  Equitable relief, there

15   needs to be an equitable interest, despite the language of lien

16   or equitable interest from *Grupo Mexicano*, accounting for *Great*

17   *Western Life* in 2002, accounting for *Gucci* more recently.

18   Those cases have held that there needs to be an equitable

19   interest; a lien isn't good enough.

20           THE COURT:  How do you define "equitable interest"?

21           MR. WATKINS:  An equitable interest here is a term of

22   art, your Honor.  It means that the movant needs to bring a

23   claim for final equitable relief over particular assets, and

24   the preliminary restraint needs to be ancillary to that

25   equitable interest.  It is not.  It is not, as Justice

13

OA2VLEAO

1   Ginsburg, writing for the dissent in *Grupo*, for example, would

2   have had.  It is not something that goes to general equitable

3   ideals.  Rather, as *Gucci*, reaffirmed, from the Second Circuit

4   reaffirmed, the other approach took hold, that is to say, it is

5   set in stone the scope of -- in 1789 of the English Court of

6   Chancery.

7           THE COURT:  Justice Ginsburg would have allowed the

8   injunction in *Grupo Mexicano* without any lien.  True?

9           MR. WATKINS:  I believe that's right, your Honor.

10          THE COURT:  *Grupo Mexicano* was 5-4.  Justice Ginsburg

11  wrote for the dissent and said that the court was simply wrong

12  on its interpretation of the equitable powers of federal courts

13  after the merger of law and equity.  So that definition of

14  equitable interest which you rely on would have answered this

15  question completely because Justice Ginsburg would have said

16  that the injunction in *Grupo Mexicano* was authorized.

17          MR. WATKINS:  Yes, your Honor.  Perhaps I was unclear.

18          If the point was what comprises an equitable interest

19  under the law, under *Gucci*, it is not something that is within

20  a trial court's discretion — any court's discretion or

21  speculation.

22          THE COURT:  What is it?

23          MR. WATKINS:  It is the relief that typically,

24  traditionally — two different cases use different words, both

25  from the Supreme Court.  Equitable relief typically or

A-1308

14

OA2VLEAO

1   traditionally had the power to grant.  And applied here, there

2   needs to be an equitable claim for final equitable relief over

3   specific assets to which the preliminary restraint is

4   ancillary.

5            So, for example --

6            THE COURT:  Hold on.  Hold on.

7            But you anchored that argument a few moments ago on

8   the basis of what Justice Ginsburg said in her dissent in *Grupo*

9   *Mexicano*.  And she would have affirmed the injunction to the

10  unsecured creditor in *Grupo Mexicano*, who was concerned about

11  the dissipation of assets by the debtor.  And she would have

12  said or she did say that the injunction in that case was

13  authorized under the court's equitable powers after the merger

14  of law and equity.

15           MR. WATKINS:  Your Honor, I believe I was misclear and

16  have confused matters.  I invoked Justice Ginsburg's dissent

17  with respect to the sentiment expressed about the grand aims of

18  equity, not about the outcome of that particular case.

19           THE COURT:  But how can you divide her sentiments to

20  her position with respect to what the appropriate outcome of

21  that case was?

22           MR. WATKINS:  I don't think Justice Ginsburg, writing

23  for a 5-4 justice dissent in *Grupo Mexicano* affects what the

24  Second Circuit in *Gucci* in 2014 has said what an equitable

25  interest is.  And while it is an interesting discourse, to be

A-1309

15

OA2VLEAO

1    sure, I believe that *Gucci* is very clear about what an

2    equitable interest is, and that might be the most direct way to

3    the answer.  *Gucci* says that the creditor must "pursue a claim

4    for final equitable relief" with respect to the particular

5    assets on which the restraint is sought.  And the preliminary

6    injunction must be ancillary to the final relief.  That's the

7    Second Circuit.

8              THE COURT:  The plaintiff in this case is, in fact,

9    seeking an injunction that relates to the amount of the

10   security interest it claims it has in the total of the

11   defaulted debt, which, in turn, is guaranteed as to performance

12   by the guarantor.  The TRO and the preliminary injunction were

13   both limited to that amount.  And that's the amount that the

14   plaintiff is seeking to restrain against dissipation.  No more.

15   Just that amount.

16             MR. WATKINS:  Your Honor, what the plaintiff seeks in

17   its complaint in the final paragraph of every claim for relief

18   is $609 million.  What the plaintiff seeks in the moving papers

19   on the TRO is to protect dissipation that would prevent their

20   client from being paid $609 million.

21             It stood out to me that when I reviewed the transcript

22   from June 7th, Ms. Nathanson even said in the context of

23   uncertainty about how much money 777 might have, is, Well, if

24   you have $609 million, I don't understand why you haven't paid

25   it to us.  And if 777 finds itself $609 million, I think it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-1310**

OA2VLEAO

1  very clear what Leadenhall asks for in this case.  It doesn't

2  ask for $609 million to be used to purchase replacement

3  collateral so that they may continue their business with 777.

4  No, it asks to be paid the $609 million.  So that is one

5  problem with the contractual equitable relief argument.

6  THE COURT:  But it asks for the preliminary

7  injunction, that that amount be restrained, so that it is

8  ultimately available.

9  MR. WATKINS:  To be paid.  Exactly so.  A contract

10  claim for money damages.  Exactly so, your Honor.

11  That is what they say in their moving papers, that's

12  what they say in the transcripts, that's what the complaint

13  makes very clear.

14  Now, the complaint also does say, We would like to

15  enjoin further violations of the LSA.

16  THE COURT:  And it seeks a declaratory judgment.

17  MR. WATKINS:  That is mentioned nowhere in

18  Leadenhall's papers, and it has certainly waived any argument

19  that any declaratory judgment is final equitable relief.  They

20  rely in their reply brief in the TRO on one thing for final

21  equitable relief.  They say they seek specific performance.

22  They don't.  And they don't contest now that they don't.  So

23  they recharacterized it.

24  And now they say, Well, actually, when we seek to

25  enjoin further breaches of this contract, what we're actually

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1311

17

OA2VLEAO

1  asking for in this complaint is a mandatory injunction to have

2  the defendants post $609 million of collateral.  Whether that's

3  the case or not, it is not evident to me that that is what that

4  final request to be enjoined from further breaches actually

5  seeks.

6        Many cases say that one cannot transform a claim at

7  law into one of equity by seeking to enjoin further breaches of

8  contract.  But more importantly, more importantly, this final

9  relief of performance, there is absolutely no obligation

10  anywhere in any of the contracts for borrowers or guarantors to

11  pledge collateral, replacement collateral or otherwise.  The

12  point is absolutely dispositive and it's a critically important

13  one.  They argue that in their brief, but that is not true.

14        The obligation is to pay the money back.  And there's

15  some others, too.  That's the obligation.

16        How is that obligation secured?  It's secured by

17  pledging of collateral, which happened simultaneously with

18  execution of the LSA.  One could look, for example, to ECF

19  178-2, the pledge agreement which Leadenhall didn't file, but

20  we did.  178-2, the second whereas clause:  Whereas, to secure

21  the obligations — obligations are to pay money.  To secure the

22  obligations, with a capital O, of the borrower under the loan

23  and security agreement, the pledgor has agreed to pledge all of

24  its right, title, and interest and so on, in the collateral.

25  The obligations are paying the money back.  Pledging the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1312

18

OA2VLEAO

1    collateral is something that secures the obligations.

2          Section 2.2, titled "Security for Obligations."

3    Again, the obligations, capital O, the performance of

4    obligations is what Leadenhall is after here, it says.

5    Obligations, capital O, is paying the money back.  The security

6    for those obligations is the pledge of collateral, which

7    happens by this pledge agreement and memorialized by this

8    pledge agreement and in the LSA itself.  In the LSA itself, it

9    says that borrower hereby grants a first-priority security

10   interest in the collateral.

11         So a deal was made.  I loan you money.  You'll pay me

12   back.  And in the meantime, I'll hold something of yours to

13   secure your obligation.  But the obligation — I don't mean you,

14   your Honor.  I'm sorry.

15         THE COURT:  No, no, I didn't take it that way.  I

16   wasn't -- I didn't imply you suggested that I would post $600

17   million.

18         MR. WATKINS:  It is a building block of

19   debtor/creditor law, and one that is followed here, that the

20   obligation is to pay the money back and the collateral is held

21   to secure that performance.  So the collateral is held to

22   secure the performance.

23         And so when Leadenhall says that a part of the

24   performance that guarantees guarantors guaranteed is to pledge

25   collateral, that's not right.  That's not right.

A-1313

19

OA2VLEAO

1          And even looking to the paragraphs of the LSA they

2     cite, some of them they didn't even file with the Court, but

3     none of them involve an obligation to pledge any collateral.

4     They cite Section 2.15.  That is where the collateral -- pardon

5     me.  The security interest is hereby granted.  Sections 7.01(c)

6     and 7.02(g), they say that a borrowing-based deficiency can

7     trigger an event of default.

8          So if there's not enough collateral, is there some

9     obligation of performance to go and post more?  No.  If there's

10    not enough, there is not.  There is absolutely not anywhere in

11    the contract any obligation to post more collateral.  Instead,

12    what the contract says, what the LSA says, is if you don't have

13    enough collateral, it is an event of default, which can trigger

14    various other things, including acceleration, which is what we

15    have here.

16         No obligation in 7.01(c) or 7.02(g) anywhere to pledge

17    sufficient collateral.  Even Leadenhall says "sufficient

18    collateral," not particular assets.  But that is a completely

19    separate point.

20         They cite 2.07.  2.07 of the LSA, your Honor, does not

21    obligate borrowers or guarantors either.  And for present

22    purposes, I don't think there needs to be any distinction

23    between borrowers and guarantors.  One could imagine that they

24    are exactly the same entity here.  There's nothing special

25    about there being a guarantor.  The question is about which

A-1314

20

OA2VLEAO

1    assets are pledged.  Section 2.07 gives the borrowers the right

2    at any time to prepay the loans in whole or in part without

3    penalty.  It doesn't obligate them to post-replacement

4    collateral.  That is just not true.  So this guaranty of

5    performance, there's no performance that involves posting

6    collateral at any point.

7            Section 5.01, they cite, 5.01(i), they cite, those are

8    further assurances about working with the collateral agent and

9    filing UCCs and so on.  And Leadenhall does not contest that

10   nowhere does it allege breach of that section.  They cite

11   Section 2(a) of the guaranty.  Nothing in that section says

12   anything about any supposed obligation to set aside sufficient

13   assets to secure Leadenhall's debt, contrary to what Leadenhall

14   argues.

15           So the guaranty of performance your Honor has

16   mentioned today and was a part of the ruling at the TRO, there

17   is no obligation whatsoever of borrowers or guarantors ever to

18   post additional collateral or make up collateral.  The

19   collateral was posted at the time, at the time the LSA was

20   signed.

21           Now, are there consequences if there isn't enough

22   collateral?  Yes, there are.  There are events of default.  But

23   never is a remedy for there being insufficient collateral an

24   obligation to post more.  That is nowhere in the contracts.

25   And so there is no contract claim -- even if they had sued for

A-1315

21

OA2VLEAO

1    specific performance of that performance, there is nothing

2    whatsoever in the LSA, the guaranty or elsewhere, about posting

3    collateral.

4          I strayed for a moment when I mentioned sufficient

5    assets as opposed to particular assets.  Even the *Great Western*

6    *Life* case, the Supreme Court case, says that even when you do

7    seek specific performance with respect to some assets, that is

8    insufficient to give a court — a federal court — the authority

9    to restrain the disposition of any particular assets.  It needs

10   to be particular assets.

11         And that's why cases like the *Quantum* case say that

12   even there, where you bring an equitable claim, say, for a

13   fraudulent conveyance with respect to particular assets; and

14   one might seek equitable relief with respect to those assets.

15         As *Dong v. Miller* talks about, invalidating alleged

16   fraudulent transfers, setting aside alleged fraudulent

17   transfers, rescinding them; or *Great Western Life* talks about

18   restitution and equity, talks about equitable liens and

19   constructive trusts.  Even when all of those elements are met

20   and there's a particular asset identified, the Court may

21   restrain only those particular assets.

22         So that means that if those particular assets have

23   been dissipated since, the Court may not restrain anything

24   more; may not restrain an amount of money that equates to those

25   particular assets.  That may be an unsatisfying answer; that

A-1316

22

OA2VLEAO

1    may strike some as an unfair answer.  But that is the answer

2    the law compels, and it is very clear, your Honor, in the

3    cases.  It is very clear in *Great Western Life*, it's very clear

4    in *Quantum*.

5         THE COURT:  Okay.  Anything further?

6         MR. WATKINS:  No, your Honor.

7         THE COURT:  All right.  Let me listen to Leadenhall.

8         MS. NATHANSON:  Good afternoon, your Honor.

9         Leigh Nathanson, for Leadenhall.

10        A-CAP, which let's just start out by pointing out that

11   the movant here does not include any of the enjoined parties

12   who don't appear to dispute the Court's authority to have

13   enjoined the assets that it enjoined, which are all assets in

14   which Leadenhall has an equitable interest.

15        Let me just start with the *Gucci* case, because

16   Mr. Watkins is, I believe, making an argument that not only

17   must the movant seeking a preliminary injunction show an

18   equitable interest in the assets to be enjoined, but also that

19   the movant needs to seek particular relief in the prayer for

20   relief or elsewhere, and identify the particular assets that

21   are to be enjoined if they go beyond the collateral.

22        *Gucci* — and this is in the context of the Lanham Act,

23   but it's instructive.  *Gucci* notes, in response to an argument

24   by the party resisting the restraint, that the court exceeded

25   its equitable authority because it failed to identify the

A-1317

OA2VLEAO

1    particular property derived from the defendant's allegedly

2    unlawful activities that the plaintiffs seek to recover.  The

3    court then said:  We know of no requirement, however, and

4    certainly there is none in the Lanham Act, that would obligate

5    plaintiffs to make this identification prior to obtaining a

6    preliminary injunction.

7           So what *Grupo Mexicano* does -- and it doesn't talk

8    about any of the limitations on the type of relief that a

9    secured creditor can get.  What *Grupo Mexicano* does is say that

10   an unsecured creditor cannot get preliminary relief because its

11   claim is not an equitable claim.  That's what it says.

12          So let's look at the preliminary injunction here,

13   which was crafted as an appropriate exercise of this Court's

14   discretion under Rule 65, and consistent with *Grupo Mexicano*

15   and its progeny, to implement reasonable means to preserve the

16   status quo with respect to Leadenhall's ability to recover on

17   its secured claims as a secured creditor of the enjoined

18   parties.  And the court did this by restraining only assets in

19   which Leadenhall has a security interest or an equitable

20   interest, because it is a secured creditor.

21          THE COURT:  By the way, how would you define

22   "equitable interest"?

23          MS. NATHANSON:  I would define "equitable interest" as

24   an interest where the Court can order some remedy other than

25   payment of money damages — and that includes performance here —

A-1318

24

OA2VLEAO

1   that implicates the assets to be enjoined.

2          So here, Leadenhall has a security interest in assets

3   up to the amount of what is borrowed by the borrowers.  They

4   are supposed to put collateral up against that debt, that is

5   what security is.  The LSA makes this clear.  There are many

6   representations in there about maintaining collateral free and

7   clear of other interests.  If "maintain" does not mean

8   continuously provide collateral, I don't know what does.  And I

9   think it's instructive here that the parties to the LSA and the

10  enjoined parties here do not dispute that they had an

11  obligation to put up collateral against this debt.

12         So Leadenhall had a security interest in the

13  collateral that was put up against the debt.  It has an

14  equitable interest in having security to secure its debt in the

15  amount of the debt.  And again, the amount that was borrowed

16  changed from time to time here, because the borrowers could

17  make an election to increase it or decrease it and then had to

18  maintain an appropriate borrowing base correspondent to that.

19         And so, yes, there is particular collateral that is

20  the first layer of what is restrained here.  The first

21  subsection of the preliminary injunction, as ordered, restrains

22  the collateral that the borrowers pledged to Leadenhall.  And

23  that decision of what to pledge was the borrowers' decision.

24  And we know they dissipated that collateral such that it was

25  not sufficient to meet their obligations, their equitable and

A-1319

OA2VLEAO

1    performance obligations, under the contract.

2            And only if that collateral is not sufficient to

3    satisfy Leadenhall's equitable interest — the security interest

4    that it was guaranteed — then the restraint extends to cash and

5    cash equivalents of the borrowers and guarantors.  And again,

6    only to the extent necessary to satisfy the equitable claims.

7            Leadenhall brings claims for treble damages under RICO

8    in this case.  That is no not what we sought to have restrained

9    because that is a money damages claim, and there isn't a basis

10   under *Grupo Mexicano* for us to have asked for that.  And to the

11   point your Honor made earlier, the cases that A-CAP cites

12   saying the relief was limited to the collateral are cases where

13   the requested relief was limited to the collateral because the

14   collateral existed.

15           Here, in the absence of the collateral, which was, in

16   many cases, fictitious, in some cases never owned, in other

17   cased double-pledged to multiple creditors such that it was not

18   free and clear of adverse interests as required under the LSA,

19   that doesn't erase Leadenhall's security interest.  It means

20   that Leadenhall has an equitable interest in forcing the

21   borrowers and, by extension, the guarantors, to perform their

22   obligation to create sufficient collateral in whatever means

23   they create it to satisfy the secured debt obligation.

24           And I just want to point out one thing in response to

25   Mr. Watkins' claims about the pledge agreements.  So the pledge

A-1320

26

OA2VLEAO

1    agreements are not the agreements by which the guarantors

2    guaranty anything.  Those are the guaranty agreements.  The

3    pledge agreements are not agreements by which the borrowers put

4    up collateral.  The pledge agreements are a separate set of

5    agreements by which the sellers — which is another set of

6    entities on the borrower side, those are the entities that

7    acquire the collateral that goes to the borrowers to serve as

8    collateral.  The pledge agreements are agreements that pledge

9    the equity interests of the sellers in the borrower to

10   Leadenhall.  So it's an additional level of pledge; but it has

11   nothing to do with the actual underlying collateral.

12           THE COURT:  It was a pledge of 100 percent of the

13   equity interest in the borrowers.

14           MS. NATHANSON:  Correct.  So those agreements are not

15   relevant to the equity interest in -- or, I'm sorry, they are

16   not relevant to the equitable interest that Leadenhall has in

17   the collateral.  They are an additional equity interest that

18   Leadenhall has, but those are not the agreements that are

19   operative on this point.

20           And so again, turning back to the scope of the

21   preliminary injunction, which is narrowly tailored to capture

22   only the bounds of Leadenhall's equitable interests, again,

23   only if the cash and cash equivalents of borrowers and the

24   guarantors are not sufficient to satisfy the equitable

25   interest, then — only then — we go to proceeds received by the

A-1321

27

OA2VLEAO

1    borrowers and guarantors in transactions, which need to be

2    reserved in order to preserve the status quo.

3           And again, there's a prohibition on the dissipation of

4    assets by the borrowers and the guarantors.  But the Court made

5    clear that this does not prohibit transactions where the

6    borrowers and guarantors receive fair value for those assets;

7    it's not meant to restrain transactions in the normal course of

8    business or otherwise fair transactions, which I'll get to in a

9    moment.

10          And so your Honor was correct in granting a

11   preliminary injunction, that we are out of the world of *Grupo*

12   *Mexicano*.  *Grupo Mexicano* does not prescribe limitations on the

13   types of assets that can be enjoined, as long as there is an

14   equitable interest pled, which there is here.

15          And as we discussed during the hearings on the TRO and

16   the preliminary injunction, *Grupo Mexicano* would essentially be

17   eviscerated if it were the case that a secured creditor could

18   be rendered unsecured with no equitable or security interests

19   to act as remedies in a court of law if the borrower could

20   simply abscond with the security as if it were any other money

21   that was lent.  The difference between a secured loan and an

22   unsecured loan is that if you have an unsecured loan, you have

23   fewer remedies if the borrower takes that money and runs and

24   doesn't pay it back.

25          And so yes, as Mr. Watkins said, there is an

A-1322

28

OA2VLEAO

1   obligation to repay the loan; but there is also an independent

2   security obligation where if that loan is not repaid — and it

3   hasn't been here — the borrower — and here, the guarantors as

4   well — owe a security interest in the amount of what was

5   borrowed to the lender.  And that's exactly what we have here.

6         The Court recognized as the basis for granting the TRO

7   and then converting the PI, that, here, we were supposed to

8   have $609 million worth of security.  The defendants did not

9   dispute that that security was not there.  And so the Court

10  recognized the equitable interest of Leadenhall in having that

11  amount.  And yes, it's money, but none of the cases state that

12  if money is what you're seeking, whether it's in the form of

13  security or in the form of repayment of loan, then you're back

14  in the land of *Grupo Mexicano*.  The distinction that *Grupo*

15  *Mexicano* makes is are you a secured creditor or are you an

16  unsecured creditor.

17        And so I just want to talk for a moment about where we

18  are practically, and the letter that we filed last night comes

19  into this a bit.

20        The preliminary injunction as currently crafted — and

21  I think this is one of the ways that we can see how it's

22  consistent with the scope of the Court's authority — is not

23  causing any of the problem that A-CAP suggests.  A-CAP brought

24  this motion and it told the Court at our hearing on August 1st

25  as much, because it was afraid that the preliminary injunction

A-1323

29

OA2VLEAO

1    was having a chilling effect on unnamed transactions in the

2    market that would be good for all parties involved, according

3    to A-CAP's word.  And the Court was very careful to make sure

4    that it tailored the relief fashioned so that it would allow

5    fair transactions and allow the normal course of business, and

6    also provide a procedural mechanism for the parties to come to

7    the Court if there were transactions that the defendants wanted

8    to effectuate to make sure that they are consistent with the

9    preliminary injunction.

10         And we now know that the preliminary injunction in its

11   current form has not prevented a prospective transaction with

12   respect to assets that the defendants are interested in selling

13   or transferring.  And the parties are looking to work together

14   to get information about those transactions and determine

15   whether they constitute a dissipation of assets or not.

16         So the idea that the application of the preliminary

17   injunction as ordered is causing problems that are indicative

18   of an excess of the Court's authority is simply not true.

19         THE COURT:  Do you want to respond to the litigation

20   that was just filed in Florida?

21         MS. NATHANSON:  It's a litigation arising out of

22   apparently a former 777 employee.

23         THE COURT:  No, I mean, the litigation allegedly

24   arises out of Leadenhall's employment of an agent to hack 777

25   partners and to steal computers.

A-1324

30

OA2VLEAO

1          MS. NATHANSON:  Sure.

2          What the litigation is really about and the complaint,

3     I think, makes this clear, is that a former employee of 777

4     apparently trespassed onto the SuttonPark offices and took --

5          THE COURT:  Two former employees of 777 who then --

6          MS. NATHANSON:  Well, no, no.  One was authorized.

7     One was authorized.  I mean, I'll say about the complaint that

8     Leadenhall doesn't take a position on what the former employee

9     Noah Davis did.  We don't have information about that in order

10    to.  But what I know is frivolous and potentially sanctionable

11    is the allegation that Leadenhall directed this.  And so our

12    intention is to respond to that complaint in due course.

13         But there are a few factual allegations that I believe

14    the defendants here know to be false, including that there was

15    no employment relationship between Leadenhall or its -- and its

16    consultant.  There was also no employment relationship between

17    the consultant and the gentleman.  But either way, I mean --

18         THE COURT:  I mean, the gist of the allegations is

19    that Leadenhall has hired an agent to hack or otherwise steal

20    confidential information from one of the defendants in the

21    case, 777 Partners.

22         MS. NATHANSON:  That is the gist of it.  But there are

23    no factual allegations to support that.

24         What we do explain in our amended complaint and what

25    is true is that Leadenhall retained as a consultant a former

A-1325

31

OA2VLEAO

1      employee of 777, not the guy who's alleged to have gained the

2      unauthorized access, but a different gentleman who has a

3      consulting company called Safe.  And he was retained by

4      Leadenhall to conduct a collateral audit of what collateral

5      remains, which is permitted under the LSA.  The 777 defendants

6      originally put up some resistance to having this gentleman be

7      the one to perform the audit.  We understand that came from

8      A-CAP.  777 ultimately agreed that his consulting firm could

9      come and perform the audit.

10             We then heard from 777 at some point that his team's

11     access had been suspended ostensibly due to technical

12     difficulties.  We were later told that that wasn't true, and

13     that it was really that they were investigating some

14     allegations of unauthorized access, not by the consultant, but

15     by an independent contractor that worked with him on IT who was

16     a former colleague of his also at 777.

17             THE COURT:  I take it that Leadenhall wouldn't

18     sanction unauthorized hacking of one of the other parties in

19     this case.

20             MS. NATHANSON:  Absolutely not.  And Leadenhall has a

21     discrete amount of information that was obtained by the

22     consultant in the collateral audit.  It all has to do with

23     Leadenhall's collateral.  They'll be prepared in due course in

24     that case to swear to that and to what they have and to put

25     evidence forth in support of that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1326

32

OA2VLEAO

1          But I think if you take a look at the allegations in

2     the complaint, tying Leadenhall to the gentleman who

3     trespassed, you'll see that there's nothing there.  Leadenhall

4     was -- in fact, as soon as the consultant learned from the IT

5     contractor that he had gone into the offices and done this, it

6     was I who asked the consultant to immediately disclose what

7     they had learned to 777.  And so I understand 777 reported that

8     to the police, which I'm glad about because I think that should

9     get to the bottom of why this guy did it.  Apparently, he told

10    the consultant that he was a disgruntled former employee, he

11    had a payment dispute with 777 and he was angry.  I can't

12    substantiate or refute any of what he said, but that's what we

13    know about it.  What I do know is that Leadenhall would, of

14    course, never direct, condone, allow any unauthorized access

15    into the 777 systems.

16          THE COURT:  Thank you.

17          Go ahead.

18          MS. NATHANSON:  I was really about to wrap up, but I

19    think in terms of the discussion of what an equitable interest

20    looks like, it has to be that the security interest here means

21    something.  I think *Grupo Mexicano* makes that distinction very

22    clear.  *Gucci* makes clear in the language I read earlier that

23    the plaintiff need not identify all of the specific assets that

24    are meant to comprise the assets for which an equitable

25    interest exists.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1327

33

OA2VLEAO

1          Here, I think we've done a pretty good job of that.

2    We know what the collateral was supposed to be.  We know the

3    amount in which it was supposed to be posted.  We know that the

4    guarantors stepped into the shoes voluntarily by signing the

5    guaranty agreements and guaranteeing not only the obligation to

6    pay back the loan, but also the obligation to perform under the

7    LSA and, in fact, all of the obligations of the borrowers,

8    including their obligation to provide security and to maintain

9    security free and clear of other interests throughout the

10   course of the loan.

11          The final point I'll make is that there is another

12   source of authority for this Court to have enjoined the same

13   assets that are enjoined in the preliminary injunction, and

14   that's Rule 64's adoption of New York CPLR 6201's prejudgment

15   attachment authority.  And I'll note that we had a colloquy

16   about this at the TRO hearing about whether it was properly

17   raised in our opening brief seeking a preliminary injunction.

18   It was in that opening brief, albeit in a footnote.

19          THE COURT:  No, but the problem with that is it's not

20   a specific remedy that's being sought.

21          MS. NATHANSON:  Well, it was -- sorry.

22          THE COURT:  If it were a specific remedy, then you'd

23   have to show that the individual requirements of the New York

24   attachment have been met.  And then there would be specific

25   assets that were attached.  And some of the cases refer to a

A-1328

34

OA2VLEAO

1    TRO or a preliminary injunction as a form of equitable relief

2    that's less oppressive than an attachment.  Because an

3    attachment is specific assets that you can't do anything with

4    because they've been attached.  And that's not what's being

5    sought here.

6           The lesser injunctive relief, an injunction against

7    the dissipation of the assets, is what's being sought.  And

8    Justice Ginsburg, I think, in her dissent, specifically

9    referred to the ability of courts these days to have more

10   restrictive equitable relief in the form of attachments, for

11   example, than the less restrictive injunction that was at issue

12   in *Grupo Mexicano*.

13          So my problem with your reference to the attachment is

14   it's not really a relief that's being sought in the case, even

15   if you've referred to attachment somewhere in the papers.  It's

16   not -- when you look at the TRO or the preliminary injunction,

17   it's not an attachment.

18          MS. NATHANSON:  That's correct.  And I wasn't trying

19   to make the point that that was the relief that we originally

20   sought.  We did make reference to it really because it was an

21   alternative option that the Court could have exercised, and we

22   think we did make the necessary showing.  But that is not the

23   relief that we sought.  We were looking to have the less

24   restrictive relief implemented.

25          But the point I was going to make with reference to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1329

35

OA2VLEAO

1   Rule 64 is only that the idea that the Court's authority cannot

2   extend — cannot.  I'm not saying whether it does or not in this

3   case, but cannot extend to freeze or restrict assets beyond

4   those in which a security interest is alleged, is not the case.

5   There are other mechanisms for the Court to do that.  And if

6   the Court saw fit to revisit its ruling here, that is another

7   possibility and a road that we could go down.

8           But I thought I heard Mr. Watkins say rather

9   categorically that a federal court does not have the authority

10  to implement a restraint on assets where there is no security

11  interest.  And I just wanted to make the point that Rule 64

12  provides an avenue for doing so; and so it cannot be the case

13  that such a restraint is improper.  There is a different

14  showing, it is a different type of restraint, but it is not the

15  case that a court lacks that authority categorically.

16          THE COURT:  Okay.  Thank you.

17          MS. NATHANSON:  Thank you, your Honor.

18          THE COURT:  All right.

19          Mr. Watkins, you seem anxious to say something.

20          Two minutes.

21          MR. WATKINS:  Yes, your Honor.

22          First, a critically important point I think here is

23  the nature of Leadenhall's collateral.  It's all assets about

24  borrowers.

25          What are those assets?  Receivables, the right to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1330

36

OA2VLEAO

1   receive future payments of lottery winnings and so on.  Those

2   are particular assets that they had.

3          When were they pledged?  They were pledged in the LSA,

4   hereby pledged in the LSA.  There's no obligation of borrowers.

5   And thus, no guaranty of guarantors to pledge more collateral

6   to make up for a collateral deficit.

7          Now, there is absolutely a contractual obligation for

8   the borrowing base for the collateral to be enough -- to be

9   worth enough in present value to cover the loans.

10         And what is the consequence for that in event of

11  default?  Thus, the contract claims that Leadenhall has

12  brought.

13         And what does it get?  It can accelerate and it can

14  get money, but it cannot force anybody or seek to force anybody

15  to pledge more receivables.  It can seek the money it's owed

16  and that's what it's done here.  But that is a contract claim

17  for money damages, not an equitable claim.

18         There's a lot of talk now in Leadenhall's papers about

19  fraudulent transfer of assets.  Didn't move on fraud.  But even

20  so, cases like the *Paradigm* case say that to the extent there's

21  any injunction, it must be limited to the assets that *Paradigm*

22  in that case alleges were fraudulently transferred.  The

23  equitable interest extends only to the assets allegedly

24  fraudulently transferred.

25         THE COURT:  But *Paradigm* was a case where there was no

A-1331

37

OA2VLEAO

1    other equitable interest other than the specific assets that

2    had been fraudulently transferred.  And so Judge Furman said

3    that was the equitable interest, and so that was the limit of

4    the equitable interest.  That's not the limit of the equitable

5    interest in this case.  There was no --

6              MR. WATKINS:  Security interest.

7              THE COURT:  There was no security interest in

8    *Paradigm*.  The only basis for the injunction in *Paradigm* was

9    because of specific assets that had been allegedly fraudulently

10   conveyed to a third party.  And so the limit of the injunction

11   was the fraudulently conveyed assets to the third party.

12             MR. WATKINS:  Yes.  That addresses the equitable

13   interest, which seems to have been conflated a bit with the

14   security interest.  They are two distinct things.  A lien, a

15   creature of contract.  A lien in particular assets on the one

16   hand, and an equitable interest on the other hand.  They're

17   quite different things.  *Dong v. Miller* is one, where

18   there's -- pardon me, the *AKF* case.  I mentioned before that

19   there are some cases that say it doesn't matter if there's a

20   security interest.

21             The *AKF* case from 2021, which we cite, is one of them.

22   It says that it doesn't matter that whether there's a security

23   interest that is valid and properly perfected, plaintiff has

24   not shown that this case falls within an exception to *Grupo*

25   because plaintiff seeks no equitable relief, in italics, with

A-1332

38

OA2VLEAO

1    respect to the receipts at issue in that case.  There needs to

2    be equitable relief sought, it held.

3           The *Professional Merchant Advance Capital* case too,

4    despite plaintiff's security interest, it has not made a claim

5    reaching any particular assets of defendants, and so no

6    injunction is appropriate.  It's inappropriate under both state

7    and federal law to do so on a contract claim for money damages,

8    it held.

9           THE COURT:  Okay.  All right.  Thank you.

10          I'm prepared to decide.

11          The plaintiffs, Leadenhall Capital Partners LLP and

12   Leadenhall Life Insurance Linked Investments Fund PLC

13   (together, "Leadenhall"), allege that the defendant borrowers

14   and guarantors defrauded the plaintiffs of hundreds of millions

15   of dollars by pledging as collateral assets that did not exist,

16   were not owned by the defendant borrowers, or had already been

17   pledged to another lender.  Leadenhall also alleges that the

18   guarantors — 777 Partners and 600 Partners — control the

19   borrowers.  Leadenhall further alleges that several of the

20   defendants are on the brink of financial distress.

21          The plaintiffs obtained a temporary restraining order

22   ("TRO"), which, "other than in the normal and ordinary course

23   of business," generally prohibited dissipation of assets or the

24   expenditure or dissipation of any cash or cash equivalents of

25   the borrowers and guarantors where the value of assets pledged

A-1333

39

OA2VLEAO

1   as collateral is less than the full amount of accelerated debt

2   and required notice to Leadenhall and two other interested

3   parties of any attempt by any defendant to foreclose on or

4   repossess any assets of the borrowers and guarantors.  ECF No.

5   114; see also June 7 Hearing Tr., ECF No. 128.  Subsequently,

6   this Court held a hearing to convert the TRO into a preliminary

7   injunction, see July 8 Hearing Tr., ECF No. 148, at which point

8   the Court issued a preliminary injunction with the same terms.

9   See ECF No. 146.

10          Defendant Advantage Capital Holdings LLC ("A-CAP") —

11  which is not a borrower or guarantor, but allegedly holds a

12  first priority all-asset lien over the assets of 777 Partners.

13  See complaint, paragraph 12, ECF No. 1 — now seeks to modify

14  the preliminary injunction pursuant to Federal Rule of Civil

15  Procedure 59(e) on the ground that this Court lacked the

16  authority to issue the injunction under the Supreme Court's

17  decision in *Grupo Mexicano de Desarrollo S.A. v. All. Bond*

18  *Fund, Inc.*, 527 U.S. 308 (1999).  The application is not joined

19  by the borrowers or guarantors or the two intervenor additional

20  creditors.

21          The following facts are drawn from the parties'

22  submissions in connection with this motion and the earlier

23  requests for preliminary injunctive relief.

24          In May 2021, Leadenhall entered into a secured credit

25  facility, memorialized in a Loan and Security Agreement ("LSA")

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1334

40

OA2VLEAO

1    dated May 7, 2021, with four borrowers, all subsidiaries of

2    Defendants 777 Partners LLC and 600 Partners LLC.  Declaration

3    of Craig Gillespie ("Gillespie Decl."), paragraph 2, Ex. 1,

4    excerpts from LSA § 2.01, ECF No. 58; Compl. paragraphs 3-4,

5    45-50.  The secured credit facility had a maturity date in

6    September 2024.

7            Each borrower pledged to Leadenhall as collateral a

8    security interest in 100% of its assets.  Gillespie Decl.,

9    paragraph 2 n.1; LSA § 2.15; Compl. paragraphs 5, 51.

10   Moreover, the borrowers agreed to own the collateral assets

11   "free and clear" of any other claims at all times.  Compl.

12   paragraphs 5-6, 76-88.  The borrowers reaffirmed that agreement

13   every month and every time they borrowed money from Leadenhall,

14   by submitting compliance reports and attestations.  LSA §§

15   4.01(h), (i); Compl. paragraph 56.

16           In addition to first-priority security interests in

17   the borrowers' assets and recourse against each borrower,

18   Leadenhall also negotiated a guaranty from 777 Partners and 600

19   Partners of all of the borrowers' obligations.  Gillespie

20   Decl., Ex. 2, Excerpts from Guaranty Agreement ("Guaranty"), §§

21   2 and 3.  Among the "Trigger Events" granting Leadenhall

22   recourse against 777 Partners and 600 Partners for the

23   borrowers' obligations is a borrower's "failure . . . to own

24   the collateral pledged . . . free and clear."  *Id.* § 1

25   (definition of "Trigger Event" at clause (ix)).  Leadenhall

A-1335

41

OA2VLEAO

1   also obtained a pledge of 100% of the equity interests in the

2   borrowers. Compl. paragraph  47(d).

3        On September 19, 2022, Leadenhall received an

4   anonymous email alleging that Defendant Josh Wander, who

5   allegedly controls the defendant entities, had either never

6   bought assets pledged to Leadenhall as collateral or had

7   pledged them to other lenders.  Gillespie Decl. paragraph 5,

8   Ex. 3.  Upon investigation, Leadenhall confirmed the anonymous

9   tip.  *Id.*  Paragraphs 6-7.

10       On March 28, 2023, Leadenhall held a recorded

11  conference call with Wander, where Wander admitted that one of

12  the borrowers, SPLCSS III LLC ("SuttonPark"), had

13  double-pledged collateral to both Leadenhall and another

14  lender, in breach of the LSA.  Declaration of Phil Kane ("Kane

15  Decl.") paragraphs 2-5, ECF No. 59.

16       On a second recorded conference call with Wander on

17  April 3, 2023, Wander admitted to other fundamental breaches.

18  *Id.*  Paragraphs 7-9.  Around this time, Leadenhall discovered

19  that another borrower, Dorchester Receivables II LLC

20  ("Dorchester"), had also pledged assets that were already

21  pledged to another lender, sold or transferred to a

22  third-party, or never purchased in the first place. Gillespie

23  Decl. paragraph 9, Ex. 5.

24       On November 29, 2023, Leadenhall sent formal notices

25  of the SuttonPark and Dorchester borrowers' breaches to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1336

42

OA2VLEAO

1   borrowers, the guarantors, and members of A-CAP.  *Id.*

2   Paragraph 8, Ex. 4.  In light of the breaches, all of the

3   borrowers executed an amendment to the LSA, agreeing to pay

4   additional interest on the uncollateralized portion of their

5   outstanding debt.  *Id.*  Paragraph 11.  In January 2024, at

6   Leadenhall's request, SuttonPark and Dorchester submitted

7   revised monthly compliance reports going back to March 2023.

8   *Id.*  Paragraph 10, Exs. 6 and 7.  The revised reports confirmed

9   that SuttonPark and Dorchester had, going back to at least

10  March 2023, borrowed hundreds of millions of dollars in excess

11  of contractual limitations.  *Id.*

12          After sending the notice of breach, Leadenhall began

13  negotiations with Wander to recoup the debt extended to his

14  companies.  On February 21, 2024, Leadenhall executed a

15  "Paydown and Partial Release Letter" with the borrowers and

16  guarantors, in which the borrowers agreed to repay immediately

17  approximately $25 million.  Gillespie Decl.  Paragraph 12, Ex.

18  8.  However, the borrowers were able to pay only half of that

19  amount.  *Id.*  Paragraph 13.

20          Leadenhall then served the borrowers and guarantors

21  with a default notice on March 12, 2024, notifying them that

22  the events detailed in the prior notice of breach constituted

23  facility events of default under the LSA.  *Id.*  Paragraph 15,

24  Ex. 9.  On March 15, 2024, Leadenhall served the borrowers and

25  guarantors an acceleration notice, notifying them that

A-1337

43

OA2VLEAO

1    Leadenhall was exercising its contractual right, upon a

2    facility event of default, to call immediately due and payable

3    the outstanding balance due to Leadenhall from all four

4    borrowers under the facility in the amount of $609,529,966.82.

5    *Id.* Paragraph 16, Ex. 10.

6          Following acceleration, Leadenhall continued to

7    attempt to negotiate a restructuring of the outstanding debt.

8    *Id.* Paragraph 17, Ex. 11.  In late March 2024, the parties

9    exchanged draft forbearance agreements, whereby Leadenhall

10   would forbear on exercising certain remedies in exchange for

11   payments pursuant to a repayment plan.  *Id.*

12         On March 29, 2024, however, the defendants failed to

13   make an agreed-upon $15 million payment, *id.* Ex. 11 § 5(d),

14   because 777 Partners could not make that payment absent

15   financing from A-CAP, and because agreeing to a repayment plan

16   without A-CAP's approval would constitute an event of default

17   on A-CAP's outstanding loans to 777 Partners.  Declaration of

18   Luca Albertini ("Albertini Decl.") paragraphs 2-4, ECF No. 60;

19   see also Gillespie Decl., paragraphs 18-21.

20         During this time, Wander's businesses allegedly began

21   to deteriorate.  On May 2, 2024, Wander stated that 777

22   Partners was running down its business and disposing of assets

23   to repay creditors.  Albertini Decl. paragraph 7.  However,

24   just three days before, on April 30, 2024, 777 Partners

25   reportedly loaned $20 million to Everton, an English football

A-1338

44

OA2VLEAO

1   club that 777 Partners was in the process of purchasing.

2   Compl. paragraphs 193, 208.  And earlier in April, Hertha BSC,

3   a German football club owned by 777 Partners, reported that 777

4   Partners had invested another $80 million in the club.  After

5   the complaint in this case was filed, 777 Partners reportedly

6   loaned Everton another $8 million.  Plaintiffs' memo in support

7   of TRO at 13, ECF No. 57.

8           Leadenhall filed this action on May 3, 2024.  See

9   Compl.  On May 13, 2024, Leadenhall sought a TRO to prevent the

10  defendant borrowers and guarantors from dissipating their

11  assets to frustrate the collection of a final judgment.  ECF

12  No. 56.

13          In response to Leadenhall's motion for a TRO, the

14  defendants argued that the Court lacked the authority to impose

15  a TRO under *Grupo Mexicano*.  See 777 Entity Defs.' TRO Opp.

16  Mem. at 14-15, ECF No. 86; A-CAP Defs.' TRO Opp. Mem. at 12-13,

17  ECF No. 89.  The defendants reiterated this argument at a June

18  7, 2024 hearing on the motion for a TRO.  See June 7 Hearing

19  Tr. at 18.

20          At the June 7 hearing, this Court granted the

21  plaintiffs' motion for a TRO.  The Court concluded that

22  Leadenhall was likely to succeed on the merits of its contract

23  claims, that there was a likelihood of irreparable injury in

24  the absence of an injunction; that the balance of hardships

25  tipped in favor of Leadenhall; and that the public interest

A-1339

45

OA2VLEAO

1   would not be disserved by the issuance of a TRO.  See *id*. at 55

2   and 57 to 59.  This Court distinguished *Grupo Mexicano* on the

3   ground that the plaintiffs in this case had a secured interest

4   in the pledged collateral, unlike the plaintiffs in Grupo

5   Mexicano.  *Id*. at 55.

6          The resulting TRO enjoined, "other than in the normal

7   and ordinary course of business": (1) the transfer or

8   encumbering of collateral; (2) to the extent that the value of

9   the collateral is less than the accelerated debt, the

10  expenditure of cash or cash equivalents of the borrowers or

11  guarantors up to the accelerated debt; (3) to the extent the

12  value of the collateral plus the value of any cash or cash

13  equivalents of the borrowers is less than the accelerated debt,

14  the expenditure by the borrowers and guarantors of any cash or

15  cash equivalents up to the accelerated debt; and (4) any action

16  by the borrowers or guarantors to dissipate the value of their

17  assets, including by transferring assets to any other

18  defendant.

19         The TRO further required the borrowers and guarantors

20  to provide notice to Leadenhall and to two other interested

21  creditors of any attempt by any defendant to foreclose on or

22  repossess assets of the borrowers and guarantors.  Only the

23  borrowers and guarantors were enjoined by the TRO — the Court

24  did not enjoin A-CAP.  See generally *id*.; see also June 7

25  Hearing Tr. at 5.

A-1340

46

OA2VLEAO

1           On July 8, 2024, the Court held a hearing to convert

2    the TRO into a preliminary injunction.  See July 8 Hearing Tr.

3    A-CAP's counsel, then representing Intervenor Haymarket,

4    characterized the TRO as "challenging" because transactions

5    "ha[d] been chilled by the TRO."  Id. at 23-24.  However, as

6    this Court noted, the parties did not bring any specific

7    transactions to the attention of the Court.  Id. at 25-26.  The

8    Court "issue[d] the preliminary injunction for the reasons

9    stated that [it] issued the TRO" and with the same terms.  Id.

10   at 32; see also ECF No. 146.

11          On July 31, 2024, A-CAP filed a Proposed Order to Show

12   Cause Without Emergency Relief, seeking a modification of the

13   preliminary injunction pursuant to Rule 59(e).  See ECF No.

14   152.  A-CAP's proposed modification would require the borrowers

15   and guarantors to preserve what remains of Leadenhall's

16   collateral, but would not prevent dissipation of assets or

17   expenditure of cash while the value of the remaining

18   collateral, combined with existing cash and cash equivalents,

19   is worth less than the accelerated debt.

20          In support of a proposed modification of the

21   preliminary injunction, A-CAP does not argue that the

22   preliminary injunction has unreasonably blocked specific

23   transactions.  In fact, A-CAP has not brought any particular

24   transaction to the Court's attention and instead relies on an

25   online news source to support its contention that "it is

A-1341

OA2VLEAO

1    'difficult to sell any of 777's assets without Leadenhall's

2    approval.'"  A-CAP Defs.' Opp. Mem. at 11, ECF No. 155 (quoting

3    Philippe Auclair & Paul Brown, End of Season Sales).

4         Rule 59(e) motions to alter or amend a judgment are

5    evaluated under the same standard as motions for

6    reconsideration.  See *In re Evergreen Mutual Funds Fee*

7    *Litigation,* 240 F.R.D. 115, 117 (S.D.N.Y. 2007).  They are "an

8    extraordinary remedy to be employed sparingly in the interest

9    of finality."  *Maksymowicz v. Weisman & Calderon, LLP,* No. 14

10   Civ. 1125, 2014 WL 1760319, at *1 (S.D.N.Y. Feb. 2, 2014).

11        As such, Rule 59(e) should be "narrowly construed and

12   strictly applied so as to avoid repetitive arguments on issues

13   that have been considered fully by the Court, and to prevent

14   the rule from being used as a substitute for appealing a final

15   judgment."  *In re Evergreen,* 240 F.R.D. at 117 (quoting

16   *Williams v. N.Y.C. Dep't of Corr.*, 219 F.R.D. 78, 83 (S.D.N.Y.

17   2003) and *USA Certified Merchants, LLC v. Koebel*, 273 F. Supp.

18   2d 501, 503 (S.D.N.Y. 2003)).

19        Therefore, like motions for reconsideration, Rule

20   59(e) "may not be used to advance new facts, issues or

21   arguments not previously presented to the Court, nor may it be

22   used as a vehicle for relitigating issues already decided by

23   the Court."  *Grand Crossing, L.P. v. U.S. Underwriters Ins.*

24   *Co.*, No. 03 Civ. 5429, 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6,

25   2008) (evaluating a motion for reconsideration).

A-1342

48

OA2VLEAO

1          In this motion, A–CAP seeks to re–litigate issues

2     already decided by this Court.  In particular, A–CAP argues

3     that the United States Supreme Court's decision in *Grupo*

4     *Mexicano* denies this Court the authority to issue a preliminary

5     injunction extending to assets not specifically designated as

6     collateral by the defendants in the LSA.  See A–CAP's Mem. in

7     Support of Mot. to Modify ("A–Cap's Mem.") at 13–14, ECF No.

8     155.

9          This Court previously distinguished *Grupo Mexicano*,

10    when imposing the TRO, on the ground that Grupo Mexicano

11    concerned unsecured creditors, whereas "Leadenhall has a

12    secured first–priority interest in the collateral the borrowers

13    pledged," and "the guarantors guaranteed performance of all the

14    borrowers' obligations to Leadenhall."  June 7 Hearing Tr. at

15    55.  A–CAP cites no controlling law or factual circumstances

16    that this Court overlooked in reaching that conclusion.

17         Accordingly, A–CAP has failed to meet its burden on a

18    motion to amend a preliminary injunction brought under Rule

19    59(e) and the request to modify the preliminary injunction

20    should be denied.

21         Moreover, the Court did not err in distinguishing

22    *Grupo Mexicano* and imposing the preliminary injunction.  In

23    *Grupo Mexicano*, the Supreme Court considered whether, "in an

24    action for money damages, a United States District Court has

25    the power to issue a preliminary injunction preventing the

A-1343

49

OA2VLEAO

1   defendant from transferring assets in which no lien or

2   equitable interest is claimed."  527 U.S. at 310.

3        In that case, unsecured creditors sought a preliminary

4   injunction to prevent the defendant from transferring or

5   dissipating its only significant asset, which the plaintiffs

6   hoped to use to satisfy an anticipated money judgment against

7   the defendant.  The District Court granted the injunction.

8        The Second Circuit Court of Appeals affirmed, see 143

9   F.3d 688 (2d Cir. 1998), but the Supreme Court reversed,

10  reasoning that "the High Court of Chancery in England at the

11  time of the adoption of the Constitution and the enactment of

12  the original [1789] Judiciary Act" had no such power to issue

13  preliminary injunctions.  *Grupo Mexicano*, 527 U.S. at 318, 321.

14  The Court observed that the appropriate mode of analysis in

15  evaluating a district court's authority to issue a preliminary

16  injunction is to ask, "whether the relief respondents requested

17  . . . was traditionally accorded by courts of equity."  *Id*. at

18  319.

19       In its decision, the Supreme Court distinguished two

20  earlier Supreme Court cases that had approved preliminary

21  injunctions freezing assets.  *Id*. at 324-27.

22       First, the Supreme Court concluded that *Deckert v.*

23  *Independence Shares Corp.*, 311 U.S. 282 (1940), was

24  distinguishable because the plaintiffs in that case sought an

25  equitable remedy and "[t]he preliminary relief available in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1344

50

OA2VLEAO

1   suit seeking equitable relief has nothing to do with the

2   preliminary relief available in a creditor's bill seeking

3   equitable assistance in the collection of a legal debt." *Grupo*

4   *Mexicano*, 527 U.S. at 325.  Courts have subsequently held that

5   in a "mixed case" where plaintiffs seek both equitable and

6   legal relief in relation to specific funds, a court retains its

7   equitable power to freeze assets.  *Dong v. Miller,* No. 16 Civ.

8   5836, 2018 WL 1445573, at *8 (S.D.N.Y. Mar. 23, 2018) (quoting

9   *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 Civ.

10  3489, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013)); *see also*

11  *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489,

12  494 (4th Cir. 1999).

13          After distinguishing Deckert, where the ultimate

14  relief sought was equitable, the Supreme Court distinguished

15  *United States v. First National City Bank,* 379 U.S. 378 (1965),

16  on, among other grounds, the basis that in that case, "the

17  creditor . . . asserted an equitable lien on the property,

18  which presents a different case from that of the unsecured

19  general creditor."  *Grupo Mexicano,* 527 U.S. at 326 (citing

20  *First National,* 379 U.S. at 379-80).

21          In its decision, the Court in *Grupo Mexicano* also

22  relied on "the historical principle that before judgment . . .

23  an unsecured creditor has no rights at law or in equity in the

24  property of his debtor."  *Id.* at 330.  The same is not true of

25  secured creditors.

A-1345

51

OA2VLEAO

1     Other district courts have subsequently determined

2  that *Grupo Mexicano* does not control where a secured creditor

3  seeks a preliminary injunction restraining asset transfers.

4  *See, e.g., Quantum Corp. Funding, Ltd. v. Assist You Home*

5  *Health Care Services of Va.*, 144 F. Supp. 2d 241, 249 (S.D.N.Y.

6  2001) (granting a preliminary injunction after noting "[t]he

7  issue in *Grupo Mexicano*, as other courts have recognized, was

8  whether a district court has the power to enjoin assets in

9  which the potential judgment creditor has absolutely no

10  equitable interest.

11     Such is not the record before me and *Grupo Mexicano* is

12  therefore distinguishable"); *III Finance Ltd. v. Aegis Consumer*

13  *Funding Grp.*, No. 99 CIV. 2579, 1999 WL 461808, at *4 n.1

14  (S.D.N.Y. Jul. 2, 1999) (granting a preliminary injunction and

15  finding that "[t]he Grupo case is inapplicable here because III

16  Finance claims a security interest in the assets subject to the

17  preliminary injunction"); *Bank of America, N.A. v. Won Sam Yi*,

18  294 F. Supp. 3d 62, 79 (W.D.N.Y. 2018) (granting a preliminary

19  injunction because "[the] [p]laintiff is a secured creditor who

20  holds a security interest over the Collateral, as granted by

21  [the] [d]efendants through the Security Agreement").

22     By contrast, the major cases cited by A-CAP are

23  inapposite. *See JSC Foreign Economic Association*

24  *Technostroyexport v. International Development & Trade*

25  *Services, Inc.*, 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1346

OA2VLEAO

1    (denying a preliminary injunction requested by an unsecured

2    creditor); *Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear*

3    *Corp.,* No. 06 Civ. 52, 2006 WL 2337186, at *7 (S.D.N.Y. Aug.

4    12, 2006) (denying a preliminary injunction where "[the]

5    [p]laintiff stands in the position of an unsecured creditor,

6    seeking satisfaction in the form of money judgment for a debt

7    owed"); *Won Sam Yi,* 294 F. Supp. 3d at 79 (granting a

8    preliminary injunction to a secured creditor).

9           In short, *Grupo Mexicano*'s "holding was limited to

10   actions for money damages in which the plaintiffs seek

11   preliminary injunction to prevent the defendant 'from

12   transferring assets in which no lien or equitable interest is

13   claimed.'" *Gucci America v. Weixing Li,* 768 F.3d 122, 130 (2d

14   Cir. 2014) (quoting *Grupo Mexicano,* 527 U.S. at 310); *Rahman*,

15   198 F.3d at 496 (describing *Grupo Mexicano*'s holding as

16   "carefully circumscribed").

17          Leadenhall has a security interest in the assets of

18   the borrowers, see LSA § 2.15, and so is plainly a secured

19   creditor.  Leadenhall also has an interest in the assets of the

20   guarantors who guaranteed "performance when due (whether at

21   stated maturity, by acceleration, or otherwise) of the

22   Guaranteed Obligations" including the obligation to pledge a

23   first-priority security interest.  See Guaranty, §§ 1 and 2(a).

24          Furthermore, contrary to A-CAP's assertions, this is

25   not an action for money damages alone.  Leadenhall also

A-1347

53

OA2VLEAO

1    requests "[a]n order enjoining [the] [d]efendants violating

2    their obligations under the Agreements"; "[a]n order declaring

3    the rights and duties of the parties"; and "[a]n order

4    declaring that [the] [p]laintiffs may exercise any rights and

5    remedies due to them following a material breach or Event of

6    Default under the Agreements." Compl. at 81.

7            In its amended complaint, filed after A-CAP's proposed

8    order to show cause, Leadenhall also requests "[a]n order

9    voiding fraudulent transfers and rescinding payments related

10   thereto." Am. Compl., paragraph 417, ECF No. 187. These are

11   equitable prayers for relief. Because Leadenhall is a secured

12   creditor, seeking both monetary and equitable relief, *Grupo*

13   *Mexicano* does not control, and this Court has the authority to

14   issue a preliminary injunction to prevent the dissipation of

15   assets.

16           Having concluded that *Grupo Mexicano*'s narrow holding

17   does not limit the Court's authority to enter a preliminary

18   injunction in this case, the question remaining is whether this

19   Court exceeded the permissible scope of a preliminary

20   injunction enjoining the dissipation of assets.

21           A-CAP contends that "when a lien is limited to

22   particular assets, only those assets can be restrained.'"

23   A-CAP's Mem. at 14. But in this case, Leadenhall claims a

24   security interest in all the assets of the borrowers up to the

25   value of the accelerated loan, as well as an interest in the

A-1348

54

OA2VLEAO

1    assets of the guarantors up to that amount, based on the

2    guarantee by the guarantors of the performance by the borrowers

3    of their obligations, and there is no showing by A-CAP that the

4    value of the assets of the borrowers and the guarantors is in

5    excess of the amount preserved against dissipation by the

6    preliminary injunction.

7         Under the logic of *Grupo Mexicano*, A-CAP would need to

8    show that any further limitation on the Court's authority also

9    applied to the English High Court of Chancery "at the time of

10   the adoption of the Constitution and the enactment of the

11   original Judiciary Act" in 1789.  *See Grupo Mexicano*, 527 U.S.

12   at 318-19.

13        A-CAP has not attempted to make such a showing.

14   Indeed, as the plaintiffs note, as A-CAP conceded at argument,

15   A-CAP has cited no case where a court has found that a court

16   lacked authority to issue an asset-freezing injunction covering

17   the assets of a guarantor of performance of a secured lender up

18   to the value of the secured debt.  Indeed at argument, A-CAP

19   said that the Court can consider the borrowers and guarantors

20   the same for purposes of this motion.

21        Instead, in evaluating the scope of preliminary

22   injunctions, courts have looked to whether a preliminary

23   injunction in favor of a secured creditor is a reasonable

24   measure to preserve the status quo.  *First National,* 379 U.S.

25   at 385 (quoting *Deckert*, 311 U.S. at 290).

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1349

55

OA2VLEAO

1      Courts have also asked whether "there is a strong

2   nexus between the [property to be enjoined] . . . and [the

3   plaintiff's] claims for money damages." *Quantum*, 144 F. Supp.

4   2d at 250 (citing *Republic of Philippines v. Marcos*, 806 F.2d

5   344, 356 (2d Cir. 1986) and *State of New York v. Panex*

6   *Industries, Inc.*, 860 F. Supp. 977, 980-81 (W.D.N.Y. 1994)).

7      Along these lines, courts in the Second Circuit have

8   concluded that, subject to the constraints of *Grupo Mexicano*,

9   "[a] preliminary judgment may issue to preserve assets as

10  security for a potential monetary judgment where the evidence

11  shows that a party intends to frustrate any judgment on the

12  merits by making it uncollectible." *Pashaian v. Eccelston*

13  *Properties, Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996); *see also*

14  *Marcos,* 806 F.2d. ("[P]reliminary injunctions are proper to

15  prevent a defendant from making a judgment uncollectible.");

16  *Won Sam Yi*, 294 F. Supp. 3d at 80 (granting a preliminary

17  injunction to a secured creditor where the defendants continued

18  to use and dissipate the collateral); *Bank of China, New York*

19  *Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 191 (S.D.N.Y. 2002).

20      In this case, the Court did not exceed the scope of

21  its authority in issuing the preliminary injunction.

22  Leadenhall alleges that the defendant borrowers and guarantors

23  were dissipating or preparing to dissipate assets in which it

24  holds a security interest.  See e.g. Compl. paragraph 208.  The

25  preliminary injunction applies only to collateral, cash, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1350

56

OA2VLEAO

1    cash equivalents up to the value of the accelerated debt — the

2    amount which the defendants were contractually obligated to

3    secure and guarantee.  There is therefore a "strong nexus"

4    between the enjoined property and Leadenhall's requests for

5    relief.  The preliminary injunction was also plainly a

6    "reasonable measure" to preserve the status quo pending a final

7    adjudication of Leadenhall's equitable and legal claims.  The

8    current preliminary injunction contains a carve-out for

9    transactions in the normal course of business and A-CAP has

10   failed to bring any questionable transactions to the Court's

11   attention.

12         Accordingly, the Court did not err in distinguishing

13   *Grupo Mexicano* and imposing the preliminary injunction.

14         The Court has considered all of the parties'

15   arguments.  To the extent not specifically addressed above, the

16   arguments are either moot or without merit.  For the foregoing

17   reasons, A-CAP's motion to modify the preliminary injunction is

18   denied.

19         So ordered.

20         Okay.  There is a motion to dismiss that's pending;

21   correct?  No?

22         MR. McCARTHY:  I believe it's not yet due, your Honor.

23   We're about to --

24         THE COURT:  What's the schedule?

25         MR. McCARTHY:  October 10th the motions will be filed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1351

57

OA2VLEAO

1          THE COURT:  Have I indicated a response and reply

2    date?

3          MS. NATHANSON:  Yes, your Honor, we have a schedule.

4          I believe it's late November for the opposition.

5          THE COURT:  Okay.

6          MR. McCARTHY:  There is a schedule, your Honor.  I

7    don't have it memorized, yes.

8          THE COURT:  Okay.  Anything further for me today?

9          MS. NATHANSON:  Nothing from plaintiffs.

10         Thank you, your Honor.

11         THE COURT:  All right.  Thank you, all.

12         I appreciated the briefs.  I appreciated the argument.

13                         *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

A-1352

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>        Plaintiffs,<br><br>   vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>        Defendants. | Civil Action No. 1:24-cv-03453 |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Defendants Advantage Capital Holdings LLC and Kenneth King (collectively "A-CAP Defendants") hereby appeal to the United States Court of Appeals for the Second Circuit from the District Court's July 8, 2024 Order granting Plaintiffs a preliminary injunction (ECF No. 146) and October 2, 2024 Order on the record denying A-CAP Defendants' Rule 59(e) Motion to Modify the Preliminary Injunction (ECF No. 199).

A-1353

Dated:    October 3, 2024            Respectfully submitted,
          New York, New York

                                     CADWALADER, WICKERSHAM & TAFT LLP

                                     By: /s/ Jonathan Watkins
                                         Jonathan M. Watkins
                                         Michael E. Petrella
                                         Matthew M. Karlan
                                         Mark A. Singer
                                         200 Liberty Street
                                         New York, NY 10281
                                         Telephone: (212) 504-6000
                                         Fax: (212) 504-6666
                                         jonathan.watkins@cwt.com
                                         michael.petrella@cwt.com
                                         matthew.karlan@cwt.com
                                         mark.singer@cwt.com

                                     *Counsel for Defendants Advantage Capital
                                     Holdings LLC and Kenneth King*

A-1354

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
LEADENHALL CAPITAL PARTNERS LLP :
and LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC, : 24 Civ. 3453 (JGK)

                           Plaintiffs, : **NOTICE OF APPEAL**

        v. :

JOSH WANDER, STEVEN PASKO, :
KENNETH KING, 777 PARTNERS LLC,
600 PARTNERS LLC, SPLCSS III LLC, SIGNAL :
SML 4 LLC, INSURETY AGENCY SERVICES
LLC, DORCHESTER RECEIVABLES II LLC, :
SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY :
CAPITAL LLC, SUTTONPARK SERVICING LLC,
SIGNAL SERVICING LLC, INSURETY :
SERVICING LLC, and ADVANTAGE CAPITAL
HOLDINGS LLC, :

                         Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

      Notice is hereby given that defendants, 777 Partners LLC, 600 Partners LLC, SPLCSS III

LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, and Signal SML 4 LLC,

in the above-named case, hereby appeal to the United States Court of Appeals for the Second

Circuit from the District Court's July 8, 2024, Order (ECF No. 146), which entered a preliminary

injunction against them.

Dated:  New York, New York          SMITH, GAMBRELL & RUSSELL, LLP
       October 22, 2024

                                 By: _____
                                   John G. McCarthy
                         *Attorneys for the 777 Entity Defendants*
                         1301 Avenue of the Americas, 21st Floor
*Of counsel*                   New York, New York 10019
   David A. Pellegrino            Tel: (212) 907-9700
   Katie L. Schwartz             jmccarthy@sgrlaw.com
   Ryan J. Solfaro

## **CERTIFICATE OF SERVICE**

I certify that one copy of Appellant's Confidential Appendix Volume 1 of 2, and

Volume 2 of 2 was served via overnight delivery on the parties listed below:

Craig Carpenito
Leigh Nathanson
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2142

Paul Alessio Mezzina
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
202-626-8972

Dated: November 22, 2024

/s/ Jonathan M. Watkins
JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants Advantage Capital Holdings LLC and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000