# No. 24-2647

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees*,

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY,
ACM DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors*,

*(Caption continued on inside cover)*

————————

On Appeal from the United States District Court
for the Southern District of New York, No. 1:24-cv-3453
Hon. John G. Koeltl

————————

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

————————

Paul Alessio Mezzina
Zoe M. Beiner
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-05000

Craig Carpenito
Leigh M. Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 790-5359
lnathanson@kslaw.com

*Counsel for Plaintiffs-Appellees Leadenhall Capital Partners LLP*
*and Leadenhall Life Insurance Linked Investments Fund PLC*

January 16, 2025

v.

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING, 777 PARTNERS
LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC,
INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP, SUTTONPARK
SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (both private non-governmental parties) certify the following:

Leadenhall Capital Partners LLP is organized under the laws of England and maintains its principal place of business in London, England. Its parent company is Mitsui Sumitomo Insurance Company, Limited, which is a subsidiary of MS&AD Insurance Group Holdings, Inc., a publicly traded company. Leadenhall Capital Partners LLP has no other parent company or publicly held company owning 10% or more of its stock.

Leadenhall Life Insurance Linked Investments Fund PLC is organized under the laws of Ireland and maintains its principal place of business in Dublin, Ireland. It does not have a parent company and there is no publicly held company owning 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ...............................................................iv

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUE ..........................................................4

STATEMENT OF THE CASE AND FACTS .........................................4

    A.    Factual Background ...............................................................4

            1.    The parties enter a secured "borrowing-base" credit facility ................................................................4

            2.    The Borrowers' breaches come to light ........................8

            3.    A-CAP takes control of the Guarantors' operations ................................................................11

    B.    Procedural History ...............................................................12

            1.    Leadenhall files suit and wins a narrow asset-preserving injunction .....................................12

            2.    The district court denies A-CAP's motion to modify the preliminary injunction .............................17

            3.    Four weeks after noticing its appeal, A-CAP files a unilateral emergency motion, followed by this appeal ................................................................19

SUMMARY OF ARGUMENT .................................................................20

STANDARD OF REVIEW......................................................................22

ARGUMENT ........................................................................................22

I.    *Grupo Mexicano* does not apply because Leadenhall is a secured creditor seeking both monetary and equitable relief........................................................................................22

A.    *Grupo Mexicano* does not prevent a district court from taking reasonable measures to protect a secured creditor's interests pending final judgment ........................22

B.    The preliminary injunction is ancillary to Leadenhall's claims for equitable relief................................35

II.    The district court could have secured Leadenhall's rights via a prejudgment attachment pursuant to Rule 64, nullifying the argument that it lacked authority to do so............46

CONCLUSION ........................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*180 Life Scis. Corp. v. Tyche Cap. LLC*,
216 A.D.3d 419 (N.Y. App. Div. 1st Dep't 2023) ................................ 48

*Ames v. Clifford*, 863 F. Supp.
175 (S.D.N.Y. 1994) ........................................................................ 48

*Atlas Life Ins. Co. v. W.I. S., Inc.*,
306 U.S. 563 (1939) ........................................................................ 31

*Bank of Am., N.A. v. Won Sam Yi*,
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ............................................. 26

*Bankers Tr. Co. v. Litton Sys., Inc.*,
599 F.2d 488 (2d Cir. 1979) ............................................................ 28

*Beijing Neu Cloud Oriental Sys. Tech. Co.*
*v. Int'l Bus. Machs. Corp.*,
110 F.4th 106 (2d Cir. 2024) ........................................................... 46

*Bollenbach v. Haynes*,
2018 WL 4278347 (S.D.N.Y. May 29, 2018) .................................. 47

*Cap. Ventures Int'l v. Republic of Argentina*,
443 F.3d 214 (2d Cir. 2006) ............................................................ 47

*Coley v. Vannguard Urban Improvement Ass'n*,
2016 WL 7217641 (E.D.N.Y. Dec. 13, 2016) ................................. 39

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010) .............................................................. 34

*Deckert v. Indep. Shares Corp.*,
311 U.S. 282 (1940) ........................................................................ 32

*Dong v. Miller*,
2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ................................. 39

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ................................................................. 42, 45

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................. *passim*

*Gucci Am., Inc. v. Weixing Li,*
    768 F.3d 122 (2d Cir. 2014) ....................................................... 37, 45

*Headley v. Tilghman,*
    53 F.3d 472 (2d Cir. 1995) ............................................................... 46

*III Finance Ltd. v. Aegis Consumer Funding Grp., Inc.,*
    1999 WL 461808 (S.D.N.Y. July 2, 1999) .......................................... 26

*In re Firestar Diamond, Inc.,*
    657 B.R. 730 (Bankr. S.D.N.Y. 2024) ............................................... 48

*JSC Foreign Econ. Ass'n Technostroyexport*
    *v. Int'l Dev. & Trade Servs., Inc.,*
    295 F. Supp. 2d 366 (S.D.N.Y. 2003) ............................................... 47

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F.3d 42 (2d Cir. 2020) ............................................................. 22

*Noble Prestige Ltd. v. Galle,*
    83 F.4th 1366 (11th Cir. 2023) ....................................................... 34

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.,*
    2013 WL 1915330 (S.D.N.Y. May 9, 2013) .................................. 38, 39

*Quantum Corp. Funding, Ltd.*
    *v. Assist You Home Health Care Servs. of Va., L.L.C.,*
    144 F. Supp. 2d 241 (S.D.N.Y. 2001) .......................................... 26, 38

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
    375 U.S. 180 (1963) ....................................................................... 30

*SEC v. Kontilai,*
    2025 WL 22538 (2d Cir. Jan. 3, 2025) ............................................. 38

*Shamrock Power Sales, LLC v. Scherer,*
  2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016) ....................................... 40

*Students for Fair Admissions, Inc.*
  *v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) .................................................................... 31

*United States ex rel. Rahman v. Oncology Assocs., P.C.,*
  198 F.3d 489 (4th Cir. 1999) ...................................................... 38, 40

*United States v. First Nat'l City Bank,*
  379 U.S. 378 (1965) ............................................................ 25, 32, 35

*Unites States v. Dreier,*
  952 F. Supp. 2d 582 (S.D.N.Y. 2013) .................................................. 28

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,*
  2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ...................................... 39

## Rules

Fed. R. Civ. P. 64 .....................................................................21, 46

Fed. R. Civ. P. 65 ............................................................... *passim*

## Other Authorities

Black's Law Dictionary (7th ed. 1999) .................................................23

Black's Law Dictionary (12th ed. 2024) ...............................................23

11A Wright, Miller, & Kane,
  Federal Practice and Procedure § 2941 (3d ed.) ................................28

## INTRODUCTION

Leadenhall loaned hundreds of millions of dollars to four entities, referred to herein as the Borrowers, based on fraudulent promises by the Borrowers and their Guarantors that the debt provided by Leadenhall would be fully secured.[1]  Before the district court, Leadenhall laid bare this fraudulent scheme.  The Borrowers, the Guarantors, and their co-conspirators admitted—on phone calls recorded with their permission and in writing—that they impaired Leadenhall's security interest by, among other things, double-pledging or failing to own the collateral that was supposed to secure Leadenhall's investment.  Through further investigation, Leadenhall discovered that this was not caused by an innocent mistake or technical glitch, as initially claimed, but by a pattern of intentional fraud carried out with the participation of its lender A-CAP, an insurance group holding company.[2]  Recognizing that

---

[1]  "Leadenhall" refers to Plaintiffs-Appellees Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC.  The "Borrowers" are Defendants-Appellants SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, and Signal SML 4 LLC.  The "Guarantors" are Defendants-Appellants 777 Partners LLC and 600 Partners LLC.

[2] Because Defendants-Appellants A-CAP Holdings LLC and Kenneth King refer to themselves collectively as "A-CAP," Leadenhall does the same.

Leadenhall's contract claims were likely to succeed, the district court entered a preliminary injunction to prevent the Borrowers and Guarantors from further dissipating assets necessary to provide the full security to which Leadenhall was entitled, including by transferring those assets to A-CAP.

A-CAP, a co-conspirator not bound by the preliminary injunction but seeking to strip assets from the entities that are bound, now leads the charge in this appeal. A-CAP does not claim the injunction is overbroad or preventing any legitimate transaction. Instead, A-CAP's sole argument is that the district court ran afoul of the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), by restraining assets of the Guarantors in which Leadenhall supposedly has "no 'equitable interest.'" A-CAP Br. 1.

The district court, however, correctly held that *Grupo Mexicano* has no application here. *Grupo Mexicano* holds only that under Federal Rule of Civil Procedure 65, an "unsecured general creditor" is not entitled to a preliminary injunction restraining defendants' assets pending adjudication of a "contract claim for money damages." 527 U.S. at 326, 330-33. But Leadenhall is not a general creditor. Whereas the debt in

*Grupo Mexicano* was explicitly unsecured, *id.* at 310, here the Borrowers and Guarantors agreed that Leadenhall would be a fully secured creditor, and then tried to defeat Leadenhall's security interest through fraud. *Grupo Mexicano* does not govern this very different scenario.

Moreover, Leadenhall is not just pursuing contract claims for money damages; Leadenhall has an independent equitable interest in the assets of the Guarantors up to the amount necessary to fulfill the Borrowers' and Guarantors' obligation to pledge security interests in and maintain sufficient collateral, free and clear, to fully secure Leadenhall's investment. Leadenhall is pursuing equitable relief to compel the Borrowers and Guarantors to comply with this obligation. And the preliminary injunction entered by the district court simply preserves the status quo and prevents the Borrowers and Guarantors from dissipating assets that are necessary to comply with that obligation. The injunction is thus properly in aid of the district court's equitable jurisdiction, and it serves the fundamental purpose of equity: preventing Defendants from profiting from their own fraud. This Court should affirm the preliminary injunction.

## STATEMENT OF THE ISSUE

Whether *Grupo Mexicano* prevents a district court from restraining asset transfers that would destroy a secured creditor's right to be fully collateralized.

## STATEMENT OF THE CASE AND FACTS

### A. Factual Background

#### 1. The parties enter a secured "borrowing-base" credit facility.

In May 2021, Leadenhall entered into a secured credit facility with the Borrowers, memorialized in a Loan and Security Agreement ("LSA") and other interrelated contracts. *See generally* A-50-52, A-211-49, A-1091-94, CA-40-513. Because this was a secured credit facility, each Borrower pledged a first-priority security interest in 100% of its assets to Leadenhall. A-51, A-53, A-214, A-1046, A-1093, A-1095, CA-49, CA-82. To ensure the entire debt was secured, the Borrowers could take on debt only up to the amount of their respective "Borrowing Bases"—essentially, credit limits—which corresponded to the value of the collateral. A-38, A-202-03, A-209, A-212, A-232-35, A-1077, A-1094, CA-48, CA-70, CA-119-22.

The cardinal rule of the credit facility was that the Borrowers were required, at all times, to own the assets pledged as collateral "free and clear" of any other claims. A-39, A-60-63, A-218, A-232-35, A-1078, A-1104-07, CA-97, CA-119-22. Pursuant to Article II, titled "Amounts and Terms of the Loans," in § 2.15 each Borrower pledged to Leadenhall a "first-priority security interest" in 100% of their assets at all times. A-212, A-214-15, CA-49, CA-70, CA-82-83. Among their Representations and Warranties in Article IV, in § 4.01(h) each Borrower promised that it "is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim," with certain exceptions not relevant here. A-218, CA-97. Among their Covenants in Article V, each Borrower promised in § 5.01(d) that, "[e]xcept for the security interests created hereunder in favor of" Leadenhall, it "shall not sell, assign . . . or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral," and in § 5.01(k)(vi) that it "shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person . . . or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person," with

certain exceptions not at issue here. A-223, A-226, CA-104, CA-107. Upon executing the LSA, each Borrower represented that it owned all collateral "free and clear" and confirmed the same in writing each month—and every time it borrowed against the facility—by submitting Compliance Reports attesting to the sufficiency of its Borrowing Bases and reaffirming the truth of the representations and warranties in the LSA. A-54, A-218, A-1094-97, CA-97.

Each Borrower was also required at all times to own sufficient collateral "free and clear" to secure its entire debt to Leadenhall. A-39, A-60-63, A-212, A-218, A-232-35, A-1078, A-1104-07, CA-70, CA-97, CA-119-22. In the LSA's terms, the Borrowers were required to ensure that no Borrowing Base Deficiency existed and, if one should arise, cure it promptly, on penalty of default. In Article VII of the LSA, each Borrower agreed that a "Borrower Group Event of Default" would occur— triggering Leadenhall's remedies against that Borrower and its affiliates—if "[a] Borrowing Base Deficiency shall exist, and . . . not be remedied within three (3) Business Days." A-235, CA-122. And each Borrower agreed that a "Facility Event of Default" would occur— triggering remedies against *all* Borrowers regardless of their role in the

6

default—if "[a] Borrowing Base Deficiency shall exist, and . . . not be remedied within 30 days." A-232, CA-119. A "Facility Event of Default" would also occur if "[t]he security interest created pursuant to Section 2.15 shall for any reason cease to be a valid and perfected first priority security interest." A-232, CA-119.

In addition to the first-priority security interests in the Borrowers' assets and recourse against each Borrower, Leadenhall negotiated a guarantee from the Borrowers' parent entities, 777 Partners and 600 Partners (collectively, the "Guarantors"). A-203, A-251-68. Pursuant to the Guaranty Agreement, the Guarantors "jointly and severally absolutely, unconditionally and irrevocably guarantee[d]" the Borrowers' "Guaranteed Obligations." A-254. The "Guaranteed Obligations" included every one of the Borrowers' "Obligations" under the LSA, A-252, meaning "the performance of all of the terms, covenants and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA and its ancillary agreements, CA-61, including the obligations set forth above to set aside and pledge to Leadenhall sufficient assets free and clear of other security interests to secure Leadenhall's debt. A-254-55. The Guaranty Agreement also

outlined "Trigger Events" granting Leadenhall recourse against the Guarantors for the Borrowers' obligations, including a Borrower's "failure . . . to own the Collateral pledged free and clear." A-253-54.

### 2. The Borrowers' breaches come to light.

In September 2022, Leadenhall received an anonymous tip that collateral ostensibly securing Leadenhall's loans was pledged to other creditors (*i.e.*, "double-pledged") or not owned by the Borrowers and Guarantors at all. A-64-65, A-120, A-203, A-1110. Over the next year, Leadenhall investigated and verified the tip. A-203-04, A-1110-27. That investigation confirmed that the double-pledging resulted not from a "mistake," but from a sprawling fraudulent scheme. A-65-92, A-1110-45. Leadenhall discovered that the Borrowers and their parent companies, the Guarantors, with former Managing Partners Josh Wander and Steven Pasko at the helm, had gone to great lengths to cover up the collateral deficiency, including falsely blaming the double-pledging on an antiquated computer system and then submitting forged bank statements to Leadenhall. A-65-68, A-86-89, A-1111-19, A-1123-31.

On November 29, 2023, Leadenhall sent formal notice of the Borrowers' breaches. A-75, A-130-34, A-1121. After months of

8

negotiations, during which the Borrowers and Guarantors promised to rectify the issue, it became clear that Wander and his companies, including the Borrowers and the Guarantors, were in severe financial distress and unable to commit to repaying Leadenhall. A-89-105, A-1131-37, A-1167-73. Consequently, on March 15, 2024, Leadenhall exercised its right to accelerate the full amount of the outstanding balance due from the Borrowers and the Guarantors—$609,529,966.82 (the "Accelerated Debt"), which was supposed to be fully secured pursuant to the LSA. A-89-90, A-296-317, A-1131-32.

Following acceleration, Leadenhall continued its efforts to negotiate some consensual repayment for the benefit of its investors. A-90, A-206, A-319-59, A-1132. But in early April 2024, Wander confirmed that 777 Partners could not make even a $15 million repayment—less than 2.5% of the Accelerated Debt. A-101, A-207, A-1134. And on April 29, 2024, Wander admitted that 777 Partners did not have $400 million to repay the Borrowers' debts. A-207, A-1137.

The 777 businesses have been in free-fall for the last year. In early 2024, the foundation supporting the enterprise—777's Bermuda-based reinsurance subsidiary, 777 Re Ltd.—crumbled, extinguishing the key

funding source for the Borrowers, Guarantors, and their affiliates. *See* A-80, A-362-63, A-1151. As a reinsurer, 777 Re accepts payments from primary insurance companies in exchange for indemnifying their liabilities; in reinsurance parlance, 777 Re's customers "cede" liabilities to 777 Re. A-80-81, A-1152-54. By the end of 2023, approximately 99% of 777 Re's nearly $4 billion in invested assets were tied to reinsurance agreements with five reinsurers, three of which are owned by A-CAP. A-82-83, A-362, A-1175-76. The continued operation of many of 777's businesses—including ventures in professional football, aircraft leasing, Canadian airlines, and asset management—depends heavily on 777 Re's assets. A-100, A-363, A-1151, A-1175-76. But in 2024, following regulatory scrutiny and a credit downgrade of 777 Re, the five firms announced they would "recapture" their exposure to 777 Re, devastating 777 Re's asset values. A-99-100, A-362, A-1174-76. This had a domino effect on the Guarantors' ability to service the debts of many of their businesses and spawned at least sixteen other lawsuits collectively seeking more than $130 million. A-102, A-372-709, A-1185-89.[3]

---

[3] Since the filing of this appeal, regulators in Utah and South Carolina, where A-CAP's five insurance companies are based, have issued

### 3. A-CAP takes control of the Guarantors' operations.

Leadenhall's investigation also revealed that A-CAP is in fact the Wizard of Oz behind the 777 Entities' curtain. A-40-41, A-78-86, A-1079-80, A-1141-45. During conference calls in March and April 2023, recorded with Wander's permission, Wander disclosed to Leadenhall that A-CAP had a first-priority "all asset lien" over all of the assets of 777 Partners. A-72, A-1118. Leadenhall later learned that A-CAP was behind the scenes—literally—for these discussions, having physically moved into 777 Partners' Miami offices. A-1079-80; A-1142-45. Indeed, as a former employee of a 777-affiliate explained to Leadenhall, by early 2023, A-CAP had an express agreement whereby it controlled 777 Partners' operations, approved its business decisions, and even funded payroll. A-86, A-205-06, A-1141-45. And the day before Leadenhall initiated this action, Wander informed Leadenhall that A-CAP could no longer provide any funds to 777 Partners or its affiliates due to regulatory

---

emergency orders requiring all five companies to cease writing new business as of December 31, 2024, due to their "hazardous financial condition." A-CAP is appealing both orders.

scrutiny and because A-CAP itself sought to foreclose on their assets. A-207-08, A-1176-77.

### B.    Procedural History

#### 1.    Leadenhall files suit and wins a narrow asset-preserving injunction.

On May 3, 2024, Leadenhall filed suit against the Borrowers, the Guarantors, A-CAP, Wander, Pasko, and other affiliated entities, asserting claims including breach of contract, fraud, and RICO violations. *See generally* A-37-118.  Shortly thereafter, on May 13, 2024, Leadenhall moved for a temporary restraining order to preserve the status quo and prevent Defendants from frustrating collection of a final judgment by (1) preventing the Borrowers from dissipating their remaining assets in which they had granted Leadenhall a first-priority security interest, and (2) preventing the Guarantors from dissipating their remaining assets that they were contractually obligated to use to grant Leadenhall an adequate first-priority security interest to secure the debt through their Borrower subsidiaries.  *See generally* A-169-72.

The TRO application was based on Leadenhall's breach-of-contract claims against the Borrowers and Guarantors and supported by, among other evidence, declarations attesting to recordings in which Wander

admitted the fraudulent double-pledging; LSA amendments applying additional interest to the "Uncollateralized Portion" of the debt (all of which was required to be collateralized); and restated Compliance Reports reflecting that hundreds of millions of dollars of collateral had been double-pledged or was never actually owned by the Borrowers, the Guarantors, or their affiliates. A-105-06, A-108-09, A-181-82, A-205, A-271-74. Leadenhall demonstrated irreparable harm with sworn declarations and other evidence showing that the Borrowers and Guarantors could not or would not pay down even $15 million of the $609 million Accelerated Debt, A-205-07; A-364-65; that they were in the process of running down and liquidating assets, A-207-08; A-365; and that they were dissipating any remaining liquidity into professional football teams—including by lending ten million dollars to Everton (an English football team) *after* the original complaint in this case was filed. A-188-89, A-365, A-1177. Leadenhall proposed a TRO that was narrowly tailored to restrain further dissipation of assets and protect Leadenhall's equitable rights only up to the amount of the Accelerated Debt, which was supposed to be fully secured under the LSA. A-189-90.

In opposing Leadenhall's motion for a TRO, the Borrowers, the Guarantors, and A-CAP did not contest that mountain of evidence. Instead, they argued exactly what they argue here—that *Grupo Mexicano* prevented the district court from restraining the Guarantors' assets. *See* D.Ct.Dkt. 86 at 14-15. At the TRO hearing, Defendants urged the district court to find that Defendants' double-pledging and other fraudulent conduct in violation of the LSA had transformed Leadenhall from a fully secured creditor to an "unsecured creditor" and that as a result, A-CAP could not be prevented from stripping the Guarantors' remaining assets. A-782-83, A-791, A-796.

The district court rejected Defendants' argument, distinguishing *Grupo Mexicano* on the ground that Leadenhall is a secured creditor under the LSA and the Guarantors had guaranteed performance of the Borrowers' obligations with respect to the security. A-819 (explaining that "[i]n *Grupo Mexicano*, as opposed to this case, the notes issued by the borrower and guaranteed by the guarantors were explicitly unsecured"). Leadenhall stated at the TRO hearing that it did not seek to restrain transactions for fair value in the ordinary course of business, and the district court made clear that the TRO would not restrain such

transactions. A-772, A-797-98, A-823-25. Over a lengthy objection from A-CAP that the TRO might nonetheless impede such transactions, the district court stated that, "[i]f the parties are contemplating a transaction that they think might violate the TRO, it would behoove them to simply talk to the plaintiffs about it." A-828.

Following the hearing on June 7, 2024, the district court issued a TRO enjoining the Borrowers and Guarantors, other than in the normal and ordinary course of business, from (A) transferring any assets pledged to Leadenhall as collateral; (B) to the extent the value of the collateral was less than the Accelerated Debt, spending or dissipating cash or cash equivalents up to the amount of the Accelerated Debt; (C) to the extent the value of the collateral plus cash and cash equivalents was less than the Accelerated Debt, spending or dissipating cash or cash equivalents received from any transactions up to the amount of the Accelerated Debt; and (D) dissipating the value of their assets, including by transferring assets to A-CAP and other Defendants. A-831-34. The TRO also required under subsection (E) that the Borrowers and Guarantors notify Leadenhall if a Defendant attempted to foreclose on, repossess, or exercise remedies against the Borrowers' and Guarantors' assets. A-834.

With an express carve-out for transactions in the normal and ordinary course of business, the TRO was designed not to interfere with the rights of other creditors—including intervenors National Founders and ING, both of which supported the TRO and preliminary injunction—while protecting Leadenhall's rights as a secured creditor under the LSA. A-768-69; A-823.

On July 8, 2024, after finding no disputed factual issues warranting an evidentiary hearing, the district court heard oral argument on whether to convert the TRO into a preliminary injunction. A-910. A-CAP's counsel again sought to characterize Leadenhall as an "unsecured creditor[]" notwithstanding the LSA. D.Ct.Dkt. 140 at 4-5, 9. At the hearing, A-CAP's counsel also claimed the TRO had proved "challenging" because it had caused unidentified "contemplated transactions" to be "chilled" and that Leadenhall was using the TRO to block "many, many transactions" in order to extract "holdup value." A-924-25, A-927-29, A-931-32.

The district court, however, recognized that A-CAP had not brought any such transactions to its attention and had presented "no information" suggesting that "plaintiffs are engaged in a holdup." A-928. The court

made clear that if the TRO were used to block legitimate transactions, the court would entertain an application from Defendants to modify the injunction to allow those transactions to go forward. A-930-33. But the court chastised A-CAP for making conclusory assertions that the TRO was "impeding transactions" "without explaining exactly what transactions there are" and "[w]ithout support, without affidavit, solely argument." A-931-33. Because no circumstances had changed since the issuance of the TRO, the district court issued a preliminary injunction on July 8, 2024, with the same terms as the TRO. SPA-1-3.

### 2. The district court denies A-CAP's motion to modify the preliminary injunction.

On July 31, 2024, A-CAP moved to modify the preliminary injunction to permit the Borrowers and Guarantors to dissipate assets and spend cash or cash equivalents (including receipts from transactions) even while the collateral is worth less than the Accelerated Debt. D.Ct.Dkt. 152. In other words, A-CAP sought to delete subsections (B) through (D) from the court's preliminary injunction. SPA-2. If A-CAP had its way, the Borrowers and Guarantors would have been obliged *only* to preserve specific assets pledged as collateral by the Borrowers and would have been free to do as they please with other assets, even though

17

the Guarantors are obligated by the LSA to deploy those assets to grant Leadenhall a fully adequate security interest to secure its investment.

A-CAP's single argument in support of its motion to modify the injunction was, again, that the district court lacked authority under *Grupo Mexicano* to restrain the Guarantors' assets. D.Ct.Dkt. 155 at 13-22. A-CAP did not identify any transactions purportedly blocked or "chilled" by the preliminary injunction. That was unsurprising, as A-CAP's counsel conceded at the August 1, 2024 conference that no such transactions existed. A-1006 (Mr. Watkins: "There is no particular transaction . . . . They're not—there's nothing to present in terms of a particular transaction . . . .").

On August 30, 2024, Leadenhall filed an amended complaint, which it corrected on September 6, 2024. *See generally* A-1073-1228. Leadenhall's amended complaint clarified that Leadenhall was seeking not only money damages but also "injunctive relief" compelling the Borrowers and Guarantors to comply with their contractual obligations "by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt." A-1203; *see also* A-1192, A-1215, A-1218.

18

The district court held a hearing on October 2, 2024, on A-CAP's motion to modify the injunction. A-1295. After considering the parties' arguments and Leadenhall's amended complaint, the district court denied A-CAP's motion. A-1342. In once again rejecting A-CAP's reading of *Grupo Mexicano*, the district court expressly addressed the amended complaint—observing that like the original complaint, Leadenhall's "amended complaint, filed after A-CAP's proposed order to show cause," included "equitable prayers for relief." A-1347.

### 3. Four weeks after noticing its appeal, A-CAP files a unilateral emergency motion, followed by this appeal.

A-CAP noticed this appeal on October 3, 2024. A-1352-53. The Borrowers and Guarantors filed their notice of appeal on October 22, 2024. A-1354.

Nearly a month after filing its notice of appeal, on October 31, 2024, A-CAP filed an "emergency" motion for expedited review—even though it still could not identify any transactions impacted by the preliminary injunction. *See generally* C.O.A.Dkts. 22 & 23. The Borrowers and Guarantors filed a cursory response in support of A-CAP's motion.

C.O.A.Dkt. 26. This Court granted the motion to expedite in part. C.O.A.Dkt. 35.

A-CAP subsequently filed the principal brief on appeal, asking this Court to vacate the portion of the preliminary injunction that restrains assets of the Guarantors. The Borrowers and Guarantors—the entities actually bound by the preliminary injunction—filed a three-page brief adopting A-CAP's arguments. *See generally* C.O.A.Dkt. 48.

## SUMMARY OF ARGUMENT

**I.** A-CAP's reliance on *Grupo Mexicano*—which forms the sole basis of its appeal—is misplaced for at least two reasons.

*First*, *Grupo Mexicano* held only that an unsecured general creditor may not obtain an asset-restraining preliminary injunction to secure a potential money judgment. That case did not address the relief available to a *secured* creditor, like Leadenhall, who is unable to foreclose on its security interest because Defendants fraudulently deprived it of its promised collateral. In an action brought by a secured creditor, a court has the power to issue an injunction restraining defendants from dissipating assets where the restraint is a reasonable measure for preserving the status quo. It would contravene the fundamental

20

principles of equity to allow defendants to deprive a creditor of that equitable right through fraud.

*Second*, this Court has held (and A-CAP concedes) that following *Grupo Mexicano*, a prejudgment asset freeze remains available where it is ancillary to final equitable relief sought by the plaintiff. Here, Leadenhall has an equitable interest in forcing the Borrowers and the Guarantors to perform their obligation to maintain, at all times, sufficient collateral to satisfy the secured debt obligation. And Leadenhall seeks final equitable relief in the form of an injunction compelling the Guarantors to satisfy this obligation. The preliminary injunction, which restrains the Guarantors' assets only to the extent necessary to ensure that the Guarantors will be able to comply with such an injunction, is properly ancillary to the final equitable relief Leadenhall is seeking.

**II.** This Court can also affirm the preliminary injunction on an alternative basis. Although the district court had ample authority to issue the preliminary injunction under Rule 65, it could also have secured Leadenhall's rights via a prejudgment attachment under state law pursuant to Rule 64, obviating the basis for this appeal. New York law

21

permits a prejudgment attachment where a plaintiff has a likelihood of prevailing on the merits and obtaining a money judgment and either (i) the defendant is a foreign corporation not qualified to do business in the state, or (ii) the defendant has disposed of property with intent to defraud its creditors. Both conditions are present here.

## STANDARD OF REVIEW

This Court reviews the district court's "decision to grant a preliminary injunction for abuse of discretion, examining the legal conclusions underpinning the decision de novo and the factual conclusions for clear error." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58 (2d Cir. 2020). The scope of the injunctive relief is likewise "evaluated for abuse of discretion." *Id.*

## ARGUMENT

**I.** ***Grupo Mexicano* does not apply because Leadenhall is a secured creditor seeking both monetary and equitable relief.**

> **A.** ***Grupo Mexicano* does not prevent a district court from taking reasonable measures to protect a secured creditor's interests pending final judgment.**

A-CAP's entire challenge to the district court's ruling is based on a single Supreme Court case that has no application here. In *Grupo Mexicano*, the Supreme Court addressed the question of whether, in an

action for money damages by an "unsecured general creditor," a district court has the power under Rule 65 to issue a preliminary injunction "preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. at 310, 326.[4] The Court determined that because courts of equity traditionally lacked power to restrain asset transfers to ensure that an "unsecured creditor" could recover a money judgment, the answer was no. *Id.* at 330-33. In ruling against the unsecured creditors in that case, the Court distinguished precedent where "the creditor (the Government) asserted an equitable lien on the property, which presents a different case from that of the unsecured general creditor." *Id.* at 326 (citation omitted). The Court relied on "the historical principle that before judgment . . . an unsecured creditor has no rights at law or in equity in the property of his debtor," which limits the ability of "any prowling creditor" to encumber debtors'

---

[4] A-CAP attempts to conflate the concepts of *secured* creditors and *judgment* creditors and argues that secured creditors are merely "general creditors" until they win a judgment. A-CAP Br. 27. That is incorrect. The term "general creditor" has long been synonymous with "unsecured creditor," and the opposite of "secured creditor." *Creditor*, Black's Law Dictionary (7th ed. 1999); *see also Creditor*, Black's Law Dictionary (12th ed. 2024).

assets. *Id.* at 330 (quotation marks omitted). But the Court did not identify any analogous principle for secured creditors. *See id.*

Accordingly, the district court correctly held that *Grupo Mexicano* is inapposite because Leadenhall is a *secured* creditor. A-819. A-CAP does not dispute that Leadenhall has a security interest in the Borrowers' assets. A-CAP Br. 26. Nor can it—Leadenhall is a secured creditor under the LSA and negotiated for the Borrowers' debt to be fully secured by collateral with a value equivalent to the debt. A-212, A-214, A-232-35, CA-70, CA-82, CA-119-22. And the Borrowers represented dozens of times that they owned and pledged to Leadenhall enough collateral to fully cover the debt they drew from the secured credit facility. A-54, A-218, A-1096-97, CA-97. Leadenhall also negotiated for a guarantee that the Guarantors would not only assume the Borrowers' payment obligations but perform *all* of the Borrowers' obligations, including their obligations to secure and pledge sufficient collateral to secure the debt. A-252-55, CA-61. Because *Grupo Mexicano* has nothing to say about cases brought by secured creditors to recover their secured debts from the parties bound to provide security, Leadenhall's secured-creditor status renders *Grupo Mexicano* inapplicable.

A-CAP offers no sound basis for extending *Grupo Mexicano*'s holding. A-CAP claims that the district court's approach would provide secured creditors with a "new" and "powerful weapon of oppression." A-CAP Br. 27-28 (quoting *Grupo Mexicano*, 527 U.S. at 330-31). But there is nothing "new" about secured creditors having rights to the property securing their debts, as *Grupo Mexicano* recognized. 527 U.S. at 326 (approving of the preliminary injunction in *United States v. First National City Bank*, 379 U.S. 378 (1965), in part because "the creditor (the Government) asserted an equitable lien on the property"). In fact, in the passage A-CAP misquotes, the *Grupo Mexicano* Court said nothing about the rights long enjoyed by secured creditors, but simply echoed a century-old concern about handing a "powerful weapon of oppression" to "any prowling creditor" *without* a security interest. *Id.* at 330 (quotation marks omitted).

Subsequent case law further underscores that A-CAP's fearmongering is misplaced. The district court hardly charted a new course in issuing the preliminary injunction—courts have repeatedly distinguished *Grupo Mexicano* where, as here, a secured creditor seeks preliminary injunctive relief restraining asset transfers to prevent a

25

debtor from rendering itself judgment-proof. *See Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., L.L.C.,* 144 F. Supp. 2d 241, 249 (S.D.N.Y. 2001) (granting a preliminary injunction to a secured creditor after determining "[t]he issue in *Grupo Mexicano,* as other courts have recognized, was whether a district court has the power to enjoin assets in which the potential judgment creditor has absolutely no equitable interest. Such is not the record before me and *Grupo Mexicano* is therefore distinguishable."); *III Finance Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *4 n.1 (S.D.N.Y. July 2, 1999) (granting a preliminary injunction and holding that "[t]he *Grupo* case is inapplicable here because III Finance claims a security interest in the assets subject to the preliminary injunction."); *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 79 (W.D.N.Y. 2018) (distinguishing *Grupo Mexicano* and granting a preliminary injunction because the plaintiff was "a secured creditor who holds a security interest over the Collateral, as granted by Defendants through the Security Agreement" (collecting cases)).

To salvage its *Grupo Mexicano* argument, A-CAP insists that Leadenhall lacks a specific security interest in the *Guarantors'* assets.

26

But as the district court correctly held in refusing to modify the preliminary injunction, Leadenhall has "an interest in the assets of the [G]uarantors, up to [the value of the Accelerated Debt], based on the guarantee by the [G]uarantors of the performance by the [B]orrowers of their obligations." A-1347-48. The Borrowers were obligated at all times to own, "free and clear" of any other encumbrance, assets sufficient to fully secure Leadenhall's debt, on penalty of default. A-39, A-60-63, A-212, A-218, A-232-35, A-1078, A-1104-07, CA-70, CA-97, CA-119-22. And the Guarantors guaranteed not only the Borrowers' obligation to pay their debt on time, but *all* of their "Obligations," meaning "the performance of all of the terms, covenants and agreements on the part of such Borrower" under the LSA. CA-61. If the Borrowers' assets are now worth less than their outstanding debt—thereby forcing Leadenhall to exercise recourse to the Guarantors—that is only because the Borrowers exceeded their borrowing limit and fraudulently "unsecured" their secured debt: precisely the situation that the guaranty was negotiated to backstop.

A-CAP cannot now capitalize on its fraud (and that of its co-conspirators) to argue that the injunction cannot reach the portion of

Leadenhall's secured debt that Defendants rendered "unsecured." *Grupo Mexicano* did not consider a situation where the defendant sought to frustrate the plaintiff's security interest through fraud—it dealt only with whether, based "'on traditional principles of equity jurisdiction,'" a court could issue a preliminary injunction "preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. at 310, 319 (quoting 11A Wright, Miller, & Kane, Federal Practice and Procedure § 2941 (3d ed.)). A court of equity would dismiss out of hand A-CAP's attempt to invoke the "traditional principles of equity jurisdiction" articulated in *Grupo Mexicano* to avoid injunctive relief where it was Defendants' own fraud that violated Leadenhall's lien and rendered a secured debt "unsecured." To do otherwise would "violat[e] the well-settled rule that 'no one shall be permitted to profit by his own fraud.'" *See Unites States v. Dreier*, 952 F. Supp. 2d 582, 590 (S.D.N.Y. 2013) (quoting *Bankers Tr. Co. v. Litton Sys., Inc.*, 599 F.2d 488, 492 (2d Cir. 1979)). Indeed, one of the hallmarks of equity was its commitment to flexibility in the name of preventing fraud.

For this reason, A-CAP's efforts to distinguish the cases from this Circuit in which courts have issued asset-preserving injunctions to a

secured creditor fall short. A-CAP argues that those injunctions "strictly limit[ed] the restraint to the particular assets in which the plaintiff claims a security interest." A-CAP Br. 30. But the injunctions in those cases were so limited only because the specific assets pledged by the borrower still existed—unlike here, where Defendants have either double-pledged, failed to pledge, or absconded with the specific collateral they promised would fully secure Leadenhall's investment. And none of those cases involved a separate guaranty by which the Guarantors agreed to step into the shoes of the Borrowers—including assuming the obligation to pledge and maintain sufficient collateral to keep the creditor secured.

Here, there is no question that Leadenhall has a security interest in the collateral pledged by the Borrowers, nor is there any question that the Borrowers had an obligation, guaranteed by the Guarantors, to own and maintain sufficient collateral free and clear to fully secure Leadenhall's debt. As discussed further below, the injunction here is narrowly tailored to preserve assets equivalent to the amount of the Accelerated Debt—*i.e.*, equivalent to the security that should have existed—by the parties who took on the obligation to pledge and maintain

29

that security. To the extent it is necessary for the injunction here to reach anything beyond the Borrowers' assets, that is only because the Borrowers' fraud was more brazen than in prior cases. But equity does not permit the Borrowers to profit from that fact.

Indeed, *Grupo Mexicano*'s distinction between unsecured and secured creditors would be eviscerated if a borrower could deprive a secured creditor of its right to obtain a prejudgment restraint simply by absconding with the security. Courts of equity have traditionally exercised their powers broadly and flexibly to prevent fraud. *See, e.g., SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 193 n.41 (1963) (quoting Chancellor Hardwicke's famous statement in 1759: "Fraud is infinite, and were a Court of Equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes which the fertility of man's invention would contrive."). It would be fundamentally *in*equitable to allow a borrower's fraud to limit the remedies otherwise available to a secured creditor. A-CAP presents no reason to think a court of equity would have tolerated that result. And it presents no case, whether from

30

traditional courts of equity or any court up to the present day, stating that a borrower could abscond with collateral backing secured debt and a federal district court does not have any power over a party guaranteeing all of the borrowers' obligations to issue preliminary relief. *Grupo Mexicano* does not suggest otherwise.

Still, A-CAP argues at length that *Grupo Mexicano* requires this Court to blind itself to the principles that have guided equity jurisdiction for centuries. *Grupo Mexicano* says no such thing. It is telling that on this point, A-CAP quotes extensively not from the majority opinion in *Grupo Mexicano*, but from the dissent's description of that opinion. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion."). In fact, *Grupo Mexicano* reaffirmed the Court's holding that the Judiciary Act of 1789—and by extension, Rule 65—embodies "*the principles of the system of*" equity that "had been devised and was being administered by the English Court of Chancery." *Grupo Mexicano*, 527 U.S. at 318-19 (emphasis added) (quoting *Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939)). While the Court disapproved of invoking "the grand

31

aims of equity" as authority "to grant relief whenever legal remedies are not practical and efficient," *id.* at 321 (quoting *id.* at 342 (Ginsburg, J., dissenting in relevant part)), that is a far cry from what the district court did here. The district court relied not on a vague power to fill any perceived gap in the remedies available at law, but on the concrete equitable principle recognized in *Grupo Mexicano* itself: While a general creditor has no right to the debtor's assets before judgment, *id.* at 319-20, that rule does not apply to a secured creditor, who has bargained for the right for his debt to remain secured while he pursues enforcement.

Because Leadenhall is a secured creditor, and thus not among the class of creditors to which *Grupo Mexicano*'s holding applies, the only question is whether the preliminary injunction is "a reasonable measure to preserve the status quo." *First Nat'l City Bank*, 379 U.S. at 385 (quotation marks omitted); *accord Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940). The district court's preliminary injunction satisfies this test. Again, the Borrowers agreed that Leadenhall would be a fully secured creditor and that they would provide enough collateral, free and clear, to secure their entire debt to Leadenhall. A-202-03, A-209, A-212-15, A-218, A-223, A-226, A-232-35, CA-70-71, CA-82-83, CA-97, CA-104,

32

CA-107, CA-119-22. The Guarantors, in turn, guaranteed all of the Borrowers' obligations—including not just the obligation to *repay* the debt, but also the obligation to *secure* the debt. A-252-55, CA-61. Leadenhall's equitable rights as a secured creditor are not nullified by the Borrowers' fraudulent depletion of (or failure to own) the specific collateral they pledged. The Guarantors' assets must be preserved (up to the amount of the Accelerated Debt) so they can ultimately fulfill their own obligation to protect Leadenhall's rights as a secured creditor. As the district court correctly determined, an injunction to restrain dissipation of those assets was necessary given the undisputed evidence that the Borrowers and Guarantors have virtually no cash or cash equivalents to repay the Accelerated Debt.

In a last-ditch effort to distract from the clear justification for the preliminary injunction, A-CAP urges the Court to adopt a new requirement that Leadenhall cannot obtain an asset-preserving injunction absent foreclosure on the liens created by the security interest at issue. A-CAP Br. 28. The Court should reject this argument.

As an initial matter, A-CAP never made this argument below and failed to preserve it for this Court's review. *See generally* D.Ct.Dkts. 90

& 155. Of the three cases A-CAP cites in support, one was never cited below, and two A-CAP mentioned only in passing in a footnote in support of its motion to modify the injunction, without even urging the district court to adopt their reasoning. A-CAP therefore forfeited the argument. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 100 n.21 (2d Cir. 2010).

To the extent the Court considers this argument, it is unavailing. A-CAP's primary authority is an Eleventh Circuit case, *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1384 (11th Cir. 2023), in which the court reversed the district court's grant of a preliminary injunction where the plaintiff sought to confirm and enforce an arbitral award for breach of contract. The court there reasoned that the plaintiff, a secured creditor, had "*elected* to obtain an award against [the borrower] *in personam* on the underlying debt, rather than attempting to foreclose on its security interest." *Id.* at 1383 (emphasis added). As discussed, that is not what happened here. Leadenhall did not "elect" to forego foreclosure on its security interest—it did not have the option of foreclosing because the promised collateral was unavailable due to Defendants' fraud.

Like the Supreme Court in *Grupo Mexicano*, the Eleventh Circuit in *Noble* did not consider a scenario where a secured creditor is rendered

34

"unsecured" through fraud. And unlike the plaintiff in *Noble Prestige*, Leadenhall *did* exercise contractual remedies—specifically, acceleration of the debt—that were frustrated by the Borrowers and Guarantors. The district court correctly concluded that in these circumstances, the Guarantors' assets must be preserved—but only to the extent necessary to protect Leadenhall's rights as a secured creditor. A-1348. This is "eminently appropriate to prevent further dissipation of assets." *First Nat'l City Bank*, 379 U.S. at 385 (approving a temporary injunction to prevent foreign taxpayers from transferring assets abroad as a "reasonable measure to preserve the status quo").

In short, *Grupo Mexicano* does not prevent a court from issuing a preliminary injunction to preserve the status quo and protect the equitable rights of a secured creditor who has been deprived of its collateral through fraud. That is exactly what the district court did here.

## B. The preliminary injunction is ancillary to Leadenhall's claims for equitable relief.

Although the Court need not look past Leadenhall's secured creditor status to determine that *Grupo Mexicano* does not apply to this case, the relief the court ordered is also consistent with *Grupo Mexicano* because Leadenhall has an equitable interest in all the assets enjoined

35

and the injunction is ancillary to Leadenhall's claims for final equitable relief.

Leadenhall has an independent equitable interest in the enjoined assets of the Guarantors by virtue of the contractual obligation, undertaken by both the Borrowers and the Guarantors, to pledge and maintain sufficient collateral, free and clear, to ensure that Leadenhall's debt remains fully secured. A-39, A-60-63, A-212, A-214, A-218, A-223, A-226, A-232-35, A-252-55, A-1078, A-1104-07, CA-61, CA-70, CA-82, CA-97, CA-104, CA-107, CA-119-22. This obligation gives Leadenhall an equitable interest in assets of the Borrowers and Guarantors up to the amount necessary to fulfill that obligation. In other words, Leadenhall has an equitable interest in forcing the Borrowers—and Guarantors—to perform their obligations to hold sufficient collateral to satisfy the secured debt obligation.

Moreover, as this Court has recognized and A-CAP acknowledges, under *Grupo Mexicano*, courts retain the power to issue a prejudgment asset freeze "where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief."

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (citation omitted); *see* A-CAP Br. 29-30.[5]

That test is satisfied here. Leadenhall's original complaint sought not just monetary damages, but also "[a]n order enjoining Defendants [from] violating their obligations under the Agreements." A-117. Leadenhall's amended complaint, which the district court expressly considered when denying A-CAP's motion to modify the injunction, expanded on that request and clarified that Leadenhall is seeking injunctive relief to compel the Borrowers and Guarantors to fulfill their contractual obligation to acquire and pledge sufficient collateral to secure Leadenhall's debt. *See* A-1192-93, A-1203, A-1215, A-1218; *see also* A-1347 (district court observing that Leadenhall's amended complaint includes "equitable prayers for relief."). And the district court's preliminary injunction is ancillary to that equitable relief because it

---

[5] Beginning with its Statement of the Issues, A-CAP's brief repeatedly and falsely claims that in *Gucci* this Court held that *Grupo Mexicano* allows preliminary injunctive relief "only" in the situation above. A-CAP Br. 5, 10-11, 22, 29-30, 31, 32. But in each case, the word "only" is supplied by A-CAP, and does not appear in any relevant passage in *Gucci*. In *Gucci*, this Court did not purport to rewrite the rule in *Grupo Mexicano* to exclude secured creditors, but merely applied *Grupo Mexicano* to a fact pattern that did not involve a secured creditor.

freezes the Borrowers' and Guarantors' assets only up to the amount necessary to fulfill that obligation and allows transactions in the ordinary course of business.

To be sure, Leadenhall also seeks money damages. Seizing on this, A-CAP engages in a lengthy discourse about whether Leadenhall's claims are primarily legal or equitable and whether the district court relied *solely* on Leadenhall's equitable prayers for relief in refusing to modify the injunction. But a claim for monetary damages "along with equitable relief does not defeat the district court's equitable powers." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999). And just this month, this Court observed that "*Grupo Mexicano* does not prevent a pre-judgment freeze of untainted assets at least to preserve an ultimate award of equitable relief." *SEC v. Kontilai*, 2025 WL 22538, at *4 (2d Cir. Jan. 3, 2025).

So "'where plaintiffs seek *both* equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets.'" *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) (quoting *Quantum*, 144 F. Supp. 2d at 250 n.9); *see also Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL

1610790, at *1 (S.D.N.Y. Oct. 27, 2000) ("[C]ourts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets."). That is, in a "mixed case" seeking legal and equitable relief, "'a court retains its equitable power to freeze assets'" where there is "'a nexus between the injunctive relief requested and the equitable relief ultimately sought.'" *Dong v. Miller*, 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) (quoting *Paradigm BioDevices*, 2013 WL 1915330, at *2 & *Coley v. Vannguard Urban Improvement Ass'n*, 2016 WL 7217641, at *2 (E.D.N.Y. Dec. 13, 2016)).

That nexus between preliminary and final equitable relief clearly exists here. The preliminary injunction is narrowly tailored to preserve the status quo and protect Leadenhall's ability to obtain the final equitable relief it seeks—which would be frustrated if the Borrowers and Guarantors dissipated their assets such that they could no longer afford to acquire and pledge sufficient collateral to comply with the injunction Leadenhall is seeking. Put differently, by freezing the Borrowers' and Guarantors' assets up to the value of the Accelerated Debt, the preliminary injunction "act[s] in aid of the ultimate relief sought"—

39

performance of the Borrowers' and Guarantors' obligation to maintain sufficient collateral. *Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016); *see Rahman*, 198 F.3d at 498 ("The injunction in this case freezes the defendants' assets, prohibiting the defendants from transferring them 'outside the ordinary course of business.' . . . It is readily apparent that [such] mandates are designed to enable or to aid the district court in giving the relief requested in the complaint.").

A-CAP, along with the Borrowers and Guarantors, argues that the preliminary injunction cannot be justified based on Leadenhall's request for injunctive relief in its amended complaint because the district court originally issued the preliminary injunction based on the initial complaint. A-CAP Br. 16; Borrowers & Guarantors Br. 2. But the district court addressed the amended complaint at the hearing on A-CAP's motion to modify the preliminary injunction, and it recognized that the injunction was supported by the request in the amended complaint for injunctive relief compelling the Guarantors to perform their obligations to set aside sufficient assets to secure Leadenhall's debt. Having asked the court to reconsider the propriety of its injunction by moving to modify

40

the injunction, A-CAP cannot ignore the record on which the court relied when denying that motion.

A-CAP offers four further responses, none of which finds any support in the record or the law. *First*, A-CAP states, without elaboration or citation, that Leadenhall's "interest" in the Guarantors' assets "is purely contractual, not equitable." A-CAP Br. 41. It is not clear what that means, since contracts—and particularly breaches of contracts— often give rise to equitable rights, including but not limited to rights of specific performance, rescission, restitution, disgorgement, and the like.

*Second*, A-CAP claims that Leadenhall did not assert a claim or apply for preliminary relief based on an obligation to pledge collateral. A-CAP Br. 41. That is incorrect. Leadenhall's contract claims, on which it moved for preliminary relief, included a claim that the Guarantors breached their obligation, triggered by the Borrowers' "failing to own Collateral 'free and clear' of any other security interests," to "guarantee the payment *and/or the performance* of the Borrowers following that Trigger Event." A-109 (emphasis added), A-1199 (same). In particular, the Guarantors breached their obligation to guarantee the performance of the LSA provisions specified in the Complaint, including the

41

Borrowers' promise in LSA §§ 4.01(h) and 5.01(d) to maintain sufficient collateral to secure their entire debt to Leadenhall "free and clear of any Adverse Claim," and their promise in LSA § 5.01(k)(vi) not to "grant an Adverse Claim on any of [their] assets to secure any obligation of any other Borrower, any Other Company or any other Person," A-105, A-212, A-218, A-223, A-226, A-232-35, A-252-55, A-1199-1202, CA-61, CA-70, CA-97, CA-104, CA-107, CA-119-22. And Leadenhall sought injunctive relief compelling the Guarantors to perform the Borrowers' obligations under the LSA by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt." A-1203; *see also* A-117 (requesting "[a]n order enjoining Defendants violating their obligations under the Agreements"). That is not a claim for "[s]pecific performance of a past due monetary obligation," as A-CAP claims. A-CAP Br. 42 n.13 (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-11 (2002)). That is a claim for equitable relief compelling the Guarantors to comply with their obligation to grant Leadenhall sufficient collateral to guarantee the Borrowers' obligations to fully and effectively secure their debt. And that is the claim on which Leadenhall already proved a likelihood of success on the merits.

42

*Third*, A-CAP contends that neither the LSA nor the Guaranty Agreement obligated the Borrowers or the Guarantors "to set aside or pledge any collateral." A-CAP Br. 42-43. That could not be further from the truth. A-CAP begins this argument by claiming that the "core" obligation under the LSA is to repay the debt on time. *Id.* at. 43. But A-CAP does not get to decide (nor is it relevant) which contractual promises are "core" and which are somehow less important; the Borrowers (and thus the Guarantors) were required to perform all of them. A-CAP then points to one of the many terms and covenants in the LSA (§ 2.15) that required the Borrowers to pledge and maintain "free and clear" sufficient collateral to secure their entire debt, but it ignores many others, including but not limited to §§ 5.01(d) and 5.01(k)(vi), as well as §§ 7.01(c) and 7.02(g), which require that the collateral be sufficient to support a "Borrowing Base" greater than outstanding borrowings. A-CAP Br. 43; A-212, A-214-15, A-218, A-223, A-226, A-232-35, CA-70, CA-82-83, CA-97, CA-104, CA-107, CA-119-22. A-CAP next argues that "[i]f there were such an Obligation" to pledge sufficient collateral, "surely that defined term [Obligation] would have been defined to include it." A-CAP Br. 43. Indeed: "Obligations" is defined in the LSA

43

to include "the performance of *all of the terms, covenants and agreements on the part of such Borrower* (whether as Borrower or otherwise) to be performed under this Agreement or any document delivered in connection with this Agreement." CA-61 (emphasis added). There is no obligation more "core" to a secured borrowing-base credit facility like this one than pledging adequate collateral to secure the debt.

In a further attempt to salvage this argument, A-CAP invokes the "Pledge Agreements," which are separate contracts between Leadenhall and other subsidiaries of the Guarantors, known as the Sellers. A-CAP Br. 43; *See generally* CA-514-61. Through the Pledge Agreements, the Sellers pledged *additional* security to Leadenhall on top of the Borrowers' and Guarantors' assets. Contrary to A-CAP's misreading of the Pledge Agreements, the term "Pledged Collateral" in those agreements does not refer to the Borrowers' collateral nor the Guarantors' assets that they were required to use to grant Leadenhall an adequate security interest, but rather to the Sellers' equity interests in the Borrowers, which the Sellers pledged as separate or "collateral security for, the prompt and complete payment or performance in full when due . . . of all Obligations"

44

as defined in the LSA.  CA-515-16, CA-527-28, CA-539-40, CA-551-52. The Pledge Agreements are irrelevant to the question before the Court.

*Fourth*, A-CAP argues that, for Leadenhall to have an equitable interest in the Guarantors' assets, the contracts had to identify "particular funds or property" in advance.  A-CAP Br. 44 (quoting *Knudson*, 534 U.S. at 213-14).  That is not what the Supreme Court said in *Knudson*, and it is not the law.  The passage A-CAP misleadingly quotes from *Knudson* addressed only the specific remedy of restitution, which is not at issue here.  534 U.S. at 214.  A-CAP goes so far as to insert words into a quotation from *Knudson* to distort its meaning and suggest a false analogy—a tactic this Court should ignore.  A-CAP Br. 24, 44. Further, A-CAP's argument is directly contrary to this Court's holding in *Gucci*.  There, the party opposing "the Asset Freeze Injunction" argued that it "exceeded the court's equitable authority because it failed to identify the 'particular property'" to be enjoined.  768 F.3d at 133.  This Court then held: "We know of no requirement, however, and certainly there is none in the Lanham Act, that would obligate plaintiffs to make this identification prior to obtaining a preliminary injunction." *Id.*

**II.** **The district court could have secured Leadenhall's rights via a prejudgment attachment pursuant to Rule 64, nullifying the argument that it lacked authority to do so.**

Even if *Grupo Mexicano* had prevented the district court from restraining the Guarantors' assets under Rule 65, the court could have secured Leadenhall's rights via a prejudgment attachment under Rule 64 and state law. Although the district court did not rely on Rule 64, this Court is "free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machs. Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (quoting *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995)).

Rule 64 provides that in an action in federal court, "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). *Group Mexicano* addressed only the power of federal district courts to restrain assets under Rule 65 and expressly distinguished the "use of state prejudgment remedies" under Rule 64. 527 U.S. at 318, 330. Accordingly, even in cases (unlike this one) where *Grupo Mexicano* applies, it does not limit the availability

46

of prejudgment attachment under state law. *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 390 & n.11 (S.D.N.Y. 2003); *Bollenbach v. Haynes*, 2018 WL 4278347, at *1 n.1 (S.D.N.Y. May 29, 2018).

New York law authorizes prejudgment attachment when (1) the plaintiff has a cause of action for a money judgment, (2) it is probable that the plaintiff will succeed on the merits, (3) one or more of the grounds for attachment provided in Section 6201 of the New York Civil Practice Law and Rules exist, and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218-19 (2d Cir. 2006).

Each of those conditions is met here. *First*, Leadenhall undisputedly has a cause of action for a money judgment. *See* A-CAP Br. 2. *Second*, the district court held that Leadenhall has a "likelihood of success on the merits," A-819, and A-CAP has not challenged that holding. *Third*, at least two grounds for attachment under CPLR § 6201 exist: (a) the Guarantors are "foreign corporations not qualified to do business in the state," § 6201(1); and (b) as the district court recognized

47

in finding irreparable harm, Defendants have, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in [Leadenhall's] favor, . . . assigned, disposed of, encumbered or secreted property . . . or [are] about to do" so, § 6201(3). *Fourth*, the Guarantors have not brought any counterclaims against Leadenhall or identified any counterclaims they could bring, and Leadenhall is unaware of any such counterclaims. And, in addition to the statutory requirements, the district court already recognized that Leadenhall has shown attachment is appropriate and needed, due to the Borrowers and Guarantors' imminent insolvency and manifest intent to dissipate assets. A-820; *see In re Firestar Diamond, Inc.*, 657 B.R. 730, 762 (Bankr. S.D.N.Y. 2024) (finding need for attachment where "a defendant's *financial position or past and present conduct*, poses a real risk to the enforceability of a future judgment" (emphasis in original) (quoting *Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994))); *180 Life Scis. Corp. v. Tyche Cap. LLC*, 216 A.D.3d 419, 420 (N.Y. App. Div. 1st Dep't 2023) (affirming attachment where "there was an imminent risk that defendant would liquidate the [attached property] and remove the

proceeds from New York absent an attachment, thus rendering defendant judgment-proof").

## CONCLUSION

The Court should affirm the preliminary injunction.

Respectfully submitted,

*/s/ Leigh M. Nathanson*

| | |
|---|---|
| Paul Alessio Mezzina | Craig Carpenito |
| Zoe M. Beiner | Leigh M. Nathanson |
| King & Spalding LLP | KING & SPALDING LLP |
| 1700 Pennsylvania Avenue NW | 1185 Avenue of the Americas |
| Washington, DC 20006 | 34th Floor |
| (202) 737-05000 | New York, NY 10036 |
| pmezzina@kslaw.com | (212) 790-5359 |
| zbeiner@kslaw.com | ccarpenito@kslaw.com |
| | lnathanson@kslaw.com |

*Counsel for Plaintiffs-Appellees Leadenhall Capital Partners LLP and*
*Leadenhall Life Insurance Linked Investments Fund PLC*

January 16, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,428 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Date: January 16, 2025

/s/ *Leigh M. Nathanson*
Leigh M. Nathanson

*Counsel for Plaintiffs-Appellees*
*Leadenhall Capital Partners LLP*
*and Leadenhall Life Insurance*
*Linked Investments Fund PLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 16, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

/s/ *Leigh M. Nathanson*
Leigh M. Nathanson

*Counsel for Plaintiffs-Appellees*
*Leadenhall Capital Partners LLP*
*and Leadenhall Life Insurance*
*Linked Investments Fund PLC*