# 24-2647-cv(L), 24-2867-cv(CON)

## United States Court of Appeals

### *for the*

## Second Circuit

————————

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS FUND PLC,

*Plaintiffs-Appellees,*

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY, ACM
DELEGATE LLC, NATIONAL FOUNDERS LP,

*Intervenors,*

*(For Continuation of Caption See Inside Cover)*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS
## ADVANTAGE CAPITAL HOLDINGS LLC
## AND KENNETH KING

JONATHAN M. WATKINS
MICHAEL E. PETRELLA
MATTHEW M. KARLAN
CADWALADER, WICKERSHAM & TAFT LLP
*Attorneys for Defendants-Appellants*
  *Advantage Capital Holdings LLC*
  *and Kenneth King*
200 Liberty Street
New York NY 10281
(212) 504-6000

CP COUNSEL PRESS   (800) 4-APPEAL • (335961)

– v. –

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING,
777 PARTNERS LLC, 600 PARTNERS LLC, SPIESS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,

*Defendants-Appellants,*

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLP,
SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC,
INSURETY SERVICING LLC,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

PRELIMINARY STATEMENT .............................................................. 1

ARGUMENT ......................................................................................... 4

I.    A SECURITY INTEREST IN BORROWERS'
ASSETS CANNOT AUTHORIZE A FREEZE OF
GUARANTORS' ASSETS ......................................................... 4

    A.    *Grupo Mexicano* Looks to a Creditor's Claim to
the Restrained Assets, Not Whether the
Creditor Is Otherwise "Secured" ................................... 4

    B.    The Freeze of Guarantors' Assets Is Not Relief
that was Historically Available ................................... 10

    C.    Leadenhall's Unsubstantiated Accusations of
Fraud Cannot Expand the Courts' Powers ................. 14

II.    LEADENHALL'S PRELIMINARY INJUNCTION IS
NOT ANCILLARY TO ANY FINAL EQUITABLE
CLAIMS FOR RELIEF ......................................................... 18

    A.    Leadenhall Moved for Preliminary Relief on Its
Claims for Money Damages, Not on Any Claim
to Compel the Posting of Collateral ............................ 18

    B.    Leadenhall Has No Equitable Interest in
Guarantors' Assets ....................................................... 20

III.    LEADENHALL DID NOT SEEK AND CANNOT
OBTAIN ATTACHMENT UNDER RULE 64 ...................... 29

CONCLUSION ................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AKF, Inc. v. AvantGarde Senior Living,*
2021 WL 2662070 (N.D.N.Y. Apr. 29, 2021) ....................................... 11

*Bank of China, New York Branch v. NBM L.L.C.,*
192 F. Supp. 2d 183 (S.D.N.Y. 2002) ................................................... 31

*Cacchillo v. Insmed, Inc.,*
638 F.3d 401 (2d Cir. 2011) .................................................................. 29

*Charlesbank Equity Fund II v. Blinds to Go, Inc.,*
370 F.3d 151 (1st Cir. 2004) ................................................................ 11

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.,*
524 F. Supp. 2d 412 (S.D.N.Y. 2007) ................................................... 30

*Deeper Life Christian Fellowship, Inc. v. Sobol,*
948 F.2d 79 (2d Cir. 1991) ................................................................... 21

*Dong v. Miller,*
2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ....................................... 27

*Ehrenfeld v. Mahfouz,*
518 F.3d 102 (2d Cir. 2008) ................................................................. 29

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002) ...................................................................... passim

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ...................................................................... passim

*Gucci America, Inc. v. Weixing Li,*
768 F.3d 122 (2d Cir. 2014) ........................................................... 11, 20

*Klipsch Grp. v. Big Box Store Ltd.,*
2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012) ........................................ 13

*Morin v. Trupin,*
738 F. Supp. 98 (S.D.N.Y. 1990) .......................................................... 31

*Noble Prestige Ltd. v. Galle,*
83 F.4th 1366 (11th Cir. 2023) ...................................................... 11, 12

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
  2013 WL 1915330 (S.D.N.Y. May 9, 2013) .............................. 13, 26, 27

*Prof'l Merch. Advance Cap., LLC v. C Care Servs., LLC*,
  2013 WL 12109397 (S.D.N.Y. Oct. 2, 2013) ......................................... 11

*Royal Palm Senior Inv'rs, LLC v. Carbon Capital II, Inc.*,
  2009 WL 1941862 (S.D.N.Y. July 7, 2009) ..........................................4-5

*SEC v. Kontilai*,
  2025 WL 22538 (2d Cir. Jan. 3, 2025) ................................................. 25

*Sequa Corp. v. GBJ Corp.*,
  156 F.3d 136 (2d Cir. 1998) ................................................................. 21

*Spinelli v. Nat. Football League*,
  903 F.3d 185 (2d Cir. 2018) ................................................................. 15

*United States ex rel. Rahman v. Oncology Assoc.*,
  198 F.3d 489 (4th Cir. 1999) ............................................................... 27

*United States v. First Nat. City Bank*,
  379 U.S. 378 (1965) ........................................................................... 7, 8

*United States v. Harrell*,
  268 F.3d 141 (2d Cir. 2001) ................................................................. 12

## Statutes & Other Authorities:

CPLR § 6201 ........................................................................................ 30

CPLR § 6201(1) .................................................................................... 30

CPLR § 6201(3) .................................................................................... 30

1 Commentaries on Equity Jurisprudence § 12 (1836) ......................... 17

1 D. Dobbs, Law of Remedies §4.3(2) (2d ed. 1993) ............................ 26

## PRELIMINARY STATEMENT

Leadenhall conjures a version of law and procedural history that diverges from reality. It argues that *Grupo Mexicano* is categorically inapplicable to any lender with "secured-creditor status." In truth, however, *Grupo Mexicano* holds that, on contract claims for money damages, federal courts are powerless to preliminarily restrain assets in which the movant claims no lien or equitable interest. What matters is not *whether* a lender is a "secured creditor," but *which* assets have been pledged as security (and therefore can be restrained) and which have not (and therefore cannot be restrained). Leadenhall concedes that it has no lien on any asset of Guarantors, and it cites no case in the history of equity that does what it asks this Court to affirm: a freeze of *unencumbered*[1] assets based on a security interest in *other* assets (of another obligor). This precludes any lien-based freeze of Guarantors' assets.

Leadenhall is, however, well aware of the *in terrorem* consequences of the preliminary injunction—and of its own repeated

---

[1] Throughout, we refer to assets "unencumbered" by any lien of Leadenhall. Guarantors' assets *are* encumbered by A-CAP's and its affiliates' senior liens.

accusations.  It thus seeks to preserve the freeze of Guarantors' assets by coating its contract claims with veneers of alleged fraud.  But Leadenhall did not move on, let alone establish the likely success of, any claim sounding in fraud.[2]  Because the preliminary injunction rests solely on Leadenhall's contract claims for payment of Accelerated Debt, as a matter of procedure, no tale of fraud can be used to support that preliminary restraint.  Nor, as a matter of law, are Leadenhall's fraud allegations capable of expanding federal courts' authority.  Courts of equity traditionally refused to preliminarily restrain a debtor's unencumbered assets based on a creditor's allegations of fraud, and modern federal courts are powerless to break new ground—even when, as here, the creditor appeals to the "hallmarks of equity" and insists that no fraud has ever been so "brazen."

Nor can Leadenhall justify the preliminary injunction by inventing an "equitable interest" in Guarantors' assets and showing that the restraint is ancillary to any claim for final equitable relief.  The

---

[2] Leadenhall exaggerates the unverified and untested facts it pleads in support of its fraud claims.  Those claims, which assert that Borrowers made fraudulent misrepresentations to induce Leadenhall to lend more than it otherwise would have, are the subject of motions to dismiss.  *See* Dkt. Nos. 208–215.

preliminary injunction was sought and issued to serve a single end: to preserve assets in aid of Leadenhall's ability to collect a money judgment on its contract claim for $609.5 million of Accelerated Debt. And despite Leadenhall's focus on a purported obligation to pledge replacement collateral, such a theory appears nowhere in the complaint on which it moved, Leadenhall's application for interim relief, or the district's orders issuing the restraint. In fact, Leadenhall concedes that its theory did not emerge until it filed a "clarif[ying]" Corrected Amended Complaint—months after the district court froze Guarantors' assets.

In any case, the LSA imposes no obligation to pledge replacement collateral in the event Borrowers' collateral fell short. The bargained-for remedy for an asserted Borrowing Base Deficiency is to declare an Event of Default, accelerate the debt, and seek immediate payment of the Accelerated Debt. And that is precisely what Leadenhall has done. Leadenhall does not, however, have any *equitable* interest in collecting that debt, and courts are thus powerless to restrain unencumbered assets in aid of collection.

Leadenhall also asks this Court to order prejudgment attachment. But Leadenhall applied for no such relief below, and it

cannot do so here. Nor, in any case, can Leadenhall meet New York's requirements for prejudgment attachment.

Because the district court had no authority to restrain Guarantor's assets, the Court should reverse or vacate the district court's restraint on those assets.

## **ARGUMENT**

## I. **A SECURITY INTEREST IN BORROWERS' ASSETS CANNOT AUTHORIZE A FREEZE OF GUARANTORS' ASSETS.**[3]

A. *Grupo Mexicano* Looks to a Creditor's Claim to the Restrained Assets, Not Whether the Creditor Is Otherwise "Secured."

*Grupo Mexicano* forbids prejudgment restraints of "*assets* in which no lien or equitable interest is claimed." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 310 (1999). And Leadenhall concedes that it has *no* lien (or even a security interest, to the extent one would suffice under *Grupo Mexicano*) in the assets that are the subject of this appeal—Guarantors' assets.[4] Nor, for the reasons

---

[3] Unless otherwise noted, all emphasis and modifications are supplied and internal citations are omitted.

[4] *See, e.g.*, Opp. at 26 (declining to dispute that it "lacks a specific security interest in the *Guarantors'* assets"); *cf. id.* ("Leadenhall has a security interest in the collateral pledged by the Borrowers."); A.1334–35 at 40:7–41:2; A.1346 at 52:17–23; A.1347–48 at 53:21–54:6; *see also Royal Palm*

set out in A-CAP's opening brief and below, does Leadenhall have an equitable interest in those assets. That is enough to resolve this appeal in A-CAP's favor.

Because that result is unavoidable under *Grupo Mexicano*, Leadenhall tries to evade that seminal authority by arguing that *Grupo Mexicano* is categorically inapplicable to all lenders with "secured-creditor status." According to Leadenhall, a security interest in any asset of any obligor is enough to "render[] *Grupo Mexicano* inapplicable," and "the Court" thus "need not look past Leadenhall's secured creditor status." Opp. at 24; *see also id.* at 22–25. Leadenhall supplies no authority for its sweeping proposition. Nor does it explain how a claimed security interest in different assets of a different obligor can negate the Supreme Court's holding that courts are powerless to restrain those "assets in which no lien or equitable interest is claimed." *Grupo Mexicano*, 527 U.S. at 310, 333. Nor could it; Leadenhall's proposition is flatly wrong.

---

*Senior Inv'rs, LLC v. Carbon Capital II, Inc.*, 2009 WL 1941862, at *10 (S.D.N.Y. July 7, 2009) (holding that when, as here, a Guaranty "does not secure a note by any specific personal property or fixtures of the guarantor," it "does not itself create a security interest").

-5-

Under *Grupo Mexicano*, courts' power to restrain assets prejudgment hinges on whether the "*assets*" at issue are encumbered (by a claim of the plaintiff-creditor), *id.*, not on whether the creditor can *otherwise* be labeled "secured." While a prejudgment creditor that is "unsecured" as to all assets worldwide can have no lien on any particular asset it seeks to freeze, the converse is not true. A lender with "secured-creditor status" over *some* asset may well have no lien on the *particular* assets it might wish to freeze. That is the case with Leadenhall, which concededly has no lien (or security interest) in Guarantors' assets—the frozen assets in dispute.

Nothing in *Grupo Mexicano* suggests that plaintiffs boasting of "secured-creditor status" are outside its reach. The Court framed the issue in terms of courts' "power" over *assets* that have no encumbrance, *see id.* at 310, not on the label affixed to the creditor. The Court's ultimate holding likewise comes with no whiff of excluding from its reach any class of creditors. *Id.* at 333.

Nor does the Court's analysis hinge on such "status." To reach its result, the Court examined "whether the relief respondents requested" "was traditionally accorded by courts of equity" at the time of the

-6-

"enactment of the original Judiciary Act" in 1789, and thus within the powers of modern federal courts. *Id.* at 318–19. And on that inquiry, the only characteristic of the creditor that mattered was whether it had whether it had reduced its claims to *judgment. Id.* at 320–21. As the Court explained, the "requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law—rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim." *Id.* at 330. The Court thus followed the "well-established general rule that a *judgment establishing the debt was necessary* before a court of equity would interfere with the debtor's use of his property." *Id.* at 321. And while respondents "assert[ed] that there were . . . exceptions to the general rule," the Court declined to announce any (whether for those with secured-creditor status or otherwise). *See id.*

Even so, Leadenhall invokes—with misleading citations—the Supreme Court's two mentions of "unsecured" creditors to try to conjure support for its contorted reading of the case. Opp. at 23 (citing *Grupo Mexicano*, 527 U.S. at 326, 330). But neither use of the term limits the applicability of the Court's holding. In one instance, the Court merely mentioned, in distinguishing *United States v. First Nat. City Bank*, 379

U.S. 378 (1965), that the creditor there asserted "an equitable lien on the property" to be restrained, "which presents a different case from that of the unsecured general creditor."[5] *Grupo Mexicano*, 527 U.S. at 326. That dictum does nothing to limit the Court's holding. And while it is no doubt true, it is also inapposite here—unlike the plaintiff in *First National*, Leadenhall asserts no equitable lien on *any* assets.[6] *See generally* A-37–118. As with an "unsecured general creditor," Leadenhall asserts no lien, security interest, or (as addressed below) equitable interest in the restrained assets that are the subject of this appeal.

In its next use of the term "unsecured creditor," the *Grupo Mexicano* Court invoked, in recounting both sides' policy arguments, the

---

[5] Leadenhall insists that "the term 'general creditor' has long been synonymous with 'unsecured creditor.'" Opp. at 23. *Grupo Mexicano* suggests otherwise, stating the "rule requiring a judgment was a product . . . of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either in law or equity, in the property of his debtor." 527 U.S. at 319–20. In any event, the distinction is immaterial here, as Leadenhall has neither a judgment nor a security interest in Guarantors' assets.

[6] An equitable lien is claim in which a plaintiff seeks imposition of a lien on "money or property identified as belonging in good conscience to plaintiff [that] could clearly be traced to particular funds or property in the defendant's position." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

"historical principle that before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor." *Grupo Mexicano*, 527 U.S. at 329–30. The Court declined to resolve those policy arguments, and its dictum on the matter does not narrow its holding. In any case, the "historical principle" applies equally to Leadenhall here—Leadenhall lacks a judgment and admits that it has no lien or security interest in the property at issue: the assets of *Guarantors*. Br. at 26.[7] And under the "historical principle," Leadenhall thus has no rights at law or equity in the property of Guarantors.

What is more, categorically excluding those with "secured-creditor status" from *Grupo Mexicano*'s reach would yield patently illogical results that cannot be squared with the way in which *Grupo Mexicano* has been understood and applied over the past quarter century. It would, for instance, allow a bank to freeze a homeowner's unencumbered college savings account based on its mortgage on the home. That is not the law.

---

[7] Despite Leadenhall's protestations that it is not a "prowling creditor," Opp. at 25, it does not contest that it has no judgment, lien, or security interest in any asset of Guarantors.

-9-

B.   The Freeze of Guarantors' Assets Is Not Relief that was Historically Available.

Leadenhall does not dispute that federal courts lack the authority to issue prejudgment asset restraints that were "historically unavailable from a court of equity."  *Grupo Mexicano*, 527 U.S. at 333.  Nor can it contest that it bears the burden on its application for injunctive relief—including the burden to show that the relief it sought was historically available.  For two main reasons, Leadenhall has failed to satisfy that burden.

*First*, Leadenhall makes no showing that, traditionally, courts of equity would freeze assets in contract cases based on no more than a plaintiff's claimed security interest.  *Compare* Br. at 30 (noting the lack of any authority suggesting that courts of equity traditionally issued such restraints), *with* Opp. at 30–35 (supplying no such authority, only speculation about what "a court of equity would have" done).  Because courts of equity did not issue such restraints, modern federal courts are powerless to do so.  *See Grupo Mexicano*, 527 U.S. at 318–19 (limiting restraints to those "traditionally accorded by courts of equity"); *id.* at 332 ("[T]he equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity

-10-

jurisprudence."); *id.* at 333 (holding an asset-restraining preliminary injunction unauthorized "[b]ecause such a remedy was historically unavailable from a court of equity"); *cf. Gucci America, Inc. v. Weixing Li,* 768 F.3d 122, 131 (2d Cir. 2014) (explaining that courts "maintain the equitable power" to "issue a prejudgment asset freeze . . . where such relief *was* traditionally available").

In any case, as the First Circuit has observed, authorizing a prejudgment asset freeze based on a mere *security interest* (rather than a lien or equitable interest) would require "an extension of the Court's holding" in *Grupo Mexicano. Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 159 (1st Cir. 2004). Leadenhall concedes that the only Court of Appeals to address the matter, *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1384 (11th Cir. 2023), declined to do so. And rather than argue that *Noble* (or the district court cases in accord)[8] was wrongly decided, Leadenhall resorts to arguing that (i) A-CAP "forfeited" its argument on the point and (ii) it has not foreclosed, it "did not 'elect' to

---

[8] Leadenhall fails to address the well-reasoned district court cases cited by A-CAP. Br. at 29 (citing, *e.g.*, *Prof'l Merch. Advance Cap., LLC v. C Care Servs., LLC*, 2013 WL 12109397, at \*2 (S.D.N.Y. Oct. 2, 2013) (Sullivan, J.), and *AKF, Inc. v. AvantGarde Senior Living*, 2021 WL 2662070, at \*6 (N.D.N.Y. Apr. 29, 2021)).

forgo foreclosure." Opp. at 33–34. A-CAP has not, however, forfeited any argument[9]—and, in any case, a litigant's alleged waiver cannot expand federal courts' powers.

On foreclosure, Leadenhall's argument makes little sense. Opp. at 34. It claims to hold the senior security interest in all of Borrowers' assets. And it alleges that the Collateral continues to comprise receivables worth about $230 million. A-76–77 ¶¶ 131, 133–34; A-168. Leadenhall fails to explain how it lacked "the option of foreclosing" on that $230 million of Collateral. Whatever the reason, Leadenhall has not foreclosed. And according to the only Court of Appeals to consider the issue, foreclosure is a prerequisite to a freeze of even those assets in which a plaintiff claims a security interest.

*Second*, there is no conceivable basis for a security interest in certain assets (Borrowers') to empower courts to freeze *different* assets (of a different obligor, Guarantors) in which the creditor claims *no* security interest. Even the district court cases that diverge from *Noble Prestige* scrupulously—and universally—limit freezes to the particular

---

[9] Because A-CAP addressed this purely legal issue with supporting authorities below, Dkt. No. 155 at 15 n.12, it has not waived anything, *see United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001).

assets in which the plaintiff claims a security interest. *See, e.g.*, Br. at 30 n.8 (collecting cases). That includes every case Leadenhall cites on the matter.[10]

There is good reason that Leadenhall cites no authority— whether case law, treatise, or otherwise—to support a freeze beyond the particular assets in which the plaintiff claims a security interest. Leadenhall does not dispute that such a freeze is unprecedented. *Compare* Br. at 30, *with* Opp. 28-30 (acknowledging that the "prior cases" have "limited" such freezes to "the specific assets pledged by the borrower"). And because the sort of freeze ordered below was not historically available in courts of equity, *see* Br. at 30—another point undisputed by Leadenhall—the district court's restraint exceeds its equitable powers. *See, e.g.*, *Grupo Mexicano*, 527 U.S. at 333.

---

[10] Restraints based on equitable interests are similarly limited to the particular assets in which the plaintiff has an equitable interest. *See, e.g.*, *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at \*4, \*5 (S.D.N.Y. May 9, 2013) (holding that courts' "authority to enter a preliminary injunction" extends only as far as plaintiff has a "lien or equitable interest in the assets it seeks to restrain"); *Klipsch Grp. v. Big Box Store Ltd.*, 2012 WL 5265727, at \*7 n.8 (S.D.N.Y. Oct. 24, 2012) (refusing "to freeze assets beyond those in which Plaintiff claims an equitable interest").

C.  Leadenhall's Unsubstantiated Accusations of Fraud Cannot Expand the Courts' Powers.

Because Leadenhall recognizes that courts have never restrained unencumbered assets based on a plaintiff's claimed security interest in *different* assets, it crafts another purported justification for the freeze of Guarantors' assets—one it spins out of whole cloth. Leadenhall argues that the freeze is properly supported by its unverified allegations that the value of its alleged *contractual* interest in Guarantors' assets has been compromised by alleged fraud. Opp. at 27. Yet Leadenhall cites no case imposing a preliminary injunction on such grounds. It instead asks this Court to break new ground "because the Borrowers' fraud was more brazen than in prior cases." *Id.* at 30. For two main reasons, Leadenhall's theory fails.

*First*, Leadenhall applied for, and obtained, preliminary injunctive relief based solely on its *contract* claims. *See, e.g.*, Opp. at 12 ("The TRO application was based on Leadenhall's breach-of-contract claims against the Borrowers and Guarantors . . . ."); Dkt. No. 172 at 8 (admitting that "[t]he TRO application was based on [its] breach of contract claims"). Because Leadenhall did not move based on its fraud claims—much less show that those claims are likely to succeed, A.816 at

-14-

52:4-5, A.819 at 55:20–22[11]—those claims cannot be used to expand the scope of the preliminary injunction. *Cf. Spinelli v. Nat. Football League*, 903 F.3d 185, 198–99 (2d Cir. 2018) (rejecting legal theory that "inherently turns on the specific facts" and was not raised in the moving papers below).[12] As *Grupo Mexicano* explained, restraining unencumbered assets before *judgment* "would lead to an unnecessary, and, perhaps, a fruitless and oppressive interruption of the exercise of the debtor's rights" in its property. 527 U.S. at 320. All the more if such assets could properly be restrained based merely on a creditor's unverified *allegations* on which it has not shown a likelihood of success.

---

[11] Leadenhall's sensational accusations of fraud are no more than unverified—and untested—allegations and Leadenhall even overstates what it alleges. For instance, A-CAP is alleged to have merely *learned of* the alleged misconduct years after the alleged fraud was complete—and several months after Leadenhall became aware. A-39–40, A-63, A-68–74, A-79 ¶¶ 142–44, A-90, A-103–123, A-142, A-1094–95 ¶ 55. And while Leadenhall casts aspersions about Borrowers absconding with its Collateral, Opp. at 28–29, the only fraud it claims is fraudulent misrepresentation. *See, e.g.,* A-63–78 ¶¶ 89–138 ("Knowing Misrepresentations Concerning Its Collateral").

[12] While Leadenhall asserts that some Defendants "admitted . . . that they impaired Leadenhall's security interest," Opp. at 1, no Defendant has admitted any such thing in this litigation. At most, an individual Defendant is *alleged* to have acknowledged that certain collateral was mistakenly misallocated. A-71–72 ¶¶ 113, 117–118.

*Second*, Leadenhall's speculation about what "a court of equity would have" done, Opp. at 28, cannot expand the authority of federal courts. Leadenhall can point to no precedent for the district court's freeze of *Guarantors'* assets. It instead offers unsupported argument that issuing that unprecedented relief was appropriate because it purportedly alleges "fraud" that "was more brazen than in prior cases." Opp. at 30. But federal courts' equitable authority is fixed by history, not speculation over what an English Court would have done. What matters is what courts of equity actually did—"typically," *Knudson*, 534 U.S. at 210, "traditionally," and "historically," *Grupo Mexicano*, 527 U.S. at 319, 333.[13] Because courts of equity refused to restrain unencumbered assets based on theories like Leadenhall's, modern federal courts have no authority to do the opposite: "the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create

---

[13] Leadenhall's arguments track those of dissenting Justices in *Grupo Mexicano*, and *Knudson*, which have now been rejected twice by the Court. And while Leadenhall criticizes A-CAP's reference to these dissents, it is hardly controversial that dissents can help "clarify what the majority is doing," *see* Bryan A. Garner et al., The Law of Judicial Precedent 239–40 (2016).

remedies previously unknown to equity jurisprudence." *Grupo Mexicano*, 527 U.S. at 332; *see also id.* at 318–19, 333.

That forecloses what Leadenhall seeks here: to create new relief based on an allegedly new degree of fraud, *see* Opp. at 30. According "relief that has never been available before," however, "is to invoke a 'default rule' not of flexibility but of omnipotence." *Grupo Mexicano*, 527 U.S. at 322. And if "new conditions"—say, unprecedented fraud—"might call for a wrenching departure from past practice," that departure can be effected by only by *Congress*, not the courts. *Id.*

Indeed, the *Grupo Mexicano* Court held that even "debtors' trying to avoid paying their debts" through "sophisticated strategies," including fraudulent ones—precisely what Leadenhall alleges here— could not justify prejudgment restraints of assets in which the creditor has no lien or equitable interest. *Id.* There is nothing new, it observed, about a debtor defrauding a creditor. Indeed, "[h]ard was the case of bond creditors, whose debtor devised away his real estate," or otherwise defrauded him. *Id.* at 321. "But" even in that circumstances, "a Court of Equity can give no relief." *Id.* (quoting 1 Commentaries on Equity Jurisprudence § 12, pp. 14–15 (1836)). "The law of fraudulent

conveyances and bankruptcy was developed to prevent such conduct; *an equitable power to restrict debtor's use of his unencumbered property before judgment was not." Id.* at 322.  The Supreme Court has thus flatly (and emphatically) prohibited precisely what Leadenhall seeks here.

## II. LEADENHALL'S PRELIMINARY INJUNCTION IS NOT ANCILLARY TO ANY FINAL EQUITABLE CLAIMS FOR RELIEF.

### A. Leadenhall Moved for Preliminary Relief on Its Claims for Money Damages, Not on Any Claim to Compel the Posting of Collateral.

Leadenhall would have the Court believe that the preliminary injunction is about preserving Leadenhall's ability to "force," through final equitable relief, Borrowers and Guarantors to repair the alleged $350 million Collateral deficiency by pledging that amount in replacement Collateral.  That is fiction.

Notwithstanding Leadenhall's supposed "clarification"—in its Corrected Amended Complaint, filed long after the asset freeze—this appeal is about $609 million of Accelerated Debt.  Leadenhall does not dispute that "the final paragraph of every claim for relief" in the Complaint that it moved on "demands money and nothing else," Dkt. No. 155 at 16, and its application for preliminary relief mentions no other

-18-

form of final relief, *see* A-173. In fact, Leadenhall has only sought payment of the Accelerated Debt, from the time of its first Notice of Breach through to seeking (and obtaining) an asset freeze. *See, e.g.*, A-131 (reserving "the right to bring a claim for damages on the contractual breaches specified herein," with no mention of an equitable remedy); A-159 (reserving the right to "accelerate and declare all Obligations under the Agreements immediately due and payable," with no mention of an equitable remedy); A-148 ("accelerat[ing] and declar[ing] all Obligations under the Agreements immediately due and payable" and asserting that "the Accelerated Amount and other Obligations continue to bear Interest at the Default Interest Rate," with no mention of an equitable remedy); A-109 ¶ 236; A-277 ¶ 2 (describing the "Remaining Obligations" as comprising only repaying "the aggregate principal balance . . . of the outstanding Obligations").

And, as Leadenhall admits, the purpose of the preliminary relief to "prevent Defendants from frustrating *collection of a final judgment*" for money damages. Opp. at 12.[14] Indeed, from its own terms,

_____

[14] *See also* A-1019; Dkt. No. 155 at 19; A-177 (asserting that it "seeks the Court's intervention to prevent Wander from rendering Defendants judgment-proof and irreparably harming Leadenhall's ability to ever

it is evident that was the aim of the preliminary injunction:  it restrains assets up to the amount of the $609 million Accelerated Debt, A-833 §§ 2(B)–(C), *not* the $351 million Leadenhall alleges would be necessary to cure the Collateral deficiency it alleges.  Dkt. No. 263 at 1, 3.

District courts do not, however, have the authority to provide such "'equitable assistance in the collection of a legal debt.'"  *Gucci Am.*, 768 F.3d at 131.

B.    Leadenhall Has No Equitable Interest in Guarantors' Assets.

Faced with a quandary, Leadenhall retreats to what it calls a "clarification" in its Amended Complaint.  It asserts that its amended prayers for relief transform its *contract* claim into an "equitable" one that, as amended seeking to "forc[e] the Borrowers—and Guarantors—to perform their obligations to hold sufficient collateral to satisfy the secured debt obligation."  Opp. at 4, 8, 36.  In so doing, Leadenhall tacitly

---

recover what it is owed"); A-189 (asserting that the "preliminary relief Leadenhall seeks [aims] to prevent the Borrowers and Guarantors from using insolvency as a shield against judgment"); A-190 n.15 (stating that "Leadenhall's requested relief is designed" only to protect the ability to pay the "outstanding debt due to Leadenhall under the LSA"); A-194 (asserting irreparable harm stemming from potential efforts to "frustrate the collection of [a] money judgment[]").

admits that, based on the record before it, the district court lacked the authority to issue the preliminary injunction.

As an initial matter, those "clarified" prayers cannot be used to justify a preliminary injunction that preceded them. Those prayers were added well after the district court issued the preliminary injunction. A-815 at 51:7–9, A-823 at 59:21–23; A-933 at 32:10–11. They were thus not the subject of litigation on Leadenhall's application, and Leadenhall could not—and did not—show them likely to succeed. In fact, those prayers were added even after A-CAP filed its Rule 59(e) motion to modify the preliminary injunction. A-1347 at 53:7–8; *see also* Opp. at 40–41.

Even so, Leadenhall suggests that, because the district court mentioned the amended prayers in denying the motion to modify, they can properly support the propriety of the preliminary injunction. Not so. A later-filed Amended Complaint cannot support an earlier preliminary injunction based on the original Complaint, even if it was later was mentioned by the district court. *See Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 81 (2d Cir. 1991) (considering only the original complaint when a district court issued a preliminary injunction and the plaintiff later amended its complaint); *cf. Sequa Corp. v. GBJ Corp.*, 156

F.3d 136, 144 (2d Cir. 1998) ("It is well-settled that Rule 59 is not a vehicle for . . . presenting the case under new theories.").

In any case, Leadenhall asserts that appending those belated prayers provide it, "by virtue of [an alleged] contractual obligation," an "equitable interest in forcing the Borrowers—and Guarantors—to perform their obligations to hold sufficient collateral to satisfy the secured debt obligation." Opp. at 36. For many reasons, however, Leadenhall does not have the sort of equitable interest that could support the preliminary injunction.

*First*, *Grupo Mexicano* demands an equitable interest in particular *assets*, not a supposed interest in forcing debtors to take some action. *Grupo Mexicano*, 527 U.S. at 325.

*Second*, a prayer to enjoin further *contract* breaches is simply not an equitable claim for relief. *See* Br. at 37–38.

*Third*, neither the LSA nor the Guaranty Agreement create any obligation to pledge or acquire replacement Collateral, as Leadenhall now asserts. Under the LSA itself, Borrowers "hereby grant[ed]" all their assets as Collateral. Br. at 43 (citing CA-82 §§ 2.15(a), (c)). The LSA does not, however, oblige Borrowers to pledge any other collateral

-22-

("additional," "replacement," or otherwise) whatsoever, under any circumstance. There is simply no such Obligation. *See* CA-61 § 1.01.

Instead, if the value of the Borrowing Base dips below the value of the outstanding loans to create a Borrowing Base Deficiency, Leadenhall had the right to declare an Event of Default. CA-48 § 1.01; CA-119 § 7.01(c); CA-122 § 7.02(g). Borrowers, in turn, had the right— but not the obligation—to cure any such alleged deficiency. CA-74–75 § 2.07. If Borrowers failed to cure, Leadenhall could declare a Borrower Group Event of Default. CA-122 § 7.02(g). An uncured default of that sort led next to a Facility Event of Default. CA-119 § 7.01(c).

Tracking these plain terms, Leadenhall declared Facility and Borrower Group Events of Default on March 12, 2024. *See* A-158. Borrower Group and Facility Events of Default both come with the right to "declare the related Loans then outstanding to be due and payable" with any accrued interest and fees—in other words, to accelerate the debt. CA-120 § 7.01; CA-124 § 7.02. And Leadenhall did just that on March 15, 2024. A-148.

The LSA does not, however, require Borrowers to pledge replacement Collateral in response to a Borrowing Base Deficiency, any

-23-

type of Event of Default, or otherwise. *See* CA-119–20 § 7.01; CA-120–24 § 7.02. Neither Sections 7.01 nor 7.02 of the LSA, which concern Events of Default, specifies any requirement for Borrowers (or Guarantors) to pledge supplemental collateral. Section 4.01(h) is merely a representation that Borrowers are the legal owners of the Collateral, a term defined to refer to all of Borrowers' assets. CA-97 § 4.01(h). Section 5.01(d) is Borrowers' covenant not to sell or dispose of the Collateral; it does not require, in the event of breach, the pledge of any replacement collateral. CA-104 § 5.01(d). Nor does any other provision cited by Leadenhall require any such pledge of replacement Collateral in the event of a Borrowing Base Deficiency, or any other breach. *See* CA-82–83 § 2.15 (granting security interest); CA-107 § 5.01(k)(vi) (covenanting not to pay or distribute assets under certain conditions); CA-105–07 § 5.01 (assuring execution and delivery of requisite financing statements).

It is thus no coincidence that while Leadenhall's several pre-litigation notices declare Events of Default, Accelerate Debt, and reserve claims for money damages, none mentions any supposed obligation (or any request) to pledge replacement Collateral. *See* A-131, A-147, A-158.

Indeed, Leadenhall's theory only surfaced once certain Defendants pointed out that Leadenhall's contract claims for money damages cannot, under *Grupo Mexicano*, confer the sort of equitable interest needed to support a prejudgment asset freeze. *Compare* Opp. at 41–45, *with* CA-24. It is a theory made for litigation, not one found in the LSA's plain terms.

*Fourth*, even an imagined equitable interest in the pledging of "sufficient assets" would supply the requisite equitable interest in any *particular* asset of Guarantors. For such a remedy to sound in equity, it must seek particular "money or property identified as belonging in good conscience" to the plaintiff, and which can "*clearly be traced to particular funds or property in the defendant's possession.*" *Knudson*, 534 U.S. at 213. And an equitable claim for relief seeking such particular, traceable funds or property is the sort of claim capable of creating the "equitable interest" in an asset that *Grupo Mexicano* and its progeny require.

Leadenhall argues that "identify[ing] 'particular funds or property'" referenced in *Knudson* relates only to restitution claims. Opp. at 45.[15] Not so. But the Supreme Court addresses several varieties of

---

[15] Additionally, claims for an accounting of profits and statutory claims like those in *SEC v. Kontilai*, 2025 WL 22538 (2d Cir. Jan. 3, 2025), are exceptions to this general rule. Br. at 11 n.5

relief in that case—constructive trusts, equitable liens, money judgments, specific performance of contractual obligations, and more. *See generally Knudson*, 534 U.S. at 210–14. And a trend emerges. Generally, a claim for relief that seeks to compel the transfer of sufficient assets to cover a certain sum—but no particular, traceable asset—is legal. *Id.* at 211, 213. A claim for relief that seeks to compel the transfer of a particular asset, by contrast, is generally equitable. *See, e.g.*, 1 D. Dobbs, Law of Remedies §4.3(2), pp. 591, n. 10, 592 (2d ed. 1993) (explaining that relief is equitable when plaintiff identifies and "trace[s] his money or property to some particular funds or assets").

And courts have extended the principles laid out in *Knudson* to disputes involving relief other than restitution. In *Paradigm BioDevices*, for instance, the court relied on *Knudson* to freeze only the particularly identified assets that were the subject of plaintiff's equitable claim for rescission—the court explained that the "general rule" in equity is "to restore to the plaintiff *particular* funds or property in the defendant's possession." 2013 WL 1915330, at *4 (citing *Knudson*, 534 U.S. at 213). The court further held that plaintiff's equitable interest extended only to those particular assets, and, for that reason, that "*Grupo*

-26-

*Mexicano* . . . does not permit the Court to enjoin *all* of [Defendant's] assets, as Plaintiff requests," or any other. *Id.* Rather, only when a "plaintiff creditor asserts a cognizable claim to *specific assets* of the defendant,'" the court may "in the interim invoke equity to preserve the *status quo* pending judgment." *Id.* at *2 (quoting *United States ex rel. Rahman v. Oncology Assoc.*, 198 F.3d 489, 496 (4th Cir. 1999)).

Likewise, in *Dong v. Miller*, the district court relied on *Knudson* (among other cases) to distinguish between a fraudulent-conveyance claim that did not target "those specific assets that [Plaintiff] alleges were fraudulently transferred" (a claim at law) and equitable-lien claims on which plaintiff "s[ought] equitable relief . . . in the form of liens on specific assets that are currently in Defendants' possession but, according to Plaintiff, 'belonging in good conscience to [him].'" 2018 WL 1445573, at *10 (E.D.N.Y. Mar. 23, 2018) (quoting *Knudson*, 534 U.S. at 213). And the court ruled that for an asset-freezing preliminary injunction to be proper, it must be "reasonably necessary to preserve the status quo with respect to *particular assets* so that the court can grant the movant ultimate relief." 2018 WL 1445573, at *8.

Here, Leadenhall does not seek, as final relief, the compelled transfer of any specific asset or funds. It purportedly seeks to compel, based on its supposed "contractual right," the transfer of "sufficient assets" of any kind to Borrowers in an (unspecified) amount that would, it asserts, cure the alleged Collateral deficiency. What is "sufficient" is unspecified by Leadenhall on appeal, but given its allegation that its Collateral remains worth about $230 million, the amount is far less than $609 million frozen by the preliminary injunction. *See* A-833. That remedy does not, however, bear any of the hallmarks of an equitable remedy. Leadenhall cites no authority that it is.

*Fifth*, Leadenhall has not, as it claims, "already proved a likelihood of success on the merits" of a claim for final injunctive relief compelling Borrowers and Guarantors to acquire or pledge replacement collateral. Opp. at 42. Nowhere in Leadenhall's application for preliminary relief did it so much as mention any supposed claim of the sort. Indeed, according to Leadenhall, it did not "clarify" the supposed meaning of its prayer to enjoin further breaches until months later. Moreover, Leadenhall has never attempted to show that it is likely to succeed on any sort of mandatory injunction of any kind—a sort of relief

that "issue[s] only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011).

## III. LEADENHALL DID NOT SEEK AND CANNOT OBTAIN ATTACHMENT UNDER RULE 64.

Leadenhall's final gambit is to have this Court maintain the preliminary injunction order based on prejudgment attachment—a wholly different form of relief not granted by the district court. (Opp. at 46.) But Leadenhall never before moved for prejudgment attachment and cannot properly ask this Court to grant it. *See Ehrenfeld v. Mahfouz*, 518 F.3d 102, 105 (2d Cir. 2008) ("'The law in this Circuit is clear that where a party . . . advances arguments available but not pressed below,'" "'waiver will bar raising the issue on appeal.'").

That choice was deliberate. At the June 7, 2024 hearing, the district court admonished Leadenhall that it could not, "for the first time in its reply brief," argue that "even if Leadenhall is not entitled to an injunction, [it] is entitled to an attachment." A.823 at 59:13–15. Rather, "[i]f Leadenhall seeks an attachment, it should move separately for an attachment, and the Court would afford the other parties an opportunity

-29-

to respond, and Leadenhall an opportunity to reply." *Id.* at 59:17–20. Even then, Leadenhall elected not to pursue attachment in the first instance. It cannot now urge this Court to grant that relief. Nor can the assertion that the district court "could have" instead ordered "prejudgment attachment" be a proper basis to affirm the preliminary injunction—a distinct form of relief. Opp. at 46.

In any event, Leadenhall is not entitled to attachment under New York law, which applies here through Rule 64. Because of "their 'extraordinary' nature, attachments sought under New York law must be strictly construed against the party seeking to utilize this particularly severe provisional remedy." *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 524 F. Supp. 2d 412, 417–18 (S.D.N.Y. 2007). Leadenhall relies on two grounds from New York's C.P.L.R. § 6201: (1) that "Guarantors are 'foreign corporations not qualified to do business in the state'" Opp. at 47, N.Y. C.P.L.R. § 6201(1); and (2) Guarantors have acted "'with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in [Leadenhall's] favor, . . . assigned, disposed of, encumbered, or secreted property . . . or [are] about to do' so" Opp. at 47–48, N.Y. C.P.L.R. § 6201(3). The first provision fails because it applies

only when attachment is needed to obtain personal or in rem jurisdiction over the foreign corporations, which is not the case here. *Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187–88 (S.D.N.Y. 2002). The second provision fails because this ground requires a factual record to support it, yet no such record exists. *Morin v. Trupin*, 738 F. Supp. 98, 105 (S.D.N.Y. 1990) ("New York law is clear that in the attachment context, '. . . intent [to defraud] must be proved, and the facts relied upon to prove it must be fully set out in the moving affidavits.'").

## CONCLUSION

For these reasons, the Court should reverse or vacate the district court's preliminary injunction order to the extent it freezes Guarantors' assets.

Dated: January 27, 2025
New York, New York

By: */s/ Jonathan M. Watkins*
Jonathan M. Watkins

*Counsel for Advantage Capital Holdings LLC and Kenneth King*

-31-

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for Appellant certifies that this motion:

(i)     complies with the word limitations of LR 32.1(a)(4)(B) because it contains 6,486 words, including footnotes and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as calculated by the word processing system used in its preparation; and

(ii)     complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in Microsoft Word using the proportionally-spaced serif typeface of Century Schoolbook in 14-point font.

Dated:  January 27, 2025
        New York, New York


                                By: */s/ Jonathan M. Watkins*
                                    Jonathan M. Watkins

                                    *Counsel for Advantage Capital*
                                    *Holdings LLC and Kenneth King*

-32-