*Smith, Gambrell & Russell, LLP*
*1301 Avenue of the Americas*
*15th Floor*
*New York, New York 10019*
*Tel: 212-907-9700*



*John G. McCarthy*
*Direct Tel: 212-907-9703*
*Direct Fax: 212-907-9803*
*JMCCARTHY@sgrlaw.com*

April 30, 2025

**VIA CM/ECF**

Catherine O'Hagan Wolfe, Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:  *Leadenhall Capital Partners LLP v. Advantage Capital Holdings LLC*
     Nos. 24-2647, 24-2867 (argued April 1, 2024, before Sack, Pérez, Merriam, JJ.)

Dear Ms. Wolfe:

Defendants-Appellants in the consolidated appeal[1] respectfully submit this letter-brief pursuant to this Court's April 9, 2025 Amended Order, Dkt. 69.

## I. THE RELATIONSHIP BETWEEN BORROWERS AND GUARANTORS SHOULD NOT AFFECT THE COURT'S ANALYSIS.

In its April 9 order, the Court inquired "whether the close relationships among Borrowers and Guarantors (including certain parties serving as members

---

[1] Defendants-Appellants 777 Partners LLC and 600 Partners LLC are referred to herein as the "Guarantors." Defendants-Appellants SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, and Signal SML 4 LLC are referred to herein as the "Borrowers". The Guarantors and Borrowers are collectively referred to as the "777 Appellants." This letter brief is being submitted by the 777 Appellants.

SGR/80273467.2

Catherine O'Hagan Wolfe
April 30, 2025
Page 2

of other parties' LLCs) should affect the Court's analysis."  The answer is no for several reasons.  Such relationships are typical and Plaintiffs-Appellees Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investment Funds PLC (collectively "Leadenhall") were aware of the relationships and required that they be kept in place.  Moreover, as explained in the other sections below, the focus of the analysis is the assets involved, not the entities.

> As at least one scholarly article has observed:
>
> One of the major sources of the economic strength of the large corporate group, particularly the multinational enterprise, is its ability to direct available group resources to the companies within the group that can earn the highest return for comparable risks and thereby maximize group profits. In brief, the parent corporation typically centralizes and exercises the financial decision making power of the group, acting as an internal capital market by channelling available group resources to the most advantageous investment opportunities available within the group. Such intragroup financing necessarily involves intercompany loans and guaranties.
>
> When lending to enterprises of smaller dimensions, lenders will commonly insist upon guaranties by group affiliates, controlled corporations, or controlling shareholders before they will lend to any component of the group. This requirement strengthens the borrower's credit and avoids possible intragroup manipulation of its affairs to the lender's detriment. In some cases, such strengthening of the borrower's credit position may also serve the borrower's interests by contributing to the negotiation of a somewhat lower interest rate. In other cases, such guaranties may be required to make the borrowing possible at all.

Catherine O'Hagan Wolfe
April 30, 2025
Page 3

Phillip I. Blumberg, *Intragroup (Upstream, Cross-Stream, and Downstream) Guaranties Under the Uniform Fraudulent Transfer Act*, 9 Cardozo L. Rev. 685, 686–87 (1987). The close relationship between the Borrowers and the Guarantors was contemplated by the parties. The Recitals of the Guaranty Agreement provide:

> each of the Guarantors is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement and the other Transaction Documents (which benefits are hereby acknowledged by the Guarantors) ….

A-251. In fact, Leadenhall required that the close relationship be maintained as demonstrated by the fact that a facility event of default would occur if "without the consent of the Lenders (i) 777 Partners LLC or 600 Partners LLC, as applicable, ceases to Control all entities that are in the respective Borrower Group …." A-233 (§ 7.01(h)). The evidence submitted in support of its preliminary injunction application demonstrates that Leadenhall knew that the same individuals controlled the Guarantors, the Borrowers and the servicers.[2] *Compare* A-258 *with* A-238 *and* A-239. Finally, guarantees, like all contracts, require consideration to be enforceable and the provision of a benefit to a company with a

---

[2] Similarly, Craig Gillespie signed the Guaranty Agreement on behalf of eight different lender entities. A-259 to A-265.

close relationship to the guarantor has been held to be sufficient. *See, e.g., AXA Investment Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 382-83 (S.D.N.Y. 2012).

Accordingly, the Court's analysis should not be affected by the close relationships between the Borrowers and Guarantors.

## II. LEADENHALL'S SUGGESTED INTERPRETATION OF THE GUARANTY AGREEMENT IS INCORRECT.

In its April 9 order, the Court inquired "whether the Guaranty Agreement is properly interpreted to, upon a triggering event, create a security interest in any assets of Guarantors or to obligate Guarantors to provide sufficient collateral to secure Borrowers' loans." The Guaranty Agreement does neither. Moreover, such an interpretation would be in contravention of the applicable law as to interpretation of guarantees and of security agreements.

In *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co. of Chicago*, 93 F.3d 1064 (2d Cir. 1996), this Court summarized New York law as follows:

> Under New York law, guarantee agreements must be strictly construed according to their terms. A guarantor's obligation must be "narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract." Guarantees are strictly construed because the guarantor "cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty."

Catherine O'Hagan Wolfe
April 30, 2025
Page 5

*Id*. at 1073-74 (citations omitted). "Under longstanding rules of contract interpretation, '[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.'" *Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082, 128 N.E.3d 674, 675, 104 N.Y.S.3d 596, 597 (2019).

In *Chase*, this Court held that the guarantors were not liable because "[t]he Guaranty nowhere contemplates that the defendants as guarantors would complete the improvements …." *Id*. at 1075. Similarly, the clear and unambiguous language of the Guaranty Agreement provides that the "Guaranteed Obligations" relating to the Borrowers are limited to the payment of money. Section 2 of the Guaranty Agreement is headed: "<u>Guaranty of Payment of Guaranteed Obligations</u>." A-254 (emphasis in original). Section 2(a) provides: "Each Guarantor agrees that its guarantee constitutes a guaranty of payment when due and not merely of collection" and that "each Guarantors liability shall extend to all amounts that constitute part of the Guaranteed Obligations." A-255. The use of the phrase "payment and performance" in some sentences of Section 2, when considered in the full context of those sentences, is clearly referring only to payment of money. Section 3 also refers to "a guarantee of payment when due of

Catherine O'Hagan Wolfe
April 30, 2025
Page 6

the Guaranteed Obligations," A-255, and that "such Guaranteed Obligations shall be limited to the resulting Borrowing Base Deficiency." A-255 to A-256. Several subsections of Section 3 refer to payment or collection of the Guaranteed Obligations. A-256 to A-257 (subsections 3(b), 3(e), 3(g), 3(h)(i) and 3(i)). Even the definitions section of the Guaranty Agreement refers to "the date of payment by the Guarantors of any Guaranteed Obligations …." A-252 (definition of Insurety Guaranty Limit); A-253 (definition of Signal Guaranty Limit). The Guaranty Agreement repeatedly refers to the Guaranteed Obligations as involving either payment of money or an amount due. Nowhere in the Guaranty Agreement is there any language that can be construed as granting a security interest in assets of the Guarantors. *See* A-251 to A-268. The Guaranty Agreement also does not contain language that can be construed as requiring the Guarantors to provide Collateral to secure Leadenhall's loans. *Id*.

The New York Uniform Commercial Code (the "UCC") governs whether a secured transaction has occurred between the Guarantors and Leadenhall. A security transaction can never be inferred or ambiguous. Specific steps must be taken by the parties to create and perfect a security interest in favor of a lender in assets. None of those steps was taken in this case.

The Guaranty Agreement uses the phrase "security interest" only one time, in item (ix) of the definition of Trigger Event. A-253 to A-254. The provision involves the failure of a Borrower to own Collateral free and clear of someone else's security interest. *Id*. The word collateral appears a dozen times in the Guaranty Agreement. A-251, A-253, A-254, A-255 & A-256. Not one use of the term in the Guaranty Agreement involves assets of the Guarantors.

Leadenhall is not a secured party with respect to the Guarantors. Under the UCC, in order to qualify as a "secured party," Leadenhall would have to be a "person in whose favor a security interest is created or provided for under a security agreement" or otherwise meet the definition of secured party under UCC § 9-102(a). *McDaniel v. 162 Columbia Heights Housing Corp.*, 21 Misc. 3d 244, 247-48, 863 N.Y.S.2d 346, 350 (Sup. Ct., Kings Cnty. 2008); *Lashua v. La Duke*, 272 A.D.2d 750, 751, 707 N.Y.S.2d 542, 544 (3d Dept. 2000) ("In order for a security interest to be valid and enforceable against the debtor and third parties, the debtor must sign a document describing the collateral, the security interest must attach and must be perfected …"). A leading treatise on the UCC notes:

> How does a secured party create an enforceable Article 9 security interest? Section 9-203 requires only a few steps. In general: (1) the creditor must give value, (2) the debtor must have rights in the collateral, (3) there must be a security agreement, (4) the security agreement must describe the collateral, and (5) either the security

Catherine O'Hagan Wolfe
April 30, 2025
Page 8

agreement must be in a record signed by the debtor, or there must be some other event, as described in 9-203(b)(3), to provide grounds for concluding that the parties have entered into a security agreement.

4 White, Summers, & Hillman, Uniform Commercial Code § 31:2 (6th ed. 2025).

Leadenhall has no security agreement with the Guarantors. The Guaranty Agreement cannot be deemed to create a security interest in favor of Leadenhall because, according to New York law, "a security interest only attaches to collateral and is enforceable only if the debtor has authenticated a security agreement that provides a description of collateral…." *In re Bucala*, 464 B.R. 626, 629 (Bankr. S.D.N.Y. 2012); *In re Ditech Holding Corp.*, 2020 WL 3967897, *13 (Bankr. S.D.N.Y July 9, 2020) (security agreement requires a writing signed by the debtor which describes collateral). The UCC provides examples of reasonable identification of collateral to include a specific listing, category, type of collateral, quantity, computational or allocational formula or procedure. NY UCC § 9-108(b); *see also In re Residential Capital, LLC*, 497 B.R. 403, 418 (Bankr. S.D.N.Y. 2013). The Guaranty Agreement contains no mention of any collateral to be provided by the Guarantors, much less a reasonable identification of such. A-251 to A-268.

Further, in order to have a perfected security interest in the Guarantors' assets, Leadenhall would have had to file a financing statement. However, an

initial financing statement may not be filed unless the Guarantors authorize the filing in an authenticated record. *McDaniel*, 863 N.Y.S.2d at 350-51 (citing NY UCC § 9-509). Since the Guarantors never authorized the filing of a financing statement, UCC § 9-509 does not permit Leadenhall to file a financing statement. Accordingly, Leadenhall does not (and cannot) have a security interest in any of the Guarantors' assets.

The language of the Loan and Security Agreement (the "LSA") also does not support Leadenhall's interpretation. Under the terms of the LSA, the Borrowers granted a security interest in the Collateral "[t]o secure the performance by the Borrowers of all of the Obligations …." A-214 (LSA § 2.15(a)). This language confirms that the provision of security interests in Collateral does not fall within the definition of "Obligations." More importantly, there is no language in the LSA granting Leadenhall a security interest in any asset of the Guarantors. As such, it does not constitute a security agreement as to the Guarantors.

Additionally, the evidence that Leadenhall submitted in support of its application for a preliminary injunction was devoid of any reference to the Guaranty Agreement creating a security interest in the Guarantors' assets or that the Guarantors were obligated to provide Collateral. A-202 to A-708; A-730 to

Catherine O'Hagan Wolfe
April 30, 2025
Page 10

A-765. Leadenhall submitted declarations from three of its executives discussing multiple conversations with Josh Wander. A-202 to A-209 (Craig Gillespie); A360 to A362 (Phil Kane); A-364 to A-366 (Luca Albertini). They all discussed efforts to have Borrowers pay down the deficiency. A-205 ¶¶ 12-13 (paydown letter); A-206, ¶ 18 (asking about paydown); A-361, ¶ 6; A-364, ¶ 2 to A-366, ¶ 8. None of Leadenhall's witnesses averred that the Borrowers were obligated to provide additional Collateral or that Leadenhall claimed a security interest in the Guarantors' assets. A-202 to A-366.

Leadenhall's pre-litigation correspondence is also consistent with the interpretation that the Guaranteed Obligations do not create a security interest in Guarantors' assets or obligate Guarantors to provide collateral to secure Borrowers' loans. Nowhere in the various notices that it sent to the 777 Appellants did Leadenhall demand, claim or even suggest that the Guaranty Agreement created a security interest in assets of the Guarantors or required Guarantors to provide collateral to Leadenhall. *See* A-285 to A-317. In fact, that correspondence makes clear that Leadenhall was seeking payment of money only. *Id*. On November 29, 2023, Leadenhall sent a notice of breach to two Borrowers and the Guarantors. A-291 to A-294. Leadenhall did not demand that they provide sufficient new Collateral to secure the loans, rather it sought "a detailed

description of how … the Borrowers intend to make up for that shortfall in value ….." A-293 to A-294.  In February 2024, the parties entered into a Paydown and Partial Release Letter which contained a provision entitled "Remaining Obligations" and only mentioned "the aggregate principal balance … of the outstanding Obligations under the Master Loan Agreement …."[3]  A-277.  On March 12, 2024, Leadenhall reserved the right to "accelerate and declare *all Obligations* under the Agreements immediately due and payable …."  A-286

---

[3] As the District Court found, in the Paydown and Partial Release Letter, Leadenhall extracted "additional interest to the <u>uncollateralized portion</u> of the outstanding debt." A-817 (emphasis added).  The reason for the additional interest is that lenders like Leadenhall price secured debt differently from unsecured debt.  One scholarly article described this concept as follows:

> Establishing a credit relationship is a form of lending. Inherent in this relationship is the concept of priority. Priority refers to rights of creditors to payment with respect to other creditors. Specifically, it provides for the order in which creditors are entitled to repayment from the debtor in the event of liquidation. Priority is determined either by statute or by a contractual relationship between the parties. Importantly, priority represents a level of risk as compared to other creditors, and it strongly influences the terms under which a credit relationship exists. That is, creditors extend credit to obligors with an understanding of their priority of repayment and their rights upon default.

Jason Gordon & Robert J. Landry, III, *The Risk-Shifting Effect of Business Bankruptcy: A Statutory Solution to Provide Additional Protections for Personal Guarantors of Debts by Closely-Held Business Ventures*, 32 Emory Bankr. Dev. J. 67, 70–71 (2015).

(emphasis added).  Finally, on March 15, 2024, Leadenhall "accelerate[d] and declare[d] *all Obligations* under the Agreements immediately due and payable." A-297.  Clearly, Leadenhall understood in 2023 and 2024 that the term "Obligations" in the Guaranty Agreement was limited to the payment of money and did not include the Guarantors granting security interests or providing new Collateral.

Perhaps the most compelling proof that the Guaranty Agreement did not create a security interest in assets of the Guarantors is the forbearance agreement drafted by the same law firm representing Leadenhall before this Court. Leadenhall submitted to the District Court as evidence supporting its preliminary injunction application, a redlined copy of a draft forbearance agreement with the notation "*K&S Draft 3/23/24*" to indicate its initial drafter.  A-319 (red font and strikethrough omitted).  Schedule 8 to that draft would have required each Guarantor to deliver to Leadenhall a "Guaranty and Security Agreement."  A-356 (items c and d).  Leadenhall's request in late March 2024 for such agreements is inconsistent with its current contention that it obtained a security interest in all the assets of the Guarantors by operation of the Guaranty Agreement and the LSA.

Accordingly, as a legal and factual matter, the Guaranty Agreement cannot be properly interpreted as creating a security interest in any asset of the

Guarantors or to require the Guarantors to provide Collateral for Leadenhall's loan to the Borrowers.

### III. LEADENHALL'S CONTENTION THAT IT OBTAINED AN EQUITABLE INTEREST IN GUARANTORS' ASSETS IS NOT SUPPORTED BY THE LAW OR THE RECORD BELOW.

In the April 9 order, this Court asked "whether the allegation that Guarantors engaged in 'orchestrated acts of fraud' 'to conceal the true state of Leadenhall's collateral' securing its loans to Borrowers, App'x at 1131, gives Leadenhall an equitable interest in Guarantors' assets." The unverified allegation in Leadenhall's amended complaint is not relevant to the 777 Appellants' appeal for several reasons and no legal support exists for such a proposition.

The 777 Appellants took their consolidated appeal from the July 8, 2024 order granting the preliminary injunction. A-1354. An allegation made months later in an amended pleading clearly was not a basis upon which the District Court relied to grant the preliminary injunction. Also, the quoted statement is unverified. A-1228. To obtain the extraordinary relief of a pre-judgment injunction, Leadenhall was required to come forward with evidence, not allegations, demonstrating a likelihood of success on the merits. *Herbert v. Sanfeliz*, No. 22 Civ. 4299 (KMK), 2022 WL 3755305, at *2 (S.D.N.Y. Aug. 30, 2022) ("the plaintiff must submit evidence sufficient to support a finding that the

plaintiff will likely succeed on the merits and suffer irreparable harm, as the plaintiff bears the burden on their motion for a preliminary injunction"); *J.T. v. de Blasio*, 500 F. Supp. 137, 181 (S.D.N.Y. 2020) ("summariz[ing] what the evidence – not the allegations, but the evidence – does or does not show" on preliminary injunction motion). If Leadenhall had relied on such an allegation in the District Court in moving for a preliminary injunction, the District Court could not properly have granted such relief based on that allegation.

Even if Leadenhall's unverified assertion were to be considered, it would be insufficient to allow for an asset-freezing injunction against the Guarantors. The 777 Entity Defendants are unable to find a single case in this Circuit (or any other) since the Supreme Court's decision where a common law fraud claim was sufficient to overcome the *Grupo Mexicano* dictate. The analysis in *OSRecovery, Inc. v. One Groupe Intern., Inc.*, 305 F. Supp. 2d 340 (S.D.N.Y. 2004), is instructive. In *OSRecovery*, the District Court found "that plaintiffs are likely to establish that the entire … operation was a thorough-going fraud from beginning to end." *Id*. at 343. The District Court, however, denied a motion for preliminary injunction under Rule 65 similar to the one entered here because "the freeze order that plaintiffs seek is impermissible as a matter of law." *Id*. at 347-48 (*citing Grupo Mexicano* and *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94

N.Y.2d 541, 729 N.E.2d 683, 708 N.Y.S.2d 26 (2000)). The District Court observed that "[a]part from a conclusory statement in their memorandum to the effect that they believe defendants' assets may 'consist of converted funds from Plaintiffs' OSGold and OSOpps account' … they have not even alluded to any such theory, let alone adduced evidence to support it." *Id*. at 347 n 43. Here, Leadenhall does not have the benefit of a finding like that in *OSRecovery* and it also did not adduce evidence to support freezing specific assets belonging to the Guarantors. *See Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 Civ. 3489 (JMF), 2013 WL 1915330, at *4 (S.D.N.Y. May 9, 2013) ("equitable interest extends only to the assets fraudulently transferred"); *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05 Civ. 15 (MHD), 2005 WL 3642217, at *8 (S.D.N.Y. Dec. 30, 2005) ("Imposition of an equitable lien requires proof of 'a particular agreement by defendants to confer a security interest in the property at issue.' A constructive trust also requires identification of a specific *res* that is linked to the alleged wrongdoing." (citations omitted)); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 705 (S.D. Tex. 2002) ("To establish a right to a constructive trust, Amalgamated must identify a specific asset or fund of money …"); *Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*, 812 F. Supp. 2d 944, 947–48 (C.D. Ill. 2011) (holding that *Grupo Mexicano* prohibited issuance of preliminary

Catherine O'Hagan Wolfe
April 30, 2025
Page 16

injunction because plaintiff's "'equitable claims' of promissory estoppel, unjust enrichment, and claim for injunctive relief all derive from the same occurrence, namely, a breach of contract.").

Leadenhall's allegation in its later-filed amended complaint is factually and legally insufficient to create an equitable interest in any asset of the Guarantors, let alone all of their assets, and did not (and could not) support the preliminary injunction as to the Guarantors.

## IV. WHILE ENFORCING EQUITABLE INTERESTS CAN BE WITHIN THE EQUITY JURISDICTION OF THE FEDERAL COURTS, LEADENHALL FAILED TO OFFER SUFFICIENT EVIDENCE.

Finally, the Court asked "whether enforcing such obligations or interests is within the equity jurisdiction of the federal courts, including whether such relief was historically available from a court of equity." The 777 Entity Defendants have never contended that a federal court was without power to issue an injunction when the movant demonstrates the existence of an equitable interest in property subject to such injunction. Here, Leadenhall failed to submit evidence of such interest (because none exists) and the District Court did not find that Leadenhall was likely to succeed at proving such interest in the Guarantors' assets.

Even if this Court was the factfinder, it still could not affirm the preliminary injunction as entered against the Guarantors. If Leadenhall had submitted evidence demonstrating a likelihood of success on the merits that it somehow obtained an equitable interest in any asset of the Guarantors, Leadenhall failed to adduce evidence that it is entitled to provisional equitable relief under *Dekert v. Independence Shares Corp.*, 311 U.S. 282 (1940). Leadenhall failed to offer any evidence in the District Court on its motion for preliminary injunction to satisfy the requirement of showing (1) cognizable equitable relief and (2) a sufficient nexus between the cognizable relief in equity and the assets sought to be frozen. As one District Court has explained:

> Following *Rahman's* framework, this court begins with an analysis of the claims Amalgamated raises to determine whether they seek cognizable equitable relief, so that *Deckert,* rather than *Grupo,* governs. If plaintiffs are seeking cognizable relief in equity, they must show a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request. The second step, as required by *De Beers,* is to determine whether the temporary restraining order is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed.

*Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 696–97 (S.D. Tex. 2002) (discussing *U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489 (4th Cir. 1999)).

## CONCLUSION

For the foregoing reasons and those previously presented to this Court by the 777 Appellants and the A-CAP Appellants in the lead appeal, the preliminary injunction as to the assets of the Guarantors must be vacated immediately.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP
*Attorneys for the 777 Appellants*

John G. McCarthy

SGR/80273467.2

## CERTIFICATE OF SERVICE

I hereby certify that, on April 30, 2025, I served the foregoing document on counsel for Plaintiffs-Appellees and counsel for the A-CAP Appellants via CM/ECF.

Dated: April 30, 2025

_____
John G. McCarthy

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's Amended Order because it contains 3,609 words, excluding the signature block and certificates. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

_____
John G. McCarthy

SGR/80273467.2