# King & Spalding

King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, New York 10036

Tel: +1 212 556 2100
Fax: +1 212 556 2222
kslaw.com

Leigh M. Nathanson
Partner
Direct Dial: +1 212 790 5359
lnathanson@kslaw.com

April 30, 2025

**VIA ACMS**

Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re: *Leadenhall Capital Partners LLP v. Wander*,
> **Nos. 24-2647(L), 24-2867(Cons)**

Dear Ms. Wolfe:

Plaintiffs-Appellees Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall") submit this supplemental letter brief to address the Court's questions following the April 1, 2025 oral argument. As the district court correctly held, Leadenhall has an independent equitable interest in the assets of the Guarantors up to the amount necessary to

April 30, 2025
Page 2

fulfill the Borrowers' and Guarantors' obligation to pledge security interests in and maintain sufficient collateral, free and clear, to fully secure Leadenhall's investment. A-1346-47. The answers to this Court's questions only underscore the propriety of the district court's carefully crafted injunction prohibiting asset transfers that would destroy Leadenhall's right to be fully secured.

*First*, the Borrowers' and Guarantors' close relationship explains how this unusual guaranty came about and crystallizes the strong nexus between the Guarantors' enjoined assets and the performance obligation Leadenhall now seeks to enforce. *Second*, the Guaranty Agreement obligates the Guarantors to provide sufficient collateral to secure the Borrowers' loans in the event the Borrowers fail to fulfill their obligation to maintain collateral free and clear. This obligation also creates an equitable interest in the Guarantors' assets to the extent necessary to fulfill this obligation. *Third*, although the performance obligation is alone sufficient to support the injunction, the allegations of fraud provide an additional basis supporting Leadenhall's right to relief with respect to the Guarantors' assets. *Fourth*, enforcing such obligations or interests

April 30, 2025
Page 3

and, particularly, the *relief* ordered—the freezing of assets in dispute—was traditionally available in courts of equity.

For these reasons, along with those set forth in Leadenhall's brief and at oral argument, this Court should affirm the preliminary injunction.

## I. The unusually close relationship between the Borrowers and the Guarantors explains the strength of the Guaranty Agreement and supports the strong nexus between the assets enjoined and the ultimate relief sought.

The Guaranty Agreement specifies that "each of the Guarantors is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the [LSA]." A-251. The crux of the LSA is that Leadenhall provides funding for the Borrowers to "acquire Receivables and Related Security," the proceeds of which are distributed among Leadenhall and, ultimately, the Guarantors. CA-109 (providing that the Borrowers may "declare and pay cash dividends to its members"—*i.e.*, the Guarantors—from the leftover collection proceeds). A-CAP does not dispute that the Borrowers and Guarantors are "exactly

April 30, 2025
Page 4

the same entity." A-1313.[1]  Indeed, the Borrowers are special purpose vehicles created and controlled by the Guarantors specifically for the purpose of holding Leadenhall's collateral in connection with the LSA. *See generally* A-1091-94, CA-40-513.  This unusually close relationship between the Borrowers and Guarantors should inform the Court's analysis in two ways.

*First*, this relationship explains how the unusual Guaranty Agreement at the heart of this appeal came about and why the Guarantors took on equitable obligations as opposed to a simple non-payment guaranty.  Typically, a guaranty refers to "an obligation to answer for the debt of another."   63 N.Y. Jur. 2d Guaranty and Suretyship § 2 (2d ed.); *see also Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 276 A.D.2d 341, 343 (N.Y. App. Div. 2000) ("'A guarantee is an agreement to pay a debt owed by another which creates a secondary liability and thus is collateral to the contractual obligation.'"

---

[1] At the hearing before the district court on A-CAP's motion to modify the preliminary injunction, counsel for A-CAP represented: "And for present purposes, I don't think there needs to be any distinction between borrowers and guarantors.  One could imagine that they are exactly the same entity here." A-1313.

April 30, 2025
Page 5

(quoting *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356 (N.Y. App. Div. 1977))). But here, the Guarantors did not simply guarantee debt repayment; rather, the Guarantors "jointly and severally absolutely, unconditionally and irrevocably guarantee[d]" *all* of the Borrowers' "Guaranteed Obligations" under the LSA, A-254, including the Borrowers' *performance* obligations, CA-61, A-54-55. As discussed in more detail *infra*, those performance obligations encompass the Borrowers' obligation to grant Leadenhall "a first-priority security interest in the Collateral," CA-82, and continually maintain the applicable collateral "free and clear of any Adverse Claim," CA-97. Because the borrowed amount changed whenever the Borrowers decided to draw down additional funds from the credit facility by making a "Borrowing Request," CA-70-71, the amount of collateral required changed as well, meaning the Borrowers were contractually required to ensure they owned the appropriate amount of collateral on an ongoing basis, *see, e.g.*, CA-105 § 5.01(i) (requiring the Borrowers to "take all further actions, that may be reasonably necessary or desirable . . . to perfect or protect the security interest granted under [the LSA]"); *see also*

April 30, 2025
Page 6

A-255[2] ("This Guaranty is a **primary** obligation of each Guarantor and not merely a contract of surety.").  Because the Guarantors took on the same responsibility as the Borrowers to ensure that the Borrowers held sufficient collateral at all times, the Guarantors assumed the risk of having their own assets restrained as a reasonable measure to preserve the status quo while Leadenhall seeks a judgment requiring, *inter alia*, that the collateral be made whole.  As the injunction here provides, this narrow restraint applies *only* in the event that the collateral held by the Borrowers is insufficient to provide the security interest that Leadenhall bargained for, and *only* up to the amount of the deficiency.  A-831-34.

The Guarantors' agreement to undertake this type of obligation is different in kind from that of a run-of-the-mill guarantor.  As detailed in the Amended Complaint, the Borrowers, the Guarantors, and the other 777 entity defendants[3] function as a single unit in which each entity is

---

[2] Unless otherwise indicated, all emphases are added.

[3] Specifically, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLP, SuttonPark Servicing LLC, Signal Servicing LLC, and Insurety Servicing LLC—all of which are Defendants below but not parties to this appeal, along with Josh Wander and Steven Pasko.  Unless otherwise indicated, "Defendants" as used herein refers to *all* defendants named in the district court action.

April 30, 2025
Page 7

an alter ego of its owners, all ultimately owned, dominated, and controlled by Josh Wander and Steven Pasko. A-1162-66. The 777 entities work out of the same offices and have a single group of employees, A-1086-88, 1108; pervasively lack corporate formalities like independent boards, A-1162-64; and do not transact at arms-length, *see, e.g.*, A-1163 (detailing co-mingling of assets). There is no dispute that the Borrowers and Guarantors essentially operate as one. While it is conceivable that a guarantor who is a true third party—not an affiliate or insider of the borrower—could agree to a performance guaranty like that at issue here, it is unlikely that an unaffiliated party that is not a direct beneficiary of the secured loan would take on this risk, because a third-party guarantor typically does not receive the type of consideration that the Guarantors did here. *Compare* A-251 *with Leslie Fay, Inc. v. Rich*, 478 F. Supp. 1109, 1116 (S.D.N.Y. 1979) ("[T]he guarantor as a principal party to the negotiations resulting in the ultimate transaction is in a strong position to include in the agreement specific conditions upon which the guaranty is based."). Even if a third-party guarantor did undertake the risk inherent in a *performance* guaranty as opposed to a

April 30, 2025
Page 8

*payment* guaranty, such a risk would be realized only if the borrower absconded with, falsified, or otherwise destroyed the collateral. In short, the close relationship between the Borrowers and Guarantors explains the Guarantors' assumption of risk and distinguishes this case—and Leadenhall's entitlement to preliminary relief—from other borrower-guarantor cases.

The district court properly accounted for this close relationship in denying A-CAP's motion to modify the injunction. The district court was not persuaded by A-CAP's argument that *Grupo Mexicano* prohibits "an asset-freezing injunction covering the assets of a guarantor of performance of a secured lender up to the value of the secured debt." A-1348. In so holding, the court specifically noted A-CAP's concession that "the Court can consider the borrowers and guarantors the same for purposes of this motion." *Id*. The district court rejected A-CAP's attempt to insulate the Guarantors' assets where the LSA and Guaranty Agreement do not support such a distinction. Consistent with those agreements and the benefits they provided the Guarantors both "direct[ly] and indirect[ly]," A-251, the court properly held the

April 30, 2025
Page 9

Guarantors to their equitable performance guaranty rather than permitting them to hide behind special purpose shells they created solely to hold collateral. A-1347-50. In short, the court acknowledged that these entities' unusually close relationship, which existed for the Guarantors' benefit, explains why the Guarantors agreed to a performance guaranty—and why Leadenhall negotiated such a guaranty in the first place to mitigate the risk of insufficient collateral.

*Second*, the close relationship between the Borrowers and Guarantors supports the district court's finding of a strong nexus between the restrained assets and the ultimate relief sought: an injunction requiring performance of the Guaranty. A-1228 (seeking final relief "enjoining Defendants violating their obligations under the Agreements"). Following *Grupo Mexicano*, courts have repeatedly held that "[w]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief

April 30, 2025
Page 10

requested." *Dong v. Miller*, 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) (quotation marks omitted); *see also Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) ("[A]s many courts have held, where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains its equitable power to freeze assets." (quotation marks omitted)); *Nat'l Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 1243, 1250 (D. Colo. 2000) (explaining that a preliminary injunction is appropriate where "there is a strong nexus between the assets enjoined and [p]laintiffs' claims for money damages").

Consistent with *Grupo Mexicano*—which did not involve any equitable interest or request for ultimate equitable relief—a court has discretion to craft an asset-restraining injunction where the plaintiff is a secured creditor so long as there is a "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit." *Dong*, 2018 WL 1445573, at *8 (quotation marks omitted). The court's authority to do so is limited by the requirement that the injunction be a "reasonable measure" to preserve the status quo. *Paradigm*, 2013 WL 1915330, at *4 (granting preliminary injunction

April 30, 2025
Page 11

after determining that "under *Grupo Mexicano* and *Deckert*, a district court may enjoin the disposition of assets pending judgment only to the extent that an injunction is 'a reasonable measure to preserve the status quo pending final determination.'" (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 325 (1999))). This flexible standard would be superfluous if, as A-CAP contends, the *only* permissible measure were to restrain whatever portion of the collateral itself still exists.

That nexus exists here by virtue of the "primary obligation[s]" undertaken by the Guarantors, A-255, reflecting the close relationship between the Borrowers and the Guarantors. Again, Leadenhall has a security interest in the assets of the Borrowers, who are contractually required to *fully* secure Leadenhall's debt with collateral and continuously maintain that collateral; and the Guarantors broadly guaranteed all of the Borrowers' obligations with respect to Leadenhall's security interest—not just the obligation to repay Leadenhall. Leadenhall's security interest in the Borrowers' assets up to the amount of the accelerated debt is not nullified by the Borrowers' improper

April 30, 2025
Page 12

depletion (or failure to own) the specific collateral they pledged. Rather, because the Guarantors guaranteed performance of all of the Borrowers' obligations, some of the Guarantors' assets must be preserved to satisfy Leadenhall's guaranteed interests. Those are the only assets affected by the preliminary injunction. A-1349-50. And it is both reasonable and necessary for the injunction to restrain further dissipation of those assets—which the Guarantors put at risk when they agreed to step into the Borrowers' shoes—to ensure the Guarantors still have assets to pledge when Leadenhall wins a permanent injunction. All the more so given the undisputed evidence presented during the TRO proceedings that the Borrowers and Guarantors have virtually no cash or cash equivalents due to asset stripping *by A-CAP*.

In an attempt to retreat from its concession in the proceedings below, A-CAP now goes to great lengths to differentiate between the assets of the Borrowers and Guarantors. But the close relationship between the Borrowers and Guarantors, manifested in the contractual obligations both sets of parties undertook, precludes such strict demarcation. For one, the Guarantors are not true third parties to the

transactions: they are affiliates that wholly own and control the Borrowers and pledged to use their *own* assets to secure the Borrowers' obligations. This was not an altruistic venture—the Guarantors were direct beneficiaries of the Borrowers' and Leadenhall's financing. But even accepting A-CAP's insistence that these entities hold distinct assets at face value (which Leadenhall's allegations of alter-ego cast serious doubt upon), the close relationship between the Borrowers and Guarantors nevertheless underscores the clear nexus between the portion of the Guarantors' assets subject to the injunction and the ultimate equitable relief Leadenhall seeks: enforcement of the Guarantors' performance obligations.

## II. Upon a triggering event, the Guaranty Agreement obligates the Guarantors to provide sufficient collateral to secure the Borrowers' loans and creates an equitable interest in the Guarantors' assets to the extent necessary to fulfill this obligation.

The Guaranty Agreement provides an additional—and critical—layer of security for Leadenhall's investment, making clear that the buck stops at the real party in interest: the Guarantors. 777 Partners and 600 Partners orchestrated the Leadenhall credit facility, for which they

April 30, 2025
Page 14

created special purpose Seller, Borrower, and Servicer vehicles, each of which had a defined role in purchasing, holding, and servicing the collateral for the benefit of Leadenhall.[4]  The Guarantors guaranteed *all* of those entities' obligations to do their parts as follows:

> "Guaranteed Obligations" means, with respect to each Borrower Group, collectively
>
> (i) the "Obligations," as defined in the Loan and Security Agreement, of the Borrower in such Borrower Group;
>
> (ii) the obligations of the Servicer in such Borrower Group under the applicable Servicing Agreement; and
>
> (iii) the obligation of the Seller in such Borrower Group to repurchase Defective Receivables or Guaranteed Receivables pursuant to the Loan and Security Agreement.

A-251-52.  Section 2 of the Guaranty Agreement further provides: "This Guaranty is an absolute, unconditional and ***continuing*** guaranty of the full and punctual payment and ***performance*** of all of the Guaranteed Obligations . . . and is in no way conditioned upon any requirement that any Recipient [defined to include Leadenhall and its affiliates] first attempt to collect any amounts owing in respect of the Guaranteed

---

[4] Specifically, the Sellers purchased receivables that they transferred to the Borrowers to hold as collateral for Leadenhall.  A-1091-92.  The Servicers serviced the receivables on behalf of the Borrowers and for the benefit of Leadenhall.  *Id.*

April 30, 2025
Page 15

Obligations from any Borrower or any other Person." A-254-55. Again, lest there be any doubt that the Guarantors are themselves liable for all of these obligations upon a triggering event, the same section clarifies that "[t]his Guaranty is a ***primary*** obligation of each Guarantor and not merely a contract of surety." A-255. The "Guaranteed Obligation[]" to ensure the Borrowers hold adequate collateral to secure Leadenhall's investment gives Leadenhall an equitable interest in the Guarantors' assets necessary to facilitate that obligation. A-252.

There is no other plausible reading of the Guaranty Agreement—which must be "interpreted most strongly against" the Guarantors. *Gold v. Smith*, 155 Misc. 221, 222-23 (N.Y. City Ct. 1935); *see also Douglass v. Reynolds, Byrne & Co.*, 32 U.S. 113, 122 (1833) ("[T]he words of the guarantee are to be taken as strongly against the guarantor as the sense will admit."). Under the Guaranty Agreement, the Guarantors each "jointly and severally absolutely, unconditionally and irrevocably guarantee[d] to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment *and performance* when due (whether at stated maturity, by acceleration or otherwise) of the

April 30, 2025
Page 16

Guaranteed Obligations of the [Borrowers], in each case, so long as a Trigger Event has occurred and is continuing . . . ." A-254. The Guaranty Agreement further specifies that "[s]hould any [Borrower] default in the payment or **performance** of any of its Guaranteed Obligations, and Recipient (or its assigns) may require the immediate payment and **performance** thereof by the Guarantors and require payment and performance of any Guaranteed Obligations that are then due and payable . . . to be paid in full in cash by the Guarantors." A-255. The "Guaranteed Obligations" refer to "the 'Obligations,' as defined in the [LSA]." A-252.

Given the unassailable language in the Guaranty Agreement establishing that the Guarantors undertook all of the Borrowers' "Obligations" under the LSA, A-CAP has resorted to arguing that no agreement obligates anyone—Borrower or Guarantor—"to provide substitute collateral in the event of a collateral shortfall." A-CAP Opening Br. at 14. But this ignores the language—and the entire purpose—of the LSA, which defines "Obligations" as, "with respect to each Borrower, the performance of all of the terms, covenants and

April 30, 2025
Page 17

agreements on the part of such Borrower . . . to be performed under" the LSA or "any document delivered in connection with this Agreement." CA-61. As set forth below, those terms, covenants, and agreements revolved around the Borrowers' obligation to, at all times, own sufficient collateral free and clear of other interests to secure Leadenhall's debt—in other words, to create and maintain sufficient collateral to satisfy the secured debt obligation.

*First*, in Section 2.15 of the LSA, each Borrower granted Leadenhall "a first-priority security interest in the Collateral." CA-82. Importantly, "Collateral" is defined not to identify specific receivables but to "mean[] all of such Borrower's right, title and interest in, to and under all assets of such Borrower . . . ***whether now existing or hereafter arising***," including "all Receivables" held by the Borrower and proceeds associated therewith. CA-49. The definition of "Collateral" expressly contemplates that assets that did not belong to the Borrowers at the time the LSA was executed may *become* Collateral. Similarly, Section 2.07 provides for "Substitution of Receivables" as long as the value of the substitute receivables exceeds the value of the receivables to be substituted:

April 30, 2025
Page 18

> Each Borrower shall use selection procedures to substitute Eligible Receivables for Guaranteed Receivables or Lottery Receivables in a manner that is not intended to be adverse to the interests of Lenders in the applicable Lender Group in relation to the selection procedures that have been used in selecting the Receivables to be purchased by Affiliates of applicable Borrower for their own account. The Valuation Amount of the substitute Eligible Receivable shall exceed the Valuation Amount of the substituted Receivable and such substitute Eligible Receivable shall become part of the Collateral hereunder and the outstanding principal on the related Loan shall be noted (or written up) in the same amount as was noted (or written up) in respect of the applicable Receivable prior to the substitution.

CA-74. Thus, each Borrower had an obligation to ensure that the value of the Collateral matched the value of the loan, including by substituting new receivables.

*Second*, under Section 4.01(h), each Borrower represented that it "***is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***." CA-97.[5] Each Borrower made this representation not only upon the execution of the LSA, but also on every date on which any borrowing was made, and on the date of each Monthly Report and each Compliance Report—in other words, each Borrower

---

[5] An "Adverse Claim" refers to "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement," and has the same meaning under the Guaranty Agreement. CA-46; A-251-54.

represented that this *continued* to be true throughout the life of the credit facility.  CA-105-07.

*Third*, each Borrower warranted that throughout the term of the borrowing relationship, pursuant to Section 5.01(d), "such Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof."  CA-104.

*Finally,* Section 9.01(iv) of the LSA provides a right to indemnification for any losses arising out of the Borrowers' failure to vest a security interest in the Collateral free and clear of Adverse Claims: "[E]ach Borrower shall pay on demand to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from . . . **the failure to vest in the Collateral Agent on behalf of the Secured Parties a valid and perfected security interest in the Collateral free and clear of any Adverse Claim** . . . ."  CA-131.

April 30, 2025
Page 20

The upshot of these provisions is that the entire credit facility depended on the Borrowers' owning and maintaining sufficient collateral free and clear of any Adverse Claims that could interfere with Leadenhall's remedies in the event of default. Because the amount that was borrowed changed from time to time, the collateral was adjusted accordingly. CA-84. Whether these required adjustments are viewed as an obligation to provide "replacement" collateral or deposit sufficient funds to maintain an appropriate borrowing base, the result is the same: the Borrowers had to own sufficient collateral to secure Leadenhall's debt for the duration of the credit facility. And if at any time the Borrowers failed to maintain sufficient collateral free and clear to secure all outstanding obligations—one of the specified "Trigger Events"—the Guarantors were obliged to step into the Borrowers' shoes and ensure sufficient collateral existed to secure Leadenhall's first-priority interest. A-253-55.

Having established Leadenhall's equitable interest in forcing the Guarantors to perform their obligation to maintain sufficient collateral, and having established the strong nexus between that interest and the

April 30, 2025
Page 21

Guarantors' assets that would enable them to satisfy that obligation, there is *no* requirement that Leadenhall must also identify particular assets to be enjoined beyond the collateral. This Court's decision in *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014), is instructive. There, this Court rejected the argument by the party resisting the restraint that the district court exceeded its equitable authority in issuing an asset-freezing injunction because "it failed to identify the 'particular property' derived from the defendants' allegedly unlawful activities." *Id.* at 133. The Court explained that "[w]e know of no requirement . . . that would obligate plaintiffs to make this identification prior to obtaining a preliminary injunction." *Id.* This principle is equally applicable here. Leadenhall demonstrated an equitable interest in the Guarantors' assets—*i.e.*, their obligation to provide sufficient collateral to secure the Borrowers' loans. Nothing requires Leadenhall to take the additional step of identifying the particular assets to be enjoined (including ill-gotten gains) in advance of a ruling on the merits.

April 30, 2025
Page 22

**III.    Leadenhall's allegation that the Guarantors engaged in "orchestrated acts of fraud" "to conceal the true state of Leadenhall's collateral" gives rise to an equitable interest in the Guarantors' assets that is sufficient but not necessary to support the preliminary injunction.**

The strong nexus between Leadenhall's security interest and the narrow restraint of the Guarantors' assets designed to preserve that interest is itself sufficient to support the preliminary injunction.  But here, there is another basis: Leadenhall's equitable interest in the Guarantors' assets by virtue of the Guarantors' obligation to maintain sufficient collateral upon a Trigger Event *independently* supports the court's authority to issue the injunction.  Neither of these bases for the relief issued here depends on Leadenhall's allegations of fraud.  Still, while not necessary to support the injunction, the allegations of fraud give rise to an additional equitable interest.

As a threshold matter, Leadenhall's allegations of fraud are not, as A-CAP insists, "[u]nsubstantiated."  A-CAP Reply Br. at 14.  Leadenhall moved for a temporary restraining order in May 2024 based on its breach of contract claims against the Borrowers and Guarantors.  A-173-201.  Leadenhall established a likelihood of success on the merits of those

April 30, 2025
Page 23

contract claims based on, among other evidence, Defendants' recorded and written admissions that they had breached the LSA by misrepresenting hundreds of millions of dollars of collateral as "free and clear" when, in reality, they had either double-pledged that collateral or never owned it at all. A-207-08; A-360-63; CA-97. That the factual predicate of Leadenhall's contract claims *also* gives rise to fraud, RICO, and other claims does not mean that Leadenhall—or the court below—relied on fraud-specific allegations (for example, allegations about Defendants' *mens rea*) as a "justification" for the injunction. A-CAP Reply Br. at 14. And A-CAP does not challenge the district court's holding that Defendants' misrepresentations concealing the true state of Leadenhall's collateral constituted a breach of the LSA, making Leadenhall likely to succeed on the merits of its contract claims and satisfying the first prong of the preliminary injunction standard. *See* A-1350.

Although not the basis for the injunction, those allegations of fraud give rise to an additional equitable interest here—that is, an interest that permits the district court to order a remedy other than payment of money

April 30, 2025
Page 24

damages that implicates the assets enjoined. The difference between a secured and an unsecured creditor is that an unsecured creditor has less recourse in the event of default. A-CAP's entire argument turns on casting Leadenhall as an unsecured creditor as to the Guarantors' assets and, therefore, supposedly within *Grupo Mexicano*'s purview. *See, e.g.*, A-CAP Opening Br. at 25. But the Guarantors guaranteed performance of the Borrowers' *secured* debt obligations. CA-70, 97, 119-22. And, as the district court observed, "A-CAP has cited no case where a court has found that a court lacked authority to issue an asset-freezing injunction covering the assets of a guarantor of performance of a secured lender up to the value of the secured debt." A-1348. Having established that *Grupo Mexicano* does not *proscribe* such a remedy for secured creditors, *see supra* Section 1, Leadenhall invokes Defendants' fraud to explain *why* courts must have discretion to enjoin assets beyond the collateral itself as a "reasonable measure" to preserve the status quo.

The only reason that Leadenhall must now seek recourse against the *Guarantors* is that the Borrowers exceeded their borrowing limit through fraud. A-CAP contends that *Grupo Mexicano* ties the district

April 30, 2025
Page 25

court's hands such that Defendants can render Leadenhall unsecured by falsifying or absconding with its security and then dissipate their remaining assets to A-CAP while Leadenhall pursues a judgment as an unsecured creditor. This rule does not comport with equity. "It is an established maxim that equity will not suffer a wrong to be without a remedy." *See, e.g.,* 27A Am. Jur. 2d Equity § 6 (2d ed.). Accordingly, as discussed in Leadenhall's response brief (at 27–28), fraud cannot defeat a security interest. *United States v. Dreier*, 952 F. Supp. 2d 582, 590 (S.D.N.Y. 2013) (rejecting argument that petitioner could not enforce security agreement tainted by fraud). Declaring Leadenhall an unsecured creditor by virtue of A-CAP and its co-conspirators' fraud before a determination on the merits would "run[] counter to the inherent power of the court of equity to prevent an intended fraud from reaching its full fruition." *Upjohn Co. v. Schwartz*, 246 F.2d 254, 258 (2d Cir. 1957). The fraud thus gives rise to an equitable interest in the *relief* Leadenhall seeks: the preservation of its security interest through a preliminary injunction "to prevent frauds or gross and irremediable injustice in respect to such property." Joseph Story, Commentaries on

April 30, 2025
Page 26

Equity Jurisprudence § 905 (3d ed 1920).  As discussed next, courts of equity have always recognized "[t]he propriety of this sort of relief."  *Id.*

## IV. Restraining the assets at issue in this litigation to enforce Leadenhall's equitable interests is within the traditional equity jurisdiction of federal courts.

The answer to this Court's final question—"whether enforcing such obligations or interests is within the equity jurisdiction of the federal courts, including whether such relief was historically available from a court of equity"—is emphatically yes.

Leadenhall's case against the Guarantors is not a simple damages action given the unusual nature of the Guaranty Agreement and the Guarantors' obligation to step into the Borrowers' shoes to, *inter alia*, maintain sufficient collateral *fully* securing the debt.  Leadenhall seeks to enforce that performance obligation via this lawsuit.  While A-CAP disputes, contrary to the language of the LSA, that *either* the Borrowers or the Guarantors are obligated to maintain collateral for Leadenhall's secured credit facility, A-CAP Opening Br. at 14, this is not the stage for adjudication of that question because preliminary injunctive relief "do[es] not conclusively resolve legal disputes," *Lackey v. Stinnie*, 145 S. Ct. 659,

April 30, 2025
Page 27

667 (2025). Similarly, the injunction at issue in this appeal will not result in any determination of which creditor has superior rights to the enjoined assets, let alone dispose of those assets—to the contrary, its purpose is to preserve the status quo until *all* of the parties have their day in court on the question of whether Leadenhall is entitled to the *ultimate* relief it seeks. A-831-34. The question now is simply whether federal courts have the equitable jurisdiction to temporarily restrain assets in dispute (here, the Borrowers' pledged collateral and the Guarantors' assets necessary to fulfill their performance obligations) in order to protect the courts' ability to grant effectual relief at the conclusion of a suit. They do.

The traditional powers of courts of equity extended to preliminarily restraining property in dispute in order to protect the availability of adequate relief. The case of *Harman v. Jones* (1841) 41 Eng. Rep. 505 (Ch.) provides an example. There, the court explained that an injunction restraining the divestment of real property was permissible if (but only if) it was in advance of "obtaining the decision of a Court of law" as to proper legal title. *Id.* at 505. The court went on to explain that the "proper office" of a court of equity in such context is "solely to protect the

April 30, 2025
Page 28

property, until that right can be determined by the jurisdiction to which it properly belongs." *Id.* That is exactly what Leadenhall seeks here—to protect the assets securing its loan as well as the cash and cash equivalents necessary to avoid Defendants' efforts to *defeat* that security interest before the district court can conclusively resolve Leadenhall's right to those assets. Other opinions from English courts of equity support this rule. *See, e.g.*, *Hilton v. Earl of Granville* (1841) 41 Eng. Rep. 498, 502 (Ch.) (identifying "the principle . . . of preserving property until a legal decision on the right can be had").

A nineteenth-century treatise dedicated to this precise issue of equitable jurisdiction to issue injunctions further supports this conclusion, explaining that "[t]he protection of legal rights to property from irreparable or at least from serious damage pending the trial of the legal right is part of the original and proper office of a Court of equity." William Williamson Kerr, A Treatise on the Law and Practice of Injunctions in Equity 196 (1867). Courts of equity had the power to issue a preliminary injunction, like the one at issue here, where a plaintiff "needs the aid of the Court for the protection of the property in question

April 30, 2025
Page 29

until the legal right can be ascertained," the only constraint being that "the Court does not pretend to determine legal rights to property, but merely keeps the property in its actual condition until the legal title can be established." *Id.*

Analogous precedent exists in American courts. *See, e.g.*, *U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 496 (4th Cir. 1999) ("[W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant ***or seeks a remedy involving those assets***, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested."); *see also Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL 1610790, at *2 (S.D.N.Y. Oct. 27, 2000) ("[C]ourts have traditionally had the power to enjoin defendants from dissipating funds that are the subject of the underlying suit."). The modern rule requiring movants to establish a nexus between the assets enjoined and the relief requested is a logical outgrowth of a court of equity's traditional power "to protect

April 30, 2025
Page 30

property pending litigation." *Caldwell v. Vanvlissengen* (1851) 68 Eng. Rep. 571, 575 (Ch.).

Consistent with this traditional equitable authority to "preserve the property in dispute *in statu quo*," the district court here did nothing more than give "its opinion that there is a substantial question to be tried, and that, till the question is ripe for trial, a case has been made out for the preservation of the property in the meantime." Story, Commentaries § 873. The preliminary injunction does not, for example, declare that Leadenhall is entitled to any assets now or even that Leadenhall will be entitled to assets, cash, or cash equivalents if other liens exist—it simply enjoins the Borrowers and Guarantors from, other than in the normal course of business, (1) transferring assets pledged as collateral and (2) spending or dissipating cash or cash equivalents necessary to satisfy the Guarantors' equitable obligation—that is, it restrains assets only to the extent of the collateral deficiency. A-831-34. What the preliminary injunction does *not* do is permit A-CAP, an alleged co-conspirator, to jump the line, strip assets, and leave Leadenhall—a secured creditor—holding an empty bag.

April 30, 2025
Page 31

Despite what A-CAP may contend, nothing requires Leadenhall to point to a case in which a historical court of equity granted a preliminary injunction on the exact, or nearly identical, facts presented here. Although equitable relief "is restrained by fixed rules and established principles," "a lack of jurisdiction is not inferred from the novelty of the disputed question." 27A Am. Jur. 2d Equity § 92. The purpose of equity is to give courts flexibility to address novel circumstances—not enshrine rigid rules to cover every situation. *See McQuiddy v. Ware*, 87 U.S. 14, 19 (1873) ("There is no artificial rule on such a subject, but each case as it arises must be determined by its own particular circumstances."). As Justice Story explained in his *Commentaries on Equity Jurisprudence*, "[i]t is impossible that any code, however minute and particular, should embrace or provide for the infinite variety of human affairs, or should furnish rules applicable to all of them"; equity therefore exists in "every rational system of jurisprudence" to address the cases in "which the antecedent rules cannot be applied without injustice, or to which they cannot be applied at all." *Id.* § 7; *see also* The Federalist No. 83, at 505 (Rossiter ed., 1961) ("[T]he great and primary use of a court of equity is

April 30, 2025
Page 32

to give relief in extraordinary cases, which are exceptions to general rules." (emphasis omitted) (footnote omitted)). The Supreme Court, too, has long described a court's "*flexible* jurisdiction in equity as to protect all rights and do justice to all concerned." *Providence Rubber Co. v. Goodyear*, 76 U.S. 805, 807 (1869) (emphasis added); *see also Patterson v. Hewitt*, 195 U.S. 309, 317 (1904) (noting the "flexible remedies of a court of equity"); *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2944 (4th ed. 2020) ("In England the chancery courts made available extraordinary and highly flexible relief . . . .").

*Grupo Mexicano* is in accord with this principle: It "do[es] not question the proposition that equity is flexible." *Grupo Mexicano*, 527 U.S. at 322. And while the Supreme Court noted "that flexibility is confined within the *broad* boundaries of traditional equitable relief," *Grupo Mexicano* instructs that those boundaries "'depend on traditional

April 30, 2025
Page 33

*principles* of equity jurisdiction'" and whether "the *relief* . . . was traditionally accorded by courts of equity," *id.* at 308, 319. Neither of those factors requires identifying a directly analogous case.

Nonetheless, there *is* precedent in both English and American courts of equity for preliminary injunctions issued for the benefit of secured creditors prohibiting dissipation of funds *other than the security* that would not otherwise be subject to restraint where the security itself is depleted. Kerr's treatise on injunctions in equity provides: "A mortgagor in possession of the mortgaged estate . . . is in equity the owner of the estate, and may exercise all acts of ownership and may commit waste, provided he does not diminish the security or render it insufficient; ***but if the security is insufficient he may not commit waste****. . . .* The same principles which apply in respect of waste by a mortgagor in possession are also applicable as between the heir or executor of a debtor in possession and a judgment creditor." Kerr, A Treatise on the Law and Practice of Injunctions in Equity at 262-63 (footnotes omitted). In a similar vein (and around a similar time), a New York court recognized that "where a surety, or a person standing in the

April 30, 2025
Page 34

situation of a surety for the payment of a debt, receives a security for his indemnity and to discharge such indebtedness, the principal creditor is in equity entitled to the ***full benefit of*** that security. And it makes no difference that such principal creditor did not act upon the credit of such security in the first instance, or even know of its existence." *Curtis v. Tyler & Allen*, 9 Paige Ch. 432, 435 (N.Y. Ch. 1842).

Reflecting the flexibility of the courts of equity to fashion "reasonable measures" to preserve a plaintiff's ability to obtain equitable relief, this Court has recognized that a plaintiff seeking a pre-judgment restraint need not identify *specific* assets to be enjoined; a court may restrain fungible assets (*i.e.*, cash) in the amount implicated by the plaintiff's claims (which may be "mixed" legal and equitable claims). *Gucci*, 768 F.3d at 131. The injunction ordered here—a restraint on (1) the collateral and (2) assets of the Borrowers and Guarantors sufficient to cover *only* the amount of the collateral deficiency—is precisely the type of relief that traditional courts of equity employed and is directly analogous to the relief affirmed by this Court in *Gucci*. This is why A-CAP cannot point to a single case prohibiting an asset-restraining

April 30, 2025
Page 35

injunction implicating cash or cash equivalents where the collateral was depleted due to the defendants' wrongdoing. In the end, "[e]quity courts are not so incompetent or so powerless as to be unable to cope with the ingenuity of the cunning and the astute in devising new forms of wrong." 27A Am. Jur. 2d Equity § 92. This Court should not adopt a holding that would render them so.

Respectfully submitted,

<u>*/s/ Leigh M. Nathanson*</u>

| | |
|---|---|
| Paul Alessio Mezzina | Craig Carpenito |
| Zoe M. Beiner | Leigh M. Nathanson |
| King & Spalding LLP | KING & SPALDING LLP |
| 1700 Pennsylvania Avenue NW | 1185 Avenue of the Americas |
| Washington, DC 20006 | 34th Floor |
| (202) 737-0500 | New York, NY 10036 |
| pmezzina@kslaw.com | (212) 790-5359 |
| zbeiner@kslaw.com | ccarpenito@kslaw.com |
| | lnathanson@kslaw.com |

*Counsel for Plaintiffs-Appellees Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC*

April 30, 2025

# CERTIFICATE OF COMPLIANCE

I hereby certify that this letter brief complies with the type-volume limitation of this Court's April 8, 2025 Order because it contains 6,534 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Date: April 30, 2025

/s/ *Leigh M. Nathanson*
Leigh M. Nathanson

*Counsel for Plaintiffs-Appellees*
*Leadenhall Capital Partners LLP*
*and Leadenhall Life Insurance*
*Linked Investments Fund PLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 30, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

/s/ Leigh M. Nathanson
Leigh M. Nathanson

*Counsel for Plaintiffs-Appellees*
*Leadenhall Capital Partners LLP*
*and Leadenhall Life Insurance*
*Linked Investments Fund PLC*