# C A D W A L A D E R

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

April 30, 2025

**BY ACMS**

Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the
Second Circuit
40 Foley Square
New York, NY 10007

Re:  ***Leadenhall Capital Partners LLP, et al. v. Advantage Capital Holdings LLC, et al.*, Nos. 24-2647, 24-2867 - <u>Corrected</u>**

Dear Ms. O'Hagan Wolfe:

Defendants-Appellants Advantage Capital Holdings LLC ("A-CAP") and Kenneth King respectfully submit this letter brief in response to the Court's April 9, 2025 Amended Order (Dkt. No. 69.1) directing supplemental letter-briefs on four issues.

A-CAP's view on each is straightforward.  First, the "close relationships" among Borrowers and Guarantors should not affect the analysis.  District courts' authority hinges only on the nature of plaintiff's interest in the frozen assets, not on any characteristic of

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

defendants. And incidentally, a parent guaranteeing a subsidiary's (or child's) loan is exceedingly common and typically preferred.

Second, the Guaranty is a garden-variety unsecured guaranty;[1] as Leadenhall has acknowledged, its only security interest is in the Collateral, a term that is defined in great detail, yet includes no asset of Guarantors; and no agreement requires any party to supply or maintain any Collateral, all of which was duly pledged upon execution of the LSA. Borrowers have no Obligation to *maintain* sufficient Collateral to avoid a Borrowing Base Deficiency; instead, the LSA imposes consequences (like acceleration) if such a Deficiency persists. In any case, Leadenhall is fully equipped to pursue its Collateral (and any alleged proceeds). This case, by contrast, is a contract case over an Accelerated Debt.

---

[1] Leadenhall's assertions about the peculiarity of guaranteeing performance are both incorrect and inconsequential to the analysis.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Third, Leadenhall's allegations of fraud create no equitable interest in Guarantors' assets, as Leadenhall itself has acknowledged. The same would be true for all claims at law seeking money damages.

Fourth, offering equitable assistance in the collection of a legal debt has never been properly within the equitable jurisdiction of any court. Adding an intermediate step to the ultimate collection of money damages (if any) cannot change what Leadenhall's contract claims are truly about.

For these reasons and those we have shared previously, the district court's freeze of Guarantors' assets—which are A-CAP's collateral—should be vacated. Anything less would conflict with the clear holdings of the Supreme Court.

## I.    Guarantors' and Borrowers' Relationship Does Not Affect the Scope of Courts' Authority Under Rule 65.

A district court's authority to restrain assets prejudgment is concerned only with what interest *plaintiff* might have in the assets it seeks to freeze. *See, e.g., Grupo Mexicano de Desarrollo S.A. v. Alliance*

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

*Bond Fund, Inc.*, 527 U.S. 308, 310 (1999) (holding that courts lack the authority to freeze "assets in which no lien or equitable interest is claimed" by plaintiff. *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (holding that courts' power hinges on the sort of claims *plaintiff* is pursuing). That authority is unaffected by the characteristics of defendants, and the "close relationships" among Borrowers and Guarantors are no exception.

Judge Sullivan's ruling in *Professional Merchant Advance Capital, LLC v. C Care Services, LLC*, 2013 WL 12109397, at *2 (S.D.N.Y. Oct. 2, 2013) (Sullivan, J.) is illustrative. There, defendant-guarantor was the *controlling owner* of the defendant-debtor, and he guaranteed the "payment and *performance*" of the debtor's obligations in the underlying loan and *security* agreement. *Id.* at 6. Plaintiff alleged an "ongoing course of deceptive conduct," featured his security interest in debtor's assets, and sought interim relief. *Id.* at 7. The court, however, properly focused on what matters: the nature of *plaintiff's*

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

*interest in the assets he sought to freeze. Id.* at 2. And the court properly held that because plaintiff brought only contract claims, he had no equitable interest in the assets—and the court thus had no authority to freeze any assets. *Id.*

Courts in this Circuit routinely confront cases with allegations targeting controllers, and they focus on what property drives the analysis. *See, e.g.*, *Dong v. Miller*, 2018 WL 1445573, at *10 (E.D.N.Y. Mar. 22, 2018) (refusing to freeze all assets of debtors and guarantors, instead restraining only those in which plaintiff sought an equitable lien); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *4–5 (S.D.N.Y. May 9, 2013) (holding, where judgment debtor allegedly fraudulently transferred certain assets to its corporate parent and plaintiff sought rescission, that plaintiff's "equitable interest is limited to those assets, and only those assets may be enjoined," and even then "only to the extent they remain in [the parent-transferee's] possession").

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

In fact, because the analysis is concerned only with ***plaintiff's interest in assets***—and unaffected by defendants' characteristics—the result here would be the same even if, hypothetically, Borrowers and Guarantors were to be treated as a single entity.[2] When presented with a single entity with diverse assets, courts distinguish among its assets and freeze only those in which plaintiff claims an equitable interest. *See, e.g., Paradigm*, 2013 WL 1915330, at *4–5; *Klipsch Grp. v. Big Box Store Ltd.*, 2012 WL 5265727, at *7 n.8 (S.D.N.Y. Oct. 24, 2012) (refusing "to freeze assets beyond those in which Plaintiff claims an equitable interest") (Nathan, J.). *See* Reply Br. at 25–28.

---

[2] The hypothetical illustrates what drives the analysis under the law; it does not suggest that conflating the entities is factually or legally supported. To the contrary, the Borrowers are, like most SPVs, "created with care precisely to avoid the risk that a court would disregard their corporate separateness from their parents." *RCC Ventures, LLC v. Brandtone Holdings Ltd.*, 322 F.R.D. 442, 448 (S.D.N.Y. 2017) (refusing to disregard the corporate veil). In any case, Leadenhall did not assert in either the Complaint or its application for interim relief that any corporate form should be disregarded.

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

The result is the same when a prejudgment restraint stems (at least in part) from a security interest—a point Leadenhall concedes, *compare* Br. at 30, *with* Opp. at 28-30 (acknowledging that the "prior cases" have "limited" such freezes to "the specific assets pledged by the borrower").[3] There too the freeze is unaffected by the characteristics of the defendants; courts uniformly freeze only those assets in which plaintiff has a security interest. *See, e.g.*, *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F. Supp. 2d 241, 250 & n.9 (S.D.N.Y. 2001) (enjoining "only a portion of" the assets at issue: the "specific funds" in which plaintiff "possess[ed] a security interest"); *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *4 & n.1 (S.D.N.Y. July 2, 1999) (holding that the preliminary injunctive relief issued shortly before *Grupo Mexicano* remained "proper" because,

---

[3] The prevailing view is that courts are authorized to freeze only those assets in which plaintiff has a *judgment* lien or equitable interest, and that a mere security interest in certain assets is not enough to authorize courts to freeze those assets. *See infra* Part IV.

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

upon close analysis, "[plaintiff] claims a security interest in the assets subject to the preliminary injunction") (Chin, J.); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 83 (W.D.N.Y. 2018) (restraining only "the Collateral").

While inapt in any case, Leadenhall hopes to evade controlling law, though, with tales of peculiar facts; it argues that it is "an unusual situation" for guarantors to "not [be] independent from the borrowers," but rather "controll[ing]" SPV subsidiaries.[4] That has it exactly backwards: a parental or "downstream" guaranty is the norm, while guaranties from unaffiliated third parties are "not very common." Guaranties: Overview, Prac. Law Finance (2025); *see also* 5 Theodore Eisenberg, *Debtor-Creditor Law* § 42.12 (2025). Corporate parents—by definition, entities who comprise a majority of voting members of an

---

[4] MP3 Audio, *Leadenhall Capital Partners LLP v. Wander*, at 20:39-20:44 (2d Cir. Apr. 1, 2025), https://ww3.ca2.uscourts.gov/decisions/isysquery/d8e98af5-f173-4f87-92bf-35339791d9e6/61-70/list/ (hereinafter "Oral Arg.").

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

LLC, as here, or voting stockholders of a corporation—are desirable guarantors precisely because they have the ability to control the operations of their subsidiaries as well as the incentive to maximize the value of their subsidiaries' assets. *Cf.* Howard Ruda, 1A Asset Based Financing: A Transactional Guide (2017), § 11.01 at 11-18–11-19 ("Therefore, it is common to require the principal of a company to guaranty its debts" because it may "motivate cooperation with the lender in its efforts to effect recovery.").

In any case, district courts' authority to freeze assets depends on whether and what interest plaintiff might have in those assets, not defendants' relationships.

## II. The Guaranty Agreement Creates No Security Interest or Obligation to Provide Collateral to Secure Borrowers' Loans.

The Guaranty Agreement does not, upon a triggering event or otherwise, (a) create a security interest in any assets of Guarantors or

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

(b) obligate Guarantors to provide sufficient collateral to secure Borrowers' loans.

### A. The Guaranty Agreement Creates No Security Interest in Guarantors' Assets.

The Guaranty Agreement creates no security interest in any asset of Guarantors.

*1. Without a proper security agreement, there can be no security interest.* Under New York's Uniform Commercial Code,[5] a security interest can be created only by an authenticated "security agreement" that "specifically grants a security interest in the specified collateral to the lender—a clause that is commonly called a 'granting clause.'" 6 West's McKinney's Forms Uniform Commercial Code § 9-203; *see also* 79 C.J.S. Secured Transactions § 99 (2024) ("A security interest is enforceable only according to its terms, and secures only the debts that

---

[5] The LSA and Guaranty choose New York law. *See* A-48 ¶ 37.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

the agreement says it secures, and does not automatically secure all the debtor's debts to the creditor.").

And "[w]ithout a security agreement, the lender acquires no rights in the borrower's assets." McKinney § 9-203; *see* N.Y. U.C.C. § 9-203(b).[6]

To be effective, the granting clause must be "reasonably specific" in its description of the assets comprising the collateral. 95 N.Y. Jur. 2d Secured Transactions § 13. *See* N.Y. U.C.C. § 9-108 (the description must "reasonably identif[y]" the collateral); Ruda, *supra*, § 3.04(4))(a), at 81 (this aims "to ensure that debtors are in agreement with the scope of their security interest grant"). It must be "specific enough to allow

---

[6] Because "a security agreement is often of little practical value to a client if the client must have the security interest confirmed by an appellate court," 2B Debtor-Creditor Law § 24.03, sophisticated creditors and their counsel typically must ensure "the security agreement is contained in a document which is clearly labelled as such, which describes the collateral with as much particularity as practical, and which is authenticated by the debtor in an unambiguous manner." *Id.*

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

creditors' agents, sheriffs, and others to distinguish between goods subject to a security interest and the debtor's other similar property not subject to the security interest." Theodore Eisenberg, 2 Debtor-Creditor Law (2025) § 10-02. Describing the collateral as "all assets" of an obligor creates no security interest in any asset. *See* N.Y. U.C.C. § 9-108(c).

2. *The LSA includes a security agreement.* Here, Borrowers granted Leadenhall a security interest by and through Section 2.15(a) of the LSA. CA-82 § 2.15(a). The granting clause leaves no doubt about who grants a security interest (Borrowers), in what assets the interest is granted (the "Collateral"), when the interest is granted ("hereby"— i.e., upon execution), or why it is granted (to secure the performance of Borrowers' Obligations):

> *To secure the performance* by the Borrowers of all *of the Obligations, each Borrower hereby grants* to the Collateral Agent for the benefit of the Secured Parties in the Related Lender Group

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

> with respect to such Borrower, a first-priority
> security interest in *the Collateral*.

*Id.* (emphasis added). "Collateral" is defined—and described with reasonable specificity—to include certain defined Receivables and Collections of Borrowers; rights of Borrowers under certain Agreements and Contracts; certain Borrower Accounts and Lock-Boxes; and Borrowers' membership interests in certain Lottery Holding SPVs, which assets in turn are defined to identify specific items in Schedules to the LSA. CA-49 § 1.01 (defining "Collateral"); CA-47 (defining "Borrower Accounts"); CA-63 (defining "Receivable").

Through defined terms and the schedules incorporated into the definitions, the assets of Borrowers that *are* Collateral—as well as those that *are not*—are specifically and exhaustively defined. "Receivable," for instance, is defined to mean the assets described in Schedules VIII, IX, X, and XI to the LSA—one schedule for each of the four SPV Borrowers. CA-63. Those schedules, in turn, each comprise several pages of definitions to disambiguate between Collateral and

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

unencumbered assets. CA-305–345. They also refer to yet more schedules to identify, by "File Name" and "File No.," *see, e.g.*, CA-303, receivables of Borrowers that are "Excluded" from the Collateral, *see, e.g.*, CA-318. No mention of Guarantors' assets—past, present, or future—appears anywhere.

As for attachment, under Section 2.15 (named "<u>Security Interest</u>"), "*each Borrower hereby grants*" the "first-priority security interest in *the Collateral*." CA-82 § 2.15. That interest was thus "hereby granted" by operation of law upon execution of the LSA. The LSA does not indicate any other assets on which a security interest would attach at any other time.

Based on the security interest granted under the LSA, Leadenhall filed UCC-1 financing statements reflecting its first-priority security interest in many of Borrowers' assets. *See* A-954–960 (describing Leadenhall's security interest in Dorchester Borrower's receivables defined as "Transferred Assets"); A-964–969 (same for

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Insurety Borrower); A-975–980 (same for Signal Borrower); A-986–993

(same for SuttonPark Borrower III LLC).[7]  Each financing statement

that covers the assets of a Borrower is accompanied by a multi-page

Addendum and Exhibit that provides a "Description of Property

Covered," complete with several "Defined Terms." A-954–960.  Still,

those descriptions are not as comprehensive as the definition of

"Collateral" in the LSA—and, indeed, Borrowers agreed that, in those

"financing statements," Leadenhall's Collateral Agent could have

"describe[d] the property being secured as 'all assets' or 'all personal

property' of such Borrower," CA-82, as Judge Merriam noted at

argument, Oral Arg. at 2:24-2:37.

There is a reason:  financing statements aim only "to give notice

to third parties that the debtor's property may be encumbered."  Ruda,

---

[7] Given that Borrowers pledged their assets to Leadenhall as security,
the LSA also restricts Borrowers from granting other liens over their
assets (Section 5.01(d)) and incurring other debt (Section 5.01(o))—as is
customary. CA-104, CA-109.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

*supra*, § 3.04. By contrast, "[t]he security agreement is between the parties and greater specificity is required to ensure that debtors are in agreement with the scope of their security interest grant." *Id.*; *see also* N.Y. U.C.C. § 9-502(a). In any case, the scope of a security interested is always delimited by the granting clause in the security agreement, not the typically more general description in the financing statement. *See* N.Y. U.C.C. §§ 9-108, 9-504; *see also* 4 James J. White, et al., Uniform Commercial Code § 31:5 (6th ed.) ("[S]uper generic descriptions are acceptable in financing statements but not in security agreements"); 79 James Buchwalter, et al., *C.J.S. Secured Transactions* § 99.

Underscoring the importance and timing of those financing statements, each was included among the LSA's "**CLOSING DOCUMENTS,**" CA-296, CA-301–02, and the statements were accompanied at closing by two "Perfection Opinion[s]," one for "Borrowers," and one for "Insurety Borrower," CA-300. That is to say, if those documents memorializing the security interest "hereby

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

grant[ed]" by and through Section 2.15(a) had not materialized at closing, the LSA would not have closed. *See generally* Signing and Closing M&A Transactions, Prac. Law Corp. & Sec. (2025).[8]

    *3. The Guaranty includes no security agreement.* Guarantors entered only a Guaranty Agreement with Leadenhall, *not* a Guaranty and Security Agreement.[9] *See* A-356. No term of the Guaranty purports to grant Leadenhall a security interest—in fact, the phrase appears nowhere in the Guaranty. Nor does the Guaranty identify any asset of Guarantors for any purpose, much less to describe any asset as collateral.[10] With no security agreement, Leadenhall has no security

---

[8] *Available at* https://www.westlaw.com/9-381-0516?transitionType= Default&contextData= (sc.Default)&VR=3.0&RS=cblt1.0.

[9] Nor did those entities enter a separate security agreement.

[10] Because New York law strictly construes guaranties in guarantors' favor, the Court should not liberally construe any language to grant a security interest where none exists. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

interest in any asset of Guarantors. Uncoincidentally, Leadenhall has filed no financing statement relating to them. Naturally, no such statement or related perfection opinion was among the documents needed for closing. CA-296-302.

In fact, the Guaranty is a textbook example of an unsecured guaranty.[11] Unsecured guaranties of this sort create nothing more than contractual obligations enforceable at law. *See, e.g.*, *Royal Palm Senior Inv'rs, LLC v. Carbon Cap. II, Inc.*, 2009 WL 1941862, at *10 (S.D.N.Y.

---

188 F.3d 31, 34 (2d Cir. 1999) ("guarantee agreements are construed *strictissimi juris* under New York law").

[11] *See e.g.,* A-254 ("Each Guarantor hereby jointly and severally absolutely, unconditionally and irrevocable guarantees to the Recipient, for its benefit and the benefit of other Recipients, the full and punctual payment and performance when due . . . of the Guaranteed Obligations") *with* Ruda, 1 Asset Based Financing: A Transactional Guide Form 11-6 ("Guarantor hereby unconditionally, absolutely and irrevocably guaranties to Lender the full and punctual payment, performance and discharge of all indebtedness, liabilities and obligations (collectively "Obligations") of Debtor to Lender"), available at https://plus.lexis.com/api/permalink/ 7a322091-e473-487b-ab19-c6e8fcdd3acc/?context=1530671&federationidp=N348XT55825.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

July 7, 2009) (holding that "N.Y. U.C.C. does not govern a guaranty agreement, which is merely a guaranty to pay an underlying debt and does not itself create a security interest as it does not secure a note by any specific personal property or fixtures of the guarantor.") Therefore, Leadenhall can only obtain contractual—legal—relief against Guarantors.

Leadenhall could have bargained for a guaranty under which Guarantors' pledged assets of their own. It tried to—unsuccessfully—in the Forbearance Agreement it prepared in March 2024. A-356 ¶ 1(c), (d) (draft Forbearance Agreement purporting to require a "Guaranty and Security Agreement in favor of the Agent for the benefit of the Lenders executed by" 777 Partners and 600 Partners). Secured guarantees are common; and, in *Bank of America v. Won Sam Yi*, for

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

instance, performance of the guaranty was secured by specifically

identified assets of the guarantor:

> Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank . . . against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank . . . .

No. 17-cv-01283 (W.D.N.Y. Feb. 8, 2018), ECF No. 16-7, at 5 ¶ 6. In

another example, a corporate parent—as guarantor for its subsidiary—

entered a Guaranty and Security Agreement granting the lender "a

valid, first priority, continuing security interest in" specifically

identified "Collateral" comprising guarantors' assets. Entropic

Communications, Inc., Registration Statement (Form S-1), Exhibit

10.29, at 8 (July 27, 2007).[12] The parent-guarantor granted that

---

[12] *Available at* https://www.sec.gov/Archives/edgar/data/1227930/000119312507163534/dex1029.htm.

CADWALADER

Catherine O'Hagan Wolfe
April 30, 2025

security interest "to secure prompt, full and complete payment and performance of any and all Guaranteed Obligations." *Id.* Here, by contrast, Guarantors made only a contractual commitment to perform its Guaranteed Obligations.

4. *The Guaranty grants no security interest in Guarantors' assets.* The Guaranty of "payment and performance" does not, as hypothesized at argument, cause "Guarantors [to] step into the shoes of the Borrowers" in a way that makes "any and all of their assets and property count as collateral," thus "making the guarantees effectively secured." Oral Arg. at 2:43-2:48, 3:09-3:16.

**a.** Shorthand is no substitute for precise analysis of the governing agreements. As the length of the LSA highlights, "[c]redit agreements thrive on specificity." RICHARD WIGHT, ET AL., THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE 171 (2009). And "a guarantor is liable only for what it clearly agreed to." Ruda, *supra*, § 11.04; *see Compagnie Financiere,* 188 F.3d at 34 (applying "*strictissimi juris* under New York

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

law"). A guaranty cannot, moreover, be "effectively secured"; the signature demand of the UCC is that to create a security interest, the grant must be explicit and the encumbered assets specifically described. N.Y. U.C.C. § 9-203. Permitting anything less—especially in this Circuit under New York law—would compromise the foundation of sophisticated asset-based lending: lenders' ability to confidently take intangible assets as security, without fear that another lender may one day succeed in claiming an undisclosed competing interest and freezing its collateral.

Here, Guarantors guarantee the "full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations," A-254 § 2(a) ("Guaranty of Payment of Guaranteed Obligations"), which includes the Obligations of Borrowers under the LSA, A-252.[13] Those Obligations are, "with

---

[13] The Guaranty indicates that "all of the Guaranteed Obligations" are capable of being "paid in full in cash." A-252.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

respect to each Borrower, the performance of all of the terms, covenants and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under this Agreement . . . including the punctual payment when due of all obligations and indebtedness . . . ." CA-61. While there are many Obligations "to be performed" by Borrowers under the LSA, *id.,* granting a security interest is not one of them.

What is more, Leadenhall has never asserted that Borrowers' grant to Leadenhall of a first-priority security interest in the Collateral was ineffectual in any way. To the contrary, Leadenhall promptly perfected its security interest in the Collateral by filing UCC-1 financing statements reflecting its first-priority security interest in the Collateral, and Leadenhall has repeatedly asserted that it has "a security interest in Borrowers' assets." (Opp. at 24.) Thus, even if Guarantors were somehow required to "step into the shoes of Borrowers" and grant a security interest in the Collateral, there would

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

be no further security interest in the Collateral for Guarantors (or any other entity) to grant.

**b.** Because no granting clause—in any agreement—identifies any asset of Guarantors, there can be no security interest in any asset of Guarantors. *Royal Palm*, 2009 WL 1941862, at *10 (holding that because a Guaranty of "the payment and performance of the Guaranteed Obligations" "does not secure a note by any specific personal property or fixtures of the guarantor," it "does not itself create a security interest").

**c.** Contrary to Leadenhall's representation at argument, a guaranty of payment and performance is far from unusual. Indeed, guaranties of the sort are so common that they are featured in widely used collections of form contracts. *See, e.g.*, Ruda, *supra*, Form 11-6 ("Guarantor hereby unconditionally, absolutely and irrevocably guaranties to Lender the full and punctual payment, performance and discharge of all indebtedness, liabilities and obligations (collectively

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

"Obligations") of Debtor to Lender"); *see also Prof. Merch. Advance*, 2013 WL 12109397 Ex. A at 4 (limited, unsecured guaranty stating it would "guarantee . . . performance of all the representations, warranties, covenants made by Merchant in this Agreement and the Merchant Agreement"). And when a creditor claims a breach of that sort of guaranty, its sole remedy is one at law. *See Royal Palm*, 2009 WL 1941862, at *10.

    **d.** The exchange at argument hypothesized something akin to a "springing lien"—a contingent security interest in a guarantor's assets that is granted only only if a specific triggering event occurs. WIGHT, ET AL., *supra*, § 8.4. But "springing liens" are not stealthy; they too must comply with the UCC's requirements to memorialize both the security interest and the encumbered assets with reasonable particularity. *See* N.Y. UCC § 9-203; *see also In re MPM Silicones, LLC*, 874 F.3d 787 (2d Cir. 2017) (addressing claims involving carefully documented "Second-Lien Springing Notes").

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

**e.** Leadenhall has long acknowledged that only A-CAP, not Leadenhall, has a security interest in Guarantors' assets. A-CAP, which possesses the first-priority security interest in Guarantors' assets, has raised repeatedly that Leadenhall possesses no security interest in Guarantors' assets. So too have the 777 Defendants. And Leadenhall never asserted to the contrary. Instead, Leadenhall has only ever asserted that it has a security interest in Borrowers' assets, *see, e.g.*, Opp. at 24, 26; A-51–53, 55 ¶¶ 47(d), 51, 62; A-181; A-209, n.1; A-1024, and the district court only found a security interest in Borrower's assets. A.1334–35 at 40:7–41:2; A.1346 at 52:17–23; A.1347–48 at 53:21–54:6.

**B.** **The Guaranty Agreement Does Not Obligate Guarantors to Provide, Upon a Triggering Event, Sufficient Collateral to Secure Borrowers' Loans.**

Leadenhall's belated arguments about supposed Obligations to maintain or pledge replacement Collateral are born from litigation

**CADWALADER**

Catherine O'Hagan Wolfe
April 30, 2025

imperative, not the terms of the governing contracts. Leadenhall still identifies no term imposing any such Obligation, and none exists.

Context is instructive. The LSA[14] employs a common "borrowing base structure in which the availability of loans (typically revolving credit loans) is tied to an agreed valuation (the 'borrowing base') of the collateral security." WIGHT, ET AL., *supra*, 142. The LSA effects this feature by making each Lender's lending "Commitment," CA-50 § 1.01, subject to the conditions of Section 3.02, CA-70 § 2.01(a), including the condition that the Borrower have sufficient capacity under its Borrowing Base, CA-94 § 3.02(c).

Under the LSA, if the Principal Amount of the outstanding Loans to a Borrower exceed its Borrowing Base—*i.e.*, there is a "Borrowing

---

[14] The LSA sets out the terms of a revolving credit facility between Leadenhall and four SPV Borrowers in 777's Structured Settlement business. A-50–A-52 ¶ 45–48. From its creation in May 2021, hundreds of millions of dollars were loaned under that facility—loans that rolled over from a "prior credit facility" among those entities. *Id.*

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

Base Deficiency"—the *Lenders have no further obligation* to extend loans to that Borrower.  CA-48 § 1.01 (definitions of "Borrowing Base Deficiency" and "Borrowing Base Limitation"); CA-94 § 3.02(c).  That is, the borrowing base *caps the lender's commitment*.  Nowhere does any *Borrower* commit, covenant, or otherwise Obligate itself to maintain a sufficient amount of Collateral or to avoid a Borrowing Base Deficiency.[15]  This approach in the LSA is the typical one. *See* WIGHT, ET AL., *supra*, at 142 (explaining that in the typical facility, when "the amount of the loans . . . exceeds the borrowing base, the lenders are not obligated to honor the borrowing request").

A Borrowing Base Deficiency comes with other consequences under the LSA.  For one, such a Deficiency gives Lenders the right to declare an Event of Default.  CA-48 § 1.01; CA-119 § 7.01(c); CA-122

---

[15] So-called "maintenance covenants" are commonly used in other contexts, to, for example, to require corporate borrowers to maintain certain financial-performance ratios or levels of liquidity.

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

§ 7.02(g). While Borrowers are given "*the right*, at any time, to prepay the Loans in whole or in part without penalty," when there is a Borrowing Base Deficiency, such prepayments are only permitted if the "prepayment will cure the Borrowing Base Deficiency or Event of Default." CA-74 § 2.07(a) (emphasis added).[16]

If the Borrower cannot or does not avail itself of that prepayment right, the consequences become more severe. To begin, funds on deposit in the applicable Collection Account are applied in an amount necessary (as possible) to cure any Borrowing Base Deficiency—i.e., forced prepayment, not forced collateralization. CA-84–86 § 2.18(a), CA-87–88 § 2.19(a), CA-89–90 § 2.20(a), and CA-91–92 § 2.21(a). An uncured Event of Default also leads to a Borrower Group Event of Default,

---

[16] WIGHT ET AL., *supra*, at 142 (explaining that commonly, when "the amount of the borrowing base falls below the aggregate outstanding loans and letters of credit, the borrower is required immediately to repay a sufficient amount of the loans to eliminate the shortfall").

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

CA-122 § 7.02(g), and then to a Facility Event of Default, CA-119 § 7.01(c).

Each type of Default triggers Lender's ability to both enforce its security interests over the Collateral, CA-82 § 2.15, and "declare the related Loans then outstanding to be due and payable" with any accrued interest and fees—in other words, to accelerate the debt. CA-120 § 7.01; CA-124 § 7.02.

The LSA does not, however, obligate Borrowers to increase the value of the Borrowing Base (and thus the Collateral) in response to a borrowing base deficiency. That approach would be highly unusual. *Accord* WIGHT ET AL., *supra* (making no mention of such an approach). The simpler, typical approach, is paying down the principal through partial prepayment—the one taken by the LSA. Nowhere does the LSA oblige Borrowers to increase the Borrowing Base or make any pledge of

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Collateral ("additional," "replacement," or otherwise).[17]  There is simply

no such Obligation.   *See* CA-61 § 1.01.

Here, an alleged Borrowing Base Deficiency placed Borrowers in

Default, Leadenhall accelerated all the debt under the facility last

March.  A-148.[18]  As a result, what had allegedly been a *$344 million*

Borrowing Base Deficiency affecting two Borrowers, A-150 (Ex. A n.2),

transformed into an alleged *$609 million* Accelerated Debt (complete

with "fees and Interest charged at the Default Interest Rate") for which

all four Borrowers are allegedly jointly and severally liable, A-148.

While Leadenhall's several pre-litigation notices declare Events of

Default, Accelerate Debt, and reserve claims for money damages, none

mentions any supposed Obligation (or any request) to increase the value

---

[17] As discussed above, substantially all Borrower's assets had already
been pledged as Collateral upon closing, by and through Section 2.15(a).

[18] Leadenhall did not foreclose, opting instead to sue for breach and seek
money damages in the amount of the Accelerated Dent.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

of the Borrowing Base or otherwise pledge replacement Collateral.  *See* A-131, A-147, A-158.

Leadenhall has pointed to various provisions of the LSA to try to support its assertion that Borrowers (or Guarantors) have agreed to pledge "sufficient collateral to secure the debt."  Opp. at 24; *see also id.* at 43 (identifying LSA provisions).  None impose any such Obligation:

- Section 4.01(h) is a representation by the Borrowers that each "is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim."  CA-97 § 4.01(h).  That is and has always been true, and Leadenhall has never claimed to the contrary.[19]  Instead, it asserts that Borrowers overstated the net present value of its assets that comprise that duly owned and pledged Collateral.  In any case, that alleged breached has nothing to do with any alleged Obligation to avoid a Borrowing Base Deficiency.

- Sections 5.01(d) and 5.01(k)(vi) are *negative* covenants; Borrowers promise *not* to "sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral," CA-104 § 5.01(d), or to "make any payment or distribution of assets with respect to any

---

[19] Leadenhall's UCC-1 financing statements covering the Collateral highlight as much.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

obligation of any other Borrower" under specified circumstances," CA-107 § 5.01(k)(vi). None of those terms requires the pledging of additional Collateral.[20]

- Sections 7.02(g) and 7.01(c) define a Borrower Group Event of Default and a Facility Event of Default, respectively, and provide that the consequence of uncured Events of Default is for Leadenhall to accelerate the outstanding debt. CA-119 § 7.01(c), CA-122 § 7.02(g). Spelling out what consequences befall a Borrower who fails to avail itself of its *right* to cure (through prepayment) a Borrowing Base Deficiency does not, however, transform that *right* into an *Obligation*, much less one that requires the pledging of Collateral. *Cf.* Opp. at 43 (asserting, incorrectly, that these terms "require that the collateral be sufficient to support a 'Borrowing Base' greater than outstanding borrowings").

For these reasons, nothing in the LSA imposes any Obligation to provide "sufficient Collateral." And because there is no such Obligation of Borrowers, there is also no Guaranteed Obligation of Guarantors.

---

[20] While Leadenhall may allege that those negative covenants were breached, any such claim is irrelevant here: Leadenhall brings no claim for equitable relief with respect to any alleged disposition of any particular asset, nor does it seek final equitable relief with respect to any such asset.

CADWALADER

Catherine O'Hagan Wolfe
April 30, 2025

## III. Leadenhall's Fraud Allegations Supply No Equitable Interest.

The allegation in the Amended Complaint that Guarantors engaged in "orchestrated acts of fraud" "to conceal the true state of Leadenhall's collateral" securing its loans to Borrowers, A-1131, does not give Leadenhall an equitable interest in Guarantors' assets.

At argument, Leadenhall emphasized that it does not assert that its allegations of fraud give it an equitable interest—that alleged interest, it argues, comes instead from its contractual rights and security interest. *See* Oral Arg. at 24:22-24:29. What is more, Leadenhall even conceded that its "allegations of fraud" are "not relevant . . . to the findings that were the predicate of the preliminary injunction here." *Id.* at 25:20-25:32; *see id.* 25:33-26:07.

Leadenhall is right that its allegations of fraud supply no equitable interest. It seeks no final equitable relief on those claims, which are purely claims at law for money damages. A-111, A-112, A-

C A D W A L A D E R

Catherine O'Hagan Wolfe
April 30, 2025

113.[21]  And as with all other sorts of claims, fraud claims might only create an equitable interest when they are claims for final equitable relief—those that seek "the vacation of [a] fraudulent conveyance" of particular assets, for instance.  FREDERICK S. WAIT, A TREATISE ON FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 60 at 88 (1884).[22]

The claims brought by Leadenhall that sound in fraud bear no resemblance to that sort of claim.  Leadenhall accuses 777 not of absconding with its Collateral, but of *fraudulent misrepresentations*—overstating, in Monthly Reports, the present value of receivables that didn't exist or were owned by the Volans facility, to which other 777-

---

[21] Indeed, its only even nominally equitable prayers for relief relate exclusively to its claims for breach of contract—Leadenhall sought declaratory relief regarding the parties' contractual rights and an "order enjoining Defendants violating their obligations under the Agreements," A-117.

[22] In the days of the divided bench, "every kind of fraud [was] equally cognizable, and equally adverted to, in a court of law," and "some frauds are only cognizable there . . . ."  3 WILLIAM BLACKSTONE, COMMENTARIES *432.

CADWALADER

Catherine O'Hagan Wolfe
April 30, 2025

affiliated SPV borrowers are parties, together with lender-intervenor National Founders. A-63-77 ¶¶ 89–138 ("Knowing Misrepresentations Concerning Its Collateral").[23] Those fraudulent misrepresentations, Leadenhall alleges, caused it to lend more than it otherwise would have, and caused most of the alleged Borrowing Base Deficiency of about $350 million. A-75 ¶ 129, A-150.

According to the Complaint, about $150 million of the inflation in Monthly Reports is attributable to Leadenhall's Monthly Reports incorrectly continuing to list assets that had been transferred to intervenor that Volans facility (the assets of which were National Founders' collateral). A-70 ¶ 111, A-72 ¶¶ 120–121 (alleging "'double-pledg[ing]'" was effected by a "'Form of Assignment' executed by Mr.

_____

[23] The Complaint includes one claim for fraudulent misrepresentation and dependent claims for aiding and abetting and civil conspiracy. A-1123-1124 ¶¶ 151-154.. The Complaint was the operative pleading when Leadenhall sought and secured a TRO; when it sought and secured a preliminary injunction; and even when A-CAP moved to modify the preliminary injunction.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Pasko on September 30, 2022").)    The rest of the fraudulent overstatements, Leadenhall alleges, is attributable to its Borrowers inflating their Monthly Reports to include assets that didn't exist or that the Borrowers never purchased.  A-77–78 ¶ 138, A-74 ¶ 126.

Given the nature of its allegations, Leadenhall might have brought claims seeking a constructive trust or equitable lien on the particular assets allegedly "double-pledged."  So too could it have sought to rescind any allegedly improper transfers.  Had it done so, a freeze of the subject assets may have been appropriate.  But alleged misrepresentations about nonexistent or never-owned assets can support no freeze.  Nor can generalized, unsubstantiated accusations of dissipation, which form no part of any claim and have nothing to do with its Collateral.

And while Leadenhall did add two fraudulent transfer claims to its September 2024 amended complaint, those claims have nothing to do with Leadenhall's Collateral, the LSA, the Guaranty, or anything

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

else relevant to this appeal.  A-1224–A-1227 ¶¶ 403–416.[24]  They cannot

support a restraint like the one at issue here.

In any case, Leadenhall is right on this score:  its allegations of

fraud create no equitable interest.

## IV.  Enforcing Leadenhall's Asserted Obligations and Interests Is Not Within the Equity Jurisdiction of Historical or Modern Courts.

Enforcing the obligations and interests asserted by Leadenhall is

outside the equity jurisdiction of the federal courts, and no prejudgment

relief based on those asserted obligations and interests was historically

available from a court of equity.  Leadenhall asserts obligations and

interests of two sorts:  those stemming from asserted contract rights,

and those stemming from its security interest in the Collateral held by

---

[24] Leadenhall's new claims challenge the alleged lack of consideration for a debt obligation undertaken by 777 Partners on which A-CAP is the creditor.  A-1226 ¶ 411.  Leadenhall seeks to void the obligation and to rescind any payments made to A-CAP on the obligation rescinded. A-1227 ¶ 416.  Those claims thus provide no basis for any prejudgment restraint on Guarantor's assets.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Borrowers. Neither traditionally supported prejudgment asset freezes in courts of equity, and neither can support a freeze under the federal courts' Rule 65 authority.

*1. Enforcing Leadenhall's asserted contractual interests and obligations is outside courts' equitable jurisdiction, now and historically.* Leadenhall argues that it has "*an interest* in making the borrowers and the guarantors use their assets to purchase collateral, and put them in the facility," and that, under the LSA and Guaranty, "both the guarantors and the borrowers are responsible for that *obligation*." Oral Arg. at 23:00-23:07, 24:22-24:29. But any such interest or obligation is purely a creature of contract—and, in fact, relief Leadenhall purports to seek on its contract claims. A-117 ¶ 282. Moreover, as Leadenhall concedes, the preliminary "injunction was predicated on contract claims." Oral Arg. at 25:30-25:32.

Those contractual alleged interests and obligations cannot support the interim relief issued here. To the contrary, "under both

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

state and federal law, courts may not issue [asset-freezing] preliminary relief in breach of contract cases." *Prof. Merch. Advance*, 2013 WL 12109397, at *2; *cf. Gucci*, 768 F.3d 122, 131 (2d Cir. 2014) (requiring a claim for final *equitable* relief); *Dong*, 2018 WL 1445573, at *8 (E.D.N.Y. Mar. 23, 2018) ("It is . . . not true that the *Grupo Mexicano* rule falls away once a plaintiff asserts any claim for equitable relief."). We are aware of no case in which a prejudgment asset freeze was issued under Rule 65 on the basis of contract claims. And despite several opportunities, Leadenhall has supplied no such case.

Relevant treatises reflect that the result was no different in historical courts of equity. *See, e.g.*, WAIT § 73, pp. 112–113 (explaining that on a "contract claim," a "creditor . . . is not . . . entitled to interfere by injunction before judgment with any contemplated alienation of property by the debtor, even after instituting suit by attachment") (cited in *Grupo Mexicano*, 527 U.S. at 319); GARRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES § 9 at 11 (1940) ("A creditor merely as

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

such' . . . has 'simply a debt upon which he can sue at law.'") (cited in *Grupo Mexicano*, 527 U.S. at 319).

*2. Courts lack the authority to freeze assets in aid of collecting a legal debt.* The Supreme Court has repeatedly held that "equity would never permit[] an injunction against failure to pay a simple indebtedness." *Knudson*, 534 U.S. at 216; *Prof. Merch. Advance*, 2013 WL 12109397, at *2 ("[U]nder both state and federal law, courts may not issue [asset-freezing] preliminary relief in breach of contract cases."). Leadenhall repeatedly acknowledges, however, that this is the relief it seeks:

- "Leadenhall moved for a TRO to preserve the status quo and prevent the Borrowers and Guarantors from dissipating their remaining assets to ***frustrate collection of a final judgment***." A-1019.

- Leadenhall asserts that the "TRO was designed to . . . ***protect Leadenhall's right to the outstanding debt***." A-1020.

- Leadenhall tailored its relief to "***the $609 million debt outstanding*** on its breach of contract claims." CA-24.

CADWALADER

Catherine O'Hagan Wolfe
April 30, 2025

• Leadenhall "accelerated $609 million worth of debt owed to it, which is what Leadenhall seeks an injunction to preserve while it pursues its claims." A-771 7:2–4.[25]

This sort of "equitable assistance in the collection of a legal debt" is beyond the equity jurisdiction of the federal courts; it has, in fact, never "been thought justified in the long history of equity jurisprudence." *Grupo Mexicano*, 257 U.S. at 327 (citations omitted).

*3. The prayer to enjoin further alleged breaches cannot authorize the freeze.* Leadenhall also cannot invoke the Court's equity jurisdiction by recasting its prayer to "enjoin[]" further contract breaches into a *de facto* specific performance claim, A-117—even if the LSA was rewritten to obligate the pledge of additional collateral. Specific performance "of a contract to pay money" is "[t]ypically" the sort of relief that "was not

---

[25] Leadenhall has also made clear that its ultimate aim is to collect money damages, not to compel the cure of any collateral deficiency: "If [Borrowers and Guarantors] have the collateral, it's sitting right there, if that's the case, I don't know why Leadenhall has not been paid back on its acceleration notice . . . ." A-787.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

available in equity." *Knudson*, 534 U.S. at 211; *see also id.* at 212 (underscoring the "unavailability of an injunction to enforce a contractual obligation to pay money"); *id.* at 210 (holding that "equitable relief" under the statute at issue "must refer to those categories of relief that were *typically* available in equity").

Nor can the result be evaded by the "lawyerly inventiveness," *id.* at 211 n.1, of seeking to compel the transfer of an amount of money or unspecified assets—much less money or assets sufficient to cover the amount of contract damages sought—to a third-party intermediary (here, Borrowers). This Court rejected such a gambit in *Coan v. Kaufman*, holding that an "injunction requiring the defendants to restore funds [to an intermediary] to be distributed" to the plaintiff "does not transform what is effectively a money damages request into equitable relief." *Coan v. Kaufman*, 457 F.3d 250, 264 (2d Cir. 2006) (Sack, J.).

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Moreover, "[d]uring the development of the jurisdiction of courts of equity, it came to be recognized that equitable relief would not be granted if the award of damages at law was adequate to protect the interests of the injured party." Restatement (Second) of Contracts § 359 cmt. a (Am. L. Inst. 1981). And here, the legal relief of money damages is at least as adequate as any injunctive relief sought by Leadenhall— i.e., the compelled transfer of all assets to Borrowers, up to the amount of the money damages sought, to hold as Collateral. For this reason too, the compelled transfer of assets to Borrowers is a remedy historically unavailable in courts of equity.

*4. Equity requires an interest in specific assets.* Equity does not recognize a claim for "sufficient" assets—it can only act on "a specifically identified fund, not [on] the [debtor's] assets generally." *Coan*, 457 F.3d at 263 (citing *Sereboff v. Mid Atl. Medical Services, Inc.*, 547 U.S. 356, 126 (2006); *see* 1 GLENN, *supra*, § 11 at 14 ("[I]n no sense of the word can

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

it be said that a debtor holds his general estate in trust for his creditors."). Br. 23–24; Reply Br. 5-6.

Even so, Leadenhall argues that "a number of cases post-*Grupo Mexicano* set a precedent for," and "*Gucci* . . . makes clear, you don't have to identify specific assets at the time of obtaining a preliminary injunction." Oral Arg. at 19:45-20:04. Those requirements were met in *Gucci* because the plaintiff sought an accounting of profits under the Lanham Act, which itself supplied "specific statutory authority." *Gucci*, 768 F.3d at 131 n.11. And even at common law, accounting of profits is both "one of the earliest examples of a restitutionary action in equity," *id.* at 131, and a "limited exception" to the usual rule limiting prejudgment restraints to the "identif[ied] particular res" in which plaintiff has an equitable interest. *Knudson*, 534 U.S. at 214 & n.2. *See Paradigm*, 2013 WL 1915330, at *4–5 (rejecting plaintiff's reliance on cases involving accounting of profits and requiring claims reaching "*particular* funds or property in the defendant's possession"); *accord* 1

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

DAN B. DOBBS, LAW OF REMEDIES § 4.3(1), at 588, § 4.3(5), at 608 (2d ed.1993).

Leadenhall's argument is thus based on a narrow exception that is inapplicable here. Freezes of "sufficient" assets (which sound *in personam*) were otherwise not traditionally available in courts of equity, and thus equally outside the equity jurisdiction of federal courts.

5. *Security interests are not equitable interests.* At argument, Leadenhall asserted that "[t]he security is the equitable interest that Leadenhall has . . ." Oral Arg. at 24:16-24:21; *see id.* at 21:40-21:47 (suggesting that "a security interest" is one type, but not "the only type of equitable interest that can give rise to this type of preliminary injunction"). But Leadenhall's *security* interest (in the Collateral) does not, alone, amount to an *equitable* interest. The former stems from a security agreement, the latter from an equitable claim for relief over particular assets.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

A security interest does, however, create an opportunity to bring an equitable claim for relief over the collateral—*i.e.*, a foreclosure. But Leadenhall instead "ignore[d] its security interest and" opted instead to seek to "reduce its claim to judgment." 34:7 Creditor's alternatives upon default; *see* 51 Am. Jur. 2d Liens § 79 (explaining that "liens generally are enforceable only in proceedings brought for that purpose," and "[c]laims for enforcement of a lien are separate and distinct from an underlying breach of contract claim"); *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 159 (1st Cir. 2004) (observing that authorizing a prejudgment asset freeze based on a mere *security interest* would require "an extension of the Court's holding" in *Grupo Mexicano*).

For that reason, under the prevailing, well-reasoned authority, Leadenhall's security interest cannot authorize any freeze of any asset. *See Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1384 (11th Cir. 2023); *Prof. Merch. Advance*, 2013 WL 12109397, at *2 (Sullivan, J.); *AKF, Inc. v. AvantGarde Senior Living*, 2021 WL 2662070, at *6 & n.6 (N.D.N.Y.

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

Apr. 29, 2021); *USAlliance Fed. Credit Union v. S/V HELICORNE II*, 2024 WL 3029117, at *3 (E.D.N.Y. June 16, 2024).

\*　　　　\*　　　　\*

For these reasons, Defendants-Appellants A-CAP and Mr. King respectfully submit that the District Court's preliminary injunction order should be vacated as to Guarantors' assets.

Respectfully submitted,

*/s/ Jonathan M. Watkins*

Jonathan M. Watkins

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this letter brief complies with the type-volume limitation of this Court's April 8, 2025 Order because it contains 7,677 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated:  April 30, 2025
        New York, New York

By: */s/ Jonathan M. Watkins*
    Jonathan M. Watkins

*Counsel for Advantage Capital*
*Holdings LLC and Kenneth King*

**C A D W A L A D E R**

Catherine O'Hagan Wolfe
April 30, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on April 30, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

By: */s/ Jonathan M. Watkins*
Jonathan M. Watkins

*Counsel for Advantage Capital
Holdings LLC and Kenneth King*